# EXHIBIT 37

# Report on Orphan Works

**A Report of the Register of Copyrights · January 2006**



**Copyright**
United States Copyright Office

Library of Congress
U.S. Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000

ANT_BARTZ_000435397

ANT_BARTZ_000435398

## ACKNOWLEDGMENTS

This Report is the product of several dedicated staff members of the U.S. Copyright Office. Jule Sigall, Associate Register for Policy and International Affairs, managed the study and was the principal drafter of the Report. Oliver Metzger and Matt Skelton, Attorney-Advisors in the Office of Policy and International Affairs, along with Rob Kasunic, a Principal Legal Advisor in the Office of General Counsel, composed the team that performed the research and analysis for the study, and drafted many sections of the Report. David Carson, General Counsel of the Copyright Office, provided wise counsel and sound advice throughout the process. Mary Rasenberger, Policy Advisor for Special Programs, provided research and analysis in the early stages of this project. Todd Schnitzer, Sharmili Hazra and Chris Stillabower, legal interns in the Office of Policy and International Affairs, all provided valuable research assistance to the project.

Jill Pelkola led the administrative support for the project by receiving and processing the over 850 comments from the public and handling logistics for the roundtable discussions. Ed Rogers and George Thuronyi provided valuable assistance in building the orphan works web page, including making the written comments available to the public within days of their receipt in the Office. Helen Hester-Ossa, Teresa McCall and Chuck Gibbons provided excellent assistance in printing and publishing the Report. Denise Prince, Sandy Jones and Cecily Patterson also provided administrative support for the study.

I must provide a special thanks to Peter Menell, Robert Barr and David Grady at the Berkeley Center for Law and Technology of the University of California – Berkeley, Boalt Hall School of Law, for arranging to host the California roundtable, and to the staff of the Subcommittee on Courts, the Internet and Intellectual Property of the House Judiciary Committee, particularly Joe Keeley, for arranging to host the Washington roundtable discussion.

Marybeth Peters
Register of Copyrights

ANT_BARTZ_000435399

ANT_BARTZ_000435400

UNITED STATES COPYRIGHT OFFICE　　　　　　　　REPORT ON ORPHAN WORKS

## TABLE OF CONTENTS

I.　EXECUTIVE SUMMARY ..................................................................................................1
　A.　INTRODUCTION AND BACKGROUND ...........................................................................1
　B.　DESCRIPTION OF ORPHAN WORKS SITUATIONS .........................................................2
　C.　LEGAL BACKGROUND ..............................................................................................3
　D.　DESCRIPTION OF PROPOSED SOLUTIONS ..................................................................5
　E.　CONCLUSIONS AND RECOMMENDATIONS ..................................................................7
　　1.　The Reasonably Diligent Search Requirement .................................................8
　　2.　The Attribution Requirement ..........................................................................10
　　3.　Other Alternatives Considered .......................................................................11
　　4.　Limitation on Remedies ...................................................................................11
　　　a.　Monetary Relief .......................................................................................12
　　　b.　Injunctive Relief .......................................................................................13
　　5.　Administrative Provisions ...............................................................................14
　　6.　International Context .......................................................................................14
　　7.　Application to Types of Uses ..........................................................................14

II.　INTRODUCTION AND BACKGROUND ..................................................................15
　A.　THE ORPHAN WORKS ISSUE ...................................................................................15
　B.　THE ORPHAN WORKS STUDY ..................................................................................17

III.　DESCRIPTION OF ORPHAN WORK SITUATIONS .............................................21
　A.　INTRODUCTION .......................................................................................................21
　B.　OBSTACLES TO IDENTIFYING AND LOCATING COPYRIGHT OWNERS .......................23
　　1.　Inadequate Information on the Work Itself .....................................................23
　　2.　Changes of Ownership or in the Circumstances of the Owner .......................26
　　　a.　Changes of Ownership .............................................................................27
　　　b.　Changes in the Circumstances of the Owner ...........................................28
　　3.　Limitations of Existing Information Resources ...............................................29
　　　a.　Copyright Office Resources .....................................................................29
　　　b.　Third-Party Information Resources ..........................................................30
　　　c.　Specific Limitations .................................................................................31
　　4.　Difficulties Researching Copyright Information ............................................32
　　5.　Problems Outside the Scope of the Study .......................................................34
　　　a.　Copyright Owner Known, But Permission Not Obtained ..........................34
　　　b.　Problems Determining Copyright Status ..................................................34
　　　c.　Problems Related to Pre-1972 Sound Recordings ...................................35
　C.　CATEGORIES OF PROPOSED USES ...........................................................................36
　　1.　Uses by Subsequent Creators .........................................................................36
　　2.　Large-Scale Access Uses ................................................................................37
　　3.　Enthusiast Uses ..............................................................................................38
　　4.　Private Uses ....................................................................................................39

IV.　LEGAL BACKGROUND ..............................................................................................41
　A.　HISTORICAL FACTORS THAT AFFECT THE ORPHAN WORKS PROBLEM .....................41
　B.　PROVISIONS IN U.S. COPYRIGHT LAW THAT RELATE TO ORPHAN WORKS ..............44
　　1.　Section 108(h) ................................................................................................45
　　2.　Section 115(b) ................................................................................................47
　　3.　Section 504(c)(2) Limitation on Damages ......................................................49
　　4.　Sections 203, 304(c), and 304(d) ...................................................................50
　C.　OTHER RELEVANT LEGAL CONSIDERATIONS ..........................................................52
　　1.　Section 102(b) -- The Idea/Expression Dichotomy .........................................53
　　2.　Section 107 -- Fair Use ..................................................................................55

**Page i**

ANT_BARTZ_000435401

3.    Other Exemptions.................................................................................................56
4.    Determining the Copyright Status of the Work ...................................................57
5.    Substitutes for the Work ......................................................................................58
D.    INTERNATIONAL CONTEXT...............................................................................................59
1.    Formalities............................................................................................................60
2.    The "Three-Step Test"..........................................................................................61
3.    Berne Provisions Related to Remedies.................................................................65
4.    TRIPS Provisions Related to Remedies................................................................66
5.    WIPO Internet Treaties Provisions Related to Remedies .....................................67

V.    DESCRIPTION OF PROPOSED SOLUTIONS...........................................................69
A.    EXISTING SOLUTIONS.......................................................................................................69
1.    Statutes and Regulations......................................................................................69
B.    NON-LEGISLATIVE SOLUTIONS ........................................................................................70
C.    LEGISLATIVE SOLUTION: LIMITATION ON REMEDIES......................................................71
1.    Criteria for Designation of a Work as Orphaned .................................................71
a.    The Requirement of a Search for the Owner ...........................................71
i.    The Role of Registries.................................................................73
ii.    The Standard of Reasonable Search ............................................77
b.    Limitations on Works, Users, and Uses...................................................79
i.    Limitations on Categories of Works............................................79
ii.    Limitations on Categories of Users .............................................81
iii.    Limitations on Categories of Uses ..............................................82
c.    Approval by an Authorized Body (e.g., the Copyright Office)................82
2.    Consequences of Designation...............................................................................83
a.    User Fees..................................................................................................84
b.    Time Limits ..............................................................................................86
c.    Exclusive vs. Non-Exclusive Licenses ...................................................86
3.    When an Owner Appears......................................................................................86
4.    TRIPS Article 13 .................................................................................................88
5.    Moral Rights.........................................................................................................89
D.    OTHER LEGISLATIVE SOLUTIONS .....................................................................................89

VI.   CONCLUSIONS AND RECOMMENDATIONS ........................................................92
A.    CONCLUSIONS..................................................................................................................92
B.    RECOMMENDATIONS........................................................................................................93
1.    Background ...........................................................................................................93
2.    Specific Provisions...............................................................................................95
a.    The Requirement of Reasonably Diligent Search....................................96
i.    Defining Reasonably Diligent Search ........................................98
ii.    Developing Reasonable Search Criteria .....................................108
b.    The Requirement of Attribution ..............................................................110
c.    Other Alternatives Considered ................................................................112
d.    The Limitation on Remedies....................................................................115
i.    Limitations on Monetary Relief..................................................115
ii.    Limitations on Injunctive Relief.................................................119
e.    Other Provisions......................................................................................121
f.    International Considerations.....................................................................121
3.    Applying the Recommendation to Orphan Work Uses .........................................122
a.    The Large-Scale Access User ..................................................................122
b.    Subsequent Creator..................................................................................124
c.    Enthusiast User........................................................................................125
d.    Private User .............................................................................................125
C.    RECOMMENDED STATUTORY LANGUAGE .........................................................................127

ANT_BARTZ_000435402

## I.   Executive Summary

### A.  Introduction and Background

This Report addresses the issue of "orphan works," a term used to describe the situation where the owner of a copyrighted work cannot be identified and located by someone who wishes to make use of the work in a manner that requires permission of the copyright owner.  Even where the user has made a reasonably diligent effort to find the owner, if the owner is not found, the user faces uncertainty – she cannot determine whether or under what conditions the owner would permit use.  Where the proposed use goes beyond an exemption or limitation to copyright, the user cannot reduce the risk of copyright liability for such use, because there is always a possibility, however remote, that a copyright owner could bring an infringement action after that use has begun.

Concerns have been raised that in such a situation, a productive and beneficial use of the work is forestalled – not because the copyright owner has asserted his exclusive rights in the work, or because the user and owner cannot agree on the terms of a license – but merely because the user cannot locate the owner.  Many users of copyrighted works have indicated that the risk of liability for copyright infringement, however remote, is enough to prompt them not to make use of the work.  Such an outcome is not in the public interest, particularly where the copyright owner is not locatable because he no longer exists or otherwise does not care to restrain the use of his work.

The Copyright Office has long shared these concerns, and has considered the issue of orphan works to be worthy of further study.  The Office was pleased that on January 5, 2005 Senators Orrin Hatch and Patrick Leahy asked the Register of Copyrights to study the orphan works issue in detail, and to provide a report with her recommendations.  Also in January 2005, Representatives Lamar Smith and Howard Berman expressed interest in the issue and supported the undertaking of this study.

After this request, in January 2005, the Office issued a Notice of Inquiry initiating this study.  We received over 850 written initial and reply comments from the public, and held three days of roundtable discussions in late July in Washington, D.C. and Berkeley, California.  The Office subsequently met informally with various organizations separately, in a effort to explore more specific issues raised in the comments and

ANT_BARTZ_000435403

roundtables, and inviting them to further express their individual concerns.  This Report is the culmination of those efforts.

### B.  Description of Orphan Works Situations

Section III of the Report catalogs and organizes the various situations described in the comments as "orphan work" situations.  The written initial and reply comments, most of which were authored by individuals, described an enormous variety of problems and proposed uses.  It is difficult, however, to quantify the extent and scope of the orphan works problems from these comments, for several reasons.  First, about 40% of the comments do not identify an instance in which someone could not locate a copyright owner, and another large portion identified situations that were clearly not orphan work situations.  Still, about 50% of the comments identified a situation that could fairly be categorized as an orphan works situation, and even more instances were collected in comments filed by trade associations and other groups.  Thus, there is good evidence that the orphan works problem is real and warrants attention, and none of the commenters made any serious argument questioning that conclusion.

The Report describes the most common obstacles to successfully identifying and locating the copyright owner, such as (1) inadequate identifying information on a copy of the work itself; (2) inadequate information about copyright ownership because of a change of ownership or a change in the circumstances of the owner; (3) limitations of existing copyright ownership information sources; and (4) difficulties researching copyright information.[1]  It then describes other situations raised by commenters that were alleged to be "orphan work" situations but upon closer inspection are outside the scope of this inquiry.  These include situations where the user contacted the owner, but did not receive permission to use the work, either because the owner did not respond to the request, refused the request, or required a license fee that the user felt was too high.  Other such problems include general difficulties determining the status of copyright protection for a given work, and problems related to the legal protection accorded pre-1972 sound recordings.[2]

---

[1] *See infra* pages 23-34.

[2] *See infra* pages 34-36.

**Page 2**

ANT_BARTZ_000435404

Finally, Section III catalogs the proposed uses that the commenters indicated were most affected by the orphan works situations.  In our view these uses fall into one of four general categories: (1) uses by subsequent creators who add some degree of their own expression to existing works to create a derivative work; (2) large-scale "access" uses where users primarily wish to bring large quantities of works to the public, usually via the Internet; (3) "enthusiast" or hobbyist uses, which usually involve specialized or niche works, and also appear frequently to involve posting works on the Internet; and (4) private uses among a limited number of people.[3]

### C.  Legal Background

Section IV of the Report provides the legal backdrop for consideration of the orphan works issue.[4]  First, it sets out the historical factors that affect the orphan works problem by describing how the issue is, in some respects, a result of the omnibus revision to the Copyright Act in 1976.  Specifically, the 1976 Act made obtaining and maintaining copyright protection substantially easier than the 1909 Act.  Copyrighted works are protected the moment they are fixed in a tangible medium of expression, and do not need to be registered with the Copyright Office.  Also, the 1976 Act changed the basic term of copyright from a term of fixed years from publication to a term of life of the author plus 50 (now 70) years.  In so doing, the requirement that a copyright owner file a renewal registration in the 28th year of the term of copyright was essentially eliminated.

These changes were important steps toward the United States' assumption of a more prominent role in the international copyright community, specifically through accession to the Berne Convention, which prohibits formalities like registration and renewal as a condition on the enjoyment and exercise of copyright.  Moreover, there was substantial evidence presented during consideration of the 1976 Act that the formalities such as renewal and notice, when combined with drastic penalties like forfeiture of copyright, served as a "trap for the unwary" and caused the loss of many valuable copyrights.  These changes, however, exacerbate the orphan works issue, in that a user generally must assume that a work he wishes to use is subject to copyright protection, and

---

[3] *See infra* pages 36-40.

[4] *See infra* pages 41-68.

ANT_BARTZ_000435405

often cannot confirm whether a work has fallen into the public domain by consulting the renewal registration records of the Copyright Office.

Section IV then goes on to describe existing provisions of copyright law that might address the orphan works situation in certain circumstances. While U.S. copyright law does not contain an omnibus provision addressing all orphan works as such, it does contain a few provisions that permit certain users to make certain uses of certain classes of orphan works, and other provisions that reduce the risk in using an orphan work. These provisions include section 108(h), section 115(b), section 504(c)(2), and the termination provisions (sections 203, 304(c), and 304(d)). These existing sections provide models that may be useful in the development of an omnibus orphan works provision.

This discussion demonstrates that the current Copyright Act does not contain provision designed to address the orphan works situation that is the subject of this study. While some provisions, like section 108(h), might address the question for some users in certain situations, in general a user faced with an orphan works situation will not find a specific section or other provision of the Act on which he might rely to make use of the work.

Nevertheless, we believe that the focus on developing legislative text to address orphan works should not obscure the fact that the Copyright Act and the marketplace for copyrighted works provide several alternatives to a user who is frustrated by the orphan works situation. Indeed, assessing whether the situations described to use in the comments were true "orphan works" situations was difficult, in part because there is often more than meets the eye in a circumstance presented as an "orphan works" problem.

For purposes of developing a legislative solution we have defined the "orphan works" situation to be one where the use goes beyond any limitation or exemption to copyright, such as fair use. However, in practice, most cases will not be so neatly defined, and a user may have a real choice among several alternatives that allow her to go forward with her project: making noninfringing use of the work, such as by copying only elements not covered by copyright; making fair use; seeking a substitute work for which she has permission to use; or a combination of these alternatives. Indeed, evidence

**Page 4**

ANT_BARTZ_000435406

presented to us indicates that users in the orphan works situation make exactly these types of choices.  Section IV describes some of those alternatives and how they might be applicable to different scenarios described in the comments.

Finally, Section IV sets out the international law context for consideration of an orphan works solution.  Specifically, it describes the obligations that the various international copyright treaties impose on the United States with respect to imposition of formalities to copyright, limitations and exceptions to copyright and copyright remedies.

### D.  Description of Proposed Solutions

Numerous comments received in this proceeding proposed various solutions to the orphan works problem, and Section V of the Report catalogs and describes them. These solutions can be grouped into four categories:

- <u>Solutions that already exist under current law and practice</u>.  These were usually noted only in passing;  commenters (even commenters opposed to any orphan works provision) did not take the position that the existing law is sufficient to solve the orphan works problem.[5]

- <u>Non-legislative solutions</u>.   An example of a solution in this category is a proposal for improved databases for locating owners of works.  These solutions were also usually noted only in passing, and were not advanced as sufficient to fix the problem.[6]

- <u>Legislative solutions that involve a limitation on remedies when a user uses an orphan work</u>.  The most substantive comments fell into this category, and most of the comments by professional organizations or academics fell into this category.[7]

- <u>Other legislative solutions</u>.  Examples of proposed solutions in this category are deeming all orphaned works to be in the public domain, or changing the tax or bankruptcy codes to reduce the factors that cause orphan works to come into existence in the first place.[8]

As explained in Section V, most of the comments focused on various aspects of the third category, legislative proposals involving a limitation on remedies.  Almost every commenter who advocated a limitation-on-remedies system agreed that a fundamental

---

[5] *See infra* page 69.

[6] *See infra* page 70.

[7] *See infra* pages 71-89.

[8] *See infra* page 89

ANT_BARTZ_000435407

requirement for designation of a work as orphaned is that the prospective user have conducted a search for the owner of the work, and that the search results in the owner not being located. The commenters differed in the types of searches they would consider adequate.

Many commenters were in favor of determining whether a search was reasonable on an "ad hoc" or case-by-case basis, whereby each search is evaluated according to its circumstances. This approach was offered as having the advantage of flexibility to cover the wide variety of situations that depend on the type of work and type of use involved. Several others were in favor of a "formal" approach, whereby the copyright owner is required to maintain his contact information in a centralized location, and a user need only search those centralized locations to perform a reasonable search. That approach was offered as being more certain than the "ad hoc" approach.

The commenters also discussed the role that registries would play in an orphan works system. Some proposed a mandatory registry for owner information, which was opposed by several commenters as reinstating the problematic features of the pre-1976 copyright law, and might violate international obligations related to formalities. Many commenters expressed support for voluntary registries of owner information that could be consulted by users in performing their reasonable searches. Some copyright owners expressed concern about even voluntary registries as not offering much efficiency in certain cases, such as photographs. Some commenters proposed that user registries be established in which a user would file a notice that he intends to use a work for which he cannot locate an owner. Both voluntary and mandatory user registries were proposed. Concerns were raised as to whether user registries were unnecessarily burdensome on owners, who might have to consult the registry frequently to monitor use of their copyrights.

Other issues discussed by the commenters and described in Section V include whether the orphan works system should be limited based on the age of the work, on whether the work is unpublished, and on whether the work is of foreign origin. Many commenters expressed the view that none of these characteristics should disqualify any particular work; rather, these aspects of a work should be considered in the determination

ANT_BARTZ_000435408

of whether the search for the owner was reasonable.  Some commenters also proposed that the use of orphan works be limited to non-profit educational or cultural institutions.

Once a work has been designated as an orphan work, several comments addressed whether the user would have to pay any fees for the use of the work.  A common suggestion was that the user be obligated to pay a reasonable license fee if the copyright owner surfaced after use began.  Others proposed a low fixed statutory fee, such as $100 per work used, and another suggestion was the actual damages caused by the use with a low statutory cap.  Some participants favored the use of an escrow that users would pay into upon use of the orphan work, with that money distributed to owners if they surfaced.

If an owner does appear and claim infringement, most commenters agreed that some limitation on the remedies for infringement is essential to encouraging the use of the work.  Most agreed that statutory damages and attorneys fees should not be available, because those remedies create the most uncertainty in the minds of users.  With respect to injunctive relief, many commenters proposed that the orphan work user be permitted to continue the use he had been making before the owner surfaced, but that new uses of the work remain subject to injunction and full copyright remedies.

### E.  Conclusions and Recommendations

Section VI of the Report contains the Copyright Office's conclusions and recommendations.[9]  Our conclusions are:

- The orphan works problem is real.
- The orphan works problem is elusive to quantify and describe comprehensively.
- Some orphan works situations may be addressed by existing copyright law, but many are not.
- Legislation is necessary to provide a meaningful solution to the orphan works problem as we know it today.

We recommend that the orphan works issue be addressed by an amendment to the Copyright Act's remedies section.  The specific language we recommend is provided at the end of this Report.[10]

---

[9] *See infra* page 92.

[10] *See infra* page 127.

ANT_BARTZ_000435409

In considering the orphan works issue and potential solutions, the Office has kept in mind three overarching and related goals. First, any system to deal with orphan works should seek primarily to make it more likely that a user can find the relevant owner in the first instance, and negotiate a voluntary agreement over permission and payment, if appropriate, for the intended use of the work. Second, where the user cannot identify and locate the copyright owner after a reasonably diligent search, then the system should permit that specific user to make use of the work, subject to provisions that would resolve issues that might arise if the owner surfaces after the use has commenced. In the roundtable discussions, there seemed to be a clear consensus that these two goals were appropriate objectives in addressing the orphan works issues. Finally, efficiency is another overarching consideration we have attempted to reflect, in that we believe our proposed orphan works solution is the least burdensome on all the relevant stakeholders, such as copyright owners, users and the federal government.

The proposed amendment follows the core concept that many commenters favored as a solution to the orphan works problem: if the user has performed a reasonably diligent search for the copyright owner but is unable to locate that owner, then that user should enjoy a benefit of limitations on the remedies that a copyright owner could obtain against him if the owner showed up at a later date and sued for infringement. The recommendation has two main components:

- the threshold requirements of a reasonably diligent search for the copyright owner and attribution to the author and copyright owner; and

- the limitation of remedies that would be available if the user proves that he conducted a reasonably diligent search.

The details of the recommendation are set out in Section VI, followed by a discussion of some other proposals that we considered carefully, but ultimately decided not to recommend.[11]

### 1.  The Reasonably Diligent Search Requirement

Subsection (a) sets out the basic qualification the user of the orphan work must meet – he must perform a "reasonably diligent search" and have been unable to locate the owner of the copyright in the work. Such a search must be completed before the use of

---

[11] *See infra* page 93-122.

ANT_BARTZ_000435410

the work that constitutes infringement begins.  The user has the burden of proving the search that was performed and that it was reasonable, and each user must perform a search, although it may be reasonable under the circumstances for one user to rely in part on the search efforts of another user.

Several commenters complained of the situation where a user identifies and locates the owner and tries to contact the owner for permission, but receives no response from the owner.  They suggested that works in these situations should be considered orphan works.  We have concluded that such a solution is not warranted, as it touches upon some fundamental principles of copyright, namely, the right of an author or owner to say no to a particular permission request, including the right to ignore permission requests.  For this reason, once an owner is located, the orphan works provision becomes inapplicable.

The proposal adopts a very general standard for reasonably diligent search that will have to be applied on a case-by-case basis, accounting for all of the circumstances of the particular use.  Such a standard is needed because of the wide variety of works and uses identified as being potentially subject to the orphan works issues, from an untitled photograph to an old magazine advertisement to an out-of-print novel to an antique postcard to an obsolete computer program.  It is not possible at this stage to craft a standard that can be specific to all or even many of these circumstances.  Moreover, the resources, techniques and technologies used to investigate the status of a work also differ among industry sectors and change over time, making it hard to specify the steps a user must take with any particularity.

Section VI contains a discussion of several factors that commenters identified as being relevant to the reasonableness of a search, including:

- The amount of identifying information on the copy of the work itself, such as an author's name, copyright notice, or title;

- Whether the work had been made available to the public;

- The age of the work, or the dates on which it was created and made available to the public;

- Whether information about the work can be found in publicly available records, such as the Copyright Office records or other resources;

ANT_BARTZ_000435411

- Whether the author is still alive, or the corporate copyright owner still exists, and whether a record of any transfer of the copyright exists and is available to the user; and

- The nature and extent of the use, such as whether the use is commercial or noncommercial, and how prominently the work figures into the activity of the user.

Importantly, our recommendation does not exclude any particular type of work from its scope, such as unpublished works or foreign works. Section VI explains why we believe that unpublished works should not be excluded from this recommendation, and how the unpublished nature of a work might figure into a reasonable search determination.

Our recommendation permits, and we encourage, interested parties to develop guidelines for searches in different industry sectors and for different types of works. Most commentators were supportive of voluntary development of such guidelines. When asked whether the Copyright Office should have authority to embody guidelines in more formal, binding regulations to provide certainty, we were surprised to hear that most user groups – whom we thought would desire more certain rules for searches – opposed the Copyright Office issuing rules related to search criteria. Based on our desire to maintain flexibility in the reasonable search standard and this expressed opposition to formal rulemaking, we have not proposed that the orphan works legislation provide the Office with any rulemaking authority.

### 2. The Attribution Requirement

We also recommend one other threshold requirement for a user to qualify for the orphan works limitations on remedies: throughout the use of the work, the user must provide attribution to the author and copyright owner of the work if such attribution is possible and as is reasonably appropriate under the circumstances. The idea is that the user, in the course of using a work for which he has not received explicit permission, should make it as clear as possible to the public that the work is the product of another author, and that the copyright in the work is owned by another. While only a handful of commenters proposed a requirement along these lines, we found several good reasons to support this requirement, described in Section VI, including the notion that attribution is critically important to authors, even those who consent to free use of their works. The

ANT_BARTZ_000435412

requirement of attribution should be a flexible rule, and should not be interpreted in a strict way to create unnecessarily another obstacle to the use of orphan works.

### 3. Other Alternatives Considered

There were two other mechanisms proposed to help address the orphan works issue that we considered but ultimately concluded would not be appropriate to recommend at this time. First, as noted above, some commenters suggested that users should be required to file with the Copyright Office some public notice that they have conducted a reasonable search and intend to use an orphan work. While a centralized registry of user certifications or notice of intent to use sounds promising on the surface, upon closer examination there are potential pitfalls that outweigh the benefits at this time, for reasons that we describe in Section VI.

The other mechanism proposed by some commenters is a requirement that orphan works users pay into an escrow before commencing use. In our view, an escrow requirement in an "ad hoc" reasonable search system like we recommend would be highly inefficient. Every user would be required to make payment, but in the vast majority of cases, no copyright owner would resurface to claim the funds, which means the system would not in most cases actually facilitate payments between owners and users of orphan works. We are sympathetic to the concerns of individual authors about the high cost of litigation and how, in many cases, the individual creator may have little practical recourse in obtaining relief through the court system. We believe that consideration of new procedures to address this situation, such as establishment of a "small claims" or other inexpensive dispute resolution procedure, would be an important issue for further study by Congress.

### 4. Limitation on Remedies

If a user meets his burden of demonstrating that he performed a reasonably diligent search and provided reasonable attribution to the author and copyright owner, then the recommended amendment would limit the remedies available in that infringement action in two primary ways: First, it would limit monetary relief to only reasonable compensation for the use, with an elimination of any monetary relief where the use was noncommercial and the user ceases the infringement expeditiously upon notice. Second, the proposal would limit the ability of the copyright owner to obtain full

ANT_BARTZ_000435413

injunctive relief in cases where the user has transformed the orphan work into a derivative work like a motion picture or book, preserving the user's ability to continue to exploit that derivative work. In all other cases, the court would be instructed to minimize the harm to the user that an injunction might impose, to protect the user's interests in relying on the orphan works provision in making use of the work.

### a.  Monetary Relief

A vast majority of the commenters in this proceeding agreed that the prospect of a large monetary award from an infringement claim, such as an award of statutory damages and attorneys' fees, was a substantial deterrent to users who wanted to make use of an orphan work, even where the likelihood of a claim being brought was extremely low. Most of the proposals for addressing the orphan works problem called for clear limitations on the statutory damages and attorneys' fees remedies in cases involving orphan works. Our recommendation follows this suggestion by limiting the possible monetary relief in these cases to only "reasonable compensation," which is intended to represent the amount the user would have paid to the owner had they engaged in negotiations before the infringing use commenced. In most cases it would equal a reasonable license fee, as that concept is discussed in recent copyright case law.

While many commenters supported a general remedy like "reasonable compensation," some expressed concern about the impact that *any* monetary remedy at all might have on their ability to go forward and use orphan works. For example, museum representatives explained that they would like to use hundreds or even thousands of orphan works in their collections, so the potential of even a minimal monetary award for each work, would, in their view, be prohibitive. Libraries and archives made similar observations, given their desire to make large collections of orphan works accessible.

In our view, a general standard of reasonable compensation is the right solution to this problem, for several reasons. First, with respect to the concern about a chilling effect of any monetary remedy, it must be noted that in nearly all cases where a diligent search has been performed, the likelihood of a copyright owner resurfacing should be very low, so that no claim for compensation is ever made. Second, it should be clear that "reasonable compensation" may, in appropriate circumstances, be found to be zero, or a royalty-free license, if the comparable transactions in the marketplace support such a

ANT_BARTZ_000435414

finding. Our discussions with museums, universities and libraries indicated that in many orphan works situations a low or zero royalty is likely to be the reasonable compensation.

In addition, to make absolutely sure that the concerns of nonprofit institutions like libraries, museums and universities about monetary relief are assuaged, we recommend an additional limitation on monetary relief where the user is making a non-commercial use of the work and expeditiously ceases the infringement after receiving notice of the infringement claim. In that case, there should be no monetary relief at all. Libraries, archives and museums indicated that posting material on the Internet was a primary use they would like to make of orphan works, and that they would take down any material if a copyright owner resurfaced. This additional provision provides certainty about their exposure in that circumstance. If the organization wishes to continue making use of the work, it would have to pay reasonable compensation for its past use, and, as described below, for future use of the work.

### b. Injunctive Relief

In addition to the limits on monetary relief, several commenters in this proceeding suggested that limitations on injunctive relief were needed as well. Most specifically, users who would like to create derivative works based on orphan works, most notably filmmakers and book publishers, stressed that the fear of an untimely injunction – brought just as the book was heading to stores, or just before release of the film – provides enough uncertainty that many choose not use the work, even though the likelihood of such injunction is small.

In light of these comments, we recommend that injunctive relief for infringement of an orphan work be limited in two ways. First, where the orphan work has been incorporated into a derivative work that also includes significant expression of the user, then injunctive relief will not be available to stop the use of the derivative work in the same manner as it was being made prior to infringement, provided the user pays reasonable compensation to the copyright owner. Second, in all other cases, full injunctive relief is available, but the court must account for and accommodate any reliance interest of the user that might be harmed by an injunction. For example a full injunction will still be available where a user simply republishes an orphan work, or posts it on the Internet without transformation of the content.

ANT_BARTZ_000435415

### 5.  Administrative Provisions

We also recommend two other administrative provisions.  First, a savings clause that makes clear that nothing in the new section on orphan works affects rights and limitations to copyright elsewhere in the Copyright Act, which is consistent with the structural approach of placing the provision in the remedies chapter.  Second, we recommend that the provision sunset after ten years, which will allow Congress to examine whether and how the orphan works provision is working in practice, and whether any changes are needed.

### 6.  International Context

The Notice of Inquiry asked questions about how any proposed solution to the orphan works issue would comport with the United States' international obligations in the various copyright treaties.  Our recommendation does not exclude foreign works from its scope, so it must comport with the United States' international copyright obligations.  We believe that one of the primary advantages of the ad hoc, reasonably diligent search approach is that it is fully compliant with international obligations.

### 7.  Application to Types of Uses

To further explain how our recommendation would work in practice, Section VI takes the four general categories of users described in Section III and describes how the recommended limitation on remedies would apply in each scenario.[12]  The Section describes how the Large-Scale Access User, Subsequent Creator, Enthusiast User and Personal User would proceed under the recommendation.  We believe that nearly all orphan work situations are encompassed by one of those four categories, so that if our recommendation resolves users' concerns in a satisfactory way, it will likely be a comprehensive solution to the orphan works situation.

---

[12] *See infra* pages 122-126.

ANT_BARTZ_000435416

## II. Introduction and Background

### A. The Orphan Works Issue

This Report addresses the issue of "orphan works," a term used to describe the situation where the owner of a copyrighted work cannot be identified and located by someone who wishes to make use of the work in a manner that requires permission of the copyright owner. In general, the copyright system establishes a marketplace of exclusive rights, in which copyright owners can control, subject to limitations and exemptions, the exploitation of their work. In the typical situation, a person who wishes to exercise one or more of the rights under copyright would seek to find the copyright owner and obtain permission for her planned use. If the owner is found and refuses to grant permission, the user cannot make such use, unless she curtailed her activity to fall within an exemption or limitation to copyright. On the other hand, the owner might grant permission subject to certain conditions, such as payment of a license fee. In some cases the owner might permit the use without any conditions at all.

In the situation where the owner cannot be identified and located, however, the user faces uncertainty – she cannot determine whether or under what conditions the owner would permit use. Where the proposed use goes beyond an exemption or limitation to copyright, the user cannot reduce the risk of copyright liability for such use, because there is always a possibility, however remote, that a copyright owner could appear and bring an infringement action after that use has begun. Concerns have been raised that in such situation, a productive and beneficial use of the work is forestalled – not because the copyright owner has asserted his exclusive rights in the work, or because the user and owner cannot agree on the terms of a license – but merely because the user cannot locate the owner. Many users of copyrighted works who have limited resources or are particularly risk-averse have indicated that the risk of liability for copyright infringement, however remote, is enough to prompt them simply to not make use of the work. Such an outcome is not in the public interest, particularly where the copyright owner is not locatable because he no longer exists or otherwise does not care to restrain the use of his work.

Concerns about the orphan works issue have been raised in the past. As described in Section IV, when the Copyright Act was revised in 1976 to provide automatic

ANT_BARTZ_000435417

protection that subsists immediately upon fixation of a work (without formal requirements such as registration or notice), it meant that a user generally must assume that a work he wishes to use is subject to copyright protection, even where circumstances indicate that the work has no commercial value or no copyright owner who might object to its use. During consideration of the 1976 Act, some users pointed out that the longer copyright term created by that revision might inhibit scholarly or academic uses of works where the copyright owner may no longer be actively exploiting the work commercially.[13] During consideration of the Sonny Bono Copyright Term Extension Act of 1998[14] (which extended the term of copyright by 20 years), the Copyright Office noted problems with unlocatable copyright owners, while some users pointed out that term extension could exacerbate problems with orphan works.[15] The Copyright Office also encountered these problems during its study on Copyright and Digital Distance Education in 1999, in which the Office reported that when attempting to license educational materials, "it can be time-consuming, difficult or even impossible to locate the copyright owner."[16] In addition, over the years the Copyright Office has become aware of situations where the inability to find a copyright owner has stifled the use of a work.

---

[13] Congress summarized these concerns as follows:

> A point that has concerned some educational groups arose from the possibility that, since a large majority (now about 85 percent) of all copyrighted works are not renewed, a life-plus-50 year term would tie up a substantial body of material that is probably of no commercial interest, but that would be more readily available for scholarly use if free of copyright restrictions.

H.R. Rep. No. 94-1476, at 136 (1976).

[14] Pub. L. No. 105-298, 112 Stat. 2827 (Oct. 27, 1998).

[15] As Register of Copyrights Marybeth Peters observed:

> [F]inding the current owner can be almost impossible. Where the copyright registration records show that the author is the owner finding a current address or the appropriate heir can be extremely difficult. Where the original owner was a corporation, the task is somewhat easier but here too there are many assignments and occasionally bankruptcies with no clear title to works.

*Copyright Term Extension: Hearing on S. 483 Before the Senate Committee on the Judiciary*, 104th Cong. 18-19 (1995) (statement of Marybeth Peters, Register of Copyrights); *see also* Letter from Larry Urbanski, Chairman, American Film Heritage Association, to Senator Strom Thurmond Opposing S. 505 (Mar. 31, 1997), *available at* http://homepages.law.asu.edu/~dkarjala/OpposingCopyrightExtension/letters/AFH.html (stating that as much as 75% of motion pictures from the 1920s are no longer clearly owned by anyone)

[16] *See* U.S. COPYRIGHT OFFICE, REPORT ON COPYRIGHT AND DIGITAL DISTANCE EDUCATION 41-43 (1999).

---

**Page 16**

ANT_BARTZ_000435418

These experiences and concerns have been expressed mostly informally and anecdotally, but have also been discussed in recent scholarship as well.[17]

## B. The Orphan Works Study

The Copyright Office has long shared these concerns, and has considered the issue of orphan works to be worthy of further study.  The Office was pleased that on January 5, 2005, Senator Orrin Hatch, Chairman of the Subcommittee on Intellectual Property of the Senate Judiciary Committee, and Patrick Leahy, ranking member of the Subcommittee on Intellectual Property and the Senate Judiciary Committee, asked the Register of Copyrights to study the orphan works issue in detail, and to provide a report with her recommendations.  Also in January 2005, Representatives Lamar Smith and Howard Berman, the Chairman and Ranking Member, respectively, of the Subcommittee on Courts, the Internet and Intellectual Property of the House Judiciary Committee, expressed interest in the issue and supported the undertaking of this study.

Shortly thereafter on January 26, 2005, the Copyright Office issued a Notice of Inquiry[18] describing the orphan works problem, and inviting the public to submit written comments on the problem to the Office during an initial 60-day period, followed by a 45-day period for reply comments.  The Office received an overwhelming response (by comparison to past studies), receiving 721 initial comments, and 146 reply comments.[19]  Virtually every interest group typically involved in copyright policy debates was represented in the comments, as the Office received comments from the following groups and organizations:

- **book publishers** (*e.g.*, Association of American Publishers);
- **authors** (*e.g.*, The Authors Guild, Science Fiction & Fantasy Writers of America, Society of Children's Book Writers and Illustrators);

---

[17] Analysis of data on trends in copyright registrations and renewals over the last century suggests that a large number of works may fall into the category of orphan works.  *See* WILLIAM M. LANDES & RICHARD A. POSNER, *The Economic Structure of Intellectual Property Law* 211-12 (Belknap Press 2003); *see also* H.R. Rep. No. 94-1476, at 136 (1976).

[18] 70 Fed. Reg. 3739 (Jan. 26, 2005).  All Federal Register notices published by the Copyright Office during this study are included as Appendix A.

[19] Both the initial and reply comments have been posted to the Office's Orphan Works website at http://www.copyright.gov/orphan/.  Indexes of the initial and reply comments accepted by the Office are included as Appendix B.

ANT_BARTZ_000435419

- **libraries and archives** (*e.g.*, Carnegie Mellon University Libraries, Cornell University Libraries, Library Copyright Alliance, Library of Congress, University of Michigan Libraries, Society of American Archivists, Stanford University Libraries, UCLA Film and Television Archive);

- **museums** (*e.g.*, The J. Paul Getty Trust, The Metropolitan Museum of Art, The Solomon R. Guggenheim Foundation, Smithsonian Institution);

- **music publishers** (*e.g.*, The Harry Fox Agency);

- **recording artists and musicians** (*e.g.*, American Federation of Musicians ("AFM"), American Federation of Television and Radio Artists ("AFTRA"), Recording Artists Coalition);

- **record companies** (*e.g.*, Recording Industry Association of America);

- **rights administration organizations** (*e.g.*, American Society of Composers, Authors and Publishers ("ASCAP"), Broadcast Music, Inc. ("BMI"), Creative Commons, Copyright Clearance Center ("CCC"));

- **academic organizations** (*e.g.*, American Council of Learned Societies, College Art Association, Duke Center for the Study of the Public Domain, Glushko-Samuelson Intellectual Property Law Clinic, Kernochan Center for Law, Media and Arts, National Humanities Alliance);

- **illustrators** (*e.g.*, Graphic Artists Guild, Illustrators Partnership of America);

- **photographers** (*e.g.*, American Society of Media Photographers, Professional Photographers of America, Picture Archive Council of America);

- **independent filmmakers** (*e.g.*, Association of Independent Video and Filmmakers, Film Arts Foundation, IFP-New York, National Alliance for Media, Arts and Culture, National Video Resources);

- **film studios** (*e.g.*, Motion Picture Association of America);

- **software companies** (*e.g.*, Entertainment Software Association, Microsoft, Software and Information Industry Association);

- **Internet companies and advocacy groups** (*e.g.*, Electronic Frontier Foundation, Google, NetCoalition, Public Knowledge); and

- **numerous individuals**.

ANT_BARTZ_000435420

After the written comments phase, the Office published a Notice of Public Roundtables[20] on orphan works.  The Office hosted two days of roundtables in Washington, D.C. on July 26 and 27, 2005, and an additional day of roundtables in Berkeley, California,[21] on August 2, 2005.[22]  In total, 33 representatives of 37 organizations participated in the roundtables in Washington, D.C., while 21 representatives of 26 organizations participated in Berkeley, California.[23]  A wide array of organizations and individuals participated in these roundtables, including:

- **book publishers** (*e.g.*, Association of American Publishers, Holtzbrinck Publishers, Houghton Mifflin Company);

- **authors** (*e.g.*, The Authors Guild, Science Fiction & Fantasy Writers of America);

- **libraries and archives** (*e.g.*, Library Copyright Alliance, Stanford University Libraries, University of California – Los Angeles Libraries, University of California – San Diego Libraries);

- **museums** (*e.g.*, The J. Paul Getty Trust);

- **recording artists and musicians** (*e.g.*, American Federation of Television and Radio Artists ("AFTRA"), Recording Artists Coalition);

- **record companies** (*e.g.*, Recording Industry Association of America);

- **rights administration organizations** (*e.g.*, Creative Commons, Copyright Clearance Center ("CCC"));

- **academic and scholarly societies** (*e.g.*, College Art Association);

- **illustrators** (*e.g.*, Graphic Artists Guild, Illustrators Partnership of America);

- **photographers** (*e.g.*, American Society of Media Photographers, Professional Photographers of America, Picture Archive Council of America);

---

[20]  70 Fed. Reg. 39,341 (July 7, 2005).

[21]  The Office would like to thank the University of California–Berkeley, Boalt Hall School of Law, and the Berkeley Center for Law and Technology for hosting the roundtable in Berkeley, California.

[22]  Transcripts for the roundtables (and sound recordings of the Berkeley roundtables) have been posted to the Office's Orphan Works website.

[23]  A list of roundtable participants and their organizations is included as Appendix C.

ANT_BARTZ_000435421

- **independent filmmakers** (*e.g.*, Association of Independent Video and Filmmakers, Film Independent, National Video Resources, Film Arts Foundation);

- **film studios** (*e.g.*, 20th Century Fox, Motion Picture Association of America);

- **software companies** (*e.g.*, Software and Information Industry Association); and

- **Internet companies and advocacy groups** (*e.g.*, Internet Archive, Google, NetCoalition, Public Knowledge).

The Office subsequently met informally with various organizations separately, in an effort to explore more specific issues raised in the comments and roundtables, and inviting these groups to further express their individual concerns.  These meetings were also held to give commenters who did not have a chance to participate in the roundtables another avenue to discuss their ideas and concerns with us.[24]

*    *    *

This Report is the culmination of these efforts, and is intended to do five things: (i) explain the process the Copyright Office undertook to study this issue; (ii) catalog and describe the wide variety of factual circumstances that the many commenters offered as examples of what they believed to be the orphan works problem; (iii) set out the legal backdrop for the orphan works issue; (iv) summarize the various solutions to the problems proposed by the commenters; and (v) present our findings and conclusions about the orphan works issue, and set forth our recommendations for addressing the problem.

---

[24] A list of the parties with whom the Office met informally is included as Appendix D.

ANT_BARTZ_000435422

### III. Description of Orphan Work Situations

#### A. Introduction

This section summarizes problems of identifying and locating copyright owners as cited and described by the public during the course of the study.  To date, very little systematic research of specific problems related to unidentifiable and unlocatable copyright owners had been undertaken.  While practical experience and numerous anecdotal examples suggested very real problems because of unidentifiable or unlocatable copyright owners, the magnitude and precise contours of these problems across various categories of works and various forms of uses remained largely unknown.  Thus one of the Office's goals from the outset of this study was to learn more about the scope and dimensions of orphan works problems by collecting information about specific situations where users wished to make use of a copyrighted work but could not because they were unable to identify and locate the copyright owner in order to ask for permission.[25]

By all accounts, the public responded enthusiastically.  We received over 850 written initial and reply comments, describing an enormous variety of problems and proposed uses, with the vast majority of written comments (about 85%) filed by individuals.  These numbers alone, however, do not accurately portray the actual extent of the orphan works problem.  A large portion of the comments (about 40%) did not identify a specific instance where a copyright owner could not be identified or located.  Another portion (10%) presented enough specific information for us to conclude that the problem presented was *not* in fact an orphan works situation.

Still, approximately 50% of comments did contain information that could fairly be construed as presenting an orphan works situation, and a significant number of those comments (about 45%, or about 24% of all comments) provided enough information about a specific situation for us to conclude that it presented an orphan works situation.  But here again, these numbers alone do not tell the complete story.  Several of the comments discussing genuine orphan works situations were submitted by trade associations, academic societies, or other organizations, which surveyed their members, collected responses, and aggregated numerous genuine orphan works situations into a

---

[25] *See* 70 Fed. Reg. 3739, 3741-42.

ANT_BARTZ_000435423

single comment.  For example, the submission by the College Art Association provides several examples where the user was unable to identify and locate a copyright owner in the course of publishing scholarly studies of art history and art education.[26]  Additionally, the submission by Carnegie Mellon University Libraries details that institution's systematic study of the feasibility of obtaining permission to digitize and provide web-based access for its collection, during which it discovered that for the books in the study, 22% of the publishers could not be found.[27]

This Section will attempt to organize the situations most frequently described in the comments in a meaningful and understandable way.  First, it will set out the most common obstacles to successfully identifying and locating the copyright owner, such as (1) inadequate identifying information on a particular copy of the work; (2) inadequate information about copyright ownership because of a change of ownership or a change in the circumstances of the owner; (3) limitations of existing copyright ownership information sources; and (4) difficulties researching copyright information.  For each of these categories, we cite examples from the record to illustrate the problem, explain efforts by users to overcome these obstacles, and, in some cases, cite examples where a user was successful in locating the copyright owner in such situations.

Second, this section will describe other situations raised by commenters that were alleged to be "orphan work" situations but upon closer inspection are outside the scope of this inquiry.  These include situations where the user contacted the owner, but did not receive permission to use the work, either because the owner did not respond to the request, refused the request, or required a license fee that the user felt was too high.  These issues are outside the scope of this inquiry because in such cases the copyright owner *can* be identified and located, and thus the question of the use of the work is left to the negotiation between the owner and the user, or the application of an existing exemption to copyright, and not any proposed solution to the "orphan works" problem.  Other problems described in this section are those which may be concurrent with orphan work situations, but which do not involve locating a copyright owner and thus are outside

---

[26] College Art Association ("CAA") (647). *See also* Library Copyright Alliance ("LCA") (658) (aggregating many responses from various member libraries); and Authors Guild (R135) (aggregating responses to a survey of members).

[27] Carnegie Mellon University Libraries ("Carnegie Mellon") (537).

**Page 22**

ANT_BARTZ_000435424

the scope of this proceeding. These problems include general difficulties determining the status of copyright protection for a given work, and problems related to the legal protection accorded pre-1972 sound recordings.

Finally, we also try to catalog the proposed uses that the commenters indicated were most affected by orphan works situations. In our view most of the uses described fall into four general categories: (1) uses by subsequent creators who add some degree of their own expression to existing works and create a derivative work; (2) large-scale "access" uses where users primarily wish to bring large quantities of works to the public, usually via the Internet; (3) "enthusiast" or hobbyist uses, which usually involve specialized or niche works, and may also involve posting works on the Internet; and (4) private uses among a limited number of people. It is important to keep these categories in mind when considering any proposed solution to the orphan works problem so that the proper balance between removing unnecessary obstacles to productive uses of the work and preserving the interests of authors and copyright holders can be struck by such a solution.

## B.  Obstacles to Identifying and Locating Copyright Owners

### 1.  Inadequate Information on the Work Itself

A search for the owner of copyright in a work almost always begins with information available on the work itself. The comments, however, describe numerous situations involving works that bear no information about the author or the owner of copyright in the work – no name of the author, no copyright notice, no title in short, no indicia of ownership on a particular copy of the work *at all*.[28] While the legal consequences of omitting an effective copyright notice were minimized during the process of revising U.S. copyright law for Berne accession,[29] the practical effect of such an omission from the copy of the work is that often a search for the owner of copyright in the work is dead in its tracks as soon as it has begun. Without even a name to start with, potential users must rely on circumstantial or contextual information – to the extent that any is available – to ascertain the relevant factors in deciding whether to exploit the work, *e.g.*, whether it was likely published, whether it was likely registered and renewed,

---

[28] *See* CAA (647) (discussing many examples).

[29] *See infra* Section IV, Legal Background.

ANT_BARTZ_000435425

whether it may have been a work for hire or instead used under a license agreement, etc. Ordinarily a copyright notice is an effective, efficient mechanism to provide information about copyright ownership, and to help subsequent users avoid a situation where they are forced to make a "best guess" about copyright ownership. Yet the comments suggest that where there is no indicia of ownership at all, these are exactly the sorts of best guesses that users are frequently asked to make in the orphan works context.

The comments show that this obstacle is most pervasive – by far – with photographs. Again and again, the comments point to situations involving inadequate information about the author or owner on individual photographs. Numerous individuals complained about situations where they could not use photographs, or did so with trepidation, because they simply had no way of even knowing who took the picture.[30] The most common recurring situation with photographs typically involves the reprinting of old family photographs for preservation, sentimental, or nostalgic purposes. Usually the commenter owns an old, damaged or deteriorating photograph with no identifying information about the photographer, or outdated information at best. The commenter presents the photograph to a photo-finisher for reproduction, but the finisher refuses to reproduce the work. We understand that most commercial photo-finishers fully comprehend the liability risks associated with the reproduction of the copyrighted works, and therefore have broad, strict policies against such reproduction where there is any indication that the work may be protected by copyright. Thus, in the typical scenario described in the comments, a clerk or other employee declines to provide the service, and may even explain why the photo-finisher cannot reproduce the photograph. But invariably, the exchange frustrates both the owner of the photograph who would like the work reproduced or preserved, as well as the photo-finisher who would like to profit from the transaction. As one representative of a photo-finisher stated during the roundtable discussions:

> [W]e're in a situation where we've got those kind of pieces sitting in front
> of us where, you know, the customer's upset and rightfully so because
> they can't get a family photograph. And we're in a situation as a retailer

---

[30] *See, e.g.*, Spurgeon (54); Duffy (56); Duncan (65); Earnest (78); Arnold (108); Johnson (111); Fox (118); Rook (121).

ANT_BARTZ_000435426

where we'd like to do nothing more than take their money, but we can't because of our policy and the law.[31]

Another situation involving photographs recurred frequently in the comments. Archives, libraries and museums maintain vast collections (in some cases, millions) of photographs, very few of which have any indication of who the author was.[32]  Typically these institutions acquire these works by donation, such as where individuals give personal effects to a museum upon the death of a family member, or where a scholar donates professional writings to a library upon retirement, and similar situations.  While these occurrences are common, the donors rarely have information about the copyright provenance of the materials they donate.  These institutions then face a dilemma in striving to meet the expectations of donors and in fulfilling their institutional purpose of preserving and making works available, while also complying with the law of copyright and minimizing their exposure to liability for infringement.  In most cases these institutions err on the side of caution.  Most appear to allow access to these materials on their facilities, but restrict reproduction.  Some museums may also display these works publicly in exhibits, or even include them in other programming or materials, but usually only where other circumstantial information about the work (such as the most likely author, the date of creation, etc.) allows them to perform some level of due diligence research about copyright ownership before using the work.

The comments also provide information about situations involving inadequate information on the work itself in other categories of works as well, including the following:

- literary works (such as unpublished and/or anonymous manuscripts and letters);[33]

- audiovisual works (such as home videos and/or instructional films);[34]

---

[31] August 2 Roundtable Tr. at 34 (Comment of Joe Lisuzzo, Wal-Mart Stores, Inc., Photomarketing Association Mass Merchants Council).

[32] *See, e.g.*, University of Washington Libraries (189) (describing collection of "about a million" photographs at the University of Washington Libraries); Cornell University Library (569) (describing one library at Cornell University with a collection of "over 350,000 unpublished photographs … [y]et only 1% of the photographs have any indication as to who created the photograph"); The J. Paul Getty Trust, The Metropolitan Museum of Art, and the Solomon R. Guggenheim Foundation ("Getty") (610) (noting the collection of "over 2 million images" at the Getty Research Library).

[33] *See, e.g.*, Getty (610).

ANT_BARTZ_000435427

- works of fine art and visual art (such as images and/or illustrations, especially those posted to and found on the Internet);[35] and

- various ephemera (such as postcards, brochures, pamphlets).[36]

Solutions to the problem of inadequate information on the face of the work are few and far between in the comments. As alluded to earlier, when confronted by the absence of clear information about the work's owner, most users simply do not use the work. In situations where the items have been donated to an institution, there may be records associated with that donation, such as the name of the donor and his or her estate, and therefore some additional information may be available. But where authorship of a specific work cannot be determined, this additional information may not be very helpful.

In spite of this uncertainty, however, users occasionally exploit works having indeterminate ownership. This typically occurs only when the user perceives an acceptable risk based on the facts surrounding the work and the use at issue, and almost always after the user has performed some degree of due diligence in attempting to locate copyright owner based on the limited contextual information available. This appears to be the case for both experienced users of copyrighted works,[37] as well as for members of the public generally.[38]

### 2. Changes of Ownership or in the Circumstances of the Owner

Even if an author or copyright owner can be identified from a copy of the work, events since the creation of that copy can affect the ability of a subsequent user to identify or locate the current copyright owner. Copyright is, after all, a form of property. As with other forms of property, ownership may pass through many hands, and by

---

[34] *See, e.g.*, Baker (253) (discussing films "produced by amateurs who did not include credits"); Kernochan (666) (discussing difficulties clearing rights in video clips for an educational resource, many of which were of "unidentified origin").

[35] *See, e.g.*, CAA (647).

[36] *See, e.g.*, Goodman Associates (46) (postcards); Miller (573) (various ephemera of local interest).

[37] *See, e.g.*, National Institutes of Health, National Library of Medicine (654) (describing a policy for conducting a search for copyright owners; if unsuccessful, materials are web-published with a disclaimer).

[38] *See, e.g.*, Earnest (78) (describing the use of an aerial photograph of a building on the campus of Stanford University in a "historical exhibit at Stanford's Computer Science Department"; first a search of local aerial photography companies was conducted, but all denied ownership; the user remains "uneasy about its ambiguous status").

---

Page 26

ANT_BARTZ_000435428

various legal mechanisms. Therefore it is not uncommon for the chain of title to copyright in a work to be somewhat complicated to trace. Even where ownership does not change hands, the owner's circumstances may change. The owner may change addresses during a move to a new home or place of business. The owner may die, dissolve, or otherwise cease business altogether. These situations are a common refrain in the comments.

### a.  Changes of Ownership

A number of comments discuss situations where a user wished to make use of a specific work, but discovered that the original author or owner had transferred rights to another party. The circumstances of these transfers span a wide spectrum of specific situations, from a transfer of rights to just a single work, to mergers between two companies, to acquisitions of the assets of an entire company.[39]

The comments, however, raise common themes across these situations. First, these situations almost always involve copyright ownership by a business entity. Second, the comments demonstrate that each additional party to ownership adds another layer of complexity and potential difficulty to a prospective user. The comments also suggest that multiple transfers can create problems for the owner itself. These parties are simply unaware of what they own. Determining ownership conclusively after multiple mergers, transfers or acquisitions can be a difficult, time-consuming task. This problem can be exacerbated in situations where the work is out of print, or is not otherwise being exploited commercially; determining ownership conclusively in such a case may not be cost-efficient. When this is the case, the owner may have little incentive to invest the time and resources required to resolve the matter, or even to respond to requests from potential users. As a result, users may be caught between multiple potential owners, all of whom refuse to be the sole, true owner.[40] Typically in these situations, the status of ownership in the work remains unknown to the potential, who usually abandon the planned use.

---

[39] *See, e.g.*, Spehr (516); Kolling (527); Buck (555); UCLA Film and Television Archive (638).

[40] *See, e.g.*, Thomas (570) (describing a situation where two publishers both said the other owned rights to a particular work); UCLA Film and Television Archive (638) (describing a situation involving a 1933 feature film produced by Paramount; Universal now owns most of the Paramount library from the time period, but the parties dispute ownership of the specific work in question); Grayson (R43) (also discussing situation between Paramount and Universal).

ANT_BARTZ_000435429

### b.  Changes in the Circumstances of the Owner

The comments suggest that changes in the circumstances of the copyright owner are also primary causes for the current owner to be unidentifiable or unlocatable.  While the situations vary from a simple change of address to death or dissolution, they tend to break down between situations involving ownership by individuals and those involving ownership by business.  These situations present similar issues, but each is discussed separately below.

With respect to individual copyright owners, the comments frequently described a problem involving the death of the author or the last known copyright owner.  In some cases, users do not know how or where to access information about the author's estate.  In other cases, it is unknown to the user whether the author even provided for transfer of ownership in his estate.  On the other hand, some comments describe cases where individual owners do make long-term provisions for their copyrights in their estates, and in these cases many estates are actively interested in the exploitation of these interests.[41]

Transfer of copyright ownership from one generation to the next by will, or otherwise, creates another class of problems involving individual copyright owners.  Some heirs are completely unaware of their rights.  Rights may be fractionally distributed among a variety of heirs, some or all of which may be remote from each other, or the potential user.  Very little can be categorically stated about whether users proceed with planned uses in these situations, which vary so widely that user decisions almost always turn on the facts of each case.

With respect to corporate owners of copyright, going out of business or ceasing operations appears to be one of the most common frustrations to potential users.  The comments provide numerous examples along these lines, many involving software companies, where the work may be referred to colloquially as "abandonware."[42] Bankruptcy of a business can also inhibit the availability of good information about

---

[41] *See, e.g.*, Perkins (205).

[42] *See, e.g.*, Johnson (334); Hamill (354); Pechter (347); Getchel (583).

**Page 28**

ANT_BARTZ_000435430

copyright ownership.[43]  In these situations, the comments suggest that most potential users do not proceed with planned uses.

### 3.  Limitations of Existing Information Resources

The comments show users employ a wide variety of techniques for searching for a copyright owner.  Examples include basic Internet searches, using old phone books, and searches for death certificates and records concerning estates.[44]  These comments demonstrate a great range in the difficulty of searches across categories of works and types of uses, due in part because certain industries and user communities have developed existing, publicly accessible databases regarding copyright ownership.[45]  These existing information resources, however, do have limitations, which can complicate and frustrate searches, and therefore a number of potential uses as well.

### a.  Copyright Office Resources

The Copyright Office is a primary resource of information about copyright ownership.  The Office maintains extensive records related to copyright registrations and ownership.  Most of the Office's records are public documents and are available to the public during normal business hours.  For example, from 1891 to 1982 the Copyright Office published the *Catalog of Copyright Entries* (CCE), which listed all registrations made during a particular period of time.  After 1982, the CCE was discontinued, and all registrations from 1978 to the present are recorded in an automated catalog.  This catalog allows users to search for works in various ways (*e.g.*, by title, by category of work) online 24 hours a day through the Office's website.[46]

---

[43] *See, e.g.*, Rosen (62) (commenter intervened during bankruptcy proceedings to address ownership of copyright in software owned by the bankrupt company); Corry (64) (commenter interested in republication of a specialized magazine, but unclear of ownership due to bankruptcy of original publisher); Troup (283) (commenter wished to use certain software and was willing to pay, but does not know who to pay due to bankruptcy of the original developer).

[44] *See, e.g.*, Sifferman (137) (trying various methods to locate an old photographer); Carlson (168) (describing various search resources from online telephone directories to contacting estates); Brooks (340) (contacted a state agency for information).

[45] *See generally* ASCAP (628); BMI (640); Harry Fox Agency (690); *see also* CCC (691).

[46] *See* http://www.copyright.gov/records/.  This resource, however, is limited to information collected by the Office since 1978.  During the course of the study, many commenters and participants suggested the Office make all of its records – especially pre-1978 registration records – available and searchable online.  *See, e.g.*, Kernochan (666) ("Perhaps digitizing the pre-1978 records could facilitate efforts to locate copyright owners and reduce the scope of the 'orphan works' problem"); *see also* Pierce (637); Peters (670); RIAA (687). Many participants suggested that doing so would greatly reduce the

ANT_BARTZ_000435431

In addition to recording registrations of claims to copyright and copyright renewal registrations, the Office also records documents related to copyright ownership, such as assignments, transfers, and security interests.[47] These documents are maintained in microfiche format, with more recent documents available in electronic format, and are available to the public during regular business hours.

The Office also offers fee-based searches of any of these various kinds of records,[48] and provides information useful for researching the ownership of copyrights.[49] Private search firms offer similar searches of Copyright Office records. The circular also offer many helpful suggestions for searching the Office's records, and for conducting copyright searches generally, but warns that the absence of information about a specific work in the Office's records may not mean that the work is unprotected. Lastly, the Office maintains a webpage that refers online visitors to other Internet-based information resources maintained by third-parties that might have useful information about copyright ownership.[50]

### b. Third-Party Information Resources

Third-party or private resources play an important role in the accumulation and maintenance of copyright ownership information, and therefore serve as important resources to potential users.[51] Usually these resources exist where industry groups have

search costs associated with searching for Copyright Office records that are not currently available online. However, doing so would involve a significant expenditure of resources. The Office has studied the feasibility of making this information available and searchable online, and preliminary figures estimated the cost to be about $35 million. July 26 Roundtable at 43-44 (statement of Marybeth Peters, Register of Copyrights).

The Office also learned during the orphan works study that some researchers have made a few pre-1978 registration records available online independently of the Copyright Office. *See, e.g.*, The Online Books Page: Information About the Catalog of Copyright Entries, *available at* http://onlinebooks.library.upenn.edu/cce/; U.S. Catalog of Copyright Entries (Renewals), *available at* http://www.kingkong.demon.co.uk/ccer/ccer.htm.

[47] 17 U.S.C. § 205 (2005).

[48] *See* 37 C.F.R. § 201.3 (2005).

[49] *See* U.S. COPYRIGHT OFFICE, CIRCULAR 22: HOW TO INVESTIGATE THE COPYRIGHT STATUS OF A WORK (2005).

[50] *See* Copyright Internet Resources, *available at* http://www.copyright.gov/resces.html.

[51] *See, e.g.*, ASCAP (628) (noting that the databases of performing-rights organizations contain extensive contact information for owners of copyright in musical works, and also have staff available to assist with inquiries); BMI (640) (noting that performing-rights organizations, as well as the Harry Fox

ANT_BARTZ_000435432

had some incentive to centralize this information, including situations where owners have utilized some form of collective rights administration, as in the music industry. In other cases interested users and researchers have developed other information resources.[52]

Generally these third-parties tend to provide good information about copyright ownership. Moreover, the comments show that these organizations understand that providing such information tends to reduce orphan works situations. This is not to say that orphan works problems vanish altogether where various groups have provided these resources, even in the case of the performing-rights organizations.[53] But the comments do suggest that orphan works situations appear to be less frequent in areas where rights may be administered collectively, or where these resources exist otherwise, than in areas where similar resources have not yet developed.

### c. Specific Limitations

Even where ownership information resources exist, however, they have limitations. For example, the comments generally describe situations where these resources did not have information about a particular work.[54] In other cases, comments described situations where these databases provided inaccurate or conflicting information,[55] or that these resources may be too remote or too costly to make use of, rendering them practically inaccessible for some users. For example, some commenters note that for the portion of Copyright Office records that are not available online, many users cannot afford the expense of traveling to Washington, D.C. to access records, or paying the Office or private firm to conduct the search.[56] Finally, searchers must often consult other general kinds of public records when tracking down the copyright owner,

---

Agency have extensive databases and can offer licenses); CCC (691) (noting that the Copyright Clearance Center has "built up substantial information" related to finding right-holders).

[52] *See supra* note 46.

[53] *See* Save the Music/Creative Commons (R114) (describing a search of ASCAP's repertory that failed to return positive results for songs of interest to Save the Music).

[54] *See id.*

[55] *See, e.g.,* Kline (151) (used in spite of conflicting information between the Copyright Office, Harry Fox Agency, ASCAP, and BMI),

[56] *See* Carnegie Mellon (537) (describing fees associated with various searches at the Copyright Office, and asserting that many cannot afford such searches, especially given the very real prospect of a refusal of permission or otherwise no clear authority to proceed with a use after spending much time and money to conduct a search).

ANT_BARTZ_000435433

such as old estate records.  The availability and accuracy of these kinds of information resources may vary dramatically from jurisdiction to jurisdiction, yielding a mixed bag of search experiences.[57]

### 4.  Difficulties Researching Copyright Information

The comments also show that conducting searches can prove to be costly, time-consuming endeavors.  The comments are littered with examples of situations where the trail ran cold, turned into a dead end, or simply involved more time and money than the user was willing to spend.[58]  Often the user can incur substantial costs without any guarantee that the search will produce information that provides a clear chain of title.[59]  Some searches turn into outright investigations.[60]

In many cases, the mere perception that a search will become long and arduous is itself enough to thwart some potential uses.[61]  This appears to be the case for several reasons.  The comments suggest that the nature of the planned use often affects whether the user decides to bother searching for the copyright owner at all.  Some comments claimed that in academic, scholarly, and other non-commercial uses, any search costs immediately outweigh the expected monetary return of the use.

---

[57] *See* Perkins (205) (commenter turned up an email address for a deceased author's heir after a relatively quick Internet search of estate records in the jurisdiction); *but cf.* Berard (181) (describing a group of users who are interested in a radio series whose original right holders were known, but also known to be deceased, the users have been unable to verify whether rights passed to their son); Pierce (637) (describing requests for wills and death certificates, saying "[s]ometimes these are useful, but often they … are a dead end.").

[58] *See, e.g.,* Barr (257) (commenter wished to use a math book in a course, but gave up the search when the original publisher referred him to original author's widow who was likely deceased); Duke # 1 (597) ("Search costs are currently so high that many users simply forgo using the work and never start the search in the first place").

[59] *See* Cornell University Library (569) (describing the experience of the Cornell University Library in a recent project for which clearance was needed for a specific set of works; after spending an estimated $50,000 in staff time on clearance issues, no copyright owner could be determined for 58% of the titles included in the project).

[60] *See, e.g.,* Pickett (603) (describing a music professor's search for published music and manuscripts of a French female composer; after contacting the French National Library and SACEM, the French collective rights administration organization, no estate or known relatives could be found, yet SACEM still said the permission of the estate was needed; commenter hired a private investigator who turned up two distant relatives who were surprised to learn of their rights, yet still have not given permission to use the works).

[61] *See Orphan Works Analysis and Proposal*, Center for the Study of the Public Domain, Duke Law School ("Duke #2") (597) ("[S]earch costs are so high *in general* that many of our respondents said that they did not start any search in the first place. … If costs are too high, users will simply forgo even looking for an author, and will abandon the use of a work." (emphasis in original)).

ANT_BARTZ_000435434

In other cases, the characteristics of the underlying work can affect the decision to undertake a search.  The comments discuss some of the types of information about an underlying work that users frequently look for when deciding whether a search for the owner is likely to be productive.  For example, it appears to be common knowledge among experienced searchers that the age of the work can often affect the availability of information about copyright ownership.[62]  Similarly, where the work is obscure or foreign, users often assume that records about ownership do not exist, or on the off chance that they do, that such records are practically unavailable.[63]  In these situations the commenters almost always abandon use of the work altogether.

Comments that discuss perceived difficulties alone, however, provide little information about actual difficulties experienced during genuine searches for copyright owners.  This point should not be overlooked, because other comments suggest that for many searches abandoned at an early stage, the user would have found the right-holder with slightly more effort.

For example, one commenter described his experience searching for the estate of Roger Hayward, an illustrator whose drawings the commenter wished to use in connection with an article he was writing about the history of molecular illustration.[64]  Preliminary searching showed that Mr. Hayward retained rights in his work, that he had died in 1979, and that some other users had also been interested in using Hayward's drawing but had been unable to track down the author's heirs for permission.  This commenter, however, continued searching.  Using Internet-based tools, he quickly found the following:  that Mr. Hayward died in Merced County, California; that Hayward left his entire estate to his wife, Elizabeth; that she died in 1983; and that she left her estate to the couple's nieces and nephews.  After a few more hours of searching the Internet, the commenter located two of these relatives and even had an email address.  Within a few days had received written permission to use his work.

---

[62] *See, e.g.*, Carnegie Mellon (537) ("In general, the older the book, the more difficult it was to find the publisher").

[63] *See* Creative Commons (643) (discussing difficulties and high costs of clearing a number of relatively obscure foreign works).

[64] Perkins (205).

ANT_BARTZ_000435435

In sum, while many comments suggest that many orphan works situations involve real dead ends – even for experienced copyright searchers – comments like the one described above suggest that at least some of these situations might have been resolved with just a little more searching in the right place.

### 5.   Problems Outside the Scope of the Study

#### a.   Copyright Owner Known, But Permission Not Obtained

A number of comments described situations involving works that were "out of print" (*i.e.*, not currently being exploited commercially), or where the license fee was arguably too high, or where the known copyright owner did not respond to requests for permission to use the work.[65]  Upon closer examination, however, a common thread through each of these comments is an identifiable and locatable copyright owner, making these situations outside the scope of this study.[66]  While we have refrained from offering a categorical definition of "orphan works," and have invited interested parties to submit definitions,[67] the term certainly must mean what it implies:  that the "parent" of the work is unknown or unavailable.  Therefore works whose owners are known, and situations involving those works, do not fit this definition and are not the subject of this inquiry.[68]

#### b.   Problems Determining Copyright Status

The comments also describe a number of situations where users complained about not only about difficulties identifying or locating a copyright owner, but also about

---

[65] Lipton (87) (describing high cost of licensing rights); Sneden (135) (describing a known photographer who offered to sell to sell a reprint of a copy at a price the commenter found too high); Lawrence (210) (citing problems with slow responses and high fees); Woods (574) (describing problems related to the documentary *Eyes on the Prize* related to renegotiation of license fees for music contained in the documentary); Simms (R27) (discussing difficulties locating out of print books and music).

[66] *See* Association of American Publishers, Inc. ("AAP") (605) (stating that where difficulties are encountered even after the copyright owner is identified, "such matters are outside the scope of the 'orphan work' issue"); MPAA (646) ("[A] work is not properly classified as an orphan if the user has been able to communicate with the copyright owner but has not succeeded in gaining the permission she seeks, whether because of the failure to agree upon a license fee or for some other reason").

[67] Notice of Inquiry, *supra* note 18, at 3741.

[68] This is not to suggest that all "out of print" works fall outside the scope of this study.  Rather, we simply point out that while the concepts of "out of print" status and "orphan work" status may be related the two are not identical.  The "out of print" description suggests the work is not currently in commercial exploitation, irrespective of whether this is because of some conscious choice by the copyright owner, or because there simply is no copyright owner.  Conversely, there appears to be consensus in the record that an "orphan work" is a copyrighted work for which an owner cannot be identified or located, irrespective of whether the work is being exploited commercially.  Both terms may aptly describe a single work, but the concepts are not one and the same.

---

ANT_BARTZ_000435436

problems associated with determining whether a work is protected by copyright at all.[69] We generally see these problems as outside the scope of this study.

Determining the status of copyright protection for a work can be very easy or it can be very difficult depending on the work. Such difficulties, however, are almost always related to various aspects of the law not at issue in this proceeding, *e.g.*, the doctrine of "publication" under the 1909 Act, the "work for hire" doctrine, etc. To help users with these questions, the Copyright Office publishes a number of documents that provide useful information to those unfamiliar with the scheme of legal protection as it has evolved.[70] From the outset, however, the purpose of this study has been limited to examining situations involving works that are protected, but for which no copyright owner can be identified or located. As such, problems determining copyright status fall outside the scope of this inquiry. Of course, to the extent that determining the identity of the author or copyright owner assists in determining the copyright status of a work, this study certainly is relevant to such situations.

### c. Problems Related to Pre-1972 Sound Recordings

A few comments raised concerns related to problems with pre-1972 sound recordings, which are also outside the scope of this proceeding.[71] Congress did not extend federal copyright protection to sound recordings until 1972. Sound recordings fixed before that time remain subject to protection afforded by state laws until February 15, 2067.[72] Until that time, any amendments to federal copyright law – including any exception addressing orphan works generated by this proceeding – will have no effect on

---

[69] *See, e.g.*, Rhodes (68) (complains about difficulty determining whether works from 1902 are still protected by copyright); Romano (102) (finding it difficult to determine copyright status of films in a personal collection that date from 1894-1977); Meadow (438).

[70] *See* U.S. COPYRIGHT OFFICE, CIRCULAR 15: RENEWAL OF COPYRIGHT (2005); U.S. COPYRIGHT OFFICE, CIRCULAR 15A: DURATION OF COPYRIGHT: PROVISIONS OF THE LAW DEALING WITH THE LENGTH OF COPYRIGHT PROTECTION (2005); U.S. COPYRIGHT OFFICE, CIRCULAR 15T: EXTENSION OF COPYRIGHT TERMS (2005); U.S. COPYRIGHT OFFICE, CIRCULAR 22: HOW TO INVESTIGATE THE COPYRIGHT STATUS OF A WORK (2005).

[71] *See, e.g.*, Brooks (579).

[72] 17 U.S.C. § 301(c) (2005).

ANT_BARTZ_000435437

rights or remedies applicable to these works under state laws.  This view is consistent with the few comments that addressed pre-1972 sound recordings.[73]

## C.  Categories of Proposed Uses

The comments presented not only descriptions of problems, but also information about the various kinds of productive uses of orphan works.  In our view these uses fall into four general categories as described below.  It is important to keep these categories in mind when considering any proposed solution to the orphan works problem.  In many cases these types of uses reveal the users' needs or preferences, or their amenability to certain forms of relief that might be available to a resurfacing copyright owner.  With this in mind, these categories serve as a reference point for the discussion below on how best to remove unnecessary obstacles to productive uses of works, while preserving the interests of authors and copyright holders.

### 1.  Uses by Subsequent Creators

The comments describe many situations where subsequent authors and creators wish to incorporate existing works into their own creative expressions.  We loosely refer to these situations very generally as *uses by subsequent creators*.[74]  The typical scenario might involve an author or publisher that wishes to include a photograph in a new book, or a movie studio that wishes to create a film version of an obscure novel.

There are a few other important aspects about this particular category of use to keep in mind.  First, in this category we have envisioned uses that involve an extensive use of the underlying work that would go beyond the limits of fair use.  Second, commercial users in these cases typically incur a significant reliance interest if they begin use of the work.  This reliance can take many forms, but in most cases a new work has

---

[73] *See* Brooks (579) (observing that pre-1972 recordings "remain under state and common law until the year 2067 ... [t]hus they may not be directly impacted by modifications in federal copyright law"); RIAA (687) ("Since pre-1972 U.S. sound recordings are protected only under state law, we assume that questions concerning their 'orphan works' status are outside the scope of this proceeding").  For a recent study of the issues related to pre-1972 sound recordings, *see* June M. Besek, *Copyright Issues Relevant to Digital Preservation and Dissemination of Pre-1972 Commercial Sound Recordings by Libraries and Archives*, COUNCIL ON LIBRARY AND INFORMATION RESOURCES AND THE LIBRARY OF CONGRESS (December 2005) (available at http://www.clir.org/pubs/reports/pub135/contents.html).

[74] *See, e.g.*, Goodman Associates (46) (documentary about the history of postcards); Nelson (67) (used archival footage of unknown provenance in a film); Wheeler (180) (freelance artist would like to use old photographs in new works); Briggs (369) (wanted to include photos in a history of a station in the Antarctic); CAA (647) (describing scholarly journals and publications that incorporate works of art).

ANT_BARTZ_000435438

been created, and costs incurred in the production and distribution of copies. Therefore commercial users tend to be highly sensitive to any injunctive relief available to the surfacing copyright owner, especially in situations where an injunction comes at a critical point in the marketing and distribution of the work.[75] However, in some situations (*e.g.*, unpublished works), commercial users acknowledged that injunctive relief might be appropriate.[76]

It should also be noted that commercial users in this category usually budget for costs associated with the use of works. Generally they are willing to pay license fees for permission to use works before their planned uses, and therefore tend to be more amenable than non-profit users to paying some sort of monetary damages or compensation to the resurfacing copyright owner, usually in the form of a reasonable royalty or fair market value for on-going use of the work.[77]

### 2.  Large-Scale Access Uses

The comments also describe a number of situations where institutional users wish to make a large quantity of works available to the public. We refer to this second category of uses as *large-scale access uses*.[78] Typically users in this category are academic or non-profit institutions, such as libraries, archives or museums. These organizations maintain or curate vast quantities of works, many of which have been donated to the organizations with very little information about copyright ownership. Ideally these users would like to digitize and post collections online, or develop other programming that incorporates these works in connection with their other activities, which are usually non-commercial.[79]

---

[75] AAP (605); MPAA (646).

[76] July 26 Roundtable Tr. at 100-101 (Comment of Allan Adler, Association of American Publishers) ("However, with respect to the area of unpublished works, there may be certain areas where ... there might be exceptions made with respect to when injunctive relief possibly could be available").

[77] AAP (605); MPAA (646)

[78] Strong (473) (describing access to library materials at UCLA and the University of California – San Diego); Carnegie Mellon (537) (describing plans to digitize of a portion of its collection); Getty (610) (describing current practices in the museum community of digitizing collections and making them available online); LCA (658) (describing the experiences of many individual libraries during their digitization projects); Google (681) (describing the Google Print project involving large-scale digitization and indexing).

[79] Note, however, that at least one commenter in this category plans large-scale commercial uses. *See* Google (681).

ANT_BARTZ_000435439

A few important aspects about this mode of use should be kept in mind. First, this mode of distribution usually involves very little cost for each individual work. So while the user's reliance interest in the project as a whole may be quite significant, the reliance interest for each individual work is usually very low. Similarly, where the reliance interest for each individual work is low, the overall value of each individual work to the project as a whole is also very low. This can vary of course, depending on the extent to which the use highlights or features any one particular work or group of works.

With this in mind, generally the commenters who propose to make these kinds of uses have been agreeable to a system that allows for injunctive relief for a resurfacing owner, provided that such relief is limited in scope only to the work or works for which that party can demonstrate ownership, and not to the entire collection or display. Conversely, because of the large quantity of works involved in these uses, generally these users are adverse to paying monetary compensation for the use, especially in the case of a non-commercial use. Some advocate that there should be no monetary compensation with the trade-off that use would be permitted only for a limited amount of time.[80] Others would not limit the time period of the use, but would limit compensation to actual damages capped at various maximum amounts.[81]

### 3. Enthusiast Uses

Another category of uses commonly described in the comments involves uses by enthusiasts of a particular work, or hobbyists or experts in a particular field. We loosely refer to this category of uses as *enthusiast uses*.[82] The typical example of these situations in the comments involves an individual with a personal interest in a particular work, artist, or subject, or an individual with academic or technical expertise in a specific field. Usually these commenters expressed interest in using works from these fields, which in most cases appeared to be of limited interest to the general public. The specific areas of

---

[80] Getty (610).

[81] Various (R127) (describing the "cap on actual damages" approach and indicating support for it from by many parties, including College Art Association, Glushko-Samuelson Intellectual Property Law Clinic, Library Copyright Alliance, Public Knowledge).

[82] *See, e.g.,* Corry (64) (interested in republishing a specialized magazine); Smith (90) (interested in republishing a companion to a famous literary anthology); Thorm (142) (describing fans who would like to republish a role-playing game); Meadow (438) (would like to use old journals and magazines with information about the history of the steel industry in the United States); Geiger (544) (interested in biodiversity and "monographic treatments" in the biological sciences).

**Page 38**

interest vary throughout the comments, but a few fields did recur with some frequency, such as genealogical records and materials,[83] dramatic radio productions from the last century,[84] and various software programs.[85]  Generally the works at issue in these comments are no longer available commercially, and therefore these users would like to republish them on a limited basis for others who share the same interest or expertise (in these cases, this category may overlap with private uses below), or post these works to the Internet so that others with shared interests might enjoy the works as well.

Generally these users do not express any preference for the availability of injunctive relief or monetary damages.  Their interests rest primarily in the ongoing availability or preservation of a particular work itself.  The honest desire to comply with the law, as well as avoid potential liability, appear to be the primary reasons why many of these uses are not undertaken currently.  It is our sense, however, that in these cases the motivation for the use is not commercial, but rather in honor or celebration of the particular work or expression.  As such, most of these users would likely comply with the wishes of the copyright owner if the rightful party could simply be identified.  It seems likely therefore, that these users would be amendable to at least the availability of injunctive remedies as well as some form of monetary damages or compensation.

### 4.  Private Uses

The last category of uses recurring throughout the comments involves use by individuals for personal purposes, or *private uses*.  There are many examples of these situations, but perhaps the most common involves a user who wishes to make a reproduction of a family photograph, but the original photographer is unidentifiable, or long gone.[86]  A number of other examples come from the area of software, where the user owns a copy of a program that was originally written for a computer or operating system that is now obsolete.[87]  In these cases, the user would like to transfer the copy to a new

---

[83] *See, e.g.,* Dionne (6); Haslacker (98); Dohnal (191); Struwe (193); Montgomery (202).

[84] *See, e.g.,* HRT (29); WSCA-FM (32); Leary (50).

[85] *See, e.g.,* Ashdown (48); Ruske (71); Bowns (84); Mahon (233); Rush (265).

[86] *See, e.g.,* Grudecki (110) (family photos); Grimsley (119) (family photos); Stevenson (150) (family photos).

[87] *See, e.g.,* Stowell (298) (limited reproduction of old software used to keep personal notes); Mol (320) (describing the "transfer" of old software to new platforms).

ANT_BARTZ_000435441

system, but understands this to be inappropriate either because of copyright law, or because of the license agreement.  In other cases, the hardware or software platforms may still be widely used, but the original publisher of the software is long gone.[88]

As with enthusiast users, private users typically do not express a preference for the availability of injunctive relief or monetary damages to a resurfacing copyright owner.  Private users also generally appear motivated by honest attempts to follow the law, and in most cases also appear willing to provide some compensation to the copyright owner if that party could simply be identified.

---

[88] *See, e.g.*, Staggers (300) (began using shareware, and attempted to locate the software company in order to pay for the software only to find the company was gone).

---

**Page 40**

ANT_BARTZ_000435442

## IV. Legal Background

Development of a comprehensive orphan works solution that fits well within domestic and international copyright law requires an understanding of the provisions of those bodies of law that relate to orphan works.  In general, the orphan works issue is one driven by factual circumstances and considerations – in most orphan works cases the user is not faced with uncertainty about the copyright law and its applicability to her conduct, but with uncertainty about the identity of the copyright owner and how to locate him.  The legal background, however, is relevant to the orphan works issue in several ways.  Examination of the Copyright Act reveals several provisions that compound the orphan works problem, other provisions that solve the problem (but only for limited sets of works, users, or uses), and, finally, still other provisions that provide users with viable alternatives to using orphan works in an infringing way.  Understanding these provisions is necessary when crafting an orphan works solution.  Moreover, proposed solutions to the orphan works situation must be consistent with a firm understanding of both the domestic and international copyright systems.  This section, therefore, describes the legal background and examines the treatment of orphan-works-like situations under the current Copyright Act (and its implementing regulations), and the international law limitations that would apply to any comprehensive orphan works provision.  It is intended to help inform the discussion of the orphan works issue to help develop a robust solution that learns from experience in the copyright system and provides an efficient complement to that system.

### A.  Historical Factors that Affect the Orphan Works Problem

The orphan works issue is, in some respects, a result of the omnibus revision to the U.S. copyright law in the Copyright Act of 1976,[89] which changed several basic features of the system of copyright protection in the United States.  Today, copyright subsists in original works of authorship upon fixation in any tangible medium of expression.[90]  Works need not be registered with the Copyright Office, or published with proper notice, to obtain federal copyright protection, as was the case prior to the 1976

---

[89]  Pub. L. No. 94-553, 90 Stat. 2541 (1976).

[90]  17 U.S.C. § 102(a) (2005).

ANT_BARTZ_000435443

Act. The 1976 Act thus made it substantially easier for authors to obtain protection for their works.

The 1976 Act made maintaining protection in those works substantially easier as well. Prior to the 1976 Act, the term of copyright was split into two periods of years: an initial 28-year term, followed by an additional 28-year renewal term. Protection for the renewal term could be secured only by registration of a renewal with the Copyright Office during the last year of the first term. Failure to renew properly resulted in complete loss of copyright.

The 1976 Act, however, changed the basic measure of copyright's term. Instead of two fixed terms of years, the 1976 Act provided a single term for the life of the author, plus an additional 50 years, which was extended to 70 years in 1998.[91] This general term applies to works created on or after January 1, 1978.[92] Works created before then and in the first term of copyright under the old law were still subject to the renewal requirement until 1992, when renewal for those works was made automatic by statute.[93] The term for these works was extended to 75 years in 1976, and then to 95 years in 1998.

These basic changes were important steps toward the United States' assumption of a more prominent role in the international copyright community. Specifically, these changes harmonized U.S. copyright law with prevailing international norms, moving the U.S. closer to membership in the Berne Convention.[94] Berne – the oldest and most widely accepted international agreement on the protection of literary and artistic works – forbids "formalities" such as registration and renewal as a condition to copyright protection.[95] The prohibition on formalities has been a fundamental principle of

---

[91] Pub. L. 94-553, § 302(a), 90 Stat. 2541 (1976). *See supra* note 14.

[92] *Id.*

[93] Copyright Renewal Act of 1992, title I of the Copyright Amendments Act of 1992, Pub. L. No. 102-307, 106 Stat. 264 (1992) (amending 17 U.S.C. § 304 to add an automatic renewal term).

[94] Berne Convention for the Protection of Literary and Artistic Works (Paris Act 1971) (hereinafter "Berne Convention" or "Berne"). The U.S. formally acceded to Berne in 1988. *See* Berne Convention Implementation Act, Pub. L. No. 100-568, 102 Stat. 2853 (1988).

[95] "The enjoyment and exercise of these rights shall not be subject to any formality; …." Berne Convention art. 5(2). *See infra* at 60-61.

ANT_BARTZ_000435444

international copyright protection for nearly a century, and remains important today.[96] Moreover, there was substantial evidence presented during consideration of the 1976 Act that the formalities such as renewal and notice, when combined with drastic penalties like forfeiture of copyright, served as a "trap for the unwary" and caused the loss of many valuable copyrights.[97] Notwithstanding these improvements to copyright in the United States, the change to providing automatic protection that subsists immediately upon fixation of a work exacerbate the orphan works issue, in that a user generally must assume that a work he wishes to use is subject to copyright protection, and often cannot confirm whether a work has fallen into the public domain by consulting the renewal registration records of the Copyright Office. It should be noted, though, that Congress was cognizant of this consequence of the switch to a life-plus-50-years system at the time it passed the 1976 Act. Congress recognized the problem, but considered it to be outweighed by the many benefits of the new system:

> A point that has concerned some educational groups arose from the possibility that, since a large majority (now about 85 percent) of all copyrighted works are not renewed, a life-plus-50 year term would tie up a substantial body of material that is probably of no commercial interest but

---

[96] Berne's "no formalities" requirement has been incorporated by reference into the modern treaties addressing copyright. *See* Agreement on Trade-Related Aspects of Intellectual Property Rights, Apr. 15, 1994, art. 9.1, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, Legal Instruments–Results of the Uruguay Round vol. 31, 33 I.L.M. 81, 87 (1994); WIPO Copyright Treaty, Apr. 12, 1997, art. 3, S. Treaty Doc. No. 105-17 (1997), 36 I.L.M. 65, 69 (1997); WIPO Performances and Phonograms Treaty, Apr. 12, 1997, art. 20, S. Treaty Doc. No. 105-17 (1997), 36 I.L.M. 76, 80 (1997).

[97] *See, e.g.*, H.R. Rep. No. 94-1476, at 134 (1976) ("One of the worst features of the present copyright law is the provision for renewal of copyright. A substantial burden and expense, this unclear and highly technical requirement results in incalculable amounts of unproductive work. In a number of cases it is the cause of inadvertent and unjust loss of copyright. Under a life-plus-50 system the renewal device would be inappropriate and unnecessary."); *Copyright Law Revision: Hearings on S. 1006 before the Subcommittee on Patents, Trademarks, and Copyrights of the Committee on the Judiciary, United States Senate*, 89th Cong. 68 (1965) (statement of Abraham Kaminstein, Register of Copyright) ("It is important for the revised term provisions to do away with the present system of copyright renewal, which is a nightmare of complexity and which frequently results in the inadvertent loss of protection."); *Copyright Law Revision: Hearings on S. 597 Before the Subcommittee on Patents, Trademarks, and Copyrights of the Committee of the Judiciary, United States Senate*, 90th Cong. 37 (1967) (statement of John Dos Passos, Authors League of America) ("The present system by which copyright has to be renewed every 28 years has worked a great deal of hardship. It is very easy for an author to let the time of renewal slip by. A number of American and foreign authors or their heirs have lost their copyrights through ignorance or inadvertence. A man who makes his living by writing finds it hard to keep track of a great number of different items. In some cases, the renewal fees can become a real burden. If you do not renew the copyright at the specified time, there is no remedy whatsoever.").

ANT_BARTZ_000435445

that would be more readily available for scholarly use if free of copyright restrictions. A statistical study of renewal registrations made by the Copyright Office in 1966 supports the generalization that most material which is considered to be of continuing or potential commercial value is renewed. Of the remainder, a certain proportion is of practically no value to anyone, but there are a large number of unrenewed works that have scholarly value to historians, archivists, and specialists in a variety of fields. This consideration lay behind the proposals for retaining the renewal device or for limiting the term for unpublished or unregistered works.

It is true that today's ephemera represent tomorrow's social history, and that works of scholarly value, which are now falling into the public domain after 29 years, would be protected much longer under the bill. Balanced against this are the burdens and expenses of renewals, the near impossibility of distinguishing between types of works in fixing a statutory term, and the extremely strong case in favor of a life-plus-50 system. Moreover, it is important to realize that the bill would not restrain scholars from using any work as source material or from making "fair use" of it; the restrictions would extend only to the unauthorized reproduction or distribution of copies of the work, its public performance, or some other use that would actually infringe the copyright owner's exclusive rights. The advantages of a basic term of copyright enduring for the life of the author and for 50 years after the author's death outweigh any possible disadvantages.[98]

The orphan works problem is thus a by-product of the United States' modern copyright system, and has been with us since at least the day the 1976 Act went into effect.

### B. Provisions in U.S. Copyright Law that Relate to Orphan Works

While U.S. copyright law does not contain an omnibus provision addressing all orphan works as such, it does contain a few provisions that permit certain users to make certain uses of certain classes of orphan works, and other provisions that reduce the risk in using an orphan work. There are thus already some "orphan works provisions" in U.S. copyright law, although they are not labeled as such. These provisions include section 108(h), section 115(b), section 504(c)(2), and the termination provisions (sections 203, 304(c), and 304(d)).[99] These existing laws provide models that may be useful in the development of an omnibus orphan works provision.

---

[98] H.R. Rep. No. 94-1476, at 136 (1976).

[99] Other provisions in the Copyright Act can permit use of orphan works. For example, statutory licenses other than section 115 (such as the licenses available under sections 112, 114, and 118) can permit

ANT_BARTZ_000435446

### 1. Section 108(h)

Section 108(h) was enacted as part of the Sonny Bono Copyright Term Extension Act of 1998,[100] and has sometimes been referred to as an "orphan works" provision.[101] Intended to ameliorate the effects that the 20-year extension of term might have on libraries and archives in their use of older works, the provision allows libraries and archives to reproduce, distribute, display or perform works in the last 20 years of their term if certain conditions exist, as spelled out in the subsection:

> (h)(1)  For purposes of this section, during the last 20 years of any term of copyright of a published work, a library or archives, including a nonprofit educational institution that functions as such, may reproduce, distribute, display or perform in facsimile or digital form a copy or phonorecord of such work, or portions thereof, for purposes of preservation, scholarship, or research, if such library or archives has first determined, on the basis of a reasonable investigation, that none of the conditions set forth in subparagraphs (A), (B), and (C) of paragraph (2) apply.
>
> (2) No reproduction, distribution, display, or performance is authorized under this subsection if –
>
>> (A)  the work is subject to normal commercial exploitation;
>>
>> (B)  a copy or phonorecord of the work can be obtained at a reasonable price; or

---

use of an orphan work. *See* 37 C.F.R. §§ 253.9, 260.7, 261.8, 262.8 (2005). Similarly, any of the exceptions to copyright – for example those found in section 110 – could permit use of an orphan work. The provisions discussed in this Section of the Report are those that bear the closest resemblance to an orphan works provision, and those that are the most instructive for the drafting of an omnibus orphan works provision.

[100] Pub. L. No. 105-298, 112 Stat. 2827 (1998).

[101] The Preservation of Orphan Works Act ("POWA") was title IV of the Family Entertainment and Copyright Act of 2005, Pub. L. No. 109-9, 119 Stat. 218, 226 (April 27, 2005). POWA contained a single provision, which amended section 108(i). Section 108(i) had provided that the rights of reproduction and distribution granted by section 108 do not apply to certain classes of works: musical, pictorial, graphic or sculptural works, or motion pictures or other audiovisual works other than audiovisual works dealing with news. However, section 108(i) also excluded from this rule the reproduction and distribution rights granted under section 108(b) (allowing certain reproductions and distributions for purposes of preservation and security or for deposit for research use in another library or archives) and 108(c) (allowing certain reproductions solely for the purpose of replacement of a copy or phonogram that is damaged, deteriorating, lost or stolen, or if the existing format in which the work was stored has become obsolete). POWA extended the exemption to the rights granted under section 108(h): therefore, library reproductions allowed under section 108(h) are no longer limited by section 108(i). This provision promotes the preservation of orphan works because it enables libraries and archives to take advantage of section 108(h) for more classes of works (for example, musical works), and those previously excluded classes of works will include many orphan works.

ANT_BARTZ_000435447

(C) the copyright owner or its agent provides notice pursuant to regulations promulgated by the Register of Copyrights that either of the conditions set forth in subparagraphs (A) and (B) applies.

(3) The exemption provided in this subsection does not apply to any subsequent uses by users other than such library or archives.

Section 108(h), in other words, allows use of a work without permission by libraries and archives if the work is not subject to normal commercial exploitation and is not obtainable at a reasonable price. As with the other provisions discussed in this section of the Report, section 108(h) can affect both orphan works and non-orphan works. It does not require that the owner be non-locatable, and does not require a library to conduct a reasonable search for the owner of the work (although the fact of whether the library conducted a reasonable search for the owner may figure into the analysis of whether the library conducted a reasonable investigation of whether the work was subject to normal commercial exploitation or available for a reasonable price).

Section 108 relies expressly on the concept of reasonableness: the terms "reasonable investigation" and "reasonable price" are central to its operation. However, section 108(h) defines neither of these terms. Similarly, it does not define the important term "normal commercial exploitation." We could find no case interpreting these terms in section 108(h) to date.[102]

It is also significant that section 108(h)(2)(C) provides a formal way for a copyright owner to opt out of the exception (provided that the owner can truthfully state that the work is subject to normal commercial exploitation or is available at a reasonable price). However, the "opt-out" registry established by section 108(h)(2)(C) has never been used in the eight years[103] since section 108(h) became law.[104]

---

[102] In his dissent in *Eldred v. Ashcroft*, 537 U.S. 186 (2003), Justice Breyer called section 108(h) a "limited" exception, and expressed the view that the term "reasonable investigation" is "open-ended." *Id.* at 252.

[103] The Sonny Bono Copyright Term Extension Act became effective October 27, 1998.

[104] The provision does not provide much incentive for a copyright owner to file such a notice before it discovers that one of its works is being used under this subsection. By its terms, it appears that such a notice can be filed at any time, even after a library or archive begins use of a work it had determined to have met the criteria. Once the notice is filed, the work is no longer subject to the exception, and the library or archives would have to cease its use under section 108(h). In most cases it would thus seem more efficient for a copyright owner to "wait and see" whether a work is being used under section 108(h) rather than to file such notices proactively.

ANT_BARTZ_000435448

### 2. Section 115(b)

The Copyright Act provides owners of copyright certain exclusive rights.[105]   A would-be user of a work that is protected by exclusive rights must obtain a license from the owner of those rights prior to using the work, or the use will constitute infringement. However, in certain limited circumstances, the Act permits a user to use a copyrighted work without a license from the owner of the work, under a so-called "statutory" (or "compulsory") license.  Under these licenses, the user ordinarily must pay the owner a royalty that is fixed by regulation (or a royalty agreed to by the user and the owner).

The section 115 statutory license permits any person to distribute phonorecords of a nondramatic musical work, including by means of digital phonorecord delivery, when phonorecords of that musical work have previously been distributed to the public in the United States with the authority of the copyright owner, provided that the person's primary purpose in making the phonorecords is to distribute them to the public for private use.[106]  In order to avail herself of this statutory license, the would-be user must serve a notice of her intention to use the work on the copyright owner.  The statute provides, however, that "[i]f the registration or other public records of the Copyright Office do not identify the copyright owner and include an address at which notice can be served, it shall be sufficient to file the notice of intention in the Copyright Office."[107]  Further, the owner of the musical work "must be identified in the registration or other public records of the Copyright Office" in order to receive any royalties under the license.[108]  Thus, a would-be user who is not able to locate the owner may make and distribute phonorecords of the orphan work according to the terms of the statutory license, provided she satisfies the conditions of section 115(b)(1) – and may continue to do so royalty-free until the owner

---

[105] *See* 17 U.S.C. § 106.

[106] There are still more limitations on eligibility, *see* 17 U.S.C. § 115(a)(1)(i) – (ii), as well as various procedural requirements, *see* 17 U.S.C. § 115(b).

[107] 17 U.S.C. § 115(b)(1); *accord* 37 C.F.R. § 201.18(f)(3).  If the Copyright Office's records do identify an owner and an address, but the would-be user sends the notice to that address and the notice is returned or refused, the user may file the rejected notice with the Copyright Office, along with a statement that the notice was sent to the last address listed in the records, but was returned.  37 C.F.R. § 201.18(f)(2).

[108] 17 U.S.C. § 115(c)(1).

**Page 47**

ANT_BARTZ_000435449

files a registration or other record with the Copyright Office, at which point the work would no longer be an orphan work.[109]

It should be noted that section 115(c)(1)'s bright-line test for the availability of the royalty-free license captures non-orphan works as well as orphan works. The test is whether the owner's identity is reflected in the records of the Copyright Office: if it is not, the user is not liable for royalty payments. The would-be user's actual knowledge of the owner's identity is not relevant, so the user may file the notice with the Copyright Office even if the user has actual knowledge of the owner's identity and contact information.[110]  Similarly, the would-be user may file the notice with the Copyright Office even if a reasonable search would yield the identity of the owner and the owner's address, yet the information is unknown to the would-be user because the user failed to conduct any search other than a search of the records of the Copyright Office. In either of these situations, the work in question would not be an orphan work, yet would be subject to a royalty-free license pursuant to sections 115(b)(1) and (c)(1).

Sections 115(b)(1) and (c)(1) do not state expressly that the would-be user must conduct a search of the Copyright Office's records: they state only that the notice may be served on the Copyright Office if the records of the Copyright Office "do not identify" the owner, and that the owner "must be identified" in the records in order to be entitled to royalties. While this might leave open an interpretation that liability for royalties hinges on whether the records in fact reflected the information on the date notice was given (*i.e.*, regardless of whether the user actually conducted any search of the records to determine that fact), the regulations make clear that the would-be user is required to have an actual search of the records conducted.[111]

---

[109] The legislative history states that the requirement of filing an official document with the Copyright Office helps to ensure accurate payment should the owner appear. *See* H.R. Rep. 94-1476 at 109-110 (1976) (the owner does not receive the royalties until identified in the records of the Copyright Office because "proper identification is an important precondition of recovery").

[110] *See* 37 C.F.R. § 201.18(f)(4) (providing that, "alternatively," if the user knows the name and address of the owner, the user "may" serve the notice on the owner).

[111] *See* 37 C.F.R. § 201.18(d)(1)(vi) (the user must include in the notice "an affirmative statement that with respect to the nondramatic musical work named in the Notice of Intention, the registration records of the Copyright Office have been searched and found not to identify the name and address of the copyright owner of such work.").

ANT_BARTZ_000435450

The Copyright Office received over 350 notices pursuant to section 115(b)(1) in 2004 and 380 in 2005.[112]

### 3.  Section 504(c)(2) Limitation on Damages

Under section 504(a) and (b), a copyright owner is entitled to elect, in an action for infringement, between (a) actual damages plus any additional profits of the infringer (minus any overlap between these), or (b) statutory damages.  Section 504(c)(1) provides the basic range for statutory damages, but section 504(c)(2) provides for adjustments to that range in certain circumstances.  Where the infringement was willful, section 504(c)(2) provides for an increase in the upper limit of the range.  Conversely, section 504(c)(2) also provides for reduction of the bottom limit of the range in two circumstances:

> [1]  In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.  [2]  The court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords; or (ii) a public broadcasting entity which or a person who, as a regular part of the nonprofit activities of a public broadcasting entity . . . infringed by performing a published nondramatic literary work or by reproducing a transmission program embodying a performance of such a work.[113]

These provisions have been in the 1976 Act since its inception in 1976,[114] and have not raised any serious objection, either domestically or internationally.  Like many of the orphan works provisions proposed by commenters,[115] they limit otherwise-available infringement remedies based on the user's knowledge and the reasonableness of

---

[112] A small number of these notices did not relate to unidentified owners.

[113] With respect to the first circumstance, section 401(d) denies the "innocent infringer" defense where the infringer had access to a copy of the work bearing a copyright notice.  17 U.S.C. § 401(d).

[114] Pub. L. No. 94-553, § 504(c)(2), 90 Stat. 2541, 2585 (1976).  The minimum amount in the first sentence cited was raised from $100 to $200 in 1988.  Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853, 2860.

[115] *See infra* pages 69-92.

ANT_BARTZ_000435451

the user's beliefs. They reduce, in certain cases, the exposure that inevitably results from the uncertainty inherent in the flexible concept of fair use. For example, if the user is an employee of a library who is contemplating a use that will infringe a work if it is not fair use, but the user has reasonable grounds for believing, and actually does believe, that the contemplated use is fair use, the user can go forward with the use without fear of the ordinary minimum statutory damage award, which under section 504(c)(1) is $750. Section 504(c)(2)'s reduction of the minimum from $750 to zero can benefit the library in its planning, especially when multiple uses of multiple works come within this provision. This same benefit would apply when the library seeks to use an orphan work, and the library reasonably believes that the use is a fair use.

Section 504(c)(2) can thus directly benefit certain would-be users of orphan works (*e.g.*, libraries that contemplate uses for which they have reasonable grounds to believe are fair uses). It also provides a useful model for orphan works proposals that contemplate a limitation on remedies, because like many of these proposals, section 504(c)(2) encourages use of works by reducing infringement exposure in certain situations in which the user lacks certain information. In the case of section 504(c)(2), the information concerns whether the use is infringing; in the case of orphan works, the information concerns who the owner is, and whether that owner would consent to use.

### 4. Sections 203, 304(c), and 304(d)

Other provisions of the existing copyright law do not actually permit use of an orphan work, but they attempt to address situations similar to the orphan works situation – namely, situations in which a person with an interest in a work cannot be located. These are the termination provisions. Under section 203, an author of a work (or certain members of her surviving family) has an inalienable right to terminate a grant of a transfer or license of the copyright in the work (or of any right under a copyright), where the transfer was executed on or after January 1, 1978.[116] Section 304(c) provides a similar right to terminate a transfer of the renewal copyright of a work that was in its first or renewal term on January 1, 1978, and section 304(d) provides a similar right to terminate a transfer of the additional 20 years of protection provided by the Sonny Bono Copyright Term Extension Act of 1998.

---

[116] Certain exceptions apply.

**Page 50**

ANT_BARTZ_000435452

While the right to terminate is inalienable, the provisions require that the terminating party serve a notice on the grantee or the grantee's successor in order to effect the termination.  Since the grantee or her successor may have become unlocatable between the time of the grant and the time prescribed for the notice,[117] an author (or other terminating party) may not be able to serve the grantee or successor with the required notice.  In this situation, the regulations provide the following:

> The service provision of section 203, section 304(c) or section 304(d) of title 17, U.S.C., whichever applies, will be satisfied if, before the notice of termination is served, a reasonable investigation is made by the person or persons executing the notice as to the current ownership of the rights being terminated, and based on such investigation:
>
>> (i) If there is no reason to believe that such rights have been transferred by the grantee to a successor in title, the notice is served on the grantee; or
>>
>> (ii) If there is reason to believe that such rights have been transferred by such grantee to a particular successor in title, the notice is served on such successor in title.[118]

The regulation also specifies that "reasonable investigation,"

> [i]ncludes, but is not limited to, a search of the records in the Copyright Office; in the case of a musical composition with respect to which performing rights are licensed by a performing rights society, a 'reasonable investigation' also includes a report from that performing rights society identifying the person or persons claiming current ownership of the rights being terminated.[119]

Finally, the terminating party may serve the grantee or grantee's successor at an address "which, after a reasonable investigation, is found to be the last known address of the grantee or successor in title."[120]

These regulations are thus similar to section 108(h) and section 115.  They establish default rules for resolving where the termination notice may be served, and rely on the concept of reasonable investigation by the author as a prerequisite to the default

---

[117] The time span between a grant and a notice of termination will always be significant: at earliest, 25 years after the execution of the grant in the case of section 203, 46 years after the copyright was originally secured in the case of section 304(c), and 65 years after the copyright was originally secured in the case of section 304(d).

[118] 37 C.F.R. § 201.10(d)(2).

[119] § 201.10(d)(3).

[120] § 201.10(d)(1).

ANT_BARTZ_000435453

rule. As with section 108(h), the term "reasonable investigation" is used but not defined – although the regulation does provide certain minima that must be included in a reasonable investigation.

*       *       *

The statutory and regulatory provisions discussed in this Section of the Report either reduce (or eliminate) the legal sanctions against certain limited uses of orphan works, or address situations similar to the orphan works situation. In either instance, they provide useful models for crafting an omnibus orphan works provision.

## C.  Other Relevant Legal Considerations

The discussion above indicates that the current Copyright Act does not contain a provision designed to address the orphan works situation that is the subject of this study. While some provisions, like section 108(h), might address the question for some users in certain situations, in general a user faced with an orphan works situation will not find a specific section or other provision of the Act on which he might rely to make use of the work. In Section VI, we recommend a legislative amendment that would more comprehensively address the orphan works situation.

Nevertheless, we believe that the focus on developing legislative text to address orphan works should not obscure the fact that the Copyright Act and the marketplace for copyrighted works provide several alternatives to a user who is frustrated by the orphan works situation. Indeed, assessing whether the situations described in the comments were true orphan works situations was difficult, in part because there is often more than meets the eye in a circumstance presented as an orphan works problem. Many times in the comments there was not enough information as to whether the user considered all of the alternative legal solutions that might be applicable to her intended use of the work.

For purposes of developing a legislative solution we have defined the orphan works situation to be one where the use goes beyond any limitation or exemption to copyright, such as fair use. However, in practice, most cases will not be so neatly defined, and a user may have a real choice among several alternatives that allow her to go forward with her project: making noninfringing use of the work, such as by copying only elements not covered by copyright; claiming fair use; seeking a substitute work for which she has permission to use; or a combination of these alternatives. Indeed, the Authors

ANT_BARTZ_000435454

Guild provided survey data that users confronted by the orphan works situation make exactly these types of choices.[121]  In this section we describe some of those alternatives and how they might be applicable to different scenarios described in the comments.

### 1.  Section 102(b) -- The Idea/Expression Dichotomy

Section 102(b) embodies the idea/expression dichotomy in copyright law, making clear that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."[122]  In other words, copyright extends only to the expression contributed by the author, not to the ideas and facts contained in the work.  This distinction is critical to allowing subsequent creators and users build on an existing work by taking its ideas and facts to create new works of their own, and is one of the "traditional contours" of copyright that helps it to be compatible with and supportive of the First Amendment's guarantee of freedom of expression.[123]  Indeed, the public domain is enriched immediately by the creation of copyrighted works because those works reveal and explain ideas that are immediately available for use without copyright restriction, even though the copyright term will not expire for decades.[124]

The idea/expression dichotomy is especially important for works of non-fiction, such as historical and news accounts, and more "utilitarian" works like computer programs, textbooks, manuals and the like.  Much of the value in these works is the facts, ideas, systems, and methods described in them, not necessarily the particular expression embodied therein.  While copyright prevents a user from simply duplicating the exact words of the author, it does allow that user to restate the ideas, methods, concepts and other non-protected elements.  In most cases it is not difficult for a user to come up with a different expression of the same underlying facts or concepts without borrowing any

---

[121] Authors Guild (R135) at App. p. 13 (indicating that 47% of the time the user "made use of the work in a way that [she] believed was consistent with fair use rules," 21% of the time the user "paraphrased the text," 36% of the time the user "altered [her] work to avoid the copyrighted work entirely," found a different work to use, or a combination of these choices).

[122] 17 U.S.C. § 102(b).

[123] *Eldred v. Ashcroft*, 537 U.S. 186, 219-21 (2003).

[124] *Id.* at 219 ("[E]very idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication.").

ANT_BARTZ_000435455

protected expression from the author.  It is for this reason that such copyrights are often referred to as "thin" copyrights.

Computer programs are good examples of copyrighted works for which the idea/expression dichotomy is highly relevant.  Under section 102(b), copyright does not extend to the functional aspects of a computer program, only the expression contained therein, which includes the literal source and object code, plus any structure, sequence and organization that is original.  Someone can develop a computer program that performs the same functions as another copyrighted program but without taking any of the protected expression contained in that underlying work. [125]

We received numerous comments from individuals who cited computer programs as examples of orphan works, typically where the company that produced the software had gone out of business and the copyright owner of the program could not be located.[126] Such software was often termed "abandonware."  In some examples the user could have (and in fact did) write his own code to interface with the existing work or duplicate its features and functions.[127]  Similarly, other commenters described their efforts to compile and maintain documentation and manuals for older computer hardware and software.[128] Manuals and documentation, like the computer programs, are full of facts and ideas not subject to copyright which a user can paraphrase, excerpt or summarize without copyright liability.

To be sure, the line between idea and expression is not fixed and bright, but a gray area that requires judgment and therefore entails uncertainty as to whether the user has taken only ideas and concepts.  Moreover, a user who simply wishes to reproduce works wholesale into her works, even works with a "thin" copyright, is likely reproducing some copyrighted expression that would require permission or exemption.  Nevertheless, the doctrine is real and has been successfully invoked by many defendants in copyright

---

[125] *See, e.g., Lotus Dev. Corp. v. Borland Int'l*, 49 F.3d 807 (1st Cir. 1995), *aff'd by an equally divided court*, 516 U.S. 233 (1996); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992).

[126] *See* Mahan (233).

[127] *See* Andre (315) (describing how when owner of portions of code cannot be found, the code is rewritten); Berry (608) (describing how users of a typesetting program "TeX" rewrite code for "add-on packages" when the owner of that code cannot be found).

[128] *See* Jones (157).

---

**Page 54**

ANT_BARTZ_000435456

cases.[129]  In fact, the uncertainty over the application of the idea/expression dichotomy is faced by both copyright owners and copyright users, and thus users may benefit from the uncertainty if it prompts a copyright owner not to bring action against a work that attempts to copy only idea and not expression.  A user in the orphan works situation should consider whether the idea/expression dichotomy might allow her to go forward without permission from the absent copyright owner.[130]

### 2.  Section 107 -- Fair Use

Section 107 embodies the "fair use" doctrine in copyright law, another common law doctrine that the Supreme Court has referred to as a "traditional contour" of copyright.[131]  It provides an essential safeguard to ensure that copyright does not stifle uses of works that enrich the public, such as "criticism, comment, news reporting, teaching, scholarship, or research."[132]  Along with the idea/expression dichotomy, fair use is one of copyright's important First Amendment accommodations.[133]

Section 107 does not define fair use; rather, it sets out a list of nonexclusive factors that a court is to consider in determining whether a particular use is fair.  The intent of Congress in the 1976 codification was to preserve the existing common law development of the doctrine and allow courts after 1976 to continue the process of assessing fair use claims on a case-by-case basis.[134]

As with the idea/expression dichotomy, the case-by-case nature of fair use may generate uncertainty as to its application in a particular circumstance.  In the Notice of

---

[129]  Indeed, as Judge Patel of the Northern District of California recently concluded, that idea/expression distinctions "require a certain degree of judicial interpretation is not merely permissible – it is a bedrock assumption of our common law system."  *See Aharonian v. Gonzales*, No. C 04-5190 MHP, 2006 U.S. Dist. LEXIS 13 at *18 (N.D. Cal. Jan. 3, 2006).

[130] As described in more detail in Section VI, our recommendation to address orphan works is fully compatible with existing doctrines like the idea/expression dichotomy and other copyright limitations.  A user can rely on section 102(b) as a first line of defense, and if she is unsuccessful in that argument can then invoke the limitations on remedies provided in our recommendation, so long as she meets the requirements specified therein.

[131] *Eldred*, 537 U.S. at 221.

[132] 17 U.S.C. § 107.

[133] *Eldred*, 537 U.S. at 219.

[134] *See* H.R. Rep. 94-1476, at 66 (1976) ("Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis.  Section 107 is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way.").

ANT_BARTZ_000435457

Inquiry, we observed that users had expressed concern over the uncertain nature of fair use and the idea/expression dichotomy, and that this uncertainty contributes to a user's hesitation in using an orphan work. Some commenters in this proceeding confirmed that view,[135] although there were some who described situations that seemed to fall squarely within classic fair use situations that should not have given those users any pause in whether they could use the work.[136]

Note, however, that as with section 102(b), uncertainty in the application of fair use cuts both ways, and may prompt a copyright owner not to pursue an infringement claim against a user for fear that the use might be ruled fair by a court. Moreover, the fair use doctrine has a long pedigree and precedents to help inform users as to what types of uses might be fair or not, and one can obtain guidance from these precedents. For example, a "Best Practices in Fair Use" report was recently developed by groups involved in documentary filmmaking to help give guidance to such users about the scope and limits of fair use in that context.[137]

We stress that the presence of an orphan works provision should not act as a substitute or replacement for fair use. The user of an orphan work should consider whether her use might fall within fair use, or curtailing her use in a way to have it more clearly fall within the exemption, in addition to or in lieu of reliance on any orphan works provision.

### 3.   Other Exemptions

Many comments also described situations where a proposed use of an orphan work might be subject to other exemptions in the Copyright Act. For example, use of an orphan work by a library or archive might be covered by section 108, which contains

---

[135] College Art Association (647) at 5.

[136] *See, e.g.,* Lopresti (115) (author of a book about the Pacific Northwest who wishes to quote many sources appears to be making transformative fair use of works for scholarship and commentary purposes); Heitmann (182) (novelist and playwright afraid to quote someone for fear of being sued, but such use seems well within fair use protection for commentary and criticism, particularly in transformative works); and McPherson (325) (author of an article on abilities and foibles of old computer hardware wanted to use manuals, specifications, guides and articles with unlocatable owners, apparently in traditional fair use scholarship, commentary and research ways).

[137] American University Center for Social Media, *Documentary Filmmakers' Statement of Best Practices in Fair Use* (Nov. 18, 2005), available at http://www.centerforsocialmedia.org/rock/backgrounddocs/bestpractices.pdf.

---

**Page 56**

ANT_BARTZ_000435458

other exemptions and limitations related to preservation, replacement and patron use, in addition to the "orphan works" provision in section 108(h) described above.[138]   Other commenters presented scenarios that might fall within one of the educational and religious exemptions in section 110.[139]   Section 117 permits owners of a copy of a computer program to make a copy of and adaptation to the program in certain circumstances which might be applicable to the types of situations involving "abandonware" described above.[140]

### 4.   Determining the Copyright Status of the Work

Another common question raised by many of the scenarios presented to us is whether the works described were in fact in the public domain and thus needed no permission for use.   For example, one project described a film project involving the history of postcards from the 1890s to 1960s, which on the surface appears to involve many works that are now in the public domain.[141]   Other examples include the use of a diary from a Civil War soldier[142] and sheet music from a Gilbert & Sullivan musical.[143] As noted above, we recognize that determining whether an older work has fallen into the public domain under the provision of the 1909 Act can in specific cases be difficult and complex.   In most cases, however, one can quickly ascertain whether an older work is still under copyright.   The Copyright Office's Circular 22, "How to Investigate the Copyright Status in a Work", provides the starting point for such an investigation.[144]

---

[138] 17 U.S.C. § 108.   In 2005, the Section 108 Study Group was formed to examine whether and how that section needs to be amended to account for changes wrought by digital technology.   Sponsored by the Library of Congress and the Copyright Office, the Study Group hopes to have recommendations published in 2006.   *See* http://www.loc.gov/section108/ to follow the workings of this group.

[139] *See* Collins (219) (describing use of various musical works in religious services that might be covered by the section 110(3) exemption for performance in such settings); Deutsch (460) (describing desire to have musical recordings required for a college course made available to students via the Internet, which may be covered by sections 110(1) and 110(2)).

[140] 17 U.S.C. § 117(a)(1).

[141] Goodman Associates (46).

[142] McGowan (218).

[143] Willisson (430).

[144] *See supra* note 49.

ANT_BARTZ_000435459

### 5. Substitutes for the Work

A user faced with an orphan work might be in the position to consider whether he could replace the orphan work with another work for which he has permission to use. Of course, in many cases the nature of the project or artistic choice might demand use of that particular orphan work, but some comments indicated that alternative works can be used. The public domain can be source of such alternative works. For example, one commenter described how she was preparing a website that chronicled the life of Queen Charlotte of England but was not able to obtain permission to use a copyrighted image of a portrait of the Queen. Instead, she used a public domain black-and-white lithograph from a 1911 book instead. Similarly, she received no response to a request to use photographs of royal residences from a book published in the 1970s, so she instead relied on public domain engravings of those residences from 1819.[145]

The marketplace can also offer substitutes for an orphan work. For example, photography and illustration archives offer images that might meet the user's needs. Many works are made available on the Internet under a Creative Commons license that generally permit a wide range of re-use in new projects.[146] One commenter described how his frustration with obtaining permissions for sound and images for use in developing educational software led him to create his own sounds and images and offer them to other users via free licenses.[147] If the orphan work is not indispensable to the user's project, a substitute work may be the most efficient solution.

*    *    *

The purpose of this subsection is to place the orphan works issue in its practical context, where the process of creating and making works available to the public is usually a complex and dynamic situation with few black-and-white choices. A robust and effective solution to the orphan works problem must be developed with that full picture in mind. It is important to remember that the current law and marketplace can offer the orphan work user a meaningful and effective solution which, in many cases, does not

---

[145] Wessel (567).

[146] *See* Save the Music/Creative Commons (643) (describing Creative Commons licenses).

[147] Hart (278).

ANT_BARTZ_000435460

appear at first glance. It is our hope that the orphan works amendment we recommend becomes another effective solution available to users in the orphan works situation.

### D. International Context

Development of any omnibus orphan works provision must keep in mind the United States' international law obligations that relate to copyright. Those obligations are found primarily in the major multilateral treaties dealing with copyright: the Berne Convention for the Protection of Literary and Artistic Works (Paris 1971) ("Berne"), the World Trade Organization ("WTO") Agreement on the Trade-related Aspects of Intellectual Property Rights (1994) ("TRIPS")[148]; the WIPO[149] Copyright Treaty (1996) ("WCT"); and the WIPO Performances and Phonograms Treaty (1996) ("WPPT"). These treaties require, among other things, signatory countries to provide certain minimum copyright rights to authors (and right holders) who are nationals of other signatory countries. They also contain rules that govern the acquisition of those rights, the scope of any exceptions to those rights, and the remedies that must be afforded to right holders.

It is possible for the United States to comply with these obligations by imposing conditions that might violate a treaty only on United States works and not on foreign works, as is done with the requirement that a work be registered prior to suit for copyright infringement in section 411(a).[150] We do not believe such an approach should be taken with orphan works, for several reasons. First, excluding foreign works from the orphan works system would exclude a large class of works for which locating the copyright owner is often very difficult. Second, introducing distinctions between United States and foreign works adds complexity to copyright law that should be avoided. Third, that approach discriminates against United States copyright owners and their works. Finally, as described in Section VI, we believe our recommendation is fully consistent with treaty obligations.

---

[148] *See supra* note 96.

[149] "WIPO" is an acronym for World Intellectual Property Organization.

[150] 17 U.S.C. § 411(a).

ANT_BARTZ_000435461

### 1. Formalities

Berne has long imposed the rule that "[t]he enjoyment and the exercise" of the rights guaranteed by Berne "shall not be subject to any formality . . . ."[151]  The concept of "formalities" is flexible:

> Formalities are any conditions or measures – independent from those that relate to the creation of the work (such as the substantive condition that a production must be original in order for it to qualify as a protected work) or the fixation thereof (where it is a condition under national law) – without the fulfillment of which the work is not protected or loses protection.  Registration, deposit of the original or a copy, and the indication of a notice are the most typical examples.[152]

The TRIPS Agreement incorporates this rule:  it is thus part of the United States' WTO obligations as well as a Berne obligation.[153]  Finally, WCT requires all parties to comply with (among other things) Berne Article 5(2), and WPPT expressly bans formalities.[154]

For many years, U.S. copyright law did condition copyright protection on compliance with the very sort of formalities Berne prohibited – registration, deposit of copies, and notice[155] – and thus did not conform to the Berne rule.  During this period, the United States was not a party to Berne.  However, in 1988, the United States acceded to Berne and passed the Berne Convention Implementation Act ("BCIA").[156]  Under the

---

[151] Berne art. 5(2).  The provision of Berne was added at the 1908 Berlin revision conference of Berne.  Sam Ricketson, *The Berne Convention for the Protection of Literary and Artistic Works:  1886-1986*, 219-20, 222 (1987); Mihaly Ficsor, *Guide to the Copyright and Related Rights Treaties Administered by WIPO*, ¶ BC-5.5, at 41 (2003).

[152] Ficsor, *supra* note 151, ¶ BC-5.7 at 41; *accord* Ricketson, *supra* note 151 at 222 (formalities are "everything which must be complied with in order to ensure that the rights of the author with regard to his work may come into existence" (quoting the German delegate at the 1884 Diplomatic Conference)).

[153] *See* TRIPS art. 9(1).

[154] *See* WCT art. 1(4); WPPT art. 20.

[155] *See, e.g.*, 17 U.S.C. §§ 10 (copyright may be secured by publication with notice), 12 ("Copyright may also be had of the works of an author, of which copies are not reproduced for sale, by the deposit, with a claim of copyright, [of certain copies]"); 13 (requiring prompt deposit of copies of all works in which copyright was secured pursuant to § 10), 14 (if the copies required by § 13 are not deposited, the Copyright Office may require the proprietor of the copyright to deposit them, and if the proprietor does not the proprietor shall be liable for a fine, "and the copyright shall become void"), 19 (prescribing form of notice) (1975).

[156] *See supra* note 94.

---

**Page 60**

ANT_BARTZ_000435462

BCIA (and under current law), neither registration nor publication with notice is required for copyright to subsist in a work.[157]

Any legislative solution to the orphan works problem, therefore, must not require an author to comply with formalities if failure to comply with those formalities would result in the author becoming unable to enjoy or exercise the copyright in the work.  A prohibited formality could prevent the formation of rights, or divest existing rights later in the life of the copyright.  For example, if an orphan works statute required that, promptly after creation or publication, all works be registered with the Copyright Office and that all unregistered works be deemed orphan works, which automatically and permanently fall into the public domain (resulting in a complete loss of rights for the author), Berne's rule against formalities would be implicated, and violated.  If an orphan works statute provided that works not bearing a certain prescribed notice (for example a statement that the author does not intend for the work to be treated as an orphan work) be deemed orphan works and automatically and permanently fall into the public domain, the rule against formalities would also be violated.  A requirement that the author file a renewal registration midway through the minimum term of protection mandated by Berne in order to enjoy the remainder of the term would also violate the rule.  Finally, Berne forbids a situation in which a formality must be complied with in order to bring a legal proceeding to enforce the copyright:  in this case, the "exercise" of the right is being conditioned on compliance with the formality.[158]  Each of these limitations must be kept in mind when considering legislative solutions to the orphan works problem.

### 2.  The "Three-Step Test"

In addition to the ban on formalities imposed by the international copyright system, the other major obligation of that system relates to the scope of limitations and exceptions to copyright a country can enact.  Under Berne, different limitations and exceptions are allowed for each substantive right.  For example, members may provide limitations and exceptions to the reproduction right only "in certain special cases, provided that such reproduction does not conflict with a normal exploitation of the work

---

[157] *See* 17 U.S.C. § 408(a) (registration "is not a condition of copyright protection") (2005).

[158] *See* Ricketson, *supra* note 151, at 223.

ANT_BARTZ_000435463

and does not unreasonably prejudice the legitimate interests of the author."[159]  The Berne public performance right, on the other hand, is subject to exceptions under the "minor exceptions" or "minor reservations" doctrine, which allows certain users to make certain *de minimis* musical performances without the permission of the copyright owner:  for example, concerts by military bands.[160]

The Berne reproduction exception test has come to be known as the "three-step test":  the first step being "certain special cases," the second, "does not conflict with a normal exploitation of the work," and the third, "does not unreasonably prejudice the legitimate interests of the author."[161]  Although originally applicable only to the reproduction right under Berne, the test has now come to apply, through TRIPS, "horizontally" to copyright limitations and exceptions generally.[162]  Under TRIPS, the three-step test is made applicable to all exclusive rights.[163]  The WCT likewise provides that any exceptions to the new rights granted under the WCT will be subject to the three-step test, and further provides that parties to the WCT, when applying Berne, will confine any limitations of, or exceptions to, Berne rights to those that pass the three-step test.[164]  Similarly, WPPT provides that any exceptions to the new rights granted under the WPPT will also be subject to the three-step test, and further provides that parties to the WPPT will provide the "same kinds of limitations or exceptions with regard to the protection of performers and producers or phonograms as they provide for … in connection with the protection of copyright in literary and artistic works."[165]  Finally, the WCT and WPPT each contain Agreed Statements that explain the applicability of Berne exceptions  to the rights protected by those treaties:

---

[159] Berne art. 9(2).

[160] Ficsor, *supra* note 151, ¶ BC-11.12 to BC-11.15, at 70.

[161] *See generally* Standing Committee on Copyright and Related Rights, *WIPO Study on Limitations and Exceptions of Copyright and Related Rights in the Digital Environment* 20-27 (2003) (WIPO Doc. No. SCCR/9/7).

[162] *Id.* at 65.

[163] *See* TRIPS art. 13 ("Members shall confine limitations or exceptions to exclusive rights to certain special cases which do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the right holder.").

[164] *See* WCT art. 10.

[165] WPPT art. 16.

**Page 62**

ANT_BARTZ_000435464

> It is understood that the provisions of Article 10 permit Contracting Parties to carry forward and appropriately extend into the digital environment limitations and exceptions in their national laws which have been considered acceptable under the Berne Convention.  Similarly, these provisions should be understood to permit Contracting Parties to devise new exceptions and limitations that are appropriate in the digital network environment.
>
> It is also understood that Article 10(2) neither reduces nor extends the scope of applicability of the limitations and exceptions permitted by the Berne Convention.[166]

Guidance as to the meaning of each of the three steps in the test can be found in the panel report in the WTO trade dispute concerning section 110(5) of the U.S. Copyright Act.[167]  In that dispute, the European Union argued that the exception to copyright protection found in section 110(5) (as amended in 1998 by the Fairness in Music Licensing Act)[168] violated TRIPS' requirement that parties comply with Berne.[169] The panel held in favor of the European Union with regard to section 110(5)(B), stating that it violated TRIPS Article 13 and Berne.[170]  In the course of its holding, the panel made numerous statements regarding the meaning of TRIPS Article 13's three-step test, many of which are instructive for an orphan works regime.

"Certain Special Cases":  The panel held that the term "certain" requires that "an exception or limitation in national legislation must be clearly defined. … However, there is no need to identify explicitly each and every possible situation to which the exception could apply, provided that the scope of the exception is known and particularised."[171] The term "special" requires that the exception or limitation "must be limited in its field of application or exceptional in its scope.  In other words, an exception or limitation should be exceptional in [a] quantitative as well as a qualitative sense.  This suggests a narrow

---

[166] WCT Agreed Statement Concerning Article 10; WPPT Agreed Statement Concerning Article 16 (incorporating same by reference).

[167] *See* World Trade Organization, *United States – Section 110(5) of the US Copyright Act, Report of the Panel* ("WTO 110(5) Panel Report") (June 15, 2000) (WTO Doc. No. WT/DS160/R).

[168] Pub. L. No. 105-298, 112 Stat. 2827, 2830 (Oct. 27, 1998).

[169] *See* WTO Panel Report, *supra* note 167, at ¶¶ 3.1 – 3.2.

[170] *Id.* ¶ 7.1(b).

[171] *Id.* ¶ 6.108.

ANT_BARTZ_000435465

scope as well as an exceptional or distinctive objective."[172]  While the legislative objective must be distinct, it is not necessary to show that it was legitimate in a normative sense.[173]

"Do Not Conflict with a Normal Exploitation of the Work":  The panel held that the term "exploitation" means "the activity by which copyright owners employ the exclusive rights conferred on them to extract economic value from their rights to those works."[174]  "Normal" exploitation "clearly means something less than full use of an exclusive right."[175]  Each exclusive right should be judged individually when considering whether a limitation or an exception conflicts with a normal exploitation of a work.[176] Uses conflict with a normal exploitation of the work when the owner would ordinarily expect to receive compensation for the uses, but also when "uses, that in principle are covered by that right but exempted under the exception or limitation, enter into economic competition with the ways that right holders normally extract value from that right to the work (*i.e.*, the copyright) and thereby deprive them of significant or tangible commercial gains."[177]  Finally, consideration of potential as well as actual economic effects of the exception or limitation is appropriate in some circumstances.[178]

"Do Not Unreasonably Prejudice the Legitimate Interests of the Right Holder": The panel held that an "interest" is a legal right to a property, or to use or benefit from a property, but also includes more generally "something that is of some importance to a natural or legal person."[179]  The term "legitimate" means that the interest must be a legally valid interest, but also must be "justifiable in the light of the objectives that

---

[172] *Id.* ¶ 6.109.

[173] *Id.* ¶ 6.112; *but cf.* Ricketson, *supra* note 151, at 482 (construing the three-step test of Berne Article 9(2) and stating that "special" means that the exception or limitation "is justified by some clear reason of public policy or some other exceptional circumstance").

[174] WTO 110(5) Panel Report ¶ 6.165.

[175] *Id.* ¶ 6.167.

[176] *Id.* ¶ 6.173.

[177] *Id.* ¶¶ 6.176, 6.183; *but cf.* Ricketson, *supra* note 151, at 483 (the three-step test of Berne 9(2) does not ban uses "which do not form part of [the author's] normal mode of exploiting the work – that is, uses for which he would not ordinarily expect to receive a fee – even though they fall strictly within the scope of his reproduction right").

[178] WTO 110(5) Panel Report ¶¶ 6.185 – 188.

[179] *Id.* ¶ 6.223.

**Page 64**

ANT_BARTZ_000435466

underlie the protection of exclusive rights."[180]  Finally, "prejudice to the legitimate interests of right holders reaches an unreasonable level if an exception or limitation causes or has the potential to cause an unreasonable loss of income to the copyright owner."[181]

While the panel's statements are not necessarily conclusively authoritative, they are at least evidence of the manner in which a future WTO panel might interpret TRIPS Article 13, and may also influence other decisionmakers.

### 3. Berne Provisions Related to Remedies

Berne requires, as a base-line minimum, certain substantive rights (for example, the rights of reproduction, public performance, adaptation, and broadcasting) but Berne does not provide many rules related to the enforcement of those rights.[182]  It requires such things as "national treatment" for works protected under the Convention[183] and a presumption of authorship in infringement actions,[184] but in terms of specific remedial requirements provides only a few rules related to seizure of infringing copies.[185] Generally, "the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed."[186] Therefore, analysis of whether an orphan works provision complies with Berne will, generally, not center on whether the provision contradicts a requirement for a specific

---

[180] *Id.* ¶ 6.224.

[181] *Id.* ¶ 6.229.

[182] *See* Paul Goldstein, INTERNATIONAL COPYRIGHT: PRINCIPLES, LAW AND PRACTICE § 5.6 (2001).

[183] Berne art. 5(1).  National treatment requires that, with respect to works protected under Berne, an author enjoys the same rights in any Berne country as the nationals of that country enjoy (as well as the minimum rights enumerated by Berne).

[184] *Id.* art. 15(1) ("In order that the author of a literary or artistic work protected by this Convention shall, in the absence of proof to the contrary, be regarded as such, and consequently be entitled to institute infringement proceedings in the countries of the Union, it shall be sufficient for his name to appear on the work in the usual manner.")

[185] *Id.* arts. 16 ("(1) Infringing copies of a work shall be liable to seizure in any country of the Union where the work enjoys legal protection.  (2) The provisions of the preceding paragraph shall also apply to reproductions coming from a country where the work is not protected or has ceased to be protected.  (3) The seizure shall take place in accordance with the legislation of each country."); 13(3) (recordings made pursuant to the compulsory license in Article 13 "and imported without permission from the parties concerned in the country where they are treated as infringing recordings shall be liable to seizure.").

[186] *Id.* art. 5(2); *see also id.* art. 6*bis*(3).

ANT_BARTZ_000435467

form of remedy;  rather, it will be center on whether the provision significantly undermines any of the minimum required rights, and, if it does, whether it comes within one of the acceptable exceptions.

### 4.   TRIPS Provisions Related to Remedies

Unlike Berne, TRIPS contains (in Part III) numerous provisions expressly dedicated to enforcement of copyright (as well as other intellectual property rights).[187] Under TRIPS, World Trade Organization Members are required to "make available to right holders civil judicial procedures concerning the enforcement of" copyright and certain other intellectual property rights,[188] and to "provide for criminal procedures and penalties to be applied at least in cases of wilful . . . copyright piracy on a commercial scale."[189]  These procedures must be "available under [Members'] law so as to permit effective action against any act of infringement of intellectual property rights covered by this Agreement, including expeditious remedies to prevent infringements and remedies which constitute a deterrent to further infringements."[190]  These procedures must be "fair and equitable."[191]

The civil judicial procedures must satisfy numerous procedural and evidentiary minima.[192]  Regarding injunctions, TRIPS requires that the "judicial authorities . . . have the authority to order a party to desist from infringement.[193]  The judicial authorities must also have "the authority to order the infringer to pay the right holder damages adequate to compensate for the injury the right holder has suffered because of an infringement of that person's intellectual property right by an infringer who knowingly,

---

[187] *See* TRIPS arts. 41- 61.  *See generally* Ficsor, *supra* note 151, at 11 ("[T]he TRIPS Agreement includes two new elements of historical importance, which had been missing from the international system of intellectual property protection; namely, first, its Part III (Articles 41 to 61) contains detailed norms on enforcement of intellectual property rights, and, second, it extends the efficient WTO dispute settlement system to intellectual property rights . . . ."); Goldstein, *supra* note 182, §§ 5.6.1. – 5.6.3.; Daniel Gervais, *The TRIPS Agreement: Drafting History and Analysis* 195-235 (1998).

[188] TRIPS art. 42.

[189] *Id.* art. 61.

[190] *Id.* art. 41.

[191] *Id.* arts. 41(2).

[192] *Id.* arts. 41 – 43.

[193] *Id.* art 44(1).  This authority is not required where the protected subject matter was "acquired or ordered by a person prior to knowing or having reasonable grounds to know that dealing in such subject matter would entail infringement of an intellectual property right." *Id.*

---

Page 66

ANT_BARTZ_000435468

or with reasonable grounds to know, engaged in infringing activity."[194] TRIPS mandates other powers for the judicial authorities as well, including the power to order "provisional measures" (*i.e.* emergency measures taken to prevent an infringement or to preserve evidence of an infringement).[195]

For criminal actions, TRIPS mandates deterrent sentences of imprisonment and/or monetary fines, and, "in appropriate cases," seizure, forfeiture and destruction of the infringing goods and "any materials and implements the predominant use of which has been in the commission of the offence."[196]

Finally, TRIPS includes numerous requirements related to seizure by the customs authorities of infringing goods.[197]

Therefore, analysis of an orphan works provision under TRIPS must include an analysis not only of whether the provision complies with the minimum rights and allowable exceptions in Part II of TRIPS, but also an analysis of whether the remedies provided to the owner of the orphan work comport with the enforcement provision in Part III of TRIPS (unless the orphan works provision comes within a permissible exception to copyright, in which case the enforcement provisions are inapplicable).

### 5.    WIPO Internet Treaties Provisions Related to Remedies

WCT and WPPT contain identical provisions that require signatory countries to "ensure that enforcement procedures are available under their law so as to permit effective action against any act of infringement of rights covered by this Treaty, including expeditious remedies to prevent infringements and remedies which constitute a deterrent to further infringements."[198] Because these provisions mimic TRIPS Article 41, and because TRIPS provides much greater additional detail, as a practical matter compliance with the WCT and WPPT enforcement provisions will be subsumed within compliance

---

[194] *Id.* art. 45(1). The judicial authorities must also be authorized to order the infringer to pay the right holder's expenses, which may include appropriate attorney fees; judicial authorities may also be authorized to order recovery of profits and/or payment of pre-established damages. *Id.*

[195] *Id.* arts 46-48, 50.

[196] *Id.* art. 61.

[197] *Id.* arts. 51-60.

[198] WCT art. 14(2); WPPT art. 23(2).

ANT_BARTZ_000435469

with TRIPS, and an orphan works provision that complies with TRIPS will almost certainly comply with WCT and WPPT.

*        *        *

In considering legislative solutions to the orphan works problem it is important to keep in mind the requirements of the international instruments to which the United States has agreed:  exercise and enjoyment of a copyright right cannot be conditioned on a formality, any exceptions or limitations on copyright must conform to the three-step test, and the effect on the owner's remedies must comply with the various remedy rules.

ANT_BARTZ_000435470

## V. Description of Proposed Solutions

This Section of the Report summarizes the solutions proposed in the public comments received in response to the orphan works Notice of Inquiry, dated January 26, 2005 (the "NOI").[199]  It is not a comprehensive account of every solution proposed in the comments:  rather, it is designed to serve as a narrative summary of all of the major issues raised.

The public comments contained a great variety of proposed solutions.  These solutions can be grouped into four categories:

- Solutions that already exist under current law and practice.  These were usually noted only in passing;  commenters (even commenters opposed to any orphan works provision) did not take the position that the existing law is sufficient to solve the orphan works problem.

- Non-legislative solutions.  An example of a solution in this category is a proposal for improved databases for locating owners of works.  These solutions were also usually noted only in passing, and were not advanced as sufficient to fix the problem.

- Legislative solutions that involve a limitation on remedies when a user uses an orphan work.  The most substantive comments fell into this category, and most of the comments by professional organizations or academics fell into this category.

- Other legislative solutions.  Examples of proposed solutions in this category are deeming all orphaned works to be in the public domain, or changing the tax or bankruptcy codes to reduce the factors that cause orphan works to come into existence in the first place.

Additional detail concerning these four categories is provided below.

### A.  Existing Solutions

#### 1.  Statutes and Regulations

A few commenters noted some of the existing solutions discussed in Section IV, including sections 108(h),[200] 115(b),[201] 302(e),[202] and 504(c).[203]  They also noted that

---

[199] Both the initial comments and the reply comments are summarized.  Citations to some of the comments are provided in the footnotes, but these are illustrative, not comprehensive, i.e., not every comment that supported the position noted is cited.  In the citation, the name of the commenter is followed by the number assigned to the comment on the U.S. Copyright Office's website.  The letter "R" before the number indicates a reply comment.

[200] Kernochan Center for Law, Media and the Arts, Columbia University School of Law ("Kernochan") (666); Consortium of College & University Media Centers ("CCUMC") (667); Library of

ANT_BARTZ_000435471

certain statutory licenses other than section 115 can also permit use of orphan works,[204] and that the statute of limitations in section 507(b) would make damages unavailable against an orphan work user (or any other user) following three years after the claim of infringement accrued.[205]  As noted above, however, essentially no commenters took the position that existing solutions were adequate to solve the orphan works problem.

## B.  Non-Legislative Solutions

Some commenters proposed solutions that would not require any legislative change.  A significant number argued that the orphan works problem would be improved if the Copyright Office's pre-1978 records were made available on-line, in the manner in which its post-1978 record are.[206]  Other commenters had even more ambitious suggestions for the Copyright Office:  for example, they recommended that the Copyright Office:  establish a database of corporate mergers, so ownership of works made for hire can be traced more easily;[207] digitize Copyright Office deposits and place thumbnail images of them on-line;[208] and provide a lineage of ownership for every copyright.[209]  Other commenters recommended new databases that might or might not be operated by the Copyright Office:  for example, they advocated publication of lists of all works as they were about to fall into the public domain;[210] and a database of all works in the public domain.[211]

---

Congress ("LOC") (630) at 2, 8; Stanford University Libraries ("Stanford") (457 & R111) (proposing changes to section 108(h)).

[201] Recording Industry Association of America ("RIAA") (687).

[202] Field (34); College Art Association ("CAA") (647) at 31 n.83; LOC (630); Kernochan (666).

[203] The J. Paul Getty Trust, The Metropolitan Museum of Art, and the Solomon R. Guggenheim Foundation ("Getty") (610).

[204] RIAA (687) (noting that orphan work use is possible under sections 112 and 114).  *See also supra*, note 99.

[205] The American Society of Composers, Authors and Publishers ("ASCAP") (R106).

[206] RIAA (687); Motion Picture Association of America ("MPAA") (646), AIVF (663), Kernochan (666); UCLA Film and Television Archive ("UCLA") (638).

[207] Kernochan (666).

[208] The American Society of Media Photographers ("ASMP") (668).

[209] Bailey (26).

[210] Sincaglia & O'Shell (587).

[211] Grove (331); McKamey (95).

ANT_BARTZ_000435472

Several of the comments focused on ways in which the orphan works problem could be reduced by changing Copyright Office regulations and/or procedures. Commenters recommended that the Copyright Office provide guidance to people who want to reduce their rights and/or donate works to the public domain,[212] establish a system of unique identifiers for all written and visual works (similar to ISBN numbers),[213] clarify and simplify procedures for registering freelance contributions to periodicals,[214] provide a suggested clause for wills that would allocate rights in copyrights specifically, and send a copy of this clause with every certificate of registration.[215]

As with the comments that focused on existing solutions, however, there was little suggestion that the non-legislative solutions, standing alone, would adequately solve the orphan works problem.

### C. Legislative Solution: Limitation on Remedies

Many commenters proposed a limitation-on-remedies solution to the orphan works problem. These commenters first addressed the criteria for designating a work as an orphan, then discussed the consequences of that designation in terms of the limitations on remedies available to a resurfacing owner.

#### 1. Criteria for Designation of a Work as Orphaned

##### a. The Requirement of a Search for the Owner

Almost every commenter who advocated a limitation-on-remedies system agreed that a fundamental requirement for designation of a work as orphaned is that the prospective user have conducted a search for the owner of the work, and that the search result in the owner not being located. Indeed, this requirement seems to flow naturally from the NOI's definition of orphan work ("copyrighted works whose owners are difficult or even impossible to locate"). The commenters differed, however, in the types of searches they would consider adequate.[216]

---

[212] Ramos (39).

[213] Perkins (205).

[214] Science Fiction and Fantasy Writers of America, Inc. ("SFFWA") (607).

[215] SFFWA (607).

[216] One commenter, however, argued against even requiring a search. The argument was that it is inefficient to require searches for owners of works if the works are in categories of works that are highly

ANT_BARTZ_000435473

"Case-by-case" versus "Formal" Approaches. One overriding issue (noted in the NOI) is whether a "case-by-case" standard should apply, or a "formal" standard.[217] Many were in favor of a case-by-case system;[218] one argued that the definition of a reasonable search will vary greatly depending on the category of the work, and it will be impossible to prescribe *ex ante* the searches that will be adequate for each category.[219] Another attacked the formal system as a dramatic reversal of the current copyright regime, in which an owner need not perform any positive act to preserve his rights; under a formal regime, they argued, every owner would as a practical matter be required to keep contact information publicly available in order to avoid having his or her works become subject to the orphan work provision.[220]

Several others were in favor of the formal approach;[221] one argued that it places the burden of keeping contact information current on the party best able to bear it: the owner of the copyright.[222] Supporters of formal systems argued and supporters of case-

---

unlikely to be of continuing commercial interest to the owner. Moreover, requiring a search will make large projects that lack large budgets unfeasible. This commenter argued in favor of establishing definite criteria for orphan work status, which would include objective criteria such as the age of the work, whether it was being exploited commercially, and whether it was listed on certain voluntary registries, but also argued that no actual search for the owner should be required if those objective criteria were true at the time of the use. *See* Harvard University Library (639).

[217] Under a "case-by-case" standard, the user's search is judged on a case-by-case basis, *i.e.* the adequacy of a search for an owner is considered *ad hoc*, with reference to the circumstances prevailing at the time of the search. Under the "formal" approach, there is a pre-set list of required searches, and once the user performs those searches without success, the work is deemed orphaned. It should be noted that the case-by-case versus formal issue can be separated conceptually from the issue of registries, even though the two issues were often combined in the comments. For example, a formal system could consist in allowing use of an orphan work if searches are conducted according to a pre-determined list of searches, but the list did not include a search of a designated orphan work registry. The list might include searches on prominent Internet search engines, searches of any collective management organizations' databases, and searches of the Copyright Office's records, but no search of designated orphan works registry. Conversely, a case-by-case standard might or might not involve a registry. For example, if a well-known and comprehensive voluntary registry of owners existed in a particular industry or for a particular type of work, presumably any "reasonable search" for the owner would include a search of that registry.

[218] Association of American Publishers, Inc. ("AAP") (605); International Coalition for Copyright Protection ("ICCP") (693), North Carolina Statue University Libraries ("NC State") (606), ASMP (668) (anything else would be "Procrustean"), Kernochan (666); College Art Association ("CAA") (647)

[219] Public Knowledge ("Public Knowledge") (629).

[220] National Music Publishers' Association, Inc. & The Harry Fox Agency, Inc. ("NMPA") (690)

[221] Google, Inc. ("Google") (681), Sincaglia & O'Shell (587).

[222] Save the Music & Creative Commons ("Creative Commons") (643); Creative Commons (R114).

---

ANT_BARTZ_000435474

by-case systems conceded, that a weakness of case-by-case systems is their uncertainty.[223]   One supporter of the case-by-case system replied that sacrificing certainty is acceptable because the "gatekeepers" of many cultural institutions (*i.e.*, the general counsels at libraries, museums etc.) want a cap on damages more than they want certainty that use is permitted.[224]

Another supporter of the formal approach stated that searches should be clear enough, and simple enough, for a computer to perform, because one of the major obstacles to the use of orphan works is the labor-intensive nature of manual searches. [225]

### i.   The Role of Registries

In the comments, the issue of registries was often intertwined with the issue of whether a case-by-case or formal system is appropriate.  The advocates for a formal approach typically also advocated that the formal approach's pre-set list of searches include only one search:  a search of a registry of owners.  Once that registry was searched without success, the user would be free to use the work under the orphan work provision, without further need to search.  The practical result of this system would be that an owner would be required to list his or her work on the owner registry, or the work could automatically be used as an orphan work.

Owner Registry.  Many commenters attacked a mandatory owner registry (*i.e.*, one that constituted the sole search criteria in a formal regime).[226]  One commenter argued that such a registry would in effect reinstate a version of the 1909 Act's renewal requirement, which the commenters lamented as an antiquated formality that prejudiced inexperienced owners.[227]  One comment complained that any mandatory-owner-registry system failed to address the fundamental problem of the orphan work situation – *i.e.*, market failure – and instead just "defined it away."[228]  Another comment argued, along a

---

[223] July 26 Roundtable Tr. at 16-19.

[224] Glushko Samuelson Intellectual Property Law Clinic ("Glushko") (595).

[225] Google (681); *see also* Internet Archive (657).

[226] NMPA (690); Future of Music Coalition, American Federation of Television and Radio Artists, and American Federation of Musicians of the United States and Canada ("Future of Music") (669); MIT Libraries ("MIT") (515); MPAA (646); AAP (605); UCLA (638); RIAA (687).

[227] NMPA (690).

[228] MPAA (R125).

ANT_BARTZ_000435475

similar vein, that the purpose of an orphan works provision should be to promote licensing activity, and that any system that causes an owner to lose all rights upon failure to satisfy a formality discourages, not encourages, voluntary licensing, because it gives an incentive not to negotiate with an owner who failed to comply with the formalities.[229]

Another frequent criticism of a mandatory owner registry was that it would subject the owner's enjoyment of his or her copyright to a formality, and thus would violate Article 5(2) of the Berne Convention.[230] Most of the commenters who held this view appeared to consider the violation so obvious as not to require any in-depth analysis:  for example, in one case the commenter stated simply that where an owner suffered any diminution of rights as a result of a failure to register, Berne was clearly violated.[231] There were those, however, who defended mandatory owner registries against the charge of Berne violation.  One of these argued that Berne is violated only when "all meaningful relief" is denied to the owner.[232] Another commenter argued that the owner's failure to register can be deemed a "choice" by the owner to opt into the orphan works system, the advantages of that system being very low transaction costs for licensing.  This same commenter argued that since an orphan works system promotes uses – *i.e.*, the enjoyment and exercise – of works that would not be possible otherwise because of high transaction costs, the Berne proscription against formalities that interfere with the enjoyment and exercise is not violated.[233]

Although most commenters agreed that a mandatory owner registry would violate Berne and would in general be ill-advised, many commenters expressed support for the creation of some sort of *voluntary* owner registry.[234] An unspoken assumption in essentially all of the comments was that an orphan works provision is a second-best

---

[229] RIAA (R137).

[230] NMPA (690); Future of Music (669); MIT (515); MPAA (646); AAP (605); UCLA (638).

[231] Goldstein & Ginsburg (519).

[232] Association of Independent Video and Filmmakers, Film Arts Foundation, IFP-New York, National Alliance for Media Arts and Culture, and National Video Resources ("AIVF") (663)  In support, this commenter cited S. Rep. No. 101-681 [*sic*, probably 100-352] at 15 (1988).

[233] Creative Commons (643).

[234] MIT (515); Brigham Young University ("BYU") (548); RIAA (687); MPAA (646); AAP (605); Copyright Clearance Center ("CCC") (691); The Stanford University Libraries ('Stanford") (457) (in context of a proposal limited to amending section 108(h)); International Documentary Association ("IDA") (686); ASMP (668); AIVF (663); Kernochan (666); Professional Photographers of America ("PPA") (642).

**Page 74**

ANT_BARTZ_000435476

solution for a situation in which a voluntary, market transaction is not possible.[235]
Improving the means by which users and owners can actually negotiate, and thus
reducing the number of orphan works to which any provision would apply, was therefore
a very widely agreed goal.  Voluntary registries of owners, obviously, would make the
owners easier to find, and thus would facilitate negotiation.[236]

There were those, however, who expressed reservations about even voluntary
registries.  One comment argued that any registry, voluntary or mandatory, owner or user,
would be essentially useless for photographs.[237]  Very often any description of a typical
orphan work photograph would be useless:  for example, "farmer with three horses,
mountains in background."[238]  A user might never match the photograph to the
description.  Conversely, requiring an owner to monitor a user database would be
pointless for the same reason.  In addition, adding thumbnail images of the photograph
might not help either (even if it were legal and logistically feasible) because the database
of images might quickly swell to millions of images:  owners and users could still miss
each other in the mix.

Another critic of an owner registry made an efficiency argument:  the commenter
argued that requiring every owner to register would impose a very large social cost, but
only a tiny fraction of the works registered will ever be used.[239]  Finally, one
photographer organization objected to an owner registry on the ground that it would be
unfairly burdensome for professional photographers, a large percentage of whom, the
organization asserted, have never registered a single work due to the logistical burdens
associated with registering.[240]  These photographers, the argument went, will be even
harder pressed to go back and assemble every photograph taken during their lives for
placement on an owner registry.

---

[235] *Cf.* RIAA (R137).

[236] *See, e.g.*, ASMP (668); Kernochan (666).

[237] NC State (606).

[238] *Id.*

[239] Glushko (595).

[240] PPA (642).

ANT_BARTZ_000435477

User Registry. Many commenters thought that some form of user registry – an "Intent To Use" registry – was a good idea. Some felt that it should be mandatory.[241] One of them argued that requiring a prospective user to file a public document, under penalty of perjury, would "keep the users honest."[242] It would also, they argued, help identify abusers of the system.[243] Others opined that any user registry should be voluntary; they argued that actual use by the user would be more likely to bring out the owner than a listing on a registry.[244]

Against user registries, it was argued that the existence of such a registry would as a practical matter force owners to monitor the registry constantly, which would impose significant burdens on owners.[245] Additionally, some complained that requiring a prospective user to file a notice was too burdensome for the user.[246]

Mechanics of Registries. Many commenters provided thoughts on how registries might work as a practical matter. For owner registries, commenters advocated requiring the owner to list a title of the work (if one exists), a description of the work, and the owner's contact information.[247] For user registries, commenters advocated requiring the prospective user to provide a description of the work, contact information for the user, a description of the proposed use, and the search efforts undertaken.[248] Some also argued that the user should be required to document the search efforts, although others disagreed, saying that it would be unfair if, years later, the user misplaced the documentation and thus became subject to full infringement remedies.[249]

There was general agreement (among the relatively small group who commented on the issue) that penalties should be available against parties who knowingly put false

---

[241] Creative Commons (643) (for unpublished works); RIAA (687); MIT (515); Michigan State University ("Michigan State") (545); Public Knowledge (629); Duke #2 (597).

[242] The Authors Guild, Inc. ("Authors Guild") (R135).

[243] Authors Guild (R135).

[244] Microsoft Corporation (695).

[245] AAP (605).

[246] AAP (605); CAA (647).

[247] Google (681).

[248] Creative Commons (643); Google (681); Duke #2 (597); MPAA (646); NMPA (690).

[249] Compare Public Knowledge (629) and PPA (642) with AAP (R85).

---

**Page 76**

ANT_BARTZ_000435478

information on registries (for example, anyone who falsely claimed not to have been able to find an owner when they in fact did, or anyone who falsely claimed to own a copyright when in fact he or she did not).[250]  One commenter also proposed that penalties should apply to an owner who "timed" the system in order to take advantage of a "submarine orphan work" situation – that is, the owner became aware of a notice of intent to use, but waited until the user had invested resources in a derivative work, or perhaps in a restored version of the work, then appeared and demanded that the user desist.[251]

There was disagreement over who should operate the registry(-ies).  Several thought that the natural and best choice was the Copyright Office, in part because it is hard to guarantee that any private entity will exist decades from now.  On the other hand, several commenters argued that a private institution would be more efficient.  A few commenters advocated a system modeled on the domain-name-registry system, which would involve having multiple registries that compete with each other.[252]

Many additional small administrative matters were discussed in the comments, but few of these involved issues of principle.  One exception is the issue of whether the registries should be machine-queryable, because this issue intersects with the issue of the criteria for a reasonable-efforts search.  Commenters who wish to clear rights to thousands of works at once, and to do so at low cost, desired this feature in a registry.  This feature would of course only be possible if the criteria of a reasonable-efforts search were definite enough that they could be satisfied by a machine.[253]

### ii.  The Standard of Reasonable Search

There was significant philosophical disagreement on the criteria for a "reasonable search" or "due diligence."[254]  Some commenters proposed specific resources that should be searched, including:

---

[250] RIAA (687); IDA (686); PPA (642); Duke #2 (597).

[251] Duke #2 (597).

[252] Creative Commons (643); *but see* July 26 Roundtable Tr. at 122 (criticizing domain name registration system as "riddled with errors, inaccuracies, and fraud") (statement of Steve Metalitz, RIAA).

[253] Google (681); Internet Archive (657).

[254] As noted above, this issue would exist under either a formal or a case-by-case system, and whether or not registries existed.  In a formal system, the criteria would be defined *ex ante*; in a case-by-case system the merit of the search would be judged *ex post*.  In the formal systems proposed by commenters, search of the mandatory registry would, standing alone, be sufficient, but in theory a formal

ANT_BARTZ_000435479

- Copyright Office records;

- Internet search engines;

- On-line telephone directories and address directories;

- Print telephone directories when the owner's geographical location is known;

- Databases of trade associations or professional groups;

- For musical works, the PRO databases; and

- The ownership information appearing on the face of the orphan work[255]

Several commenters favored varying the standard of reasonable efforts depending on the category of user, or the category of work. For example, they argued that the standard for finding the owner of a musical work will be different than the standard for finding the owner of a photograph, because musical work performing rights organizations ("PROs") have very well developed databases of information, whereas photography organizations do not have resources of equal magnitude.[256] Examples of varying the work by category of user included making standards for libraries lower than for commercial entities.[257] Some commenters argued, more broadly, that the nature and resources of the user should be considered when determining whether a search was adequate.[258]

"Piggybacking." Opinions diverged on the question of whether a user seeking to use an orphan work should be able to "piggyback" on searches done previously by another user.[259] Several commenters argued that a subsequent user should be able to rely

---

system could be devised in which the user was required to search the mandatory registry plus other sources. Likewise, a case-by-case system could in practice require search of voluntary registries, or not.

[255] PPA (642); ASMP (668); NMPA (690); Broadcast Music, Inc. ("BMI") (640); NMPA (R120).

[256] MPAA (646); IDA (686); see also ASCAP (628).

[257] Duke #2 (597); SAA (R88)

[258] Glushko (595) at 3; AAP (R85) at 5

[259] For example, user A conducts five fruitless searches for the owner (a search of the Copyright Office's records on date X, an Internet search engine search on date Y etc.), then concludes that the owner is unlocatable and thus that the work is an orphan. User A goes ahead and uses the work, and perhaps posts the results of his searches on an official Intent-To-Use database. The question of piggybacking is whether a subsequent user, B, is entitled to rely on the searches conducted by A in order to establish that the owner could not be found with reasonable efforts on date X and Y, or whether B must perform the same searches over again.

ANT_BARTZ_000435480

on a previous user's searches;  the stated reason was usually that it would be inefficient to require subsequent users to re-perform fruitless searches.[260]  Other commenters took a different view:  they felt that any information from the first user might be unreliable, or might have changed in even a short interval following the first user's searches.[261]  In the roundtable discussions, most participants seemed to agree that a subsequent user's reliance on a prior search would simply be part of the ultimate question as to whether that subsequent user was reasonably diligent, and should be evaluated in light of all the circumstances of that search.[262]

Best Practices.  Finally, several commenters recommended that the Copyright Office, or perhaps industry organizations, publish "best practices" for searches in particular industries.[263]  These would consist of lists of resources that should be searched in order to conduct a "reasonable efforts" search for an owner.

### b.  Limitations on Works, Users, and Uses

Many commenters proposed that the definition of orphan work be limited to some subset of works and/or users:  some proposed limits on users, some on works, and some on the types of uses that users could make of orphan works.  These proposals are discussed below.

### i.  Limitations on Categories of Works

Age of the Work.  Many commenters responded to the question posed in the NOI of whether the age of the work should be part of the definition of an orphan work.  The majority said that it should not, pointing to the fact that the *sine qua non* of an orphan work – the fact that its owner cannot be located – has no necessary tie with the age of the work.[264]  These same commenters acknowledged that a work is more likely to be orphaned as it gets older, but said that age per se should not weigh in favor of deeming a

---

[260] Public Knowledge (629); Free Culture (673); IDA (686); Duke #2 (597) (proposal allows piggybacking after an initial ban period).

[261] RIAA (R137), MPAA (R125).

[262] July 26 Roundtable Tr. at 46-55.

[263] Glushko (595); Cornell University Library ("Cornell") (569); Future of Music (669).

[264] Library of Congress ("LOC") (630); Michigan State (545); RIAA (687); MPAA (646); Public Knowledge (629); Glushko (595); AAP (605); Microsoft (695); Future of Music (669); MIT OpenCourseWare ("MIT OpenCourseWare") (651).

ANT_BARTZ_000435481

work to be orphaned.[265]  The dissent from this position came from a commenter who opined that establishing a minimum time during which the work could not be orphaned would be an appropriate way to balance the interests of the public with the interests of owners.[266]  Another commenter believed that adding age to the formula of an orphan work would be appropriate if it increased the simplicity of the system (for example, in a "formal" system that required owner registration after a fixed period of time such as 28 years).[267]

Unpublished Works.  There was significant disagreement on the question (also posed in the NOI) of whether orphan works should be limited to published works.  Some held that unpublished works should be excluded, to preserve the rights of privacy and first publication recognized in *Harper & Row Pubs. v. Nation Enterprises*.[268]  Several arguments against this position were made.  One argued that unpublished works such as letters and diaries are "the building blocks of history."[269]  Several responded to the privacy argument;  they argued that  (1) the purpose of copyright law is to promote disclosure, not protect privacy; (2) the protection of privacy should be left to the law of privacy; and (3) *Harper & Row* did not establish an inflexible rule.[270]  Finally, some made the practical arguments that very few orphan works will present privacy issues,[271] and that it will often be difficult to determine whether an orphan work was published because the face of the work will not reveal the information and because the definition of "published" is very technical and has fluctuated over the past century.[272]

Foreign Works.  One commenter advocated excluding any foreign work from the definition of orphan work because if the U.S. allowed use of foreign works under an

---

[265] CAA (647) at 31; Michigan State (545); RIAA (687); MPAA (646).

[266] NMPA (690).

[267] MIT (515).

[268] 471 U.S. 539 (1985).  *See* Goldstein & Ginsburg (519); GAG (547); Future of Music (669).

[269] Public Knowledge (629).

[270] Public Knowledge (629); Society of American Archivists ("SAA") (620); CAA (647).

[271] SAA (R88).

[272] In particular, one commenter noted that publication of motion pictures has been inconsistent over the past century, *see* Loughney (700), and another commenter noted that any orphan works provision would have to address section 303(b), which states that "the distribution of any phonorecord prior to January 1, 1978, shall not constitute publication of any musical work embodied therein." RIAA (687).

ANT_BARTZ_000435482

orphan works provision, foreign countries would abuse our example and U.S. works would be subject to unfair and/or onerous orphan works provisions abroad.[273]  Other commenters favored including foreign works in the definition of orphan works, arguing that: (1) it will often be difficult to determine the nationality of an orphan work; (2) since many of the works that users will want to use will be foreign, excluding them will leave a significant part of the problem unresolved; and (3) excluding them would provide incentive to manipulate the nationality of works, including creation of works outside of the U.S. rather than within.[274]

Musical Works.  One PRO argued that all musical works should be excluded from the definition of orphan work, because essentially every musical work owner can be located through the PROs or through The Harry Fox Agency.[275]  Several comments took issue with this position, stating that various categories of musical works were poorly represented on PRO databases, or that the information on the databases was contradictory or out-of-date.[276]

### ii.  Limitations on Categories of Users

Non-Profit, Educational, Libraries or Archives.  Several commenters wanted any orphan works provision to advantage only non-profit institutions, educational institutions, libraries, and/or archives.[277]  The opponents of this limitation argued that large commercial entities are more likely to have the resources to make valuable derivative uses of orphan works, and that (especially with the rise of the Internet), the distinction between the activities of a library and its patrons is often minimal or blurred.[278]

States.  One comment raised the idea of excluding States from the eligible pool of orphan work users.[279]  The argument was that any orphan works provision that allowed,

---

[273] MPAA (646).

[274] Goldstein & Ginsburg (519); Public Knowledge (629).

[275] BMI (640); American Society of Composers, Authors and Publishers ("ASCAP") (628).

[276] Creative Commons (R114); Ristau (602); Fautley (73); Kolle (103); Kline (151); Apodaca (153).

[277] Graphic Artists Guild ("GAG") (547); NC State (606); ("Internet Archive") (657).

[278] CAA (647); Ockerbloom (674); *see also* Carnegie Mellon (537); Library Copyright Alliance ("LCA") (658).

[279] AAP (605).

ANT_BARTZ_000435483

generally, a resurfacing owner to collect fees but not to obtain an injunction against the continued use of the work, would, when applied to a State, be toothless because the only remedy – fees – would be disallowed under the 11th Amendment to the U.S. Constitution.[280]  Several reply comments signed onto this comment.[281]  The initial commenter proposed that a State be allowed to opt into the orphan works provision if it waived 11th Amendment immunity.

### iii.  Limitations on Categories of Uses

Cultural and Other Non-Commercial Uses.  Several commenters stated that any uses of orphan works should be limited to cultural uses such as restoration and preservation of works that are embodied in decaying media, use of works in educational or research projects, or, more generally, to non-commercial uses.[282]

Attribution.  Several commenters wrote in favor of requiring the user of an orphan work to include information on the work identifying the work as an orphan work, and others advocated including whatever owner information was known.[283]  One commenter argued against the latter requirement, stating that oftentimes the information collected by one user would be misleading to subsequent searchers.[284]

### c.  Approval by an Authorized Body (*e.g.*, the Copyright Office)

While many commenters discussed the standard of reasonable search, significantly fewer discussed the merits of having an official body certify the adequacy of the search prior to the use.  Of the commenters who did address this issue, several advocated having the Copyright Office review applications from potential users, and issue approvals.[285]  Some of these expressed approval for the Canadian orphan works system, under which the Canadian Copyright Board reviews applications for use of

---

[280] *Id.*

[281] MPAA (R125); Authors Guild (R135) at 5.

[282] GAG (547); Consortium of College & University Media Centers ("CCUMC") (667); Carnegie Mellon (537); PPA (642).

[283] Glushko (595); Public Knowledge (629); Morris (652).

[284] AAP (R85).

[285] GAG (547); IDA (686); ASMP (668); Tilly (677); Douglas (626).

ANT_BARTZ_000435484

orphan works, and approves them prior to use.[286] Several other commenters, however, expressed disapproval of the Canadian system: these commenters often pointed to the fact that the Canadian office has issued few licenses.[287] *See* NOI (125 licenses between 1990 and January 2005). Generally, the critics of the Canadian system felt that it would impose an undue administrative burden on whatever agency reviewed the applications, would lead to lengthy delays in the approval process, and would provide little benefit.[288] One commenter also made the converse point: the cost of pushing an application through the administrative process will in many cases exceed the commercial value of the contemplated use, which will discourage use of orphan works.[289]

Finally, one commenter advanced the idea that a court, as opposed to an administrative body, could be the one to grant *ex ante* approval to use an orphan work. The orphan works statute would give federal courts jurisdiction to hear declaratory judgment actions in which a party seeks a declaration that his or her search was adequate. The copyright owner, obviously, would not be required to participate in the proceeding.[290]

### 2. Consequences of Designation

Once a work has been designated an orphan work, the major remaining questions are what use may be made of it, and the terms of the use. There was a great deal of disagreement among the comments on how much a user should pay for use of an orphan work. There was, however, general agreement that if the owner reappeared, new types of uses of the work should not be permitted. The answer to the question of how existing uses of the work should be treated when the owner reappeared, however, proved more divisive.

---

[286] ICCP (693); Future of Music (669).

[287] Creative Commons (643). CAA (647) at 39. One commenter also argued that this approach would lead to a large backlog in the U.S. *See* Kernochan (666).

[288] Creative Commons (R114); Glushko (595); Douglas (626)

[289] Creative Commons (R114) at 18-19.

[290] Greenberg (615).

ANT_BARTZ_000435485

### a.  User Fees

Several commenters proposed that a user should be entitled to use an orphan work for free, without the payment of any fee.[291]  Most other commenters took for granted that some sort of fee should be paid, but differed on the measure of the fees.  Several favored a "reasonable license" fee.[292]  One comment stated that the orphan works problem was one of market failure, so any orphan works provision should attempt to replicate the market price – which would be the license fee that would have been negotiated between the parties.[293]  Others, however, opposed reasonable license fees because, they argued, such fees are not known prior to the use, and thus the unknown exposure to monetary liability put a cloud of uncertainty over the use.[294]  Others made the argument that a reasonable license fee might be practically impossible to calculate because the work is, by definition, not being used, so finding comparable licenses on which to base the fee might be impossible.[295]

Some commenters favored a third measure:  a fixed statutory fee.[296]  For example, display of a work on a website might be fixed at $100.  Those in favor of this measure preferred its definiteness.[297]  Some argued that the fixed rate should be low, to encourage use,[298] but others argued that it should be high, to encourage users to make efforts to find owners.[299]  Against statutory fixed fees in general, some commenters argued that low fixed rates would be tantamount to no fee at all, because any potential recovery by the

---

[291] MIT (515); the American Film Heritage Association & Moviecraft, Inc. ("AFHA") (520); Carnegie Mellon (537); Cornell (569).  One commenter argued in opposition to this view that taking the owner's copyright for use without any compensation, presumably in a case where the owner reappeared, in this way would violate the Fifth Amendment to the U.S. Constitution.  Field (34).

[292] Duke #2 (597); SAA (620).

[293] RIAA (R137).

[294] Gushko (595).

[295] CAA (647).

[296] BYU (548) (2 cents per page); Creative Commons (643) (nominal fee); IDA (686); Public Knowledge (629) ($200 per use, with use defined as a whole "transaction"), Summer (684).

[297] Creative Commons (643).  One commenter pointed out that where a compulsory license already existed in the copyright law for a type of use (*e.g.*, the section 115 license), then the orphan work amount should match the compulsory rate.  *See* NMPA (690).

[298] *E.g.*, Creative Commons (643) (nominal fee).

[299] McClatchey (R1).

---

**Page 84**

ANT_BARTZ_000435486

owner would not be worth litigating.[300]  Conversely, one commenter disapproved of fixed rates because the rate might be higher than the rate the owner would have given in a negotiated deal.[301]

A fourth measure proposed by the commenters was actual damages with a statutory cap.[302]  This approach would have many of the same benefits and drawbacks as the fixed statutory fee approach:  if the cap were low, then users would have definiteness, but owners would in essence be denied all rights.

There was also difference of opinion on who would set the fees.  Many said the Copyright Office should do it,[303] but one said that federal courts should,[304] and one said that the parties should, once an owner reappeared.[305]

While many commenters addressed the issue of the measure of the fees, far fewer addressed the issue of when the user would pay:  (1) in advance of or at the time of use; (2) only once the owner appeared, and then pay fees for past use to that point; or (3) only once the owner appeared, and then pay only fees for future use.  Several commenters said that users should not have to pay until the owner appeared, because payment of fees prior to that time would discourage use of orphan works and would "tax" people who are trying to do the right thing.[306]  Others suggested that if the owner did not appear after a designated time, the fees would escheat to either the Copyright Office (or whatever other organization is administering the fees), to an arts organization such as the National Endowment for the Arts, or to an organization that supports artists in the same field as the orphan work.[307]  Some, however, felt that the fees should go back to the user.[308]

---

[300] MPAA (R125).

[301] Electronic Frontier Foundation ("EFF") (R142).

[302] Glushko (595) (actual damages up to $100 per work, with $500 cap per transaction); AIVF (663) ($500 cap); CAA (647) (actual damages, or $100, whichever is less; for groups of works, $500 cap).

[303] Future of Music (669); GAG (547) (Copyright Office should survey authors in the appropriate field to determine royalty); ASMP (668) (Copyright Office negotiates and collects fee).

[304] AAP (605).

[305] RIAA (R137).

[306] EFF (R142); Brooks (R37); AAP (605); Duke #2 (597); Carnegie Mellon (R49); Authors Guild (R135).

[307] GAG (547); IDA (686); ASMP (668); Future of Music (669); Gupta (332); SFFWA (R108).

[308] Ockerbloom (674).

ANT_BARTZ_000435487

### b.  Time Limits

A few commenters suggested that the benefits of the orphan works system granted to the user should not be perpetual:  for example, it should have a five-year term.[309]  The user would be required to go through the reasonable-efforts search process again after five years if the user wanted to continue use of the work.

### c.  Exclusive vs. Non-Exclusive Licenses

Most commenters assumed that the orphan works system would provide the equivalent of a non-exclusive license to the user, and one said so explicitly.[310]  However, one commenter argued that a user should be allowed to seek an exclusive license if he or she paid a higher fee.[311]  Finally, one made the interesting suggestion that the fee should be set by auction:  presumably, this would be an auction for an exclusive license.[312]

### 3.  When an Owner Appears

New Uses.  Most commenters agreed that if the owner reappears, the owner's full rights in the work should restored going forward;  that is, injunctions and damages should be available to the owner for any "new" uses of the work.[313]  Defining a "new" use, however, posed difficult questions:  for example, when a user had, under the orphan works provision, made a motion picture of an orphan novel, would a release of the motion picture on DVD constitute a "new" use?

Some commenters, however, did favor allowing new uses of orphan works even after an owner appeared.[314]  They did not, however, provide policy reasons to support this position.

Existing Uses.  Most commenters also agreed that a user who had relied on the orphan works provision to invest resources in a work, perhaps producing a derivative work, should not be prevented from continuing to exploit that use after the orphan work's

---

[309] Getty (610); SFFWA (R108); *but see* Slater (672) (7-year exclusive license).

[310] Getty (610).

[311] SFFWA (607).

[312] Keefe (439).

[313] AFHA (520); Google (681) (user must stop within grace period); CAA (647); Getty (610); Directors Guild of American, Inc. ("DGA") (621).

[314] Public Knowledge (629).

ANT_BARTZ_000435488

owner appeared.[315]  Some, however, would put conditions on that use:  for example, one argued in favor of requiring the user to credit the owner going forward.[316]  For those few commenters who advocated a fixed term license for the use of an orphan work, this issue was presented differently:  they said that the existing use should be allowed to continue, but only for the remainder of the license's term.[317]

One commenter raised the issue of an existing use that is still in the process of being prepared (for example, a movie that is still in the process of being shot).  This commenter argued that these uses should be allowed to continue as well.[318]

Existing Law Not Affected.  Several commenters stated strongly that the fair use defense should not be affected in any way by an orphan works provision.[319]  One commenter also pointed out that the statute of limitations should also not be affected.[320]  The issue on which significant disagreement arose was, however, the issue of the burden of proof on the question of whether the user's search was reasonable.  One commenter proposed that once the user submitted a statement detailing the search he or she conducted, that statement would give rise to a presumption that the search was reasonable, and the burden would fall to the owner to prove that the search was unreasonable.[321]  Other commenters argued that the burden of reasonableness should lie with the user.[322]

Attorneys Fees and Statutory Damages.  There was significant philosophical disagreement on the issue of whether attorneys fees and statutory damages should be available to a reappearing owner.  Several commenters argued that statutory damages and attorneys fees would defeat the whole purpose of an orphan works provision, because

---

[315] MPAA (646); Public Knowledge (629); Future of Music (669); AIVF (663); *Orphan Films*, Center for the Study of the Public Domain ("Duke #1") (596); DGA (621); SAA (620).

[316] CAA (647).

[317] Getty (610); SFFWA (R108).

[318] Duke #1 (596).

[319] Glushko (595); AAP (605); CAA (647).

[320] CAA (647); Public Knowledge (629).

[321] Public Knowledge (629).

[322] *See, e.g.,* AAP (605).

ANT_BARTZ_000435489

uncertainty and large potential exposure would be re-introduced for the user.[323] On the other hand, one commenter argued that the absence of attorneys fees or statutory damages would result in the owner being denied even the low orphan work license fees, because the user would be faced with, at worst, a tiny liability after trial that is not worth the cost of litigation, so the user would often simply refuse to pay the owner.[324] The owner's only recourse would be to pay for expensive federal court litigation for an uncertain recovery of a small amount. One compromise between these positions was to make attorneys fees and statutory damages available where the user unreasonably refused to pay a reasonable license fee.[325] Another commenter proposed that a "small claims" court be established to handle these disputes.[326]

### 4. TRIPS Article 13

As noted above, numerous commenters discussed the implications of a limited-liability regime for compliance with the Berne Convention's prohibition on formalities. Some commenters also addressed the question of whether such a regime would violate TRIPS Article 13, which requires that "limitations or exceptions" to copyright be "confined" to "certain special cases which do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the right holder." Most of the commenters who addressed the issue opined that Article 13 would not be violated because orphan works were a narrow, well-defined category of works (and thus were "certain special cases") that were by definition not subject to any commercial exploitation (and thus use of the works did not "conflict with a normal exploitation of the work").[327]

On the other hand, one comment argued that Article 13's "certain special cases" language required a narrow range of works, a narrow range of users, and a narrow range of rights excepted. As many of the proposed orphan works provisions would apply to all works, would be available to all users, and would affect all rights, this test, the

---

[323] Public Knowledge (629); AAP (605); CAA (647).

[324] PPA (642).

[325] AAP (605).

[326] PPA (642).

[327] Glushko (595); Public Knowledge (629); AIVF (663);

---

**Page 88**

ANT_BARTZ_000435490

commenter argued, would not be met.  The comment further argued that the second step in the test ("do not conflict with a normal exploitation of the work") is usually read to refer to the sort of uses that a copyright owner generally makes of his or her work.  If the orphan works provision permitted uses that the owner would ordinarily license – and it clearly would – then the provision might fail this test also.  However, the commenter noted, in the past the second step of the test has not been applied to the orphan work context, so its construction in this context is uncertain.  The language might be flexible enough to apply to specific uses.  Finally, the commenter argued that the third step ("do not unreasonably prejudice the legitimate interests of the rightholder") should be read to encompass both actual and potential uses, so once again many of the proposed orphan works provisions would fail the test.[328]

### 5.  Moral Rights

Another implication of an orphan works provision that was explored in a few comments was the issue of moral rights.  The Berne Convention requires protection of an author's moral right of integrity and attribution.[329]  Several commenters pointed out that if there are no limits on the way that users can use an orphan work, it is possible that a user will use it in a way that the author would consider offensive.[330]  This might violate the author's moral rights.[331]  No helpful suggestions were made as to how to solve this problem (other than avoiding an orphan works provision altogether).

### D.  Other Legislative Solutions

Many comments proposed solutions to the orphan works problem that were not in the category of limitations on liability.  Many of these said, in a general way, that orphan works should "fall into the public domain."[332]  Numerous others proposed that various formalities should be imposed:  all copyrighted works should be registered (either initially or after a fixed period of years), or owners should be required to file a renewal

---

[328] Goldstein & Ginsburg (519).

[329] *See* Berne Convention Article 6 *bis*.

[330] Viscopy Ltd. (582); Long (699); Lord (650).

[331] Lord (650).

[332] Ayers (398); Webster (399); Williams (401).

ANT_BARTZ_000435491

registration at certain intervals.[333]  Some commenters also proposed radical reduction of the term of copyright (to, for example, five or ten years),[334] or the abolition of copyright altogether.[335]

Other comments proposed specific carve-outs from copyright protection:  for example, copy shops should be exempt from liability for copying family photographs; sheet music should be available for public schools; and historical events, such as the Kennedy assassination, should be public domain.[336]

Several comments proposed attacking the orphan works problem by "improving" the rules related to assignment of copyright.[337]  The most radical of these was the proposal that copyright never be assignable.[338]  Others were clarifying the rules by which copyright is transferred when a corporation goes defunct or merges.  (Specific clarifications were not given.)[339]  Similarly, one commenter proposed that heirs should not be allowed to inherit a copyright unless they perform a formality within a certain time after the death of the author.[340]

Some commenters approached the problem by suggesting changes to areas of law other than copyright.  For example, one commenter recommended changing the tax law so publishers could take a tax write-off for releasing their works under a public license.[341]  Another proposed that heirs be taxed on copyright royalties at a high rate.[342]  One commenter focused on the law of bankruptcy, and proposed that the Copyright Office promulgate regulations that establish default rules for the assignment of copyright when

---

[333] Salsbury (R67); Konop (R96); Lang (R6); Cook (R21); Lawton (R26); Creative Commons (R114).

[334] Cook (R21); Boland (R68); Konop (R96); Rook (121); Summers (684); Phillips (679).

[335] Binkley (272); Houser (134).

[336] Stone (585); T. Thompson (242); Spehr (516).

[337] Cook (R21); Heskett (408); Milazzo (R87); SFFWA (607) (provide a rule for clear chain of title).

[338] Cook (R21); Heskett (408).

[339] Milazzo (R87); SFFWA (607).

[340] Cook (R21).

[341] M. Brown (5).

[342] Konop (R96).

ANT_BARTZ_000435492

the copyright is not scheduled in the bankruptcy decree.[343]  Finally, on the international level, one comment stated that the U.S. should withdraw from the Berne Convention.[344]

---

[343] SFFWA (607).

[344] Phillips (679).

ANT_BARTZ_000435493

## VI. Conclusions and Recommendations

### A. Conclusions

Based on the submissions of the interested parties, the roundtable discussions, and all of the information we have reviewed in this study, we have concluded the following:

(1) The Orphan Works Problem is Real.  There is an identified need to address the "orphan works" issue, as a wide range of users have identified specific situations in which uncertainty about a work's ownership status could not be reasonably removed and they refrained from using that work primarily because of such uncertainty.

(2) The Orphan Works Problem is Elusive to Quantify and Describe Comprehensively.  The precise scope and contours of the problem remain difficult to assess, given that many instances require a comprehensive review of the circumstances surrounding the proposed use of the work.  Although we have received nearly 850 written comments in this proceeding and there has been a substantial amount of interest in this issue, exactly how frequently the orphan works situation occurs is not entirely clear.  Some data presented to us indicate that in most cases copyright owners are located by users, but that the portion of works for which owners are not located can be significant.[345]  In short, although difficult to quantify, the orphan works situation does occur and, in our view, warrants some form of legislative amendment.

(3) Some Orphan Works Situations May Be Addressed by Existing Copyright Law, But Many Are Not.  U.S. copyright law has a few limitations and exceptions that might be directly applicable to a user in an orphan work situation, and provides other exceptions and limitations that give the orphan work user some choice in making use of the work, but ultimately there still exist situations where U.S. copyright law does not provide users in the orphan works situation with clear guidance on whether and how they should use such works, and thus does not minimize the uncertainty over the use of those orphan works.

---

[345] The Authors Guild presented results of a survey of authors indicating that around 89% of respondents "Never" or "Rarely" encountered an orphan works situation. (R135)  Nevertheless, around 65% of respondents agreed that a legal provision to address the orphan works situation would ease their work as a writer, with less than 7% disagreeing with that statement.  Carnegie Mellon University Libraries (537) conducted a study involving requests for permissions to digitize the books in its collections and found that copyright owners could not be located for about 22% of the books in the sample.

ANT_BARTZ_000435494

(4) <u>Legislation is Necessary to Provide a Meaningful Solution to the Orphan Works Problem as We Know It Today</u>.  The Copyright Office does not currently have any regulatory authority to address the orphan works issue in any meaningful way, and thus legislation is necessary to help resolve the problems inherent in orphan works. There appears to be clear support among a wide variety of stakeholders for legislation that would give some relief to users who perform reasonably diligent searches for copyright owners, with a provision to protect the interests of authors and right-holders in the event they eventually surface.

## B.  Recommendations

We recommend that the orphan works issue be addressed by an amendment to Chapter 5 of the Copyright Act regarding "Copyright Infringement and Remedies."  The specific language we recommend is provided at the end of this Report.  We propose specific language in order to be as clear as possible about the nature and substance of our recommendations, and believe that the formulation in our Recommended Statutory Language provides the best means of implementing the concepts in our recommendation. It must be stressed, however, that we remain open to suggestions on how such language might be improved, or how it might be modified to avoid unintended consequences, and would be pleased to work with members of the Judiciary Committee and stakeholders on any proposed legislation to address the orphan works issue.

### 1.  Background

In considering the orphan works issue and potential solutions to the difficulties faced by users described in Section V, the Office has kept in mind two overarching and related goals.  First, any system to deal with orphan works should seek primarily to make it more likely that a user can find the relevant owner in the first instance, and negotiate a voluntary agreement over permission and payment, if appropriate, for the intended use of the work.  In this sense the system should encourage owners to make themselves known and accessible to potential users, and encourage users to make all reasonable efforts to find the owners of the works they wish to use.  In a perfect world, a statutory provision on orphan works would never actually be invoked:  users would make reasonable searches and where they did not find the copyright owner, it would always be the case that such owner either does not exist or does not care about the use of the work, and

ANT_BARTZ_000435495

infringement litigation would never result. Conversely, copyright owners would be encouraged to make themselves known to users and do so in a way that would make any reasonable search identify and locate them, so that users would be able to seek permission directly and not have to rely on the statutory provision.

Second, where the user cannot identify and locate the copyright owner after a reasonably diligent search, then the system should permit that specific user to make use of the work, subject to provisions that would resolve issues that might arise if the owner surfaces after the use has commenced. These provisions should balance the interests of the right holder with the interest of the user who has undertaken to use a work in reliance on the orphan works designation. Ideally those provisions should establish in the user's mind a measure of certainty about his or her copyright liability exposure in the rare event that an owner might surface in the future, while at the same time not carving back too much on the copyright owner's rights and interest in exploitation of his or her copyright. In the roundtable discussion, there seemed to be a clear consensus that these two goals were appropriate objectives in addressing the orphan works issues.[346]

Another important policy consideration guiding our deliberations and recommendation is the principle that the orphan works provision should be independent of and work in conjunction with existing exemptions and limitations to copyright. The limitation on remedies we propose is not intended in any way to affect the existing scope of copyright protection (such as that embodied in the idea/expression dichotomy) or any existing exemptions or limitations that might be applicable to the use of the orphan work. This principle is embodied in the structure of the provision, which is only applicable where the use is found to be infringing. Should a user be able to show that his use falls within the fair use exemption or is otherwise free of copyright liability, there would be no need to invoke the orphan works limitation of remedies. As described above in Section IV, for many of the situations described to us in the comments, other provisions of

---

[346] *See, e.g.* July 26 Roundtable Tr. at 63 ("[A] properly constructed orphan works solution both creates incentives for rights holders and would-be licensees to get together and frees up works that otherwise would be locked up for lack of being able to identify a rights holder. … [T]hese are [not] inherently antagonistic goals.") (statement of Mike Godwin, Public Knowledge) & 64-65 ("I would think that the objective of this process is two-fold. One is to make the existing system work better by helping users and owners to get together. The other objective is to create a safety valve for users that genuinely cannot find an owner so that they can use a work, particularly for transformative purposes." (Statement of Fritz Attaway, MPAA).

**Page 94**

ANT_BARTZ_000435496

copyright law might more specifically address the use, and those specific exemptions should be applied in the first instance. The orphan works provision we propose would only be relevant where all other exemptions have failed, and, as a result, the user would be deemed an infringer of copyright.

Finally, efficiency is another overarching consideration we have attempted to reflect, in that we believe our proposed orphan works solution is the least burdensome on all the relevant stakeholders, such as copyright owners, users and the federal government. As described in more detail below, many of the proposed solutions involve registries or other databases of owner or user information, some of which would be administered by the Copyright Office.[347] While it may be the case that such administrative mechanisms might ultimately be of great assistance in helping put owners and users of orphan works together, it is our view, at this time, that such systems would likely entail more resources and efforts than the proponents anticipate or are readily available without providing offsetting benefits, and therefore should only be implemented when a clear need for them is presented. It makes more sense at this point to implement a "low-cost" solution like the recommendation and determine with practical experience whether that is sufficient to solve much of the problem. In addition, we hope that our proposed solution is compatible with and encourages development of such registries and databases by relevant stakeholders organically, independent of government involvement, so that those systems can be the most flexible and adaptive to the needs of the owners and users of copyright in the relevant sectors.

## 2. Specific Provisions

The proposed amendment follows the core concept that many commenters favored as a solution to the orphan works problem: if the user has performed a reasonably diligent search for the copyright owner but is unable to locate that owner, then that user should enjoy a benefit of limitations on the remedies that a copyright owner could obtain against him if the owner showed up at a later date and sued for infringement. The limitations on remedies should give the user more certainty that his efforts to make the work available to the public will not result in significant monetary damage or an injunction that would disrupt the efforts the user has made in reliance on the orphan

---

[347] *See, supra*, page 73.

ANT_BARTZ_000435497

works designation.  At the same time, the owner should in most cases be able to recover compensation for the use of his work, prevent new uses of the work by the user, and, where possible, receive attribution for his work.

By amending the remedies provision of the Copyright Act, the recommendation makes clear that it is not an exemption or limitation of general applicability, but a limitation on the remedies that might be imposed in particular circumstances with respect to a particular user.  Additionally, this approach preserves the applicability of all exemptions and limitations to copyright, in that it only applies after a finding of infringement has been made – if the use of an orphan work qualifies for an exemption like fair use under section 107 or a library exemption under section 108, then there is no infringement liability and thus remedies are no longer relevant.

The recommendation has two main components: (1) the two threshold requirements of a reasonably diligent search for the copyright owner and attribution to the author and copyright owner, if possible and appropriate under the circumstances; and (2) the closed list of remedies that would be available if the user proves that he conducted a reasonably diligent search.  The details of the recommendation are set out in the next sections, followed by a discussion of some other proposals that we considered carefully, but ultimately decided not to recommend.

### a.  The Requirement of Reasonably Diligent Search

Subsection (a) sets out the basic qualification the user of the orphan work must meet:  he must perform a "reasonably diligent search" and have been unable to locate the owner of the copyright in the work.  Such a search must be completed before the use of the work that constitutes infringement begins, and the user should bear the burden of proving what search was performed and whether it was reasonable.[348]  A user might rely on the search efforts of another user for the same work, but the test is whether it was reasonable under the circumstances for that second user to do so – there should not be

---

[348] Some commenter proposed that a user bear the burden of producing evidence of his search, while the copyright owner bear the burden of proving the search was unreasonable.  *See, e.g.* Glushko (595).  In our view, because the recommendation is a limitation on remedies available against an infringer, it makes sense to place the entire burden on that infringer to prove his reasonable search, in part because the evidence of the search that was performed and the circumstances of the use will in almost every case be within the control of the user, not the copyright owner.  Note that many participants in the roundtable indicated that the issue of burden of proof will not make much difference in practice.  *See, e.g.,* July 27 Roundtable Tr. at 61 (statement of Jeffrey Cunard, CAA).

ANT_BARTZ_000435498

any *per se* rule preventing or permitting one user's "piggybacking" on another's search.[349]

The term "locate" the copyright owner should be construed to mean identify an address to which a request for permission to use the work can be sent, which is consistent with the over-arching goal of this recommendation to put copyright owners and users together. For example, if it is clear from a reasonable search that an author has a literary agent to whom permission requests can be sent, the fact that the user cannot specifically locate the author (perhaps because the author is doing research in Antarctica) does not mean that the search could not "locate" the author.

The term "locate" has another dimension that must be addressed. Several commenters complained of the situation where a user identifies and locates the owner and tries to contact the owner for permission, but receives no response from the owner. They suggested that works in these situations should be considered orphan works. This area touches upon some fundamental principles of copyright, namely, the right of an author or owner to say no to a particular permission request, including the right to ignore permission requests. As noted above, the primary goal of this study is to prompt owners and users to find each other and commence negotiation – it is *not* intended to allow use of works in disregard of the owner's wishes after that owner has been found. An owner might ignore a permission request for many legitimate reasons and in many situations: an individual author might not have the resources to respond to every request; a large corporate owner might receive thousands of such requests and it would be unduly burdensome to respond to all of them; the request may be outlandish, in that it seeks to use a valuable work for no payment or in a way clearly at odds with the manner in which the owner is exploiting the work. For this reason, once an owner is located, the orphan works provision becomes inapplicable.[350]

---

[349] *See supra* page 78 (describing commenters views on "piggybacking").

[350] *See, e.g.,* August 2 Roundtable Tr. at 22 ("It seems to me that if you find the copyright owner and the copyright owner is not cooperative or is confused or just doesn't want to talk to you, that takes it entirely out of the orphan works scheme and -- because that is not an unlocated owner.") (statement of David Eber, Houghton Mifflin Company)

It should be noted, however, that in very limited situations the failure of an individual who is believed to be an owner to respond to a permission request might be relevant to the ultimate question of whether the search has, in fact, located the owner. For example, a user may have a work for which no extrinsic evidence (for example, information from Copyright Office records, collecting rights societies, or

ANT_BARTZ_000435499

### i.  Defining Reasonably Diligent Search

The proposal adopts a very general standard for reasonably diligent search that will have to be applied by users, copyright owners and ultimately the courts on a case-by-case basis, accounting for all of the circumstances of the particular use.  Such a standard is needed because of the wide variety of works and uses identified as being potentially subject to the orphan works issues, from an untitled photograph to an old magazine advertisement to an out-of-print novel to an antique postcard to an obsolete computer program.  Each of these presents different challenges in trying to find a copyright owner, and what is reasonable in one circumstance will be unreasonable in another.  It is not possible at this stage to craft a standard that can be specific to all or even many of these circumstances.  Moreover, the resources, techniques and technologies used to investigate the status of a work also differ among industry sectors and change over time, making it hard to specify the steps a user must take with any particularity.

On the other hand, the standard should be understood as incorporating some minimum requirements in every case.  Specifically, the proposed language explicitly requires "good faith," in addition to "diligence."  The purpose of requiring good faith and a reasonable degree of diligence for every search is to safeguard against abuse of the orphan works exception by users who may conduct superficial searches merely as a pretext for exploiting a protected work.  Recall that the primary purpose of the orphan works system is to put users together with copyright owners; not to provide a way for users to *avoid* contacting copyright owners, and recognizing minimum requirements helps promote that goal.  To be sure, the standard of diligence will vary according to all of the circumstances.  But excessive haste and the absence of good faith or diligence should preclude the availability of the limitation on remedies.

---

other databases) indicates that the person is the current owner of the work.  If that user attempts to contact the person but the person does not respond, it may be reasonable to conclude that the user has not "located" the current owner in those circumstances.  *See* August 2 Roundtable Tr. 23-24 ("I think sometimes the person doesn't respond and you haven't located the right person. You might have thought that you located the right person, but still they're unlocated because it's not the right person and they're not going to respond in that context.") (statement of Dwayne K. Butler, University of Louisville).  But the test is whether the user has "located" the owner, not whether the owner has answered requests for permission.

---

**Page 98**

ANT_BARTZ_000435500

In addition to these minima, the comments and discussions we have held with interested parties suggest some additional factors to guide the inquiry into whether a search was reasonable. A discussion of several of these factors follows.

The amount of identifying information on the copy of the work itself, such as an author's name, copyright notice, or title. The most obvious starting point for any investigation of a work's ownership is the information on the work itself, such as a name of the author, or the publisher or a copyright notice. Several commenters pointed out that with some types of works, such as a print of an old photograph, the copy contains no information whatsoever about its creator, let alone a current copyright owner.[351] In such cases, the reasonably diligent steps a user might take to find the owner will likely be very limited. In contrast, most published books, even older ones, contain at least the name of the author and publisher, and often an address for the publisher, and a user would be expected to follow these leads in a reasonably diligent effort to find the current copyright owner.

For authors and copyright owners, marking copies of their works with identifying information is likely the most significant step they can take to avoid the work falling into the orphan works category. This is particularly true for works of visual art, like photographs and illustrations, that otherwise do not contain text or other information that a user can rely on to help determine the identity of the copyright owner. Nothing in the Office's recommendation would make such markings mandatory – in the absence of such information, a reasonable search by the user might very well locate the copyright owner. Nevertheless, the presence and quality of the information on particular copies will be a highly relevant fact as to whether a reasonable search will find the copyright owner.

The lack of identifying information may not be as relevant where the user is using an unauthorized copy of a work, such as a digital image of a photograph pulled from a web site operated by someone other than the author. In such a case the identifying information placed on the work by the author might have been stripped, intentionally or unintentionally, by the person who made the copy. The user should be expected to be more diligent in those circumstances in trying to find the owner than in a case where he is using an authorized copy that does not contain identifying information.

---

[351] See, supra, page 23.

ANT_BARTZ_000435501

Whether the work had been made available to the public.  Typically, works that have been published or otherwise made available to the public contain identifying information that must be investigated by the user, as described above.  Also, published status typically indicates that the author and publisher, at least at one point, had an intent to exploit and commercialize the work, and may still be doing so.  In this case, the user should be expected to do more to find the owner than for works that have not been made available to the public and that do not have any identifying information on them.

The Notice of Inquiry in this proceeding asked whether unpublished works should be excluded from any system to address orphan works.  A good number of commenters strongly opposed exclusion of unpublished works, while a handful agreed with the exclusion to preserve the author's right of first publication and privacy interests against publication where that author cannot be located.[352]  A common suggestion indicated that the unpublished nature of a work should be a factor to consider in assessing whether the search for the author was reasonably diligent.

Our recommendation does not categorically exclude unpublished works from being subject to the orphan works provision, for several reasons.  First, the determination of whether a work is published or unpublished, particularly for older works subject to the 1909 Copyright Act, can be anachronistic, difficult and uncertain, and to make orphan work status contingent on this determination would perpetuate uncertainty about the use of works rather than ameliorate it.  Also, many comments indicated that a large number of works that have unlocatable copyright owners, such as decades-old photographs and letters contained in archives, would likely fall into the unpublished category, and thus excluding them would unreasonably limit the scope of effectiveness of the orphan works provision at facilitating access to material of scholarly and public interest.

Moreover, when one examines the authorial interests at stake with unpublished works in the context of orphan works, the risk of harm to those interests is probably very low.  As we considered the issue, there appeared to be two main interests of the author that are at stake with the issue of unauthorized publication of unpublished works.  First, the professional creator, for artistic or business reasons, might not want his unpublished material made public, thinking that his reputation might suffer if a poorly executed draft

---

[352] *See, supra*, page 79.

Page 100

receives attention.  Second, the privacy of the author might be harmed when sensitive, non-public information (such as a personal diary) is made public without the consent or control of the author.

When placed in the context of the orphan works situation, however, the likelihood that such harm will result is reduced substantially.  Recall that the author's remedies would be limited only if the author cannot be found through a reasonably diligent search.  Thus, with respect to the first interest of protecting the author's professional and creative interests, so long as the author takes steps to be locatable, such as by marking copies with his name and contact information, maintaining a web site with contact information, and/or enlisting an agent or other easily located representative, a user would be able to find the author and not publish the material under the limitation on remedies for orphan works.  Indeed, the fact that an author has a public reputation that he feels might be compromised by publication of unpublished material almost certainly indicates he would be locatable by prospective users.[353]

With respect to the second interest regarding privacy, it may be the case that the author does not have any creative public reputation he seeks to protect, and thus is not naturally making himself known and locatable to prospective users.  The author may have forgotten about or be unaware of the unpublished material that the user plans to publish, such as a long-lost diary or letter sent decades earlier.  However, it is our view that the privacy interest is valid only during the lifetime of the author, a time during which the prospective user should be able to at least locate him.

Thus, we do not recommend excluding unpublished works from the orphan works system.  As to the suggestion that a work's unpublished nature should be considered in assessing the reasonableness of the search, we conclude that if any special rule should be applied regarding a reasonably diligent search involving unpublished material, it should

---

[353] *See* July 26 Roundtable Tr. at 73-74 ("The unpublished works that we're talking about are works in which the creators or the rights holders cannot be identified. I think there are going to be unpublished works all the time where the recording artist has decided not to put that track on the album but we'll be able to identify who the artist is or who the publisher is and go through a normal sort of copyright negotiation process if someone wants to use those tracks.  I think the same thing is true for Salinger letters. We know who Salinger is. We never see him but we know he's there, or his estate is there. I just want to drill down on the issue of unpublished works. The only unpublished works that we're talking about including in this proposal in the orphan works designation are those which the creator or rights holder can't be identified.") (Statement of Mike Godwin, Public Knowledge).

ANT_BARTZ_000435503

be that where the user can reasonably conclude that the author of the work is still alive, she should be expected to undertake a higher burden to locate that owner than for other types of unpublished works, given the privacy interests at stake.[354]  It should be noted that even if the orphan work limitation on remedies might apply to some unpublished material, non-copyright laws such as privacy might apply to the publication of the material, and nothing in our recommendation should affect the application of such laws.[355]  Indeed, many proponents of including unpublished works in the system touted the presence of privacy laws as sufficient to protect the interests of authors in unpublished works.[356]  Finally, to the extent it turns out that, in practice, the orphan works amendment has prompted inappropriate and damaging publication of unpublished works, we have recommended a sunset provision which would require Congress to re-authorize the amendment, and these issues can be revisited at that time or earlier if the problems arise earlier.

The age of the work, or the dates on which it was created and made available to the public.  In the Notice of Inquiry, we asked commenters for their views on whether the age of a work should be a defining criteria for an orphan work, such as excluding works that had been published within the past 25 years or 50 years.  Somewhat to our surprise, the vast majority of commenters[357] said that there should be no specific age requirement, but rather the age of the work should be but one factor that is considered in determining whether the search performed by the user was reasonable.  For example, older works will likely have identifying information on them that may no longer be relevant, such as the name of a defunct publisher or portrait studio, so in those circumstances a user might have fewer avenues of investigation than with a newer work with more current

---

[354] This rule should only apply to unpublished works owned by natural person authors, and not to corporate authors under work made for hire arrangements.  Such corporate authors do not have privacy interests, and are otherwise more likely to take steps to be locatable for reasonably diligent users.

[355] Note also that fair use might apply to permit the publication of an unpublished work, as the 1992 amendment to section 107 makes clear that "[t]he fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors."  17 U.S.C. § 107. *See also* July 26 Roundtable Tr. at 83 ("The issue of so-called [right of] first publication some people might be surprised to find was not really much of an obstacle for us to get over once we went back and considered that Congress in an early 1990's amendment had made it clear that the fact that a work is unpublished is simply one factor to consider when applying the fair use calculus ....") (Statement of Allan Adler, AAP).

[356] *See, supra* note 270 (citing comments).

[357] *See, supra* note 264 (citing comments).

---

ANT_BARTZ_000435504

information.  This is one way the age of the work might figure into the determination of whether a search was reasonable.

 <u>Whether information about the work can be found in publicly available records, such as the Copyright Office records or other resources</u>.  One of the most important factors in determining whether a search was reasonable is the extent to which information about the copyright owner's identity and location are available in publicly available registries, databases, or other sources.  The most prominent of such sources would be Copyright Office records, and it would seem that only in the very rare case would a reasonable search *not* include a review of Copyright Office records for information about a copyright owner's identity and location.[358]

 In addition, there currently exist other non-governmental resources with author and ownership information, which would likely be part of any reasonable search.  For example, ASCAP and BMI are two primary resources for information about musical works, and SoundExchange might be a source for information about sound recordings.  The Authors Guild co-founded a registry of author information, the Authors Registry, which will undertake to determine contact information for an author in the registry.[359]  In each of these sectors, it would seem necessary that a reasonable search would include consulting these organizations for information about the work at issue.

 As noted above, ideally the orphan works legislation would prompt more groups to start creating sources of information that could be easily accessed and searched by users seeking to find the copyright owners of works they wish to use.  In some circumstances, a particular source could become *de facto* a necessary component of a reasonable search, such that failure to consult it would essentially disqualify the user

---

[358] Many commenters noted the fact that many Copyright Office records (most notably registration and renewals from before 1978) are not available via online search services, and that making these records available online would help users seeking information about owners, especially for older works.  As was noted in the roundtable discussions, the Copyright Office has commissioned a feasibility study for the process of converting these records to online form.  However, we would like to stress that the paper records are available to the public, and that Office provides research staff that will research them for a fee, as will private search firms.  It should also be noted that, while providing online access would have several benefits generally – such as easier access to records that would clarify whether a work is protected by copyright – the extent to which making these records available online would help locate orphan works' owners is not entirely clear, given that in many cases an old pre-1978 registration record contains outdated information that was useful only 40 years ago.  This situation is yet another reason that a flexible search standard is needed to accommodate the current state of the resources available to the user.

[359] Authors Guild (R135) (describing Authors Registry).  *See also* http://www.authorsregistry.org/.

ANT_BARTZ_000435505

from satisfying the reasonable search requirement.  As we explain below in the discussion of the proposal for more formal, government-operated registries, it is our view that privately-operated registries like those mentioned would be much more efficient and nimble, able to change more easily in response to the demands of the marketplace and its participants, and to changes in technology surrounding the works and their uses.

Also, publicly available sources for author and owner information need not be solely the province of registries operated by collective organizations.  An individual author can maintain a website with identity and location information that is found through use of the most common search engines.  The reasonable search determination should be flexible enough to allow individual creators to make themselves known to the public seeking permission for use in whatever convenient ways the current state of technology allows.

The role played by technology should also come into play in consideration of what is a reasonable search.  With the advent of nearly ubiquitous high speed Internet access, e-mail, efficient, easy-to-use search engines and similar innovations, it has become much easier to identify and locate authors and copyright owners than it was merely 10 years ago.  One important benefit of a flexible standard like the one recommended is that as new technologies come along that make finding owners easier, the standard for what is a reasonable search can change to reflect those changes in search tools.  For example, 15 years ago it would not have been part of a reasonable search for a user in California to have discovered an advertisement in a local South Carolina newspaper placed by an author that contained information about that author and his work.  However, today it would almost certainly be unreasonable for that same user not to have found the author's website if it were one of the results from a simple Internet search using information from a copy of the work.

Another issue related to the registries or databases of owner information is the suggestion by a handful of commenters that the orphan works problem be addressed by formal registration with the Copyright Office – for example, some commenters proposed that if, after a certain period of time after publication of a work, the owner does not file with the Copyright Office current permission contact information, then the work falls into

ANT_BARTZ_000435506

the "orphan" category.[360]  While in that category, users could use the work subject only to a very small license fee, which would be paid if the owner resurfaced.  Proposals such as these would "centralize" the reasonable search effort to one location – the records of the Copyright Office; a user would need only check that registry to complete his search. After the owner resurfaced and registered with the Copyright Office, the work would no longer be in "orphan" status, and the owner would enjoy full rights under copyright again with respect to new users of the work.

Although the idea of a centralized registry of ownership information has the superficial appeal of efficiency, there are several reasons why the Copyright Office has instead recommended the "ad hoc" proposal favored by the majority of commenters. First, the experience with the registration and renewal system of the 1909 Act, which is similar to the registration systems suggested here, indicates that its primary flaw was as a "trap for the unwary."[361]  It is likely that the mandatory registration requirements in the proposed systems would contain similar traps.  Second, administration and maintenance of such a system is not a simple task, and, based on our experience in operating a registration system, would entail greater costs and burdens than the proponents anticipate. Third, such a system would likely involve disputes over whether certain registrations covered certain works, just as there has been litigation today over the scope of particular copyright registrations.[362]  The nature of many copyrighted works, especially those combined with pre-existing material or other copyrighted works, makes categorization difficult, and much of the anticipated efficiency of a centralized registry would be lost to squabbles over compliance.  These ambiguities about the scope of registrations would diminish the usefulness of the registry to users as well, as they could not be sure whether the information in the registry covered the works or the material they wish to use.  All of these costs, in our view, would delay effective relief to the orphan works problem, and lack needed flexibility to adjust to changed circumstances.

---

[360]  *See, e.g.,* Creative Commons (643) & Google (681).

[361]  *See, supra*, note 97 (describing legislative history regarding problems with the renewal system).

[362]  *See, e.g., Well-Made Toy Mfg. Co. v. Goffa Int'l Corp.*, 354 F.3d 112 (2d Cir. 2003) (analyzing whether copyright registration for a toy doll covered the elements in a derivative work of the doll that were the subject of the infringement claim).

ANT_BARTZ_000435507

It is important to stress, however, that we believe that registries are critically important, if not indispensable, to addressing the orphan works problem, as we explain above. It is our view that such registries are better developed in the private sector, and organically become part of the reasonable search by users by creating incentives for authors and owners to ensure that their information is included in the relevant databases.

Whether the author is still alive, or the corporate copyright owner still exists, and whether a record of any transfer of the copyright exists and is available to the user. In Section III, we recounted the common complaints from many users exhibited in this proceeding over trying to find the copyright owner in the situation where the author has died or the original publisher has gone out of business. Given that copyright is treated as personal property,[363] many commenters explained that trying to trace the transfer of title in these situations is frustratingly difficult – *e.g.* authors do not have wills or otherwise do not specify how the copyright is to be devised to their heirs, bankruptcy proceedings do not mention how the copyright assets are distributed. Moreover, since recordation of transfer documents in the Copyright Office as a prerequisite to suit for infringement was abolished in 1988,[364] a user often does not have access to the documents that might explain who currently owns the copyright in the work. In light of this situation, it is important that the reasonable search determination account for situations like those described above by recognizing that just because a user has identified who the owner of a work was at some point in the past does not mean that the search has "located" the owner for purposes of seeking permission and that the user is no longer eligible for the limitation on remedies for orphan works.

Conversely, users should make all reasonable efforts to identify and locate the copyright owner, including efforts to contact individuals involved in the creation of the work who probably are not legal owners of the copyright. For example, if the user determines that the last known owner of a copyrighted motion picture was a production company that is no longer in business, a reasonable search would also include trying to contact the director, screenwriter, lead actors and other individuals prominently involved in the creation of the work to try to locate the current copyright owner, even though these

---

[363] 17 U.S.C. § 201(d).

[364] *See* Berne Convention Implementation Act, Pub. L. No. 100-568, 102 Stat. 2853 (1988).

**Page 106**

ANT_BARTZ_000435508

individuals are not likely to be owners of the copyright in the work.[365]  Similarly, for sound recordings, a reasonable search would involve contacting the recording artist if the record company that produced the work no longer exists and tracing the chain of title has hit a dead end.

The nature and extent of the use, such as whether the use is commercial or noncommercial, and how prominently the work figures into the activity of the user.  How the work is to be used is also highly relevant to whether the search is reasonable.  If a work is to play a prominent role in the user's activity, then more effort to find the owner should be required.  Similarly, more effort should be required where the use is commercial as opposed to non-commercial.  Also, the more broadly the work is disseminated, the more effort to locate the owner should be required, even where the user is a non-commercial entity.

For example, if a commercial publisher plans to use a photograph for the cover of a new book, it should expend more effort to find the owner than when it simply reproduces the photograph among many others in smaller form on the inside of the book.  Similarly, where a museum plans to use a photograph in advertisements and brochures for a new exhibit, and on the cover of the accompanying coffee table book, then such use demands more effort to find the copyright owner than if simply making that work available as part of a large collection on a website.  By contrast, where a user seeks to copy an old personal photograph from a long lost studio for personal use or limited dissemination, a reasonable search would involve less effort than in those situations described above.  Also, the amount of searching necessary to satisfy the "reasonably diligent search" requirement is a work-by-work analysis, an important consequence of which is that the amount of searching necessary for use of a particular orphan work will not be related to the number of other works the would-be user intends to use in addition to the orphan work in question.

---

[365] Directors Guild of America ("DGA") (621).  The DGA requested that orphan works' users be required to obtain permission from the director of a motion picture if the copyright owner of that work could not be located.  To include such a provision in the recommendations would go well beyond the scope of this study, and touch upon fundamental issues about how rights and interests in the exploitation of motion pictures are apportioned.  The guilds' concern, however, about how directors' works might be used against their wishes in reliance on the orphan works provision, should prompt them to take steps, in their agreements with motion picture production companies, to ensure that the current copyright owner of a film is known and easily found from a reasonable search.

ANT_BARTZ_000435509

When considering circumstances surrounding the use, it is important that the focus be on the nature and extent of the *use* in addition to the attributes of the *user*. Although the fact that a user might be an individual or non-profit entity with minimal resources is part of the circumstance of the use, where the use involves widespread dissemination of a work that would compete with authorized sales and commercial exploitation, a relatively high level of diligence should be required, regardless of the resources of the user. In considering the level of diligence required to find the owner when planning to use a work, the user should carefully consider the extent of the use he intends to make.[366]

### ii.  Developing Reasonable Search Criteria

Another important issue that surfaced in discussions with stakeholders is exactly how factors like those described above should be developed and made part of the system for orphan works. Should they be (i) left to the courts to decide on a case-by-case basis; (ii) made part of the statute, like "fair use" and section 107; (iii) embodied in legislative history; (iv) part of a Copyright Office regulation; or (v) embodied in another instrument, like voluntary guidelines or best practices developed by private stakeholders? There was some concern expressed in the comments and roundtables that a general standard like the one included here might be too uncertain for users to apply, particularly unsophisticated users, and thus not help clarify what a user is to do in the orphan works situation.

To help address this concern, many commenters expressed support for the development of guidelines for reasonable searches in the different sectors (say, for example, guidelines for searches related to motion pictures) through further discussions among the groups in such sectors, perhaps under the auspices of the Copyright Office. Any such guidelines can and should address the factors described above, and we favor the development of guidelines or even binding criteria if need be on a sector-by-sector basis, and strongly encourage the parties to engage in those discussions.

A question was raised as to whether the results of these voluntary discussions on guidelines should be made formal in some way, such as through a rulemaking proceeding in the Copyright Office to adopt the guidelines as criteria for a reasonable search. We

---

[366] Note that in our recommendation, as described below, whether a use is commercial or non-commercial will also be relevant to scope of remedies that will be available in a particular orphan works situation should the copyright owner resurface. *See infra,* page 115.

ANT_BARTZ_000435510

anticipated that users would be concerned that a general reasonable search standard would not provide enough certainty – that is, without a defined checklist of actions that would constitute a reasonable search, a user could never know for certain whether she had done enough to find the copyright owner.[367]  For this reason we explored the possibility of giving the Copyright Office the authority to define reasonable search specifically in regulations, after hearing from the interested parties in a particular sector.

Much to our surprise, most of the groups involved objected to this suggestion, arguing that informal, voluntary processes would involve more collaborative discussion and result in more useful guidelines being developed.[368]  In fact, groups that are typically users of copyrighted works and who might be thought to desire more certainty over exactly what entails a reasonable search, such as libraries and archives, generally were not in favor of formal rulemaking related to the reasonable search component.

As a result, the Copyright Office has decided at this time not to propose that the orphan works legislation provide it with any rulemaking authority.  One concern we had about developing such binding criteria is that invariably it would be incomplete and outdated quickly, as new technologies and sources of information are developed over time.[369]  For example, if one in 1993 were to develop reasonable search criteria, it probably would not have included the use of Internet search engines like Yahoo! and Google which would become available just a few years later.[370]  We do believe, however, that a description of the general factors like that above be included in the legislative

---

[367] *See, e.g.,* July 26 Roundtable Tr. at 17 ("The biggest problem with a reasonable effort search is you never -- you don't know if [what] you've done will satisfy a court and that what you've done really would be considered a reasonable effort search. You don't have the certainty.") (Statement of Jonathan Band, Library Copyright Alliance).

[368] *See* July 26 Roundtable at 31-32 (comments of Library Copyright Alliance and Public Knowledge objecting to formal adoption of guidelines by Congress, at least initially).

[369] *See* July 26 Roundtable at 20-21 ("I think the other issue is that when you define so specifically, especially if it were defined in statute what a diligent search is, then suddenly you lose flexibility. What is a diligent search today? We may learn in a year or in two years through experience that is not going to be the standard that we want to hold this by. There has to be some flexibility.") (Statement of David Trust, Professional Photographers Association)

[370] *See* July 26 Roundtable at 45 ("I would just like to caution that it's important to keep in mind that the technology that we live with every day and the Internet and database technology and computer technology is evolving very rapidly. A solution to these problems that may seem appropriate today five years from now may seem completely ridiculous.") (Statement of Michael Copabianco, SFFWA)

ANT_BARTZ_000435511

history to any orphan works legislation so that some guidance is available to copyright owners, users and the courts in applying the provisions.

Without any formal process for establishing criteria for reasonable searches, participants in the various sectors would be free to develop their own voluntary guidelines for reasonable searches.  Ideally these would be collaborative between user and owner groups, but they could also be separate endeavors.  In either case, the individual groups could publish the results of their efforts for users to consult when conducting searches.  For example, a library association could publish its best practices or guidelines for users trying to find the owner of a photograph, and a photography association could publish its own separate set of guidelines.  None of these guidelines would be definitive and dispositive – in any given circumstance a user who follows just one set might not be conducting a reasonably diligent search.  If there were litigation over that use, a court might analyze the various sets of guidelines, and, in determining whether the particular search was reasonable, opine on the quality or lack thereof of one or more guidelines.  In any event, users would benefit from various sources of information as to how to conduct searches, even if this information comes from multiple sources. If a more formal system for developing criteria turns out in practice to be warranted, that issue can be revisited during reauthorization at the time of the legislation's sunset provision.

### b.  The Requirement of Attribution

We also recommend one other threshold requirement for a user to qualify for the orphan works limitations on remedies:  throughout the use of the work, the user must provide attribution to the author and copyright owner of the work if such attribution is possible and as is reasonably appropriate under the circumstances.  The idea is that the user, in the course of using a work for which he has not received explicit permission, should make it as clear as possible to the public that the work is the product of another author, and that the copyright in the work is owned by another.  While only a handful of commenters proposed a requirement along these lines,[371] we found several good reasons to support this requirement.

---

[371] *See, e.g.,* Museum Comments (610), suggesting that the user apply an Orphan Works (or "OW") notice to the copy that incorporates the orphan work.  Other commenters opposed "user" formalities such as notice or registration of intent to use, in part out of competitive concerns. *See, e.g.* AAP (R85).  As

ANT_BARTZ_000435512

First, it provides more notice to authors and copyright owners that their work is being used, and might facilitate them contacting the user and working out a voluntary agreement about the use of the work. The desire to put owners and users together should not end with the user's reasonable search and commencement of use. Attribution will help facilitate the marketplace transactions that are the primary goal of the recommended solution to the orphan works problem.

Second, attribution is a critically important aspect of copyright for authors and owners, particularly individual authors. From our discussions with various stakeholders, in the situation where an author is found after a search prior to use, many times the author consents to a royalty-free use, provided that the user provides proper attribution. Indeed, the Creative Commons has published information that for those authors who adopt one of the many forms of Creative Commons licenses, about 94% of them opt for a license that requires attribution.[372] Thus, even among a group of creators that are willing to permit wide dissemination and re-use of their works, attribution is an essential and important part of preserving the author's interests in the work.

Third, given that any user would have to perform a reasonably diligent search to find the owner in the first place, she would likely have already developed the information that would go into an attribution. Indeed, many user groups who participated in this proceeding, such as the museums, universities and libraries, indicated to us that providing information about the works they use is part of their normal course of operation – their mission in many respects is to provide the public with this type of historical context for the materials they make available. Accordingly, this requirement would not, therefore, impose an unreasonable burden on the user.

Fourth, representatives of individual authors expressed strong concern that any orphan works regime would be abused by users who simply use it to hide their clear intent to infringe works, or by those who actually did not perform a reasonably diligent search. Requiring attribution would help curb abuse, because a blatant infringer would

---

explained in this Section, attribution is somewhat different from the formalities proposed and addressed by the comments in this proceeding.

[372] *See* Brief of Creative Commons *filed in MGM Studios, Inc. v. Grokster, Ltd.*, No. 04-480, at 27 (S. Ct. Feb. 2005) (available at http://www.copyright.gov/docs/mgm/creative-commons.pdf); *See also supra* note 137 (referencing documentary filmmakers' "Best Practices for Fair Use," which makes repeated reference to attribution as part of the best practices).

ANT_BARTZ_000435513

not likely be inclined to provide notice to the copyright owner in the situation where he has not performed a proper search.  It will also serve to remind users that the orphan works provision is not an exemption from copyright – they still have obligations to the copyright owner should she resurface after the use has begun.

The requirement of attribution should be a flexible rule, and should not be interpreted in a strict way to unnecessarily create another obstacle to the use of orphan works.  As described, many orphan works situations involve untitled, unattributed works for which determining even the identity of the author may not be possible.  The recommendation includes language to make sure that in such situations, the user is still eligible for the orphan works limitations on remedies.  Similarly, the information contained in the attribution should be reasonable under the circumstances – formalistic errors or similar omissions in the attribution should not be cause to disqualify the user from the orphan works category.

### c.  Other Alternatives Considered

There were two other mechanisms proposed to help address the orphan works issue that we considered but ultimately concluded would not be appropriate to recommend at this time.  First, some commenters suggested that users should be required to file with the Copyright Office some public notice that they have conducted a reasonable search and intend to use an orphan work.[373]  In essence, a user would be required to certify publicly that he has been unable to locate the copyright owner before his planned use can commence.  These commenters argue that there are several benefits to such a system.  First, it would help curb abuse of the orphan works provision, in that users who did not perform a reasonable search would be less likely to file a notice.  Second, it would give copyright owners who are actively exploiting their works an easier means of monitoring searches to determine if one of their works was being used.  Third, it would allow users more information about searches being conducted by others, which will help them in their own searches for copyright owners.

Several groups opposed this proposal, most notably commercial book publishers.  They claim that such notice would impair their competitive position with other publishers, who would use the filings to determine what books or types of books they

---

[373]  *See* notes 241-242, *supra.*

ANT_BARTZ_000435514

plan to publish.  Also, they argued that with respect to fair use of works, they do not have to give notice that they are invoking the exemption, and they should not be under a similar obligation for the use of an orphan work. [374]

While a centralized registry of user certifications or notice of intent to use sounds promising on the surface, upon closer examination there are potential pitfalls that outweigh the benefits at this time.  First, as we described with owner-based registration systems, many types of works are difficult to classify and accurately represent in a textual database like the one proposed.  For example, for untitled photographs and other visual works, there is a real possibility that a textual database will not be very useful to owners and users looking for works.  For such a database to work, it would likely need to have a copy of the work included in the record and displayed to searchers, a requirement that will increase the cost and complexity of the system.[375]  Second, the system might place an inappropriate burden on users, particularly ones with large collections of orphan works.  For example, a typical situation raised in the comments was an archive that has tens of thousands of photographs it wished to make available.  Even a very modest filing fee for such notices would probably make it prohibitive for the user to make the works available.[376]

In sum, it is our conclusion that recommending such a registry at this time would be premature.  We believe the truly "ad hoc" system – where users simply conduct a reasonable search and then commence use, without formality – is the most efficient way to proceed.  As noted below, however, we also propose a sunset provision to allow Congress to reexamine the question after ten years to see if additional mechanisms like a user registry might be more practical and beneficial.

The other mechanism proposed by some commenters is a requirement that orphan works users pay into an escrow before commencing use.  The amount collected in the escrow would be paid out to copyright owners if they resurface.  This proposal is similar

---

[374] July 26 Roundtable Tr. at 59-61 (statement of Allan Adler, AAP).  *See also, e.g.*, AAP (605) & AAP (R85).

[375] Even if the works are displayed, it is also difficult to index them in a way that is meaningful for users trying to locate an image with no identifying textual data.

[376] The registry might address this problem with group or collective notice, but that likely creates problems for searchers try to find one work among the collection represented by the notice.

ANT_BARTZ_000435515

to the system in Canada that was mentioned in the Notice of Inquiry.[377]  The proponents of an escrow requirement, mostly individual authors like illustrators, recording artists and photographers, argue that it would prevent abuse of the orphan works system and create a practical way for individual copyright owners to obtain compensation for the use of their works, which according to them is currently impractical due to the high cost of litigation. Most other commenters strongly disfavored the Canadian approach, and also opposed an escrow system of any kind.

In our view, an escrow requirement in an "ad hoc" reasonable search system like we recommend would be highly inefficient.  Every user would be required to make payment, but in the vast majority of cases, no copyright owner would resurface to claim the funds.  Thus, most if not all of the funds collected would not be distributed to the authors, and thus the system would not actually facilitate payments between users and owners of orphan works.  Also, establishing the amount to be paid would be a difficult and time-consuming task.  Moreover, the escrow requirement might needlessly discourage legitimate orphan works users from making use of works simply because of the administrative cost or the volume of works they wish to use, as in the case with a notice of intent to use registry.

We are sympathetic to the concerns of individual authors about the high cost of litigation and how, in many cases, the individual creator may have little practical recourse in obtaining relief through the court system, particularly against infringements involving small amounts of actual damages.  This problem, however, has existed for some time and goes beyond the orphan works situation, extending to all types of infringement of the works of individual authors.  While there are some mechanisms in place to help address the problem, such as enforcement by collective organizations or timely registration to secure the availability of statutory damages and attorneys fees, we believe that consideration of new procedures, such as establishment of a "small claims" or other inexpensive dispute resolution procedure, would be an important issue for further study by Congress.  It is not, however, within the province of this study on orphan works.

---

[377] 70 Fed. Reg. 3739, 3741 (Jan. 26, 2005).

ANT_BARTZ_000435516

### d.  The Limitation on Remedies

If a user meets his burden of demonstrating that he performed a reasonably diligent search and provided reasonable attribution to the author and copyright owner, then the recommended amendment would limit the remedies available in that infringement action in two primary ways:  first, it would limit monetary relief to only reasonable compensation for the use, with an elimination of any monetary relief where the use was noncommercial and the user ceases the infringement expeditiously upon notice.  Second, the proposal would limit the ability of the copyright owner to obtain full injunctive relief in cases where the user has transformed the orphan work into a derivative work like a motion picture or book, preserving the user's ability to continue to exploit that derivative work.  In all other cases, the court would be instructed to minimize the harm to the user that an injunction might impose, to protect the user's interests in relying on the orphan works provision in making use of the work.  These recommendations are discussed in detail in this section.

### i.  Limitations on Monetary Relief

A vast majority of the commenters in this proceeding agreed that the prospect of a large monetary award from an infringement claim, such as an award of statutory damages and attorneys' fees, was a substantial deterrent to users who wanted to make use of an orphan work, even where the likelihood of a claim being brought was extremely low.[378] Most of the proposals for addressing the orphan works problem called for clear limitations on the statutory damages and attorneys' fees remedies in cases involving orphan works.  Our recommendation follows this suggestion by limiting the possible monetary relief in these cases to only "reasonable compensation."[379]

---

[378] *See supra* note 323.  The likelihood of statutory damages or attorneys' fees being awarded in an orphan works case is probably low, given that for those remedies to be available, the work must have been registered prior to infringement, *see* 17 U.S.C. § 412, and if a work is registered it is unlikely that the copyright owner is unlocatable through a diligent search.  Nevertheless, there is the possibility that an old registration might exist and is not found on reasonable search (*e.g.* for a photograph whose title in the registration is not descriptive of the work) or contains outdated information, and thus the prospect of statutory damages might be more likely in some circumstances.

[379] The Copyright Act elsewhere provides a limitation on remedies to reasonable compensation in circumstances somewhat analogous to the orphan works situation.  Section 104A(d)(3) addresses the situation where someone has created a derivative work based on a foreign work that was in the public domain but has been restored in 1996.  It protects the interests of the "reliance party" who created the derivative work creator by allowing the party "to continue to exploit that derivative work for the duration of the restored copyright if the reliance party pays to the owner of the restored copyright reasonable

---

ANT_BARTZ_000435517

The term "reasonable compensation" is intended to represent the amount the user would have paid to the owner had they engaged in negotiations before the infringing use commenced. In most cases it would equal the reasonable license fee as that concept is discussed in Judge Leval's opinion in *Davis v. The Gap, Inc.,* [380] which explains why a reasonable license fee is appropriate in circumstances very similar to the orphan works situation where the user has sought to find the owner through diligent search:

> The Gap was not seeking, like [other] defendant[s], to surreptitiously steal material owned by a competitor. … [T]he Gap and Davis could have happily discussed the payment of a fee, and … Davis's consent, if sought, could have been had for very little money, since significant advantages might flow to him from having his [work] displayed in the Gap's ad. Alternatively, if Davis's demands had been excessive, the Gap would in all likelihood have simply eliminated Davis's [work] from the photograph. Where [a prior court case was] motivated by its perception of the unrealistic nature of a suggestion that the infringer might have bargained with the owner, …, such a scenario was in no way unlikely in the present case.[381]

As that decision makes clear, reasonable compensation would equal what a reasonable willing buyer and reasonable willing seller in the positions of the owner and user would have agreed to at the time the use commenced, based predominantly by reference to evidence of comparable marketplace transactions. As the *Davis* case suggests, the burden is on the copyright owner to demonstrate that his work had fair market value, and such assertion cannot be based on "undue speculation."[382] It is not enough for the copyright owner to simply assert the amount for which he would have licensed the work *ex post*; he must have evidence that he or similarly situated copyright owners have actually licensed similar uses for such amount.[383]

---

compensation for conduct which would be subject to a remedy for infringement but for the provisions of this paragraph." 17 U.S.C. § 104A(d)(3)(A). The section also includes some guidance on how "reasonable compensation" should be determined, by looking to the harm to the actual or potential market value of the work and the contributions of the copyright owner and reliance party in creating the derivative work.

[380] 246 F.3d 152 (2d Cir. 2001).

[381] *Id.* at 164. We use the term "compensation" instead of "license fee" to encompass other forms of payment that might be made in certain situations, such as a simple sales price for additional reprints of a photograph.

[382] *See* 246 F.3d at 166.

[383] In *Davis*, the court rejected the plaintiff's claim that he would have licensed the defendant's use for $2.5 million as "wildly inflated"; instead, the court looked to actual, similar transactions the copyright

**Page 116**

ANT_BARTZ_000435518

While many commenters supported a general remedy like "reasonable compensation," some expressed concern about the impact that *any* monetary remedy at all might have on their ability to go forward and use orphan works. For example, museum representatives explained that they would like to use hundreds or even thousands of orphan works in their collections, so even a minimal monetary award might be prohibitive. Libraries and archives made similar observations, given their desire to make large collections of orphan works accessible. To address these concerns, the museums have proposed that in the orphan works situation the user receive a time-limited exemption, one that last only 5 years from the reasonable search, with no monetary payment required. Others have proposed a low cap on monetary damages, such as $100 or $500 per work. They believe this would give them more certainty about their potential exposure and thus more confidence using the orphan work.

On the other side of this issue were individual copyright owners. While corporate copyright owners were generally in favor of a reasonable compensation approach, individual authors like photographers, illustrators and graphic artists noted that under current conditions, obtaining a lawyer to even file an infringement case is prohibitively expensive, so much so that only where statutory damages are available is it possible to file a case. If compensation were limited to only a reasonable royalty, they fear that it will likewise be practically impossible even to recover that compensation given the cost of litigation.

In our view, a general standard of reasonable compensation is the right solution to this problem, for several reasons. First, with respect to the concern about a chilling effect of any monetary remedy, it must be noted that in nearly all cases where a diligent search has been performed, the likelihood of a copyright owner resurfacing should be very low, so that no claim for compensation is ever made. Second, it should be clear that "reasonable compensation" may, in appropriate circumstances, be found to be zero, or a royalty-free license, if the comparable transactions in the marketplace support such a finding. Indeed, given that the burden is on the copyright owner to produce evidence of

---

owner had concluded (a license for a cover on a magazine for $50) to conclude that a reasonable license fee would be in the range of $50. 246 F.3d at 161.

ANT_BARTZ_000435519

market value for the work, it is unlikely that for orphan works, where by definition the owner was not locatable by reasonable search, the plaintiff could produce such evidence.

Our discussions with museums, universities and libraries indicated that in many orphan works situation a low or zero royalty is likely to be the reasonable compensation. For example, a common situation is the following:  A university would like to republish an article from an encyclopedia, and it has received permission (royalty-free) from the publisher, but the photographs contained in the article are owned separately by individual photographers.  Nineteen of the twenty photographs have identifiable owners, all of whom grant a royalty-free license when contacted by the university.  The twentieth photograph is similar to the other nineteen in type, quality and subject matter, but is an orphan work, and the university relies on the proposed legislation in deciding to publish it.  If the owner surfaces after publication, it is our view that the university has a good case that "reasonable compensation" in that situation is zero, given the other royalty-free licenses involved in publication of similar works in a similar context.  Furthermore, to the extent some of the other photographs were licensed for payment, the university has some certainty about the range of license fees it might have to pay for use of the orphan work. In addition, the nature of the user will come into play in such a determination – just as a museum might stress in negotiations with a copyright owner its non-profit status and its public service mission as justification for a low or no royalty payment, those factors could be considered by the court in assessing reasonable compensation.

In addition, to make absolutely sure that the concerns of nonprofit institutions like libraries, museums and universities about monetary relief are assuaged, we recommend an additional limitation on monetary relief where the user is making a non-commercial use of the work and expeditiously ceases the infringement after receiving notice of the infringement claim.  In that case, there should be no monetary relief at all.  Libraries, archives and museums indicated that posting material on the Internet was a primary use they would like to make of orphan works, and that they would take down any material if a copyright owner resurfaced.  This additional provision provides certainty about their exposure in that circumstance.  If the organization wishes to continue making use of the work, it would have to pay reasonable compensation for its past use, and, as described below, for future use of the work.

**Page 118**

ANT_BARTZ_000435520

The language used to define commercial use ("direct or indirect commercial advantage") is used throughout the Copyright Act,[384] and we have added one example of a commercial use ("sale of copies or phonorecords of the work") to make clear where reasonable compensation would be required, even from a nonprofit organization.[385] The museum example is instructive. Most of the activities of a not-for-profit museum related to orphan works, such as posting the work on a website that is not supported by advertising or that generates other revenue, would be "without purpose of direct or indirect commercial advantage." However, where the museum essentially acts as a publisher and the infringement consists of selling books, DVDs or other materials in its gift shop, that conduct would not fall within the exception in the recommendation, and such activity would require the museum to pay reasonable compensation to the owner if he surfaces. The amount of that compensation might still be zero or very low, based on the evidence the owner must produce about the market value of the work and the evidence of license fees paid (or not paid) by the museum for similar uses of similar works.

### ii.  Limitations on Injunctive Relief

In addition to the limits on monetary relief, several commenters in this proceeding suggested that limitations on injunctive relief were needed as well. Most specifically, users who would like to create derivative works based on orphan works, most notably filmmakers and book publishers, stressed that the fear of an untimely injunction – brought just as the book was heading to stores, or just before release of the film –

---

[384] *See, e.g.,* 17 U.S.C. §§ 108(a)(1) (limiting exemption to reproduction and distribution "made without any purpose of direct or indirect commercial advantage"), 109(b) (limiting first sale doctrine for sound recordings and computer programs where they are rented "for the purpose of direct or indirect commercial advantage"), 110(4) (exempting public performance of musical works for educational, religious or charitable purposes where, among other conditions, the performance is made "without any purpose of direct or indirect commercial advantage") & 506 (defining one form of criminal infringement as willful infringement "for purposes of commercial advantage or private financial gain").

[385] Some participants in the roundtables noted that nonprofit organizations can undertake both commercial and noncommercial activities with respect to copyrighted works. *See, e.g.,* August 2 Roundtable Tr. 51 ("As a librarian I very well understand our willingness to say let's deal with the noncommercial because we're doing this for the common good, for the public good, but let's be realistic. In today's university situation we're doing a lot of stuff that is commercial as well, and that starts to get us into areas that we cannot make blanket distinctions that everything that is being done within an educational institution is going to be for nonprofit, but we are in business. We are trying to make a living out of some of the stuff that we are holding and protecting.") (statement of Christine Sundt, University of Oregon, College Art Association, Visual Resources Association)

ANT_BARTZ_000435521

provides enough uncertainty that many choose not use the work, even though the likelihood of such injunction is small.[386]  On the other hand, as noted above, many users who wish to make orphan works available on the Internet, such as libraries, museums and digital archives, are willing to "take down" material upon an owner resurfacing, so that facing even a full injunction was not as troublesome to these types of users.

In light of these comments, we recommend that injunctive relief for infringement of an orphan work be limited in two ways.  First, where the orphan work has been incorporated into a derivative work that also includes substantial expression of the user, then injunctive relief will not be available to stop the use of the derivative work in the same manner as it was being made prior to the claim of infringement, provided the user pays reasonable compensation to the copyright owner.  Second, in all other cases, full injunctive relief may be available, but the court must to the extent practicable account for and accommodate any reliance interest of the user that might be harmed by an injunction.

With respect to the first category, the language regarding "significant expression" is intended to exclude situations where the work is simply put into a collection of other works, like an electronic database.  There is an argument under copyright law that such activity is the creation of a derivative work, but the intent in this provision is to apply to those situations where a user transforms an orphan work into a new work, such as taking a novel and turning it into a motion picture, or using a manuscript or photograph as part of a historical book.  In those situations the user's reliance interest is greater, and he has contributed new expression to the public benefit, and thus is entitled to more freedom from injunctive relief.  The scope of that freedom, however, is limited; the copyright owner retains full rights with respect to new derivative works, such as a sequel to the original motion picture.

In contrast, a full injunction will still be available where a user simply republishes an orphan work, or posts it on the Internet without transformation of the content.  Such users might still have incurred some costs or burden in making that work available to the public in that way, such as having printed 10,000 copies of a book that have yet to be

---

[386] *See, e.g.*, July 26 Roundtable Tr. at 243 ("As a book publisher I'm not going to take a risk of -- I'm not going to put it between the covers if the book has a likelihood of being enjoined 50 days later just as we are starting to sell copies and after we've printed X thousand copies.") (Statement of Paul Slevan, Holtzbrinck Publishing).

ANT_BARTZ_000435522

sold. The court is instructed to avoid unnecessary hardship on the user in those circumstances, say, for example, by allowing the unsold copies to be sent to retailers.

### e. Other Provisions

We also recommend two other administrative provisions. First, a savings clause that makes clear that nothing in the new section on orphan works affects rights and limitations to copyright elsewhere in the Copyright Act, which is consistent with the structural approach on placing the provision in the remedies chapter. Second, we recommend that the provision sunset after ten years, which will allow Congress to examine whether and how the orphan works provision is working in practice, and whether any changes are needed.

### f. International Considerations

The Notice of Inquiry asked questions about how any proposed solution to the orphan works issue would comport with the United States' international obligations in the various copyright treaties. Those obligations are set forth in Section IV above, and because our recommendation does not exclude foreign works from its scope, it must comport with the United States' international copyright obligations. We believe that one of the primary advantages of the ad hoc, reasonably diligent search approach is that it is fully compliant with international obligations. Because it requires users to find copyright owners and depends on whether they have been reasonably diligent in doing so, it does not impose any formalities on authors and copyright owners that condition the enjoyment and exercise of copyright protection. Moreover, the recommendation is not a new exemption or limitation to copyright that is applicable to all users or a certain class of users for all time – rather, it is a modification to the remedies that are available in a specific infringement case where a particular user has proven that certain circumstances exist. In this sense it is quite similar to existing provisions in section 504 that modify the available remedies in certain cases.[387] Finally, we believe the modified set of remedies still preserves a wide range of meaningful relief to authors and copyright owners even in the orphan works situation, such as reasonable compensation and injunctive relief in most cases.

---

[387] *See supra* page 49 (discussing section 504(c)(2)).

ANT_BARTZ_000435523

We are mindful that many countries monitor the activities of the United States in copyright law and may be influenced by any orphan works legislation that is passed to examine the question themselves.  One concern that has been raised is that other countries, particularly those unwilling to deal with substantial piracy problems or looking to avoid protecting U.S. copyright owners in their country, might use the orphan works issue as a pretext for allowing weaker enforcement and remedies against pirate copyright operations.[388]  It is our hope that this Report and further Congressional deliberations on the topic will make clear the precise scope of this issue and make clear that any such efforts would in fact be a pretext, and that these deliberations will inform the consideration of legitimate orphan works studies by other countries.

### 3.  Applying the Recommendation to Orphan Work Uses

To further explain how our recommendation would work in practice, this section takes the four general categories of users described in Section III and describes how the recommended limitation on remedies would apply in each scenario.  As noted in that section, we believe that nearly all orphan work situations are encompassed by one of those four categories, so that if our recommendation resolves users' concerns in a satisfactory way, it will likely be a comprehensive solution to the orphan works problem.

### a.  The Large-Scale Access User

As described, the "Large-Scale Access User" is typically a library, archive or museum that has a large-number of works that it would like to make available to the public, such as through its web site or as part of an exhibition.  Such users often deal with unpublished works that are parts of collections of material acquired through donations from individuals.  In most cases the use of these materials is made as part of an overall effort to catalog, preserve and make the works accessible to the public.

Assuming the user would want to make use of a work that goes beyond any statutory exemption such as fair use, the orphan works recommendation would require the user to perform a reasonably diligent search for the owner of the copyright in the work.  This user might have several leads on finding the owner, given that it is probably already performing research into areas related to the work, such as the historical context

---

[388] July 27 Roundtable Tr. at 206-7 (statement of Steve Metalitz, RIAA).

**Page 122**

ANT_BARTZ_000435524

in which the work was created.[389]  Also, most users like these indicated to us that it is part of their mission to place the works in their historical context, which would include identifying and locating the creator and owner of the work.  Upon completing its due diligence, the user could commence use of the work, which must include attribution to the author, if such attribution is possible, as appropriate under the circumstances.  The user should make certain to document all of the steps taken to locate the owner and its attribution during use so that should the copyright owner surface, the user is able to demonstrate that it met the criteria for the orphan work limitations on remedies, and such evidence can be produced in the event of any litigation.

If the owner surfaces and claims that the user is infringing his copyright, the user has several choices.  First, it can assert any limitation or exemption from copyright that might apply to its activity.  Second, it can produce the evidence of reasonable search and attribution that make it eligible for the limitation on remedies in the recommendation.[390] If the use was noncommercial, which is likely with this type of user, and if the user expeditiously ceases infringement – say, by taking the material down from its website – then it would be subject to no monetary remedy whatsoever.[391]  Moreover, because the infringing use has stopped, ongoing injunctive relief would be irrelevant.  If the user has transformed the work and made it part of a film or book that it produced and is making available, it can continue to make use of that derivative work provided it pays reasonable compensation to the owner.[392]  In no case would the user face statutory damages or attorneys' fees.

This discussion looks at the situation from the perspective of infringement litigation ensuing.  Ideally, litigation never occurs, but the owner and user negotiate in light of the available remedies and come up with a mutually acceptable resolution.  For

---

[389] As described above, if the user believes that the work is unpublished and the author still alive, it should make extra effort to find that author given the privacy concerns that might be at stake.

[390] *See* Recommended Statutory Language, section 514(a).

[391] *See* Recommended Statutory Language, section 514(b)(1)(A).

[392] *See* Recommended Statutory Language, section 514(b)(2)(A).  To help minimize uncertainty about the amount of "reasonable compensation" this user might have to pay, it should keep records of transactions it has with known copyright owners who consent to use of their works in situation analogous to the use made of the orphan work.  To the extent many or most of these transactions involve no or small amounts, that evidence would go a long way to ensuring that the "reasonable compensation" is similarly low, or even zero.

ANT_BARTZ_000435525

example, it might not be in the interest of the owner for the user to take down the material from the website – instead, the owner might permit such ongoing use provided the user provide a link or other contact information for the owner, which would make it easier for other users to find that owner and help defeat other claims that the work is an orphan work.

### b.  Subsequent Creator

This user takes an orphan work and transforms it to create or include it as part of a derivative work.  Some examples include a filmmaker who takes an old screenplay and modifies it to create a new film, a book publisher that takes a manuscript and has another author write a novel based on that manuscript, or a songwriter who uses a poem as the lyrics to a song he composes.  In most cases this type of user will be making commercial use of the work, as it hopes to commercialize and exploit the derivative work it is creating.

If the user performs a reasonably diligent search and cannot locate the owner, it can go forward with the use.  It would be required to provide appropriate attribution to the author and owner, if it knows their identities, in the derivative work it is creating.  It should also be prepared to pay reasonable compensation to the owner if she surfaces and makes a claim for infringement, given that in most cases the use will be commercial and not eligible for the elimination of monetary relief for noncommercial uses.  The user can be confident, however, that if the owner surfaces – even at an inopportune moment like the middle of filming of a motion picture – the user will be able to continue to prepare and exploit the derivative work under our recommendation, provided it pays reasonable compensation and makes reasonable attribution to the author and owner.[393]

As with the large-scale access user, the recommendation is designed to encourage negotiation and settlement between the resurfacing owner and orphan work user.  While the subsequent creator would be able to exploit its derivative work, if it wanted to make additional derivative works (such as a television series based on the original motion picture it created), it would need permission of the orphan work owner, who is now clearly known and locatable.  Ideally the owner and user would negotiate a mutually satisfactory resolution of issues like these.

---

[393] *See* Recommended Statutory Language, section 514(b)(2)(A).

ANT_BARTZ_000435526

### c.   Enthusiast User

As described, the enthusiast user is typically an individual who has expertise or interest in a particular subject and wishes to make use of works, such as old journals, books or articles, that relate to his area of interest.  This use often involves making the work available on the Internet for other enthusiasts or anyone in the public who is interested in the subject matter.  In most cases the use is not being made for commercial purposes, but mostly for scholarly or hobbyist purposes.

This user will find himself in a similar position as the large-scale access user.  He must perform a reasonably diligent search for the owner, which will likely be part of the user's ongoing efforts to develop expertise in the field.  In fact, in some cases the enthusiast user might be in the best position to find the owner given the breadth of knowledge and interest he has for the subject.

Once he has performed the search and been unable to find the owner, he can make use of the work by, for example, posting it on the Internet for other enthusiasts.  If the owner surfaces and notifies the user of his copyright, the user can take the material down to ensure that he has no monetary liability for the use (provided he has not made commercial use of the work).  As with the other uses, though, the owner may wish to allow continued use of the work, given that many people who are interested in the subject would likely visit the enthusiast's site or otherwise become known to the owner.

### d.   Private User

The most common situation involving personal use described to us in the comments involved the reproduction of old family photographs from studios and photographers who are long gone.  In such a case the dissemination of the work will likely be very limited, generally among family members and relatives.  In such a case the user should make an effort to find the original photographer and copyright owner.  If that photographer cannot be found through such search, then the user could commence reproduction of the work.

It is highly unlikely that the copyright owner will surface in cases like these for a few reasons.  First, discovery of the infringement is not likely, given that the infringing copies will be disseminated – if at all – among a limited group and not generally made

**Page 125**

ANT_BARTZ_000435527

available to the public.[394]  Second, the amount of damages involved in these cases is likely very small, probably in the range of the cost of reprints, so that litigation costs would far outweigh prospective recovery, even if full remedies were available. Nevertheless, if the user stopped his infringing activities upon notice of infringement, he would be insulated from monetary liability by the non-commercial provision in the recommendation.[395]

The more interesting question arises when the personal user enlists the aid of a commercial photofinisher to help in making the copies of the orphan photograph.  By making reproductions of the photographs, the photofinisher is committing infringement, and would benefit from the limitations of remedies only if it can demonstrate that it met the requirements of reasonable search and attribution for the work.  In most cases it would be the user, not the photofinisher, who performs any search for the owner. Whether it is reasonable for the photofinisher to rely on the search of its customer depends on the circumstances – it might be possible for the company to institute procedures to record the efforts made by the user as evidence of the reasonable search.  It would also be required to include attribution of the original photographer on the prints made for the customer.

In short, our recommendation might very well apply to the photofinisher who makes copies of the orphan family photograph, but it may not provide the most efficient solution to this problem.  A more efficient solution involves discussions between the photofinishers and the photography associations to develop more appropriate procedures for the photofinishers to undertake to find the original copyright owner.  The photography associations have indicated to us that they are willing to develop such procedures, perhaps by providing photofinishers with an online database that could be searched by employees to locate missing photographers.  We hope that Congressional attention to this issue will prompt a solution that allows the public to obtain copies of orphan photographs in an efficient manner that protects the interests of active and locatable photographers.

---

[394] If the user made the work available on a public website it might increase the likelihood of discovery of infringement, but not necessarily by much.

[395] *See* Recommended Statutory Language, section 514(b)(1)(A).  This provision would also apply other types of personal private uses described to us, like those users who want to modify computer programs for their private use.  For similar reasons as photographs, it is unlikely that the copyright owner, if he exists, would discover truly private use of a work.

Page 126

## C. Recommended Statutory Language

SECTION 514:  LIMITATIONS ON REMEDIES:  ORPHAN WORKS

(a) Notwithstanding sections 502 through 505, where the infringer:

(1) prior to the commencement of the infringement, performed a good faith, reasonably diligent search to locate the owner of the infringed copyright and the infringer did not locate that owner, and

(2) throughout the course of the infringement, provided attribution to the author and copyright owner of the work, if possible and as appropriate under the circumstances,

the remedies for the infringement shall be limited as set forth in subsection (b).

(b) LIMITATIONS ON REMEDIES

(1) MONETARY RELIEF

(A) no award for monetary damages (including actual damages, statutory damages, costs or attorney's fees) shall be made other than an order requiring the infringer to pay reasonable compensation for the use of the infringed work; *provided*, however, that where the infringement is performed without any purpose of direct or indirect commercial advantage, such as through the sale of copies or phonorecords of the infringed work, and the infringer ceases the infringement expeditiously after receiving notice of the claim for infringement, no award of monetary relief shall be made.

(2) INJUNCTIVE RELIEF

(A) in the case where the infringer has prepared or commenced preparation of a derivative work that recasts, transforms or adapts the infringed work with a significant amount of the infringer's expression, any injunctive or equitable relief granted by the court shall not restrain the infringer's continued preparation and use of the derivative work, provided that the infringer makes payment of reasonable compensation to the copyright owner for such preparation and ongoing use and provides attribution to the author and copyright owner in a manner determined by the court as reasonable under the circumstances; and

(B) in all other cases, the court may impose injunctive relief to prevent or restrain the infringement in its entirety, but the relief shall to the extent practicable account for any harm that the relief would cause the infringer due to the infringer's reliance on this section in making the infringing use.

(c) Nothing in this section shall affect rights, limitations or defenses to copyright infringement, including fair use, under this title.

(d) This section shall not apply to any infringement occurring after the date that is ten years from date of enactment of this Act.

ANT_BARTZ_000435529