# EXHIBIT 39

UNITED STATES COPYRIGHT OFFICE

# ORPHAN WORKS AND MASS DIGITIZATION

A REPORT OF THE REGISTER OF COPYRIGHTS                    JUNE 2015



ANT_BARTZ_000435530

UNITED STATES COPYRIGHT OFFICE

# ORPHAN WORKS AND MASS DIGITIZATION

A REPORT OF THE REGISTER OF COPYRIGHTS                                    JUNE 2015

ANT_BARTZ_000435531

ACKNOWLEDGMENTS

This Report reflects the dedication and expertise of the Office of Policy and International Affairs at the U.S. Copyright Office.  Karyn Temple Claggett, Associate Register of Copyrights and Director of Policy and International Affairs, managed the overall study process, including coordination of the public comments and roundtable hearings, analysis, drafting, and recommendations.  I am also extremely grateful to Senior Counsel Kevin Amer and Attorney-Advisor Chris Weston (Office of the General Counsel), who served as the principal authors of the Report and made numerous important contributions throughout the study process.

Senior Advisor to the Register Catie Rowland and Attorney-Advisor Frank Muller played a significant role during the early stages of the study, providing research, drafting, and coordination of the public roundtable discussions.  In addition, Ms. Rowland and Maria Strong, Deputy Director of Policy and International Affairs, reviewed a draft of the Report and provided important insights.  Barbara A. Ringer Fellows Michelle Choe and Donald Stevens provided helpful research and analysis for several sections of the Report.  Senior Counsel Kimberley Isbell, Counsels Brad Greenberg and Aurelia Schultz, Attorney-Advisors Katie Alvarez and Aaron Watson, and Law Clerk Konstantia Katsouli contributed valuable research and citation assistance.

Finally, I would like to thank the many interested parties who participated in the public roundtables and submitted written comments to the Office.  The wide range of perspectives and thoughtful analyses we received during the public comment period were an essential part of the development of our final recommendations.

Maria A. Pallante
Register of Copyrights and Director
U.S. Copyright Office

ANT_BARTZ_000435532

# TABLE OF CONTENTS

EXECUTIVE SUMMARY .................................................................................................1

I.  OVERVIEW AND BACKGROUND ......................................................................8
    A.  Prior Orphan Works Study and Proposed Legislation.................................9
        1.  2006 Report on Orphan Works ............................................................9
        2.  2006 and 2008 Proposed Legislation .................................................11
    B.  Subsequent Legal Developments...............................................................13
        1.  Google Books Litigation ...................................................................13
        2.  HathiTrust Litigation ........................................................................17
    C.  International Experiences ..........................................................................18
        1.  The Nordic Model: Extended Collective Licensing .........................18
        2.  European Union: Two-Pronged Approach.........................................19
            a.  Orphan Works Directive ........................................................19
            b.  Memorandum of Understanding.............................................22
        3.  Hungary ..............................................................................................23
        4.  France .................................................................................................25
        5.  Germany .............................................................................................27
        6.  United Kingdom .................................................................................28
        7.  Canada ................................................................................................30
        8.  Japan ...................................................................................................31
        9.  Korea ..................................................................................................32
    D.  Updated Copyright Office Review ............................................................33
        1.  Mass Digitization Discussion Document ..........................................33
        2.  Current Study.....................................................................................34

II.  ORPHAN WORKS ..............................................................................................34
    A.  Consequences of Orphan Works  .............................................................34
    B.  Solutions to the Orphan Works Problem...................................................39
        1.  No Legislative Change .......................................................................40
            a.  Role of Fair Use ....................................................................40
            b.  Best Practices.........................................................................44
        2.  Exception-Based Model .....................................................................47
        3.  Government License Model and Small Claims...................................48
        4.  Extended Collective Licensing...........................................................49
        5.  Limitation on Liability Model: The Copyright Office's
            Recommendation................................................................................50
            a.  Applicability to All Categories of Works .............................51

i

        b.   Applicability to All Types of Uses and Users ............................54
        c.   Eligibility for Limitations on Remedies ....................................56
              i.   Conditions ......................................................................56
              ii.  Good Faith Diligent Search ............................................56
                   1)  Qualifying Searches ................................................56
                   2)  Judicial Consideration of Qualified Foreign Searches..........58
                   3)  Recommended Practices ..........................................59
                   4)  Qualifying Third-Party Databases ............................60
              iii. Notice of Use ..................................................................60
              iv.  Notice of Claim of Infringement ....................................62
        d.   Limitation on Remedies ..............................................................63
              i.   Monetary Relief: "Reasonable Compensation"..............................63
              ii.  "Safe Harbor" for Certain Nonprofit Institutions and Uses .......64
              iii. Effect of Registration on Monetary Damages .............................66
              iv.  Injunctive Relief ............................................................67
              v.   Injunctive Relief: Limitations Regarding State Actors.................69
        e.   Relationship to Other Provisions of Title 17 ........................70
              i.   Fair Use Savings Clause ..................................................70
              ii.  Preservation of Statutory Licenses..................................71
              iii. Copyright for Derivative Works and Compilations...................71
        f.   Report to Congress ....................................................................71
III.  MASS DIGITIZATION ...........................................................................72
  A.  Overview .........................................................................................72
  B.  Non-Legislative Solutions ................................................................76
     1.  Mass Digitization as Fair Use ........................................................76
     2.  Voluntary Agreements ...................................................................79
  C.  Extended Collective Licensing .........................................................82
     1.  Types of Works and Publication Status ..........................................84
        a.   Literary Works ..........................................................................85
        b.   Embedded Pictorial or Graphic Works.........................................87
        c.   Photographs ..............................................................................88
     2.  Types of Users and Uses...............................................................89
     3.  CMO Authorization Requirements ...............................................90
     4.  Opt-Out Provisions ......................................................................93
     5.  Determination of License Terms ...................................................94
     6.  Security Measures.........................................................................98
     7.  Distribution of Royalties...............................................................98
     8.  Fair Use Savings Clause ..............................................................101

ii

ANT_BARTZ_000435534

9.   Sunset ...................................................................................................102

10.  Treaty Considerations ...........................................................................102

11.  Notice of Inquiry ..................................................................................104

12.  Summary ..............................................................................................104

IV.    CONCLUSION ..........................................................................................105

APPENDICES

Appendix A:   Orphan Works Legislation Discussion Draft and Section-by-Section Analysis
Appendix B:   Federal Register Notices
Appendix C:   Commenting Parties and Roundtable Participants
Appendix D:   Comparative Summaries of U.S. Orphan Works Legislative Proposals
Appendix E:   Comparative Summary of Select Orphan Works Provisions
Appendix F:   Comparative Summary of Select Extended Collective Licensing Provisions

iii

ANT_BARTZ_000435535

# EXECUTIVE SUMMARY

As the Supreme Court reaffirmed in 2012, facilitating the dissemination of creative expression is an important means of fulfilling the constitutional mandate to "promote the Progress of Science" through the copyright system.[1] This Report addresses two circumstances in which the accomplishment of that goal may be hindered under the current law due to practical obstacles preventing good faith actors from securing permission to make productive uses of copyrighted works. First, with respect to orphan works, referred to as "perhaps the single greatest impediment to creating new works,"[2] a user's ability to seek permission or to negotiate licensing terms is compromised by the fact that, despite his or her diligent efforts, the user cannot identify or locate the copyright owner. Second, in the case of mass digitization – which involves making reproductions of many works, as well as possible efforts to make the works publicly accessible – obtaining permission is essentially impossible, not necessarily because of a lack of identifying information or the inability to contact the copyright owner, but because of the sheer number of individual permissions required.

The U.S. Copyright Office previously examined the topics of orphan works and mass digitization in separate publications issued in 2006 and 2011, respectively. The Office noted the broad impact of both issues on the copyright system, discussed various potential responses, and, with respect to orphan works, proposed a legislative solution. Following the Office's initial orphan works report, the House and the Senate Judiciary Committees considered the problem of orphan works in some depth in 2006 and 2008, holding multiple hearings and introducing multiple bills, which, consistent with the Office's recommendation, would have reduced the exposure of a good faith user provided he or she searched for but failed to locate the relevant copyright owner(s). The House Judiciary Committee also considered mass digitization issues in 2009 and 2014, albeit in much less depth.[3]

---

[1] *Golan v. Holder*, 132 S. Ct. 873, 887-88 (2012) (quoting U.S. CONST. art. I, § 8, cl. 8).

[2] *Preservation and Reuse of Copyrighted Works: Hearing Before the Subcomm. on Courts, Intellectual Property, & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 81 (2014) (statement of Michael C. Donaldson, Int'l Documentary Ass'n and Film Independent); *see also* IAN HARGREAVES, DIGITAL OPPORTUNITY: A REVIEW OF INTELLECTUAL PROPERTY AND GROWTH 38 (2011), *available at* http://webarchive.nationalarchives.gov.uk/20140603093549/http://www.ipo.gov.uk/ipreview-finalreport.pdf (describing orphan works as "the starkest failure of the copyright framework to adapt").

[3] *See Preservation and Reuse of Copyrighted Works, supra* note 2; *Competition and Commerce in Digital Books: Hearing Before the H. Comm. on the Judiciary*, 111th Cong. (2009).

ANT_BARTZ_000435536

While the fundamental aspects of orphan works and mass digitization have remained unchanged since the Office's prior reviews, a number of important domestic and international developments have affected the legal landscape.  In the United States, it is difficult to separate the issue of mass digitization from two lawsuits arising out of the Google Books project, in which authors and book publishers have asserted violations of their exclusive rights and Google and libraries have asserted fair use.[4]  Recent decisions in these cases have magnified the public debate surrounding the costs and benefits arising from digitization projects more generally, and how best to license, except, or otherwise regulate them under the law.

Meanwhile, a growing number of countries have adopted legislative responses to both orphan works and mass digitization, ranging from calibrated exceptions to government licenses to extended collective licensing.  And, private entities have developed innovative new copyright information registries and other resources to more efficiently bring rightsholders together with those seeking to use their works.

These combined developments – all of which will have substantial ramifications for U.S. copyright stakeholders – strongly suggest that it is time to revisit potential solutions in the United States.  The goal in doing so is not to interfere with jurisprudence, but rather to ensure that the rules are clear and that all parties are on equal footing.  Indeed, with so many equities at stake, the complexity and breadth of the issues make them well suited for legislative action.[5]  While the Office has addressed these issues together in this Report, we recommend separate solutions.

**Orphan Works**

The Office's current review of orphan works focuses on the challenges that users face when attempting to make use of individual works on a case-by-case basis.  The Office concludes, as it did previously, that the orphan works problem is widespread and significant.  As a broad spectrum of participants in this study noted, anyone using an orphan work does so under a legal cloud, as there is always the possibility that the copyright owner could emerge after the use has commenced and seek substantial infringement damages, an injunction, and/or attorneys' fees.  While some users certainly may have viable defenses on fair use or other grounds, many will choose to forego use of the work entirely rather than risk the prospect of expensive litigation.

---

[4] The book publishers settled their claims against Google in 2012.  The terms are confidential.

[5] *See Authors Guild v. Google, Inc.* (*Google I*), 770 F. Supp. 2d 666, 677 (S.D.N.Y. 2011) ("The questions of who should be entrusted with guardianship over orphan books, under what terms, and with what safeguards are matters more appropriately decided by Congress than through an agreement among private, self-interested parties.").

ANT_BARTZ_000435537

The Copyright Office continues to believe that this uncertainty and the gridlock it produces do not serve the goals of the copyright system. This Report explores the relevant legal and business issues and a number of potential solutions. For instances other than mass digitization, the Office recommends a framework in which liability is limited for a user who conducts a good faith diligent search for the copyright owner, and favors the kind of legislation set out in the Shawn Bentley Orphan Works Act passed by the Senate in 2008.

Although the Office is recommending a legislative framework that would limit good faith orphan works users' legal liability, it also examined other potential approaches. For example, some stakeholders recommended against comprehensive legislation in this area in favor of reliance on fair use. While current judicial trends may make fair use appear attractive to some user groups at the present moment, the Office found that, in additional to lacking the certainty of specific legislation, a fair use-only approach does little to encourage users to search diligently for copyright owners. That said, users should always have the choice of relying upon fair use in appropriate circumstances, and therefore the Office explicitly preserved that option in the draft legislation.

The Office also considered a variety of foreign models, such as enacting an orphan works exception or creating a government-run licensing program. Unlike fair use, both of these approaches would require a good faith diligent search for the copyright owner, but in practice they tend to be either rarely used or extremely limited in terms of the scope of users and uses covered. For these reasons, the Office determined that a limited liability model, on the whole, provides the most comprehensive and well-calibrated approach for the United States.

A limitation on liability addresses the needs of both commercial and noncommercial actors alike, and appropriately takes into account global developments. It has the benefit of providing considerable legal certainty to those users who want or need it for certain projects, while being fully compatible with fair use. In sum, the proposed orphan works legislative framework would do the following:

- Establish a limitation on remedies for copyright infringement for eligible users who can prove they have engaged in a good faith diligent search for the owner of a copyright and have been unable to identify or locate him or her;

- Define a diligent search as, at a minimum, searching Copyright Office records; searching sources of copyright authorship, ownership, and licensing; using technology tools; and using databases, all as reasonable and appropriate under the circumstances;

3

ANT_BARTZ_000435538

- Require the Copyright Office to maintain and update Recommended Practices for diligent searches for various categories of works, through public consultation with interested stakeholders;

- Permit a U.S. court, in its determination of whether a particular search qualifies under the statute, to take into account a foreign jurisdiction's certification that a search was in good faith and sufficiently diligent, provided the foreign jurisdiction provides similar treatment to qualifying U.S. searches;

- In addition to a diligent search, condition eligibility on a user filing of a Notice of Use with the Copyright Office, providing appropriate attribution, and engaging in negotiation for reasonable compensation with copyright owners who file a Notice of Claim of Infringement, among other requirements;

- Limit monetary relief for infringement of an orphan work by an eligible user to "reasonable compensation" – the amount that a willing buyer and a willing seller would have agreed upon immediately before the use began;

- Bar monetary relief for infringements of orphan works by eligible nonprofit educational institutions, museums, libraries, archives, or public broadcasters, for noncommercial educational, religious, or charitable purposes, provided the eligible entity promptly ceases the infringing use;

- Condition injunctive relief for infringement of orphan works by accounting for any harm the relief would cause the infringer due to its reliance on its eligibility for limitations on remedies;

- Limit the scope of injunctions against the infringement of an orphan work if it is combined with "significant original expression" into a new work, provided the infringer pays reasonable compensation for past and future uses and provides attribution;

- Allow a court to impose injunctive relief for the interpolation of an orphan work into a new derivative work, provided the harm to the owner-author is reputational in nature and not otherwise compensable;

- Condition the ability of state actors to enjoy limitations on injunctive relief upon their payment of any agreed-upon or court-ordered reasonable compensation; and

- Explicitly preserve the ability of users to assert fair use for uses of orphan works.

4

ANT_BARTZ_000435539

The Office has included draft statutory language reflecting the aforementioned framework in the Appendices.[6]

**Mass Digitization**

In the case of mass digitization, the issue is not so much a lack of information as it is a lack of efficiency in the licensing marketplace. For a digitization project involving hundreds, thousands, or millions of copyrighted works, the costs of securing *ex ante* permissions from every rightsholder individually often will exceed the value of the use to the user. This would be true even if every relevant copyright owner could be identified and located. Thus, even where a library or other repository agrees that a use requires permission and would be willing to pay for a license (*e.g.*, to offer online access to a particular collection of copyrighted works), the burdens of rights clearance may effectively prevent it from doing so. To the extent that providing such access could serve valuable informational or educational purposes, this outcome is difficult to reconcile with the public interest. At the same time, there is too much at stake to allow such use to occur without appropriate legal clarity. The potential harm to a copyright owner's legal rights and economic investments, both immediately and throughout the course of the copyright term, is both serious and real.

In analyzing potential solutions, the Copyright Office considered both the short-term and long-term impact on the copyright system. A number of options proposed by stakeholders – including reliance on fair use, voluntary licensing, and industry memoranda of understanding – would not involve new legislation. We agree that these can facilitate certain narrow digitization projects up to a point, but have concluded that they likely cannot provide a comprehensive solution. While courts have found some mass digitization projects to be protected by fair use in certain compelling but narrowly focused sets of circumstances, it is unlikely that fair use will ever yield the kind of broad use of full-text works that some would like to see in the online environment. On the contrary, that kind of use almost certainly would need to rest on licensing. Yet, users are unlikely to be able to clear rights on a case-by-case basis for the full range of works and copyright interests that are implicated by a mass digitization project, not only because of volume but also because there will always be gaps between the licenses that are available and the licenses that are needed to complete the undertaking. It has thus become clear that some type of collective licensing mechanism would be beneficial for the copyright system as a whole.

To encourage further dialogue among stakeholders, and to assist Congress, the Copyright Office has proposed in this Report a statutory framework known as extended collective licensing

---

[6] *See* Appendix A.

ANT_BARTZ_000435540

("ECL"), which can be used to authorize projects on terms set forth by the parties under government supervision. Under this model, licenses are issued and administered by collective management organizations ("CMO"s) representing copyright owners in particular categories of works.[7] CMOs would be authorized by the Copyright Office to issue licenses for mass digitization projects and to collect royalties on behalf of both members and non-members of the organizations, based on transparent formulas and accounting practices. All rightsholders would have the right to opt out, and procedures for doing so would be clear and unencumbered. The framework thus would seek to eliminate the practical impediments to mass digitization by creating a centralized, market-based mechanism for the clearance of rights and the compensation of copyright owners. It also recognizes that no licensing entity has or will ever have the full portfolio of rights that are implicated by mass digitization projects.

We acknowledge that several participants in this review opposed the adoption of ECL on various grounds. Some contended that the administrative burdens of such a system would outweigh the benefit to stakeholders. Others noted that the United States lacks extensive experience with collective rights management, and argued that existing U.S. CMOs are not equipped to manage licenses on the scale that would be required. These are legitimate concerns that reflect the existing landscape, and they indicate that the timing and implementation of ECL requires ongoing deliberation.

At the same time, we believe it significant that governments around the world are increasingly turning to ECL as a way to address mass digitization issues similar to those facing the United States; in fact, France, Germany, and the United Kingdom all have implemented forms of ECL since the Copyright Office last examined the issue in 2011. Furthermore, it should be noted that in at least one U.S. sector – literary works – several parties already worked together in 2008 and 2009 to develop a regime that would closely resemble ECL through the attempted settlement of the Google Books class action. That precedent would seem to suggest a willingness on the part of some stakeholder groups to negotiate mass digitization licenses under an ECL program, and to develop the collective structures necessary to participate in such a system.[8] We

---

[7] CMOs are membership organizations through which rightsholders can license their works on a collective basis under mutually agreed terms and conditions. Examples in the United States include ASCAP, BMI, and SESAC for the licensing of public performance rights in musical works.

[8] Indeed, the Google Books settlement demonstrated that "rights holders and rights users are capable of coming to the table and arriv[ing] at a solution which serves the interests of all stakeholders and also promotes the goals of copyright law." Authors Guild, Inc., Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 9 (undated) ("Authors Guild Additional Comments"). In the Statement of Interest it filed in the case, the United States raised concerns about the settlement primarily because it would have bestowed the benefits of mass digitization on only one party, not because

ANT_BARTZ_000435541

also note that for photographs, the use of a framework like ECL may be innovative; it would provide a cost-effective means of obtaining permission and allow terms to be renegotiated over time as appropriate.

The Copyright Office accordingly is proposing a narrow "pilot program" that would create a limited ECL framework for three categories of copyrighted works: (1) literary works; (2) pictorial or graphic works published as illustrations, diagrams, or similar adjuncts to literary works; and (3) photographs. The framework would allow copyright owners in those categories to form a CMO and seek authorization from the Office to issue extended collective licenses for certain mass digitization activities, or to seek such authorization through an existing CMO. To receive authorization, a CMO would have to demonstrate, among other requirements, that it represents a significant portion of rightsholders in a particular field and that a substantial percentage of its membership has consented to the application. Following a CMO's authorization, users would be able to take advantage of applicable licenses, which would govern uses for all works in the defined category. Importantly, this process would be voluntary for both rightsholders and users. Should a CMO's membership conclude that the costs of administering extended collective licenses would outweigh the benefits to rightsholders, the CMO could elect not to seek ECL authorization, and it would remain free to license its members' works as under current law. Likewise, users would remain free to seek out direct licenses or to rely on fair use, as would be explicitly acknowledged in the pilot program statute.

The Office recommends that specific legislation to establish this program be developed through further consultation with stakeholders. Such input is critical, we believe, given that the proposed system is premised on voluntary participation. To begin this dialogue, the Office is issuing along with this Report a Notice of Inquiry requesting public comment on various issues concerning the scope and administration of an ECL program. The Office will then seek to facilitate further discussion through stakeholder meetings and, if necessary, additional requests for written comment. Based on this input, the Office will draft a formal legislative proposal creating an ECL pilot program for Congress's consideration.

While the Office will seek public comment on specific statutory provisions, we believe that any ECL pilot should include certain general elements. The legislation should:

---

of any fundamental concern about the functioning or legitimacy of an appropriately structured ECL program more generally. *See* Statement of Interest of United States of America Regarding Proposed Amended Settlement Agreement at 2, *Authors Guild, Inc. v. Google Inc.*, No. 05 Civ. 8136 (S.D.N.Y. Feb. 4, 2010), ECF No. 922 ("U.S. Statement of Interest").

ANT_BARTZ_000435542

U.S. Copyright Office                                    Orphan Works and Mass Digitization

- Permit the Register of Copyrights to authorize CMOs meeting specified criteria to issue licenses on behalf of both members and non-members of the organization to allow the use of copyrighted works implicated by the creation or operation of a digital collection;

- Apply only to the three categories of works noted above, with possible additional limitations based on works' commercial availability or date of publication;

- Give copyright owners the right to limit the grant of licenses with respect to their works or to opt out of the system entirely;

- Permit the licensed works to be used only for nonprofit educational or research purposes and without any purpose of direct or indirect commercial advantage;

- Establish eligibility requirements for a CMO seeking ECL authorization, including evidence demonstrating its level of representation among authors in the relevant field, the consent of its membership to the ECL proposal, and its adherence to standards of transparency, accountability, and good governance;

- Provide for the negotiation of license rates and terms between the CMO and a prospective user, subject to a dispute resolution process;

- Require the parties to negotiate terms obligating the user, as a condition of its license, to implement and maintain reasonable digital security measures controlling access to the relevant works;

- Require the CMO to collect and distribute royalties to rightsholders within a specified period and to conduct diligent searches for non-members for whom it has collected payments;

- Provide for the disposition of royalties remaining unclaimed after a specified period;

- Include a provision expressly preserving the ability of users to assert fair use in connection with mass digitization projects; and

- Sunset five years after the legislation's effective date.

## I. OVERVIEW AND BACKGROUND

The Copyright Office has long been concerned with the problem of orphan works and has considered a variety of possible solutions. Following the Office's 2006 Report and recommendations on the topic, Congress held two years of hearings and came close in 2008 to

8

enacting provisions that would have allowed for use on a case-by-case basis. Since that time, several developments in the United States and overseas have underscored the continuing importance of the issue, while also highlighting the growing significance of orphan works in the context of mass digitization. In particular, litigation over the Google Books project and the adoption of new licensing regimes to facilitate similar projects overseas have prompted extensive discussion over the opportunities and challenges presented by mass digitization in the United States.

## A. Prior Orphan Works Study and Proposed Legislation

### 1. 2006 Report on Orphan Works

The Copyright Office published its first Report on Orphan Works in January 2006 after conducting a comprehensive analysis of the issues and soliciting public input.[9] In the Report, the Office defined an "orphan work" as any original work of authorship for which a good faith prospective user cannot readily identify and/or locate the copyright owner(s) in a situation where permission from the copyright owner(s) is necessary as a matter of law.[10] The Report documented the experiences of users unable to find copyright owners, the kinds of works at issue, and the kinds of projects that may be forestalled. The Office cited public comments indicating that the problem of orphan works affects a broad cross-section of stakeholders, including members of the general public, archives, publishers, and filmmakers.[11] For many such users, the Office determined, "the risk of liability for copyright infringement, however remote, is enough to prompt them not to make use of [an orphan] work" – an outcome that "is not in the public interest, particularly where the copyright owner is not locatable because he no longer exists or otherwise does not care to restrain the use of his work."[12]

---

[9] *See* U.S. COPYRIGHT OFFICE, REPORT ON ORPHAN WORKS (2006), *available at* http://copyright.gov/orphan/orphan-report-full.pdf ("2006 REPORT"). Additional information on the Office's 2005-2006 study is available at http://www.copyright.gov/orphan/.

[10] *See id.* at 1; *see also* David R. Hansen, *Orphan Works: Mapping the Possible Solution Spaces* 17 (Berkeley Digital Library Copyright Project, White Paper No. 2, 2012) (attached at Appendix A of Berkeley Digital Library Copyright Project, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry (Feb. 4, 2013) ("Berkeley Digital Library Copyright Project Initial Comments")) (analyzing issues relating to defining the term "orphan works").

[11] 2006 REPORT, *supra* note 9, at 36-40.

[12] *Id.* at 1.

ANT_BARTZ_000435544

The Report noted that the orphan works problem was exacerbated by a series of changes in U.S. copyright law over the past thirty-plus years.[13]  Those changes gradually but steadily relaxed the obligations of copyright owners to assert and manage their rights and removed formalities in the law that had provided users with readily accessible copyright information.  Significant among those changes were the elimination of the registration and notice requirements, which resulted in less accurate and incomplete identifying information on works, and the automatic renewal of copyrighted works that were registered before the effective date of the 1976 Copyright Act.[14]

Subsequent amendments, such as the Sonny Bono Copyright Term Extension Act of 1998, extended the duration of copyright and thus increased the likelihood that some copyright owners would become unlocatable.[15]  The Copyright Office has long asserted that Congress amended the law for sound reasons, primarily to protect authors from technical traps in the law and to ensure U.S. compliance with international conventions.[16]  However, "the net result of these amendments has been that more and more copyright owners may go missing."[17]

---

[13] *Id.* at 41-44.

[14] *See* Copyright Act of 1976, Pub. L. No. 94-553, § 408(a), 90 Stat. 2541, 2580 (codified as amended at 17 U.S.C. § 408(a)) (making registration permissive); Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, § 7(a)-(b), 102 Stat. 2853, 2857-58 (codified at 17 U.S.C. §§ 401(a), 402(a)) (making notice permissive); Copyright Amendments Act of 1992, Pub. L. No. 102-307, § 102(a), 106 Stat. 264, 264 (codified as amended at 17 U.S.C. § 304(a)) (adding automatic renewal term for works in their first term on January 1, 1978).

[15] Pub. L. No. 105-298, 112 Stat. 2827.

[16] Marybeth Peters, *The Importance of Orphan Works Legislation*, U.S. COPYRIGHT OFFICE (Sept. 25, 2008), http://www.copyright.gov/orphan/OWLegislation/.  With the 1976 Act, the United States took several important steps toward assuming a more prominent role in the international copyright community.  These changes harmonized U.S. copyright law with prevailing international copyright norms and moved the U.S. closer to compliance with the Berne Convention.  *See* Berne Convention for the Protection of Literary and Artistic Works art. 5(2), Sept. 9, 1886, as revised July 24, 1971, and as amended Sept. 28, 1979, 102 Stat. 2853, 1161 U.N.T.S. 3 ("Berne Convention") ("The enjoyment and the exercise of these rights shall not be subject to any formality . . . .").  Berne's "no formalities" requirement has been followed by several modern treaties addressing copyright.  *See* WTO Agreement on Trade-Related Aspects of Intellectual Property Rights art. 9.1, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, 33 I.L.M. 81 (1994) ("TRIPS Agreement"); WIPO Copyright Treaty art. 3, Dec. 20, 1996, 36 I.L.M. 65 ("WCT"); WIPO Performances and Phonograms Treaty art. 20, Dec. 20, 1996, 36 I.L.M. 76 ("WPPT"); WIPO Beijing Treaty on Audiovisual Performances art. 17, June 24, 2012, WIPO Doc. AVP/DC/20.

[17] Peters, *supra* note 16.

ANT_BARTZ_000435545

While noting that the orphan works issue potentially affects all kinds of works, the Report observed that a significant percentage of the problem, if not the majority, involves orphan photographs. Photographs are particularly challenging because they frequently lack or may become divorced from ownership information; that is, no label or caption is affixed to the photographs themselves. As a result, the Report explained, potential users of photographic works often lack the most basic information with which to discern a search path, let alone ownership.[18]

After reviewing a number of possible legislative solutions, the Office recommended that Congress amend the Copyright Act to limit the remedies available against good faith users of orphan works where the user had performed a "reasonably diligent search" for the copyright owner, and conditional upon the user providing attribution to the author and owner of the work wherever possible.[19] The Office did not at this early stage recommend specific statutory or regulatory guidelines for determining a reasonably diligent search, but "favor[ed] the development of guidelines or even binding criteria" by users and stakeholders.[20] If a user satisfied the statutory requirements, the Office recommended that remedies be limited to injunctive relief and "reasonable compensation" for the use of the work.[21] The Office also recommended a "take-down" option for certain noncommercial users engaged in noncommercial activities.[22]

### 2.  2006 and 2008 Proposed Legislation

Both the 109th and the 110th Congresses considered the orphan works problem, in each case introducing legislation that built upon many of the Copyright Office's recommendations.[23] The proposed legislation in both cases would have: (1) limited remedies available under the Copyright Act when a user is unable to locate the rightsholder after conducting a good faith

---

[18] 2006 REPORT, *supra* note 9, at 23-25.

[19] *See id.* at 93-122.

[20] *Id.* at 108.

[21] *Id.* at 115-21.

[22] *Id.* at 118-19.

[23] Proposed bills included the Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008); the Orphan Works Act of 2008, H.R. 5889, 110th Cong. (2008); and the Orphan Works Act of 2006, H.R. 5439, 109th Cong. (2006). For a comparison of these bills, as well as our current proposal, see the charts attached as Appendix D.

ANT_BARTZ_000435546

reasonably diligent search; (2) been applicable on a case-by-case basis, meaning that users could not assume that an orphan work would retain its orphan status indefinitely; and (3) permitted the copyright owner or other rightsholder later to collect reasonable compensation from the user, but not statutory damages or attorneys' fees. In other words, the proposed legislation did not create an exception or limitation of general applicability, but rather placed a limitation on the remedies that might be imposed in a particular circumstance with respect to a particular user.

Congress came very close to adopting orphan works legislation in 2008, but ultimately did not do so before adjourning. Orphan works bills were introduced in both the House and Senate, and the Senate passed its version, the Shawn Bentley Orphan Works Act of 2008, by unanimous consent.[24] That bill would have limited remedies where the infringer had performed and documented a good faith reasonably diligent search before using the work; the infringing use of the work provided attribution to the copyright owner, if known; and the infringing user included an appropriate symbol or notice in association with any public distribution, display, or use of the work.[25] The legislation also would have required any search to use methods and resources that are reasonable and appropriate under the circumstances, including a search of Copyright Office records not available online and resources for which a charge or subscription may be imposed.[26] In addition, it would have directed the Register of Copyrights to maintain and make available statement(s) of Recommended Practices for conducting and documenting searches for various categories of copyright-protected works.[27]

Provided that a user conducted and documented a reasonably diligent search, only "reasonable compensation" for the use of the infringed work would have been available.[28] An exception, however, would have applied where the infringer was a nonprofit educational institution, museum, library, archives, or public broadcasting entity. No monetary relief could be assessed against such a user if the infringement was performed without any purpose of commercial advantage and was primarily educational, religious, or charitable in nature, and the infringer promptly ceased the infringement after receiving notice of the claim.[29] The bill also

---

[24] S. 2913; *see* 154 CONG. REC. S9867 (daily ed. Sept. 26, 2008), *available at* https://www.congress.gov/crec/2008/09/26/CREC-2008-09-26-pt1-PgS9867-3.pdf.

[25] S. 2913 sec. 2, § 514(b)(1)(A).

[26] *Id.* § 514(b)(2)(A).

[27] *Id.* § 514(b)(2)(B)(i).

[28] *Id.* § 514(c)(1).

[29] *Id.* § 514(c)(1)(B).

ANT_BARTZ_000435547

would have allowed injunctive relief to prevent or restrain infringement, except where the infringing user added a significant amount of original expression to any use being made of the orphan work, paid reasonable compensation for the use, and provided attribution to the legal owner of the work if requested.[30]

## B. Subsequent Legal Developments

As the discussions over potential solutions to individual uses of orphan works progressed, two high-profile lawsuits in the United States implicated similar copyright-clearance issues in the broader context of mass digitization. Each of these cases arose out of Google's agreements with various research libraries to electronically scan the books in their collections.

### 1. Google Books Litigation

In 2004, Google began an ambitious project to digitize millions of books held by several major libraries, including many books still protected by copyright.[31] As part of this "Google Books" project, Google provided digital copies of the scanned books to partner libraries and made text of the books available for online searching. Users were permitted to view "snippets" of scanned books that were still protected by copyright and to download full copies of books that were in the public domain.[32] Google did not obtain prior permission from the authors or publishers of the books. In September 2005, the Authors Guild and a group of authors filed a class action lawsuit in the Southern District of New York, asserting that the Google Books project amounted to willful copyright infringement. Several publishers filed a related action against Google in the same court later that year.[33]

---

[30] *Id.* § 514(c)(2)(B). The bill also would have directed the Register of Copyrights to undertake a process to certify that databases are available that facilitate searching for pictorial, graphic, and sculptural works protected by copyright. *Id.* sec. 3. The legislation's effective date would have been delayed until the Copyright Office published a notice in the Federal Register that it had certified the existence of at least two such databases. *Id.* sec. 2(c)(1)(A)(ii)(I).

[31] *See, e.g., About Google Books*, GOOGLE, http://books.google.com/intl/en/googlebooks/about/.

[32] A "snippet" was an excerpt consisting of one-eighth of a page. Google implemented security measures to limit the portion of any book accessible through snippet views, including generating only three snippets in response to any given search query and "blacklisting" (*i.e.*, making unavailable) certain snippets and entire pages. *See Authors Guild, Inc. v. Google, Inc.* (*Google II*), 954 F. Supp. 2d 282, 286-87 (S.D.N.Y. 2013).

[33] For a detailed discussion of the background of the case, *see Google I*, 770 F. Supp. 2d 666. Several associations of photographers and other visual artists filed a separate action challenging the Google Books program in April 2010. That case was settled in September 2014. *See* Press Release, Nat'l Press

ANT_BARTZ_000435548

In October 2008, the authors, publishers, and Google reached a settlement agreement, which they filed for approval with the court pursuant to Federal Rule of Civil Procedure 23. After a large number of objections from various individual authors, stakeholder groups, and foreign governments, the parties filed an amended settlement agreement in November 2009. Under the amended settlement, Google could scan, digitize, and exploit out-of-print books through a number of new business arrangements unless the relevant copyright owner opted out. These business arrangements included online access, use of the books in subscription databases, and use of advertisements in connection with these services. The settlement also proposed to establish a "Book Rights Registry" that would maintain a database of rightsholders and administer distribution of revenues from exploitation of the scanned books. Google would provide payments to the Registry on behalf of rightsholders and, in turn, the Registry would distribute the funds to registered rightsholders.[34] If no rightsholder came forward to claim the funds after a certain amount of time, the funds could be used to cover the expense of searching for copyright owners or be donated to literacy-based charities.[35]

Many commenters highlighted the settlement's similarity to an ECL system,[36] though the main difference was the fact that the settlement would inure to the benefit of just one user and operate effectively as a court-sanctioned competitive advantage.[37] The United States filed a

---

Photographers Ass'n, Google, Photographers Settle Litigation Over Books (Sept. 5, 2014), *available at* https://nppa.org/news/google-photographers-settle-litigation-over-books.

[34] The amended settlement agreement covered photographs and other pictorial works contained in books only where a party holding a copyright interest in the image also held a copyright interest in the book. *See* Am. Settlement Agreement §§ 1.13, 1.75, *Authors Guild, Inc. v. Google Inc.*, No. 05 Civ. 8136 (S.D.N.Y. Nov. 13, 2009), ECF No. 770, Exhibit 1 ("Google Books Am. Settlement"); *id.*, Attachment N at 4 ("[T]he Amended Settlement only authorizes Google to display the pictorial images in such Books if a U.S. copyright owner of the pictorial image also is a Rightsholder of the Book."). A "Copyright Interest" was defined to include an exclusive license, *id.* § 1.41, and therefore the agreement apparently would have permitted Google to display illustrations that had been exclusively licensed to the copyright owner of the book in which they appear.

[35] *See Google I*, 770 F. Supp. 2d at 671-72; Google Books Am. Settlement, *supra* note 34, § 6.3(a)(i)(3).

[36] *See, e.g.*, Pamela Samuelson, *The Google Book Settlement as Copyright Reform*, 2011 WIS. L. REV. 479, 519 n.192 (2011) ("Approval of the . . . settlement would, in effect, have created an extended collective license akin to those adopted in some Nordic countries.").

[37] *See Google I*, 770 F. Supp. 2d at 678-79 ("The [amended settlement] would grant Google control over the digital commercialization of millions of books, including orphan books and other unclaimed works."); U.S. Statement of Interest, *supra* note 8, at 2 ("Under the [amended settlement] as proposed, Google would remain the only competitor in the digital marketplace with the rights to distribute and otherwise exploit a vast array of works in multiple formats."). The settlement did include provisions contemplating use of the

14

Statement of Interest, acknowledging the "worthy objectives" of creating such a licensing framework, but noting that even as amended, the agreement would "confer significant and possibly anticompetitive advantages on a single entity – Google."[38]

In March 2011, Judge Denny Chin rejected the amended settlement agreement.[39] The court recognized that "the benefits of Google's book project are many," including making books more accessible to "[l]ibraries, schools, researchers, and disadvantaged populations," facilitating access for persons with disabilities, generating new audiences and sources of income for authors and publishers, and preserving older books currently "falling apart buried in library stacks."[40] Nevertheless, the court determined that the proposed settlement would inappropriately implement a forward-looking business arrangement granting Google significant rights to exploit entire books without permission from copyright owners, while releasing claims beyond those presented in the dispute.[41] The court also expressed concern over the settlement's treatment of orphan works, concluding that the "questions of who should be entrusted with guardianship over orphan books, under what terms, and with what safeguards, are matters more appropriately decided by Congress than through an agreement among private, self-interested parties."[42] Citing Supreme Court precedent, the court also affirmed that it is "Congress's responsibility to adapt the copyright laws in response to changes in technology."[43] Finally, the court found that the settlement agreement would raise international concerns and that for that reason as well, "the matter is better left for Congress."[44]

---

digital corpus by Google competitors, but as the court noted, such uses would have required Google's consent. *See Google I*, 770 F. Supp. 2d at 682-83.

[38] U.S. Statement of Interest, *supra* note 8, at 1-2.

[39] *See Google I*, 770 F. Supp. 2d 666.

[40] *Id.* at 670. The U.S. Department of Justice likewise recognized such benefits. *See* U.S. Statement of Interest, *supra* note 8, at 1 ("Breathing life into millions of works that are now effectively dormant, allowing users to search the text of millions of books at no cost, creating a rights registry, and enhancing the accessibility of such works for the disabled and others are all worthy objectives.").

[41] *Google I*, 770 F. Supp. 2d at 677.

[42] *Id.*

[43] *Id.* (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 430-31 (1984)).

[44] *Id.* at 678.

ANT_BARTZ_000435550

In October 2012, the five major publisher plaintiffs settled with Google. According to public statements about the settlement, the publisher plaintiffs will be permitted to choose whether or not to include digitized books in the Google Books project.[45] Further details of the settlement have not been made public. Notably, the settlement does not require formal court approval because it only resolves the claims of the specific publisher plaintiffs. The settlement does not affect claims made by the Authors Guild or non-parties to the lawsuit.[46] Therefore, the settlement would not address orphan works in which copyrights are owned by anyone other than the publisher plaintiffs.

In November 2013, Judge Chin granted Google's motion for summary judgment on its fair use defense against the remaining claims by the Authors Guild.[47] After considering the four fair use factors enumerated in 17 U.S.C. § 107, the court concluded that "Google Books provides significant public benefits," and that its book scanning project constitutes fair use.[48] The court found that Google's "use of book text to facilitate search through the display of snippets" was transformative in nature because it "transforms expressive text into a comprehensive word index that helps readers, scholars, researchers, and others find books."[49] Such use, the court held, "does not supersede or supplant books because it is not a tool to be used to read books."[50] The court further held that, although Google copied books in their entirety, that factor did not weigh strongly against a finding of fair use because "Google limits the amount of text it displays in response to a search."[51] For similar reasons, the court found that Google Books did not negatively impact the market for books, noting that Google's policy of "blacklisting" certain pages and snippets would prevent any user from accessing an entire book through multiple searches.[52]

---

[45] *See* Press Release, Ass'n of Am. Publishers, Publishers and Google Reach Settlement (Oct. 4, 2012), *available at* http://www.publishers.org/press/85/; *see also* Claire Cain Miller, *Google Deal Gives Publishers a Choice: Digitize or Not*, N.Y. TIMES, Oct. 5, 2012, http://www.nytimes.com/2012/10/05/technology/google-and-publishers-settle-over-digital-books.html?_r=0.

[46] As noted, *see supra* note 33, the photographers also settled separately with Google.

[47] *Google II*, 954 F. Supp. 2d 282.

[48] *Id.* at 293-94.

[49] *Id.* at 291.

[50] *Id.*

[51] *Id.* at 292.

[52] *Id.* at 292-93.

ANT_BARTZ_000435551

Thus, while the court found the Google Books project to be fair use, it did not address whether a mass digitization project involving uses beyond the display of snippets would qualify for such protection. Nor did it separately address treatment of orphan works outside of the mass digitization context.

The author plaintiffs have appealed the district court's decision to the U.S. Court of Appeals for the Second Circuit. Oral argument was held on December 3, 2014.

### 2. HathiTrust Litigation

In September 2011, the Authors Guild, along with two foreign authors' groups and a number of individual authors, sued a consortium of colleges, universities, and other nonprofit institutions known as HathiTrust.[53] HathiTrust members had agreed to allow Google to scan the books in their collections for inclusion in the HathiTrust Digital Library ("HDL"). For copyrighted works in the HDL, HathiTrust permitted three uses: (1) full-text searches by the general public, (2) full access for library patrons with certified print disabilities, and (3) creation of preservation copies under specified circumstances. In addition to those uses, the plaintiffs also challenged the University of Michigan's separate Orphan Works Project, under which out-of-print works whose copyright owners could not be located would be made accessible in digital format to library patrons. The complaint alleged, *inter alia*, that the plaintiffs were easily able to locate several of the authors whose works were deemed orphaned by HathiTrust, and thus the project was not actually limited to orphan works. Shortly after the complaint was filed, the University suspended the Orphan Works Project indefinitely.[54]

In October 2012, the district court ruled in favor of HathiTrust on issues relating to full-text searches, print-disabled access, and preservation.[55] The court found these activities to be largely transformative and ultimately protected by fair use, further opining that "the underlying rationale of copyright law is enhanced" by the HDL.[56] The court did not reach the merits of the claims regarding the Orphan Works Project, however, finding instead that the issue was not ripe for adjudication in light of the project's suspension.[57]

---

[53] *See Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445 (S.D.N.Y. 2012).

[54] *See id.* at 449.

[55] *Id.* at 464.

[56] *Id.*

[57] *Id.* at 455-56.

ANT_BARTZ_000435552

On appeal, the Second Circuit upheld the district court's finding that the creation of a full-text searchable database and the provision of access for the print-disabled were fair uses.[58]  The court vacated the finding that HathiTrust's preservation function was fair use and remanded for consideration of whether the plaintiffs had standing to challenge that aspect of HathiTrust's activities.[59]  In addition, the court affirmed the district court's ruling that the plaintiffs' challenge to the Orphan Works Project was not ripe for adjudication.[60]

## C.  International Experiences

Foreign governments likewise have grappled with the challenge of facilitating beneficial uses of copyrighted works when obtaining clearance is effectively impossible – either because of a work's orphan status or the number of rightsholders involved.  A handful of countries have long had laws addressing this issue in certain contexts, and many others have adopted legislative responses within the past decade.  To date, more than twenty countries have enacted such laws, some of which are limited to the use of orphan works on a case-by-case basis, while others permit licensing on a mass scale.[61]  In the aggregate, however, they indicate that U.S. stakeholders, to the extent they participate in the global copyright marketplace, are likely to be affected by legislation in this area even if the United States does not develop a response of its own.  The provisions discussed below do not constitute an exhaustive list, but rather provide a representative overview of how these issues have been handled internationally.

### 1.  The Nordic Model: Extended Collective Licensing

For several decades, the Nordic countries have maintained ECL regimes, which allow CMOs to license numerous works within a specific field of use, including works owned by rightsholders who are not members of the organization.  While there is some variety in these provisions, they commonly provide ECL for activities such as broadcasting and cable retransmission, reproduction for educational purposes, reproduction for internal uses by

---

[58] *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014).

[59] *Id.* at 104.

[60] *Id.* at 105.

[61] Approximately twenty countries have implemented the European Union's October 2012 Directive on Certain Permitted Uses of Orphan Works in national legislation.  *See infra* note 80.  Several additional countries have adopted other types of orphan works legislation or legislation to address large-scale uses through extended collective licensing.  For additional information on foreign approaches to these issues, see the charts attached as Appendices E (orphan works laws) and F (ECL laws).

ANT_BARTZ_000435553

businesses and other organizations, and uses by libraries, archives, and museums.[62]  ECL thus is often employed to facilitate uses that are considered socially beneficial but for which the costs of obtaining rights on an individual basis may be prohibitively high.  Under an ECL system, representatives of copyright owners and representatives of users negotiate terms that are binding on all members of the group by operation of law (*e.g.*, all textbook publishers), unless a particular copyright owner opts out.[63]  A CMO authorized by the government collects the licensing fee and administers payments.[64]  It is not quite compulsory licensing in that the parties (rather than the government) negotiate the rates, but it requires a legislative framework and often involves some degree of government oversight.

### 2.  European Union: Two-Pronged Approach

#### a.  Orphan Works Directive

In 2011, the European Commission issued a draft proposal for an orphan works directive along with a working paper entitled *Impact Assessment on the Cross Border Online Access to Orphan Works*.[65]  The Commission acknowledged the difficulties caused by orphan works and noted that

---

[62] *See* JOHN AXHAMN & LUCIE GUIBAULT, INSTITUUT VOOR INFORMATIERECHT, CROSS-BORDER EXTENDED COLLECTIVE LICENSING: A SOLUTION TO ONLINE DISSEMINATION OF EUROPE'S CULTURAL HERITAGE? 29, 43 (2008), *available at* http://www.ivir.nl/publicaties/download/292.

[63] Daniel Gervais, *Collective Management of Copyright Theory and Practice*, in COLLECTIVE MANAGEMENT OF COPYRIGHT AND RELATED RIGHTS 21-22 (Daniel Gervais ed., 2d ed. 2010).

[64] *See, e.g.*, Höfundalög 1972 nr. 73 29. Maí, eins og henni var síðast breytt með lögum nr 93/2010 [Copyright Act, No. 73, of 29 May 1972, as amended by Act No. 93 of 21 April 2010], arts. 15a, 23, 23a (Ice.), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=332081 (unofficial translation), last amended by Act No. 126/2011 (translation unavailable; Report relies on 2010 version of the law); LOV 1961-05-12 nr 02: Lov om opphavsrett til åndsverk m.v. (åndsverkloven) [Act No. 2 of May 12, 1961 Relating to Copyright in Literary, Scientific and Artistic Works] as amended on Dec. 22, 2006, §§ 36, 37, 38a (Nor.), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=248181 (unofficial translation), last amended by LOV-2014-06-13 nr 22 [Act No. 22 of June 13, 2014] (translation unavailable; Report relies on 2006 version of the law); LAG OM UPPHOVSRÄTT TILL LITTERÄRA OCH KONSTNÄRLIGA VERK [URL] [Act on Copyright in Literary and Artistic Works] (Svensk författningssamling [SFS] 1960:729), as amended by LAG, June 27, 2013 (2013:691), §§ 42a (Swed.) (unofficial translation on file with United States Copyright Office); last amended by LAG, July 8, 2014 (SFS 2014:884) (translation unavailable; Report relies on 2013 version of the law).

[65] *Commission Staff Working Paper: Impact Assessment on the Cross-Border Online Access to Orphan Works Accompanying the Proposal for a Directive of the European Parliament and of the Council on Certain Permitted Uses of Orphan Works*, COM (2011) 289 final (May 24, 2011), *available at* http://ec.europa.eu/governance/impact/ia_carried_out/docs/ia_2011/sec_2011_0615_en.pdf ("EU Impact Assessment").  Like the United States, the European Union has been examining the issue of orphan works

ANT_BARTZ_000435554

a solution in the EU was particularly urgent to avoid a "knowledge gap" with the United States if the then-pending Google Books settlement were approved. The Commission identified several policy options for handling orphan works and assessed the economic and social impacts of each.[66] Among the options the Commission considered were ECL, a specific orphan works license, and a statutory exception.

The EU rejected ECL because that model, which does not require users to conduct an upfront diligent search prior to engaging in use of orphan works, would not allow for a "positive determination" of works' orphan status.[67] Any agreement negotiated between a library or other memory institution and a collecting society to digitize or use certain books (*e.g.*, out-of-print books) would extend to *all* copyright rightsholders beyond the known and registered members of the collecting society (including orphan rightsholders). Because orphan works would be included as part of the license and presumably would be made available under such license without being explicitly recognized as orphans, ECL would not allow for mutual recognition of orphan works across the European Community – a principle that the EU highly valued during its deliberations.[68] Further, the EU rejected ECL because of the perceived difficulties in establishing licensing rates and the concern that any library making use of a large number of orphan works could be forced to pay significant sums for works that have no defined market value.[69]

---

for many years. *See, e.g., Communication from the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions, i2010: Digital Libraries*, COM (2005) 465 final (Sept. 30, 2005), *available at* http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52005DC0465&from=EN (indicating that the EU may need to intervene regarding the orphan works issue); *Green Paper on Copyright in the Knowledge Economy*, COM(2008) 466 final, Brussels, 16 July 2008, *available at* http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52008DC0466&rid=1 (acknowledging the cross-border implications of the orphan works issue); Commission Recommendation 2006/585/EC of 24 August 2006 on the Digitisation and Online Accessibility of Cultural Material and Digital Preservation, 2006 O.J. (L 236), *available at* http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32006H0585&rid=2 (encouraging member states to adopt licensing mechanisms to facilitate the use of orphan works and promulgate lists of known orphan works).

[66] *See* EU Impact Assessment, *supra* note 65, at 21-35.

[67] *Id.* at 27-29.

[68] *Id.*

[69] *Id.* at 28. The EU noted that digitizing the estimated fifty million orphan works in the United Kingdom under an ECL regime could cost British libraries as much as € 650 million. To illustrate the magnitude of this cost, the EU noted that the 2008-09 total domestic reprography income of the U.K.'s Copyright Licensing Agency was € 63.5 million and the British Library's budget was € 140 million. *Id.*

20

The EU also considered but declined to implement a specific license for orphan works.[70] The EU found that this model, which would require a library user to obtain a license for online access to recognized orphan works via each collecting society operating in the countries of the works' first publication, could present significant challenges for libraries with collections comprised of works published in several jurisdictions.[71]  Beyond this, the EU determined that there would be significant challenges in establishing reasonable licensing rates for works deemed to be orphans.[72]

Ultimately, the EU opted for a statutory exception-based model.  In October 2012, the European Council formally approved the proposed Directive on Certain Permitted Uses of Orphan Works, which requires member states to establish a statutory exception to the rights of reproduction and "making available" for certain permitted uses of orphan works.[73]  The Directive excludes photographs unless embedded in other works, and limits the use of orphan works to "libraries, educational establishments and museums, . . . archives, film or audio heritage institutions and public-service broadcasting organisations" that are located in member states and that have public service missions.[74]  A public service organization that falls under the Directive may partner with a private organization and "generate revenues in relation to their use of orphan works" if that use is consistent with the public service organization's mission.[75]  The private sector partner, however, is not permitted to use the works directly.[76]

The Directive requires a diligent search and provides that once a work is deemed orphaned in one member state, it is deemed orphaned in all member states and "may be used and

---

[70] *Id.* at 29-31.

[71] *Id.* at 30.

[72] *Id.*

[73] The European Council's approval marked the last step in the legislative process.  *See* Press Release, Council of the European Union, Intellectual Property: New EU Rules for Orphan Works (Oct. 4, 2012), *available at* http://www.consilium.europa.eu/uedocs/cms_data/docs/pressdata/en/intm/132721.pdf.

[74] Directive 2012/28/EU of the European Parliament and of the Council of 25 October 2012 on Certain Permitted Uses of Orphan Works, art. 1(1), 2012 O.J. (L 299) 8, *available at* http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2012:299:0005:0012:EN:PDF ("EU Orphan Works Directive").

[75] *Id.* recital 21.

[76] *Id.* recital 22.

ANT_BARTZ_000435556

accessed" in any of them.[77] The Directive also calls for a single registry to maintain data on all works deemed orphan.[78] A rightsholder who later resurfaces may reclaim ownership of a work once deemed orphan and claim fair compensation for the use of the work as provided by individual member states' laws. Member states were required to implement the Directive in national legislation by October 29, 2014,[79] and twenty countries reportedly have done so to date.[80] Implementation of the EU Directive has not come without criticism, however, specifically of its limited scope and lack of certainty for orphan works users.[81]

### b. Memorandum of Understanding

Although the European Union did not endorse an ECL model as part of a legislative proposal to address orphan works, the EU did support collective licensing as one important aspect of any comprehensive orphan works solution. In 2011, the European Commission assisted private parties in negotiating a Memorandum of Understanding (the "MOU") to encourage voluntary collective licensing for "out-of-commerce" books and journals.[82] The MOU defines out-of-commerce works as works that are no longer commercially available because authors and publishers have chosen not to publish new editions or sell copies through the customary channels of commerce.[83] The MOU expresses several principles that libraries, publishers, authors, and collecting societies should follow in order to license the digitization and making available of books or journals that are out-of-commerce. The European Commission views the MOU as

---

[77] *Id.* art. 4.

[78] *Id.* recital 16.

[79] *Id.* art. 9.

[80] *See* Kerstin Herlt, *ACE Survey on the Implementation of the Orphan Works Directive*, FORWARD (Apr. 3, 2015), http://project-forward.eu/2015/04/03/ace-survey-on-the-implementation-of-the-orphan-works-directive/.

[81] *See, e.g.*, Berkeley Digital Library Copyright Project Initial Comments at 22 (citing comments by European public interest organizations criticizing the Directive for not applying to commercial users or uses, and for exposing orphan work users to retroactive financial liability).

[82] Memorandum of Understanding, Key Principles of the Digitsation and Making Available of Out-of-Commerce Works (Sept. 20, 2011), *available at* http://ec.europa.eu/internal_market/copyright/docs/copyright-infso/20110920-mou_en.pdf ("MOU on Out-of-Commerce Works").

[83] *Id.* at 2.

ANT_BARTZ_000435557

complementary to the Orphan Works Directive, and part of a two-pronged approach to facilitate the development of digital libraries in Europe.[84]

### 3. Hungary

Hungary currently addresses the orphan works problem under three separate sections of the Hungarian Copyright Act (HCA).  Through Act CII of 2003, Hungary amended the HCA to include a free use provision allowing libraries, archives, and other educational institutions, in the absence of an agreement to the contrary, to provide limited, on-site access to the works in their collections, including orphans, to members of the public through specially-dedicated computer terminals for scholarly research and other educational purposes.[85]

Hungary's collective rights management provisions may also cover the exploitation of certain economic rights in some works that would otherwise be orphans.  Under Hungarian copyright law, there exist three types of collective rights management:  compulsory collective rights management, collective rights management founded on a voluntary agreement between the rightsholders, and collective rights management prescribed by statute.[86]  All three types of collective rights management are said to have "extended" effect:  the CMO may license specific rights in works on behalf of both members and non-members of the CMO.[87]  The latter two forms (voluntary and statutorily-prescribed) also permit rightholders to opt out of the arrangement

---

[84] *See Communication from the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions, A Single Market for Intellectual Property Rights: Boosting Creativity and Innovation to Provide Economic Growth, High Quality Jobs and First Class Products and Services in Europe*, at 24, COM (2011) 287 final (May 24, 2011), *available at* http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52011DC0287&from=EN.

[85] 2003. évi CII. törvény egyes iparjogvédelmi és szerzői jogi törvények módosításáról (Act CII of 2003 on the Amendment of Certain Industrial Rights Protection and Copyright Statutes), § 66 (translation unavailable); 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright) § 38(5) (effective Oct. 29, 2014) (translation of the most recent version of the statute unavailable).

[86] 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright), § 87(1), (3) (effective Oct. 29, 2014); NAGYKOMMENTÁR A SZERZŐI JOGI TÖRVÉNYHEZ [GRAND COMMENTARY ON THE COYPRIGHT ACT], § 87, 1. pont (Péter Gyertyánfy, ed., 2014).

[87] NAGYKOMMENTÁR A SZERZŐI JOGI TÖRVÉNYHEZ [GRAND COMMENTARY ON THE COYPRIGHT ACT], § 87, 1. pont (Péter Gyertyánfy, ed., 2014); a very slight exception to this rule is where multiple CMOs represent the same economic rights of the same group of rightholders.  Here, the CMOs must agree as to which CMO will enjoy extended effect in its licensing, and in the absence of agreement, the Hungarian Intellectual Property Office (HIPO) will designate the CMO most suited to this task.  *See* 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright), § 87(2), (4) (effective Oct. 29, 2014).

ANT_BARTZ_000435558

within a reasonable time.  Because the statute permits collective rights management founded on a voluntary agreement between the rightholders, there is theoretically no limit on the works and economic rights eligible for collective rights management.  However, any proposed CMO would be subject to approval by the Hungarian Intellectual Property Office (HIPO) and the related conditions for approval set out in the Hungarian Copyright Act.[88]

The first version of a Hungarian system specifically dedicated to permitting the use of orphan works came into effect on February 1, 2009.[89]  Under the orphan works provisions of the HCA, HIPO may grant licenses for both for-profit and non-profit uses of orphan works to applicants who carry out a documented diligent search and pay compensation for such use.[90]  Licenses for the use of orphan works are only valid for a term not exceeding five years, are only valid in Hungary, and are non-exclusive and non-transferable.[91]  Significantly, HIPO may only grant permission to use orphan works that are not already subject to collective licensing.[92]  If a work is subject to collective rights management, but the author opted out and subsequently became unknown or moved to an unidentified location, the Hungarian legal literature suggests

---

[88] 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright), §§ 90-92 (effective Oct. 29, 2014).

[89] 2008. évi CXII. törvény a szerzői jogról szóló 1999. évi LXXVI. törvény módosításáról (Act CXII of 2008 on the Amendment of Act LXXVI of 1999 on Copyright), §§ 8, 25 (effective Oct. 29, 2014); strictly speaking, the 2009 orphan works provisions are not the first orphan-works provisions under Hungarian Copyright law. The Hungarian academic literature refers to some type of orphan works system put in place during the 1950s.  *See* Dénes István Legeza, *„Segítsük az árvákat": útmutató az árva művek egyes felhasználásaihoz* [*"Let's Help the Orphans": Guidelines on Certain Uses of Orphan Works*], 7(5) IPARJOGVÉDELMI ÉS SZERZŐI JOGI SZEMLE [REV. INDUS. RTS. PROT. & COPYRIGHT L.] 23, 26-27 (2012).

[90] 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright), § 57/A(1)-(2) (effective Mar. 15, 2014 – Oct. 28, 2014); 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright), §41/B(1)-(2) (effective Oct. 29, 2014); *see also* Mihály Ficsor, *How to Deal with Orphan Works in the Digital World? An Introduction to the New Hungarian Legislation on Orphan Works*, EUROPEAN PARLIAMENT DIRECTORATE GENERAL FOR INTERNAL POLICIES (2009), http://www.europarl.europa.eu/document/activities/cont/200911/20091113ATT64497/20091113ATT64497EN.pdf.

[91] 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright), § 57/A(1) (effective Mar. 15, 2014 – Oct. 28, 2014); 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright), §41/B(1) (effective Oct. 29, 2014).

[92] 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright), § 57/A(7) (effective Mar. 15, 2014 – Oct. 28, 2014); 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright), § 41/A(9) (effective Oct. 29, 2014).

ANT_BARTZ_000435559

that such a work could be licensed under the orphan works system.[93]  The regulations accompanying the orphan works provisions also require HIPO to record the permissions it has granted in a publicly-available registry.[94]

The orphan works provisions of the HCA were recently amended through Act CLIX of 2013 to implement the EU Orphan Works Directive.[95]  Under the recent amendment, users not specifically named in the Orphan Works Directive continue to apply to HIPO for permission to use orphan works, as before.  Users named in the Orphan Works Directive ("beneficiary institutions") may use works comprising part of their own collections according to the rules of the Directive.  Presumably, these beneficiary institutions would be required to apply to HIPO for permission to use works not comprising part of their collections, or to use orphan works in a manner not contemplated under the Directive.  All orphan works-related changes entered into force on October 29, 2014, as per the Directive.[96]

### 4.  France

France passed a law in February 2012 to make it easier to digitize twentieth century out-of-commerce books, implicating books published in France before January 1, 2001 that are not

---

[93] Dénes István Legeza, „Segítsük az árvákat": útmutató az árva művek egyes felhasználásaihoz ["Let's Help the Orphans": Guidelines on Certain Uses of Orphan Works], 7(5) IPARJOGVÉDELMI ÉS SZERZŐI JOGI SZEMLE [REV. INDUS. RTS. PROT. & COPYRIGHT L.] 23, 48 (2012).

[94] 138/2014. (IV.30.) Korm. r. az árva mű felhasználásának részletes szabályairól (Governmental Decree No. 138/2014 (IV. 30.) on Detailed Regulations on the Use of Orphan Works), §8; 100/2009. (V. 8.) Korm. r. az árva mű egyes felhasználásainak engedélyezésére vonatkozó részletes szabályokról (Governmental Decree No. 100/2009 (V. 8.) on Detailed Regulations Concerning the Permitting of Certain Uses of Orphan Works), § 8.  Through May 13, 2015, HIPO had recorded only forty-five separate licenses in its public registry of orphan works, covering seventy-eight separate works.  See Árva művek nyilvántartása (Registry of Orphan Works), HUNGARIAN INTELLECTUAL PROPERTY OFFICE (May 13, 2015), http://www.sztnh.gov.hu/hu/szakmai-oldalak/szerzoi-jog/mivel-fordulhat-hozzank/arva-mu/arva-muvek-nyilvantartasa.

[95] 2013. évi CLIX. törvény a szellemi tulajdonra vonatkozó egyes törvények módosításáról (Act CLIX of 2013 on the Amendment of Certain Statutes Concerning Intellectual Property), §§ 5, 16, 24, 26, 27(b); see also Péter Mezei, The New Orphan Works Regulation of Hungary, 45(8) INT'L REV. INTELL. PROP. 940 (2014) (discussing the details of the recent amendment and Hungary's experience with its orphan works provisions up to the time of the amendment).

[96] 2013. évi CLIX. törvény a szellemi tulajdonra vonatkozó egyes törvények módosításáról (Act CLIX of 2013 on the Amendment of Certain Statutes Concerning Intellectual Property) § 34(3).

ANT_BARTZ_000435560

currently being commercially distributed or published either in print or digital formats.[97]  Each book classified as out-of-commerce is listed in a register managed by the French National Library. The author or publisher then has six months to object to management of the book's digital rights by a designated CMO.  In the case of a publisher, an objection triggers an obligation to exploit the book within two years.  If no objection is filed, the CMO is authorized to license the reproduction and dissemination of the work in a digital format.[98]  The publisher holding rights to the print edition has a priority right to negotiate with the CMO for an exclusive license to release a digital version, which it must do within three years, or the CMO may offer non-exclusive digital licenses to other publishers.[99]  If no copyright owner claims rights to a work within ten years of its transfer to a CMO, libraries and archives will be allowed, with some exceptions, to digitize and provide access to it free of charge, so long as the institution does not pursue a commercial or economic advantage.[100]

The most recent list published by the *Bibiothèque nationale* includes approximately 99,000 "unavailable" titles.[101]  Such listings, however, have generated only a small number of oppositions from rightsholders.  As of October 2013, Sofia, the collecting society designated to administer the

---

[97] *See* Loi 2012-287 du 1er mars 2012 relative à l'exploitation numérique des livres indisponibles du xxe siècle [Law 2012-287 of March 1, 2012, on the Digital Exploitation of Unavailable Books of the 20th Century], JOURNAL OFFICIEL DE LA RÉPUBLIQUE FRANÇAISE [J.O.] [OFFICIAL GAZETTE OF FRANCE] Mar. 2, 2012, p. 3986 (translation unavailable) ("Law 2012–287"); *see also* Veraliah, *French Parliament Passed Law on Out of Commerce Works on 22nd February 2012*, INTERNATIONAL FEDERATION OF REPRODUCTION RIGHTS ORGANIZATIONS (Mar. 1, 2012), http://www.ifrro.org/content/french-parliament-passed-law-out-commerce-works-22nd-february-2012.  This legislation is separate from the EU Orphan Works Directive, which France implemented on February 20, 2015.  *See* Loi 2015-195 du 20 février 2015 portant diverses dispositions d'adaptation au droit de l'Union européenne dans les domaines de la propriété littéraire et artistique et du patrimoine culturel (1) [Law 2015-195 of February 20, 2015 Regarding Various Provisions to Adapt to European Union Law in the Fields of Literary and Artistic Property and Cultural Heritage] JOURNAL OFFICIEL DE LA RÉPUBLIQUE FRANÇAISE [J.O.] [OFFICIAL GAZETTE OF FRANCE] Feb. 22, 2015, p. 3294 (translation unavailable).

[98] Law 2012-287 arts. 134-2, 134-3.

[99] *Id.*; *see also* Jane C. Ginsburg, *Fair Use for Free, or Permitted-but-Paid?* 42 (Columbia Law Sch. Ctr. for Econ. Studies, Working Paper No. 481), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2444500; Veraliah, *supra* note 97; David R. Hansen, *Orphan Works: Mapping the Possible Solution Spaces*, *supra* note 10, at 17-18 & n.99.

[100] Law 2012-287 art. 134-8.

[101] *Liste de livres en gestion collective* [*List of Books Under Collective Management*], BIBLIOTHÈQUE NATIONALE DE FRANCE [NATIONAL LIBRARY OF FRANCE], https://relire.bnf.fr/registre-gestion-collective.

ANT_BARTZ_000435561

licenses for unavailable books, reportedly had received only 2,500 oppositions, primarily from authors and publishers intending to publish digital editions of their works.[102]

The French law has been criticized on the ground that it goes beyond the Nordic ECL model by granting management authority to a collecting society that need not make a showing that it is representative of relevant rightsholders.[103]  It also has been argued that the law fails to offer an adequate opt-out mechanism because it "not only requires authors and publishers to declare their ownership and their objections in order to retain their rights, but also, at least for the publishers, in fact to exercise their rights, lest they be granted to other publishers."[104]

### 5.  Germany

In 2013, Germany enacted legislation providing for extended collective licensing of out-of-commerce works published before January 1, 1966 currently in the collections of publicly accessible libraries, educational institutions, museums, and similar institutions.[105]  The law establishes a presumption that the CMO that administers rights in such works is entitled to do so with respect to works owned by non-members, provided that the relevant work has been listed in a government registry of out-of-commerce works, a rightsholder has not objected within six weeks, and the licensed uses do not serve commercial purposes.[106]

---

[102] *See* Ginsburg, *Fair Use for Free, supra* note 99, at 43.

[103] *See id.* at 43-44.

[104] *Id.* at 44.

[105] Gesetz über die Wahrnehmung von Urheberrechten und verwandten Schutzrechten (Urheberrechtswahrnehmungsgesetz) [UrhWahrnG] [Law on the Administration of Copyright and Neighboring Rights], Sept. 9, 1965, BGBL. I at 1294, last amended by Gesetz [G], Oct. 1, 2013, BGBL. I at 3728, art. 2, §13d(1), *cited provision translated at* https://www.vgwort.de/fileadmin/pdf/allgemeine_pdf/out_of_commerce_law_2013.pdf (unofficial translation); *see also* Press Release, VG WORT, New German Legislation on Orphan and Out of Commerce Works, http://www.vgwort.de/fileadmin/pdf/allgemeine_pdf/German_legislation_on_orphan_and_out-of-commerce_works.pdf.

[106] Urheberrechtswahrnehmungsgesetz [UrhWahrnG] [Law on the Administration of Copyright and Neighboring Rights], Sep. 9, 1965, BGBL. I at 1294, last amended by Gesetz [G], Oct. 1, 2013, BGBL. I at 3728, art. 2, §13d(1).

ANT_BARTZ_000435562

### 6. United Kingdom

Like the United States, the United Kingdom has considered proposed solutions to the orphan works problem for several years.[107]  The issue was a key focus of an independent review of the U.K. intellectual property system launched by Prime Minister David Cameron in November 2010.[108]  The review panel's March 2011 report (known as the Hargreaves Report) described the orphan works problem as "the starkest failure of the copyright framework to adapt," and cited evidence that the orphaning rate may be around forty percent in some EU archives.[109]  "As long as this state of affairs continues," the report warned, "archives in old formats (for instance celluloid film and audio tape) [will] continue to decay, and further delay to digitisation means some will be lost for good."[110]  The report recommended a two-pronged legislative response that would "establish extended collective licensing for mass licensing of orphan works, and a clearance procedure for use of individual works."[111]

In 2013, the U.K. largely adopted these recommendations through amendments to its Copyright, Designs and Patents Act of 1988.[112]  The legislation's individual-use provisions authorize the Secretary of State to grant non-exclusive licenses for the use of orphan works where the prospective user has conducted a diligent search but has failed to locate the copyright owner.[113]  This government licensing framework is intended to operate in tandem with the narrower orphan works exceptions established by the EU Directive and transposed into U.K. law.[114]  As explained by the U.K. Intellectual Property Office (U.K. IPO), the licensing scheme allows "all types of work to be used for potentially any use that a copyright work can be licensed

---

[107] *See, e.g.*, ANDREW GOWERS, GOWERS REVIEW OF INTELLECTUAL PROPERTY 69-72 (2006), *available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/228849/0118404830.pdf (explaining the issue as it applied to the U.K. in 2006).

[108] *See* Press Release, U.K. Intell. Prop. Office, Independent Review Launched to Ensure IP System Promotes Growth (Nov. 4, 2010), *available at* https://www.gov.uk/government/news/independent-review-launched-to-ensure-ip-system-promotes-growth.

[109] HARGREAVES, *supra* note 2, at 38.

[110] *Id.*

[111] *Id.* at 40.

[112] Enterprise and Regulatory Reform Act 2013, c. 24, § 77.

[113] *Id.*

[114] *See* Copyright and Rights in Performances (Certain Permitted Uses of Orphan Works) Regulations 2014, S.I. 2014/2861.

ANT_BARTZ_000435563

for, by any type of licensee within the UK," while the Directive "allows only non-commercial use by specific beneficiary organisations," and covers only the rights of reproduction and making available.[115]

Following a public comment process, regulations governing the issuance and terms of individual orphan works licenses were implemented on October 29, 2014.[116]  The regulations define a diligent search to include, at a minimum, consultation of an orphan works register to be established by the Comptroller-General of Patents, Designs and Trade Marks, databases maintained by the EU Office for Harmonization in the Internal Market, and any relevant sources listed in a schedule to the legislation.[117]  In collaboration with stakeholders in various creative sectors, the U.K. IPO has developed a series of industry-specific guides to assist prospective users in conducting diligent searches.[118]  Under the regulations, an applicant who demonstrates such a search may be issued a non-exclusive license to use the work within the U.K. for up to seven years, with the possibility of renewal.[119]  License fees are set by the Comptroller-General based on fees for similar works and uses, and must be retained by the agency for eight years.[120]  If no rightsholder claims his or her fees within that time, the agency may use them to fund social, cultural, and educational activities.[121]

The 2013 legislation's ECL provisions establish a process through which a CMO may be authorized to license certain uses of copyrighted works owned by non-members of the

---

[115] U.K. INTELL. PROP. OFFICE, GOVERNMENT RESPONSE TO THE TECHNICAL CONSULTATION ON ORPHAN WORKS 4-5 (2014), *available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/315078/Orphan_Works_Government_Response.pdf.

[116] Copyright and Rights in Performances (Licensing of Orphan Works) Regulations 2014, S.I. 2014/2863 ("U.K. Orphan Works Licensing Regulations").

[117] *Id.* art. 2; art. 4, ¶¶ 3, 5; art. 5.

[118] *See Orphan Works Diligent Search Guidance for Applicants*, U.K. INTELL. PROP. OFFICE (Sept. 17, 2014), https://www.gov.uk/government/publications/orphan-works-diligent-search-guidance-for-applicants.

[119] U.K. Orphan Works Licensing Regulations, S.I. 2014/2863, art. 6, ¶ 2; art. 8; *see also Intellectual Property – Guidance: Copyright: Orphan Works*, U.K. INTELL. PROP. OFFICE (May 12, 2015), https://www.gov.uk/copyright-orphan-works.

[120] U.K. Orphan Works Licensing Regulations, S.I. 2014/2863, art. 10.

[121] *Id.* art. 13, ¶¶ 1-2.

ANT_BARTZ_000435564

organization.[122]  A CMO can seek such authority from the Secretary of State, and any authorization must specify the types of work to which it applies and the particular acts that the CMO is permitted to license.[123]  The law gives the Secretary broad authority to issue implementing regulations on a range of matters, including qualification requirements for CMOs, the treatment of royalties, and the maintenance of registries.[124]  Such regulations may provide only for non-exclusive licenses and must give copyright owners the right to opt out.[125]  An initial set of regulations developed by the U.K. IPO under this authority took effect on October 1, 2014, although no CMOs of which we are aware have sought to apply the ECL provisions to date.[126]

### 7.  Canada

The Canadian Copyright Act (Section 77) permits users to file applications with the Copyright Board of Canada for the use of certain types of orphan works on a case-by-case basis. If an applicant demonstrates that it made a reasonable effort to locate the rightsholder and the rightsholder cannot be located, the Board will approve the request and issue a conditional non-exclusive license.[127]  Only published works and certain types of fixations are eligible to be licensed.[128]  The Copyright Board may issue licenses permitting certain uses including reproduction, publication, performance, and distribution.[129]  In June 2012, Canada passed amendments to its Copyright Act that included an expansion of the exception for nonprofit

---

[122] Enterprise and Regulatory Reform Act, 2013, sec. 77(3), § 116B.

[123] *Id.* sec. 77(3), § 116B(2).

[124] *Id.* sec. 77(3), § 116C.

[125] *Id.* sec. 77(3), § 116B(3), (4).

[126] *See* U.K. ECL Regulations, S.I. 2014/2588; *see also* U.K. INTELL. PROP. OFFICE, EXTENDING THE BENEFITS OF COLLECTIVE LICENSING (2013), *available at* https://www.gov.uk/government/consultations/extending-the-benefits-of-collective-licensing; U.K. INTELL. PROP. OFFICE, GOVERNMENT RESPONSE TO THE TECHNICAL CONSULTATION ON DRAFT SECONDARY LEGISLATION FOR EXTENDED COLLECTIVE LICENSING (ECL) SCHEMES (2014), *available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/309883/government-response-ecl.pdf ("U.K. GOVERNMENT RESPONSE").

[127] Copyright Act, R.S.C. 1985, c. C-42, s. 77.

[128] *Id.* s. 77(1).

[129] *Id.* ss. 3, 15, 18, 21, 77(1).

ANT_BARTZ_000435565

organizations acting for the benefit of persons with perceptual disabilities to cover cross-border exchanges of orphan works that have been translated into a print-disabled format.[130]

The 2006 Orphan Works Report identified some of the Canadian system's burdens, and several studies have noted that it is rarely used.[131]  To date, fewer than 300 licenses have been issued under this system.[132]

### 8. Japan

The Copyright Law of Japan (Article 67) permits users to apply to the Commissioner of the Agency of Cultural Affairs to use certain types of orphan works.[133]  The applicant must have been unable to find or determine the rightsholder after due diligence and must deposit compensation for the benefit of the rightsholder.[134]  The provision only allows the compulsory licensing of works that have been made public or those for which it is clear that they have been offered to or made available to the public for a considerable period of time.[135]  The amount of compensation to be deposited for each application is decided by the Agency of Cultural Affairs, in consultation with the Culture Council, and must correspond to the ordinary royalty rate.[136]

---

[130] *Id.* ss. 32, 32.01; Copyright Modernization Act, S.C. 2012, c. 20, ss. 36-37.

[131] 2006 REPORT, *supra* note 9, at 82-83; *see also* AGNIESZKA VETULANI, EUROPEAN COMMISSION DG INFORMATION SOCIETY AND MEDIA UNIT E4: DIGITAL LIBRARIES AND PUBLIC SECTOR INFORMATION, THE PROBLEM OF ORPHAN WORKS IN THE EU: AN OVERVIEW OF LEGISLATIVE SOLUTIONS AND MAIN ACTIONS IN THIS FIELD 9-10 (2008), *available at* http://ec.europa.eu/information_society/newsroom/image/report_orphan_works_2008_6591.pdf.

[132] *See Decisions – Unlocatable Copyright Owners*, COPYRIGHT BOARD OF CANADA, http://www.cb-cda.gc.ca/unlocatable-introuvables/licences-e.html.

[133] Copyright Act, Law No. 48 of 1970, as amended up to Law No. 35 of 2014, art. 67, para. 1, *translated at* http://www.cric.or.jp/english/clj/doc/20150227_October,2014_Copyright_Law_of_Japan.pdf (unofficial translation).

[134] *Id.* "Due diligence" in finding and attempting to contact the copyright owner includes reviewing publications and other materials that publicize information relating to copyright owners, inquiring with copyright management organizations and other organizations that hold copyright owner information, and advertising in a daily newspaper for information about the copyright owner.  Enforcement Order of the Copyright Act, Cabinet Order No. 335 of 1970, as amended up to Cabinet Order No. 299 of 2009, art. 7-7 (translation unavailable).

[135] Copyright Act, Law No. 48 of 1970, art. 67, para. 1.

[136] *Id.* art. 67, para. 1; art. 71.

ANT_BARTZ_000435566

Copies of works reproduced under Article 67 must indicate that they were licensed under that provision as well as the date when the license was issued.[137]  From 1972 to 2010, only eighty-two compulsory licenses were granted.[138]

### 9.  Korea

Under the Korean Copyright Act (Article 50), users may apply for a compulsory license from the Minister of Culture, Sports and Tourism to use certain types of orphan works.[139]  The works must have been "made public" in order to be eligible to be licensed.[140]  The applicant must deposit compensation and demonstrate on the application the "considerable efforts" taken by the applicant to identify the rightsholder or the rightsholder's place of residence.[141]  The amount of compensation is set by the market and determined by the Korea Copyright Commission.[142]  After receiving approval and depositing compensation, the applicant must indicate on any copies made pursuant to a compulsory license that they were made with the approval of the Minister of

---

[137] *Id.* art. 67, para. 3.

[138] Of these eighty-two licenses, sixty-two were granted between 1999 and 2010, and twenty licenses were granted between 1972 and 1998.  It should be noted that these eighty-two licenses, however, represented 158,601 individual works licensed during this period because one application can cover multiple different works.  Marcella Favale et al., *Copyright, and the Regulation of Orphan Works: A Comparative Review of Seven Jurisdictions and a Rights Clearance Simulation* 45 (U.K. Intellectual Prop. Office, CREATe Working Paper 2013/7, 2013), *available at* https://zenodo.org/record/8377/files/CREATe-Working-Paper-2013-07.pdf (citing Tetsuya Imamura, Exploitation of Orphan Works – Japanese Compulsory License System, Remarks at School of Law, Queen Mary, University of London & Meiji University Seminar: Recent Developments in Japanese Copyright Law – Exceptions and Limitations (Mar. 21, 2012)).

[139] Copyright Act of 1957, Act No. 432, Jan. 28, 1957, as amended up to Act No. 12137, Dec. 30, 2013, art. 50(1), *translated at* http://elaw.klri.re.kr/eng_service/lawView.do?hseq=32626&lang=ENG (unofficial translation).

[140] *Id.*

[141] *Id.*  "Considerable efforts" include perusing the copyright register, inquiring with copyright management organizations, and publicly announcing such inquiry in a daily newspaper and the website of the Ministry of Culture, Sports and Tourism.  Enforcement Decree of the Copyright Act, Presidential Decree No. 1482, Apr. 22, 1959, as amended by Presidential Decree No. 23721, Apr. 12, 2012, art. 18, *translated at* http://elaw.klri.re.kr/eng_service/lawView.do?hseq=28794&lang=ENG (unofficial translation).

[142] Copyright Act of 1957, Act No. 432, art. 50(1); Jay (Young-June) Yang & Chang-Hwan Shin, *Korea* § 8[2][d][iii][A], in INTERNATIONAL COPYRIGHT LAW AND PRACTICE (Paul Edward Geller & Lionel Bently eds., Lexis Nexis 2013).

ANT_BARTZ_000435567

Culture, Sports and Tourism and the date approval was issued.[143]  To date, only ten licenses have been issued under the program.[144]

### D.  Updated Copyright Office Review

#### 1.  Mass Digitization Discussion Document

In light of the widespread attention on mass digitization issues sparked by the Google Books and HathiTrust cases, and to facilitate further dialogue among stakeholders, the Copyright Office issued a publication in October 2011 entitled *Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document*.[145]  It provided an overview of the existing mass digitization landscape in the United States and posed several policy questions for further consideration, including whether "there [is] a reason for Congress to encourage the digitization of copyrighted books by user groups," or whether such activities should instead be "left to the marketplace and the copyright law as it currently exists."[146]  In addition, the Office suggested that "Congress may want to explore orphan works in the context of large-scale digitization projects, addressing questions such as whether there should be more lenient or more stringent search requirements for these types of uses."[147]  Noting the challenge of clearing rights on a case-by-case basis in that context, the Office observed that "it may be helpful to consider whether other licensing models might be used – such as voluntary collective licensing, mandatory collective licensing, or even statutory licensing – at least for facilitating certain projects and transactions of interest and importance to the public."[148]

---

[143] Copyright Act of 1957, Act No. 432, art. 50(2).

[144] *See* 이용승인신청공고 [*Posting of Applications for Use*], KOREA COPYRIGHT COMM'N, FINDCOPYRIGHT, https://www.findcopyright.or.kr/statBord/statBo03List.do?bordCd=3.

[145] U.S. COPYRIGHT OFFICE, LEGAL ISSUES IN MASS DIGITIZATION: A PRELIMINARY ANALYSIS AND DISCUSSION DOCUMENT (2011), *available at* http://www.copyright.gov/docs/massdigitization/USCOMassDigitization_October2011.pdf ("LEGAL ISSUES IN MASS DIGITIZATION").

[146] *Id.* at 15-16.

[147] *Id.* at 28.

[148] *Id.* at 29.

ANT_BARTZ_000435568

### 2. Current Study

In 2012, the Office began a second formal study of orphan works to examine the issue in light of the various domestic and international developments that had occurred since consideration of the 2008 bills. The Office published a general Notice of Inquiry in October 2012, seeking public comments on what had changed in the legal and business environments that might be relevant to a resolution of the problem and what additional legislative, regulatory, or voluntary solutions deserved deliberation.[149] In addition to requesting views on case-by-case uses of orphan works, the Notice asked commenters to address potential orphan works solutions in the context of mass digitization.[150] In response, the Office received ninety-one initial comments and eighty-nine reply comments from a broad range of interested parties.

The Office then published a Notice of Inquiry in February 2014 seeking additional comments on the issues raised in the public comments and inviting interested parties to participate in a series of public roundtable discussions.[151] The roundtables, held on March 10-11, 2014 in Washington, D.C., addressed many of the issues raised in the public comments: (1) the need for legislation in light of recent legal and technological developments; (2) defining a good faith "reasonably diligent search" standard; (3) the role of private and public registries; (4) the types of works subject to any orphan works legislation, including issues related specifically to photographs; (5) the types of users and uses subject to any orphan works legislation; (6) remedies and procedures regarding orphan works; (7) mass digitization, generally; (8) extended collective licensing and mass digitization; and (9) the structure and mechanics of a possible extended collective licensing system in the United States. The Office thereafter received 166 additional comments, again representing a wide spectrum of views and perspectives.

## II. ORPHAN WORKS

### A. Consequences of Orphan Works

As stated in the Executive Summary, the aspect of this Report addressing orphan works does so in the context of case-by-case rather than systematic uses. Currently, anyone using an orphan work runs the risk that the copyright owner may step forward and bring an infringement

---

[149] Orphan Works and Mass Digitization, 77 Fed. Reg. 64,555 (Oct. 22, 2012).

[150] Id. at 64,560-61.

[151] Orphan Works and Mass Digitization: Request for Additional Comments and Announcement of Public Roundtables, 79 Fed. Reg. 7706 (Feb. 10, 2014).

ANT_BARTZ_000435569

action for substantial damages, attorneys' fees, and/or injunctive relief unless a specific exception or limitation to copyright applies.[152]  In these cases, productive and beneficial uses of works may be inhibited not because the copyright owner has asserted his or her exclusive rights in the work, or because the user and owner cannot agree on the terms of a license, but merely because the user cannot identify and/or locate the owner and therefore cannot determine whether, or under what conditions, he or she may make use of the work.

The uncertainty surrounding the ownership status of orphan works does not serve the objectives of the copyright system.  For good faith users, orphan works are a frustration, a liability risk, and a major cause of gridlock in the digital marketplace.[153]  The consequences of this uncertainty reverberate through all types of uses and users, all types and ages of works, and across all creative sectors.[154]  By electing to use a work without permission, users run the risk of an infringement suit resulting in litigation costs and possible damages.  By foregoing use of these works, a significant part of the world's cultural heritage embodied in copyright-protected works may not be exploited and may therefore fall into a so-called "20th-century digital black hole."[155]

---

[152] The Copyright Act, 17 U.S.C. § 101 *et seq.*, includes several exceptions and limitations that would allow use of orphan works under certain circumstances, such as Section 107 (fair use), Section 108(h) (use by libraries during the last twenty years of the copyright term), and Section 115(b) (statutory license to distribute phonorecords).  The Office concluded in its 2006 Orphan Works Report, however, that existing provisions would not address many orphan works situations.  *See* 2006 REPORT, *supra* note 9, at 7.  The role of fair use in the orphan works context is discussed in Part II.B.1.a, *infra*.

[153] "[N]either . . . orphans or market gridlock, are good for the copyright system.  It is not good for the users and authors who would otherwise engage in transactions, but perhaps more importantly, it does not engender faith in the operation of the law or respect for the goals of the law."  Maria A. Pallante, *Orphan Work & Mass Digitization: Obstacles & Opportunities*, 27 BERKELEY TECH. L.J. 1251, 1252 (2012).

[154] *See, e.g.*, Berkeley Digital Library Copyright Project Initial Comments at 12-14; Carnegie Mellon University Libraries, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 6 (Jan. 30, 2013) ("Carnegie Mellon Initial Comments"); Kernochan Center for Law, Media and the Arts, Columbia Univ. School of Law, Reply Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 3-4 (Mar. 6, 2013) ("Kernochan Center Reply Comments").

[155] MAURIZIO BORGHI & STAVROULA KARAPAPA, COPYRIGHT AND MASS DIGITIZATION: A CROSS-JURISDICTIONAL PERSPECTIVE 70 (2013) (internal quotation marks omitted); *see also* James Boyle, *A Copyright Black Hole Swallows Our Culture*, FINANCIAL TIMES, Sept. 6, 2009, http://www.ft.com/cms/s/0/6811a9d4-9b0f-11de-a3a1-00144feabdc0.html#axzz3bSxDtvBz; Rebecca J. Rosen, *The Missing 20th Century: How Copyright Protection Makes Books Vanish*, THE ATLANTIC, Mar. 30, 2012, http://www.theatlantic.com/technology/archive/2012/03/the-missing-20th-century-how-copyright-protection-makes-books-vanish/255282/; *see also* Christopher Buccafusco & Paul J. Heald, *Do Bad Things*

ANT_BARTZ_000435570

This outcome is difficult to reconcile with the objectives of the copyright system and may unduly restrict access to millions of works that might otherwise be available to the public. As one representative of documentary filmmakers recently testified before Congress, "[t]he orphan works problem is perhaps the single greatest impediment to creating new works that are now possible due to [new digital technologies]. The United States desperately needs a workable solution."[156]

The precise size and scope of the orphan works problem is difficult to gauge, in part because works are deemed orphan only after an unsuccessful and often costly search is conducted, and thus projects relying upon orphan works often do not go forward. There is, however, substantial evidence that the orphan works problem remains significant. Some of the most recent research into the contours of the issue comes from the United Kingdom and the European Union.[157] Data gathered from U.K. cultural institutions through a 2011-2012 stakeholder consultation on orphan works demonstrates that the issue is pervasive across the spectrum of cultural institutions and the types of works held.[158] Similar studies undertaken in the European Union also indicate that there is a significant orphan works problem throughout Europe.[159]

---

*Happen When Works Enter the Public Domain?: Empirical Tests of Copyright Term Extension*, 28 BERKELEY TECH. L.J. 1 (2013).

[156] *Preservation and Reuse of Copyrighted Works*, *supra* note 2, at 81 (statement of Michael C. Donaldson, Int'l Documentary Ass'n and Film Independent).

[157] *See* U.K. INTELL. PROP. OFFICE, IMPACT ASSESSMENT (FINAL), ORPHAN WORKS 10-11 (2012), *available at* http://webarchive.nationalarchives.gov.uk/20140603093549/http://www.ipo.gov.uk/consult-ia-bis1063-20120702.pdf ("2012 U.K. IMPACT ASSESSMENT").

[158] The estimated numbers of orphans are staggering: National History Museum, London – 25% of its 500,000 item collection; European Film Archives – 4-7% of its 3,200,000 titles; Imperial War Archive – 20% of its 11,000,000 item collection; National History Museum, London – 20% of 1,000,000 book collection; National Library of Scotland – around 25% of 1,500,000 book collection. 2012 U.K. IMPACT ASSESSMENT at 10. The 2012 Impact Assessment is largely consistent with a 2009 U.K. study concluding that approximately thirteen million orphan works exist in the United Kingdom, with the number possibly ballooning as high as fifty million. JISC, IN FROM THE COLD: AN ASSESSMENT OF THE SCOPE OF 'ORPHAN WORKS' AND ITS IMPACT ON DELIVERY OF SERVICES TO THE PUBLIC 18 (2009), http://webarchive.nationalarchives.gov.uk/20140702233839/http://www.jisc.ac.uk/media/documents/publications/infromthecoldv1.pdf.

[159] *See* ANNA VUOPALA, ASSESSMENT OF THE ORPHAN WORKS ISSUE AND COSTS FOR RIGHTS CLEARANCE 18-19 (2010), http://www.ace-film.eu/wp-content/uploads/2010/09/Copyright_anna_report-1.pdf (estimating that there are nearly three million orphaned books in the EU).

ANT_BARTZ_000435571

There is a robust body of evidence indicating that the orphan works issue in the United States may be just as widespread.  That there is a domestic orphan works problem was confirmed by the Office's 2006 Report and is a view shared widely among the stakeholders consulted for this Report, from creators[160] to owners[161] to users[162] to academics.[163]  A minority of commenters argued that the orphan works problem is either overblown or nonexistent, depending upon the type of work in question,[164] and promoted for purely commercial reasons.[165]  Nevertheless, there is compelling evidence that "the orphan works problem is not only real, but very significant in size and scope."[166]  Beyond the substantial body of information gathered by the Copyright Office during the inquiry leading up to the publication of the 2006 Report,[167] more recent U.S. studies

---

[160] *See, e.g.*, Am. Soc'y of Media Photographers ("ASMP"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 4 (Feb. 4, 2013) ("ASMP Initial Comments"); Copyright Alliance, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2 (Feb. 4, 2013) ("Copyright Alliance Initial Comments"); Directors Guild of Am., Inc. ("DGA") & Writers Guild of Am., West Inc. ("WGAW"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 3 (Feb. 4, 2013) ("DGA & WGAW Initial Comments").

[161] *See, e.g.*, Ass'n of Am. Publishers ("AAP"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2 (Feb. 4, 2013) ("AAP Initial Comments"); Motion Picture Ass'n of Am. ("MPAA"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 5 (Feb. 4, 2013) ("MPAA Initial Comments").

[162] *See, e.g.*, Am. Ass'n of Law Libraries ("AALL") et al., Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 1 (Feb. 1, 2013) ("AALL et al. Initial Comments"); Soc'y of Am. Archivists, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 1 (Jan. 29, 2013) ("Soc'y of Am. Archivists Initial Comments").

[163] *See, e.g.*, Berkeley Digital Library Copyright Project Initial Comments at 7-14; Inst. for Intell. Prop. & Soc. Justice ("IIPSJ"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 1-2 (Feb. 12, 2012 [sic]) ("IIPSJ Initial Comments").

[164] *See* Authors Guild, Inc., Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2 (Feb. 4, 2013) ("Authors Guild Initial Comments") (arguing that the orphan works problem for books "appears to be vastly overstated").

[165] *See* Nat'l Writers Union, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2-3 (Feb. 4, 2013) (stating that the orphan works problem has been "appropriated and misused to serve commercial interests antithetical to those of writers and other creators").

[166] David R. Hansen et al., *Solving the Orphan Works Problem for the United States*, 37 COLUM. J. L. & ARTS 1, 4-5 (2013).

[167] 2006 REPORT, *supra* note 9, at 36-39.  *See, e.g.*, Cornell Univ. Library, Initial Comments Submitted in Response to U.S. Copyright Office's Jan. 26, 2005 Notice of Inquiry at 1-2 (Mar. 23, 2005).  Cornell sought to digitize 343 in-copyright but out-of-print monographs.  After spending more than $50,000 in staff time

ANT_BARTZ_000435572

have drawn similar conclusions. Studies of library collections of printed, published books and similar works estimate that between 17% and 25% of published works and as much as 70% of specialized collections are orphan works.[168] Several commenters in the present review cited articles detailing the particularly acute orphan works issues faced by librarians and archivists working with specialized collections.[169]

The prevalence of the orphan works problem breeds uncertainty. As a result, cautious libraries, archives, and museums may forgo socially beneficial use of orphan works, thereby excluding potentially important works from the public discourse and threatening to impoverish our national cultural heritage.[170] Other types of socially beneficial uses of orphan works may be forestalled due to the potentially harsh consequences of statutory damages, injunctions, and attorneys' fees. Filmmakers may avoid projects using orphan works as documentary source

---

working on the project, Cornell could not identify or locate rightsholders for 198 (58%) of the works. *See also* Carnegie Mellon Univ. Libraries, Initial Comments Submitted in Response to U.S. Copyright Office's Jan. 26, 2005 Notice of Inquiry at 3 (Mar. 22, 2005). In 1999-2001, Carnegie Mellon performed a study regarding locating publishers of in-copyright books in order to digitize them. Only 22% of the publishers could be found.

[168] Michael Cairns, *580,388 Orphan Works – Give or Take*, PERSONANONDATA (Sept. 9, 2009), http://personanondata.blogspot.com/2009/09/580388-orphan-works-give-or-take.html (concluding that up to 25% of the Google Books corpus (as of 2009) could be considered orphan works); *see also* John P. Wilkin, *Bibliographic Indeterminacy and the Scale of Problems and Opportunities of "Rights" in Digital Collection Building*, RUMINATIONS (Feb. 2011), *available at* http://www.clir.org/pubs/ruminations/01wilkin/wilkin.html (estimating that approximately 50% the monographs in the HathiTrust corpus are orphan works).

[169] *See, e.g.,* Maggie Dickson, *Due Diligence, Futile Effort: Copyright and the Digitization of the Thomas E. Watson Papers*, 73 AM. ARCHIVIST 626 (2010), *available at* http://archivists.metapress.com/content/16rh811120280434/fulltext.pdf (cited by Berkeley Digital Library Copyright Project Initial Comments at 10; Soc'y of Am. Archivists Initial Comments at 2; Council of Univ. Librarians, Univ. of California, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 4 (Feb. 2013); Univ. of North Carolina, Chapel Hill Libraries, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2 (Feb. 4, 2013)); Dwayne K. Butler, *Intimacy Gone Awry: Copyright and Special Collections*, 52 J. LIBRARY ADMIN. 279 (2012) (cited by Berkeley Digital Library Copyright Project Initial Comments at 10 n.21).

[170] Soc'y of Am. Archivists Initial Comments at 4 ("[T]he unfortunate result of [archivists'] caution is that the scope of online cultural resources that could be used for new studies and innovation is much smaller than it ought to be, and would be if an orphan works exception were recognized in the statute."); AALL et al. Initial Comments at 3 ("[M]any cannot afford the time and legal costs associated with searching for potential rights holders of millions of items, nor can they afford to risk exposing their institution to unknown amounts of potential damages . . . .").

ANT_BARTZ_000435573

materials,[171] businesses may elect not to commercially reissue lost works,[172] and researchers may avoid potentially socially beneficial research activities.[173]  According to one scholarly commentator, the orphan works problem "manifest[s] the greatest obstacle to copyright social utility in the developed world."[174]  Hence, eliminating barriers to the use of orphan works would yield considerable societal benefits that would reverberate throughout the copyright system, and would unquestionably support and promote the progress of knowledge in the United States.[175]

## B. Solutions to the Orphan Works Problem

While there is general consensus that the orphan works issue is a problem in the United States, opinions vary as to the best way to address it.  Some stakeholders insisted that the current judicial interpretation of fair use (Section 107), combined with the advent of several best practices documents, is sufficient.[176]  Other options are illustrated by legislation in foreign jurisdictions that has created a statutory exception for orphan works, or makes their use conditional upon government permission.  A number of stakeholders believe that legislation creating a limitation on liability for users of orphan works remains the most appropriate solution for the United States.[177]  The limitation on liability approach was thoroughly analyzed and unanimously

---

[171] *See* Int'l Documentary Ass'n et al., Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2 (Feb. 4, 2013) ("Int'l Documentary Ass'n et al. Initial Comments") ("In many cases, filmmakers cannot even begin their projects; in more cases, the projects cannot be as rich as they should be; valuable information may have to be omitted; and important illustrative content cannot be used."); *see also* Microsoft Corp., Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 6-7 (Feb. 4, 2013) ("Events over the past several years in the United States and abroad have made clear that an orphan works solution has the potential to unleash huge benefits from a wide array of potential uses, ranging from individual remixes to mass digitization.").

[172] *See, e.g.*, Tim Brooks, *How Copyright Affects Reissues of Historic Recordings: A New Study*, 36 ARSC J. 183 (2005), http://www.arsc-audio.org/pdf/Brooks47872_ARSC_Fall05.pdf.

[173] *See* Soc'y of Am. Archivists Initial Comments at 4 (discussing "a growing understanding that most archivists are overly cautious when it comes to copyright").

[174] IIPSJ Initial Comments at 1.

[175] *See* U.S. CONST. art. 1, § 8, cl. 8.

[176] *See, e.g.*, Library Copyright Alliance ("LCA"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2-4 (Jan. 14, 2013) ("LCA Initial Comments").

[177] *See, e.g.*, AALL et al. Initial Comments at 2 ("We would enthusiastically support the reintroduction of similar legislation [to the Shawn Bentley Act] in the new Congress."); Int'l Documentary Ass'n et al. Initial Comments at 7 ("The Copyright Office took the right approach in its 2006 *Report on Orphan Works* when it recommended solutions that require the potential user of an orphan work to conduct a reasonably diligent

ANT_BARTZ_000435574

adopted by the Senate in 2008, and in the Office's view it best balances the benefits and burdens of interested parties.[178]  The Office therefore recommends the introduction of a modified version of the 2008 Shawn Bentley Orphan Works Act, as set forth below.  We will, however, briefly review the pros and cons of other proffered solutions the Office considered during the current inquiry.

### 1.  No Legislative Change

#### a.  Role of Fair Use

The Copyright Office believes that fair use is a critical affirmative defense to infringement and, in appropriate circumstances, an important option for users of copyrighted works.  Courts have been applying fair use to new fact patterns since *Folsom v. Marsh* in 1841,[179] and this evolution remains an essential part of U.S. copyright law.  Indeed, the Office successfully advocated for the codification of fair use in the 1976 Act.[180]  The Office continues to believe that fair use and orphan works liability limitation provisions should coexist in the statute.[181]  In practice, however, the use of most orphan works is one in which the would-be user believes it is

---

search and pay reasonable compensation to resurfacing rightholders, and that limit money damages and injunctions against the user of the orphan work under certain circumstances."); MPAA Initial Comments at 6-7 ("[S]tructuring orphan works as a defensive limitation to a copyright claim creates a more efficient, market-oriented, and meaningful solution to the orphan works problem than can be gained from a construct which imposes limitations on a (possibly unaware) copyright owner's rights.").

[178] The House failed to pass the 2008 bill before recessing for the presidential election and because it was otherwise embroiled in economic bailout negotiations.  *See, e.g.*, Christopher Howard, *Orphan Works Legislation Dies in House*, COLLEGE ART ASS'N NEWS (Oct. 10, 2008), http://www.collegeart.org/news/2008/10/10/orphan-works-legislation-dies-in-the-house/; Ryan Paul, *"Orphan Works" Copyright Reform Fails in Wake of Bailout Bid*, ARS TECHNICA (Oct. 1, 2008), http://arstechnica.com/tech-policy/2008/10/orphan-works-copyright-reform-fails-in-wake-of-bailout-bid/; David Kravets, *'Orphan Works' Copyright Law Dies Quiet Death*, WIRED (Sept. 30, 2008), http://www.wired.com/2008/09/orphan-works-co/.

[179] 9 F. Cas. 342 (C.C.D. Mass. 1841) (No. 4901).  While *Folsom v. Marsh* introduced what have become the four statutory fair use factors, the term "fair use" itself did not appear in the judicial vocabulary until *Lawrence v. Dana* in 1869 (15 F. Cas. 26 (C.C.D. Mass. 1869) (No. 8136)).  *See* Michael J. Madison, *A Pattern-Oriented Approach to Fair Use*, 45 WM. & MARY L. REV. 1525, 1588 (2004).

[180] *See, e.g.*, STAFF OF H. COMM. ON THE JUDICIARY, 87TH CONG., REP. OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW 25 (Comm. Print 1961).

[181] See discussion of the fair use savings clause in Part II.B.5.e.i, *infra*.

ANT_BARTZ_000435575

necessary to seek permission or a license, to either ensure peace of mind, avoid unpredictability, or, more likely, to avoid exposure to liability. Fair use may also be of limited utility in cases where users need to document and articulate their basis for using a work to others in a business chain, or to insurers in order to obtain coverage for a project.

The Office's 2006 Report on orphan works envisioned only a limited role for the fair use exception in solving the orphan works problem, because it defined orphan works situations in part as those "where the use goes beyond any limitation or exemption to copyright, such as fair use."[182] In other words, if fair use applied (and of course there are many situations where its application is unclear), then there was no need to undertake an orphan works inquiry. Likely due to this formulation, the 2006 Report identified virtually no stakeholder comments arguing that fair use was a sufficient solution to the orphan works problem.[183]

Fair use jurisprudence has evolved significantly since 2006, and paired with this evolution has been a change in the view of several stakeholders regarding the value of fair use vis-à-vis orphan works. In the consultative process surrounding the 2006 and 2008 orphan works bills, for example, several major American library associations, under the umbrella of the Library Copyright Alliance ("LCA"), enthusiastically supported "meaningful relief for the use of orphan works."[184] Indeed, in a 2008 hearing before the House Subcommittee on the Courts, the Internet, and Intellectual Property, the LCA called orphan works its "top legislative priority."[185]

In its written statements and roundtable remarks during the present orphan works process, however, the LCA,[186] along with some individual university libraries,[187] has argued

---

[182] 2006 REPORT, *supra* note 9, at 52.

[183] *See id.* at 70 (noting that "essentially no commenters took the position that existing solutions were adequate to solve the orphan works problem").

[184] *Promoting the Use of Orphan Works: Balancing the Interests of Copyright Owners and Users: Hearing Before the Subcomm. on the Courts, the Internet, & Intell. Prop. of the H. Comm. on the Judiciary,* 110th Cong. 136 (2008) (statement of Mary Alice Baish on behalf of LCA).

[185] *Id.*

[186] In 2008 the LCA consisted of the AALL, the American Library Association ("ALA"), the Association of Research Libraries ("ARL"), the Medical Library Association ("MLA"), and the Special Libraries Association ("SLA"). *Id.* In its 2013-14 submissions, the LCA identifies its members as the ALA, ARL, and Association of College and Research Libraries. *See* LCA Initial Comments at 1. The AALL, MLA, and SLA have continued to support orphan works legislation during the 2013-2014 consultation process. *See* AALL et al. Initial Comments at 1.

ANT_BARTZ_000435576

against comprehensive orphan works legislation.[188]  This position is likely informed in part by two recent court decisions that have found that Google's mass digitization of the contents of several libraries qualifies as fair use for the purposes of (1) research, full-text searching, preservation, and access by the print-disabled (*Authors Guild, Inc. v. Google*);[189] and (2) full-text searching and access by the print-disabled (*Authors Guild, Inc. v. HathiTrust*).[190]  The LCA and other similarly situated stakeholders maintain that, unlike in 2008, applying the courts' current fair use reasoning to orphan works produces a result just as – if not more – beneficial to institutional users of such works as would legislation.[191]  They argue that if courts are allowing the digitization of millions of non-orphaned works under certain circumstances, then surely they would allow the digitization of individual orphan works, especially for noncommercial uses by nonprofit educational entities.[192]  Moreover, those arguing against orphan works legislation from a fair use perspective maintain that any legislation would inevitably be overly complex and restrictive, and thus any gain in certainty would be offset by a lack of flexibility and the burdens of what would constitute a reasonably diligent search.[193]

    The Copyright Office notes that the judiciary has yet to explicitly address how to apply fair use to orphan works.  Thus, the informed and scholarly views of some commenters as to the

---

[187] *See, e.g.*, Duke Univ. Libraries, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 4 (Jan. 2013); Mass. Inst. of Tech. Libraries ("MIT Libraries"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 1 (undated); North Carolina State Univ. Libraries, Initial Comments in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 1-2 (Jan. 2013); UCLA Library, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 1 (May 21, 2014).

[188] *See, e.g.*, *Preservation and Reuse of Copyrighted Works*, *supra* note 2, at 32 (statement of James G. Neal, Vice President for Information Services and University Librarian, Columbia University) ("[C]hanges in the legal landscape have diminished our need for legislation concerning orphan works."); *see also* LCA Initial Comments at 7-8 ("Congress should consider a simple one sentence amendment to 17 USC § 504(c)(2) that grants courts the discretion to reduce or remit statutory damages if the user conducted a reasonably diligent search prior to the use.").

[189] *Google II*, 954 F. Supp. 2d 282.  As noted, *Google II* is on appeal to the Second Circuit.

[190] *HathiTrust*, 755 F.3d 87.

[191] *See, e.g.*, LCA Initial Comments at 7 ("Because of these significant changes in the copyright landscape over the past seven years, we are convinced that libraries no longer need legislative reform in order to make appropriate uses of orphan works.").

[192] *See, e.g.*, *id.* at 3.

[193] *See, e.g.*, Tr. at 44:3-45:8 (Mar. 10, 2014) (Jonathan Band, LCA).

ANT_BARTZ_000435577

application of fair use in specific orphan works situations do not yet have as their basis any controlling case law. Also, fair use jurisprudence is, because of its flexibility and fact-specific nature, a less concrete foundation for the beneficial use of orphan works than legislation, and is always subject to change. This fact was acknowledged by one commenter, who remarked that, "if the trend [in fair use decisions] changes at some point then we might have a different position. But right now the trend is in our favor."[194] The Office does not believe that reliance on judicial trends, which may turn at any point, is a sufficient basis to forgo a permanent legislative solution.

Indeed, several stakeholders from the library, archives, and museum communities prefer orphan works legislation to an exclusive reliance on fair use.[195] "Fair use," noted one group of commenters, "famous for its lack of certainty and for the high cost of pursuing as a defense in litigation, is not a panacea for all museum uses of orphan works."[196] The Copyright Office would add that this is particularly true if the institution in question is not protected by Eleventh Amendment immunity from money damages (as are state universities), or lacks the funds to aggressively defend its actions as fair use.[197] In fact, the Office's proposed legislative framework should arguably present the most attractive option to such entities, as it provides certainty for all users while at the same time granting libraries, archives, and museums additional protection through a bar on monetary relief for past uses. Moreover, even in the event that some, or even many, uses of orphan works by libraries and other cultural institutions would constitute a fair use, the number of possible users and uses go well beyond these communities. Consider, for example, commercial uses of orphan works, such as the use of a photograph in a book or the use of a book as source material for a screenplay. The current judicial fair use posture as exemplified

---

[194] Tr. 43:16-19 (Mar. 10, 2014) (Jonathan Band, LCA). One recent example of a fair use ruling being reversed on appeal was *Cambridge Univ. Press v. Patton*. In this case, the district court found that the digitization of copyrighted scholarly works for "e-reserves" by Georgia State University was, in most cases, a fair use. The Eleventh Circuit reversed and remanded, finding in part that "because Defendants' unpaid copying was nontransformative and they used Plaintiffs' works for one of the purposes for which they are marketed, the threat of market substitution is severe." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1283 (11th Cir. 2014).

[195] *See, e.g.*, AALL et al. Initial Comments at 2; Rutgers Univ. Libraries, Initial Comments in Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 4 (Feb. 4, 2013) ("Rutgers Univ. Libraries Initial Comments"); Soc'y of Am. Archivists Initial Comments at 7; Art Inst. of Chicago et al., Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2 (Feb. 4, 2013) ("Art Inst. of Chicago et al. Initial Comments").

[196] Art Inst. of Chicago et al. Initial Comments at 2.

[197] *See* Kernochan Center, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 2 (May 21, 2014) ("Kernochan Center Additional Comments").

ANT_BARTZ_000435578

by *HathiTrust,* addressing as it does primarily noncommercial uses by noncommercial actors, does not easily apply to for-profit users and uses in the way that comprehensive orphan works legislation would.[198]

Congress has a responsibility to address all of the socially beneficial uses of orphan works; the possibility that fair use may cover *some* uses by *some* stakeholders should not foreclose more broadly applicable legislation.[199]  The government's mandate is to think more broadly in order to develop a solution that considers all stakeholders and the overall functioning of the system as a whole.

### b.  Best Practices

Advocates in favor of fair use as the sole solution to the orphan works problem often emphasize the role of best practices – *i.e.,* documented standards adopted by members of an industry (or group of related industries) for how best to apply the fair use exception to their professional tasks.[200]  In addition to providing a compendium of current industry practice and guiding future behavior, many argue that best practices also serve the strategic function of demonstrating what kind of use is "normal" in a given community, thus bolstering the idea that such a use is a fair one.[201]  Hence, for example, the Association of Research Libraries' 2012 *Code of Best Practices in Fair Use for Academic and Research Libraries* contends that, in digitizing material in its special collections, a library is on firmer fair use ground when the item is an orphan work.[202]

---

[198] *See* Int'l Documentary Ass'n and Film Independent, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 12 (May 21, 2014) ("Int'l Documentary Ass'n and Film Independent Additional Comments").

[199] This view is consistent with Judge Chin's opinion in rejecting the proposed Google Books settlement and its treatment of orphan works in 2011:  "The questions of who should be entrusted with guardianship over orphan books, under what terms, and with what safeguards are matters more appropriately decided by Congress than through an agreement among private, self-interested parties.  Indeed, the Supreme Court has held that 'it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives.'"  *Google I,* 770 F. Supp. 2d at 677 (citations omitted).

[200] *See, e.g.,* Hansen et al., *Solving the Orphan Works Problem for the United States, supra* note 166, at 27-28 (citing fair use best practices developed for communities of documentary filmmakers, poets, dance archivists, and others).

[201] *See* LCA Initial Comments at 3 (citing research indicating that judges in fair use cases take into account the "habit, custom, and social context of the use") (quoting PATRICIA AUFDERHEIDE & PETER JASZI, RECLAIMING FAIR USE 71 (2011)).

[202] *See* ASS'N OF RESEARCH LIBRARIES ET AL., CODE OF BEST PRACTICES IN FAIR USE FOR ACADEMIC AND RESEARCH LIBRARIES 20 (2012), *available at* http://www.arl.org/storage/documents/publications/code-of-best-practices-fair-use.pdf ("FAIR USE FOR ACADEMIC AND RESEARCH LIBRARIES"); LCA Initial Comments at 4.

44

ANT_BARTZ_000435579

Similarly, the December 2014 *Statement of Best Practices in Fair Use of Orphan Works for Libraries & Archives*, coordinated through affiliates of American University and the University of California at Berkeley, opines that the use of orphan works by memory institutions for preservation and access purposes "present[s] a strong case under the fourth fair use factor, the impact on the market for the work," because "if owners cannot be located, there is little chance that there is a current, functioning market for those works."[203] Neither code, however, provides guidance on how a library should go about determining if a work is orphaned in the first place, beyond the lack of commercial exploitation by the owners and the likelihood that the owners could not be located.[204]

Thus, even with the additional guidance best practices documents may provide, the Office is far from convinced that such documents can sufficiently improve the certainty of fair use in dealing with orphan works to completely obviate the need for legislation. The problem is that fair use best practices often are arrived at absent consultation with authors and other copyright owners, and therefore they run the risk of being more of an aspirational document – what a community believes fair use *ought* to be – than a descriptive one.[205] As one commenter put it,

> [A] particular community's shared perception that uncompensated copying and communication of works of authorship is necessary or desirable does not suffice to make the use "fair," particularly if the interests of the user group align almost exclusively in favor of limiting the scope of copyright, or if authors and copyright owners have been excluded from the process of formulating the "best practices."[206]

---

[203] PROGRAM ON INFORMATION JUSTICE AND INTELLECTUAL PROPERTY, AMERICAN UNIVERSITY WASHINGTON COLLEGE OF LAW ET AL., STATEMENT OF BEST PRACTICES IN FAIR USE OF ORPHAN WORKS FOR LIBRARIES & ARCHIVES 21 (2014), *available at* http://www.cmsimpact.org/sites/default/files/documents/orphanworks-dec14.pdf ("FAIR USE OF ORPHAN WORKS").

[204] *See* FAIR USE FOR ACADEMIC AND RESEARCH LIBRARIES, *supra* note 202, at 20; *see also* FAIR USE OF ORPHAN WORKS, *supra* note 203, at 6 n.2 ("Because the goal of this project was to articulate how fair use applies in a wide variety of contexts with respect to collections containing orphan works, it was neither necessary nor useful to rigidly adhere to a particular definition of 'orphan works,' though many definitions exist.").

[205] *See, e.g.*, FAIR USE OF ORPHAN WORKS, *supra* note 203, at 13 ("This statement was not negotiated with rightsholders that do not have as their mission to collect, preserve, and provide access to collections of material."); FAIR USE FOR ACADEMIC AND RESEARCH LIBRARIES, *supra* note 202, at 3 ("This code of best practices was not negotiated with rights holders. . . . It presents a clear and conscientious articulation of the values of [the library] community, not a compromise between those values and the competing interests of other parties.").

[206] Kernochan Center Additional Comments at 3-4.

ANT_BARTZ_000435580

Perhaps this is no more aptly demonstrated than in the public discussions at the Copyright Office's Orphan Works/Mass Digitization roundtables in March of 2014. While many library stakeholders strongly supported best practice guidelines as a solution to orphan works issues, content owners – those who would be testing those guidelines in court – were troubled.[207]

While the Copyright Office supports fair use in appropriate orphan works circumstances, *i.e.*, those that meet the requirements of Section 107 as developed by the courts, it is unable to agree that the orphan status of a work should somehow automatically weigh in favor of fair use. This type of presumption of fair use in the case of orphan works would eliminate the usual safeguards that are so critical to a balanced copyright law and the fair use analysis in particular, such as the need to consider specific facts and the consideration of the standards under which a copyright owner should recover compensation. The point here is that fair use is not a mere convenience; it requires appropriate analysis. In order for the orphan status of a work to play a part in that analysis, there must first be an agreed-upon standard of how to determine the orphan nature of the work in the first place. Simply stating that the owner "likely could not be located"[208] does not provide a way to make a conclusive determination.

A blanket fair use solution would also apply unpredictably and indefinitely, removing the ability of copyright owners to recover compensation in all instances, and regardless of whether the owner re-emerges and begins to exploit the work herself. This would be true even when the user has profited tremendously or is refusing to terminate the use. Moreover, without a statutory requirement of a diligent search preceding an orphan determination, it would likely apply unpredictably from circuit to circuit, as different courts would make different judgments about whether a work is truly orphaned, and thus how its use should be considered in the context of the market. In contrast, the limitations on liability described below are calibrated to be applied consistently to varying factual situations.

The Copyright Office is sympathetic to the fact that fair use is evolving in the courts, and that some users are concerned about the impact of a legislative solution on this trajectory. As stated above, the Office agrees that a legislative solution must coexist without prejudice to fair use

---

[207] *See, e.g.*, Tr. at 65:20-66:2 (Mar. 10, 2014) (Allan Adler, AAP) ("I worry about best practices. Best practices provide greater certainty only to the people who create the best practices and who actually favor the way they work."). *See also* Tr. at 41:21-42:4 (Mar. 10, 2014) (Janice Pilch, Rutgers Univ. Libraries) ("[B]est practices can work very nicely and sometimes they do. But when they're used as a way of 'doing it anyway' until you get caught and the only people who can catch you are wealthy right holders, the system has broken down.").

[208] FAIR USE FOR ACADEMIC AND RESEARCH LIBRARIES, *supra* note 202, at 20.

46

ANT_BARTZ_000435581

jurisprudence. That said, it is important to restate that recent decisions do not address the question of orphan works directly and, to the extent that they can be interpreted to provide guidance to an orphan works scenario, speak only to situations where public access is limited to those with print disabilities (*Google, HathiTrust*) or to the provision of limited numbers of small snippets (*Google*). Neither of these options satisfies the need for broad public access to orphan works that legislation would provide. Additionally, even when bolstered by best practices documents, fair use remains fundamentally an *ex post* determination, which provides little comfort to, for example, the user preparing a derivative work based on an orphan work, whose investment is imperiled by a reappearing copyright owner seeking an injunction.[209]

### 2. Exception-Based Model

The United States could establish exceptions to exclusive rights for the use of orphan works, much like exceptions that exist for other uses such as preservation[210] or education.[211] This model has recently received significant attention overseas, particularly in the European Union and Australia.[212] Under an exception-based model, the use of an orphan work – provided the user met certain requirements, such as a reasonably diligent search – would not be considered copyright infringement, and thus it would not result in a remedy for the rightsholder. In common with the limited remedy approach, Congress could specify what works, users, and uses would be eligible.

Exception-based approaches are not unhelpful when it comes to harmonization, but they are by nature circumscribed, in part to comply with the three-step test set forth in several international copyright treaties.[213] Under this model, Congress could, for example, choose to exempt museums and libraries only for certain nonprofit uses of orphan works. Rightsholders would not receive compensation. Some have criticized the EU model as being of limited utility

---

[209] *See* Hansen et al., *Solving the Orphan Works Problem for the United States, supra* note 166, at 30.

[210] *See* 17 U.S.C. § 108 (Limitations on exclusive rights: Reproduction by libraries and archives).

[211] *See* 17 U.S.C. § 110 (Limitations on exclusive rights: Exemption of certain performances and displays).

[212] *See* Berkeley Digital Library Copyright Project Initial Comments at 20-22 (discussing the EU Orphan Works Directive and the Australian Law Reform Commission Consultation on Copyright and the Digital Economy "Issues Paper," both from 2012).

[213] *See* WCT, *supra* note 16, art. 10; WPPT, *supra* note 16, art. 16; TRIPS Agreement, *supra* note 16, art. 13; Berne Convention, *supra* note 16, art. 9(2). A more detailed discussion of the three-step test is provided in Part III.C.10, *infra*.

ANT_BARTZ_000435582

because it covers a limited class of works and is restricted to a limited class of beneficiary institutions.[214]  The limited scope of the EU Directive has led some EU member states to develop orphan works legislation that covers broader classes of works, users, and uses.

### 3.  Government License Model and Small Claims

Another potential solution is direct government licensing of orphan works.  As implemented, such licensing, because it is done on an individualized basis, can manage a broader scope of works, users, and uses than can the exception-based model.  Some countries, including Canada, Hungary, the United Kingdom, Japan, and Korea, have instituted systems whereby a putative user of an orphan work submits documented evidence of a failed diligent search for the owner to a government agency, which can then issue a license for the use.[215]  The user must also pay a fee, which is held in escrow by the agency for the owner, should he or she reappear.  In 2006, the Copyright Office considered such a system, and determined that it would be "highly inefficient."[216]  In fact, our current review only reinforces that conclusion, as we have found substantially fewer than 1,000 total licenses granted to date by the five countries noted above.[217]  Moreover, the model requires users to pay fees even if there is no identifiable owner.

Some may see an escrow system as a better method of preventing unauthorized uses of their works of authorship.[218]  We believe, however, that as search capabilities grow and more

---

[214] *See supra* Part I.C.2.a (discussion of EU Orphan Works Directive); *see also* Berkeley Digital Library Copyright Project Initial Comment at 22 (citing criticisms of the Directive's limited scope).

[215] *See* Copyright Act, R.S.C. 1985, c. C-42, s. 77 (Can.); 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI. of 1999 on Copyright), § 41/B(1) (Hung.) (effective from Oct. 29, 2014) (translation unavailable); 138/2014. (IV.30.) Korm. r. az árva mű felhasználásának részletes szabályairól (Governmental Decree No. 138/2014 (IV. 30.) on Detailed Regulations on the Use of Orphan Works), § 3 (Hung.) (translation unavailable); Enterprise and Regulatory Reform Act 2013, c. 24, § 77 (U.K.); U.K. Orphan Works Licensing Regulations, S.I. 2014/2863; Copyright Act, Law No. 48 of 1970, art. 67, para. 1 (Japan), *translated at* http://www.cric.or.jp/english/clj/doc/20150227_October,2014_Copyright_Law_of_Japan.pdf (unofficial translation); Copyright Act of 1957, Act No. 432, art. 50 (S. Kor.), *translated at* http://elaw.klri.re.kr/eng_service/lawView.do?hseq=32626&lang=ENG (unofficial translation).

[216] 2006 REPORT, *supra* note 9, at 114.  The 2006 Report's conclusions were based on an examination of the Canadian experience with government licenses; since then, both Hungary (2009) and the United Kingdom (2013) have established similar systems.

[217] *See supra* Part I.C.3 & 6-9.  Note, however, that in some countries (*e.g.*, Korea) a single license may cover the use of many separate orphan works.

[218] *See, e.g.*, Atlantic Feature Syndicate, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2 (undated).

ANT_BARTZ_000435583

artists make themselves known via searchable image registries like PLUS (Picture Licensing Universal System),[219] there will be a smaller and smaller likelihood that owners of orphan works will not be able to be connected with those who want to use their works. Under this scenario, money paid into a government escrow account will not ultimately go to owners, representing only an unnecessary cost to orphan works users.[220]

Moreover, in 2013, the Office published a major study and detailed plan for a small copyright claims system, which would significantly ease the path towards adjudication of infringement actions heretofore considered too expensive.[221]  It is not a coincidence that some copyright owners view the development of a small claims system as an important adjunct to orphan works legislation.[222]  The Office's small claims proposal would serve as an additional backstop for small copyright owners so that they would be more likely to recover in the event that infringement does occur.

### 4.  Extended Collective Licensing

When an extended collective licensing regime also covers the use of orphan works, such as in the Nordic countries,[223] users of orphan works have to pay a fee to a CMO representing copyright owners, which then distributes the proceeds to those owners.  All uses that are covered by an ECL would be permitted for orphan works, regardless of whether the owners of the works are members of a CMO, although owners often have the ability to opt out, and thus withdraw their works from coverage by the license.  As the mass digitization section of this Report indicates, the Office believes that there is a role in the United States for extended collective licensing in regulating the use of works of authorship on a large scale.  In many cases mass

---

[219] *See* PLUS REGISTRY, www.plusregistry.org.

[220] *See* Tr. at 269:14-271:8 (Mar. 10, 2014) (Jeff Sedlik, PLUS Coalition).

[221] U.S. COPYRIGHT OFFICE, COPYRIGHT SMALL CLAIMS (2013), *available at* http://copyright.gov/docs/smallclaims/usco-smallcopyrightclaims.pdf.  The Office recommends the establishment of a small claims tribunal within the Copyright Office, where cases with a value of not more than $30,000 would be adjudicated.  Participation in such a system would be voluntary on the part of both plaintiff and defendant, and while the tribunal would permit the full panoply of copyright infringement defenses, the process itself would be streamlined in terms of discovery and motion practice.  Judgments by a small claims tribunal would be binding on the participants, though without precedential effect.

[222] *See, e.g.*, ASMP Initial Comments at 6.  Indeed, the 2006 House bill would have directed the Copyright Office to conduct an inquiry on remedies for small copyright claims.  H.R. 5439, 109th Cong., § 4.

[223] See discussion of Nordic ECLs in Part I.C.1, *supra*.

ANT_BARTZ_000435584

digitization involves corpuses containing mostly published works, for which there is a significant likelihood of owners being found, and thus a justification for ECL representation. For an orphan work, however, by definition there is no owner to be identifiable or locatable, and thus no one to receive a licensing fee, or to opt out of the CMO altogether. Although some stakeholders from the creative sector endorsed the idea of applying ECL to the orphan works problem,[224] the Office agrees with various commenters that ECL specifically for orphan works would end up ultimately as a system to collect fees, but with no one to distribute them to, potentially undermining the value of the whole enterprise.[225]

### 5. Limitation on Liability Model: The Copyright Office's Recommendation

In the public process leading up to this Report, many stakeholders (both copyright owners and organizations representing the public) acknowledged that the orphan works problem cannot be solved without amending the Copyright Act, and that limiting the liability exposure of good faith users is the most appropriate form of statutory change.[226] There was strong support for the approach previously taken by the Senate's Shawn Bentley Orphan Works Act of 2008.[227] This bill was the result of several years of legislative effort, including substantive legal analyses,

---

[224] *See* Authors Guild Additional Comments at 1.

[225] *See, e.g.,* Soc'y of Am. Archivists Initial Comments at 7 ("[R]epositories that are seeking to increase access to our cultural heritage generally have no surplus funds. . . . Allocating those funds in advance to a licensing agency that will only rarely disperse them would be wasteful, and requiring such would be irresponsible from a policy standpoint. Extended collective licensing will only further impede noncommercial access to orphan works.").

[226] *See, e.g.,* ASMP Initial Comments at 3-4; Art Inst. of Chicago et al. Initial Comments at 2; Electronic Frontier Foundation & Public Knowledge, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 4; Future of Music Coalition, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2, 4; Google Inc., Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 5; Int'l Documentary Ass'n et al. Initial Comments at 2; Prof'l Photographers of Am. ("PPA"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 4 (Feb. 4, 2013) ("PPA Initial Comments").

[227] *See, e.g.,* AALL et al. Initial Comments at 2; Am. Intell. Prop. Law Ass'n, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 3 (Feb. 4, 2013); AAP Initial Comments at 2; Digital Media Ass'n, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 4 (Feb. 4, 2013); Kernochan Center Additional Comments at 3; Picture Archive Council of Am., Inc. ("PACA"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2-3 (Feb. 4, 2013) ("PACA Initial Comments"); Recording Industry Association of America ("RIAA"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 3-4 ("RIAA Initial Comments"); Rutgers Univ. Libraries Initial Comments at 2.

ANT_BARTZ_000435585

stakeholder debate, and congressional oversight.  It built upon efforts in 2006, and included a number of new proposals specifically aimed at visual artists.[228]  For many people, the Shawn Bentley Act represents a deliberate, technology-neutral, innovative, and balanced approach to the orphan works problem.

The Copyright Office agrees that the Shawn Bentley Act continues to be the most viable legislative solution, but is introducing three key substantive modifications.  These are:  (1) a Notice of Use provision, chiefly in order to increase the likelihood that owners will connect with users; (2) allowing judicial consideration of the results of foreign diligent searches, in recognition of the international scope of the orphan works problem; and (3) an exception to the restriction on injunctions for use of orphan works in derivative works, addressing the integrity concerns of certain owners.  Our proposed legislation is attached as Appendix A, and its key elements are detailed in the sections below.

### a.    Applicability to All Categories of Works

Like past iterations of orphan works legislation, the Copyright Office's suggested approach would apply to every category of copyrightable work.  In its 2006 Report, the Office considered and rejected suggestions that unpublished works, foreign works, and musical works be excluded from an orphan works solution.[229]  Similarly, the 2006 and 2008 bills included no restrictions upon the categories of works to be covered.[230]  Consistent throughout the Office's study of orphan works has been the belief that any work, regardless of category or age, can potentially be orphaned and, just as importantly, that all categories of orphan works have the potential to be reused in socially beneficial ways.   There should be no distinction as to whether a work is currently being exploited, or whether it was created decades ago or more recently.

The Copyright Office recognizes that there are special concerns with regard to pictorial, graphic, and sculptural works.  Notably, advocates for illustrators and textile manufacturers have been persistent since 2006 in pointing out that, because their works are rarely made available to the public with copyright information attached – either for business or aesthetic reasons or because the information is nefariously stripped out – a search, no matter how diligent, is unlikely

---

[228] See PACA Initial Comments at 2 (describing PACA's role in helping craft language in the Shawn Bentley Act that "would not unduly burden the owners and representatives of works of visual art or harm the market for the visual arts").

[229] 2006 REPORT, supra note 9, at 79-81.

[230] See Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong.; Orphan Works Act of 2008, H.R. 5889, 110th Cong.; Orphan Works Act of 2006, H.R. 5439, 109th Cong.

ANT_BARTZ_000435586

to be successful.[231]  Thus, they argue, orphan works legislation, if applied to commercial uses, will create a loophole for bad actors to exploit, without any benefit to visual arts creators and owners in terms of increased licensing.[232]  Furthermore, they maintain that in order to close this loophole, visual artists will be effectively forced to spend an enormous amount of time and money digitizing and registering their works with private registries, a burden that only the most wealthy will be able to bear.[233]

The Office takes these concerns seriously, but does not believe that they outweigh the benefits of comprehensive orphan works legislation encompassing all categories of works.  In fact, it is the very same characteristics of mass distribution and frequent lack of textual identifying information that some argue would put visual art works at special risk for infringement under an orphan works regime, that make it necessary to include such works.  Visual art works present, in fact, almost the paradigmatic orphan works situation, and better that potential users have an incentive to diligently search for their owners than that they are infringed outright or collect dust.  Furthermore, the Office believes that many features of the proposed legislation, such as the rigorous search standard and the Notice of Use provision, make it less likely that bad actors will find an orphan works limitation an attractive shield for their activities.

Additionally, developments since 2008 have helped to reduce the obstacles facing visual artists in an orphan works context – most notably the development of credible visual art registries and a major report and legislative proposal from the Copyright Office regarding a small claims mechanism.  As orphan works legislation goes forward, the prospect of its enactment may spur increased support for and investment in visual arts registries.  Currently, several visual arts organizations support the non-profit PLUS Registry as an important way to enable diligent searches for owners of orphan works.[234]  PLUS functions as a "hub" connecting registries in

---

[231] *See* Illustrators' P'ship of Am., Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 26 (Feb. 4, 2013) ("Illustrators' P'ship of Am. Initial Comments") (Appendix: statement of Cynthia Turner at the Small Business Administration Roundtable: "How Will the Orphan Works Bills Economically Impact Small Entities?" (Aug. 8, 2008)); *Promoting the Use of Orphan Works*, *supra* note 184, at 89-90 (statement of Corinne P. Kevorkian, F. Schumacher & Co.).

[232] *See, e.g.*, Illustrators' P'ship of Am. Initial Comments at 20 ("By defining millions of copyrighted works as orphans on the premise that some *might* be, previous bills would allow Internet content providers to build financial empires by harvesting the work of others, providing their databases with content they could never create themselves nor acquire from authors without having to pay for it.").

[233] *See id.* at 3-4.

[234] *See, e.g.*, Am. Photographic Artists ("APA"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 4 (Feb. 4, 2013); ASMP Initial Comments at 5-6; Graphic Artists

ANT_BARTZ_000435587

eighty-eight countries, and provides both literal and image-based searches.[235] Rightsholders may list their works at no cost, while the storage of image records and rights records is at a nominal cost.[236] Overseas, the U.K.'s Copyright Hub is a website dedicated to making the licensing of protected works easier, for both owners and users,[237] and it connects with several collective licensing organizations and registries.[238] Other ongoing initiatives are likely to produce additional resources of this type in the coming years. For example, the Copyright Office has entered into an academic partnership with Stanford Law School in which students are exploring ways to centrally assemble information concerning the licensing of photographs and the data standards relied upon by copyright owners and licensees to engage in such transactions.[239] Of course, the use of PLUS, or any other registry, should be treated as only one component of a qualifying search.

In the unlikely but unfortunate event that a work of visual art is erroneously claimed by a user to be "orphaned," and cognizable damages to the owner result, a small claims tribunal of the sort recommended by the Office[240] should provide a suitable forum for hearing the resulting complaint. Photographers were one of the primary constituencies advocating for a small

---

Guild ("GAG"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 3 (Jan. 31, 2013) ("GAG Initial Comments"); PACA Initial Comments at 7-8; PPA Initial Comments at 8.

[235] PACA Initial Comments at 7-8. Registries such as PLUS should become even more helpful as image-recognition technology improves. *See* John Markoff, *Researchers Announce Advance in Image-Recognition Software*, N.Y. TIMES, Nov. 18, 2014, http://www.nytimes.com/2014/11/18/science/researchers-announce-breakthrough-in-content-recognition-software.html.

[236] PACA Initial Comments at 7-8.

[237] *See* THE COPYRIGHT HUB, http://www.copyrighthub.co.uk.

[238] *See, e.g.*, BRITISH ASS'N OF PICTURE LIBRARIES & AGENCIES, http://www.bapla.org.uk); DESIGN & ARTISTS COPYRIGHT SOCIETY, http://www.dacs.org.uk.

[239] *See Academic Partnerships*, U.S. COPYRIGHT OFFICE, http://www.copyright.gov/about/special-programs/partnerships.html. Additionally, the Copyright Office is currently seeking information regarding the digital marketplace for certain visual works, such as challenges faced by creators in the areas of monetization, licensing, registration, and enforcement. *See* Notice of Inquiry, Copyright Protection for Certain Visual Works, 80 Fed. Reg. 23,054 (Apr. 24, 2015).

[240] *See* COPYRIGHT SMALL CLAIMS, *supra* note 221.

53

ANT_BARTZ_000435588

copyright claims system,[241] and the Office believes that such a tribunal would be a particularly apt venue for determining whether a qualifying search was performed by the user, and other questions of compliance with the remedy limitation requirements of an orphan works solution.

It also has been argued that musical works should be exempt from the scope of any orphan works legislation, because the detailed record-keeping of the music publishing industry, including performing rights organizations, makes it unlikely that information on a musical work will be impossible to find – in short, that orphaned musical works are a vanishing if not extinct species.[242]  While this may be true for published works,[243] there are certainly many unpublished musical works whose owners will indeed escape the most diligent of searches.  Moreover, the comparative ease of finding the owner of a published musical work does not argue against including such works in an orphan works system; it only means that, in practice, the owners of these works will be found, and resort to a limitation on liability will be unlikely.  The proposed legislation also provides that if a work (such as a musical work) is covered by a statutory license, that license will apply instead of the orphan works provision.

### b.  Applicability to All Types of Uses and Users

The Copyright Office recommends that future orphan works legislation apply to all types of uses and all types of users, noncommercial and commercial, with the single exception of fixations of works of visual art in or on commercially available useful articles.

Several stakeholders have commented in the recent round of written and roundtable participation that they would be comfortable with orphan works legislation *only* if it applied solely to noncommercial uses (*e.g.*, preservation and education) by noncommercial users (*e.g.*,

---

[241] *See, e.g.*, APA, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 27, 2011 Notice of Inquiry in re: Study on Remedies for Copyright Small Claims (Jan. 17, 2012); ASMP, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 27, 2011 Notice of Inquiry in re: Study on Remedies for Copyright Small Claims (Jan. 16, 2012); PACA, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 27, 2011 Notice of Inquiry in re: Study on Remedies for Copyright Small Claims (Jan. 16, 2012).

[242] *See, e.g.*, Nat'l Music Publ'rs' Ass'n, Inc. ("NMPA") and Harry Fox Agency, Inc. ("HFA"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2 (Feb. 4, 2013) ("NMPA & HFA Initial Comments").

[243] There emerged at the public roundtable some dispute over the comprehensiveness of corporate information regarding musical works and sound recordings.  Tr. at 170:1-171:15 (Mar. 10, 2014) (Nancy Prager, Prager Law, PLLC & Jay Rosenthal, NMPA).

ANT_BARTZ_000435589

libraries, museums, archives, and nonprofit educational institutions).[244]  We appreciate that such a restriction might provide a level of comfort for rightsholders,[245] but maintain that it is essential to include commercial users and uses for two primary reasons.

The first is that, simply put, nonprofit entities are not the only source of public benefit in the creative sector.  To realize the full potential of an orphan works system, commercial users such as authors, musicians, documentarians, and others must be able to enjoy limited liability for their uses – post-diligent search – of orphan works.  As one stakeholder put it, "most documentary and independent filmmakers are, of course, commercial users, but that does not diminish their important role in our democracy as journalists, storytellers, and historians documenting the American experience."[246]  The second reason is that in many cases a use that begins as noncommercial – say, a public television documentary – may become commercial – the selling of copies or streams of that documentary after it airs.  In other words, while it might be legislatively feasible to limit orphan works legislation to noncommercial uses by noncommercial users, this distinction is quite likely to break down in practice.[247]

The one exclusion for commercial uses – fixations in or on useful articles – is reasonable because such uses tend to be secondary to the kind of beneficial uses that are the intended result of orphan works legislation.  The re-purposing of a pictorial, graphic, or sculptural work on an

---

[244] *See, e.g.*, Am. Ass'n of Independent Music ("A2IM"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 3 (Feb. 4, 2012 [sic]) ("A2IM Initial Comments") (suggesting that any solution be limited to "only libraries, museums and schools that meet certain strict definitions"); Artists Rights Soc'y ("ARS"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2 (undated); GAG Initial Comments at 9 (GAG "absolutely opposes any commercial use by commercial users.  A definition of non-commercial use must be developed."); Nat'l Press Photographers Ass'n, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 4-5 (Jan. 24, 2013).

[245] The EU Orphan Works Directive, of course, restricts its exceptions to specified nonprofit cultural institutions with public service missions.  *See* EU Orphan Works Directive, *supra* note 74, art. 1(1).  This aspect of the Directive has been criticized by several commentators.  *See* Berkeley Digital Library Copyright Project Initial Comments at 22 (citing criticisms of the Directive's limited scope).  In fact, several EU countries have supplemented their compliance with the Directive with additional orphan works solutions, such as government licensing.  *See, e.g.*, 2013. évi CLIX. törvény a szellemi tulajdonra vonatkozó egyes törvények módosításáról (Act CLIX. of 2013 on the Amendment of Certain Statutes Concerning Intellectual Property), § 16 (Hung.) (translation unavailable); U.K. Orphan Works Licensing Regulations, S.I. 2014/2863.

[246] Int'l Documentary Ass'n and Film Independent Additional Comments at 12.

[247] *See, e.g.*, Tr. at 156:2-4 (Mar. 10, 2014) (Nancy Prager, Prager Law PLLC) ("So that distinction, between commercial and noncommercial, to me is a little bit of a red herring and also a little bit undefinable.").

ANT_BARTZ_000435590

article of pure functionality such as a mug or t-shirt does not redound to the public's benefit so much as it represents a mere decoration choice.[248]  Additionally, this exclusion helps address the risk pointed out by textile manufacturers of their designs being illegitimately reused,[249] as it would preserve full remedies for infringements on such articles as upholstery, curtains, and floor coverings.

### c.  Eligibility for Limitations on Remedies

#### i.     Conditions

There are six conditions in the Office's recommended legislative language that users must satisfy in all instances to qualify for the limitation on monetary or injunctive relief.  These reflect the fact that users in this context would be in discussions with rightsholders if they could locate them, and want to either locate them or be sure that they have taken all required steps.

Users must:  (1) if sued for infringement, prove to the court by a preponderance of the evidence that they performed a good faith, qualifying search to locate and identify the owner of the infringed copyright before the use of the work began; (2) file a Notice of Use with the Copyright Office; (3) provide attribution to the legal owner of the copyright, if reasonable under the circumstances; (4) include a to-be-determined "orphan works" symbol with any public distribution, display, or performance of the work; (5) assert eligibility for such limitations in the initial pleading in any civil action involving the infringed work; and (6) state with particularity the basis for eligibility for the limitations during initial discovery disclosures.

#### ii.    Good Faith Diligent Search

##### 1)   Qualifying Searches

The current legislative recommendation closely follows the Shawn Bentley Act approach for search requirements.  A search qualifies where the user undertakes a reasonably "diligent effort" to locate the owner prior to, and at a time reasonably proximate to, commencing use.  A diligent search requirement is necessary both to offset the limitations on infringement remedies

---

[248] *See, e.g.,* ARS, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 2 (undated) (expressing concern regarding the "most egregious exploitation of an artist's works, be it for application to coffee mugs, posters, rugs, corporate logos, advertisements, t-shirts and boxer shorts").

[249] *Promoting the Use of Orphan Works, supra* note 184, at 43 (statement of Corinne P. Kevorkian, F. Schumacher & Co.).

ANT_BARTZ_000435591

that would otherwise apply, and to facilitate wherever possible the would-be user locating and working with the owner. The term "owner" here refers to an owner of any exclusive right relevant to the infringement, or an entity with the authority to grant or license such a right.[250] "Authors" of works of visual art, who may bring infringement actions under Section 106A based upon violations of their rights of attribution and integrity, are not affected by this draft legislation. In other words, a qualifying search does not confer a limitation on liability if that liability is under Section 106A.

A search is considered to be "diligent" if users search or utilize: (1) Copyright Office online records; (2) reasonably available sources of copyright authorship and ownership information, including licensor information where appropriate; (3) technology tools and, where reasonable, expert assistance (such as a professional researcher or attorney); and (4) appropriate databases, including online databases. Each search is mandatory only to the degree it is reasonable under the circumstances. For example, a search of Copyright Office records is only necessary if sufficient identifying information already exists on which to base the search. Users, however, cannot rely solely on a lack of identifying information; instead the user must undertake the most comprehensive search possible in light of limited information, because a lack of identifying information does not excuse a user from conducting any searches.

Beyond the enumerated sources, the legislation requires that users take any other actions that are reasonably likely to be useful in identifying and locating the copyright owner. What is

---

[250] Two groups of commenters argued that artists and creators – such as screenwriters, directors, actors, and musicians – who are not technically copyright "owners" in the sense that they possess any of the exclusive rights enumerated in Section 106 of the Copyright Act, but who retain a beneficiary interest in a work they have created or participated in, via residual or royalty agreements, should have to be sought out as part of a qualifying search, and, if located, be able to grant or withhold permission for use of the work. *See* DGA & WGAW Initial Comments at 2; Screen Actors Guild & Am. Fed. of Television & Radio Artists ("SAG-AFTRA"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 3-4 (Feb. 4, 2013) ("SAG-AFTRA Initial Comments"). Furthermore, these commenters argued, should a user exploit an orphan work commercially after failing to locate the owner, that user should be obligated to pay reasonable compensation and provide attribution to the relevant author, actor, or other creator. *See, e.g.*, SAG-AFTRA Initial Comments at 3-4. The Office agrees that non-owner creators should be sought out in the course of a good faith qualifying search, but primarily because of the information they will likely have regarding the owner(s) of the work in question. The Office does not agree, however, that such parties should necessarily stand in the shoes of the owner of the work in terms of being able to grant permission for use; this re-calibration of the roles of licensor and licensee is not properly addressed by orphan works legislation. Similarly, because a user of an orphan work enjoys none of the exclusive rights of the owner, it would be unreasonable to require him to pay compensation based upon a contract with which he has no privity. Non-owner creators who are authors of works of visual art, however, have separate rights under Section 106A that are not affected by this draft legislation.

ANT_BARTZ_000435592

"reasonably likely" depends upon the facts known at the outset of the search, as well as upon facts uncovered during the search – in other words, as the search progresses, users may need to refine their search efforts. A qualifying search may also require use of resources that impose a charge (*e.g.*, online databases requiring a subscription or paid services, such as the Copyright Office's search service). When a user fails to conduct a qualifying search, the user is not eligible for a limitation on remedies. This does not technically mean that the user cannot move forward if he or she is inclined to take a risk; indeed this is the situation we have today. Rather, it means that the user will have no clear shield against liability.

### 2)    Judicial Consideration of Qualified Foreign Searches

Since Congress last considered orphan works legislation in 2008, foreign jurisdictions have made great strides in tackling the problem.[251] The European Union, the United Kingdom, Hungary, and others require, as does the Office's draft legislation, that a documented, diligent, good faith search be undertaken before a work can be considered an orphan work.[252] What happens, then, if a foreign jurisdiction determines that a work is orphaned based on a search conducted in that foreign jurisdiction, and the user who performed the search wants to use the same work in the United States? What if a different user wanted to rely upon a foreign determination of a work as orphaned? Particularly in the case of the U.K., Hungary, and Canada, where a government entity must certify each orphan works search, it would seem both logical and efficient that such a search should carry some weight in the United States.

The Office recommends, then, that when a foreign search for the owner of a work is diligent but unsuccessful, and certified as such by an appropriate government authority, a United States court, in determining whether a particular search qualifies under the statute, should be allowed to take the results of the foreign search into account,[253] provided that the foreign

---

[251] *See supra* Part I.C, discussing various foreign orphan works regimes.

[252] *See* EU Orphan Works Directive, *supra* note 74, art. 4; U.K. INTELL. PROP. OFFICE, GOVERNMENT RESPONSE TO THE TECHNICAL CONSULTATION ON ORPHAN WORKS, *supra* note 115, at 4 (2014); 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright) § 41/A(1) (Hung.) (effective from Oct. 29, 2014); 138/2014. (IV.30.) Korm. r. az árva mű felhasználásának részletes szabályairól (Governmental Decree No. 138/2014 (IV. 30.) on Detailed Regulations on the Use of Orphan Works), § 3 (Hung.).

[253] Giving evidentiary weight to foreign investigations or searches is not an alien concept in the United States. Under the Federal Food, Drug, and Cosmetic Act, for example, the results of foreign safety inspections of foreign entities for purposes of export/import of food, drugs, and cosmetics "may be used as . . . evidence of compliance with" sections of the Act concerning adulterated drugs and devices, the standards for admission of imported drugs, and "for any other purposes as determined appropriate by the Secretary." 21 U.S.C. § 384e. *See also Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 327 (3d Cir.

ANT_BARTZ_000435593

jurisdiction also recognizes qualifying U.S. searches. This provision would apply whether the U.S. user is the same as the foreign user, or different. It would not replace the need for a qualifying U.S. search, but complement it. In addition, giving U.S. courts the option of considering foreign searches as probative evidence that a reasonably diligent search was carried out would increase the likelihood that foreign jurisdictions will afford similar evidentiary weight to searches conducted in the United States.

### 3) Recommended Practices

Any qualifying search will be based on applicable statement(s) of Recommended Practices made available by the Copyright Office. The draft legislation stipulates that the Register of Copyrights maintain and make available statements of Recommended Practices for each category of work under Section 102(a).[254] In formulating these Recommended Practices, the Register must consider materials, resources, databases, technology tools, and practices that are reasonable and relevant to the qualifying search. This kind of process would be implemented in a publicly transparent manner.

Importantly, the Register may consider *any* comments submitted to the Copyright Office by *any* interested stakeholders. Recommended Practices documents created using the input of both rightsholders and users will likely achieve a balanced approach serving the interests of both groups.[255] Furthermore, widespread and diverse stakeholder input will serve to legitimize these

---

2002) (Alito, J.) (upholding a district court decision to admit evidence of trademark registrations in foreign countries only insofar as the evidence was relevant to the question of whether one of the parties had acted in good faith, and not the validity of any U.S. trademark). The dissent, concurring on the relevance issue, noted that "[i]n ordinary trademark litigation, however, evidence of foreign registrations is irrelevant." *Id.* at 336 n.1 (Rosenn, J., dissenting) (citing *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599-600 (5th Cir. 1985); *Double J of Broward, Inc. v. Skalony Sportswear GmbH*, 21 U.S.P.Q.2d 1609, 1612 (T.T.A.B. 1991)). *See also Timely Prods. Corp. v. Arron*, 523 F.2d 288, 295 (2d Cir. 1975) ("The presumption of validity which the issuance of the U.S. patent confers . . . is a real one . . . which does not require *nor admit* of augmentation by proof of the issuance of corresponding foreign patents.") (emphasis added); *Heineken Tech. Servs. v. Darby*, 103 F. Supp. 2d 476, 480 (D. Mass. 2000) (citing *Timely Products Corp. v. Arron* for the proposition that "[t]he Federal Circuit has noted . . . antipathy towards foreign patent determinations on numerous occasions").

[254] These categories are (1) literary works; (2) musical works, including any accompanying words; (3) dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisual works; (7) sound recordings; and (8) architectural works. 17 U.S.C. § 102(a).

[255] The United Kingdom recently published orphan works "diligent search guidance" documents targeted at film and sound, literary works, and visual art, which may prove useful resources for the Copyright

ANT_BARTZ_000435594

Recommended Practices documents and the orphan works provision generally in the eyes of users, rightsholders, and the general public.

### 4) Qualifying Third-Party Databases

In a departure from the Shawn Bentley Act, the Copyright Office's proposed legislative language does not include a requirement for the Office to certify third-party databases containing visual art works. The Office believes that the development of such databases has progressed to the point that the involvement of the Office is no longer necessary as a spur to innovation. The PLUS Registry, discussed above, is the largest and most well-known of the databases being developed. We agree with the Copyright Alliance when it says that PLUS demonstrates "that it is feasible to define standards for identifying rights holders and communicating rights information; and model best practices for operating an industry neutral, global, nonprofit rights registry for images."[256] Moreover, the Copyright Office will be making improvements to its own database and the registration and recordation options for visual artists, all of which point to a data-driven future in which more artists will be findable.

### iii. Notice of Use

The Notice of Use mechanism was not a feature of the Shawn Bentley Act passed by the Senate in 2008; it appeared only in the 2008 House bill. The Office believes that the principal advantage of a Notice of Use requirement is that copyright owners can use it to become aware that their work is considered orphaned and more easily respond to users. As noted above, the goal of any orphan works provision should be to unite owners and users. While filing a Notice of Use for each use of an orphan work may place a significant burden on users in some instances, this is true principally with respect to users wishing to use a large number of orphan works related to a single project (*e.g.*, the digitization of a library's entire special collection). In many cases, the mass digitization framework described in Part III.C would obviate the need for individual Notices in such circumstances. Hence, we see the Notice of Use as a mechanism for isolated uses.

The recommended legislation provides that the Register of Copyrights will create and maintain an archive or registry to maintain Notice of Use filings. Notice of Use filings will include: (1) the type of work used (under 17 U.S.C. § 102(a)); (2) a description of the work; (3) a

---

Office. *See Orphan Works Search Guidance for Applicants*, U.K. INTELLECTUAL PROPERTY OFFICE, https://www.gov.uk/government/publications/orphan-works-diligent-search-guidance-for-applicants.

[256] Copyright Alliance Initial Comments at 4.

ANT_BARTZ_000435595

summary of the qualifying search conducted; (4) any other identifying indicia available to the user; (5) the source of the work (*e.g.*, library or website where work was located, publication where work originally appeared); (6) a certification that the user performed a qualifying search; and (7) the name of the user and a description of how the work will be used.

The provision goes on to indicate that these Notice of Use filings will be retained by the Copyright Office and will be provided to individuals and the public only under regulations promulgated by the Office.  Clearly, an archive of Notice of Use filings will be most useful when copyright owners have the ability to search it periodically in order to see if a work of theirs has been identified as an orphan.[257]  Some parties have raised concerns, however, that requiring public disclosure of orphan work uses would involve revealing competitive or confidential information in some cases, to the detriment of the user.[258]  This drawback could be dealt with if the regulations require only a general description of the use of the work, as detailed usage information is not necessary in order for an owner to recognize his or her work.[259]  While the Office cannot and does not want to predetermine the outcome of the regulatory process for setting conditions for making Notice of Use filings available, at this time it appears to us that the more publicly searchable a Notice of Use database is, the greater the likelihood of bringing users and owners together.

In the 2006 Report, the Office recommended against the adoption of a Notice of Use provision at that time.  The Office was concerned that the difficulty of providing a textual description for certain types of works (*e.g.*, untitled photographs and other visual works) would limit the registry's usefulness to rightsholders seeking to determine if their works had been used, and to users inquiring whether a work had been the subject of a previous search.[260]  We recognize that a text-based system presents inherent limitations as a means of identification, but we believe that the combination of items required under the current legislation – description of the work,

---

[257] *See* RIAA Initial Comments at 2 (A Notice of Use database "will allow copyright owners to exercise diligence to ensure that their works are not erroneously treated as orphaned – much as the trademark ITU [Intent to Use] program allows trademark owners to object to registrations before marks are used by third parties.").

[258] *See id.* at 2-3; Tr. at 218:14-219:8 (Mar. 10, 2014) (Patrick McCormick, Int'l Documentary Ass'n and Film Independent).

[259] *See* RIAA Initial Comments at 2-3.

[260] *See* 2006 REPORT, *supra* note 9, at 113.  The Office also expressed concern that a Notice of Use requirement could be burdensome to users wishing to make use of large collections of orphan works.  As noted, we believe that the mass digitization framework proposed below could eliminate this burden in many cases.

ANT_BARTZ_000435596

summary of the search conducted, where it was located, etc. – will generate useful identifying information in most cases.  Indeed, the value of this type of registry is reflected in the EU Directive, which requires that information about user organizations' diligent searches and their use of orphan works be recorded in a publicly accessible online database managed by the Office for Harmonization in the Internal Market.[261]

Others have argued that a Notice of Use registry could discourage diligent searches in that a user who sees a work listed there may be misled into believing that a subsequent search for the rightsholder is unnecessary or unlikely to be successful.[262]  The legislation makes clear, however, that every prospective user must satisfy the diligent search requirement independently, and that such obligation entails more than simply searching the Copyright Office's online records.  And while some users might forego such efforts after discovering that the work was the subject of a prior unsuccessful search, the Office believes that most will utilize the information in the registry to help ensure that their own searches include all appropriate sources.[263]

### iv.   Notice of Claim of Infringement

The limitations on remedies do not apply where, after receiving a Notice of Claim of Infringement from the owner of the work, the user fails to negotiate reasonable compensation with the rightsholder, or fails to render payment once an agreement is reached in a reasonably timely manner.  The recommended legislation contains a definition of a Notice of Claim of Infringement, specifying the following information that must be included at a minimum:  the name of the owner, the title or a description of the work, contact information for the owner or the owner's representative, and information sufficient for the user to find the orphan work within the user's materials.  The "owner of the infringed copyright" refers to the individual(s), organization(s), or other authorized agent(s) owning any particular exclusive right under Section 106 applicable to an infringement.

---

[261] EU Orphan Works Directive, *supra* note 74, art. 3(5), (6).

[262] *See* Int'l Documentary Ass'n and Film Independent Initial Comments at 10; Tr. at 219:9-14 (Mar. 10, 2014) (Patrick McCormick, Int'l Documentary Ass'n and Film Independent) ("Other users will find it misleading if they see that there and fail to do their own diligent search, which is a further concern because they may be the best situated party to actually find the rights holder.").

[263] *See, e.g.*, NMPA & HFA Initial Comments at 9 ("The maintenance of records and results of diligent searches as well as information regarding any use made of orphan works filed in this Registry will help ensure that subsequent users have taken the required steps before using a particular work.").

ANT_BARTZ_000435597

### d.  Limitation on Remedies

#### i.    Monetary Relief: "Reasonable Compensation"

Where a user satisfies the eligibility requirements of the orphan works legislation, monetary relief is limited to "reasonable compensation."  Neither actual and statutory damages, nor costs or attorneys' fees, would be available.  In most cases, "reasonable compensation" will be close to or identical to a reasonable license fee.  Statutory damages for infringement of a work whose copyright owner cannot be located, and thus will not have been licensed for a long time, would be unlikely to have been assessed at the high end of recovery in any event.[264]  Some commenters have stressed the importance of the recovery of costs and attorneys' fees as an incentive for re-appearing owners to bring suit in the first place, and criticized the absence of this remedy.[265]  However, incentives to litigate are obviated by the requirement that, once the owner files a Notice of Claim of Infringement, the user must negotiate for reasonable compensation.  Because the costs of litigation can be avoided, there is no need to include the remedies of costs and attorneys' fees as part of the orphan works legislation.

The concept of reasonable compensation is discussed in Judge Pierre Leval's opinion in *Davis v. The Gap, Inc.*,[266] which explains why the "reasonable license fee" construct is appropriate in situations where users have sought to find the owner through a good faith diligent search:

> The Gap was not seeking, like [other] defendant[s], to surreptitiously steal material owned by a competitor. . . . [T]he Gap and Davis could have happily discussed the payment of  a fee, and . . . Davis's consent, if sought, could have been had for very little money, since significant advantages might flow to him from having his [work] displayed in the Gap's ad.  Alternatively, if Davis's demands had been excessive, the Gap would in all likelihood have simply eliminated Davis's [work]

---

[264] The range for statutory damages is generally between $750 and $30,000 per work infringed.  17 U.S.C. § 504(c).

[265] *See* Bruce A. Lehman, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 1 (undated) ("It is hard to imagine circumstances that would justify a rights holder bringing action where the monetary relief would almost never amount to more than a fraction of litigation costs."); NMPA & HFA Initial Comments at 10-11 ("[We] are concerned that copyright owners that are found after an orphan work has already been used will be discouraged from pursuing legal action to claim their rights if they must pay legal fees and other court costs.  Without a legal fee remedy, copyright owners will find it difficult to retain legal counsel to prosecute their claims.").

[266] 246 F.3d 152 (2d Cir. 2001).

ANT_BARTZ_000435598

from the photograph. Where [a prior court case] was motivated by its perception of the unrealistic nature of a suggestion that the infringer might have bargained with the owner, . . . such a scenario was in no way unlikely in the present case.[267]

The *Davis* case shows that the burden of demonstrating fair market value falls to the copyright owner. The proposed orphan works provision specifies that "reasonable compensation" refers to the value that would have been arrived at *immediately before* the infringement began. This wording precludes copyright owners from asserting the amount for which he or she would have licensed the work *ex post* – the owner must prove that similarly situated owners have licensed similar uses for such amount.[268] The Office believes that "reasonable compensation" should be understood to include a percentage-based royalty as well as a single, fixed sum, so that an orphan work user does not reap an unfair windfall in the event that his reuse of the work proves to be commercially successful.[269] Ultimately the "reasonable compensation" structure "allows a copyright owner to present evidence related to the market value of his work and, at the same time, allows the copyright user to more precisely gauge his exposure to liability."[270]

### ii. "Safe Harbor" for Certain Nonprofit Institutions and Uses

The proposed legislation would further limit remedies where certain eligible users make specific noncommercial uses of orphan works, by providing an additional safe harbor against liability for those users. Eligible entities (nonprofit educational institutions, museums, libraries, archives, and public broadcasters) must prove that the use was primarily for educational,

---

[267] *Id.* at 164.

[268] *Id.* at 166. In the *Davis* case, the court rejected the plaintiff's claim that he would have licensed the defendant's use for $2.5 million as "wildly inflated." The court looked to actual similar transactions Davis had concluded, including a license for a photograph in a magazine for $50. The court concluded that reasonable compensation would be in the range of $50. *Id.* at 161.

[269] *See* Jane C. Ginsburg, *Recent Developments in US Copyright Law: Part I – "Orphan" Works* 7 (Columbia Law Sch. Pub. Law & Legal Theory Working Paper Grp., Paper No. 08-183, 2008), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1263361 ("If 'the amount' can be understood to mean 'the basis on which a sum will be calculated,' then the term can encompass a percentage royalty, and thereby avoid some inequities and possibly unintended consequences. For example, if the use proved enormously lucrative, but its success could not have been anticipated, the 'legal or beneficial owner' will not share in the proceeds of the exploitation if 'amount' means pre-determined fixed sum, but will share in the proceeds if 'amount' includes a stated percentage royalty.") (citations omitted).

[270] *Promoting the Use of Orphan Works*, *supra* note 184, at 22 (statement of Marybeth Peters, Register of Copyrights).

ANT_BARTZ_000435599

religious, or charitable purposes. If, upon receiving a Notice of Claim of Infringement, and after a good faith investigation of that Notice, such users promptly cease using the infringed work, a court is barred from ordering them to pay even reasonable compensation. Hence, unlike other users, eligible entities can avoid paying damages for past use of an orphan work. Eligible entities also have the option of negotiating reasonable compensation with the owner instead of ceasing their use of the work.

When the safe harbor was initially proposed in the Office's 2006 Report, there was no requirement that an eligible infringer be a nonprofit or cultural institution, only that the use be without any purpose of direct or indirect commercial advantage. This was also the case in the 2006 orphan works bill; the requirement that the infringer be a nonprofit educational institution, museum, library, archives, or public broadcaster was added in the 2008 orphan works bills, and we retain it in the current draft legislation. Throughout the orphan works consultative process, the concept of a safe harbor for limited purposes has engendered significant debate.[271] In the most recent commenting process, several stakeholders argued that eliminating the possibility of re-emerging owners obtaining monetary relief from unlicensed uses by non-profit users was "without merit"[272] and "harmful."[273] Medical illustrators, for example, rely to a large degree on non-profit entities such as universities and foundations for licensing income, and it was argued that they would have their economic incentives undermined should their licensees be able to infringe orphan works without the deterrent of monetary damages.[274]

The Office is convinced that the safe harbor provision is both necessary to prompt nonprofit educational and memory institutions to take advantage of the orphan works provision, and will not harm the creative incentives for professional artists. Because, as some commenters have noted, "not every act of a non-profit organization is non-commercial in its nature and

---

[271] *See, e.g.*, Maria A. Pallante, *Orphan Works & Mass Digitization: Obstacles & Opportunities*, 27 BERKELEY TECH L. J. 1251, 1257 (2012) ("[T]hose who were there know that this special treatment [safe harbor] was a real struggle . . . ."); *Promoting the Use of Orphan Works*, *supra* note 184, at 75 (2008) (statement of Victor Perlman, General Counsel and Managing Director, ASMP) (acknowledging broad areas of compromise reached during 2006 and 2008 negotiations of orphan works legislation, but noting that "the parties ultimately came to an impasse over certain aspects of the bill, primarily the extent of the so-called 'safe harbor'" provision).

[272] Ass'n of Medical Illustrators ("AMI"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 3 (Feb. 4, 2013) ("AMI Initial Comments").

[273] PPA et al., Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 11 (May 20, 2014) ("PPA et al. Additional Comments").

[274] AMI Initial Comments at 3.

ANT_BARTZ_000435600

marketplace effect,"[275] the Office's proposal restricts the applicability of the safe harbor both in terms of a user's identify and the nature (educational, religious, or charitable) of its use. Many nonprofits, such as libraries, archives, and museums, are in the business of acquiring and preserving unique and important works, and have a mission to make them available. When such works are orphaned, realizing this mission becomes fraught with legal uncertainty.[276] The Office's safe harbor proposal is based on the fact that, usually, public access to or display of an orphan work by a library or museum occurs without any kind of monetary compensation for the owner, so it is appropriate, should the owner re-appear, that the remedy be the removal of the work from public view rather than reasonable compensation, which in many cases would be zero. Additionally, the entities that qualify for the safe harbor provision must still file a Notice of Use document with the Copyright Office. And, of course, where a finder of fact determines that a non-profit user failed to perform a qualifying search or failed to comply with any of the procedural mechanisms contained in the proposed legislation, then that user may be liable for the full set of remedies available under the Copyright Act, including statutory damages.

### iii.    Effect of Registration on Monetary Damages

The proposed legislation includes a provision allowing courts, when determining reasonable compensation, to take into account the value, if any, added to a work by virtue of its registration with the Copyright Office. This provision, originally proposed as part of the 2008 House bill, seeks to address circumstances where a qualifying search fails to uncover the copyright owner even though the work in question is registered and the Copyright Office records are examined (as would ordinarily be required). This can happen, for example, with a lyric-less sound recording, or a work of visual art, with no textual search terms available to use in searching. Thus, reasonable compensation in such instances should include a measure of the damages available for the infringement of the registered work, even if the work in question was initially unable to be located through a qualifying search. This provision is intended to encourage registration and reward those who have registered their works with the Office. It also reflects the

---

[275] PPA et al. Additional Comments at 12.

[276] *See, e.g.*, Museum of Fine Arts, Boston, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2 (Feb. 1, 2013) ("Because of the lack of any type of safe harbor for those who, despite a good faith effort, are unable to locate a rights holder for an orphan work, the MFA is faced with limited options with regard to how to treat these works: (1) minimize its exposure to risk and restrict these images from distribution or digital display which in most cases will result in the total restriction of the public from these works, or (2) accept the risk of potential liability resulting from providing digital access to these works. These are unacceptable options for any cultural heritage institution to be forced to weigh and do little if anything to serve the purpose of the copyright system.").

ANT_BARTZ_000435601

reality that an owner who registers his or her work likely has more interest in its exploitation.

#### iv.  Injunctive Relief

Under the draft legislation, courts in most cases may enjoin any infringement alleged in a civil action, including by stopping further copying or distribution of the orphaned work.  Where users have shown themselves to be acting in good faith by meeting the requirements of a reasonably diligent search, any injunctive relief, however, should account for the harm caused by users' reliance on the orphan works provision.  Thus, the draft legislation would not completely bar injunctive relief in all circumstances:  for example, a court could enjoin the further printing or publication of copies of an orphaned work, but permit the retail sale of existing copies. [277]

And in the case of derivative works created with orphans, the draft legislation significantly limits the availability of injunctive relief.  Where a user has created a derivative work containing a "significant amount of original expression," the general provision with respect to injunctive relief, which dates back to the 2006 Orphan Works Report, remains the same in the current draft:  a user may, upon paying reasonable compensation to the owner of the work in a reasonably timely manner and providing attribution (where requested), avoid an injunction and continue to prepare and use the new work.  A court may determine that payment of a percentage-based royalty constitutes reasonable compensation.  This provision accounts for the reliance interest of the user, who – based upon a qualifying but unsuccessful search for the copyright owner – may have created a new work that combines the orphan work with his own significant original expression in a way that is effectively impossible to untangle without doing damage to the new work.[278]

While limiting injunctive relief encourages users to utilize and invest in derivative works based on orphan works, it does not do so without exacting some cost.[279]  The restriction on the

---

[277] *See* 2006 REPORT, *supra* note 9, at 120-21.

[278] *See, e.g.,* Software & Info. Indus. Ass'n ("SIIA"), Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 16 (May 20, 2014) ("SIIA Additional Comments") ("Where the orphan work and the user's contribution to the derivative work are inseparably comingled within the derivative work, injunctive relief may cause the user more harm than the harm caused to the copyright owner by allowing the user to continue to use the work.").

[279] In fact, the provision was extensively debated during consideration of the Shawn Bentley Act in 2008. *See generally,* MPAA Initial Comments at 8.  *See also Promoting the Use of Orphan Works, supra* note 184, at 3 (statement of Rep. Howard Berman, Chairman, Subcomm. on Courts, the Internet, & Intell. Prop.) (identifying "[h]ow much of the infringer's own expression should be required to prevent an injunction" as an open question during congressional deliberations in 2008); *id.* at 89-90 (statement of Corinne P.

67

ANT_BARTZ_000435602

scope of injunctive relief with respect to derivative works applies for the entire term of the copyright in the orphan work. Therefore, a user could continue to use a derivative work for decades despite objections from the owner, as well as enjoy copyright protection for that derivative work.[280] Some have criticized this result as inequitable,[281] with one commenter describing it as "obliging authors permanently to tolerate even derivative uses they find offensive or that distort their works."[282] The Office acknowledges that, but for the designation of the work as an "orphan," the owner would normally be allowed to seek injunctive relief on the basis that her derivative work rights were being infringed.[283] Not allowing such relief in an orphan works situation is particularly difficult, the Office notes, when the owner is also the author of the work, and risks suffering harm that, in the court's view, cannot be remedied by reasonable compensation, such as serious damage to the author's reputation.

In order to acknowledge and provide a measure of redress for this problem, the Office's draft legislation adds a new provision with respect to certain derivative uses. The new provision allows author-owners to seek injunctive relief for the use of their orphan work in an unauthorized derivative work, but only if the continued preparation or use of the new work would be prejudicial to the author-owner's honor or reputation, and a Court finds that such harm cannot be cured through reasonable compensation. The Office is introducing this concept for the first time in this Report, with the intention of preserving for a limited set of owners the same derivative works rights they enjoy outside of the orphan works context and which are consistent with global norms and essential to a twenty-first century copyright law. To be clear, this is not a new cause of action – the plaintiff must hold at least one of the Section 106 rights in order to bring suit in the first place – but it does acknowledge the personal nature of reputational harm, in that the owner

---

Kevorkian, F. Schumacher & Co.) ("[I]f our [textile] designs are incorporated into a derivative work, then we find ourselves in situations where that design lives on into another piece of work which we may not find satisfactory to us even if reasonable compensation is accorded.").

[280] *See* Part II.B.5.e.iii, Copyright for Derivative Works and Compilations, *infra*.

[281] *See* Ginsburg, *Recent Developments in US Copyright Law*, *supra* note 269, at 8-9; Am. Soc'y of Illustrators P'ship ("ASIP"), Reply Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2 ("Because the legislation prohibited injunctions, in recognition of the infringer's investment in utilizing an 'orphaned' work, it ensured that *artists' exclusive rights could never again be effectively exercised*.") (underlining and italics in original).

[282] Ginsburg, *Recent Developments in US Copyright Law*, *supra* note 269, at 10.

[283] *See, e.g.*, *Pearson Educ., Inc. v. Nugroho*, No. 08 Civ. 8034, 2009 U.S. Dist. LEXIS 101600 (S.D.N.Y. Oct. 27, 2009) (injunction granted for infringement of derivative work right); *CBS Operations, Inc. v. Reel Funds Int'l*, No. 3-06-CV-0588-L, 2007 U.S. Dist. LEXIS 58939 (N.D. Tex. Aug. 13, 2007) (same).

ANT_BARTZ_000435603

must also be an author of the work.[284]  Indeed, the language of this provision partially tracks that of the Visual Artists Rights Act (VARA) of 1990,[285] and in doing so recognizes the moral interest and legitimate concerns of authors who confront unauthorized derivative works based upon their creations.[286]  Of course, the user remains able to mount a fair use defense against such an injunction, which is particularly important given the freedom of expression issues raised when copyright infringement injunctions are sought.[287]

### v.  Injunctive Relief: Limitations Regarding State Actors

States and their employees generally are not subject to monetary damages for copyright infringement.[288]  This removes, to some degree, the incentive for state actors, such as universities,

---

[284] An entity that owns the copyright in a work entirely because of a transfer, for example, and has no personal reputational interest at stake, would not be allowed to seek an injunction under this provision. Likewise, an author who has entirely divested herself of all rights identified in Section 106 would have no ownership standing to bring an infringement action in the first place.

[285] Pub. L. No. 101-650, 104 Stat. 5089, 5128 (1990).  VARA appears in the Copyright Act as 17 U.S.C. § 106A.

[286] See, e.g., A2IM Initial Comments at 2 ("The Orphan Work should additionally not be made available for use as part of a derivative work with another musical work, such as a 'mash-up', which could result in a new musical work the original copyright owner might not approve . . . ."); see also Joseph Ford, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 1 (Apr. 10, 2014); Andrea Mistretta, Reply Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 1 (Feb. 18, 2013).  It is also worth pointing out that a plaintiff owner/author who is remunerated for the use of her (previously) orphan work as part of a derivative work, but who believes that the continued use of her work in this manner damages her reputation (e.g., who claims a violation of her right of integrity as the author of the work), may find support for her position under Section 106A, provided the work in question is one of visual art.  Similar protections are available in state law statutes concerning authorship rights in works of fine art (e.g., California Art Preservation Act, CAL. CIV. CODE § 987; New York Artists' Authorship Rights Act, N.Y. ARTS & CULT. AFF. LAW § 14.03), to the extent such statutes are not preempted by the Copyright Act (see 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT, §§ 8D.07[C], 8D.08[C] (2015)).

[287] See, e.g., Mark A. Lemley & Eugene Volokh, Freedom of Speech and Injunctions in Intellectual Property Cases, 48 DUKE L.J. 147, 208 (1998) ("The fair use doctrine has been interpreted to protect unauthorized parodies of a copyright owner's works, despite the 'moral' objection the owner likely has to the publication of such a parody." (citing Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994)).

[288] See Chavez v. Arte Publico Press, 204 F.3d 601, 603, 608 (5th Cir. 2000) (instructing the district court to dismiss copyright infringement claims against a state entity because that entity is immune from money damages, and holding that the Copyright Remedy Clarification Act, which sought to abrogate the states' Eleventh Amendment immunity to suit for copyright infringement, is unconstitutional).  Cf. Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, 527 U.S. 627, 647-48 (1999) (finding that the Eleventh Amendment bars suits against State entities for patent infringement); Seminole Tribe v. Fla., 517 U.S. 44, 54

to engage in qualifying searches for the owners of orphan works, as their monetary liability is zero either way. State actors are, however, subject to limited injunctive relief if found to have committed copyright infringement. If a state actor, after performing a qualifying search, uses an orphan work as part of a new derivative work, and the owner emerges, the owner potentially could be barred both from injunctive relief (under the orphan works statute) and from damages (under the Eleventh Amendment), thus leaving the copyright owner with no remedy.[289] To encourage state actors to search for orphan work owners, the proposed legislation provides that state actors cannot take advantage of the limitation on injunctive relief unless they engage in a qualifying search and pay any reasonable compensation either agreed upon with the owner of the work at issue or determined by a court. If a state actor refuses to pay the reasonable compensation, it becomes liable for full injunctive relief under Title 17. Similar provisions were in both the House and Senate 2008 orphan works bills.

### e.  Relationship to Other Provisions of Title 17

#### i.  Fair Use Savings Clause

The draft legislation includes a specific provision stating that it does not affect any right, limitation, or defense to copyright infringement, including fair use, under Title 17. A fair use "savings clause" was included in earlier bills and remains important today. Retaining the ability of unlicensed users of orphan works to defend their activities based upon fair use will allow the continued development of the fair use doctrine in the courts. The application of fair use to new fact patterns, such as uses of orphan works, is an essential aspect of copyright law jurisprudence, and should not be foreclosed by the introduction of a limitation on liability. Indeed, the Library Copyright Alliance, which otherwise opposes any orphan works legislation, stated that, "[i]n any event, any legislation in this area must contain an explicit savings clause similar to that in 17 U.S.C. § 108(f)(4), that nothing in this provision 'in any way affects the right of fair use as

---

(1996) (affirming that the Eleventh Amendment generally bars suits for monetary damages against a state). It should be noted, however, that injunctive relief is still available against individual state employees, who are not considered to be acting within the scope of their official duties when they violate a valid federal law. *See, e.g.*, *Ex Parte Young*, 209 U.S. 123, 155-56 (1908). In 2000, former Register of Copyrights Marybeth Peters testified in the wake of *Chavez* that the *Ex Parte Young* doctrine "provides only limited relief . . . because it provides no compensation for the damages already inflicted upon a copyright owner due to past infringement by a State." *State Sovereign Immunity and Protection of Intellectual Property: Hearing Before the Subcomm. on Courts & Intellectual Prop. of the H. Comm. on the Judiciary*, 106th Cong. 55 (2000) (statement of Marybeth Peters, Register of Copyrights).

[289] *See* SIIA Additional Comments at 14-15.

ANT_BARTZ_000435605

provided by section 107.'"[290]  In situations where unauthorized use of what may be an orphan work clearly falls under fair use, it makes sense for this exception to remain available.[291] Additionally, less risk-averse entities may prefer testing the limits of fair use instead of undertaking good faith diligent searches, and they should not be precluded from making that choice.

### ii.   Preservation of Statutory Licenses

The proposed legislation makes clear that if the planned use of an orphan work would be permitted by a statutory license – for example, the Section 114 public performance for sound recordings license or the Section 115 mechanical license for musical works – that license applies and the user may not rely upon the orphan works provision.  This provision insures that the statutorily mandated license fee will be paid even though the owner of the work cannot be located by the user at that particular time.

### iii.   Copyright for Derivative Works and Compilations

The proposed legislation clarifies that, despite the language of 17 U.S.C. § 103(a),[292] any user of an orphan work who qualifies for the limitation on remedies may still enjoy copyright protection for a compilation or derivative work that employs preexisting unlicensed orphan works.  Like those sections of the bill relating to injunctive relief, this provision seeks to incentivize good faith uses of orphan works, despite the fact that they are technically infringing. Users are encouraged to engage in productive uses of otherwise dormant orphan works, provided the works qualify under the diligent search standard.

### f.   Report to Congress

The final section of the proposed legislation requires the Register of Copyrights to submit a report to Congress on the "implementation and effects" of the orphan works limitation on remedies, within five years of its enactment.  The report must also include appropriate

---

[290] LCA Initial Comments at 8.  We recognize, however, that some maintain that even a fair use savings clause might not be sufficient.  *See, e.g.*, Tr. at 366:22-368:1 (Mar. 10, 2014) (Krista Cox, Ass'n of Research Libraries) (noting that "the savings clause might not be completely adequate").

[291] *See, e.g.*, Berkeley Digital Library Copyright Project Initial Comments at 16; AAP, Reply Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 4 (Mar. 6, 2013).

[292] "The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully."  17 U.S.C. § 103(a).

ANT_BARTZ_000435606

recommendations for legislative changes, if any.[293]  The Office's 2006 Report contained a recommendation that an orphan works provision should sunset after ten years, in order to "allow Congress to examine whether and how the orphan works provision is working in practice, and whether any changes are needed."[294]  We believe that a five-year report will serve the same essential review function as a sunset provision, without the risk that users who have relied upon the orphan works limitation on liability will suddenly find themselves subject to traditional copyright damages and injunctions.

## III.  MASS DIGITIZATION

As discussed above, the legal issues surrounding both the case-by-case use of orphan works and mass digitization projects arise out of practical obstacles to copyright clearance.  By its nature, however, mass digitization is not amenable to a solution premised on a user's diligent search for individual copyright owners:  the vast number of rightsholders from whom permission may be required in order to digitally reproduce and offer access to a large collection of works renders such a model impracticable in this context.  A framework for mass digitization accordingly requires a distinct response, and therefore we consider the topic separately.

In the Office's view, the legitimate goals of mass digitization cannot be accomplished or reconciled under existing law other than in narrow circumstances.  For this reason, as explained below, we are recommending the adoption of an extended collective licensing pilot program that would provide full-text access to works under conditions to be agreed upon between rightsholder and user representatives.  The general parameters of this framework are discussed below.  In lieu of proposing draft legislative language at this time, however, the Office is issuing a Notice of Inquiry requesting public comment on several issues that we believe warrant additional stakeholder input.  The Office will utilize these comments to facilitate further dialogue regarding various elements of the pilot program, and will thereafter develop a formal legislative proposal for Congress's consideration.

### A.  Overview

The term "mass digitization" does not lend itself to a precise definition.  As an initial matter, there is no generally agreed-upon standard for determining whether a project is sufficiently large to be considered a "mass" digitization.  In its 2011 *Legal Issues in Mass*

---

[293] This requirement is the same as the report requirements in the 2006 orphan works bill (H.R. 5439) and both 2008 orphan works bills (S. 2913 and H.R. 5889).

[294] 2006 REPORT, *supra* note 9, at 14.

ANT_BARTZ_000435607

*Digitization* publication, the Office observed that, in the context of books, the term had come to mean "large-scale scanning," and cited the then-15 million-volume Google Books project as a "consensus" example of a project that would qualify.[295]  At the same time, the Office noted the possibility that "a project capturing far fewer books might also be considered mass digitization."[296]  In general, this Report uses the term to refer to projects in which the scale of digital copying is so extensive as to make the individual clearance of rights a practical impossibility.  Of course, any legislative solution would need to attempt to define both the policy rationale and the universe of projects to be covered.  We describe potential definitional frameworks in Part III.C below.

Moreover, the concept of mass digitization, in general, cannot easily be defined by type of work, purpose, or use.  While the term is commonly associated with library projects – for example, creating digital copies of an entire collection to facilitate preservation and access – in many cases "mass digitization involves activities that exceed the purpose of building a digital library."[297]  As one study observes, "the legal issues arising from mass digitization projects have common features with those emerging from other activities of the web economy, such as . . . the systematic extraction and reutilization of the contents of various databases to make price comparisons, or the aggregation of digital content into web results."[298]  Similarly, a participant in the Office's roundtables cited commercial databases of student academic papers and attorney court filings (both of which have been at issue in recent litigation) as examples of activities that could be described as mass digitization insofar as they involve the digital copying and storage of large numbers of works.[299]

Beyond definitional challenges, mass digitization presents a variety of complex policy considerations, including both opportunities and risks.  Some mass digitization projects offer considerable public benefits.  In the Google Books litigation, for example, the district court identified several valuable purposes served by that project, including facilitating research, both through traditional methods and newly developed "data mining" techniques; expanding access

---

[295] LEGAL ISSUES IN MASS DIGITIZATION, *supra* note 145, at 8-9.

[296] *Id.* at 9.

[297] BORGHI & KARAPAPA, *supra* note 155, at 2.

[298] *Id.*

[299] Tr. at 112:15-113:12, 113:17-115:6, 139:15-140:12 (Mar. 11, 2014) (Jonathan Band, LCA); *see A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009); *White v. West Publ'g Corp.*, 29 F. Supp. 3d 396 (S.D.N.Y. 2014).

ANT_BARTZ_000435608

to books, particularly for traditionally underserved populations such as the print-disabled; preserving "[o]lder books . . . that are falling apart buried in library stacks"; and generating new audiences and sources of income for authors and publishers.[300]  As the United States recognized in that case, "[b]reathing life into millions of works that are now effectively dormant, allowing users to search the text of millions of books at no cost . . . and enhancing the accessibility of such works for the disabled and others are all worthy objectives."[301]

These benefits are also receiving greater recognition internationally.  As noted, the European Commission assisted in the negotiation of the 2011 Memorandum of Understanding (MOU) to encourage the digitization of out-of-commerce books and journals in Europe.  The MOU observes that "the large-scale digitisation and making available of Europe's cultural heritage contained in the collections of publicly accessible cultural institutions is in the public interest as well as in the interest of the cultural and creative sector."[302]

Realizing such benefits, however, may require qualification of certain exclusive rights under copyright law.  Indeed, because of the practical impossibility of securing clearances on a work-by-work basis, current mass digitization projects in the United States either are limited to public domain works or rely on the fair use doctrine to justify copying and using works or parts of works without the rightsholders' advance authorization.  While certainly some of these uses may be fair, many have argued that such a system "seems to turn copyright on its head:  while copyright is a system of *ex ante* permissions, mass digitization comes with a compelling demand to revert copyright into an opt-out regime" in which a copyright owner must take affirmative steps to exclude his or her work.[303]  The district court in the Google Books case emphasized that concern in rejecting the proposed class action settlement, finding it "incongruous with the purpose of the copyright laws to place the onus on copyright owners to come forward to protect their rights when Google copied their works without first seeking their permission."[304]

---

[300] *Google II*, 954 F. Supp. 2d at 287-88.

[301] U.S. Statement of Interest, *supra* note 8, at 1.

[302] MOU on Out-of-Commerce Works, *supra* note 82, at 1.

[303] BORGHI & KARAPAPA, *supra* note 155, at 2; *see also, e.g.*, MPAA, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 4-5 (May 20, 2014) ("Mass digitization projects (like the Google Books Projects) that copy and otherwise exploit copyrighted works without permission represent a fundamental departure from the usual copyright rule that it is up to the copyright owner 'to do and to authorize' the acts listed in Section 106.").

[304] *Google I*, 770 F. Supp. 2d at 682.

ANT_BARTZ_000435609

Others have noted more practical concerns.  Some stakeholders contend that, absent adequate security protections, mass digitization could precipitate the introduction into the marketplace of a flood of unauthorized digital copies of copyrighted works.  "[W]ith no limits on who could undertake mass digitization," they argue, "copyrighted works would inevitably be copied by entities that are not trustworthy, who, for example, might take no steps to prevent further downstream copying and distribution."[305]  The Copyright Office does not take these concerns lightly.

In analyzing these competing considerations, the overarching question is whether the copyright system can strike an appropriate balance between facilitating those aspects of mass digitization that serve the public interest and safeguarding the rights of copyright owners.  The Office addresses this issue first by considering whether the legal issues implicated by mass digitization warrant a legislative response or whether "these activities [should] be left to the marketplace and the copyright law as it currently exists."[306]  In other words, to what extent are the public benefits of mass digitization achievable through legal or voluntary solutions available under current law, such as direct or voluntary licensing regimes, the fair use doctrine, corporate agreements, or multistakeholder best practices documents?  For the reasons explained in the next section, the Office concludes that while these approaches can enable a wide variety of mass digitization activities, they cannot fully address the legal uncertainty in this area, nor can they authorize the full spectrum of uses that the market may desire, and which may, in turn, cause varying degrees of concern for authors and other copyright owners.

We then describe a potential legislative framework that would permit users to digitally reproduce and provide online access to a collection of works for certain purposes through an extended collective licensing model.  Such a system would provide a more comprehensive solution by defining the types of mass digitization activities that are permitted without the need to engage in a fair use analysis, while ensuring that rightsholders receive some compensation for the use of their works.  It would, however, present a number of administrative and other

---

[305] PPA et al. Additional Comments at 6; *see also* Tr. at 123:11-15 (Mar. 11, 2014) (June Besek, Kernochan Center) ("If you are going to do this, you ought to be able to secure the materials that you have.  And if you can't, then you ought not be able to do it."); Tr. at 129:7-16 (Mar. 11, 2014) (Jan Constantine, Authors Guild, Inc.) ("[I]f mass digitization occurs outside the context of a respectable organization, but in the context of a pirate or a niche collector of civil war books and they are going to mass digitize 50 of the books that their followers want to read and they just send them out there with no software protection and no cares in the world about market impact, it is a real problem for creators.").

[306] LEGAL ISSUES IN MASS DIGITIZATION, *supra* note 145, at 16.

ANT_BARTZ_000435610

considerations that would benefit from further discussion and stakeholder input. Thus, we are recommending a limited pilot to garner the necessary experience.

### B. Non-Legislative Solutions

#### 1. Mass Digitization as Fair Use

During the Office's review, representatives of libraries and other user groups contended that mass digitization legislation is unnecessary because courts are capable of evaluating such projects on a case-by-case basis under the fair use doctrine.[307] Noting the general judicial trend "toward an emphasis on transformative purpose," these commenters observed that courts have applied the doctrine to approve digitization projects in a variety of forms.[308] That jurisprudence, they argued, has made fair use a "stable, predictable, coherent doctrine" that provides substantial guidance to users assessing whether a given project would be deemed infringing.[309] This approach would encourage users to digitize without any involvement from copyright owners, and provide further that the works, once digitized, would be made available for a variety of purposes to intermediaries, end-users, or the general public.

The Office is not persuaded that fair use has achieved the predictability and stability that these commenters ascribe to it. To be sure, courts have concluded thus far that the mass reproduction and limited display uses at issue in the Google Books cases (full-text search, access for the print-disabled, and display of "snippets") are protected by fair use.[310] But while these cases are important, and reflect both the evolution of the fair use doctrine and the need to reconcile exclusive rights with other public policy priorities, they were decided on the basis of the highly fact-specific inquiry prescribed by 17 U.S.C. § 107, and therefore they do not extend to the wider dissemination of copyrighted works without permission or compensation. Certainly, none

---

[307] *See, e.g.*, Tr. at 140:13-20 (Mar. 11, 2014) (Jonathan Band, LCA) ("[F]air use allows the case-by-case granularity of inspection that is really hard to imagine that any legislation would ever do any better at. And so, it seems that it is the perfect solution to this problem, or at least a better solution that [sic] any other solution that is likely to emerge.").

[308] Brandon Butler, Michael Carroll & Peter Jaszi, American Univ. Washington College of Law, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 3 (May 21, 2014) ("Butler et al. Additional Comments").

[309] *Id.* at 1-2.

[310] As noted, as of the date of this Report, the appeal of the decision in *Google II* is pending before the Second Circuit.

ANT_BARTZ_000435611

purported to announce a standard to govern the application of fair use to mass digitization cases generally. To the contrary, the Second Circuit in *HathiTrust* cautioned that its decision should not be read to "foreclos[e] a future claim based on circumstances not now predictable, and based on a different record."[311] Thus, as a means of providing a coherent and reliable set of standards to govern the broad variety of digitization activities throughout the marketplace, fair use appears ill-suited. As one scholar recently observed in this context, "any rule that privileges flexibility necessarily produces unpredictability. The greater the former, the greater also the latter."[312] And that unpredictability will slow the development of future mass digitization projects by dissuading litigation-averse users from undertaking such activities.

Nor is the uncertainty in this area necessarily limited to questions of how settled legal principles should apply to particular facts. The Seventh Circuit recently questioned the broad application of the "transformative use" standard that underlies much of the case law on which fair use proponents rely. Specifically, the court noted the potential overlap between transformative use and the author's right to prepare or authorize derivative works. The court reasoned that "[t]o say that a new use transforms the work is precisely to say that it is derivative and thus, one might suppose, protected under [17 U.S.C.] § 106(2)."[313] Moreover, even where the transformative use standard has been applied in mass digitization cases, its meaning has not been entirely free from ambiguity. The district court in *HathiTrust* held that the use of digital copies to facilitate access for print-disabled persons is transformative on the ground that providing such access "was not the intended use of the original work."[314] On appeal, the Second Circuit found that conclusion to be a "misapprehension," explaining that "[a]dded value or utility is not the test" and that "enabl[ing] a larger audience to read . . . works" is not a transformative use.[315] (The court nevertheless concluded that the provision of access for the print-disabled was a fair use.) Thus, the proposition advanced by the commenters advocating a fair use-based approach – that courts have settled on "a unified view of fair use grounded in the concept of transformativeness"[316] – seems premature at this time.

---

[311] *HathiTrust*, 755 F.3d at 101.

[312] Ginsburg, *Fair Use for Free*, *supra* note 99, at 3.

[313] *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1555 (2015).

[314] *HathiTrust*, 902 F. Supp. 2d at 461.

[315] *HathiTrust*, 755 F.3d at 96, 101.

[316] Butler et al. Additional Comments at 1.

ANT_BARTZ_000435612

The Copyright Office believes that reliance on fair use can go only so far in enabling the development of mass digitization: in our view, it would exclude uses of copyrighted works that more broadly implicate the statutory rights of copyright owners and the balance of the overall Copyright Act. For example, the Office noted in 2011 that fair use would be "difficult to square with" a mass digitization project involving "the large scale scanning and dissemination of entire books."[317] Both the *Google* and *HathiTrust* cases strongly support that conclusion. The district court in *Google* stated that "Google would have no colorable defense to a claim of infringement based on the unauthorized copying and selling or other exploitation of entire copyrighted books,"[318] and later emphasized in support of its fair use determination that Google's display of snippets "is not a tool to be used to read books."[319] The *HathiTrust* court similarly found it "[i]mportant[]" that "the HDL does not allow users to view any portion of the books they are searching," but instead "simply permits users to 'word search' – that is, to locate where specific words or phrases appear in the digitized books."[320] Accordingly, should Congress wish to encourage or facilitate mass digitization projects providing substantial access to the expressive contents of copyrighted works, it would need to look beyond fair use to a licensing model, either voluntary or statutory.

Some stakeholders respond to these concerns by pointing to the codes of best practices described above, which have been developed by user groups to provide guidance on fair use questions.[321] For the reasons discussed, however, the Office concludes that such documents, despite their benefits, may be of limited utility in forecasting whether particular uses – at least those not yet addressed by the courts – could give rise to infringement liability.[322] Given that they typically are developed without the input of copyright owners, these codes cannot reflect an

---

[317] LEGAL ISSUES IN MASS DIGITIZATION, *supra* note 145, at 23.

[318] *Google I*, 770 F. Supp. 2d at 678.

[319] *Google II*, 954 F. Supp. 2d at 291.

[320] *HathiTrust*, 755 F.3d at 97.

[321] *See, e.g.*, Butler et al. Additional Comments at 7-8; LCA, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 7-11 (May 16, 2014) ("LCA Additional Comments"); MIT Libraries, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry 3 (undated) ("MIT Libraries Additional Comments").

[322] *See* Part II.B.1.b, *supra*.

ANT_BARTZ_000435613

industry-wide consensus as to the lawfulness of the uses they describe, let alone a judicial determination.[323]

## 2. Voluntary Agreements

In the 2011 Discussion Document, the Copyright Office described two voluntary licensing models – direct licensing and voluntary collective licensing – and examined the extent to which each could provide a market-based framework for mass digitization.[324]  Direct licensing refers to individually negotiated agreements between copyright owners and users, while voluntary collective licensing involves rightsholders authorizing one or more third-party organizations to negotiate licenses on their behalf.  These approaches have the advantage of allowing copyright owners to retain control over the use of their works by enabling them to set prices and terms for particular types of licenses, and they would not require copyright owners to opt out of a statutory scheme like extended collective licensing.  Both types have the capacity to offer large or small options to users, including, for example, the micro-licenses that are so critical to the digital economy.

The Copyright Office agrees there are viable markets for the licensing of some copyrighted works for digitization and display purposes.  In October 2012, for example, Google and the publisher plaintiffs in the Google Books litigation entered into a settlement agreement under which publishers can choose to allow Google to digitize their copyrighted out-of-print books in exchange for receiving a digital copy for their own use.[325]  Google is permitted to display twenty percent of each digitized book online in response to user searches.  Users can purchase a complete copy from the Google Play store, and revenue is shared by Google and the publishers.[326]  Similarly, under Amazon's Look Inside the Book program, publishers can submit digital copies of books to be offered for sale and choose the percentage of each book (within a range of ten to eighty percent) that will be visible to users prior to purchase.[327]  Arrangements like these suggest

---

[323] See, e.g., FAIR USE FOR ACADEMIC AND RESEARCH LIBRARIES, supra note 202, at 3 ("This code of best practices was not negotiated with rights holders. . . . It presents a clear and conscientious articulation of the values of [library] community, not a compromise between those values and the competing interests of other parties.").

[324] LEGAL ISSUES IN MASS DIGITIZATION, supra note 145, at 30-34.

[325] See Miller, supra note 45.

[326] Id.

[327] See Look Inside the Book (LITB) Program, AMAZON.COM, https://www.amazon.com/gp/feature.html?docId=1001119971 (follow link to "Print book FAQs").

ANT_BARTZ_000435614

that the market is developing ways to fill the gap between mass digitization activities protected by fair use and those requiring a licensing solution.

A question, then, is whether the federal government might play a role in aiding the development of more private agreements. The European Commission's involvement in the negotiation of the multistakeholder MOU noted above could provide an example of such an effort. The MOU is the product of a dialogue among representatives of copyright owners, libraries, and collecting societies to facilitate the digitization of out-of-commerce books and journals by libraries and similar institutions in Europe.[328] It sets out several principles intended to "encourage and underpin voluntary licensing agreements to allow cultural institutions to digitise and make available online these type of works while fully respecting copyright."[329] Congress could direct the Copyright Office to coordinate the development of a similar set of consensus principles among U.S. stakeholders. Such a document could encourage the growth of licensed mass digitization projects by establishing an industry-wide framework for the negotiation of voluntary agreements for that purpose.

There are, however, inherent limitations to any purely voluntary model as a means of effectuating large-scale digitization projects. The need to identify, locate, and negotiate individual licenses with a multitude of rightsholders may render a direct licensing solution cost-prohibitive for many potential users. Such costs would be compounded in situations where ownership of the relevant digital rights is uncertain or disputed – as in the case of works created before such formats were contemplated.[330] A voluntary collective licensing model would eliminate many of these transaction costs, but its opt-in nature may prevent collective organizations from being able to license all of the works or uses desired for mass digitization projects. In other words, they cannot provide licenses or permissions for works they do not represent.

As the Copyright Office noted in 2011, "[m]embership in these collective organizations is purely voluntary and no one organization may be able to license the exhaustive repertoire that would be needed to allow mass digitization of literary works."[331] Orphan works, moreover,

---

[328] *See Out-of-Commerce Works*, EUROPEAN COMMISSION (Oct. 10, 2014), http://ec.europa.eu/internal_market/copyright/out-of-commerce/index_en.htm.

[329] *Id.*

[330] *See* LEGAL ISSUES IN MASS DIGITIZATION, *supra* note 145, at 31 & n.73.

[331] *Id.* at 34.

ANT_BARTZ_000435615

would necessarily be excluded from such a system other than in perhaps limited circumstances when an organization has received prior authority to represent an author or copyright owner who then goes missing. (In this case, the organization has the legal authority to license the work.) While the 2009 Google Books settlement was a privately negotiated agreement that would have covered orphan works, the parties believed it could do so because, as a class action settlement, it would have bound non-parties to the litigation.[332] And as the district court's rejection of the settlement indicates, the class action procedure cannot provide a comprehensive framework for the mass licensing of orphan works. Indeed, the court rejected the settlement largely on the basis of its determination that the treatment of orphan works is a policy matter "more appropriately decided by Congress than through an agreement among private, self-interested parties."[333]

At the same time, the European Commission's MOU underscores the challenge of relying on a strictly voluntary approach. To enable the digitization of works outside a CMO repertory, the MOU seeks to establish the following presumption:

> For the purpose of . . . [a digitization] Agreement, where a rightholder whose work was first published in a particular Member State has not transferred the management of his rights to a collective management organisation, the collective management organisation which manages rights of the same category in that Member State of first publication shall be presumed to manage the rights in respect of such work.[334]

The MOU thus attempts to establish a principle of extended collective licensing – the application of negotiated licensing terms to all members of a class of rightsholders – through a voluntary agreement among representative organizations. It is not clear, however, that this presumption would have any legal effect against a non-CMO member who later brought an infringement claim for the unauthorized use of his or her copyrighted work in a mass digitization project. That party, after all, is not a signatory to the MOU and never authorized a CMO to act on his or her behalf. Indeed, the MOU acknowledges that "legislation might be required" to provide "legal

---

[332] *See* FED. R. CIV. P. 23(e).

[333] *Google I*, 770 F. Supp. 2d at 677.

[334] MOU on Out-of-Commerce Works, *supra* note 82, at 3. A CMO can benefit from this presumption only if it makes its "best efforts to alert rightholders in question" in accordance with methods agreed upon with rightsholder organizations in the country where the CMO is based. *Id.*

ANT_BARTZ_000435616

certainty when, under an applicable presumption, the collective management organisations represent rightholders that have not transferred the management of their rights to them."[335]

As that language suggests, voluntary stakeholder agreements by themselves cannot entirely insulate mass digitization users from infringement claims by nonparty copyright owners. Therefore, notwithstanding the appeal of a pure market-based approach, a strictly voluntary model may not create the legal certainty necessary to enable the full range of mass digitization activities that Congress considers in the public interest.

## C.  Extended Collective Licensing

Extended collective licensing is a scheme that is somewhere between voluntary licensing and compulsory licensing.  As discussed above, in an ECL system the government "authorizes a collective organization to negotiate licenses for a particular class of works (*e.g.*, textbooks, newspapers, and magazines) or a particular class of uses (*e.g.*, reproduction of published works for educational or scientific purposes)" with prospective users.[336]  By operation of law, the terms of such licenses are automatically extended to, and made binding upon, all members of the relevant class of rightsholders – including those who do not belong to the collective organization – unless they affirmatively opt out.  ECL differs from compulsory licensing in that private entities, rather than the government, establish royalty rates and terms of use.  In that respect, ECL "is thought to be beneficial because it preserves the freedom to contract more so than alternative compulsory license schemes."[337]

In 2011, the Office noted that ECL regimes had been in place in Nordic countries for several decades, but generally had not been adopted in countries whose national languages are in wide use internationally.[338]  The Office further observed that ECL typically had been applied only to "limited types of works and uses, such as the use of published works for educational and scientific purposes, or the reproduction of works within an organization solely for internal use."[339] "Applying [ECL] to a mass digitization project that provides access to a wide range of works," we

---

[335] *Id.* at 1.

[336] LEGAL ISSUES IN MASS DIGITIZATION, *supra* note 145, at 35.

[337] Hansen, *Orphan Works: Mapping the Possible Solution Spaces*, *supra* note 10, at 17.

[338] *See* LEGAL ISSUES IN MASS DIGITIZATION, *supra* note 145, at 34 n.7.

[339] *Id.* at 36.

ANT_BARTZ_000435617

determined, "would be a dramatic extension of the concept."[340]  The Office therefore recommended that any analysis of a possible ECL framework in the United States include careful consideration of, among other issues, ECL's relationship to other available licensing models, the interplay between ECL and the existing exceptions for fair use and libraries under Sections 107 and 108, respectively, and the effect, if any, of an ECL regime on U.S. international treaty obligations.[341]

Since that time, three key U.S. trading partners – France, Germany, and the United Kingdom – have adopted versions of ECL to allow for digitization of copyrighted works for certain purposes.[342]  Those laws indicate a growing international acceptance of ECL as a means of addressing issues of mass digitization, and they could provide a model for such legislation in the United States.[343]  Although the United States does not have this long tradition of ECL, and some stakeholders have expressed skepticism, we believe it is the best answer to solving the mass licensing that is inherent to mass digitization.  The parties to the Google Books settlement were able to achieve consensus with an analogous model, and we believe that with government support and oversight to ensure that any legislation is developed transparently and in a way to benefit a wide array of stakeholders equally, ECL can be successful here.

The Office accordingly recommends that, to garner experience with ECL in the United States, Congress strongly consider the adoption of a limited "pilot program" that would enable ECL for certain mass digitization projects serving nonprofit educational and research purposes. One critical component of this recommendation is that copyright owners would have the right to opt out of the licensing regime at all times, and the legislation would require clear and streamlined procedures for doing so.  As is true under existing collective licensing systems in the United States (*e.g.*, the licensing of musical public performance rights by ASCAP, BMI, and SESAC), the negotiation and administration of licenses would be handled by CMOs acting on behalf of copyright owners in a particular category of works.  Under an ECL framework, CMOs would be permitted (but not required) to apply to the Copyright Office for authorization to

---

[340] *Id.*

[341] *Id.* at 37.

[342] *See supra* Part I.C.4-6.

[343] Congress may wish to look in particular to the ongoing implementation of the U.K. ECL regulations, which took effect in October 2014.  As indicated below, our proposed ECL framework is based in part on the U.K. model, and therefore the U.K. experience over the ensuing months should provide useful guidance on how such a system might operate in practice.

ANT_BARTZ_000435618

negotiate extended collective licenses on behalf of both members and non-members of the organizations for certain mass digitization uses. Among other provisions, the legislation would define the types of works and uses available for licensing, establish eligibility and oversight requirements for participating CMOs, and provide for the timely distribution of royalties to rightsholders.

The following sections set forth the general elements that the Office believes the ECL pilot should include. We have not, however, provided a formal legislative proposal. As stated above, because the success of an ECL system depends on the voluntary participation of stakeholders, the Office believes that specific legislative provisions should be developed through a public process involving input from interested parties. To that end, the Office is issuing a Notice of Inquiry requesting public comment on several questions concerning the scope and administration of the program. From there, the Office will present an appropriate legislative proposal to Congress.

### 1. Types of Works and Publication Status

Given the lack of precedent for ECL in the United States and its relatively circumscribed application elsewhere, any such program would need to be limited at the outset to specific categories of works. For the reasons discussed below, we would say, in general, that ECL makes the most sense for the following works: (1) literary works; (2) pictorial or graphic works published as illustrations, diagrams, or similar adjuncts to literary works; and (3) photographs. Whether an ECL framework should include further limitations within these categories – such as, for example, excluding works published after a certain date or works that are commercially available – requires significantly more public discussion and will be examined through the Office's Notice of Inquiry and public comment process.

The Office does not advise covering unpublished works in the ECL framework for a number of reasons.[344] First, the administrative costs associated with managing such a vast universe of rights would likely outweigh any benefit a CMO could realize from doing so under an ECL scheme.[345] The burdens would be compounded by the virtual impossibility of determining

---

[344] See 17 U.S.C. § 101 ("'Publication' is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.").

[345] See Tr. at 270:13-18 (Mar. 11, 2014) (Janice T. Pilch, Rutgers Univ. Libraries) ("[I]f an extended collective licensing regime extended to all photographs ever made by any citizen, any person, any picture ever taken, any letter ever written, then you can't do that. And what CMO would take care of that?").

ANT_BARTZ_000435619

reasonable licensing fees for the use of works for which there has never been a commercial market. Furthermore, applying ECL to unpublished works would be difficult to reconcile with the right of first publication, which recognizes that the "threshold decision . . . whether and in what form to release [a] work," generally belongs to the author.[346] Unsurprisingly, therefore, no ECL system of which we are aware provides for the licensing of unpublished works.[347]

### a. Literary Works

A number of commenters proposed literary works as an appropriate starting point for an ECL system.[348] Books are "the centerpiece of many cultural collections" and as such are "relevant to many – perhaps the majority of – large-scale scanning initiatives."[349] Moreover, the proposed class action settlement in the Google Books litigation provides a template for an ECL system in this context. "Approval of the . . . settlement would, in effect, have created an extended collective license" by giving Google the right to scan and make specified uses of digital copies of books without the prior authorization of copyright owners, unless they opted out.[350] A centralized Book

---

[346] *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 553 (1985). Although first publication is not expressly listed among the exclusive rights of 17 U.S.C. § 106, the principle that an author generally is entitled to control his or her work's first publication is reflected in several provisions of the Copyright Act, including the Section 108 library exceptions and the Section 115 statutory license for making and distributing phonorecords of nondramatic musical works. *See* 17 U.S.C. § 108(b) (permitting reproduction and distribution of unpublished works in a collection "solely for purposes of preservation and security or for deposit for research use in another library or archives"); *id.* § 115(a)(1) (compulsory license only available "[w]hen phonorecords of a nondramatic musical work have been distributed to the public in the United States under the authority of the copyright owner"). First publication principles are also incorporated in the Berne Convention. *See* Berne Convention, *supra* note 16. Berne Article 10 allows the fair quotation of a copyrighted work, but only if it "has already been lawfully made available to the public," and the uses permitted by Article 10*bis* apply only to "articles published in newspapers or periodicals . . . and . . . broadcast works."

[347] *See* Tr. at 271:1-4 (Mar. 11, 2014) (Jerker Rydén, Nat'l Library of Sweden) (foreign ECL regimes do not include unpublished works because "[i]t is the prerogative of the author to make [a work] available to the public. That is his or her decision.").

[348] *See* Authors Guild Additional Comments at 9-10; Center for Democracy & Technology ("CDT"), Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 3-4 (May 16, 2014) ("CDT Additional Comments").

[349] CDT Additional Comments at 3.

[350] Samuelson, *supra* note 36, at 519 n.192 (2011); *see Google I*, 770 F. Supp. 2d at 671-72 (describing terms of the settlement).

ANT_BARTZ_000435620

Rights Registry would have collected and distributed royalties to rightsholders, regardless of whether they had authorized the Registry to act on their behalf.[351]

The Authors Guild has urged that any ECL legislation be further limited to out-of-commerce literary works to avoid interfering with existing digital licensing markets for in-commerce books.[352] It is true that the need for an ECL framework is arguably greater in the case of out-of-commerce books given the particular market obstacles to the dissemination of such works. As one commenter noted, "the re-sale of commercially unavailable works" is a socially valuable activity that "may . . . be worth permitting," but it is "very likely not a fair use and [is] hard to license individually since rightholders have ceased commercial exploitation."[353] Consequently, "there is currently no widespread marketplace solution for facilitating digital access to out-of-print books" – an important difference between that category of works and those that are commercially available.[354] On the other hand, limiting ECL to out-of-commerce books could diminish the research and educational value of the digital resources that the system is intended to make possible. Moreover, such a limitation could hamper the system's efficiency goals in that it would require either the user or the CMO to determine the commercial status of every work in a collection and to exclude those that are commercially available.

There are a number of ways in which Congress could attempt to balance these concerns. It could make both in- and out-of-commerce works eligible for ECL, but place greater limits on the uses that could be made of the former. For example, the legislation could permit authorized CMOs to issue licenses for full digital access to out-of-commerce works, while allowing them to license only narrow uses of in-commerce works, such as full-text search and the display of short text excerpts in response to user queries.[355] The proposed Google Books settlement adopted this

---

[351] *See Google I*, 770 F. Supp. 2d at 671-72.

[352] *See Preservation and Reuse of Copyrighted Works*, *supra* note 2, at 56, 74-75 (statement of Jan Constantine, General Counsel, Authors Guild, Inc.); Authors Guild Additional Comments at 9-10.

[353] CDT Additional Comments at 3.

[354] *Id.* at 4.

[355] We recognize that there are existing markets in which publishers directly license their works for text and data mining, including at least one centralized platform enabling users to obtain permissions and access works from multiple publishers. *See CrossRef Text and Data Mining*, CROSSREF.ORG, http://www.crossref.org/tdm/index.html. We do not believe, however, that our proposed ECL program would materially interfere with these markets. As discussed below, a CMO could obtain ECL authorization only if it demonstrated significant representation among the relevant class of rightsholders and the consent of its membership to its proposed licensing plan. These safeguards should ensure that the royalty rates and terms offered by a CMO for text and data mining do not undercut those offered by member publishers in

ANT_BARTZ_000435621

distinction. It would have allowed Google to publicly display out-of-print books in various ways, while permitting only "non-display" uses of in-print books.[356] Alternatively, Congress could limit the class of eligible works to those published before a certain date on the theory that older works as a group are less likely to have viable digital licensing markets. This would have the advantage of avoiding the need to resolve questions about works' commercial availability, though it would likely sweep in a significant number of works for which digital markets do exist. The Office is interested in receiving stakeholder views on whether these or other approaches could provide a workable framework for the treatment of commercially available works under ECL, or whether such works should be excluded altogether.

### b. Embedded Pictorial or Graphic Works

The Office also recommends that the ECL legislation extend to pictorial or graphic works published as illustrations, diagrams, or similar adjuncts to literary works.[357] Were such works not covered, the CMO or licensee would be required to identify every instance in which the copyright in an illustration is held by someone other than the owner of the work in which it appears and, unless those images could be separately licensed, to exclude them from the digital collection. That scenario, we believe, would undermine much of the efficiency served by an ECL system.

Moreover, applying ECL to these works could help to eliminate obstacles to the compensation of visual artists for "secondary uses" of illustrations published in books and periodicals.[358] One illustrators' association argued that, under current law, such uses often

---

the direct market. Moreover, our understanding is that publishers often offer value-added products and services in connection with text and data mining licenses, and they would remain free to do so under an ECL system. *See Researcher FAQ*, CROSSREF.ORG, http://tdmsupport.crossref.org/researcher-faq/ (stating that a copyright exception for text and data mining would not obviate the need for a common licensing platform because "[r]esearchers [would] still benefit from being able to download content from different publishers without having to resort to different publisher-specific APIs or screen-scraping publisher sites"). Finally, any publisher concluding that ECL would interfere with its existing or potential markets would be entitled to opt out any or all of its works.

[356] Google Books Am. Settlement, *supra* note 34, §§ 1.31, 1.52, 1.94, 3.2(b), 3.3, 3.4.

[357] *Cf.* 17 U.S.C. § 108(i) (exceptions for libraries and archives apply to "pictorial or graphic works published as illustrations, diagrams, or similar adjuncts to works of which copies are reproduced or distributed in accordance with subsections (d) and (e)").

[358] *See* AMI, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 11-12 (May 20, 2014) ("AMI Additional Comments"). AMI's comments were endorsed by the American Society of Illustrators Partnership. *See* ASIP, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 2 (May 21, 2014).

ANT_BARTZ_000435622

"generate no royalty income" for artists because "users are either unaware of the need to clear the rights to visual components of literary works licensed through the [Copyright Clearance Center][,] or the two existing visual artists collecting societies cannot assure them of a comprehensive license."[359]  The association also contended that many visual artists do not "receive a share of royalties currently collected by foreign reprographic rights collecting societies," arguing that "only a few [societies] have attempted to provide for payments to U.S. artist rights holders" and that payments in any event often go to entities not authorized to act on behalf of copyright owners.[360]  The Office agrees with this commenter that "[a] statutory extended collective license could address this problem by codifying the obligation to distribute licensing revenue and providing a regulatory mechanism that would assure that organizations representing rights holders actually have been authorized to do so."[361]

### c.  Photographs

Finally, the Office recommends that the ECL framework be used to permit the licensing of photographs for use in qualifying mass digitization projects.  Photographs represent a source of immense research and educational value to the public, yet both the sheer volume of such works and the lack of centralized rights clearance mechanisms are impediments to licensing on a large scale.[362]  Making photographs eligible for ECL could help to address this inefficiency by encouraging photography rightsholders to develop representative CMOs to issue and manage digital licenses.  Some stakeholder groups have expressed interest in such a system and have suggested that at least some of the structures necessary for ECL may already exist within the photography sector.  American Photographic Artists, Inc., for example, advocated for a statutory licensing system and collective rights management for secondary uses of photographs, arguing that "[t]he PLUS Registry, and other distribution vehicles in the industry, now supply a means of distributing . . . revenues to the rights owners, and can assist in making equitable distributions . . . to creators and their representatives when a rights owner cannot be found."[363]

---

[359] AMI Additional Comments at 11.

[360] *Id.* at 12.

[361] *Id.*

[362] As noted, *see supra* note 239, the Office recently issued a Notice of Inquiry seeking public comment on various aspects of the current marketplace for photographs and other visual works.

[363] APA, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 4 (May 20, 2014).

ANT_BARTZ_000435623

### 2.  Types of Users and Uses

Congress has a range of options in determining what types of entities should be eligible to obtain a mass digitization license and for what purposes.  Perhaps the most narrow approach would be to limit such licenses to the groups covered by the exceptions under Section 108: libraries and archives acting "without any purpose of direct or indirect commercial advantage."[364] At the other end of the spectrum would be a model like the U.K. ECL system, which does not restrict the class of eligible users or distinguish between nonprofit and commercial uses.  In our view, an appropriate middle-ground approach would be to eschew limits on the categories of users who may engage in mass digitization activities, but to limit permissible uses to those undertaken for nonprofit educational or research purposes and without any purpose of direct or indirect commercial advantage.  Such a framework would restrict the legislation's scope to mass digitization projects serving the public interest, while permitting entities falling outside the traditional categories of libraries and archives but engaged in similar activities to utilize the system under proper circumstances.  Thus, while a for-profit entity would not be precluded from undertaking a mass digitization project (such as through a partnership with a nonprofit library or educational institution), it would not be permitted to generate revenue from the collection by, for example, displaying advertisements or charging access fees.

In addition, to make clear that ECL is intended as a solution for large-scale digitization projects only, we recommend that the legislation require that any licensed uses be made in connection with the creation or operation of a qualifying digital collection.  The Office believes that a prospective ECL licensee also should be required to demonstrate that the clearance of rights on an individual basis would be impracticable.  This additional requirement would prevent a licensee from using the system to avoid seeking individual permissions in situations where they could be obtained notwithstanding the number of works involved – for example, where a collection consists of works owned by a single author.

Upon obtaining a license, a user would be permitted to make the covered digital collection available online in accordance with any statutory use restrictions as noted above, and subject to specified limitations on eligible end-users and methods of access.  A potential model may be found in the portions of the Google Books settlement pertaining to users of Institutional Subscriptions.  Those provisions would have allowed access to the digital collection by "appropriate individuals within the subscriber institution."[365]  In the case of educational

---

[364] 17 U.S.C. § 108(a)(1).

[365] Google Books Am. Settlement, *supra* note 34, § 4.1(e).

ANT_BARTZ_000435624

institutions, appropriate individuals included "faculty, students, researchers, staff members, librarians, personnel and business invitees of the subscriber and walk-in users from the general public."[366] For public libraries, such individuals included "library patrons and personnel."[367] The settlement would have permitted remote access for higher educational institutions; for most other subscribers, remote access would have required approval by the Book Rights Registry.[368]

To enforce these restrictions, the user would be required to implement and maintain reasonable digital security measures preventing unauthorized access to the licensed collection. This recommendation is discussed in Part III.C.6 below.

### 3. CMO Authorization Requirements

ECL regimes typically require that CMOs be subject to approval and oversight by the appropriate public authority.[369] Under a U.S. ECL program, the Copyright Office would be the logical agency to conduct those tasks. A CMO seeking ECL authorization would be required to submit an application to the Office demonstrating, among other things, its representativeness in the relevant field, the consent of its membership to the licensing proposal, and sufficient standards of transparency, accountability, and good governance in its operations.

As to the level of representation and consent, the U.K. ECL system offers useful guidance. The U.K regulations provide that ECL authorization may be granted only if the Secretary of State is satisfied that "the relevant licensing body's representation in the type of relevant works which are to be the subject of the proposed Extended Collective Licensing Scheme is significant."[370] To qualify, a CMO must show "the number of right holders' mandates it has, relative to the (estimated) total number of mandates; and the number of works it controls relative to the (estimated) total number of works."[371] The U.K. IPO has explained that this test "needs to be flexible" because "where the total number of non-members is not known the determination of a

---

[366] *Id.*

[367] *Id.*

[368] *Id.* § 4.1(a)(iv).

[369] For specific approval and oversight requirements, see the Comparative Summary of Select Extended Collective Licensing Provisions, attached as Appendix F.

[370] U.K. ECL Regulations, S.I. 2014/2558, art. 4, ¶ 4(b).

[371] EXTENDING THE BENEFITS OF COLLECTIVE LICENSING, *supra* note 126, at 8.

ANT_BARTZ_000435625

percentage is impossible."[372]  In addition, CMOs "must show that they have made all reasonable efforts to find out total numbers of rights holders and works, using a transparent methodology."[373]  The consent obligation similarly provides a "high but non-specific threshold," requiring a CMO to "demonstrate the support of a substantial proportion of its voting members for any ECL application."[374]  To ensure that consent is informed, a CMO must provide details on "how and when members are told of the ECL application, what they are told about the ECL application, and how and when they are polled."[375]

Some commenters cautioned that it may prove difficult for any single U.S. CMO to demonstrate a substantial level of representation given the lack of an extensive CMO "infrastructure" in the United States.[376]  They asserted that, in contrast to Europe's long-established CMOs, which "represent and make payments to thousands of rightsholders," the U.S. CMOs currently in operation "do not represent the majority of rightsholders of classes of works."[377]  Others, however, emphasized the broad scope of some existing U.S. CMO operations. The Copyright Clearance Center (CCC), for example, stated that it "manages hundreds of millions of rights to tens of millions of works" and has "distributed over $1 billion to participating rightsholders over the past seven years."[378]  The Authors Guild similarly noted that the Authors Registry – an affiliated payment agent for foreign-collected royalties – "has paid out more than $22 million to more than 10,000 authors."[379]  Moreover, these commenters touted the organizations' experience and success in locating holders of rights in "lost" or out-of-print works.[380]  Such evidence may suggest at least some capacity to achieve greater representation in

---

[372] U.K. GOVERNMENT RESPONSE, *supra* note 126, at 5; EXTENDING THE BENEFITS OF COLLECTIVE LICENSING, *supra* note 126, at 8.

[373] U.K. GOVERNMENT RESPONSE, *supra* note 126, at 5.

[374] *Id.* at 6.

[375] *Id.* at 7.

[376] Berkeley Digital Library Copyright Project Initial Comments at 28.

[377] *Id.* at 28-29.

[378] Copyright Clearance Center, Inc. ("CCC"), Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 2 (Feb. 4, 2013) ("CCC Initial Comments").

[379] Authors Guild Additional Comments at 10.

[380] *Id.* at 10; CCC Initial Comments at 2-3.

ANT_BARTZ_000435626

the event ECL is implemented and a market emerges for the large-scale licensing of such works. In addition, both CMOs have partnerships with foreign collecting societies, which suggests some existing framework for providing licensing services on an international basis.[381]

   As an additional prerequisite to licensing authorization, a CMO would be required to demonstrate its adherence to transparency, accounting, and good-governance standards.  We recommend that these requirements be prescribed through Copyright Office regulations.  Such a showing is critical in light of the concern expressed by some commenters that, in practice, "little money is actually distributed to the creators" by CMOs, "there can be a lack of accountability, and [CMOs] do not take into account the different interests of different authors."[382]  The regulations would require information on factors such as the CMO's experience administering collective licenses in the relevant field, the composition of its board and management, its accounting and distribution policies, and its proposals for protecting the interests of non-member rightsholders. We also recommend that the CMO application process include a notice and public comment period in which the Office could obtain stakeholder views on the CMO's capacity to manage extended collective licenses.  A similar process is provided for under the U.K. ECL regulations.[383]

   Once authorized, a CMO would be subject to auditing by rightsholders.  This requirement would be analogous to existing regulations giving copyright owners and performers the right to audit the designated entity (currently SoundExchange) charged with distributing royalties under the statutory licenses for ephemeral recordings and digital audio transmissions.[384]  Like those provisions, the audit regulations under an ECL program should seek to minimize a CMO's exposure to undue administrative burdens – for example, by limiting the number of audits

---

[381] *See About RightsDirect*, RIGHTSDIRECT, http://www.rightsdirect.com/about-rightsdirect/ (CCC international subsidiary notes that it works "in close partnership with the world's leading rightsholders and collecting societies" and that "[t]ogether, CCC and RightsDirect serve more than 35,000 companies and over 12,000 rightsholders around the globe"); *Royalties*, THE AUTHORS REGISTRY, http://www.authorsregistry.org/bio.htm (listing foreign collecting societies from which Authors Registry receives payments).

[382] LCA Additional Comments at 7.

[383] U.K. ECL Regulations, S.I. 2014/2558, art. 7.

[384] *See* 37 C.F.R. § 380.7.

ANT_BARTZ_000435627

permitted for any one calendar year and/or requiring the rightsholder to bear the cost of an audit unless a substantial underpayment is discovered.[385]

### 4. Opt-Out Provisions

Although existing ECL laws do not uniformly give copyright owners the right to opt out of licensing, the Office believes that such a right is essential to the legitimacy of such a system in the United States.  Any ECL legislation accordingly should provide that a rightsholder may exclude or limit the grant of licenses with respect to his or her work.[386]  CMOs should be required, among other obligations, to respond to and act upon opt-out notices within a prescribed time period;[387] to provide a means for rightsholders to opt out before licensing commences;[388] to establish a process by which copyright owners can opt out multiple works at once;[389] and, in the case of a copyright owner opting out *after* an ECL license has been issued, to terminate the license within a reasonable time period.[390]  The Office recommends that specific opt-out procedures be established through regulations, which should seek to ensure that opting out is made as straightforward as possible, with minimal costs and burdens placed on rightsholders.

---

[385] *Cf. id.* § 380.7(b) ("A Copyright Owner or Performer may conduct a single audit of the Collective . . . during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once."), (g) ("The Copyright Owner or Performer requesting the verification procedure shall pay the cost of the procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Collective shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.").

[386] *Cf.* Enterprise and Regulatory Reform Act 2013 sec. 77, § 116B(3) (U.K.) ("The regulations must provide for the copyright owner to have a right to limit or exclude the grant of licenses by virtue of the regulations.").

[387] *See* U.K. ECL Regulations, S.I. 2014/2588, art. 16, ¶ 4 (requiring action by CMOs within fourteen days of receipt of an opt-out notice).

[388] *See id.*, art. 16, ¶ 3(b) (CMOs must allow non-member rightsholders' opt outs to "take effect before the commencement of the Extended Collective Licensing Scheme").

[389] *See id.*, art. 4, ¶ 4(d) (Secretary must be satisfied that "the opt out arrangements, including those for multiple works, are adequate to protect the interests of right holders").

[390] The U.K. regulations require termination within six months of receipt of such a notice, or within nine months where the licensee is an educational establishment and the CMO had obtained government consent to the longer term at the time of its ECL authorization.  *See id.* art. 16, ¶ 5.  The IPO reports that this exception for educational establishments was adopted "to cover an academic year."  U.K. GOVERNMENT RESPONSE, *supra* note 126, at 35.

ANT_BARTZ_000435628

### 5. Determination of License Terms

Under an ECL system, license terms are negotiated between the relevant CMO and prospective users. Thus, an authorized CMO would be permitted to negotiate royalty rates for uses made in connection with a qualifying mass digitization project – specifically, the creation of digital copies of works, the display of works through online access, and copying and printing by end-users. Given that the CMO would be authorized to negotiate on behalf of all rightsholders in a particular field, the legislation would need to provide an antitrust exemption similar to those in other Copyright Act provisions allowing negotiation by a "common agent."[391] To reduce disparities in bargaining power between the CMO and users, the Office recommends that the legislation also provide a parallel exemption permitting eligible users to negotiate ECL terms and conditions collectively notwithstanding any provision of the antitrust laws. This would allow user groups to negotiate through a collective counterpart to the CMO, such as a university or library consortium.[392] The Copyright Act currently includes similar dual exemptions under various statutory licensing provisions.[393]

The proposed Google Books settlement provides an example of how ECL pricing agreements could be structured. For present purposes, the most relevant aspects of that agreement are the pricing and payment terms applicable to uses by educational institutions and public libraries. Those entities would have been eligible to purchase Institutional Subscriptions allowing users to access the full contents of a digital collection online.[394] Google and the proposed Books Rights Registry were to determine subscription pricing based on a licensee's full-time employment equivalency – or, for a higher educational institution, its number of full-time

---

[391] *See* 17 U.S.C. §§ 112(e)(2) (authorizing copyright owners and users to designate common agents to negotiate royalty rates and terms under statutory license for making of ephemeral recordings, notwithstanding any provision of the antitrust laws), 114(e)(1) (same for digital public performance of sound recordings), 115(c)(3)(B) (same for making and distributing phonorecords of nondramatic musical works), 118(b) (same for reproduction, performance, and display of published nondramatic musical, pictorial, graphical, and sculptural works by public broadcasting entities).

[392] *Cf.* Ginsburg, *Fair Use for Free, supra* note 99, at 53-55 (describing antitrust exemption in proposed Free Market Royalty Act that would permit collective negotiation by webcasters for digital public performance licenses).

[393] *See supra* note 391.

[394] Google Books Am. Settlement, *supra* note 34, §§ 1.77, 4.1.

ANT_BARTZ_000435629

equivalent students – taking into account "prices for comparable products and services, surveys of potential subscribers, and other methods for collecting data and market assessment."[395]

The settlement provided a royalty allocation plan intended to compensate copyright owners on both a per-work and a per-use basis. Revenues collected by the Book Rights Registry from subscription fees would have been divided into two separate funds: a Subscription Inclusion Fund and a Subscription Usage Fund.[396] The Subscription Inclusion Fund was to be distributed to rightsholders when it contained an amount sufficient to pay $200 for every book and $50 and $25, respectively, for every full and partial "Insert" (separately copyrighted material such as forewords, essays, poems, and tables) included in the subscription database.[397] Monies in the Subscription Usage Fund were to be allocated to rightsholders at the end of specified reporting periods according to a usage formula to be developed by the Registry.[398] The formula could "include factors such as the number of times users view a Book, how much of the Book is viewed, [and] whether and how much of the Book is copied/pasted and/or printed."[399]

In addition to Institutional Subscriptions, the settlement would have authorized Google to provide free public access to books through computer terminals at not-for-profit higher education institutions and public libraries.[400] For higher education institutions, the number of terminals would have been based on full-time equivalency; for example, institutions other than associate's colleges would have had one terminal for every 10,000 full-time equivalent students.[401] For public libraries, the ratio would have been one terminal per library building.[402] Users would have been

---

[395] *Id.* § 4.1(a)(iii), (vii).

[396] *Id.*, Attachment C §§ 1.1(b), 1.2(f)(i)(1).

[397] *Id.*, Attachment C § 1.2(f)(i)(2), (ii). "Insert" is defined at Section 1.75 of the main document.

[398] *Id.*, Attachment C § 1.1(a), (d).

[399] *Id.*, Attachment C § 1.1(a).

[400] *Id.* § 4.8(a)(i).

[401] *Id.* § 4.8(a)(i)(1).

[402] *Id.* § 4.8(a)(i)(3).

ANT_BARTZ_000435630

able to print pages for a per-page fee, with revenues divided between Google and applicable rightsholders.[403]

To be clear, we describe these provisions not to endorse any specific royalty terms, but rather to emphasize that despite the complexity of the issues surrounding creation of an ECL regime in the United States, they are by no means insurmountable. As the settlement demonstrates, representatives of rightsholder and user communities have previously agreed to a detailed licensing framework for mass digitization activities involving literary works. The settlement thus would seem to suggest the possibility of negotiated ECL agreements based on a similar model. As one industry group noted, the settlement "shows that rights holders and rights users are capable of coming to the table and arriv[ing] at a solution which serves the interests of all stakeholders and also promotes the goals of copyright law."[404]

To address situations in which the parties are unable to agree to terms, an ECL system would need to establish a mechanism to facilitate resolution of disputes. This is necessary in part because of ECL's potential antitrust implications: a CMO authorized to license an entire class of works might otherwise be able to demand unreasonable licensing terms. While this imbalance in bargaining power would be mitigated if, as we recommend, the legislation also permitted collective negotiation by users, the availability of some third-party dispute resolution process likely would still be needed to ensure that negotiations proceed in good faith. In various other contexts, the Copyright Act provides for statutory licensing in the event the parties cannot agree to terms, with rates set by the Copyright Royalty Board (CRB).[405] A statutory licensing "backstop," however, is in tension with one of the fundamental premises of an ECL program – privately negotiated licensing terms – and in fact could distort negotiations by deterring some parties from reaching agreements. "[W]ere compulsory licensing an option should negotiations fail, actors who believe they have more to gain from a compulsory license regime than from a negotiated license might not bargain in good faith."[406] The Office accordingly is reluctant to

---

[403] *Id.* § 4.8(a)(ii); *id.*, Attachment C § 2.1 (distribution of printing fees from Public Access Service to rightsholders).

[404] Authors Guild Additional Comments at 9.

[405] *See* 17 U.S.C. §§ 111 (cable retransmissions), 112 (ephemeral recordings), 114 (digital public performance of sound recordings), 115 (mechanical rights in nondramatic musical works), 116 (jukeboxes), 118 (public broadcasting), 119 (satellite retransmissions), 122 (local into local satellite retransmissions).

[406] Ginsburg, *Fair Use for Free*, *supra* note 99, at 55.

ANT_BARTZ_000435631

recommend a mandatory adjudication process requiring rates and terms to be set by a non-party government agency.

There are, however, a number of more flexible dispute resolution procedures that Congress could consider. At a minimum, the government could play a role as a facilitator of negotiations through informal mediation proceedings. Several foreign countries with ECL regimes provide a government-appointed mediator in the event the parties cannot agree to license terms,[407] and we believe the CRB is well suited to serve that function under a U.S. ECL system. Should Congress wish to provide for a binding decision in cases where mediation fails to produce agreement, it could consider authorizing the CRB to resolve disputes through some form of arbitration.[408] Of course, any binding arbitration would make the system more like a compulsory licensing scheme, and therefore Congress would need to carefully consider how such a process might fit within a voluntary licensing program. At least two foreign ECL jurisdictions seek to achieve a balance through voluntary procedures under which the parties can agree to submit their dispute to a binding proceeding, but are not required to do so.[409] The Office is interested in receiving the views of interested parties on which form of dispute resolution would serve the goals of the system most effectively.

---

[407] See Appendix F, "Dispute Resolution Mechanism" column.

[408] For example, one prominent academic has proposed that for certain redistributive uses of copyrighted works, including mass digitization, licensing disputes be resolved by the CRB through last-best-offer, or "baseball," arbitration. See Ginsburg, *Fair Use for Free, supra* note 99, at 51-60. Baseball arbitration is intended to "encourage private ordering and incentivize settlement" by "requiring the arbitrator to select one of two proposed offers." *Id.* at 58. While in conventional arbitration the arbitrator has discretion to "compromise[] between the parties' positions or award[] a unique solution," baseball arbitration "prohibits arbitrators from compromising between final offers." Elissa M. Meth, Note, *Final Offer Arbitration: A Model for Dispute Resolution in Domestic and International Disputes*, 10 AM. REV. INT'L ARB. 383, 387 (1999). It thus "urges the parties to avoid extremes by confronting them with the risk that the arbitrator will accept the other party's offer." Ginsburg, *Fair Use for Free, supra* note 99, at 58.

[409] See LOV 1961-05-12 nr 02: Lov om opphavsrett til åndsverk m.v. (åndsverkloven) [Act No. 2 of May 12, 1961 Relating to Copyright in Literary, Scientific and Artistic Works], as amended on Dec. 22, 2006, § 38 (Nor.), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=248181 (unofficial translation), last amended by LOV-2014-06-13 nr 22 [Act No. 22 of June 13, 2014] (translation unavailable); LAG OM MEDLING I VISSA UPPHOVSRÄTTSTVISTER (Svensk författningssamling [SFS] 1980:612) [Act on Mediation in Certain Copyright Disputes] (1995) art. 5 (Swed.), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=241666 (unofficial translation), as amended by LAG, May 26, 2005 (2005:361), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=129617 (unofficial translation), last amended by LAG, June 27, 2013 (2013:690) (translation unavailable).

ANT_BARTZ_000435632

### 6. Security Measures

As noted, a major concern expressed by rightsholders during this study was that mass digitization could cause incalculable damage to copyright owners' markets unless the law provides effective protection against unauthorized access to and dissemination of works in digital collections.[410]  Indeed, as was suggested during the roundtables, the need for reliable security measures is one of the strongest justifications for a legislative solution for mass digitization, as security is not specifically addressed under the fair use analysis of Section 107.[411]  The Office thus agrees that preventing unauthorized access to the databases subject to ECL is a critical aspect of any potential mass digitization solution.  At the same time, we are mindful of the consideration raised by other commenters that overly restrictive security requirements could undermine the system's user-friendliness and, consequently, its value to the public.[412]

As a general matter, we believe that a mass digitization user should be obligated as a condition of its license to implement and reasonably maintain adequate security measures to control access to its digital collection, and to prevent unauthorized reproduction, distribution, or display of the licensed works during and after the scope of the license.  The Office therefore recommends that the legislation require CMOs and users to incorporate such terms into any license issued pursuant to the statute.  The Office is seeking additional stakeholder input regarding any specific technical measures that should be required as part of this obligation.

### 7. Distribution of Royalties

An authorized CMO should be subject to several requirements to ensure the equitable distribution of royalties.  First, while a CMO should be permitted to deduct fees from the license payments it collects, such deductions should be limited to amounts reasonably necessary to cover

---

[410] *See supra* Part III.A.

[411] *See* Tr. at 144:19-21 (Mar. 11, 2014) (June Besek, Kernochan Center) ("[T]he fact that they have to employ a security apparatus is what is missing in Section 107.").

[412] *See id.* at 131:19-132:4 (Corynne McSherry, Electronic Frontier Foundation) ("If we require, somehow, that any database comes wrapped in some kind of technological protection measure, we are all automatically going to make it less usable, less user friendly.  We are going to undermine ourselves from the get-go and undermine the public interest from the get-go."); *id.* at 148:2-7 (Michael W. Carroll, American University/Creative Commons USA) ("[J]ust be careful about how onerous you think about making this because otherwise, it becomes the TEACH Act, which I think would be an unfortunate result, where you are targeting the law-abiding institutions.").

ANT_BARTZ_000435633

specified operational costs.[413]  We recommend that the legislation provide restrictions similar to those currently applicable to the agent designated to distribute royalties under the statutory licenses of Sections 112 and 114.[414]  Prior to distribution, a CMO would be permitted to deduct from its receipts the reasonable costs incurred in connection with (1) the administration, distribution, and calculation of the royalties; (2) the settlement of disputes relating to the collection and calculation of the royalties; and (3) the licensing and enforcement of rights subject to ECL, including those incurred in participating in negotiations or dispute resolution proceedings.

Second, the legislation should establish a specific time period within which a CMO must distribute royalties to rightsholders whom it has identified and located.  The February 2014 EU Directive on Collective Management of Copyright and Related Rights (EU CMO Directive) mandates that such payments be made "as soon as possible but no later than nine months from the end of the financial year in which the rights revenue was collected," unless certain exceptions apply.[415]  The U.K. ECL regulations adopt that same timeframe for distributions to non-CMO member rightsholders.[416]  In the United States, there is some industry precedent for distributions by CMOs on a quarterly basis.[417]  The Office invites public comment on what distribution schedule would be appropriate for the proposed ECL pilot.

Third, a CMO should be required to conduct diligent searches for non-member rightsholders for whom it has collected royalties.  The Office believes that this obligation should

---

[413] *Cf.* Directive 2014/26/EU of the European Parliament and of the Council of 26 February 2014 on Collective Management of Copyright and Related Rights and Multi-Territorial Licensing of Rights in Musical Works for Online Use in the Internal Market, art. 12, 2014 O.J. (L 84) 72, 87, *available at* http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32014L0026&from=EN; U.K. ECL Regulations, S.I. 2014/2588, art. 18, ¶¶ 1-2.

[414] *See* 17 U.S.C. § 114(g)(3).

[415] Directive 2014/26/EU art. 13(1).

[416] U.K. ECL Regulations, S.I. 2014/2588, art. 18, ¶ 3.  Member rightsholders presumably are free to negotiate a different payment schedule with the CMO.

[417] *See, e.g.,* Copyright Clearance Center, Royalty Payment Schedule (2014), *available at* http://www.copyright.com/wp-content/uploads/2015/03/Royaltypaymentschedule.pdf; *General FAQ,* SOUNDEXCHANGE, http://www.soundexchange.com/about/general-faq/.

ANT_BARTZ_000435634

include, but not be limited to, maintaining a publicly available list of information on all licensed works for which one or more rightsholders have not been identified or located.[418]

Some commenters argued that a diligent-search obligation would create a potential conflict of interest for CMOs. In their view, CMOs "that would otherwise retain unallocated funds for their own uses . . . would be incentivized to conduct a less thorough search for nonmembers."[419] To address that concern, both the EU CMO Directive and the U.K. regulations require the transfer of any undistributed royalties to a separate account nine months after the end of the financial year of their collection.[420] After a specified period of years, any royalties remaining unclaimed may be used "to fund social, cultural and educational activities" for the benefit of rightsholders.[421] The Office recommends that a U.S. ECL law include analogous requirements. Where a CMO has failed to identify or locate a rightsholder owed royalties by the statutory distribution date, it should be required to transfer those funds to a segregated trust account.[422] If the funds remained unclaimed after three years, the CMO would be permitted to deduct a reasonable fee to defray costs incurred in identifying and locating non-member rightsholders, and then would be required to distribute the balance to educational or literacy-based charities selected by its membership. These requirements would apply notwithstanding any provisions of state law, including those pertaining to unclaimed property.[423]

---

[418] *Cf.* Directive 2014/26/EU art. 13(3); U.K. ECL Regulations, S.I. 2014/2588, art. 18, ¶ 5.

[419] Berkeley Digital Library Copyright Project Initial Comments at 30; *see also* MIT Libraries Additional Comments at 4.

[420] Directive 2014/26/EU art. 13(2); U.K. ECL Regulations, S.I. 2014/2588, art. 18, ¶ 3.

[421] Directive 2014/26/EU art. 13(6); U.K. ECL Regulations, S.I. 2014/2588, art. 19, ¶ 3. Under the Directive, member states may direct such transfers after three years from the end of the financial year in which the funds were collected. Directive 2014/26/EU art. 13(4). In the U.K., title passes to the Secretary of State after three years from the end of the financial year of collection. U.K. ECL Regulations, S.I. 2014/2588, art. 19, ¶ 1. The Secretary "may either hold these monies on deposit or direct a collecting society to retain these funds . . . for any period up to 8 years from when the ECL authorisation began." U.K. GOVERNMENT RESPONSE, *supra* note 126, at 40. Thereafter, the Secretary "may determine what happens to these monies, including that they be used for social and cultural purposes." *Id.*

[422] *Cf.* 37 C.F.R. § 380.8 (in case of unclaimed royalties collected under statutory licenses for ephemeral recordings and digital audio transmissions, "the Collective shall retain the required payment in a segregated trust account for a period of 3 years from the date of distribution").

[423] *Cf. id.*

ANT_BARTZ_000435635

### 8. Fair Use Savings Clause

A number of commenters expressed opposition to ECL on the theory that it would weaken the fair use doctrine by inducing users whose activities might be protected by fair use to pay license fees rather than risk litigation.[424]  The Office understands these concerns, but ultimately finds them overstated.  As discussed above, our proposed ECL solution is intended in large part to enable activity for which there is broad agreement that no colorable fair use claim exists:  providing digital access to copyrighted works in their entirety.  To the extent it could be argued that any individual aspect of a mass digitization project might by itself qualify as fair use (*e.g.*, the underlying digital copying), we would expect that view to be reflected in the overall license fee negotiated between the CMO and the user.  That is, where the parties agree that a particular use would likely be deemed fair under established law, the portion of the license fee pertaining to that activity would likely be at or near zero.

More fundamentally, the Office notes that providing certainty to users through specific copyright limitations is fully compatible with fair use.  Indeed, as one group of commenters concerned about ECL's potential effect on fair use acknowledged in the context of the Section 108 library exceptions, "there is . . . real value in establishing that certain uses are categorically favored and authorized without regard to the fair use balancing test."[425]  For many mass digitization users – particularly non-state actors with limited resources – the avoidance of exposure to federal litigation and infringement liability will be well worth the cost of a license.  Yet those making a different risk/reward calculation would be free to forego a license and assert the fair use defense in the event litigation arose.  To confirm this understanding, the Office recommends that the legislation include a savings clause providing that nothing in the statute is intended to affect the scope of fair use.[426]

---

[424] *See, e.g.*, Butler et al. Additional Comments at 11 ("[F]air use *can* be shrunk in practice by offering apparent certainty in exchange for more conservative practice."); Public Knowledge and Electronic Frontier Foundation, Comments Submitted in Response to U.S. Copyright Office's Feb. 10, 2014 Notice of Inquiry at 3 (May 21, 2014) ("Naturally risk-averse parties making fair uses of orphan works would in many cases pay for licenses anyway, which would ultimately degrade the perceived robustness of fair use."); Tr. at 190:20-192:18 (Mar. 11, 2014) (Brandon Butler, American University Washington College of Law).

[425] Butler et al. Additional Comments at 7.

[426] *Cf.* 17 U.S.C. § 108(f)(4) ("Nothing in this section . . . in any way affects the right of fair use as provided by section 107 . . . .").

ANT_BARTZ_000435636

### 9. Sunset

The Office recommends that the legislation include a five-year sunset clause to give Congress the opportunity to assess the program's effectiveness and to consider whether ECL should be implemented on a long-term or permanent basis. A CMO's obligations regarding the maintenance and disposition of unclaimed royalties would extend beyond the sunset date until all such monies were disbursed.

### 10. Treaty Considerations

Insofar as an ECL system would establish a new limitation or exception to the rights of copyright owners, Congress would need to be satisfied that it complies with the requirements of international treaties to which the United States is a party. The Berne Convention, the TRIPS Agreement, the WIPO Copyright Treaty, and the WIPO Performances and Phonograms Treaty all require that any limitation or exception meet a variant of the so-called "three-step test": (1) it must be confined to certain special cases that (2) do not conflict with a normal exploitation of the work and (3) do not unreasonably prejudice the legitimate interests of the rightsholder.[427]

Decisions issued by World Trade Organization ("WTO") dispute resolution panels have provided some guidance as to the interpretation and application of the three-step test.[428] The first step – that a limitation or exception be confined to certain special cases – has been construed to require that the provision be "clearly defined in national legislation and narrow in scope and reach (i.e. essentially the dictionary meanings of 'certain' and 'special')."[429] For these purposes, "it is the scope in respect of potential users that is relevant for determining whether the coverage of the exemption is sufficiently limited to qualify as a 'certain *special* case.'"[430] In our view, an ECL law drawn in the manner described here should meet this requirement, as the class of potential users would be limited to those undertaking mass digitization activities for nonprofit educational

---

[427] *See* WCT, *supra* note 16, art. 10; WPPT, *supra* note 16, art. 16; TRIPS Agreement, *supra* note 16, art. 13; Berne Convention, *supra* note 16, art. 9(2).

[428] *See* Panel Report, *United States – Section 110(5) of the US Copyright Act: Report of the Panel*, WT/DS160/R (June 15, 2000) ("WTO Copyright Panel Report") (applying three-step test as set forth in TRIPS Agreement in copyright context); Panel Report, *Canada – Patent Protection of Pharmaceutical Products*, WT/DS114/R (Mar. 17, 2000) (applying TRIPS three-step test in patent context).

[429] DANIEL GERVAIS, THE TRIPS AGREEMENT: DRAFTING HISTORY AND ANALYSIS ¶ 2.191, at 289 (4th ed. 2012); *see* WTO Copyright Panel Report, *supra* note 428, ¶ 6.112, at 34.

[430] WTO Copyright Panel Report, *supra* note 428, ¶ 6.127, at 37.

ANT_BARTZ_000435637

or research purposes.  It thus would exclude large numbers of would-be users seeking to make digital collections available commercially or for purposes unrelated to education or research.

Under the second step – no conflict with a normal exploitation of the work – a limitation or exception is prohibited if it "is used to limit a commercially significant market or . . . to enter into competition with the copyright holder."[431]  Here again, we believe the safeguards proposed above should minimize any such conflicts.  The requirement that a CMO demonstrate its representativeness in the field and the consent of its membership would "ensure[] that any limitation imposed on outsiders' rights [will have] been approved by a 'substantial' number of authors of works of the same category."[432]  Therefore, "the limitation imposed through the ECL agreements is only an obligation on them to exploit their work in a manner that a substantial number of authors have found to be a 'normal exploitation' of their own works."[433]  To the extent that any non-member rightsholder disagreed, he or she would be entitled to opt out.

The third step – no unreasonable prejudice to the legitimate interests of the rightsholder – is implicated where a limitation or exception "causes or has the potential to cause an unreasonable loss of income to the copyright owner."[434]  It seems highly unlikely that the ECL framework described here would be found to have that effect.  ECL programs typically are more protective of rightsholders' economic interests than are statutory licensing schemes, as ECL royalty terms and rates are negotiated between representatives of owners and users, rather than imposed by the government.[435]  As stated, the Copyright Office's proposal would provide still further protection by giving non-members the right to opt out of any license they consider unfavorable.

More generally, the fact that ECL regimes have existed in several Nordic countries for decades without ever being challenged on these grounds would seem to belie any suggestion that a properly crafted ECL system in the United States would conflict with international norms.  That conclusion is bolstered by other countries' recent adoption of ECL laws – one of which (the

---

[431] GERVAIS, *supra* note 429,  ¶ 2.184, at 282.

[432] AXHAMN & GUIBAULT, *supra* note 62, at 51.

[433] *Id.*

[434] WTO Copyright Panel Report, *supra* note 428, ¶ 6.229.

[435] *See* AXHAMN & GUIBAULT, *supra* note 62, at 51 ("[I]t is reasonable to assume that systems that grant authors the possibility to influence the limitation's scope or function can be presumed to be less prejudicial than limitations not granting this opportunity.").

ANT_BARTZ_000435638

United Kingdom's) is broader in scope than that described here. The Office accordingly concludes that compliance with the United States' treaty obligations would not preclude the adoption of an appropriately tailored ECL program.

### 11. Notice of Inquiry

To assist it in developing legislation within these general parameters, the Office is publishing a Notice of Inquiry inviting public comment on the outstanding issues discussed above. The Office is particularly interested in stakeholder views regarding examples of mass digitization projects that may be appropriate for licensing under the proposed pilot. These comments may include (but need not be limited to) descriptions of particular collections of copyrighted works (*e.g.*, Depression-era photographs) that prospective users may wish to digitize and make available through ECL. The Office believes that information about the types of mass digitization projects that users have the desire and capacity to undertake will provide a useful starting point for stakeholder dialogue on various elements of the pilot program.

### 12. Summary

Based on the above analysis, the Copyright Office believes that the copyright law would benefit from the addition of an ECL framework to facilitate certain mass digitization projects in a manner that meets the overall objectives of an effective and balanced Copyright Act. The Office recommends, as a first step, a pilot program on which it will seek further public comment.

An ECL regime in the United States would allow the Register of Copyrights to authorize CMOs to license the use of copyrighted works on behalf of both members and non-members in connection with the creation or operation of a digital collection. Three categories of published works would be eligible for ECL: (1) literary works, (2) pictorial or graphic works embedded in such works, and (3) photographs. At least with respect to out-of-commerce works, an authorized CMO would be permitted to license the creation of digital copies, the display of works through online access, and copying and printing, subject to restrictions on eligible end-users and methods of access. If in-commerce works are covered, a substantially narrower range of permitted uses may be advisable for those works. The legislation would not limit the categories of users eligible to obtain a license, but would require that the uses be made only for nonprofit educational or research purposes and without any purpose of direct or indirect commercial advantage.

To qualify for licensing authority, a CMO would be required to submit an application providing evidence of its representativeness in the relevant field, the consent of its membership to the ECL proposal, and its adherence to sufficient standards of transparency, accountability, and good governance. After receiving ECL authorization, a CMO would be subject to rightsholder

ANT_BARTZ_000435639

audits. Copyright owners would have the right to limit the grant of licenses with respect to their works or to opt out of the system altogether.

Royalty rates and license terms would be negotiated between the CMO and a prospective user, subject to a CRB dispute resolution process. All licenses would include provisions obligating the user to implement and maintain reasonable digital security measures. The CMO would be required to collect and distribute royalties to rightsholders within a prescribed period and to conduct diligent searches for non-members for whom it has collected payments. Unclaimed royalties would have to be maintained by the CMO in a designated account for three years, after which time they would be distributed to educational or literacy-based charities selected by its membership. The legislation would include a fair use savings clause.

The success of such a system would depend on the viability of the market for the digital resources available for licensing. A sufficient number of prospective users would have to conclude that the benefits obtainable through ECL – including legal certainty and broader permitted uses – are greater than the costs of securing a license. Likewise, for CMOs, the benefits of administering extended collective licenses must exceed the additional administrative burdens that authorization would necessarily entail. As the U.K. IPO has observed, "ECL schemes will only be possible where the market wants them."[436]

## IV. CONCLUSION

Both the use of individual orphan works and mass digitization offer considerable opportunities for the diffusion of creativity and learning. Too often, however, the public is deprived of the full benefit of such uses, not because rightsholders and users cannot agree to terms, but because a lack of information or inefficiencies in the licensing process prevent such negotiations from occurring in the first place. As countries around the world are increasingly recognizing, these obstacles to clearance are highly detrimental to a well-functioning copyright system in the twenty-first century. The Office thus agrees that a solution for the United States is "desperately need[ed],"[437] though the two issues warrant different responses.

For orphan works, the Office recommends the adoption of a modified version of the 2008 Shawn Bentley Act that would limit the infringement remedies available against a user who has undertaken a good faith diligent search for the rightsholder and completed certain notice and

---

[436] U.K. GOVERNMENT RESPONSE, *supra* note 126, at 1.

[437] *Preservation and Reuse of Copyrighted Works*, *supra* note 2, at 81 (statement of Michael C. Donaldson, Int'l Documentary Ass'n and Film Independent).

ANT_BARTZ_000435640

attribution requirements. For mass digitization, a comprehensive solution likely would require legislation establishing an ECL option, which we believe should initially take the form of a limited pilot program developed through additional stakeholder outreach and discussion. Should Congress wish to consider an ECL model, we recommend that any legislation follow the general framework described here – notably, that it be limited, at least at the outset, to projects serving nonprofit educational and research purposes and that it provide an express opt-out right for copyright owners. Ultimately, the Office concludes that legislation addressing both orphan works and mass digitization could do much to further the objectives of the copyright system by providing legal certainty to users, establishing reliable mechanisms for the compensation of authors, and making vast numbers of long forgotten works available for the public good.

106

ANT_BARTZ_000435641

**APPENDIX A**     ORPHAN WORKS LEGISLATION
DISCUSSION DRAFT AND
SECTION-BY-SECTION ANALYSIS

ANT_BARTZ_000435642

## Orphan Works Act of 20__

__th CONGRESS
__ Session

### AN ACT

To provide a limitation on judicial remedies in copyright infringement cases involving orphan works.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SECTION 1. SHORT TITLE.

This Act may be cited as the "Orphan Works Act of 20__".

## SEC. 2. LIMITATION ON REMEDIES IN CASES INVOLVING ORPHAN WORKS.

(a) LIMITATION ON REMEDIES.—Chapter 5 of title 17, United States Code, is amended by adding at the end the following:

### Sec. 514. Limitation on remedies in cases involving orphan works

(a) DEFINITIONS.—In this section, the following definitions shall apply:

(1) NOTICE OF CLAIM OF INFRINGEMENT.—The term "notice of claim of infringement" means, with respect to a claim of copyright infringement, a written notice sent from the owner of the infringed copyright or a person acting on the owner's behalf to the infringer or a person acting on the infringer's behalf, that includes at a minimum—

(A) the name of the owner of the infringed copyright;

(B) the title of the infringed work, any alternative titles of the infringed work known to the owner of the infringed copyright, or if the work has no title, a description in detail sufficient to identify that work;

(C) an address and telephone number at which the owner of the infringed copyright or a person acting on behalf of the owner may be contacted; and

(D) information reasonably sufficient to permit the infringer to locate the infringer's material in which the infringed work resides.

(2) OWNER OF THE INFRINGED COPYRIGHT.—The "owner of the infringed copyright" is the owner of any particular exclusive right under section 106 that is applicable to the infringement, or any person or entity with the authority to grant or license such right.

(3) REASONABLE COMPENSATION.—The term "reasonable compensation" means, with respect to a claim of infringement, the amount on which a willing buyer and willing seller in the positions of the infringer and the owner of the infringed copyright would have agreed with respect to the infringing use of the work immediately before the infringement began.

(b) CONDITIONS FOR ELIGIBILITY.—

(1) CONDITIONS.—

1

(A) IN GENERAL.—Notwithstanding sections 502 through 506, and subject to subparagraph (B), in an action brought under this title for infringement of copyright in a work, the remedies for infringement shall be limited in accordance with subsection (c) if the infringer—

    (i) proves by a preponderance of the evidence that before the infringement began, the infringer, a person acting on behalf of the infringer, or any person jointly and severally liable with the infringer for the infringement—

        (I) performed and documented a qualifying search, in good faith, to locate and identify the owner of the infringed copyright; and

        (II) was unable to locate and identify an owner of the infringed copyright;

    (ii) prior to using the work, filed with the Register of Copyrights a Notice of Use under paragraph (3);

    (iii) provided attribution, in a manner that is reasonable under the circumstances, to the legal owner of the infringed copyright, if such legal owner was known with a reasonable degree of certainty, based on information obtained in performing the qualifying search;

    (iv) included with the public distribution, display, or performance of the infringing work a symbol or other notice of the use of the infringing work, the form and manner of which shall be prescribed by the Register of Copyrights;

    (v) asserts in the initial pleading to the civil action eligibility for such limitations; and

    (vi) at the time of making the initial discovery disclosures required under rule 26 of the Federal Rules of Civil Procedure, states with particularity the basis for eligibility for the limitations, including a detailed description and documentation of the search undertaken in accordance with paragraph (2)(A) and produces documentation of the search.

(B) EXCEPTION.—Subparagraph (A) does not apply if, after receiving notice of the claim for infringement and having an opportunity to conduct an expeditious good faith investigation of the claim, the infringer—

    (i) fails to negotiate reasonable compensation in good faith with the owner of the infringed copyright; or

    (ii) fails to render payment of reasonable compensation in a reasonably timely manner after reaching an agreement with the owner of the infringed copyright or under an order described in subsection (c)(1)(A).

(2) REQUIREMENTS FOR SEARCHES.—

    (A) REQUIREMENTS FOR QUALIFYING SEARCHES.—

2

ANT_BARTZ_000435644

(i) IN GENERAL.—A search qualifies under paragraph (1)(A)(i)(I) if the infringer, a person acting on behalf of the infringer, or any person jointly and severally liable with the infringer for the infringement, undertakes a diligent effort that is reasonable under the circumstances to locate the owner of the infringed copyright prior to, and at a time reasonably proximate to, the infringement.

(ii) DILIGENT EFFORT.—For purposes of clause (i), a diligent effort—

(I) requires, at a minimum—

(aa) a search of the records of the Copyright Office that are available to the public through the Internet and relevant to identifying and locating copyright owners, provided there is sufficient identifying information on which to construct a search;

(bb) a search of reasonably available sources of copyright authorship and ownership information and, where appropriate, licensor information;

(cc) use of appropriate technology tools, printed publications, and where reasonable, internal or external expert assistance; and

(dd) use of appropriate databases, including databases that are available to the public through the Internet; and

(II) shall include any actions that are reasonable and appropriate under the facts relevant to the search, including actions based on facts known at the start of the search and facts uncovered during the search, and including a review, as appropriate, of Copyright Office records not available to the public through the Internet that are reasonably likely to be useful in identifying and locating the copyright owner.

(iii) CONSIDERATION OF RECOMMENDED PRACTICES.—A qualifying search under this subsection shall ordinarily be based on the applicable statement of Recommended Practices made available by the Copyright Office.

(iv) LACK OF IDENTIFYING INFORMATION.—The fact that, in any given situation,—

(I) a particular copy or phonorecord lacks identifying information pertaining to the owner of the infringed copyright; or

(II) an owner of the infringed copyright fails to respond to any inquiry or other communication

3

about the work, shall not be deemed sufficient to meet the conditions under paragraph (1)(A)(i)(I).

(v) USE OF RESOURCES FOR CHARGE.—A qualifying search under paragraph (1)(A)(i)(I) may require use of resources for which a charge or subscription is imposed to the extent reasonable under the circumstances.

(vi) EFFECT OF FOREIGN SEARCHES.—If a search is found to be qualifying under the laws of a foreign jurisdiction, and this search is relied upon in part by a U.S. infringer, a court may take this fact into account when determining whether the U.S. search is qualifying, *provided* the foreign jurisdiction accepts qualifying U.S. searches in a reciprocal manner.

(B) INFORMATION TO GUIDE SEARCHES; RECOMMENDED PRACTICES.—

(i) STATEMENTS OF RECOMMENDED PRACTICES.—The Register of Copyrights shall maintain and make available to the public and, from time to time, update at least one statement of Recommended Practices for each category, or, in the Register's discretion, subcategory of work under section 102(a) of this title, for conducting and documenting a search under this subsection.  Such statement will ordinarily include reference to materials, resources, databases, and technology tools that are relevant to a search. The Register may maintain and make available more than one statement of Recommended Practices for each category or subcategory, as appropriate.

(ii) CONSIDERATION OF RELEVANT MATERIALS.—In maintaining and making available and, from time to time, updating the Recommended Practices in clause (i), the Register of Copyrights shall, at the Register's discretion, consider materials, resources, databases, technology tools, and practices that are reasonable and relevant to the qualifying search.  The Register may consider any comments submitted to the Copyright Office by any interested stakeholders.

(3) NOTICE OF USE ARCHIVE.—The Register of Copyrights shall create and maintain an archive to retain the Notice of Use filings under paragraph (1)(A)(i)(III).  Such filings shall include—

(A) the type of work being used, as listed in section 102(a) of this title;

(B) a description of the work;

(C) a summary of the search conducted under paragraph (1)(A)(i)(I);

(D) the owner, author, recognized title, and other available identifying element of the work to the extent the infringer

4

knows such information with a reasonable degree of certainty;

(E) the source of the work, including the library or archive in which the work was found, the publication in which the work originally appeared, the website from which the work was taken, (including the url and the date the site was accessed);

(F) a certification that the infringer performed a qualifying search in good faith under this subsection to locate the owner of the infringed copyright; and

(G) the name of the infringer and how the work will be used.

Notices of Use filings retained under the control of the Copyright Office shall be made available to individuals or the public only under the conditions specified by regulations of the Copyright Office.

(4) PENALTY FOR FAILURE TO COMPLY.—If an infringer fails to comply with any requirement under this subsection, the infringer is not eligible for a limitation on remedies under this section.

(c) LIMITATIONS ON REMEDIES.—The limitations on remedies in an action for infringement of a copyright to which this section applies are the following:

(1) MONETARY RELIEF.—

(A) GENERAL RULE.—Subject to subparagraph (B), an award for monetary relief (including actual damages, statutory damages, costs, and attorney's fees) may not be made other than an order requiring the infringer to pay reasonable compensation to the owner of the exclusive right under the infringed copyright for the use of the infringed work.

(B) FURTHER LIMITATIONS.—An order requiring the infringer to pay reasonable compensation for the use of the infringed work may not be made under subparagraph (A) if the infringer is a nonprofit educational institution, museum, library, archives, or a public broadcasting entity (as defined in subsection (f) of section 118), or any of such entities' employees acting within the scope of their employment, and the infringer proves by a preponderance of the evidence that—

(i) the infringement was performed without any purpose of direct or indirect commercial advantage;

(ii) the infringement was primarily educational, religious, or charitable in nature; and

(iii) after receiving a notice of claim of infringement, and having an opportunity to conduct an expeditious good faith investigation of the claim, the infringer promptly ceased the infringement.

(C) EFFECT OF REGISTRATION ON REASONABLE COMPENSATION.—If a work is registered, the court may, in determining reasonable

5

ANT_BARTZ_000435647

compensation under this paragraph, take into account the value, if any, added to the work by reason of such registration.

(2) INJUNCTIVE RELIEF.—

(A) GENERAL RULE.—Subject to subparagraph (B), the court may impose injunctive relief to prevent or restrain any infringement alleged in the civil action.  If the infringer has met the requirements of subsection (b), the relief shall, to the extent practicable and subject to applicable law, account for any harm that the relief would cause the infringer due to its reliance on subsection (b).

(B) EXCEPTION.—In a case in which the infringer has prepared or commenced preparation of a new work of authorship that recasts, transforms, adapts, or integrates the infringed work with a significant amount of original expression, any injunctive relief ordered by the court may not restrain the infringer's continued preparation or use of that new work, if—

(i) the infringer pays reasonable compensation in a reasonably timely manner after the amount of such compensation has been agreed upon with the owner of the infringed copyright or determined by the court; and

(ii) the court requires that the infringer provide attribution, in a manner that is reasonable under the circumstances, to the legal owner of the infringed copyright, if requested by such owner;

however

(iii)  The subsection (2)(B)(i)-(ii) limitation on injunctive relief shall not apply if—

(I)    the owner of the work is also an author of the work;

(II)   the owner requests such injunctive relief; and

(III)  the owner alleges, and the court so finds, that the infringer's continued and intentional preparation or use of the new work would be prejudicial to the owner's honor or reputation, and this harm is not otherwise compensable.

(C) LIMITATIONS.—The limitations on injunctive relief under subparagraphs (A) and (B) may not be available to an infringer or a representative of the infringer acting in an official capacity if the infringer asserts that neither the infringer nor any representative of the infringer acting in an official capacity is subject to suit in the courts of the United States for an award of damages for the infringement, unless the court finds that the infringer—

(i) has complied with the requirements of subsection (b); and

6

(ii) pays reasonable compensation to the owner of the exclusive right under the infringed copyright in a reasonably timely manner after the amount of reasonable compensation has been agreed upon with the owner or determined by the court.

(D) RULE OF CONSTRUCTION.—Nothing in subparagraph (C) shall be construed to authorize or require, and no action taken under such subparagraph shall be deemed to constitute, either an award of damages by the court against the infringer or an authorization to sue a State.

(E) RIGHTS AND PRIVILEGES NOT WAIVED.—No action taken by an infringer under subparagraph (C) shall be deemed to waive any right or privilege that, as a matter of law, protects the infringer from being subject to suit in the courts of the United States for an award of damages.

(d) PRESERVATION OF OTHER RIGHTS, LIMITATIONS, AND DEFENSES.—This section does not affect any right, or any limitation or defense to copyright infringement, including fair use, under this title.  If another provision of this title provides for a statutory license that would permit the use contemplated by the infringer, that provision applies instead of this section.

(e) COPYRIGHT FOR DERIVATIVE WORKS AND COMPILATIONS.—Notwithstanding section 103(a), an infringer who qualifies for the limitation on remedies afforded by this section shall not be denied copyright protection in a compilation or derivative work on the basis that such compilation or derivative work employs preexisting material that has been used unlawfully under this section.

(f) EXCLUSION FOR FIXATIONS IN OR ON USEFUL ARTICLES.—The limitations on remedies under this section shall not be available to an infringer for infringements resulting from fixation of a pictorial, graphic, or sculptural work in or on a useful article that is offered for sale or other commercial distribution to the public.

(g) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 5 of title 17, United States Code, is amended by adding at the end the following:

**514. Limitation on remedies in cases involving orphan works.**

(h) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendments made by this section shall take effect on January 1, 20__.

## SEC. 3. REPORT TO CONGRESS.

Not later than December 12, 20__, the Register of Copyrights shall report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives on the implementation and effects of the amendments made by section 2, including any recommendations for legislative changes that the Register considers appropriate.

ANT_BARTZ_000435649

# Section-by-Section Analysis of Orphan Works Proposal

The analysis below provides a brief summary of the key provisions of the proposed orphan works limitation on remedies legislation. This legislation applies to all categories of works, all users, and virtually all uses. It provides limitations on the remedies available to plaintiffs in copyright infringement cases where the work being infringed is demonstrated to be an orphan work. The key factor for determining if a work is an orphan work is the inability to identify or to locate the copyright owner after a good-faith qualifying search. The proposal also includes a savings clause preserving the defense of fair use, along with all other rights and limitations. While not identical, this legislation is substantively based upon the Shawn Bentley Orphan Works Act, which passed the Senate but not the House in 2008. The Copyright Office intends it to be enacted as a new "section 514. Limitation on remedies in cases involving orphan works."

## Section 514(a). Definitions

This section defines three important terms used in the proposed legislation. First, it describes the required elements of a "Notice of Claim of Infringement," which is a written document sent by the owner of an infringed copyright to the user of the work, typically after the user has performed an unsuccessful good faith qualifying search and begun to use the work, setting forth identifying and contact information regarding the work and its ownership. As noted below, such a notice is a precursor to a reasonable compensation negotiation.

The second term defined in this section is "owner of the infringed copyright," which is an owner of any of the exclusive rights under section 106, or any entity with the authority to license any such right. An owner of the infringed copyright is the subject of a good faith qualified search, and the party who may file a Notice of Claim of Infringement.

Finally, "reasonable compensation" is defined as the amount on which a willing buyer and willing seller would have agreed upon for use of the infringed work immediately before infringement began.

## Section 514(b)(1). Conditions for Eligibility - Conditions

This section lists six conditions, each of which must be met by an infringer if the infringer is to be eligible for limitations on remedies. First, the infringer must prove by a preponderance of the evidence that, before the infringement began, he or she performed a good faith qualifying search (a concept that is elucidated below) for the owner of the infringed copyright, but was unable to identify and locate the owner. Second, the infringer must file a Notice of Use with the Register of Copyrights. Third the infringer must attribute the infringed work to the legal owner, if known, and if such attribution is reasonable under the circumstances. Fourth, any public distribution, display, or performance of the infringing work must include an "orphan work" symbol, the design of which and manner of inclusion to be determined by the Register of Copyrights. Fifth, the infringer must assert eligibility for limitations on remedies in

1

ANT_BARTZ_000435650

its initial pleading; and sixth, the infringer must, as part of making discovery disclosures under Rule 26 of the Federal Rules of Civil Procedure, state in detail the basis for eligibility for the limitations, including a description and documentation of the qualified search.

Even if an infringer meets all of the above requirements, there is no eligibility for limitations on remedies if the infringer receives a Notice of Claim of Infringement from the copyright owner and either fails to negotiate reasonable compensation or fails to pay reasonable compensation, either under an agreement with the owner or under a court order.

## Section 514(b)(2)(A). Conditions for Eligibility – Requirements for Qualifying Searches

In general, a qualifying search requires a "diligent effort," that is reasonable under the circumstances, to locate the copyright owner before and at a time reasonably proximate to the infringement. A diligent effort requires, at minimum, four elements. First, a search of relevant online Copyright Office records, provided sufficient identifying information exists. Second, a search of reasonably available sources of copyright authorship and ownership information, as well as licensor information where appropriate. Third, the use of appropriate technology tools, print resources, and reasonable expert assistance. Fourth, the use of appropriate databases, including those available online. A diligent effort also includes reasonable and appropriate actions considering facts available at the start of a search and uncovered during a search, along with review of non-online Copyright Office records that are likely to be useful.

In performing a qualifying search, the infringer will ordinarily rely upon applicable statements of Recommended Practices produced and maintained by the Copyright Office, which are described below.

Neither the lack of identifying information on a copy or phonorecord regarding the copyright owner, nor the fact that an identified owner does not respond to communications regarding a work, is sufficient to meet the conditions for a qualifying search. A qualifying search may require the use of paid resources, such as subscription databases.

## Section 514(b)(2)(A)(vi). Effect of Foreign Searches

Some foreign jurisdictions certify searches for copyright owners as being in good faith and sufficiently diligent. If a U.S. infringer relies in part upon such a certification in making the case that his search qualifies, a court may take this into account. This rule only applies, however, if the foreign jurisdiction whose certification is being relied upon reciprocally accepts qualifying searches from the U.S. in the same manner.

## Section 514(b)(2)(B). Conditions for Eligibility – Information to Guide Searches; Recommended Practices

The Register of Copyrights shall maintain and make available to the public, and

2

ANT_BARTZ_000435651

periodically update, at least one statement of Recommended Practices per category (or subcategory) of works under 102(a), for conducting and documenting a qualifying search. Each statement will ordinarily refer to relevant materials, resources, databases, and technology tools. The Register, at her discretion, shall consider materials, resources, databases, technology tools, and practices that are reasonable and relevant, as well as any comments by interested stakeholders.

### Section 514(b)(3). Conditions for Eligibility – Notice of Use Archive

A Notice of Use filing (which is one of the conditions for eligibility) must include: type of work being used (as listed in section 102(a)), description of work, summary of qualifying search, any available identifying elements of work, source of work (if website, include URL and date), certification of good faith qualifying search, and name of infringer. The Copyright Office must create and maintain a Notice of Use archive; filings shall be made available only under Copyright Office regulations.

### Section 514(c)(1) Limitations on Remedies - Monetary Relief

Monetary relief (including actual damages, statutory damages, costs, and attorney's fees) shall be limited to an order to pay reasonable compensation to the owner of the infringed copyright for use of the infringed work. No monetary relief may be made if the infringer is a nonprofit educational institution, museum, library, archives, or public broadcaster (or employee thereof), and proof by preponderance of the evidence is made that infringement was performed without purpose of direct or indirect commercial advantage; was primarily educational, religious, or charitable; and, after Notice of Claim of Infringement and good faith investigation, infringement promptly ceases. Additionally, a court may take the value added to an infringed work by virtue of its registration into account in determining reasonable compensation.

### Section 514(c)(2) Limitations on Remedies - Injunctive Relief

Injunctive relief is available for infringement of orphan works. However, if the infringer qualifies for limitations on liability, the injunction must account for any harm the relief would cause the infringer due to his reliance on eligibility for remedies limitation.

*Exception for Derivative Works* – If the user has prepared or begun to prepare a new work that combines the infringed work with significant original expression, the court may not enjoin the preparation or use of the new work, provided that the user pays timely reasonable compensation, as either agreed with the owner or ordered by the court, and, if requested by the owner, the infringer provides attribution to the legal owner of the work, as reasonable under the circumstances. This exception does not apply if an owner, who is also the author of the work in question, seeks injunctive relief in order to remedy a situation where his or her reputational interests are at stake, such as the unauthorized use of the orphan work in a manner that is

ANT_BARTZ_000435652

prejudicial to the owner's honor.  In such a situation, the court has the option of granting injunctive relief.

*Eleventh Amendment Limitations* – If an infringer (such as a State entity) asserts that it is immune, under the Eleventh Amendment, from money damages, it may not take advantage of the limits on injunctive relief, unless it (a) complies with the eligibility requirements and (b) pays timely reasonable compensation, as either agreed with the owner or ordered by the court. These limitations are not to be construed to authorize, require, or constitute an award of damages; nor shall they constitute an authorization to sue a State.  If an infringer pays reasonable compensation under this limitation, this does not waive any Eleventh Amendment protection it has from being sued for money damages.

## Section 514(d)  Preservation of Other Rights, Limitations, and Defenses

All rights, limitations, and defenses regarding copyright infringement are preserved, including fair use.  If the use contemplated by the infringer is covered by a statutory license, that license applies instead of these limitations on remedies.

## Section 514(e)  Copyright for Derivative Works and Compilations

If an infringer qualifies for limitations on remedies, he can still obtain copyright protection for a derivative work or compilation that uses preexisting material in a manner that is technically infringing under this section.

## Section 514(f)  Exclusion for Fixations in or on Useful Articles

The limitations on remedies do not apply to fixations of pictorial, graphic, or sculptural works in or on useful articles that are made commercially available.

## Report to Congress

Within five years from enactment, the Register of Copyrights shall report to Congress on the implementation and effects of the orphan works amendments, including any recommendations for appropriate changes.

ANT_BARTZ_000435653

**APPENDIX B**      FEDERAL REGISTER NOTICES

ANT_BARTZ_000435654

will be distributed on or about January 1, 2013.

This notice is issued pursuant to 42 U.S.C. 2996f(f). Comments and recommendations concerning potential grantees are invited, and should be delivered to LSC within thirty (30) days from the date of publication of this notice.

**Victor M. Fortuno,**

*Vice President & General Counsel.*

[FR Doc. 2012–25948 Filed 10–19–12; 8:45 am]

**BILLING CODE 7050–01–P**

## LIBRARY OF CONGRESS

### Copyright Office

[Docket No. 2012–12]

### Orphan Works and Mass Digitization

**AGENCY:** Copyright Office, Library of Congress.

**ACTION:** Notice of inquiry.

**SUMMARY:** The U.S. Copyright Office is reviewing the problem of orphan works under U.S. copyright law in continuation of its previous work on the subject and in order to advise Congress as to possible next steps for the United States. The Office has long shared the concern with many in the copyright community that the uncertainty surrounding the ownership status of orphan works does not serve the objectives of the copyright system. For good faith users, orphan works are a frustration, a liability risk, and a major cause of gridlock in the digital marketplace. The issue is not contained to the United States. Indeed, in recent months, the European Commission has adopted measures that would begin to resolve the issue in certain contexts and a number of foreign governments are reviewing or proposing solutions. The Copyright Office seeks comments regarding the current state of play for orphan works. It is interested in what has changed in the legal and business environments during the past few years that might be relevant to a resolution of the problem and what additional legislative, regulatory, or voluntary solutions deserve deliberation. This is a general inquiry and the Office will likely publish additional notices on this topic.

**DATES:** Comments are due by 5:00 p.m. EST on January 4, 2013. Reply comments are due by 5:00 p.m. EST on February 4, 2013.

**ADDRESSES:** All comments shall be submitted electronically. A comment page containing a comment form is posted on the Copyright Office Web site

at *http://www.copyright.gov/orphan/comment-submission.* The Web site interface requires commenting parties to complete a form specifying name and organization, as applicable, and to upload comments as an attachment via a browser button. To meet accessibility standards, commenting parties must upload comments in a single file not to exceed six megabytes ("MB") in one of the following formats: the Adobe Portable Document File ("PDF") format that contains searchable, accessible text (not an image); Microsoft Word; WordPerfect; Rich Text Format ("RTF"); or ASCII text file format (not a scanned document). The form and face of the comments must include both the name of the submitter and organization. The Copyright Office will post all comments publicly on the Copyright Office's Web site exactly as they are received, along with names and organizations. If electronic submission of comments is not feasible, please contact the Copyright Office at 202–707–8350 for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Karyn Temple Claggett, Senior Counsel, Office of Policy and International Affairs, by email at *kacl@loc.gov*; or Catherine Rowland, Senior Counsel, Office of Policy and International Affairs, by email at *crowland@loc.gov*; or contact the Copyright Office by telephone, at 202–707–8350.

**SUPPLEMENTARY INFORMATION:**

### I. Background

An "orphan work" is an original work of authorship for which a good faith, prospective user cannot readily identify and/or locate the copyright owner(s) in a situation where permission from the copyright owner(s) is necessary as a matter of law.[1] Under current law, anyone who uses an orphan work without permission runs the risk that the copyright owner(s) may bring an infringement lawsuit for substantial damages, attorneys' fees, and/or injunctive relief unless a specific exception or limitation to copyright applies.[2] In such a situation, a productive and beneficial use of the work may be inhibited—not because the

copyright owner has asserted his exclusive rights in the work, or because the user and owner cannot agree on the terms of a license—but merely because the user cannot identify and/or locate the owner and therefore cannot determine whether, or under what conditions, he or she may make use of the work. This outcome is difficult if not impossible to reconcile with the objectives of the copyright system and may unduly restrict access to millions of works that might otherwise be available to the public (e.g., for use in research, education, mainstream books, or documentary films). Accordingly, finding a fair solution to the orphan works problem remains a major goal of Congress and a top priority for the Copyright Office.

### A. 2006 Report on Orphan Works

The Copyright Office published its Orphan Works Report ("Report") in January 2006, after conducting a comprehensive study at the request of Congress. The Report documented the experiences of users who are unable to find copyright owners, the kinds of works at issue, and the kinds of projects that may be forestalled. It analyzed the legal issues, including the application of statutory damages in the orphan works context, and discussed a variety of possible solutions. In preparing the Report, the Office conducted an extensive public outreach process, including a series of roundtables in New York City and Washington, DC and a public comment period that yielded over 850 written comments from a variety of stakeholders. In short, the Office concluded that the problem of orphan works is pervasive; it affects a broad cross-section of stakeholders including members of the general public, archives, publishers, and filmmakers.

The orphan works problem was exacerbated by a series of changes in U.S. copyright law over the past thirty-plus years. These changes slowly but surely relaxed the obligations of copyright owners to assert and manage their rights and removed formalities in the law that had served in part to provide users with readily accessible copyright information. Significant among those changes were the elimination of the registration and notice requirements, which resulted in less accurate and incomplete identifying information on works, and the automatic renewal of copyrighted works that were registered before the effective

---

[1] *See* United States Copyright Office, Report on Orphan Works (2006) ("Orphan Works Report" or "Report," at 1, *available at http://www.copyright.gov/orphan/orphan-report.pdf.*

[2] The Copyright Act, 17 U.S.C. § 101 *et seq.,* includes several exceptions and limitations that would allow use of orphan works under certain circumstances, such as § 107 (fair use), § 108(h) (use by libraries during the last twenty years of the copyright term), and § 115(b) (statutory license to distribute phonorecords). The Office concluded in its Orphan Works Report, however, that existing provisions would not address many orphan works situations. *See* Orphan Works Report at 7.

ANT_BARTZ_000435655

64556    **Federal Register** / Vol. 77, No. 204 / Monday, October 22, 2012 / Notices

date of the 1976 Copyright Act.[3] Subsequent amendments, such as the Sonny Bono Copyright Term Extension Act of 2008, extended the duration of copyright and increased the likelihood that some copyright owners would become unlocatable. To be clear, Congress amended the law for sound reasons, primarily to protect authors from technical traps in the law and to ensure U. S. compliance with international conventions. However, "the net result of these amendments has been that more and more copyright owners may go missing." [4]

As reflected in the Report, all kinds of works are potentially at issue, from music to books to film clips. That said, the Report also reflects that a significant percentage of the problem, if not the lion's share, involves orphan photographs. Photographs are particularly challenging because they affect a vast variety of images, from historically important archival photographs residing in archives to contemporary photographs for which there may or may not be a living copyright owner. Photographs of all kinds also frequently lack or may become divorced from ownership information; that is, no label or caption is affixed to the photographs themselves. As a result, potential users of photographic works often lack the most basic information to begin a search. The Office received many comments focused on the difficulty of obtaining information about the author or copyright owner of individual photographs, and the numerous situations where photographs could not be used because the potential user could not discern a search path, let alone ownership.

After reviewing a number of possible legislative solutions, the Office recommended a limitation on remedies, with some caveats. In general, the Office recommended that Congress amend the Copyright Act to limit the remedies available against good faith users of orphan works after the user had performed a "reasonably diligent search" for the owner of that work and conditional upon the user providing attribution to the author and owner of the work wherever possible.[5] Notably, the Office did not at this early stage recommend specific statutory or

regulatory guidelines for determining a reasonably diligent search, but "favor[ed] the development of guidelines or even binding criteria" by users and stakeholders.[6] If a user satisfied the statutory requirements, the Office recommended that Congress limit the remedies that the copyright owner could seek against the good faith user of an orphan work to injunctive relief and "reasonable compensation" for the use of the work.[7] The Office also recommended a "take-down" option for certain noncommercial users engaged in noncommercial activities.

## B. 2008 Proposed Legislation

Both the 109th and the 110th Congresses considered the orphan works problem, in each case introducing legislation that built upon many of the Copyright Office's recommendations.[8] The proposed legislation would have: (1) Limited remedies available under the Copyright Act when a user is unable to locate the copyright owner or other appropriate rights holder after conducting a good faith reasonably diligent search; (2) been applicable on a case-by-case basis, meaning that users could not assume that an orphan work would retain its orphan status indefinitely; and (3) permitted the copyright owner or other rights holder later to collect reasonable compensation from the user, but not statutory damages or attorneys' fees. In other words, the proposed legislation did not create an exception or limitation of general applicability, but rather placed a limitation on the remedies that might be imposed in a particular circumstance with respect to a particular user. The legislation also provided a special provision for noncommercial actors engaged in noncommercial activities, with some conditions.

Photographs proved to be a particularly complex and difficult area to resolve. As cited in the Report and the congressional deliberations that followed, the problem of orphan photographs is well documented. At the same time, Congress wrestled with how best to protect photographers who are the victims of accidental or nefarious acts, including purposeful deletion of bylines, captions, or digital watermarks. The 2008 bills built upon the foundation of the 2006 bill and included a number of proposals designed with

photographers in mind, such as: A provision in both the House and the Senate drafts that required users to promptly compensate copyright owners should they appear (including for example, where the amount of payment might be too small to make litigation to collect it worthwhile); provisions in both drafts that would have excluded infringements resulting from fixation of a pictorial, graphic, or sculptural work in or on a useful article that is offered for sale or other commercial distribution to the public (e.g., the use of photographs on tote bags or similar mass merchandise); and a provision in the House draft that required a user to file search information and related evidence with the Copyright Office under fees to be set by regulation. Moreover, the 2008 bills would have delayed the effective date of legislation until such time as the Copyright Office could confirm the availability of two "separate and independent searchable, comprehensive electronic databases, that allow for searches of copyrighted works that are pictorial, graphic, and sculptural works[.]" [9]

Search criteria also became a major focus in both the House and the Senate, and stakeholders with a variety of perspectives engaged in discussions and refinement of the bills throughout the 2008 deliberations. Ultimately, Congress settled upon an innovative mix of mandatory and voluntary requirements that served to provide meaningful guidance to users, and incentives to copyright owners to make themselves locatable (including through investment in registries and search tools that might connect users to them). For example, the bills set forth certain baseline requirements (such as searching the online records of the Copyright Office), but also would have required users to consult the best practices applicable to the work at issue (e.g., practices for finding photographers or filmmakers), which would be developed through the participation of both copyright owners and copyright users and coordinated by the Register of Copyrights.

Congress came very close to adopting a consensus bill shortly before the presidential election in 2008, but did not enact orphan works legislation before adjourning.

---

[3] These changes, as well as other changes in the 1976 Act and in the Berne Convention Implementation Act of 1988, were important steps toward harmonizing U.S. copyright law with international treaties.

[4] Letter of Marybeth Peters, Register of Copyrights, U.S. Copyright Office (Sept. 25, 2008), available at http://www.copyright.gov/orphan/.

[5] See Orphan Works Report at 93–120.

[6] Id. at 108–10.

[7] Id. at 115–21.

[8] Proposed bills included: The Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008), which was passed by the Senate; the Orphan Works Act of 2008, H.R. 5889, 110th Cong. (2008); and the Orphan Works Act of 2006, H.R. 5439, 109th Cong. (2006).

[9] See H.R. 5889, at Section 4(b)(1) (delaying effective date of legislation for pictorial, graphic, and sculptural works until January 2013 or the Copyright Office could confirm the availability of searchable databases); see also S. 2913, at Section 2 (delaying effective date of entire legislation until January 2013 or the Copyright Office could confirm the availability of searchable databases for certain pictorial, graphic, and sculptural works).

ANT_BARTZ_000435656

*C. Ongoing Litigation*

Recent high-profile litigation in the United States raised additional questions and concerns regarding orphan works, particularly in the context of mass digitization. The possibility of mass digitization was not squarely addressed by the parties responding to the Copyright Office in 2005–2006, is not a focus of the Orphan Works Report, and was not addressed by Congress in its proposed legislation. The Report does reflect some limited discussion of the increased risk of institutions that might want to use more than one orphan work in a single project, such as an archive posting multiple historic images to its Web site. This discussion informed and led to the special provisions for noncommercial actors addressed above, but it did not address situations where works might be digitized systematically, including for preservation purposes, or situations where collections of works might be reproduced en masse, including through public-private partnerships. Ultimately, the issues at the heart of mass digitization are policy issues of a different nature: the works may in fact have copyright owners, but it may be too labor-intensive and too expensive to search for them, or it may be factually impossible to draw definitive conclusions about who the copyright owners are or what rights they actually own.

(1) Google Books Search Litigation

In 2004, Google began an ambitious project to scan and digitize millions of books held in several major academic libraries, including many books still protected by copyright. As part of its "Google Books" project, Google provided digital copies of the scanned books to partner libraries and made text of the books available for online searching. Users were permitted to view "snippets" of scanned books that were still protected by copyright and to download full copies of books that were in the public domain. Google did not, however, obtain permission from the relevant copyright owners for the project. In 2005, a group of authors and publishers filed a class action lawsuit in federal district court asserting that the Google Books project amounted to willful copyright infringement.[10]

The parties filed a proposed settlement with the district court on

October 28, 2008. After significant objections from various individual authors, groups, and foreign governments, the parties filed an amended settlement agreement on November 13, 2009. Under the terms of the amended settlement, copyright owners of out-of-print books were required to "opt out" of the settlement or their works could be scanned, digitized, and exploited by Google through a number of new business arrangements. These business arrangements included online access, use of the books in subscription databases, and use of advertisements in connection with these services. The settlement also proposed to establish a "Book Rights Registry" (the "Registry") that would maintain a database of rights holders and administer distribution of revenues from exploitation of the scanned books. Google would provide payments to the Registry on behalf of rights holders and, in turn, the Registry would distribute the funds to registered rights holders. If no rights holder came forward to claim the funds after a certain amount of time, the funds could be used to cover the expense of searching for copyright owners or donated to literary-based charities.[11]

The Department of Justice ("DOJ") filed two statements of interest in the case on behalf of the United States. DOJ acknowledged that "[b]reathing life into millions of works that are now effectively dormant" and increasing public access to those works is a "worthy objective[ ]."[12] At the same time, DOJ expressed concern that the settlement could conflict with core principles of the Copyright Act and also confer a "significant and possibly anticompetitive advantage" on Google.[13]

On March 22, 2011, Judge Chin of the United States District Court for the Southern District of New York rejected the amended settlement agreement filed in the case.[14] The opinion acknowledged that "the benefits of Google's book project are many."[15] The court, however, also expressed concern about the potential reach of the parties' proposal. Ultimately, the court concluded that the proposed settlement would inappropriately implement a

forward-looking business arrangement granting Google significant rights to exploit entire books without permission from copyright owners, while at the same time releasing claims well beyond those presented in the dispute.[16] The court noted that the settlement would give Google—and Google alone—the ability to control the digital commercialization of millions of books as it would require authors and other rights holders of out-of-print books to "opt out" of the settlement by objecting to the reproduction, distribution, and display of their works.

The court rejected the settlement in part because of the settlement's treatment of orphan works. The court expressly deferred to Congress on orphan works-related issues, stating that the "questions of who should be entrusted with guardianship over orphan books, under what terms, and with what safeguards, are matters more appropriately decided by Congress than through an agreement among private, self-interested parties."[17] Citing Supreme Court precedent, the court also affirmed that it is "Congress's responsibility to adapt the copyright laws in response to changes in technology."[18] Finally, the court asserted that the settlement agreement would raise international concerns and thus for that reason as well, "the matter is better left for Congress."[19]

The Second Circuit recently stayed the case pending Google's appeal of class certification. On October 4, 2012, the five major publisher plaintiffs settled with Google. According to public statements about the settlement, the publisher plaintiffs will be permitted to choose whether or not to include digitized books in the Google Books project.[20] Further details of the settlement have not been made public. Notably, the settlement does not appear to require formal court approval because it only resolves the claims of the specific publisher plaintiffs. The settlement does not affect claims made by the Authors Guild or non-parties to the lawsuit. Therefore, the settlement would not address claims over orphan works.

(2) HathiTrust Litigation

On September 12, 2011, the Authors Guild, along with two foreign authors' groups and a number of individual

---

[10] For a discussion of the background of the case, see *Authors Guild, Inc. v. Google Inc.*, 770 F. Supp. 2d 666 (S.D.N.Y. 2011). A group of photographers and illustrators filed a related suit in 2010. *See Am. Soc'y of Media Photographers, Inc. v. Google Inc.*, No. 10–2977 (S.D.N.Y. 2010).

[11] *See Authors Guild, Inc.*, 770 F. Supp. 2d at 670–71.

[12] Statement of Interest of the United States of America Regarding Proposed Amended Settlement Agreement, *Authors Guild, Inc. v. Google, Inc.*, No. 05–8136 (S.D.N.Y Feb. 4, 2010) at 1, *available at* http://www.justice.gov/atr/cases/f255000/255012.pdf.

[13] *Id.* at 2.

[14] *See Authors Guild, Inc.*, 770 F. Supp. 2d 666, 670.

[15] *Id.* at 670.

[16] *Id* at 677.

[17] *Id.*

[18] *Id.*

[19] *Id.* at 678.

[20] *See* Statement of the Ass'n of Am. Publishers, *Publishers and Google Reach Settlement* (Oct. 4, 2012), *available at* http://www.publishers.org/press/85/.

ANT_BARTZ_000435657

authors, sued an online digital repository known as the HathiTrust Digital Library ("HathiTrust") and its five major university partners.[21] The suit challenged HathiTrust's digitization efforts and its plan to digitize and make available orphan works to faculty, students, and library patrons (the "Orphan Works Project"). In addition to its overarching claim of copyright infringement, the complaint alleged, *inter alia,* that the Authors Guild was easily able to locate several of the authors whose works were deemed orphaned and digitized by the HathiTrust. Thus, the Authors Guild argued that the Orphan Works Project was not actually limited to orphan works. The Authors Guild sought an injunction preventing defendants from "making available any so-called orphan work protected by copyright" and impoundment of "all unauthorized digital copies of works protected by copyright."[22] Shortly thereafter, HathiTrust suspended the Orphan Works Project indefinitely.

On July 27, 2012, the parties in *Authors Guild, Inc.* v. *HathiTrust* submitted their final round of briefs connected to their motions for summary judgment.[23] The Authors Guild's motion asked the court to reject the defendants' copyright defenses, including fair use. The Authors Guild also urged the court to issue an injunction against the HathiTrust's suspended Orphan Works Project. The Authors Guild acknowledged in its reply brief that the "issues raised by orphan works * * * are important," but argued that "[b]y scanning the books without authority, Defendants usurp authors' rights to control the digital reproduction of their work and expose them to security risks that previously did not exist."[24]

The HathiTrust and its partner libraries argued in their reply brief that all four factors of a fair use analysis favor the libraries' activities, even in an environment of rapid technological advancement.[25] "Plaintiffs continue to ask this Court to wait for Congress to

legislate," the defendants stated, but "[w]here, as here, Congress has not spoken, courts should 'take the Copyright Act * * * as [they] find it,' rather than close off publicly beneficial uses made possible by a new technology."[26]

On October 10, 2012, the district court ruled in favor of the HathiTrust and its partner libraries on issues relating to digitization, preservation, searching,[27] and access for the print-disabled.[28] The court found that these activities are largely transformative and ultimately protected by fair use, further opining that "the underlying rationale of copyright law is enhanced" by the HathiTrust digital library.[29] The court did not reach the merits of the copyright claims with respect to the Orphan Works Project, however, finding instead that the issue is not ripe for adjudication because the contours of the Orphan Works Project have changed and the defendants have suspended the project.[30]

## D. The Role of the Copyright Office and Private Registries

In October 2011, the Register of Copyrights released a two-year plan of priorities and special projects for the U.S. Copyright Office. The special projects include several technical endeavors designed to update the Office's record systems, which may help users to locate a copyright owner or confirm the suspicion that no such owner exists.

### (1) Historic Copyright Records

One such project is the Office's multiyear effort to digitize the entire inventory of historic copyright records dating back to 1870, many of which are still relevant in determining the copyright status of many works. Since 2008, the Office has digitized more than 22 million of the Office's approximately 60 million historical records. The Office is also engaged in a variety of investigative endeavors, including crowd sourcing, to determine how best to make the records searchable. This task is no small feat because the records are unique and cannot be destroyed or put at risk during the digitization process. Some historical records date back nearly to the civil war. They range from index cards to large documents, and some are written in pencil. Through

this project, the Office has engaged with a number of experts and the public (through meetings, blogs, and crowd sourcing) to evaluate cost-effective approaches to metadata capture, public display, and how best to make the scanned materials publicly available in a meaningful way as soon as possible.

### (2) Upgrades to Copyright Registration and Recordation Systems

Alongside the digitization of the Office's historic records, the Office is also actively pursuing a comprehensive analysis of its electronic registration and recordation systems, not only to enhance the experience for authors and copyright owners, who rely on these services to secure legal rights, but also to develop a plan for improving the nature, accuracy, and searchability of the Office's public databases. The Office is meeting with a diverse range of business and information technology experts to explore appropriate technical upgrades and enhancements, including exploring the feasibility of connecting the Office's database of copyright ownership records with private sector data to facilitate licensing and other productive uses of copyrighted works.

Together, these projects lay the foundation necessary to build and maintain a twenty-first century database of copyright ownership information that will enhance public access to information and improve potential users' ability to investigate the copyright status of works, including the identification and location of copyright owners.

### E. Discussion of Legal Issues in Mass Digitization

Outside of litigation, the issue of mass digitization has been aired largely through the symposia of academic institutions or professional associations (*i.e.,* bar associations).[31] To further the conversations, the Copyright Office published a Preliminary Analysis and Discussion Document (the "Analysis")[32] in October 2011, in which it laid out the issues raised by the intersection between copyright law and the mass digitization of books, including

---

[21] *Authors Guild, Inc.* v. *HathiTrust,* No. 11–6351 (S.D.N.Y. filed Sept. 12, 2011).

[22] First Am. Compl. at page 28, *Authors Guild, Inc.* v. *HathiTrust,* No. 11–6351 (S.D.N.Y 2011).

[23] A third motion, in support of the HathiTrust, was filed by the National Federation of the Blind. *See* Def. Intervenors' Reply in Supp. of Mot. for Summ. J., *Authors Guild, Inc.* v. *HathiTrust,* No. 11–6351 (S.D.N.Y. filed July 27, 2012).

[24] *See* Reply Mem. of Law in Further Supp. of Pls.' Mot. for Summ. J. at 1, 2, *Authors Guild, Inc.* v. *HathiTrust,* No. 11–6351 (July 27, 2012).

[25] *See* Reply Mem. in Supp. of the Libraries' Mot. for Summ. J. on Fair Use and Lack of Infringement Under Section 106 of the Copyright Act, *Authors Guild, Inc.* v. *HathiTrust,* No. 11–6351 (S.D.N.Y. July 27, 2012).

[26] *Id.* at 1 (citations omitted).

[27] The court took care to note that the searching function did not reveal any copyrighted material. *See Authors Guild, Inc.* v. *HathiTrust,* No. 11–CV–6351, 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012).

[28] *See id.*

[29] *Id.* at *14.

[30] *Id.* at *7–8.

[31] For example, the Berkeley Center for Law and Technology hosted a symposium entitled Orphan Works and Mass Digitization in April 2012. Additionally, the Kernochan Center for Law, Media and the Arts at Columbia Law School, in cooperation with the Copyright Office, will present a public symposium on November 2, 2012, which will include discussions of mass digitization in the context of Section 108.

[32] United States Copyright Office, Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document (2011), *available at http://www.copyright.gov/docs/massdigitization/USCOMassDigitization_October2011.pdf.*

ANT_BARTZ_000435658

  
some of the issues raised by the Google Books and HathiTrust cases. The Office identified a number of key legal and policy questions to explore when assessing mass digitization, including the objectives and public policy goals of mass digitization projects, the interplay among library exceptions, fair use, and licensing, and the ability of public and private actors to work together.

In the Analysis, the Office observed that under current law the issues of mass digitization and orphan works cannot reasonably be separated from the issue of licensing because the premise of an orphan works situation is that a good faith user has tried to, or would like to, locate the copyright owner but cannot. The Office described existing licensing options (direct licensing and voluntary collective licensing), as well as two licensing models (extended collective licensing and statutory licensing) that might operate as potential if not partial solutions for the orphan works problem, particularly in the mass digitization context.[33]

The Office noted that while the United States has not adopted extended collective licensing, these regimes exist in a number of Nordic countries.[34] Typically, this model operates something like a class action settlement, in the sense that representatives of copyright owners and representatives of users negotiate terms that are binding on all members of the group by operation of law (e.g., all textbook publishers), unless a particular copyright owner opts out. The government or a trusted designee administers payments. It is not quite compulsory licensing in that the parties (rather than the government) negotiate the rates, but it requires a legislative framework and often involves some degree of government oversight. Finally, the Office discussed the potential use of statutory licenses created by Congress. Statutory licenses provide users with access to certain types of works, under certain circumstances, in exchange for a statutorily or administratively set fee. The Office has traditionally viewed statutory licenses as a mechanism of last resort that must be narrowly tailored to

address a specific failure in a specifically defined market.

*F. International Developments*

Foreign countries are also renewing their focus on the orphan works problem. The European Union and various other countries have recently proposed or adopted a number of legislative approaches to the orphan works issue.

(1) Recent and Proposed Legislation

Like the United States, the European Union has been grappling with the issue of orphan works for many years. In 2011, the European Commission issued a draft proposal for an orphan works directive along with a working paper entitled "Impact Assessment on the Cross Border Online Access to Orphan Works."[35] The Commission acknowledged the difficulties caused by orphan works and noted that a solution in the European Union was particularly urgent to avoid a "knowledge gap" with the United States if the then-pending Google Books Settlement was approved. The Commission identified several policy options for handling orphan works and assessed the economic and social impacts of each. Among the policy options the Commission considered was a statutory exception, extended collective licensing, and a specific orphan works license.

The European Council formally approved the proposed orphan works directive ("Directive") on October 4, 2012.[36] The Directive requires Member States to establish an exception and limitation to the rights of reproduction and "making available" for certain permitted uses of orphan works. The Directive excludes photographs unless embedded in other works, and limits the use of orphan works to "libraries, educational establishments or museums * * * archives, film or audio heritage institutions and public service broadcasting organizations" that are located in Member States and that have public service missions.[37] A public

organization that falls under the Directive may partner with a private organization and "generate revenues in relation to their use of orphan works" if that use is consistent with the public organization's mission.[38] The private partner, however, will not be permitted to use the works directly. The Directive requires a diligent search and provides that once a work is deemed orphaned in one Member State, it is deemed orphan in all Member States and "may be used and accessed" in all Member States. The Directive also calls for a single registry to maintain data on all works deemed orphan. A rights holder who later resurfaces may reclaim ownership of a work once deemed orphan and claim fair compensation for the use of the work as provided by individual Member States' laws. Member States have two years to implement the Directive in national legislation.

The European Commission also recently assisted private parties in negotiating a Memorandum of Understanding ("Memorandum") to encourage voluntary collective licensing for "out-of-commerce" books and journals.[39] "Out-of-commerce" works are works that are no longer commercially available because authors and publishers have chosen not to publish new editions or sell copies through the customary channels of commerce. The Memorandum expresses several principles that libraries, publishers, authors, and their collecting societies should follow in order to license the digitization and making available of books or journals that are out-of-commerce. The European Commission views the Memorandum as complimentary to its legislative proposals for orphan works, and part of a two-pronged approach to facilitate the development of digital libraries in Europe.

Additionally, the United Kingdom issued proposed legislation[40] in 2012 that would amend the Copyright, Designs and Patents Act of 1988 to permit the commercial and non-commercial use of orphan works under a licensing scheme that would include both individual licensing of orphan works as well as a form of voluntary

---

[33] In the context of voluntary collective licensing of books, the most experienced organization is the Copyright Clearance Center ("CCC"). The CCC was started by publishers in the age of photocopying and has since evolved to handle certain kinds of digital licenses. Voluntary collective licensing, however, does not provide solutions for orphan works where the authors are unknown and have not joined the collecting society.

[34] See Analysis at App. F (listing countries that follow this approach and providing an overview of the laws).

[35] European Commission, Commission Staff Working Paper Impact Assessment on the Cross-Border Online Access to Orphan Works Accompanying the Proposal for a Directive of the European Parliament and of the Council on Certain Permitted Uses of Orphan Works, COM (2011) 289 final (May 24, 2011), *available at http:// ec.europa.eu/governance/impact/ia_carried_out/ docs/ia_2011/sec_2011_0615_en.pdf.*

[36] The European Council's approval marked the last step in the legislative process. *See* Press Release, Council of the European Union, Intellectual Property: New EU Rules for Orphan Works (Oct. 4, 2012), *available at http:// www.consilium.europa.eu/uedocs/cms_data/docs/ pressdata/en/intm/132721.pdf.*

[37] *See Directive of the European Parliament and of the Council on Certain Permitted Uses of Orphan*

---

*Works,* Art. 1(1), *available at http:// register.consilium.europa.eu/pdf/en/12/pe00/ pe00036.en12.pdf.*

[38] *Id.* at p. 13, ¶ 21.

[39] Memorandum of Understanding, *Key Principles of the Digitsation and Making Available of Out-of-Commerce Works* (Sept. 20, 2011), *available at http://ec.europa.eu/internal_market/copyright/ docs/copyright-infso/20110920-mou_en.pdf.*

[40] Enterprise and Regulatory Reform Bill, 2012–13, (HC Bill 61), cl. 59, *available at http:// www.publications.parliament.uk/pa/bills/cbill/ 2012-;2013/0061/cbill_2012-20130061_en_1.htm.*

ANT_BARTZ_000435659

extended collective licensing. The scheme would require a diligent search, the results of which would be verified by "an independent authorising body." [41] The proposal would also establish an orphan works registry and, if the name of the rights holder is unknown (and therefore cannot be credited), any licensed use of the work would have to include a notice that refers back to the registry. [42] The potential scheme is described as one in which rights holders will always reserve the right to opt out. [43]

(2) Existing Laws

Several countries already have adopted forms of orphan works solutions in national law. The Canadian Copyright Act (Section 77) permits users to file applications with the Copyright Board of Canada for the use of certain types of orphan works on a case-by-case basis. If an applicant demonstrates that it made a reasonable effort to locate the rights holder and the rights holder cannot be located, the Board will approve the request and issue a conditional non-exclusive license. [44] Pursuant to the Canada Copyright Act, the Copyright Board may issue licenses permitting uses including reproduction, publication, performance, and distribution. In June 2012, Canada passed amendments to its Copyright Bill that included an expansion of the exception for nonprofit organizations acting for the benefit of persons with perceptual disabilities to cover cross-border exchanges of orphan works that have been translated into a print disabled format. [45] The 2006 Orphan Works Report identified some of the Canadian system's burdens, and several studies have noted that it is rarely used. [46]

France passed a law in February 2012 that would make it easier to digitize twentieth century out-of-commerce books, implicating books published in France before January 1, 2001, which

are not currently being commercially distributed or published either in print or digital formats. [47] The scheme is conducted on an opt-out basis and, if an author chooses not to exploit the work within six months of the inscription of the book into the register managed by the French National Library, the digital rights are transferred to a designated collective management organization. [48] If the copyright holder fails to claim rights to works that have been transferred to a designated collective management organization after ten years, libraries and archives will be allowed, with some exceptions, to digitize and provide access to the digitized works free of charge so long as the institution does not pursue a commercial or economic advantage. [49]

Hungary amended its Copyright Act in 2009 to permit the use of orphan works under certain circumstances. Under the amended Act, the Hungarian Patent Office has the right to grant licenses for certain uses of orphan works to applicants who carry out a documented diligent search and pay compensation for such use. [50] These licenses are limited to the territory of Hungary. Japan, Korea, and India have adopted either compulsory or government licensing for some orphan works. [51]

Denmark and Finland both adopted extended collective licensing regimes, which allow collective licensing

organizations to license numerous works within a specific field of use, including works owned by rights holders who are not members of the organization and orphan works. [52]

## II. Subject of Inquiry

The Copyright Office seeks comments regarding the current state of play for orphan works, including what has changed in the legal and business environments that might be relevant to a resolution of the problem and what additional legislative, regulatory, or voluntary solutions deserve deliberation at this time. The Office has posed two questions below. In responding to these questions, a party may wish to discuss a number of relevant topics, including for example: The merits of limiting remedies; the interplay between orphan works and fair use, section 108, section 121, or other exceptions and limitations; the role of licensing; the types of orphan works that should be implicated; the types of users who should benefit; the practical or legal hurdles to forming or utilizing registries; international implications; and the relative importance of the Register's plans to improve the quality and searchability of Copyright Office records. The Office requests that responding parties separately address each of the questions for which a response is submitted and provide as much specificity as possible.

*1. Orphan Works on an Occasional or Case-by-Case Basis*

With respect to the occasional or isolated use of an orphan work, how has the legal landscape or legal thinking evolved in the past four years? The 2008 proposed legislation included several key components: (a) A good faith, reasonably diligent search for the copyright owner; (b) attribution to the author and copyright owner, if possible and appropriate under the circumstances; and (c) a limitation on remedies that would be equitable if the user proves that he or she conducted a reasonably diligent search. Good faith users were expected to consult the Copyright Office Web site for practices proffered by copyright owners and users alike under the direction and coordination of the Register of Copyrights. The legislation included special provisions for certain noncommercial actors using orphan works in a noncommercial manner, as a further attempt to reduce liability for those perceived to be most risk-averse under current law. Moreover, the

---

[41] *See Government Policy Statement: Consultation on Modernising Copyright*, at 7 (July 2012), *available at http://www.ipo.gov.uk/response-2011-copyright.pdf.*

[42] *Id.* at 8.

[43] *See id.* at 10; *see also* The BIS Blog, *Copyright Reform: Orphan Works and Extended Collective Licensing*, Aug. 14, 2012, *available at http://blogs.bis.gov.uk/blog/2012/08/14/copyright-reform-orphan-works-and-extended-collective-licensing* ("The Government's proposals for ECL are not compulsory nor can they be imposed on a sector. It would be up to a collecting society to apply to use the system and every rights holder would retain the capacity to opt out.").

[44] Copyright Act, R.S.C., c. C–42, s. 77 (1985) (Can.), *available at http://laws.justice.gc.ca/PDF/C-42.pdf.*

[45] *Id.* at s. 32.

[46] Orphan Works Report at 82–83.

[47] *See Loi n° 2012–287 du 1er mars 2012 relative à l'exploitation numérique des livres indisponibles du xxe siècle* [Law Number 2012–287 of March 1, 2012, on the Digital Exploitation of Unavailable Books] Art. 134–1 (2012) (Fr.) ["Law 2012–287"], *available at http://www.legifrance.gouv.fr/affichTexte.do;jsessionid=4D8B77A47AA211DE6E336FD22AA18F60.tpdjo09v_2?cidTexte=JORFTEXT000025422700&dateTexte=20121016; see also* International Federation of Reproduction Rights Organisations, French Parliament Passed Law on Out of Commerce Works on 22nd February 2012, (March 3, 2012), *available at http://www.ifrro.org/content/french-parliament-passed-law-out-commerce-works-22nd-february-2012.*

[48] *See* Law Number 2012–287, Art. 134–4.

[49] *See id.*, Art. 134–8.

[50] *See* Government Regulation on the Detailed Rules Related to the Licensing of Certain Use of Orphan Works, Arts. 2(1), 2(2), 3, Decree 100/2009, V. 8 (Hun.), *available at http://www.hipo.gov.hu/English/jogforras/100_2009.pdf; see also* Mihály Ficsor, *How to Deal with Orphan Works in the Digital World? An Introduction to the New Hungarian Legislation on Orphan Works* (European Parliament Committee on Legal Affairs, eds. 2009), *available at http://www.europarl.europa.eu/RegData/etudes/divers/juri/2009/419607/IPOL-JURI_DV(2009)419607_EN.pdf.*

[51] *See* Chosakuken-Ho [Copyright Law], Law No. 48 of 1970, 2009, art. 67, 74 (Japan), *unofficial translation available at http://www.cric.or.jp/cric_e/clj/clj.html); see also* Copyright Act of Korea, No. 9785 (2009) (S. Kor.); Copyright (Amendment) Act, 2012, at para. 17 (2012) (India), *available at http://copyright.gov.in/Documents/CRACT_AMNDMNT_2012.pdf.*

[52] *See* Consolidated Act on Copyright 2010, No. 202, Art. 50–51 (2010) (Den.); *see also* Copyright Act, No. 404, §§ 13–14 (2010) (Fin.).

ANT_BARTZ_000435660

legislation would have applied to all kinds of copyrighted works, published or unpublished, from photographs to manuscripts to music and books. Please comment on the continued viability of the above framework in the case of occasional uses of orphan works. If there are other possible approaches, including approaches that might best be described as interim approaches, please explain the benefits and supporting legal authority in sufficient detail.

*2. Orphan Works in the Context of Mass Digitization*

The Office's Orphan Works Report did not analyze the issue of mass digitization in detail, and the subsequent 2008 proposed legislation did not squarely address the possibility of systematic or en masse copying, display, or distribution. Please comment on potential orphan works solutions in the context of mass digitization. How should mass digitization be defined, what are the goals and what, therefore, is an appropriate legal framework that is fair to authors and copyright owners as well as good faith users? What other possible solutions for mass digitization projects should be considered?

If there are any pertinent issues not discussed above, the Office encourages interested parties to raise those matters in their comments. In addition, the Office is considering and hereby provides notice that it may convene one or more roundtables or formal hearings on the matters raised above in 2013. The Office may also publish one or more additional Notices of Inquiry.

Dated: October 17, 2012.

**Maria A. Pallante,**

*Register of Copyrights.*

[FR Doc. 2012–25932 Filed 10–19–12; 8:45 am]

**BILLING CODE 1410–30–P**

---

## NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

**[Notice 12–083]**

### NASA Advisory Council; Technology and Innovation Committee; Meeting

**AGENCY:** National Aeronautics and Space Administration.

**ACTION:** Notice of meeting.

**SUMMARY:** The National Aeronautics and Space Administration (NASA) announces a meeting of the Technology and Innovation Committee of the NASA Advisory Council (NAC). The meeting will be held for the purpose of reviewing status of the Space Technology programs; status of activities within the Office of the Chief

Technologist; update on the Advance Exploration Systems program: status of the Hypersonic Inflatable Aerodynamic Decelerator project; status of the Space Technology Research Grants program; and a Mars Science Laboratory update.

**DATES:** Thursday, November 15, 2012, 8:00 a.m. to 4:00 p.m., Local Time.

**ADDRESSES:** NASA Headquarters, 300 E Street SW., Room 2E39, Washington, DC 20546.

**FOR FURTHER INFORMATION CONTACT:** Mr. Mike Green, Office of the Chief Technologist, NASA Headquarters, Washington, DC 20546, (202) 358–4710, fax (202) 358–4078, or *g.m.green@nasa.gov*.

**SUPPLEMENTARY INFORMATION:** The meeting will be open to the public up to the capacity of the room. This meeting is also available telephonically and by WebEx. Any interested person may call the USA toll free conference call number 866–804–6184, pass code 3472886, to participate in this meeting by telephone. The WebEx link is *https://nasa.webex.com/*, the meeting number is 996 249 510, and the password is TICmte@1115.

The agenda for the meeting includes the following topics:

—Office of the Chief Technologist Update
—Status of NASA's Space Technology program
—Briefing and overview of NASA's Advanced Exploration Systems program
—Update on Mars Science Laboratory and role of technology in mission
—Update on Space Technology Research Grants program
—Status of the Hypersonic Inflatable Aerodynamic Decelerator project

It is imperative that the meeting be held on these dates to accommodate the scheduling priorities of the key participants. Attendees will be requested to sign a register and to comply with NASA security requirements, including the presentation of a valid picture ID, before receiving an access badge. U.S. Citizens will need to show a valid, officially-issued picture identification such as a driver's license to enter the NASA Headquarters building (West Lobby—Visitor Control Center) and must state that they are attending the NAC Technology and Innovation Committee meeting in room 2E39 before receiving an access badge. Permanent Residents will need to show residency status (valid green card) and a valid, officially issued picture identification such as a driver's license and must state that they are attending the NAC Technology and

Innovation Committee meeting in Room 2E39 before receiving an access badge. U.S. Citizens and Permanent Residents are requested to submit their names and affiliation 5 working days prior to the meeting to Ms. Anyah Dembling via email at *anyah.b.dembling@nasa.gov* or by telephone at (202) 358–5195. Foreign Nationals must provide to NASA the following information: Full name; gender; date/place of birth; citizenship; social security number; green card information (resident alien number, expiration date); visa information (number, type, expiration date); passport information (number, country of issue, expiration date); employer/ affiliation information (name of institution, title/position, address, country of employer, telephone, email address); and the title/position of attendee no less than 8 working days prior to the meeting by contacting Ms. Anyah Dembling via email at *anyah.b.dembling@nasa.gov* or by telephone at (202) 358–5195.

**Patricia D. Rausch,**

*Advisory Committee Management Officer, National Aeronautics and Space Administration.*

[FR Doc. 2012–25926 Filed 10–19–12; 8:45 am]

**BILLING CODE 7510–13–P**

---

## NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES

### President's Committee on the Arts and the Humanities: Meeting #68

**AGENCY:** National Endowment for the Arts, National Foundation on the Arts and Humanities.

**ACTION:** Notice of Meeting.

**SUMMARY:** Pursuant to section 10 (a)(2) of the Federal Advisory Committee Act (Pub. L. 92–463), as amended, notice is hereby given that a meeting of the President's Committee on the Arts and the Humanities (PCAH) will be held in the Crystal Room, The Willard Intercontinental, 1401 Pennsylvania Avenue NW, Washington, DC 20004. Ending time is approximate.

**DATES:** November 18, 2012 from 4:00 p.m. to 6:00 p.m.

**FOR FURTHER INFORMATION CONTACT:** Lindsey Clark of the President's Committee at (202) 682–5409 or *lclark@pcah.gov*.

**SUPPLEMENTARY INFORMATION:** The meeting, on Sunday, November 18th, will begin with welcome, introductions, and announcements. Updates and discussion on recent programs and activities will follow. The meeting also will include a review of PCAH ongoing

*Affected Public:* Individuals or Households and Private Sector—businesses or other for-profits.

*Total Estimated Number of Respondents:* 53,323.

*Total Estimated Number of Responses:* 53,323.

*Total Estimated Annual Burden Hours:* 11,440.

*Total Estimated Annual Other Costs Burden:* $0.

Dated: November 26, 2012.

**Michel Smyth,**

*Departmental Clearance Officer.*

[FR Doc. 2012–29058 Filed 11–29–12; 8:45 a.m.]

**BILLING CODE 4510–FT–P**

---

## LIBRARY OF CONGRESS

### Copyright Office

**[Docket No. 2012–10]**

### Extension of Comment Period: Orphan Works and Mass Digitization

**AGENCY:** Copyright Office, Library of Congress.

**ACTION:** Extension of comment period.

**SUMMARY:** The Copyright Office is extending the period of public comment in response to its October 22, 2012 Notice of Inquiry requesting comments on issues relating to orphan works and mass digitization under U.S. copyright law.

**DATES:** Comments are due by 5:00 p.m. EST on February 4, 2013. Reply comments are due by 5:00 p.m. EST on March 6, 2013.

**ADDRESSES:** All comments and reply comments shall be submitted electronically. A comment page containing a comment form is posted on the Office Web site at *http://www.copyright.gov/orphan/*. The Web site interface requires commenting parties to complete a form specifying name and organization, as applicable, and to upload comments as an attachment via a browser button. To meet accessibility standards, commenting parties must upload comments in a single file not to exceed six megabytes (MB) in one of the following formats: The Adobe Portable Document File (PDF) format that contains searchable, accessible text (not an image); Microsoft Word; WordPerfect; Rich Text Format (RTF); or ASCII text file format (not a scanned document). The form and face of the comments must include both the name of the submitter and organization. The Office will post the comments publicly on the Office's Web site exactly as they

are received, along with names and organizations. If electronic submission of comments is not feasible, please contact the Office at 202–707–8350 for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Karyn Temple Claggett, Senior Counsel, Office of Policy and International Affairs, by email at *kacl@loc.gov;* or Catherine Rowland, Senior Counsel, Office of Policy and International Affairs, by email at *crowland@loc.gov;* or contact the Copyright Office by telephone, at 202–707–8350.

**SUPPLEMENTARY INFORMATION:** On October 22, 2012, the Copyright Office published a Notice of Inquiry inviting public comments on issues relating to orphan works and mass digitization under U.S. copyright law. Due to the number and complexity of the issues raised in that Notice, it appears that some stakeholders may need additional time to respond. In order to facilitate full and adequate public comment, the Office hereby extends the time for filing comments to 5:00 p.m. EST on February 4, 2013. The due date for filing reply comments is extended to 5:00 p.m. EST on March 6, 2013.

Dated: November 27, 2012.

**Maria A. Pallante,**

*Register of Copyrights.*

[FR Doc. 2012–29023 Filed 11–29–12; 8:45 am]

**BILLING CODE 1410–30–P**

---

## NATIONAL LABOR RELATIONS BOARD

### Sunshine Act Meetings: December 2012

**TIME AND DATES:**

All meetings are held at 2:30 p.m.

Tuesday, December 4;
Wednesday, December 5;
Thursday, December 6;
Tuesday, December 11;
Wednesday, December 12;
Thursday, December 13;
Tuesday, December 18;
Wednesday, December 19;
Thursday, December 20;
Wednesday, December 26;
Thursday, December 27.

**PLACE:** Board Agenda Room, No. 11820, 1099 14th St., NW., Washington, DC 20570.

**STATUS:** Closed.

**MATTERS TO BE CONSIDERED:** Pursuant to § 102.139(a) of the Board's Rules and Regulations, the Board or a panel thereof will consider "the issuance of a subpoena, the Board's participation in a civil action or proceeding or an arbitration, or the initiation, conduct, or

disposition * * * of particular representation or unfair labor practice proceedings under section 8, 9, or 10 of the [National Labor Relations] Act, or any court proceedings collateral or ancillary thereto." See also 5 U.S.C. 552b(c)(10).

**CONTACT PERSON FOR MORE INFORMATION:** Lester A. Heltzer, Executive Secretary, (202) 273–1067.

Dated: November 28, 2012.

**Lester A. Heltzer,**

*Executive Secretary.*

[FR Doc. 2012–29120 Filed 11–28–12; 4:15 pm]

**BILLING CODE 7545–01–P**

---

## NATIONAL SCIENCE FOUNDATION

### Proposal Review; Notice of Meetings

In accordance with the Federal Advisory Committee Act (Pub. L. 92–463, as amended), the National Science Foundation (NSF) announces its intent to hold proposal review meetings throughout the year. The purpose of these meetings is to provide advice and recommendations concerning proposals submitted to the NSF for financial support. The agenda for each of these meetings is to review and evaluate proposals as part of the selection process for awards. The review and evaluation may also include assessment of the progress of awarded proposals. The majority of these meetings will take place at NSF, 4201 Wilson Blvd., Arlington, Virginia 22230.

These meetings will be closed to the public. The proposals being reviewed include information of a proprietary or confidential nature, including technical information; financial data, such as salaries; and personal information concerning individuals associated with the proposals. These matters are exempt under 5 U.S.C. 552b(c), (4) and (6) of the Government in the Sunshine Act. NSF will continue to review the agenda and merits of each meeting for overall compliance of the Federal Advisory Committee Act.

These closed proposal review meetings will not be announced on an individual basis in the **Federal Register**. NSF intends to publish a notice similar to this on a quarterly basis. For an advance listing of the closed proposal review meetings that include the names of the proposal review panel and the time, date, place, and any information on changes, corrections, or cancellations, please visit the NSF Web site: *http://www.nsf.gov/events/*. This information may also be requested by telephoning, 703/292–8182.

ANT_BARTZ_000435662

electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

*Agency:* DOL–OS.

*Title of Collection:* National Longitudinal Study of Unemployment Insurance Recipients.

*OMB ICR Reference Number:* 121308–0190–001.

*Affected Public:* Individuals or Households.

*Total Estimated Number of Respondents:* 2,178.

*Total Estimated Number of Responses:* 5,695.

*Total Estimated Annual Time Burden:* 2,373 hours.

*Total Estimated Annual Other Costs Burden:* $0.

Dated: February 4, 2014.

**Michel Smyth,**

*Departmental Clearance Officer.*

[FR Doc. 2014–02821 Filed 2–7–14; 8:45 a.m.]

**BILLING CODE 4510–23–P**

---

## LEGAL SERVICES CORPORATION

### Notice and Request for Comments: LSC Merger of Service Areas in Louisiana

**AGENCY:** Legal Services Corporation.

**ACTION:** Notice and Request for Comments—LSC merger of the two service areas covering the south-central and southeastern region of Louisiana.

**SUMMARY:** The Legal Services Corporation (LSC) intends to merge the two service areas that cover the twelve counties of the south-central region of Louisiana (including Baton Rouge) and the ten counties of the southeastern region of the state (including New Orleans). Grants for these individual service areas have been awarded to Southeast Louisiana Legal Services Corporation (SLLSC) since 2011. For 2014, LSC awarded SLLSC three-year grants for these two service areas. LSC intends to merge the two service areas into one service area and to award one grant for the new combined service area. Doing so will harmonize the grant structure with the current delivery model.

**DATES:** All comments must be received on or before the close of business on March 12, 2014.

**ADDRESSES:** Written comments may be submitted to LSC by email to *competition@lsc.gov* (this is the preferred option); by submitting a form online at *http://www.lsc.gov/contact-us;* by mail to Legal Services Corporation,

3333 K Street NW., Third Floor, Washington, DC 20007, Attention: Reginald Haley; or by fax to 202–337–6813.

**FOR FURTHER INFORMATION CONTACT:** Reginald J. Haley, Office of Program Performance, Legal Services Corporation, 3333 K Street NW., Washington, DC 20007; or by email at *haleyr@lsc.gov.*

**SUPPLEMENTARY INFORMATION:** The mission of LSC is to promote equal access to justice and to provide funding for high-quality civil legal assistance to low-income persons. Pursuant to its statutory authority, LSC designates service areas in U.S. states, territories, possessions, and the District of Columbia for which it provides grants to legal aid programs to provide free civil legal services.

The LSC Act charges LSC with ensuring that "grants and contracts are made so as to provide the most economical and effective delivery of legal assistance to persons in both urban and rural areas." 42 U.S.C. 2996f(a)(3). Merging the two Louisiana service areas will provide an economical and effective delivery approach for serving the legal needs of the low-income population and will harmonize the grant structure with the current delivery model.

LSC provides grants through a competitive bidding process, which is regulated by 45 CFR Part 1634. In 2013, LSC implemented a competitive grants process for 2014 calendar year funding that included, inter alia, these Louisiana service areas. For 2014, LSC awarded SLLSC three-year grants for both of these service areas. LSC intends to merge the two service areas into a single service area and merge the 2014 grants for those service areas into a single grant beginning March 21, 2014.

LSC invites public comment on this decision. Interested parties may submit comments to LSC no later than the close of business on March 12, 2014. More information about LSC can be found at: *http://www.lsc.gov.*

Dated: February 5, 2014.

**Atitaya C. Rok,**

*Staff Attorney.*

[FR Doc. 2014–02810 Filed 2–7–14; 8:45 am]

**BILLING CODE 7050–01–P**

---

## LIBRARY OF CONGRESS

### U.S. Copyright Office

[Docket No. 2012–12]

### Orphan Works and Mass Digitization; Request for Additional Comments and Announcement of Public Roundtables

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of Inquiry.

**SUMMARY:** The U.S. Copyright Office will host public roundtable discussions and seeks further comments on potential legislative solutions for orphan works and mass digitization under U.S. copyright law. The meetings and comments will provide an opportunity for interested parties to address new legal developments as well as issues raised by comments provided in response to the Office's previous Notice of Inquiry.

**DATES:** The public roundtables will be held on March 10, 2014 from 9:00 a.m. to 5:00 p.m. EST and March 11, 2014 from 9:00 a.m. to 5:00 p.m. EST. Written comments must be received no later than 5 p.m. EST on April 14, 2014.

ADDRESSES:

**Public Roundtables**

The public roundtables will take place in the Copyright Office Hearing Room, LM—408 of the Madison Building of the Library of Congress, 101 Independence Avenue SE., Washington, DC 20559. The Copyright Office strongly prefers that requests for participation be submitted electronically. The agendas and the process for submitting requests to participate in or observe one of these meetings are included on the Copyright Office Web site. If electronic registration is not feasible, please contact the Office at 202–707–1027.

**Public Comments**

Members of the public will have the opportunity to submit written comments following the public roundtable meetings. The written comments may address topics listed in this Notice of Inquiry as well as respond to any issues raised during the public meetings. All written comments should be submitted electronically. A comment form will be posted on the Copyright Office Web site at *http://copyright.gov/ orphan/* no later than March 12, 2014. The Web site interface requires commenting parties to complete a form specifying name and organization, as applicable, and to upload comments as an attachment via a browser button. To meet accessibility standards, commenting parties must upload

ANT_BARTZ_000435663

**Federal Register** / Vol. 79, No. 27 / Monday, February 10, 2014 / Notices      **7707**

comments in a single file not to exceed six megabytes (MB) in one of the following formats: the Adobe Portable Document File (PDF) format that contains searchable, accessible text (not an image); Microsoft Word; WordPerfect; Rich Text Format (RTF); or ASCII text file (not a scanned document). The form and face of the comments must include both the name of the submitter and organization. The Office will post the comments publicly on the Office's Web site exactly as they are received, along with names and organizations. If electronic submission of comments is not feasible, please contact the Office at 202–707–1027 for special instructions.

**FOR FURTHER INFORMATION CONTACT:**
Karyn Temple Claggett, Associate Register of Copyrights and Director of Policy and International Affairs, by telephone at 202–707–1027 or by email at *kacl@loc.gov*, or Catherine Rowland, Senior Counsel for Policy and International Affairs, by telephone at 202–707–1027 or by email at *crowland@loc.gov*.

**SUPPLEMENTARY INFORMATION:**
*Background:* The Copyright Office is reviewing the issue of orphan works[1] under U.S. copyright law in continuation of its previous work on the subject and to advise Congress on potential legislative solutions. As part of its current review, the Office is considering recent developments in the legal and business environments regarding orphan works in the context of: (1) occasional or isolated uses of orphan works; and (2) mass digitization. In October 2011, the Office published a Preliminary Analysis and Discussion document (the "Analysis") that examined various legal issues involved in mass digitization projects.[2]

Subsequently, to assist with further review of the issue, the Office published a general Notice of Inquiry (the "Notice") seeking comments from the public on both mass digitization and isolated uses of orphan works.[3] The Notice provided background on the Office's previous review of this issue in its January 2006 *Report on Orphan*

*Works* (the "2006 Report"),[4] legislation proposed in 2006 and 2008,[5] the Google Books Search and Hathitrust litigation,[6] the role of the Office and private registries in alleviating the orphan works problem, legal issues in mass digitization, and recent international developments. In 2013, the Office received ninety-one initial comments from various interested parties and eighty-nine reply comments. The Notice, comments, and background materials are available at the Copyright Office Web site. The Office now announces public roundtables and seeks further public comments to discuss new legal developments as well as specific issues raised by earlier public comments as it considers potential legislative recommendations.

*Subjects of Comments and Public Roundtables:* After reviewing the comments in response to the Copyright Office's prior Notice, the Office is interested in holding public roundtables to further explore the issues surrounding orphan works and mass digitization. The Office will hold the public roundtable discussions over the course of two days. The first day will cover the following topics: (1) The need for legislation in light of recent legal and technological developments; (2) defining a good faith "reasonably diligent search" standard; (3) the role of private and public registries; (4) the types of works subject to any orphan works legislation, including issues related specifically to photographs; and (5) the types of users and uses subject to any orphan works legislation. The second day will include discussions of the following topics: (1) Remedies and procedures regarding orphan works; (2) mass digitization, generally; (3) extended collective licensing and mass digitization; and (4) the structure and mechanics of a possible extended collective licensing system in the United States. Each of these topics is explained in more detail below.

Additionally, the Office invites further written comments regarding the subjects briefly identified above and further explained below, including from parties who did not previously address those subjects, or those who wish to amplify or clarify their earlier comments or respond to issues raised in the public

roundtable meetings. A party choosing to respond to this Notice of Inquiry need not address every subject below, but the Office requests that responding parties clearly identify and separately address each subject for which a response is submitted. Commenters may address any or all of the issues identified below, as well as provide information on other aspects of these issues that are relevant to developing potential legislative solutions to the issues of orphan works and mass digitization.

*Day One*

Session 1: The Need for Legislation in Light of Recent Legal and Technological Developments

The Office's 2006 Report concluded that the orphan works problem was pervasive and provided draft legislative language for congressional consideration. Though several bills were introduced in 2006 and 2008,[7] none of them ultimately were enacted. Since then, high-profile litigation in the United States brought the issue of orphan works back to the fore. In rejecting the proposed settlement agreement in *The Authors Guild, Inc.* v. *Google Inc.* in 2011, the Southern District Court of New York explicitly noted that it is Congress, and not the courts, who should decide how to resolve the issue of orphan works.[8] Recently, the same district court granted summary judgment to Google on copyright infringement claims relating to the Google Books Library Project, concluding that "Google Books provides significant public benefits," and that its book scanning project constitutes fair use under U.S. copyright law.[9] While the court's ruling did find the Google Books mass digitization project to be fair use, it neither indicated how broadly the opinion could be used to justify other types of mass digitization projects nor did it explicitly address the issue of orphan works.

Similarly, on October 10, 2012, the Southern District of New York also

---

[1] "An 'orphan work' is an original work of authorship for which a good faith, prospective user cannot readily identify and/or locate the copyright owner(s) in a situation where permission from the copyright owner(s) is necessary as a matter of law." Copyright Office Notice of Inquiry, Orphan Works and Mass Digitization, 77 FR 64555 (Oct. 22, 2012), *available at http://www.copyright.gov/fedreg/2012/77fr64555.pdf*.

[2] U.S. Copyright Office, Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document (2011), *available at http://www.copyright.gov/docs/massdigitization/USCOMassDigitization_October2011.pdf*.

[3] Notice, 77 FR 64555–61.

[4] U.S. Copyright Office, Report on Orphan Works (2006), *available at http://www.copyright.gov/orphan/orphan-report-full.pdf*.

[5] Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008); Orphan Works Act of 2008, H.R. 5889, 110th Cong. (2008); Orphan Works Act of 2006, H.R. 5439, 109th Cong. (2006).

[6] *Authors Guild, Inc.* v. *HathiTrust*, 902 F. Supp. 2d 445 (S.D.N.Y. 2012); *Authors Guild, Inc.* v. *Google Inc.*, 770 F. Supp. 2d 666 (S.D.N.Y. 2011) ("*Google I*").

[7] *See supra* note 5.

[8] *Google I*, 770 F. Supp. 2d at 678. "Google Books" is the larger project that includes the Google Books Library Project and the Google Books Partner Project (formerly "Google Print"). Google commenced its book scanning project (then referred to as "Google Print Library Project") in 2004. In September 2005, the Authors Guild of America and five publisher members of the Association of American Publishers ("AAP") sued Google for copyright infringement. The Google Books Partner Project was created when Google and the publishers announced a settlement agreement in October 2012. References to "Google Books" or the "Google Books case" relate to litigation surrounding the Library Project.

[9] *Authors Guild, Inc.* v. *Google Inc.*, Case No. 05 Civ. 8136 (DC), 2013 WL 6017130, *26 (S.D.N.Y Nov. 14, 2013) ("*Google II*").

ANT_BARTZ_000435664

ruled that the digitization project undertaken by the HathiTrust Digital Library ("HathiTrust") and its five university partners was largely transformative and protected by fair use.[10] The court, however, did not consider the copyright claims relating to the HathiTrust Orphan Works Project, finding that the issue was not ripe for adjudication because the defendants had suspended the project shortly after the complaint was filed.[11]

In addition to these legal developments, technology has significantly progressed since Congress last considered the orphan works issue. Since 2008, technological developments have arguably mitigated the orphan works problem via vastly improved search tools and database technology. Improved search engine technology allows users to locate rights holders (and vice versa) via image, sound, or video searches. Improved databases, such as the PLUS Registry,[12] and database interoperability allow copyright rights holders to better publicize ownership information. Yet, many argue that these technologies are not being effectively utilized in the context of orphan works and a legislative solution remains necessary.

In light of recent legal and technological developments, the Office is interested in discussing the current need for legislation to address the issues of orphan works and mass digitization. Specifically, the public roundtable meetings will allow participants to discuss whether recent legal developments have obviated the need for legislation, or whether new legislation would resolve or alleviate the concerns identified in the comments. Can the orphan works problem be resolved under existing exceptions and limitations contained in the current Copyright Act, such as fair use? Should this determination hinge on the type of use or user making use of the work? If legislation is deemed necessary, how

should it reflect or acknowledge recent developments in fair use law, if at all?

Additionally, the Office would like to discuss the impact of technological advancements. For example, have improved search tools and database technologies mitigated the orphan works problem, or are these technologies not being effectively utilized in the context of orphan works?

Session 2: Defining the Good Faith "Reasonably Diligent Search" Standard

In its 2006 Report, the Copyright Office recommended that Congress amend the Copyright Act to limit the remedies available against good faith users of orphan works after the user performed a generally "reasonably diligent search" to locate the owner of that work. The 2008 bills set forth certain baseline requirements such as searching the Office's online records, and would have required users to consult best practices applicable to the work at issue. Both copyright owners and users would have participated in developing these best practices, which the Register of Copyrights would have coordinated.

The Office is interested in discussing how best to define a good faith, reasonably diligent search in light of changes in the legal and technological environment since 2008, and whether improvements can be made to the standard set forth in the 2008 bills. What are the relative advantages or risks of flexible versus rigidly-defined search standards? Additionally, should the Office participate in developing search criteria or evaluating searches, and should regulations set forth specific search criteria? Moreover, what should be the role of community-developed best practices documents that may guide particular groups of users making particular types of uses, and who should develop these "best practices" documents? Finally, what role should the Office play in developing, monitoring, or certifying search criteria?

Session 3: The Role of Private and Public Registries

One question regarding orphan works is the role public and private registries might play in any orphan works solution. The most obvious of these registries, the Copyright Office's own registration and recordation system, provides a wealth of copyright information but has limitations based on both technological requirements and the fact that registration and recordation is not mandatory in the United States. There are other registries that have ownership information, and there has been some suggestion that the Office

should investigate enhancing interoperability between the Office system and private rights registries.[13]

The Office would like to discuss the role registration and recordation may play in helping to more effectively mitigate the orphan works problem. For example, in the context of orphan works, how could the Office facilitate and incentivize owners to register their works and keep their ownership and contact information current? Should failure to register with the Office affect the orphan status of a work? How could any such incentives be reconciled with the United States' obligations under the Berne Convention and other international instruments? Additionally, the Office is interested in learning more about the appropriate role of third party registries (commercial and noncommercial). For example, what could be the Office's role in overseeing or certifying these third party registries? Would it be helpful for the Office to establish a registry requiring users to register their use of, or intent to use, orphan works similar to that envisioned in the Orphan Works Act of 2008?[14] Does the recently-passed UK orphan works legislation, which envisions a key role for a web portal connecting multiple private and public Web sites and databases, present an attractive model for utilizing and organizing these registries in the United States?

Session 4: Types of Works Subject to Orphan Works Legislation, Including Issues Related Specifically to Photographs

As described in the Office's previous Notice and many of the responding comments, orphan works remain a pervasive issue in copyright law. While the issue cuts across all creative sectors, the unique challenges posed by photographs have long been an obstacle to developing an effective orphan works solution. Photographs and other works of visual art may lack or may more easily become divorced from ownership information, especially in the age of social media that has largely transpired since Congress considered the 2008 bills. This lack of identifying

---

[10] *HathiTrust*, 902 F. Supp. 2d 445.

[11] *Id.* at 455–56.

[12] The PLUS Registry (the "Registry") is an online database created and operated by PLUS Coalition, Inc., an international group of communities "dedicated to creating, using, distributing and preserving images." Users may search the Registry to find rights and descriptive information ("metadata") for any image, and to

find current contact information for related creators, rights holders and institutions. Owners may register their images and image licenses to allow authorized users to find rights and descriptive metadata using a specific ID or image recognition. Plus Coalition, Inc., "About," *https:// www.plusregistry.org/cgi-bin/WebObjects/ PlusDB.woa/1/wo/kl6vPj6TeDu1MqoK7ajbug/ 0.107.27*. The role of private and public registries is further discussed in Session 3, below.

[13] As mentioned in the Notice, the Office has begun digitizing its historic records and is initiating upgrades to its registration and recordation systems. These projects will facilitate public access to, and thus improve users' ability to investigate, the copyright status of works, including the identification and location of copyright owners. The upgrades to the registration and recordation systems also are meant to facilitate the effective registration of works and recordation of documents related to registered works, helping to ensure that the record and contact information on file with the Office remains accurate. Notice, 77 FR 64558.

[14] H.R. 5889, 110th Cong. sec. 2(a), § 514(b)(3) (2008).

ANT_BARTZ_000435665

information often prevents users from locating or even initiating a search for orphaned photographs' rights holders. The 2008 bills included a number of provisions specifically aimed at resolving some of the issues specific to photographs.

In light of the peculiar position of photographs, it is important to consider how any orphan works solution might address these specific works, either by creating specific rules or excluding them altogether. Excluding photographs would not be a novel solution; the European Union recently approved an orphan works directive (the "Directive") that provides an exception for noncommercial public interest users making noncommercial public interest uses of orphan works, while providing a general exclusion of photographs from the scheme.[15]

The Office is interested in discussing how to address the problems presented by certain types of works, including specifically photographic and visual arts orphan works. Should an orphan works solution exclude any particular type of work or should it include all copyrighted works? Would the exclusion of certain types of works substantially undermine the effectiveness of any orphan works solution? If all types of works are included, what (if any) special provisions are required to ensure that all copyright owners, such as photographers, are treated equitably within the legislative framework? Do recent developments such as the creation of voluntary registries, like the PLUS Registry,[16] mitigate any of the earlier concerns regarding the treatment of photographs?

Session 5: Types of users and uses subject to orphan works legislation

The Copyright Office's previous orphan works review did not differentiate between commercial and noncommercial uses and users of orphan works. Since then, however, there has been a debate regarding whether an orphan works solution should take into account the user's status as either a commercial or noncommercial entity. For example, the

---

[15] Directive 2012/28/EU, of the European Parliament and of the Council of 25 October 2012 on Certain Permitted Uses of Orphan Works, *available at http://register.consilium.europa.eu/doc/srv?l=EN&t=PDF&gc=true&sc=false&f=PE%2036%202012%20REV%202*. Note, however, that photographs embedded in other, covered, works (e.g., photographs contained in books) are included within this scheme. *Id.* at art. 1(4).

[16] *See* Plus Coalition, Inc., supra note 12. Both the 2008 House and Senate bills would have delayed implementation until after such a registry was developed.

Directive provides an exception for noncommercial public interest users making noncommercial public interest uses of orphan works.[17] Any solution that excludes commercial users and uses, however, may arguably provide an incomplete solution. Some have argued that the policy motivations behind any orphan works legislation logically should extend to commercial uses that may promote the underlying goals of the Copyright Act. The United Kingdom's recently adopted orphan works legislation does not differentiate between commercial and noncommercial users or uses.

The Office thus is interested in learning more about whether an orphan works solution should encompass both commercial and noncommercial uses. Should orphan works legislation apply equally to commercial and noncommercial uses and users? If not, how should specific types of uses and users be treated within the legislative framework? Should orphan works legislation be limited only to uses by noncommercial entities with a public service mission? Should these entities be permitted to use orphan works only for limited purposes such as preservation, or should they be able to broadly use orphan works to provide access to the public? Should commercial entities be able to make commercial use of orphan works? What are the relative advantages or disadvantages of allowing such use?

*Day Two*

Session 1: Remedies and Procedures Regarding Orphan Works

The Office's 2006 Report did not suggest creation of an exception to copyright for use of orphan works, but instead recommended that Congress limit the remedies that the copyright owner could seek against good faith users of orphan works to injunctive relief and "reasonable compensation" for the use of the work. The Office also recommended a "take-down" option for certain noncommercial users engaged in noncommercial activities, which was incorporated in the proposed 2008 legislation. In addition to the take-down provision, the legislation also would have (1) limited remedies to good faith users of orphan works having performed a reasonably diligent search, (2) been applicable on a case-by-case basis, and (3) permitted rights holders to reasonable compensation, but not statutory damages or attorneys' fees. The Senate bill would have allowed owners to reclaim their works by serving a

---

[17] *See* Directive, *supra* note 15, at art. 6(2).

"Notice of Claim of Infringement," requiring the user to cease the infringement and negotiate in good faith with the rights holder.[18]

The appropriate structure and scope of remedies continues to be a significant issue of concern both for copyright owners and potential users of orphan works. For example, the threat and unpredictable nature of statutory damages, the need for predictability and reasonableness in assessing damages, and the rights available to creators of derivative works based on orphan works are all issues that warrant further discussion.

The Office is interested in discussing remedies and procedures in the context of orphan works. What remedies should be available where orphan works rights holders emerge after a third party has already begun to use an orphaned work? What rights should be available for creators of derivative works based on orphan works? What procedures should be put in place where these situations arise? Does the limitation on liability model still make sense in the current legal environment? Should orphan works legislation instead be re-framed as an exception to copyright as it is in an increasing number of foreign jurisdictions?

Session 2: Mass Digitization, Generally

The Office's 2006 Report and the 2008 proposed legislation did not consider the issue of mass digitization in detail. Although mass digitization was ongoing in 2008, the practice has since become much more prevalent. Thus, it is important to understand how mass digitization fits into an orphan works solution. Because many of the comments submitted in response to the Notice indicated that the issue of mass digitization should be treated separately from the issue of orphan works, it also is important to understand whether mass digitization fits into an orphan works solution.

The Copyright Office would like to discuss the intersection of mass digitization and orphan works at the public roundtable meetings. As a preliminary matter, the Office is interested in discussing what types of digitization projects should be covered by any legislative proposal, including the scope of activities that can be accurately described as "mass digitization." Additionally, it is important to review the relative risks and benefits of mass digitization projects. The Office would like to discuss the types of entities that might

---

[18] S. 2913, 110th Cong. sec. 2(a) § 514(c)(1)(B), 514(b)(1)(A) (2008).

ANT_BARTZ_000435666

7710    **Federal Register** / Vol. 79, No. 27 / Monday, February 10, 2014 / Notices

be able to engage in such activities under any legislative proposal, and the types or categories of works that should be covered. Moreover, under what circumstances should mass digitization projects proceed and how may digitized materials be used? How might any mass digitization solution differ from that of a general orphan works solution? Would potential solutions developed in the context of mass digitization ameliorate the issue of orphan works? How might these potential solutions interact?

Session 3: Extended Collective Licensing and Mass Digitization

Several foreign countries have laws that address mass digitization in different ways. For example, recently-passed legislation in the United Kingdom creates a bifurcated approach allowing certain types of individual uses of orphan works and mass digitization.[19] There, individual or occasional users of orphan works may apply for a non-exclusive license from a centralized government or government-sanctioned private agency on payment of a license fee held in escrow should rights holders re-emerge.[20] Users also must perform a diligent search for the rights holder, which must be verified by the authorizing body before a license will be issued.[21] Cultural institutions engaging in mass digitization, on the other hand, may digitize works (including orphan works) in their existing collections through an extended collective licensing regime.[22] The licenses granted are not exclusive and all rights holders have the right to opt out of any license.[23] Hungary has adopted a similar two-tier orphan works solution.[24] Several Nordic

countries also have adopted extended collective licensing regimes for limited types of works and uses in the context of mass digitization.[25]

The Office is interesting in reviewing the option of extended collective licensing for purposes of mass digitization in detail. For example, the Office is interested in discussing whether the United States should look abroad to foreign extended collective licensing approaches for ideas on domestic action on the issue of mass digitization. If so, which approach or components of any particular approach present attractive options for a potential U.S. course of action? Should such a system include both commercial and noncommercial uses, or be limited to noncommercial entities? How do extended collective licensing systems work in practice in the countries where they have been adopted? Are there statistics or any longitudinal data regarding the success of extended collective licensing regimes, particularly vis-à-vis orphan works and mass digitization, around the world? Further, would the U.S. political, legal, and market structures, which can be quite different from foreign counterparts, support an extended collective licensing-type solution?

Session 4: The Structure and Mechanics of a Possible Extended Collective Licensing System in the United States

Extended collective licensing systems exist where representatives of copyright owners and users negotiate terms that are binding on both members and similarly situated non-members of the group by operation of law, unless an interested copyright rights holder elects to opt out. Collective management organizations function by establishing, collecting, and distributing these license fees. These organizations typically are sanctioned or overseen by the government. Where these organizations collect licensing fees relating to orphan works, they typically hold these fees until the owner emerges to collect the fee or for a statutorily set period of time. In this way, extended collective licensing may present an option for resolving many of the issues inherent in mass digitization projects, especially as they relate to the incidental digitization of orphan works contained in these digitized collections.

While some other countries have embraced extended collective licensing, the United States currently does not have the legal framework for such a system. Nevertheless, there has been some discussion that extended collective licensing might be helpful in a mass digitization scenario. It is unclear, however, how extended collective licensing could integrate with the current U.S. legal infrastructure to streamline the licensing process, or whether it could possibly upset existing and well-functioning markets for certain copyright-protected works. Moreover, the mechanical operation of such a system is unclear; for example, questions remain regarding procedures whereby copyright rights holders may "opt out" of any extended collective licensing regime.

The Office is interested in discussing specific details of an appropriate extended collective licensing system in the United States for mass digitization purposes. How might an extended collective licensing regime be structured in the United States? Could an extended collective licensing system be compatible with U.S. copyright laws, legal norms, and industry practices? How much direct oversight should the Office or any other governmental entity have over the establishment, authorization, and/or operation of collective management organizations? Are any existing collective management organizations in the United States capable of administering an extended collective licensing regime for mass digitization? If new collective management organizations are created, should they be structured as government entities, nonprofit entities licensed and/or funded by the government, or commercial entities licensed and/or funded privately or by the government?

Additionally, the Office recognizes that the opt-out and orphan works issues inherent in mass digitization projects are ripe for further discussion. For example, should rights holders be permitted to opt out of any extended collective licensing system at any time? How would rights holders' ability to opt out affect licensees who may have made significant investments in the use of licensed works? How should orphan works "incidentally" included in a mass digitization project be handled? Should the collective management organization be responsible for attempting to locate all rights holders and, if so, should a "reasonably diligent search" standard be applied to the organization? How should license fees be calculated and how should remuneration of authors and authors' groups be handled? What

---

[19] See Enterprise and Regulatory Reform Act, 2013, c. 24, § 77, available at http://www.legislation.gov.uk/ukpga/2013/24/section/77.

[20] Id.

[21] Id.

[22] Id. In extended collective licensing models, representatives of copyright owners and representatives of users negotiate terms that are binding on all members of the group by operation of law (e.g., all textbook publishers), unless a particular copyright owner opts out. Extended collective licensing regimes authorize the grant of broad licenses to make specified uses of in-copyright works for which it would be unduly expensive to clear rights on a work-by-work basis (e.g., mass digitization of in-copyright works, photocopying in-copyright articles in library settings). The government or a trusted designee typically administers payments. It is not quite compulsory licensing in that the parties (rather than the government) negotiate the rates, but it nevertheless requires a legislative framework and often involves some degree of government oversight. See Notice, 77 FR 64559.

[23] Enterprise and Regulatory Reform Act 2013 at Section 77.

[24] 100/2009 (V. 8) Korm. rendelet az árva mű egyes felhasználásainak engedélyezésére vonatkozó részletes szabályokról (Government Regulation on

the Detailed Rules Related to the Licensing of Certain Use of Orphan Works), arts. 2(1), 2(2), 3 (Hung.), available at http://www.hipo.gov.hu/English/joglorras/100_2009.pdf.

[25] See, e.g., Consolidated Act on Copyright 2010, No. 202, Art. 50–51 (2010) (Denmark); see also Copyright Act, No. 404, §§ 13–14 (2010) (Finland).

ANT_BARTZ_000435667

types of entities should be able to utilize an extended collective licensing system for mass digitization.

Dated: February 5, 2014.

**Karyn A. Temple Claggett,**

*Associate Register of Copyrights and Director of Policy and International Affairs.*

[FR Doc. 2014–02830 Filed 2–7–14: 8:45 am]

**BILLING CODE 1410–30–P**

---

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

### Information Security Oversight Office

[NARA–2014–015]

### National Industrial Security Program Policy Advisory Committee (NISPPAC)

**AGENCY:** National Archives and Records Administration (NARA).

**ACTION:** Notice of Advisory Committee Meeting.

**SUMMARY:** In accordance with the Federal Advisory Committee Act (5 U.S.C. app 2) and implementing regulation 41 CFR 101–6, NARA announces an upcoming meeting of the National Industrial Security Program Policy Advisory Committee (NISPPAC).

**DATES:** The meeting will be held on March 19, 2014, from 10:00 a.m. to 12:00 p.m.

**ADDRESSES:** National Archives and Records Administration; 700 Pennsylvania Avenue NW., Archivist's Reception Room, Room 105; Washington, DC 20408.

**FOR FURTHER INFORMATION CONTACT:** David O. Best, Senior Program Analyst, ISOO, by mail at the above address, telephone (202) 357–5123, or email *david.best@nara.gov.* Contact ISOO at *ISOO@nara.gov* and the NISPPAC at *NISPPAC@nara.gov.*

**SUPPLEMENTARY INFORMATION:** This meeting will be open to the public. However, due to space limitations and access procedures, the name and telephone number of individuals planning to attend must be submitted to the Information Security Oversight Office (ISOO) no later than Friday, March 14, 2014. ISOO will provide additional instructions for gaining access to the location of the meeting.

Dated: February 5, 2014.

**Patrice Little Murray,**

*Acting Committee Management Officer.*

[FR Doc. 2014–02816 Filed 2–7–14: 8:45 am]

**BILLING CODE 7515–01–P**

---

## NUCLEAR REGULATORY COMMISSION

[Docket No. NRC–2013–0239]

### Agency Information Collection Activities: Submission for the Office of Management and Budget (OMB) Review; Comment Request

**AGENCY:** Nuclear Regulatory Commission.

**ACTION:** Notice of the OMB review of information collection and solicitation of public comment.

**SUMMARY:** The U.S. Nuclear Regulatory Commission (NRC) has recently submitted to OMB for review the following proposal for the collection of information under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35). The NRC hereby informs potential respondents that an agency may not conduct or sponsor, and that a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The NRC published a **Federal Register** notice with a 60-day comment period on this information collection on November 8, 2013 (78 FR 67204).

1. *Type of submission, new, revision, or extension:* Extension.

2. *The title of the information collection:* 10 CFR part 70, "Domestic Licensing of Special Nuclear Material."

3. *Current OMB approval number:* 3150–0009.

4. *The form number if applicable:* Not applicable.

5. *How often the collection is required:* On occasion. Required reports are collected and evaluated on a continuing basis as events occur. Applications for new licenses and amendments may be submitted at any time. Generally, renewal applications are submitted every 10 years and for major fuel cycle facilities updates of the safety demonstration section are submitted every 2 years. Nuclear material control and accounting information is submitted in accordance with specified instructions.

6. *Who will be required or asked to report:* Applicants for and holders of specific NRC licenses to receive title to, own, acquire, deliver, receive, possess, use, or initially transfer special nuclear material.

7. *An estimate of the number of annual responses:* 1,620 responses.

8. *The estimated number of annual respondents:* 606.

9. *An estimate of the total number of hours needed annually to complete the requirement or request:* 89,240.6 hours (81,791.1 hours reporting + 7379.4

hours recordkeeping + 70.1 hours third party disclosure).

10. *Abstract:* Part 70 of Title 10 of the *Code of Federal Regulations* (10 CFR), establishes requirements for licenses to own, acquire, receive, possess, use, and transfer special nuclear material. The information in the applications, reports, and records is used by NRC to make licensing and other regulatory determinations concerning the use of special nuclear material.

The public may examine and have copied for a fee publicly-available documents, including the final supporting statement, at the NRC's Public Document Room, Room O–1F21, One White Flint North, 11555 Rockville Pike, Rockville, Maryland 20852. The OMB clearance requests are available at the NRC's Web site: *http://www.nrc.gov/ public-involve/doc-comment/omb/.* The document will be available on the NRC's home page site for 60 days after the signature date of this notice.

Comments and questions should be directed to the OMB reviewer listed below by March 12, 2014. Comments received after this date will be considered if it is practical to do so, but assurance of consideration cannot be given to comments received after this date.

Danielle Y. Jones, Desk Officer, Office of Information and Regulatory Affairs (3150–0009), NEOB–10202, Office of Management and Budget, Washington, DC 20503.

Comments can also be emailed to *Danielle_Y_Jones@omb.eop.gov* or submitted by telephone at 202–395–1741.

The Acting NRC Clearance Officer is Kristen Benney, telephone: 301–415–6355.

Dated at Rockville, Maryland, this 4th day of February, 2014.

For the Nuclear Regulatory Commission.

**Kristen Benney,**

*Acting NRC Clearance Officer, Office of Information Services.*

[FR Doc. 2014–02748 Filed 2–7–14: 8:45 am]

**BILLING CODE 7590–01–P**

---

## NUCLEAR REGULATORY COMMISSION

[NRC–2014–0001]

### Sunshine Act Meeting Notice

**DATE:** Weeks of February 10, 17, 24, March 3, 10, 17, 2014.

**PLACE:** Commissioners' Conference Room, 11555 Rockville Pike, Rockville, Maryland.

**STATUS:** Public and Closed.

ANT_BARTZ_000435668

## INTERNATIONAL TRADE COMMISSION

[Investigation No. 337–TA–906]

**Certain Standard Cell Libraries, Products Containing or Made Using the Same, Integrated Circuits Made Using the Same, and Products Containing Such Integrated Circuits: Commission Decision Not To Review Granting Complainant's Motion To Amend the Complaint and Notice of Investigation**

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has determined not to review an initial determination ("ID") (Order No. 10) of the presiding administrative law judge ("ALJ") granting complainant's motion to amend the complaint and notice of investigation in the above-captioned investigation.

**FOR FURTHER INFORMATION CONTACT:** Clint Gerdine, Esq., Office of the General Counsel, U.S. International Trade Commission, 500 E Street SW., Washington, DC 20436, telephone (202) 708–2310. Copies of non-confidential documents filed in connection with this investigation are or will be available for inspection during official business hours (8:45 a.m. to 5:15 p.m.) in the Office of the Secretary, U.S. International Trade Commission, 500 E Street SW., Washington, DC 20436, telephone (202) 205–2000. General information concerning the Commission may also be obtained by accessing its Internet server at *http://www.usitc.gov*. The public record for this investigation may be viewed on the Commission's electronic docket (EDIS) at *http://edis.usitc.gov*. Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205–1810.

**SUPPLEMENTARY INFORMATION:** The Commission instituted this investigation on January 24, 2014, based on a complaint filed by Tela Innovations, Inc. ("Tela") of Los Gatos, California. 79 FR 4175–76. The complaint alleges violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, in the importation into the United States, the sale for importation, and the sale within the United States after importation of certain standard cell libraries, products containing or made using the same, and products containing

such integrated circuits by reason of infringement of certain claims of U.S. Patent No. 8,490,043. The complaint further alleges the existence of a domestic industry. The Commission's notice of investigation named Taiwan Semiconductor Manufacturing Company, Limited of Hsinchu, Taiwan and TSMC North America of San Jose, California (collectively, "TSMC") as respondents. The Office of Unfair Import Investigations was also named as a party.

On January 30, 2014, Tela moved to amend the complaint and notice of investigation to add allegations of violation of section 337 by reason of infringement of certain claims of U.S. Patent No. 8,635,583. The Commission investigative attorney and TSMC opposed the motion, and Tela filed a reply to their oppositions.

On March 13, 2014, the ALJ issued the subject ID granting the motion to amend the complaint and notice of investigation. No party petitioned for review of the ID. The Commission has determined not to review this ID.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, and in Part 210 of the Commission's Rules of Practice and Procedure, 19 CFR part 210.

By order of the Commission.

Issued: April 1, 2014.

**Lisa R. Barton,**

*Acting Secretary to the Commission.*

[FR Doc. 2014–07570 Filed 4–3–14; 8:45 am]

**BILLING CODE 7020–02–P**

## LIBRARY OF CONGRESS

### U.S. Copyright Office

[Docket No. 2012–12]

**Extension of Comment Period: Orphan Works and Mass Digitization: Request for Additional Comments**

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Extension of comment period.

**SUMMARY:** The U.S. Copyright Office is extending the deadline for public comments that address topics listed in the Office's February 10, 2014 Notice of Inquiry and that respond to any issues raised during the public roundtables held in Washington, DC, on March 10–11, 2014.

**DATES:** Comments are now due May 21, 2014 by 5:00 p.m. EDT.

**ADDRESSES:** All comments and reply comments shall be submitted

electronically. A page containing a comment form is posted on the Office Web site at *http://www.copyright.gov/orphan/*. The Web site interface requires commenting parties to complete a form specifying name and organization, as applicable, and to upload comments as an attachment via a browser button. To meet accessibility standards, commenting parties must upload comments in a single file not to exceed six megabytes (MB) in one of the following formats: The Portable Document File (PDF) format that contains searchable, accessible text (not an image); Microsoft Word; WordPerfect; Rich Text Format (RTF); or ASCII text file format (not a scanned document). The form and face of the comments must include both the name of the submitter and organization. The Office will post the comments publicly on the Office's Web site exactly as they are received, along with names and organizations. If electronic submission of comments is not feasible, please contact the Office at 202–707–1027 for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Karyn Temple Claggett, Associate Register of Copyrights and Director of Policy and International Affairs by email at *kacl@loc.gov* or by telephone at 202–707–1027; or Catherine Rowland, Senior Counsel for Policy and International Affairs, by email at *crowland@loc.gov* or by telephone at 202–707–1027.

**SUPPLEMENTARY INFORMATION:** On February 10, 2014, the Copyright Office published a Notice of Inquiry announcing public roundtables and inviting additional public comments on potential legislative solutions for orphan works and mass digitization under U.S. copyright law. The Office held its public roundtables on March 10–11, 2014, during which various participants voiced a wide range of opinions. To enable commenters sufficient time to respond to issues raised during the March 2014 roundtables, the Office is extending the time for filing additional comments from April 14, 2014 to May 21, 2014.

Dated: March 31, 2014.

**Karyn Temple Claggett,**

*Associate Register of Copyrights and Director of Policy and International Affairs.*

[FR Doc. 2014–07505 Filed 4–3–14; 8:45 am]

**BILLING CODE 1410–30–P**

ANT_BARTZ_000435669

**APPENDIX C**        COMMENTING PARTIES AND
                      ROUNDTABLE PARTICIPANTS

ANT_BARTZ_000435670

## Parties Who Submitted Initial Comments in Response
## to the October 22, 2012 Notice of Inquiry

1.   Abbott, Waring

2.   Abraham, Daniel

3.   American Association of Independent Music

4.   American Association of Law Libraries; the Medical Library Association; and the
     Special Libraries Association

5.   American Bar Association Section of Intellectual Property Law

6.   American Federation of Musicians of the United States and Canada, AFL-CIO, and
     The Recording Academy

7.   American Intellectual Property Law Association

8.   American Photographic Artists

9.   American Society of Composers, Authors and Publishers (ASCAP) and Broadcast
     Music, Inc. (BMI)

10.  American Society of Illustrators Partnership

11.  American Society of Journalists and Authors

12.  American Society of Media Photographers

13.  Art Institute of Chicago; The J. Paul Getty Trust (operates the J. Paul Getty Museum);
     Los Angeles County Museum of Art; The Metropolitan Museum of Art; The Museum
     of Modern Art; and The Solomon R. Guggenheim Foundation (operates the Solomon
     R. Guggenheim Museum in New York, the Guggenheim Museum in Bilbao, Spain,
     and the Peggy Guggenheim Collection in Venice, Italy)

14.  Artists Rights Society

15.  ArtistsUndertheDome.org

16.  Association of American Publishers

17.  Association of Art Museum Directors

18.  Association of Medical Illustrators

1

ANT_BARTZ_000435671

19.  Atlantic Feature Syndicate

20.  Authors Guild

21.  Berkeley Digital Library Copyright Project

22.  Blankenhorn, Dana

23.  Buzard, Von R.

24.  Carnegie Mellon University Libraries

25.  Computer & Communications Industry Association

26.  Consortium of College & University Media Centers

27.  Cook, Walter G., Jr.

28.  Copyright Alliance

29.  Copyright Clearance Center, Inc.

30.  Council of University Librarians at the University of California

31.  Croxton, Matthew David

32.  Dance Heritage Coalition

33.  David Sanger Photography LLC

34.  Devorah, Carrie

35.  Digital Media Association

36.  Directors Guild of America, Inc. and Writers Guild of America, West, Inc.

37.  Drucker, Philip

38.  Dufresne, Walter

39.  Duke University Libraries

40.  Electronic Frontier Foundation and Public Knowledge

41.  Emison, David Erik

2

ANT_BARTZ_000435672

42.    Emory University Libraries

43.    Films Around the World, Inc.

44.    Future of Music Coalition

45.    Gerrity Medical Art

46.    Giordano, Michael

47.    Google Inc.

48.    Graphic Artists Guild

49.    Hall, Victoria K.

50.    Illustrators' Partnership of America

51.    Independent Film & Television Alliance

52.    Internet Archive

53.    Institute for Intellectual Property and Social Justice

54.    International Association of Scientific, Technical and Medical Publishers

55.    International Documentary Association; Film Independent; Independent Filmmaker Project; Kartemquin Educational Films, Inc.; National Alliance for Media Arts and Culture; Gilda Brasch; Kelly Duane de la Vega of Loteria Films; Katie Galloway; Roberto Hernandez; Karen Olson of Sacramento Video Industry Professionals; Marjan Safinia of Merge Media; and Geoffrey Smith of Eye Line Films

56.    Jarrell, Debora

57.    Kane, Chris

58.    Lampi, Michael

59.    Lehman, Bruce

60.    Library of Congress

61.    Library Copyright Alliance (including the American Library Association, the Association of College and Research Libraries, and the Association of Research Libraries)

ANT_BARTZ_000435673

62. Mackie, Jane Beasley

63. Magazine Publishers of America

64. Massachusetts Institute of Technology Libraries

65. McHugh, Thomas

66. Microsoft Corporation

67. Motion Picture Association of America, Inc.

68. Museum of Fine Arts, Boston

69. National Music Publishers' Association and The Harry Fox Agency

70. National Press Photographers Association

71. National Writers Union

72. North Carolina State University Libraries

73. Ohmart, Ben

74. Pangasa, Maneesh

75. Perry4Law

76. Picture Archive Council of America, Inc. (PACA)

77. Professional Photographers of America

78. Pro-Imaging.org

79. Recording Industry Association of America

80. Rutgers University Libraries

81. Science Fiction and Fantasy Writers of America, Inc.

82. Screen Actors Guild-American Federation of Television and Radio Artists (SAG AFTRA)

83. SESAC, Inc.

84. Singer, Andrew B.

4

ANT_BARTZ_000435674

85.    Society of American Archivists

86.    Software & Information Industry Association

87.    Stein, Gregory Scott

88.    Tanner, Kim

89.    University of Michigan

90.    University of North Carolina-Chapel Hill

91.    Zimmerman, Jill

5

ANT_BARTZ_000435675

## Parties Who Submitted Reply Comments in Response
## to the October 22, 2012 Notice of Inquiry

1.  American Society of Illustrators Partnership

2.  American Society of Media Photographers

3.  Association of American Publishers

4.  Berkeley Digital Library Copyright Project

5.  Brown, Bridget C.

6.  Brown, Simon

7.  Calcaterra, Garrett

8.  Cameron, Laura

9.  Carlson, Jeannie

10. Carnegie Mellon University

11. Center for Democracy & Technology

12. Clift, Elayne G.

13. Cole, Brandon

14. College Art Association

15. Columbia Law School, Kernochan Center for Law, Media and the Arts

16. Competitive Enterprise Institute

17. Copyright Alliance

18. Croxton, Matthew David

19. Davidson, Susan M. "Sunny"

20. Directors Guild of America, Inc. and Writers Guild of America, West, Inc.

21. Doniger / Burroughs APC

22. Dubrowski, Ken

6

ANT_BARTZ_000435676

23. Elliott-Mace, Patrice

24. Elsa Peterson Ltd

25. Elwell, David

26. Feldman, Jay

27. Fisher, Richard

28. Five Birds Publishing/Productions/Industries

29. Foley, Sylvia

30. Future of Music Coalition

31. Getty Images

32. Gimlet Eye Books

33. Ginger, Ann Fagan

34. Google Inc.

35. Gormandy, Karen

36. Gorski, Paul

37. Graphic Artists Guild

38. Hoffman, Ann

39. Hopper, Thomas

40. Hulse, Dean

41. Illustrators' Partnership of America

42. Intellectual Property Owners Association

43. International Documentary Association; Film Independent; National Alliance for Media Arts and Culture; Kartemquin Educational Films, Inc.; Glen Pitre; Tallgrass Film Association

44. Kagan, Mya

7

ANT_BARTZ_000435677

45. Ladd, Tom

46. Laitala, Lynn Maria

47. Levesque, Kim

48. Library Copyright Alliance

49. Liebman, Lisa

50. Littleton, Sally

51. Lukowski, Jeanett

52. Maute, Paula

53. Mistretta, Andrea

54. Molina, Lenard

55. Motion Picture Association of America, Inc. and The Independent Film & Television Alliance

56. Murphy, Roy

57. Natalie Reid Associates

58. National Federation of the Blind

59. National Music Publishers' Association and The Harry Fox Agency, Inc.

60. National Press Photographers Association

61. National Writers Union (UAW Local 1981, AFL-CIO)

62. The New York Public Library

63. Nylund, Alison P.

64. Ostrach, Stefan

65. Pappas, Alex

66. Patterson, James

67. Pepi, Eugene

8

ANT_BARTZ_000435678

68. Petry, Elisabeth

69. Photo Marketing Association International

70. Picture Archive Council of America, Inc. (PACA)

71. Public Knowledge and Electronic Frontier Foundation

72. Rhoads, Susan

73. Rhodes, Chris

74. Rob Coppolillo Writing

75. Science Fiction and Fantasy Writers of America, Inc.

76. Sirabian, Karen

77. Smithsonian Institution

78. Software & Information Industry Association

79. Spafford, John M.

80. Spencer, Linda

81. Suddeth, Charles

82. Tokunaga, Christine Marie

83. Tulane University Law School

84. Weinstein, Ron

85. Werner, Paul

86. Wilson, Valorie

87. Wintle, Carol

88. Yancey, Victoria

89. Zoka Institute, LLC

ANT_BARTZ_000435679

**Parties Who Submitted Comments in Response
to the February 10, 2014 Notice of Inquiry**

1.    American Association of Independent Music

2.    American Association of Law Libraries

3.    American Intellectual Property Law Association

4.    American Photographic Artists

5.    American Society of Illustrators Partnership

6.    American Society of Media Photographers

7.    American Theatre Critics Association

8.    Anonymous 1

9.    Anonymous 2

10.    Aoki, Brenda Wong

11.    Art Copyright Coalition

12.    Artists Rights Society

13.    Asante, Adanze

14.    Association for Recorded Sound Collections

15.    Association of Learned and Professional Society Publishers

16.    Association of Medical Illustrators

17.    Authors Guild, Inc.

18.    Balint, Eszter

19.    Basinet, Cynthia

20.    Bellamy, Mary

21.    Benton, Steve

22.    Berger, David

10

ANT_BARTZ_000435680

23. Black, James

24. Bracher, Jim

25. Bradley, Mike

26. British Photographic Council

27. Brooks, Tim

28. Brown, Simon

29. Burns, Leslie

30. Butler, Brandon, Peter Jaszi, and Michael Carroll

31. California Digital Library

32. Carino, Marilyn

33. Carroll, Michael W.

34. Carroll, Michael W. and Creative Commons USA

35. Cash, Rosanne

36. Center for Democracy and Technology

37. College Art Association

38. Columbia Law School, Kernochan Center for Law, Media and the Arts

39. Confurius, Martin

40. Copyright Alliance

41. Crowell, Rodney

42. Culbertson, Lin

43. Das, Kalani

44. Davenport, Doris

45. Dazeley, Peter

11

ANT_BARTZ_000435681

46.   DePofi, Rick

47.   Di Fiore, Vince

48.   Diamant, Anita Abigail

49.   Dogole, Ian

50.   East Bay Ray

51.   Emery, Dorine

52.   Epstein, Gerald

53.   Evans, Greg

54.   Family, S. Lupe

55.   Ferry, Christopher

56.   Films Around the World

57.   Ford, Joseph

58.   Ford, Karen

59.   Gallagher, Tess

60.   Gerrity, Peg

61.   Gibbs, Melvin

62.   Glass, Will

63.   Goldbetter, Larry

64.   Graphic Artists Guild

65.   Gray, Megan (1)

66.   Gray, Megan (2)

67.   Halcyon Yarn

68.   Haschke, Tracy Ostmann

ANT_BARTZ_000435682

69.    HathiTrust Digital Library

70.    Hitchman, CV

71.    Holderness, Mike

72.    Horowitz, Shel

73.    International Association of Scientific, Technical & Medical Publishers

74.    International Documentary Association and Film Independent

75.    Izu, Mark

76.    Janzon, Tomas

77.    Kagan, Mya

78.    Kane, Terry

79.    Katz, Sue

80.    Kirwan, Larry

81.    Knobler, Daniel

82.    Lacey, Louise

83.    LaFond, Michael

84.    Leonard, Kiri Oestergaard

85.    Leventhal, John

86.    Levy, Adam Stuart

87.    Library Copyright Alliance

88.    Linden, Colin

89.    Lindgren, Michael

90.    Linn, Amy

91.    Lopresti, Robert

13

ANT_BARTZ_000435683

92.    Luntzel, Timothy

93.    Lustig, Ellen

94.    Marc

95.    Massachusetts Artists Leaders Coalition

96.    Massachusetts Institute of Technology (MIT) Libraries

97.    Matheson, Lisa

98.    McCraw, Jamie

99.    McRea, John

100.    Merritt, Tift

101.    Midler, Bette

102.    Miller, John Edwin

103.    Montfort, Matthew

104.    Moon, Elizabeth

105.    Motion Picture Association of America, Inc.

106.    Murphy, Roy

107.    Music Library Association

108.    National Council of Textile Organizations

109.    National Music Publishers' Association

110.    National Press Photographers Association

111.    Nelson, Christopher Gabriel

112.    Newman, Sharlene

113.    Noonan, Sean

114.    O'Reilly, Aodhan

ANT_BARTZ_000435684

115. Oleksiw, Susan

116. Orner, Peter

117. Ounsworth, Alec

118. PACA, The Digital Media Licensing Association

119. Parisi, Lynn Reznick

120. Petersen, John

121. Pickerell, Jim

122. Pro-Imaging.org

123. Professional Photographers of America; American Photographic Artists, Inc.; American Society of Media Photographers; Graphic Artists Guild; National Press Photographers Association; and PACA, The Digital Media Licensing Association

124. Public Knowledge and the Electronic Frontier Foundation

125. Rabben, Linda

126. Reaves, Paul-Newell

127. Recording Industry Association of America

128. Reid, Vernon

129. Ribot, Marc

130. Richard, Jerome

131. Rieser, Daniel

132. Roche, Ted

133. Rosenberg, Erez

134. Rosenthal, Elizabeth J.

135. Rowan, Diana

136. Russell, Angelica

15

ANT_BARTZ_000435685

137.    Schlofner, Becky

138.    Shneider, Joshua

139.    Science Fiction and Fantasy Writers of America

140.    Shapiro, Paul

141.    Sickafoose, Todd

142.    Simon, Ruth F.

143.    Slivinski, Lucy

144.    Smith, George E.

145.    Snell, Theron

146.    Society of American Archivists

147.    Software & Information Industry Association

148.    Stace, Wesley

149.    Suddeth, Charles

150.    Thien, Kristen

151.    Tovares, Raul

152.    University of California, Los Angeles Library

153.    University of Minnesota Libraries

154.    University of North Carolina, Chapel Hill Scholarly Communications Office

155.    Urselli, Mark

156.    Wagner, Jeroen

157.    Walker, Rick

158.    Walker, Robert Kirk

159.    Wasser, Joan

ANT_BARTZ_000435686

160.   Webb Aviation

161.   Webster, Katharine

162.   Wieselman, Doug

163.   Wikimedia District of Columbia

164.   Wilson, Amanda

165.   Winterbottom, Carla

166.   Zorn, John

17

ANT_BARTZ_000435687

## Participants in the March 10-11, 2014 Public Roundtables

1.  Adler, Allan (Association of American Publishers)

2.  Aiken, Paul (The Authors Guild)

3.  Band, Jonathan (Library Copyright Alliance)

4.  Barnes, Gregory (Digital Media Association)

5.  Besek, June (Kernochan Center for Law, Media and the Arts)

6.  Boyle, Patrick (University of Southern California Intellectual Property and Technology Law Clinic – International Documentary Association and Film Independent)

7.  Burgess, Richard (American Association of Independent Music)

8.  Butler, Brandon (American University, Washington College of Law)

9.  Capobianco, Michael (Science Fiction and Fantasy Writers of America)

10. Carroll, Michael W. (American University, Washington College of Law; Creative Commons USA)

11. Chertkof, Susan (Recording Industry Association of America)

12. Cohen, Dan (Digital Public Library of America)

13. Collier, Daniel (Tulane University)

14. Constantine, Jan (The Authors Guild)

15. Courtney, Kyle K. (Harvard University)

16. Cox, Krista (Association of Research Libraries)

17. Cram, Greg (The New York Public Library)

18. Dessy, Blane (Library of Congress)

19. Devorah, Carrie (Center for Copyright Integrity)

20. Feltren, Emily (American Association of Law Libraries)

21. Fertig, Rachel (Association of American Publishers)

ANT_BARTZ_000435688

22.    French, Alec (Directors Guild of America)

23.    Furlough, Mike (HathiTrust Digital Library)

24.    Gard, Elizabeth Townsend (Tulane University)

25.    Goodyear, Anne Collins (College Art Association)

26.    Gray, Megan (Attorney)

27.    Griffin, Jodie (Public Knowledge)

28.    Haber, Frederic (Copyright Clearance Center, Inc.)

29.    Hansen, David (Digital Library Copyright Project, University of California, Berkeley School of Law; and Law Library, University of North Carolina School of Law)

30.    Harbeson, Eric (Society of American Archivists)

31.    Hare, James (Wikimedia District of Columbia)

32.    Hill, Douglas (RightsAssist, LLC)

33.    Hoffman, Ann F. (National Writers Union)

34.    Holland, Brad (American Society of Illustrators Partnership)

35.    Jacob, Meredith (Program on Information Justice & Intellectual Property, American University, Washington College of Law)

36.    Katz, Ariel (Faculty of Law, University of Toronto)

37.    Kaufman, Roy (Copyright Clearance Center, Inc.)

38.    Klaus, Kurt R. (Attorney at Law)

39.    Knife, Lee (Digital Media Association)

40.    Kopans, Nancy (ITHAKA/JSTOR)

41.    Lakind, Debra (Museum of Fine Arts, Boston)

42.    Lehman, Bruce (Association of Medical Illustrators)

19

ANT_BARTZ_000435689

43.    Lerner, Jack (University of Southern California Intellectual Property and Technology Law Clinic – International Documentary Association and Film Independent)

44.    Levine, Melissa (University of Michigan Library)

45.    Love, James (Knowledge Ecology International)

46.    Mahoney, Jim (American Association of Independent Music)

47.    Matthews, Maria D. (Professional Photographers of America)

48.    McCormick, Patrick (University of Southern California Intellectual Property and Technology Law Clinic – International Documentary Association and Film Independent)

49.    McDiarmid, Andrew (Center for Democracy & Technology)

50.    McGehee, Alex (Association of Recorded Sound Collections)

51.    McSherry, Corynne (Electronic Frontier Foundation)

52.    Michalak, Sarah (HathiTrust Digital Library)

53.    Mopsik, Eugene (American Society of Media Photographers)

54.    Natanson, Barbara (Library of Congress)

55.    Osterreicher, Mickey (National Press Photographers Association)

56.    Penrose, Brooke (Museum of Fine Arts, Boston)

57.    Perlman, Victor (American Society of Media Photographers)

58.    Pilch, Janice T. (Rutgers University Libraries)

59.    Prager, Nancy C. (Prager Law PLLC)

60.    Prescott, Leah (Georgetown Law Library)

61.    Rae, Casey (Future of Music Coalition)

62.    Rechardt, Lauri (International Federation of the Phonographic Industry)

63.    Ress, Manon (Knowledge Ecology International)

64.    Rogers, Kelly (Johns Hopkins University Press)

20

ANT_BARTZ_000435690

65.    Rosenthal, Jay (National Music Publishers' Association)

66.    Rushing, Colin (SoundExchange, Inc.)

67.    Russell, Carrie (American Library Association)

68.    Rydén, Jerker (National Library of Sweden)

69.    Sabrin, Amy (National Portrait Gallery – Smithsonian Institution)

70.    Sanders, Charles J. (Songwriters Guild of America)

71.    Schroeder, Fredric (National Federation of the Blind)

72.    Schruers, Matthew (Computer & Communications Industry Association)

73.    Sedlik, Jeff (PLUS Coalition)

74.    Shaftel, Lisa (Graphic Artists Guild)

75.    Shannon, Salley (American Society of Journalists & Authors)

76.    Sheffner, Ben (Motion Picture Association of America, Inc.)

77.    Slocum, Chuck (Writers Guild of America, West)

78.    Stein, Gregory Scott (Tulane University)

79.    Turner, Cynthia (American Society of Illustrators Partnership)

80.    Weinberg, Michael (Public Knowledge)

81.    Wolff, Nancy (PACA, The Digital Media Licensing Association)

ANT_BARTZ_000435691

**APPENDIX D**    COMPARATIVE SUMMARIES OF
U.S. ORPHAN WORKS LEGISLATIVE
PROPOSALS

ANT_BARTZ_000435692

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Limitation on Remedies** | "(a) Notwithstanding sections 502 through 505, where the infringer: (1) prior to the commencement of the infringement, performed a good faith, reasonably diligent search to locate the owner of the infringed copyright and the infringer did not locate that owner, and (2) throughout the course of the infringement, provided attribution to the author and copyright owner of the work, if possible and as appropriate under the circumstances, the remedies for the infringement shall be limited as set forth in subsection (b)." 2006 Report at 127. | "(a) LIMITATION ON REMEDIES.— (1) CONDITIONS.— Notwithstanding sections 502 through 505, in an action brought under this title for infringement of copyright in a work, the remedies for infringement shall be limited under subsection (b) if the infringer sustains the burden of proving, and the court finds, that— (A) before the infringing use of the work began, the infringer, a person acting on behalf of the infringer, or any person jointly and severally liable with the infringer for the infringement of the work— (i) performed and documented a reasonably diligent search in good faith to locate the owner of the infringed copyright; but (ii) was unable to locate the owner; and (B) the infringing use of the work provided attribution, in a manner reasonable under the circumstances, to the author and owner of the copyright, if known with a | "(b) CONDITIONS FOR ELIGIBILITY.— (1) CONDITIONS.— (A) IN GENERAL.— Notwithstanding sections 502 through 505, and subject to subparagraph (B), in a civil action brought under this title for infringement of copyright in a work, the remedies for infringement shall be limited in accordance with subsection (c) if the infringer— (i) proves by a preponderance of the evidence that before the infringement began, the infringer, a person acting on behalf of the infringer, or any person jointly and severally liable with the infringer for the infringement— (I) performed and documented a qualifying search, in good faith, for the owner of the infringed copyright; and (II) was unable to locate the owner of the infringed copyright; (ii) before using the work, filed with the Register of Copyrights a Notice of Use under paragraph (3); (iii) provided attribution, | "(b) CONDITIONS FOR ELIGIBILITY.— (1) CONDITIONS.— (A) IN GENERAL.— Notwithstanding sections 502 through 506, and subject to subparagraph (B), in an action brought under this title for infringement of copyright in a work, the remedies for infringement shall be limited in accordance with subsection (c) if the infringer— (i) proves by a preponderance of the evidence that before the infringement began, the infringer, a person acting on behalf of the infringer, or any person jointly and severally liable with the infringer for the infringement— (I) performed and documented a qualifying search, in good faith, to locate and identify the owner of the infringed copyright; and (II) was unable to locate and identify an owner of the infringed copyright; (ii) provided attribution, in a manner that is reasonable under the circumstances, to the legal | "(b) CONDITIONS FOR ELIGIBILITY.— (1) CONDITIONS.— (A) IN GENERAL.— Notwithstanding sections 502 through 506, and subject to subparagraph (B), in an action brought under this title for infringement of copyright in a work, the remedies for infringement shall be limited in accordance with subsection (c) if the infringer— (i) proves by a preponderance of the evidence that before the infringement began, the infringer, a person acting on behalf of the infringer, or any person jointly and severally liable with the infringer for the infringement— (I) performed and documented a qualifying search, in good faith, to locate and identify the owner of the infringed copyright; and (II) was unable to locate and identify an owner of the infringed copyright; (ii) prior to using the work, filed with the Register of Copyrights a Notice of Use under |

ANT_BARTZ_000435693

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Limitation on Remedies (cont'd)** | | reasonable degree of certainty based on information obtained in performing the reasonably diligent search." | in a manner that is reasonable under the circumstances, to the owner of the infringed copyright, if such owner was known with a reasonable degree of certainty, based on information obtained in performing the qualifying search; (iv) included with the use of the infringing work a symbol or other notice of the use of the infringing work, in a manner prescribed by the Register of Copyrights; (v) asserts in the initial pleading to the civil action the right to claim such limitations; (vi) consents to the jurisdiction of United States district court, or such court holds that the infringer is within the jurisdiction of the court; and (vii) at the time of making the initial discovery disclosures required under Rule 26 of the Federal Rules of Civil Procedure, states with particularity the basis for the right to claim the limitations, including a detailed | owner of the infringed copyright, if such legal owner was known with a reasonable degree of certainty, based on information obtained in performing the qualifying search; (iii) included with the public distribution, display, or performance of the infringing work a symbol or other notice of the use of the infringing work, the form and manner of which shall be prescribed by the Register of Copyrights, which maybe in the footnotes, endnotes, bottom margin, end credits, or in any other such manner as to give notice that the infringed work has been used under this section; (iv) asserts in the initial pleading to the civil action eligibility for such limitations; and (v) at the time of making the initial discovery disclosures required under rule 26 of the Federal Rules of Civil Procedure, states with particularity the basis for eligibility for the limitations, including a detailed description and | paragraph (3); (iii) provided attribution, in a manner that is reasonable under the circumstances, to the legal owner of the infringed copyright, if such legal owner was known with a reasonable degree of certainty, based on information obtained in performing the qualifying search; (iv) included with the public distribution, display, or performance of the infringing work a symbol or other notice of the use of the infringing work, the form and manner of which shall be prescribed by the Register of Copyrights; (v) asserts in the initial pleading to the civil action eligibility for such limitations; and (vi) at the time of making the initial discovery disclosures required under rule 26 of the Federal Rules of Civil Procedure, states with particularity the basis for eligibility for the limitations, including a detailed description and documentation of the search undertaken in |

ANT_BARTZ_000435694

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Limitation on Remedies (cont'd)** | | | description and documentation of the search undertaken in accordance with paragraph (2)(A). (B) EXCEPTION.— Subparagraph (A) does not apply if, after receiving notice of the claim for infringement and having an opportunity to conduct an expeditious good faith investigation of the claim, the infringer— (i) fails to negotiate reasonable compensation in good faith with the owner of the infringed copyright; or (ii) fails to render payment of reasonable compensation in a reasonably timely manner." | documentation of the search undertaken in accordance with paragraph (2)(A) and produces documentation of the search. (B) EXCEPTION.— Subparagraph (A) does not apply if the infringer or a person acting on behalf of the infringer receives a notice of claim of infringement and, after receiving such notice and having an opportunity to conduct an expeditious good faith investigation of the claim, the infringer— (i) fails to engage in negotiation in good faith regarding reasonable compensation with the owner of the infringed copyright; or (ii) fails to render payment of reasonable compensation in a reasonably timely manner after reaching an agreement with the owner of the infringed copyright or under an order described in subsection (c)(1)(A)." | accordance with paragraph (2)(A) and produces documentation of the search. (B) EXCEPTION.— Subparagraph (A) does not apply if, after receiving notice of the claim for infringement and having an opportunity to conduct an expeditious good faith investigation of the claim, the infringer— (i) fails to negotiate reasonable compensation in good faith with the owner of the infringed copyright; or (ii) fails to render payment of reasonable compensation in a reasonably timely manner after reaching an agreement with the owner of the infringed copyright or under an order described in subsection (c)(1)(A)." |

ANT_BARTZ_000435695

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Requirements for Searches & Information to Guide Searches** | The Report identifies the following factors to be taken into consideration when determining if a search was reasonable: <br>- The amount of identifying information on the copy of the work itself, such as an author's name, copyright notice, or title. <br>- Whether the work had been made available to the public. <br>- The age of the work, or the dates on which it was created and made available to the public. <br>- Whether information about the work can be found in publicly available records, such as the Copyright Office records or other resources. <br>- Whether the author is still alive, or the corporate copyright owner still exists, and whether a record of any transfer of the copyright exists and is available to the user. <br>- The nature and extent of the use, such as whether the use is commercial or noncommercial, and how prominently the work figures into the activity of the user. | [from DEFINITIONS section] <br>"(B) REQUIREMENTS FOR REASONABLY DILIGENT SEARCH.—(i) For purposes of paragraph (1), a search to locate the owner of an infringed copyright in a work— <br>(I) is 'reasonably diligent' only if it includes steps that are reasonable under the circumstances to locate that owner in order to obtain permission for the use of the work; and <br>(II) is not 'reasonably diligent' solely by reference to the lack of identifying information with respect to the copyright on the copy or phonorecord of the work. <br>(ii) The steps referred to in clause (i)(I) shall ordinarily include, at a minimum, review of the information maintained by the Register of Copyrights under subparagraph (C). <br>(iii) A reasonably diligent search includes the use of reasonably available expert assistance and reasonably available technology, which may include, if reasonable under the circumstances, | "(2) REQUIREMENTS FOR SEARCHES.— <br>(A) REQUIREMENTS FOR QUALIFYING SEARCHES.— <br>(i) IN GENERAL.—For purposes of paragraph (1)(A)(i)(I), a search is qualifying if the infringer undertakes a diligent effort to locate the owner of the infringed copyright. <br>(ii) DETERMINATION OF DILIGENT EFFORT.—In determining whether a search is diligent under this subparagraph, a court shall consider whether— <br>(I) the actions taken in performing that search are reasonable and appropriate under the facts relevant to that search, including whether the infringer took actions based on facts uncovered by the search itself; <br>(II) the infringer employed the applicable best practices maintained by the Register of Copyrights under subparagraph (B); and <br>(III) the infringer performed the search before using the work and at a time that was reasonably proximate to the commencement of the | "(2) REQUIREMENTS FOR SEARCHES.— <br>(A) REQUIREMENTS FOR QUALIFYING SEARCHES.— <br>(i) IN GENERAL.—A search qualifies under paragraph (1)(A)(i)(I) if the infringer, a person acting on behalf of the infringer, or any person jointly and severally liable with the infringer for the infringement, undertakes a diligent effort that is reasonable under the circumstances to locate the owner of the infringed copyright prior to, and at a time reasonably proximate to, the infringement. <br>(ii) DILIGENT EFFORT.— For purposes of clause (i), a diligent effort— <br>(I) requires, at a minimum— <br>(aa) a search of the records of the Copyright Office that are available to the public through the Internet and relevant to identifying and locating copyright owners, provided there is sufficient identifying information on which to construct a search; <br>(bb) a search of reasonably available sources of copyright | "(2) REQUIREMENTS FOR SEARCHES.— <br>(A) REQUIREMENTS FOR QUALIFYING SEARCHES.— <br>(i) IN GENERAL.—A search qualifies under paragraph (1)(A)(i)(I) if the infringer, a person acting on behalf of the infringer, or any person jointly and severally liable with the infringer for the infringement, undertakes a diligent effort that is reasonable under the circumstances to locate the owner of the infringed copyright prior to, and at a time reasonably proximate to, the infringement. <br>(ii) DILIGENT EFFORT.— For purposes of clause (i), a diligent effort— <br>(I) requires, at a minimum— <br>(aa) a search of the records of the Copyright Office that are available to the public through the Internet and relevant to identifying and locating copyright owners, provided there is sufficient identifying information on which to construct a search; <br>(bb) a search of reasonably available sources of copyright |

4

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Requirements for Searches & Information to Guide Searches (cont'd)** | 2006 Report at 9-10. | resources for which a charge or subscription fee is imposed. (C) INFORMATION TO GUIDE SEARCHES.—The Register of Copyrights shall receive, maintain, and make available to the public, including through the Internet, information from authoritative sources, such as industry guidelines, statements of best practices, and other relevant documents, that is designed to assist users in conducting and documenting a reasonably diligent search under this subsection. Such information may include— (i) the records of the Copyright Office that are relevant to identifying and locating copyright owners; (ii) other sources of copyright ownership information reasonably available to users; (iii) methods to identify copyright ownership information associated with a work; (iv) sources of reasonably available technology tools and reasonably available expert assistance; and | infringement. (iii) LACK OF IDENTIFYING INFORMATION.—The fact that a particular copy or phonorecord lacks identifying information pertaining to the owner of the infringed copyright is not sufficient to meet the conditions under paragraph (1)(A)(i)(I). (B) INFORMATION TO GUIDE SEARCHES; BEST PRACTICES.— (i) STATEMENT OF BEST PRACTICES.—The Register of Copyrights shall maintain and make available to the public, including through the Internet, current statements of best practices for conducting and documenting a search under this subsection. (ii) CONSIDERATION OF RELEVANT MATERIALS AND STANDARDS.—In maintaining the statements of best practices required under clause (i), the Register of Copyrights shall, from time to time, consider materials and standards that may be relevant to the requirements for a qualifying search under | authorship and ownership information, and where appropriate, licensor information; (cc) use of appropriate technology tools, printed publications, and where reasonable, internal or external expert assistance; and (dd) use of appropriate databases, including databases that are available to the public through the Internet; and (II) shall include any actions that are reasonable and appropriate under the facts relevant to the search, including actions based on facts known at the start of the search and facts uncovered during the search, and including a review, as appropriate, of Copyright Office records not available to the public through the Internet that are reasonably likely to be useful in identifying and locating the copyright owner. (iii) CONSIDERATION OF RECOMMENDED PRACTICES.—A qualifying search under this subsection shall ordinarily be based on the applicable | authorship and ownership information, and where appropriate, licensor information; (cc) use of appropriate technology tools, printed publications, and where reasonable, internal or external expert assistance; and (dd) use of appropriate databases, including databases that are available to the public through the Internet; and (II) shall include any actions that are reasonable and appropriate under the facts relevant to the search, including actions based on facts known at the start of the search and facts uncovered during the search, and including a review, as appropriate, of Copyright Office records not available to the public through the Internet that are reasonably likely to be useful in identifying and locating the copyright owner. (iii) CONSIDERATION OF RECOMMENDED PRACTICES.—A qualifying search under this subsection shall ordinarily be based on the applicable |

ANT_BARTZ_000435697

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Requirements for Searches & Information to Guide Searches (cont'd)** | | (v) best practices for documenting a reasonably diligent search." | subparagraph (A)." | statement of Recommended Practices made available by the Copyright Office and additional appropriate best practices of authors, copyright owners, and users to the extent such best practices incorporate the expertise of persons with specialized knowledge with respect to the type of work for which the search is being conducted. (iv) LACK OF IDENTIFYING INFORMATION.—The fact that, in any given situation,— (I) a particular copy or phonorecord lacks identifying information pertaining to the owner of the infringed copyright; or (II) an owner of the infringed copyright fails to respond to any inquiry or other communication about the work, shall not be deemed sufficient to meet the conditions under paragraph (1)(A)(i)(I). (v) USE OF RESOURCES FOR CHARGE.—A qualifying search under paragraph (1)(A)(i)(I) may require use of resources for which | statement of Recommended Practices made available by the Copyright Office. (iv) LACK OF IDENTIFYING INFORMATION.—The fact that, in any given situation,— (I) a particular copy or phonorecord lacks identifying information pertaining to the owner of the infringed copyright; or (II) an owner of the infringed copyright fails to respond to any inquiry or other communication about the work, shall not be deemed sufficient to meet the conditions under paragraph (1)(A)(i)(I). (v) USE OF RESOURCES FOR CHARGE.—A qualifying search under paragraph (1)(A)(i)(I) may require use of resources for which a charge or subscription is imposed to the extent reasonable under the circumstances. (vi) EFFECT OF FOREIGN SEARCHES.—If a search is found to be qualifying under the laws of a foreign jurisdiction, and this search is relied upon in part by a U.S. infringer, a court may take this fact |

ANT_BARTZ_000435698

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Requirements for Searches & Information to Guide Searches (cont'd)** | | | | a charge or subscription is imposed to the extent reasonable under the circumstances. (B) INFORMATION TO GUIDE SEARCES; RECOMMENDED PRACTICES.— (i) STATEMENTS OF RECOMMENDED PRACTICES.—The Register of Copyrights shall maintain and make available to the public and, from time to time, update at least one statement of Recommended Practices for each category, or, in the Register's discretion, subcategory of work under section 102(a) of this title, for conducting and documenting a search under this subsection. Such statement will ordinarily include reference to materials, resources, databases, and technology tools that are relevant to a search. The Register may maintain and make available more than one statement of Recommended Practices for each category or subcategory, as appropriate. (ii) CONSIDERATION OF | into account when determining whether the U.S. search is qualifying, *provided* the foreign jurisdiction accepts qualifying U.S. searches in a reciprocal manner. (B) INFORMATION TO GUIDE SEARCHES; RECOMMENDED PRACTICES.— (i) STATEMENTS OF RECOMMENDED PRACTICES.—The Register of Copyrights shall maintain and make available to the public and, from time to time, update at least one statement of Recommended Practices for each category, or, in the Register's discretion, subcategory of work under section 102(a) of this title, for conducting and documenting a search under this subsection. Such statement will ordinarily include reference to materials, resources, databases, and technology tools that are relevant to a search. The Register may maintain and make available more than one statement of Recommended Practices for each category or |

7

ANT_BARTZ_000435699

**Orphan Works Legislative Language: Comparison Chart**

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Requirements for Searches & Information to Guide Searches (cont'd)** | | | | RELEVANT MATERIALS.— In maintaining and making available and, from time to time, updating the Recommended Practices in clause (i), the Register of Copyrights shall, at the Register's discretion, consider materials, resources, databases, technology tools, and practices that are reasonable and relevant to the qualifying search. The Register shall consider any comments submitted to the Copyright Office by the Small Business Administration Office of Advocacy. The Register shall also, to the extent practicable, take the impact on copyright owners that are small businesses into consideration when modifying and updating best practices." | subcategory, as appropriate. (ii) CONSIDERATION OF RELEVANT MATERIALS.— In maintaining and making available and, from time to time, updating the Recommended Practices in clause (i), the Register of Copyrights shall, at the Register's discretion, consider materials, resources, databases, technology tools, and practices that are reasonable and relevant to the qualifying search. The Register may consider any comments submitted to the Copyright Office by any interested stakeholders." |

8

ANT_BARTZ_000435700

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Notice of Use Archive** | [none] | [none] | "(3) NOTICE OF USE ARCHIVE.—The Register of Copyrights shall create and maintain an archive to retain the Notice of Use filings under paragraph (1)(A)(i)(III). Such filings shall include— (A) the type of work being used, as listed in section 102(a) of this title; (B) a description of the work; (C) a summary of the search conducted under paragraph (1)(A)(i)(I); (D) the owner, author, recognized title, and other available identifying element of the work, to the extent the infringer knows such information with a reasonable degree of certainty; (E) a certification that the infringer performed a qualifying search in good faith under this subsection to locate the owner of the infringed copyright; and (F) the name of the infringer and how the work will be used. Notices of Use filings retained under the control of the Copyright Office shall be furnished only | [none] | "(3) NOTICE OF USE ARCHIVE.—The Register of Copyrights shall create and maintain an archive to retain the Notice of Use filings under paragraph (1)(A)(i)(III). Such filings shall include— (A) the type of work being used, as listed in section 102(a) of this title; (B) a description of the work; (C) a summary of the search conducted under paragraph (1)(A)(i)(I); (D) the owner, author, recognized title, and other available identifying element of the work to the extent the infringer knows such information with a reasonable degree of certainty; (E) the source of the work, including the library or archive in which the work was found, the publication in which the work originally appeared, the website from which the work was taken, (including the url and the date the site was accessed); (F) a certification that the infringer performed a qualifying search in good |

ANT_BARTZ_000435701

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| Notice of Use Archive (cont'd) | | | under the conditions specified by regulations of the Copyright Office." | | faith under this subsection to locate the owner of the infringed copyright; and (G) the name of the infringer and how the work will be used.<br><br>Notices of Use filings retained under the control of the Copyright Office shall be made available to individuals or the public only under the conditions specified by regulations of the Copyright Office." |

10

ANT_BARTZ_000435702

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Penalty for Failure to Comply with Search Requirements** | [none] | [none] | "(4) PENALTY FOR FAILURE TO COMPLY.—If an infringer fails to comply with any requirement under this subsection, the infringer is subject to all the remedies provided in section 502 through 505, subject to section 412." | "(3) PENALTY FOR FAILURE TO COMPLY.—If an infringer fails to comply with any requirement under this subsection, the infringer is not eligible for a limitation on remedies under this section." | "(4) PENALTY FOR FAILURE TO COMPLY.—If an infringer fails to comply with any requirement under this subsection, the infringer is not eligible for a limitation on remedies under this section." |

ANT_BARTZ_000435703

# Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Limitations: Monetary Relief** | "(1) MONETARY RELIEF (A) no award for monetary damages (including actual damages, statutory damages, costs or attorney's fees) shall be made other than an order requiring the infringer to pay reasonable compensation for the use of the infringed work; *provided*, however, that where the infringement is performed without any purpose of direct or indirect commercial advantage, such as through the sale of copies or phonorecords of the infringed work, and the infringer ceases the infringement expeditiously after receiving notice of the claim for infringement, no award of monetary relief shall be made."<br><br>2006 Report at 127. | "(1) MONETARY RELIEF.— (A) GENERAL RULE.— Subject to subparagraph (B), an award for monetary relief (including actual damages, statutory damages, costs, and attorney's fees) may not be made, other than an order requiring the infringer to pay reasonable compensation for the use of the infringed work. (B) EXCEPTIONS.—(i) An order requiring the infringer to pay reasonable compensation for the use of the infringed work may not be made under subparagraph (A) if— (I) the infringement is performed without any purpose of direct or indirect commercial advantage and primarily for a charitable, religious, scholarly, or educational purpose, and (II) the infringer ceases the infringement expeditiously after receiving notice of the claim for infringement, unless the copyright owner proves, and the court finds, that the infringer has earned proceeds directly attributable to the | "(1) MONETARY RELIEF.— (A) GENERAL RULE.— Subject to subparagraph (B), an award for monetary relief (including actual damages, statutory damages, costs, and attorney's fees) may not be made other than an order requiring the infringer to pay reasonable compensation to the legal or beneficial owner of the exclusive right under the infringed copyright for the use of the infringed work. (B) FURTHER LIMITATIONS.—An order requiring the infringer to pay reasonable compensation for the use of the infringed work may not be made under subparagraph (A) if the infringer is a nonprofit educational institution, library, or archives, or a public broadcasting entity (as defined in subsection (f) of section 118) and the infringer proves by a preponderance of the evidence that— (i) the infringement was performed without any purpose of direct or indirect commercial advantage, | "(1) MONETARY RELIEF.— (A) GENERAL RULE.— Subject to subparagraph (B), an award for monetary relief (including actual damages, statutory damages, costs, and attorney's fees) may not be made other than an order requiring the infringer to pay reasonable compensation to the owner of the exclusive right under the infringed copyright for the use of the infringed work. (B) FURTHER LIMITATIONS.—An order requiring the infringer to pay reasonable compensation for the use of the infringed work may not be made under subparagraph (A) if the infringer is a nonprofit educational institution, museum, library, archives, or a public broadcasting entity (as defined in subsection (f) of section 118), or any of such entities' employees acting within the scope of their employment, and the infringer proves by a preponderance of the evidence that— (i) the infringement was | "(1) MONETARY RELIEF.— (A) GENERAL RULE.— Subject to subparagraph (B), an award for monetary relief (including actual damages, statutory damages, costs, and attorney's fees) may not be made other than an order requiring the infringer to pay reasonable compensation to the owner of the exclusive right under the infringed copyright for the use of the infringed work. (B) FURTHER LIMITATIONS.—An order requiring the infringer to pay reasonable compensation for the use of the infringed work may not be made under subparagraph (A) if the infringer is a nonprofit educational institution, museum, library, archives, or a public broadcasting entity (as defined in subsection (f) of section 118), or any of such entities' employees acting within the scope of their employment, and the infringer proves by a preponderance of the evidence that— (i) the infringement was |

ANT_BARTZ_000435704

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Limitations: Monetary Relief (cont'd)** | | infringement. (ii) If the infringer fails to negotiate in good faith with the owner of the infringed work regarding the amount of reasonable compensation for the use of the infringed work, the court may award full costs, including a reasonable attorney's fee, against the infringer under section 505, subject to section 412." | (ii) the infringement was primarily educational, religious, or charitable in nature, and (iii) after receiving notice of the claim for infringement, and after conducting an expeditious good faith investigation of the claim, the infringer promptly ceased the infringement, except that if the legal or beneficial owner of the exclusive right under the infringed copyright proves, and the court finds, that the infringer has earned proceeds directly attributable to the infringement, the portion of such proceeds so attributable may be awarded to such owner. (C) EFFECT OF REGISTRATION ON REASONABLE COMPENSATION.—If a work is registered, the court may, in determining reasonable compensation under this paragraph, take into account the value, if any, added to the work by reason of such registration." | performed without any purpose of direct or indirect commercial advantage; (ii) the infringement was primarily educational, religious, or charitable in nature; and (iii) after receiving a notice of claim of infringement, and having an opportunity to conduct an expeditious good faith investigation of the claim, the infringer promptly ceased the infringement." | performed without any purpose of direct or indirect commercial advantage; (ii) the infringement was primarily educational, religious, or charitable in nature; and (iii) after receiving a notice of claim of infringement, and having an opportunity to conduct an expeditious good faith investigation of the claim, the infringer promptly ceased the infringement. (C) EFFECT OF REGISTRATION ON REASONABLE COMPENSATION.—If a work is registered, the court may, in determining reasonable compensation under this paragraph, take into account the value, if any, added to the work by reason of such registration." |

13

ANT_BARTZ_000435705

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Limitations: Injunctive Relief** | "(2) INJUNCTIVE RELIEF (A) in the case where the infringer has prepared or commenced preparation of a derivative work that recasts, transforms or adapts the infringed work with a significant amount of the infringer's expression, any injunctive or equitable relief granted by the court shall not restrain the infringer's continued preparation and use of the derivative work, provided that the infringer makes payment of reasonable compensation to the copyright owner for such preparation and ongoing use and provides attribution to the author and copyright owner in a manner determined by the court as reasonable under the circumstances; and (B) in all other cases, the court may impose injunctive relief to prevent or restrain the infringement in its entirety, but the relief shall to the extent practicable account for any harm that the relief would cause the infringer due to the infringer's reliance on this section in making the | "(2) INJUNCTIVE RELIEF.— (A) GENERAL RULE.— Subject to subparagraph (B), the court may impose injunctive relief to prevent or restrain the infringing use, except that, if the infringer has met the requirements of subsection (a), the relief shall, to the extent practicable, account for any harm that the relief would cause the infringer due to its reliance on having performed a reasonably diligent search under subsection (a). (B) SPECIAL RULE FOR NEW WORKS.—In a case in which the infringer recasts, transforms, adapts, or integrates the infringed work with the infringer's original expression in a new work of authorship, the court may not, in granting injunctive relief, restrain the infringer's continued preparation or use of that new work, if the infringer— (i) pays reasonable compensation to the owner of the infringed copyright for the use of the infringed work; and (ii) provides attribution to the owner of the infringed | "(2) INJUNCTIVE RELIEF.— (A) GENERAL RULE.— Subject to subparagraph (B), the court may impose injunctive relief to prevent or restrain any infringement alleged in the civil action. (B) EXCEPTION.—In a case in which the infringer has prepared or commenced preparation of a work that recasts, transforms, adapts, or integrates the infringed work with a significant amount of the infringer's original expression, any injunctive relief ordered by the court— (i) may not restrain the infringer's continued preparation or use of that new work; (ii) shall require that the infringer pay reasonable compensation to the legal or beneficial owner of the exclusive right under the infringed copyright for the use of the infringed work; and (iii) shall require that the infringer provide attribution, in a manner that is reasonable under the circumstances, to the owner of the infringed copyright, if requested by | "(2) INJUNCTIVE RELIEF.— (A) GENERAL RULE.— Subject to subparagraph (B), the court may impose injunctive relief to prevent or restrain any infringement alleged in the civil action. If the infringer has met the requirements of subsection (b), the relief shall, to the extent practicable and subject to applicable law, account for any harm that the relief would cause the infringer due to its reliance on subsection (b). (B) EXCEPTION.—In a case in which the infringer has prepared or commenced preparation of a new work of authorship that recasts, transforms, adapts, or integrates the infringed work with a significant amount of original expression, any injunctive relief ordered by the court may not restrain the infringer's continued preparation or use of that new work, if— (i) the infringer pays reasonable compensation in a reasonably timely manner after the amount of such compensation has been agreed upon with the | "(2) INJUNCTIVE RELIEF.— (A) GENERAL RULE.— Subject to subparagraph (B), the court may impose injunctive relief to prevent or restrain any infringement alleged in the civil action. If the infringer has met the requirements of subsection (b), the relief shall, to the extent practicable and subject to applicable law, account for any harm that the relief would cause the infringer due to its reliance on subsection (b). (B) EXCEPTION.—In a case in which the infringer has prepared or commenced preparation of a new work of authorship that recasts, transforms, adapts, or integrates the infringed work with a significant amount of original expression, any injunctive relief ordered by the court may not restrain the infringer's continued preparation or use of that new work, if— (i) the infringer pays reasonable compensation in a reasonably timely manner after the amount of such compensation has been agreed upon with the |

ANT_BARTZ_000435706

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Limitations: Injunctive Relief (cont'd)** | infringing use." 2006 Report at 127. | copyright in a manner that the court determines is reasonable under the circumstances. (C) TREATMENT OF PARTIES NOT SUBJECT TO SUIT.—The limitations on remedies under this paragraph shall not be available to an infringer that asserts in an action under section 501(b) that neither it nor its representative acting in an official capacity is subject to suit in Federal court for an award of damages to the copyright owner under section 504, unless the court finds that such infringer has— (i) complied with the requirements of subsection (a) of this section; (ii) made a good faith offer of compensation that was rejected by the copyright owner; and (iii) affirmed in writing its willingness to pay such compensation to the copyright owner upon the determination by the court that such compensation was reasonable under paragraph (3) of this subsection. (D) CONSTRUCTION.— | such owner. (C) LIMITATIONS.—The limitations on injunctive relief under subparagraphs (A) and (B) shall not be available to an infringer if the infringer asserts in the civil action that neither the infringer or any representative of the infringer acting in an official capacity is subject to suit in the courts of the United States for an award of damages to the legal or beneficial owner of the exclusive right under the infringed copyright under section 106, unless the court finds that the infringer— (i) has complied with the requirements of subsection (b); and (ii) has made an enforceable promise to pay reasonable compensation to the legal or beneficial owner of the exclusive right under the infringed copyright. (D) RULE OF CONSTRUCTION.—Nothing in subparagraph (C) shall be construed to authorize or require, and no action taken under such subparagraph shall be | owner of the infringed copyright or determined by the court; and (ii) the court also requires that the infringer provide attribution, in a manner that is reasonable under the circumstances, to the legal owner of the infringed copyright, if requested by such owner. (C) LIMITATIONS.—The limitations on injunctive relief under subparagraphs (A) and (B) shall not be available to an infringer or a representative of the infringer acting in an official capacity if the infringer asserts that neither the infringer nor any representative of the infringer acting in an official capacity is subject to suit in the courts of the United States for an award of damages for the infringement, unless the court finds that the infringer— (i) has complied with the requirements of subsection (b); and (ii) pays reasonable compensation to the owner of the exclusive right under the infringed copyright in a reasonably | owner of the infringed copyright or determined by the court; and (ii) the court requires that the infringer provide attribution, in a manner that is reasonable under the circumstances, to the legal owner of the infringed copyright, if requested by such owner; however (iii) the subsection (2)(B)(i)-(ii) limitation on injunctive relief shall not apply if— (I) the owner of the work is also an author of the work; (II) the owner requests such injunctive relief; and (III) the owner alleges, and the court so finds, that the infringer's continued and intentional preparation or use of the new work would be prejudicial to the owner's honor or reputation, and this harm is not otherwise compensable. (C) LIMITATIONS.—The limitations on injunctive relief under subparagraphs (A) and (B) may not be available to an infringer or a representative of the infringer acting in an |

ANT_BARTZ_000435707

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Limitations: Injunctive Relief (cont'd)** | | Nothing in subparagraph (C) shall be deemed to authorize or require, and no action taken pursuant to subparagraph (C) shall be deemed to constitute, an award of damages by the court against the infringer. (E) RIGHTS AND PRIVILEGES NOT WAIVED.—No action taken by an infringer pursuant to subparagraph (C) shall be deemed to waive any right or privilege that, as a matter of law, protects such infringer from being subject to suit in Federal court for an award of damages to the copyright owner under section 504." | deemed to constitute, either an award of damages by the court against the infringer or an authorization to sue a State. (E) RIGHTS AND PRIVILEGES NOT WAIVED.—No action taken by an infringer under subparagraph (C) shall be deemed to waive any right or privilege that, as a matter of law, protects the infringer from being subject to suit in the courts of the United States for an award of damages to the legal or beneficial owner of the exclusive right under the infringed copyright under section 106." | timely manner after the amount of reasonable compensation has been agreed upon with the owner or determined by the court. (D) RULE OF CONSTRUCTION.—Nothing in subparagraph (C) shall be construed to authorize or require, and no action taken under such subparagraph shall be deemed to constitute, either an award of damages by the court against the infringer or an authorization to sue a State. (E) RIGHTS AND PRIVILEGES NOT WAIVED.—No action taken by an infringer under subparagraph (C) shall be deemed to waive any right or privilege that, as a matter of law, protects the infringer from being subject to suit in the courts of the United States for an award of damages." | official capacity if the infringer asserts that neither the infringer nor any representative of the infringer acting in an official capacity is subject to suit in the courts of the United States for an award of damages for the infringement, unless the court finds that the infringer— (i) has complied with the requirements of subsection (b); and (ii) pays reasonable compensation to the owner of the exclusive right under the infringed copyright in a reasonably timely manner after the amount of reasonable compensation has been agreed upon with the owner or determined by the court. (D) RULE OF CONSTRUCTION.—Nothing in subparagraph (C) shall be construed to authorize or require, and no action taken under such subparagraph shall be deemed to constitute, either an award of damages by the court against the infringer or an authorization to sue a State. |

ANT_BARTZ_000435708

**Orphan Works Legislative Language: Comparison Chart**

|  | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Limitations: Injunctive Relief (cont'd)** |  |  |  |  | (E) RIGHTS AND PRIVILEGES NOT WAIVED.—No action taken by an infringer under subparagraph (C) shall be deemed to waive any right or privilege that, as a matter of law, protects the infringer from being subject to suit in the courts of the United States for an award of damages. |

17

ANT_BARTZ_000435709

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Reasonable Compensation** | "[R]easonable compensation would equal what a reasonable willing buyer and reasonable willing seller in the positions of the owner and user would have agreed to at the time the use commenced, based predominantly by reference to evidence of comparable marketplace transactions. . . . It is not enough for the copyright owner to simply assert the amount for which he would have licensed the work *ex post*; he must have evidence that he or similarly situated copyright owners have actually licensed similar uses for such amount."<br><br>2006 Report at 116. | "(3) REASONABLE COMPENSATION.—In establishing reasonable compensation under paragraph (1[monetary relief]) or (2 [injunctive relief]), the owner of the infringed copyright has the burden of establishing the amount on which a reasonable willing buyer and a reasonable willing seller in the positions of the owner and the infringer would have agreed with respect to the infringing use of the work immediately before the infringement began." | **[from DEFINITIONS section]**<br>"(4) REASONABLE COMPENSATION.—The term 'reasonable compensation' means, with respect to a claim for infringement, the amount on which a willing buyer and willing seller in the positions of the infringer and the owner of the infringed copyright would have agreed with respect to the infringing use of the work immediately before the infringement began." | **[from DEFINITIONS section]**<br>"(3) REASONABLE COMPENSATION.—The term 'reasonable compensation' means, with respect to a claim of infringement, the amount on which a willing buyer and willing seller in the positions of the infringer and the owner of the infringed copyright would have agreed with respect to the infringing use of the work immediately before the infringement began." | **[from DEFINITIONS section]**<br>"(3) REASONABLE COMPENSATION.—The term 'reasonable compensation' means, with respect to a claim of infringement, the amount on which a willing buyer and willing seller in the positions of the infringer and the owner of the infringed copyright would have agreed with respect to the infringing use of the work immediately before the infringement began." |

18

ANT_BARTZ_000435710

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Exclusion for Fixations in or on Useful Articles** | [none] | [none] | "(d) EXCLUSION FOR FIXATIONS IN OR ON USEFUL ARTICLES.—The limitations on monetary and injunctive relief under this section shall not be available to an infringer for infringements resulting from fixation of a work in or on a useful article that is offered for sale or other distribution to the public." | "(f) EXCLUSION FOR FIXATIONS IN OR ON USEFUL ARTICLES.—The limitations on remedies under this section shall not be available to an infringer for infringements resulting from fixation of a pictorial, graphic, or sculptural work in or on a useful article that is offered for sale or other commercial distribution to the public." | "(f) EXCLUSION FOR FIXATIONS IN OR ON USEFUL ARTICLES.—The limitations on remedies under this section shall not be available to an infringer for infringements resulting from fixation of a pictorial, graphic, or sculptural work in or on a useful article that is offered for sale or other commercial distribution to the public." |

19

ANT_BARTZ_000435711

## Orphan Works Legislative Language: Comparison Chart

|  | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Savings Clause** | "(c) Nothing in this section shall affect rights, limitations or defenses to copyright infringement, including fair use, under this title."<br><br>2006 Report at 127. | "(c) PRESERVATION OF OTHER RIGHTS, LIMITATIONS, AND DEFENSE.—This section does not affect any right, limitation, or defense to copyright infringement, including fair use, under this title.  If another provision of this title provides for a statutory license when the copyright owner cannot be located, that provision applies in lieu of this section." | "(e) PRESERVATION OF OTHER RIGHTS, LIMITATIONS, AND DEFENSES.—This section does not affect any right, limitation, or defense to copyright infringement, including fair use, under this title.  If another provision of this title provides for a statutory license that would permit the infringement contemplated by the infringer if the owner of the infringed copyright cannot be located, that provision applies instead of this section." | "(d) PRESERVATION OF OTHER RIGHTS, LIMITATIONS, AND DEFENSES.—This section does not affect any right, or any limitation or defense to copyright infringement, including fair use, under this title.  If another provision of this title provides for a statutory license that would permit the use contemplated by the infringer, that provision applies instead of this section." | "(d) PRESERVATION OF OTHER RIGHTS, LIMITATIONS, AND DEFENSES.—This section does not affect any right, or any limitation or defense to copyright infringement, including fair use, under this title.  If another provision of this title provides for a statutory license that would permit the use contemplated by the infringer, that provision applies instead of this section." |

20

ANT_BARTZ_000435712

# Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Derivative Works** | [none] | "(d) COPYRIGHT FOR DERIVATIVE WORKS.— Notwithstanding section 103(a), the infringing use of a work in accordance with this section shall not limit or affect the copyright protection for a work that uses the infringed work." | "(f) COPYRIGHT FOR DERIVATIVE WORKS AND COMPILATIONS.— Notwithstanding section 103(a), an infringer who qualifies for the limitation on remedies afforded by this section with respect to the use of a copyrighted work shall not be denied copyright protection in a compilation or derivative work on the basis that such compilation or derivative work employs preexisting material that has been used unlawfully under this section." | "(e) COPYRIGHT FOR DERIVATIVE WORKS AND COMPILATIONS.— Notwithstanding section 103(a), an infringer who qualifies for the limitation on remedies afforded by this section shall not be denied copyright protection in a compilation or derivative work on the basis that such compilation or derivative work employs preexisting material that has been used unlawfully under this section." | "(e) COPYRIGHT FOR DERIVATIVE WORKS AND COMPILATIONS.— Notwithstanding section 103(a), an infringer who qualifies for the limitation on remedies afforded by this section shall not be denied copyright protection in a compilation or derivative work on the basis that such compilation or derivative work employs preexisting material that has been used unlawfully under this section." |

21

ANT_BARTZ_000435713

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| Definitions | [none] | "(2) DEFINITIONS; REQUIREMENTS FOR SEARCHES.— (A) OWNER OF INFRINGED COPYRIGHT.—For purposes of paragraph (1), the 'owner' of an infringed copyright in a work is the legal or beneficial owner of, or any party with authority to grant or license, an exclusive right under section 106 applicable to the infringement." | "(a) DEFINITIONS.—In this section, the following definitions shall apply: (1) MATERIALS AND STANDARDS.—The term 'materials and standards' includes— (A) the records of the Copyright Office that are relevant to identifying and locating copyright owners; (B) sources of copyright ownership information reasonably available to users, including private databases; (C) industry practices and guidelines of associations and organizations; (D) technology tools and expert assistance, including resources for which a charge or subscription fee is imposed, to the extent that the use of such resources is reasonable for, and relevant to, the scope of the intended use; and (E) electronic databases, including databases that are available to the public through the Internet, that allow for searches of copyrighted works and for the copyright owners of works, including through text, sound, and image | "(a) DEFINITIONS.—In this section, the following definitions shall apply: (1) NOTICE OF CLAIM OF INFRINGEMENT.— The term 'notice of claim of infringement' means, with respect to a claim of copyright infringement, a written notice sent from the owner of the infringed copyright or a person acting on the owner's behalf to the infringer or a person acting on the infringer's behalf, that includes at a minimum— (A) the name of the owner of the infringed copyright; (B) the title of the infringed work, any alternative titles of the infringed work known to the owner of the infringed copyright, or if the work has no title, a description in detail sufficient to identify that work; (C) an address and telephone number at which the owner of the infringed copyright or a person acting on behalf of the owner may be contacted; and (D) information reasonably sufficient to permit the infringer to | "(a) DEFINITIONS.—In this section, the following definitions shall apply: (1) NOTICE OF CLAIM OF INFRINGEMENT.—The term 'notice of claim of infringement' means, with respect to a claim of copyright infringement, a written notice sent from the owner of the infringed copyright or a person acting on the owner's behalf to the infringer or a person acting on the infringer's behalf, that includes at a minimum— (A) the name of the owner of the infringed copyright; (B) the title of the infringed work, any alternative titles of the infringed work known to the owner of the infringed copyright, or if the work has no title, a description in detail sufficient to identify that work; (C) an address and telephone number at which the owner of the infringed copyright or a person acting on behalf of the owner may be contacted; and (D) information reasonably sufficient to permit the infringer to |

ANT_BARTZ_000435714

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Definitions (cont'd)** | | | recognition tools. (2) NOTICE OF CLAIM FOR INFRINGEMENT.—The term 'notice of the claim for infringement' means, with respect to a claim for copyright infringement, a written notice that includes at a minimum the following: (A) The name of the owner of the infringed copyright. (B) The title of the infringed work, any alternative titles of the infringed work known to the owner of the infringed copyright, or if the work has no title, a description in detail sufficient to identify it. (C) An address and telephone number at which the owner of the infringed copyright may be contacted. (D) Information from which a reasonable person could conclude that the owner of the infringed copyright's claims of ownership and infringement are valid. (3) OWNER OF THE INFRINGED COPYRIGHT.— The 'owner of the infringed copyright' is the legal | locate the infringer's material in which the infringed work resides. (2) OWNER OF THE INFRINGED COPYRIGHT.— The 'owner of the infringed copyright' is the owner of any particular exclusive right under section 106 that is applicable to the infringement, or any person or entity with the authority to grant or license such right on an exclusive or nonexclusive basis." | locate the infringer's material in which the infringed work resides. (2) OWNER OF THE INFRINGED COPYRIGHT.— The 'owner of the infringed copyright' is the owner of any particular exclusive right under section 106 that is applicable to the infringement, or any person or entity with the authority to grant or license such right." |

ANT_BARTZ_000435715

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| Definitions (cont'd) | | | owner of the exclusive right under section 106 that is applicable to the infringement in question, or any party with the authority to grant or license that right." | | |

24

ANT_BARTZ_000435716

## Orphan Works Legislative Language: Comparison Chart

|  | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Establishment of a Database** | "Although the idea of a centralized registry of ownership information has the superficial appeal of efficiency, there are several reasons why the Copyright Office has instead recommended the 'ad hoc' proposal favored by the majority of commenters. First, the experience with the registration and renewal system of the 1909 Act, which is similar to the registration systems suggested here, indicates that its primary flaw was as a 'trap for the unwary.' It is likely that the mandatory registration requirements in the proposed systems would contain similar traps. Second, administration and maintenance of such a system is not a simple task, and, based on our experience in operating a registration system, would entail greater costs and burdens than the proponents anticipate. Third, such a system would likely involve disputes over whether certain registrations covered certain works, just | [none] | "SEC. 3. DATABASE OF PICTORIAL, GRAPHIC, AND SCULPTURAL WORKS. (a) ESTABLISHMENT OF DATABASE.— (1) IN GENERAL.—The Register of Copyrights shall undertake a certification process for the establishment of an electronic database to facilitate the search for pictorial, graphic, and sculptural works that are subject to copyright protection under title 17, United States Code. (2) PROCESS AND STANDARDS FOR CERTIFICATION.—The process and standards for certification of the electronic database required under paragraph (1) shall be established by the Register of Copyrights, except that certification may not be granted if the electronic database does not contain— (A) the name of all authors of the work, and contact information for any author if the information is readily available; (B) the name of the | "SEC. 3. DATABASES OF PICTORIAL, GRAPHIC, AND SCULPTURAL WORKS. The Register of Copyrights shall undertake a process to certify that there exist and are available databases that facilitate a user's search for pictorial, graphic, and sculptural works that are subject to copyright protection under title 17, United States Code. The Register shall only certify that databases are available under this section if such databases are determined to be effective and not prohibitively expensive and include the capability to be searched using 1 or more mechanisms that allow for the search and identification of a work by both text and image and have sufficient information regarding the works to enable a potential user of a work to identify or locate the copyright owner or authorized agent. Prior to certifying that databases are available under this section, the Register shall determine, | [none] |

ANT_BARTZ_000435717

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Establishment of a Database (cont'd)** | as there has been litigation today over the scope of particular copyright registrations. The nature of many copyrighted works, especially those combined with pre-existing material or other copyrighted works, makes categorization difficult, and much of the anticipated efficiency of a centralized registry would be lost to squabbles over compliance. These ambiguities about the scope of registrations would diminish the usefulness of the registry to users as well, as they could not be sure whether the information in the registry covered the works or the material they wish to use. All of these costs, in our view, would delay effective relief to the orphan works problem, and lack needed flexibility to adjust to changed circumstances." <br><br> 2006 Report at 105 (footnotes omitted). | | copyright owner if different from the author, and contact information of the copyright owner; (C) the title of the copyrighted work, if such work has a title; (D) with respect to a copyrighted work that includes a visual image, a visual image of the work, or, if such a visual image is not available, a description sufficient to identify the work; (E) one or more mechanisms that allow for the search and identifica-tion of a work by both text and image; and (F) security measures that reasonably protect against unauthorized access to, or copying of, the information and content of the electronic database. (b) PUBLIC AVAILABILITY.—The Register of Copyrights— (1) shall make available to the public through the Internet a list of all electronic databases that are certified in accordance with this section; and (2) may include any database so certified in a statement of best practices | to the extent practicable, their impact on copyright owners that are small businesses and consult with the Small Business Administration Office of Advocacy regarding those impacts. The Register shall consider the Office of Advocacy's comments and respond to any concerns." | |

ANT_BARTZ_000435718

## Orphan Works Legislative Language: Comparison Chart

|  | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Establishment of a Database (cont'd)** |  |  | established under section 514(b)(5)(B) of title 17, United States Code." |  |  |

27

ANT_BARTZ_000435719

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Effective Date** | "(d) This section shall not apply to any infringement occurring after the date that is ten years from date of enactment of this act." 2006 Report at 127. | "(c) EFFECTIVE DATE.— The amendments made by this section shall apply only to infringing uses that commence on or after June 1, 2008." | "SEC. 4. EFFECTIVE DATE. (a) IN GENERAL.—With respect to works other than pictorial, graphic, and sculptural works, the amendments made by section 2 shall apply to infringements that commence on or after January 1, 2009. (b) PICTORIAL, GRAPHIC, AND SCULPTURAL WORKS.—With respect to pictorial, graphic, and sculptural works, the amendments made by section 2 shall— (1) take effect on the earlier of— (A) the date on which the Copyright Office certifies under section 3 at least 2 separate and independent searchable, comprehensive, electronic databases, that allow for searches of copyrighted works that are pictorial, graphic, and sculptural works, and are available to the public through the Internet; or (B) January 1, 2013; and (2) apply to infringing uses that commence on or after that effective date. (c) PUBLICATION IN | "(c) EFFECTIVE DATE.— (1) IN GENERAL.—The amendments made by this section shall— (A) take effect on the later of— (i) January 1, 2009; or (ii) the date which is the earlier of— (I) 30 days after the date on which the Copyright Office publishes notice in the Federal Register that it has certified under section 3 that there exist and are available at least 2 separate and independent searchable, electronic databases, that allow for searches of copyrighted works that are pictorial, graphic, and sculptural works, and are available to the public; or (II) January 1, 2013; and (B) apply to infringing uses that commence on or after that effective date. (2) DEFINITION.—In this subsection, the term 'pictorial, graphic, and sculptural works' has the meaning given that term in section 101 of title 17, United States Code." | "(h) EFFECTIVE DATE.— (1) IN GENERAL.—The amendments made by this section shall take effect on January 1, 20___." |

ANT_BARTZ_000435720

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Effective Date (cont'd)** | | | FEDERAL REGISTER.—The Register of Copyrights shall publish the effective date described in subsection (b)(1) in the Federal Register, together with a notice that the amendments made by section 2 take effect on that date with respect to pictorial, graphic, and sculptural works. (d) DEFINITION.—In this section, the term 'pictorial, graphic, and sculptural works' has the meaning given that term in section 101 of title 17, United States Code." | | |

29

ANT_BARTZ_000435721

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Study on Copyright Deposits** | [none] | [none] | "SEC. 7. STUDY ON COPYRIGHT DEPOSITS. (a) IN GENERAL.—The Comptroller General of the United States shall conduct a study examining the function of the deposit requirement in the copyright registration system under section 408 of title 17, United States Code, including— (1) the historical purpose of the deposit requirement; (2) the degree to which deposits are made available to the public currently; (3) the feasibility of making deposits, particularly visual arts deposits, electronically searchable by the public for the purpose of locating copyright owners; and (4) the impact any change in the deposit requirement would have on the collection of the Library of Congress. (b) REPORT.—Not later than 2 years after the date of the enactment of this Act, the Comptroller General shall submit to the Committee on the Judiciary of the House of Representatives and the | "SEC. 6. STUDY ON COPYRIGHT DEPOSITS. (a) IN GENERAL.—The Comptroller General of the United States shall conduct a study examining the function of the deposit requirement in the copyright registration system under section 408 of title 17, United States Code, including— (1) the historical purpose of the deposit requirement; (2) the degree to which deposits are made available to the public currently; (3) the feasibility of making deposits, particularly visual arts deposits, electronically searchable by the public for the purpose of locating copyright owners; and (4) the impact any change in the deposit requirement would have on the collection of the Library of Congress. (b) REPORT.—Not later than 2 years after the date of the enactment of this Act, the Comptroller General shall submit to the Committee on the Judiciary of the Senate and the Committee on the | [none] |

30

ANT_BARTZ_000435722

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Study on Copyright Deposits (cont'd)** | | | Committee on the Judiciary of the Senate a report on the study conducted under this section, including such administrative, regulatory, or legislative recommendations that the Register considers appropriate." | Judiciary of the House of Representatives a report on the study conducted under this section, including such administrative, regulatory, or legislative recommendations that the Comptroller General considers appropriate." | |

31

ANT_BARTZ_000435723

## Orphan Works Legislative Language: Comparison Chart

| | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Report to Congress on Amendments** | [none] | "SEC. 3. REPORT TO CONGRESS ON AMENDMENTS. The Register of Copyrights shall, not later than December 12, 2014, report to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate on the implementation and effects of the amendments made by section 2, including any recommendations for legislative changes that the Register considers appropriate." | "SEC. 5. REPORT TO CONGRESS. Not later than December 12, 2014, the Register of Copyrights shall report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives on the implementation and effects of the amendments made by section 2, including any recommendations for legislative changes that the Register considers appropriate." | "SEC. 4. REPORT TO CONGRESS. Not later than December 12, 2014, the Register of Copyrights shall report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives on the implementation and effects of the amendments made by section 2, including any recommendations for legislative changes that the Register considers appropriate." | "SEC. 3. REPORT TO CONGRESS. Not later than December 12, 20__, the Register of Copyrights shall report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives on the implementation and effects of the amendments made by section 2, including any recommendations for legislative changes that the Register considers appropriate." |

32

ANT_BARTZ_000435724

## Orphan Works Legislative Language: Key Differences Chart

| Key Differences | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Limitation on Remedies** | Limitation on remedies only when infringer (i) prior to use, performs "good faith, reasonably diligent" search for owner, but cannot locate, and (ii) provides attribution to author and to owner as appropriate under the circumstances. | Infringer has burden of proving performance and documentation of search, and of proving reasonable attribution.<br><br>Expands infringer responsibility to "a person acting on behalf of the infringer, or any person jointly and severally liable with the infringer for the infringement of the work."<br><br>Attribution required only if known with "reasonable degree of certainty" based on reasonably diligent search. | Preponderance of the evidence standard for "qualifying searches."<br><br>Requirement that infringer file Notice of Use prior to infringement.<br><br>Inclusion of symbol or other notice of use of infringing work.<br><br>In initial pleading to civil action, assertion that infringer has right to claim limitations.<br><br>Consent to U.S. District Court jurisdiction.<br><br>Inclusion of description and documentation of search as part of initial discovery disclosures under Rule 26.<br><br>No limitations on remedies if infringer does not, after receiving notice of claim for infringement, (i) negotiate for reasonable compensation with owner, or (ii) render reasonable compensation in timely manner. | Same as H.R. 5889, except (i) good faith qualifying search must be in order to locate and identify owner; (ii) no Notice of Use requirement, and (iii) no requirement to consent to U.S. District Court jurisdiction. | Adopts S. 2913 approach, plus addition of Notice of Use requirement. |

1

ANT_BARTZ_000435725

## Orphan Works Legislative Language: Key Differences Chart

| Key Differences | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Requirements for Searches & Information to Guide Searches** | No recommended statutory language. <br><br> Factors that may need to be taken into account in determining if a search is reasonable: (i) Amount of identifying information on copy of work. (ii) Availability of work to public. (iii) Age of work, or when published. (iv) Availability of information in publicly available records. (v) Whether author alive, corporate owner exists, or record of transfer available. (vi) Nature and extent of infringing use. | "Reasonably diligent search" means taking steps reasonable under the circumstances, and ordinarily includes review of Copyright Office records, use of expert assistance, and use of technology (including fee-based technology if reasonable under the circumstances). <br><br> Reference solely to lack of identifying information on copy of work is not "reasonably diligent." <br><br> Responsibility of Register to maintain and make available to public information to guide searches, such as: (i) relevant Copyright Office records (ii) other sources of copyright ownership information, (iii) methods of identifying copyright ownership information, (iv) sources of technology tools and expert assistance, and (v) best practices for documenting search. | A search qualifies if court finds it is "diligent" when it considers: (i) Whether actions are reasonable and appropriate under facts relevant to search, including facts uncovered during search itself. (ii) Whether infringer employed Register's best practices. (iii) Whether search performed before and at a time reasonably proximate to infringement. <br><br> Reference solely to lack of identifying information on copy of work is not "diligent effort." <br><br> "Statements of Best Practices" required of Register. In formulating, Register shall consider "materials and standards" relevant to the requirements for a qualifying diligent search. | Requires specific minimum actions for a diligent effort: (i) search of relevant online Copyright Office records, provided sufficient identifying information available; (ii) search of sources of copyright ownership, authorship, and licensor information; (iii) use of appropriate technology tools, print resources, and expert assistance; (iv) use of appropriate databases; (v) adjustment of search strategy based upon facts uncovered during search; (vi) use of onsite Copyright Office records if likely to be useful. <br><br> Qualifying search "ordinarily based" on Copyright Office Statement of Recommended Practices for relevant category of works, and upon any additional 3rd-party best practices. <br><br> Copyright Office must maintain, make available, and update at least one statement of Recommended Practices for each category of works | Adopts S. 2913 approach with following exceptions: <br><br> (i) Qualifying search need not be based upon 3rd-party best practices. <br><br> (ii) Courts may consider reliance on foreign qualifying searches, if reciprocal. <br><br> (iii) Office may, but is not required to, consider Small Business Admin. and other stakeholder comments in formulating Recommended Practices. <br><br> (iv) The Office is not required to consider impact of Recommended Practices upon small businesses. <br><br> Reference solely to lack of identifying information on copy of work or lack of response from the owner of the copyright is not "reasonably diligent." <br><br> Qualifying searches may include the use of resources for charge. |

2

ANT_BARTZ_000435726

## Orphan Works Legislative Language: Key Differences Chart

| Key Differences | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Requirements for Searches & Information to Guide Searches (cont'd)** | | | | under section 102(a), for conducting and documenting a search. Office must consider relevant resources and materials, including comments from Small Business Admin. Office of Advocacy, and must consider impact on small business copyright owners.<br><br>Reference solely to lack of identifying information on copy of work or lack of response from the owner of the copyright is not "reasonably diligent."<br><br>Qualifying searches may include the use of resources for charge. | |

ANT_BARTZ_000435727

## Orphan Works Legislative Language: Key Differences Chart

| Key Differences | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| Notice of Use Archive | No recommended statutory language. | No such provision. | Addition of requirement for Register to create Notice of Use archive, with instructions as to what details to include. Public access to the archive to be determined by Copyright Office regulations. | Removes archive provision. | Re-inserts archive provision, adding requirement to include information on source of infringer's copy of work. |

4

ANT_BARTZ_000435728

## Orphan Works Legislative Language: Key Differences Chart

| Key Differences | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Penalty for Failure to Comply with Search Requirements** | No recommended statutory language. | No such provision. | Addition of provision stating that no limitation of liability will be available if search requirements not met. | Same as H.R. 5889, with slightly different wording. | Same as S. 2913. |

5

ANT_BARTZ_000435729

## Orphan Works Legislative Language: Key Differences Chart

| Key Differences | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Limitations: Monetary Relief** | Only monetary relief available is payment of reasonable compensation.<br><br>Exception: No monetary relief of any kind available if (a) infringement performed without purpose of direct or indirect commercial advantage, and (b) infringement ceases expeditiously after notice of claim for infringement. | Conditions under which court may not order payment of reasonable compensation changed to require that infringement performed for charitable, religious, scholarly, or educational purpose.<br><br>Even if conditions for non-payment of reasonable compensation are met, reasonable compensation still can be ordered if infringer earned proceeds directly attributable to the infringement.<br><br>Court may order payment of full costs, including reasonable attorney's fee, if infringer doesn't negotiate in good faith regarding amount of reasonable compensation. | Reasonable compensation to be made to the "legal or beneficial owner" of exclusive right in the infringed work.<br><br>New structure of exception: no payment of reasonable compensation if infringer is a nonprofit educational institution, library, or archives, or a public broadcasting entity, and proves by preponderance of evidence: (a) no purpose of direct or indirect commercial advantage, (b) infringement primarily educational, religious, or charitable, and (c) after receiving notice of claim for infringement and expeditious investigation of this claim, infringer promptly ceases infringement.  If infringer earned direct profits from infringement, portion attributable to infringement must be paid to legal or beneficial owner.<br><br>No good faith negotiation provision.<br><br>Court may take registration of work into consideration when determining reasonable compensation. | Reasonable compensation only due to owner of exclusive right.<br><br>Adds employees of entities enumerated in H.R. 5889 acting within scope of employment to exception<br><br>Exception structure same as H.R. 5889, except to remove provision concerning payment of direct profits.<br><br>No ability for court to take registration into account in determining reasonable compensation. | Identical to S. 2913, with addition of ability of court to take registration into account when determining reasonable compensation. |

ANT_BARTZ_000435730

## Orphan Works Legislative Language: Key Differences Chart

| Key Differences | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Limitations: Injunctive Relief** | General rule: court may impose injunctive or equitable relief, but in doing so must account for any harm such relief would cause the infringer due to the infringer relying upon this remedy limitation.<br><br>Exception: When infringer creates or is in the process of creating a derivative work that uses a "significant amount" of the infringer's expression, court may not restrain this creation, provided that (a) reasonable compensation is paid and (b) attribution to author and copyright owner made as appropriate. | General rule: if infringer has performed reasonably diligent search, injunctive or equitable relief must account for infringer's reliance upon results of that search.<br><br>Exception: same as 2006 Report, but no requirement for use of "significant amount" of the infringer's expression, and attribution due only to owner of work.<br><br>Limitations: An infringer who asserts that it is immune from suit in Federal court for damages cannot avail itself of these limitations on injunctive relief unless (a) it performed a reasonably diligent search, (b) made a good faith offer of compensation that was rejected by the copyright owner, and (c) affirmed that it was willing to pay such compensation upon determination by the court that such compensation was reasonable.<br><br>Construction of limitations: does not require or constitute an award of damages, and complying with its conditions does not constitute a waiver of the infringer's immunity from suit for damages. | General rule: omits provision that court must account for infringer's reliance on remedy limitation.<br><br>Exception: reinstates requirement for use of "significant amount" of infringer's expression.<br><br>Limitations: Slightly different conditions – (a) compliance with qualifications for limitations, and (b) enforceable promise to make reasonable compensation to legal or beneficial owner of infringed work.<br><br>Construction of limitations: adds provision that limitations are not an authorization to sue a State. | General rule: Same as H.R. 5439. Reinstates provision that court must account for infringer's reasonable reliance on remedy limitation.<br><br>Exception: Similar to H.R. 5889; requires payment of reasonable compensation in a reasonably timely manner after such compensation has been agreed upon with owner of work or determined by court.<br><br>Limitations: Slightly different conditions – (a) compliance with qualifications for limitations, and (b) actual payment of reasonable compensation to owner of infringed work.<br><br>Construction of limitations: Essentially same as H.R. 5889. | All provisions same as S. 2913, except for addition of new exception allowing an owner-author to seek injunctive relief against the use of an orphan work as part of a derivative work, provided that the infringer uses the orphan work in a way that is harmful to the owner-author's honor or reputation, and is not otherwise compensable. |

ANT_BARTZ_000435731

## Orphan Works Legislative Language: Key Differences Chart

| Key Differences | 2006 USCO Report | 2006 Text (H.R. 5439) | 2008 Text (H.R. 5889) | 2008 Shawn Bentley Act (S. 2913) | 2015 USCO Discussion Draft |
|---|---|---|---|---|---|
| **Reasonable Compensation** | No recommended statutory language.<br><br>Report text notes that concept based upon what reasonable willing seller and reasonable willing buyer and reasonable willing seller would have agreed to at time of use, as supported by evidence of what licenses for similar uses have cost. | Owner of infringed work has burden of establishing amount to which reasonable willing seller and reasonable willing buyer, in the positions of owner and infringer, would have agreed immediately prior to infringement. | Same meaning as H.R. 5439, without placing burden on either party. | Same as H.R. 5889. | Same as H.R. 5889. |

ANT_BARTZ_000435732

**APPENDIX E**      COMPARATIVE SUMMARY OF
SELECT ORPHAN WORKS PROVISIONS

ANT_BARTZ_000435733

## Comparative Summary of Select Orphan Works (Individual or Case-by-Case Use) Provisions

| Country or Jurisdiction | Type | Eligible Users | Eligible Works | Permitted Uses | Search Standard | Registry, Database, or Archive for Recording Orphan Works | Rights of Re-Emerging Rightsholders |
|---|---|---|---|---|---|---|---|
| Canada | Non-exclusive license centrally granted by Copyright Board of Canada.[1] | Any user who demonstrates that he or she has made reasonable efforts to locate copyright owner and that owner cannot be located.[2] | Published works, fixations of performances, published sound recordings, fixations of communication signals in which copyright subsists.[3] | Any uses specified in sections 3, 15, 18, and 21 of the Canadian Copyright Act.[4] | Applicant must satisfy Copyright Board that he or she made "reasonable efforts" to locate the owner.[5] | Copyright Board maintains a database of the licenses issued.[6] | No later than five years after the expiration of a license, rightsholders may collect royalties fixed in the license, or, in default of their payment, commence an action to recover them in a court of competent jurisdiction.[7] |

ANT_BARTZ_000435734

## Comparative Summary of Select Orphan Works (Individual or Case-by-Case Use) Provisions

| Country or Jurisdiction | Type | Eligible Users | Eligible Works | Permitted Uses | Search Standard | Registry, Database, or Archive for Recording Orphan Works | Rights of Re-Emerging Rightsholders |
|---|---|---|---|---|---|---|---|
| **European Union** | Limited exception to copyright.[8] | Publicly accessible libraries, educational establishments and museums, archives, film or audio heritage institutions, and public service broadcasting organizations established in EU Member States.[9] | Published written works, cinematographic or audiovisual works, and phonograms held in beneficiary institutions; specified works that have never been published or broadcast but have been made publicly accessible by such institutions. Includes works that are embedded or incorporated in, or constitute an integral part of, covered works.[10] | (1) Making the work available to the public, (2) reproduction for purposes of digitization, making available, indexing, cataloging, preservation, or restoration. Use must be to achieve aims related to the organization's public interest mission.[11] | "Diligent search" that is carried out in good faith by consulting the appropriate sources for the category of works and protected subject matter.[12] At minimum, user must consult sources listed in the Directive's annex.[13] | The Office for Harmonization in the Internal Market (OHIM) maintains a single publicly accessible online database.[14] | Rightsholder is entitled to fair compensation – taking into account the promotion of cultural objectives, non-commercial nature of use, and possible harm to rightsholders – and may put an end to the work's orphan status.[15] |

ANT_BARTZ_000435735

## Comparative Summary of Select Orphan Works (Individual or Case-by-Case Use) Provisions

| Country or Jurisdiction | Type | Eligible Users | Eligible Works | Permitted Uses | Search Standard | Registry, Database, or Archive for Recording Orphan Works | Rights of Re-Emerging Rightsholders |
|---|---|---|---|---|---|---|---|
| **Hungary**<br><br>(The Hungarian provisions are intended to operate in tandem with the transposed EU Directive and the Hungarian collective rights management provisions. The provisions described here concern uses and users other than those addressed in the EU Directive. For uses and users addressed in the EU Directive, procedures different than those applied here occasionally apply.) | Centrally-granted, non-exclusive, non-transferable license valid for not more than five years.<br><br>License does not permit sub-licensing and/or revision of the work.[16] | Any user who conducts search for a rightsholder and submits evidence of search and information about planned use to the Hungarian Intellectual Property Office (HIPO).[17] | Any work that is copyrightable and not covered under collective rights management.[18] If the work was subject to an ECL, but the rightsholder opted out and later became unknown or moved to an unknown location, HIPO may issue a license.[19] | Any commercial or noncommercial uses for which collective rights management does not exist.[20] | Applicant must submit evidence that he or she conducted a search for the rightsholder's identity and place of residence, and that the search produced no results.[21] | HIPO maintains a database of licenses issued.[22] | • Rightsholders are entitled to adequate remuneration, which is calculated by HIPO based on extent, mode of use, and other circumstances of use.[23]<br>• Funds deposited with the Office are transferred to collecting societies or the National Cultural Fund after five years, and are no longer available to rightsholders.[24]<br>• Rightsholder may withdraw permission to use work, but where serious preparations have been made to use the work based on a license, continued use may be permitted for up to remaining period of license, extending at most to one year.[25]<br>• Rightsholders may dispute the amount of remuneration through the judicial process.[26] |

ANT_BARTZ_000435736

## Comparative Summary of Select Orphan Works (Individual or Case-by-Case Use) Provisions

| Country or Jurisdiction | Type | Eligible Users | Eligible Works | Permitted Uses | Search Standard | Registry, Database, or Archive for Recording Orphan Works | Rights of Re-Emerging Rightsholders |
|---|---|---|---|---|---|---|---|
| India | Centrally-granted license valid for a term specified in the license.[27] | Any person may apply for a license.[28] | Any unpublished work or any work published or communicated to the public where the work is withheld from the public in India, the author is dead, unknown, or cannot be traced, or the copyright owner cannot be found.[29] | Publish or communicate to the public the work or a translation thereof.[30] | Applicant must publish proposal for use of work in one issue of a daily English-language newspaper having circulation in the major part of India. Where application is for the publication of a translation, applicant must also publish proposal in one issue of a daily newspaper in that language. Applicant must submit newspapers with license application.[31] | Grants of licenses are published in Official Gazette and on the website of the Copyright Office and Copyright Board, and copies of the licenses are sent to all concerned parties.[32] | Copyright Board determines amount of royalty to be deposited by applicant. Board may consider prevailing standards for royalties with regard to such works and other matters considered relevant. Rightsholder may claim royalty at any time.[33] |

ANT_BARTZ_000435737

## Comparative Summary of Select Orphan Works (Individual or Case-by-Case Use) Provisions

| Country or Jurisdiction | Type | Eligible Users | Eligible Works | Permitted Uses | Search Standard | Registry, Database, or Archive for Recording Orphan Works | Rights of Re-Emerging Rightsholders |
|---|---|---|---|---|---|---|---|
| Japan | License centrally granted by Commissioner of the Agency for Cultural Affairs (ACA).[34] | Any user who conducts search for a rightsholder and submits evidence of search and information about planned use to the ACA.[35] | Works that have been made public or for which "it is clear that it has been offered to or made available to the public for a considerable period of time."[36] | Any uses approved/specified by license.[37] | An Enforcement Order lays out specific requirements for "due diligence" in searches, including: • Review publications and other materials that the ACA specifies and that publicize information relating to copyright ownership. • Inquire with copyright management organizations and other organizations that the ACA specifies and that hold copyright ownership information. • Seek information from the public by advertising in a daily newspaper or by equivalent methods that the ACA specifies. • Attempt to contact rightsholder using information obtained through these and other measures.[38] | After issuing a license, the ACA gives public notice that the license has been issued in the Official Gazette.[39] | Compensation is calculated by the ACA, in cooperation with the Culture Council, based on the ordinary rate of royalty. Rightsholder can object to a license fee within six months after learning that a license has been issued.[40] |

ANT_BARTZ_000435738

## Comparative Summary of Select Orphan Works (Individual or Case-by-Case Use) Provisions

| Country or Jurisdiction | Type | Eligible Users | Eligible Works | Permitted Uses | Search Standard | Registry, Database, or Archive for Recording Orphan Works | Rights of Re-Emerging Rightsholders |
|---|---|---|---|---|---|---|---|
| Korea | License centrally granted by the Minister of Culture, Sports and Tourism.[41] | Any user who makes considerable efforts to search for a rightsholder, deposits compensation money, and obtains approval from the Minister of Culture, Sports and Tourism.[42] | Works (excluding foreigners' works) made open to the public by means of public performance, broadcasting, or exhibition and by other means, or published.[43] | Any uses approved/specified by license.[44] | Search for rightsholders must fail despite "considerable efforts," and meet the following requirements: • Perusal of copyright register and inquiry with copyright trust management business yield no results. • Passage of ten days after Ministry of Culture, Sports and Tourism announces matter in general daily newspaper or on Ministry website and information searching system. If application fee for a work has not been distributed after three years, or if Ministry has failed to identify or locate the rightsholder, search requirements are deemed satisfied.[45] | Ministry of Culture, Sports and Tourism maintains a database of licenses issued.[46] | Rightsholders are entitled to adequate remuneration in the form of the licensing fee – calculated by the Minister of Culture, Sports and Tourism – and can object to any application to use their work by submitting an objection to the Minister of Culture, Sports and Tourism.[47] |

ANT_BARTZ_000435739

## Comparative Summary of Select Orphan Works (Individual or Case-by-Case Use) Provisions

| Country or Jurisdiction | Type | Eligible Users | Eligible Works | Permitted Uses | Search Standard | Registry, Database, or Archive for Recording Orphan Works | Rights of Re-Emerging Rightsholders |
|---|---|---|---|---|---|---|---|
| Taiwan | License centrally granted by Taiwan Intellectual Property Office (TIPO).[48] | Any user who uses its best effort but fails to obtain a valid authorization from the copyright owner due to either the identity or the location being unknown.[49] | Statute and regulations do not restrict the types of works eligible for licensing. | Applicant specifies the "cultural or creative product to be produced through exploitation of the work."[50] TIPO grants authorization to use the work within a certain permitted scope.[51] | Prospective user must use "best effort" to identify or locate copyright owner, and clarify reason for failure in application to TIPO,[52] including: • Statement that applicant inquired with the related copyright organizations regarding the rightsholder's identity or location, and received no response within 30 days, or organization responded that information cannot be ascertained. • Statement that applicant advertised in a newspaper or otherwise searched publicly, and received no response within 30 days.[53] | TIPO publishes authorization to use the work in a government report.[54] | User deposits royalties approved by TIPO. Amount shall be commensurate with freely negotiated amount of reasonable remuneration.[55] |

ANT_BARTZ_000435740

## Comparative Summary of Select Orphan Works (Individual or Case-by-Case Use) Provisions

| Country or Jurisdiction | Type | Eligible Users | Eligible Works | Permitted Uses | Search Standard | Registry, Database, or Archive for Recording Orphan Works | Rights of Re-Emerging Rightsholders |
|---|---|---|---|---|---|---|---|
| **United Kingdom**<br><br>(The U.K. provision is intended to operate in tandem with the transposed EU Directive and the U.K. ECL provisions.) | Centrally-granted non-exclusive license valid for not longer than seven years.[56]<br><br>License does not permit sub-licensing and may not affect author's or performer's moral rights.[57] | Any user who conducts search for a rightsholder and submits evidence of diligent search, planned use, an affidavit, and a reasonable processing fee to the authorizing body (the Comptroller-General of Patents, Designs and Trade Marks).[58] | Any copyright-protected work or performance.[59] | Any uses in the United Kingdom approved/specified by license and covered by copyright or performers' exclusive rights.[60] | Users must carry out a "diligent search" or refer to an existing diligent search relevant to the planned use and work in question.[61]<br><br>Minimum requirements include a search of the OHIM registry and relevant sources listed for each particular category in schedule ZA1 of the U.K. regulations implementing the EU Directive.[62]<br><br>The Comptroller may issue guidance on what additional sources may be relevant to a diligent search for certain works.[63] | The Comptroller maintains a database of licenses issued.[64] | Rightsholder is entitled to deposited license fee – calculated by taking into account the licensing market for similar works that are not orphaned – within eight years of date of first use. A reasonable amount can be awarded after eight years, depending on the circumstances.[65]<br><br>User may continue use for unexpired term of license or until expiration of notice period in license.[66] |

ANT_BARTZ_000435741

## Comparative Summary of Select Orphan Works (Individual or Case-by-Case Use) Provisions

| Country or Jurisdiction | Type | Eligible Users | Eligible Works | Permitted Uses | Search Standard | Registry, Database, or Archive for Recording Orphan Works | Rights of Re-Emerging Rightsholders |
|---|---|---|---|---|---|---|---|
| **United States**<br><br>*2015 Proposed Legislation* | Limitation on judicial remedies.[67] | Any user who seeks permission to use a copyright-protected work and cannot locate and identify the owner after conducting a reasonably diligent search.[68] | All (published and unpublished) copyright-protected works.[69] | Any (commercial or noncommercial) use.[70] | Users must employ "diligent effort that is reasonable under the circumstances" to locate copyright owner before and at a time reasonably proximate to the infringement.<br><br>Diligent effort requires, at a minimum, search of Copyright Office online records; search of reasonably available sources of authorship and ownership information, and licensor information where appropriate; use of technology tools and, where reasonable, expert assistance; and use of appropriate databases. Shall also include actions that are reasonable and appropriate under the facts relevant to the search.[71] | Copyright Office must create and maintain a Notice of Use archive; filings made available under Copyright Office regulations.<br><br>Notice of Use filing must include: type of work, description of work, summary of qualifying search, any available identifying elements of work, source of work (if website, include URL and date), certification of good faith qualifying search, name of infringer, and description of use.[72] | Monetary relief:<br>• Reasonable compensation (amount willing buyer and willing seller would have agreed upon before infringement began).<br>• Not available where user is nonprofit public interest institution making non-commercial educational, charitable, or religious use, and user ceases use promptly after receiving Notice of Claim of Infringement.<br><br>Injunctive relief:<br>• Must account for harm injunction would cause infringer due to reliance on limitation of liability.<br>• If user prepared or began to prepare derivative work with significant original expression, court may not enjoin, provided user compensates owner and provides attribution if requested (does not apply where author seeks injunction to remedy reputational harm).[73] |

9

ANT_BARTZ_000435742

**Notes:**

- Chart reflects high-level summaries of applicable laws. For detailed information, please refer to statutory text.
- Citations are based on currently available public information.
- For non-English sources, citations are to the most recent version for which an English translation is publicly available, including unofficial translations.

---

[1] Copyright Act, R.S.C. 1985, c. C-42, s. 77(1)-(2) (Can.).

[2] *Id.* s. 77(1).

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *See Decisions – Unlocatable Copyright Owners,* COPYRIGHT BOARD OF CANADA, http://www.cb-cda.gc.ca/unlocatable-introuvables/licences-e.html.

[7] Copyright Act, R.S.C. 1985, c. C-42, s. 77(3).

[8] Directive 2012/28/EU of the European Parliament and of the Council of 25 October 2012 on Certain Permitted Uses of Orphan Works, art. 6(1), 2012 O.J. (L 299) 5, 9-10.

[9] *Id.* art. 1(1).

[10] *Id.* art. 1(2)-(4).

[11] *Id.* art. 6(1)-(2).

[12] *Id.* art. 3.

[13] *Id.* art. 3(2).

[14] *Id.* art. 3(6).

[15] *Id.* recital 18, art. 6(5).

[16] 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright), § 41/B(1) (Hung.) (effective Oct. 29, 2014) (translation unavailable).

10

ANT_BARTZ_000435743

[17] 138/2014. (IV.30.) Korm. r. az árva mű felhasználásának részletes szabályairól (Governmental Decree No. 138/2014 (IV. 30.) on Detailed Regulations on the Use of Orphan Works), §3(1)-(2) (Hung.) (translation unavailable).

[18] 1999. évi LXXVI. törvény, § 41/A(9).

[19] *See* Dénes István Legeza, „*Segítsük az árvákat": útmutató az árva művek egyes felhasználásaihoz* [*"Let's Help the Orphans": Guidelines for Certain Uses of Orphan Works*], 7(5) IPARJOGVÉDELMI ÉS SZERZŐI JOGI SZEMLE [REV. INDUS. RTS. PROT. & COPYRIGHT L.] 23, 48 (2012) (Hung.).

[20] 1999. évi LXXVI törvény, §§41/A(9), 41/B(2); 138/2014 (IV. 30) Korm r., § 3(1).

[21] 1999. évi LXXVI törvény, § 41/B(1); 138/2014 (IV. 30) Korm r., §3(1)-(2).

[22] 138/2014 (IV. 30) Korm. r., § 8(1).

[23] 1999. évi LXXVI törvény, §41/B(1)-(2); 138/2014 (IV. 30) Korm r., § 3(1).

[24] 1999. évi LXXVI törvény, §41/B(5).

[25] *Id.* §41/B(3)-(4).

[26] *Id.* § 41/B(6).

[27] The Copyright Act, No. 14 of 1957, § 31A(1), as amended by the Copyright (Amendment) Act, 2012, § 17, INDIA CODE, *available at* http://indiacode.nic.in/; Copyright Rules, 2013, § 11(4)-(5), Gazette of India, part II, section 3(i) (Mar. 14 2013), *available at* http://copyright.gov.in/Documents/Copy-Right-Rules 2013.pdf.

[28] The Copyright Act, No. 14 of 1957, § 31A(1), as amended by the Copyright (Amendment) Act, 2012, § 17.

[29] *Id.*

[30] *Id.*; Copyright Rules, 2013, § 11(1).

[31] The Copyright Act, No. 14 of 1957, § 31A(2); Copyright Rules, 2013, § 11(3).

[32] Copyright Rules, 2013, § 11(6).

[33] The Copyright Act, No. 14 of 1957, § 31A(5); Copyright Rules, 2013, § 12.

[34] Copyright Act, Law No. 48 of 1970, as amended up to Law No. 35 of 2014, art. 67, para. 1 (Japan), *translated at* http://www.cric.or.jp/english/clj/doc/20150227_October,2014_Copyright_Law_of_Japan.pdf (unofficial translation).

ANT_BARTZ_000435744

[35] *Id.* art. 67, paras. 1-2.

[36] *Id.* art. 67, para. 1.

[37] *Id.* art. 67, paras. 1-2.

[38] Enforcement Order of the Copyright Act, Cabinet Order No. 335 of 1970, as amended up to Cabinet Order No. 39 of 2014, art. 7-7 (Japan) (translation unavailable).

[39] Copyright Law, Law No. 48 of 1970, art. 70, para. 6.

[40] *Id.* art. 67, para 1; art. 71; art. 72, para. 1.

[41] Copyright Act of 1957, Act No. 432, Jan. 28, 1957, as amended up to Act No. 12137, Dec. 30, 2013, art. 50 (S. Kor.), *translated at* http://elaw.klri.re.kr/eng_service/lawView.do?hseq=32626&lang=ENG (unofficial translation).

[42] *Id.*

[43] *Id.* arts. 2(25), 50(1).

[44] *Id.* art. 50; Enforcement Decree of the Copyright Act, Presidential Decree No. 1482, Apr. 22, 1959, as amended by Presidential Decree No. 23721, Apr. 12, 2012, art. 21 (S. Kor.), *translated at* http://elaw.klri.re.kr/eng_service/lawView.do?hseq=28794&lang=ENG (unofficial translation).

[45] Copyright Act of 1957, Act. No. 432, art. 50; Copyright Act Enforcement Decree art. 18.

[46] Copyright Act of 1957, Act No. 432, art. 50(4); Copyright Act Enforcement Decree art. 21(2).

[47] Copyright Act of 1957, Act. No. 432, art. 50(1), (3); Copyright Act Enforcement Decree art. 20(3).

[48] Copyright Act of the Republic of China (promulgated by Order No. 212 of the National Government, May 14, 1928, updated through Presidential Order No. Hua Zong-(1)-Yi-Zih 10300009931), XIANXING FAGUI HUIBIAN, art. 2 (Taiwan), *translated at* www.tipo.gov.tw/dl.asp?filename=42129352671.docx; Act of the Organization of Intellectual Property Office, Ministry of Economic Affairs 2011 (promulgated by Executive Yuan, effective Jan. 26, 1999, updated through Dec. 28, 2011), art. 2(4) (Taiwan), *translated at* http://www.tipo.gov.tw/public/Data/21126971671.pdf; Law for the Development of the Cultural and Creative Industries (Ref. No. Hua-Zong-Yi-Yi-Zi 09900022451, promulgated Feb. 3, 2010), art. 24 (Taiwan), *translated at* http://law.moc.gov.tw/law/inc/GetFile.ashx?FileId=1643.

[49] Law for the Development of the Cultural and Creative Industries art. 24.

[50] Regulations Governing Application for Approval of License of Works of Unknown Owner of Copyrights and Royalties for Use Thereof (Promulgated by the Ministry of Economic Affairs, Sep. 24, 2010, effective Sep. 24, 2010), art. 3(4) (Taiwan), *translated at* www.tipo.gov.tw/dl.asp?fileName=332914501682.doc ("Regulations Governing Works of Unknown Owner").

12

ANT_BARTZ_000435745

[51] Law for the Development of the Cultural and Creative Industries art. 24.

[52] *Id.*

[53] Regulations Governing Works of Unknown Owner art. 3(6).

[54] Law for the Development of the Cultural and Creative Industries art. 24.

[55] *Id.*; Regulations Governing Works of Unknown Author art. 6.

[56] Copyright and Rights in Performances (Licensing of Orphan Works) Regulations, 2014, S.I. 2014/2863, art. 6, ¶ 2(a)-(b) (U.K.).

[57] *Id.* art. 6, ¶ 2(c), (e).

[58] *Id.* art. 4, ¶¶ 6-7; art. 9.

[59] *Id.* art. 3, ¶¶ 1-2.

[60] *Id.* art. 6, ¶ 2(b).

[61] *Id.* art. 4, ¶ 1.

[62] *Id.* art. 4, ¶ 3(a); Copyright and Rights in Performances (Certain Permitted Uses of Orphan Works) Regulations, 2014, S.I. 2014/2861, Schedule ZA1, Part 2.

[63] Copyright and Rights in Performances (Licensing of Orphan Works) Regulations, 2014, S.I. 2014/2863, art. 4, ¶ 4.

[64] *Id.* arts. 2 ("authorising body," "Comptroller"), 5.

[65] *Id.* art. 10, ¶¶ 1-2; art. 12, ¶ 4(b); art. 13, ¶ 3.

[66] *Id.* art. 12, ¶ 3.

[67] [Discussion Draft] Orphan Works Act of 20__, sec. 2, § 514(b)-(c) (attached at Appendix A).

[68] *Id.* § 514(b).

[69] *Id.* § 514.

[70] *Id.*

[71] *Id.* § 514(b)(2).

13

ANT_BARTZ_000435746

[72] *Id.* § 514(b)(3).

[73] *Id.* § 514(c).

ANT_BARTZ_000435747

APPENDIX F      COMPARATIVE SUMMARY OF
SELECT EXTENDED COLLECTIVE
LICENSING PROVISIONS

ANT_BARTZ_000435748

## Comparative Summary of Select Extended Collective Licensing Provisions

| Country | Covered Activities | Government Oversight | Opt-Out Provisions | Dispute Resolution Mechanism | Use of Funds |
|---|---|---|---|---|---|
| Czech Republic | • *Phonograms published for commercial purposes:* performance of artistic performances or performance of phonograms as such; non-theatrical performance of musical works.<br>• *Radio or television broadcasting:* broadcast of certain type of works (not specified).<br>• *Radio or television broadcasts:* performance of broadcasts of certain type of works (not specified), artistic performances, phonograms, and audiovisual fixations.<br>• *Lending:* original or reproduction of a work (except computer program) or a work or performance fixed as an audio or audiovisual fixation.<br>• *Libraries:* making available (including reproduction of published works) of works to individuals for purposes of research and private study; excludes computer programs, phonograms, audiovisual fixations, published musical notations, and works not subject to license agreements.<br>• *Live non-theatrical performance of a work:* may not be for direct or indirect economic or commercial benefit.[1] | • Approval by Ministry of Culture.[2]<br>• Ministry may revoke authorization.[3] | • Opt-out allowed for all ECLs except performance of radio or television broadcasts of certain type of works, artistic performances, phonograms, and audiovisual fixations.[4] | • Mediation: parties may choose one or more mediators appointed by Ministry of Culture.[5]<br>• Mediator's proposal deemed accepted unless party objects within thirty days.[6] | • CMO must "invite for registration" known rightsholders for whom it has collected royalties.[7]<br>• If rightsholder is represented by another CMO, collecting CMO must provide remuneration to the representing CMO for distribution.[8] |

1

ANT_BARTZ_000435749

## Comparative Summary of Select Extended Collective Licensing Provisions

| Country | Covered Activities | Government Oversight | Opt-Out Provisions | Dispute Resolution Mechanism | Use of Funds |
|---|---|---|---|---|---|
| Denmark | • *Educational activities:* reproduction of published works and recordings of works broadcast on radio and television.<br>• *Business enterprises:* reproduction for internal use of descriptive articles in newspapers, magazines, and collections, brief excerpts of other published descriptive works, musical works, and illustrations reproduced in association with text.<br>• *Public libraries:* digital reproduction of articles from newspapers, magazines, and composite works, brief excerpts from books and other published literary works, and illustrations and music reproduced in connection with text.<br>• *Use by visually- and hearing-handicapped persons:* reproduction through sound or visual recording by government and other social or non profit institutions of works broadcast on radio or television.<br>• *Works of fine art:* reproduction, if the work has been made public.<br>• *Radio and television:* broadcast of published works by DR, TV 2/Danmark A/S and regional TV 2 companies. Repetition and making available of works in these companies' productions broadcast before January 1, 2007. Simultaneous and unaltered retransmission via cable and radio systems of works broadcast wirelessly on radio or television.<br>• *General license:* users and CMOs in specific fields may agree to exploitation of works through ECL.[9] | • Approval by Minister for Culture.[10] | • Opt-out allowed only for ECLs regarding reproduction of fine art, primary broadcasting, rebroadcasting of works in broadcasters' productions, and general ECL provision.[11] | • Mediation: for most covered uses, each party may demand mediation. Mediator is appointed by Minister for Culture.[12]<br>• Arbitration: each party may bring a dispute before the Copyright License Tribunal if it concerns educational activities, business enterprises, public libraries, distribution of sound recordings to visually-impaired persons, works of fine art, primary broadcasting, or cable and radio retransmission. Tribunal may lay down terms of remuneration.[13] | • Unrepresented authors may claim individual remuneration from CMO. Each party may bring disputes before Copyright License Tribunal.[14] |

2

ANT_BARTZ_000435750

## Comparative Summary of Select Extended Collective Licensing Provisions

| Country | Covered Activities | Government Oversight | Opt-Out Provisions | Dispute Resolution Mechanism | Use of Funds |
|---------|-------------------|---------------------|-------------------|-----------------------------|--------------|
| Finland | • *Photocopying:* published works.<br>• *Use for internal communication:* reproduction of writing published in a newspaper or periodical and illustrations accompanying the text. Copies may be used for communication to public. Excludes radio/television transmission and photocopying.<br>• *Educational activities and scientific research:* reproduction and communication to the public of works made public. Excludes radio/television transmission and photocopying.<br>• *Use by archives, libraries, and museums:* reproduction and communication to the public of works in a collection, with certain exceptions.<br>• *Art in collections or displayed or offered for sale:* reproduction by maintainer of the collection and communication to public by means other than radio/television transmission.<br>• *Original radio/television transmissions:* transmission of works by broadcasting organizations, excluding dramatic and cinematographic works. Reproduction of works for use in broadcasts more than four times per year.<br>• *New transmission of television programs stored in archives:* transmission by broadcasting organizations of works included in television programs transmitted before January 1, 1985.<br>• *Retransmission of radio/television transmission:* simultaneous retransmission without alteration of a work included in a radio or television transmission.[15] | • Approval by Ministry of Education.<br>• For fixed period, maximum five years.[16] | • Opt-out allowed for all ECLs except photocopying, reproduction of works for use in broadcasts, and simultaneous and unaltered retransmission of broadcasts.[17] | • Arbitration: available for disputes involving photocopying or other reproduction for use in educational activities or retransmission of broadcast works.<br>• Where either party refuses arbitration, the other may submit matter to District Court of Helsinki.[18] | • Unrepresented authors may claim individual remuneration from CMO. Claims must be submitted within three years of end of calendar year in which use took place.[19] |

3

ANT_BARTZ_000435751

## Comparative Summary of Select Extended Collective Licensing Provisions

| Country | Covered Activities | Government Oversight | Opt-Out Provisions | Dispute Resolution Mechanism | Use of Funds |
|---|---|---|---|---|---|
| France | • *Out-of-commerce books:* digital reproduction and dissemination of books published in France before January 1, 2001 that are not currently being commercially distributed or published in printed or digital form.[20] | • Approval by Minister of Culture.[21] | • Author and publisher may object to CMO management within six months of book's listing in register; author can later object based on harm to honor or reputation; publisher who objects must exploit book within two years.[22]<br>• Author may object to grant of exclusive license to original print publisher by proving that publisher lacks digital rights.[23]<br>• Author may withdraw CMO's right to issue non exclusive licenses if he proves that he is the sole owner of digital rights.[24]<br>• Author and publisher may jointly withdraw rights from CMO; publisher must exploit book within eighteen months.[25] | • Not specified. | • After specified period, CMOs may use royalties collected on behalf of rightsholders who have not been identified or located to support training programs for authors and the promotion of reading.[26] |

ANT_BARTZ_000435752

## Comparative Summary of Select Extended Collective Licensing Provisions

| Country | Covered Activities | Government Oversight | Opt-Out Provisions | Dispute Resolution Mechanism | Use of Funds |
|---------|-------------------|---------------------|--------------------|------------------------------|--------------|
| Germany | • *Out-of-print works:* reproduction and making available of out-of-commerce works in books, scientific journals, newspapers, magazines, or other writings published before January 1, 1966 and located in the collections of publicly accessible libraries, educational institutions, museums, archives, and film or audio heritage institutions. Commercial purposes not allowed.[27] | • Approval by Patent Office in agreement with Federal Cartel Office. <br>• Where the Patent Office and the Federal Cartel Office cannot agree on approval, the matter is presented to the Federal Minister for Justice, who decides on the matter in consultation with the Federal Minister for the Economy. <br>• Authorization may be revoked.[28] | • Relevant CMO presumed to administer rights unless rightsholder objects within six weeks of notice of work's entry in Register of Out of Commerce Works. <br>• Thereafter, rightsholder may object to CMO administration at any time.[29] | • Arbitration: any party may apply to Arbitration Board, which shall propose a settlement. Settlement proposal is deemed accepted if no objection is filed within one month. <br>• Appeal: judiciary. For disputes involving remuneration rates or the conclusion or amendment of an inclusive contract, arbitration must precede initiation of judicial proceedings.[30] | • CMO must distribute revenue according to a fixed distribution plan.[31] |

5

ANT_BARTZ_000435753

## Comparative Summary of Select Extended Collective Licensing Provisions

| Country | Covered Activities | Government Oversight | Opt-Out Provisions | Dispute Resolution Mechanism | Use of Funds |
|---|---|---|---|---|---|
| Hungary | • Extended collective licensing is not a separate category of licensing. All three types of collective rights management (compulsory, voluntary, and statutorily-prescribed) have extended effect.[32] • Statute does not limit categories of eligible works or uses.[33] | • All CMOs approved and subject to annual review by Hungarian Intellectual Property Office (HIPO).[34] • HIPO may revoke authorization.[35] • Where multiple CMOs represent same category of rightsholders, must agree on which CMO will enjoy "extended" effect of licensing. HIPO designates CMO in event of lack of agreement.[36] | • Limitation on opt-out period: must opt out more than three months before the end of the calendar year; opt-out takes effect no earlier than the first day of the following year. • Opt-out not available where statute prescribes compulsory collective rights management.[37] | • Fees approved by HIPO with solicited input of "significant users" and representative user organizations in lieu of adversary dispute resolution process. • HIPO reviews CMO behavior once a year or as needed.[38] | • CMO must undertake search for unknown/unlocatable rightholders, taking all necessary measures expected in given situation. • CMO must retain undistributed funds for at least one year in a separate account. • Undistributed funds may be used for purposes advancing CMO's rightholders' interests, particularly cultural and social. Specific rules in statute.[39] |

6

ANT_BARTZ_000435754

## Comparative Summary of Select Extended Collective Licensing Provisions

| Country | Covered Activities | Government Oversight | Opt-Out Provisions | Dispute Resolution Mechanism | Use of Funds |
|---------|-------------------|---------------------|-------------------|------------------------------|--------------|
| Iceland | • *Photocopying:* photocopying or reproduction of works in a similar fashion for business purposes.<br>• *Broadcast:* performance by broadcasting stations of smaller literary or musical works (*e.g.*, individual poems, short stories, essays, individual songs, or smaller musical works) or sections of larger works. Does not include dramatic works.<br>• *Rebroadcast:* simultaneous rebroadcast to the public via cable of broadcast works.<br>• *Visual art:* display on television of previously presented works.<br>• *Rebroadcast of performances:* simultaneous rebroadcast to the public via cable of broadcast performances.[40] | • Approval by Ministry of Education, Science and Culture.[41] | • Opt-out allowed except for cable rebroadcast of works and performances.[42] | • Three-person committee appointed by Ministry of Education, Science & Culture. Committee ruling is the final administrative decision.<br>• Either party may submit dispute to committee if it involves reimbursement for photocopying, cable rebroadcast of work or performance, or television display of visual art.[43] | • Claims for remuneration for photocopying must be submitted within four years of use.[44]<br>• Non-members of CMOs enjoy same right of remuneration for use of their works as members.[45] |

7

ANT_BARTZ_000435755

## Comparative Summary of Select Extended Collective Licensing Provisions

| Country | Covered Activities | Government Oversight | Opt-Out Provisions | Dispute Resolution Mechanism | Use of Funds |
|---------|-------------------|---------------------|--------------------|------------------------------|--------------|
| Norway | • *Educational activities:* copying of published works, fixation of broadcasts. Educational purposes only.<br>• *Institutions, commercial enterprises, etc.:* copying of published works, fixation of broadcasts.<br>• *Archives, libraries, and museums:* copying and making available to the public of published works in collections.<br>• *Use by disabled:* fixation of published films or pictures, with/without sound, and transmitted broadcasting programs not essentially consisting of musical works, for use by disabled.<br>• *Broadcasting:* broadcasting of published works, including issued works of art and photographic works, but not including stage and cinematographic works.<br>• *Works in broadcasters' collections:* broadcasters may use works in their collections broadcast before January 1, 1997 in connection with new broadcasts or transmission so that individual can choose the time and place of access.<br>• *Retransmission of broadcasts:* communication to the public, by simultaneous and unaltered retransmission, of works included in broadcasts.[46] | • Approval by Ministry of Culture.[47] | • Opt-out allowed for broadcasting of published works and use of works in broadcasting organizations' collections.[48] | • Mediation: for most covered uses, each party may demand mediation. Where parties so agree, conditions for copying or interpretation of agreement may be determined through binding proceeding.[49]<br>• For simultaneous and unaltered retransmissions, where a party refuses mediation or mediation fails to produce a result within six months, either party may demand that terms be determined by a commission.[50] | • Claims for remuneration must be put forward within three years of the end of the year in which the use occurred.[51] |

8

ANT_BARTZ_000435756

## Comparative Summary of Select Extended Collective Licensing Provisions

| Country | Covered Activities | Government Oversight | Opt-Out Provisions | Dispute Resolution Mechanism | Use of Funds |
|---|---|---|---|---|---|
| Sweden | • *Activities of public authorities, enterprises, and organizations:* copy, communicate, and perform literary works and works of fine arts that have been made public.<br>• *Educational activities:* reproduction for educational purposes of works that have been made public.<br>• *Certain libraries and archives:* make copies of works that form part of their own collections, and make available works that have been made public.<br>• *Radio and television transmissions:* broadcast literary, musical, and fine art works that have been made public. If part of radio or television broadcast, may communicate to the public and make copies necessary for communication. Does not apply to stage works.<br>• *Retransmission:* transmit to public, simultaneously and in unaltered form, works that form part of wireless sound radio or television broadcast.<br>• *Communication to the public by sound radio or television organizations:* communication to the public of works that have been made public and form part of organization's own productions or productions commissioned by organization and broadcast before July 1, 2005.<br>• *General ECL:* reproduction or making available to the public of works that have been made public.[52] | • Approval not required.[53] | • Opt-out allowed for all ECLs except retransmission of broadcast works.[54] | • Mediation: for several covered uses, any party may request mediation before government-appointed mediator.<br>• If parties do not agree to solution, mediator may propose arbitration. Where parties do not agree to arbitrate, government is notified.[55]<br>• District Court of Stockholm has jurisdiction over cases involving radio and television transmissions and retransmission of broadcast works.[56] | • Claims for remuneration must be put forward within three years from the end of the year in which the use occurred.[57] |

ANT_BARTZ_000435757

## Comparative Summary of Select Extended Collective Licensing Provisions

| Country | Covered Activities | Government Oversight | Opt-Out Provisions | Dispute Resolution Mechanism | Use of Funds |
|---|---|---|---|---|---|
| United Kingdom | • *General ECL*: regulations do not limit categories of works or uses eligible for ECL.[58] | • Approval by Secretary of State.<br>• For five-year period initially, with possibility of renewal. Subject to revocation by Secretary.[59] | • Opt-out allowed for all ECLs.[60] | • Users may refer licensing scheme to Copyright Tribunal, which can determine reasonable terms.[61] | • CMO must distribute funds within nine months of the end of the financial year in which royalty was collected.<br>• CMO must forward undistributed license fees to Secretary three years after end of financial year of receipt, unless Secretary directs CMO to retain for additional period.<br>• Secretary retains undistributed funds for eight years after CMO's authorization, then may use them to fund social, cultural, and educational activities for the benefit of non-member rightsholders.[62] |

ANT_BARTZ_000435758

**Notes:**

- Chart reflects high-level summaries of applicable foreign laws.  For detailed information, please refer to statutory text.
- Citations are based on currently available public information.
- For non-English sources, citations are to the most recent version for which an English translation is publicly available, including unofficial translations.

---

[1] Úplné znění zákona č. 121/2000 Sb., o právu autorském, o právech souvisejících s právem autorským a o změně některých zákonů (autorský zákon), jak vyplývá ze změn provedených zákony č. 81/2005 Sb., č. 61/2006 Sb., č. 216/2006 Sb. [Consolidated Version of Act No. 121/2000 Coll., on Copyright and Rights Related to Copyright and on Amendment to Certain Acts (the Copyright Act), as amended by Act No. 81/2005 Coll., Act No. 61/2006 Coll. and Act No. 216/2006 Coll.] art. 101(9) (Czech), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=137175 (unofficial translation), last amended by Act No. 356/2014 of Dec. 18, 2014 (translation unavailable; chart relies on 2006 version of the law).

[2] *Id.* art. 98(1).

[3] *Id.* art. 99.

[4] *Id.* art. 101(9).

[5] *Id.* art. 102(1).

[6] *Id.* art. 102(5).

[7] *Id.* art. 101(10).

[8] *Id.* art. 101(12).

[9] LBK nr 202 af 27/02/2010 Gældende (Ophavsretsloven) [Consolidated Act on Copyright 2010] §§ 13(1), 14(1), 16b(1), 17(4), 24a(1), 30(1), 30a(1), 35(1), 50(1), (2) (Den.), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=191420 (unofficial translation), most recently published as LBK nr 1145 af 23/10/2014 Gældende (Ophavsretsloven) [Consolidated Act on Copyright 2014] (translation unavailable; chart relies on 2010 version of the law).

[10] *Id.* § 50(4).

[11] *Id.* §§ 24a(1), 30(2), 30a(2), 50(2).

[12] *Id.* § 52(1), (3).

[13] *Id.* §§ 13(5), 14(2), 16b(2), 17(3), 24a(2), 30(6), 35(3), 48(1).

[14] *Id.* § 51(2).

11

ANT_BARTZ_000435759

[15] Tekijänoikeuslaki 404/1961 (muutos 307/2010) [Copyright Act (amended through 307/2010) §§ 13, 13a(1), 14(1), 16d, 25a(2), 25f(1)-(3), 25g(1), 25h(1) (Fin.), *translated at* http://www.finlex.fi/en/laki/kaannokset/1961/en19610404.pdf (unofficial translation), last amended by Act 608/2015 of May 22, 2015 (translation unavailable; chart relies on 2010 version of the law).

[16] *Id.* § 26(1), (2).

[17] *Id.*, §§ 13, 13a(3), 14(4), 16d(2), 25a(2), 25f(1), 25g(2), 25h.

[18] *Id.* § 54.

[19] *Id.* § 26(5).

[20] Loi 2012–287 du 1er mars 2012 relative à l'exploitation numérique des livres indisponibles du xxe siécle [Law 2012–287 of March 1, 2012, on the Digital Exploitation of Unavailable Books], JOURNAL OFFICIEL DE LA RÉPUBLIQUE FRANÇAISE [J.O.] [OFFICIAL GAZETTE OF FRANCE] Mar. 2, 2012, p. 3986 (codified at CODE DE LA PROPRIÉTÉ INTELLECTUAL arts. L. 134-1, L. 134-3 I) (Fr.) (translation unavailable); *see also* Jane C. Ginsburg, *Fair Use for Free, or Permitted-but-Paid?* 41-42 (Columbia Law Sch. Ctr. for Econ. Studies, Working Paper No. 481), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2444500.

[21] CODE DE LA PROPRIÉTÉ INTELLECTUAL art. L. 134-3 I.

[22] *Id.* art. L. 134-4.

[23] *Id.* art. L. 134-5.

[24] *Id.* art. L. 134-6.

[25] *Id.*

[26] *Id.* art. L. 134-9.

[27] Gesetz über die Wahrnehmung von Urheberrechten und verwandten Schutzrechten (Urheberrechtswahrnehmungsgesetz) [UrhWahrnG] [Law on the Administration of Copyright and Neighboring Rights], Sept. 9, 1965, BGBL. I at 1294, as amended by Gesetz [G], May 8, 1998, BGBL. I at 902 (Ger.), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=126251 (unofficial translation), last amended by Gesetz [G], Oct. 1, 2013, BGBL. I at 3728, art. 2, § 13d(1), *translated at* https://www.vgwort.de/fileadmin/pdf/allgemeine_pdf/out_of_commerce_law_2013.pdf (unofficial translation). An English translation is available only for sections 13d and 13e of the 2013 amendments. The other citations below are to the 1998 version of the law.

[28] *Id.* §§ 1(1), 2, 4, 18.

[29] *Id.* § 13d(1).5, (2).

[30] *Id.* §§ 14(1), 14a(2)-(3), 16(1)-(2).

ANT_BARTZ_000435760

[31] *Id.* § 7.

[32] NAGYKOMMENTÁR A SZERZŐI JOGI TÖRVÉNYHEZ [GRAND COMMENTARY ON THE COYPRIGHT ACT], § 87, 1. pont (Péter Gyertyánfy, ed., 2014) (Hung.).

[33] *See* 1999. évi LXXVI. törvény a szerzői jogról [Act LXXVI. of 1999 on Copyright] arts. 85, 87(1), 91(2)-(3) (Hung.) (effective from Oct. 29, 2014) (translation unavailable; chart relies on official Hungarian version of the law) (a translation of the previous version of the Act, expired Oct. 29, 2014, is available at http://www.hipo.gov.hu/English/jogforras/hungarian_copyright_act.pdf).

[34] *Id.* arts. 87(2), (4), 92/A, 92/E, 92/H.

[35] *Id.* art. 92/K(6)(d).

[36] *Id.* art. 87(2).

[37] *Id.* art. 87(3).

[38] *Id.* arts. 92/H(1), (5)-(6), 92/K.

[39] *Id.* art. 89(8)-(9).

[40] Höfundalög 1972 nr. 73 29. Maí, eins og henni var síðast breytt með lögum nr 93/2010 [Copyright Act, No. 73, of 29 May 1972, as amended by Act No. 93 of 21 April 2010], arts. 15a, 23, 23a, 25, 45a (Ice.), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=332081 (unofficial translation), last amended by Act No. 126/2011 (translation unavailable; chart relies on 2010 version of the law).

[41] *Id.*

[42] *Id.*

[43] *Id.* art. 57.

[44] *Id.* art. 15a.

[45] *Id.* arts. 15a, 23, 23a, 25, 45a.

[46] LOV 1961-05-12 nr 02: Lov om opphavsrett til åndsverk m.v. (åndsverkloven) [Act No. 2 of May 12, 1961 Relating to Copyright in Literary, Scientific and Artistic Works] as amended on Dec. 22, 2006, §§ 13b, 14, 16a, 17b, 30, 32, 34, 36 (Nor.), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=248181 (unofficial translation), last amended by LOV-2014-06-13 nr 22 [Act No. 22 of June 13, 2014] (translation unavailable; chart relies on 2006 version of the law).

[47] *Id.* § 38a.

13

ANT_BARTZ_000435761

[48] *Id.* §§ 30, 32.

[49] *Id.* § 38.

[50] *Id.* § 36.

[51] *Id.* § 37.

[52] LAG OM UPPHOVSRÄTT TILL LITTERÄRA OCH KONSTNÄRLIGA VERK [URL] [Act on Copyright in Literary and Artistic Works] (Svensk författningssamling [SFS] 1960:729), as amended by LAG, June 27, 2013 (2013:691), §§ 42b-42h (Swed.) (unofficial translation on file with United States Copyright Office); last amended by LAG, July 8, 2014 (SFS 2014:884) (translation unavailable; chart relies on 2013 version of the law).

[53] *See* Johan Axhamn & Lucie Guibault, *Cross-Border Extended Collective Licensing: A Solution to Online Dissemination of Europe's Cultural Heritage?* 58 (Amsterdam Law School, Research Paper No. 2012-22, 2011), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2001347.

[54] URL §§ 42b-42h.

[55] LAG OM MEDLING I VISSA UPPHOVSRÄTTSTVISTER (Svensk författningssamling [SFS] 1980:612) [Act on Mediation in Certain Copyright Disputes] (1995) arts. 2-6 (Swed.), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=241666 (unofficial translation), as amended by LAG, May 26, 2005 (2005:361), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=129617 (unofficial translation), last amended by LAG, June 27, 2013 (2013:690) (translation unavailable; chart relies on 1995 and 2005 versions of the law).

[56] URL § 58.

[57] *Id.* § 42a.

[58] Copyright and Rights in Performances (Extended Collective Licensing) Regulations, 2014, S.I. 2014/2588, art. 3, ¶ 1; 4 ("U.K. ECL Regulations").

[59] *Id.* art. 4, ¶¶ 1, 6; arts. 9, 14.

[60] *Id.* art. 4, ¶ 4(d); art. 16.

[61] Copyright, Designs and Patents Act, 1988, pt. 1, c. 7, §§ 118-121; *see also* U.K. INTELLECTUAL PROPERTY OFFICE, EXTENDING THE BENEFITS OF COLLECTIVE LICENSING 18 (2013), *available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/308286/consult-2013-ecl.pdf ("[The] Government believes there is existing jurisdiction for the Copyright Tribunal to make determinations about the reasonableness of ECL schemes.").

[62] U.K. ECL Regulations, S.I. 2014/2588, art. 18, ¶ 3; art. 19.

14

ANT_BARTZ_000435762

U.S. COPYRIGHT OFFICE  ·  LIBRARY OF CONGRESS  ·  101 INDEPENDENCE AVENUE SE  ·  WASHINGTON, DC 20559-6000  ·  WWW.COPYRIGHT.GOV

ANT_BARTZ_000435763