1   Justin A. Nelson*                        Rachel Geman*
    Alejandra C. Salinas*                    Jacob S. Miller*
2   Collin Fredricks*                        Danna Z. Elmasry*
    **SUSMAN GODFREY L.L.P**                  **LIEFF CABRASER HEIMANN**
3   1000 Louisiana Street, Suite 5100        **& BERNSTEIN, LLP**
    Houston, TX 77002-5096                   250 Hudson Street, 8th Floor
4   Telephone: (713) 651-9366                New York, New York 10013-1413
    jnelson@susmangodfrey.com                Telephone: (212) 355-9500
5   asalinas@susmangodfrey.com               rgeman@lchb.com
    cfredricks@susmangodfrey.com             jmiller@lchb.com
6                                            delmasry@lchb.com
    Rohit D. Nath (SBN 316062)
7   **SUSMAN GODFREY L.L.P**                  Daniel M. Hutchinson (SBN 239458)
    1900 Avenue of the Stars, Suite 1400     Reilly T. Stoler (SBN 310761)
8   Los Angeles, CA 90067-2906               **LIEFF CABRASER HEIMANN**
    Telephone: (310) 789-3100                **& BERNSTEIN, LLP**
9   RNath@susmangodfrey.com                  275 Battery Street, 29th Floor
                                             San Francisco, CA 94111-3339
10  Jordan W. Connors*                       Telephone: (415) 956-1000
    **SUSMAN GODFREY L.L.P**                  dhutchinson@lchb.com
11  401 Union Street, Suite 3000             rstoler@lchb.com
    Seattle, WA 98101
12  Telephone: (206) 516-3880                Scott J. Sholder*
    jconnors@susmangodfrey.com               CeCe M. Cole*
13                                           **COWAN DEBAETS ABRAHAMS**
    J. Craig Smyser*                         **& SHEPPARD LLP**
14  **SUSMAN GODFREY L.L.P**                  60 Broad Street, 30th Floor
    One Manhattan West, 51st Floor,          New York, New York 10010
15  New York, NY 10019                       Telephone: (212) 974-7474
    Telephone: (212) 336-8330                ssholder@cdas.com
16  csmyser@susmangodfrey.com                ccole@cdas.com

17  *Attorneys for Plaintiffs and the Proposed Class*
    *in Bartz et al. v. Anthropic PBC, Case 3:24-cv-*
18  *05417 (N.D. Cal.)*

19  *(Pro Hac Vice)*

20              UNITED STATES DISTRICT COURT

21            NORTHERN DISTRICT OF CALIFORNIA

22              SAN FRANCISCO DIVISION

23  ANDREA BARTZ, ET AL.,              Case No.  3:24-cv-05417-WHA

24          Plaintiffs,                **PLAINTIFFS' OPPOSITION TO
                                       ANTHROPIC'S MOTION FOR**
25  v.                                 **SUMMARY JUDGMENT**

26  ANTHROPIC PBC,

27          Defendant.                 **FILED UNDER SEAL**

28

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ............................................................................... 2

        A.      Anthropic Prioritizes Books in its Race to Keep Up with OpenAI....................... 2

        B.      Anthropic Downloads ████████ Millions of Pirated Books. ......................... 3

        C.      ████████████████████████████████████████████████████

III.    LEGAL STANDARD ........................................................................................... 5

IV.     ARGUMENT ........................................................................................................ 5

        A.      Anthropic Cannot Establish That Its Downloading of Books For Free From
                Pirate Websites Is Fair Use As A Matter of Law............................................... 6

                1.      Courts have consistently rejected fair use defenses of piracy.................... 6

                2.      Factor One: The purpose of Anthropic's piracy was to avoid
                        purchasing lawful copies................................................................... 7

                3.      Factor Two: Books are at the core of copyright protection. ................... 11

                4.      Factor Three: Anthropic repeatedly copied Plaintiffs' entire books. ........ 12

                5.      Factor Four: Anthropic has made no effort to meet its burden to
                        establish that its piracy has not harmed the book sale market. ................ 12

        B.      Anthropic's Unlicensed Use of Books in LLM Training Is Not Fair Use. ........... 13

                1.      Factor One: Anthropic's use of books in training is commercial and
                        not transformative. .......................................................................... 14

                2.      Factor Four: Potential market for LLM training. ................................ 19

        C.      The Court's Five Questions Demonstrate the Absence of Fair Use Here............ 24

**TABLE OF AUTHORITIES**

Page

**Cases**

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001), *as amended* (Apr. 3, 2001)............................................*passim*

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009)...................................................................................... 9, 18

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994)..........................................................................................*passim*

*Andy Warhol Foundation for the Visual Arts v. Goldsmith*,
598 U.S. 508 (2023).....................................................................................................*passim*

*Atari Games Corp. v. Nintendo of America Inc.*,
975 F.2d 832 (Fed. Cir. 1992).........................................................................................8, 9

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014)...................................................................................9, 18, 22

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)................................................................................9, 18, 25

*BMG Music v. Gonzalez*,
430 F.3d 888 (7th Cir. 2005)..............................................................................7, 11, 12

*Caldwell v. UnitedHealthCare Ins. Co.*,
2021 WL 275467 (N.D. Cal. Jan. 27, 2021) (Alsup, J.) ........................................... 16

*Cambridge Univ. Press v. Patton*,
769 F.3d 1232 (11th Cir. 2014)................................................................................... 16

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).....................................................................................................*passim*

████████████████████████

███████████████████████████

*Deppe v. United Airlines*,
217 F.3d 1262 (9th Cir. 2000)..................................................................................... 21

*Dr. Seuss Enters.L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020)....................................................................................... 12

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
109 F.3d 1394 (9th Cir. 1997)..................................................................................... 11

# TABLE OF AUTHORITIES
### (continued)

Page

███████████████████

████████████████████████████████████████████████

*Fox News Network, LLC v. TVEyes*, Inc.,
  883 F.3d 169 (2d Cir. 2018)..................................................................................... 22

*Google v. Oracle*
  593 U.S. at 26-29 ................................................................................... 11, 16, 17

*Hachette Book Grp. v. Internet Archive*,
  115 F.4th 163 (2d. Cir. 2024)................................................................. 19, 22, 23, 25

*Harper & Row, Publrs. v. Nation Enters.*,
  471 U.S. 539 (1985)............................................................................................. 7, 19

*In re Aimster Copyright Litigation*,
  334 F.3d 643 (7th Cir. 2003) (Posner, J.) .............................................................. 10

*In re Barboza*,
  545 F.3d 702 (9th Cir. 2008)..................................................................................... 6

*In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868 (N.D. Cal.
  2022) ........................................................................................................................... 7

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003)................................................................................. 9, 18

*MCA, Inc. v. Wilson*,
  677 F.2d 180 (2d Cir. 1981)................................................................................... 23

*McGucken v. Pub Ocean Ltd.*,
  42 F.4th 1149 (9th Cir. 2022)................................................................................. 19

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005)............................................................................................... 10

*Monge v. Maya Mags., Inc.*,
  688 F.3d 1164 (9th Cir. 2012)............................................................................... 5, 13

*Oracle Am., Inc. v. Google LLC*,
  886 F.3d 1179 (Fed. Cir. 2018)................................................................................. 9

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007)..................................................................... 9, 10, 11, 18

*Ringgold v. Black Ent. Television, Inc.*,
  126 F.3d 70 (2d Cir. 1997)..................................................................................... 21

# TABLE OF AUTHORITIES
### (continued)

Page

*Sega Enterprises Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) ............................................................ 8, 11, 16, 17

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) ........................................................................ 21

*Sony BMG v. Tenenbaum*,
    672 F.Supp.2d. 217 (D. Mass. 2009) ................................................. 10, 12, 16, 17

*Sony Computer Enterprise, Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ....................................................................... 8, 17

*Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*,
    2025 WL 458520 (D. Del. Feb. 11, 2025) (Bibas, J.) ............................... 17, 22, 24

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
    953 F.3d 638 (9th Cir. 2020) ............................................................................ 22

*Triller Fight Club II LLC v. H3 Podcast*,
    2023 WL 11877604 (C.D. Cal. Sept. 15, 2023) ................................................ 10

*U.S. v. Moore*,
    604 F.2d 1228 (9th Cir. 1979) .......................................................................... 25

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) ................................................................ 6, 7

*United States v. Slater*,
    348 F.3d 666 (7th Cir. 2003) ........................................................................... 6, 7

*Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*,
    447 F.3d 769 (9th Cir. 2006) ........................................................................ 14, 15

*White v. W. Pub. Corp.*,
    29 F. Supp. 3d 396 (S.D.N.Y. 2014) ................................................................. 18

**Statutes**

17 U.S.C. § 106(1) ............................................................................................ 25

17 U.S.C. § 106(3) ............................................................................................ 25

17 U.S.C. § 107 ................................................................................................... 6

17 U.S.C. § 107(1) .............................................................................................. 7

17 U.S.C. § 107(4) ............................................................................................. 12

**TABLE OF AUTHORITIES**
(continued)

**Page**

17 U.S.C. § 109 .......................................................................................................................... 25

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................. 5, 19

**I.    INTRODUCTION**

When the founders of Anthropic created their company in January 2021, they confronted a dilemma. Facing the daunting challenge of catching up with much larger rivals—including their erstwhile employer OpenAI and large technology companies with massive budgets such as Google and Meta—they were short on cash with little access to proprietary data and only a small window of time to catch up. So they cheated. Instead of relying on publicly-available data or paying for a license—which would have taken longer and cost more money—they went to known pirated websites and downloaded books for free.

And it worked. Anthropic's large-scale infringement of copyrighted books enabled it to jumpstart a business currently valued at $61.5 billion. Ex. 45. Books have provided the type of data that, in Anthropic's words, ███████████████████████████████████████████████████████████████████████████ By exploiting the creative expression of copyrighted books to train its large language models, Anthropic generated dynastic wealth for its founders while leaving authors nothing.

Anthropic obtained books illegally from ███████ pirated sources: ███████████████████████████████████████████████████████████████ Courts have held time and again that downloading copyrighted works from pirate websites to avoid paying for them is copyright infringement which no fair use justifies. Anthropic hardly addresses this point in its motion, and it is dispositive here.

But Anthropic's infringing acts were not restricted to piracy. More recently, Anthropic has ██████████████████████████████████████████████. After acquiring books—███████████—Anthropic copied books multiple times to train its LLMs. The training process, fundamentally, is intended to exploit the expressive elements of these works. It mines the order of words, expression of ideas, and sentence structure and compresses them into its LLMs. Despite the burgeoning licensing market for the use of copyrighted works for LLM training, Anthropic

1  made no effort to pay authors for these unlicensed reproductions. Courts have held that such

2  "institutional, systematic copying" to "avoiding the necessity of paying for license fees" is a

3  manifestly unfair use. *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 920 (2d Cir. 1994).

4      At most, Anthropic's fair use defense raises a litany of material factual disputes. These

5  include whether Anthropic has shown that a market for LLM training is unlikely to develop,

6  beyond any dispute of material fact, despite numerous publicly-reported licensing deals; whether

7  Anthropic's training process exploits the expressive elements of authors' works; and whether

8  Anthropic has shown beyond any dispute of fact that the public would benefit from a regime

9  where authors go entirely uncompensated from the exploitation of their works in training LLMs.

10  Resolution of each is needed to rule on Anthropic's fair use defense, and none can be resolved

11  without wading into hotly-disputed facts, expert battles, and credibility determinations.

12      Finally, even if relevant, the promise or peril of AI raises disputed factual issues.

13

14                                    Regardless, this case is not a referendum on AI

15  and resolving it in Plaintiffs' favor would not end AI. It is about whether writers are entitled to

16  fair compensation for Anthropic's conscription of their creations to develop a wildly profitable

17  technology—one that threatens to eliminate the very profession that made it possible.

18  **II.    FACTUAL BACKGROUND**

19      **A.    Anthropic Prioritizes Books in its Race to Keep Up with OpenAI.**

20      In January 2021, several OpenAI employees defected to found Anthropic. Anthropic

21  released its flagship model, Claude, to the public on March 14, 2023, and has since released seven

22  subsequent versions of Claude, most recently Claude 3.7 Sonnet on February 24, 2025.

23      To train its LLMs, Anthropic uses, among other things, a massive amount of books.

24

25

26

27

28



**Anthropic Downloads** ... **Pirated Books.**

---

[1] All exhibits are attached to the Declaration of Collin Fredricks in Support of Plaintiffs' Opposition to Anthropic's Motion for Summary Judgment.



After downloading ▮▮▮▮▮▮▮ pirated books, Anthropic used them to train its LLMs. ▮▮▮



**III.    LEGAL STANDARD**

Summary judgment is proper only when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Fair Use is an affirmative defense, and "the defendant bears the burden of proof." *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012). Anthropic bears the burden here for all of its uses of Plaintiffs' copyrighted books: "fair use . . . requires an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'" *Andy Warhol Foundation for the Visual Arts v. Goldsmith*, 598 U.S. 508, 533 (2023).

**IV.    ARGUMENT**

Plaintiffs have two theories of infringement. For fair use purposes, Anthropic's infringing

---

[4] After Anthropic stopped using LibGen and PiLiMi, Anthropic's engineers were concerned they were not getting "old-books quality data" from public-domain books. Ex. 20, at -39. One engineer mourned, "the amount of data we're leaving on the table because of copyright just makes my bones hurt." *Id.* at -38.

1    acts correspond to distinct "uses" for analysis under 17 U.S.C. § 107. *Warhol*, 598 U.S. at 533; *cf.*

2    *In re Barboza*, 545 F.3d 702, 704-05 & n.1 (9th Cir. 2008) (noting that unlicensed "infringement

3    by duplication" required separate analysis from subsequent sales and distribution).

4        *First,* Anthropic infringed when it downloaded ▮▮▮▮▮▮▮ Plaintiffs' books from

5    known pirated websites. Copying books from pirated websites to avoid paying for them is a

6    standalone act of infringement that courts have consistently held is not fair use.[5]

7        *Second,* Anthropic committed copyright infringement when it made additional unlicensed

8    copies of books to train its LLMs. That use too is not fair: when a company needs numerous

9    copies to commercially exploit expressive elements of a work, it has to pay for the copies (or

10   licenses) it needs. Anthropic didn't do that, and at most, whether its copying of books to train

11   LLMs is fair use presents disputed factual issues that cannot be resolved on summary judgment.

12       **A.**    **Anthropic Cannot Establish That Its Downloading of Books For Free From Pirate Websites Is Fair Use As A Matter of Law.**

13

14       **1.**    **Courts Have Consistently Rejected Fair Use Defenses of Piracy.**

15       No court has *ever* held that downloading known pirated materials is fair use—much less

16   when done by a \$61.5 billion company, at a massive scale, to rake in massive revenues. It is an

17   elementary principle of copyright law that copying an entire work simply to avoid paying for a

18   legitimate copy is not fair use. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 n.10

19   (1994) ("most infringements are simple piracy," but "such cases are worlds apart from many of

20   those raising reasonable contentions of fair use" (quotation omitted)).

21       Likewise, every court to address the issue has held that downloading copyrighted

22   materials from a peer-to-peer file sharing website is not fair use. *See, e.g.*, *A&M Recs., Inc. v.*

23   *Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001), *as amended* (Apr. 3, 2001) (affirming that

24   users' downloading music files using the Napster directory is not fair use); *United States v. Slater*,

25   348 F.3d 666, 668 (7th Cir. 2003) (rejecting "Pirates With Attitudes" defendants' argument that

26   district court erred by declining to give a fair use jury instruction); *UMG Recordings, Inc. v.*

27

28   ---
[5] Because Anthropic fails to address its initial acquisition of pirated copies, it cannot do so for the first time on its reply.

PLAINTIFFS' OPPOSITION TO ANTHROPIC'S
MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:24-CV-05417-WHA

1    *MP3.Com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000) (rejecting fair use defense even when

2    the downloader already owned one purchased copy); *BMG Music v. Gonzalez*, 430 F.3d 888, 890

3    (7th Cir. 2005) ("the only appellate decision on point has held that downloading copyrighted

4    songs cannot be defended as fair use, whether or not the recipient plans to buy songs she likes

5    well enough to spring for"). In *Slater*, the Seventh Circuit held that the defendants' fair use

6    arguments "barely pass the straight-face test" and that it was "preposterous to think that Internet

7    piracy is authorized by virtue of the fair use doctrine." 348 F.3d at 669 (cleaned up).

8        Thus, "no analysis is required" because "it is obvious . . . that downloading [copyrighted

9    materials] via peer-to-peer systems does not constitute fair use," *see In re DMCA § 512(h)*

10   *Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 879 (N.D. Cal. 2022). Downloading copyrighted

11   works from illegal websites to avoid the purchase price undermines a key purpose of copyright

12   law: "to assure contributors to the store of knowledge a fair return for their labors." *Harper &*

13   *Row*, *Publrs. v. Nation Enters.*, 471 U.S. 539, 546 (1985). Regardless, the result is the same

14   applying the four factors to Anthropic's piracy.

### 2.   Factor One: The purpose of Anthropic's piracy was to avoid purchasing lawful copies.

17       The first factor is the purpose and character of the use. 17 U.S.C. § 107(1). Under this

18   factor, the extent to which the use is transformative "must be balanced against the commercial

19   nature of the use," and commercial nature weighs more strongly when the use is more likely to

20   substitute for the original. *Warhol*, 598 U.S. at 532-33.

#### a.   Anthropic's free downloads for a commercial purpose weigh sharply against fair use.

22       The purpose and character of Anthropic's use was inherently substitutive: it pirated books

23   to avoid the trouble and expense of purchasing lawful copies. Like mid-2000s teenagers,

24   Anthropic went to illegal websites to "get for free something they would ordinarily have to buy."

25   *Napster*, 239 F.3d at 1015. Anthropic does not argue—nor can it—that downloading or torrenting

26   is transformative. *See id.* ("downloading MP3 files does not transform the copyrighted work");

27   *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000).

28       Anthropic's use, in fact, is far worse than the piracy in *Napster* and *MP3.com*, as

1  Anthropic downloaded works for free as part of a multibillion dollar commercial enterprise.

2  There is no doubt that a *human* who downloaded large quantities of books from the Pirate Library

3  Mirror to read—instead of buying them—would be committing copyright infringement. *Napster*,

4  239 F.3d at 1015. Nor can Anthropic dispute that its large-scale book piracy was commercial:

5  Anthropic has generated ▮▮▮▮▮▮▮▮▮▮ in annual recurring revenue from Claude and, as its

6  CEO admitted, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8  ▮▮▮▮▮▮▮▮▮▮▮ Because the "commercial character of [a] use, though not dispositive,

9  tends to weigh against a finding of fair use," Anthropic's fair use defense is more meritless than

10 those flatly rejected in *Napster, MP3.com*, and other cases. *Warhol*, 598 U.S. at 537 (cleaned up).

11      Anthropic's Factor One argument relies on two lines of cases: (1) the "intermediate

12 copying" cases, and (2) the search-engine thumbnail cases. Neither helps its case.

13      **Intermediate copying cases:** These cases are inapposite because this case is not about

14 intermediate copying: it is about Anthropic's unlawful acquisition of its initial copy. The key

15 cases Anthropic cites are *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992),

16 and *Sony Computer Enterprise, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000). Both cases

17 involved reverse engineering computer code to understand its functional elements. *See Sega*, 203

18 F.3d at 1527-28; *Sony*, 203 F.3d at 608. Critically, the defendant in each case lawfully purchased

19 its initial copy. *See Sega*, 203 F.3d at 1514-15 ("Accolade purchased a Genesis console . . .");

20 *Sony*, 203 F.3d at 601 ("Connectix engineers purchased a Sony PlayStation . . ."). That is why the

21 decisions referred to the copying as "intermediate"—because the challenged copies were those *in*

22 *between* the initial lawful copy and the final transformative result.

23      By contrast, in *Atari Games Corp. v. Nintendo of America Inc.*, defendant Atari

24 unlawfully obtained the source code it wanted to reverse engineer by requesting a copy from the

25 Copyright Office, representing that it was "a defendant in an infringement action and needed a

26 copy of the program for that litigation." 975 F.2d 832, 836 (Fed. Cir. 1992). In reality, "no suit

27 existed." *Id.* The Court held that while true intermediate copying *would be* fair use, Atari's

28 unlawful acquisition of the source code foreclosed any intermediate copying defense: "To invoke

the fair use exception, an individual must possess an authorized copy of a literary work." *Id.* at 843. The Court continued: "Because Atari was not in authorized possession of the Copyright Office copy of 10NES, any copying or derivative copying of 10NES source code from the Copyright Office does not qualify as a fair use." *Id.*

Other cases Anthropic cites also fit this pattern. In each case, the defendant lawfully obtained its *initial* copy before subsequently making additional copies in service of some transformative end result. *See, e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202, 208 (2d Cir. 2015) ("*Google Books*") (Google acquired books through "bi-lateral agreements [with] a number of the world's major research libraries"); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 90 (2d Cir. 2014) ("Colleges, universities, and other nonprofit institutions . . . made the books in their collections available for inclusion"); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 635 (4th Cir. 2009) (Plaintiffs "submitted their papers" to Defendant); *Oracle Am., Inc. v. Google LLC*, 886 F.3d 1179, 1187 (Fed. Cir. 2018) (the Java code Google copied had been "made available without charge under an open source license"). None of these cases involved Internet piracy and each of them provides a stark contrast with the way in which Anthropic wrongfully acquired books in the pirated datasets.

**Search-engine thumbnail cases:** *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) and *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) involved search engines' use of thumbnails—"reduced, lower-resolution versions of full-sized images"—to direct users to third-party websites with the full images. *Perfect 10*, 508 F.3d at 1155. These cases have nothing to do with piracy. The defendants did not even store full-size copies of the images—just the low-resolution thumbnails. *See id.* at 1160 ("Google does not have a copy of the images for purposes of the Copyright Act."); *Arriba*, 336 F.3d at 815. And in *Perfect 10*, the plaintiff challenged display and distribution, but not any initial illegal acquisition. 508 F.3d at 1159.

None of Anthropic's cited cases excuse downloading copyrighted works for free from pirate websites in lieu of paying for lawful copies on the open market. And, as explained *supra* IV.B.2.b., none involve the exploitation of the expressive elements, as Anthropic has done here.

1

**b.      Anthropic's Arguments About "Bad Faith" Are Irrelevant,
Wrong, and Present Material Triable Questions That Cannot
Be Resolved on Summary Judgment.**

2

3          Whether bad faith is a relevant consideration or not, Anthropic committed copyright

4   infringement by its *actions*: downloading unauthorized copies of Plaintiffs' books from illegal

5   websites. That infringement was actionable from the day Anthropic downloaded those initial

6   copies regardless of any contemplated or actual subsequent copying and use, and regardless of the

7   state of mind of the downloader.

8          In the many other cases that have analyzed whether downloading pirated works is fair use,

9   the decisions did not turn on post-acquisition use. Most of these actions addressed claims of

10  indirect infringement against website proprietors, where the downloaders of copyrighted content

11  were the direct infringers. *See, e.g.*, *In re Aimster Copyright Litigation*, 334 F.3d 643, 645 (7th

12  Cir. 2003) (Posner, J.) (explaining that the "[t]eenagers and young adults" who use the Aimster

13  platform "are the direct infringers"); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545

14  U.S. 913, 919 (2005); *Sony BMG v. Tenenbaum*, 672 F.Supp.2d. 217, 226 (D. Mass. 2009). The

15  question in those cases was whether the direct infringers' downloads were fair use—and courts

16  categorically answered "no" *regardless of* how the downloaders later used the works. Surely

17  some users of peer-to-peer networks who downloaded music were also taking music lessons or

18  seeking artistic inspiration, but no court has held that this subsequent conduct inoculates the

19  decision to acquire a work for free instead of paying for it. Quite the opposite: Because the

20  "purpose and character" of piracy is to "get for free something they would ordinarily have to

21  buy," it is not excused by some later conduct. *Napster*, 239 F.3d at 1015. This has nothing to do

22  with "bad faith," as Anthropic contends, but is relevant to the purpose and character of the use.

23          In any event, bad faith is still a relevant consideration in this Circuit. *See Perfect 10*, 508

24  F.3d at 1164 n.8 (reciting "the general rule that a party claiming fair use must act in a manner

25  generally compatible with principles of good faith"); *Triller Fight Club II LLC v. H3 Podcast*,

26  2023 WL 11877604, at *8 (C.D. Cal. Sept. 15, 2023) ("[u]ntil and unless the Supreme Court rules

27  that the defendants' good faith—or lack thereof—is not a relevant consideration, this Court is

28  bound by the holdings of the Ninth Circuit.").

1    And here, whether Anthropic downloaded pirated books in bad faith presents at minimum

2    a material and disputed question of fact.



8                                                                                         At a

9    minimum, there are disputed material facts regarding whether Anthropic's conduct comported

10    with "principles of good faith and fair dealing." *Perfect 10*, 508 F.3d at 1164 n.8.

11        In sum, Anthropic's piracy was an end-run around the most basic principle of copyright

12    law and was quintessentially commercial under Factor One. As in *Napster*, Anthropic's "repeated

13    and exploitative unauthorized copies of copyrighted works were made to save the expense of

14    purchasing authorized copies." 239 F.3d at 1015. In the words of Judge Easterbrook,

15    "downloading full copies of copyrighted material without compensation to authors cannot be

16    deemed 'fair use.'" *Gonzalez*, 430 F.3d at 891.

17                    **3.    Factor Two: Books are at the core of copyright protection.**

18        The second fair use factor "calls for recognition that some works are closer to the core of

19    intended copyright protection than others, with the consequence that fair use is more difficult to

20    establish when the former works are copied." *Campbell*, 510 U.S. at 586. "Creative works," like

21    books, receive greater protection than "informational and functional works," like computer code.

22    *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997). While

23    Anthropic effectively ignores Factor Two, that is where the Court started in *Google v. Oracle*,

24    and the fact that the computer code at issue was "functional in nature" figured prominently in the

25    Court's ultimate finding of fair use. 593 U.S. at 26-29; *see also Sega*, 977 F.2d at 1527 (stating

26    that "the key to this case is that we are dealing with computer software," and signaling that

27    "wholesale copying" might merit a different result "in more traditional contexts.").

28

**4.  Factor Three: Anthropic repeatedly copied Plaintiffs' entire books.**

Under the third factor, courts consider whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole . . . are reasonable in relation to the copying." *Campbell*, 510 U.S. at 586-87. "[C]opying an entire work militates against a finding of fair use." *Napster*, 239 F.3d at 1016 (citation omitted). Anthropic admits it "generally" copies "the entire text of the books." MSJ at 8, 18. The amount of Anthropic' copying bears no "reasonable" relationship to Anthropic's illegitimate purpose of avoiding purchasing legitimate copies here. This factor therefore weighs against fair use.

**5.  Factor Four: Anthropic Has Made No Effort to Meet Its Burden to Establish That Its Piracy Has Not Harmed the Book Sale Market.**

The fourth factor is considered the most important and addresses the impact on the "potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The analysis considers not just the defendant's conduct, but whether "unrestricted and widespread conduct of the sort engaged in by [the defendant] could 'create incentives to pirate intellectual property.'" *Dr. Seuss Enters.L.P. v. ComicMix LLC*, 983 F.3d 443, 461 (9th Cir. 2020) (quoting *Monge*, 688 F.3d at 1182). Here, the harm caused by piracy like Anthropic's is straightforward: Plaintiffs did not receive the financial benefits they would have received from the purchase of lawful copies. *See Napster*, 239 F.3d at 1017 ("Having digital downloads available for free on the Napster system necessarily harms the copyright holders' attempts to charge for the same downloads."); *Tenenbaum*, 672 F.Supp.2d at 231 ("It is difficult to compete with a product offered for free."); *Gonzalez*, 430 F.3d at 890-91 ("[A]ll 1,000+ of [defendant's] downloads . . . undermined the means by which authors seek to profit.").

Anthropic does not even address this type of harm, but it is undeniable that the book sales market is a thriving market. *See* Malackowski Decl. ¶ 31. And that market is readily available for AI companies to participate in—

_____

6

1 ████████████████████████████████████████████████████████
2 ████████████████████████████████████████████████████████
3 ███████████████████████████████████████

4     Anthropic asserts that its free downloads here were permitted because it put these pirated

5 books to a transformative use—using them for "teaching" and "learning." *See* Kaplan Decl.

6 ¶¶ 35-36, 64. But if a would-be infringer could get off scot-free by identifying some educational

7 purposes, then copyright protection would be of little use in the internet age. *Napster* and its

8 progeny would effectively be dead letter. Anyone could download books, music, or movies from

9 Napster-type websites, so long as they could show they had some "transformative" purpose

10 similar to Anthropic's: perhaps they downloaded *The Power Broker* to learn about Robert Moses.

11 But lofty purposes do not entitle one to take pirated copies free off the internet. In *Napster*,

12 because the plaintiffs sought to hold Napster contributorily liable for the infringing acts of its

13 users, the Ninth Circuit addressed a laundry list of potentially noninfringing uses of the peer-to-

14 peer network software and rejected each one. *See Napster*, 239 F.3d at 1017-19. If Napster had

15 needed only to show that some portion of users put their illegal downloads to educational

16 purposes, there is little doubt the case would have come out the other way.

17     But it didn't, and that makes sense. Without the ability to protect the longstanding market

18 for book sales (or album sales, or movie sales), copyrights would offer little incentive to create.

19 Authors write books to sell them. Humans and multibillion-dollar corporations cannot circumvent

20 that market by copying them from the dark corners of the internet.

21          **B.**    **Anthropic's Unlicensed Use of Books in LLM Training Is Not Fair Use.**

22     In addition to its pirated downloads, Anthropic infringed when it made additional copies

23 of Plaintiffs' works to train its LLMs without a license to do so. This is the second infringing act

24 that requires a fair use analysis, and it encompasses not only the books Anthropic pirated and

25 used in training, but also ████████████████████████████████████

26 _____

27 [7] █████████████████████████████████████████████████ And

there is no question that "unrestricted and widespread" piracy like Anthropic's would harm the

28 book sale market broadly. *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1182 (9th Cir. 2012)

1    Under the four factors, Anthropic's use of books in training is not fair use either. The

2    analysis under Factors 2 and 3 is identical to above: Plaintiffs' books are creative works (not

3    computer code), and Anthropic copied them in their entirety. Factors 1 and 4 also weigh against

4    fair use, and at a minimum hinge on disputed questions of fact, as set forth below.

5         **1.    Factor One: Anthropic's use of books in training is commercial and not
              transformative.**

6

7         **a.    Anthropic Cannot Invoke Fair Use to Avoid Paying for the
               Copies It Needs to Fuel Its Commercial Mission.**

8    In *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994), the Second

9    Circuit faced a fact pattern very similar to Anthropic's ▇▇▇▇▇▇. Texaco employed

10   "between 400 and 500 researchers nationwide . . . to develop new products and technology

11   primarily to improve its commercial performance in the petroleum industry." *Id.* at 915. To

12   support those researchers, Texaco subscribed to "many scientific and technical journals," which it

13   kept in a centralized library. *Id.* When researchers wanted to access those journals, they would

14   check them out from that library. *Id.* Texaco, however, only paid for a few subscriptions. *Id.* So

15   its researchers would often photocopy articles in their entirety to "have them available for later

16   reference as needed," before checking them back in to Texaco's library. *Id.* The Second Circuit

17   held that Texaco's copying was not fair use. The purpose of its "institutional, systematic copying"

18   was to "increase[] the number of copies available to scientists while avoiding the necessity of

19   paying for license fees or for additional subscriptions." *Id.* at 916. And even though the copies

20   were used for research, the court found that research "could be regarded simply as another 'factor

21   of production' utilized in Texaco's efforts to develop profitable products." *Id.* at 922.

22   This is also the law in the Ninth Circuit. In *Wall Data Inc. v. Los Angeles Cnty. Sheriff's

23   Dep't*, 447 F.3d 769, 774 (9th Cir. 2006), the Los Angeles County Sheriff's Department

24   purchased 3,663 licenses to the plaintiff's software. But it then went on to load that software onto

25   6,007 workstations, configuring the software so that it "could only be accessed by 3,663

26   workstations at a time." *Id.* at 776. This, too, was not fair use, because the copies "'were made to

27   save the expense of purchasing authorized copies,' or at least the expense of purchasing a more

28   flexible license." *Id.* at 779 (quoting *Napster*, 239 F.3d at 1015).

PLAINTIFFS' OPPOSITION TO ANTHROPIC'S
MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:24-CV-05417-WHA

1

2

3

4

5

6             Even training a *single* model requires creating a

7 lot of copies: including raw copies, filtered copies, tokenized copies, and copies compressed in

8 the training process. *See* Zhao Decl. ¶ 38. And as in *American Geophysical Union* and *Wall Data*,

9 the same principle applies: when a commercial entity needs a lot of copies of a copyrighted work,

10 it must pay for the copies it needs. It is not sufficient

11                  Anthropic "could

12 have bargained for the flexibility it desired, but it did not." *Id.* at 781.[8]

13                      **b.**     **The Parties Vigorously Dispute the Nature and Details of the**

14                            **Training Process**

15           Anthropic argues that "Claude itself" is transformative, and is different from a book. MSJ

16 at 13, 14. But that addresses the wrong question. Plaintiffs need not show that *Claude itself* is an

17 infringing copy of Plaintiffs' books. Here, the infringing copies are the numerous copies of

18 Plaintiffs' books Anthropic made to train its LLMs, like the photocopied journal articles in

19 *Texaco*. The question under Factor One for this use is whether *the copying of books to train*

20 *Claude* is transformative.

21           Using books to train LLMs is not a transformative use, and at best there are disputed facts.

22 Anthropic tries to avoid this conclusion by anthropomorphizing its LLMs, likening Claude to "an

23 intelligent human," MSJ at 1, and failing to provide a systematic explanation of LLM training.

24           Anthropic avoids going into any detail to avoid drawing attention to the parties' very

25 different explanations of what is going on in the training process. As Plaintiffs' expert Ben Zhao

26      ―――――――――

[8]

27

28

1  explains ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ LLM training is

2  better understood as a sophisticated type of compression. *See* Zhao Decl. ¶ 54-77. LLMs train by

3  compressing a version of the expression contained in their training data in their weights and

4  biases—which explains why they retain the ability to regurgitate that expression verbatim if

5  prompted. *See id.* Anthropic may disagree with this characterization, but the parties' conflicting

6  descriptions of the training process present another issue of disputed material fact. *See Caldwell*

7  *v. UnitedHealthCare Ins. Co.*, 2021 WL 275467, at *3 (N.D. Cal. Jan. 27, 2021) (Alsup, J.)

8  ("summary judgment must be denied in favor of a trial at which time the various experts can be

9  cross-examined and their credibility assessed.").

10      It is also false that Anthropic used Plaintiffs' books for a "fundamentally different purpose

11  from the books themselves." MSJ at 1. By Anthropic's own telling, it used books for one of their

12  core purposes: facilitating "learning" using human expression. According to Anthropic, books

13  enable LLMs to write like human authors, answer technical questions like human experts, and

14  give advice like human consultants. And the training process is what gives LLMs like Claude

15  those abilities. In that sense, what an LLM gets out of a textbook or a novel is analogous to what

16  any human student or reader would get out of them. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

18      But to equate Claude (or any LLM, for that matter) with a human—a strategy Anthropic

19  relies upon heavily to justify its infringement—is a fallacy. Fundamentally, humans must pay for

20  the copyrighted works they learn from (or otherwise lawfully procure them)—and humans are not

21  multi-billion-dollar companies. *See Texaco*, 60 F.3d at 916; *Cambridge Univ. Press v. Patton*,

22  769 F.3d 1232, 1237, 1283 (11th Cir. 2014) (after bench trial, reversing grant of fair use to

23  university whose professors made copies of books for students, because the professors' "unpaid

24  copying was nontransformative and they used Plaintiffs' works for one of the purposes for which

25  they are marketed").

26      In addition, Anthropic argues that its copying is fair use because it used books "only as

27  inputs." MSJ at 10, 11. But the cases it cites are inapposite. Most of the cases (including *Sega*,

28  *Sony*, and *Google v. Oracle*) involved computer code. In the only case so far to address whether

1  AI training is fair use, the court emphasized this very distinction: "[T]hose cases are all about

2  copying computer code. This case is not." *Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*,

3  2025 WL 458520, at *8 (D. Del. Feb. 11, 2025) (Bibas, J.) (holding that the reproduction of

4  Westlaw headnotes to train an AI model was not fair use).

5        Not only did those cases all involve computer code, they all involved mining the

6  *functional elements* of that code, rather than its expressive qualities. *See Oracle*, 593 U.S. at 3

7  ("Google copied these lines not because of their creativity or beauty but because they would

8  allow programmers to bring their skills to a new smartphone computing environment."); *Sony*,

9  203 F.3d at 603-04 (copying was "necessary to gain access to the unprotected functional elements

10  within the program"); *Sega*, 977 F.2d at 1527 (disassembly was "the only way to gain access to

11  the ideas and functional elements embodied in [the] copyrighted computer program"). Here, by

12  contrast, Anthropic needs books precisely for their expressive qualities—prose, coherence, and

13  organization. Unlike *Oracle*, *Sony*, and *Sega*, where the expression was beside the point, here the

14  expression is the entire point. ██████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████

18        LLMs mimic human writing by strip mining and compressing that expression—even to

19  the point of verbatim memorization. █████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████

22  ████████████████ That focus on and use of the expressive content contained in the books in

23  question categorically differentiates this case from cases like *Sega, Sony,* and *Google,* where there

24  was no serious dispute as to the functional (rather than expressive) nature of the use.

25        To attempt to keep Claude from regurgitating the passages it has memorized, Anthropic

26  has set up "guardrails" to screen ██████████████████████████████

27  ████████████████████████████████████████

28  ████████████████████████████████████████

1

2

3                                           Anthropic even admits memorization is "a problem." MSJ at 4. At

4 a minimum, the degree of Claude's memorization during training presents another disputed issue

5 of material fact.

6         Furthermore, the *non*-computer code cases Anthropic relies on (*Google Books*,

7 *HathiTrust*, *Perfect 10*, and *Arriba*), as addressed above, are inapposite as they all involved a

8 similar pattern of transformation: the defendants indexed creative works so that users could

9 search for them more easily. Because only a snippet of the book (*Google Books*, *HathiTrust*) or a

10 low-resolution version of the image (*Perfect 10*, *Arriba*) was shown to the user, the use was

11 merely as "a pointer directing a user to a source of information," rather than serving a competing

12 "entertainment, aesthetic, or informative function." *Perfect 10*, 508 F.3d at 1165.[9] And, unlike the

13 index-and-search cases, Anthropic takes pains

14

15         *Google Books*, in particular, "test[ed] the boundaries of fair use," and is nothing like

16 Anthropic's use of books here. 804 F.3d at 206. In that case, again, Google executed "bi-lateral

17 agreements" with "a number of the world's major research libraries" to create a searchable index

18 of books. *Id.* at 208. When users search the Google Books index, they are directed to links to buy

19 the queried books, generating revenue for authors. *Id.* at 209. As in the other cases Anthropic

20 cites, the book was used as a "pointer" which directed users to the creative work. Anthropic, by

21 contrast, offers no evidence that its exploitation of Plaintiffs' works promotes books sales, as was

22 critical in *Google Books*.

                                        \* \* \*

23

24         Ultimately, Anthropic's whole argument collapses into its contention that use in training is

25 transformative. When a use is transformative, Anthropic tells the Court, nothing else matters.

26 [9] Anthropic also cites the inapposite Fourth Circuit case *iParadigms*. There, student papers were
indexed and used to detect plagiarism, a different purpose from the originals and another example

27 of an "index-and-search" use entirely distinct from Anthropic's covert use here. 562 F.3d at 634-
35. The same goes for *White v. W. Pub. Corp.*, 29 F. Supp. 3d 396, 399 (S.D.N.Y. 2014), in

28 which legal briefs were indexed to make them text-searchable.

That is not the case. Plaintiffs disagree that Anthropic's use of books in training is transformative. But even if it *were* transformative, that doesn't end the analysis. As the Court explained in *Warhol*, the first factor "is just one factor in a larger analysis." 598 U.S. at 528-29; *Harper & Row*, 471 U.S. at 566 (calling Factor Four "undoubtedly the single most important element of fair use"). The Court should give all four factors due weight and reject Anthropic's attempt to reduce the entire case down to whether LLM training is transformative.

### 2.    Factor Four: Potential market for LLM training.

Anthropic's unlicensed use of books in training harmed Plaintiffs by depriving them of licensing revenues they are owed—and that other AI companies are already paying. *See Hachette Book Grp. v. Internet Archive*, 115 F.4th 163, 192 (2d. Cir. 2024) ("impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor"); Malackowski Decl. ¶¶ 39-52. Anthropic states there is no Factor Four harm because no market for books as LLM training data "exists or plausibly could," MSJ at 20, but it doesn't come close to meeting its burden to disprove Factor Four harm as a matter of law. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) ("Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets."); *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1163 (9th Cir. 2022).[10]

### a.    Disputed factual questions about the licensing market for LLM training precludes summary judgment on fair use.

In assessing the Fourth Factor, the Court should consider whether a defendant has deprived the Plaintiff of licensing revenues, provided that there is a "traditional, reasonable, or likely to be developed market[]" for the use in question. *Am. Geophysical Union* 60 F.3d at 931. Anthropic does not dispute that it deprived Plaintiffs of licensing revenues, but only disputes whether there is a burgeoning market for LLM training for Plaintiffs' works. Because Anthropic cannot establish that a licensing market is unlikely to develop—beyond any dispute of fact—it

---

[10] Because Anthropic decided to move for summary judgment at this early stage, its document productions are ongoing. To the extent the Court finds that additional discovery could confirm that the fair use determination depends on material fact disputes, the Court should deny Anthropic's motion under Rule 56(d). *See* Fed. R. Civ. P. 56(d); Fredricks Decl. ¶ 2.

1  cannot meet its burden on summary judgment as to Factor Four.

2         There is a mountain of evidence confirming that an LLM training market for books is

3  likely to develop. Plaintiffs' expert James Malackowski—Co-founder and Senior Managing

4  Director of Ocean Tomo—analyzed a number of public and nonpublic licensing deals or

5  negotiations for AI training licenses, the rise of intermediaries to facilitate collective licensing

6  regimes where there is disparate ownership, the large demand for LLM training material, and the

7  willingness of rightsholders to enter licensing markets, ultimately concluding that an LLM

8  training market for books is likely to develop in the near future. Malackowski Decl. ¶¶ 39-52.

9  Anthropic may disagree with Mr. Malackowski's conclusions, or try and wish away the tens of

10 public AI training licensing deals, but it cannot establish—as it must on summary judgment—that

11 a licensing market for training is unlikely to develop as a matter of law.

12        Anthropic offers its own competing expert testimony from Dr. Steven Peterson, but Dr.

13 Peterson's conclusions are deeply flawed—and certainly not the stuff of summary judgment.

14

15

16

17

18

19

20

21

22

23

24        Anthropic also relies on the testimony of Tom Turvey, its Head of Data Partnerships,

25

26

27

28

1  ████████████████████████████████████████████████

2  ████████████████████████████████  Anthropic's claim that a licensing marketing

3  for LLM training is unlikely to develop depends entirely on competing expert and fact witness

4  testimony, and for that reason Factor Four cannot be resolved in Anthropic's favor at summary

5  judgment.[11] *See Deppe v. United Airlines*, 217 F.3d 1262, 1266 (9th Cir. 2000) (court "may not

6  make credibility determinations" at summary judgment).

7          **b.**     <u>**Lost licensing revenues are a cognizable market harm.**</u>

8        Anthropic argues that lost licensing revenues are not cognizable in this case as a matter for

9  law for two reasons, neither of which holds water.

10        ***First***, Anthropic argues that Plaintiffs' assertions of lost licensing revenue "fall[] prey to a

11  long-recognized circularity problem." MSJ 19. But it is well-worn law that the "vice of

12  circularity" is easily "avoid[ed] . . . by considering only ***traditional, reasonable, or likely tobe***

13  ***developed markets*** when considering a challenged use upon a potential market." *Ringgold v.*

14  *Black Ent. Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997) (cleaned up) (reversing summary

15  judgment grant for defendants in light of evidence of unpaid licensing fees); *Am. Geophysical*

16  *Union,* 60 F.3d at 931 (holding that "traditional, reasonable, or likely to be developed markets"

17  are "legally cognizable" and "[t]he vice of circular reasoning arises only if the availability of

18  payment is conclusive against fair use").[12] Because a reasonable juror could find that a licensing

19  market for Plaintiffs' works is likely to develop (*supra* IV.2.a), Anthropic falls far short of its

20  burden to show that lost licensing revenues are non-cognizable here as a matter of law.

21        ***Second***, Anthropic argues that lost licensing revenues are non-cognizable where the

22  allegedly infringing use in question is "transformative." MSJ 18-19. This is irrelevant and wrong.

23  ──────────

24  [11] Assessing Mr. Turvey's credibility will be especially important. When he was an employee at Google and testified in the antitrust case against Apple in 2013, his credibility was severely undermined during cross-examination. *See* Ex. 40 ("Turvey had gone from saying the publishers had told him directly, to saying they had merely told people on his team, to finally saying the publishers had 'likely' told someone on his team").

25

26  [12] Anthropic cites *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013). But *Seltzer confirmed* that the Court, on Factor Four, must "consider[] any impact on traditional, reasonable, or likely to developed [sic] markets," ultimately concluding that, in that particular case, the plaintiff failed to supply any evidence of cognizable lost licensing revenues.

It is irrelevant because Anthropic's copying to train its models is nontransformative, *supra* IV.1.b. But setting that aside, Anthropic is also wrong on the law. The principle Anthropic relies on traces back to the Supreme Court's decision in *Campbell v. Acuff-Rose Music, Inc.*, and applies where there is some economic reason why a copyright holder may be disincentivized to license a particular type of transformative work. 510 U.S. at 571. For example, "when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act." *Id.* at 591-92. There is, however, no *per se* rule that Factor Four is categorically irrelevant for any transformative use. *See id.* at 591 (noting that transformative use merely makes market harm "less certain"); *Fox News Network, LLC v. TVEyes*, Inc., 883 F.3d 169, 180 (2d Cir. 2018) (considering licensing revenues where use was "somewhat transformative"). Rather, "the role of the courts is to distinguish between biting criticism that merely suppresses demand and copyright infringement, which usurps it." *Id.* at 592 (cleaned up). Anthropic offers no explanation for why its use here is anything like the markets addressed in *Campbell* and its progeny—*e.g.,* criticism, parody, or commentary—nor could it.[13]

### c. The public benefit weighs against fair use and presents trial issues of fact.

The Court must also "balance the benefit the public will derive if the use is permitted [against] the personal gain the copyright owner will receive if the use is denied." *Hachette*, 115 F.4th at 195. In considering public benefit, the Court must do so "[w]ithin the framework of the Copyright Act," which recognizes "'the Progress of Science and useful Arts' is best promoted by laws that protect authors' original works and permit authors to set the terms of engagement, at least for a limited time." *Id.*; *Ross Intel.*, 2025 WL 458520 at *10 ("Copyrights encourage people to develop things that help society . . . . Their builders earn the right to be paid.").

Here, the record confirms that the public will benefit more from a regime in which authors

---

[13] Anthropic's other cited cases confirm its misreading. *HathiTrust*'s example of the sort of "transformative uses" for which harm "does not count" is "a negative book review . . . dissuading readers from purchasing copies of her book." 755 F.3d at 99. Anthropic's one Ninth Circuit case is quoted only for the unremarkable proposition that "a copyright holder cannot prevent others from entering *fair use* markets." *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020) (emphasis added).

1    are compensated for the use of their material for LLM training versus one in which they are not.

2    LLM technology is rapidly developing and improving and, as it gets better, will likely reduce the

3    incentives for humans to create new works. ███████████████████████████████████

4    ███████████████████████████████████████████████████████████████████████

5    ███████████████████████████████████████████████████████████

6    Compensation for use in AI training will create the incentives for human authorship necessary to

7    preserve future public benefit from human creativity. What is more, the progress of AI depends

8    on human authorship, and written works in particular. ████████████████████████

9    ███████████████████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████████████

12   LLMs may indeed hold promise, but that continued promise and progress depends on continued

13   *human* creation—and one way to incentivize that essential human creation in the AI-era is by

14   compensating authors for the use of their works in LLM training.

15           Anthropic's arguments about the public benefit make two assumptions: (1) without free

16   access to copyrighted books, LLMs could not exist; and (2) LLMs undisputedly benefit the

17   public. Both questions are highly contested and cannot be resolved on summary judgment.

18           As to the first assumption, ███████████████████████████████

19   ███████████████████████████████████████████████████████████████████████

20   ███████████████████████████████████████████████████████████████████████████

21   ███████  Anthropic therefore does not need copyrighted books to create an LLM, but it needs

22   high-quality expression to create the *most commercially competitive* LLM. But fair use does not

23   exist to protect one company's commercial advantage over its competitors. *MCA, Inc. v. Wilson*,

24   677 F.2d 180, 182 (2d Cir. 1981) ("the court may consider whether the alleged infringing use was

25   primarily for public benefit or for private commercial gain").

26           As to the second question, Anthropic's sweeping statements about the promise and myriad

27   applications for AI more generally is irrelevant to the fair use analysis, which is focused on

28   considering the public benefit "within the framework of the Copyright Act." *Hachette*, 115 F.4th

1   at 195; *Ross Intel.*, 2025 WL 458520, at *10. But in any event, whether LLMs hold more promise

2   than peril—or the opposite—is hotly contested. ████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████

9   ████████    What is more, Anthropic's CEO reported there is a 10-25% risk that its LLMs will cause

    human extinction or catastrophically impair human civilization. *See* Ex. 39, at 1. At minimum, the

10  public benefit factor presents yet another series of material factual disputes that cannot be

11  resolved in Anthropic's favor on summary judgment. *Thomson Reuters*, 2025 WL 458520, at *10.

12          **C.      The Court's Five Questions Demonstrate the Absence of Fair Use Here.**

13                  **1.    *Case 1.* An e-book is purchased at full price and read over five days by**
14                          **the purchaser. Each day he reloads the entire e-book.**

15          Plaintiffs assume that this purchase is from an authorized / legitimate retailer. Plaintiffs

16  assume that "reload[ing] the entire e-book," refers to re-downloading it from the retailer and, in

17  so doing, the person is not violating any of the e-book's digital rights management or license. If

18  these hold, then the purchaser has violated neither copyright law nor any license.

19                  **2.    *Case 2.* Same as Case 1 but he buys the e-book for one cent from a**
20                          **notorious counterfeiter known as Books 'R' Cheap.**

            This is paid piracy. For example, Z-Library and Anna's Archive both offer paid
21
    subscription services which increase users' download caps. *See* Ex. 41; Ex. 42. In this case, the
22
    copy made by the purchaser (and the additional copies made during re-loadings) is an infringing
23
    act not protected by fair use. *See supra* IV.A.
24
                    **3.    *Case 3.* Same as Case 2 but his purpose throughout is to write a**
25                          **transformative parody of the work (and he does).**

26          This case implicates two "uses." The initial acquisition from a counterfeiter is

27  infringement; the purchaser's subsequent actions are irrelevant. As to use in a "transformative

28  parody," that requires a fact-specific fair use analysis of its own. *See Warhol*, 598 U.S. at 533.

**4.    *Case 4.* Same as Case 3 but his purpose further includes to write the parody with cowriters, so he buys one e-book and copies it for all co-writers (they jointly write the parody).**

The analysis here is the same as to the initial acquisition of the counterfeit copy (infringing) and the resulting parody (arguably fair use). However, there is now a third use: the copies that the purchaser made for his co-writers would also be infringing acts. *See* 17 U.S.C. § 106(1) (reproduction). Furthermore, the distribution to the cowriters for purpose of their common enterprise could also be an infringing act not excused by "fair use." *Id.* § 106(3) (distribution).

**5.    *Case 5.* Someone buys a copy of the e-book at full price and then gives it to a writer who uses it to write a transformative parody of the work.**

Assuming that the copy was purchased from an authorized retailer there is no infringement as to the receipt of that initial copy by the purchaser. As to the gift of the e-book, Plaintiffs assume the Court means gifting a copy of the e-book (rather than, e.g., the Kindle on which the ebook resides). If the gift involves making an unlicensed copy of the e-book, that would be an infringing act subject to a fair use analysis. As to the use by the writer, the legality of that use would again depend on the outcome of the fact-specific fair use analysis.

**6.    Briefly explain to what extent it makes any difference for the copyright laws whether the work is purchased as an e-book or instead in print and converted by the purchaser immediately into a digital format before the next step.**

This coda primarily implicates the so-called "First Sale Doctrine." Under the First Sale Doctrine, an individual who acquires a lawful copy of the work (*e.g.*, per Cases 1 and 5) is free to dispose of that particular copy in a manner they see fit. *See* 17 U.S.C. § 109. However, as this coda specifies that the physical book purchaser *immediately* converts the physical book to a "digital format," that is a *prima facie* infringing act under the statute and the digital copy is no longer subject to a First Sale defense. *See* 17 U.S.C. § 106(1) (reproduction right); *U.S. v. Moore,* 604 F.2d 1228, 1232 (9th Cir. 1979). There would still be fair use analysis of this *prima facie* infringement implicating a panoply of considerations.[14] *See Hachette*, 115 F.4th at 181-82.

---

[14] For instance, the precise manner in which the digital copy was stored could impact the results of that analysis. *See Google Books*, 804 F.3d at 227.

Dated:  April 24, 2025                    Respectfully submitted,

                                          /s/ *Justin A. Nelson*

                                          Justin A. Nelson

                                          Justin A. Nelson (*Pro Hac Vice*)
                                          Alejandra C. Salinas *(Pro Hac Vice)*
                                          Collin Fredricks (*Pro Hac Vice*)
                                          **SUSMAN GODFREY L.L.P..**
                                          1000 Louisiana Street, Suite 5100
                                          Houston, TX 77002-5096
                                          Telephone: (713) 651-9366
                                          jnelson@susmangodfrey.com
                                          asalinas@susmangodfrey.com
                                          cfredricks@susmangodfrey.com

                                          Rohit D. Nath (SBN 316062)
                                          **SUSMAN GODFREY L.L.P.**
                                          1900 Avenue of the Stars, Suite 1400
                                          Los Angeles, CA 90067-2906
                                          Telephone: (310) 789-3100
                                          RNath@susmangodfrey.com

                                          Jordan W. Connors *(Pro Hac Vice)*
                                          **SUSMAN GODFREY L.L.P.**
                                          401 Union Street, Suite 3000
                                          Seattle, WA 98101
                                          Telephone: (206) 516-3880
                                          jconnors@susmangodfrey.com

                                          J. Craig Smyser *(Pro Hac Vice)*
                                          **SUSMAN GODFREY L.L.P.**
                                          One Manhattan West, 51st Floor,
                                          New York, NY 10019
                                          Telephone: (212) 336-8330
                                          csmyser@susmangodfrey.com

                                          *Proposed Co-Lead Counsel*

                                          Rachel Geman *(Pro Hac Vice)*
                                          Jacob S. Miller *(Pro Hac Vice)*
                                          Danna Z. Elmasry *(Pro Hac Vice)*
                                          **LIEFF CABRASER HEIMANN
                                          & BERNSTEIN, LLP**
                                          250 Hudson Street, 8th Floor
                                          New York, New York 10013-1413
                                          Telephone: (212) 355-9500
                                          rgeman@lchb.com
                                          jmiller@lchb.com
                                          delmasry@lchb.com

PLAINTIFFS' OPPOSITION TO ANTHROPIC'S
MOTION FOR SUMMARY JUDGMENT
CASE NO.  3:24-CV-05417-WHA

1

2          Daniel M. Hutchinson (SBN 239458)
           Reilly T. Stoler (SBN 310761)
3          **LIEFF CABRASER HEIMANN**
           **& BERNSTEIN, LLP**
4          275 Battery Street, 29th Floor
           San Francisco, CA 94111-3339
5          Telephone: (415) 956-1000
           dhutchinson@lchb.com
6          rstoler@lchb.com

7          *Proposed Co-Lead Counsel*

8          Scott J. Sholder (Pro Hac Vice)
           CeCe M. Cole (Pro Hac Vice)
9          **COWAN DEBAETS ABRAHAMS**
           **& SHEPPARD LLP**
10         60 Broad Street, 30th Floor
           New York, New York 10010
11         Telephone: (212) 974-7474
           ssholder@cdas.com
12         ccole@cdas.com

13         *Additional Counsel for the Class*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO ANTHROPIC'S
MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:24-CV-05417-WHA