1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF CALIFORNIA
2

3  ANDREA BARTZ, CHARLES GRAEBER,
   and KIRK WALLACE JOHNSON,
4  individually and on behalf of
   others similarly situated,
5

        Plaintiffs,
6

    v.                          Case No. 24-CV-5417-WHA
7

   ANTHROPIC PBC,               San Francisco, California
8                               Date:  May 22, 2025
        Defendant.              12:00 p.m.
9

10   . . . . . . . . . . . . . . . . . . . . . . .

11         TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT
                      ORAL ARGUMENT
12
            BEFORE THE HONORABLE WILLIAM H. ALSUP
13        SENIOR UNITED STATES DISTRICT COURT JUDGE

14

15

16

17

18

19

20

21

22

23

24 ─────────────────────────────────────────────────
         Proceedings recorded by machine shorthand,
25   transcript produced by computer-aided transcription.

1                      A P P E A R A N C E S

2     For the Plaintiffs:

3     Mr. Rohit D. Nath              Ms. Alejandra C. Salinas
      SUSMAN GODFREY, LLP            SUSMAN GODFREY, LLP
4     1900 Avenue of the Stars      1000 Louisiana Street
      Suite 1400                    Suite 5100
5     Los Angeles, CA 90067         Houston, TX 77002

6     Mr. J. Craig Smyser           Mr. Reilly T. Stoler
      SUSMAN GODFREY, LLP           LIEFF CABRASER HEIMANN &
7     One Manhattan West            BERNSTEIN, LLP
      51st Floor                    275 Battery Street
8     New York, NY 10019            29th Floor
                                    San Francisco, CA 94111
9     Mr. Jacob S. Miller
      LIEFF CABRASER HEIMANN &
10    BERNSTEIN, LLP
      250 Hudson Street
11    Eight Floor
      New York, NY 10013

12
      For the Defendant:
13
      Mr. Joseph Farris             Mr. Joseph R. Wetzel
14    Ms. Jessica L. Gillotte       LATHAM & WATKINS, LLP
      Mr. Douglas Winthrop          505 Montgomery Street
15    ARNOLD & PORTER KAYE          Suite 2000
      SCHOLER, LLP                  San Francisco, CA 94111
16    Three Embarcadero Center
      Tenth Floor
17    San Francisco, CA 94111

18

19

20

21

22

23

24

25

I N D E X

                                                              Page

Argument by Mr. Farris.............................     9

Argument by Mr. Nath...............................    23

Rebuttal argument by Mr. Farris....................    51

Surrebuttal by Mr. Nath............................    65

```
 1                    P R O C E E D I N G S
 2        (Court called to order at 11:52 p.m.)
 3        DEPUTY CLERK:  Now calling Case Number 24-cv-50417,
 4   Bartz, et al., versus Anthropic PBC.
 5        Counsel, could you please come forward to the podiums
 6   and announce your appearances beginning with plaintiffs.
 7        MR. NATH:  Good afternoon, Your Honor.  Rohit Nath
 8   from Susman Godfrey on behalf of the plaintiffs.  With me here
 9   today is Craig Smyser and Alejandra Salina from Susman Godfrey,
10   Jacob Miller and Reilly Stoler from Lieff Cabraser.
11        I'll add my partner Mr. Nelson and Ms. Geman could not
12   make it to the hearing today after it was rescheduled from
13   yesterday to -- from tomorrow to today because there was a
14   simultaneous hearing in the OpenAI matter which Judge Stein
15   requested the attendance of lead counsel.
16        THE COURT:  All right.  Thank you.
17        And?
18        MR. FARRIS:  Good morning, Your Honor.  Joe Farris
19   with Arnold & Porter for Anthropic.  I'm here with my
20   colleagues Doug Winthrop and Jessica Gillotte from Arnold &
21   Porter, Joe Wetzel from Latham & Watkins, and my client Devon
22   Hanley Cook and Brian Israel.
23        THE COURT:  Who are all those people on your side of
24   the room back there?
25        MR. FARRIS:  Too many people to introduce, but there
```

1    are other Arnold & Porter lawyers and other Anthropic

2    representatives.

3              THE COURT:  All right.  Welcome to all of you.

4              I see you don't have as many people on your side

5    today.

6              MR. NATH:  This time unfortunately not.

7              THE COURT:  I'm just teasing.  It's okay.

8              All right.  This is a motion, but while I got you both

9    here, the -- I'm going to hold up something.  This is the under

10   seal part -- part of the record, and you see the redacted out

11   things?

12             How am I supposed to rule in favor of either side when

13   you're hiding the deck of cards?  This is not a deck of 52.

14   This is a deck of about 40 cards.  And I can't -- I don't know

15   what the hidden cards are.

16             Now, you're the one that wants to win the motion, so

17   I'm going to start with you.  Now, this was submitted by the

18   authors.  It's not -- you didn't submit it, but it looks like

19   it's one of your documents.

20             So how am I supposed to -- how am I supposed to rule

21   in your favor if these materials are being redacted?

22             MR. FARRIS:  Because the redactions you're pointing to

23   there are privileged redactions.  I recognize them from the

24   document.

25             And so we may have an issue where you're not able to

1   distinguish what's privileged versus what's being sealed based

2   on the format.  I don't know if we --

3           THE COURT:  Is there someplace -- how am I supposed to

4   know that that's allegedly privileged?

5           MR. FARRIS:  Well, we were envisioning that you'd be

6   reviewing the highlighted versions of the documents where you

7   can see yellow highlights for what we're seeking to seal.  We

8   were not envisioning that you would be --

9           THE COURT:  Did we get any such document?

10          He says we didn't get any such document where we could

11  see through the document.  Do you think you submitted one?  If

12  so, there's been a snafu.

13          MS. GILLOTTE:  So it's the --

14          THE COURT:  Why don't you come up here so -- if you're

15  talking to me, I can't hear you.

16          MR. FARRIS:  Sorry.  I didn't file this motion, so I

17  want to make sure I get it right.

18          MS. GILLOTTE:  Hello, Judge.  Are those the copies

19  that plaintiffs filed --

20          THE COURT:  These are from what plaintiff filed, but

21  it looks like it's your documents.

22          MS. GILLOTTE:  So if there are no -- if there are no

23  highlights, then it might be that the entire -- we haven't had

24  a chance to review plaintiffs' renewed or revised motion to

25  file under seal from last night yet.

1          (Interruption for clarification by the court reporter.)

2              THE COURT:  There is the yellow that says books --

3     what?

4              DEPUTY CLERK:  Please state your appearance.

5              MS. GILLOTTE:  Oh, hi.  My name is Jessica Gillotte.

6     I'm counsel for Anthropic.

7              THE COURT:  All right.  We have a remote court

8     reporter today.  Thank you.

9              Well, let's go ahead with the argument.  No one is

10    going to win this motion, it will be denied, unless this is

11    sorted out so that I can see what I'm supposed to see instead

12    of 40 cards out of a deck of 52.  Okay?

13             I want you to look here, Ms. Jessica.  Look at that,

14    what I got there, and that's what is supposedly under seal now.

15    This is not the public version.  This is the under seal

16    version.  I want you to see what I'm up against.

17             MR. FARRIS:  So these are definitely privileged

18    redactions, and we --

19             THE COURT:  It doesn't say that.

20             MR. FARRIS:  You're correct.  One thing we could do is

21    go back and redo these and literally write privileged

22    redactions every place it's a privileged redaction to make that

23    abundantly clear.

24             THE COURT:  Well, what if it's a phony -- I'm going to

25    tell you, in my experience only about 20 percent of assertions

1    of privilege are legit.  The rest of them are phony boloney,

2    and they're just dressed up and called privileged.  Now, maybe

3    you're in the 20 percent.

4            But would it be fair for somebody to win or lose this

5    case based on phony privilege assertions?  I don't know.

6            You're going to have to tell me -- submit today by

7    midnight something that tells us if these are privileged and

8    what the basis for the privilege is.

9            MR. FARRIS:  Okay.

10           THE COURT:  And if there was anyone who was not a

11   lawyer who is copied on it, that blows the privilege unless the

12   individual is the one -- all the time putting a business lawyer

13   on it and then making business decisions with lawyers getting

14   cc'd.

15           MR. FARRIS:  We're aware of that.  You may notice

16   several of the documents are actually marked attorney-client

17   privilege, and we produced them anyway because we thought there

18   were lawyers on it, but nonetheless, we didn't think it was

19   privilege.  So we really were aware of that when we went

20   through.

21           Now, we can go through, we can mark them all --

22           THE COURT:  Please do that.

23           MR. FARRIS:  -- and tie it to a privilege log as well

24   so you can see that.

25           THE COURT:  Thank you.  All right.  Do that by

1    midnight.

2          Okay.  Now we're going to turn to the actual argument,

3    so who's going to do that?

4          MR. FARRIS:  That's me, Your Honor.

5          THE COURT:  All right.  You get to go first.

6          You get to sit down.

7          Go ahead.

8          MR. FARRIS:  Thank you, Your Honor.

9          I'd like to start by reading just one very short quote

10   from their papers that I think cuts to the quick of what's

11   going on with the plaintiffs' case here.  "Claude itself is not

12   a substitute for books."  That's from their papers, from their

13   expert.

14         THE COURT:  Sorry.  I didn't -- you read it too fast.

15   Read it slowly.

16         MR. FARRIS:  "Claude itself is not the substitute for

17   books."  That's from James Malackowski, their expert, their

18   licensing person.  It's at paragraph 38.

19         THE COURT:  Please adjust the microphone so it catches

20   your voice better.  You don't have to bend over.  Make sure

21   you've got it as close as you can get it.  But the people in

22   the back are not going to be able to hear you.

23         MR. FARRIS:  Okay.  I'll focus on talking into the

24   microphone.

25         THE COURT:  That's much better.  Thanks.

1         MR. FARRIS:  No problem.

2         This particular admission that Claude is not the

3    substitute for books creates an insurmountable problem for

4    them.  It's because there's one claim in this case.  It's a

5    claim that Claude was trained, and that is the claim of

6    infringement based on the training.

7         There's no claim that anything Claude has ever output

8    has caused infringement, has been expressive content that's

9    similar to what the plaintiffs produce.  That gives them

10   nowhere to really go on factors one and four.

11        So if you hold that thought for a second, I can

12   address kind of what I think the heart of our position on

13   factors one and four is.

14        For factor one, we all know the central question is

15   transformativeness.  That comes from the *Campbell* case.  That

16   was reiterated by the *Warhol* case very recently.  Whether the

17   secondary work supersedes the original or has a further purpose

18   and different character, *Warhol* called that a problem of

19   substitution.

20        The *Warhol* court also emphasized that

21   transformativeness is a matter of degree.  So if you think

22   about it as a sliding scale as the court put it in *Campbell*,

23   the more transformative a work is, the less will be the

24   significance of other factors.  I think that's a very important

25   principle to bear in mind as you're looking at this case.

1    THE COURT:  Read that to me again and don't leave

2  anything out of that sentence.  Read to me what the Supreme

3  Court said that you just read to me.

4    MR. FARRIS:  This is from the *Campbell* case, so the 2

5  Live Crew case, the more transformative a work is, the less

6  will be the significance of other factors.  I do have ellipses

7  at the end of that sentence.

8    THE COURT:  Give me the page number.

9    MR. FARRIS:  The page number is 579.

10    THE COURT:  Thank you.

11    MR. FARRIS:  Okay.  All right.  So when you look at

12  what cases they're citing to on transformativeness and what

13  cases we're citing, I think it will become clear why that's

14  important.

15    So on one end of the scale, their side, they're citing

16  cases where the courts are consistently finding not

17  transformative uses, and the consistent theme, what's happening

18  in those cases is that the original work is being repackaged,

19  redistributed, but is essentially just a means of getting the

20  original creative expression to the end-user, just a new way of

21  doing something like that, that -- a new way of shifting the

22  original expression to a new person.

23    Now, that describes *Napster*, the peer-to-peer file

24  sharing cases they cite.  They cite six of those cases.

25  They're all about substituting for someone's work, providing an

1   exact substitute.

2       It also describes the Second Circuit *Texaco* case they

3   cite and rely on heavily about the oil scientists who were

4   photocopying scientific journals and handing them off to each

5   other.  Again, just providing the direct substitute for the

6   original work with the expressive content in it.

7       These are their lead cases.  These are the cases they

8   tell you are most comparative here on transformativeness.  That

9   should tell you a lot.

10      Now, on the other end of the spectrum, the cases we

11  cite, you actually see something new that's being created that

12  is not a substitute for the original.  That's the *Sega* case,

13  the *Connectix* cases.  These are the reverse-engineering cases,

14  you know, with PlayStation, Sony, and Sega Genesis cartridges

15  where a direct competitor reverse-engineered, copy copyrighted

16  expression as an intermediate copy, and then created a new

17  product.

18      *Google versus Oracle* goes a step further.  The copying

19  wasn't even intermediate there.  The expression was in the end

20  product, but they created a new product.  That was

21  transformative.

22      *Perfect 10*, *Ariba*, the search engine cases, copied

23  images from the Internet to create a search engine.  Same

24  expression was there in the end product, but it was a new

25  product, so it was transformed.

1          And the last group of cases I point you to really

2     focus on are the *Google Books* and *HathiTrust* cases.  They

3     copied entire libraries to create a new tool that did something

4     different, that expanded the functionality of the works, rather

5     than just delivering --

6          THE COURT:  What was the fact pattern in the *Google*

7     *Books* case?

8          MR. FARRIS:  Yeah, so there's two of them.  The

9     *HathiTrust* is the one that comes first, and that is where the

10    nonprofit collective of universities are working with Google to

11    scan their entire libraries.  And in that case they built a

12    more rudimentary search tool where they could kind of count

13    where words appeared in the books.  So that was a fair use

14    case.  Frankly, an easier one because of the facts.

15         About a year later the *Google Books* case, Google

16    itself got sued as part of the same project.  They had the same

17    scan of the entire library of books, but now it was a

18    commercial entity, obviously, so it was a harder decision, and

19    Google was doing different things with the books too.

20         The thing I think that was closest to the line that

21    Google was doing was creating a search functionality but then

22    allowing readers to review snippets of the books, so you could

23    pull up at a time, like, three snippets and just read

24    expressive text from the books.  The author said, well, you're

25    taking our market by doing that, you're showing people our

1    portions of our books, and we're not getting paid for that.  So

2    they argued this is substitution.  This is very close to the

3    line.

4         And Judge Laval, who was the judge in the Second

5    Circuit who decided that case, who is obviously well respected

6    as far as fair use issues, he said, no, that's not.  And he

7    said that it was sort of close to the line.  He really looked

8    at the facts.  He said, you know, how easy is it to access the

9    replicated expression.

10        You could get, I think, up to a total of 16 percent of

11   it shown for those snippet views, but it was out of order and

12   it was jumbled, and it was a lot of work to get to it.  And he

13   said, you know, that's not enough.  There's an expansion of the

14   utility of this works going on here.  We've transformed it.

15   We've created a valuable tool.  We're expanding the knowledge

16   that society can get from these books.  So a good thing.

17        And that outweighs -- yes, that's going to cause some

18   harm on the book.  He acknowledged that's going to cause some

19   loss of sales.  You people aren't going to buy those books

20   because they're going to get everything they need from snippet

21   view, said that is outweighed by the transformative value by

22   this new technology.

23        THE COURT:  Did -- I'm confused on one -- how did

24   Google get its hands on the books to begin with?  Did it buy

25   the books and scan that and how did that happen?

1          MR. FARRIS:  There were a group of university

2     libraries, you know, big state schools like the University of

3     Michigan I think was the lead school, and they had a

4     partnership with Google where they said you can scan all the

5     books in our library.

6          And the libraries got to keep archival copies of their

7     books.  They got access to these tools, and the Google got to

8     scan the books and keep the dataset and build tools out of it.

9          THE COURT:  Why wasn't that scanning held to be a

10    violation of the Copyright Act?

11         MR. FARRIS:  Because it was fair use, because it was

12    bound up in the process of creating the transformative tool

13    that Google and the libraries created.

14         And of course the authors didn't think so, right?

15    They sued and they said that's a violation.  You digitized our

16    works without our permission, this is unauthorized, you weren't

17    entitled to do that.  And the court said, well, you may not

18    have been entitled to it, but you did something that really

19    advanced the progress of arts and science here, so it's fair

20    use.

21         THE COURT:  All right.  So that was which case?

22         MR. FARRIS:  That's the *Google Books* and the

23    *HathiTrust* cases.

24         THE COURT:  That's Judge Laval?

25         MR. FARRIS:  Yeah, he's in the second one.

1          THE COURT:  What did the Supreme Court do in that

2    case?

3          MR. FARRIS:  Did not hear it.  It didn't go to Supreme

4    Court.

5          THE COURT:  And the year of that decision?

6          MR. FARRIS:  2015.

7          THE COURT:  Okay.  All right.  So keep going.  So

8    that's really the -- do you rely on any of those other factors

9    under Section 107?

10          MR. FARRIS:  Which other factors --

11          THE COURT:  Well, the purpose and character of the

12    use, whether it's commercial or for a nonprofit, educational

13    purpose; (2) the nature of the copyrighted work; (3) the amount

14    and substantiality of the portion used in relation to the

15    copyrighted work as a whole.

16          MR. FARRIS:  Right.

17          THE COURT:  And the effect of the use upon the

18    potential market or value of the copyrighted work.

19          MR. FARRIS:  Right, yes.  So we think they all favor

20    us here.  In the second factor whether the work is expressive

21    or not, obviously plaintiffs represent a very diverse group of

22    books, and some of them will be more expressive than others.

23          But this is summary judgment.  We're going to assume

24    for this purpose that their books are highly expressive and the

25    kind of thing that Copyright Act favors and protects.

1          But that said, I ask you to look at, again, the *Google*

2     *Books* here and see what Judge Laval said about factor two.  He

3     found it favored Google there.  He said -- and I can read the

4     quote -- "The second factor favors fair use not because

5     plaintiffs' works provide valuable information about -- excuse

6     me -- because --

7          THE COURT:  Start over.

8          MR. FARRIS:  I'll start over.

9          "The second factor favors fair use not because

10    plaintiffs' works are factual, but because the secondary use

11    transformatively provides valuable information about the

12    original rather than replicating protected expression in a

13    matter that provides a meaningful substitute for the original."

14         THE COURT:  Okay.  You've said it, but remind me what

15    the transformative use was.

16         MR. FARRIS:  Developing a way to search those books,

17    taking an old, dusty library where nobody could get access to

18    the information sitting in the back of the library, digitizing

19    it, and creating a tool to search through it so you could now

20    go find, you know, what -- information that was never

21    accessible before and get to it quickly, efficiently, and

22    broaden the scope of human knowledge.

23         THE COURT:  If that was a particular phrase you wanted

24    and didn't know where it came from, you could put that in, and

25    it would search a million books and tell you -- tell you where

1    that phrase appears?

2         MR. FARRIS:  Yep, that's correct.  But it would do it

3    in a limited fashion.  It would show you, like, three snippets

4    at a time, and you could refresh it and keep doing it, but it

5    wouldn't show you the whole book because they were conscious.

6    They didn't want this to be a mechanism to just deliver the

7    book, deliver the expression to the user.

8         And our case -- I think it's a critical comparison to

9    our case because you can't get any expression from the books to

10   the user in our case, right.  There's no claim that you can.

11        Certainly we copy their books.  That is part of the

12   process of training Claude, but Claude transforms that.  It

13   does a statistical analysis on that book and millions of other

14   books and millions of other data points.

15        And what comes out of Claude is not -- not the books.

16   We've transformed it into entirely new things.  It's a tool

17   that can do analysis, a tool that can answer questions, a tool

18   that can write code.  Can generate prose for sure, but is not

19   alleged to have generated any prose that looks like the prose

20   of the plaintiffs.

21        So for that reason we don't think we're actually using

22   any expressive content under the second factor, and we think

23   this is more like the *Google Books* case where this factor

24   favors us.

25        And the other thing I'll quickly point out --

1          THE COURT:  Is there an analogous Ninth Circuit

2     decision that follows Judge Laval?

3          MR. FARRIS:  That follows Judge Laval?

4          THE COURT:  Or cites him with approval.  We are in the

5     Ninth Circuit, not the Second Circuit.

6          MR. FARRIS:  There is a case -- well, first of all, I

7     say the Supreme Court cites Judge Laval with approval.  If you

8     read the *Andy Warhol* case, that *Google Books* case is cited four

9     times.

10          THE COURT:  It is?

11          MR. FARRIS:  It is.

12          THE COURT:  Well, that's a good thing.

13          MR. FARRIS:  Yeah.

14          THE COURT:  By the majority?

15          MR. FARRIS:  By the winning side.

16          THE COURT:  Okay.  Well, that's something maybe the

17     other side has got to answer.  All right.

18          MR. FARRIS:  Okay.  So one last point on the second

19     factor, very briefly, just for you to bear in mind as you read

20     the cases, one thing that is often critical under that factor

21     is whether a work is published or not.

22          So there's this 1985 Supreme Court case, *Harper & Roe*,

23     where The Nation Magazine was accused of scooping part of

24     Gerold Ford's memoirs and publishing them, kind of stealing the

25     right of first publication, which basically zeroed out the

1    value from the rights holder from the original work.

2         In that case factor two weighed heavily against the

3    defendant, and there's some other cases they cite, usually in

4    the context of news reporting and scooping people.

5         So bear that in mind.  There are a few cases where

6    there's no fair use where that is actually really significant.

7    And that's not an allegation here.  These are all the published

8    books.

9         The third factor, you know, the amount substantiality

10   of the use, case after case of the ones I've cited are in

11   harmony here.  They all basically state the principle that if

12   you need to take the amount of the work you take to justify

13   your innovation, you can take the entire work.

14        So *Perfect 10*, *Ariba*, the search engine cases, you can

15   scrape the whole image out of the Internet.  Google, you can

16   scan the whole books.  There's a case called *iParadigms,* which

17   is a good one here too, where there were -- it was a tool, a

18   technological tool to compare student papers against other

19   student papers to detect plagiarism.  You had to scan the

20   entire paper, put it into an archive for the machine to work.

21   Another fair use case.  If the amount you need was necessary to

22   justify the tool, fair use weighs in favor of the defendant.

23        So the final factor, factor four, which is the market

24   harm factor, I think the most important thing for you to think

25   about here is to think about what they're actually claiming in

1  this case as the theory of harm.  And in their brief, there is

2  one theory of harm based on the training of Claude, is that

3  they lost licensing fees for that.  They don't say that Claude

4  has actually harmed them but that they should be paid a

5  licensing fee.

6       And that should be a red flag.  Over the years courts

7  have said when that's the theory, when that's the only theory

8  of harm, this poses the risk of vice of circular reasoning

9  where the demand for a licensing fee itself becomes the proof

10 that there is a market for this use that is being disrupted.

11      To quote the Nimmer treatise on this, "It is a given

12 in every fair use case the plaintiff suffers a loss of a

13 potential market if that potential market is defined as the

14 theoretical market for licensing the very use at bar."

15      And the Ninth Circuit quoted that -- I'm quoting that

16 from Nimmer just because the Ninth Circuit quoted it, quoted it

17 just a few years ago in the *Tresona Multimedia v. Burbank High*

18 *School* case, which is in our papers.

19      That was a cause of action where the rights holder for

20 an Olivia Newton John song sued a high school musical that had

21 intermixed her song into a play that the school was putting on,

22 and the court found that that's not a cognizable harm under the

23 fourth factor.  You're trying to invent a licensing market that

24 didn't exist of high schools licensing old Olivia Newton John

25 songs for musicals.

1         The Ninth Circuit cited to the *Bill Graham* case there,

2    and the *Bill Graham* case is from the Second Circuit.  That's

3    *Bill Graham*, the promoter for The Grateful Dead.  He sued a

4    maker of a book of coffee table art who had come to him, and

5    the coffee table art maker had said, hey, we'd like to put some

6    old Grateful Dead posters in our coffee table book about The

7    Grateful Dead, and Bill Graham said no.

8         They went out, they did it anyway.  They put the

9    posters in there, but they did it in a transformative way.

10   They didn't just display the posters as art; they used them as

11   tiny, shrunken, reduced images along a timeline of The Grateful

12   Dead to illustrate kind of -- to be biographical anchors.

13        The court said, well, you didn't use the work for its

14   original expressive content; you used it for a transformative

15   use there, so therefore, we're not going to find that there's

16   going to be a licensing market for that where there never was

17   one before, even though the plaintiff had asked for a license.

18        I'll give you one more case on why there shouldn't be

19   a licensing market deemed here.  That's the *HathiTrust* case

20   that I described earlier.  That's the earlier version of the

21   *Google Books* case.

22        In that case the authors claimed, well, we could have

23   licensed you our books to use in that search engine, so you

24   should find factor four favors us.  And the court in

25   *HathiTrust*, not Judge Laval, the other one, he said, no, it

1    doesn't favor you because the Copyright Act is concerned with

2    only one type of economic injury; the harm that results because

3    the secondary use serves as a substitute for the original

4    works.  It further explained that by definition transformative

5    uses are not substitutes.

6            And this gets me back to the very beginning of the

7    presentation.  You know, our expert, Dr. Steve Peterson, the

8    economist, has opined as a matter of economics Claude is not a

9    substitute for a book.

10           Their expert came in.  He agreed with that.  That's

11   the first thing I said today.  So we don't have a dispute about

12   whether Claude substitutes for a book.

13           There should not be a dispute about whether Claude is

14   transformative, and that means factor four is going to weigh in

15   our favor, and you cannot find a licensing market in that

16   situation or a potential licensing market.

17           THE COURT:  Okay.  Let me hear from the other side,

18   and I'll give you a chance for rebuttal.

19           UNIDENTIFIED SPEAKER:  May I approach, Your Honor?

20           MR. NATH:  It's slides, Your Honor.

21           THE COURT:  Oh, hand it to the clerk.  Thank you.

22           Okay.

23           MR. NATH:  Your Honor, I want to start by saying this

24   is obviously -- we're on a motion for summary judgment in the

25   middle of discovery.  The Defendant Anthropic needs to

1    establish that they can win on fair use on their affirmative

2    defense beyond any dispute of material fact, and there's

3    several material facts, factual disputes that preclude summary

4    judgment here.

5        But I want to start with one principle that the *Warhol*

6    case teaches us, which is that each use, each separate use

7    needs to be treated differently.  And in that context this

8    means that each copy that Anthropic makes needs to be analyzed

9    in its context.

10        And why is that important here?  Because there are two

11    separate theories of infringement and two separate fair use

12    issues at issue in this case.

13        The first is that Anthropic downloaded content free

14    from known pirated websites like a website called Pirate

15    Library Mirror and did so to avoid purchasing it.  And the

16    question is whether that is fair use.  Then the second thing

17    they did is they made reproductions of books for the purpose of

18    LLM training.

19        Both of those two questions need to be treated

20    separately, and I'd like to start with the first and why

21    downloading free from a pirated website to avoid paying for a

22    copy of a book is under a -- decades of unbroken line of

23    authority not fair use.

24        So the first slide we have here is an example of

25    the -- from the record of the websites that they visited.  The

1    first is Library Genesis.  It openly advertises that it's a

2    project in blatant violation of the copyright laws.  And the

3    second is Pirate Library Mirror, and it says we deliberately

4    violate the copyright law in most countries.

5         These are the sources, the places that Anthropic went

6    to, to go get their books.  They said we need -- we want

7    books -- and we're going to walk into the purpose and the

8    character of that use, the reason why Anthropic wanted books.

9    We want books, and so instead of going out in the open market,

10   going to Amazon like most of us do when we want a book, they

11   went to these websites.

12        So why does that matter?  There's a long line of

13   authority including Judge Easterbrook's decision in *BMG versus*

14   *Gonzalez* in the Seventh Circuit from 2005, in the *Napster* case,

15   *A&M Records versus Napster* from 2001, holding that downloading

16   music for free, downloading copyrighted works for free to avoid

17   paying for it is not fair use and is copyright infringement.

18        And that makes sense because it has an obvious

19   substitutive effect.  If Anthropic or any human, man, or

20   machine goes and downloads a copy of a book or a movie or a

21   piece of music instead of paying for it, that is not considered

22   fair use because it has an obvious substitution effect.

23        THE COURT:  Wait.  You may be right on that, but the

24   other side said that Judge Laval said you were wrong and that

25   the original copying of all those books and the university

1   libraries was okay because they were eventually going to do

2   some transformative use.

3          MR. NATH:  Well, Your Honor, that's actually --

4          THE COURT:  Is he -- I'd like to hear whether -- what

5   you say to that argument.

6          MR. NATH:  Yes.  So Judge Laval -- first of all, the

7   book scanning in *Google Books* was a very different situation,

8   the book scanning -- or the book downloading at issue here.

9          In *Google Books* there was a consortium of libraries

10  who had lawfully acquired books, and they made scans of it and

11  shared it with Google.  There was a bilateral agreement.  Very

12  different -- it would have been a very different case had

13  Google -- Judge Laval did not sanction Google going to a place

14  like Pirate Library Mirror or Library Genesis to source their

15  books.

16         There are a couple of other distinctions --

17         THE COURT:  Wait.  Did those university libraries have

18  the legal right to allow Google to copy those works?

19         MR. NATH:  That was the issue in dispute in that case.

20  But there are a couple of other distinctions, Your Honor,

21  between *Google Books* and this case that I would like to point

22  out.

23         First of all, the libraries obviously had a lawful

24  copy and presumably had paid for that copy in the first place.

25  There's no question that the libraries that Anthropic turned to

1    did not have authorized copies of the works, and that is

2    something that wasn't at issue in *Google Books*.

3          The second issue is the question of substitution here,

4    and the purpose and character of the use is very different.  So

5    I want to just focus -- I want to start with the purpose and

6    character of the use and then explain why the market harm for

7    Anthropic's free downloads from pirated websites is different

8    in this case than in that one.

9          So let's look at the record.  Actually, let me take a

10   step back.  *A&M Records versus Napster*, it was an indirect

11   copyright infringement claim, and the court ultimately

12   concluded that any users of Napster who were downloading copies

13   of music for the purpose of avoiding paying for it, they were

14   the copyright infringers.

15         It didn't actually matter in that case ultimately.

16   The court analyzed a variety of circumstances in which, you

17   know, if you do this with the music or do something else with

18   the music, whether that's fair use.  The court said, no, none

19   of this is fair use.

20         But let's take a look at what Anthropic did here and

21   why it made copies of books.  The first point, this is from the

22   record.  This is Exhibit 3 to our opposition for summary

23   judgment.  Why did Anthropic want to get books?  This is very

24   different from *Google Books*.

25         Anthropic wanted, quote/unquote, good writing.  The

1    exhibit on the screen in front of you is Anthropic's

2    description of what they said is the good writing hypothesis.

3    They wanted examples of -- for example, you know, Robert Caro's

4    *The Power Broker* or something like that because good writing,

5    the protected expressive elements of the works they wanted to

6    help train their large language model.

7            Google in *Google Books*, that is not what they were

8    after.  They were not after good quality writing.  They just

9    wanted to index the world of books so that you could search for

10   it.

11           So thereafter the expressive elements of the books --

12   I wanted to -- I quote my opposing counsel in distinguishing

13   the *Graham* case -- or sorry, citing the *Graham* case, he said

14   the key distinguishing factor in that case was that the

15   defendant did not want to, quote, use the work for its original

16   expressive content.

17           In this case that is exactly why Anthropic went to get

18   books, of why Anthropic went to pirated libraries to get books.

19           The second issue is in -- critical in the *Napster*

20   case, critical in the *BMG versus Gonzalez* case was the purpose

21   of the defendant in those cases, the downloader, was to avoid

22   paying for a lawful copy of the work.

23           There is no evidence in the record in *Google* about

24   Google trying to avoid paying for lawful copies of the works.

25   They actually went to great lengths to go to libraries.  They

1    entered bilateral agreements.  They did a lot of work on that

2    project.

3         THE COURT:  Well, did they pay for any of those

4    copies?

5         MR. NATH:  They ultimately didn't pay for the actual

6    copies of the work.  They went to a legal library.

7         But let's look at the record here.  MSJ opposition

8    Exhibit 27 explains -- Anthropic CEO explaining why they went

9    to pirated libraries instead of when they had a choice, we can

10   go out and buy copies of these books and we go download them

11   free from Pirate Library Mirror.  This is the explanation:  "It

12   would be a huge legal/practice/business slog."  That is Exhibit

13   27.  That was the reason why they went to these libraries.

14        And so in total, if you look at the first factor on

15   their actual original download from these pirated libraries,

16   they're in exactly the same position as end-users in *Napster* or

17   *BMG Records*.  The end-users in those cases, they wanted music.

18   They wanted music for their expressive elements.  Here

19   Anthropic wanted books.  They wanted books for its expressive

20   elements, which is a critical difference from any of the cases

21   that Anthropic cites.  And I'll get into that in more detail as

22   I proceed with the presentation.

23        And then they also wanted to avoid paying for actually

24   copies out in the open market.

25        Now, in the second principle factors, factor four --

1   and actually I just want to make one more point.  The rule that

2   Anthropic is asking this court to endorse -- I just want to

3   make it clear.  The rule that Anthropic is asking this court to

4   endorse is something frankly extraordinary in copyright law.

5          In page -- I think it's page 2 of their reply brief is

6   what we have up on the screen.  This is the rule that they

7   fashioned here.  Courts have consistently held that

8   unauthorized copies made as part of a process of creating new,

9   noninfringing, public-facing content is fair use.  That is --

10  that is the rule they fashioned so that they can protect

11  themselves while still being consistent with the long line of

12  cases -- still trying to be consistent with other cases that

13  exist.

14         Your Honor, if that is the rule, then *A&M Records*

15  *versus Napster, BMG versus Gonzalez*, the long line of cases

16  that were peer-to-peer file sharing would no longer be the law.

17  It would essentially be a blanket --

18         THE COURT:  I don't -- their answer to that is none of

19  -- those were just scrape, follow, or file copying cases and

20  not one shred of transformative use, just some kid in the

21  garage that wanted to listen for free to all the records they

22  wanted to.  No, there's no transformative use.

23         Go ahead.

24         MR. NATH:  Sorry.  Apologies, Your Honor.

25         That actually is -- what they're saying is that any

1    time that you're creating new public-facing content, you're

2    downloading content for the purpose of creating new public-

3    facing content, you are no longer an infringer, and that is

4    fair use.  In the age of the Internet, that is not a rule that

5    is workable that would prevent piracy.

6         I have a GoodReads account, which is a social media

7    account where I can post, you know, reviews of books.  Everyone

8    has an Amazon account where they can post reviews of books.

9    You can imagine that virtually any of the infringers in *BMG* or

10   *Napster* could have avoided liability in that circumstance by

11   just saying that, you know, we post content about the books,

12   whether it's a bad book review, whether it's a bad music

13   review.  In the age of the Internet, that is not a limiting

14   principle that will prevent the piracy effectively --

15        THE COURT:  How many any of those kids in the garage

16   are really going to be putting reviews of the records on the

17   Internet?  Maybe one or two, but that doesn't sound to me

18   like -- it would be so hard to sort that out.

19        MR. NATH:  Your Honor, I think it actually would be if

20   you, you know, sort through Amazon and look at any book, there

21   are, you know, hundreds, thousands of reviews written by

22   anybody about the quality of the book.  And under Anthropic's

23   proposed rule that would -- that would be dispositive of a fair

24   use defense.

25        But I want to also move on to something else because

1    there's another really --

2         THE COURT:  All right.  Let me put in my own words

3    what you're saying because it's a fair point.

4         You're saying under Anthropic's view of the law, you

5    could blatantly download in the same way that *Napster* people

6    did so long as you are able to show that you did it for the

7    purpose of fair use, which might be as simple as a short review

8    on Amazon.

9         MR. NATH:  Exactly.  And the critical feature here,

10   Your Honor, is one of the cardinal sins in copyright law is

11   that the court cannot be privileging high art over low art,

12   right?  You're not making a distinction between -- so a really

13   bad book review would be a noninfringing public-facing content

14   that would be automatically fair use if Anthropic were to win

15   this case.

16        And so there's no way -- it would effectually

17   legitimize piracy and create this gigantic loophole in *BMG* and

18   *Napster* decisions.

19        There are a couple of other reasons why in this case

20   that the piracy really cannot be fair use, and at a minimum

21   there are factual disputes --

22        THE COURT:  I want to stick with your point a minute.

23        MR. NATH:  Okay.

24        THE COURT:  Let's say that the judge were to hold or

25   the law were to hold that, yes, you're right, the first copy

1    that they acquired, they should have paid for it.  And so you

2    figure out what Amazon would have charged for a used book, so

3    let's say it's $8.  But from that point on it's all fair use.

4         So your authors would get $8 per book or whatever the

5    -- you know, I'm going through libraries where they have a book

6    sale, you can buy a book for $1.  And I have.  They're good

7    deals.  If you go through them long enough, you find the one

8    you want.

9         So wouldn't that be enough to -- if they had bought

10   these books to begin with, from that point on, once they buy it

11   legit, from that point on, it's fair use?

12        Help me -- I see your first point, but you're not

13   coming to grips with the rest of the timeline.

14        MR. NATH:  Right, Your Honor.  So if I'm

15   understanding, the question is -- the question is, okay, maybe

16   the piracy or the initial acquisition is unfair use --

17        THE COURT:  Make them pay for the piracy part, but

18   everything else was transformative.

19        MR. NATH:  After that the additional copies maybe are

20   justified under the fair use doctrine.  We think --

21        THE COURT:  That's what I'm trying to get you to

22   answer.

23        MR. NATH:  And the answer to that is *American*

24   *Geophysical Union versus Texaco*.  That case was a Second

25   Circuit case.  It's been cited favorably in the Ninth Circuit

1    several times, including in the *A&M Records versus Napster*

2    decision, and I want to briefly describe --

3         THE COURT:  Is that the one where they copied the

4    parts so each engineer could have their own chapter?

5         MR. NATH:  Exactly.  So I won't go through the facts,

6    but --

7         THE COURT:  But I don't even see why that would be

8    transformative.  Why is that analogous?

9         MR. NATH:  It is the 1980s-1990s analog to exactly

10   what Anthropic is doing today.

11        So it was undisputed in that case that *Texaco*, much

12   like Anthropic, was using these -- using those journal articles

13   in the course of research to develop new inventions that

14   judge -- that -- in that case the Second Circuit held that,

15   okay, this -- these inventions might benefit the public, right,

16   that you are making copies of a journal article to read the

17   journal articles to help you with your scientific research.

18        Here, what is Anthropic doing?  They're using --

19   they're using books for their expressive purpose.  They're

20   analyzing -- this is the Kaplan declaration at 47.  That's one

21   of Anthropic's co-founders.  He acknowledges that what is

22   happening during the training process, they're analyzing how

23   words fit together, how paragraphs fit together.  They actually

24   want the expressive content of the books in order to create a

25   machine that generates output that mimics quality human

1  expression.  So they needed quality human expression, which is

2  why they're getting the books.

3           And just like in *Texaco*, at the very end of the line

4  there is something that both defendants claim benefits the

5  public; it's research, it's development, it's scientific

6  progress.  But that wasn't enough.

7           Why the critical distinction between *Texaco* and all

8  these other cases is twofold.  One, they're using the

9  expressive content of the works here.

10          THE COURT:  What did they -- what did the *Texaco* case

11  hold?

12          MR. NATH:  The *Texaco* case held that the reproduction

13  of photocopying in the course of scientific research in that

14  case was not fair use.  It held that it was not a

15  transformative use.

16          They were building a research library without paying

17  just the -- a basic licensing fee and a customary licensing fee

18  in that industry and that it held that the fourth factor, which

19  is -- which considers licensing revenues, so lost licensing

20  revenues, weighed sharply against *Texaco* in that case.

21          So in the subsequent copies, we think *Texaco* is the

22  most on point case.  *Google Books* doesn't get them quite there

23  because you're talking about a search engine, right?  The

24  search engine is not exploiting the expressive qualities of the

25  work.

1          And the other important factor -- and this is under

2     the *Warhol* case.  Justice Sotomayor's decision in the *Warhol*

3     case made it clear that the court under the first factor also

4     needs to consider the justification for the use.

5          And what does that mean?  Well, the quintessential

6     example of a justification for the use that justifies what

7     you're doing under the first factor is like the parody in

8     *Campbell versus Acuff-Rose* where there was 2 Live Crew who

9     parodied the song "Pretty Woman."  And Justice Sotomayor said,

10    look, you can't make a parody without borrowing and mimicking

11    the original, and so that is a high level of justification for

12    the use.

13         But if you're below that, right, if you don't have

14    that kind of justification, you may not be able to satisfy your

15    burden under the first factor to establish that a

16    transformative use actually weighs in your favor under the

17    first factor.

18         We think the use is not transformative because they're

19    exploiting the expressive elements of the work, and in fact,

20    the memorization of the model proves that, that the model

21    actually memorizes the expression -- expressive content of the

22    work.

23         But even so, they lack a justification.  It's not that

24    Anthropic needed these books to train a model.  You can train a

25    large language model without books.  It is that the books gave

1  them a competitive advantage.

2        And I'd like to just cite a few examples from the

3  record.

4        Can we go to slide 20.

5        So this is an example of an internal document.  This

6  is our opposition Exhibit 4 describing why books are so

7  important.  And this internal document says, "We have a fairly

8  high level of confidence of one trillion of book data would

9  make our models 10 percent more efficient, which effectively

10  means that we can train future models for 10 percent less

11  compute."

12        The importance of books was not that they were

13  essential to be able to develop a model that generated -- that,

14  you know, generated the output that they're talking about, but

15  it give them a competitive advantage and helped them save money

16  and made it more efficient.

17        Why is this critical?  Because in *Texaco* the

18  description, the ultimate -- what ultimately basically was

19  dispositive of the fair use defense there was that *Texaco* used

20  these journal articles effectively as a factor of production in

21  their ultimate research operation, and that is exactly what's

22  happening here.

23        A couple of -- one -- a couple of other examples are

24  MSJ opposition Exhibit 1, the exhibit that Your Honor was

25  looking at at the very beginning of the hearing I believe,

1  which says that Anthropic has staying neck and neck with OpenAI

2  on model capabilities despite using 5X fewer resources.

3          And how does it do that?  High quality data, high

4  quality expression in its training set.  It says adding high

5  quality data --

6          THE COURT:  What does it mean other than the sentence

7  has got a noun, a verb, you know, no sentence fragments?  It's

8  well written in the sense that a third grader could do it if

9  you know it's got to have a noun, it's got to have a verb,

10  maybe an object.  What are you getting at in this high quality

11  writing?

12          Is it more than that?  Is it more than just sentence

13  structure?

14          MR. NATH:  It is more than that, Your Honor.

15          THE COURT:  Explain what it is.

16          MR. NATH:  So they want to create a model that has a

17  variety of applications and commercial applications that can --

18  it can write a research paper.  It can write a book, for

19  example.  It can -- it can ingest a book and then spit out data

20  that mimics the quality of a book.

21          And to do that, they can't, for example, use, you

22  know, a training dataset that is -- is exclusively tenth grade

23  research papers.  Or at least if they did that, they would have

24  a product that's worse.

25          And so why do they need books?  They need books for

1   its expressive content because they're using it for the purpose

2   of generating a model that mimics that longer quality of

3   expression, right?  So a book is a -- long stretches of

4   coherent texts.  That's from our expert, Ben Zhao, who says

5   it's actually the coherence and the long stretch of coherent

6   text that makes books -- that is why books are particularly

7   valuable training data.

8          And at a minimum, Your Honor, I think this confirms

9   that there is at least a dispute of fact at this stage of the

10  proceedings over whether Anthropic's use is truly

11  transformative, unlike -- and I'd just like to point, for

12  example, they cited *Sega versus Accolade*.  In *Sega versus*

13  *Accolade* the principle issue was -- and I'll pull up a quote

14  from that case actually.

15         Could we go to slide 14.  Sorry.  Slide 23.

16         In *Sega versus Accolade* and *Google v. Oracle* I want to

17  point the court to what was really principally happening in

18  those cases.  So, for example, in *Google v. Oracle*, Google

19  copied these lines not because of their creativity or beauty

20  but because they would allow programmers to bring their skills

21  to build the new smartphone computing environment.

22         Anthropic is taking these expressive works for

23  precisely the protected -- the protected expression, exactly

24  what the Copyright Act protects.  And that is the important

25  consideration.

1          That's why even though I think it's absolutely clear

2    that they needed to pay for the initial acquisition, right,

3    that downloading free from a pirated website is copyright

4    infringement, they still needed to pay for a license for the

5    additional reproductions they made.

6          Unlike the search engine cases they're citing, unlike

7    the computer code cases they're citing, this is a case where

8    they're actually mining the protected expression at issue.

9          I want to turn to -- if it's okay, Your Honor, I would

10   like to turn back to the piracy point because I think there are

11   a couple of other points, one of which is something that's

12   developed somewhat recently.

13         So with respect to the piracy question, I think Your

14   Honor had it right that they really should have paid --

15             THE COURT:  No.  I don't have anything right yet.

16             MR. NATH:  Fair enough.

17             THE COURT:  I was just positing that.

18             MR. NATH:  Yeah.

19             THE COURT:  So don't say that that's what the judge is

20   going to rule.  I'm asking if that's your best -- that's your

21   clearest point is that they should have paid for the first use

22   instead of stealing it off the Internet.  That is your best

23   point.  But after that it's not so clear.

24         But you want to go back to that, fine, go ahead.

25             MR. NATH:  I'd like to address a couple of other

1    issues related to that.  One of the arguments that they made is

2    that under factor four we haven't shown any harm to the market

3    in connection with whether it's a theory of piracy or something

4    else.  So I'd like to address that specifically.

5         As to the harm to the market, with respect to their

6    downloads of pirated books, the court considers in the fourth

7    factor not just what Anthropic did but the court needs to

8    imagine if Anthropic's conduct was widespread, how that would

9    impact the market for books.

10        And obviously every download of a pirated book will

11   have a significant -- you know, is money that's not spent in

12   the book market more generally.  And that's why Judge

13   Easterbrook noted that was -- that was an obviously substitute

14   of use.

15        The Malackowski declaration, our damages in factor

16   four expert, paragraphs 31 through 32 also confirms that

17   there's harm to the book market from their downloads.  But the

18   actual factor four harm doesn't stop there.

19        Anthropic -- this was attached -- this actually came

20   to our attention quite recently.  This is in the class cert

21   reply, Exhibit 53, is a post on something called Anna's

22   Archives.  It's on the screen right now.

23        And what Anthropic's actually doing, the acts of

24   Anthropic to download massive amounts of books, there's

25   evidence in the record that confirms that this is actually

1    sustaining shadow libraries.  It's keeping these shadow

2    libraries alive.

3            And that has a very different market effect and a

4    much -- a very strong market effect for book authors because

5    that means that these shadow libraries will continue to exist

6    and maybe flourish not just for Anthropic or other AI companies

7    to download books, but that means that those books will remain

8    freely available as substitutes for anyone that wants to

9    download a book.

10           THE COURT:  I don't understand.  How does downloading

11   from -- by Anthropic for something that is free and Anthropic

12   doesn't pay for it, how does that support -- since there's no

13   payment, how does that support the website?

14           MR. NATH:  Well, take a look at -- we've discovered

15   this somewhat recently, but I'll point the court to Exhibit 53

16   on the slide.  This is from Anna's Archive.  Anna's Archive is

17   the successor to the Pirate Library Mirror.  So this is why

18   this came to our attention somewhat recently is because we

19   discovered the Pirate Library Mirror issue only two months ago.

20           So this is what it says on the website.  "Not too long

21   ago shadow libraries were dying.  CyHub, the massive illegal

22   archive of academic papers had stopped taking in new works due

23   to lawsuits.  Z-Library" --

24       (Interruption for clarification by the court reporter.)

25           MR. NATH:  Sorry.  "Z-Library, the largest illegal

1    library of books saw its alleged creators arrested on criminal

2    copyright charges."  Then -- it says, "Then came AI.  Virtually

3    all major companies building LLMs contacted us to train on our

4    data.  Most but not all U.S.-based companies reconsidered once

5    they started the illegal nature of the work."

6         We don't know exactly why AI use is sustaining these

7    libraries, but it's clear from the library itself the successor

8    to Pirate Library Mirror, that at least they think it's having

9    this effect.  At a minimum this is a triable question of fact

10   as to whether their use of these libraries could sustain these

11   shadow libraries' existence.

12        THE COURT:  Tell me, you said at the outset there were

13   some issues of fact, and I want to make sure I understand what

14   they are.  So that's one, keeping the pirate libraries alive.

15        MR. NATH:  Keeping the pirate libraries alive, Your

16   Honor.  Whether their download of pirated books -- whether

17   they're downloading pirated books for the use -- for an

18   expressive use, whether they're downloading pirated books for

19   the purpose of avoiding paying for a copy, that's the critical

20   purpose that on which *Napster* and *BMG* depend on, and then

21   whether their use actually helps sustain pirate libraries.

22        Those are the key questions -- those I think are the

23   key disputed questions of fact that this court would have to

24   resolve in order to resolve the piracy question.

25        Then there's a separate question of whether they can

1   make additional copies of works that they acquired for LLM

2   training.  For that under the bucket of transformativeness this

3   court would have to decide how the LLM training process works,

4   whether it is actually mining the expression of these works as

5   we contend or whether it is just doing a statistical analysis

6   and not doing anything related to the protective expressive

7   elements of those works.

8          THE COURT:  What does our record here contain on the

9   subject of the intermediate use?

10          In other words, does one of these declarations tell me

11   what the intermediate uses are?

12          MR. NATH:  There are a few declarations that describe

13   what the intermediate uses are and how they're using it, how

14   they're actually using the books, if I'm understanding the

15   court's question.

16          THE COURT:  Well, then -- but why then is there a fact

17   issue?

18          MR. NATH:  So there is a fact issue because they're

19   dueling descriptions of what the AI process -- what the AI

20   training process actually does, and there's a dispute --

21   there's an expert battle over what it's actually doing.

22          THE COURT:  All right.  Give me one example of the

23   battle of the experts on that point.

24          MR. NATH:  Sure, Your Honor.  So Dr. Zhao in his

25   declaration, if you look at paragraphs 70, 71, and 72, he

1    describes the training process.  He says it's similar to what's

2    called lossy compression, which one way to describe it is if

3    you have a giant file and you compress it into a ZIP file, you

4    lose some of the contents of the work, but effectively you're

5    just actually compressing the file.

6           And Dr. Zhao says that that is an accurate way to

7    describe what the training process is doing, that it's actually

8    taking the expressive content of the training data and

9    compressing it down into a model.  And that confirms that

10   there's no actual transformative use going on here, that

11   it's -- that what the model is doing is actually just repeating

12   over and over the training data over and over again.

13          Now, they make the point that they're not actually

14   distributing copies of the work.  The only reason that's the

15   case is that they have a -- outside of the model there is a

16   separate filtration system that just checks it against the

17   training data and makes sure that there aren't exact copies of

18   works going out there.  But the actual model training process

19   itself is, one, mining the expressive content of the work, and

20   it is not transformative.  So that's what Dr. Zhao says.

21          Their experts -- they rely on their own scientist,

22   Dr. Kaplan, describe this as more of a statistical process.

23   They say that Dr. Zhao's compression analogy is not accurate

24   and doesn't accurately describe the training process.

25          One really important thing here for summary judgment,

1   Your Honor, is no one really knows what these LLMs are actually

2   doing, and you don't have to take our word for it.  Anthropic's

3   own CEO has said this -- I think he said it a couple of weeks

4   ago.  He says that -- so that we do not understand how our AI

5   creations work.  This lack of -- I'm skipping a little bit.  It

6   says, "This lack of understanding is essentially unprecedented

7   in the history of technology.  Modern generative AI systems are

8   opaque in a way that fundamentally differs from traditional

9   software."

10          So at bottom we're on a summary judgment record --

11          THE COURT:  Then how is the jury supposed to figure it

12   out?

13          MR. NATH:  Your Honor, I think this is a

14   quintessential jury question because there is a substantial

15   question about what Anthropic is doing.

16          We have our expert who has given his take on what the

17   training process looks like.  They have an expert, Dr. Kaplan,

18   and their own founders will describe what the training process

19   is, and they'll describe it as something that they think is

20   much more transformative.  But at a minimum there's going to

21   have to be a trial over whether and what exactly the training

22   process is doing.

23          THE COURT:  That leads me to a different question.

24   What does the Supreme Court say is the role of the judge and

25   the role of the jury when it comes to these factors and the

1    transformative -- what are the issues that the jury should

2    decide?  And then what is it that the judge must decide and

3    cannot delegate to the jury?

4          MR. NATH:  So this is -- in *Google versus Oracle* the

5    court answered this question essentially, and Your Honor is

6    going to have to ultimately weigh the factors after the --

7    after there is fact-finding.

8          So any factual disputes, for example, if there's a

9    battle of the experts over whether Anthropic's technology is

10   actually focused on the expressive elements of the work or not,

11   that can be decided by the jury.

12         The other example of a factual dispute that would go

13   to a jury described in *Google v. Oracle* is whether there is an

14   existing licensing market or whether there's actually been

15   market harm in connection with a particular secondary use.

16   Those are the types of questions that would go to the jury.

17         I think what we would probably have in this case is we

18   would have a trial -- I want to be optimistic and say a class-

19   wide trial -- and we'd have a trial on these questions.  And

20   then the court on a full record, after it gets answered to

21   special interrogatories from a jury, would -- Your Honor would

22   weigh the factors and enter a decision on the fair use defense.

23         THE COURT:  Now, in the *Google* case on the second

24   trial, I did exactly that.  I gave the jury interrogatories.

25   They answered them.  I ruled for Google.  The federal circuit

1    said, no, as a matter of law it should have gone the other way.

2    And then the Supreme Court said, no, the federal circuit was

3    wrong, and as a matter of law, you know, it should have gone in

4    favor of Google.

5            So but if I read the Supreme Court's decision, the

6    jury findings didn't figure into the issue of law very much or

7    maybe not at all.  The Supreme Court just found that it was

8    transformative, and that seemed to override everything else.

9            MR. NATH:  So I think --

10           THE COURT:  I'm troubled about this.  What is the -- I

11   know that that's the leading decision on it, but has there been

12   law since the *Google-Oracle* case that helps us understand the

13   role of the judge versus the role of the jury?

14           MR. NATH:  From the Supreme Court that is the last

15   indication of what -- of the role of the judge versus the jury.

16           But I think -- I would hesitate to read too much into

17   the court's decision on the four factors in that case as it

18   relates to this case.  Certainly Justice Breyer's description

19   of the role of the judge and the jury is the Supreme Court's

20   kind of last word on the issue, and Justice Breyer makes it

21   absolutely clear that there is a role -- the jury definitely

22   does have a role, that the jury decides factual questions, and

23   then the court will be involved in weighing the factors after

24   the jury decides factual questions.

25           In that case I think Your Honor is correct that the

1    jury findings may not have been that -- may not have weighed

2    that heavily for a couple of reasons.  First of all, as Your

3    Honor held very early in that case, there was -- if there was

4    anything copyrightable -- Your Honor held that there wasn't any

5    copyrightable expression at all.

6            THE COURT:  That was the first time.  That was on the

7    first appeal.  Then we came back down for the fair use issue.

8            MR. NATH:  Yeah, and Justice Breyer doesn't deal with

9    the transformative use or the transformativeness question

10    first.  The first question he addresses was the nature of the

11    copyrighted work.  That was what loomed large in that case

12    because Justice Breyer basically says if this is copyrightable

13    at all, it's about as thin as copyright can get.

14            Computer code is already considered relatively thin

15    copyright, and Justice Breyer said even in the realm of

16    computer code, this is really, really thin and very functional.

17            THE COURT:  But he did -- the opinion did assume it

18    was copyrightable.

19            MR. NATH:  It absolutely did assume it was

20    copyrightable, but the very thin copyright played a role in the

21    decision.

22            THE COURT:  And assumed to be legit.

23            Well, in your case you have authors who do expressive

24    content, so your point there is you have a better copyright,

25    and it's not -- not as thin as in *Oracle*.  That's a good point.

1            All right.  I need to give the other side a rebuttal.

2    You get to make one more point.

3            MR. NATH:  Okay.  If I can make one more point, I

4    would say that the other issue with *Google v. Oracle* and

5    frankly all of the other copying cases they're talking about is

6    they are -- the driving concern there is that a finding of fair

7    use would effectively have given a copyright holder a monopoly

8    over the functional elements of the work, the nonexpressive

9    elements of the work.  That is not what is at issue here, so

10   there really isn't any concern about that.

11           If I could make one last point in two sentences, which

12   is that with respect to the training copies that they make on

13   factor four, I didn't really end up having a chance to respond

14   to that, but *American Geophysical Union versus Texaco* solves

15   what they call a circularity problem and says that as long as

16   we focus on markets that are either likely to develop or

17   traditional markets, then you can consider lost licensing

18   revenue as a factor under factor four.

19           And we have evidence from our expert that confirms

20   that there actually is a licensing market.  There have been

21   over $2.5 billion worth of licensing deals in the AI space

22   where AI companies are going to rights holders and getting

23   licenses.

24           THE COURT:  Well, how many companies have done that?

25   I know of one.  Are there more than one?

1          MR. NATH:  More than one, Your Honor.  Virtually --

2    most companies in the space, most of the big players in the

3    space have made deals.  The American Association of Publishers

4    estimates at least from public reporting there are at least --

5    or they have reported that there have been at least 66 deals

6    that they are aware of.  And public reporting -- among their

7    members, so actual publishers.

8          And then public reporting, we've counted over 100

9    actual AI licensing deals, and that's in a very short time

10   period.

11         THE COURT:  Any AI licensing of books?

12         MR. NATH:  AI licensing of copyrighted materials.

13   Some of these deals are for books, and some of them are for

14   other types of copyrighted works.

15         THE COURT:  Okay.  Let's hear your rebuttal.  I'll

16   give you a short surrebuttal, time permitting.

17         Go ahead, please.

18         MR. FARRIS:  Thank you.  I'll just go through the

19   order of the arguments.

20         On the issue of the piracy and initial acquisition of

21   the work and whether that should be a different theory, I just

22   want to clarify for *Google Books*, absolutely did not have

23   permission there.  That's why the authors sued, right?  When

24   they found out the libraries were doing that and making those

25   copies with Google, they sued.

1       There was --

2       THE COURT:  Now, who did they sue?

3       MR. FARRIS:  They sued the libraries and they sued

4  Google.

5       THE COURT:  Okay.  What did the -- how did that one

6  come out?

7       MR. FARRIS:  They both came out as fair use, and the

8  court did not consider the initial digitization of unauthorized

9  copies separate from the overall ultimate purpose.

10       I think that --

11       THE COURT:  Again, that's Judge Laval?

12       MR. FARRIS:  That is.

13       THE COURT:  The Second Circuit?

14       MR. FARRIS:  It is.  But there's other --

15       THE COURT:  But then they come back and give me the

16  *Texaco* case.  That was also the Second Circuit, wasn't it?

17       MR. FARRIS:  Many years before it was, and it was a

18  nontransformative use.  It was photocopying scientific journals

19  at a corporation.  Rather than buying multiple licenses, just

20  buying one license for the corporation and sharing it among the

21  scientists.

22       THE COURT:  But the idea was to come up with a great

23  invention so the engineers would have -- use that -- the

24  textbooks for their R&D to come up with a good invention, and

25  they were trying to do something transformative.

1          MR. FARRIS:  They were.  And I think the court

2    recognized rightly there that this can get too attenuated at

3    some point.  You can't just bless yourself by saying I have a

4    research purpose and, therefore, go and take any textbook you

5    want.  That would destroy the academic publishing market if

6    that were the case.

7          You have to actually look at what you're doing with

8    the work, not what the person's intentions generally -- in our

9    case obviously our intentions and what we're doing with the

10    work are both transformative.  So it's quite different than

11    just passing around versions of the journal.

12          And I'll note in the *Texaco* case there was an

13    established licensing market.  I think there were like 11 oil

14    companies that subscribed to this journal, and there was a

15    market for how you could count the photocopies you made, and

16    you'd buy special licenses for that.  And *Texaco* just didn't do

17    it, so they were acting in direct contravention of a market

18    doing something that was nontransformative.  That's why it's a

19    pretty poor fit here.

20          As far as piracy in the initial acquisition too, it's

21    not just *Google Books*.  I'd urge you to think about it in the

22    context of the *Perfect 10* and *Ariba* search engine cases.  That

23    was Google going out and copying stuff from websites without

24    any permission or authorization.

25          *And Perfect 10* found out Google was doing that,

1    including copying from pirated websites that themselves didn't

2    have authorization.  It sent cease and desist letters for three

3    years and said stop doing that.  Google didn't do it, and then

4    there was a fair use determination that building a search

5    engine was transformative.

6           There was not a decision that acquiring the works

7    divorced from all other context was itself an infringement.  In

8    fact, there's at footnote eight in the *Perfect 10* decision, the

9    court says specifically we're not going to find -- we're not

10   going to get rid of the fair use doctrine based on the idea at

11   the initial acquisition of a non-authorized work overrides it.

12          THE COURT:  The initial acquisition did -- was that

13   specifically in play in that case?  Or was that not

14   specifically briefed and litigated?

15          MR. FARRIS:  I can't tell you the extent to which it

16   was briefed, but the footnote addresses it directly, so that

17   tells me that it was raised.

18          And I guess to zoom out a little broader from this,

19   the Supreme Court has now -- this is a version of the you acted

20   in bad faith, therefore you don't get a fair use defense

21   argument.  The Supreme Court has now twice said they're

22   skeptical that bad faith has any role to play in the fair use

23   analysis.

24          THE COURT:  What are those two types?

25          MR. FARRIS:  In the *Campbell* case because 2 Live Crew

1    had gone to Roy Orbison and asked for permission, and Roy

2    Orbison had said no.  And the Supreme Court said, well, we're

3    not going to hold that against 2 Live Crew, no permission need

4    be sought nor granted, and we're skeptical that allegations of

5    bad faith have anything to do with this.

6        The second time was your case, the *Google* case.  The

7    court said we're skeptical that bad faith has any role in this

8    to play, which by the way the federal circuit was too, and the

9    federal circuit had heard that case and then it was sent back

10   down to you.  They had ignored the allegations of bad faith.

11   That didn't stop Oracle from raising them.

12       We actually cite in our brief Oracle's Supreme Court

13   opening brief.  They call Google a pirate, and they said the

14   code was purloined, right?  So this is a common refrain, you're

15   acting in bad faith, you're a pirate, and the Supreme Court

16   ignored it.  It didn't ignore it.  It said we're skeptical it

17   has any role to play at all, but we don't need to weight it to

18   find fair use here.

19       THE COURT:  All right.  Your opponent says that your

20   argument proves too much because anyone could then download

21   anything from a pirate site and then put a short review on

22   Amazon and say, hey, I downloaded a free copy, but it was for

23   fair use to -- would that fly?  It seems to me like it would

24   under your theory.

25       MR. FARRIS:  I don't think it would because I think it

1    sounds like in the case you're giving, that person is right in

2    their view just to try to get out of jail on this, right?

3          THE COURT:  No, not necessarily.  Could be -- it might

4    seem that way, but it would be a very easy thing to write and

5    post was on Amazon, and maybe it is a get out -- but who -- who

6    is to tell whether it's good faith or bad faith?

7          MR. FARRIS:  Well, in that case I would ask, you know,

8    did the person keep the copy afterwards?  Did they consume it

9    and enjoy it?  Did they have dual purposes here or were they

10   literally a person who only downloaded to write a review?

11         In that case actually the Copyright Act might favor

12   because that person has now put a new work into the world, and

13   the balance is in general the progress of art, however bad the

14   art was, was advanced.

15         THE COURT:  I don't know.  To me that doesn't sound

16   right that you could take down -- download from a pirate site,

17   even if you're going to use it for fair use.  To me it's a

18   different thing than how you use the product later to develop a

19   transformative use.

20         I understand you're saying *Google Books* exonerated it.

21   Was that specifically briefed in the *Google Books* case?

22         MR. FARRIS:  The bad faith was, yes.

23         THE COURT:  Not bad faith, but the initial

24   acquisition, did the *Google Books* opinion say even the initial

25   copying was perfectly okay because it was all in the aid of a

1  transformative use?

2      MR. FARRIS:  No.  But it was -- the -- Google had

3  acquired the code in violation of a license.

4      THE COURT:  No, no, no.  I'm talking about the *Google*

5  *Books* case with the --

6      MR. FARRIS:  Oh, sorry.

7      THE COURT:  -- universities.  You're talking about the

8  *Oracle* case.  I mean, the *Google Books* case where they went to

9  the universities and downloaded all those millions of books.

10 That's the one.

11     Was that briefed, the initial acquisition briefed?

12     MR. FARRIS:  I can't tell you what -- exactly how it

13 was briefed.  I can tell you the court specifically referenced

14 digitization and talked about how the digitization itself was

15 not going to be an independent analysis.  It was part of the

16 overall purpose.

17     THE COURT:  Well, but if they -- how did -- see, I got

18 to look at it more.  Sometimes people cite -- lawyers cite

19 decisions where the point they're trying to make was not

20 actually the point that was being litigated, and they draw an

21 inference from the outcome that it must have been litigated,

22 but actually it's not always litigated.

23     And I need to go back and look at that decision in the

24 *Google Books* to see if it went so far as to say even the very

25 initial copy by the university was perfectly legit, and you

1    don't seem to be saying that they went that far.

2          MR. FARRIS:  Well, I think -- no, I think the opinion

3    goes that far.  What I can't tell you is whether there was an

4    initial acquisition theory briefed because as far as I know,

5    this is a novel theory.  Maybe it's being run in the other AI

6    cases, but this is not something that has actually been briefed

7    before specifically because it's not really a copyright claim.

8    Like, there is no exclusive right based on your initial

9    acquisition or getting access --

10          THE COURT:  But if you -- if somebody downloads from

11    *Napster* a copy of a song, you could go to prison for that.

12    That is a copyright violation.

13          And now if you download from a pirate site a copy of

14    somebody's book, standing alone, you could go to prison for

15    that too.

16          So I don't -- that -- I have a hard time seeing that

17    you can commit what is ordinarily a crime and yet get

18    exonerated because you wind up using it for transformative use.

19          MR. FARRIS:  Even in those *Napster* cases, which were

20    nontransformative uses, the court still does fair use analysis

21    and still considers the arguments that the defendants make

22    about legitimate reasons they had for doing it.  So you can't

23    override the analysis just based on the initial acquisition.

24          I point out -- I understand, I recognize the court's

25    concern here that there could be a gap in the way copyright law

1    and fair use treat this, but this is the only claim in this

2    case.

3            Is there another way, another remedy against, for

4    example, these websites?  Probably.  There's probably other

5    remedies out there, but this is not a place where the Copyright

6    Act really gives a tool to deal with the --

7            THE COURT:  Sure, it does.  The Copyright Act deals

8    with downloading from pirate sites.  That's what *Napster* was

9    all about.

10           I have a question for you.  Counsel listed a few fact

11   questions.  What is your view of a role of the judge versus a

12   role of the jury?

13           MR. FARRIS:  I think for the most part he was correct,

14   but I would say there are multiple examples since the *Warhol* --

15   it's just ultimately the judge's -- the judge must make the

16   final decision and weigh the different factors; however, if

17   there's not genuine disputes of the subsidiary factual issues,

18   there's no obligation to send anything to the jury.  It's like

19   any other summary judgment case.  And we said --

20           THE COURT:  It wouldn't be if -- if it's a material

21   fact, it has to go to the jury, doesn't it?

22           MR. FARRIS:  That's right.  So there could be.  If you

23   think there's an actual factual dispute, you certainly could

24   send it to a jury, have them decide it, and then come back and

25   weigh the facts.

1            Our view is that there's nothing to have a trial about

2    here.  We know how the technology works.  We know what

3    Anthropic did.  We know what the state of the market is.  Those

4    facts aren't in dispute.

5            Now, how you weigh them, how you view them through the

6    lens of the law, that's a judicial job, but it's not a job for

7    the jury.

8            If I -- here is two fact issues.  I can tell our

9    response on the two fact issues that were raised.  The first

10   one is this claim that we're somehow keeping the pirate library

11   alive.  That's a hail Mary argument.  You will not see that

12   anywhere in their papers at all.  That's the first time that

13   I've heard that really today.  And I guess he cited his class

14   certification reply for that.

15           There is no evidence in the record of that whatsoever.

16   Anthropic, as you know, has stopped using these pirate

17   libraries.  We hear that people object to it.  We don't think

18   it was wrong under copyright law, but we've stopped.  We

19   stopped quite some time ago.  When we actually downloaded these

20   libraries was in 2021 and 2022.  We did not pay for them.  We

21   did not do anything to support those websites.  So I don't even

22   know how it's conceivable that we would have supported them.

23           I think the exhibit we saw a short cut of from,

24   Mr. Nath says that some other actors did pay these libraries.

25   We didn't do that.  So there's no facts in dispute about

1    whether we supported them.  It's undisputed that we downloaded

2    one time from these libraries in 2021 and 2022.  There's

3    nothing to have a trial about there.

4         The second factual dispute he raised was about how LLM

5    training works, and he relied on his expert Dr. Zhao's

6    declaration, which describes -- I think he said the all-in

7    training process is like a giant ZIP file or something along

8    those lines.  I may not have used his exact words.

9         We specifically did not take issue with that in our

10   reply.  We don't dispute it.  We think you can decide the case

11   without deciding that.

12        Now, for the record, we think that's an

13   oversimplification of the process, but we think it's an attempt

14   to generate a factual dispute and one that doesn't get them to

15   a trial here.

16        The reason why is even if you take his opinion at face

17   value and you assume that all Anthropic is doing is just

18   compressing these books down into a model and that's what the

19   model is, fine.  All these cases we've been talking about today

20   include perfect copies of works and transformative uses.  The

21   search engine cases, you scrape the exact image, you put it

22   into the search engine, but you created something

23   transformative.  It doesn't matter that you had an exact copy

24   of it.

25        The *Google Books* cases, it's an exact copy of a book.

1    It's a literal scan of a book, just like here, no compression

2    involved at all.  So the idea that there's some kind of

3    compression going on here doesn't create a factual issue, and

4    we think you can decide the case --

5            THE COURT:  Which expert is analogizing it to

6    compression?

7            MR. FARRIS:  It's their expert.  Our -- we didn't

8    submit an expert on this because our chief science officer

9    knows the technology as much as anybody.  He put in an opening

10   declaration where he described the process.  Their expert,

11   Dr. Zhao said, well, he hasn't described it the way I would

12   described it, I'd call it something different.

13           He's characterizing a part of it differently -- again,

14   we don't think accurately, but I don't think that that

15   difference of characterization gets them to a trial here

16   because the facts can be decided as they are.

17           THE COURT:  That's a fast glide over thin ice.  If you

18   say the facts can be decided as they are, that doesn't answer

19   whether there's a dispute.  I think your better point would be

20   to say you assume all of the other side's fact version is true.

21           MR. FARRIS:  I think you said it better than I did.

22           THE COURT:  Yeah, and even under that version, your

23   best argument is the transformative use overrides it all.

24           MR. FARRIS:  Yeah.

25           THE COURT:  That's your best argument.

1          MR. FARRIS:  That's correct.

2          THE COURT:  And that may be correct, but I'm not there

3    yet.

4          All right.  What else would you like to say?

5          MR. FARRIS:  One last point they made, they cited the

6    *Andy Warhol* case, and I think the argument was something along

7    the lines that we are -- we're taking too much quality

8    expression.  That was all the slides they had that said that.

9    They're not trying to just build this product; they're trying

10   to build the best product they can by getting the best

11   expressive quality from the books they can.

12         I think the response to that is quite simply that fair

13   use doesn't require us to build a bad product.  If we can build

14   a better product by doing what is otherwise transformative, the

15   Copyright Act says build a better product.  That's the whole

16   goal here.  We want to advance the progress of arts and

17   science.

18         So I don't think the fact that Anthropic is using high

19   quality data to build a great product is anything the *Warhol*

20   court would frown on at all.  That would be perfectly justified

21   under that rationale.

22         THE COURT:  Okay.  You can make one more point, and

23   then I'm going to give a surrebuttal to the other side.

24         MR. FARRIS:  The last point I would make is -- I'd

25   direct you -- if you're thinking about this and you're thinking

1    this is a close call, there is a useful discussion in the *Sony*

2    *Betamax* Supreme Court case, you know, from the 1980s at pages

3    429 to 432.

4         And Justice Stevens there talks about how the

5    Copyright Act has been amended many times in history as

6    technology changes, and he notes that during times of rapid

7    technological change there has been a recurring theme of

8    judicial reluctance to expand the protections afforded by

9    copyright without explicit legislative guidance, which he calls

10    a sound policy.

11         In other words, the court is saying there if

12    technology is changing so rapidly that there are new interests

13    coming into the balance and there's a risk that we're going to

14    impede the progress of arts and science, we should be

15    circumspect and be careful about interjecting ourselves as the

16    courts.

17         So I think here where -- again, back to the very

18    beginning of my presentation, there's no harm demonstrated to

19    these authors anywhere in the record.  On the one hand, there's

20    an obvious technological tool which is doing great things and

21    moving forward the progress of the arts.  On the other hand,

22    the authors maybe want to benefit from that, but they're not

23    being harmed by it.  And in that case the balance the Copyright

24    Act wants to strike is clear.

25         THE COURT:  Okay.  Surrebuttal.

1          MR. NATH:  One of the things my friend on the other

2     side said was that Anthropic stopped using it -- stopped using

3     pirate libraries.  They actually kept the copies that they got

4     from pirate libraries and still using them today.  That is --

5     that is in the record.

6          It is clear that Anthropic's rule here would

7     essentially legalize piracy.  I think I heard my friend on the

8     other side basically admit that, that as long as you create

9     some sort of review, if you -- even if you keep the copy or you

10    get rid of it, then post something online, then essentially you

11    are -- that is fair use under their interpretation.

12         That would have a massive impact on the incentive to

13    create.  That means if you create books, movies, and music, you

14    know that those -- all of that work is available for free out

15    there.  That is a huge problem.

16         There is no question that under *BMG* and under *Napster*

17    that getting copyrighted works for the purpose of getting its

18    expressive elements and to avoid paying is not fair use,

19    whether you're a multibillion dollar company or a person

20    getting copyrighted works in their garage.

21         Second, they have acknowledged -- as I hear it, they

22    admit that -- they admit that their model training is

23    essentially just compression, that it's compression of all of

24    the copyrighted works into a final model.  That is not a

25    transformative use and certainly means that the court shouldn't

1    be able to grant summary judgment in their favor on --

2        THE COURT:  Didn't your own expert -- he read the

3    final Claude does not output to any user any of the authors'

4    copyrighted works.

5        MR. NATH:  Well --

6        THE COURT:  It's been educated on all these works, but

7    then the answers -- it uses the language of good writing to

8    compose answers, but so what?  That's what we all do.  We read

9    good books and learn from them, and then we hope that we can

10   write as well as they can.

11       So I don't -- I don't -- so what if it's compression?

12       MR. NATH:  First, Your Honor, I paid for my textbooks

13   in college and law school.  Anthropic should be required to do

14   the same, right?  If that's really what's going on here,

15   they're educating their models, they need to pay for the books

16   that they use to educate them.

17       THE COURT:  Okay.  Two dollars, you buy the book from

18   the local library.

19       MR. NATH:  If that's the case --

20       THE COURT:  That's not the case.  You're after

21   thousands and thousands of dollars.  You're not after the $2.

22   So they -- yeah, probably they should have bought those books

23   instead of stealing them off the Internet, but they could have

24   done it for $2, $10, maybe even $20 a book.

25       MR. NATH:  Your Honor, if that's the case, the court

1    denies summary judgment on the copyright claim because that

2    means that the court will have found that there is at least a

3    dispute of fact over whether Anthropic committed copyright

4    infringement.

5         THE COURT:  There's no dispute of facts.  The record

6    is going to be one way or the other.  Right now I'm inclined to

7    say that did violate the Copyright Act but that the subsequent

8    uses were fair use.  That's kind of the way I'm leaning right

9    now.

10        MR. NATH:  Your Honor, the subsequent uses in our view

11   were not fair use under the *Texaco* case, and I think --

12        THE COURT:  I know, but he said no, no, no, the

13   connection between the R&D and some transformative future

14   product by *Texaco* was so attenuated that you could not say that

15   that was fair use.

16        In our case there was a direct use of these products

17   to create and train this artificial intelligence machine

18   learning.  That is a much more 1 to 1 ratio.  So I'm not sure

19   *Texaco* is on point.

20        MR. NATH:  Your Honor, I think *Texaco* is on point for

21   the key distinguishing factor between this case and every other

22   case about LLM training, including Third Circuit judges --

23   Judge Bibas's decision in the *Ross Intelligence* -- or *Thomson*

24   *Reuters versus Ross Intelligence* case, which is that, one,

25   they're exploiting the expressive elements of the use in the

1  course of model training.

2      Just like the *Texaco* scientists were reading --

3  Anthropic describes it as consumptive use, that's the

4  distinguishing factor, that the scientists were reading the

5  articles for exactly what the articles were used for, and

6  exactly why people paid for them is because they wrote and

7  reported scientific findings that could help them in the lab.

8      Anthropic is taking books and using them to educate

9  its models in doing exactly what the books are intended to be

10  used for and making multiple reproductions of them.

11      The second piece is the court needs to consider factor

12  four.  Even if the court gets past factor one and decides that,

13  okay, this is a transformative use, the court needs to consider

14  factor four, and there the court has to consider lost licensing

15  revenues.

16      Under the *Texaco* case, under the *TVEyes* case and even

17  some of the case they cite like *Seltzer versus Green Day*, it's

18  clear that regardless of where the court comes out on

19  transformativeness, the court needs to consider whether there

20  is an existing --

21      THE COURT:  There's a circularity to that point.

22  Okay.  So one of the -- at the last hearing one of the major

23  publishers entered into a license with a major company for a

24  lot of money for AI, but you can easily see that that was to

25  avoid this kind of litigation.

1          But these people want to do the litigation and

2     establish that they have a fair use right, which was not

3     established in that case, so they weren't willing to litigate

4     it.

5          They are willing to litigate it.  Now, if they are

6     right, then that is not analogous.  There is no potential

7     market.

8          MR. NATH:  Well, the cases do not say potential

9     market.  And I understand the cases have addressed the question

10    of circularity.  In *Texaco* they refer to it as the vice of

11    circularity, and what *Texaco* concludes -- and it's been cited

12    several times since then, most recently by the Second Circuit

13    in *TVEyes*.

14         *Fox News versus TVEyes* in 2018 says we solve this

15    problem of circularity by limiting the number of markets we

16    look at when we're considering cognizable lost licensing

17    revenue harm.

18         We consider either traditional markets like the book

19    sale market, reasonable markets, or likely to develop.  So we

20    need to show in order for licensing -- we need to have a trial

21    over -- in order to figure out whether licensing revenues are

22    cognizable, whether there's a likely-to-develop market for

23    AI -- for licensing AI training.

24         Now, there's a litany of evidence in the record to at

25    least create a material factual dispute.  We think we're right

1    about that, but if we are right about that, then that is a

2    cognizable market harm that the court needs to consider on

3    factor four.

4        There's a second piece that I think the court should

5    also consider on factor four, which is the effect on the

6    incentive to create.  Exhibit 38 is a statement from Anthropic

7    CEO Dario Amodei predicting what's going to happen over the

8    course of time as these model proliferate and advance, the

9    models that were trained on our clients' works.

10        And the ultimate conclusion is that human labor and

11    writers are generally going to be obsolete because the models

12    will advance to the point where they actually are replacing all

13    human written work product.  And the copyright --

14        THE COURT:  That's baloney.  I don't believe that will

15    ever happen, that the world will be taken over by robots.

16        MR. NATH:  Your Honor --

17        THE COURT:  That's science-fiction.

18        MR. NATH:  That is at minimum --

19        THE COURT:  I'm sorry.  I'm not going to buy that.

20        MR. NATH:  At least on the fourth factor there is a

21    cognizable license on market harm.

22        The other issue on the fourth factor is the evidence

23    from our expert Dr. Malackowski, which says that currently

24    right now Anthropic's models present the threat of generating

25    cheap knock-offs and flooding the market generally with books.

1          THE COURT:  They say that they have a guardrail in

2     place to prevent any use of the -- any feedback to the user of

3     copyrighted work.

4          MR. NATH:  Right.  We're not saying that it's

5     outputting exact replicas of the work.  What Dr. Malackowski

6     confirms based on a view of the public record is that models

7     like Anthropic and other models are generating easy, cheap

8     knock-offs that basically just saturate or just generally

9     flooding the market with books because you can make a book at a

10    push -- something book length with a push of a button.  That

11    makes it harder to differentiate yourself in the market.  That

12    is a type of market harm.

13         THE COURT:  Look, let's say this.  How many mystery

14    novels involving murder do you think have ever been written?

15    I'm going to say 500,000.  I don't know.  It's not a lot of

16    them.  And they all kind of go the same way.

17         Wouldn't it be easy for the computer to come up with

18    one, and it would kind of read like -- in parts like all

19    500,000?  But it wouldn't be word for word this -- the

20    literal -- but all mystery novels are going to have a lot of

21    similarities, a lot.

22         So okay.  Time to bring it to a close.  I'll let you

23    make one last point, and then I've got to say good-bye.

24         MR. NATH:  Your Honor, we'd focus on -- Anthropic has

25    downloaded millions of copyrighted books without authorization

1    from websites like Pirate Library Mirror and Library Genesis.

2    They are no different from the pirates of the *Napster* era, and

3    we think the court can deny summary judgment on that basis.

4              THE COURT:  Thank you.

5              Okay.  I'd like to give you a research assignment, and

6    you get three pages, no footnotes, no double-spacing

7    [verbatim], no appendixes.  I just want double-space three

8    pages.

9              And the single question is:  In the *Google Books*

10   decision did the decision expressly and explicitly say that the

11   original copying by the universities or by Google at the

12   universities was protected by fair use?

13             I'm not talking about the original digitization within

14   the Google setup.  I'm talking about the original copying at

15   the university libraries.

16             And was that briefed.  Second related question:  Was

17   it briefed?

18             Now, I know you all have the ability to do this, so

19   5:00 p.m. tomorrow, 5:00 p.m. tomorrow.  Can you do that?  Are

20   you going to tell me that you have so many lawyers, you still

21   can't do that?

22             MR. FARRIS:  We can do it.

23             MR. NATH:  We can do that, Your Honor.

24             THE COURT:  Okay.  I look forward to reading that.

25   I'm going to read it myself, but I would like to have your --

```
 1          MR. FARRIS:  She wanted to ask you a question, but you
 2   asked for the order by midnight.
 3          THE COURT:  Go ahead.
 4          MS. GILLOTTE:  Your Honor, this is Jessica Gillotte
 5   again, counsel for defendant.
 6          Would you like those documents with the privileged
 7   stamp refiled on the docket or a copy for the court?
 8          THE COURT:  What do you want?
 9          I want it to be filed the same way as the document
10   that was under seal, that says under seal.  And then you should
11   send us a copy too.  Send us both.
12          I'm going to give you -- what did I say --
13          MS. GILLOTTE:  You said by midnight tonight.
14          THE COURT:  No.  I'm going to give you till 5:00 p.m.
15   tomorrow.
16          MS. GILLOTTE:  Okay.  Thank you very much.
17          THE COURT:  All right.
18          All right.  Most interesting -- and I don't have an
19   answer right now.  Everything that I said was my way of
20   leaning.  Sometimes I say that and change my mind.  But I go
21   one step at a time.
22          All right, my friends.  Thank you.
23      (Proceedings adjourned at 1:28 p.m.)
24
25                  C E R T I F I C A T E
```

1        I certify that the foregoing is a true and correct

2   transcript from the stenographically reported proceedings in

3   the above-entitled matter.

4        SIGNED 22nd of May, 2025

5

6                        /s/Danielle R. Murray
                         DANIELLE R. MURRAY, RMR, CRR
                         United States Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25