Justin A. Nelson*
Alejandra C. Salinas*
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (SBN 316062)
Michael Adamson (SBN 321754)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
rnath@susmangodfrey.com
madamson@susmangodfrey.com

Jordan W. Connors*
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101-2683
Telephone: (206) 516-3880
jconnors@susmangodfrey.com

J. Craig Smyser*
Samir Doshi*
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 51st Floor,
New York, NY 10001-8602
Telephone: (212) 336-8330
csmyser@susmangodfrey.com
sdoshi@susmangodfrey.com

*Co-Lead Class Counsel*
*\*(Pro Hac Vice)*

Rachel Geman*
Jacob S. Miller*
Danna Z. Elmasry*
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
rgeman@lchb.com
jmiller@lchb.com
delmasry@lchb.com

Daniel M. Hutchinson (SBN 239458)
Jallé Dafa (SBN 290637)
Amelia Haselkorn (SBN 339633)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-
1000dhutchinson@lchb.com
jdafa@lchb.com
ahaselkorn@lchb.com

Betsy A. Sugar*
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
222 Second Ave., #1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com

*Co-Lead Class Counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, and MJ + KJ, INC., individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case No.: 3:24-cv-05417-WHA <br><br> **UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT** |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ................................................................. v

GLOSSARY OF DEFINED TERMS ................................................................... vi

NORTHERN DISTRICT OF CALIFORNIA PROCEDURE GUIDANCE FOR CLASS
ACTION SETTLEMENTS: REFERENCE TABLE ............................................. viii

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

I.      INTRODUCTION ....................................................................................... 1

II.     SUMMARY OF SETTLEMENT TERMS ................................................ 3

        A.      Non-Reversionary Settlement Fund Of At Least $1.5 Billion ............... 3

        B.      Past Release Only and No Release of Any Output Claim ...................... 4

        C.      Class Definition and Works List: Unchanged From Class Certification
                Order ........................................................................................................ 5

        D.      Prospective Relief: Anthropic Will Destroy The Works Acquired from
                Library Genesis and Pirate Library Mirror ............................................ 5

        E.      Notice and Administration ..................................................................... 6

        F.      Plan of Allocation ................................................................................... 7

        G.      Attorneys' Fees, Expenses, and Service Awards ................................... 8

III.    PROCEDURAL BACKGROUND ............................................................ 9

        A.      Pleadings and Case Schedule ................................................................. 9

        B.      Discovery and Experts ........................................................................... 9

        C.      Key Rulings and Motions ..................................................................... 11

        D.      Litigation Notice, Notice Distribution, and Creation of the Works List ....... 14

        E.      Settlement Negotiations, Involvement of Constituency Counsel, and
                Confirmatory Discovery on Valuation .................................................. 16

IV.     LEGAL STANDARD ............................................................................... 17

V.      ARGUMENT ............................................................................................ 18

        A.      The Rule 23(e)(2) Requirements are Met Because the Proposed Settlement
                Is Fair, Reasonable, and Adequate. ...................................................... 18

                1.      The Class Representatives and Class Counsel Have Adequately
                        Represented the Class. .............................................................. 18

                2.      The Settlement Was Negotiated at Arm's Length. ..................... 19

                3.      The Settlement Will Provide Extraordinary Relief to the Class. ...... 20

                        i.      The Settlement Is An Excellent Outcome for the Class ........ 20

                        ii.     The Class Faced Significant Litigation Risk Both At Trial
                                and on Appeal. ................................................................ 22

                4.      The Settlement Treats Class Members Equitably. ...................... 25

        B.      The Court Should Direct Notice to the Class ....................................... 26

VI.     TIMELINE ................................................................................................ 26

VII.    CONCLUSION ......................................................................................... 27

# TABLE OF AUTHORITIES

Page

**Cases**

*AdTrader, Inc. v. Google LLC,*
  2021 WL 2073816 (N.D. Cal. Mar. 23, 2021) ....................................................... 27

*Authors Guild v. Google, Inc.,*
  804 F.3d 202 (2d Cir. 2015) ........................................................................ 1, 3, 24

*Bayat v. Bank of the W.,*
  2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) ......................................................... 26

*In re Bluetooth Headset Prods. Liab. Litig.,*
  654 F.3d 935 (9th Cir. 2011) .......................................................................... 26

*In re California Pizza Kitchen Data Breach Litig.,*
  129 F.4th 667 (9th Cir. 2025) .................................................................... 18, 19

*Carlotti v. ASUS Computer Int'l,*
  2019 WL 6134910 (N.D. Cal. Nov. 19, 2019) .................................................... 18, 22

*Chamberlan v. Ford Motor Co.,*
  402 F.3d 952 (9th Cir. 2005) .......................................................................... 14

*In re ConAgra Foods, Inc.,*
  2022 WL 17243625 (C.D. Cal. Nov. 14, 2022) ....................................................... 25

*In re Facebook Biometric Info. Priv. Litig.,*
  522 F. Supp. 3d 617 (N.D. Cal. 2021) ................................................................ 23

*In re Facebook, Inc. Consumer Priv. User Profile Litig.,*
  2023 WL 8443230 (N.D. Cal. Oct. 10, 2023) ......................................................... 23

*Fleming v. Impax Lab'ys Inc.,*
  2021 WL 5447008 (N.D. Cal. Nov. 22, 2021) .......................................................... 6

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,*
  2017 WL 4685536 (C.D. Cal. May 8, 2017) ....................................................... 22, 26

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) .................................................................... 18, 21

*Hesse v. Sprint Corp.,*
  598 F.3d 581 (9th Cir. 2010) ........................................................................... 5

*In re Hyundai & Kia Fuel Econ. Litig.,*
  926 F.3d 539 (9th Cir. 2019) .......................................................................... 18

*Kadrey v. Meta Platforms Inc.*,
   2025 WL 1752484 (N.D. Cal. June 25, 2025) ................................................... 14, 24

*Katz-Lacabe v. Oracle Am., Inc.*,
   2024 WL 4804974 (N.D. Cal. Nov. 15, 2024) ........................................................ 23

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) ................................................................................. 18

*Lieber v. Bertelsmann AG*,
   No. C 04-1671 (MHP), Dkt. 1298 (N.D. Cal. Aug. 31, 2007) ............................... 23

*In re Lyft, Inc. Sec. Litig.*,
   2022 WL 17740302 (N.D. Cal. Dec. 16, 2022) ..................................................... 21

*Meredith Corp. v. SESAC, LLC*,
   87 F. Supp. 3d 650 (S.D.N.Y. 2015) ..................................................................... 27

*Moreno v. Cap. Bldg. Maint. & Cleaning Servs., Inc.*,
   2021 WL 1788447 (N.D. Cal. May 5, 2021) ............................................................ 9

*Novoa v. GEO Grp., Inc.*,
   2020 WL 6694349 (C.D. Cal. Sept. 14, 2020) ...................................................... 28

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ................................................................................. 19

*Raffin v. Medicredit, Inc.*,
   2018 WL 6011551 (C.D. Cal. May 11, 2018) ................................................... 8, 27

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ................................................................................. 26

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ................................................................................. 19

*Terry v. Hoovestol, Inc.*,
   2018 WL 4283420 (N.D. Cal. Sept. 7, 2018) ........................................................ 18

*Zimmerman v. Paramount Glob.*,
   2025 WL 763734 (S.D.N.Y. Mar. 11, 2025) ......................................................... 27

**Statutes and Rules**

17 U.S.C. § 504(c) ........................................................................................................ 23

17 U.S.C. § 504(c)(2) .................................................................................................... 24

28 U.S.C. § 1292(b) ................................................................................................. 13, 24

Fed. R. Civ. P. 23 ................................................................................................. *passim*

1

**Other Authorities**

2

4 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 13:50 (6th ed. June 2025 update).............................................................................................................. 20

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on September 8, 2025, at 12:00 p.m., in Courtroom 12 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Representative Plaintiffs Andrea Bartz, Inc., Charles Graeber, and MJ + KJ Inc. ("Plaintiffs") and Class Counsel, on behalf of the Class, will and hereby do move the Court for an order granting preliminary approval of the Class Action Settlement, directing notice to the Class, approving a process for setting a Plan of Allocation, and scheduling a fairness hearing.[1]

This Motion is based upon this Notice of Motion; the Memorandum of Points and Authorities in Support thereof; the Declarations of Class Counsel Rachel Geman and Justin A. Nelson, the Hon. Layn R. Phillips (ret.) (mediator), Jennifer Keough (proposed Notice and Claims Administrator), Robert Mills (expert), Mary Rasenberger (Authors Guild), and Maria Pallante (Association of American Publishers); the records, pleadings, and papers filed in this action and in the related Ninth Circuit litigation (No. 25-4843 (9th Cir.)); and upon such argument as may be presented to the Court at the hearing of this motion.

---

[1] All capitalized terms shall have the same meaning as in the Settlement Agreement attached as Exhibit A to the Declaration of Class Counsel in Support of Preliminary Settlement Approval ("CC Decl.").

**GLOSSARY OF DEFINED TERMS**

| Term | Definition |
|---|---|
| AAP | Association of American Publishers, Inc. |
| Action | Case captioned *Bartz et al. v. Anthropic PBC*, No. 3:24-cv-05417-WHA (N.D. Cal.) |
| Approved Claim | A Claim Form submitted by a Class Member that is (a) timely and submitted in accordance with the directions on the Claim Form and the terms of the Settlement Agreement, (b) fully completed and physically or electronically signed by the Class Member, and (c) satisfies the conditions of eligibility for a Settlement Payment as set forth in the Settlement Agreement. |
| APWG | Author-Publisher Working Group |
| ASIN | Amazon Standard Identification Numbers |
| Authors Coordination Counsel | The law firms of Cowan DeBaets Abrahams & Sheppard LLP and Fairmark Partners LLP |
| Book | Any work possessing an ISBN or ASIN which was registered with the United States Copyright Office within five years of the work's first publication and which was registered with the United States Copyright Office before being downloaded by Anthropic or within three months of publication. |
| CC Decl. | Declaration of Co-Lead Counsel Rachel Geman and Justin Nelson |
| Claim Deadline | The date by which all Claim Forms must be postmarked or submitted electronically to be considered timely |
| Claim Form | Document substantially in the form as approved by the Court |
| Class | The "LibGen & PiLiMi Pirated Books Class" certified by the Court in the Action, Dkt. 244 |
| Class Counsel | The law firms Susman Godfrey L.L.P. and Lieff Cabraser Heimann & Bernstein, LLP who have been appointed as Co-Lead Class Counsel by the Court in the Action, Dkt. 244 |
| Class Member | A person who falls within the definition of the Class and who (a) does not submit a valid request for exclusion from the Class or (b) has submitted a valid request to be re-included in the Settlement. |
| Class Representatives | Plaintiffs Andrea Bartz, Inc., Charles Graeber, and MJ + KJ, as appointed by the Court in Dkt. 244, at 14 |
| Class Work | Books that meet the definition of the Class certified by the Court in Dkt. 244, at 11 |
| Court | The United States District Court for the Northern District of California, San Francisco Division, the Honorable William Alsup presiding, or any judge who shall succeed him as the Judge assigned to the Action. |
| Defendant | Anthropic PBC |
| Fee Award | The amount of attorneys' fees and reimbursement of costs and expenses to Class Counsel approved by the Court to be paid out of the Settlement Fund |
| ISBN | International Standard Book Number |
| Keough Decl. | Declaration of Jennifer Keough |
| LibGen | Library Genesis, an online repository of pirated material |
| Mills Decl. | Declaration of Robert Mills |
| Notice Plan | Plan constructed by Settlement Administrator JND Legal to supply notice to Class Members pursuant to Federal Rule 23 |
| Pallante Decl. | Declaration of Maria Pallante, CEO of the AAP |

| Term | Definition |
|------|-----------|
| Parties | Plaintiffs and Anthropic |
| PCC | Publishers' Coordination Counsel, the law firms Edelson PC and Oppenheim + Zebrak, LLP |
| Phillips Decl. | Declaration of the Honorable Layn R. Phillips |
| PiLiMi | Pirate Mirror Library, an online repository of pirated material |
| Plaintiffs | Andrea Bartz, Inc., Charles Graeber, and MJ + KJ, Inc. |
| Rasenberger Decl. | Declaration of Mary E. Rasenberger, CEO of the Authors Guild, Inc. |
| Released Claim | Any and all claims or causes of action for any relief of any kind including, but not limited to, actual damages, statutory damages, liquidated damages, penalties, injunctive relief, declaratory relief, attorneys' fees and costs, expenses and interest, liabilities, demands, or lawsuits against the Released Parties arising from Defendant's alleged past torrenting (including uploading and seeding), scanning, retention, and use of works, including training, research, development, and production of AI models and associated products and services of works on the "Works List" as of the date of preliminary approval of the Settlement. For the avoidance of doubt, Released Claims extend only to past claims on the Works List. Released Claims do not extend to any activity or conduct that occurs or occurred after August 25, 2025. |
| Released Parties | Anthropic PBC and its subsidiaries, and each of their principals, employees, and representatives |
| Releasing Parties | Plaintiffs, the Class Members, and their respective present or past heirs, executors, estates, administrators, assigns, and agents |
| Service Award | Additional payment to named Plaintiffs in a class action lawsuit, intended to compensate them for their time, effort, and risks in bringing the case on behalf of the larger class |
| Settlement Administrator | JND Legal Administration, subject to approval of the Court, which will provide the Notice as set forth herein, create and maintain the Settlement Website, send Settlement Payments to Class Members, be responsible for any tax reporting, and perform such other settlement administration matters set forth herein, contemplated by the Settlement, and/or ordered by the Court. |
| Settlement Agreement | Agreement entered into by Parties on September 5, 2025 |
| Settlement Class | The "LibGen & PiLiMi Pirated Books Class" certified by the Court in the Action, Dkt. 244 |
| Settlement Fund | The non-reversionary settlement fund that shall be established by the Defendant |
| Settlement Payment | Payment from the Settlement Fund to each Class Member who timely submits a valid Claim Form. |
| Settlement Website | Website at www.AnthropicCopyrightSettlement.com to be created, launched, and maintained by the Settlement Administrator, and which allows for the electronic submission of Cash Claim Forms and provides access to relevant settlement administration |
| Works List | Joint list of Works that satisfy criteria for inclusion in Class that includes for each work: the title, author(s), publisher, an ISBN and/or ASIN, and United States copyright registration number |

**NORTHERN DISTRICT OF CALIFORNIA PROCEDURE GUIDANCE FOR CLASS ACTION SETTLEMENTS: REFERENCE TABLE**

| Guidance Section | Guidance Topic | Page(s) Where Guidance Is Discussed |
|---|---|---|
| 1(a) | Differences between settlement class and class certified by Court | 5 |
| 1(b) | Differences between claims certified for class treatment and claims to be released | 4–5 |
| 1(c) | Class recovery and justification of discount | 4–4 |
| 1(d) | Any other cases affected by the settlement | 3 n.2 |
| 1(e) | Proposed plan of allocation | 7–8 |
| 1(f) | Expected claim rate | 8 n.5 |
| 1(g) | Reversion | 3–4 |
| 2(a) | Information about the settlement administrator | 6–7 |
| 2(b) | Settlement administrator's procedures for handling Class Member data | 8–9 |
| 3 | Notice will include (a) contact information for class counsel to answer questions about notice; (b) website; (c) instructions to access the case docket via PACER; (d) date and time of the final approval hearing; (e) advice to the class to confirm final approval date has not changed | Keough Dec. Exs. B–G |
| 3 | Explanation of notice distribution plan | 6–7, 23–24 |
| 4 | Opt-outs | 26–27 |
| 5 | Objections | 26–27 |
| 6 | Attorneys' fees | 8–9, 24–25 |
| 7 | Service awards | 8–9, 24–25 |
| 8 | *Cy pres* awardees | 26, n.9 |
| 9 | Timeline | 26–27 |
| 10 | CAFA and similar requirements | 7, n.4 |
| 11 | Comparable outcomes | 21–22, Ex. A |

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

If approved, this landmark settlement will be the largest publicly reported copyright recovery in history, larger than any other copyright class action settlement or any individual copyright case litigated to final judgment. The proposed settlement well surpasses other copyright recoveries, will provide meaningful compensation for each Class Work, and will set a precedent of AI companies paying for their use of pirated websites like Library Genesis and Pirate Library Mirror. Subject to court approval, the principal terms are:

- Anthropic will pay the Class at least ***$1.5 billion dollars***, plus interest. With around 500,000 works in the Class, this amounts to an estimated gross recovery of ***$3,000 per Class Work***.

- Anthropic will ***destroy the LibGen and PiLiMi datasets*** after the expiration of any litigation preservation or other court orders.

- In exchange, Anthropic will receive a ***past release only*** for conduct up to August 25, 2025. Claims arising out of conduct after August 25, 2025 won't be released by the Settlement, nor will any claims (past or future) arising out of allegedly infringing outputs from Anthropic's AI models.

This result is nothing short of remarkable.

This outcome was anything but preordained. Plaintiffs' core allegation is that Anthropic committed largescale copyright infringement by downloading and commercially exploiting books that it obtained from allegedly pirated datasets. Anthropic's principal defense was fair use, the same defense that defeated the claims of rightsholders in the last major battle over copyrighted books exploited by large technology companies. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 206 (2d Cir. 2015). Indeed, among the Court's first questions to Plaintiffs' counsel at the summary judgment hearing concerned *Google Books*. But against this backdrop, Plaintiffs secured critical victories for the Class. These included: (i) uncovering Anthropic's use of material from Library Genesis ("LibGen") and Pirate Library Mirror ("PiLiMi"); (ii) the partial denial of Anthropic's summary judgment motion, which found Anthropic's use of pirated material "inherently, irredeemably infringing," Dkt. 231 at 19; and (iii) the first-ever order certifying a class of copyright

1   owners pursuing claims against an LLM company, Dkt. 244.

2          Plaintiffs achieved these results through tireless, high-quality work. Shortly after the initial

3   case management conference, Plaintiffs aggressively pursued discovery into Anthropic's use of so-

4   called shadow libraries including—Anthropic's use of Library Genesis and Pirate Library Mirror.

5   Over the course of the case, Plaintiffs took and defended 20 depositions, reviewed hundreds of

6   thousands pages of documents, conducted inspections of at least 3 TB of training data, and litigated

7   17 discovery motions. And after the Court's Class Certification Order, Class Counsel—in

8   conjunction with their experts—worked day and night to assemble the Works List by matching

9   millions of records of Anthropic's downloads to U.S. Copyright Office registration records.

10  Without these extraordinary efforts this landmark $1.5 billion recovery for rightsholders have been

11  possible.

12         This Settlement is particularly exceptional when viewed against enormous risks that

13  Plaintiffs and the Class faced before trial, at trial, and on appeal. Any number of things could have

14  derailed this case before trial—the possibility that this Court could decertify the class; a Rule 23(f)

15  petition; an emergency motion to stay in the Ninth Circuit; forthcoming *Daubert* motions; a motion

16  for reconsideration of the summary judgment order; and a motion to certify an interlocutory appeal,

17  among others.

18         And even had Plaintiffs overcome these obstacles and proceeded to trial on December 1, as

19  the Court recognized, "[f]or all we know . . . Anthropic will persuade the jury to find facts

20  vindicating it completely (CC Order 28)." Dkt. 296 at 6. On a per-work basis, the settlement amount

21  is 4 times larger than $750 statutory damages amount that a jury could award and 15 times larger

22  than the $200 amount if Anthropic were to prevail on its defense of innocent infringement. And

23  even if Plaintiffs succeeded in achieving a verdict greater than $1.5 billion, there is always the risk

24  of a reversal on appeal, particularly where a fair use defense is in play. *See, e.g., Authors Guild*,

25  804 F.3d at 2064. Given the very real risk that Plaintiffs and the Class recover nothing—or a far

26  lower amount—this landmark $1.5 billion+ settlement is a resounding victory for the Class.

27         In negotiating the settlement, Class Counsel consulted with leading membership and trade

28  associations for rightsholders—the Authors Guild and the Association of American Publishers.

1    Authors Guild CEO Mary Rasenberger praised the results for "authors, publishers, and

2    rightsholders generally," stating that the settlement is a "strong message to the AI industry that

3    there are serious consequences when they pirate authors' works to train their AI, robbing those least

4    able to afford it." Rasenberger Decl. ¶ 10. Likewise, AAP CEO and former Register of Copyrights

5    Maria Pallante called the Settlement "beneficial to all class members," noting that it "provides

6    enormous value in sending the message that Artificial Intelligence companies cannot unlawfully

7    acquire content from shadow libraries or other pirate sources to use as the building blocks for their

8    businesses." Pallante Decl. ¶ 14.

9         At preliminary approval, the question is whether the Court "will likely be able to (i) approve

10    the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the

11    proposal." Fed. R. Civ. P. 23(e)(1)(B). The proposed settlement easily passes both tests.

12    **II.    SUMMARY OF SETTLEMENT TERMS**

13         In Class Counsel's decades of experience litigating large complex cases across the country,

14    this Settlement easily ranks among the most successful outcomes. Class Counsel unequivocally

15    supports this $1.5 billion settlement as an enormous victory for the Class.[2] The terms are below:

16        **A.    Non-Reversionary Settlement Fund Of At Least $1.5 Billion**

17         Under the Settlement Agreement, Anthropic will pay at least $1.5 billion into a non-

18    reversionary Settlement Fund, which will be distributed to Class Members on a uniform per-work

19    basis. Viewed by any metric—and particularly when compared to complex class actions or

20    copyright cases—this Settlement is an excellent result for the Class. *See, e.g.*, 5 Nimmer on

21    Copyright § 14.02 (2025) ("The largest verdict ever in a copyright infringement case was for $1.3

22    billion" in *Oracle Corp. v. SAP AG*, but was later reduced to $356.7 million).

23         Anthropic will make four payments into the non-reversionary Settlement Fund, sequenced

24    as follows:

25         (1) $300 million due within five business days after the Court's preliminary approval order;

26         (2) $300 million due within five business days after the Court's final approval order;

27         (3) $450 million, plus interest, due within twelve months of the Court's preliminary

28

---

[2] No other case is affected by this Settlement.

1    approval; and

2    (4) $450 million, plus interest, due within twenty-four months of the Court's preliminary

3    approval order.

4        All payments will be deposited into an interest-bearing escrow account. Because Anthropic

5    will make payments on this schedule regardless of whether any appeals are filed, the Settlement

6    Fund will accrue interest to the benefit of the Class during the pendency of any appeals. Plaintiffs'

7    expert Robert Mills, a Managing Director at Berkeley Research Group, estimates that interest

8    earned by the time of Anthropic's final payment may be as high as $126.40 million. Mills Decl.

9    ¶ 4.

10       Under the negotiated payment schedule, the Settlement Fund will be fully capitalized in less

11   than two years following final approval.

12       Finally, $1.5 billion (plus accrued interest) is the ***minimum*** size of the Settlement Fund. As

13   explained below, the parties are still working to finalize the full Works List. If the Works List

14   ultimately exceeds 500,000 works, then Anthropic will pay an additional $3,000 per work that

15   Anthropic adds to the Works List above 500,000 works.

16   **B.    Past Release Only and No Release of Any Output Claim**

17       In exchange for the Settlement's benefits, members of the Class will release claims for

18   works on the Works List that "aris[e] from Defendant's alleged past torrenting (including uploading

19   and seeding), scanning, retention and use of works, including training, research, development, and

20   production of AI models and associated products and services." SA § 1.29.

21       The release is limited in three critical respects. ***First***, the release "extend[s] only to past

22   claims" and does not extend to "any claims for future reproduction, distribution, and/or creation of

23   derivative works." The Class will not release any claims of any kind arising out of conduct that

24   postdates August 25, 2025, the date the parties executed their binding term sheet. *Id.* ***Second***, the

25   release does not pertain to output claims at all, whether past or future. *Id.* And ***third***, the Settlement

26   only releases claims for "works on the Works List." *Id.* So if a Class Member owns multiple works,

27   some of which are on the Works List and some of which are not, the release covers only those

28   works on the Works List and nothing else.

MOTION FOR PRELIMINARY APPROVAL
CASE NO. 3:24-CV-05417-WHA

1    This scope of the release is well within this Circuit's governing standards and the Court's

2    order governing class settlement. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("A

3    settlement agreement may preclude a party from bringing a . . . released claim [that] is 'based on

4    the identical factual predicate as that underlying the claims in the settled class action.'") (citation

5    omitted); Dkt. 8 ("The proposed release should be limited only to the claims certified for class

6    treatment"). And, pursuant to Rule 23(e)(3), the Parties have no agreements that would modify any

7    term of the Settlement Agreement.

8    **C.      Class Definition and Works List: Unchanged From Class Certification Order**

9    The Court previously certified the following Class:

10   > All beneficial or legal copyright owners of the exclusive right to
>     reproduce copies of any book in the versions of LibGen or PiLiMi
11   > downloaded by Anthropic, as contained on the Works List. "Book"
>     refers to any work possessing an ISBN or ASIN which was registered
12   > with the United States Copyright Office within five years of the
>     work's publication and which was registered with the United States
13   > Copyright Office before being downloaded by Anthropic, or within
>     three months of publication. Excluded are the directors, officers and
14   > employees of Anthropic, personnel of federal agencies, and district
>     court personnel.

15   Dkt. 244 at 11, 31. The settlement expressly includes the further limitation in the class certification

16   order that Class Works are limited to those works identified on the Works List undergoing review

17   and finalization by the Parties. SA § 1.29.

18   Pursuant to the terms of the settlement, Plaintiffs served a draft Works List of approximately

19   465,000 works on Anthropic on September 1, 2025. CC Decl. ¶ 53. By September 15, 2025,

20   Anthropic will serve any proposed revisions to the list, after which the parties have two weeks to

21   identify any further revisions. The parties will submit a joint Works List—or any disputes related

22   to the Works List—on or before October 10, 2025.

23   **D.      Prospective Relief: Anthropic Will Destroy The Works Acquired from**
24   **Library Genesis and Pirate Library Mirror**

25   In addition to the monetary relief, the Settlement requires Anthropic to destroy the original

26   files of the works it obtained from LibGen or PiLiMi, and any copies that originate from the

27   torrented/downloaded copies, subject to any preservation obligations for litigation or other court

28   orders. Anthropic has committed to destroy the datasets within 30 days of final judgment—or

conclusion of any other preservation or court-ordered obligations—and will certify as much in writing to Class Counsel.

### E.    Notice and Administration

The Parties propose that JND Legal, an experienced and reputable national class action administrator, serve as Settlement Administrator to provide notice to the Class and all other services necessary to implement the settlement. *See, e.g.*, *Fleming v. Impax Lab'ys Inc.*, No. 16-CV-06557-HSG, 2021 WL 5447008, at *12 (N.D. Cal. Nov. 22, 2021) (appointing JND as claims administrator because it "has extensive experience implementing notification and claims administration programs in class actions"). Initially for what would have been litigation Notice, Plaintiffs selected JND Legal after reviewing competitive bids from four other notice administrators. Dkt. 318 ¶¶ 3–4. The settlement administration costs will be paid directly from the Settlement Fund. The Settlement Administrator will establish an interest-bearing escrow account at an FDIC-insured depository institution into which Anthropic will make its above-described payments into the Settlement Fund.

The Notice Plan is consistent with Rule 23 and the "rigorous notice process" the Court envisioned in its Class Certification Order. Dkt. 244 at 10. The Notice Plan will include: (i) "first-class mail and email to the author, publisher, and copyright owner listed on the copyright certificate for each work recorded"; (ii) "first-class mail and email to all trade and university publishers in the United States"; [and] (iii) publication notice "at least once in a trade journal." Dkt. 244 at 10, 29–30. In addition, notice will be delivered through major guilds (*e.g.*, the Authors Guild) and membership organizations (*e.g.,* the Association of American Publishers), which have agreed to distribute notice to their membership. Notice will also be delivered through targeted social media outreach and across widely read trade publications and high-traffic websites.[3] Distributing notice across this diverse range of channels exceeds the requirements of Rule 23. Finally, the Administrator will serve the notice required by the Class Action Fairness Act, 28 U.S.C. § 1715, no later than 10 days after this filing. No other notices to government entities are required or have

---

[3] Class Counsel has also retained Shape Advocacy, a public relations firm with significant experience working on copyright and rightsholder issues, to advise on how to maximize the reach of the notice program.

1    been provided.[4]

2    Finally, JND's procedures for protecting class member data are thorough and well

3    established. Its "security and privacy controls have been vetted and approved for use by numerous

4    large banks and federal agencies including the FTC, SEC, and CFTB." Keough Dec. ¶ 31. And its

5    employees "must complete security, and privacy training during the onboarding process, which

6    educates [them] on the proper handling of sensitive data." *Id.* ¶ 32. Moreover, "JND only collects

7    the minimum amount of data necessary to administer the class action at hand, stores data for each

8    class action in a dedicated database to prevent comingling of data, utilizes that data only for

9    purposes specified in the class action, and only retains data for the minimum amount of time

10   required." *Id.* ¶ 33.

11       **F.    <u>Plan of Allocation</u>**

12       All works in the Class are treated the same in this settlement, entitled to the same pro-rata

13   amount of the Settlement Fund, reflective of the per-work statutory damages remedy authorized by

14   the Copyright Act itself. The allocation for each Class Work will be calculated by dividing the total

15   amount of the Settlement Fund (less fees and expenses) by the total number of Class Works. Such

16   uniform distribution is fair and equitable. *See, e.g.*, *Raffin v. Medicredit, Inc.*, 2018 WL 6011551,

17   at *8 (C.D. Cal. May 11, 2018).

18       Plaintiffs reasonably anticipate that a number of Class Works may have multiple claimants,

19   typically an author (often the beneficial owner) and a publisher (often the legal owner). To ensure

20   the claims process proceeds effectively, Class Counsel has assembled an Author-Publisher

21   Working Group (APWG) to provide advice and proposals for how to efficiently address intra-work

22   distributions that may arise during the claims administration process, including the formulation of

23   a claims form that provides any information necessary to address intra-work allocation, adjustments

24   to the proposed form of notice, and process and procedures designed to minimize the administrative

25   burden of claims administration. The development of the Author-Publisher Working Group reflects

26   the fact that, as this Court noted in its class-certification order, "authors and publishers are in

27

28   [4] The Settlement Agreement also complies with CAFA's other substantive provisions. *See* 28
     U.S.C. § 1712–1714.

1  business together and will work out the best way to recover." Dkt. 244 at 12.

2          The Author-Publisher Working Group will be led by two industry experts, Authors Guild

3  CEO Mary Rasenberger and Association of American Publishers CEO Maria Pallante, and will

4  also be supervised by the Hon. Layn R. Phillips (Ret.). Ms. Rasenberger has served as the CEO of

5  the AG, a "national non-profit association of over 16,000 professional writers," for 11 years,

6  previously worked for the U.S. Copyright Office and Library of Congress, and has more than 25

7  years of experience representing authors and publishers. Rasenberger Decl. ¶¶ 3, 7. Ms. Pallante

8  served as the 12th United States Register of Copyrights and has been the President and CEO of the

9  AAP since 2017. Ms. Rasenberger and Ms. Pallante will be assisted by Authors Coordination

10  Counsel and Publishers Coordination Counsel respectively, both of whom collectively have

11  decades of experience in complex class action and copyright matters. CC Decl. ¶ 56. The Author-

12  Publisher Working Group will provide any recommendations to Class Counsel by September 30,

13  2025, ten days in advance of Plaintiffs' proposed deadline to submit for Court approval any revised

14  form of notice, a proposed claim form[5], and any proposed procedures for the claims process.

15  Anthropic will have the right to comment on these proposals and, to the extent there is

16  disagreement, the parties may seek assistance from Judge Phillips or submit any disputes to the

17  Court regarding the form of notice and claim procedures by October 10, 2025.

18          **G.      Attorneys' Fees, Expenses, and Service Awards**

19          Class Counsel will file a motion for an award of reasonable attorneys' fees, reimbursement

20  of expenses, and service awards for the Class Representatives before final approval. This motion

21  will be posted on the Settlement Website.

22          Plaintiffs will seek fees for Class Counsel and counsel whose work was authorized by Class

23  Counsel in an amount not exceeding 25% of the Settlement Fund, the benchmark percentage for a

24  reasonable fee award in the Ninth Circuit. *See, e.g., Moreno v. Cap. Bldg. Maint. & Cleaning Servs.,*

25  *Inc.*, No. 19-CV-07087-DMR, 2021 WL 1788447, at *12 (N.D. Cal. May 5, 2021) ("The

26

27  [5] Plaintiffs anticipate that with the robustness of the Notice Plan (including direct notice, publication notice, and notice through trade and membership organizations), the meaningful recoveries, and the general publicity around the settlement, the claims rates will be higher than in
28  FTC-reported averages. *See, e.g.,* https://www.ftc.gov/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns (accessed Sept. 5, 2025).

benchmark for a reasonable fee award as a percentage of the common fund is 25%."). In addition, the named Plaintiffs will seek service awards not exceeding $50,000. The settlement is not conditioned on the Court's approval of any services awards, attorneys' fees, or expenses, nor does the Settlement Agreement contain a clear sailing provision. SA § 8.4.

## III.    PROCEDURAL BACKGROUND

### A.    Pleadings and Case Schedule

This case is about Anthropic's torrenting of copyrighted books from LibGen and PiLiMi. Plaintiffs initially filed this action on August 19, 2024, alleging that Anthropic downloaded Plaintiffs' copyrighted works from pirated datasets without authorization and used those works to train its Claude LLMs. Dkt. 1. On December 4, 2024, Plaintiffs filed the Amended Class Action Complaint, to, among other things, add the Plaintiffs' loan-out companies as named Plaintiffs. Dkt. 70. Anthropic answered the amended complaint on December 18, 2024, denying liability and asserting affirmative defenses, including fair use and innocent infringement. Dkt. 72.

On October 10, 2024, the Court entered a case management order pursuant to which class-certification briefing would begin on March 6, 2025, with fact discovery closing on August 29, 2025, and a jury trial set for December 1, 2025. Dkt. 49.[6]

### B.    Discovery and Experts

The Parties engaged in robust and extensive written discovery throughout this case, producing and reviewing upwards of hundreds of thousands of pages of documents, litigating over one dozen discovery motions, conducting 20 depositions, and spent significant time inspecting source code and books data in a secure environment. *See* CC Decl. ¶¶ 14–22.

Plaintiffs served 186 requests for production, 29 interrogatories, and 65 requests for admission. *Id.* ¶ 16. In turn, Anthropic served 263 RFPs (approximately 87 directed to each named author), 75 interrogatories (25 per author), and 395 RFAs (47 for Graeber, 230 for Bartz, and 118 for Johnson). *Id.* The Parties negotiated and the Court entered three stipulated discovery protocols: a Protective Order, an ESI and Hard-Copy Document Protocol, and a Protocol for Inspection of

---

[6] The Court also required the Parties to present a technology tutorial, which occurred on January 30, 2025. Dkt. 76.

Training Data and Source Code. *See* Dkts. 63, 74, 85. These agreements governed production formats, metadata, claw-back procedures, and the mechanics of secure dataset inspections. Plaintiffs and Anthropic met and conferred dozens of times on search terms, custodians, privilege logging, and scheduling, and exchanged dozens of written proposals refining the discovery parameters. CC Decl. ¶ 14.

Document production and review were extensive. Between the Court's class certification order on July 17 and August 25 alone, Anthropic produced 54,782 documents comprising 1,640,241 pages, bringing the total defense production to more than 80,000 documents and over 2 million pages. *Id.* ¶ 15. Those productions included several "Attorneys-Eyes' Only" source code documents that Plaintiffs' counsel could only review onsite at Anthropic in a secure inspection environment. *Id.* Plaintiffs also inspected hundreds of gigabytes of Slack exports, Notion wikis, and Google Vault data. *Id.* For their part, Plaintiffs produced more than 20,000 pages of manuscript drafts, publishing contracts, registration certificates, and sales statements in response to Anthropic's 263 RFPs. *Id.*

Discovery was hard-fought. Throughout the course of the litigation, the Parties litigated 17 discovery motions with hearings resulting from 11 of those motions. *Id.* ¶ 19. Those motions related to topics such as the timing and scope of document productions, privilege challenges, and issues related to depositions and dataset inspections. *Id*. The Court and Special Master regularly intervened to resolve these disputes, set deadlines, and ensure that the Parties met their discovery obligations. *Id.*

The case also involved extensive deposition discovery, which itself was often hard-fought. *Id.* ¶ 17. Plaintiffs took a Rule 30(b)(6) depositions on November 8, 2024, to (initial deposition on dataset sources), August 8, 2025 (LibGen and PiLiMi metadata), August 15, 2025 (multiple topics relating to acquisition and use of books datasets relevant to the certified Class and the benefits Anthropic obtained from such acquisition and use), and August 25, 2025 (ESI preservation, document repositories, and retention policies). *Id.* In March 2025, Anthropic took five depositions of the named plaintiff authors and their loan-outs. *Id.* During the period the Parties were briefing summary judgment and class certification, Plaintiffs deposed Anthropic's three fact declarants and

one of its experts, and Anthropic deposed one of Plaintiffs' experts. *Id.* Then, in July and August, Plaintiffs deposed most of the main trial witnesses, (including many of Anthropic's co-founders; the individuals who torrented the relevant datasets; and those in charge of pre-training, technology, and products). *Id.* By the time of settlement—a mere four days before the fact discovery cut-off—the Parties had conducted 20 depositions and were actively preparing for six additional depositions of Anthropic's Chief Executive Officer and other trial witnesses on both sides. *Id.* ¶ 18. The deposition transcripts in this case span 4,331 pages. *Id.*

Plaintiffs engaged in extensive third party discovery as well. Plaintiffs subpoenaed major publishers, OpenAI (relating to sworn testimony of founder Ben Mann), Google, Amazon, Shawn Presser (creator of a books dataset), and Anna's Archive (creator of PiLiMi). *Id.* ¶ 22. As part of its third party discovery efforts, Plaintiffs engaged in meet and confers with numerous third parties, obtaining thousands of documents that Plaintiffs cross-produced to Anthropic. *Id.* Plaintiffs successfully moved to enforce a document subpoena to OpenAI related to its former employee (and Anthropic co-founder) Ben Mann, and those documents were introduced as exhibits at Mr. Mann's deposition.

Finally, the Parties engaged in expert discovery, with both sides submitting expert reports in connection with their respective motions for summary judgment and class certification. *Id.* ¶ 20. The Parties' experts opined on a broad range of topics, including economics, market harm, large language models, and the books in the relevant datasets. *Id.* After the Court issued its orders on summary judgment and class certification, on August 1, the Parties exchanged the topics of expert opinions to be offered on the merits at trial. *Id.* ¶ 21. Those topics included, among others, alleged pirate libraries; Anthropic's use of Class Works; torrenting, seeding, and leeching; and topics related to fair use. *Id.* By the time the Parties filed their Notice of Settlement, Dkt. 354, the Parties' experts had already substantially completed their expert reports, in anticipation of forthcoming discovery deadline on August 29. *Id.*

## C.    <u>Key Rulings and Motions</u>

The Settlement was reached only after extensive litigation on the merits, and in particular, after resolution of Anthropic's motion for summary judgment on its central fair use defense and

1    Plaintiffs' motion for class certification.

2        ***Summary Judgment.*** At Anthropic's request, the Court entertained early summary

3    judgment motions. *Id*. ¶ 23. On March 27, 2025, Anthropic moved for summary judgment, asserting

4    that its acquisition of copyrighted books for large language model training qualified as fair use.

5    Dkt. 122. On April 3, 2025, the Court posed hypothetical written questions related to Anthropic's

6    fair use defense to Plaintiffs and Anthropic, to be addressed in the parties' briefing. Dkt. 135.

7    Plaintiffs opposed on April 24, 2025, and Anthropic replied on May 8, 2025. Dkts. 158, 181. The

8    summary judgment record included 65 pages of briefing, 96 exhibits, 2 fact witness declarations,

9    and testimony from five separate experts. CC Decl. ¶ 23. The Court heard argument on the summary

10   judgment motion on May 22, 2025, and the parties submitted supplemental briefing on May 23,

11   2025, pursuant to the Court's order. *Id.*

12       On June 23, 2025, the Court rendered its Order on Fair Use, Dkt. 231, granting Anthropic's

13   motion for summary judgment in part and denying its motion in part. The Court reached different

14   conclusions regarding different sources of training data. It found that reproducing purchased-and-

15   scanned books to train AI constituted fair use. *Id.* at 13-14, 30–31. However, the Court denied

16   summary judgment on the copyright infringement claims related to the works Anthropic obtained

17   from Library Genesis and Pirate Library Mirror. *Id.* at 19, 31.

18       ***Class Certification***. On March 27, 2025, Plaintiffs moved for class certification, which

19   Anthropic opposed on April 17, and Plaintiffs replied on May 1. Dkts. 125, 146, 172. The

20   certification record included 65 pages of briefing, 96 exhibits and 4 declarations. CC Decl. ¶ 25.

21   The Court held a hearing on May 15, and pursuant to the Court's order therefrom, the Parties

22   submitted supplemental brief on May 16. Dkts. 199, 201, 202, 203.

23       On July 17, 2025, the Court certified a Rule 23(b)(3) "LibGen & PiLiMi Pirated Books

24   Class," the definition of which now serves as the Settlement Class definition. Dkt. 244 at 19, 31.

25   Among other things, the Court found that this was a "classic" case for class certification, and that

26   common "questions of law or fact common to class members predominate over" individual

27   questions. *Id.* at 1, 15 (quoting *Briseno*, 844 F.3d at 1124 nn.3-4). The Court crafted notice

28   procedures to ensure only one recovery per copyrighted work. *Id.* at 29–30.

The Court appointed Plaintiffs Andrea Bartz Inc., MJ + KJ Inc., and Graeber as Class Representatives and Lieff Cabraser and Susman Godfrey as Class Counsel. *Id*. at 31. The Court then directed the parties to confer on notice and claims administration procedures and set a timetable for dissemination of class notice. *Id*. Plaintiffs submitted a motion to approve the form and manner of class notice on August 15, Dkt. 317, to which Anthropic filed oppositions on August 18, Dkt. 329, and August 20, Dkt. 334.

***Aftermath of the Court's Summary Judgment and Class Certification Orders.*** Anthropic promptly sought leave to appeal the Court's summary judgment and class certification rulings. CC Decl. ¶¶ 29, 30. On July 14, Anthropic moved for leave to appeal pursuant to 28 U.S.C. § 1292(b) or, in the alternative, for leave to move for reconsideration pursuant to Civ. L.R. 7-9. Dkt. 241. In doing so, Anthropic argued that the Court's order on fair use addressed "novel and consequential legal questions about the proper fair-use standard in the context of copyright-infringement challenges to groundbreaking generative artificial intelligence . . . technology." *Id*. at 1. Anthropic's motion was due to be heard on August 28. Dkt. 241 at 1.

Shortly afterward, on July 31, Anthropic filed a Rule 23(f) petition with the Ninth Circuit, seeking appeal of the Court's class certification ruling. CA9, Dkt. 1.[7] Anthropic argued that the Ninth Circuit should grant review because this Court erroneously (1) certified a class given the presence of individualized issues regarding ownership, registration, validity, copying, and damages, *id*. at 2, 10–11; and (2) opined on the merits of Anthropic's fair use defense, *id*. at 3, 17–18. Anthropic also argued that it faced a "death knell" situation likely to force settlement regardless of the case's merits. *Id*. at 1, 21–23. Plaintiffs opposed on August 14, arguing that Anthropic improperly sought a review of the Court's merits decision on fair use and that Anthropic had failed to meet any of the relevant criteria for granting a Rule 23(f) petition under *Chamberlan v. Ford Motor Co*., 402 F.3d 952, 959 (9th Cir. 2005). CA9, Dkt. 19. Anthropic moved for leave to file a reply brief on August 21. CA9, Dkt. 22. That motion remains held in abeyance.

In conjunction with its motions for leave to appeal, Anthropic sought a stay of proceedings in the District Court on July 24, arguing that proceeding to trial would be inefficient and prejudicial

---

[7] Citations to "CA9" refer to the Ninth Circuit docket, No. 25-4843 (9th Cir.).

while its Rule 23(f) petition was pending in the Ninth Circuit. Dkt. 272. Plaintiffs opposed on July 28, and Anthropic replied on July 30. Dkts. 275, 278. On August 11, the Court denied Anthropic's motion to stay, holding that although "this case bristles with important issues," they "should be adjudicated only after a trial so that, on appeal, our court of appeals will have the benefit of a full record and findings." Dkt. 296 at 2.

Shortly after this Court denied the motion to stay on August 13, Anthropic filed an emergency motion in the Ninth Circuit for a stay pending resolution of its Rule 23(f) petition. CA9, Dkt. 18. Plaintiffs opposed Anthropic's motion to stay on August 25, CA9, Dkt. 25, and prior to the execution of the Term Sheet , CC Decl. ¶ 32.

On August 15, Plaintiffs filed a Motion to Approve Class Notice. Dkt. 317. Anthropic filed an opposition brief on August 18. Dkt. 329. Then, per the Court's order, Dkt. 332, Anthropic filed an additional opposition brief on August 20. Dkt. 334. On August 25, Plaintiffs filed a reply in support of the motion to approve class notice, shortly before the parties reached a settlement agreement. Dkt. 350.

### D.    Litigation Notice, Notice Distribution, and Creation of the Works List

***Notice.*** As part of the Class Certification Order, the Court required a "rigorous notice process," including the creation of a Works List. Dkt. 244 at 10. Immediately following the class certification order, Plaintiffs commenced work on a form of notice, notice distribution plan, and Works List in parallel with other ongoing discovery. *See* CC Decl. ¶¶ 47–53. Plaintiffs submitted a proposed Notice Plan on August 15, Dkt. 317, a process that followed weeks of outreach and engagement with Class Members, trade organizations, and others, Dkt. 318 ¶¶ 6–7.

***Works List.*** Plaintiffs and their experts likewise have devoted significant time to gathering, analyzing, and matching data from multiple sources to formulate a Works List that satisfies the criteria for inclusion in the Class. *See* CC Decl. ¶¶ 47–53. To perform this analysis, Plaintiffs took the approximately seven million files that Anthropic downloaded and put them through two "matching" processes aimed at assessing (a) whether a given file satisfied all the Class book criteria and (b) to improve, refine, or otherwise supplement existing metadata associated with the book files in question. *Id.* ¶ 48. Those two matching processes cued off (1) the ISBNs extracted from the raw

1    text of the files in question, or, where that ISBN was not available, (2) the metadata created by

2    users of LibGen and PiLiMi. *Id.* ¶ 49.

3        Starting with ISBNs sourced from the raw text, Plaintiffs fed these ISBNs to Bowker Books

4    Data—the key industry source of book-related metadata, *see* Dkt. 317 at 7—in order to compile

5    accurate metadata regarding the underlying file, including, e.g. title, author, publication date, and

6    publisher. CC Decl. ¶ 47, 50. That metadata was then used to identify matching registration records

7    at the United States Copyright Office. *Id.* ¶ 50. The information compiled from these two sources

8    was then put through a number of verifications in order to confirm that the underlying file

9    corresponded to the book identified, including by checking, e.g., how often the title appeared in the

10   raw text of the book, whether the title and author both appeared in the raw text of the book, the

11   presence of the publication date (and its proximity to a © symbol), and whether the publication date

12   occurred within 5 years of the registration date. *Id.*

13       For those book files where an ISBN was missing from the raw text of the underlying file,

14   Plaintiffs used the metadata from LibGen and PiLiMi to source title(s) and author(s), and then

15   checked Bowker for candidate ISBNs (and associated metadata). *Id.* From that point, the matching

16   process mirrored the raw-text ISBN matching described above. *Id.* ¶ 51.

17       The result of these two extensive processes was a large list of records reflecting information

18   derived from a variety of sources and verified against the raw text of the underlying book. *Id.* ¶ 52.

19   However, many of these records pointed to identical ISBN or Copyright Office registrations.

20   Deduplication reduced the number of matching records by approximately half. *Id.* Plaintiffs also

21   subjected the list methodology to further robustness testing to determine the potential for false

22   negatives or positives by soliciting and incorporating feedback from samples manually reviewed

23   by certain publishers. *Id.* Where the metadata or book identification process could be improved,

24   Plaintiffs incorporated this feedback into the algorithms and filters used to generate the final list.

25   *Id.*

26       Pursuant to the terms of the parties' term sheet, on September 1, 2025, Plaintiffs provided

27   Anthropic a list of the approximately 465,000 works which Plaintiffs presently believe satisfy the

28   criteria for inclusion on the Works List. *Id.* ¶ 53. Anthropic will provide proposed revisions to the

Works List by September 15, 2025. *Id.* The parties have agreed to meet and confer in good faith to address any revisions from Plaintiffs or Anthropic and submit a joint Works List to the Court on or before October 10, 2025. *Id.*

### E. Settlement Negotiations, Involvement of Constituency Counsel, and Confirmatory Discovery on Valuation.

Consistent with the Court's order governing putative class actions, Dkt. 8, the Parties did not address settlement until after the Court expressly granted Plaintiffs' counsel permission to do so. Dkt. 210. On May 28, the Parties first addressed the possibility of mediation via a call between Class Counsel and Anthropic but did not discuss substance. CC Decl. ¶ 36. The Parties then worked together to select a mediator and developed a process and schedule for mediation, with the mediator supervising the process and participating in all discussions both between the parties and separately with each party. *Id.* Multiple mediation sessions were held—both individually and jointly—but the Parties did not reach a settlement agreement in those initial sessions. *See id.* ¶¶ 36–37.

After those initial sessions, in early August, the Parties retained Judge Phillips to supervise subsequent settlement discussions. *Id.* ¶ 38. By early August, the Parties had the benefit of the Court's orders on class certification, summary judgment, and Anthropic's motion to stay. *Id.* ¶ 37. The Parties were also briefing Anthropic's Rule 23(f) petition in the Ninth Circuit and were in the throes of active discovery of key fact witnesses, including nine depositions between August 1 and August 25. *Id.* In addition, on August 11, Plaintiffs notified the Court that they had associated with additional counsel, Edelson PC and Oppenheim + Zebrak, LLP (the Publishers' Coordination Counsel or "PCC"), to serve as publishers coordination counsel, as well as Professor Samuel Issacharoff to advise on procedural issues. Dkt. 298.

On August 14, the Parties exchanged mediation briefs and submitted those briefs to Judge Phillips. CC Decl. ¶ 38. Following ex parte sessions over the following days, the Parties attended an all-day mediation session with Judge Phillips on August 19 in the offices of Susman Godfrey in New York. *Id* ¶ 39. Although the Parties were unable to resolve the case during the August 19 session, they continued arms-length, good-faith discussions, with the assistance of the mediator. *Id.* ¶ 40. The Parties continued intense discussions through the weekend, including over numerous

1  conferences with Judge Phillips's staff and directly between the Parties on Saturday August 23,

2  Sunday August 24, and Monday August 25. Phillips Decl. ¶ 14.

3         Late on the night of August 25 (when it was already August 26 in the Eastern and Central

4  time zones), the Parties executed a binding term sheet and notified this Court and the Ninth Circuit

5  the following morning. CC Decl. ¶ 33. Over the following days, Plaintiffs have also used that time

6  to further improve the Works List, providing it to Anthropic on September 1. CC Decl. ¶ 53.

7         Overall, the degree of pre-Settlement litigation, extensive work on notice and Class Member

8  identification, and hard-fought Settlement negotiations have situated Plaintiffs to achieve the best

9  possible attainable Settlement. That is precisely what the Plaintiffs now present to the Court for

10  approval, and to fulfill the Court's specific and important requirements for notice and claims.

11  **IV.    <u>LEGAL STANDARD</u>**

12         The Ninth Circuit maintains a "strong judicial policy that favors settlements, particularly

13  where complex class action litigation is concerned." *In re Hyundai & Kia Fuel Econ. Litig.*, 926

14  F.3d 539, 556 (9th Cir. 2019). Thus, while "Rule 23 imposes strict *procedural* requirements on the

15  approval of a class settlement, a district court's only role in reviewing the *substance* of that

16  settlement is to ensure that it is 'fair, adequate, and free from collusion.'" *Lane v. Facebook, Inc.,*

17  696 F.3d 811, 819 (9th Cir. 2012) (emphasis added) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d

18  1011, 1027 (9th Cir. 1998)). District courts conduct that task by applying the *Hanlon* factors and

19  the Rule 23(e) criteria, *see In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 674

20  (9th Cir. 2025)., as well as by considering the Northern District's Procedural Guidance for Class

21  Action Settlements ("Guidance"). *See Carlotti v. ASUS Computer Int'l*, 2019 WL 6134910, at *13–

22  17 (N.D. Cal. Nov. 19, 2019). At the preliminary approval stage, the court's role is to assess whether

23  the settlement "falls within the range of possible approval." *Terry v. Hoovestol, Inc.*, 2018 WL

24  4283420, at *1 (N.D. Cal. Sept. 7, 2018) (internal quotation marks and further citations omitted).

25         Under Rule 23(e), to determine whether a settlement is "fair, reasonable, and adequate,"

26  courts consider whether: (A) "the class representatives and class counsel have adequately

27  represented the class"; (B) "the proposal was negotiated at arm's length"; (C) "the relief provided

28  for the class is adequate"; and (D) "the proposal treats class members equitably relative to each

other." *In re California Pizza Kitchen*, 129 F.4th at 674. Under *Hanlon*, the pertinent factors are (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Id.* The court, ultimately, must assess the settlement in its entirety, rather than dissecting its individual components, to determine overall fairness. *See Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). For that reason, the "relative degree of importance to be attached to any particular factor will depend upon . . . the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

## V.    ARGUMENT

The proposed Settlement is, to our knowledge, the largest known copyright recovery in American history, and it easily merits preliminary approval. The Settlement satisfies the Federal Rule of Civil Procedure 23(e)(2) criteria, comports with the Northern District's Procedural Guidance for Class Action Settlements, and adheres to this Court's Order re Putative Class Actions and Factors to be Evaluated for Any Proposed Class Settlement. Dkt. 8.

### A.    The Rule 23(e)(2) Requirements Are Met Because the Proposed Settlement Is Fair, Reasonable, and Adequate.

#### 1.    The Class Representatives and Class Counsel Have Adequately Represented the Class.

The Court must first consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). This analysis includes "the nature and amount of discovery" undertaken in the case. Fed. R. Civ. P. 23(e), advisory committee's note to 2018 amendment; *see also* Court's Order re Class Actions (Factors 1–2), Dkt. 8.[8] This Court has already found Plaintiffs Andrea Bartz, Inc., Charles Graeber, and MJ + KJ, Inc. to be adequate Class Representatives, and Lieff Cabraser and Susman Godfrey, to be adequate Class Counsel for

---

[8] Factors 11, 12, 13, and 14 of the Court's Order re Class Actions are inapplicable here, where the Court certified a Class and the Parties began settlement discussions after the Court permitted them to do so. Dkt. 210.

the purposes of a litigation class. Dkt. 244 at 14.

The six weeks following the class certification order have only confirmed that Plaintiffs and Class Counsel far exceed the threshold of adequacy under Rule 23. In the last four weeks, Plaintiffs have opposed Anthropic's Rule 23(f) petition, motion for a stay in District Court, motion for a stay in the Ninth Circuit, and motion for reconsideration and to certify an interlocutory appeal; filed critical discovery motions, obtaining key third party discovery from OpenAI related to Anthropic co-founders' past conduct and favorable rulings on Anthropic's privilege claims; and took 9 depositions, securing important admissions on a variety of issues in the case. Adequacy is readily satisfied.

And with the approval of the American Association of Publishers, Plaintiffs added Edelson PC, and Oppenheim + Zebrak LLP as Publishers' Coordination Counsel, who added significant value in coordinating with publishers.

## 2.   **The Settlement Was Negotiated at Arm's Length.**

Rule 23(e)(2)(B) directs courts to consider whether "the proposal was negotiated at arm's length." This "'procedural' concern[]" requires the Court to examine "the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e) advisory committee's note to 2018 amendment. Evidence of "a truly adversarial bargaining process" is the "the presence of a neutral third party mediator." 4 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 13:50 (6th ed. June 2025 update) ("Newberg"); *see also* Fed. R. Civ. P. 23(e)(2)(B) advisory committee's note to 2018 amendment (noting that "the involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests").

This Settlement was the product of a highly adversarial bargaining process that arose only after extensive discovery and after the parties had fiercely litigated a number of central issues in the case. The parties did not begin settlement discussions until the Court expressly granted Plaintiffs' counsel express permission to do so, after the hearings on class certification and summary judgment. Dkt. 210. By that time, the Parties thoroughly understood the merits of their claims and defenses and the risks both sides faced at trial and on appeal. The Parties entered

mediation armed with significant knowledge to advocate their positions effectively.

The proposed settlement was intensely negotiated under the supervision of renowned mediator Judge Layn Phillips. As Judge Phillips's declaration confirms, the Settlement is the product of "vigorous, heavily disputed negotiations" over a variety of issues, including the cash consideration and scope of the release. *See* Declaration of Hon. Layn Phillips ("Phillips Decl.") ¶¶ 15–16. To start, even after a full day of in-person mediation with Judge Phillips, the Parties were unable to reach agreement. Instead, the Parties continued discussions over the next week. *Id.* ¶ 14. It was only after these extensive hard-fought negotiations—particularly over Friday, Saturday, Sunday, and Monday August 22 to 25—that the Parties reached an agreement and executed a binding term sheet on August 25, 2025. *See id.* ¶¶ 14–16. That term sheet was later memorialized into the comprehensive Settlement Agreement executed on September 5, 2025. CC Decl. ¶ 42. This process for developing the Settlement Agreement bears all the hallmarks of arms-length negotiation. *See In re Lyft, Inc. Sec. Litig.*, No. 19-CV-02690-HSG, 2022 WL 17740302 at *4 (N.D. Cal. Dec. 16, 2022) (granting preliminary approval where the "parties reached the settlement with the assistance of an experienced mediator after two-and-a-half years of litigation, extensive discovery and motion practice, and months of negotiations" and noting the absence of any "subtle signs of collusion" such as reversions or clear-sailing agreements).

### 3. **The Settlement Will Provide Extraordinary Relief to the Class.**

Rule 23(e)(2)(C) directs the Court to evaluate whether "the relief provided for the class is adequate, taking into account (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed method of distributing relief . . . ; (iii) the terms of any proposed award of attorney's fees . . . ; and (iv) any agreement required to be identified under Rule 23(e)(3)[.]" *See also Hanlon*, 150 F.3d at 1026 (Factors 2–5); Dkt. 8 (Factors 3, 5–7). Each of these factors weighs in favor of preliminary approval.

#### a. **The Settlement Delivers Extraordinary Monetary Relief and Assurance of Finality in the Face of Substantial Litigation Risk.**

##### i. *The Settlement Is An Excellent Outcome for the Class.*

The Settlement secures a non-reversionary common fund of at least $1.5 billion, plus

interest resulting in a per-book amount of approximately $3,000 per work. As described above, Anthropic will pay the full $1.5 billion in less than two years following final approval, will accelerate those payments if it achieves certain milestones, will destroy the books that it downloaded or torrented from LibGen or PiLiMi and any copies that originate from the torrented copies (as consistent with its legal obligations), and will pay an additional $3,000 per work for any work Anthropic adds to the Works List above 500,000. In addition, the Settlement Agreement releases only past claims, except for past claims based on output, which are not released.

This settlement is groundbreaking in several respects. To the best of Class Counsel's knowledge, it would be the largest publicly reported copyright recovery in history, the largest publicly reported copyright settlement, and the largest class-action copyright recovery. *See* **Exhibit A** (Table 1, comparing other copyright settlements); *Carlotti*, 2019 WL 6134910, *16–17 (quoting Guidelines ¶ 11, which calls for "lead class counsel [to] provide [comparative] information for at least one of their past comparable class settlements"). This Settlement would also be the first major recovery in any of the copyright actions pending against large AI companies nationwide.

The settlement compares favorably to other comparable class action recoveries, recoveries that themselves delivered meaningful relief. For example, in *Ferrick v. Spotify USA Inc.*, Judge Alison J. Nathan praised a class-wide copyright settlement valued at approximately $112.5 million (with $43.45 million paid in cash) as a "significant recovery" for the 535,000-member class, even though the award was valued at $210.28 per class member. 2018 WL 2324076, at *1, *6 (S.D.N.Y. May 22, 2018). Other copyright settlements have involved settlement awards that are no more than a fraction of the award here. *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2017 WL 4685536, at *2 (C.D. Cal. May 8, 2017) (common fund between $25 and $99 million in copyright case); *Lieber v. Bertelsmann AG*, No. C 04-1671 (MHP), Dkt. 1298 (N.D. Cal. Aug. 31, 2007) ($130 million common fund in Napster case involving pirated music). This case also compares favorably to other class-wide settlements of statutory damages claims outside the copyright context against large technology companies. *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 2023 WL 8443230, at *1, *3 (N.D. Cal. Oct. 10, 2023) ($725 million settlement fund for 253 million class members); *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 629 (N.D. Cal. 2021) ($650 million

settlement fund for 6.9 million class members). With Anthropic paying approximately $3,000 *per work*, this case's $1.5 billion settlement is higher than settlements reached in comparable class actions.

The per-work recovery here is significant when viewed in light of the statutory damages range as well. The Settlement Fund represents a per-work payment of approximately $3,000, which is four times the minimum statutory damages amount and fifteen times the minimum statutory damages amount for innocent infringement. 17 U.S.C. § 504(c). Anthropic has made clear that if the case were to proceed to trial it would present defenses, including innocent infringement, seeking to minimize its damages exposure. *See, e.g.*, Dkt. 280.

This settlement is an excellent result for the Class.

          *ii.*      <u>*The Class Faced Significant Litigation Risk Both At Trial and on Appeal.*</u>

The Settlement is an especially significant outcome for the Class when considered in light of the enormous risks from continued litigation. At the time the parties signed the term sheet, any number of things could have derailed the Class's opportunity to have their day in Court on December 1, 2025: (i) the Ninth Circuit could have granted Anthropic's emergency request for stay; (ii) the Ninth Circuit could have granted Anthropic's Rule 23(f) petition, which may have resulted in a reversal of the class certification order; (iii) this Court could have granted Anthropic's Rule 1292(b) motion or its motion for reconsideration of the fair use order; (iv) this Court could have granted any number of *Daubert*, *in limine*, or summary judgment motions that could have effectively ended the case for Plaintiffs before trial. And these were merely the risks that Plaintiffs and the Class would have faced on the path to *get* to trial.

Once trial began on December 1, the Class faced a real risk of an adverse jury verdict, or a recovery far smaller than that provided for in the Settlement Agreement. As the Court noted in denying the motion to stay, "[f]or all we know at this stage, Anthropic will persuade the jury to find facts vindicating it completely (CC Order 28)." Dkt. 296 at 6. At trial, Anthropic would have every opportunity to present its principal fair use defense, which if successful would have been dispositive of the Class's claims. *See Authors Guild*, 804 F.3d at 206. Anthropic had in fact argued in its Section

1 1292(b) motion that Judge Chhabria held that the downloading of large quantities of books from

2 LibGen was fair use in the *Kadrey* case. Dkt. 241. Anthropic also planned to present an innocent

3 infringement defense, relying on testimony from its executives that they subjectively believed their

4 reproductions of Plaintiffs' works were fair use. This defense, if successful, could have limited any

5 recovery to as low as $200 per work, less than 7% of the per-work payment under the Settlement.

6 *See* 17 U.S.C. § 504(c)(2). Absent the Settlement, the Class faced a real, meaningful risk of a total

7 loss—or far lower recovery—at trial.

8    Even if a jury were to side with Plaintiffs, Anthropic's inevitable post-trial motions

9 and appeals would certainly delay—and potentially reduce or eliminate—any trial court judgment.

10 Indeed, because fair use is a mixed question of law and fact, the Court's decision weighing the four

11 fair use factors would have been reviewed *de novo* by an appellate court. Between the immediate

12 risk posed by Anthropic's pending Rule 23(f) petition, the myriad issues that could have ended this

13 litigation and the chance of recovery before trial, and the "novel" questions of fair use and AI

14 training on which Anthropic claims the Court erred, this case carried notable trial and appellate risk

15 that underscores how this $1.5 billion+ Settlement is an enormous victory for the Class.

16      **b.**  <u>**The Distribution Is Effective and Fair.**</u>

17  "A claims processing method should deter or defeat unjustified claims, but the court should

18 be alert to whether the claims process is unduly demanding." *In re ConAgra Foods, Inc.*, 2022 WL

19 17243625, at *8 (C.D. Cal. Nov. 14, 2022) (quoting Fed. R. Civ. P. 23 advisory committee's note

20 to 2018 amendment).

21  The claims process in this case will not be unduly demanding. Claimants with rights in a

22 work on the Works List will be able to submit a claim either by mail or online. *See id.* (finding

23 distribution effective where, as here, "[c]lass members will be able to easily complete and submit

24 a claim form by mail or online"). Class Counsel will work with relevant stakeholders to ensure that

25 such claim forms are reasonably easy to understand and prepare. Keough Decl. ¶ 99. And the forms

26 will furthermore be submitted to the Court for approval on October 10, 2025, before notice is

27 distributed.

28  The Works List will also greatly limit if not eliminate the possibility of unjustified claims.

1   Direct notice, in connection with other methods of notice such as publication notice and notice via

2   social media, ensure that notice will reach the vast majority of Class Members. Notice recipients

3   will be encouraged to cross-check their works against the Works List. And the Administrator will

4   be able to easily determine whether a submitted claim matches a work on the Works List. *Id.* The

5   risk of unjustified claims is further reduced because the information from which the Class List was

6   derived—including relevant copyright information and analysis of the datasets themselves—is

7   written and verifiable. Thus, the risk of disbursing Settlement funds to unjustified claimants is low.

8                    c.      <u>**The Anticipated Request for Awards, Costs, and Fees.**</u>

9           The Settlement Agreement provides for attorneys' fees in an amount not to exceed 25% of

10  the gross benefits provided to the Settlement Class, and reimbursement for all expenses incurred or

11  to be incurred. SA § 8.1. Class Counsel's application seeking their costs, attorneys' fees, and any

12  incentive award will be proposed to be scheduled to be heard at the same time as the final approval

13  hearing. The fee and expense application, along with the detailed bases for any requested Service

14  Awards, will be posted on the Settlement Website upon filing and before the objection deadline,

15  affording Class Members ample opportunity to evaluate and comment. The Settlement Agreement

16  is not conditioned on the Court ordering a fee award, and Anthropic retains the right to oppose the

17  motion, eliminating any "clear-sailing" concern. *See Bayat v. Bank of the W.*, No. C-13-2376 EMC,

18  2015 WL 1744342, at *7 (N.D. Cal. Apr. 15, 2015) ("[B]ecause any attorneys' fees award will

19  come out of the common fund, there is no 'clear sailing' agreement here that would warrant against

20  settlement approval." (citing *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th

21  Cir. 2011)). Finally, any proposed service awards will be modest relative to the size of the case,

22  and will be justified by the Class Representatives' extensive efforts over the past year and

23  anticipated ongoing efforts in communicating with fellow Class Members *See Flo & Eddie, Inc.*,

24  2017 WL 4685536, at *10 ("Incentive awards are fairly typical in class action cases." (quoting

25  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009)).

26                   d.      <u>**No Other Agreements Require Disclosure Under Rule 23(e)(3).**</u>

27          Finally, the Parties have no agreements "made in connection with the proposal." Fed. R.

28  Civ. P. 23(e)(3); *see* Fed. R. Civ. P. 23(e)(2)(C)(iv). Accordingly, all the Rule 23(e)(2)(C) sub-

1    factors support Settlement.

2        4.    **The Settlement Treats Class Members Equitably.**

3        The final Rule 23(e)(2) factor asks whether "the proposal treats class members equitably

4    relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The proposed Settlement satisfies this standard

5    as well.

6        First and foremost, all works in the Class are treated the same. Each work for which a valid

7    claim is submitted will receive the same amount of cash from the Settlement Fund. This uniform

8    per-work treatment is appropriate and squares with Anthropic's decision to torrent/download the

9    Class Works *en masse* from LibGen and PiLiMi. *See* Dkt. 244 (Class Certification Order) at 1–3.

10   Courts routinely recognize that this type of pro rata or per-work allocation methodology is an

11   equitable, rational, and efficient way to distribute Settlement funds. *See, e.g.*, *Raffin*, 2018 WL

12   6011551, at *4 (pro rata distributions fair where class members experienced the same privacy harm

13   and would have been eligible for the same statutory damages if successful at trial); *Zimmerman v.*

14   *Paramount Glob.*, No. 22-CV-9355 (VSB), 2025 WL 763734, at *4, *6 (S.D.N.Y. Mar. 11, 2025)

15   (pro rata distribution in copyright action based on "the number of times SiriusXM played [class

16   members'] works without royalty compensation" was equitable); *Meredith Corp. v. SESAC, LLC*,

17   87 F. Supp. 3d 650, 667 (S.D.N.Y. 2015) (pro rata plan of allocation "ha[d] an obvious rational

18   basis" and "the benefit of simplicity").

19       Likewise, all payments to Class Members will be distributed at the same time, with the first

20   such payment to be made within 28 days of the Effective Date.[9] SA § 2.1(d). And Anthropic's

21   agreement to destroy the original files of the works it torrented/downloaded from LibGen and

22   PiLiMi, as well as any copies that originate from the torrented/downloaded copies, will benefit all

23   Class Members equally.

24       The proposed Settlement therefore satisfies all the Rule 23(e)(2) factors, as it is the product

25   of vigorous, arm's-length negotiations, provides substantial and equitable relief to the Class, and

26   was achieved through the diligent efforts of experienced counsel and representatives.

27

28   [9] If there are remainder funds, they will be distributed to Class members as feasible, with *cy pres* only being used if there is truly no way to get funds to the Class or even to a subset of the Class that has elected electronic payment. SA § 1.34. Any *cy pres* recipient will require court approval.

**B.    The Court Should Direct Notice to the Class.**

Once the Court concludes a proposed settlement is likely to be approved and that the prerequisites for class certification are satisfied, Federal Rule of Civil Procedure 23 mandates that the Court must "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B).

Plaintiffs' proposed Notice Plan—described in the Declaration of Jennifer Keough filed herewith—comports with Rule 23 and due process. Keough Decl. ¶ 98 This comprehensive plan for disseminating notice—including direct mail and email notice as well as notice via targeted ads and a case website—constitutes the best notice practicable under the circumstances. *See, e.g.*, *AdTrader, Inc. v. Google LLC*, No. 17-07082, 2021 WL 2073816 (N.D. Cal. Mar. 23, 2021) (approving notice plan that included direct mailings, emails, and a case-specific website); *Novoa v. GEO Grp., Inc.*, No. 17-2514, 2020 WL 6694349 (C.D. Cal. Sept. 14, 2020) (approving notice plan that included a digital media campaign, emails, publication of notice, and a case specific website). The comprehensive Notice Plan is directed to reach the Class the Court certified, satisfying Fed. R. Civ. P. 23(e)(1)(B).

Finally, and in accordance with the Guidelines, Class Members will have 60 days from the Notice Date to opt out or object. *See also* Court's Order re Class Actions (Factor 8). The proposed Notice Plan complies with Rule 23(e)(5) by instructing Class Members who wish to opt out of or object to the Settlement how to do so. The Notice Plan clearly apprises Class Members of (1) the deadlines to opt out or exclude themselves from the Settlement; (2) the method to opt out; and (3) the consequence of opting out. *See* Keough Decl. Ex. B (Detailed Notice). Likewise, pursuant to Rule 23(e)(5), the proposed Notice Plan instructs Class Members of their right to object to the Settlement and the deadline to submit an objection. As described in Exhibits C and D to the Keough Declaration, the notices make clear that the Court can only approve or deny the Settlement and cannot change the terms of the Settlement.

## VI.    TIMELINE

In accordance with the Guidelines and as set forth in the proposed Order, the parties propose the following timeline below:

| Event | Parties' Proposal |
|---|---|
| Notice Date | 60 days after Preliminary Approval (Settlement Agreement ¶ 1.23) |
| Fee/Cost/Service-Award Motion | 35 days before Opt-Out and Objection Deadline |
| Opt-Out / Objection Deadline | 60 days after Notice (Settlement Agreement ¶ 1.24) |
| Re-inclusion Deadline | 30 days from the Objection/Exclusion Deadline (Settlement Agreement ¶ 4.15) |
| Claims Deadline | 120 days after Notice (Settlement Agreement ¶ 1.6) |
| Final Approval Motion Deadline | At Claim Form Deadline |
| Final Approval Hearing | 14 days after submission of Motion for Final Approval |

## VII.   CONCLUSION

The Parties respectfully request that the Court (1) grant preliminary approval of the Settlement between the already-certified Class and Anthropic; (2) approve a process for setting a Plan of Allocation; (3) appoint JND Legal as the Settlement Administrator and approve the proposed Notice Plan; and (4) schedule a Final Approval Hearing.

Dated: September 5, 2025

By: */s/ Justin A. Nelson*
*/s/ Rachel Geman*

Justin A. Nelson *
Alejandra C. Salinas *
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (SBN 316062)
Michael Adamson*

**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
rnath@susmangodfrey.com
madamson@susmangodfrey.com

Jordan W. Connors *
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
jconnors@susmangodfrey.com

J. Craig Smyser *
Samir Doshi*
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 51st Floor,
New York, NY 10019
Telephone: (212) 336-8330
csmyser@susmangodfrey.com
sdoshi@susmangodfrey.com

Rachel Geman *
Jacob S. Miller*
Danna Z. Elmasry*
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
rgeman@lchb.com
jmiller@lchb.com
delmasru@lchb.com

Daniel M. Hutchinson (SBN 239458)
Jallé Dafa (SBN 290637)
Amelia Haselkorn (SBN 339633)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
dhutchinson@lchb.com
jdafa@lchb.com
ahaselkorn@lchb.com

Betsy A. Sugar*
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
222 Second Ave., #1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com

Jay Edelson*
J. Eli Wade-Scott*
**EDELSON PC**
350 North LaSalle Street, 14th Floor
Chicago, IL 60654
Telephone: (312) 589-6370
jedelson@edelson.com
ewadescott@edelson.com

Matthew J. Oppenheim*
Jeffrey M. Gould*
**OPPENHEIM & ZEBRAK LLP**
4530 Wisconsin Ave, NW, 5th Floor
Washington, DC 20016
Telephone: 202.450.3958
matt@oandzlaw.com
jeff@oandzlaw.com

Scott Jonathan Sholder*
**Cowan DeBaets Abrahams & Sheppard LLP**
60 Broad St, 30th Floor
New York, NY 10004
212-974-7474
Email: ssholder@cdas.com

MOTION FOR PRELIMINARY APPROVAL
CASE NO. 3:24-CV-05417-WHA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: September 5, 2025

*/s/ Justin Nelson* _____