Justin A. Nelson*
Alejandra C. Salinas*
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (SBN 316062)
Michael Adamson (SBN 321754)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
rnath@susmangodfrey.com
madamson@susmangodfrey.com

Jordan W. Connors*
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101-2683
Telephone: (206) 516-3880
jconnors@susmangodfrey.com

J. Craig Smyser*
Samir Doshi*
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 51st Floor,
New York, NY 10001-8602
Telephone: (212) 336-8330
csmyser@susmangodfrey.com
sdoshi@susmangodfrey.com

*Co-Lead Class Counsel*
*(Pro Hac Vice)*

Rachel Geman*
Jacob S. Miller*
Danna Z. Elmasry*
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
rgeman@lchb.com
jmiller@lchb.com
delmasry@lchb.com

Daniel M. Hutchinson (SBN 239458)
Jallé Dafa (SBN 290637)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
dhutchinson@lchb.com
jdafa@lchb.com

Betsy A. Sugar*
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
222 Second Ave., #1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com
*Co-Lead Class Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, and MJ + KJ, INC., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 3:24-cv-05417-WHA<br><br>**DECLARATION OF COURT APPOINTED CLASS COUNSEL RACHEL GEMAN AND JUSTIN A. NELSON IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT** |

## TABLE OF CONTENTS

A.      INTRODUCTION ................................................................................................ 3

B.      THE WELL-PLEADED COMPLAINT AND THE EXTENSIVE
        DISCOVERY THAT FOLLOWED ....................................................................... 4

    i.      *The Nature of the Action* ............................................................................. 4

    ii.     *Fact Discovery between the Parties* .............................................................. 6

    iii.    *Expert Discovery* ........................................................................................ 8

    iv.     *Third Party Discovery* ................................................................................ 8

C.      THE SEVERAL, DISPUTED KEY MOTIONS IN THIS COURT AND THE
        NINTH CIRCUIT ............................................................................................... 9

    i.      *Summary Judgment* ..................................................................................... 9

    ii.     *Class Certification* ...................................................................................... 9

    iii.    *Interlocutory Review* ................................................................................. 10

    iv.     *Motions to Stay* ......................................................................................... 11

    v.      *Notice and Other Filings* ........................................................................... 12

D.      THE CONTESTED, ARM'S LENGTH NEGOTIATION OF THE
        SETTLEMENT AGREEMENT ......................................................................... 12

    i.      *Mediation* ................................................................................................. 12

    ii.     *Settlement* ................................................................................................. 13

E.      THE EFFORTS TO ENSURE MAXIMUM CLASS MEMBER RECOVERY
        14

    i.      *Notifying Class Members* ........................................................................... 14

    ii.     *Developing the List of the Works-in-Suit* ..................................................... 15

    iii.    *Ensuring the Maximum Disbursement of the Settlement Award* ................... 17

F.      CLASS COUNSEL UNEQUIVOCALLY SUPPORT THE SETTLEMENT 18

G.      CLASS COUNSEL HAVE SIGNIFICANT EXPERIENCE LITIGATING
        CLASS-ACTION AND OTHER COMPLEX CASES ...................................... 18

    i.      *Lieff Cabraser* ........................................................................................... 19

    ii.     *Susman Godfrey* ......................................................................................... 25

Justin A. Nelson and Rachel Geman jointly declare and state as follows:

1.      We are Co-Lead Class Counsel for Plaintiffs in the above-captioned case. We make this declaration in support of Plaintiffs' Unopposed Motion for Preliminary Approval of the Settlement Agreement.

2.      I, Rachel Geman, am a partner at Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser"), and serve as an attorney of record for Plaintiffs in the above-captioned class action. I am also a court-appointed Class Counsel. I am an active member in good standing of the New York State Bar, and am admitted *pro hac vice* to practice before this Court. *See* Dkt. 29. I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.

3.      I, Justin A. Nelson, am a partner at Susman Godfrey L.L.P. ("Susman Godfrey"), and serve as an attorney of record for Plaintiffs in the above-captioned class action. I am also a court-appointed Class Counsel. I am an active member in good standing of the bar of Texas, and am admitted *pro hac vice* to practice before this Court. *See* Dkt. 34. I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.

A.      **<u>INTRODUCTION</u>**

4.      To the best of our knowledge, this is the largest known copyright settlement in American history. A certified class of legal and beneficial owners of hundreds of thousands of copyrighted works will recover at least $1,500,000,000 dollars through a non-reversionary settlement fund. Based upon the number of anticipated works on the Class List, we expect that the non-reversionary settlement will equate to approximately $3,000.00 per Work—a sum that well surpasses past copyright settlements. The settlement also provides for Interest both during the approval process and while in escrow after approval but before distribution.

5.      The settlement also provides other benefits. The release is a past release only. The release is only for Works on the Works List, each of which is eligible for the approximately $3,000 per-Work compensation. And the release does not include any claim based on the output of AI models. The Defendant, Anthropic PBC, will delete the books it downloaded from Library Genesis

("LibGen") and Pirate Library Mirror ("PiLiMi"), subject to certain legal preservation obligations and court orders. And together, Plaintiffs and Defendant will resolve—after a year of sharply contested proceedings involving nearly two dozen depositions, scores of discovery motions, summary judgment proceedings, class certification proceedings, and simultaneous litigation in the Ninth Circuit—one of the most important copyright cases of the day. The Settlement Agreement was hard fought. It is eminently fair. And Plaintiffs' Counsels' plan for ensuring maximum distribution of the award satisfies exacting scrutiny.

6.      This declaration begins by providing an overview of the work performed by Co-Lead Class Counsel to understand the claims and defenses in this case, to evaluate them, and to ultimately elect to reach this settlement rather than continue to trial. The declaration then next explains the work that Co-Lead Class Counsel will continue conducting to ensure maximum disbursement of the award in the Settlement Agreement to Class members. Finally, the declaration will conclude by explaining why Co-Lead Class Counsel believe that the Settlement Agreement provides exceptional relief to the Class.

7.      We are immensely thankful for the work of this Court, Special Master McElhinny, and Retired Judge Layn Phillips in assisting the Parties throughout this action, including by resolving hotly contested issues on the merits, adjudicating several critical discovery disputes, and mediating a comprehensive and compelling settlement.

8.      In light of the remarkable monetary award and other non-monetary relief, we respectfully submit that the Settlement Agreement merits this Court's approval. Attached as **Exhibit A** is a true and correct copy of the Settlement Agreement executed on September 5, 2025, between Plaintiffs and Anthropic.

**B.      THE WELL-PLEADED COMPLAINT AND THE EXTENSIVE DISCOVERY THAT FOLLOWED**

i.      *The Nature of the Action*

9.      Plaintiffs filed this case on August 19, 2024, on behalf of themselves and other legal and/or beneficial owners of copyrighted works, alleging that Defendant Anthropic PBC ("Anthropic"), reproduced their works without permission in violation of the Copyright Act, 17

U.S.C. § 501 *et seq.* Plaintiffs' 17-page, 40-footnote, complaint sought "statutory damages or compensatory damages at their election, restitution, disgorgement, attorneys' fees and costs, and any other relief that may be permitted by law or equity," including an order "[p]ermanently enjoining Anthropic from engaging in the infringing conduct" as alleged. Dkt. 1 at 18.

10.    Plaintiffs' complaint alleged in detail Anthropic's unlawful acquisition of copyrighted works. For instance, Plaintiffs alleged that Anthropic "copied and exploited a trove of copyrighted books—including but not limited to the books contained in Books3." Dkt. 1 at 12; *see also* Dkt. 1 at 9. Plaintiffs further alleged that Anthropic used such books notwithstanding the fact that their pirated nature was evident. Dkt. 1 at 12. For example, Plaintiffs alleged that, according to publicly available datasheets, "Books3 is almost entirely comprised of copyrighted works." Dkt. 1 at 11.

11.    Plaintiffs also alleged the grievous harms that Anthropic's conduct caused the then-putative class. Plaintiffs explained that "Anthropic, in taking authors' works without compensation, has deprived authors of books sales and licensing revenues." Dkt. 1 at 12 –13. "There has long been an established market for the sale of books and e-books," Plaintiffs explained, "yet Anthropic ignored it and chose to scrape a massive corpus of copyrighted books from the internet, without even paying for an initial copy." Dkt. 1 at 13; *see also* Dkt. 1 at 13 ("Anthropic, however, has chosen to use Plaintiffs works and the works owned by the Class free of charge, and in doing so has harmed the market for the copyrighted works by depriving them of book sales and licensing revenue.").

12.    This Court held a scheduling conference on October 10, 2024 and set a trial date of December 1, 2025. At the conference, the Court asked each side to provide an impromptu two-minute summary of their arguments. Counsel for Plaintiffs responded, previewing the arguments that have been hotly contested in this Court, including piracy. The Court commented: "A very good, short summary. You get an A plus. I don't have to agree with everything, but you did what I asked. In two minutes or less, you summarized the case." Dkt. 50, 3:25-5:4.

13.    Anthropic filed its answer on October 21, 2024, in lieu of filing any motion to dismiss. Dkt. 57. Plaintiffs thereafter filed an amended complaint on December 4, 2024, continuing

1    to allege Anthropic's violations of the Copyright Act in detail. Once again, Anthropic was

2    compelled to file an answer instead of moving to dismiss. Dkt. 72.

3                          ii.    *Fact Discovery between the Parties*

4          14.    Discovery in this case has been extensive by any measure. The Parties produced

5    millions of pages of documents, litigated over one dozen discovery motions, inspected source code

6    and books data in a highly secure environment, and took or defended twenty depositions. That

7    discovery was governed by extensive, negotiated protocols that the Court itself reviewed and

8    ordered: a Protective Order, an ESI and Hard-Copy Document Protocol, and a Protocol for

9    Inspection of Training Data and Source Code. Dkt. Nos. 63, 74, 85, which among other things,

10   controlled production formats, metadata, claw-back procedures, and the mechanics of secure

11   dataset inspections. Plaintiffs and Anthropic also met and conferred several dozens of times on all

12   facets of discovery, including negotiating search terms and custodians for document production;

13   the number of deponents and the length of depositions; privilege logging; responses to written

14   discovery; and scheduling various matters. The Parties also exchanged dozens of written proposals

15   as to these discovery issues as well. In sum, the Parties exerted significant effort in discovery,

16   emblematic of the deeply contested nature of this case. During the course of discovery, Plaintiffs

17   discovered that Anthropic's use of pirated books was much more extensive than just Books3.

18   Anthropic also torrented/downloaded books from the pirated websites Library Genesis and Pirate

19   Library Mirror, but had not disclosed this publicly.

20         15.    Document Production and Review. Document production and review were likewise

21   extensive. For example, during just the period between the Court's class certification order (July

22   17, 2025) and the date of the Parties' executed Term Sheet (August 25, 2025), Anthropic produced

23   54,782 documents comprising 1,640,241 pages, bringing the total defense production to more than

24   80,000 documents and over 2 million pages, including "Attorneys-Eyes' Only" source code

25   documents that Class Counsel could only review onsite, with advanced notice and no Internet

26   connection, at Anthropic's secure inspection environment. Plaintiffs also inspected hundreds of

27   gigabytes of Slack exports, Notion wikis, and Google Vault data. Plaintiffs likewise produced more

28

than 20,000 pages of manuscript drafts, publishing contracts, registration certificates, and sales statements in response to Anthropic's Requests for Production ("RFPs").

16.    <u>Written Discovery</u>. Plaintiffs served nine sets of RFPs comprising 186 individual requests; eight sets of Interrogatories totaling 29 interrogatories; and three sets of Requests for Admission ("RFA") totaling 65 RFAs. In turn, Anthropic served 263 RFPs (approximately 87 directed to each named author-plaintiff), 75 interrogatories (25 per author-plaintiff), and 395 RFAs (230 for Bartz/Bartz Inc., 47 for Graeber, and 118 for Johnson/MJ+KJ). The Parties' written discovery responses to interrogatories alone spanned over 200 pages. The Parties' written responses to the RFPs spanned another 311 pages.

17.    <u>Depositions</u>. Depositions were similarly thorough. Plaintiffs took Rule 30(b)(6) depositions of Anthropic on November 8, 2024 (initial deposition on dataset acquisition), August 8, 2025 (LibGen and PiLiMi metadata), August 15, 2025 (multiple topics relating to acquisition and use of books datasets relevant to the certified Class and the benefits Anthropic obtained from such acquisition and use), and August 25, 2025 (ESI preservation, document repositories, and retention policies). Anthropic took five depositions of the named plaintiff authors and their loan-outs between March 5–7, 2025. In addition, during the period the Parties were briefing summary judgment and class certification, Plaintiffs deposed three fact witnesses from Anthropic as well as one of its experts, while Anthropic deposed one of Plaintiffs' experts. Then, in July and August, Plaintiffs deposed many of the main trial witnesses, including many of Anthropic's co-founders; the individuals who torrented the relevant datasets; and those in charge of pre-training, technology, and products.

18.    By the time the Parties' executed their Term Sheet pertaining to the settlement—a mere four days before the fact discovery cut-off—the Parties had conducted 20 depositions, and were neck-deep in preparations for then-forthcoming six additional depositions of Anthropic's Chief Executive Officer and other trial witnesses on both sides. The deposition transcripts in this case span 4,331 pages.

19.    <u>Motions Practice</u>. As this Court is well aware, discovery was hard-fought. Throughout the course of the litigation, the Parties engaged in 17 discovery motions and had

hearings as to 11 of these motions before both the District Court and the appointed Special Master. These included disputes over the timing and scope of document productions, privilege challenges, and issues related to depositions and dataset inspections. The Court and Special Master regularly intervened to resolve these disputes, set deadlines, and ensure that discovery obligations were met.

### iii.    *Expert Discovery*

20.    The Parties engaged in widespread expert discovery. Both sides submitted over 100 pages in expert reports in connection with Anthropic's motion for summary judgment and Plaintiffs' motion for class certification. Those expert reports addressed topics related to economics, market harm, large language models, and the ascertainment of books in the datasets.

21.    In addition, Plaintiffs committed significant expert resources to analyzing Anthropic's datasets and source code, including in the highly secure inspection environment, a process that occurred on nearly a daily basis in the weeks leading up to the Settlement Agreement. In addition, on August 1, the Parties exchanged topics of expert reports relating to trial experts, covering piracy; shadow libraries; Anthropic's use of Class Works; torrenting, seeding, and leeching; fair use related topics; and others. In keeping with the breadth of those topics, the Parties disclosed a total of 41 experts that could offer expert testimony. And by August 25—the date of the Parties' executed Term Sheet—the Parties' experts had substantially completed reports and the attendant work in advance of the August 29 discovery deadline to serve opening expert reports.

### iv.    *Third Party Discovery*

22.    With respect to third party discovery (in addition to the discovery specific to notice and the Class List, discussed below), Plaintiffs issued subpoenas to major publishing companies (HarperCollins and Simon & Schuster), OpenAI (relating to sworn testimony of founder Ben Mann), Google, Amazon, as well as Shawn Presser (creator of a books dataset), and Anna's Archive (creator of Pirate Library Mirror). Plaintiffs engaged in meet and confers with many of these third parties, obtained thousands of pages of documents from four of these third parties, and then reviewed and produced these documents to Anthropic. Third party discovery was unabating. During the week of the Settlement Agreement itself, Plaintiffs were engaged in extensive meet-and-confer efforts with Amazon to obtain information pertaining to Anthropic's use of Amazon's services.

**C.    THE SEVERAL, DISPUTED KEY MOTIONS IN THIS COURT AND THE NINTH CIRCUIT**

i.    *Summary Judgment*

23.    Anthropic requested to move for early summary judgment prior to the close of fact discovery. On March 27, 2025, Anthropic moved for summary judgment, asserting that its acquisition of copyrighted books for large languages model training categorically qualified as fair use. Dkt. 122. On April 3, 2025, the Court posed hypothetical written questions related to Anthropic's fair use defense to Plaintiffs and Anthropic, to be addressed in the Parties' briefing. Dkt. 135. Plaintiffs opposed Anthropic's motion on April 24, 2025, and Anthropic filed its reply on May 8, 2025. Dkt. 163, 181. The summary judgment record included 65 pages of briefing, 96 exhibits, 2 fact witness declarations, and testimony from five separate experts. The Court heard argument on the summary judgment motion on May 22, 2025, and the Parties submitted supplemental briefing on May 23, 2025, pursuant to the Court's order.

24.    Following the May 22 hearing and the Parties' supplemental submissions, the Court granted in part and denied in part Anthropic's motion. Dkt. 231. The Court reached different conclusions regarding different sources of training data. It found that reproducing purchased-and-scanned books to train AI constituted fair use. *Id.* at 13, 30–31. However, the Court denied summary judgment on the copyright infringement claims related to the works Anthropic obtained from Library Genesis and Pirate Library Mirror. *Id.* at 19, 31.

ii.    *Class Certification*

25.    On March 27, 2025, Plaintiffs moved for class certification. Anthropic opposed on April 17, and Plaintiffs replied on May 1. Dkt. 125, 146, 172. The certification record was likewise fulsome, including 65 pages of briefing, 96 exhibits and 4 declarations. The Court held a hearing on May 15, 2025 and pursuant to the Court's order therefrom, the Parties submitted supplemental briefing on May 16, 2025. Dkts. 199, 201, 202, 203.

26.    On July 17, 2025, the Court certified a Rule 23(b)(3) "LibGen & PiLiMi Pirated Books Class." Dkt. 244 at 9, 31. The Court found that this was a "classic" case for class certification, and that common "questions of law or fact … predominate[d] over" individual

questions. *Id.* at 1, 15 (quoting *Briseno*, 844 F.3d at 1124 nn.3-4). The Court crafted notice procedures to ensure that rightsholders were properly apprised of this case, and to ensure only one recovery per copyrighted work. *Id.* at 29–30.

27.    Plaintiffs Andrea Bartz Inc., Graeber, and MJ + KJ Inc. were appointed as Class Representatives, and Lieff Cabraser and Susman Godfrey were appointed as Co-Lead Class Counsel. *Id.* at 31. The Court then directed the Parties to confer on notice and claims' administration procedures and set a timetable for dissemination of Class notice. *Id.* at 29–30, 31. Plaintiffs submitted a motion to approve the form and manner of class notice on August 15, 2025, Dkt. 317, to which Anthropic filed oppositions on August 18, 2025, Dkt. 329, and August 20, 2025, Dkt. 334.

28.    On August 11, 2025, in response to this Court's class certification order and in order to ensure participation of all copyright owners in the case and pursue the common goal of maximizing the per-work recovery for the Class, Plaintiffs filed notices of appearances for additional counsel for Edelson PC and Oppenheim + Zebrak, LLP to serve as Publishers' Coordination Counsel. Dkt. 298. Those firms had the approval of the American Association of Publishers to serve in that role. *Id.* at 2. Professor Samuel Issacharoff of NYU Law School, a leading expert on class actions, also noticed his appearance the same day. *Id.*

iii.    *Interlocutory Review*

29.    Anthropic sought to immediately appeal the Court's summary judgment ruling, moving on July 14 for leave to appeal pursuant to 28 U.S.C. § 1292(b). In that motion, Anthropic moved in the alternative, for leave to move for reconsideration pursuant to L.R. Civ. 7-9. Dkt. 241. Anthropic argued that the Court's order on fair use addressed "novel and consequential legal questions about the proper fair-use standard in the context of copyright-infringement challenges to groundbreaking generative artificial intelligence . . . technology." *Id.* at 1. Plaintiffs filed their opposition to Anthropic's motion on July 28, 2025 (Dkt. 276), and Anthropic filed its reply on August 4, 2025 (Dkt. 284). The motion was scheduled to be heard on August 28. Dkt. 241 at 1.

30.    Anthropic also sought immediate appellate review of the Court's class certification decision, filing a Rule 23(f) petition with the Ninth Circuit on July 31, 2025. CA9, Dkt. 1.[1]

---

[1] Citations to "CA9" refer to the Ninth Circuit docket, No. 25-4843 (9th Cir.).

Anthropic argued that the Ninth Circuit should grant review because this Court erroneously (1) certified a Class given the presence of individualized issues regarding ownership, registration, validity, copying, and damages, *id*. at 2, 10–11; and (2) opined on the merits of Anthropic's fair-use defense, *id*. at 3, 17–18; Anthropic also argued that it faced a "death knell" situation likely to force settlement regardless of the case's merits. *Id*. at 1. Plaintiffs filed their opposition on August 14, arguing that Anthropic improperly sought to shoehorn its fair use arguments into review of the class certification order, that the class certification order carefully applied the Rule 23 requirements, and that Anthropic itself had conceded the abundant commonalities in the Class when moving for summary judgment motion prior to class certification. CA9, Dkt. 19. Anthropic moved for leave to file a reply brief on August 21. CA9, Dkt. 22. That motion remains pending but held in abeyance in the Ninth Circuit.

iv.    *Motions to Stay*

31.    In conjunction with its motion for interlocutory appeal of the Court's summary judgment under Section 1292 and its petition for interlocutory appeal of the Court's class certification decision under Rule 23(f), Anthropic sought a stay of proceedings in the District Court on July 24, 2025. Dkt. 272. Anthropic argued that trial would be inefficient and prejudicial while its Section 1292 motion and its Rule 23(f) petition were pending. *Id.* at 1. Plaintiffs opposed on July 28, and Anthropic replied on July 30. Dkts. 275, 278. On August 11, the Court denied Anthropic's motion to stay, holding that although "this case bristles with important issues," they "should be adjudicated only after a trial so that, on appeal, our court of appeals will have the benefit of a full record and findings." Dkt. 296 at 2.

32.    Shortly after this Court denied the motion to stay, Anthropic filed an emergency motion in the Ninth Circuit seeking a stay pending resolution of its Rule 23(f) petition. CA9, Dkt. 18. Plaintiffs filed their opposition on August 25, prior to the execution of the Term Sheet undergirding the Settlement Agreement. CA9, Dkt. 25. In sum, the Ninth Circuit proceedings in this case generated nearly 400 pages of briefing, including hundreds of pages of briefing from multiple different *amici*.

1            v.      *Notice and Other Filings*

2        33.     On August 15, 2025, Plaintiffs filed in the District Court a motion to approve class

3   notice. Dkt. 317. Anthropic filed an opposition brief on August 18. Dkt. 329. Per the Court's order,

4   Dkt. 332, Anthropic filed further objections on August 20. Dkt. 334. On August 25, Plaintiffs filed

5   a reply in support of the motion for Class notice, shortly before the Parties reached a settlement

6   agreement. Dkt. 350. Late in the night of August 25 (indeed, it was already the morning in the

7   Eastern and Central Time Zones), the Parties executed a binding Term Sheet, intended to

8   memorialize the Parties' agreement on material terms of a proposed class settlement.

9        34.     On August 26, 2025, the Parties informed the Ninth Circuit (CA9, Dkt. 26) and the

10  District Court (Dkt. 354) that they had entered into a binding Settlement Agreement to resolve this

11  case. On August 26, the Court ordered that the Parties "shall file a motion for preliminary approval

12  of class settlement by **NOON SEPTEMBER 5** for hearing **NOON SEPTEMBER 8, 2025**," and

13  that the "case will be stayed in the event that both sides file the above motion by noon on September

14  5." Dkt. 355 at 1. On August 27, the Ninth Circuit ordered that Anthropic's motion to hold

15  resolution of this [Rule 23(f)] petition and all pending motions in abeyance is granted." CA9, Dkt.

16  27.

17      **D.      THE CONTESTED, ARM'S LENGTH NEGOTIATION OF THE
                  SETTLEMENT AGREEMENT**
18

19      35.     The Parties did not engage in any settlement discussions in this case until the Court

20  expressly permitted them to do so. Dkt. 210.

21            i.      *Mediation*

22      36.     On May 23, 2025, the Court issued an order permitting the Parties to engage in

23  settlement discussions prior to class certification. Dkt. 210. On May 28, the Parties first addressed

24  the possibility of mediation via a call between Class Counsel and Anthropic. Over the following

25  weeks, the Parties selected and began sessions with a neutral mediator. These sessions did not result

26  in settlement. All material conversations during this timeframe happened either directly with a

27  mediator or with a mediator facilitating conversations between the Parties.

28

37.     The Parties then resumed mediation with a second mediator in August 2025. By this point, the Parties had the benefit of the Court's orders on class certification, on Anthropic's motion for summary judgment, and on Anthropic's motion to stay. The Parties were also engaged in briefing Anthropic's 23(f) petition in the Ninth Circuit, and remained in active discovery of key fact witnesses, including taking nine depositions between August 1 and August 25.

38.     On August 14, 2025, the Parties completed mediation briefing on the then-current procedural history and factual status of the case, as well as the liability, damages, and risk exposures in the case, as supported by detailed legal and factual analysis. The Parties submitted briefs to the Hon. (Ret.) Layn R. Phillips, the third-party neutral mediation overseeing the mediation.

39.     On August 19, 2025, the Parties participated in a full-day mediation session at the offices of Susman Godfrey in New York, New York. That session included the Class Counsel firms, the Publishers Coordination Counsel firms, in-house counsel for Anthropic, and outside counsel for Anthropic. While the Parties were unable to entirely resolve the case during the August 19 session, the Parties made meaningful progress during that session and therefore continued arms-length, good faith discussions under the auspices of the mediator.

40.     Following the in-person mediation session, the Parties continued to vigorously negotiate a settlement over the course of the following week. This included several mediation sessions over the weekend of August 24–25, 2025. The Parties spent a significant amount of time negotiating the form and timing of any settlement. In particular, the Parties also had heavily disputed negotiations over the scope of any release. These discussions were highly contested, with each side vigorously advocating for its respective position.

ii.     *Settlement*

41.     On August 25, 2025, the Parties executed a binding Term Sheet memorializing the material terms of the Settlement Agreement. That Term Sheet, like the Settlement Agreement now, required:

a.     the creation of a non-reversionary Settlement Fund of at least $1.5 billion for the benefit of the certified class, with Anthropic contributing an additional $3,000.00 per work for any work that it adds to the Works List that meets the class criteria above 500,000 works;

b.    a release of past claims only, limited to those works on the Works List and limited to claims arising from the same factual predicate of this lawsuit— i.e., limited to Anthropic's alleged past torrenting, scanning, retention, and use of the Works with no claims based on the output of AI models released; no release of any claims for future reproduction, distribution, and/or creation of derivative works of the works on the Works List; and a release acknowledging that the release does not constitute, in any respect, a license to torrent, scan, or train AI models on any copyrighted works, or to create infringing outputs from AI models;

c.    certified destruction all the original files of works downloaded from Library Genesis or Pirate Library Mirror and any copies that originate from the torrented copies, with an exception only for retention due to legal preservation or court-ordered obligations;

d.    a clear and streamlined claims process that will allow class members to receive pro rata cash payments; and

e.    limited releases only of claims arising from the identical factual predicate of this lawsuit.

42.    The Parties negotiated and finalized a comprehensive Settlement Agreement and Release. The Settlement Agreement was executed on September 5, 2025, and is submitted herewith as **Exhibit A** for the Court's preliminary approval. The Settlement Agreement is the product of vigorous litigation, informed analysis of the strengths and weaknesses of the case, and a hard-fought, arm's-length negotiating process overseen by an experienced neutral. The settlement achieves an extraordinary monetary payment for the certified Class and significant non-monetary relief, while eliminating all risks inherent in further litigation.

E.    **THE EFFORTS TO ENSURE MAXIMUM CLASS MEMBER RECOVERY**

i.    *Notifying Class Members*

43.    Immediately following the class certification order, Plaintiffs commenced work on the notice, the notice plan, and the Class List, alongside the fact and expert discovery that was ongoing in the case. These efforts included: (1) seeking relevant author contact information from all leading author organizations, literary agencies, and agent organizations; (2) seeking relevant publisher and author contact information from Amazon.com for self-published and non-self-published books available on that website; (3) working with publishers' organizations to gather

publisher contact information, and with publishers to seek additional author information; and (4) collecting contact information from potential Class members directly through a case website.

44.     Plaintiffs submitted a proposed notice plan on August 15, 2025, following weeks of engagement with and outreach to Class members, trade organizations, and others. Dkt. 317.

45.     Class Counsel recommended that JND Legal Administration ("JND" or the "Notice Administrator") act as the class action notice administrator to implement the best notice practicable under the circumstances.

46.     To implement the terms of the Court's class certification order, the Parties also conferred to craft a notice package that (i) clearly describes the nature of the action, the definition of the Class certified, the certified claims and corresponding issues and defenses, the litigation posture, and the binding effect of a class judgment on members; (ii) states the right to opt out; and (iii) explains the procedures and deadlines for doing so. The dissemination plan provides for direct first-class mailed and email notice to every reasonably identifiable author, publisher, and registered copyright owner, augmented by publication in leading industry periodicals, digital advertising, and social-media outreach—collectively ensuring the "best notice that is practicable under the circumstances." Dkt. 244, at 29.

> ii.     *Developing the List of the Works-in-Suit*

47.     Plaintiffs and their experts likewise have devoted significant time to gathering, analyzing, and matching data from multiple sources to determine the list of works that satisfy the criteria for inclusion in the Class. This includes but is not limited to the raw text of the files that Anthropic downloaded, the accompanying metadata (created in turn by users of LibGen and PiLiMi), data from the United States Copyright Office, and the International Standard Book Number ("ISBN") and book metadata from Bowker Books Data ("Bowker"), the key industry source of such information.

48.     At a high level, Plaintiffs took the approximately seven million files that Anthropic acquired and put the files through two "matching" processes to assess (a) whether a given file satisfied all the Class book criteria and (b) to improve, refine, or otherwise supplement existing metadata associated with the book files in question.

49.    Those two matching processes cued off (1) the ISBN extracted from the raw text of the files in question, or, where the ISBN was not available, (2) the metadata created by users of LibGen and PiLiMi.

50.    In the case of the raw-text-ISBN pipeline, the ISBN was used to source metadata from Bowker (or, in the rare case where Bowker lacked information, from an alternative source of such information: "ISBNdb"). That metadata could then be used to identify matching registration records at the United States Copyright Office. The information compiled from these two sources was then put through a number of verifications in order to confirm that the underlying file corresponded to the book identified, including by checking, e.g., how often the title appeared in the raw text of the book, whether both the title and author appeared in the raw text of the book, the presence of the publication date (and its proximity to a copyright symbol "©"), and whether the publication date occurred within five-years of the registration date.

51.    In the case of the LibGen and PiLiMi-metadata pipeline, the matching algorithm first checked Bowker for matching title-author pairs and sourced candidate ISBNs from those results. From there, the process essentially mirrors the raw-text ISBN pipeline described above.

52.    The result of these two extensive processes was a large list of records reflecting information derived from a variety of sources and verified against the raw text of the underlying book. However, many of these records pointed to identical ISBN or United States Copyright Office registrations. Deduplication reduced the number of matching records by approximately half. Plaintiffs also subjected the list methodology to further robustness testing to determine the potential for false negatives or positives by soliciting and incorporating feedback from samples manually reviewed by certain publishers. Where the metadata or book identification process could be improved, Plaintiffs incorporated this feedback into the algorithms and filters used to generate the list of works.

53.    Pursuant to the terms of the Parties' Term Sheet, on September 1, 2025, Plaintiffs provided Anthropic a list of the approximately 465,000 works that they presently believe satisfy the criteria for inclusion on the Works List. Pursuant to the Parties' negotiated agreements, Anthropic will provide proposed revisions to the Works List by September 15, 2025. The Parties

have agreed to meet and confer in good faith to address any revisions from Plaintiffs or Anthropic and submit a joint Works List on or before October 10, 2025.

iii.    *Ensuring the Maximum Disbursement of the Settlement Award*

54.    Plaintiffs have and will continue to undertake extensive efforts to ensure maximum disbursement of the settlement award to all Class members, including after the Court enters preliminary and final approval of the settlement award.

55.    Plaintiffs anticipate that there may be multiple claimants for certain Class Works (typically an author (who is often the beneficial owner) and a publisher (who is often the legal owner)). To ensure the claims process proceeds effectively, Class Counsel has assembled an Author-Publisher Working Group ("APWG") to provide advice and proposals to Class Counsel for how to efficiently address intra-work allocation that may arise during the claims administration process, including the formulation of a claims form that provides any information necessary to address intra-work allocation, adjustments to the proposed form of notice, and process and procedures designed to minimize the administrative burden of claims administration.

56.    The APWG will be led by two industry experts, Authors Guild ("AG") CEO Mary Rasenberger and Association of American Publishers ("AAP") CEO Maria Pallante, and supervised by the Hon. Layn R. Phillips (Ret.). The APWG will provide any recommendations to Class Counsel by September 30, 2025—that is, ten days in advance of Plaintiffs' proposed deadline to submit for Court approval any revised form of notice, a proposed claim form, and any proposed procedures for the claims process. Anthropic will have the right to comment on these proposals and, to the extent there is disagreement, the Parties will submit any disputes to the Court over the form of notice and claim procedures by October 10, 2025. Specifically, Class Counsel will ensure that the APWG will advise Class Counsel on the claims process, the contents of a claims form, and adjustments to the relevant sections of the form of Class notice for the purpose of fairly, equitably, and efficiently addressing situations where there are multiple claimants submitting claims for a particular work on the Works List.

1    **F.    CLASS COUNSEL UNEQUIVOCALLY SUPPORT THE SETTLEMENT**

2    57.    Class Counsel have decades of experience litigating class actions—including

3    litigating copyright class actions on behalf of copyright holders who are suing other AI companies

4    for similar conduct—and unreservedly support this extraordinary settlement. To our knowledge,

5    this is the largest copyright settlement in American history.

6    58.    Class Counsel submit this settlement is fair, reasonable, and adequate; that it was

7    reached with the assistance of a neutral after good faith, arm's length negotiations; and that its terms

8    – monetary and prospective – will provide meaningful and timely benefits to Class members.

9    59.    Class Counsel also submit that a uniform per-work payment per book is fair,

10    reasonable, and adequate in light of the uniform way books were treated by Anthropic.

11    60.    Class Counsel and their firms have represented Plaintiffs in matters where additional

12    procedural safeguards were used to further ensure the transparency and fairness of a plan of

13    allocation or distribution. *See, e.g.*, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon,"* MDL

14    2179, Dkt. 22252 (E.D. La.) (approving a significant settlement involving several different

15    stakeholders affected by an oil spill with procedural safeguards including appointment of an

16    allocation neutral); *In Re General Motors LLC Ignition Switch Litigation*, No. 14-cv-02458 (JMF),

17    Dkt. 287 ¶12 (S.D.N.Y.) (describing plan for allocation process, including the appointment of

18    counsel for settlement allocation purposes).

19    61.    In light of that experience, Class Counsel believe that the process for allocation in

20    this case will permit the finalization of a fair, reasonable, and adequate plan of allocation with

21    respect to intra-work allocation when there are multiple legal or beneficial owners of one book.

22    **G.    CLASS COUNSEL HAVE SIGNIFICANT EXPERIENCE LITIGATING
         CLASS-ACTION AND OTHER COMPLEX CASES**

23

24    62.    Below, Class Counsel set forth their respective experience in the litigation of

25    complex class actions and described the primary litigations teams who presently are working on

26    this case and are expected to continue to work over the following years. We note that Susman

27    Godfrey and Lieff Cabraser currently serve as class counsel in several other AI-related cases. Those

28    cases include *Alter et al. v. OpenAI*, No. 1:23-cv-10211-SHS (S.D.N.Y.) (Dkt. 371), and *Authors*

*Guild et al. v. OpenAI*, No. 1:23-cv-08292-SHS (S.D.N.Y.) (Dkt. 429), in which Justin Nelson of Susman Godfrey was appointed lead counsel on May 30, 2025; *Nazemian et al v. Nvidia*, No. 4:24-cv-01454 (N.D. Cal.); and *In re Mosaic LLM Litigation*, No. 3:24-cv-01451 (N.D. Cal.). Lieff Cabraser also represents plaintiffs and a proposed class in the *Kadrey et al., v. Meta Platforms, Inc.*, No. 3:23-cv-03417, an action pending in the Northern District of California.

            i.    *Lieff Cabraser*

63.    Rachel Geman testifies to the Lieff Cabraser sections.

64.    Lieff Cabraser is a national law firm with offices in San Francisco, New York, Nashville, and Munich, Germany. Lieff Cabraser's practice focuses on complex and class action litigation involving personal injury and mass torts, securities and financial fraud, employment discrimination and unlawful employment practices, product defect, consumer protection, antitrust, environmental and toxic exposures, False Claims Act, digital privacy and data security, and human rights matters. Lieff Cabraser is one of the country's largest law firms devoted exclusively to representing plaintiffs.

65.    Attached hereto as **Exhibit B** is a true and correct copy of Lieff Cabraser's current firm resume, showing some of the firm's experience in complex and class action litigation. Cases with billion-plus dollar recoveries are among those listed here: https://www.lieffcabraser.com/case-center/

66.    Lieff Cabraser's recent experience includes appointments as class counsel and achieving a number of multi-billion recoveries in major, cutting-edge matters where the firm served as lead or co-lead counsel in this District. Lieff Cabraser litigates all cases fully and achieved these recoveries only after appointments as Rule 23(g) class counsel, and significant litigation, pre-trial preparation, and/or trial.

67.    Lieff Cabraser served as co-lead counsel for plaintiffs in a nationwide multidistrict litigation regarding the Juul electronic cigarette. After concluding plaintiffs' case as co-lead trial counsel for the San Francisco Unified School District at trial in April and May 2023, Lieff Cabraser secured over $2.5 billion in settlements for plaintiffs and class members. *In re Juul Labs Mktg. Sales Practices & Prods. Liab. Litig.*, No. 3:19-md-2913-WHO (N.D. Cal.).

68.    As co-lead counsel representing the City of San Francisco, Lieff Cabraser prevailed over Walgreens in a landmark bench trial establishing the pharmacy's substantial liability for the opioid epidemic in San Francisco. *City and County Of San Francisco et al. v. Purdue Pharma L.P. et al.*, No. 3:18-Cv-07591-CRB (N.D. Cal.). Subsequently, Walgreens and the two other major chain pharmacies agreed to settle the national opioids litigation for a combined total of nearly $14 billion.

69.    Lieff Cabraser also obtained multiple, nationwide class action settlements from many of the largest car manufacturers for their unlawful emissions, securing—in the words of District Judge Charles Breyer—"extraordinary results for Class Members and for the public as a whole." *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 15-md-02672-CRB, 2017 WL 1047834, at *2 (N.D. Cal. March 17, 2017) (order granting Lieff Cabraser's attorneys' fees following Lieff Cabraser obtaining a $14.7 billion settlement from Volkswagen).

70.    Lieff Cabraser served as Co-Class Counsel in *In re High-Tech Employee Antitrust Litigation,* No. 11-cv-02509-LHK (N.D. Cal.), an antitrust case on behalf of a broad class of skilled technology workers, alleging that Google, Apple, Intel, Adobe, Pixar, Lucasflim, and Intuit entered into no-poach agreements that restricted the recruiting and hiring of each other's workers. The resulting $435 million recovery is still the largest by a class of employees from private employers ever. The *Daily Journal* described the case as the "most significant antitrust employment case in recent history," noting that it has since been "widely recognized as a legal and public policy breakthrough."[2]

71.    Lieff Cabraser served as Co-Class Counsel in *Gutierrez v. Wells Fargo Bank, N.A.*, No. C07-5923 WHA (N.D. Cal.), a class action before this Court alleging unfair practices and false representations by Wells Fargo in connection with its imposition of overdraft charges. In 2013, the Court reinstated a $203 million class judgment that had been entered in 2010 following a bench trial, and in 2014 the reinstated judgment was affirmed by the Court of Appeals.

---

[2] *See* https://www.dailyjournal.com/articles/293003 (last visited July 26, 2022).

72.     Lieff Cabraser served as co-lead Interim counsel in *In re Google LLC Location History Litigation*, No. 5:18-cv-05062-EJD (N.D. Cal.), representing individuals who alleged that their locations were tracked, and that their location information was stored and used by Google for its own purposes after the consumers disabled a feature that was supposed to prevent Google from storing a record of their locations. In January 2021, the District Court largely upheld plaintiffs' claims on a motion to dismiss. In May 2024, the Court granted final approval to a $62 million settlement.

73.     The *National Law Journal* has recognized Lieff Cabraser as one of the nation's top plaintiffs' law firms for fourteen years, and Lieff Cabraser is a member of its "Plaintiffs' Hot List Hall of Fame," "representing the best qualities of the plaintiffs' bar and demonstrating unusual dedication and creativity." *The National Law Journal* separately recognized Lieff Cabraser as one of the "50 Leading Plaintiffs Firms in America." In 2025 to date, Lieff Cabraser has seen 13 lawyers named to *Lawdragon's* inaugural "500 Leading Global Antitrust & Competition Lawyers" list, seven lawyers named to *Lawdragon's* "500 Leading Lawyers in America" list, two partners recognized in the "Lawdragon 500 Hall of Fame," 24 Lieff Cabraser lawyers as "Leading Plaintiff Financial Lawyers," 22 firm lawyers as "Leading Litigators in America," 33 firm lawyers as "Leading Plaintiff Consumer Lawyers," 14 firm lawyers as "Global Plaintiff Lawyers," and 10 firm lawyers as "Leading Plaintiff Employment & Civil Rights Lawyers." Lieff Cabraser also had 3 lawyers named to *Lawdragon's* 2025 "Lawdragon 500X, The Next Generation" list. Our firm has been named a finalist for *Benchmark Litigation's* "Plaintiff Firm of the Year" and "Labor & Employment Firm of the Year" awards. In addition, *Law360* named Lieff Cabraser as one of its "Practice Groups of the Year" for 2024 for Class Action Law, Cybersecurity and Privacy Law, and Product Liability Law. *The National Law Journal* honored Lieff Cabraser with their 2024 "Elite Trial Lawyers" awards for Employee Rights and Anti-Discrimination. Lieff Cabraser's JUUL injuries case team shared the *Daily Journal's* 2024 "California Lawyer of the Year" award, saw two lawyers named as the *Daily Journal's* "Leading Commercial Litigators" for 2025, and *Law360* named Leiff Cabraser its 2024 "Product Liability Law Practice Group of the Year." I and my partners on this case are listed in some of these above.

74. I, Rachel Geman, am a partner in Lieff Cabraser's New York office with a practice dedicated to class actions and the False Claims Act. I chair the firm's Whistleblower Practice Group. I have served as co-lead or class counsel in a variety of consumer, privacy, employment, and financial fraud class action matters.

75. Among my recent cases and/or cases in this District are (a) *In re Plaid Inc. Privacy Litig.*, No. 4:20-cv-03056 (N.D. Cal.), where I served as court-appointed co-lead class counsel for consumers in a fintech privacy lawsuit that settled for $58 million and practice changes (2021); (b) *Chen-Oster v. Goldman Sachs*, No. 10-6950 (S.D.N.Y.), where Lieff Cabraser served as co-lead counsel and, in 2023, the team I was on obtained a $215 million class settlement, along with programmatic relief, for plaintiffs in a gender discrimination class action lawsuit against Goldman Sachs. The settlement came after over a decade of litigation and shortly before trial. It was the largest pre-trial gender bias settlement in U.S. history; (c) *Doe et al. v. MasterCorp, Inc.*, INDEX No. 1:24-cv-678 (E.D. Va.), where I served as court-appointed co-lead counsel in a representing 200 Colombian workers in settling their forced labor claims (2024); (d) *In Re: Valsartan, Losartan, and Irbesartan Products Liability Litig.*, No. 19-md-2875-RMB (D. N.J.), (e) *Guida v. Gaia, Inc.*, No. 1:22-cv-02350-GPG (D. Colo.) and *Fiorentino v. FloSports, Inc.*, No. 1:22-cv-11502-AK (D. Mass.), where I served as co-lead class counsel in Video Privacy Protection Act cases; (f) *Arevalo v. Bank of Am. Corp.*, No. 10-cv-4959-TEH (N.D. Cal), where I served as co-lead class counsel.

76. In addition to cases where I have represented class representatives and certified classes, I have represented the City of Philadelphia (affirmative civil rights litigation), multiple FCA relators (whose efforts have secured nine figures of recoveries for the government), and individual employees

77. I am an AV-Preeminent rated attorney and have been one of the *Lawdragon's* "Leading 500 Plaintiffs' Lawyers" since 2018, in the categories of consumer (2022-2025), financial (2021-2024), and employment/civil rights (2018-2024). I was selected for inclusion by peers in "The Best Lawyers in America" in the field of "Employment Law – Individuals" for 2012-2025. I am a frequent speaker and writer on topics of complex litigation, as detailed in my firm biography. I was awarded the Distinguished Honor Award by the United States Department of State in 2001.

I have served as the Union and Employee-side Chair of the ABA's Workplace and Occupational Safety & Health Committee and its Equal Employment Opportunity committee. I served as the Amicus Committee Chair of the New York Chapter of the National Employment Lawyers Association. I am also a community dispute resolution pro bono mediator.

78.    Below are the primary additional lawyers who have worked on this file in the time since Class Counsel's previously-submitted declaration.

79.    Lieff Cabraser partner Daniel M. Hutchinson is the chair of the firm's employment practice group. Mr. Hutchinson has served as lead or co-lead counsel on cases that recovered over $800 million for his clients in all variety of industries and across myriad discrimination, unpaid wages, ERISA, consumer protection, and financial fraud cases. Mr. Hutchinson has pursued dozens of consumer privacy class actions against major banks and financial services providers that place robocalls to consumers. His efforts helped result in some of the largest monetary settlements in the history of the Telephone Consumer Protection Act and ended harassing robocalls to millions of consumers. Mr. Hutchinson has been recognized as a nationwide leader in employment law. In 2014, *Law360* acknowledged Mr. Hutchinson as one of six of the nation's top employment lawyers under 40. *The Daily Journal* named him as a "Top 40 Under 40" leading lawyer in California. *The Recorder* endorsed him as one of "50 Lawyers on the Fast Track." Mr. Hutchinson has spoken and presented papers at national employment and consumer law conferences, including events sponsored by the American Bar Association's Section of Labor and Employment Law, the Mason Judicial Education Program, the Practicing Law Institute, the Impact Fund, the UCLA School of Law, the National Employment Lawyers Association, and the Consumer Attorneys of California. Mr. Hutchinson has served as the Board Chair for the Lawyers Committee for Civil Rights.

80.    Lieff Cabraser partner Jallé H. Dafa, based out of the San Francisco office, has extensive experience litigating complex class actions. Ms. Dafa represented professors against Duke University and the University of North Carolina for conspiring to suppress the mobility and pay of their faculty in *Binotti v. Duke University*, No. 1:20-cv-470 (M.D.N.C.) resulting in a settlement for a total of $73.5 million and significant injunctive relief. Ms. Dafa also successfully challenged the Trump Administration's unlawful decision to withhold COVID-19 CARES Act

stimulus relief from incarcerated Americans and their families in *Scholl, et al v. Mnuchin, et al.*, No. 4:20-cv-5309-PJH (N.D. Cal.). The District Court granted summary judgment and entered a permanent injunction ordering the government to terminate its policy, resulting in $1.5 billion in economic impact payments to plaintiffs. Ms. Dafa was involved in the firm's work against Google in *In re Google LLC Location History Litigation*, No. 5:18-cv-05062-EJD (N.D. Cal.), for its collection and tracking of location information despite the disabling of a setting to prevent such tracking, resulting in a settlement of $62 million. Ms. Dafa also served as Class Counsel in a case against Oracle, one of the world's largest data brokers, for surveilling the daily activities of Americans and complying their personal information into digital profiles—including detailed information regarding their everyday movements, finances, demographics, interests, and health concerns—and selling the personal profiles without consent to third parties for profit in *Michael Katz-Lacabe, et al. v. Oracle America Inc.*, No. 3:22-cv-04792 (N.D. Cal.). The District Court granted final approval of a settlement requiring Oracle to pay $115 million and make changes to its business practices; the settlement is on appeal. Ms. Dafa is an active member of the Bay Area legal community, serving as a Board Member of the ACLU Foundation of Northern California (ACLU NorCal), and a member of the Executive Committee of the Litigation Section of The Bar Association of San Francisco. Ms. Dafa clerked on the United States Court of Appeals for the Ninth Circuit for the Honorable Mary M. Schroeder, and the Northern District of California for the Honorable Jacqueline S. Corley. Ms. Dafa earned an A.B. from Brown University, and a J.D. from Berkeley Law School.

81.    Lieff Cabraser associate Jacob Miller is a graduate of Harvard Law School and Harvard College. Prior to joining Lieff Cabraser, Mr. Miller was a law clerk in the United States District Court for the Northern District of California and the Supreme Court of Hawaii. Mr. Miller also practiced as a litigation associate at Kaplan Hecker & Fink LLP.

82.    Lieff Cabraser associate Amelia Haselkorn is a graduate of the University of California, Irvine, School of Law and Pitzer College. Ms. Haselkorn was a Judicial Extern to Justice Steven C. González, Chief Justice of the Washington Supreme Court.

83.    Lieff Cabraser associate Danna Elmasry is a graduate of the University of Michigan Law School and the University of Chicago. Ms. Elmasry was a law clerk in the United States District Court for the Eastern District of New York.

84.    Lieff Cabraser associate Betsy A. Sugar is a graduate of Vanderbilt University Law School. Her work focuses on representing authors against LLM developers in copyright infringement cases. Ms. Sugar graduated *magna cum laude* from Davidson College.

85.    True copies of the Lieff Cabraser attorneys' profiles are attached as **Exhibit C**.

    ii.    *Susman Godfrey*

86.    Justin A. Nelson testifies to the Susman Godfrey sections.

87.    Susman Godfrey's experience in complex litigation, class action cases, and copyright matters will be a substantial benefit to the Classes and the Court. A copy of Susman Godfrey's firm profile is attached as **Exhibit D**.

88.    Susman Godfrey has extensive experience in handling complex class actions and copyright disputes, including some of the largest and most complex cases in the nation, and has demonstrated that it has the ability and resources to handle such cases effectively and efficiently. Since the firm's founding in 1980, Susman Godfrey has served as lead counsel in hundreds of class actions and complex copyright disputes in courts throughout the country.

89.    A sample of Susman Godfrey's complex class action experience includes:

- *Melissa Ferrick, et al. v. Spotify USA Inc., et al.*, No. 1:16-cv-08412-AJN (S.D.N.Y.) (appointed co-lead counsel for settlement purposes and secured a settlement valued at $112 million on behalf of a class of composition owners for claims of nonpayment of royalties for music streaming);

- *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 2:13-cv-05693-PSG-GJS (C.D. Cal.) (appointed co-lead counsel and secured $25.5 million and additional royalties);

- *In re Automotive Parts Antitrust Litigation*, MDL No. 2311 (E.D. Mich.) ($1.2 billion in settlements, the largest indirect purchaser recovery in history);

- *Moehrl, et al., v. National Association of Realtors, et al.*, No. 19-cv-01610 (N.D. Ill.); *Umpa v. National Association of Realtors, et al.*, No. 23-cv-000788-SRB (W.D. Mo.) ($418 million joint settlement on behalf of a nationwide class of home sellers with The National Association of Realtors to resolve claims in four antitrust class actions);

- *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, No. 8:10ML-02151-JVS (C.D. Cal.) ($1.6 billion settlement in economic loss class action where Susman Godfrey participated as co-lead counsel);

- *In re National Football League's "Sunday Ticket" Antitrust Litigation*, No. 2:15-ml-02668-PSG-SK (C.D. Cal.) (appointed co-lead counsel and secured a $4.7 billion pretrebling jury victory finding the NFL conspired and violated antitrust laws through its "Sunday Ticket" offering; the trial court vacated the $4.7B award on a post-trial motion, while leaving untouched the jury's determination that the NFL violated antitrust laws, and proceedings and appeals in the matter are ongoing);

- *In re LIBOR-based Financial Instruments Antitrust Litigation,* No. 11-md-02262 (S.D.N.Y.) (appointed co-lead class counsel and secured $780 million in settlements for plaintiffs who alleged several banks were involved in setting LIBOR and manipulating it to their advantage);

- *In re AXA Equitable Life Insurance Company COI Litigation*, No. 1:16-cv-740 (S.D.N.Y.) (appointed lead counsel, advanced over $4 million in expenses, and secured $307.5 million in nonreversionary cash settlement in insurance breach-of-contract action);

- *37 Besen Parkway, LLC v. John Hancock Life Ins. Co. (U.S.A.)*, No. 15-cv-9924 (S.D.N.Y.) (appointed sole interim class counsel in insurance breach-of-contract action and secured $91.25 million all-cash settlement);

DECLARATION OF RACHEL GEMAN
AND JUSTIN NELSON
CASE NO. 3:24-CV-05417

- • *In Re: TikTok, Inc Consumer Privacy Litigation*, No. 1:20-cv-04699 (N.D. Ill.) (appointed to Steering Committee to represent plaintiffs in a Biometric Information Privacy Act class action MDL against TikTok and its parent company and obtained a $92 million litigation-wide settlement);
- • *White v. NCAA*, No. 07-mc-54 (W.D. Pa.) (appointed co-lead counsel for class of current and former football and basketball players at Division I schools, securing over $200 million in settlements);

90.    Susman Godfrey has successfully led several complex class actions in this District.

91.    For example, as Court-appointed co-lead counsel in *In re Animation Workers Antitrust Litigation*, No. 14-cv-4062 (N.D.Cal.), Susman Godfrey secured more than $168 million in settlements for a class of animation industry employees in this antitrust action against the largest animation companies, including Disney, Pixar, Lucas Films, DreamWorks, and Sony, based on restrictions on their ability to compete against one another for talent.

92.    Likewise, in *In re Telescopes*, No. 5:20-cv-03639-EJD (N.D. Cal.), Susman Godfrey served as interim co-lead counsel (with Lieff Cabraser) representing a putative class of indirect purchasers of amateur telescopes impacted by a conspiracy to fix prices and allocate markets for telescopes sold to consumers in the United States. The parties reached a settlement for $32 million and are seeking court approval.

93.    And in *Rodriguez, et al. v. Google LLC, et al.*, No. 3:20-cv-04688 (N.D. Cal.), Susman Godfrey served as co-lead counsel to a class of millions of plaintiffs who alleged that Google continues to collect users' Internet and application activity even when users turn Google's "Web & App Activity" button off. In 2025, Judge Seeborg rejected Google's bid for summary judgment. The jury trial concluded on September 3, 2025, with an award of approximately $425.7 million issued against Google.

94.    Susman Godfrey—including the lawyers on this team—routinely take cases through verdict. This includes class cases too. As mentioned above, Susman Godfrey served as lead trial counsel in *In re National Football League's "Sunday Ticket" Antitrust Litigation*, which resulted in a $4.7 billion pre-trebling jury verdict and is currently on appeal to the Ninth Circuit after the

District Court entered JMOL in defendants' favor. Similarly, Susman Godfrey won a jury trial for a class of California residential telephone customers who were overcharged millions by AT&T. The Tenth Circuit upheld the verdict. *See In re Universal Service Fund Telephone Billing Practices Litig.*, 619 F.3d 1188 (10th Cir. 2010).

95.     Susman Godfrey's litigation savvy and class action proficiency are reflected in its recognition as the county's leading trial firm. The firm was named "Litigation Boutique of the Year" in 2023 by The *American Lawyer*, "Commercial Litigation Firm of the Year" in 2023 by *Benchmark Litigation*, and among five finalists for "Law Firm of the Year" and "Litigation Boutique of the Year" in 2024 by *Texas Lawyer* (with firms multiple its size). Susman Godfrey has also been consistently recognized across several practice areas in *National Law Journal's* "Elite Trial Lawyers," which profiles firms specifically for their plaintiff work. *Law360* has named Susman Godfrey "Class Action Practice Group of the Year" in three separate years, 2024, 2018, and 2017, cementing its place as a leader in the highly complex practice area, and previously gave it the distinction of "Most Feared Plaintiffs Firm" three years in a row. In 2024 the firm was also named among the few finalists for "Antitrust Firm of the Year," "Technology Firm of the Year" and "Plaintiffs Firm of the Year" by *National Law Journal* and "Law Firm of the Year" and "Litigation Department of the Year - General Commercial Litigation" by *Texas Lawyer*. Dozens of the firm's lawyers are recognized each year as "Super Lawyers" and "Rising Stars" in the states where they practice, and the firm leads *Lawdragon's* list of the country's top 500 lawyers year after year. The firm has also been named the country's leading litigation boutique by *Vault* every year since 2011. Susman Godfrey has over 160 partners and associates nationwide across its four offices, over 95% of whom served in federal judicial clerkships, the vast majority on federal appellate courts, ten of whom clerked on the United States Supreme Court.

96.     I, Justin A. Nelson, am a partner in Susman Godfrey's Houston office and have practiced law for more than twenty years, litigating complex cases in state and federal courts throughout the United States. I have served as an adjunct professor at the University of Texas School of Law. I am a former law clerk to the Honorable Sandra Day O'Conner of the United States

Supreme Court and to the Honorable J. Harvie Wilkinson III of the United States Court of Appeals for the Fourth Circuit.

97.    In 2023, I represented Dominion Voting Systems against Fox News in helping secure the landmark $787.5 million settlement arising from the latter's defamatory news coverage claiming that Dominion's voting machines were responsible for massive voter fraud during the 2020 U.S. presidential election. The settlement is believed to be the largest defamation settlement in history. The Court in *Dominion v. Fox* publicly noted that "this is the best lawyering I've had, ever."

98.    I routinely represent clients in high-stakes and complex litigation, including helping secure a nine-figure settlement against a large rental car company for a group of people who alleged they had been falsely arrested—a set of cases that spanned multiple courts and jurisdictions, including bankruptcy court. I am also a leader in AI litigation, serving as an American Law Institute panel member on Civil Liability for Artificial Intelligence. In 2024, I was nominated for "Litigator of the Year" by the *American Lawyer*. Among other awards, I have been named as one of the "500 Leading Lawyers", "500 Leading Plaintiff Financial Lawyer" and "500 Leading Litigator" in America by *Lawdragon*; one of the few litigators on *The Hollywood Reporter*'s list of "Hollywood's Top 100 Attorneys," and also been repeatedly recognized as *American Lawyer*'s "Litigator of the Week" and a *Benchmark Litigation*, "Litigation Star." I was recently named one of *Forbes'* "America's Top 250 Lawyers." On May 30, 2025, the *OpenAI* MDL court in the Southern District of New York appointed me as interim lead class counsel in a case with similar allegations as this case. *See* No. 1:25-md-03143-SHS-OTW *In Re: OpenAI, Inc. Copyright Infringement Litigation*, Dkt. 83.

99.    Susman Godfrey partner Rohit D. Nath has extensive experience litigating class actions, including those involving allegations of breach of contract and royalty disputes. He served as co-lead counsel, alongside a team of Susman Godfrey lawyers, in the *AXA COI* ($307.5 million settlement) and *37 Besen* ($91.25 million settlement) matters discussed above. He has been recognized as one of the best young lawyers in America by *Lawdragon* and *Bloomberg Law*. He was also named one of the "California Lawyer Attorneys of the Year" by *Daily Journal* for his

successful defense of COVID-19 eviction-protection measures against constitutional challenges. Mr. Nath joined Susman Godfrey after clerking for Judge Alex Kozinski on the United States Court of Appeals for the Ninth Circuit and serving as editor-in-chief of the *University of Chicago Law Review*.

100.    Susman Godfrey partner Alejandra C. Salinas is an experienced trial lawyer who has litigated complex cases in state and federal courts throughout the United States. She has amassed an impressive collection of litigation victories and favorable settlements for clients who vary from Fortune 500 industry leaders to a class of indigent detainees, including a recent $37.5 million jury verdict. She successfully represented indirect purchasers in a class action settlement against telescope manufacturers and distributors. She has been recognized as one of the best young lawyers in America by *Lawdragon*, a "Texas Rising Star" by *Thomas Reuters Super Lawyer*, and a "Top Women in Law in Houston" by the National Diversity Council.

101.    Susman Godfrey partner Jordan Connors has served clients in high-stakes matters in both state and federal court. Connors served as counsel to the largest political subdivisions in the largest state in the nation—including the University of California system, the California State University System, and the County of Los Angeles—in a landmark suit against the "Big 4" wireless carriers, Verizon, AT&T, Sprint, and T-Mobile for fraudulently over-billing the government. Connors' clients secured record settlements valued at $175 million. And in the nationally followed environmental matter, *In re Flint Water Crisis Litigation*, Connors represents a class of tens of thousands of Flint residents impacted by the Flint water crisis, for whom he secured a $641 million settlement with multiple government defendants. Connors has been recognized by *Law & Politics Magazine* as a "Rising Star" every year since 2013, an honor bestowed on 2.5 percent of attorneys in the state of Washington for "demonstrated excellence in the practice of law."

102.    Susman Godfrey partner Michael Adamson represents plaintiffs and defendants in arbitrations and federal and state courts across the country. He has been recognized by *Daily Journal* as a "Top 40 Lawyer Under 40" (2022), by *Law.com* as a "Lawyer on the Fast Track" (2025), and by *National Law Journal* as a "Plaintiff's Attorney Trailblazer" (2023). In 2023, he secured more than $330 million in a confidential arbitration pertaining to the renewable

energy industry. He also represents a putative class of disabled students and their families alleging systemic constitutional violations, as well as violations of the Individuals with Disabilities Education Act, seeking injunctive relief in the form of widespread reform to the educational system afforded to disabled students in Virginia. Mr. Adamson joined Susman Godfrey after clerking for Judge Gerald Tjoflat on the U.S. Court of Appeals for the Eleventh Circuit.

103.    Susman Godfrey associate J. Craig Smyser has represented plaintiffs and defendants in all types of high stakes commercial litigation. Mr. Smyser joined Susman Godfrey after clerking for the Honorable Debra Ann Livingston of the United States Court of Appeals for the Second Circuit and for the Honorable Christopher R. Cooper of the United States District Court for the District of Columbia.

104.    Susman Godfrey associate Samir Doshi has litigated complex cases throughout the United States. He is a former law clerk to Chief Justice John G. Roberts, Jr., of the United States Supreme Court; the Honorable Raymond J. Lohier, Jr., of the United States Court of Appeals for the Second Circuit; and Judge Randolph D. Moss of the United States District Court for the District of Columbia. He also served as a Bristow Fellow in the Office of the Solicitor General in the United States Department of Justice. He represents the class plaintiffs in *In re National Football League's "Sunday Ticket" Antitrust Litigation*, No. 2:15-ml-02668-PSG-SK (C.D. Cal.), which resulted in a $4.7 billion pre-trebling jury damages award, now on appeal to the Ninth Circuit after the District Court's grant of JMOL in defendants' favor. In 2024, Mr. Doshi represented Dutch telecommunications company Koninklijke KPN N.V., which received a $341 million jury damages award in a breach of contract dispute against Samsung Electronics Co. In 2024–2025, Mr. Doshi represented Everly Health in an arbitration for breach of contract and violations of the Lanham Act, which resulted in an arbitral award to Everly for $987 million, later confirmed by the United States District Court for the District of Delaware at over $1.03 billion. Mr. Doshi has been named a "Rising Star of the Plaintiffs' Bar" by the *National Law Journal* and features in the 2026 edition of "Best Lawyers: Ones to Watch in America" in the commercial litigation category.

105.    True copies of the Susman Godfrey attorneys' profiles are attached as **Exhibit E**.

***

DECLARATION OF RACHEL GEMAN
AND JUSTIN NELSON
CASE NO. 3:24-CV-05417

106.    I, Justin A. Nelson, declare under penalty of perjury under the laws of the United States and the State of Texas that the foregoing is true and correct to the best of my knowledge and that this declaration was executed in Austin, Texas on September 5, 2025.

107.    I, Rachel Geman, declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct to the best of my knowledge and that this declaration was executed in New York, New York on September 5, 2025.

Respectfully submitted,

Rachel Geman (*Pro Hac Vice*)

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

*Co-Lead Class Counsel.*

Justin A. Nelson (*Pro Hac Vice*)

**SUSMAN GODFREY L.L.P.**

*Co-Lead Class Counsel*

- 32 -