United States District Court
Northern District of California

1
2
3
4

UNITED STATES DISTRICT COURT

5
6

NORTHERN DISTRICT OF CALIFORNIA

7
8
9
10

ANDREA BARTZ and KIRK WALLACE
JOHNSON, individually, and ANDREA
BARTZ, INC., CHARLES GRAEBER, and
MJ + KJ, INC., individually and as
representatives of the class,

No.   C 24-05417 WHA

11

                    Plaintiffs,

**FURTHER QUESTIONS FOR
PRELIMINARY APPROVAL
HEARING ON SEPTEMBER 25**

12

           v.

13

ANTHROPIC PBC,

14

                    Defendant.

15

16        By **NOON ON SEPTEMBER 23, 2025**, both sides shall provide complete and succinct

17   written answers as to how the following scenarios will be handled or issues addressed under

18   the settlement.  If the answer turns on facts not given, identify those facts and the alternative

19   outcomes.  If the parties disagree, identify the disagreement.  If solved by anything proposed in

20   fresh filings, cite the change by chapter and verse.  Cite the provisions in the Settlement

21   Agreement and long-form notice that track your answers.  Do this for both sets of questions.[*]

22        18.      If someone submits a claim, can they later opt out?

23        19.      Assume a writer, an employer of writers, an old publisher, and a new publisher

24   each submit a claim for the same work, making incompatible ownership claims.  When and

25   how is each notified of the others' claims (if at all), and what is the proposed process for

26   resolving the dispute (if any), including by facilitating collateral resolutions in state court?

27

28   [*]  Here, bare citations to paragraphs are to the Settlement Agreement (Dkt. No. 362-3) and ones to
     questions ("Q.") are to those answered in the long-form notice (Dkt. No. 363-13 Exh. B).

20.     If the Settlement Administrator becomes aware by way of a "read receipt" that an emailed notice or other email was delivered but not opened, such as might happen where an email was auto-sorted by the recipient's email service into a spam folder, what is the Settlement Administrator required to do by way of follow-up?

21.     If the Settlement Administrator is aware that all individualized notice efforts to a given copyright owner have failed, does the copyright owner remain bound to the settlement?

22.     Some works on the Works List are not on the Class List. And, many listed on the Class List are missing addresses. How will this be cured, and cured timely?

23.     Please explain whatever methods, data, and application of methods to data support the assertions that planned general notice will actually reach 70 to 95 percent of class members or more (*e.g.*, Supp. Br. Keough ¶¶ 27, 98; *cf. id.* ¶¶ 60, 87 (quantitative thresholds)).

24.     The Settlement Agreement provides that the Settlement Administrator will maintain an email address, a P.O. Box, and a phone line "to answer Class Member inquiries" (¶ 4.4). But the proposed long-form notice contains *no* email address and *nine* various mailing addresses (QQ. 14–15, 17). How will the Settlement Administrator and Class Counsel ensure that answers provided are consistent and information reconciled across these channels?

25.     The district judge had expected that for any given work the allocation of an award would be based on the documentation between the author and the publisher of that work (in almost all cases). For some works, such documentation would show the publisher is the legal copyright owner of the exclusive right to make copies, the author is the beneficial owner, and that they agree to split proceeds from infringement actions evenly. For other works, documentation might show they split proceeds differently. For still others, documentation might show that only the author or only the publisher is an owner with any entitlement to bring suit. But, in all cases, the district judge expected the allocation to be based on individual documentation on a work-by-work basis. The appearance in this case of the Authors Guild, the Association of American Publishers, and the various law firms causes the district judge to suspect that some kind of global allocation is going to be proposed regardless of the merits of any individual case. For example, the Authors Guild and the AAP might "agree" to a global

50/50 split between authors and publishers.  But would it be right and fair to do so with respect to an author whose paperwork clearly shows the author is entitled to all proceeds?  If a global settlement within a class settlement is what class counsel have in mind, then the district judge will have concern.  Please explain the *exact* and full role of the Authors Guild, the Association of American Publishers, and each of the new law firms.

26.     Is anyone compensating any law firm or lawyer involved for work in this action (other than for defense) or does anyone expect to do so?  Explain fully.

27.     The district judge also is concerned that the re-inclusion provision will invite gamesmanship and corruption.  A publisher or an author might conclude their best strategy is to opt out in the first round.  This way, they can see how the claims process unfolds and how much they stand to receive (i.e., from any pro rata share of unclaimed funds on top of their share of $3,000 per work, less fees and expenses).  And, they may demand a side deal to re-include themselves to avoid the abort clause.  The district judge believes the traditional one-chance method is better, namely, that a class member may opt out by the deadline but if they do so they are excluded forever.  Isn't that best?

28.     The Agreement provides that defendant will delete copies derived from LibGen and PiLiMi and will validate that this is accomplished by "written certification" (¶ 2.2).  Previously, Anthropic attested that it could not possibly account for all the copies that had been made from those derived from the copies taken from LibGen and PiLiMi.  Now, it can certify the opposite (*ibid.*; Q. 11).  Please explain this discrepancy and how class members can be satisfied that this permanent injunctive relief has been accomplished.

29.     The proposed notice nowhere cites or describes the "Effective Date" (*cf.* ¶¶ 1.15, 9.3).  This and other features of the notice may mislead class members into believing that as soon as Anthropic pays the Settlement Fund, the Settlement Fund will pay them.

30.     The notice tells class members to visit a website for the full scope of their release (Q. 13).  The long-form notice must state everything to be released, clearly and completely.

31.     The Settlement Agreement provides that "[a]lthough the Release is not intended to be a general release, to the extent it could be construed as narrowing the scope of the

3

Release, [class members] expressly waive any rights or benefits available to them under the provisions of Section 1542 of the California Civil Code or any similar law" (¶ 3.2).  Give us an example or examples of claims that would be released by the Section 1542 language that would not be released by the Released Claims language itself (¶ 1.29).

32.    The proposed notice states that class members will be bound by the Court's prior orders unless they opt out and that in light of past orders and future prospects the proposed settlement is "fair, reasonable, adequate, and in the best interest of the class" (Q. 4; *see* Q. 12). It does not describe any of the past orders.  Nor does it state, for instance, the range of possible jury results from $0 to $150,000 per work — nor why named plaintiffs believe $3,000 is fair and reasonable once the risks and costs of litigation are factored in (or other benchmarks). Something like the following could and should be included:

> This class action settlement arises out of a lawsuit brought by various authors against Anthropic PBC alleging that Anthropic PBC violated the Copyright Act by downloading millions of copyrighted works from online pirate libraries entitled Library Genesis (LibGen) and Pirate Library Mirror (PiLiMi).  Anthropic denies that any such downloading was a violation of the Copyright Act and contends instead that any such downloading was a fair use under the Copyright Act because of the books' potential use to train large language models (LLMs) for artificial intelligence.
>
> From 2021 to 2025, Anthropic attempted to assemble a central library of millions of copyrighted works and in part did so by downloading books from two pirate libraries, LibGen and PiLiMi. Some of these books were later used to train LLMs by Anthropic and others were not.  Nevertheless, the central library was kept intact.
>
> This downloading allegedly violated Section 106(1) of the Copyright Act.  This section gives a copyright's owner the exclusive right to reproduce copies, or to license or transfer that right to others.  A company that copies a work without permission infringes that right unless it can show the copying was for a fair use.  The Copyright Act provides for statutory damages (like fines payable to the copyright owner) of between $200 and $150,000 per work, depending on factors including whether the copier reasonably believed its use was fair or instead copied willfully.  If the use was fair (or there was no copying), the alleged copier owes $0.
>
> Three individual authors began this action seeking statutory damages for the copying of their own books.
>
> In June 2025, the district judge ruled that reproductions of their

United States District Court
Northern District of California

1   books specifically in the process of training LLMs was a fair use
2   and therefore not a violation of the Copyright Act.  However, he
    also ruled that downloading millions of books (theirs included)
    from pirate libraries and assembling them in a central library was
3   not a fair use, at least not on the record at the time.  This left the
    issue to be resolved at trial, potentially in Anthropic's favor.

4   These authors, however, also brought this action seeking to
5   represent a class of copyright owners.

6   Note that, except in the case of a work for hire (like when someone
    hires an author to write a book for them), the author of a work
7   starts out with the exclusive right to reproduce the work.
    However, the author often licenses or transfers the exclusive right
8   to reproduce the work to a publisher.  Where the author does so in
    exchange for royalties, the author becomes the beneficial owner of
9   that right, while the publisher becomes the legal owner of that
    right.

10  In July 2025, the district judge ruled that the individual plaintiffs
11  (or their associated legal entities) could represent all beneficial and
    legal copyright owners of the exclusive right to reproduce copies
12  of the books in question.  This order was, however, conditional on
    further steps being taken.

13  That same month, Anthropic sought review of both orders by an
14  appeals court.  In particular, if the class certification order were
    heard by the appeals court and then decided in Anthropic's favor, a
15  probable result would be that the class would be de-certified —
    eliminating the chance for anyone but the three authors to recover
16  through this one action.  And, even if neither review were decided
    in Anthropic's favor, plaintiffs and class would need to prevail at
17  trial and then on probable appeals from the trial decisions.

18  Trial was set to begin in December 2025.  All evidence-gathering
    was set to end in August 2025.  What evidence was protectable by
19  assertions of attorney-client privilege was about to be decided.  So
    were threshold decisions as to whether an appellate court would
20  review the above orders (or not).

21  The parties agreed to settle.  If the case had proceeded, it is
    possible the class could have been de-certified even before trial,
22  receiving nothing.  If the case had gone to trial, it is possible the
    class could have lost on the issue of fair use, again receiving
23  nothing.  Even if the class could have prevailed at trial and later on
    likely appeals, a jury might have awarded a wide range of
24  amounts, to be paid only after the added expense and delay of the
    trial and its likely appeals.

25  The resulting settlement is the largest copyright class action
26  settlement in history.  It provides at least $3,000 per *work* (not per
    copyright owner), less costs and fees.

27  The exact text above is not mandatory but suggestive of what the parties should agree to

28  provide.

5

33.     Why don't the parties stipulate that any work on the "Works List" already meets all work-related requirements for purposes of this settlement (i.e., has an ISBN or ASIN, was registered with the U.S. Copyright Office within five years of first publication *and* either within three months of first publication or else before August 10, 2022, and was in LibGen or PiLiMi as deemed downloaded by Anthropic on August 10, 2022)?  The parties would then leave only owner-related requirements to be established by class members (i.e., is she a legal or beneficial owner of the right to reproduce that work, and not among the personnel of the district court, federal agencies, or Anthropic?).  The long-form notice and claim forms could be simplified in step (even if the notice still somewhere sets out the entirety of the class definition while stating that to ease settlement all agreed that elements were met for works on the Works List where proof ordinarily would be needed).

34.     The district judge has noticed that there are many inconsistencies between the proposed notice and the Settlement Agreement.  Please check in particular that there are no contradictions or omissions in the notice that could compromise a class member's rights.  And, with respect to all your answers to all these questions for our hearing, please check that your new representations here are reflected exactly in the proposed class notice and Agreement.  If anything further must be corrected that has not been corrected by the parties, please identify it.

These questions do not necessarily identify *all* issues that could bar approval — nor even all instances where one of the above issues comes up.

*          *          *

Also by **NOON ON SEPTEMBER 23**, both sides shall file:

**(i)** the proposed (revised) long-form notice to the class;

**(ii)** the Claim Form as it would appear in paper form; and,

**(iii)** any amendments to the Settlement Agreement.

**IT IS SO ORDERED.**

Dated:  September 16, 2025.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE