UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, and MJ + KJ, INC., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 3:24-cv-05417-WHA<br><br>DECLARATION OF JULIE A. HENNRIKUS, MARGARET LYNN MORRISON, TARA TAYLOR QUINN, MARY E. RASENBERGER, JACKI RENÉE, AND KATE RISTAU |

**DECLARATION OF NOT-FOR-PROFIT AUTHOR ORGANIZATIONS**

Pursuant to 28 U.S.C. § 1746, we, Julie A. Hennrikus, Margaret Lynn Morrison, Tara Taylor Quinn, Mary E. Rasenberger, Jacki Renée, and Kate Ristau, declare as follows:

**Novelists, Inc. (NINC)**

1. My name is Margaret Lynn Morrison. I am over twenty-one (21) years of age and am fully competent to testify to the matters contained herein. I am a member of NINC, and a board appointed representative to coalitions organized by the Authors Guild. NINC is a U.S.-based nonprofit organization which focuses on networking, education, and advocacy for professional authors of book-length fiction. NINC is unique in being the only organization for multi-published novelists across all genres and subgenres of fiction. I make the following statements based on my personal knowledge.

**Romance Writers of America, Inc. (RWA)**

2. My name is Jacki Renée. I am over twenty-one (21) years of age and am fully competent to testify to the matters contained herein. I am the President of Romance Writers of America, Inc., and I supervise the affairs of the organization. I make the following statements based on my personal knowledge. Romance Writers of America® (RWA) is a nonprofit trade association whose mission is to advance the professional and common business interests of career-focused romance writers through networking and advocacy and by increasing public awareness of the romance genre. We are part of a coalition of similar organizations convened by the Authors Guild, which strengthens our advocacy efforts.

3. My name is Tara Taylor Quinn. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. I am a 30-plus year member of Romance Writers of America and a board appointed representative to coalitions convened by the Author's Guild. I make the following statements based on my personal knowledge. I have attended pertinent sessions with Class Counsel regarding the details of the settlement.

**Science Fiction & Fantasy Writers of America (SFWA)**

4. My name is Kate Ristau. I am over twenty-one (21) years of age and am fully competent to testify to the matters contained herein. I am the President of the Science Fiction & Fantasy Writers of America (SFWA) and a representative to coalitions organized by the Authors Guild. SFWA, which is a national 501(c)(3) nonprofit organization representing approximately 2,500 authors of science fiction, fantasy, and related genres, participates in coalitions with the Authors Guild. I make the following statements based on my personal knowledge.

5. SFWA was founded by author Damon Knight in 1965 with the primary goal of helping authors deal with the business aspects of writing science fiction and fantasy, and over the

years it has broadened its purposes to include promoting the genres. Our members include both traditional published and self-published authors, as well as hybrid writers who do both. SFWA provides information to writers in general such as the highly regarded Writer Beware®, which warns writers about the numerous scams that target writers with fraudulent offers. SFWA presents the prestigious annual Nebula Awards for the best writing in the genres across a wide variety of formats. Largely volunteer-run committees, such as its Contracts Committee, provide members and non-members with model contracts, free contract reviews, and many other educational services for authors. Because of this, we are well-versed in the ins-and-outs of both short fiction and novel contracts and can testify about the types and variations among the contracts and standards in the branches of the industry that serve our genres.

6. In addition to serving its members directly, SFWA has broad outreach to other writers, especially newer writers, to familiarize them with the publishing practices of the industry, copyright, and writing excellence. Science fiction writers are especially knowledgeable about the threat and promise of artificial intelligence and other aspects of the future.

7. SFWA considers informing its members a core priority of SFWA's service to writers, and all writers are kept quickly informed about of the progress and details of this lawsuit. SFWA provides members and other writers with ancillary information through its website, sfwa.org; its blog, Planetside; and Writer Beware®. We have provided a complete list of contact information for current and past SFWA members to Class Counsel on a confidential basis pursuant to a subpoena SFWA received to facilitate members with qualifying books to receive the information they need to participate in the settlement or opt out.

8. Because one of SFWA's purposes is promoting the best science fiction and fantasy writing, since 1966 it has published a series of Nebula Award related anthologies and, as a result,

the organization holds copyrights on works that may qualify for the Class and so, may be a claimant for them. Irrespective of this, our members and their publishers stand to receive important consideration and we support the settlement.

**Sisters in Crime (SinC)**

9. My name is Julie A. Hennrikus, Executive Director of Sisters in Crime (SinC), a 501(c)(6) nonprofit. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein.

10. SinC was founded in 1986 as an advocacy organization for women crime writers. Our mission, "to promote the ongoing advancement, recognition and professional development of women crime writers," has been expanded in recent years to include other marginalized writers. We support our 4000+ members by providing craft and business webinars, rich online resources, a robust online community, and advocacy for the entire genre. Our members include authors at all stages of their writing journey as well as other advocates for the community (librarians, booksellers, readers, agents, etc.). We communicate with our members via a weekly newsletter and social media. We also have 50+ chapters worldwide. We are part of a group of similar organizations convened by the Authors Guild, which strengthens our advocacy efforts. I make the following statements based on my personal knowledge.

**The Authors Guild (Guild)**

11. My name is Mary E. Rasenberger. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. I make the following statements based on my personal knowledge.

12. I am the Chief Executive Officer ("CEO") of the Authors Guild, Inc. (the "Authors Guild" or "Guild") and our charitable and educational arm, the Authors Guild Foundation. I have held this position since 2014, when I joined the Guild (my title changed from Executive Director

to CEO in 2020). Founded in 1912, the Guild is the oldest and largest author association in the country, made up of over 16,000 professional, published writers. We are a national non-profit association that represents the interests of authors and journalists from every genre, including historians, biographers, academicians, novelists, journalists, textbook writers, children's book writers, and other writers of non-fiction and fiction. The members include thousands of textbook authors and academic authors, as well as over ten thousand authors who write books for the commercial marketplace, often referred to in the industry as "trade books." Our members include authors who publish through traditional publishers and who self-publish, from bestsellers to emerging writers.

13. Through the Foundation, the Guild informs and educates authors about the business aspects of writing, and it advocates, litigates, and lobbies on behalf of all authors to promote the rights and professional interests of authors in general, including in areas of copyright, freedom of expression, and fair pay. Many Guild members earn their livelihoods through their writing. The Guild's members routinely advocate for their rights under copyright law to ensure that they can continue to reap financial benefits from their labor.

14. Guild members have free access to our legal services team, a group of renowned publishing contract experts that provides contract reviews and interpretations and assistance resolving payment disputes with publishers, among other services. Over the last five years, the Guild has closely reviewed and provided comments on approximately 2,500 publishing contracts. This includes contracts with trade presses, university presses, educational publishers, and hybrid publishers (which combine aspects of traditional publishing and self-publishing), as well as service agreements for self-published authors. As a result, the Guild is intimately familiar with publishing

5

contract trends, including industry-standard splits, contractual rights reversions to authors, and standard terminology both across the industry and within specific market sectors.

15. Beyond directly representing its 16,000-plus members, the Guild's reach extends to many tens of thousands of other professional authors across all genres through coalitions with other author and creator groups. We convene with these groups on a monthly basis and consult with them regularly about partnerships with advocacy organizations, public programs, and the Guild's newsletter and social media outreach. The Guild regularly consults with these groups about the contractual trends in their industries.

16. The Guild is monitoring and participating closely in developments related to artificial intelligence and is also serving as a plaintiff in copyright litigation against OpenAI and Microsoft. We are keeping authors apprised of the progress of this lawsuit through our website and our bi-weekly newsletter.

17. With regard to this litigation against Anthropic, the Guild is committed to assist in ensuring that all authors on the Class List are promptly informed of the lawsuit and receive prompt court-approved notice, and has provided its full list of current and former members – with contact information – on a confidential basis to Class Counsel pursuant to a subpoena it received.

18. Aside from keeping authors informed about this lawsuit and helping to collect contact information, the Guild's involvement in the lawsuit has been limited to helping advise Class Counsel on contract norms among different types of publishers and providing sample contracts for them to review. We have also provided advice on standard industry terminology and other norms, as well as bespoke copyright issues in the publishing industry. Our advice was informed by input we received from at least a half dozen organizations that represent authors in specific genres, many of which participated in calls with Class Counsel. We also invited other

author groups to participate in calls with Class Counsel and several did, despite extremely short notice. We are grateful to these organizations for their time and insights.

19. The Authors Guild has a policy of complete transparency, and we encourage input and feedback from members and other authors. Our not-for-profit mission is to defend the profession as a whole, so we ensure that we have our ear to the ground and are hearing from all types of authors. We regularly remind authors to contact us at our general staff email inbox and receive approximately 400 queries and comments there every week; and we devote a full-time staff person to oversee that inbox, ensure that emails are answered and direct emails to the appropriate person on staff to answer. We regularly survey members and other authors about issues, we monitor our online members' forum to hear their concerns, and the Authors Guild's Council of members and the board members of the Authors Guild Foundation, which includes 55 authors, serve as ambassadors to other authors and regularly bring concerns and new issues to the staff's attention. As noted above, we also work closely with other author groups though the several coalitions that we convene. To be clear, our strategies and decisions are guided by all of the input and feedback we receive from authors.

**Joint Statements**

20. We are, individually and collectively, representatives of large, national author organizations. Neither we nor the organizations we serve are receiving any direct benefits from the settlement (except to the extent we may be legal or beneficial owners of the reproduction right in class works), our members and their publishers stand to receive important consideration, and we support the settlement.

21. Each of us is willing and eager to disseminate any approved Class notice to our members and to direct members to the Settlement website or to Class Counsel.

22. Each of us is willing to help Class members fill out claims, and willing to spend the time to collect recurring questions about the Settlement (if any) and convey them to Class Counsel.

23. Each of us, directly or indirectly, assisted in the process of educating Class Counsel about standard contract terms, thus facilitating the creation of a fair, reasonable, and adequate proposed plan of distribution.

24. Our goal is to make the claims process as efficient as possible and to encourage as many authors whose works are on the Works List as we can to file claims and to do so accurately. With this goal in mind, we have advised Class Counsel of the following:

25. First, based on our experience, if authors are forced to submit a joint claim form with current publishers and other authors, many will not participate because they will not have publisher or other author contact information, making it too difficult for them to find and connect with them to file a claim together. Particularly for older, out-of-print books, it would be difficult for authors to investigate who at the current or former publishing houses they would need to reach out to or to find any other authors' heirs – and then have to negotiate a single form. In recent decades, many publishers have gone out of business or merged with other publishing companies, and especially for out-of-print books, the authors or their heirs do not know if there is a publisher that still owns the legal rights or who it is. In such instances, it would put a difficult and in some cases impossible burden on the author to have to find the current legal owner of the rights, or even other authors of the title, who they may have long lost touch with or may have died.

26. Instead, each author should be able to submit a single claim form on their own, and if eligible, receive their share of the title's payment. We have reviewed class counsel's proposed claim form, which allows authors to submit their own claim forms, and we agree with this approach. We understand the settlement administrator may combine the claims for each title into

one overall form on the backend. We support this process as it will encourage authors to participate in the settlement.

27. Unfortunately, the overwhelming majority of authors earn little income from their writings and have to balance several jobs to supplement their income. Our 2023 survey of authors, with over 5,700 authors completing the survey and 24 author groups participating, found that full-time authors earn a mean of only $10,000 from their books and $20,000 from all writing related work; and part-time authors much less. *See Key Takeaways from the Authors Guild's 2023 Author Income Survey*, Authors Guild (Sept. 27, 2023), available at: https://authorsguild.org/news/key-takeaways-from-2023-author-income-survey/. In addition to juggling 2 or 3 jobs, all but the top bestsellers conduct much of their own marketing. That leaves little time for investigating who other rights holders might be and to reach out to them in time to file a claim, and only very few can afford lawyers.

28. Second, we support having default splits for authors and publishers to choose, as outlined in the proposed claim form, as they reflect contract norms and avoid authors and publishers having to come together to agree on the correct split. Many authors will feel they have to hire a lawyer to help them interpret the contract and negotiate if the contract is not 100% clear. This will put authors at a disadvantage. While the vast majority of trade contracts and many university/scholarly contracts that we reviewed have splits of 50/50, where publishers and authors cooperate in bringing an infringement litigation, many other contracts, including most textbook contracts, are silent, on specifically as to how infringement litigation proceeds are to be split such that other terms in the contract need to be analyzed to understand what the split should be.

29. Third, for the same reason, referring disputes to a court, state or federal, would risk unjust results because that is not a realistic option for authors. As stated above, there are few

9

authors who can afford legal fees, much less the time that would involve, and even if they could, legal fees would far exceed the award. Disputes that cannot be resolved by the parties should be referred to a special master that is appointed by the Court and paid from the Settlement Fund.

30.  Fourth, the claim form appropriately makes it easy for authors to indicate if their copyright ownership has reverted back to them. A reversion can occur in numerous scenarios. For example, most trade publishing agreements, many university press agreements, and some educational/textbook agreements have provisions that allow for licensed or assigned rights to be reverted to the author after the book goes "out of print." In that sense an "assignment" in a publishing agreement is different than in many other contexts, because it is not final or irreversible, should the book go out of print or the publisher materially breach the contract or go out of business. These out-of-print clauses have a variety of language relating to the mechanics of the request, but in essence, all describe a situation where the author can request that any rights be reverted when a book is no longer actively being distributed and sold by the publisher. Some contracts allow the publisher to bring the book back "into print" in a set number of months (commonly 6 months) and if they do not, then the rights revert to the author.

31.  We also note that some contracts with smaller publishers who may be part of the Class have terms for less than the life of the copyright and terminate automatically after a set number of years (often 5-7), and we want to make sure that there is a place on the form for those authors to indicate if the grant has terminated. Contracts may also be terminated either due to a mutual agreement by the author and publisher or in cases where the publisher breached the contract and the author has recovered rights. The Guild has assisted many authors in terminating contracts because of a publisher's breach as well as with reversions.

32. Moreover, an increasing number of books published today that have significant sales (and are likely to have been downloaded by Anthropic) are self-published by the author and never had an outside publisher other than the author's own imprint. These authors also need a simple and clear way to indicate that they should receive 100% of the settlement income on the claim form. In some cases, authors use distribution and other publishing services that take only a non-exclusive license, and there too, the author is the sole owner of the reproduction rights and should receive 100% of the proceeds. Each of these alternative arrangements or circumstances where the author is the sole owner is becoming more common in the industry and needs to be acknowledged on the form and in the allocation process.

I, Julie A. Hennrikus, hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

I, Margaret Lynn Morrison, hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

I, Tara Taylor Quinn, hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

I, Mary E. Rasenberger, hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

I, Jacki Renée, hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

I, Kate Ristau, hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on September 22, 2025

                                                                             */s/ Julie A. Hennrikus*  
                                                                             Julie A. Hennrikus

                                                                             */s/ Margaret Lynn Morrison*  
                                                                             Margaret Lynn Morrison

                                                                             */s/ Tara Taylor Quinn*  
                                                                             Tara Taylor Quinn

                                                                             */s/ Mary E. Rasenberger*  
                                                                             Mary E. Rasenberger

                                                                             */s/ Jacki Renée*  
                                                                             Jacki Renee

                                                                             */s/ Kate Ristau*  
                                                                             Kate Ristau