UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, and MJ + KJ, INC., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 3:24-cv-05417-WHA |

**DECLARATION OF MARIA A. PALLANTE IN SUPPORT OF SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

Pursuant to 28 U.S.C. § 1746, I, Maria A. Pallante, declare as follows:

1.     I am the President and Chief Executive Officer of the Association of American Publishers, Inc. ("AAP"), a role I have held since January 2017. I submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Settlement based on my personal knowledge and information learned through my role at AAP.

2.     Consistent with its role as the law and policy association for the U.S. publishing industry, AAP has a duty to understand and widely share ongoing developments in the case with its member companies and sister associations. AAP also seeks to assist Class Counsel and Publishers' Coordination Counsel ("PCC") on questions raised by copyright owners and the Court regarding the litigation generally and the proposed Settlement specifically, including as to industry norms regarding enforcement actions and division of litigation proceeds, as discussed below. AAP's staff are not counsel in this litigation and are not receiving remuneration from it.

3. Out of respect for the Court and a willingness to be of service, I took a last-minute flight to attend the hearing on September 8, 2025 on the Court's recommendation. I was therefore present in the courtroom when the Court expressed concern that AAP might be negotiating with the Authors Guild behind the scenes, suggesting an improper role in the case that does not exist. To be clear, AAP has no secret involvement in negotiating the proposed settlement and was not in the room when those negotiations occurred. Rather, AAP has provided informational support to class members in its expert judgment, as well as to Class Counsel and PCC, in keeping with its industry role. To confirm for the Court, I was invited by Class Counsel and PCC to contribute to a working group convened under the auspices of the mediator, which involved sharing my expertise with Class Counsel and PCC and remaining available to them. Overall, in speaking with counsel and stakeholders alike on a variety of legal and factual questions over many weeks, I found the discussions to be important, insightful, respectful, and productive as to all Class Members, and I am pleased to support the recommendations in Plaintiffs' Motion.

4. As explained below, AAP and publishers have worked tirelessly to support counsel in this case, to provide information to class members, to stay apprised of author perspectives, to identify and verify books that meet the Court's Class definition, and to ensure the proposed allocation plan and claims process are fair, reasonable, and adequately reflect class members' interests. AAP's mission is to promote the rule of law and public good. We are a not-for-profit organization that supports creators and innovators, prioritizes books and reading as democratic speech, fights censorship, and advocates for a modern and effective copyright system. While our members are publishing houses, we staunchly defend the rights of authors before courts and legislators.

**Background**[1]

5. AAP is the national trade association and principal public policy advocate for publishing houses in the United States. Our membership includes some 120 large, small, nonprofit, and commercial houses in the education, scholarly, and consumer publishing sectors that together comprise most of the U.S. publishing market. Some of our members have served national and international markets since the 19th century, while others have entered the industry more recently to the particular benefit of local or regional communities.

6. AAP's members invest in, publish, and distribute a wide span of subject areas and genres, including acclaimed fiction, nonfiction, and children's books, as well as academic, educational, religious, scientific, and scholarly works. Their authors include Nobel Laureates, as well as winners of the Pulitzer Prize, National Book Award, Newbery Medal, Caldecott Medal, Man Booker Prize, and Grammy Awards for spoken works, among many other honors. Many of our members' works are implicated by piracy through LibGen and the Pirate Library Mirror.

7. AAP's function is apolitical. We do not seek to serve any political party or movement, but rather to advocate to all decision makers, regardless of ideology.

8. As global innovators, publishers are constantly developing new literary works and new business models to meet the demands of both retail and library channels. They also distribute older titles—some of them among the most iconic literature ever authored—delivering them to retail, library, and education customers in a wide variety of formats, including hardcover, paperback, ebooks, audiobooks (both physical and downloaded), and interactive platforms.

9. AAP is deeply focused on issues that affect the Copyright Act, for it is the sum and detail of this statute that provide the economic incentives and legal confidence by which

---

[1] The substance of Paragraphs 5-13 was included in my prior declaration in this case, ECF 363-9, is included here again for the Court's convenience.

publishers of all sizes seek to acquire and disseminate original works of authorship to the public. In turn, our members promote democratic discourse, human empowerment, scientific progress, and political accountability.

10. Today, more than two centuries after the Framers crafted and adopted the Constitution's Copyright Clause in 1787 and the first Congress enacted the first Copyright Act in 1790—for books, maps, and charts—American publishers are an essential part of a vast, vibrant, and valuable creative economy that facilitates rapid and, frequently, borderless transactions for the enjoyment of books, music, film, television, and software. To be sure, publishing is invaluable to society, but it is not a wealthy business, particularly in comparison to any one technology or AI company today. In 2025, publishing houses doing business in the United States realized an *aggregate* total of $32B in revenue.

11. As AAP's President and CEO, I lead the organization's public policy, education, and litigation efforts, including before regulatory agencies, legislatures, and the courts. My small team and I work closely with AAP's membership to protect and advance a balanced legal framework that incentivizes the publication of creative expression and the dissemination of knowledge, including, especially, a viable twenty-first century Copyright Act that has meaningful exclusive rights, a reasonable fair use doctrine, and effective enforcement and remedies.

12. I have practiced copyright law for over three decades, including more than five years as United States Register of Copyrights from 2011 to 2016. In this role, as the Nation's public copyright attorney, I directed the Copyright Office and the public administration of the Copyright Act, including the federal registration of copyright interests, the documentation of copyright transactions, and the validity and lawful chain of title for exclusive rights. My team

and I were impartial statutory advisors to both lawmakers and executive branch agencies during an unusually active period in which the House Judiciary Committee reviewed the entire Copyright Act through public hearings and stakeholder meetings. As Register, I delivered multi-year, public studies and testimony to both the House and Senate on gaps in the law and emerging legal issues in the digital marketplace; supported the Department of Justice on legal questions pertaining to copyright litigation; represented the United States on treaty and diplomatic delegations pertaining to intergovernmental copyright obligations; and promulgated regulations governing both legal and technical developments with wide input from authors and stakeholder groups.

13. I serve on various national and international industry and legal committees, including for the American Bar Association, and teach copyright law as an adjunct law professor. I have delivered and published numerous invited lectures in the field, including the 2022 Brace Memorial Lecture for the Copyright Society ("The Art and Innovation of Exclusive Rights"); the 2018 Robert W. Kastenmeier Lecture at the University of Wisconsin, ("I am the Captain Now: Resisting Piracy and Contortion in the Copyright Marketplace"); and the 2013 Horace S. Manges Lecture at Columbia University ("The Next Great Copyright Act"), which Congress used to commence a multi-year review of copyright law. From 2007 to 2011, I served as Deputy General Counsel of the Copyright Office, and then as its principal for Policy and International Affairs. Before this, I was in private practice, including eight years as in-house counsel for the nonprofit Guggenheim art museums, in New York, and two author organizations.

## AAP and Publisher Involvement in This Case

14. Since the Court certified a class that includes publishers on July 17, 2025, AAP has actively engaged with our members and consulted with Class Counsel and Publishers'

5

Coordination Counsel to ensure that any settlement addresses publishers' interests and concerns. The overwhelming majority of works submitted to the Court on September 15, 2025 by Class Counsel implicate AAP members. To that end, AAP has helped the PCC reach American publishing houses and other smaller publishing associations that represent specific kinds of books, such as scholarly, independent, medical, and religious presses. I have personally interacted with CEOs and general counsels of dozens of AAP members regarding procedural aspects of the class action; explained criteria for copyrighted works to be included on the Works List based on the Court's class definition; helped to facilitate publishers' ability to provide input and feedback to the PCC regarding the litigation and/or settlement; provided information on author-publisher contractual norms and exceptions thereto; alerted the publishing sectors most affected by the piracy at issue; assisted with press requests relating to this action; and encouraged publishers to assist Class Counsel in ensuring a robust notice process, including as to their authors; and many related topics. In addition, AAP's members have worked tirelessly to identify and verify books that meet the eligibility requirements of the Court's Class definition.

15. AAP has had many discussions, over dozens of hours, regarding the allocation plan and claims process with Class Counsel, PCC, and Authors' counsel. We have also shared our knowledge of developments with publishers directly and with other associations that may have overlapping membership with AAP or distinct stakeholders, including the Association of University Presses ("AUP"), the Independent Book Publishers Association ("IBPA), international associations (including the International Publishers Association ("IPA") and the International Association of Scientific, Technical and Medical Publishers ("STM")), and religious publishing groups (including the Evangelical Christian Publishers Association ("ECPA") and Protestant Church-Owned Publishers Association ("PCPA")). Each of these

groups represents key stakeholders in this settlement. The purpose and effect of these discussions have been to assist counsel in formulating a plan that is fair to all class members and provides for a reasonable, rational plan of execution, including how to efficiently allocate recoveries between multiple claimants. This process has been consistent with my experience working with constituency groups across many creative sectors and genres productively for decades, both in my government roles and on many important publishing industry issues.

16. To assist with notice to the class, AAP plans to disseminate any approved Class notice to its members and direct them to the Settlement website, PCC, or Class Counsel. AAP is also coordinating with PCC and publishers to facilitate collection of author contact information for purposes of notice. And, as always, AAP will keep its members abreast of developments impacting their rights, including as they occur in this case.

**The Publishing Industry's Practices Support the Proposed Settlement**

17. Relying on my significant expertise in copyright law and the publishing industry, I have set forth below important background information regarding the key publishing sectors most impacted by this settlement and why the proposed plan is sensible and practicable.

18. The publisher class members generally fall into three sectors: (1) trade publishers, (2) university presses, and (3) education publishers. These sectors differ as to the nature of works published, markets, cost structures and risk profiles, and contractual arrangements with authors. The proposed settlement structure—including the respective claims processes for works published by trade houses or university press on the one hand and by education publishers on the other—accounts for these differences.

19. Trade publishers generally publish books for the consumer market in both physical and digital formats, investing in and promoting a wide array of authorship and

supporting both established and emerging writers. Trade books primarily include fiction, non-fiction, poetry, memoirs, and children's literature, among other literary works. Trade publishers help identify, shape, edit, design, market, manufacture, and distribute their works, and many of the books published by U.S. trade publishers are amongst the most famous works of authorship in the world. A trade publisher typically acquires—through contract from a single, clearly defined author—a subset of rights under copyright law to exclusively reproduce and distribute a book in physical and digital formats, while the author typically retains the other exclusive rights in their copyright bundle unless negotiated. 17 U.S.C. § 106. In this limited licensing transaction, the author typically receives a financial advance against royalties and a negotiated royalty stream from the publisher to be paid following recoupment of the advance. Trade publishers in the class include, for example, Hachette Book Group, Inc., HarperCollins Publishers, Macmillan Publishers, Penguin Random House LLC, and Simon & Schuster, LLC, as well as smaller publishers such as Source Books and Chronicle Books, among many others.

20.     University presses are non-profit publishers that operate as an extension of their (public or private) university's mission to promote and disseminate scholarship. University presses acquire, develop, produce, market and sell books and journals of scholarly, intellectual, and/or creative merit, in both physical and digital formats. They may distribute their books through multiple channels, including trade channels, but typically sell to a more limited readership yielding smaller financial returns than trade publishers may realize for their authors. University press works often provide an in-depth study of a single, specialized topic and/or focus on issues of regional community interest. Like trade publishers, university presses typically transact with authors for a subset of rights within the statutory copyright bundle—to exclusively reproduce and distribute their works as books in physical and digital formats—with authors

typically receiving an advance against negotiated royalties. As above, authors typically retain the other copyright interests. University presses in the class include, for example, Columbia University Press, Princeton University Press, the University of California Press, the University of Chicago Press, the University of Texas Press, the University of Wisconsin Press, and Yale University Press.

21.     Education publishers publish materials for the academic instruction of learners, including textbooks, course materials, supplemental teaching resources, test bank materials, and instructor solutions manuals, as well as non-fiction instructional works for the professional and consumer markets, all in both digital and physical formats. Education publishers tend to be deeply involved not only in preparing a book for the market but in the overall process of creating the book from start to finish, including by conceiving of the work, identifying authors, and commissioning contributions. Education publishers often have in-house teams of subject matter and/or pedagogy experts supporting the numerous academic disciplines in their catalogs. These experts are additionally tasked with ensuring that works are regularly updated and revised to stay current for students and faculty. Commonly, multiple subject-matter authors are invited to contribute to a single educational work. Education publishers typically obtain from the author(s) complete legal ownership of the copyright in their works, either by assignment of the copyright in full, through an exclusive license for all rights in the work's copyright, or through a "work made for hire" agreement. (This practice contrasts with the more limited rights to reproduce and distribute that is the norm amongst trade and university presses, discussed above.) In exchange, the author typically receives an advance against future royalties. Education publishers in the class include Cengage Learning, Inc., Elsevier, Inc., Macmillan Learning, McGraw Hill LLC., Pearson Education, Inc., and John Wiley & Sons, Inc., among many others.

22. Consistent with the differences in their sectors, the norms of trade publishers and university presses, on the one hand, and education publishers, on the other, vary in their handling of enforcement recoveries. For trade and university publishers, I am aware that publishing contracts typically provide that net recoveries from enforcement actions will be divided 50/50 between the publisher and author. In the proposed Settlement put forth by Class Counsel, to assist with an efficient resolution for the claimants, there is a proposed default rule for trade and university presses that reflects this shared norm, with an option to vary the division accordingly if a particular contract supports it.

23. The contracts of education publishers do not have the same norm for handling of litigation proceeds. Rather, I am aware that publishing contracts between education publishers and authors typically do not contain language specifically requiring the division of enforcement proceeds. In instances where education publishing contracts do reference litigation proceeds, I understand that some reserve all enforcement rights and litigation proceeds to the publisher, while others provide for splitting litigation proceeds 50/50. Moreover, some educational works may be prepared as "works made for hire," 17 U.S.C. § 101, which means the publisher is not only the legal owner of the copyright interest, but also the legal "author" of the work from the moment of creation. In such cases, there is not a separate beneficial owner. Because the allocation of enforcement proceeds for works published by education publishers is not uniform, resort to specifically negotiated rights (rather than a default rule) makes sense for this sector. I believe this approach is most fair and reasonable in the absence of norms that would support a default rule.

24. In sum, I believe the proposed allocation and claims process will justly and quickly resolve hundreds of thousands of claims for trade and university press works (which

together comprise most of the claims at issue) pursuant to default rules that reflect industry norms and encourage efficiency, while fairly permitting case-by-case adjustments where appropriate. And I believe the proposed process for the education sector reasonably reflects its lack of norms for the division of litigation proceeds and is fair and reasonable.

## Conclusion

25.     I am proud of the tremendous, transparent efforts by AAP, publishers, the PCC, and the Authors' Guild (in its role of communicating feedback from author communities) to work together to provide input towards the creation of a fair process and plan for the Court's consideration.

26.     Given the framework of the case and the process undertaken to get to this point, I believe that the settlement as presented is beneficial to all class members, and I am hopeful that the settlement will receive wide support from copyright owners. Beyond the monetary terms, the proposed settlement provides enormous value in sending the message that artificial intelligence companies cannot unlawfully acquire literary works from shadow libraries or other pirate sources to use as the building blocks for their businesses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on September 22, 2025

_____
Maria A. Pallante