**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, and MJ + KJ, INC., individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendants. | Case No.: 3:24-cv-05417-WHA <br><br> **SUPPLEMENTAL DECLARATION OF JENNIFER M. KEOUGH REGARDING PROPOSED CLASS NOTICE PLAN** |

I, JENNIFER M. KEOUGH, declare and state as follows:

1.     I am Chief Executive Officer, President, and Co-Founder of JND Legal Administration LLC ("JND"). I have more than 20 years of legal experience creating and supervising notice and claims administration programs, and have personally overseen well over 1,000 matters. I will oversee this matter personally as well. I am regularly called upon to submit declarations in connection with JND's notice and administration work. A comprehensive description of my experience is attached as **Exhibit A**.

2.     This Declaration is intended to supplement my previous Declaration regarding Notice Administration, filed September 5, 2025 ("Initial Keough Declaration"). I submit this

Declaration based on my personal knowledge, as well as upon information provided to me by experienced JND employees and Counsel for the Plaintiffs and Defendants.

### BACKGROUND AND EXPERIENCE

3.    ***Full-Service Provider.*** JND is a leading legal administration services provider with offices throughout the United States and its headquarters in Seattle, Washington. JND has extensive experience with all aspects of legal administration and has administered hundreds of class action matters. JND's class action division provides all services necessary for the effective implementation of class actions including: (1) all facets of legal notice, such as outbound mailing, email notification, and the design and implementation of media programs; (2) website design and deployment, including online claim filing capabilities; (3) call center and other contact support; (4) secure class member data management; (5) paper and electronic claims processing; (6) calculation design and programming; (7) payment disbursements through check, wire, PayPal, merchandise credits, and other means; (8) qualified settlement fund tax reporting; (9) banking services and reporting; and (10) all other functions related to the secure and accurate administration of class actions.

4.    JND and I have handled more than $65 billion in settlements and judgments. In the Northern District of California alone, JND has administered notice, claims, and/or settlement fund distributions in more than 60 matters. JND consistently provides timely and comprehensive data to counsel to facilitate the filing of Post-Distribution Accounting, as required under the N.D. Cal. Procedural Guidelines for Class Action Settlements.

5.    By a conservative estimate, across the notice programs administered by JND and me, well over 950 million notices were sent with an average deliverability rate of over 95%. Across the settlements JND and I have administered, benefits have been distributed to over 379 million class members.

6.  ***Government Relationships.*** JND is an approved vendor for the United States Securities and Exchange Commission (SEC), the Federal Trade Commission (FTC), and the Consumer Financial Protection Bureau (CFPB). In addition, we have worked with several other government agencies including the U.S. Equal Employment Opportunity Commission, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Federal Communications Commission, the Department of Justice, and the Department of Labor. We also have Master Services Agreements with various corporations and banks, which were awarded after JND underwent rigorous reviews of our systems, privacy policies, and procedures. JND has also been certified as SOC 2 Type 2 compliant by noted accounting firm Baker Tilly.[1]

7.  ***Industry Recognition.*** JND has been recognized by various publications, including the National Law Journal, the Legal Times, and the New York Law Journal, for excellence in class action administration. JND was named the #1 Class Action Claims Administrator in the U.S. by the national legal community for multiple consecutive years, and we were inducted into the *National Law Journal* Hall of Fame for having held this title for four years in a row. JND was also recognized as the Most Trusted Class Action Administration Specialists in the Americas by *New World Report* (formerly *U.S. Business News*) in the publication's 2022 Legal Elite Awards program.

8.  ***Complex Matters.*** The principals of JND, including me, collectively have over 80 years of experience in class action legal and administrative fields. We have overseen the administration and claims processes for some of the largest legal claims administration matters in the country's history and regularly prepare and implement court-approved notice and administration campaigns throughout the United States. For example, my team and I handled all aspects of mailed notice, website activities, call center operations, claim intake, scanning

---

[1] As a SOC 2 Compliant organization, JND has passed an audit under AICPA criteria for providing data security.

and data entry, and check distribution for the $20 billion Gulf Coast Claims Facility. In the $10+ billion BP Deepwater Horizon Settlement, I worked directly for Patrick Juneau, the Court-appointed administrator, in overseeing all inbound and outbound mail activities, all call center operations, all claim intake, scanning, and data entry and all check distributions for the program. I oversaw the entire administration process in the $3.4 billion Cobell Indian Trust Settlement (the largest U.S. government class action settlement ever).

9.      JND was appointed as the notice and claims administrator in the landmark $2.67 billion antitrust settlement *In re: Blue Cross Blue Shield Antitrust Litig., No. 2:13-cv-20000-RDP* (N.D. Ala.) ("BCBS Settlement") in which we mailed over 100 million postcard notices; sent hundreds of millions of email notices and reminders; placed notice via print, television, radio, internet, and more; staffed a call center with 250 agents during the peak of the notice program; and received and processed more than 8 million claims. I am the Court-appointed notice expert in that case. JND was also appointed the settlement administrator in the $1.3 billion Equifax Data Breach Settlement, where we received more than 18 million claims. I supervised all aspects of direct notice, including email notice that was sent twice to over 140 million class members. The interactive website received more than 130 million views, and the call center was staffed with 1,500 agents at the peak of call volume.

10.     Other large JND matters include a voluntary remediation program in Canada on behalf of over 30 million people; the $1.5 billion Mercedes-Benz Emissions Settlements; the $120 million GM Ignition Switch Settlement, where we mailed nearly 30 million notices and processed over 1.5 million claims; the $215 million USC Student Health Center Settlement on behalf of women who were sexually abused by a doctor at USC; the recent National Association of Realtors ("Realtors") settlements totaling over $1 billion thus far; as well as hundreds of other matters.

11.     ***Extensive Copyright Class Action Experience.*** I also have vast copyright class action experience, as outlined below.[2]

12.     The NMPA Limewire Settlement resulted from a lawsuit on behalf of NMPA/HFA alleging copyright infringement by Limewire and its owners. Claimants were able to submit supplementary documentation as part of their claim, which was reviewed in coordination with an independent auditor to ensure that all eligible income was considered when calculating settlement awards.

13.     The $130 million Napster, Inc. Copyright Settlement arose from a lawsuit brought by HFA alleging that Napster facilitated widespread copyright infringements. In addition to calculating the participating publishers' market share using HFA's mechanical income data, my team managed high call volume, communicated regularly with the class, and conducted post-distribution outreach to maximize check-cashing rates.

14.     The XM Satellite Radio Copyright Settlement was the result of a lawsuit alleging that XM Radio violated class rights in connection with radios capable of recording XM transmissions. The process required intake of claims containing extensive lists of both musical compositions and sound recordings, ascertaining which of those were eligible by coordinating with performing rights organizations, and carrying out separate distribution calculations for each class.

15.     The Sirius Satellite Radio Copyright Settlement involved a lawsuit alleging that Sirius Satellite Radio violated rights in connection with radios capable of recording transmissions. Administering this matter involved similar steps to those undertaken in the XM settlement.

16.     The *Music Force LLC v. Viacom Inc.* Settlement emerged from a lawsuit alleging that MTV Networks embodied certain musical compositions and sound recordings in transmissions without authorization. Settlement awards were calculated based on eligible songs.

---

[2] The provided experience includes matters that I personally oversaw while employed at another legal administration company.

JENNIFER M. KEOUGH DECLARATION
CASE NO. 3:24-CV-05417-WHA

17.     The *Music Force v. Black Entertainment Television* settlement arose from a lawsuit alleging that musical compositions and sound recordings were embodied in transmissions on Black Entertainment Television's networks without authorization. As part of this engagement, my team established an interactive website enabling potential class members to search song titles involved in the settlement.

18.     ***Legal Notice Expertise***. JND's Legal Notice Team operates under my direct supervision and researches, designs, develops, and implements a wide array of legal notice programs to meet the requirements of Rule 23, as well as relevant state court rules. In addition to providing notice directly to potential class members through direct mail and email, we use a variety of media channels, including newspapers, press releases, magazines, trade journals, radio, television, social media, and the internet. Our media campaigns, which are regularly approved by courts throughout the United States, are customized for each case based on the circumstances and allegations of the case, the demographics of the class, and the habits of its members, as reported by various research and analytics tools.

19.     During my career, I have submitted several hundred declarations to courts throughout the country attesting to our role in the creation and launch of various notice programs.

## COLLECTING DATA

20.     In accordance with the Settlement Agreement (Section 4.2), JND has worked with the Parties to compile, aggregate, and organize a Class List using the following sources:

      a.  The Works List compiled from various sources of data, including data from the Defendant and publishers interested in the Settlement (facilitated via Publishers' Coordination Counsel);

      b.  Author and publisher contact information submitted voluntarily via a web portal that was available on counsel's website until September 4, 2025;

    c.   Author and publisher contact information submitted via a web portal hosted on www.AnthropicCopyrightSettlement.com, which was launched on September 4, 2025;

    d.   Author contact information provided by the Author's Guild and Author's Registry;

    e.   Publisher mailing and email addresses from Bowker ISBN Services ("Bowker");

    f.   Contact information from the U.S. Copyright Office;

    g.   Author and publisher data purchased for hundreds of thousands of individuals identified as professors, writers, publishers, and "commercial and literary individuals";

    h.   Contact information sent by email to Class Counsel or JND by authors and publishers interested in the Settlement;

    i.   Author contact information received from the Science Fiction Writers of America;

    j.   Contact information identified through advanced address research as potentially belonging to the author;

    k.   Author contact information retrieved through web searches performed by JND employees from September 12, 2025, through September 22, 2025.

## CREATION OF CLASS LIST

21.    After receiving more than two million rows of data from these sources, JND's Data Team ("Data Team") imported the data into structured tables that could be efficiently and effectively used to find matches between (i) the authors and publishers listed on the Works List and (ii) the contact information for authors and publishers in the other data sources.

22.    First, the Data Team parsed the Works List to create a complete list of unique authors and publishers. If, for example, a single book on the Works List had three authors and one publisher, then each of these entities was added to their corresponding list (author or publisher). This process resulted in two tables, one containing 367,824 unique authors and another containing 16,237 unique publishers.

23.    The Data Team used these two tables as the basis for matching any contact information derived from the other sources. This was an iterative process that involved searching through each data source one at a time for matches and then synthesizing the results into a single data set. The Data Team and the Operations Team manually reviewed the emergent Class List at multiple points in the process to ensure the accuracy and reliability of the systematic matching.

24.    Where JND was unable to locate any contact information for an author or publisher, JND researched the individual or entity online to locate any potential contact information. For example, an author may have a website that provides an address to receive fan correspondence.

25.    For Class Members where JND was only able to locate limited contact information, JND used skip tracing databases to find additional information and complete the Class Member record.

26.    The Class List—an updated version of which will be filed September 23, 2025—includes all the works on the Works List and includes one row for each known entity that may have a copyright interest in the book. To date, JND has found contact information sufficient to contact 243,397 unique authors (66.2% of unique authors) accounting for 392,707 (81.3%) of books on the Works List and 15,786 unique publishers (97.2% of unique publishers) accounting for 479,950 (99.4%) of books on the Works List. JND has identified at least one email or mailing address for more than 99.8% of works on the Works list. Class Counsel has further informed me that publishers of approximately half of the works on the Works List have already agreed to provide additional contact information for their works within 45 days of preliminary approval.  This would increase

the percentage of authors' contact information from 66.2% to approximately 84% and the percentage of works with author contact information from 81.3% to 92.8%. Additionally, for the approximately 279,000 works (58%) on the Works List which list an address for the claimant and/or an address for "rights and permissions" on the copyright registration form, direct notice will be sent to these addresses as part of the notice plan.

27.    In addition, due to the broad publicity of this case, since the Court certified the Class on July 17, 2025, more than 49,000 people have submitted their contact information via online intake forms or by contacting Class Counsel. In my experience, this engagement percentage is unprecedented in such a short time, particularly without any paid efforts to promote awareness.

28.    It is JND's understanding that we will receive additional author and publisher contact information from sources such as Amazon.com (for self-published authors) and from major publishing companies. Certain publishers that are in contact with the Publishers Coordination Counsel are voluntarily providing author contact information within 45 days of Preliminary Approval, if granted. This data will allow us to further complete the Class List with contact information for most or all Class Members.

29.    Additionally, JND utilized advanced address research to identify any available contact information associated with the name of each Author identified on the Class List.

30.    Where JND does not have an email address for a Class Member, we will initiate a sophisticated email append process to obtain one. This process uses advanced skip tracing tools that analyze known information to identify an email address for the Class Member. Before sending any email notices, JND thoroughly cleans the list to correct formatting issues and remove incomplete or invalid addresses, ensuring the highest possible accuracy.

31.    JND will continue to refine the Class List by performing additional advanced address research using skip trace databases and updating the addresses through the United States Postal Service ("USPS") National Change of Address ("NCOA") database as necessary.

Additionally, where JND identifies multiple addresses associated with a publisher or author, JND will utilize these services to determine the best contact information.

32.    JND will continue to maintain the Class List throughout the lifecycle of the case, leveraging established protocols for updating Class Member information when, for example, we are notified of deceased Class Members or Class Members with legal name changes or address updates.

## NOTICE CAMPAIGN

33.    In accordance with feedback provided by the Court, JND recommends an updated Settlement Notice Plan, consisting of the following components, as further described in the sections below:

a.    Direct notice by First Class mail to all potential Class Members for whom a mailing address can be located.

b.    Direct notice by email to all potential Class Members for whom an email address can be located.

c.    A QR code (a matrix barcode) that will allow quick and direct access to the Settlement Website through a mobile device.

d.    Internet notice via a designated, case-specific Settlement Website, www.AnthropicCopyrightSettlement.com, with a searchable Works List to help website visitors determine whether they are Class Members.[3]

e.    Extensive six-week digital campaign with the Google Display Network (GDN), as well as Facebook, Instagram, and Reddit social media platforms.

f.    Trade notice placements with outlets such as *Publishers Weekly*, *Publishers Marketplace*, *The Atlantic*, *The Chronicle of Higher Education*, *Poets & Writers Magazine*, *Writer's Digest*, and Goodreads.

---

[3] The Settlement Website and Settlement Agreement will be translated into English and French.

g.    Media targeting Canada including *The Toronto Star*, *The Globe and Mail*, and *La Presse*.

h.    Claims stimulating digital effort with LinkedIn, a programmatic partner, and Demand Gen, as well as an internet search campaign.

i.    Distribution of a worldwide press release, including to U.S. journalists who specialize in the education and publishing industries.

j.    Outreach through major industry groups and literary agencies in the United States, Canada, and the United Kingdom, where class members reside. These groups have committed to email their members or clients and direct people to the Settlement Website. *See, e.g.*, Declaration of Anna Ganley (Society of Authors UK) in Support of Preliminary Approval; Declaration of Tom West (Publishers' Licensing Services Limited (UK)) in Support of Preliminary Approval; Declaration of Bridget Shine (Independent Publishers Guild (UK)) in Support of Preliminary Approval; Declaration of Matthew Fulton (Writers House) in Support of Preliminary Approval; Declaration of Catriona Stevenson (Publishers Association) in Support of Preliminary Approval; Declaration of John Degen (Writers' Union of Canada) in Support of Preliminary Approval; Declaration of Mary Rasenberger (Not-for-Profit Author Organizations) in Support of Preliminary Approval; Declaration of Maria Pallante (Association of American Publishers) in Support of Preliminary Approval; and Declaration of Peter Berkery (Association of University Presses) in Support of Preliminary Approval. Other large organizations and literary agencies have also pledged their support. For example, according to WME Books: "WME Books will use reasonable efforts to disseminate notice of the settlement to its clients by sharing a link to the Settlement Website with its thirty-seven literary agents (located in the U.S. and UK) to forward to their primary author clients." Likewise, CAA also informed us that it "will use

JENNIFER M. KEOUGH DECLARATION
CASE NO. 3:24-CV-05417-WHA

commercially reasonable good faith efforts to flag the settlement to as many of our author clients as possible."

k.      Notice via a toll-free number, email address, and post office box through which Class Members may obtain more information about the Settlement and request that the Long Form Notice be sent to them.

l.      CAFA Notice to appropriate state and federal officials.

m.      Additional reminder efforts as needed to optimize notice based on a real time analysis of engagement.

34.      JND is prepared to commence notice consistent with the Court's guidelines in granting Preliminary Approval to the Settlement.

35.      Direct notice will include sending the Short Form Notice in an envelope via First Class mail to everyone on the Class List for whom a mailing address was identified. The envelope will include a printed message stating: Important Class Action Notice, United States District Court, Northern District of California, Honorable William Alsup, 450 Golden Gate Avenue, San Francisco, CA 94102. With Court approval, JND will also include the seal for the Northern District of California on the envelope to further encourage the recipient to review the Notice. JND has prepared an envelope and Short Form Notice, which will be filed along with the long-form notice on the Court-designated deadline of September 23. Direct notice via mail to recipients located in Canada will be sent in English and French.

36.      JND recommends sending the Short Form Notice via mail rather than the Long Form Notice. The Short Form Notice will provide a short summary of the Settlement and information about key dates and deadlines. It will also include a QR code to allow a Class Member to easily navigate to the website which will contain additional information about the Settlement, including the Long Form Notice. Class Members are more likely to ingest information about the Settlement, and understand their rights and options, if it is presented in a summary format.

37.     If instead the Long Form Notice will be sent as the direct mail notice, JND recommends sending a summary of the settlement on a "buck slip" which will be printed on colored paper and highlight important information about the Settlement. JND has prepared an example buck slip, which will be filed along with the long-form notice on the Court-designated deadline of September 23.

38.     JND will also send an Email Notice to everyone on the Class List for whom an email address was identified. JND recommends that the Email Notice be in summary form because sending the Long Form Notice via email may result in the email ultimately being sorted into the Class Member's spam folder. Direct notice via email to recipients located in Canada will be sent in English and French.

39.     As additional contact information is received from Claim Forms and other sources, JND will promptly send notice on a rolling basis. Sending Notice in this manner is analogous to how JND often performs notice in securities matters.[4] Specifically, in securities matters, the notice directs all those who purchased or otherwise acquired shares of a company stock to, among other options, provide a list to JND of the names, addresses, and email addresses (where available), of all such beneficial owners. JND then disseminates the notice to potential class members via the newly acquired contact information.

40.     In this matter, JND will promptly mail the notice to any newly identified contact information for a Class Member on the Class List.

41.     Once the direct notice campaign begins, JND staff will track all Notices returned as undeliverable by the USPS and promptly re-mail any Notices that are returned with a forwarding address and update our database with the new address. Also, with my oversight, JND will use advanced address search tools to research and determine if it is possible to reach a Class Member for whom the Notice is returned without a forward address.

42.     JND uses industry-leading email solutions to achieve the most efficient email notification campaign. Our Data Team is staffed with email experts and software solution teams to

---

[4] See, for example, *In re: Fibrogen, Inc., Securities Litigation*, No. 21-cv-02623-EMC (N.D. Cal.).

conform each notice program to the particulars of the case. JND provides individualized support during the program and manages our sender reputation with the Internet Service Providers ("ISPs"). For each of our programs, we analyze the program's data and monitor the ongoing effectiveness of the notification campaign, adjusting the campaign as needed. These actions ensure the highest possible deliverability of the email campaign so that more potential Class Members receive notice.

43.    Consistent with JND's customary practice, JND will evaluate the email for potential spam language to improve deliverability. This process includes running the email through spam testing software, DKIM[5] for sender identification and authorization, and hostname evaluation. Additionally, we will check the send domain against the 25 most common IPv4 blacklists.[6]

44.    For each email campaign, including this one, JND will utilize a verification program to eliminate invalid email and spam traps that would otherwise negatively impact deliverability. We will then clean the list of email addresses for formatting and incomplete addresses to further identify all invalid email addresses.

45.    JND configures the notice template in a proprietary system that allows us to customize it based on the size of the notice effort, the timeline for delivery, and other details. For example, we may send smaller batches to specific providers (e.g., Gmail or Microsoft) to increase deliverability and reduce the potential for being flagged as a suspicious sender. JND uses advanced infrastructure that supports multi-threading and multiple "sender" IP addresses, which allows us to send more email batches simultaneously without being flagged as spam. JND's team tracks traffic to the Settlement website—including how many visits the email campaign generates—in real-time so we can adjust tactics as needed.

---

[5] DomainKeys Identified Mail, or DKIM, is a technical standard that helps protect email senders and recipients from spam, spoofing, and phishing.

[6] IPv4 address blacklisting is a common practice. To ensure that the addresses being used are not blacklisted, a verification is performed against well-known IP blacklist databases. A blacklisted address affects the reputation of a company and could cause an acquired IP addresses to be blocked.

46.    To ensure readability of the email notice, our team will review and format the body content into a structure that is applicable to all email platforms. Before launching the email campaign, we will send a test email to multiple ISPs and open and test the email on multiple devices (iPhones, Android phones, desktop computers, tablets, etc.) to ensure the email opens as expected.

47.    Additionally, JND will include an "unsubscribe" link at the bottom of the email notice to allow Class Members to opt out of any additional email notices from JND. This step is essential to maintain JND's good reputation among the ISPs and reduce complaints relating to the email campaign.

48.    Emails that are returned to JND are generally characterized as either "Hard Bounces" or "Soft Bounces." A Hard Bounce occurs when the ISP rejects the email due to a permanent reason such as the email account is no longer active. A Soft Bounce occurs when the email is rejected for temporary reasons, such as the recipient's email address inbox being full.

49.    When an email is returned due to a Soft Bounce, JND will attempt to resend the email notice up to three additional times to secure higher deliverability. If the Soft Bounce email continues to be returned after three attempts, the email will be considered undeliverable. Emails that result in a Hard Bounce are also considered undeliverable.

## PAID MEDIA

50.    To supplement the direct notice effort, JND proposes a layered media approach that will extend reach and reinforce direct notice messaging. To develop these strategies, JND used data from MRI-Simmons (MRI), a nationally accredited research firm that provides consumer demographics, product and brand usage, and exposure in all forms of advertising media through probabilistic and address-based sampling. MRI is the top producer of media/consumer research in the U.S.

51.    Here, we specifically looked at MRI data among respondents who have written something that has been published in the last 12 months ("Published Writers"). MRI data indicates

JENNIFER M. KEOUGH DECLARATION
CASE NO. 3:24-CV-05417-WHA

that, compared to the general adult population, Published Writers significantly over-index on platforms like Reddit (Index 219) and LinkedIn (Index 356), while also showing above-average usage for Instagram (Index 143). In addition, Pew's research on education and media consumption supports that highly educated adults (a strong proxy for Class Members) consume more digital news and professional content than the general population. Taken together, these insights support our inclusion of large-scale digital and social platforms for reach, alongside professional and niche environments that align closely with the habits of published authors.

52.     All digital impressions in the proposed Notice Plan are targeted to writers, authors, and copyright holders, using a combination of contextual keywords, platform interest and behavioral segments, and placements in trade and professional media.

53.     Overall, we recommend a three-tiered media approach to balance scale, specificity, and credibility:

**TIER 1: Mass Reach / Awareness**

54.     Our proposed Tier 1 leverages broad-reaching digital platforms like the Google Display Network (GDN) and Facebook with popular platforms among Published Writers like Instagram and Reddit to establish awareness. We propose serving approximately 97.5 million impressions over a six-week period.[7]

55.     **_GDN._** The GDN effort will specifically target adults 18 years of age or older ("Adults 18+") who: (1) are in-market for Book Promotion Services and Information, Literary Agents, Book Publishing Services, Book Publishers, Publishers Accepting Submissions; (2) have browsed websites such as selfpublishing.com, janefriedman.com, scribophile.com, thebookseller.com, publishersweekly.com, publishingperspectives.com, chronicle.com, writersdigest.com,

---

[7] Impressions or Exposures are the total number of opportunities to be exposed to a media vehicle or combination of media vehicles containing a notice. Impressions are a gross or cumulative number that may include the same person more than once. As a result, impressions can and often do exceed the population size.

thebookdesigner.com, insidehighered.com, edupub.org, and reedsy.com; and/or (3) have searched Google for relevant terms such as AI training data, manuscript, amazon kdp, Claude AI, books used to train AI, Reedsy, critique circle, ASIN, copyright law, indie author, AI copyright, Scribophile, author royalties, book publishing, AI ethics, publishing rights, pirated books, copyright registration, copyright infringement, author lawsuit, LibGen, how to publish a book.

56.    ***Facebook and Instagram***. Activity with Facebook and Instagram will target Adults 18+ who have: (1) job titles including Journalist/Writer, Online Publisher, Publisher and/or (2) interests in book publisher, bookselling, electronic publishing, Nobel prize in literature, publishing, self-publishing.

57.    ***Reddit.*** Efforts with Reddit will target Adults 18+ who utilize: (1) keywords such as amazon kdp, ASIN, author lawsuit, author royalties, AI copyright, AI ethics, AI training data, book publishing, books used to train AI, Claude AI, copyright infringement, copyright law, copyright registration, critique circle, indie author, ISBN, how to publish a book, LibGen, manuscript, pirated books, publishing rights, Reedsy, Scribophile; and/or (2) communities like r/selfpublishing, r/publishing, r/selfpublish, r/writers, r/writing.

58.    The digital activity will be served across all devices (desktop, laptop, tablet and mobile), with a heavy emphasis on mobile devices. The digital ads will directly link to the Settlement Website, where Class Members may access more information about the action, including the Long Form Notice, as well as file a claim electronically.

### TIER 2: Trade & Niche Media[8]

59.    Running alongside the mass reach Tier 1 effort, Tier 2 reinforces notice within trusted professional and literary environments, as well as providing extended reach with notice placements in three leading Canadian newspapers.

---

[8] Trade media have limited availability and publishers reserve the right of ad refusal. If placement of any of the proposed trade media is not feasible at the time of implementation, a comparable alternative will be sought.

60.     Placements with trade outlets such as *Publishers Weekly*, *Publishers Marketplace*, *The Atlantic*, *The Chronicle of Higher Education*, Goodreads, *Poets & Writers Magazine*, and *Writer's Digest* align with the media habits of highly educated readers, authors, and academics. Specific tactics include e-newsletters, digital banners, and select print placements to ensure that notice appears in environments directly associated with writing, publishing, and academia.

61.     *Publishers Weekly*, referred to as the "bible of the book business," is the leading trade news platform focused on providing news, reviews, bestseller lists and industry analysis for publishers, booksellers, librarians, and literary agents.

62.     *Publishers Marketplace* is an online service and industry hub for publishing professionals, offering a comprehensive deal report, agent profiles, job listings, and sales data to track industry news and trends.

63.     *The Atlantic* features articles on culture and the arts, in addition to politics, foreign affairs, business and the economy.

64.     *The Chronicle of Higher Education* is a trusted source of information for university faculty and student affairs professionals, including staff members and administrators.

65.     Goodreads is the world's largest literary social media platform. It enables writers to showcase their books, track reader engagement, and connect with audiences.

66.     *Poets & Writers Magazine* is a leading literary publication for poets, fiction writers, and creative nonfiction authors.

67.     *Writer's Digest* is a respected magazine and website providing tips, tutorials, and market listings to help writers improve their craft and get published.

68.     We have also chosen Canadian newspapers with broad reach and geographic variety. *The Toronto Star* is one of Canada's largest online news sites, and the most read newspaper in the Greater Toronto Area. *The Globe and Mail* is Canada's most widely read national newspaper, with

over 6 million readers across print and digital formats. La Presse (a digital newspaper) has nearly 4 million active monthly readers, with a strong focus on Quebec, Canada.

69.    JND has prepared digital placements and sample print ads, which will be filed along with the long-form notice on the Court-designated deadline of September 23.

**TIER 3: Claims Stimulation**

70.    Following the Tier 1 and 2 awareness and trade media phases, the final media tier functions as a reminder and call-to-action campaign to drive claim submissions. JND proposes placements through LinkedIn, a programmatic partner, and Demand Gen, an AI-powered, visually focused Google Ads platform with ads appearing on YouTube, Discover and Gmail, as well as an internet search campaign.

71.    LinkedIn activity will target by professional attributes such as job title (e.g., "Writer," "Professor," "Publisher"), industry, and academic/publishing-related groups, as well as to a custom audience list of Class Members through an email address match process.

72.    Programmatic efforts will add behavioral targeting segments such as consumers with recent interest in academic conferences and publications, interests in things like getting or being published, and professions such as Publisher and Author, all ensuring impressions reach those with demonstrated behaviors tied to copyright-relevant activities.

73.    Demand Gen activity will target based on relevant in-market and browser/search history, as previously described for the Tier 1 GDN effort, as well as to potential Class Members who visited the Settlement Website but did not complete a claim submission (re-targeting) and individuals whose characteristics match that of individuals who have visited the Settlement Website and/or filed a claim (look-alike targeting).

74.    Given that web browsers frequently default to a search engine page, search engines are a common source to get to a specific website (i.e., as opposed to typing the desired URL in the navigation bar). As a result, JND proposes a Google search effort to assist interested Class Members

in finding the Settlement Website. A custom keyword and ad group list will be generated based on content on the case website landing page, as well as other case information. Keywords are words and phrases that are bid on when they match the search term (or a variation of the search term) a person types into their Google search bar. When a search term matches a purchased keyword or phrase, a Responsive Search Ad (RSA) may be served, generating a tailored message relevant to the search term. RSAs utilize machine learning to pair various combinations of ad copy (headlines and descriptions) based on which groupings have worked well previously (i.e., produced a strong CTR/conversion performance), and what the platform anticipates will generate the ideal results from the unique searcher. When the RSA is clicked on, the visitor will be redirected to the Settlement Website where they can get more information, as well as file a claim electronically.

75.    JND has prepared a sampling of reminder digital ads, which will be filed along with the long-form notice on the Court-designated deadline of September 23.

76.    Together, our proposed three-tiered approach ensures broad reach for awareness, credible reinforcement through trade media, and a reminder push effort to stimulate claims.

**PRESS RELEASE**

77.    To further assist in getting "word of mouth" promotion about the Settlement, JND recommends the distribution of a press release at the start of the campaign to media outlets worldwide, including to journalists who specialize in reporting on higher education, teaching, books, and publishing.[9]

78.    JND has prepared an exemplary Press Release, which will be filed along with the long-form notice on the Court-designated deadline of September 23.

---

[9] Distribution includes the U.S., Canada, Full Latin America, Europe General News, Asian General News. The press release will be translated to English, Chinese (Simplified and Traditional), French, German, Japanese, Korean, Malay, Portuguese, Spanish, and Thai.

## CALCULATING MEDIA REACH

79.     The methodology for calculating the reach of our proposed Tier 1 media effort is detailed below.

80.     **Step 1: Defining the Population Base.** The first step was to identify a reasonable estimate of the number of people who hold U.S. copyrights to written works.

81.     Based on a review of copyright registrations (and using the approach described below), we estimated that (at max) 19.6 million people hold U.S. literary copyright registrations. We used that as the foundation for our reach modeling.

82.     We arrived at that estimate by reviewing copyright registrations. For the period from 2021-2024, the U.S. Copyright Office reported an average of approximately 185,000 new literary registrations per year. *See* U.S. Copyright Office, FY 2021 Report, p. 36 (https://www.copyright.gov/reports/annual/2021/ar2021.pdf); U.S. Copyright Office, FY 2022 Report, p. 29 (https://www.copyright.gov/reports/annual/2022/ar2022.pdf); U.S. Copyright Office, FY 2023 Report, p. 28 (https://www.copyright.gov/reports/annual/2023/ar2023.pdf); U.S. Copyright Office, FY 2023 Report, p. 25 (https://www.copyright.gov/reports/annual/2024/ar2024.pdf).

83.     Then, we applied that (likely elevated) average over the 53-year period since ISBNs were introduced in 1972, yielding approximately 9.8 million unique literary copyright registrations. We assumed that each registration may be owned by at least two entities in order to reflect the Court's inclusion of both legal and beneficial owners in the Class, though we understand that the average number of owners of a registered work may be below two per work and that many works will be owned by a single person or entity (for example, works that are self-published or works-for-hire).

84.     **Step 2: Establishing the Skew.** comScore determines its reach calculation using the U.S. 18+ population, or approximately 267,181,678 per the Census 2024 American Community Survey (ACS) 1-Year Estimates Data Profile. Dividing the 19.6 million copyright holder population

by the population used by comScore's analysis resulted in a skew of 7.34% (Formula: 19,600,000 ÷ 267,181,678 = 0.0734 or 7.34%).

85.    **Step 3: Running Reach in comScore.** Next, we developed a media-mix in comScore Plan Metrix / Multi-Platform Reach and Frequency to determine the maximum achievable reach across a population of 267,181,678. As previously outlined, the media mix included GDN, Facebook, Instagram, and Reddit, chosen for their scale and alignment with the target audience's online behaviors. We assumed a campaign duration of 42 days (6 weeks) with the objective of maximizing reach. The comScore model produced a result of 95% reach among the total population.

86.    **Step 4: Applying the Skew to the comScore Outputs.** We then adjusted the output to reflect the copyright holder audience; therefore, we applied the 7.34% population skew factor to the comScore reach estimate. By doing so, we effectively modeled how many impressions would be needed to reach 95% of the copyright holder population, and the result was 97.5 million.

87.    **Step 5: Validation and Defensibility.** Finally, we reviewed and confirmed our results. The 19.6 million audience base is grounded in copyright data, and likely represents an aggressive estimate. The 7.34% skew calculation is transparent, using ACS official population data. The comScore planning system is an industry-standard reach and frequency tool widely accepted in legal notice and settlement administration for calculating expected delivery against digital audiences. By combining these elements, we have high confidence in our estimate that the Tier 1 digital effort alone is expected to achieve 95% reach among the copyright holder population and therefore likely Class Members. The direct notice efforts, Tier 2 Trade and Niche Media, Tier 3 Claims Stimulation Campaign, press release distribution, and earned media will extend reach and notice exposure further.

## ADDITIONAL CLAIMS STIMULATION

88.    Once the Notice Program concludes, JND will immediately activate a comprehensive claims-stimulation strategy designed to maximize participation among Class Members who have not yet submitted a claim or opted out of the Settlement. Just as direct outreach is proven to be the most

effective method for delivering notice, it will again serve as the cornerstone of our post-notice engagement efforts.

89.     JND will launch a multi-channel outreach campaign via U.S. mail and email, deploying multiple rounds of reminder emails and postcards to Class Members who have not yet filed a claim. These communications will be precisely timed and targeted, continuing up to one week before the claims filing deadline to ensure sustained momentum and visibility.

90.     JND has prepared Reminder Emails and a Reminder Postcard, which will be filed along with the long-form notice on the Court-designated deadline of September 23.

91.     To further amplify reach and engagement, JND will initiate the previously described Tier 3 Media Claims Stimulation campaign.

**CLAIMS RATES**

92.     JND and its principles have administered thousands of claims processes, and our experience shows that claims rates vary dramatically depending on a range of case-specific variables. However, when JND has the opportunity to perform claims stimulation efforts, such as the proposed efforts described herein, we are able to achieve excellent claim-filing outcomes. By way of example, in the Equifax Data Breach Settlement, JND received over 18.5 million claims and in the BCBS Settlement, JND received over 8 million claims.

93.     In my experience, the claims rate for a Settlement is dependent on several factors, including ease of filing, perceived benefit, earned media, and frequency of notice.

94.     <u>Ease of filing:</u> Individuals are more likely to file a claim when the claim form is simple, easy to file, does not require information that is not easily attainable, and does not require supporting documentation. Additionally, today, most people prefer to file a claim utilizing an online claim form. JND leverages our plain-language and design expertise to create online claim forms that are user friendly and walk the claimant through the form step by step. The online claim form process

will prevent claimants from submitting an electronic claim without clicking necessary verifications such as signature, which minimizes deficient claim forms and ultimately increases participation rates.

95.    Perceived benefit: Settlements with a larger potential benefit payment to class members often have a higher claims rate.[10] Class members are incentivized to file a claim for higher dollar payments than filing a claim where they believe they will only receive a few dollars.

96.    Frequency of Notice: JND will send email and mail reminder notices and perform additional claims stimulation efforts to encourage Class Members to file a claim. The more times a Class Member is exposed to Notice about the Settlement increases the likelihood of them filing a claim.

97.    Earned Media: This case has already gained a significant amount of earned media,[11] which further extends the amount of notice Class Members are receiving. JND will continue to monitor the earned media and provide updates to counsel on a weekly basis. A report of the media earned to-date is attached as **Exhibit B.**

98.    Drawing on extensive expertise, JND plans to leverage these factors to achieve the highest claims rate possible in this case.

## SETTLEMENT WEBSITE

99.    On a deadline consistent with the Court's guidelines in granting Preliminary Approval to the settlement, JND will establish and maintain an informational and interactive, case-specific Settlement Website, which will have an easy-to-navigate design and will be formatted to emphasize important information and deadlines. The website will include a page

---

[10] *See Express Freight Intl., et al. v. Hino Motors Ltd., et al.,* case no. 22-cv-22483 (S.D. Fla.) where JND achieved a claims rate of over 90% where the perceived benefit was over $1,500 per vehicle.

[11] Earned media refers to publicity or exposure received through non-paid channels like word of mouth, press coverage, or social media mentions. Unlike paid media, where a financial transaction is made for guaranteed placement, earned media is generated organically without direct payment to the source. The media mentions provided here were all generated without payment.

with answers to frequently asked questions, contact information, key dates, and links to important case documents including the Long Form Notice and Settlement Agreement. The frequently asked questions will be updated regularly to reflect passed deadlines as well as questions that arise about the claim form or claims procedure. The Settlement Website will also include information on how potential Class Members can opt out of or object to the proposed Settlement if they choose.

100.    The Settlement Website will feature a searchable database that will allow potential Class Members to search by author, title, publisher, ISBN number, U.S. Copyright Office Registration Number, or ASIN number. The Settlement Website will also have an online claim form. Additionally, a downloadable claim form will be posted on the Settlement Website for Class Members who prefer to print and mail their claim form.

101.    The Settlement Website address will be prominently displayed in all printed notice documents, and will be accessible through email and digital notices, as well as through a QR code in the mailed and printed notices.

102.    The Settlement Website will be ADA-compliant and optimized for mobile visitors so that information loads quickly on mobile devices and will also be designed to maximize search engine optimization through Google and other search engines.

## CLAIM FORM AND FILING PROCESS

103.    The Settlement Website will feature a user-friendly, automated version of the Claim Form, which will ensure that all necessary fields are correctly populated, while skipping unnecessary sections. Online claim forms not only save substantial money in postage but are generally favored by claimants since the user-friendly wizard feature walks them through the claim form process and prevents them from submitting an electronic claim that is missing required information. Electronic claims also eliminate the need for JND to manually input data and generally make processing easier and less expensive.

104.    The interactive Claim Form will be accessed through a secure portal and will request the same information from claimants that is set forth in the printed Claim Form. Where a claimant logs into the claim form with a Unique ID, the claim form will be prepopulated with information (book name, copyright number, ISBN number, etc.) related to works associated with the author/publisher. This will simplify the claim-submission process and further increase the claims rate. The interactive Claim Form will also be designed to ensure that required information is provided before a claimant can move on to the next step of the Claim Form. Supporting documentation will only be required if the claimant elects the alternative option.

105.    JND will establish a bulk-filing process that allows bulk filers to submit their claims in a streamlined manner. JND will create a bulk-filer template that mirrors the information requested on the paper and online claim form and coordinate with publishers and authors to assist them with claim submission.

106.    JND has provided input to the proposed Claim Form.

107.    JND understands that everyone who has a legal or beneficial interest in a work should have an opportunity to receive their fair share of benefits from the Settlement, but a Claim Form that requires all parties to submit a joint claim together would chill claim rates and have an adverse impact on Class Members who wish to exercise their rights in this Settlement.

108.    Alternatively, in my experience, providing class members the right to file their own claim and later addressing any conflicts increases the claims rate and ultimately results in more class members receiving payment. Where a claim is submitted that is not in conflict with another claim, that claimant ultimately receives the entire benefit. Where there is a conflict, JND has experience in resolving the disputes through a multi-step notification process and/or working directly with special masters.

109.    In the $2.67 billion BCBS Settlement, benefit payments are based on the total premiums paid by claimants, including employees and employers who shared the cost of these

premiums. Claimants had the option to choose a default split between employer and employee. They could also choose an alternative option and provide documentation to support the assertion that they should receive an allocation higher than the default. While the claims-validation process is still ongoing, where documentation was submitted in support of an alternative option, JND reviewed it to determine what allocation each claimant should receive based on the documentation. If their choice for an alternative option created a conflict with any other claimants, the affected claimants are notified and provided with an opportunity to either submit opposing documentation or accept the updated allocation.

110.    Likewise, JND is overseeing the administration of the settlement in *Sidibe, et al. v. Sutter Health*, No. 3:12-cv-4854-LB (N.D. Cal), which like BCBS, requires identifying and comparing related claims and making final determinations about employee and employer paid premiums.

111.    In this Settlement, JND will match claims by the copyright number. Where more than one claim is submitted for a given copyright number, JND will review to determine whether the claims that are submitted conflict with one another. For example, if a publisher and an author each file a claim and accept the default option, then there will be no conflict. If an author files an alternative option claim and a publisher files a default claim, JND will review the documentation and determine the allocation for each claimant. Both claimants will be provided with the determination and have the opportunity to challenge it. JND will review the challenge and issue a final determination. If the final determination is challenged, a third-party neutral (such as a special master or mediator) will review all documentation already submitted and issue an ultimate determination.

112.    In nearly every case that JND handles, we receive and resolve disputes between claimants. Because of our experience, disputes are typically resolved by coordinating with each claimant and counsel as needed. The number of disputes that require a special master or referee is very small.

113.     JND also administers settlements where a formal dispute process is required by the Settlement Agreement. In certain cases, if a claimant challenges JND's final decision, the Settlement Agreement provides that a special master will review and issue a final and binding determination. JND also has experience with challenge processes where the parties review the decision and issue the final and binding determination. It is JND's experience that the number of disputes is generally less than 1% of all claims submitted.

## CONTACT CENTER SUPPORT

114.     JND uses best in class, cloud-based contact center platform utilizing Interactive Voice Response (IVR), Automated Call Distribution Omni Channel routing, robust reporting and analytics, and integrated quality management. This allows JND to meet the needs of any administration regardless of size, complexity or communications path.

115.     Our Seattle location serves as our Contact Center, Center of Excellence (COE), which allows our core Contact Center Team direct access to case project managers. This creates a timely feedback loop that is critical to handling complex inquiries and meeting project requirements. Project team leads draft scripting for contact center agents to ensure that questions are answered accurately and consistently; agents let project team leads know when claimant questions require additional scripting. With our secure and rapidly deployable, cloud-based contact center platform, JND can scale to 2,500 seats if necessary. Our call center capabilities have enabled JND to handle matters with more than 1,000,000 claimant calls.

## CAFA NOTICE

116.     On September 15, 2025, on behalf of Anthropic, JND mailed notice of the proposed settlement in Bartz v. Anthropic PBC to the United States Attorney General and to the appropriate officials in all 50 U.S. states, territories, and the District of Columbia pursuant to the Class Action Fairness Act of 2005 ("CAFA"). JND has not received any objection from any state or federal officials.

JENNIFER M. KEOUGH DECLARATION
CASE NO. 3:24-CV-05417-WHA

## ESTIMATED COSTS

117.    JND estimates the cost for notice and administration services in this Settlement will be approximately $15 million. This estimate is based on certain current key assumptions provided to JND by the Parties. The ultimate cost of notice and administration will be dependent upon several unknown factors, including, for example, any claims-stimulation efforts, the time required to facilitate claims reconciliation between publishers and authors, and the number of claims filed. Based on my experience, I believe the costs associated with the Notice Plan are reasonable and reflect the scope and complexity of the Settlement. The proposed Notice Plan includes direct mail, email, and digital and print media components, all of which are recommended to ensure adequate notice and maximize engagement. The proposed Notice Plan and the costs associated with it are consistent with similar court-approved notice programs.

## POST-DISTRIBUTION

118.    JND's commitment to class members does not end when we send payments. JND is an industry leader in achieving high benefit acceptance rates and regularly does so in the class cases in which it is involved.  We have a proven track record of performing extensive follow up via email, postcard, and sometimes even telephone outreach, successfully encouraging class members to negotiate their benefit. These efforts routinely increase the number of negotiated benefits, allowing us to achieve benefit acceptance rates as high as, or even higher than, 95%.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

JENNIFER M. KEOUGH DECLARATION
CASE NO. 3:24-CV-05417-WHA

119.    JND is aware of the Northern District of California's Procedural Guidance for Class Action Settlements and the requirement for a post-distribution accounting 21 days after the settlement checks become stale (or, if no checks are issued, all funds have been paid to class members, cy pres beneficiaries, and others pursuant to the settlement agreement). JND is prepared to provide Counsel with the necessary information to complete that filing following the expiration of all benefits. JND is also prepared to provide any additional reporting as required by Class Counsel or the Court.

Executed on September 22, 2025 at Seattle, Washington.

_____

JENNIFER M. KEOUGH