Justin A. Nelson*
Alejandra C. Salinas*
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (SBN 316062)
Michael Adamson (SBN 321754)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
rnath@susmangodfrey.com
madamson@susmangodfrey.com

Jordan W. Connors*
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101-2683
Telephone: (206) 516-3880
jconnors@susmangodfrey.com

J. Craig Smyser*
Samir Doshi*
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 51st Floor,
New York, NY 10001-8602
Telephone: (212) 336-8330
csmyser@susmangodfrey.com
sdoshi@susmangodfrey.com

*Co-Lead Class Counsel*
*(Pro Hac Vice)*

Rachel Geman*
Jacob S. Miller*
Danna Z. Elmasry*
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
rgeman@lchb.com
jmiller@lchb.com
delmasry@lchb.com

Daniel M. Hutchinson (SBN 239458)
Jallé Dafa (SBN 290637)
Amelia Haselkorn (SBN 339633)
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
dhutchinson@lchb.com
jdafa@lchb.com
ahaselkorn@lchb.com

Betsy A. Sugar*
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
222 Second Ave., #1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com

*Co-Lead Class Counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, and MJ + KJ, INC., individually and on behalf of others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>　　　　　　Defendant. | Case No.: 3:24-cv-05417-WHA<br><br>**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 3

I.  PLAINTIFFS' AND CLASS COUNSEL'S VIGOROUS PROSECUTION OF
    THIS ACTION AND INCLUSION OF KEY STAKEHOLDERS ..................................... 3

II. PUBLISHERS, THE ASSOCIATION OF AMERICAN PUBLISHERS, AND
    PUBLISHERS' COORDINATION COUNSEL HAVE PLAYED AN
    ESSENTIAL ROLE IN THE LITIGATION AND SETTLEMENT
    PROCESS. ................................................................................................................. 5

III. THE AUTHORS GUILD AND AUTHORS' COORDINATION COUNSEL
     HAVE PLAYED AN ESSENTIAL ROLE IN FORMULATING THE PLAN
     OF DISTRIBUTION ................................................................................................... 9

ARGUMENT ....................................................................................................................... 11

I.  NOTICE WILL BE THE BEST PRACTICABLE UNDER THE
    CIRCUMSTANCES .................................................................................................. 11

    A.  The Court Should Appoint JND As Settlement Administrator ..................... 12

    B.  Revised Forms of Notice ............................................................................ 12

    C.  CAFA Notice ............................................................................................. 13

    D.  Direct Notice by U.S. Mail and Email ....................................................... 14

    E.  Industry Group Notice ............................................................................... 16

    F.  Widespread and Targeted Publication Notice ............................................. 18

    G.  Social Media and Digital Notice ................................................................ 18

    H.  Online Notice ............................................................................................. 19

    I.  The Strength of the Proposed Notice Plan Will Facilitate Finality ............. 19

II. THE PROPOSED CLAIMS PROCEDURE WILL FACILITATE THE
    EFFICIENT AND EQUITABLE DISTRIBUTION OF SETTLEMENT
    FUNDS .................................................................................................................... 20

    A.  The Proposed Claim Form Makes Submitting Claims Easy ......................... 21

    B.  The Proposed Claim Form and Claims Process Will Ensure the Fair
        and Efficient Distribution of Settlement Funds .......................................... 22

    C.  The Claims Process Will Efficiently Distribute Funds Among Multiple
        Claimants for the Same Work ..................................................................... 28

    D.  The Court Should Provide For An Efficient, No-Cost Dispute
        Resolution Mechanism to Enable Efficient Resolution of Disputes That
        Arise, If Any ............................................................................................... 28

    E.  The Proposed Claim Form and Claims Procedure Are Superior to
        Other Alternatives ...................................................................................... 32

III. TIMELINE ............................................................................................................... 34

IV. CONCLUSION .......................................................................................................... 34

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Aberin v. American Honda Motor Co., Inc.*,
   2025 WL 1651941 (N.D. Cal. Jun. 11, 2025)......................................................................... 6

6

7

*In re Anthem, Inc. Data Breach Litig.*,
   327 F.R.D. 299 (N.D. Cal. 2018) .......................................................................................... 20

8

*Armstrong v. Gallia Metro. Hous. Auth.*,
   2001 WL 1842452 (S.D. Ohio Apr. 23, 2001) ..................................................................... 34

9

10

*In re: Blue Cross Blue Shield Antitrust Litig.*,
   No. 2:13-cv-20000-RDP (N.D. Ala.) ................................................................................... 33

11

*Botonis v. Bimbo Bakeries USA, Inc.*,
   2024 WL 100545 (E.D. Cal. Jan. 9, 2024)........................................................................... 36

12

13

*Carlough v. Amchem Prods., Inc.*,
   10 F.3d 189 (3d Cir. 1993).................................................................................................... 38

14

15

*Castellon v. Penn-Ridge Transportation, Inc.*,
   2020 WL 8768456 (C.D. Cal. Mar. 9, 2020) ...................................................................... 34

16

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
   424 F. Supp. 3d 456 (E.D. La. Jan. 10, 2020)..................................................................... 38

17

18

*Chinitz v. Intero Real Est. Servs.*,
   2020 WL 7042871 (N.D. Cal. Dec. 1, 2020) ....................................................................... 20

19

20

*Cisneros v. EP Wrap-It Insulation, LLC*,
   2022 WL 2304146 (D.N.M. June 27, 2022) ........................................................................ 30

21

*Clayborne v. Newtron, LLC, et al.*,
   2023 WL 5748773 (N.D. Cal. Sep. 6, 2023)......................................................................... 6

22

23

*Davis v. Yelp, Inc.*,
   2022 WL 2174877 (N.D. Cal. Aug. 1, 2022)........................................................................ 6

24

25

*De Santos v. Jaco Oil Co.*,
   2015 WL 4418188 (E.D. Cal. July 17, 2015) ...................................................................... 36

26

*Edwards v. First Am. Corp.*,
   2016 WL 8943464 (C.D. Cal. June 20, 2016) ..................................................................... 36

27

28

*Fleming v. Impax Lab'ys., Inc.*,
   2021 WL 5447008 (N.D. Cal. Nov. 22, 2021)...................................................................... 7

*Gomez-Gasca v. Future AG Mgmt., Inc.*,
    2020 WL 6149688 (N.D. Cal. Oct. 20, 2020) ........................................................ 36

*Hernandez v. Wells Fargo Bank, N.A.*,
    2022 WL 93618 (N.D. Cal. Jan. 9, 2022) (Alsup, J.) ............................................ 7

*Keller v. Nat'l Collegiate Athletic Ass'n (NCAA)*,
    2015 WL 5005901 (N.D. Cal. Aug. 19, 2015) ...................................................... 26

*Kendig v. ExxonMobil Oil Corp.*,
    2020 WL 13302377 (C.D. Cal. Aug. 24, 2020) .................................................... 36

*In Re MacBook Keyboard Litig.*,
    2022 WL 17254944 (N.D. Cal. Nov. 28, 2022) ...................................................... 6

*In re MyFord Touch Consumer Litig.*,
    2019 WL 1411510 (N.D. Cal. Mar. 28, 2019) ...................................................... 26

*O'Connor v. Uber Techs., Inc.*,
    2019 WL 1437101 (N.D. Cal. Mar. 29, 2019) ...................................................... 37

*In re Packaged Seafood Prods. Antitrust Litig.*,
    2022 WL 2803110 (S.D. Cal. July 15, 2022) ...................................................... 37

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ............................................................................................ 38

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
    2022 WL 816473 at*5 (N.D. Cal. Mar. 17, 2022) (Alsup, J.) .............................. 25

*SEB Inv't Mgmt. AB v. Symantec Corp.*,
    2022 WL 409702 (N.D. Cal. 2022) ...................................................................... 25

*Senne v. Kansas City Royals Baseball Corp., et al.*,
    2023 WL 2699972 (N.D. Cal. Mar. 29, 2023) ...................................................... 6

*Shuman v. Squaretrade, Inc.*,
    2022 WL 10177658 (N.D. Cal. Oct. 17, 2022) ...................................................... 6

*Silber v. Mabon*,
    18 F.3d 1449 (9th Cir. 1994) .............................................................................. 25

*Taafua v. Quantum Glob. Techs., LLC*,
    2021 WL 579862 (N.D. Cal. Feb. 16, 2021) ........................................................ 7

*Taylor v. Fedex Freight, Inc.*,
    2016 WL 1588405 (E.D. Cal. Apr. 20, 2016) ...................................................... 36

*Trabakoolas v. Watts Water Techs., Inc.*,
    2014 WL 12641599 (N.D. Cal. Aug. 5, 2014) ...................................................... 34

*United States v. City of New York*,
   877 F. Supp. 2d 57 (E.D.N.Y.), *amended*, 905 F. Supp. 2d 438 (E.D.N.Y.
   2012) ..................................................................................................................... 34

*Villafan v. Broadspectrum Downstream Servs., Inc.*,
   2020 WL 6822908 (N.D. Cal. Nov. 20, 2020) .......................................................... 7

*In Re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Product Litig.*,
   2022 WL 20223605 (N.D. Cal. Jul. 8, 2022) (Breyer ............................................... 6

*In Re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Product Litig.*,
   2023 WL 2600450 (N.D. Cal. Mar. 22, 2023) .......................................................... 6

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   229 F. Supp. 3d 1052 (N.D. Cal. 2017) ................................................................. 18

*Whalen v. Ford Motor Co.*,
   2018 WL 6069812 (N.D. Cal. Nov. 20, 2018) ........................................................ 34

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
   2012 WL 5055810 (D. Minn. Oct. 18, 2012) ......................................................... 34

**Statutes**

17 U.S.C. §101 ............................................................................................................... 29

28 U.S.C. § 1715(b) ....................................................................................................... 18

**Other Authorities**

Fed. R. Civ. P. 23 ................................................................................................... *passim*

1

**INTRODUCTION**

The Court should grant preliminary approval of this historic $1.5 billion Settlement. The Settlement provides an extraordinary monetary recovery to the class, releases only certain past claims, and requires the permanent destruction of the two allegedly pirated datasets. The parties have worked around the clock since the Court's initial preliminary approval hearing on September 8 to address the remaining issues the Court raised at that hearing, including related to notice, the Claim Form and process, and the plan of distribution. Class Counsel believe those issues have been sufficiently resolved and should meet with the Court's approval. Class Counsel's goals in proposing this plan of notice and distribution were to make a process that (1) will result in a high claims rate that is efficient for claimants; (2) respects pre-existing contractual relationships; and (3) is consistent with due process and this Court's guidance. Class Counsel submit that the process as outlined accomplishes these objectives.

*Notice*. Notice in this case will be comprehensive. Direct notice will be distributed via first-class mail and e-mail. In addition, a robust outreach plan exists through social media, publication in print, publication online, ***and*** targeted outreach by several well-known membership organizations in the United States and other countries. Ex. 1 (Plan of Allocation and Distribution (POA&D) ¶ 2(a)). Moreover, due to the publicity this case has attracted, Plaintiffs expect that the case will continue to generate both press and commentary among interested groups. Direct notice will be sent to both "the author and [] the publisher" and will go far beyond a "postcard." Transcript of September 8, 2025, Hearing (at 7:23–8:4) (The Court). In addition, the notice process will (with the Court's approval) be overseen by JND Legal Administration, which has been repeatedly approved as a Settlement Administrator by courts in this district in the last five years alone,[1]

---

[1] *See, e.g.*, *Aberin v. American Honda Motor Co., Inc.*, 2025 WL 1651941, at *1 (N.D. Cal. Jun. 11, 2025) (Tigar, J.); *Clayborne v. Newtron, LLC, et al.*, 2023 WL 5748773, at *7 (N.D. Cal. Sep. 6, 2023) (White, J.); *Senne v. Kansas City Royals Baseball Corp., et al.*, 2023 WL 2699972, at *20 (N.D. Cal. Mar. 29, 2023) (Spero, J.); *In Re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Product Litig.*, 2023 WL 2600450, at *1 (N.D. Cal. Mar. 22, 2023) (Breyer, J.); *In Re MacBook Keyboard Litig.*, 2022 WL 17254944, at *7 (N.D. Cal. Nov. 28, 2022) (Davila, J.); *Shuman v. Squaretrade, Inc.*, 2022 WL 10177658, at *3 (N.D. Cal. Oct. 17, 2022) (Spero, J.); *Davis v. Yelp, Inc.*, 2022 WL 2174877, at *6 (N.D. Cal. Aug. 1, 2022) (Chen, J.); *In Re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Product Litig.*, 2022 WL 20223605, at *3 (N.D. Cal. Jul. 8, 2022) (Breyer, J.); *Fleming v. Impax Lab'ys., Inc.*, 2021 WL 5447008, at *12 (N.D. Cal.

including by this Court, *see Hernandez v. Wells Fargo Bank, N.A.*, 2022 WL 93618, at *8 (N.D. Cal. Jan. 9, 2022) (Alsup, J.) (granting final approval where JND was class administrator and observing that "94% of the net settlement fund had been cashed").

*Claim Form and Process*. The Claim Form has been specifically designed to facilitate and encourage the submission of claims while also ensuring all potential claimants are again made aware of their rights, complementing information provided by the notice process. The Claim Form will permit a claimant to list every work for which the claimant seeks an award. It will also require the claimant to provide contact information about any other person who the claimant believes may be entitled to submit a claim related to the claimed work. Ex. 1 ((POA&D) ¶ 3(b)). After such information is submitted, JND will contact any identified potential claimants. Finally, after receiving response from potential claimants, JND will again communicate directly with all claimants for a work, identifying for them all other claimants of the work as well as the proposed split of the award among those claimants. This iterative process will permit the rapid and comprehensive submission of claims while concurrently ensuring that potential claimants are fully apprised from the beginning of the claims process to the very end. The proposed claims process will also ensure a wide reach and an excellent claims rate: even class members who do not file a claim will receive a check in the mail if other claimants do the work to file a claim. *Id.* ¶ 3.

*Distribution.* The proposed distribution plan is designed to offer all claimants a straightforward and speedy administration of their claims while, at the same time, allowing any claimant to ensure that their distribution adheres to their specific contractual terms. Many works in the class will be owned by a single party (like either an author or publisher); on the Claims Form, those sole-owners can identify themselves and will be entitled to 100% of the award for their work. But the majority of works on the Works List will have both a legal and beneficial owner. The sectors impacted by the settlement are principally trade books, university press books, and education books. The Claim Form and distribution plan therefore account for the similarities and differences in those sectors to ensure that the plan proposed is sensible practicable and can be

---

Nov. 22, 2021) (Gilliam, Jr., J.); *Taafua v. Quantum Glob. Techs., LLC*, 2021 WL 579862, at *2 (N.D. Cal. Feb. 16, 2021) (Demarchi, J.); and *Villafan v. Broadspectrum Downstream Servs., Inc.*, 2020 WL 6822908, at *6 (N.D. Cal. Nov. 20, 2020) (Beeler, J.).

1  efficiently administered.

2  For works where there are multiple claimants, Class Counsel have proposed—after

3  extensive consultation with authors and publishers groups—a distribution plan and Claim Form

4  that allow most claimants to choose a non-mandatory default split of 50-50. Ex. 1 ((POA&D)

5  ¶ 4(a)(i)). The default 50-50 split reflects a common, recurring term in trade and university press

6  contracts addressing how author and publisher divide the proceeds of infringement litigation. Any

7  claimant, however, can de-select that default by indicating that the claimant has a different

8  contractual arrangement that it seeks to pursue. *Id.* ¶ 4(e). For education works,[2] more

9  individualized determination of the proper allocation of the award will occur. *Id.* ¶ 4(a)(ii).

10  The Claim Form also allows claimants to indicate that they are the sole owners of the work,

11  for example because rights have reverted to the authors, rights have terminated, the book was self-

12  published, or the book was a work-for-hire. *See* Ex. 1 ((POA&D) ¶ 4). These procedures reflect the

13  typical contractual relationships between authors and publishers in these contexts, as supported by

14  Class Counsel's own review of many of those contracts; the contracts of the named Plaintiffs in

15  this case; and the experience of industry experts and stakeholders. Accordingly, the proposed

16  distribution plan does "not involve the publishers trying to force every publisher to do the same

17  thing"; does "not force every author to do the same thing"; and does "not require any global deal."

18  Transcript of September 8 Hearing (at 19:6–9, 20:17–18) (The Court). Exactly the opposite.

19  In view of these developments—which ensure an exhaustive notice process along with a

20  streamlined, fair, and careful claims process—Class Counsel respectfully submit that the Court

21  enter preliminary approval of the Settlement Agreement in full.

22  **BACKGROUND**

23  I.    **PLAINTIFFS' AND CLASS COUNSEL'S VIGOROUS PROSECUTION OF THIS ACTION AND INCLUSION OF KEY STAKEHOLDERS**

24  As the Court is aware, Plaintiffs filed this action on August 19, 2024, alleging that Anthropic

25  downloaded Plaintiffs' copyrighted works from pirated datasets without authorization and used

26

27  [2] Education works are works published by education publishers. Education publishers specialize in creating and publishing works, including but not limited to textbooks, for the instruction of students

28  and professionals, which are distributed for and through educational and professional markets. The searchable directory of works accessible on https://www.anthropiccopyrightsettlement.com/ will identify which works are education works.

those works to train its Claude LLMs. Dkt. 1. Since that day, Plaintiffs—represented since the beginning by Susman Godfrey, Lieff Cabraser Heimann & Bernstein, and Cowan DeBaets Abrahams & Sheppard ("CDAS")—have prosecuted this case with vigor. Plaintiffs served 186 requests for production, 29 interrogatories, and 65 requests for admission; litigated 17 discovery motions with hearings resulting from 11 of those motions; participated in over a dozen depositions; and engaged in critical motions practice, including summary judgment, class certification, reconsideration, interlocutory review, and to stay proceedings. The efforts of Plaintiffs and Class Counsel are described in detail in the Plaintiffs' original brief in support of their motion for preliminary approval. Dkt. 363 at 9–16.

Plaintiffs and Class Counsel have extensively engaged with relevant stakeholders in the author and publishing communities throughout this case. For example, before class certification, Plaintiffs kept the Authors Guild, Inc. ("Authors Guild") and the Association of American Publishers ("AAP") informed about the litigation and critical developments in the case, including settlement discussions after this Court permitted such conversations. After the class was certified and defined to include both authors and publishers, Plaintiffs' counsel had direct conversations with the general counsels' offices of the five major trade publications; invited the inclusion of a publishers' coordination counsel to further assist prosecution of this case; and continued to engage with authors and the class representatives about case developments. On August 11, 2025, Plaintiffs filed an official notice of association of counsel with Publishers' Coordination Counsel. *See* Dkt. 298.

The named plaintiffs and class representatives have likewise expended significant effort to ensure the effective and vigorous prosecution of this action. In addition to their deposition and discovery, Plaintiffs Bartz, Graeber, and Johnson have been intimately involved in designing the Plan of Allocation and Distribution, the claims form, and class notice, bringing their experience as published authors to ensure that the claims process and papers are readable and fair. That information has been critical in shaping a claims and distribution process that reflects author-publishing agreements and honors the existing contractual relationships between and among class members.

**II.    PUBLISHERS, THE ASSOCIATION OF AMERICAN PUBLISHERS, AND PUBLISHERS' COORDINATION COUNSEL HAVE PLAYED AN ESSENTIAL ROLE IN THE LITIGATION AND SETTLEMENT PROCESS.**

Class actions often must navigate agency problems, with representative plaintiffs and counsel advocating for absent class members who have no direct voice and whose interests largely must be surmised. This class action is different: absent class members whose rights are being litigated are not only able to speak, but to participate actively. Edelson/O+Z Decl. ¶¶ 14–17. From the moment the Court certified the class and first included publishers in the case, they have been in an all-out sprint: mobilizing to work with Class Counsel to assemble the Works List, enlisting and preparing publisher witnesses to be poised for an historic trial, and now helping to deliver this groundbreaking settlement for the benefit of the entire Class. *Id.* at ¶¶ 17, 19, 20, 21. In short, this $1.5 billion settlement would not exist but for the contributions of the publishers, the Publishers' Coordination Counsel ("PCC"), and the authors. *Id.* at ¶ 21.

After the Court certified a class to include both the legal and beneficial owners of the works at issue, publishers found themselves transformed into class members at a pivotal moment in the adjudication of their rights. *See* Transcript of Hearing, May. 15, 2025 (Dkt. No. 198) at 25–26; Order on Class Certification (Dkt. No. 244). The Class was tasked with immediate obligations on which publishers had unique knowledge: providing key expertise on the Works List under severe time constraints, preparing for a rapidly approaching trial, and engaging in settlement negotiations as large stakeholders. Edelson/O+ZDecl. ¶¶ 17, 19, 20, 21. Class Counsel invited the active participation of publisher class members through the PCC, based on publishers' deep knowledge in copyright law and the publishing industry, and the value they could bring to the class as a whole, which was originally proposed as authors only. *Id.* at ¶ 14. Rather than opting out or pursuing separate litigation, publishers chose coordinated engagement with Class Counsel through the PCC, which validates the Court's decision to certify this Class. *See* Dkt. 244 at 12. As this Court noted in its Class Certification Order, "authors and publishers are in business together and will work out the best way to recover." *Id.* That remains true after the case settled. The settlement benefits both authors and publishers in resolving claims against Anthropic and the work has been done to develop an equitable distribution mechanism for the proceeds of this historic settlement.

On August 11, Class Counsel filed a Notice of Association of Additional Counsel. Dkt. 298. That document described that the PCC would be "representing the interests of publishers in the common goal of maximizing the per-work recovery for the Class" and would "provide the publishers' perspective and assist with trial preparation and strategy, trial, assembling the class list, class notice, and settlement discussions." *Id.* That is exactly what the PCC has done. Class Counsel believed then—and continues to believe—that entry of the PCC to serve these goals would benefit the class as a whole. Edelson/O+Z Decl. ¶ 14. Not only would it keep the class united, but the PCC would provide valuable perspective and insights from the publishers to make the whole class stronger. *Id.* at ¶¶ 16, 18. And indeed, the PCC has provided invaluable contributions to the benefit of the whole class. *Id.* at ¶¶ 21, 23.

The PCC comprises two firms with critical skillsets to assist the publishers in the matter, and as the Notice of Association describes, were "supported in this role by the Association of American Publishers and its members." Oppenheim + Zebrak, LLP ("O+Z") is not a class action firm, but rather a boutique litigation firm that specializes in representing copyright and trademark owners in litigation. Edelson/O+Z Decl. ¶¶ 16–22. The O+Z partners involved in this case have litigated and tried many of the largest and most complex copyright cases of our time, including numerous mass infringement cases involving BitTorrent. Edelson/O+Z Decl. ¶ 20. Among their regular clients are many book publishers and the AAP. *See* Edelson/O+Z Decl. ¶ 22. Edelson PC is a national plaintiffs' law firm, whose class action practice has an exceptional track record of litigating cutting-edge technology cases to historic results. Edelson/O+Z Decl. ¶¶ 3–12. Together, O+Z and Edelson jumped into this case—ready to leverage the publishers' knowledge and perspective to help try it, if necessary, or settle it, if possible. *Id.* at ¶¶ 13–18.

After the Court's Class Certification Order, the PCC immediately began engaging in near-daily (and often many-times-daily) meetings with legal teams from the AAP, the Publishers Association of the UK (PA), the Association of University Presses, as well as numerous major trade, educational, and independent publishers. *Id.* at ¶ 16. These essential coordination hubs enabled publishers to align in their participation and management of the complexities in this case. With trial mere months away, the PCC identified executive-level witnesses from publishers who

1    volunteered to testify about how their industry works, the creative, educational and scientific

2    importance of books, as well as their efforts to fight piracy and the harm that comes from that

3    piracy. *Id.* at ¶ 17. The PCC worked with those witnesses to gather documents for expedited

4    production in advance of trial, and provide for their depositions. *Id.* The PCC joined Class

5    Counsel's trial strategy meetings, weighing in on expert witness strategy and the trial plan. *Id.* at

6    ¶ 18. All this work ensured that the Class would be prepared to put on the strongest possible case

7    at trial.

8         Similarly, AAP has actively engaged with its members, Class Counsel, and the PCC to

9    ensure that any settlement addresses publishers' interests and concerns, as the majority of the

10   Works List implicate AAP members. *See* Pallante Supp. Decl. ¶ 14. AAP's CEO, Maria Pallante,

11   has personally interacted with CEOs and general counsels of dozens of AAP members regarding

12   procedural aspects of the case; explained criteria for copyrighted works to be included on the Works

13   List based on the Court's class definition; helped facilitate publishers' ability to provide input and

14   feedback to the PCC regarding the litigation and/or settlement; provided information on author-

15   publisher contractual norms to facilitate a fair and reasonable allocation plan; alerted the publishing

16   sectors most affected by the piracy at issue; assisted with press requests relating to this action; and

17   encouraged publishers to assist Class Counsel in ensuring a robust notice process, including as to

18   their authors. *See id.* AAP has done all this without compensation. *Id.* ¶ 2.

19        The PCC also provided tremendous value in producing the final Works List—essential for

20   notice, trial preparation, and the ultimate settlement—which was a particularly demanding task

21   given the compressed timeline and the enormous volume of works Anthropic downloaded. *Id.* at

22   ¶¶ 19–20. The PCC engaged in an all-out effort to assist Class Counsel in accomplishing this feat,

23   committing a team of lawyers with extensive experience clearing works for inclusion in copyright

24   cases. *Id.* at ¶ 19. Those counsel worked full-time for weeks with Class Counsel's team of lawyers,

25   staff, and experts to refine the technical analysis to assess works for satisfaction of the class criteria,

26   *see* Dkt. 363-2 (Original Dec. of Class Counsel ISO Preliminary Settlement Agreement) at ¶¶ 47–

27   53, including by searching Copyright Office databases, identifying ISBNs, and matching works to

28   the criteria for class inclusion. Edelson/O+Z Decl. ¶ 19. With that assistance from the PCC, Class

Counsel was able to refine these matching processes and identify works that otherwise may not have been included across the full dataset—again, a class-wide benefit. *Id.* at ¶ 20. These efforts resulted in a Works List approximately 20% larger than otherwise. *Id.* Through the efforts of the PCC and publishers assisting Class Counsel, Plaintiffs were able to submit a high-quality works list in short order. *Id.*

The PCC and the publishers themselves dove headfirst into the case in both time and hard costs, when the only promise was a trial in three months. *Id.* at ¶¶ 17, 18, 22, 24. The PCC firms immediately devoted the full-time work—including mornings, nights, and weekends—of multiple attorneys to meet the Court's deadlines and prepare to conduct a trial that included new publisher witnesses. *Id.* at ¶¶ 17, 18, 24. Moreover, the publishers and AAP dedicated their highest-level in-house counsel to this case for months—an investment for which they will never see a cost recovery, but which will inure to the benefit of the class as a whole. *Id.* at ¶ 16.

When mediation became a reality, the PCC—representing a constituency with enormous claims against Anthropic—engaged in the negotiations in a collaborative effort with Class Counsel for the benefit of the entire class. *Id.* at ¶ 21. The publishers deployed their negotiating power to help secure the record-shattering settlement before the Court—a settlement that provides not just excellent compensation to every class member, but that Plaintiffs' counsel believe sends a critical message to artificial intelligence companies that piracy will not be tolerated. *Id.*

In light of this history, the facts on the ground show that the publishers have worked relentlessly *for* the interests of the class, including specifically authors. *Id.* at ¶ 23. Indeed, Class Counsel themselves invited the PCC's involvement in the interests of the Class, and their involvement has been of enormous benefit to the class as a whole. *Id.* at ¶¶ 21, 23. As one more data point, the PCC proposed the extraordinarily claimant-friendly design of the Plan of Allocation and Distribution, which will maximize the number of authors and publishers paid under the settlement. *Id.* at ¶ 23. In particular, the PCC proposed that, for any work claimed, any class member (*i.e.,* author or publisher) is automatically sent a check—irrespective of whether they filed a claim—for their share of the award for that work, and has a full 18 months to either cash that check or otherwise claim the proceeds. *Id.*

Through their engagement with this case, the PCC and the publishers have provided critical value to the class action and the settlement. *Id.* at ¶¶ 16–21, 23. They believe in the importance of this case and this settlement to the class as a whole and to copyright owners' efforts to fight piracy. They will continue to do that work unless instructed otherwise by the Court. The PCC will be present at the hearing and be prepared to address these points, as well as any others that pertain to the publishers' ongoing involvement in the litigation.

## III.    THE AUTHORS GUILD AND AUTHORS' COORDINATION COUNSEL HAVE PLAYED AN ESSENTIAL ROLE IN FORMULATING THE PLAN OF DISTRIBUTION.

In addition to the named plaintiffs, Class Counsel have also worked closely with several authors organizations, including the Authors Guild, which has itself sought input from a broad range of writers' organizations, and Authors Coordination Counsel. The Authors Guild is "the oldest and largest author association in the country, made up of over 16,000 professional, published writers," representing "the interests of authors and journalists from every genre, including historians, biographers, academicians, novelists, journalists, textbook writers, children's book writers, and other writers of non-fiction and fiction." Not-for-Profit Author Organizations Decl. ¶ 11. They are not being compensated—at all—for their assistance in this case. *Id.* ¶ 19 ("[N]either we nor the organizations we serve are receiving any benefits from the settlement . . . ."). Nor are they a substitute for the role of Class Counsel and the Class Representatives. Instead, the Guild is participating solely to further its "not-for-profit mission [] to defend the profession as a whole." *Id.* ¶ 18.

The contributions of the Guild have been extensive by any measure. For instance, the Guild solicited and received input "from at least a half dozen organizations that represent authors in specific genres, many of which participated in calls with Class Counsel." *Id.* ¶ 17. Among the groups with which the Guild liaised include the Romance Writers of America and the "Sisters in Crime," whose mission is "to promote the ongoing advancement, recognition and professional development of women crime writers" across its membership of over 4,000. *Id.* ¶ 9. The Guild and Class Counsel have also coordinated with the Textbook and Academic Authors Association (TAA), both directly and through its counsel at Slarskey LLC, and they have provided valuable feedback

9

on the distribution process and forthcoming proposed Claim Form.

In addition to coordinating with authors' groups across the country, the Guild offered critical input into the efficient and fair claims process that Plaintiffs propose. To do so, the Guild reviewed scores of author-publisher agreements to propose and assess potential non-mandatory default rules for the claims process to ensure that they reflect recurring terms in publishing agreements and allow any diverging contractual terms to be honored. *See id.* ¶¶ 17, 22. ("Each of us, directly or indirectly, assisted the process of educating Class Counsel about standard contract terms, thus facilitating the creation of a fair, reasonable, and adequate proposed plan of distribution."). In addition, the Guild closely reviewed the proposed Claim Form and associated notice documents, identifying substantive areas and phrasing that may prove confusing or challenging for claimants. The Guild proposed important, constructive edits, ensuring that the Claim Form would ease the burden on potential claimants and that notice would be distributed in a broad, effective, and understandable manner. The Guild did so "guided by all of the input and feedback [it] receive[d] from authors." *Id.* ¶ 18.

The Guild's work will not stop here. Along with other authors organizations, the Guild "is willing and eager to disseminate any approved Class notice to our members"; "to direct members to the Settlement website or to Class Counsel"; to "help Class members to fill out claims"; and "to spend the time to collect recurring questions about the Settlement (if any) and convey them to Class Counsel." *Id.* ¶¶ 20, 21. This massive effort on the part of the Guild—undertaken without any compensation—will further its "goal to make the claims process as efficient as possible and to encourage as many authors whose works are on the Works List as we can to file claims and to do so accurately." *Id.* ¶ 23.

Finally on the authors' side, Authors' Coordination Counsel has also provided critical assistance. From the case's inception CDAS—a boutique firm with a specialty in copyright issues and decades of experience representing authors and publishers alike—has offered its valuable copyright expertise on a host of critical issues that this case has implicated at both summary judgment and class certification. And Authors' Coordination Counsel has likewise exercised significant expertise, based on their extensive experience, determining how best to honor industry

norms and existing contractual relationships between authors and publishers in a myriad of contexts. *See* Wolff Decl. ¶¶ 2–9. Authors' Coordination Counsel also played a key role in (i) coordinating with stakeholders with respect to the Class List; the Plan of Distribution, Claim Form, and Class Notice; and (ii) advising and assisting Class Counsel with compilation of the Works List, including by improving the methods by which works were assessed for satisfaction of the class criteria. *See id.*

\*        \*        \*

Overall, the proposed notice plan and plan of allocation and distribution are carefully calibrated to ensure efficient distribution of funds to the right people, while respecting existing contractual arrangements among class members. To formulate this plan, Class Counsel sought the input of a wide array of stakeholders, including the Authors Guild and AAP, to ensure an efficient and fair distribution process.

## ARGUMENT

This supplemental brief addresses issues raised by the Court during the hearing on September 8, including the process for notice, the claim form, and the distribution of Settlement funds. *See* Dkt. 371 (ordering "clarifications respecting the Claim Form, claims procedure, and anything else"). Those processes and forms work together to satisfy all Federal Rule of Civil Procedure 23(e)(2) criteria, as well as the Northern District of California's Procedural Guidance for Class Action Settlements, and the Court's Order re Putative Class Actions and Factors to be Evaluated for Any Proposed Class Settlement. Dkt. 8. The Court should therefore enter preliminary approval of the proposed Settlement.

## I.    NOTICE WILL BE THE BEST PRACTICABLE UNDER THE CIRCUMSTANCES

Class Counsel have proposed a state-of-the-art notice plan with multiple and complementary layers that will achieve the best notice that is practicable under the circumstances. Under that plan, Class Members will receive direct mail and email notice supplemented by notice shared through prominent industry groups, trade publications, digital and social media channels, and a Settlement Website. Notice through industry groups, trade publications, digital and social media channels, and a Settlement Website will commence as soon as the Court issues preliminary

1   approval, with direct notice commencing shortly afterwards.

2   **A.    <u>The Court Should Appoint JND As Settlement Administrator</u>**

3   Proposed Settlement Administrator JND has a strong track record of success in this District

4   and nationally. In addition to its extensive experience in complex matters and copyright class

5   actions across the country, JND has substantial experience in this District. Keough Supp.

6   Decl. ¶¶ 4, 8–17. In fact, JND has administered notice, claims, and/or distribution of settlement

7   funds in more than 60 cases in the Northern District of California. Keough Supp. Decl. ¶ 4. In each

8   of those cases, JND has provided timely and comprehensive data to counsel to facilitate the filing

9   of Post-Distribution Accounting, as required by the N.D. Cal. Procedural Guidelines for Class

10  Action Settlements. Keough Supp. Decl. ¶ 4. Those Post-Distribution Accounting filings reveal the

11  following statistics regarding JND's administration of class actions in this District:

12  • JND has administered $65 billion in settlement funds and judgments;

13  • JND has administered settlement relief on behalf of more than 379 million class members;

14  • Of the 950 million notices JND has sent, approximately 5% were returned as undeliverable;

15  Keough Supp. Decl. ¶¶ 4–5.

16  JND's success in this District and beyond has resulted in favorable industry recognition.

17  JND has been praised by various publications, including the *National Law Journal*, the *Legal*

18  *Times*, and the *New York Law Journal*, for excellence in class action administration. Keough Supp.

19  Decl. ¶ 7. JND was also named the #1 Class Action Claims Administrator in the United States by

20  the national legal community for multiple consecutive years, and the company was inducted into

21  the *National Law Journal* Hall of Fame for having held this title for four years in a row. *Id.*

22  **B.    <u>Revised Forms of Notice</u>**

23  Consistent with the Court's guidance, Class Counsel have revised the proposed forms of

24  notice to reflect the proposed Plan of Allocation and Distribution ("POA&D"). The Plan of

25  Allocation and Distribution is summarized in Exhibit 1, and per the Court's order at Dkt. 383,

26  Plaintiffs will submit the revised proposed notice on or before noon tomorrow. Under the proposed

27  notice plan, Class Members will receive a short-form notice by U.S. Mail and an email Notice.

28  Keough Supp. Decl. ¶¶ 35, 38. Class Members who do not promptly submit a claim or opt out will

also receive a reminder postcard notice and periodic reminder email notices. Keough Supp. Decl. ¶¶ 88–89. In addition, a long-form notice will be posted on the Settlement Website, the address of which will be featured prominently on the other forms of notice. Keough Supp. Decl. ¶¶ 99, 101. In addition, a QR code will be featured on the mailed notices that, when scanned, will direct the recipient to the Settlement Website. Keough Supp. Decl. ¶ 101.

The revised proposed forms of notice will be filed on September 23 by noon, per the Court's order. *See* Dkt. 383. Also, as requested by the Court (Sept. 8 Hearing Tr. at 13–14), Class Counsel and JND will submit by tomorrow a proposed envelope in which the proposed Short-Form Notice will be mailed. Among other information, the proposed envelope will state, "Important Class Action Notice" and indicates it is from the "United States District Court, Northern District of California, Honorable William Alsup, 450 Golden Gate Avenue, San Francisco, CA 94102." As required by Rule 23(c)(2)(B), the proposed notices clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the certified Class; (iii) Class claims and issues; (iv) that a Class Member may enter an appearance through an attorney if the Member so desires; (v) that the Court will exclude from the Class any Class Member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

### C.    CAFA Notice

Class Action Fairness Act ("CAFA") notice has already been sent, consistent with federal law and the terms of the proposed settlement agreement. CAFA requires defendants to notify state and federal regulators of any proposed class action settlement "[n]ot later than 10 days after" the proposed settlement is filed in court. 28 U.S.C. § 1715(b); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 229 F. Supp. 3d 1052, 1058, 1067 (N.D. Cal. 2017) (weighing CAFA notice, and lack of objection by state and federal officials, as a factor in favor of final approval of federal class action settlement). On September 15, consistent with CAFA requirements and the terms of the settlement agreement (Dkt. 363-3 ¶ 4.11), JND sent, on Anthropic's behalf, notice of the proposed settlement to the attorneys general of each U.S. state and the attorney general of the United States. Keough Supp. Decl. ¶ 116. Class Counsel and JND have

1    not received any objection or other responsive correspondence from any state or federal officials.

2    Class Counsel Supp. Decl. ¶ 5; Keough Supp. Decl. ¶ 116.

3    **D.    Direct Notice by U.S. Mail and Email**

4    Direct notice will be distributed to Class Members by both U.S mail and email. Just one

5    week after the Works List was finalized and filed, the Class List[3] already contains at least one

6    mailing or email address for 99% of works on the Works List. Keough Supp. Decl. ¶ 26. The

7    updated Class List contains email or mailing addresses for approximately 97% of all publishers of

8    works on the Works List (amounting to a publisher address for 99.4% of listed works) and

9    approximately 66% of all authors of works on the Works List (amounting to an author address for

10   81% of listed works). *Id.* The Class List also includes the address information listed on the

11   registrations of the works filed with the Copyright Office. *Id.* For those approximately 279,000

12   works (58% of the total), direct notice would also be sent to these addresses as part of the notice

13   plan. *Id.*

14   Class Counsel further expect publishers to provide additional contact information. Indeed,

15   publishers of approximately half of all works on the Works List have already agreed to provide

16   author contact information within 45 days of preliminary approval. *Id.* And Class Counsel expects

17   that number to grow to 75% shortly. Even just taking those publishers who have already agreed,

18   this would raise the share of the authors of works on the Works List with contact information from

19   66% to 84%, and would raise the share of works on the Works List with author contact information

20   from 81% to 93%. *Id.* Collecting such contact information for thousands of works is, for many

21   publishers, a large, time-consuming undertaking. Thus, the proposed notice and distribution

22   schedule contemplates up to 45 days for publishers to complete this task. Ex. 1 (POA&D ¶ 2(b)).

23   Class Counsel believe that waiting to issue direct notice until the compilation of contact

24   information from publishers has completed will enhance the efficacy of direct notice and avoid

25   situations where authors wrongly believe they are not part of the class because they were not in the

26   very first tranche of direct notice. As the Court is aware, Class Counsel have collected—and

27   continues to collect—class member contact information through its website. Due to the broad

28

---

[3] An updated Class List, with additional contact information, will be filed on September 23, 2025.

publicity of this case, since the Court certified the Class on July 17, 49,000 have submitted their contact information via online intake forms or by contacting Class Counsel. Keough Supp. Decl. ¶ 27. The rate of contact-information submission has swelled since the Settlement Agreement was filed publicly on September 5.

After that, JND will continue to get notice data in the claims process. To the extent any gaps remain, the proposed Claim Form *requires* all rightsholders to submit the known contact information for any other rightsholders associated with the works for which they are submitting a claim. Ex. 1 (POA&D ¶ 3(b)(ii)).

Significantly, JND will send *both* mailed and emailed notice whenever possible. Keough Supp. Decl. ¶¶ 33–40. And, for any class member who does not promptly opt out or submit a Claim Form, JND will send a reminder postcard notice by mail and periodic reminder notices by email. Keough Supp. Decl. ¶¶ 88–89. JND will also (i) track all notices returned as undeliverable by the USPS and will promptly re-mail notices that are returned with a forwarding address and (ii) use advanced address search tools to identify a new mailing address for any notice returned without a forwarding address. Keough Supp. Decl ¶ 41.

With these procedures in place, Class Counsel and JND reasonably expect that direct notice will be sent to virtually all class members during the notice period, in many cases with class members receiving direct notice *multiple times by both mail and email*. *See* Keough Supp. Decl. ¶¶ 26, 33-49. Such efforts, by themselves, will surpass the minimum notice requirements dictated by due process and Rule 23. *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 328 (N.D. Cal. 2018) (finding that "Settlement Class Members received adequate notice of the Settlement" where "combined individual and media notice efforts reached approximately 87.5% of likely class members"); *Chinitz v. Intero Real Est. Servs.*, 2020 WL 7042871, at *2 (N.D. Cal. Dec. 1, 2020) ("The Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable.") (citation omitted). Given the number of class members in this case, the thoroughness of the proposed notice program, and the relative complexity of the claims process, JND expects that administrative costs here will likely be approximately $15 million. *See* Keough Supp. Decl. ¶ 117.

E.    **Industry Group Notice**

Plaintiffs will supplement the direct notice program with notice through prominent industry groups and guilds who have agreed to both distribute notice to their members and to encourage their members to distribute notice. Those organizations include the following:

- The Association of American Publishers (AAP), which is the national trade association and principal public policy advocate for publishing houses in the United States, with some 120 member organizations. *See* Pallante Supp. Decl. ¶¶ 5, 16.

- The Authors Guild, which is the oldest and largest author association in the country, made up of over 16,000 professional, published writers. *See* Not-for-Profit Author Organizations Decl. ¶¶ 11, 15–16, 20.

- Creative Artists Agency (CAA), which represents numerous writers across various genres. Keough Supp. Decl. ¶ 33.

- The Independent Publishers Guild, which is the membership body for the thriving independent publishing sector in the UK and Ireland, with over 600 members. Shine Decl. ¶¶ 1–3.

- Novelists, Inc., a U.S.-based nonprofit organization, which focuses on networking, education, and advocacy for professional authors of book-length fiction. *See* Not-for-Profit Author Organizations Decl. ¶¶ 1, 15–16, 20.

- The Publishers Association, which is the member organization for UK publishing and represents more than 140 members, including major consumer, academic, and education publishers of various sizes and specialties.[4] Stevenson Decl. ¶¶ 1–3.

- Publishers' Licensing Services, which is a UK-based not-for-profit organization that represents book, magazine and journal publishers and helps its more than 4,500 registered

---

[4] The Publishers Association has also committed to share notice of the settlement with other prominent publishing industry organizations, including the Independent Publishers Guild (IPG), a membership body representing the independent publishing sector in the UK with 600 members; the International Publishers Association (IPA), the world's largest federation of national, regional, and specialist publishers associations with 105 members in 84 countries; the Federation of European Publishers (FEP), the federation of publishers associations in Europe, representing 31 national associations; and the International Association of Scientific Technical & Medical Publishers (STM), the global trade association that represents the world's leading scholarly publishers with 150 members in 21 countries. Stevenson Decl. ¶ 3.

by publishers by overseeing collective licensing for book, journal, magazine, and website copying. West Decl. ¶¶ 1–4.

- Romance Writers of America, Inc. (RWA), a nonprofit trade association whose mission is to advance the professional and common business interests of career-focused romance writers. *See* Not-for-Profit Author Organizations Decl. ¶¶ 2–3, 15–16, 20.

- The Science Fiction and Fantasy Writers Association (SFWA), a national nonprofit organization, representing approximately 2,500 authors of science fiction, fantasy, and related genres. *See* Not-for-Profit Author Organizations Decl. ¶¶ 4, 15-16, 20.

- Sisters in Crime (SinC), which promotes the ongoing advancement, recognition, and professional development of women crime writers, supporting 4000+ members. *See* Not-for-Profit Author Organizations Decl. ¶¶ 9, 15–16, 20.

- The Society of Authors, which is the UK's largest trade union for writers, illustrators, and literary authors, with 12,500+ members.[5] Ganley Decl. ¶¶ 1–4.

- William Morris Endeavor (WME) Books, having closed more than 1,000 international publishing deals in recent years. Keough Supp. Decl. ¶ 33.

- The Writers Union of Canada, which represents over 3,000 authors across Canada. Degen Decl. ¶¶ 1–4.

- Writers House, one of the largest independent literary agencies in the world, with 30 active literary agents. Fulton Decl. ¶¶ 1–3.

- The Association of University Presses, which represents more than 160 university presses around the world. Berkery Dec. ¶¶ 1, 4, 5.

Together, these prominent guilds, associations, agencies, organizations, and unions will provide a

---

[5] The Society of Authors has also committed to work with other UK industry groups—including the Association of Authors' Agents (which represents 131 agencies), the Authors' Licensing and Collecting Society (which represents 128,000 members), the British Copyright Council (which represents over 500,000 individual creators), the Creators' Rights Alliance (which represents approximately 500,000 creators), and the Writers' Guild of Great Britain (which represents over 3,000 members—to notify their members about the Settlement. Ganley Decl. ¶ 3. Further, the Society of Authors has committed to notify the International Authors' Forum (which represents over 700,000 authors worldwide) and the European Writers' Council (which represents 53 organizations, representing 250,000 writers and literary translators in the book and text sector across Europe and publishing worldwide). *Id.*

1    powerful network for supplementing the direct notice efforts described above. These industry-

2    group notice efforts will commence immediately after preliminary approval is granted and will

3    persist throughout the notice period.

4    **F.    Widespread and Targeted Publication Notice**

5    The proposed settlement has already garnered widespread coverage from major media

6    organizations, including the *New York Times* (on both its news and editorial pages), *Wall Street*

7    *Journal*, and *The Washington Post*.[6] On top of that solid foundation of earned media, JND proposes

8    print and digital notice placements with other leading publications in the United States and Canada,

9    including *Publishers Weekly*, *The Atlantic*, *The Toronto Star*, *The Globe and Mail*, *La Presse*, *The*

10   *Chronicle of Higher Education*, *Goodreads*, *Poets & Writers Magazine*, and *Writer's Digest*.

11   Keough Supp. Decl. ¶¶ 33, 59–68. JND also proposes to distribute a press release to approximately

12   5,000 media outlets nationwide and in Canada, including to journalists who specialize in reporting

13   on higher education, teaching, books, and publishing. Keough Supp. Decl. ¶ 77. Press releases sent

14   to Canadian outlets will be sent in both English and French. *See* Keough Supp. Decl. ¶ 77 n.9.

15   These publication notice efforts will commence promptly after preliminary approval is granted. *See*

16   Keough Supp. Decl. ¶ 34.

17   In addition to JND's efforts, Class Counsel have retained the public affairs firm Shape

18   Advocacy. Class Counsel Supp. Decl. ¶ 6. Shape Advocacy is assisting with press communications,

19   communications to interested groups and stakeholders, and is also helping with distributing

20   settlement notice to all relevant industry, media, and affiliated groups. *Id.*

21   **G.    Social Media and Digital Notice**

22   In addition to the notice methods described above, JND also proposes to serve 97.5 million

23   _____

24   [6] *See, e.g.*, Cade Metz, *Anthropic Agrees to Pay $1.5 Billion to Settle Lawsuit With Book Authors*,
     N.Y. Times, Sept. 5, 2025; Melissa Korn, *Anthropic Agrees to Pay at Least $1.5 Billion in
     Landmark Copyright Settlement*, Wall Street Journal, Sept. 5, 2025; Matt O'Brien, *Anthropic to*

25   *pay authors $1.5 billion to settle lawsuit over pirated books used to train AI chatbots*, AP News,
     Sept. 6, 2025; Will Oremus, *AI firm Anthropic reaches landmark $1.5B copyright deal with book*

26   *authors*, The Washington Post, Sept. 5, 2025; Queenie Wong, *Anthropic's $1.5-billion settlement
     signals new era for AI and artists*, Los Angeles Times, Sept. 5, 2025; *Anthropic to pay authors*

27   *$1.5 billion to settle lawsuit over pirated chatbot training material*, Reddit r/News, Sept. 5, 2025
     (public    thread    on    settlement    garnering    several    thousand    impressions),

28   https://www.reddit.com/r/news/comments/1n9eq8i/anthropic_to_pay_authors_15_billion_to_settl
     e.

digital impressions through the leading digital network, Google Display Network, and three popular social media platforms, Facebook, Instagram, and Reddit. Keough Supp. Decl. ¶ 53. JND will use multiple sophisticated targeting strategies to direct notice to likely class members. Keough Supp. Decl. ¶¶ 54–58. And JND will also aim to stimulate claims by serving digital "reminder" ads to class members who, for example, visited the Settlement Website but did not complete a claim submission. Keough Supp. Decl. ¶¶ 70–75. Again, these notice efforts will commence shortly after the Court grants preliminary approval and will continue throughout the notice period. *See* Keough Supp. Decl. ¶ 34.

### H.  Online Notice

JND also proposes to set up, within seven days of preliminary approval, a Settlement Website, which will have an easy-to-navigate design, formatted to emphasize important information and deadlines. *See* Keough Supp. Decl. ¶¶ 34, 99. The website will include the proposed long form notice, Settlement Agreement, and other important case documents. Keough Supp. Decl. ¶ 99. The Settlement Website will also include a searchable database to allow potential class members to search for works on the Works List, an online automated Claim Form, and a downloadable Claim Form for class members who prefer to print and mail their Claim Form. Keough Supp. Decl. ¶ 100. The Settlement Website will be ADA-compliant and optimized for both mobile and computer visitors. Keough Supp. Decl. ¶ 102. The Settlement Website address will be prominently displayed in all printed notice documents, and will be accessible through email and digital notices, as well as through a QR code in the mailed and print notices. Keough Supp. Decl. ¶ 101.

### I.  The Strength of the Proposed Notice Plan Will Facilitate Finality

These exhaustive notice procedures will facilitate the finality for which the Parties bargained. This is a highly literate class and particularly likely to attend to the multiple forms of publication concerning the settlement and its provisions. Given the layers of redundant and complementary notice contemplated by Class Counsel and JND, it is hard to imagine that any meaningful set of class members will not receive notice of the proposed settlement. Even if, somehow, some class members miss the multiple rounds of proposed mail, email, industry-group,

publication, and online notice, they will still be bound by the Settlement Agreement. *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (holding that "best practicable" notice binds class members, even those who did not "actually receive" notice); 3 Newberg & Rubenstein on Class Actions § 8:36 (6th ed.) ("[N]either Rule 23 nor the Constitution requires that a class member actually receive notice: notice suffices if it is reasonably calculated to reach the absent parties."); 1 McLaughlin on Class Actions § 5:80 (21st ed.) ("Courts have repeatedly held that neither due process nor Rule 23(c)(2)(B) mandates that class members receive actual notice in order to be bound by class action proceedings. Actual receipt of notice is not required. The provision of notice reasonably calculated to apprise class members of the proceedings is sufficient."); *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, No. C 19-04744 WHA, 2022 WL 816473 at*5 (N.D. Cal. Mar. 17, 2022) (Alsup, J.) (class members' claims released; claims administrator received 28,114 claims based on 59,900 notices).

## II.    THE PROPOSED CLAIMS PROCEDURE WILL FACILITATE THE EFFICIENT AND EQUITABLE DISTRIBUTION OF SETTLEMENT FUNDS

Rule 23(e)(2)(C)(ii) requires the Court to ensure "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." *SEB Inv't Mgmt. AB v. Symantec Corp.*, 2022 WL 409702 at *4 (N.D. Cal. 2022). The "goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." 4 Newberg & Rubenstein on Class Actions § 13:53 (6th ed.). For that reason, a claims processing method should both "deter or defeat unjustified claims," but not be "unduly demanding" for bona fide claimants. Fed. R. Civ. P. 23(e)(2)(C)–(D) advisory committee's note to 2018 amendment.

The proposed Claim Form, which will be submitted tomorrow in accordance with the Court's order (Dkt. 383), satisfies these standards. After extensive consultation with authors, publishers, the class representatives, and JND, the Claim Form has been carefully designed to maximize the efficient and fair distribution of Settlement funds by minimizing the upfront burden on claimants, by providing even more notice to competing claimants, and by offering tailored default rules to ease distribution while also protecting a given claimant's right to individualized

proceedings. These choices are attentive to the unique features of this particular class, and they merit preliminary approval.

### A.    The Proposed Claim Form Makes Submitting Claims Easy

Class Counsel have intentionally designed the Claim Form "to make submitting a claim as easy as possible," while also guarding against any risk of improper claims. *Keller v. Nat'l Collegiate Athletic Ass'n (NCAA)*, 2015 WL 5005901, at *5 (N.D. Cal. Aug. 19, 2015). The Form uses plain, easy-to-understand language, with check boxes and detailed instructions. The Form also will be prepopulated with any relevant information already contained in the Works List, Class List, or other records received by JND, minimizing the burden on claimants, reducing guesswork, and eliminating errors that typically arise from the circulation of the same claim form between multiple parties. Keough Supp. Decl. ¶¶ 103–04. *See In re MyFord Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2019 WL 1411510, at *6 (N.D. Cal. Mar. 28, 2019) (finding prepopulated[7] claim forms "minimize the burden" on class members). Claimants generally will ***not*** be required to submit their publishing agreements or other documentation to submit a valid claim, further reducing the burden on claimants while also helping to ensure that award disbursement is consistent with existing contractual relationships.[8] And the online version of the Claim Form, available at the Settlement Website, will be particularly easy to use. Keough Supp. Decl. ¶ 103. For example, the online Form will feature built-in automation to ensure that all necessary fields are correctly populated, while skipping unnecessary sections. Keough Supp. Decl. ¶¶ 103–04. Considering all these user-friendly features of the Claim Form, Class Counsel reasonably believe that the Claim Form and online submission process will be effective at helping to ensure a high claims rate.

Any claimants who have questions about the Claim Form will have ample resources to obtain answers. For example, each page of the proposed Claim Form states, "Questions? Visit

---

[7] If disputes arise among co-claimants for a given work, then submission of documentation may later become necessary.

[8] While compiling the data for pre-population may require upfront time to organize, this investment will ultimately save the class time and money by minimizing manual data entry errors that would otherwise require correction during processing. The end result of this claims process is that all submissions for a given work—whether approved as pre-populated or modified by claimants—are consolidated on the backend into a single form per work, minimizing the potential for errors and streamlining administration

www.AnthropicCopyrightSettlement.com or call." The Settlement Website will include frequently asked questions and answers, which will be updated regularly to reflect common questions that arise about the Claim Form or claims procedure. Keough Supp. Decl. ¶ 99. JND has experience staffing call centers with sufficient resources to respond to any conceivable call volume. *See, e.g.*, Keough Supp. Decl. ¶¶ 9 (noting settlement in which JND utilized call centers with up to 1,500 dedicated agents). And JND has a secure and rapidly deployable, cloud-based contact center platform that can scale to 2,500 seats if necessary. Keough Supp. Decl. ¶¶ 114–15. JND's call center capabilities have enabled the company to handle matters with more than 1 million claimant calls. Keough Supp. Decl. ¶ 115. In addition, Class Counsel will be on hand to answer questions, either directly from class members or as escalated by JND's call centers. Class Counsel Supp. Decl. ¶ 25.

### B.    The Proposed Claim Form and Claims Process Will Ensure the Fair and Efficient Distribution of Settlement Funds

Class Counsel consulted with industry experts, both publishers and authors, to design a Claim Form that will facilitate the fair and efficient distribution of Settlement funds. The Claim Form and process are specifically designed to reflect contractual industry norms across the key sectors most implicated by the Settlement—namely books in the trade, university press, and education sectors.

#### 1.    The Claim Form is Straightforward and Provides Default Rules that Reflect Industry Norms and Existing Contractual Arrangements

The Claim Form is designed to maximize the number of bona fide claims. The Form contains seven sections, each of which is simple, straightforward, and easy to complete:

- Section A asks for basic contact information of the claimant, such as their name, mailing address, e-mail address, and phone number.

- Section B requires the claimant to provide readily available information identifying the work, such as the author, title, and copyright registration number. In doing so, the Form provides concise and helpful explanations to aid Claimants in retrieving that information—for example, how to find a particular copyright registration number for a given work online. Section B also requires claimants to state whether they are the sole owner of the reproduction rights of the work(s) they are claiming.

- Section C asks the claimant to identify and provide any contact information for any

other person that the claimant believes may be entitled to submit a claim related to the claimed work. Section C further cautions that the failure to provide this information may result in denial of the claim.

- Section D applies to all works with multiple claimants other than education works and informs the claimant that, unless the claimant chooses otherwise, the per-work award will be split equally between the author and the publisher (and, thereafter, split equally between any co-authors and co-publishers).

- Section E applies to education works and requests that the claimant provide information about any contractual agreements to split proceeds of the settlement award with other class members, or alternatively to indicate that they do not have this contractual information.

- Section F contains three checkboxes that claimants can select to identify the method of payment: ACH transfer, electronic transfer through Zelle, or paper check.

- Section G, finally, requires the claimant's signature and assent that the Claim Form was completed truthfully.

As mentioned, the Claim Form will provide that the author and publisher will split each per-work award equally in half (except for education works), with co-authors and co-publishers splitting the author or publisher share of the award equally amongst themselves. ***This distribution is not mandatory***. The Claim Form will provide only that the claimant has the option—not the obligation—to accept the Default Option.

The Claim Form was designed to reflect recurring contractual norms across different sectors of the industry. Trade, university, and education publishers differ as to the nature of works published, markets, cost structures and risk profiles, and contractual arrangements with authors. *See* Pallante Decl. ¶¶ 17-24.[9] Trade and university presses typically acquire from an author, , in exchange for an advance and future royalties, a subset of the bundle of rights under copyright law to exclusively reproduce and distribute book, with the author retaining other copyright interests. Id. ¶¶ 19-20. Education publishers often obtain from the author(s) complete legal ownership of the copyright in their works, either by assignment of the copyright in full, through an exclusive license

---

[9] "Trade publishers generally publish books for the consumer market." Pallante Decl. ¶ 19. University presses are non-profit publishers that operate as an extension of their (public or private) university's mission to promote and disseminate scholarship. *Id.* ¶ 20. And education publishers publish materials for the academic instruction of students and non-fiction instructional works for professional and consumer markets. *Id.* ¶ 21.

23

for all rights in the work's copyright, or at times through a "work made for hire" agreement. *Id.* ¶¶ 19-21. Authors of educational works typically receive an advance and royalty interest and therefore retain beneficial ownership (except in cases of works made for hire as defined in 17 U.S.C. §101, where the publisher is deemed the author upon creation and there is no separate beneficial owner). Consistent with these differences, the industry norm amongst trade and university publishing contracts is to divide net recoveries from enforcement actions 50/50 between the publisher and author. *See* Not-for-Profit Author Organizations Decl. ¶ 27. Education publisher contracts typically do not contain language specifically requiring division of enforcement proceeds, and where they do the terms are more varied. *Id.* ¶ 23. The proposed distribution plan accounts for these industry norms.

The default split presumed—but not mandated—by the Claim Form was developed after an extensive, thorough process involving a multitude of stakeholders—stakeholders, it is important to emphasize, who are not themselves claimants in this case and are not receiving any compensation for their help. As discussed above, Class Counsel sought and received significant input from (i) the Authors Guild, who itself worked closely with a broad consortium of author associations to provide Class Counsel with information on contractual arrangements, industry practices, as well as pre-existing and ongoing discussions with publishers regarding this case; (*see* Not-for-Profit Author Organizations Decl. ¶ 22) and (ii) the AAP, the "principal public policy advocate for" "some 120 large, small, nonprofit, and commercial houses in the education, scholarly, and consumer publishing sectors that together comprise most of the U.S. publishing market," Pallante Supp. Decl. ¶5[10]. The Guild and AAP each support the Claims Form and the default percentages it suggests—but does not require—that authors and publishers adopt.

The default split is supported by industry practice between authors and publishers, where in most cases outside of the educational context relevant to this case, the industry norm is for a

---

[10] AAP's President and CEO, Maria Pallante, has submitted a declaration in support of this Motion that provides background information regarding the key publishing sectors most impacted by this settlement (*i.e.*, trade publishers, university presses, and education publishers), and why the proposed plan is sensible and practicable. Specifically, Ms. Pallante explains how each of these sectors differs as to the nature of works published, markets, cost structures and risk profiles, and contractual arrangements with authors. *See* Pallante Decl. ¶¶ 17–24; *see also* Not-for-Profit Author Organizations Decl. ¶ 27.

publishing agreement to provide for the sharing of litigation proceeds 50/50 between author and publisher. *See* Pallante Supp. Decl. ¶ 22; Not-for-Profit Author Organizations Decl. ¶ 27 ("[W]e support having default splits for authors and publishers to choose, as outlined in the proposed claim form, as they reflect contract norms and avoid authors and publishers having to come together to agree on the correct split."). Indeed, the contracts of the named plaintiffs in this case provide for such a split. *See* Class Counsel Supp. Decl. ¶ 11 (overviewing contractual provisions). Because the Claim Form's default reflects a recurring contractual clause, the default rule will reduce the transaction costs of the claims process and likely allow a large majority of authors and publishers to collect their settlement award easily and without any dispute. In short, the "proposed method of distribution allows for rapid distribution of benefits to Participating Class Members and is not unduly demanding"—hallmarks of a well-functioning distribution process. *Cisneros v. EP Wrap-It Insulation, LLC*, 2022 WL 2304146, at *6 (D.N.M. June 27, 2022).

The plan ensures that class members can participate in the case so that they receive their share of the $1.5 billion fund, with every claimant retaining the right to prove their actual contractual entitlement differs from the default. This framework delivers on the Court's vision of customized, contract-based allocation while ensuring the settlement efficiently distributes the relief that will provide the Class—and Anthropic—finality.

With respect to education works, the Claim Form does not provide a default percentage to govern the allocation of per-work awards amongst claimants. After discussion with stakeholders—including on the authors' side the Textbook and Academic Authors' Association directly and via communications with author coordination counsel and counsel representing the TAA; and on the publishers' side with education publishers through publisher coordination counsel—Class Counsel determined that contracts for educational works varied too much to suggest a default. Moreover, despite substantial effort, no consensus developed among key stakeholders on what a default rate should be. Thus, the Claim Form requests that for educational works, the claimant make a good-faith representation regarding the percentage of recovery that the claimant is entitled to receive for a given work relative to other potential claimants in the work. Ex. 1 (POA&D ¶ 4(b)(ii)). The Form emphasizes that Claimants may but are not required, to submit any relevant contracts or publishing

agreements to demonstrate their ownership interests. *Id.* This section of course applies only if multiple claimants to a work may exist.

The claims process for education works is appropriately distinct in this regard.[11] Given the lack of any clearcut basis for a default percentage split, the plan of allocation for education works enables parties to submit either their contracts or information about their contracts, and the claims administrator will contact both parties upon submission of their claim(s). In this way, the proposed distribution plan and corresponding claim procedures will ensure the most efficient distribution of funds possible without sacrificing precision.

It bears repeating that the Claims Form **does not require** any claimant to adhere to the default percentages; does not impose any "global deal"; and does not force anyone to repudiate or change any rights they may have. Every claimant can decide to deviate from the default split consistent with an underlying agreement, or to (except for education works) adhere to the default splits to avoid the need for individualized determination and receive an award as soon as practicable. In sum, then, the proposed allocation plan achieves the Court's key objectives of ensuring comprehensive relief reaches class members, providing Anthropic with finality, and respecting the individual contractual rights negotiated between authors and publishers. The plan accomplishes these goals through a system of rebuttable default allocations based on industry norms, which can be supplemented with contractual documentation.

## 2. **The Distribution Process**

The Claim Form will allow claimants to submit claims for multiple works in one submission, maximizing the number of works that will be claimed. For each work, Claimants will be required to state whether they believe they are the sole owner of all legal and beneficial interests. Those who indicate that they may share ownership rights in a work must either (i) certify that they already submitted the required contact information to Class Counsel or the Settlement

---

[11] Education publishers publish materials for the academic instruction of learners, including textbooks, course materials, supplemental teaching resources, test bank materials, and instructor solutions manuals, as well as non-fiction instructional works for professional and consumer markets. Education publishers in the class include Cengage Learning, Inc., Elsevier, Inc., Macmillan Learning, McGraw Hill LLC, Pearson Education, Inc., and John Wiley & Sons, Inc. among many others. *See* Pallante Decl. ¶ 21.

1   Administrator or (ii) submit any contact information they have in the Claim Form. Ex. 1 (POA&D

2   ¶ 3(b)(ii)).

3       If more than one claimant submits a claim for the same work (*e.g.*, an author and publisher),

4   the Settlement Administrator will evaluate those claims for conflicts and will alert claimants if any

5   conflicts exist. *Id.* ¶ 3(d). will evaluate those claims for conflicts and will alert..JND has extensive

6   experience with this type of matching exercise and coordinating with claimants and counsel as

7   needed. *See* Keough Supp. Decl ¶¶ 108–10 (describing large class actions in which JND matched

8   competing claims and/or made final determinations regarding related claims).

9       The claims process has an additional feature to protect class members who do not submit

10  claims. Class Counsel have designed a system so that where one owner of a work submits a claim

11  (the "Filing Claimant") while another potential owner of the same work does not (the "Non-Filing

12  Claimant"), the Settlement Administrator will notify the Non-Filing Claimant of the Filing

13  Claimant's claim promptly. Ex. 1 (POA&D ¶ 3(c)(ii)). The Non-Filing Claimant will then have

14  until the later of (a) 70 days after the date the Settlement Administrator issued notice of the Filing

15  Claimant's claim or (b) the Claims Deadline to submit a claim. If the Non-Filing Claimant does not

16  file a claim within the required timeline, the Settlement Administrator will nevertheless send a

17  check to the Non-Filing Claimant for Settlement proceeds owed to the Non-Filing Claimant, as

18  indicated by the Claim Form submitted by the Filing Claimant. *Id.* If the Non-Filing Claimant does

19  not cash the check or otherwise claim these funds within 60 days, the Settlement Administrator will

20  follow up with additional forms of notice and investigate whether updated contact information is

21  available for the Non-Filing Claimant. *Id.* If, 18 months after final approval, the Non-Filing

22  Claimant still has not cashed the check, the amount distributed to the Non-Filing Claimant will be

23  redistributed instead to the Filing Claimant. *Id.* This distribution to the Filing Claimant is consistent

24  with contractual provisions regarding litigation proceeds that, if only one person pursues the action,

25  that person receives the full amount. *See, e.g.*, Dkt. 147-2 at 11; Dkt. 147-3 at 11; Dkt. 147-4 at 8;

26  Dkt. 147-11 at 11; Dkt. 147-12 at 13; Dkt. 147-21 at 8; Dkt. 147-22 at 7.

27

28

C. **The Claims Process Will Efficiently Distribute Funds Among Multiple Claimants for the Same Work**

The proposed Claims Process also employs robust notice procedures to address any situation where multiple claimants submit a claim for the same work.

The Claim Form provides for notice to all potential claimants of the work, thereby enabling work-by-work resolution of disputes between and among individual claimants, as supervised by the proposed Notice Administrator and Class Counsel. The Claim Form requires each claimant who has not already done so before submitting a claim to identify and provide current contact information in its possession for any other person who the claimant believes may be entitled to submit a claim related to the claimed work, includ[ing] authors, co-authors, co-owners, and publishers of the claimed work. Ex. 1 (POA&D ¶ 3(b)(ii)).

In addition to notifying non-filing claimants as discussed above, JND will also review each claimant's submission to determine whether any discrepancies exist regarding ownership or award allocation. If so, JND will contact the claimants to obtain additional information. Such information will include, as necessary, a copy of a publishing agreement or other relevant documentation. JND has ample experience—for example in *In re: Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-cv-20000-RDP (N.D. Ala.), among the largest antitrust settlements of all time—matching and comparing claim forms submitted by overlapping claimants. Keough Supp. Decl. ¶ 109. Requiring all claimants to provide such contact information, as well as supporting documentation as necessary, will help ensure Class Counsel and JND can effectively facilitate communication among co-claimants and efficiently resolve any issues that arise related to distribution. In the experience of the author and publisher industry experts, claimants are likely to prefer individualized negotiation to address disputes. Keough Decl. ¶ 111. The Court was thus correct in observing in its class certification order that "disputes . . . over ownership . . . will be unlikely." Dkt. 244 at 10.

D. **The Court Should Provide For An Efficient, No-Cost Dispute Resolution Mechanism to Enable Efficient Resolution of Disputes That Arise, If Any.**

In the event disputes arise that are not resolved informally—Class Counsel anticipate there will be few, if any—Plaintiffs propose having an appointed special master resolve disputes. The special master will resolve the dispute within 30 days of its submission, and any funds that are

1    subject to a dispute will be held in reserve in the interest-bearing settlement escrow account. The

2    decision by the Special Master will be confidential and binding, without right of appeal, on a non-

3    precedential basis. *See* Ex. 1 (POA&D ¶ 3(d)).

4        The use of special masters to resolve disputes during the allocation process is commonplace

5    in this Circuit. *See, e.g.*, *Trabakoolas v. Watts Water Techs., Inc.*, 2014 WL 12641599, at *4 (N.D.

6    Cal. Aug. 5, 2014) (Orrick, J.) (appointing special master "to adjudicate any appeals regarding the

7    Settlement Administrator's payment of claims"); *Whalen v. Ford Motor Co.*, 2018 WL 6069812, at

8    *2 (N.D. Cal. Nov. 20, 2018) (Chen, J.) (observing that the Court has "various tools at its disposal

9    to manage resolution of [individualized affirmative defenses] . . . , such as the use of individual

10   claim forms or the appointment of a special master"); *Castellon v. Penn-Ridge Transportation, Inc.*,

11   2020 WL 8768456, at *4 (C.D. Cal. Mar. 9, 2020) (Kronstadt, J.) (granting preliminary approval

12   and appointing special master to address "the number of Shifts that should be credited to the

13   Settlement Class Members whose Claim Forms were disputed").[12]

14       And it is commonplace for a reason. Using more accessible, less onerous dispute resolution

15   procedures is vastly preferable to Class Members compared to requiring full-blown state-court or

16   federal-court litigation to address issues of ownership or allocation. *See* Not-for-Profit Author

17   Organizations Decl. ¶ 28 ("[R]eferring disputes to a court, state or federal, would risk unjust results

18   because that is not a realistic option for authors" because "there are few authors who can afford

19   legal fees, much less the time that would involve, and even if they could, legal fees would far exceed

20   the award."). Automatically funneling every single dispute to state or federal court would

21   undermine the central feature of the class action mechanism—the aggregated and efficient

22   resolution of small claims—and require claimants to expend extraordinary efforts to receive the

23

---

24   [12] Courts outside of the Ninth Circuit also frequently appoint special masters to resolve disputes in
     the claims administration process. *See, e.g.*, *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 2012 WL

25   5055810, at *7 (D. Minn. Oct. 18, 2012) (granting preliminary approval and ordering that the
     "Special Master shall be responsible for resolving disputes, if any, arising from the Claims

26   Process"); *United States v. City of New York*, 877 F. Supp. 2d 57, 66 (E.D.N.Y.), *amended*, 905 F.
     Supp. 2d 438 (E.D.N.Y. 2012) ("[F]our Special Masters appointed by the Court will oversee the

27   claims process, including, as necessary, individual hearings"); *Armstrong v. Gallia Metro. Hous.
     Auth.*, 2001 WL 1842452, at *3 (S.D. Ohio Apr. 23, 2001) (granting final approval of settlement

28   that "provide[d] for the appointment of a Special Master to administer the claims process and
     establishes a procedure for filing claims and appealing from the Master's determination").

funds to which they are entitled. In addition, forcing parties into a higher-cost, longer resolution mechanism will disproportionately impact the less-resourced party. *See* Not-for-Profit Author Organizations Decl. ¶ 26 ("[F]ull-time authors earn a mean of only $10,000 from their books and $20,000 from all writing related work; and part-time authors much less," and "only very few can afford lawyers."). The prospect of a quick decision, by contrast, will encourage claimants to reach agreement and reduce the overall number of disputes, just as a firm trial date encourages parties to settle.

Plaintiffs are mindful of the Court's comments about a mandatory special master process here and that it not be a substitute for careful consideration of each class member's interests within the settlement itself. *See* Transcript of September 8 Hearing at 35:7–18. Plaintiffs believe that the proposed system meets the Court's objectives. If this is insufficiently protective, Plaintiffs urge the Court that, at a minimum, the Claim Form permit any claimant to elect the resolution of disputes via the special master. Such a rule, in the alternative, would allow any claimant to suggest a special master so that one side does not use the threat of drawn-out litigation as a cudgel in reaching consensual resolution.

In particular, Class Counsel propose the following procedures:

- **For all works on the Work List other than education works**, a default 50/50 split between author(s) and publisher(s) is proposed on the Claim Form, which claimants can either accept or reject. If any claimant for a work rejects that default, they will (i) state the percentage they believe they are entitled to based on the relevant publishing agreement or contract and (ii) submit documents supporting the claimed percentage. If all claimants for a given work do not agree on the percentage of recovery, the Settlement Administrator will notify each claimant of the disagreement. The claimants will then have an opportunity to meet and confer on the issue and can amend their request accordingly, and the Settlement Administrator will work with the parties in an attempt to informally resolve the dispute. If the claimants cannot resolve their disagreement, the Court-appointed special master will resolve the dispute. *See* Ex. 1 (POA&D ¶ 3(d), 4(a)(i)). All this information (and more) will be contained in the proposed General Claim Form and Long Form Notice.

- **For education works on the Works List**, claimants will make a good-faith representation regarding the percentage of recovery they believe they are entitled to receive relative to other rightsholders. If all claimants for a given work do not agree on the percentage of recovery, the Settlement Administrator will notify each claimant of the disagreement. The claimants will then have an opportunity to meet and confer on the issue and can amend their request accordingly. If the claimants cannot resolve their disagreement with assistance of the Settlement Administrator[13] they may, within 45 days of being notified of the disagreement by the Settlement Administrator, confidentially submit the contractual basis for their position, including any supporting materials (*e.g.*, the relevant contract), to a Court-appointed special master. *See* Ex. 1 (POA&D ¶ 3(d), 4(a)(ii)). All this information (and more) will be contained in the proposed Claim Form and Long Form Notice.

Finally, although the appointment of a special master to resolve appeals from disputes submitted to the Settlement Administrator is preferable, commonplace, and efficient, Class Counsel stand ready to adopt any practicable dispute resolution mechanism that the Court concludes is warranted.

---

[13] It is well established that settlement administrators are permitted to resolve disputes in claims administration. Although that is not the role that Class Counsel propose for the settlement administrator here—JND will facilitate discussions between claimants, make initial recommendations based on their contracts, and help craft mutually agreeable solutions where possible—the widespread use of settlement administrators to resolve disputes demonstrates the recognized value and acceptance of low-cost dispute resolution mechanisms in claims administration. *See, e.g.*, *Kendig v. ExxonMobil Oil Corp.*, 2020 WL 13302377 (C.D. Cal. Aug. 24, 2020) (final approval granted; claims administrator authorized to "make the final determination regarding the dispute [of the number of qualifying shifts] based on the written documentation submitted by the Class Member" and any materials submitted by counsel); *De Santos v. Jaco Oil Co.*, 2015 WL 4418188, at *10 (E.D. Cal. July 17, 2015) ("The Claims Administrator shall perform the customary duties of a Claims Administrator, including . . . resolving disputes from Class Members."); *Taylor v. Fedex Freight, Inc.*, 2016 WL 1588405, at *8 (E.D. Cal. Apr. 20, 2016) (granting preliminary approval where "if a class member disagrees with the determination of class membership or calculation of his or her number of shifts, the class member will be provided the opportunity to raise such disagreement with the claims administrator and to present any supporting documentation"); *Edwards v. First Am. Corp.*, 2016 WL 8943464, at *9 (C.D. Cal. June 20, 2016) (granting preliminary approval in dispute over title insurance referral scheme where "[t]he Claims Administrator's determination as to class membership and qualification of a claim is conclusive and binding"); *Gomez-Gasca v. Future AG Mgmt., Inc.*, 2020 WL 6149688, at *12 (N.D. Cal. Oct. 20, 2020) (granting final approval where Settlement Administrator determine class membership with option to appeal to Settlement Administrator and then to the court); *Botonis v. Bimbo Bakeries USA, Inc.*, 2024 WL 100545, at *1 (E.D. Cal. Jan. 9, 2024) (granting preliminary approval where "[c]lass membership will be determined based on employment data provided by the Defendant to the Settlement Administrator.").

E.    **The Proposed Claim Form and Claims Procedure Are Superior to Other Alternatives**

In view of the foregoing, Class Counsel strongly believe that the proposed Claim Form and claims procedure are better than other, more onerous options. At the September 8 hearing, the Court contemplated a "work-by-work" claim form that would be signed and submitted jointly by all rightsholders for a given work, but acknowledged that "this is not the only way it could be done." Transcript of September 8 Hearing at 19–21. Class Counsel discussed a work-by-work claim form as an option with industry experts, both publishers and authors, and with JND. All relevant stakeholders agreed that requiring the coordination of signatures on a single form for each work would be particularly onerous, placing a significant administrative burden on claimants. JND likewise expects that such a work-by-work claim form would unnecessarily drive down claim rates. Keough Supp. Decl. ¶ 107–08; *See* Not-for-Profit Author Organizations Decl. ¶ 24 ("[I]f authors are forced to submit a joint claim form with current publishers and other authors, many will not participate because they will not have publisher or other author contact information, making it too difficult for them to find and connect with them to file a claim together."); *see also O'Connor v. Uber Techs., Inc.*, 2019 WL 1437101, at *13 (N.D. Cal. Mar. 29, 2019) (granting preliminary approval of settlement and emphasizing the importance of the "minimal time to fill out and submit the straightforward claim form").

By contrast, the proposed Claim Form and claims procedure will shift the administrative burden to the proposed Settlement Administrator and to Class Counsel, who have the training, experience, and duty to handle such burden efficiently. *See In re Packaged Seafood Prods. Antitrust Litig.*, 2022 WL 2803110, at *8 (S.D. Cal. July 15, 2022) (granting final settlement where "[t]he Claim Form is simple and easy to complete," and "[t]he Settlement Administrator JND will administer the entire process"). For example, JND and Class Counsel bear responsibility for ensuring competing claimants are notified of alternative claims; for acquiring pertinent information from all claimants (*e.g.*, a copy of a publishing agreement or other relevant documentation); and for helping facilitate the dispute resolution process between claimants. Keough Supp. Decl. ¶¶ 111–13.

1    Requiring the express assent of *all* potential claimants prior to the filing of a claim would
2    also heighten the risk of inadequate distribution. For one, in a class this size, some claimants may
3    simply choose not to respond to notice—a reality in every class action case. In such circumstances,
4    it would be unfair to preclude all other rightsholders from submitting a claim to vindicate their
5    interests. It would also be legally problematic: a class member cannot opt out himself *and others*
6    with rights in a given work simply by remaining silent. *Cf. Phillips Petroleum Co. v. Shutts*, 472
7    U.S. 797, 812 (1985) (due process requires "an absent plaintiff be provided with an opportunity to
8    remove himself from the class by executing and returning an 'opt out' or 'request for exclusion'
9    form to the court"). Requiring affirmative assent from each claimant prior to the submission of a
10   claim would effectively convert this case into an *opt-in* class action. But "[r]equiring a plaintiff to
11   affirmatively request inclusion" is likely to "impede" class actions—precisely the opposite of what
12   should result. *Id.* at 812–13; *see also Carlough v. Amchem Prods., Inc.*, 10 F.3d 189, 200 (3d Cir.
13   1993) (observing that "an inference of consent"—not exclusion—may be "drawn from silence or
14   inaction after notice and the running of the opt out period").

15   A joint claim form would also present other drawbacks and risks. For example, the proposed
16   Claim Form allows for the submission of bank account information to allow for electronic
17   distribution of funds. Electronic distribution is generally more efficient than distribution by check,
18   and therefore in the best interest of all Class Members. *See In re Chinese-Manufactured Drywall*
19   *Prods. Liab. Litig.*, 424 F. Supp. 3d 456, 492 (E.D. La. Jan. 10, 2020) (approving distribution
20   methodology that was "designed to be efficient and cost effective, as is in the best interest of the
21   class because it minimizes the expenses that will be deducted from the recovery"). Submission of
22   sensitive bank account information is incompatible with a claim form that others are required to
23   see and sign.

24   Finally, in Class Counsel's proposal, at the end of the process, each Claimant will receive
25   a joint form specifying their distributions prior to payment. This process ensures that all claimants
26   will receive notice and will have agreed to the percentages while still allowing an efficient claims
27   procedure as required by Rule 23.

28

1

**III.**     <u>**TIMELINE**</u>

2

In accordance with the Guidelines, the proposed timeline is contained in the proposed plan

3

of allocation that is attached herewith.

4

**IV.**     <u>**CONCLUSION**</u>

5

Plaintiffs respectfully request that the Court (1) grant preliminary approval of the

6

Settlement between the already-certified Class and Anthropic; (2) approve the proposed Plan of

7

Allocation and Distribution; (3) appoint JND Legal as the Settlement Administrator and approve

8

the proposed Notice Plan; and (4) schedule a Final Approval Hearing.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

Dated: September 22, 2025

By: */s/ Justin A. Nelson*
      */s/ Rachel Geman*

3
4
5
6

Justin A. Nelson *
Alejandra C. Salinas *
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

7
8
9
10
11

Rohit D. Nath (SBN 316062)
Michael Adamson*
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
rnath@susmangodfrey.com
madamson@susmangodfrey.com

12
13
14
15

J. Craig Smyser *
Samir Doshi*
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 51st Floor,
New York, NY 10019
Telephone: (212) 336-8330
csmyser@susmangodfrey.com
sdoshi@susmangodfrey.com

16
17
18
19

Jordan W. Connors *
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
jconnors@susmangodfrey.com

20
21
22
23
24
25

Rachel Geman *
Jacob S. Miller*
Danna Z. Elmasry*
**LIEFF CABRASER HEIMANN**
**& BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
rgeman@lchb.com
jmiller@lchb.com
delmasru@lchb.com

26
27
28

Daniel M. Hutchinson (SBN 239458)
Jallé Dafa (SBN 290637)
Amelia Haselkorn (SBN 339633)
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, 29th Floor

San Francisco, CA 94111-3339
Telephone: (415) 956-1000
dhutchinson@lchb.com
jdafa@lchb.com
ahaselkorn@lchb.com

Betsy A. Sugar*
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
222 Second Ave., #1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com

Jay Edelson*
J. Eli Wade-Scott*
**EDELSON PC**
350 North LaSalle Street, 14th Floor
Chicago, IL 60654
Telephone: (312) 589-6370
jedelson@edelson.com
ewadescott@edelson.com

Matthew J. Oppenheim*
Jeffrey M. Gould*
**OPPENHEIM & ZEBRAK LLP**
4530 Wisconsin Ave, NW, 5th Floor
Washington, DC 20016
Telephone: 202.450.3958
matt@oandzlaw.com
jeff@oandzlaw.com

Scott Jonathan Sholder*
**Cowan DeBaets Abrahams & Sheppard LLP**
60 Broad St, 30th Floor
New York, NY 10004
212-974-7474
Email: ssholder@cdas.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>ATTESTATION</u>**

  Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: September 22, 2025

           */s/ Justin Nelson*_____