1  Justin A. Nelson (*pro hac vice*)
   Alejandra C. Salinas *(pro hac vice)*
2  **SUSMAN GODFREY L.L.P.**
   1000 Louisiana Street, Suite 5100
3  Houston, TX 77002-5096
   Telephone: (713) 651-9366
4
   Rohit D. Nath (SBN 316062)
5  Michael Adamson (SBN 321754)
   **SUSMAN GODFREY L.L.P.**
6  1900 Avenue of the Stars, Suite 1400
   Los Angeles, CA 90067-2906
7  Telephone: (310) 789-3100

8  Rachel Geman (*pro hac vice*)
   Jacob S. Miller (*pro hac vice*)
9  Danna Z. Elmasry (*pro hac vice*)
   **LIEFF CABRASER HEIMANN &**
10 **BERNSTEIN, LLP**
   250 Hudson Street, 8th Floor
11 New York, NY 10013-1413
   Telephone: (212) 355-9500
12
   Daniel M. Hutchinson (SBN 239458)
13 Jallé H. Dafa (SBN 290637)
   Amelia Haselkorn (SBN 339633)
14 **LIEFF CABRASER HEIMANN**
   **& BERNSTEIN, LLP**
15 275 Battery Street, 29th Floor
   San Francisco, CA 94111-3339
16 Telephone: (415) 956-1000

17 *Co-Lead Counsel*

18 [Additional counsel listed in the signature
   block.]

   Douglas A. Winthrop (Bar No. 183532)
   Joseph Farris (Bar No. 263405)
   Pieter de Ganon (Bar No. 320385)
   Jessica L. Gillotte (Bar No. 333517)
   Estayvaine Bragg (Bar No. 341400)
   **ARNOLD & PORTER KAYE SCHOLER LLP**
   Three Embarcadero Center 10th Floor
   San Francisco, CA 94111-4024
   (415) 471-3100
   (415) 471-3400 (fax)
   douglas.winthrop@aporter.com
   joseph.farris@arnoldporter.com
   pieter.deganon@arnoldporter.com
   estayvaine.bragg@arnoldporter.com
   jessica.gillotte@arnoldporter.com
   estayvaine.bragg@arnoldporter.com

   Daralyn J. Durie (Bar No. 169825)
   Ramsey Fisher (Bar No.334228)
   Jackson Lane (Bar No. 351633)
   **MORRISON & FOERSTER LLP**
   425 Market Street
   San Francisco, CA 94105
   (415) 268-7000
   (415) 268-7522 (fax)
   DDurie@mofo.com
   RamseyFisher@mofo.com
   jlane@mofo.com

   *Attorneys for Defendant Anthropic PBC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, and MJ + KJ, INC., individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case No.: 3:24-cv-05417-WHA <br><br> **JOINT RESPONSE TO COURT'S QUESTIONS FOR PRELIMINARY APPROVAL HEARING ON SEPTEMBER 25, 2025** |

1

## **TABLE OF CONTENTS**

2

INTRODUCTORY STATEMENTS ..................................................................................... 3
QUESTION 1 ..................................................................................................................... 4
QUESTION 2 ..................................................................................................................... 5
QUESTION 3 ..................................................................................................................... 7
QUESTION 4 ..................................................................................................................... 9
QUESTION 5 ................................................................................................................... 10
QUESTION 6 ................................................................................................................... 11
QUESTION 7 ................................................................................................................... 12
QUESTION 8 ................................................................................................................... 13
QUESTION 9 ................................................................................................................... 14
QUESTION 10 ................................................................................................................. 15
QUESTION 11 ................................................................................................................. 17
QUESTION 12 ................................................................................................................. 19
QUESTION 13 ................................................................................................................. 20
QUESTION 14 ................................................................................................................. 21
QUESTION 15 ................................................................................................................. 23
QUESTION 16 ................................................................................................................. 24
QUESTION 17 ................................................................................................................. 25
QUESTION 18 ................................................................................................................. 27
QUESTION 19 ................................................................................................................. 28
QUESTION 20 ................................................................................................................. 29
QUESTION 21 ................................................................................................................. 31
QUESTION 22 ................................................................................................................. 32
QUESTION 23 ................................................................................................................. 34
QUESTION 24 ................................................................................................................. 35
QUESTION 25 ................................................................................................................. 36
QUESTION 26 ................................................................................................................. 38
QUESTION 27 ................................................................................................................. 39
QUESTION 28 ................................................................................................................. 41
QUESTION 29 ................................................................................................................. 42
QUESTION 30 ................................................................................................................. 43
QUESTION 31 ................................................................................................................. 44
QUESTION 32 ................................................................................................................. 45
QUESTION 33 ................................................................................................................. 49
QUESTION 34 ................................................................................................................. 50

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTORY STATEMENTS

**Plaintiffs' Introductory Statement:**

The proposed plan of allocation and distribution (Dkt. 401-1) is designed to ensure that the settlement funds are distributed in a fair and equitable manner, and in a way that balances efficiency with the need to respect pre-existing contractual arrangements.

**Defendant's Introductory Statement:**

Anthropic provides the following guiding principles to aid the Court in understanding Anthropic's positions regarding the questions posed by the Court. First, the claims and releases operate on a per-work basis: each covered work is subject to a single settlement payment and following appropriate notice all claims (as defined in the Settlement Agreement) are released with respect to that work. Dkt. 244, p. 10. Second, the opt-out rights similarly operate on a per-work basis, with any individual opt-out being determinative for the work. Where multiple parties claim ownership interests in a work, a single owner's decision to opt out excludes that work from the settlement entirely, even if other purported owners wish to participate. Finally, Anthropic makes this submission only for purposes of approval of the proposed settlement, which was reached in the context of attempts to implement the Court's ruling on class certification. Anthropic reserves the right to challenge the Court's class certification ruling and its legal and factual predicates, the inclusion of works on the Works List, the class list, all issues related to ownership and infringement, and any notice and claims process, should the settlement not be preliminarily or finally approved.

## QUESTION 1

**Question 1:** Author and publisher file a joint claim providing adequate documentation of their beneficial and legal ownership of the right to reproduce copies and stating they have reached agreement on how to split their award.

**Plaintiffs' Response**:

In the event of a joint claim where there is agreement, the author and publisher would split the claim pursuant to such agreement. *See* Dkt. No. 405 (Sept. 23 Proposed Claim Form).

Under the parties' proposed plan of distribution, both the author and publisher would submit claim forms separately, but the Settlement Administrator would match the submissions to generate a joint claim form.

**Defendant's Response**:

Anthropic agrees with Plaintiffs' response.

**QUESTION 2**

**Question 2**: Author and publisher file joint (or separate) claims stating they have not reached agreement on how to split their award and refuse to submit the dispute to a special master.

**Plaintiffs' Response**:

The Settlement Administrator would address the issue in the first instance, require submission of documentation (including publishing agreements) from both parties, and work with the parties directly in an effort to informally resolve the dispute. *See, e.g.*, *De Santos v. Jaco Oil Co.*, 2015 WL 4418188, at *10 (E.D. Cal. July 17, 2015) ("The Claims Administrator shall perform the customary duties of a Claims Administrator, including . . . resolving disputes from Class Members.").

If, at that point, the Settlement Administrator is unsuccessful in informally resolving the dispute, then the claimants will proceed to a formal dispute-resolution process and any settlement award for the work will be held in reserve until the dispute is resolved. The Court envisioned a dispute-resolution process where, absent consent to a special master, the parties submit their dispute to any appropriate tribunal. Plaintiffs, however, strongly urge the court to consider appointing a special master as the exclusive mechanism for resolving any disputes between class members about how to split an award.

Using a special master to resolve disputes among class members is common and has been successfully used in other cases in this District and across the country. *See, e.g.*, *Trabakoolas v. Watts Water Techs., Inc.*, 2014 WL 12641599, at *4 (N.D. Cal. Aug. 5, 2014) (Orrick, J.) (appointing special master "to adjudicate any appeals regarding the Settlement Administrator's payment of claims"); *Whalen v. Ford Motor Co.*, 2018 WL 6069812, at *2 (N.D. Cal. Nov. 20, 2018) (Chen, J.) (observing that the Court has "various tools at its disposal to manage resolution of [individualized affirmative defenses] . . . , such as the use of individual claim forms or the appointment of a special master"); *Castellon v. Penn-Ridge Transportation, Inc.*, 2020 WL 8768456, at *4 (C.D. Cal. Mar. 9, 2020) (Kronstadt, J.) (granting preliminary approval and appointing special master to address "the number of Shifts that should be credited to the Settlement Class Members whose Claim Forms were disputed"); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 2012 WL 5055810, at *7 (D. Minn. Oct. 18, 2012) (granting preliminary approval and ordering that the "Special Master shall be responsible for resolving disputes, if any, arising from the Claims Process"); *United States v. City of New York*, 877 F. Supp. 2d 57, 66 (E.D.N.Y.), *amended*, 905 F. Supp. 2d 438 (E.D.N.Y. 2012) ("[F]our Special Masters appointed by the Court

will oversee the claims process, including, as necessary, individual hearings"); *Armstrong v. Gallia Metro. Hous. Auth.*, 2001 WL 1842452, at *3 (S.D. Ohio Apr. 23, 2001) (granting final approval of settlement that "provide[d] for the appointment of a Special Master to administer the claims process and establishes a procedure for filing claims and appealing from the Master's determination").

The use of a special master is customary for good reason: Giving all class members access to a no-cost dispute resolution mechanism—if any disputes arise—ensures fair and equitable distribution of proceeds. Forcing parties into a costly, longer resolution mechanism will disproportionately impact the less-resourced party. The prospect of a quick decision from the Settlement Administrator will also encourage claimants to reach agreement and reduce the overall number of disputes, just as a firm trial date encourages parties to settle. Additionally, access to this dispute resolution mechanism benefits most those groups (like authors) who lack resources to hire an attorney or litigate their claim on their own. *See* Dkt. 401 at 34–35; *see also* Joint Declaration of Nonprofit Author Groups, Dkt. 395 ¶ 26–28. Legal fees regarding a dispute worth $3,000 would quickly overcome the value.

**<u>Defendant's Response</u>**:

Assuming no rights holder opts out, claims as to that work are released as of the Effective Date. Settlement Agreement (Dkt. 363-3) ¶¶ 1.29, 1.30, 1.31, 3.1, 3.2, 4.14, 4.15. Anthropic takes no position as to what constitutes an appropriate dispute resolution mechanism as among class members, provided that no funds are released before any such dispute is fully resolved.

**QUESTION 3**

**Question 3**: Author alone files a claim providing adequate documentation of her beneficial ownership of the right to reproduce copies, but the publisher files no claim and remains silent.

**Plaintiffs' Response**:

For the purposes of this question, we are assuming that both the author and publisher are either legal owners, beneficial owners, or both. The process would proceed as follows under this scenario:

First, claimants will file their claims and the information supporting them under penalty of perjury. This approach is consistent with the Court's class certification order (noting at 26 that the "[a]ll the claimants can be made out through sworn declarations subject to challenge.").

Second, the Settlement Administrator will perform traditional fraud checks, including verifying that the author in this instance matches who they say they are. To the extent that any questions or disputes arise, the Settlement Administrator or Class Counsel can request the contract if not already provided. We have structured the proposed claims process in this manner—that is, without *requiring* front-end submission of contracts—for efficiency and to avoid drastically reducing the claims rate. Keough Supp. Decl. ¶¶ 93–94.

When the author (in this example) files a claim, and the claim form is not already pre-populated, it will require the author provide up-to-date contact information for any other potential claimants, including the publisher. Here is what will happen after that:

- The Settlement Administrator will notify the publisher that the author has submitted a claim. The Settlement Administrator will also review the publisher contact information for accuracy.

- If the publisher nevertheless declines to submit a claim by the later of (a) the claims deadline or (b) 70 days after the Settlement Administrator notifies the publisher of the author's claim, then the Settlement Administrator will send the publisher a check for the publisher's share of the award. The publisher's share will be determined by reference to the author's claim form—it will either be the default share or the share that the author certifies is specified in the publishing agreement. *See* PAO&D § 3(c)(ii)(6).

- After that, the publisher will have 18 months after final approval to claim the funds, either by cashing the check or contact the Settlement Administrator and specify another form of payment. The Settlement Administrator will make several attempts to contact the publisher before the 18-month cutoff. Dkt. 401-1, PAO&D § 3(c)(ii). If the publisher doesn't cash the check within 18 months, the

check will be canceled and those funds will be distributed to the author who submitted a claim for that work.

**Defendant's Response**:

All claims as to that work are released per the terms of the Release in the Settlement Agreement. Settlement Agreement (Dkt. 363-3) ¶¶ 1.29, 1.30, 1.31, 3.1, 3.2. Anthropic takes no position with respect to the Plaintiffs' proposal for allocating funds among potential rightsholders.

## QUESTION 4

**Question 4**: Publisher alone files a claim providing adequate documentation of its legal ownership of the right to reproduce copies, but the author files no claim and remains silent.

**Plaintiffs' Response**:

For the purposes of this question, we are assuming that both the author and publisher are either legal owners, beneficial owners, or both.

The answer is the same as the answer to Question 3, except the roles of the author and publisher are switched. To the extent that the claim form is not pre-populated with the author information that the publisher previously provided, the publisher will be required to submit contact information for the author with its claim form.

If the author doesn't submit a claim in response, the Settlement Administrator will still make additional attempts to contact the author, send the author a check, and the author will have 18 months after final approval to cash the check or otherwise claim the funds. PAO&D § 3(c)(ii)(3); Keough Supp. Decl. ¶ 111. If, even after that, the author doesn't cash the check or otherwise claim the portion of the award, then the remainder of the award will be distributed to the publisher. Dkt. 401-1, PAO&D § 3(c)(ii).

**Defendant's Response**:

All claims as to that work are released per the terms of the Release in the Settlement Agreement. Settlement Agreement (Dkt. 363-3) ¶¶ 1.29, 1.30, 1.31, 3.1, 3.2. Anthropic takes no position with respect to the Plaintiffs' proposal for allocating funds among potential rightsholders.

## QUESTION 5

**Question 5**: No claim is filed by anyone for a particular work on the Works List.

**Plaintiffs' Response**:

Under well-established law, and only after the Settlement Administrator and Class Counsel certify that all reasonable efforts to notify the relevant Class members have been exhausted, the claim is released. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809–12 (1985) (absent class members who do not opt out are bound by judgment if notice was adequate); Advisory Committee's Note to Rule 23, 39 F.R.D. 69, 99 (1966); *see also, e.g., Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, No. C 19-04744 WHA, 2022 WL 816473 at*5 (N.D. Cal. Mar. 17, 2022) (Alsup, J.) (class members' claims released; settlement administrator received 28,114 claims based on 59,900 notices). The amount will revert pro rata to the Claimants in proportion to their claim.

**Defendant's Response**:

Anthropic agrees with Plaintiffs' response.

1

**QUESTION 6**

2

**Question 6**: A publisher opts out hundreds of its published works, work by work, yet all (or most) of the

3

authors file claims for those same works. The publisher elects not to re-include itself (and the works) in the

4

class.

5

**Plaintiffs' Response**:

6

Those works are opted out from the settlement in their entirety. The legal and beneficial owners of those

7

works will not participate in the settlement, and their claims against Anthropic will be preserved.

8

**Defendant's Response**:

9

Anthropic agrees with Plaintiffs' response.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **QUESTION 7**

**Question 7**: One of three authors of a single work opts out while the others file claims to participate (as does the publisher). All claimants (but not the absent author) have reached an agreement as to how to split the award.

As a variant, two of three opt out; one later requests re-inclusion; upon receiving notice of the re-inclusion request, the third wishes to re-include.

**Plaintiffs' Response**:

There are two hypotheticals in this question. Our response assumes that all authors and the publisher are legal owners, beneficial owners, or both.

*First Hypothetical*. The work is opted out, neither the three authors nor the publisher participate in the settlement, and their claims are preserved. Because at least one co-owner elected to opt out, all claims arising out of the work are opted out, absent submission of a re-inclusion request.

The Settlement Administrator would give the other two authors and the publisher notice of third author's opt out decision. The two authors and the publisher would have the opportunity to confer with the third author and encourage her to file a re-inclusion request.

The two authors and the publisher may also challenge the author's right to opt the work out of the settlement on the basis that the author is not a class member (*e.g.*, is not a legal or beneficial owner). If disagreement remained, and if unresolved by the Settlement Administrator, the issue could be resolved by the Court in that unlikely scenario.

*Variation.* The work remains in the class because the two authors who opted out submitted re-inclusion requests and thus all three legal or beneficial owners have either done nothing (i.e., not opted out) or reincluded themselves in the class.

**Defendant's Response**:

Anthropic agrees with the Plaintiffs' response.

## QUESTION 8

**Question 8**: Describe all circumstances where a side payment might be made to induce a class member who has opted out to request re-inclusion.

**Plaintiffs' Response**:

The settlement agreement does not constrain the authors, publishers, or other rights holders from reaching any agreement with respect to how any work is to be treated. More specifically, it does not limit the circumstances in which a payment could induce a class member to seek re-inclusion.

Counsel for Plaintiffs, including Class Counsel and the PCC, are not aware of any publisher that intends to use the re-inclusion process to extract side payments. To the extent the Court is concerned about the systematic use of the re-inclusion process to secure side payments, the Court can require the disclosure of a side payment in the event of re-inclusion.

**Defendant's Response**:

Anthropic has not been in direct contact with the PCC. Otherwise, Anthropic agrees with Plaintiffs' response.

1

## QUESTION 9

2 **Question 9**: The Long-Form Notice states that every owner of a work who has "opted out" will be notified

3 regarding re-inclusion if one owner of the same work submits a claim for it (Q. 21). But the Settlement

4 Agreement provides that every owner of a work who has "*submitted a valid claim*" will be notified if one

5 owner of the same work submits an opt out for it (or, later, requests re-inclusion) (¶¶ 5.1(d)–(e) (emphases

6 added)). What is the correct plan?

7 **Plaintiffs' Response**:

8 Both are correct. All owners are notified when (a) another owner of the same work files a claim, (b) another

9 owner of the same work opts out, or (c) another owner of the same work seeks re-inclusion. Dkt. 401-1,

10 POA&D §§ 2(f), 3(c)(ii).

11 **Defendant's Response**:

12 Anthropic agrees with Plaintiffs' response.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## QUESTION 10

**Question 10**: Relatedly, counting from the date preliminary approval is granted, the Settlement Agreement sets the number of days by which steps must be completed (e.g., ¶¶ 1.23–24, 1.6, 5.1(h); *cf.*. Keough Supp. Decl. ¶ 95). The schedule permits the claims deadline (and, after it, the supplemental information deadline for validating claims) to be set after the opt-out deadline and after the re-inclusion deadline. But, again, the plan set by the Agreement requires that claims be validated before these dates so that valid claimants can be notified about any opt-out or re-inclusion request submitted by another owner of the work. What is the correct timeline?

**Plaintiffs' Response**:

The proposed timeline is below. As explained in the Plan of Allocation and Distribution (Dkt. 401-1), claims do not need to be validated before the deadline to submit exclusion requests. Any valid exclusion request requires the identification of any other potential owners of the work. Upon receiving an exclusion request, the Settlement Administrator will promptly notify any other potential legal or beneficial owners of the same work. Any re-inclusion request must be submitted by the party that submitted the exclusion request, and must be submitted at least 3 weeks prior to the claims deadline. *See* Dkt. 401-1, POA&D § 2(f). Re-inclusion requests may, therefore, be submitted after the opt-out deadline.

| Event | Timing | Date |
|---|---|---|
| Preliminary approval of settlement ("Preliminary Approval") | Day 0 | Sept. 25, 2025 |
| Settlement Administrator initiates publication notice and digital and social media notice | Within 7 days of Preliminary Approval | Oct. 2, 2025 |
| Major publishers submit author contact information to Settlement Administrator | Within 45 days of Preliminary Approval | Nov. 10, 2025 |
| Settlement Administrator finalizes distribution of direct notice ("Notice End Date") | Within 59 days of Preliminary Approval | Nov. 24, 2025 |

| | | |
|---|---|---|
| Deadline to submit opt-out request | 104 days after Preliminary Approval | Jan. 7, 2026 |
| Deadline for opt-outs to request re-inclusion | 158 days after Preliminary Approval | Mar. 2, 2026 |
| Deadline to submit claims ("Claims Deadline") | 179 days after Preliminary Approval | Mar. 23, 2026 |
| Final approval hearing | Within 30 days of the Claims Deadline | Apr. 22, 2026 |
| Assuming no appeals, Settlement Administrator calculates per-work and per-claimant distribution amounts | 80 days after the Claims Deadline | June 11, 2026 |

**Defendant's Response**:

Anthropic agrees with Plaintiffs' response.

**QUESTION 11**

**Question 11**: What documentary proof, if any, will be required to back up a claim of beneficial or legal ownership of a work on the Works List? Relatedly, the Settlement Agreement provides that the Settlement Administrator may request information beyond whatever the Claim Form requires; describe the process for any such further requests and any review.

**Plaintiffs' Response**:

Parties submitting claim forms will be required to certify under penalty of perjury that they are either the legal or beneficial owner of the work(s) claimed. No further documentation will be required to submit a claim. For example, if a claimant's name appears on the Works List for a particular work, no further verification will be required unless a dispute is raised.

The Settlement Administrator or Class Counsel will request further information from the claimant if:

- Another valid claimant challenges the party's status as a legal or beneficial owner of the work.

- The party elects to deviate from the default splits between author and publisher. In that situation, for non-Education works, each party will be required to submit the relevant agreements. Dkt. 401-1, POA&D § 4(e). For education works, Claimants need not submit documentation at the Claim Form stage but may describe the basis for their good-faith of any contractual splits. Dkt. 401-1, POA&D § 4(a)(ii). If the claimants to an education work submit conflicting responses, the Settlement Administrator will request further information and/or documentation. Dkt. 401-1, POA&D § 4(a)(ii).

- In the case of education works, the author and publisher claim forms each propose different percentage splits. Dkt. 401-1, POA&D § 4(a)(ii).

- Any questions arise from the Settlement Administrator or Class Counsel about the validity or ownership of the claim, including whether the person purporting to make the claim is actually that person; or whether the person has a valid right to make the claim.

Circumstances that might require documentation are not common but may include situations where the Class Member is deceased or their legal name is different from the name on the Class List.

The Administrator also has established protocols for identifying and removing fraudulent claims. In these situations, the Settlement Administrator has established processes in place to seek proof of identity and

eligibility. In addition, as part of its fraud prevention protocols, the Administrator may request supplemental documents from claimants and, when necessary, take steps to authenticate any documents that purport to supersede the relevant contract.

**<u>Defendant's Response</u>**:

Anthropic agrees with Plaintiffs' response.

1

## QUESTION 12

2    **Question 12**: A claimant is paid only to be sued later by an author or publisher seeking its "share" of the

3    recovery. What provisions of the notification and claims processes (or otherwise, including caselaw) would

4    bear on whether any such collateral actions could be brought and, if brought, on how they could be decided?

5    **Plaintiffs' Response:**

6    The Settlement Agreement does not itself provide for releases between and among Class members. Still, the

7    notification and claims process is designed to deliver finality as to the distribution of funds to any class

8    member that claims.

9    To take the court's hypothetical, if a publisher files a claim, the author will be notified not just through direct

10    notice, but also notified promptly after the publisher's claim is filed, and again several times after that. Even

11    if the author—after receiving such notice—still does not file a claim, the author will automatically receive a

12    check for a portion of the award, determined by reference to the publisher's claim form. The author will then

13    have 18 months after final approval to claim that distribution. Dkt. 401-1, POA&D § 3(c)(ii). Given the robust

14    notice process and litany of opportunities to receive notice and claim a settlement award, Plaintiffs expect that

15    the settlement should provide finality and class members should not retain claims to sue one another for a

16    "share" of settlement payments.

17    **Defendant's Response**:

18    The Settlement Agreement does not address what happens to any future claims brought by one class member

19    against another. Anthropic takes no position on whether claims between class members are extinguished,

20    except insofar as no class member can seek a further recovery from Anthropic for released claims.

21

22

23

24

25

26

27

28

1

## QUESTION 13

2  **Question 13**: The class defined in the order on class certification and in the Settlement Agreement requires

3  that a member of the class be a beneficial or legal owner of the exclusive right to reproduce copies of a relevant

4  work (under Section 106(1)). Suppose, however, that while the author and publisher have retained beneficial

5  and legal ownership of that right, a movie studio has acquired the exclusive legal right to prepare derivative

6  works (under Section 106(2)). Does this mean that the movie studio is not in the class and therefore has not

7  given up its potential claim against Anthropic, one turning on its contention that Anthropic created derivative

8  works?

9  **Plaintiffs' Response**:

10  Yes, the movie studio is not in the class and therefore not bound by the settlement. The class is defined to

11  include only legal or beneficial owners of the "right to reproduce" under Section 106(1). The movie studio,

12  under this hypothetical, is not a class member.

13  **Defendant's Response**:

14  Without agreeing that the movie studio would have any cognizable claim, Anthropic agrees that the movie

15  studio does not enjoy a right to reproduction under section 106(1) and therefore is not in the class.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## QUESTION 14

2 **Question 14**: Describe all circumstances wherein a claimant could receive settlement money yet still sue

3 Anthropic for any conduct sued on in this case. What provisions of the notification and claims processes (or

4 otherwise, including caselaw) would bear on whether any such follow-on actions could be brought and, if

5 brought, on how they could be decided?

6 **Plaintiffs' Response**:

7 Class Members who have remained in the Class release their claims against Anthropic as set forth in the

8 Settlement Agreement. Any claim based on released conduct would be frivolous. All court systems have

9 procedures for dealing with frivolous claims, including Rule 11 and state-law analogues. There is nothing

10 more that this Court could do (or any Court presiding over a non-class action) to prevent claimants from

11 lodging future, frivolous claims.

12 The release covers only *past* conduct related to the claims in suit. Thus, the release does *not* cover any conduct

13 that occurs after August 25, 2025—the date the term sheet was signed. It also does not cover any claim related

14 to the output of Anthropic's models, such as if the model reproduced verbatim an excerpt of a Work—past or

15 future—because output claims were not and have never been part of this suit.

16 If a claim covered by the release is later brought against Anthropic, Anthropic would point to the release and

17 the claim would be dismissed. We do not believe such claims would be filed because any lawyers filing suit

18 would have to overcome Rule 11 and explain why they can bring such a claim in spite of the release. No

19 notification under the claims process would occur.

20 As for how notice could affect future claims being brought, the parties' negotiated release will be effective on

21 all Class Members who do not opt out, so long as the notice procedures are the best practicable under the

22 circumstances. Class Counsel submits that the proposed notice procedures easily satisfy that standard.

23 Accordingly, even if, somehow, some Class Members miss the multiple rounds of proposed mail, email,

24 industry-group, publication, and online notice, they will still be bound by the Settlement release. *See Silber v.*

25 *Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (holding that "best practicable" notice binds class members, even

26 those who did not "actually receive" notice); 3 Newberg & Rubenstein on Class Actions § 8:36 (6th ed.)

27 ("[N]either Rule 23 nor the Constitution requires that a class member actually receive notice: notice suffices

28 if it is reasonably calculated to reach the absent parties."); 1 McLaughlin on Class Actions § 5:80 (21st ed.)

("Courts have repeatedly held that neither due process nor Rule 23(c)(2)(B) mandates that class members receive actual notice in order to be bound by class action proceedings. Actual receipt of notice is not required. The provision of notice reasonably calculated to apprise class members of the proceedings is sufficient.").

**Defendant's Response**:

Anthropic agrees with Plaintiffs' response.

## QUESTION 15

**Question 15**: To what extent are claims based on downloaded copies from Books3 released? If such claims are released, why is no injunctive relief proposed to delete any copies downloaded from Books3 (or further copies tracing to the copies downloaded)?

**Plaintiffs' Response**:

Claims against Books3 generally are not released, and the release does not include any Work not on the Works List. Consistent with the Court's Orders, the settlement class is identical to the certified class. If a work is in Books3 but is not on the Works List, that claim is not released by the settlement and the work is not in the class. To the extent that a work on the Works List *also* appears in Books3, the Books3 claim is released—consistent with this Court's Class Certification Order. Books3 was not included within the scope of the injunctive relief because the Books3 class was not certified. Dkt. 244 at 10.

**Defendant's Response**:

Anthropic agrees with Plaintiffs' response. In addition, Anthropic makes two points: (1) The response is consistent with the Court's ruling that there will be one remedy per work for all claims brought in this lawsuit. Dkt. 244 at 10. (2) The settlement does not require Anthropic to destroy copies of works downloaded from Books3. Although not part of the settlement agreement, Anthropic is exploring the feasibility of destroying its cop(ies) of Books3.

## QUESTION 16

**Question 16**: To what extent are claims based on copies from scanned books released?

**Plaintiffs' Response**:

Claims based on copies from Anthropic's book scanning project are released for Class Members who do not opt out only to the following extent: Some of the books Anthropic downloaded from LibGen and PiLiMi were also purchased and scanned by Anthropic before August 25, 2025. For any works on the Works List, claims arising out of "past torrenting (including uploading and seeding), scanning, retention, and use" of the works that occurred before August 25, 2025 would be released by the settlement if the owner(s) do not opt out. Dkt. 363-3, SA § 1.29.

**Defendant's Response**:

Anthropic agrees with Plaintiffs' response. In other words, if a work was both downloaded as part of LibGen and scanned, the claim as to that work is released.

**QUESTION 17**

**Question 17**: The Settlement Agreement states that any person "in Class can exclude a work or multiple works from inclusion in the Settlement" (¶ 4.14), which counsel described at our hearing as meaning that no owner could receive an award for that work as part of the Settlement (Tr. 23, 28). But both the Settlement Agreement and the Long-Form Notice elsewhere describe that absent an exclusion submitted by an owner she "remain[s] in the Settlement Class" (Q. 12). If one owner requests to exclude the work, but a second owner of the same work does not opt out of the class, will the second owner be bound by the settlement as to that work even though she is unable to collect on it? Note well that the proposed Long-Form Notice ends by summarizing that an author is "bound by the terms of this lawsuit if" she does not opt out and "[c]an [ ] receive settlement money if" she submits a claim instead, without explaining any implications on either scenario of another claimant's decision to exclude the work (Q. 29).

**Plaintiffs' Response**:

Under the Settlement Agreement, if a Work is opted out, *all claimants* to the Work will not be bound and will not be part of the Settlement Class. In the Court's hypothetical where "one owner requests to exclude the work, but a second owner of the same work does not opt out of the class," the second owner (like the first owner) *would not be bound* by the Settlement. *See* Dkt. 363-3, SA § 4.14 ("Any person or entity in Class can exclude a *work* or multiple works from inclusion in the Settlement by submitting a request for exclusion from the Settlement on or before the Objection/Exclusion Deadline." (emphasis added)); *cf. id.* at § 7.2 ("For the avoidance of doubt, if there is more than one claimant to the same work, any purported claimant who seeks to opt out their work from the class counts toward the opt-out threshold.").

To the extent the originally proposed notice was deficient on this score, the revised Long-Form Notice makes this point explicitly:

> You may exclude yourself and every other legal and beneficial owner of your work by following the directions below by [DATE]. This is the only option that allows you to bring your own separate lawsuit against Anthropic for the claims this Settlement resolves. If you exclude yourself and all other rightsholders, you will give up the right to receive any payment from this Settlement and will prevent

all other legal and beneficial owners of your works from receiving any payment from this Settlement. If you exclude yourself and all other rightsholders from the Settlement, you cannot object to it, and other legal and beneficial owners of your works cannot object to the Settlement.

Amended Long-Form Notice at 2; *id.* at Q.12 ("Unless you exclude yourself or another copyright owner excludes you, you will remain in the Settlement Class."); *id.* at Q.30 ("Even if you choose to receive payment, do nothing, or object to the Settlement, another Class Member can still opt you out of the Settlement by submitting a Class Action Opt Out Request Form.").

**Defendant's Response**:

Anthropic agrees with Plaintiffs' response.

1

## QUESTION 18

2 **Question 18**: If someone submits a claim, can they later opt out?

3 **Plaintiffs' Response**:

4 Yes, provided that the person opts out before the deadline. The Settlement Agreement provides sixty (60)

5 days to opt out "or other date ordered by the Court." Dkt. 363-3, SA § 1.24. The revised Plan of Allocation

6 and Distribution (Dkt. 401-1) proposes a 45-day period. Dkt. 401-1, POA&D § 2(d). Any valid opt out

7 submitted before the Exclusion Deadline will be honored, even if the person opting out previously filed a

8 claim.

9 As a best practice, if someone submits both a claim form and an opt-out notice, Class Counsel will contact

10 them to determine whether they intended to opt out.

11 **Defendant's Response**:

12 Anthropic agrees with Plaintiffs' response.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## QUESTION 19

**Question 19**: Assume a writer, an employer of writers, an old publisher, and a new publisher each submit a claim for the same work, making incompatible ownership claims. When and how is each notified of the others' claims (if at all), and what is the proposed process for resolving the dispute (if any), including by facilitating collateral resolutions in state court?

**Plaintiffs' Response**:

Under the Plan of Allocation & Distribution, the Settlement Administrator will provide notice to all other claimants and known potential owners of a work promptly after the claim form is filed. Dkt. 401-1, POA&D § 3(c)(ii). The Settlement Administrator will notify each claimant in writing, by email if possible or else U.S. mail if no email address is available. The Settlement Administrator will work with the parties to resolve the issue privately among themselves. Dkt. 401-1, POA&D § 3(d). If private ordering is unsuccessful, the parties will provide the option to submit the dispute to a special master for quick, no-cost resolution of the dispute. Dkt. 401-1, POA&D § 3(d).

Class Counsel has experience with the claims administration process in other copyright class actions. In Class Counsel's experience, parties with competing claims tend to work potential disputes out among themselves. The dispute resolution process is further addressed in response to Question 2.

While Plaintiffs urge the Court to approve the proposed special-master dispute resolution mechanism (*see* Question 2; Dkt. 401 at 29–31), in the absence of a special-master process, the claimants would submit their dispute to the appropriate tribunal, be it state court, small-claims court, federal court, or arbitration.

Regardless of any dispute resolution process, the funds will be held by the Settlement Administrator in an interest-bearing escrow account until any dispute is resolved.

**Defendants' Response**:

Anthropic takes no position as to what constitutes an appropriate dispute resolution mechanism as among class members, provided that no funds are released before any such dispute is fully resolved.

**QUESTION 20**

**Question 20**: If the Settlement Administrator becomes aware by way of a "read receipt" that an emailed notice or other email was delivered but not opened, such as might happen where an email was auto-sorted by the recipient's email service into a spam folder, what is the Settlement Administrator required to do by way of follow-up?

**Plaintiffs' Response**:

The Settlement Administrator will receive statistics that show (a) "hard bounces" (typically when the email address is no longer active; (b) "soft bounce" (often when an email inbox is full or subject to a temporary server shutdown); and (c) whether an email has been delivered and opened. Here is how the Settlement Administrator will deal with each scenario:

- Hard bounces – the Settlement Administrator will use standard contact information lookup tools to identify a new email address for the class member

- Soft bounces – the Settlement Administrator will re-send the email at a later date, typically within 10-14 days.

- Unopened emails – the Settlement Administrator will re-send the email within 10 days. When an email is re-sent, the Settlement Administrator will make changes to the email—including text of the email— to avoid any spam filters that may have caught the first email.

Typically, in a class of this size and this highly publicized, any systematic issue (*e.g.*, emails caught by spam filters) with email notice will be caught. That is because class members are likely to come forward if any significant number of them expect to receive notice and do not receive notice email. Keough Supp. Decl. ¶ 27. If that happens, the settlement administrator would then adjust its emails as appropriate to eliminate any identified flaws, using state-of-the-art methods, like those described above. Keough Supp. Decl. ¶¶ 42–45. . JND also plans to send periodic reminder emails to any class members who do not promptly submit a claim or opt out. Keough Supp. Decl. ¶¶ 33, 75–76, 89–90, 96. Such reminder emails will vary slightly and will also be subject to the spam-prevention methods described above. *Id.* It would be highly unlikely for JND's spam-prevention methods to fail numerous times in successive emails. Keough Supp. Decl. ¶ 45.

The proposed Settlement Administrator, JND, is also experienced and successful in minimizing the risk that its emails are auto-sorted by the recipient's email service into a spam folder. As explained by proposed

Settlement Administrator, Jennifer Keough, "JND will evaluate the email for potential spam language to improve deliverability. This process includes running the email through spam testing software, DKIM for sender identification and authorization, and hostname evaluation. Additionally, we will check the send domain against the 25 most common IPv4 blacklists." Keough Supp. Decl. ¶ 43. In addition, JND "will utilize a verification program to eliminate invalid email and spam traps that would otherwise negatively impact deliverability" and "then clean the list of email addresses for formatting and incomplete addresses to further identify all invalid email addresses." Keough Supp. Decl. ¶ 44.

In addition, the proposed notice plan contemplates many other forms of notice other than email, including direct mail and supplemental digital notice, social media notice, publication notice, online notice, and notice assisted by industry groups. Keough Supp. Decl. ¶¶ 54–69.

**Defendant's Response**:

Class Counsel is best positioned to answer this question and Anthropic does not have reason to disagree with their response. Anthropic has not been in direct contact with the Settlement Administrator.

## QUESTION 21

**Question 21**: If the Settlement Administrator is aware that all individualized notice efforts to a given copyright owner have failed, does the copyright owner remain bound to the settlement?

**Plaintiffs' Response**:

Yes, any absent class member who does not opt out will be bound. That is because the notice plan is designed to reach every class member—through broad direct notice and, if that fails, through 1) paid media, including advertisements in *Publishers Weekly*, *Writer's Digest*, and *The Atlantic*; 2) paid advertising on social media channels, targeting persons most likely interested in the lawsuit; 3) distribution through more than 20 author, publisher, and agent membership organizations worldwide; and 4) earned media, in light of the extraordinary high-profile nature of this lawsuit. With respect to any individual class member, it is highly unlikely that they will have not received notice of the lawsuit, even if individualized direct notice fails. *See* Keough Supp. Decl. ¶¶ 33–69, 87 (discussing in detail the extensive direct and media notice campaigns). Under well-established law, and upon certification by the notice provider that all reasonable efforts to notify the relevant Class members have been exhausted, the claim is released. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809–12 (1985) (absent class members who do not opt out are bound by judgment if notice was adequate); Advisory Committee's Note to Rule 23, 39 F.R.D. 69, 99 (1966); *see also, e.g., Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, No. C 19-04744 WHA, 2022 WL 816473 at*5 (N.D. Cal. Mar. 17, 2022) (class members' claims released; settlement administrator received 28,114 claims based on 59,900 notices); *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (holding that "best practicable" notice binds class members, even those who did not "actually receive" notice); 3 Newberg & Rubenstein on Class Actions § 8:36 (6th ed.) ("[N]either Rule 23 nor the Constitution requires that a class member actually receive notice: notice suffices if it is reasonably calculated to reach the absent parties.").

**Defendant's Response**:

Anthropic agrees with Plaintiffs' response.

1

**QUESTION 22**

2   **Question 22**: Some works on the Works List are not on the Class List. And, many listed on the Class List are

3   missing addresses. How will this be cured, and cured timely?

4   **Plaintiffs' Response**:

5   In accordance with the first part of the Court's question, Class Counsel investigated potential discrepancies

6   between the Works List and the Class List. In the course of that investigation, Class Counsel discovered that

7   the version of the Class List which was filed on September 15, 2025, inadvertently corresponded to an earlier

8   draft and thus failed to match the works listed on the Works List. Additionally, Class Counsel identified

9   approximately 2,300 works which met the criteria for inclusion but which were not included on the original

10   Works List and a handful of corrections to works previously included on the Works List. Class Counsel has

11   rectified both issues by re-filing the Corrected Works List and Class List alongside these responses. The

12   Corrected Works List contains 482,460 works and additionally includes the "Education" column specified in

13   the Plan of Allocation filed on September 22, 2025. *See* Dkt. 401-1 at § 4.a.

14   As to the portion of the Court's question regarding missing addresses and as set forth in Plaintiffs'

15   Supplemental Brief in Support of Preliminary Approval, Dkt. 401 at 14-15, and accompanying Supplemental

16   Declaration of Jennifer Keough, Dkt. 399 at ¶ 26, the Corrected Class List already contains at least one mailing

17   or email address for 99% of works on the Corrected Works List. The updated Class List further contains email

18   or mailing addresses for approximately 97% of all publishers of works on the Corrected Works List

19   (amounting to a publisher address for 99.4% of listed works) and approximately 66% of all authors of works

20   on the Corrected Works List (amounting to an author address for 81% of listed works). Dkt. 399 at ¶ 26.

21   Additionally, the Corrected Class List also includes the address information listed on the registrations of the

22   works filed with the Copyright Office. For those approximately 279,000 works (approximately 58% of the

23   total), the relevant address to contact is likely that listed on the registration. If these addresses are treated as

24   correct for authors, this would bring the total coverage from 81% of works to 90% of works.

25       For any remaining addresses, Class Counsel and the proposed Settlement Administrator will source

26   them from: (1) publishers, (2) online intake forms, (3) claim forms, and (4) other available sources.

27       As to publishers, Class Counsel expects publishers to provide additional contact information. Indeed,

28   publishers of approximately half of all works on the Corrected Works List have already agreed to provide

author contact information within 45 days of preliminary approval. *Id*. And Class Counsel expects that number to grow to 75% shortly. Even just taking those publishers who have already agreed, this would raise the share of the authors of works on the Corrected Works List with contact information from 66% to 84%, and would raise the share of works on the Corrected Works List with author contact information from 81% to 93%. *Id*. When treating Copyright Office-listed addresses as correct for authors, this would further raise the total from 93% to 96%.

As to online intake forms—and due to the broad publicity of this case—49,000 individuals have submitted their contact information via online intake forms or by contacting Class Counsel since the Court certified the Class on July 17. *Id.* at ¶ 27. The rate of contact-information submission has swelled since the Settlement Agreement was filed publicly on September 5.

As to claim forms, the proposed Claim Form ***requires*** all rightsholders to submit the known contact information for any other rightsholders associated with the works for which they are submitting a claim. Dkt. 401-1, POA&D at ¶ 3(b)(ii).

Finally, should there be any gaps, Class Counsel and the proposed Settlement Administrator will work diligently to source address information including from third parties via subpoena or via purchasing contact information as necessary.

**Defendant's Response**:

Anthropic understands that Plaintiffs have re-filed a Corrected Class List and Works List. Beyond that, Class Counsel is best positioned to opine on this answer, and Anthropic does not have reason to disagree with their response.

1

**QUESTION 23**

2    **Question 23**: Please explain whatever methods, data, and application of methods to data support the assertions

3    that planned general notice will actually reach 70 to 95 percent of class members or more (*e.g.*, Supp. Br.

4    Keough ¶¶ 27, 98; *cf. id.* ¶¶ 60, 87 (quantitative thresholds)).

5    **Plaintiffs' Response**:

6    The proposed Settlement Administrator has 25 years of experience and has administered hundreds of

7    high-profile and complex engagements. Dkt. 363-13, at 2-51. The notice programs administered by the

8    proposed Settlement Administrator have achieved an average deliverability rate of over 95%. *See* Dkt. 399

9    (Supp. Keough Decl.) at ¶ 5. In addition to relying upon that background and experience, the proposed

10   Settlement Administrator performed a media reach analysis, the methodology and findings of which are set

11   forth in the Supplemental Declaration. Dkt. 399 at ¶ 79-87. In short, the Settlement Administrator's analysis

12   projects that 95% of Class Members will receive general notice as a result of Tier 1 digital efforts via Google,

13   Facebook, Instagram, and Reddit alone. *Id.* at ¶ 87. Additional efforts through so-called Trade and Niche

14   Media—*e.g.*, Publishers Weekly, GoodReads, and Writer's Digest—as well as "Claims Stimulation" via

15   LinkedIn, YouTube, and Gmail are likely to increase the reach and target Class Members potentially missed

16   by the "Tier 1" efforts. This notice campaign is expected to be exceptionally robust in light of the enormous

17   publicity this case has received (and will continue to receive) and because notice will be distributed through

18   more than 20 author, publisher, and agent membership organizations worldwide.

19   **Defendant's Response**:

20   Class Counsel is best positioned to opine on the Settlement Administrator's ability to effectuate notice, and

21   Anthropic does not have reason to disagree with their response.

22

23

24

25

26

27

28

1

### QUESTION 24

2    **Question 24**: The Settlement Agreement provides that the Settlement Administrator will maintain an email

3    address, a P.O. Box, and a phone line "to answer Class Member inquiries" (¶ 4.4). But the proposed long-

4    form notice contains no email address and nine various mailing addresses (QQ. 14–15, 17). How will the

5    Settlement Administrator and Class Counsel ensure that answers provided are consistent and information

6    reconciled across these channels?

7    **Plaintiffs' Response**:

8    The proposed Long-Form notice contains a single P.O. Box and phone number for the proposed Settlement

9    Administrator and mailing addresses for Class Counsel. The proposed Email and Postcard notices contained

10   the dedicated email address info@AnthropicCopyrightLawsuit.com. Paragraph 3 of the Northern District's

11   Guidance requires that this contact information be placed on the notice.

12   All persons answering questions will be trained based on any Court-approved notice and will answer any and

13   all questions consistent with the Court-approved notice. Class Counsel will also provide the Settlement

14   Administrator with assistance for any questions which the Settlement Administrator cannot answer.

15   **Defendant's Response**:

16   Anthropic agrees with Plaintiffs' response    regarding the form of the notice. Class Counsel is best positioned

17   to opine on the Settlement Administrator's ability to answer questions regarding the settlement, and Anthropic

18   does not have reason to disagree with their response

19

20

21

22

23

24

25

26

27

28

1

**QUESTION 25**

2     **Question 25**: The district judge had expected that for any given work the allocation of an award would be

3     based on the documentation between the author and the publisher of that work (in almost all cases). For some

4     works, such documentation would show the publisher is the legal copyright owner of the exclusive right to

5     make copies, the author is the beneficial owner, and that they agree to split proceeds from infringement actions

6     evenly. For other works, documentation might show they split proceeds differently. For still others,

7     documentation might show that only the author or only the publisher is an owner with any entitlement to bring

8     suit. But, in all cases, the district judge expected the allocation to be based on individual documentation on a

9     work-by-work basis. The appearance in this case of the Authors Guild, the Association of American

10    Publishers, and the various law firms causes the district judge to suspect that some kind of global allocation

11    is going to be proposed regardless of the merits of any individual case. For example, the Authors Guild and

12    the AAP might "agree" to a global 50/50 split between authors and publishers. But would it be right and fair

13    to do so with respect to an author whose paperwork clearly shows the author is entitled to all proceeds? If a

14    global settlement within a class settlement is what class counsel have in mind, then the district judge will have

15    concern. Please explain the exact and full role of the Authors Guild, the Association of American Publishers,

16    and each of the new law firms.

17    **Plaintiffs' Response**:

18    Class Counsel's goal was to create a fair, equitable, and efficient distribution of the settlement that respects

19    contractual arrangements. Accordingly, Class Counsel convened a Working Group of key stakeholders,

20    including the Authors Guild in conjunction with other authors groups (with Authors' Coordination Counsel)

21    and Association of American Publishers (with Publishers' Coordination Counsel).

22    During the working group process, it became clear that many contracts—particularly in the trade and

23    university press sectors—split the proceeds from enforcement 50/50 between authors and publishers. Class

24    Counsel has therefore proposed non-mandatory default rules for works other than education works, which

25    will help minimize transaction costs for class members and reflect industry-standard contracts in these sectors.

26     No global "settlement within a settlement" has been proposed. The proposed plan of allocation and

27    distribution does not mandate any split between authors or publishers. It provides for default rules for most

28    works (*i.e.,* a 50/50 split between author(s) and publisher), intended to reflect recurring contractual terms in

the trade and university press sectors of the publishing industry that allows an efficient and usable claims process. Dkt. 401-1, POA&D § 4. For education works, claimants will submit information about any contractual splits in the claim form, just as the Court envisioned. The proposal also provides that an author, even one that doesn't submit a claim, will get a check in the mail if his publisher submits a claim—and vice versa. *Id.*

The exact and full role of Publishers Coordination Counsel and the Association of American Publishers and Authors Coordination Counsel and the Authors Guild is addressed in Plaintiffs' brief filed yesterday. Dkt. 401 at 5-9 (addressing publishers' contributions); *id*. at 9-11 (addressing authors' role and contributions); *see also* Dkt. 395 (Declaration of Not-For-Profit Author Organizations); Dkt. 396 (Declaration of Maria A. Pallante of the AAP); Dkt. 397 (Declaration of Nancy E. Wolff); Dkt. 398 (Declaration of Publishers Coordination Counsel Jay Edelson and Matthew J. Oppenheim).

**Defendant's Response**:

Class Counsel is best positioned to answer this question and Anthropic does not have reason to disagree with their response.

**QUESTION 26**

**Question 26**: Is anyone compensating any law firm or lawyer involved for work in this action (other than for defense) or does anyone expect to do so? Explain fully.

**Plaintiffs' Response**:

No. Class Counsel has not received and is not receiving any compensation in this matter except as may be awarded by this Court through a fee petition at the appropriate time. The same applies to all lawyers who have appeared on the Plaintiffs' side, including the Publishers' and Authors' Coordination Counsel and Prof. Samuel Issacharoff.

The PCC has no direct or indirect compensation from individual publishers, the Association of American Publishers, or anyone else in connection with this matter. The PCC is representing the publishers' interests as a whole in service to the rest of this class.

Separate from any coordination counsel issue, Class Counsel retained two law firms to advise on discrete consulting matters, whose hourly fees will be advanced as expenses: (1) Class Counsel retained the advice of transactional lawyers regarding settlement structure; and (2) Class Counsel retained an appellate specialist to advise on the Plaintiffs' opposition to Anthropic's Rule 23(f) petition and motion to stay before the Ninth Circuit.

**Defendant's Response**:

Class Counsel is best positioned to answer this question and Anthropic does not have reason to disagree with their response.

**QUESTION 27**

**Question 27**: The district judge also is concerned that the re-inclusion provision will invite gamesmanship and corruption. A publisher or an author might conclude their best strategy is to opt out in the first round. This way, they can see how the claims process unfolds and how much they stand to receive (i.e., from any pro rata share of unclaimed funds on top of their share of $3,000 per work, less fees and expenses). And, they may demand a side deal to reinclude themselves to avoid the abort clause. The district judge believes the traditional one chance method is better, namely, that a class member may opt out by the deadline but if they do so they are excluded forever. Isn't that best?

**Plaintiffs' Response**:

The purpose of the re-inclusion provision is to enable multiple claimants for a work to coordinate. Where one class member has opted out and another has made a claim based on the same work, it is most fair to give them both a chance to work it out before any class member finally and irrevocably loses all rights to payment under the Settlement.

Plaintiffs do not believe that there is a significant likelihood to gamesmanship. The court's first hypothetical involves a publisher or author "opting out in the first round" to see "how much they stand to receive." But that won't be an effective strategy. Because the Settlement Administrator will only calculate the per-work distribution 80 days *after* the claims process concludes—and therefore after the window for re-inclusion closes—it is not possible to use the re-inclusion mechanism to get a free look at the per-work share under the settlement. Dkt. 401-1, POA&D § 5(a). The Court's second hypothetical involves a party using re-inclusion as a leverage for a "side deal" to "avoid the abort clause." This is a potential problem that is not unique to the re-inclusion mechanism; a party could demand a side deal to avoid opting out to trigger the "blow up" provision. Such conduct would be unethical, and if it were to come to the Settlement Administrator or Class Counsel's attention, would require disclosure to the Court. It would not, however, be a unique product of the re-inclusion mechanism.

The re-inclusion mechanism offers class members with claims on the same Work's recovery to coordinate after they are notified of another co-class member's decision to opt out, with little corresponding risk of abuse or gamesmanship. Plaintiffs also refer to the answer to Question 8.

**<u>Defendant's Response</u>**:

Anthropic does not object to a re-inclusion process as specified by Class Counsel.

1

## QUESTION 28

2

**Question 28**: The Agreement provides that defendant will delete copies derived from LibGen and PiLiMi and

3

will validate that this is accomplished by "written certification" (¶ 2.2). Previously, Anthropic attested that it

4

could not possibly account for all the copies that had been made from those derived from the copies taken

5

from LibGen and PiLiMi. Now, it can certify the opposite (*ibid.*; Q. 11). Please explain this discrepancy and

6

how class members can be satisfied that this permanent injunctive relief has been accomplished.

7

**Plaintiffs' Response**:

8

Plaintiffs refer to Defendant's answer, which, without waiving any privileges, is consistent with their

9

understanding from discovery and discussions.

10

**Defendant's Response**:

11

Anthropic believes that the Court is referring to Anthropic's response to Interrogatory No. 6, in which

12

Anthropic stated that it cannot enumerate, after the fact, exactly how many copies of the torrented datasets it

13

has ever made due to the numerous temporary copies it has made in the course of the LLM development

14

process that it did not retain. However, while that type of historical reconstruction is not possible, Anthropic

15

believes it is possible to mechanistically identify all the original files of works torrented from Library Genesis

16

or Pirate Library Mirror, and any copies that originate from them, that are in its possession today so that it can

17

delete them.

18

19

20

21

22

23

24

25

26

27

28

1

## QUESTION 29

2 **Question 29**: The proposed notice nowhere cites or describes the "Effective Date" (cf. ¶¶ 1.15, 9.3). This and

3 other features of the notice may mislead class members into believing that as soon as Anthropic pays the

4 Settlement Fund, the Settlement Fund will pay them.

5 **Plaintiffs' Response**:

6 The revised longform states: "The Effective Date is the first business day after both: (1) the Court has entered

7 final approval and judgment, and (2) all appeal periods have ended or any appeals are resolved."

8 The revised longform notice states:

9     The Settlement Administrator will calculate payments within 80 days after the deadline for all claims

10    to be submitted. Payments may be made in up to three installments, depending on when Anthropic

11    funds the settlement as described in Question 10. Anthropic's funding alone does not trigger payments.

12    No payments will be made before the Effective Date or the calculation of payment amounts.

13    It is currently **estimated** that you will receive your payment by [DATE][To be adjusted if there are

14    multiple payments]. However, please check the Settlement Website for updates. The payments may

15    be slower than predicted if the Settlement is appealed, or faster than predicted if Anthropic pays the

16    Settlement on a faster timetable.

17 **Defendant's Response**:

18 Anthropic agrees with Plaintiffs' response.

19

20

21

22

23

24

25

26

27

28

1

**QUESTION 30**

2    **Question 30**: The notice tells class members to visit a website for the full scope of their release (Q. 13). The

3    long-form notice must state everything to be released, clearly and completely.

4    **Plaintiffs' Response**:

5    The proposed Long-Form Notice in Question 14 states, word-for-word, the definition of "Released Claims"

6    from Section 1.29 of the Settlement Agreement.

7    **Defendant's Response**:

8    Anthropic agrees with Plaintiffs' response.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**QUESTION 31**

2    **Question 31**: The Settlement Agreement provides that "[a]lthough the Release is not intended to be a general

3    release, to the extent it could be construed as narrowing the scope of the Release, [class members] expressly

4    waive any rights or benefits available to them under the provisions of Section 1542 of the California Civil

5    Code or any similar law" (¶ 3.2). Give us an example or examples of claims that would be released by the

6    Section 1542 language that would not be released by the Released Claims language itself (¶ 1.29).

7    **Plaintiffs' Response**:

8    Plaintiffs refer to Defendant's answer and would agree that *past,* non-output claims relating *only* to the works

9    in the Works List like those identified below are released.

10    **Defendant's Response**:

11    The Section 1542 Waiver is intended to provide Anthropic with protection against claimants who might argue

12    that the release does not cover claims not expressly pleaded in the complaint, such as a claim that Anthropic

13    violated the Digital Millennium Copyright Act, *e.g.*, by removing copyright management information in

14    connection with downloading the Works, or a common law claim for unjust enrichment. While Anthropic

15    believes such claims are within the scope of the Released Claims on their face, the Section 1542 waiver

16    removes any doubt about the scope of the release.

17

18

19

20

21

22

23

24

25

26

27

28

**QUESTION 32**

**Question 32**: The proposed notice states that class members will be bound by the Court's prior orders unless they opt out and that in light of past orders and future prospects the proposed settlement is "fair, reasonable, adequate, and in the best interest of the class" (Q. 4; see Q. 12). It does not describe any of the past orders. Nor does it state, for instance, the range of possible jury results from $0 to $150,000 per work — nor why named plaintiffs believe $3,000 is fair and reasonable once the risks and costs of litigation are factored in (or other benchmarks). Something like the following could and should be included:

> This class action settlement arises out of a lawsuit brought by various authors against Anthropic PBC alleging that Anthropic PBC violated the Copyright Act by downloading millions of copyrighted works from online pirate libraries entitled Library Genesis (LibGen) and Pirate Library Mirror (PiLiMi). Anthropic denies that any such downloading was a violation of the Copyright Act and contends instead that any such downloading was a fair use under the Copyright Act because of the books' potential use to train large language models (LLMs) for artificial intelligence. From 2021 to 2025, Anthropic attempted to assemble a central library of millions of copyrighted works and in part did so by downloading books from two pirate libraries, LibGen and PiLiMi. Some of these books were later used to train LLMs by Anthropic and others were not. Nevertheless, the central library was kept intact. This downloading allegedly violated Section 106(1) of the Copyright Act. This section gives a copyright's owner the exclusive right to reproduce copies, or to license or transfer that right to others. A company that copies a work without permission infringes that right unless it can show the copying was for a fair use. The Copyright Act provides for statutory damages (like fines payable to the copyright owner) of between $200 and $150,000 per work, depending on factors including whether the copier reasonably believed its use was fair or instead copied willfully. If the use was fair (or there was no copying), the alleged copier owes $0. Three individual authors began this action seeking statutory damages for the copying of their own books. In June 2025, the district judge ruled that reproductions of their books specifically in the process of training LLMs was a fair use and therefore not a violation of the Copyright Act. However, he also ruled that downloading millions of books (theirs included) from pirate libraries and assembling them in a central library was not a fair use, at least not on the record at the time. This left the issue to be resolved at trial, potentially in Anthropic's favor.

These authors, however, also brought this action seeking to represent a class of copyright owners. Note that, except in the case of a work for hire (like when someone hires an author to write a book for them), the author of a work starts out with the exclusive right to reproduce the work. However, the author often licenses or transfers the exclusive right to reproduce the work to a publisher. Where the author does so in exchange for royalties, the author becomes the beneficial owner of that right, while the publisher becomes the legal owner of that right. In July 2025, the district judge ruled that the individual plaintiffs (or their associated legal entities) could represent all beneficial and legal copyright owners of the exclusive right to reproduce copies of the books in question. This order was, however, conditional on further steps being taken. That same month, Anthropic sought review of both orders by an appeals court. In particular, if the class certification order were heard by the appeals court and then decided in Anthropic's favor, a probable result would be that the class would be de-certified — eliminating the chance for anyone but the three authors to recover through this one action. And, even if neither review were decided in Anthropic's favor, plaintiffs and class would need to prevail at trial and then on probable appeals from the trial decisions. Trial was set to begin in December 2025. All evidence-gathering was set to end in August 2025. What evidence was protectable by assertions of attorney-client privilege was about to be decided. So were threshold decisions as to whether an appellate court would review the above orders (or not). The parties agreed to settle. If the case had proceeded, it is possible the class could have been de-certified even before trial, receiving nothing. If the case had gone to trial, it is possible the class could have lost on the issue of fair use, again receiving nothing. Even if the class could have prevailed at trial and later on likely appeals, a jury might have awarded a wide range of amounts, to be paid only after the added expense and delay of the trial and its likely appeals. The resulting settlement is the largest copyright class action settlement in history. It provides at least $3,000 per work (not per copyright owner), less costs and fees. The exact text above is not mandatory but suggestive of what the parties should agree to provide.

**Plaintiffs' Response**:

Plaintiffs agree with the condensed language Anthropic proposes below.

**Defendant's Response**:

Anthropic proposes the following language to be included in the notice:

This class action settlement arises out of a lawsuit brought by various authors against Anthropic PBC ("Anthropic") alleging that Anthropic violated the Copyright Act by downloading copyrighted works from online websites called Library Genesis (LibGen) and Pirate Library Mirror (PiLiMi) for purposes of training large language models (LLMs). Anthropic denies that it violated the Copyright Act and contends instead that such downloading and subsequent use was fair use under the Copyright Act. The plaintiffs contend that Anthropic's downloading violated Section 106(1) of the Copyright Act, which gives a copyright owner the exclusive right to reproduce copies, or to license or transfer that right to others. Copying a work without permission is not copyright infringement if a defendant can show the copying was fair use. If the use is determined to be infringement, the Copyright Act provides for statutory damages of between $200 and $150,000 per work, depending on factors including the harm that was actually caused by the infringement, and whether the alleged infringer reasonably believed its use was fair or instead acted willfully. If the use was fair (or there was no copying), the defendant owes $0.

Three authors sued Anthropic alleging copyright infringement. In June 2025, the district court ruled that using the books to train AI models was fair use and therefore not a violation of the Copyright Act but left for trial the question whether downloading and all uses of the books from LibGen and PiLiMi was fair use. Because this decision was made before any class was certified, it is binding only on the named plaintiffs.

In July 2025, the district judge ruled that the individual plaintiffs (or their associated legal entities) could represent all beneficial and legal copyright owners of the exclusive right to reproduce copies of the books in question. This order was, however, conditional on further steps being taken. Anthropic sought to appeal both the fair use ruling and class certification ruling. The District Court and the Court of Appeals have not ruled on those requests.

Trial was set to begin December 2025. The parties then reached a settlement agreement. The litigation involved significant uncertainties. If the case had proceeded, it is possible the class could have been de-certified even before trial, with class members receiving nothing. If the case had gone to trial, it is possible the class could have lost on the issue of fair use, again with class members receiving nothing. Even if the class could have prevailed at trial and later on likely appeals, a jury might have awarded a

1    wide range of amounts, to be paid only after the added expense and delay of the trial and its likely

2    appeals.

3    The resulting settlement is the largest copyright class action settlement in history. It provides at least

4    $3,000 per work (not per copyright owner), less costs and fees.

1

**QUESTION 33**

2  **Question 33**: Why don't the parties stipulate that any work on the "Works List" already meets all work-related

3  requirements for purposes of this settlement (i.e., has an ISBN or ASIN, was registered with the U.S.

4  Copyright Office within five years of first publication and either within three months of first publication or

5  else before August 10, 2022, and was in LibGen or PiLiMi as deemed downloaded by Anthropic on August

6  10, 2022)? The parties would then leave only owner-related requirements to be established by class members

7  (i.e., is she a legal or beneficial owner of the right to reproduce that work, and not among the personnel of the

8  district court, federal agencies, or Anthropic?). The long-form notice and claim forms could be simplified in

9  step (even if the notice still somewhere sets out the entirety of the class definition while stating that to ease

10  settlement all agreed that elements were met for works on the Works List where proof ordinarily would be

11  needed).

12  **Plaintiffs' Response**:

13  Plaintiffs agree to the proposal below.

14  **Defendant's Response**:

15  For purposes of the settlement only, the parties agree that any work on the Works List meets the work-related

16  requirements, *i.e.*, that it (i) was downloaded by Anthropic from LibGen or PiLiMi by August 10, 2022 (the

17  agreed download date for purposes of the settlement), (ii) has at least one ISBN or ASIN, (iii) was registered

18  with the U.S. Copyright Office within five years of first publication and (iv) either within three months of

19  first publication or else before August 10, 2022. (For avoidance of doubt, in the event the settlement is not

20  approved or does not go forward for any other reason, Anthropic does not agree that any work on the Works

21  List meets those requirements for any other purpose and this will not be deemed an admission in any

22  litigation.) Therefore, no claimant will be asked to validate the works-related requirements listed above,

23  although the claimant may need to provide validation that the version(s) or edition(s) of the work it is claiming

24  are covered by the copyright registration in the event that a work has multiple IBSNs or ASINs.

25

26

27

28

## QUESTION 34

**Question 34**: The district judge has noticed that there are many inconsistencies between the proposed notice and the Settlement Agreement. Please check in particular that there are no contradictions or omissions in the notice that could compromise a class member's rights. And, with respect to all your answers to all these questions for our hearing, please check that your new representations here are reflected exactly in the proposed class notice and Agreement. If anything further must be corrected that has not been corrected by the parties, please identify it.

**Plaintiffs' Response**:

The Parties will comply with the Court's directions.

**Defendant's Response**:

Anthropic agrees with Plaintiffs' response.

Dated:  September 23, 2025

By:  /s/ Rachel Geman
     /s/ Justin A. Nelson

Justin A. Nelson (*pro hac vice*)
**SUSMAN GODFREY L.L.P**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com

*Co-Lead Counsel*

Rachel Geman (*pro hac vice*)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
rgeman@lchb.com

*Co-Lead Counsel*

Rohit D. Nath (SBN 316062)
Michael Adamson (SBN 321754)
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100

Respectfully submitted,

By:  /s/ Douglas A. Winthrop

Douglas A. Winthrop (Bar No. 183532)
Joseph Farris (Bar No. 263405)
Pieter de Ganon (Bar No. 320385)
Jessica L. Gillotte (Bar No. 333517)
Estayvaine Bragg (Bar No. 341400)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center 10th Floor
San Francisco, CA 94111-4024
(415) 471-3100
(415) 471-3400 (fax)
douglas.winthrop@aporter.com
joseph.farris@arnoldporter.com
pieter.deganon@arnoldporter.com
estayvaine.bragg@arnoldporter.com
jessica.gillotte@arnoldporter.com
estayvaine.bragg@arnoldporter.com

Assad H. Rajani (Bar No. 251143)
**ARNOLD & PORTER KAYE SCHOLER LLP**
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306
(650) 319.4500
(650) 319-4700 (fax)
assad.rajani@arnoldporter.com

RNath@susmangodfrey.com
MAdamson@susmangodfrey.com

Daniel M. Hutchinson (SBN 239458)
Jallé H. Dafa (SBN 290637)
Amelia Haselkorn (SBN 339633)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
dhutchinson@lchb.com
jdafa@lchb.com
ahaselkorn@lchb.com

Betsy A. Sugar (*pro hac vice*)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
222 2nd Avenue S., Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com

Alejandra C. Salinas (*pro hac vice*)
**SUSMAN GODFREY L.L.P**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Jordan W. Connors (*pro hac vice*)
**SUSMAN GODFREY L.L.P**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
jconnors@susmangodfrey.com

J. Craig Smyser (*pro hac vice*)
Samir H. Doshi *(pro hac vice)*
**SUSMAN GODFREY L.L.P**
One Manhattan West, 51st Floor,
New York, NY 10019
Telephone: (212) 336-8330
csmyser@susmangodfrey.com
sdoshi@susmangodfrey.com

Jacob S. Miller *(pro hac vice)*
Danna Z. Elmasry *(pro hac vice)*
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
jmiller@lchb.com

Oscar Ramallo (Bar No. 241487)
Angel Tang Nakamura (Bar No. 205396)
Ryan M. Nishimoto (Bar No. 235208)
Allyson C. Myers (Bar No. 342038)
**ARNOLD & PORTER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
(213) 243-4000
(213) 243-4199 (fax)
oscar.ramallo@arnoldporter.com
angel.nakamura@arnoldporter.com
ryan.nishimoto@arnoldporter.com
ally.myers@arnoldporter.com

Daralyn J. Durie (Bar No. 169825)
Ramsey Fisher (Bar No.334228)
Jackson Lane (Bar No. 351633)
**MORRISON & FOERSTER LLP**
425 Market Street
San Francisco, CA 94105
(415) 268-7000
(415) 268-7522 (fax)
DDurie@mofo.com
RamseyFisher@mofo.com
jlane@mofo.com

Whitney Rose O'Byrne (Bar No. 325698)
**MORRISON & FOERSTER LLP**
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017
(213) 892-5200
(213) 892-5454 (fax)
WOByrne@mofo.com

Mary Prendergast (Bar No. 272737)
Fitz Beckwith Collings (*pro hac vice*)
Aditya Vijay Kamdar (Bar No. 324567)
**MORRISON & FOERSTER LLP**
2100 L Street, N.W.
Washington, DC 20037
(202) 572-6757
(202) 887-0763 (fax)
MPrendergast@mofo.com
fcollings@mofo.com
AKamdar@mofo.com

Kathleen R. Hartnett
**COOLEY LLP**
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
(415) 693-2071
(415) 693-2222 (fax)
khartnett@cooley.com

Alexander J. Kasner (Bar No. 310637)

delmasry@lchb.com

*Co-Lead Counsel*

Scott J. Shoulder (*pro hac vice*)
CeCe M. Cole (*pro hac vice*)
**COWAN DEBAETS ABRAHAMS
& SHEPPARD LLP**
60 Broad Street, 30th Floor
New York, New York 10010
Telephone: (212) 974-7474
sshoulder@cdas.com
ccole@cdas.com

*Additional Counsel for the Class*

Jay Edelson*
**EDELSON PC**
350 North LaSalle Street, 14th Floor
Chicago, IL 60654
Telephone: (312) 589-6370
jedelson@edelson.com

Matthew J. Oppenheim*
Jeffrey M. Gould*
**OPPENHEIM & ZEBRAK LLP**
4530 Wisconsin Ave, NW, 5th Floor
Washington, DC 20016
Telephone: 202.450.3958
matt@oandzlaw.com

*Publishers' Coordinating Counsel*

Ephraim McDowell (*pro hac vice*)
**COOLEY LLP**
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 776-2266
(202) 842-7899 (fax)
akasner@cooley.com
emcdowell@cooley.com

Mark Alan Lemley (Bar No. 155830)
**LEX LUMINA LLP**
700 S. Flower St., Suite 1000
Los Angeles, CA 90017
(650) 723-4605
mlemley@lex-lumina.com

*Attorneys for Defendant Anthropic PBC*

1

## **<u>ATTESTATION</u>**

2      Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all signatories listed, and on whose behalf

3  the filing is submitted, concur in the filing's content and have authorized the filing.

4

5                                                 */s/ Justin A. Nelson*
                                                    Justin A. Nelson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28