FREEDMAN NORMAND FRIEDLAND LLP
Ivy Ngo (S.B.N. 249860)
2029 Century Park East, Suite 400N
Los Angeles, CA 90067
T: (646) 494-2900
Email: ingo@fnf.law

Devin (Velvel) Freedman (*pro hac vice*)
1 SE 3rd Avenue, Suite 1240
Miami, FL 33131
Tel: (786) 924-2900
Email: vel@fnf.law

Alex Potter (*pro hac vice*)
155 E. 44th Street, Suite 915
New York, NY 10017
T: (646) 494-2900
Email: apotter@fnf.law

*Counsel for Third Party
ClaimsHero Holdings LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, and MJ + KJ, INC., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br>v.<br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 3:24-cv-05417-WHA<br><br>**EXPERT DECLARATION OF PROFESSOR MARTIN H. REDISH IN SUPPORT OF CLAIMSHERO HOLDINGS LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER LIMITING THIRD PARTY COMMUNICATIONS WITH CLASS MEMBERS AND OTHER RELIEF** |

I, Martin H. Redish, declare as follows:

## INTRODUCTION

1.  My name is Martin H. Redish. I am the Louis and Harriet Ancel Professor of Law and Public Policy at Northwestern University Pritzker School of Law, where I have taught for the past 52 ½ years.

2. I submit this expert declaration on behalf of ClaimsHero Holdings LLC ("ClaimsHero") on the vitally important issues of constitutional and procedural policy which surround class counsel's motion. While I understand that factual issues exist which are beyond the scope of my expertise and therefore beyond the scope of this declaration, I firmly believe that class counsel's foundational assumptions and demands are grossly inconsistent with both the policy interests and underlying precepts of modern class action law and the First Amendment's established protection of commercial speech in general and attorney advertising in particular.

3. I therefore hope that in ruling on this motion, this Court will give careful consideration to the potentially significant consequences of its decision on both the future of class action law and First Amendment doctrine impacting commercial speech.

## EXPERT QUALIFCATIONS

4. I firmly believe that I qualify to serve as an expert in this matter, on issues surrounding both the policy and legal aspects of class actions and the First Amendment's protection of commercial advertising.

5. I received my AB from the University of Pennsylvania with highest honors in political science; I was also the winner of the Bennett Prize for Best Thesis in American Government. I received my JD from Harvard Law School, where I graduated magna cum laude and was a member of the Harvard Law Review.

6. I clerked for the Honorable J. Joseph Smith of the United States Court of Appeals for the Second Circuit and then practiced for two years as a litigator at the New York law firm of Proskauer Rose Goetz and Mendelsohn.

7. In September of 1973 I began as an assistant professor at Northwestern Law School, where I have taught for the last 52 ½ years. I was awarded a chair in 1990. In 2012, the Law School held a Festschrift to honor my 40 years of service. A conference was held, and the writings of scholars about my work in constitutional law, federal courts and civil procedure were subsequently published in a special issue of the Northwestern University Law Review. In 2016, the Law School honored me with a conference to commemorate the 45th anniversary of the publication of my very first scholarly article, written as a third-year law student, arguing that commercial advertising deserves substantial First Amendment protection as a matter of First Amendment theory. A number of commentators have traced the origins of the modern commercial speech doctrine to that article. In 2024, the Law School honored me by naming a classroom after me and unveiling a portrait of me.

8. I am the author of nineteen books and over 110 scholarly articles. Two of those books—*Money Talks: Speech, Economic Power, and the Values of Democracy* (N.Y.U. Press 2001) and *Commercial Speech as Free Expression* (Cambridge University Press 2021)—deal with one of the major issues in this case. Another one of my books—*Wholesale Justice: Constitutional Democracy and the Problem of the Class Action Lawsuit* (Stanford University Press 2009)—deals with the other major issue in this case. That book was the subject of a 2010 article in Forbes Magazine. I am also the coauthor of casebooks on the subjects of civil procedure (West Publishing Co.), federal courts (West Publishing Co.) and constitutional law (Carolina Academic Press).

9. I have been cited or quoted in 22 Supreme Court opinions. I am regularly included on Hein Online's listing of the 50 most cited legal scholars of all time. In 2016, I was included on a list of the 20 most influential legal scholars on judicial decision making, in a study conducted by St. Thomas Law School. In 2021, I won the Daniel J. Meltzer Award for Outstanding

Scholarship and Teaching in Federal Courts, awarded by the Association of American Law Schools. It was only the second time the award had been given.

10. My Curriculum Vitae is attached to this declaration as **Exhibit 1**.

## CONCLUSIONS

11. The Court, of course, requires no instruction on the governing law. The purpose of this declaration is not to opine on legal doctrine, but rather to illuminate the broader policy considerations and incentive structures that militate against the relief sought by Class Counsel. Any references to legal authorities herein are not intended as briefing, but as contextual support for the economic, social, and institutional policy reasons that counsel restraint in granting the requested relief

12. The work performed by ClaimsHero and other firms and organizations like it is vital to the successful operation of the class action process. Such firms perform the essential functions of informing class members of what their rights are and simultaneously reducing the danger of economic externalities to which class counsel are often, if not always, subject. Such economic externalities threaten class counsel's effective performance of their function as capitalistic guardians of the rights and interests of absent class members.

13. I make no judgments about the accuracy of class counsel's assertions that ClaimsHero's website contains misleading statements. But even if ClaimsHero's website included some misleading statements, the Supreme Court has made clear that the presence of misleading statements in attorney advertisements does not justify the extreme remedy of suppression. The Court has often recognized the extremely important First Amendment values fostered by commercial advertising in general and attorney advertising in particular. The Court has recognized that the First Amendment protects not only the rights of the speaker but also the rights of the listeners and readers in receiving information and opinion in shaping their private decisions

impacting their lives. The Court has therefore held that, when possible, misleading statements contained in attorney advertisements be corrected not by suppression but by the far less invasive process of the required inclusion of disclaimers.

## ANALYSIS

14. **Importance of Function Performed by Firms Like ClaimsHero for the Protection of the Rights of Absent Class Members:**

    a. In my scholarly writing, I have argued that the relationship between absent class members and class counsel differs dramatically from any other attorney-client relationship. In the class action context, the relationship between class counsel and absent class members is properly viewed as a form of capitalistic guardianship. Though attorney and class members rarely even meet, if properly operated, the class action process can enable the profit-motivated class attorneys to protect the interests of absent class members who often will, as a practical matter, be unable to protect those interests themselves. This may be due to the relatively small size of their claims, their lack of familiarity or comfort with the class action system, their lack of information, and the significant transaction costs preventing them from organizing together on their own. See generally Martin H. Redish, *Rethinking the Theory of the Class Action: The Risks and Rewards of Capitalistic Socialism in the Litigation Process,* 64 Emory L.J. 451 (2014).

    b. However, this "capitalistic guardianship" model of the class action can properly function only when the process is free of economic externalities. In other words, the economic incentives of class counsel must always be tied exclusively to the goal of enforcing the rights of absent class members. If the system allows class counsel to profit without protecting the rights of class members, the existence of such economic externalities threatens the functioning of the entire class action structure.

c. As currently framed, Rule 23 of the Federal Rules of Civil Procedure fails to avoid numerous potential economic externalities which may divorce class counsel's economic motivations from the interests of absent class members. This does not necessarily mean that in every class action, class counsel will not be motivated to further the welfare of absent class members. However, it does mean that such dangers exist in every class action and the existing Rule's structure fails to prevent them.

d. In fundamental capitalistic economic theory, the presence of competition is designed to avoid perverse economic externalities. It is the battle of competing profit-motivated participants which inevitably encourages each competitor to "build a better mouse trap." In this way, capitalism is designed to allow competitors to do well by doing good: Where competition is present, the only way a market participant can make a profit is to provide a better service than its competitors.

e. Of course, in the class action context allowing every class member to have their own attorney would produce chaos. It is for that reason that class counsel must be chosen. But the fact remains that once chosen, class counsel effectively operates as a monopolist, with all of the competitive disincentives that accompany that result. It is true that if the only way for class counsel to make a profit would be to effectively protect the interests of *all* class members, then monopolist power would not necessarily lead to the presence of perverse economic externalities. But as already noted, there currently exist too many holes in the system to assure that result. Courts certainly oversee settlements, but this oversight simply cannot effectively prevent class counsel from profiting at the expense of some of the absent class members. Cy pres awards and inability to compensate anything more than a small percentage of absent class members happen too often to allow

us to believe the current system avoids economic externalities plaguing the work of class counsel.

  f. Indeed, the troubling but unavoidable problem with exclusive reliance on judicial supervision of class settlements is that at the time of settlement approval, both sides of the lawsuit are in agreement. Yet the Anglo-American judicial process projects a largely passive role for the adjudicator, relying primarily on the adverseness of the parties to incentivize the production of argument and counter argument. Thus, at the time of settlement, the court is deprived of the fundamental methodology for informing itself of all of the competing considerations. *See generally* Martin H. Redish & Andrianna D. Kastanek, *Settlement Class Actions, the Case-or-Controversy Requirement, and the Nature of the Adjudicatory Process,* 73 U. Chi. L. Rev. 545 (2006).

  g. This unavoidable defect in the system's ability to look out for the best interests of *all* class members underscores the importance of firms such as ClaimsHero. Like class counsel, such firms are presumably motivated, at least in part, by a desire to make a profit. In a capitalistic system there is of course nothing wrong with that. Indeed, it is that very profit incentive that encourages such firms to provide an effective check on class counsel who, as already noted, are often insufficiently incentivized to vigorously pursue the best interests of all absent class members. Firms such as ClaimsHero perform two invaluable functions by informing class members that (1) they have the right to opt out of the settlement, (2) the settlement may inadequately protect their rights, and (3) there may be ways to increase their compensation above and beyond the amount provided by the settlement. First, the economic competition encourages class members to actively pursue and protect their own legal rights if they believe it would be more efficient for

them to do so. Second, it removes any perverse economic externality affecting class counsel.

  h. In this way, ClaimsHero and others like it (i) add a competitive check on what would otherwise be a structure plagued by the externalities inherently associated with a system of monopoly; and (ii) increase efficiency by handling the claims of class members who are more risk tolerant and desire to opt out of the deal preliminarily approved by the Court to bring their own claims for additional upside.

  i. Thus, from a policy perspective, ClaimsHero and firms like it serve an important interest in the class action marketplace. Silencing their ability to compete as requested by class counsel would deprive class members of an important benefits and opportunities.

15. **The Dangerous Effects and Implications for the First Amendment Right of Free Expression Caused by Shutting Down ClaimsHero's Website:**

  a. The argument advocated for above is further supported by established First Amendment policy and law. Both demonstrate that stopping speech like ClaimsHero's here will be detrimental, not helpful, to the class.

  b. The First Amendment right of free expression is grounded in foundational principles of democracy. In the words of famed free speech scholar Alexander Meiklejohn, "[t]he principle of the freedom of speech springs from the basic necessities of the program of self-government . . . . It is a deduction from the basic American agreement that public issues shall be decided by universal suffrage." Alexander Meiklejohn, *Political Freedom* 27 (1960). In Meiklejohn's view, the *real* governors are the voters, who make their "governing" decisions in the voting booth. Because such a function is so vital to the effective functioning

8
EXPERT DECLARATION OF MARTIN H. REDISH

of a democratic system, he reasoned, it is essential that all information and opinion relevant to those governing decisions be absolutely protected.

        c.      Meiklejohn chose to exclude commercial advertising from this process, deeming it far less worthy of protection than traditional political expression. However, as I pointed out in my very first scholarly article, commercial speech is just as vital to the effective performance of the *private* self-governing function as political speech is to performance of the *public* self-governing process. As I wrote in that article, "When the individual is presented with rational grounds for preferring one product or brand over another, he is encouraged to consider the competing information, weigh it mentally in the light of the goals of personal satisfaction he has set for himself, counterbalance his conclusions with possible price differentials, and in so doing exercise his abilities to reason and think; this aims him towards the intangible goals of rational self-fulfillment." Martin H. Redish, *The First Amendment in the Marketplace: Commercial Speech and the Values of Free Expression,* 39 Geo. Wash. L. Rev. 429, 443-44 (1971); *see also* Martin H. Redish, *Freedom of Expression: A Critical Analysis* 60-68 (1984).

        d.      Indeed, just five years after the publication of my article advocating First Amendment protection for commercial speech, the Supreme Court in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976), recognized that commercial advertising was deserving of significant First Amendment protection. The Court reasoned that "[e]ven an individual advertisement, though entirely 'commercial,' may be of general public interest." Id. at 764. Since then, the Supreme Court has dramatically expanded First Amendment protection for commercial speech. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525 (2001); *44 Liquormart v. Rhode Island,* 517 U.S. 484 (1996).

e. It is true, of course, that under the *Central Hudson* four-pronged test, the Supreme Court has excluded false and misleading speech from the scope of First Amendment protection. *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557 (1980). But recognizing the benefits of robust speech protections, the Court subsequently qualified what originally appeared to be a rigid, categorical exclusion from the scope of First Amendment protection of misleading commercial speech. In *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,* 471 U.S. 626 (1985), the Court, while adhering to the *Central Hudson* four-pronged analysis, established that in the first instance misleading commercial speech should be remedied not by suppression but rather by the required inclusion of disclaimers—in the Court's words, a requirement that the advertiser include in the advertisement "purely factual and uncontroversial information about the terms under which his services will be available."

f. As previously noted, I make no judgment about the accuracy of class counsel's allegations that ClaimsHero's website is misleading. But even assuming the accuracy of these accusations, at most this Court should consider whether ClaimsHero's website requires modifications to assure that class members receive complete and non-misleading information about the services which ClaimsHero can provide to them. Barring ClaimsHero from honestly informing absent class members of their rights would, as described above, harm the class members, not help them.

g. It's for this reason that any such restriction would also likely violate First Amendment principles and undermine the values behind protecting commercial speech. As Justice Brandeis argued in his famed concurring opinion in *Whitney v. California,* 274 U.S. 357 (1927), the way to best correct errors in public discourse is generally through "more speech, not enforced silence." It is true that in context, Justice Brandeis was discussing

speech about matters of public debate. But in many ways speech about how best to enforce legal rights of hundreds of citizens, though technically characterized as commercial speech, is today as vital to the conduct of society as was the unlawful advocacy about which Justice Brandeis spoke.

  h. There is no reason to believe that this case falls outside the directives of the Court in *Zauderer*. There the Court wrote, "[t]he State is not entitled to interfere with…access [to the courts] by denying its citizens accurate information about their legal rights." 471 U.S. at 643. What ClaimsHero seeks to *do* for absent class members is not only legal, but performs a vitally important function in making sure that class members are fully aware of their legal rights. If ClaimsHero's website requires further disclosures to be accurate (something I have no opinion on) corrections should be required rather than full suppression.

  i. While I am of course in no position to decipher class counsel's motivation in seeking the relief it has requested here, there can be little doubt what the impact of this Court's acceptance of that request would be. Such action would have the extremely harmful effect of removing a legitimate competitor from the picture, thereby excising an important means of reducing the economic externalities that plague what is otherwise a monopolistic operation. This impact would threaten full protection of absent class members' interests and deny to class members potentially valuable information about their legal rights—information which they might be able to use to protect their interests and better their lives. Such a result would simultaneously undermine both the goals of the class action framework and the values underlying First Amendment protection.

16. For all of these reasons, I strongly urge this Court to deny class counsel's motion.

1  I declare under penalty of perjury that the foregoing is true and correct.

2  Executed on Monday, November 10th, 2025, at Chicago, Illinois.

3  Respectfully submitted,

4  
5  　　　　　　　　　　　　　　　　　　Martin H. Redish