**PAGES 1 - 180**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

ANDREA BARTZ, et al,                )
                                    )
                                    )
          Plaintiffs,                )
                                    )
vs.                                 ) **NO. 3:24-cv-05417-WHA**
                                    )
ANTHROPIC PBC,                      )
                                    )
          Defendants.                )
_____)


San Francisco, California

Tuesday, November 25, 2025


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Class Plaintiffs:

              Lieff Cabraser Heimann & Bernstein, LLP
              250 Hudson Street, Eighth Floor
              New York, NY 10013
          BY: **RACHEL GEMAN, ATTORNEY AT LAW**

              Lieff Cabraser Heimann & Bernstein, LLP
              275 Battery Street, 29th Floor
              San Francisco, CA 94111
          BY: **JALLE H. DAFA, ATTORNEY AT LAW**
              **ELIZABETH CABRASER, ATTORNEY AT LAW**
              **DANIEL M. HUTCHINSON, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  April Wood Brott, CSR No. 13782
Official United States Reporter

**APPEARANCES:**   (CONTINUED)

For Class Plaintiffs:

> Susman Godfrey L.L.P.
> 1900 Avenue of the Stars, Suite 1400
> Los Angeles, CA 90067
>> BY:  **ROHIT D. NATH, ATTORNEY AT LAW**
>>     **SAMIR DOSHI, ATTORNEY AT LAW**
>>     **J. CRAIG SMYSER, ATTORNEY AT LAW**

For ClaimsHero:

> Freedman Normand Friedland LLP
> 1 SE 3rd Avenue, Suite 1240
> Miami, FL 33131
>> BY:  **VELVEL (DEVIN) FREEDMAN, ATTORNEY AT LAW**

> Freedman Normand Friedland LLP
> 155 E. 44th Street, Suite 915
> New York, NY 10017
>> BY:  **ALEX POTTER, ATTORNEY AT LAW**

> Stris & Maher LLP
> 777 S Figueroa, Suite 3850
> Los Angeles, CA 90017
>> BY:  **ELIZABETH BRANNEN, ATTORNEY AT LAW**

For Defendant Antrhopic:

> Morrison & Foerster
> 425 Market Street
> San Francisco, CA
>> BY:  **DARALYN J. DURIE, ATTORNEY AT LAW**

> Arnold & Porter Kaye Scholer LLP
> Three Embarcadero Center, Tenth Floor
> San Francisco, CA 94111
>> BY:  **DOUGLAS A. WINTHROP  ATTORNEY AT LAW**
>>     **JOSEPH R. FARRIS, ATTORNEY AT LAW**

Also Present:  Michael Mazzarella, Devon Hanley Cook

3

# I N D E X

Tuesday, November 25, 2025

## CLASS HERO'S WITNESSES                                    PAGE

**JOHN CARREYROU (via Zoom)**
Direct Examination by Mr. Freedman                          15
Cross-examination by Mr. Doshi                              18

**MICHAEL KOCHIN (via Zoom)**
Direct Examination by Mr. Freedman                          33
Cross-examination by Ms. Dafa                               35

**JANE ADAMS (via Zoom)**
Direct Examination by Mr. Freedman                          41
Cross-examination by Mr. Doshi                              43

**MATTHEW FREUND**
Direct Examination by Mr. Freedman                          46
Cross-examination by Mr. Nath                               64
Redirect Examination by Mr. Freedman                        110

**LISA BARRETTA (via Zoom)**
Direct Examination by Mr. Freedman                          120
Cross-examination by Ms. Dafa                               123

**PHILIP SHISHKIN (via Zoom)**
Direct Examination by Mr. Freedman                          132
Cross-examination by Mr. Smyser                             135

**MATTHEW SACKS (via Zoom)**
Direct Examination by Mr. Freedman                          137
Cross-examination by Mr. Smyser                             139

## E X H I B I T   I N D E X

| EXHIBITS | IDEN | EVID |
|----------|------|------|
| Exhibit 1 | 49 | -- |

**Tuesday - November 25, 2025**                                    **8:06 A.M.**

P R O C E E D I N G S

---o0o---

THE COURTROOM DEPUTY:  All rise.  This court is now in session, the honorable William Alsup presiding.

THE COURT:  Good morning.

ALL:  Good morning, Your Honor.

THE COURT:  Please have a seat.

THE COURTROOM DEPUTY:  Your Honor, now calling Civil Matter 24-5417, Bartz, et al., versus Anthropic, PBC.

Lead counsels, can you please approach the lectern and state your appearance for the record.

MS. GEMAN:  Good morning, Your Honor.  Rachel Geman, Lieff Cabraser Heimann & Bernstein.  With me today is Elizabeth Cabraser, Daniel Hutchinson, Jalle Dafa from the Lieff Cabraser firm; and from co-lead counsel, Susman Godfrey, Rohit Nath, Samir Doshi, and Craig Smyser.  We also have Michael Mazzarella from Lieff Cabraser providing lit support.

THE COURT:  Thank you.

MR. DOSHI:  Thank you, Judge.

MR. FREEDMAN:  Good morning, Your Honor.  Daralyn Durie from Morrison & Foerster for Anthropic.  With me are Doug Winthrop and Joe Farris from Arnold & Porter, and Devon Hanley Cook from Anthropic.

THE COURT:  Thank you.

**MR. FREEDMAN:**  Good morning, Your Honor.  Vel Freedman from Freedman Normand for Plaintiffs.

**THE COURT:**  Please say it a little louder.

**MR. FREEDMAN:**  Vel Freedman from Freedman Normand Friedland for ClaimsHero, Your Honor.  And also appearing with me is Alex Potter, my partner.

As well, Your Honor, we have also entered appearances for the six clients that have told claims firm they would like to opt out.  My firm will be representing them in the opt-out litigation, and with me as co-counsel in that role is Elizabeth Brannen from Stris & Maher.

**THE COURT:**  From where?

**MR. FREEDMAN:**  Stris & Maher.

**THE COURT:**  Okay.  Thank you.

Jenny, could you get me a list of all the lawyers?  Do you have that?

**THE COURTROOM DEPUTY:**  I do.

**THE COURT:**  Just, you know, any time.  I can get by for now.

**THE COURTROOM DEPUTY:**  Yes.

**THE COURT:**  Okay.  We're here for an evidentiary hearing, and I -- the lawyers need to help me figure out what is the most efficient way to proceed.  So since these are your clients, I'll let you go first.

**MR. FREEDMAN:**  Thank you, Your Honor.  We're working

out a technical issue where --

**THE COURTROOM DEPUTY:**  They're here.

**MR. FREEDMAN:**  All six?

**THE COURTROOM DEPUTY:**  Yes, all six.

**MR. FREEDMAN:**  Amazing.  Never mind.

Your Honor, I want to give you a quick update since we were here on November 13th.  Per your order, ClaimsHero made the changes you instructed within 48 hours to its website.  It also produced the materials you ordered produced to class counsel, all six of its clients have confirmed they would be here on Zoom and are now present, and ClaimsHero's CEO is here to testify in person per your order.

**THE COURT:**  Great.  Thank you.

**MR. FREEDMAN:**  Your Honor, there's also a few further developments.  ClaimsHero heard the Court's concerns about its ability to take this case on.  And as had always been the plan, ClaimsHero has now entered into formal co-counsel agreements with my firm, Freedman Normand Friedland, and with Stris & Maher to litigate any opt-out case from this class action.

And as I mentioned earlier, here with me is Elizabeth Brannen, which is Stris & Maher's managing partner.  Our two firms stand ready to take on this litigation against Anthropic. We have the experience and resources to do it.  We both routinely take on companies like Anthropic and its counsel, and we do so successfully.  If the Court wants, we'd be happy to

discuss our expertise.

As the Court --

**THE COURT:**  To discuss what?

**MR. FREEDMAN:**  Our experience and expertise.

As the Court also may have seen, Freedman Normand and Stris & Maher have entered appearances for the six clients that ClaimsHero represents, and we are prepared to represent any others that opt out.

Your Honor, Mr. Freund -- that's ClaimsHero's CEO -- has prepared a short direct examination to give the Court some background and facts about ClaimsHero so the Court can better understand what ClaimsHero is and what it does and to provide a foundation for the Court's inquiry.

And finally, Your Honor, I'm aware that some of the clients have a flight later today and others have holiday plans, and so we were hoping we could start with questioning the clients and then move on to Mr. Freund, and then after the evidentiary portion is done, answer any questions that the Court has.

**THE COURT:**  Okay.  Let's hear it.  What's your view of how we should proceed?

**MS. GEMAN:**  Your Honor, our view is we should begin with the CEO, Mr. Freund.  Obviously we're at the Court's pleasure.

In addition, Your Honor, we have some responses to the

proffer of compliance. We believe that while the -- certain statements were true, there remain additional infirmities and that the court's order, as set forth on the record of November 13th, has not been complied with.

Would Your Honor like to hear that now or at the end of the evidentiary proceedings?

**THE COURT:** Well, I am concerned about keeping these class members just sitting around doing nothing while the CEO can wait. That's okay. But the class members -- I am concerned about taking up their time. Can the class members hear me now?

**MR. FREEDMAN:** They cannot, Your Honor. They're in the waiting room.

**THE COURT:** All right. They don't need to hear me. I just wondered if they could.

So why is it so important to go with the CEO first?

**MS. GEMAN:** Rohit Nath will be taking the CEO's testimony.

**MR. NATH:** Rohit Nath from Susman Godfrey.

The only thing we ask is that the Court invoke Federal Rule of Evidence 615 and sequester the fact witnesses during examination. So if the class members are testifying first, we'd ask that Mr. Freund not be in the courtroom during that examination.

**THE COURT:** Well, in a way, he's the corporate

representative.  And if this were trial, he would be allowed to stay.  I don't think that's -- I don't think that's in order. So I'm going to let him stay.

MR. NATH:  Understood, Your Honor.  If FRE 615 applies to a party, ClaimsHero is not an actual party in this case --

THE COURT:  I understand that they're not a party, but for purposes of these proceedings, they're really the real party in interest, so I'm going to allow him to stay.

Let's do this:  Let's pick one of the class members. We'll do one first, and I'll see how that goes, and then depending on how that goes, I might decide to call the CEO up more or less out of turn.

What is the order in which we want to do these?  On that one, I'll let you decide which of the class members you want to do first.

MR. NATH:  We can begin with Mr. Carreyrou, Your Honor.

THE COURT:  Is he the one who is the Pulitzer prize winner?

MR. NATH:  Correct, Your Honor.

THE COURT:  Okay.  All right.  Then we will start with him.  Is ten minutes enough time per side?

MR. FREEDMAN:  It should be more than enough, Your Honor, for us.

THE COURT:  What?

**MR. FREEDMAN:**  That should be more than enough time for ClaimsHero, Your Honor.

**MR. NATH:**  Likewise for Plaintiff, Your Honor.  Thank you.

**THE COURT:**  Okay.  So we're going to -- I'm going to keep a clock for ten minutes per side.  If need be, we'll extend it, but we'll try and start with that.

**MR. FREEDMAN:**  Your Honor, may I address a housekeeping problem that I'm expecting may arise?

**THE COURT:**  Go ahead.

**MR. FREEDMAN:**  Which is that I don't know what questions are going to be asked of these class members, but they have an attorney-client privilege.  And while we're perfectly comfortable to be transparent with the Court, these class members intend to bring litigation directly against Anthropic, and anything they say today will then be memorialized and potentially used against them, to their detriment, in the merits litigation against Anthropic, and I don't know how the Court wants to deal with that because I understand the Court wants to hear answers from them.  But I just figured it would be cleaner to try to deal with this issue now.

**THE COURT:**  Well, if it turns out that all of what you say is correct, then of course they have the right to opt out and sue.  This is still America, and they have that right.  But

I don't want concern -- what I'm still concerned about is were they tricked into opting out on the theory that they pay your firm a small fee, which, to my mind, is 5, 10 percent.

And I'm sure it's not 5 to 10 percent.  I believe that you bait and switched them would be my initial impression.  But maybe --

Somebody's hacking and coughing.  Who is that?  Please don't do that.  It disturbs the record.  I can't hear.  If you're going to do that, please go out in the hallway.

So I don't -- you know, if they think they're going to -- they say, "Oh, yeah, we knew it was going to be 40 percent.  Oh, yeah, yeah," then I stand corrected.

MR. FREEDMAN:  Understood, Your Honor.

THE COURT:  Maybe you fixed it up in the meantime and it's all fixed up, but when it said a small fee, we'll sue them, you didn't -- anyway, I want to know how this all came about.

MR. FREEDMAN:  Understood, Your Honor, and I wanted to --

THE COURT:  I want to protect the class, and if it turns out they did it the right way, okay.  God bless you.  You can sue them yourself.

MR. FREEDMAN:  Understood, Your Honor.  And I want to address that because I went over the transcript, and I believe it's my fault the Court is under a misimpression.  You asked me

on the record whether ClaimsHero had said it would represent clients for a small fee.  And I did not hear that.  I responded yes.  As you'll hear from the CEO and from the clients, that representation was never made.  ClaimsHero --

THE COURT:  I saw it somewhere.  I saw the phrase "a small fee" somewhere in your materials.

MR. FREEDMAN:  Respectfully, Your Honor, I think you might be confusing it with someone else's materials.

THE COURT:  Maybe.  Okay.

MR. FREEDMAN:  Because we --

THE COURT:  That would be worth finding out.

MR. FREEDMAN:  Thank you, Your Honor.

THE COURT:  Do you know where I saw this "small fee"?  Maybe you'll be able to find it.

Okay.  Who do you want to start with?

MR. FREEDMAN:  Carreyrou, Your Honor.

THE COURT:  We're going to start with Carrey...

MR. FREEDMAN:  Carreyrou.

THE COURT:  Yes.  Okay.  You get to go first.

MR. FREEDMAN:  Thank you, Your Honor.

THE COURT:  And you get to go second.

MR. NATH:  Thank you, Your Honor.

THE COURT:  I might have some questions on my own.

And so can we bring Mr. Carreyrou online so that he can hear us?

Mr. Carreyrou, can you hear us?  Mr. Carreyrou, can you hear us?

THE WITNESS:  Yes.  Can you hear me?

THE COURT:  Thank you.  Can you turn up the volume a little bit so that I can -- it's a little faint.

THE COURTROOM DEPUTY:  Mr. Carreyrou, if you can speak closer to your microphone.

THE WITNESS:  Yes.  Can you hear me now?

THE COURT:  It's better, but it's not loud.

Can the courtroom hear the witness?  Some people in the back say no.

THE WITNESS:  Okay.  Let me try to put my AirPods on to see if that improves things.

THE COURT:  Sure.  Thank you.

THE WITNESS:  How is that?

THE COURT:  Much better.  Now, raise your right hand. The clerk will swear you in.

(The witness was sworn.)

THE WITNESS:  I swear.

THE COURT:  Great.  First question.

THE COURTROOM DEPUTY:  State your full name and spell your name for the record.

THE WITNESS:  John Carreyrou.  First name is spelled J-O-H-N.  Last name is spelled C-A-R-R-E-Y-R-O-U.

THE COURT:  Okay.  Thank you.  First question.

**JOHN CARREYROU,**

called as a witness by ClaimsHero, having been duly sworn,

testified as follows:

**DIRECT EXAMINATION**

**BY MR. FREEDMAN:**

Q.   Good morning, Mr. Carreyrou.

A.   Good morning.

Q.   Mr. Carreyrou, as you know, I'm Vel Freedman, and I'll be representing you in these proceedings as well as in the opt-out claim against Anthropic.

I want to ask you a few questions today.  Is that all right?

A.   Yes.

Q.   You've already shared your name with the Court, Mr. Carreyrou.  Can you share with the Court of the copyrighted work that you believe Anthropic infringed in this case?

A.   *Bad Blood*, and the subtitle is *Secrets and Lies in a Silicon Valley Startup*.

Q.   Mr. Carreyrou, are you aware that there is a settlement agreement that has been preliminarily approved by the Court in this case?

A.   Yes.

Q.   And are you aware that that settlement agreement would be -- if you took no action, you'd be entitled to file a claim in that settlement and receive approximately $3,000 before

attorneys' fees and costs?

**A.** Yes, I'm aware.

**Q.** Do you want to participate in that settlement agreement?

**A.** No.

**Q.** Do you want to opt out of that settlement agreement?

**A.** Yes.

**Q.** Did you hire ClaimsHero to opt you out of that settlement agreement?

**A.** Yes.

**Q.** Are you aware, Mr. Carreyrou, that you agreed to pay approximately 40 percent of any recovery ClaimsHero obtains in that settlement agreement?  Sorry.  Let me strike that and restart the question.

Are you aware, Mr. Carreyrou, that you have agreed to pay ClaimsHero 40 percent of any recovery from that direct litigation that must be filed against Anthropic?

**A.** Yes, although my understanding is that ClaimsHero would only take 25 percent off the first 3,000 and match the terms of the settlement.  But yes, I'm aware of the 40 percent percentage on the rest.

**Q.** That's correct.

And are you aware that ClaimsHero has -- was going to and has now obtained co-counsel to help litigate your claims against Anthropic?

**A.** Yes.

**Q.**    And that that co-counsel is both myself from Freedman Normand and Liz Brannen from Stris Maher?

**A.**    Yes.

**Q.**    Mr. Carreyrou, are you aware that filing direct action against Anthropic is not guaranteed and that you could lose?

**A.**    Yes.

**Q.**    Do you mind sharing with the Court why you want to opt out of this litigation and bring direct litigation against -- this settlement agreement and bring direct litigation against Anthropic?

**A.**    I'm not satisfied with the settlement.  I feel that it doesn't hold Anthropic to account enough.  This is a company that I feel committed an egregious act, which is that it stole a bunch of books, and I feel that really there would be no company if not for this original sin of stealing thousands or ten thousands of books, rather -- tens of thousands of books, including mine.

And so I want to hold this company to account.  I feel like the settlement reached in the class action is not satisfactory.  $3,000 per author, I don't think, is a material enough sum to hold the company to account.

**Q.**    Mr. Carreyrou, were you ever told by ClaimsHero that it was only going to charge you, quote, "a small fee"?

**A.**    No.

**Q.**    And Mr. Carreyrou, are you aware that Judge Alsup in this

litigation has ruled that Anthropic's use of your book to train its AI was fair use under the copyright laws?

**A.**    Yes.  I'm aware of that ruling.  I don't -- with all due respect, I don't agree with it, and I'm hoping that by filing a separate lawsuit, we get another stab at that question.  But I'm well aware that the judge ruled that it was fair use in this case.

**MR. FREEDMAN:**  Thank you, Mr. Carreyrou.

Your Honor, I have no further questions.

**THE COURT:**  All right.  Thank you.

Cross-examination?

**MR. DOSHI:**  Samir Doshi for Plaintiffs.

**CROSS-EXAMINATION**

**BY MR. DOSHI:**

**Q.**    Mr. Carreyrou, can you hear me okay?

**A.**    Yes.

**Q.**    I'd like to thank you for joining us this morning.  I'd like to talk about two things with you today.  The first thing I'd like to talk about is your relationship with ClaimsHero and your knowledge of it, and the second thing I'd like to talk about is your opt-out in this case.

Mr. Carreyrou, you are an investigative reporter for the New York Times, right?

**A.**    That's right.

**Q.**    And in that capacity, you know who Kyle Roche is, right?

**A.**    I do.  I wrote a profile of him several years ago.

**Q.**    Kyle Roche --

**A.**    In the New York Times.

**Q.**    Go ahead, Mr. Carreyrou.

**A.**    I was just going to complete my sentence by saying that I wrote a profile about him -- a profile of him, rather -- in the New York Times several years ago.

**Q.**    Kyle Roche holds himself out as the founder of ClaimsHero, right?

**A.**    So I'm not sure whether he holds himself out as the founder and whether he is the founder or not.  I'm not -- I'm unclear on those two questions.

        **MR. DOSHI:**  Your Honor, I'd like to show the Court a website, Roche Enterprises, in which Mr. Roche holds himself out to be the founder of ClaimsHero.

    My colleague, Mr. Mazzarella, will put that on the screen for everybody to see.

        **THE COURT:**  Okay.  Let's give it a try.  We'll make sure that the witness is able to see it.

**BY MR. DOSHI:**

**Q.**    Mr. Carreyrou, can you see on your screen the screenshot?

        **THE COURTROOM DEPUTY:**  One second.

        **THE WITNESS:**  No.  What I see is a table with a group of lawyers around it.

        **THE COURT:**  What we're doing here, this is one reason

that the judge does not like to have a witness appear remotely, but we're doing our best to see if we can get a picture of the document to you.  If that fails, you're going to have to read aloud what the document says.

**MR. DOSHI:**  Yes, Your Honor.

**THE COURTROOM DEPUTY:**  One moment, Judge.

**MR. SMYSER:**  Your Honor, if I may I approach, we have hard copies of this as well, if you'd like to look.

**THE COURT:**  Sure.

Mr. Carreyrou, can you still see -- can you see anything yet?

**THE WITNESS:**  I still see the same image, the table with the lawyers around it.

**THE COURT:**  All right.  Jenny, is this hopeless?

**THE COURTROOM DEPUTY:**  Just give me one more moment.

**THE COURT:**  Okay.  Give it a try.

**THE COURTROOM DEPUTY:**  It's trying to connect.  There.  One more step.

**THE WITNESS:**  I see the seal now, the Northern District of California.

**THE COURTROOM DEPUTY:**  One moment.

**MS. GEMAN:**  If I may I approach, I apologize.  I'm informed that if Mr. Mazzarella could be added to the Zoom room, he could publicize the document that way, if the Court would like.

THE COURT:  Well, thank you, but for Jenny -- is this working yet?

THE COURTROOM DEPUTY:  I have to call IT in.

THE COURT:  Huh?

THE COURTROOM DEPUTY:  I'm going to have to call the IT department in because they showed me how to do it, but it's not happening right now.

THE COURT:  Okay.  This has been the story of my life for 26 years.  That is not Jenny's fault.  I want you to know this.

Okay.  Which part of this do you want the witness to be aware of?  Is it the part about founding ClaimsHero?

MR. DOSHI:  That's exactly right, Your Honor.  The top --

THE COURT:  Okay.  I'm just going to read it out loud.

Mr. Carreyrou, there's a picture of a guy, and then beside it, it says, in part, "Kyle is also the founder and president of ClaimsHero, a consumer tech platform focused on consumer justice," period.  "Kyle founded ClaimsHero in 2022 and has led its growth to becoming one of the top innovators in legal technology."

Is that the part you're interested in?

MR. DOSHI:  Yes, Your Honor.

THE COURT:  Okay.  So that's what it says.  I'll take judicial notice.  I don't know if you've ever seen this or not,

but that's what it says.

Next question.

MR. DOSHI:  Thank you, Your Honor.  Before I get to the question, I appear to have lost Mr. Carreyrou on the screen.

THE COURT:  He's gone?

MR. DOSHI:  He's gone.

THE COURT:  Are you there, Mr. Carreyrou?

THE WITNESS:  I'm here, and I can still see everyone.

THE COURT:  Okay.  Great.  Did you hear my reading?

THE WITNESS:  I did.

THE COURT:  Great.  Next question.

BY MR. DOSHI:

Q.   So Mr. Carreyrou, you once wrote a story about the founder of ClaimsHero, Kyle Roche, correct?

A.   Correct.

Q.   And that story was in June 2023?

A.   That's correct.

Q.   It was published in the New York Times, right?

A.   You know, I'm not entirely sure of the date.  I could call it up on Google right now, but I'll trust that you have it right.

Q.   And you also trust me when I say it was published in the New York Times; is that right?

A.   That's correct.

**Q.** Now, at the time you published this article, Mr. Roche was involved in cryptocurrency litigation, right?

**A.** That's correct.

**Q.** And your story was about a video in which Mr. Roche was caught making some pretty ugly statements about his work as a lawyer, right?

**MR. FREEDMAN:** Objection, Your Honor. This is completely irrelevant to the inquiry from the Court, which is were these clients tricked into opting out. These clients have the right to opt out, and they shouldn't be given the third degree to be able to exercise that right.

**MR. DOSHI:** If I may, Your Honor.

**THE COURT:** No. Overruled. This is not a jury trial. But you do have limited time, so you've got to connect this all up somehow.

Okay. Please answer the question.

**THE WITNESS:** I'm sorry. Could you repeat the question?

**BY MR. DOSHI:**

**Q.** Your story was about a video in which Mr. Roche had made fairly ugly statements about his work as a lawyer, right?

**A.** Yes. Yes.

**Q.** He said that he was able to convince jurors because they were ten idiots, right?

**A.** I believe that was one of the quotes, yes.

**Q.**    Another one of his quotes was that while he was representing a company named Ava Labs and suing different companies, he actually had Ava Labs' interest in mind over that of his other clients, right?

**A.**    I don't remember exactly.  I think that was one of the statements.  It was certainly interpreted that way, yes.

**Q.**    You reported that Mr. Roche had bragged that he managed to distract the regulators from looking into Ava Labs, right?

**A.**    Correct.

**Q.**    You reported that Mr. Roche suggested his lawsuits were designed to harm Ava Labs' competitors, right?

**A.**    That was the allegation.  He made certain statements in the video, and the allegation was that those statements interpreted a certain way meant what you suggest.

**Q.**    Well, I'd --

**THE COURT:**  Wait, wait, wait.  I'm unclear on your answer.  When you say that was the allegation, does that mean that was your allegation or somebody else's allegation?

**THE WITNESS:**  So this was a video that was taken without Mr. Roche's knowledge, and there was a question, A, as to whether the video was real.  Mr. Roche maintained that he hadn't said some of the things he said, and then there was the question of whether he -- the meaning that most people took from his words was what he meant himself, and he maintained that he didn't mean the same things that people were

interpreting from the video.

THE COURT: Go ahead.

BY MR. DOSHI:

Q. I'm just going to read you a statement from your New York Times piece. It says, quote, "The videos made him look corrupt," end quote. Do you remember writing that?

A. Yes.

Q. And did you have any reason to lie when you wrote that in the New York Times?

A. No.

Q. Now, after you wrote this piece, two federal judges disqualified Mr. Roche's law firm from lawsuits. Do you recall that?

MR. FREEDMAN: Objection. Mischaracterizes the record. I mean, there's no record, but it's not true.

THE COURT: What's the objection? You've got to stand up and come a little closer so I can hear you.

MR. FREEDMAN: Your Honor, he's asking this witness questions about legal procedure. The firm was not disqualified, and this witness is not qualified to opine on legal issues of what decisions were, not to mention, Your Honor, again, I'm going to reiterate my prior objection. I don't understand what this has anything to do with whether or not Mr. Carreyrou was aware of what he was doing and chose to do it.

Why don't we just ask him if he knew Kyle Roche was affiliated with ClaimsHero and nonetheless wants to proceed. And why does this matter?  He's allowed to opt out, Your Honor.

**THE COURT:**  That, of course, is true, but I think what counsel is getting at is whether or not this -- whether or not the six opt-outs were adequately informed.  I'm going to listen to the testimony.  Objection overruled.

But you're almost out of time.  I'll give you about five more minutes.

**MR. DOSHI:**  All right.

**THE COURT:**  You can stand there if you wish to make objections, but otherwise, you should be seated.

Go ahead, Counsel.

**MR. DOSHI:**  Mr. Carreyrou, would you like me to repeat the question?

**THE COURT:**  Yes.

**THE WITNESS:**  Yes.  Repeat the last question, please.

BY MR. DOSHI:

Q.   You are aware that after you published this article in which you said these videos made Mr. Roche look corrupt that two different judges removed Mr. Roche's firm from the case, right?

A.   I believe that's the case.  I know that they had several setbacks in the litigations that they were pursuing against crypto companies following that video.

**Q.** That was a yes to my question, right, Mr. Carreyrou? You are aware that two judges --

**A.** Yes.

**Q.** -- removed the firm? Thank you.

**A.** Yes.

**Q.** You're also aware that Mr. Roche actually left his law firm, right?

**A.** Yes.

**Q.** But now he's back at one of the law firms that's sitting at the counsel table you were looking at earlier, right?

**A.** Yes.

**Q.** That same law firm is the one you said today that they are going to represent you, right?

**A.** Yes.

**Q.** The same law firm that said that they're representing ClaimsHero, right?

**A.** Yes.

**Q.** Now, the second thing I'd like to talk to you about is your communications with ClaimsHero about this case. When do you recall first talking to them?

**A.** So I talked to Kyle Roche specifically maybe two months ago.

**Q.** Was that after or before you submitted your opt-out form?

**A.** It was before I submitted my opt-out, and I believe I first submitted an opt-out on my own before asking ClaimsHero

to do it for me.

**Q.** Did you submit the opt-out form before or after you talked to Mr. Roche?

**A.** After I first talked to Mr. Roche, which would have been about two months ago.

**Q.** Mr. Carreyrou, you filed a declaration in this case, right?

**A.** That's correct.

**Q.** Who wrote that declaration?

**A.** Well, I read it. I didn't write it myself. It was written, I believe, by either Freedman Normand Friedland or ClaimsHero.

**Q.** So I'm right to say you did not write a single word of that declaration except for your signature on the last page?

**A.** That's right, but I obviously read it carefully before signing it.

**Q.** Mr. Carreyrou, my question was did you write the declaration. Did you or did you not?

**A.** I did not, but I read it before signing it.

**Q.** Now, at the time that you signed the declaration, it says that ClaimsHero would handle your suit; is that right?

**A.** If that's what it says on the declaration, then that's probably right.

**Q.** Well, did you understand at the time you signed the declaration that ClaimsHero would be handling your lawsuit?

**A.**    I understood that ClaimsHero was going to be hiring one or several law firms to handle the litigation, that it would not be handling the litigation itself.

**Q.**    And at the time you signed the declaration, do you know how many cases ClaimsHero had litigated in court?

**A.**    No.

**Q.**    Would you be surprised to learn that the answer is zero?

**A.**    No.

**Q.**    Lastly, before you opted out, did you read the long-form notice that the Court approved that contains details about this case?

**A.**    I'm not sure what document you're referring to when you talk about the long-form notice.

**Q.**    Did you ever recall reading a document that's about 25 pages long that has about 50 different FAQS on it about this case?

**A.**    I didn't read a document that was 25 pages long, but I did read some literature about the class action case and about Anthropic and the settlement.

**Q.**    And do you recall if any of that literature was approved by the Court?

**A.**    I believe -- I don't know if the website about the settlement was approved by the Court, but I certainly read swaths of that website.

              **MR. DOSHI:**  Thank you, Mr. Carreyrou.  Nothing further

at this time, Your Honor.

THE COURT:  Any redirect?

MR. FREEDMAN:  No, Your Honor.

THE COURT:  Okay.  Now, I'm going to let Mr. Carreyrou go back to writing more articles for the New York Times and hang up.  Any objection?

MR. FREEDMAN:  No, Your Honor.

Thank you, Mr. Carreyrou.

THE COURT:  Mr. Carreyrou?

MR. DOSHI:  Thank you, Your Honor.

THE COURT:  Thank you for attending.  You're excused as a witness, and you can go back to your other work.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

I'd like to hear Plaintiff pick out another of the five. Let's -- you choose the one you want.  Are they all standing by?

MR. FREEDMAN:  I believe so, Your Honor.

MR. NATH:  Mr. Kochin, Your Honor.

THE COURT:  Mr. Who?

MR. NATH:  Kochin.

THE COURT:  Okay.  I've got it right here.  Thank you.

MR. FREEDMAN:  Your Honor, I'd just raise for the Court that Jane Adams has a flight later this afternoon.  She told me she has to depart at 10:00 o'clock.

**THE COURT:** She needs to depart at 10:00 our time?

**MR. FREEDMAN:** Yes.

**THE COURT:** Okay. We'll get to her in time to make her flight.

**MR. FREEDMAN:** Thank you.

**MR. NATH:** Your Honor, we also have no objection for Ms. Adams going now if that's an issue.

**THE COURT:** All right. Let's do Jane Adams then. Okay. Jane Adams.

**THE COURTROOM DEPUTY:** Please unmute your mic. Ms. Adams, please unmute your mic, and if you can turn your video on as well.

**THE COURT:** Can the lawyers see -- I don't see on my screen Jane Adams, but I see it on --

**MR. FREEDMAN:** Your Honor, I was just told she was going to head to the airport and log back on in 20 minutes, so perhaps we start someone else.

**THE COURT:** She is going to log back in later. All right. Then skip Jane Adams for now. Let's go to Michael -- Kochin?

**MR. FREEDMAN:** Kochin, Your Honor.

**THE COURT:** Kochin?

**MR. FREEDMAN:** Kochin, Your Honor.

**THE COURT:** Kochin. Okay. And are you going to do the examination?

**MS. DAFA:** That's right, Your Honor.

**THE COURT:** Excellent.

Okay. But you get to go first.

**MR. FREEDMAN:** Thank you, Your Honor.

**THE COURT:** All right. So let's call the witness. Is Mr. Kochin there?

**THE WITNESS:** Yes.

**THE COURT:** All right. Welcome to the district court in San Francisco. Raise your right hand, please -- the witness, please -- and the clerk will swear you in.

(The witness was sworn.)

**THE WITNESS:** Yes, I affirm.

**THE COURTROOM DEPUTY:** Please state your full name and spell your name for the record.

**THE WITNESS:** Michael Shalom Kochin, M-I-C-H-A-E-L S-H-A-L-O-M K-O-C-H-I-N.

**THE COURT:** Thank you.

All right. Are we ready?

**MR. FREEDMAN:** We're ready, Your Honor.

**THE COURT:** Counsel, please proceed.

**MR. FREEDMAN:** Thank you.

                          **MICHAEL KOCHIN,**

called as a witness by ClaimsHero, having been duly sworn, testified as follows:

///

**DIRECT EXAMINATION**

**BY MR. FREEDMAN:**

**Q.**  Good morning, Mr. Kochin.

**A.**  Good morning.

**Q.**  Mr. Kochin, I'm Vel Freedman.  The Court's given me an opportunity to ask you some questions before counsel for the class will ask you some questions.  Is that okay?

**A.**  Yes.

**Q.**  Mr. Kochin, you've shared with us your name.  Can you share with the Court the name of the copyrighted work that you believe Anthropic infringed on in this litigation?

**A.**  I'm sorry to say I don't -- I think it was *Five Chapters on Rhetoric*.  I've published two single-authored books and one coauthored book, *Gender and Rhetoric in Plato's Political Thought; Five Chapters on Rhetoric;* and with Michael Taylor, which I own the copyright, *An Independent Empire*.  And I don't exactly remember which of them is -- that I'm suing on the basis of.

**Q.**  Fair enough.

Mr. Kochin, can you share with the Court what it is that you do for a living?

**A.**  I'm a professor of political science at Tel Aviv University.

**Q.**  And are you currently at Tel Aviv University, or are you visiting somewhere else?

**A.**    I am on sabbatical from Tel Aviv University at the Catholic University of America and at Hillsdale College in the District of Columbia.

**Q.**    And Mr. Kochin, are you aware the Court in this case has preliminarily approved a settlement where Anthropic will pay approximately 1.5 billion dollars that will result in about $3,000 per current infringed work, less attorneys' fees and costs?

**A.**    Yes, I'm aware of that.

**Q.**    Do you want to participate in that settlement?

**A.**    I do not.

**Q.**    You want to opt out of it?

**A.**    Yes, sir.

**Q.**    Have you hired ClaimsHero to represent you in that opt-out pursuit?

**A.**    Yes.

**Q.**    And are you aware that ClaimsHero has entered into a co-counsel agreement with my firm, Freedman Normand Friedland, and with Ms. Brannen's firm, Stris & Maher, to help litigate that case against Anthropic?

**A.**    Yes.

**Q.**    And were you aware, Mr. Kochin, that aside from the first $3,000 of any recovery, where your law firms have agreed to match whatever it is that class counsel gets awarded by the Court, you have agreed to give 40 percent of any recovery to

the law firms?

**A.** Yes.

**Q.** Do you understand, Mr. Kochin, that no lawsuit against Anthropic is a guaranteed win, and you could lose, correct?

**A.** Yes.

**Q.** Mr. Kochin, did ClaimsHero at any point in time tell you that they were only going to charge you a, quote, "small fee"?

**A.** No.

**Q.** Are you aware, Mr. Kochin, that the judge in this case has held that the -- Anthropic's use of your book to train its AI was a fair use?

**A.** I was told that, I think, on a call with my lawyers, yes.

        **MR. FREEDMAN:** Okay. And -- thank you, Mr. Kochin. I have no further questions for you. Professor Kochin. I'm sorry.

        **THE COURT:** All right. Cross-examination?

        **MS. DAFA:** Good morning, Your Honor. Jalle Dafa of Lieff Cabraser Heimann & Bernstein.

                        **CROSS-EXAMINATION**

**BY MS. DAFA:**

**Q.** Good morning, Mr. Kochin.

**A.** Good morning.

**Q.** Mr. Kochin, have you opted out of this settlement?

**A.** Yes.

**Q.** How did you first hear about ClaimsHero?

**A.**    It was some ad I saw on Facebook.

**Q.**    Did you say there were some ads you saw on Facebook?

**A.**    Yes.

**Q.**    And what did those ads say?

**A.**    Something about that I might have some kind of claim against Anthropic and something about -- first, I saw an ad, and I signed up with the class, and then there was an ad about opting out, and the opting out seemed more interesting, so I chose that.

**Q.**    You said there was an ad on filing a claim and an ad on opting out; is that right?

**A.**    Yeah.  So I joined -- I think -- my recollection is I joined the claim, and then I opted out is my recollection, based on ads I saw on Facebook.

**Q.**    Sorry.  Could you repeat that?  I didn't quite hear you.

**A.**    My recollection, which may be imperfect, is that I saw an ad on Facebook and joined the class, and then I got some ad or email -- maybe it was an email from ClaimsHero, but I think it was an ad.  I'm not sure.

And I saw it afterwards -- I got the -- after I signed on with ClaimsHero, I saw ads from ClaimsHero.  I might have seen them before.  And I got something about opting out of the class, and that seemed more interesting, like a more interesting possibility than being in the class, so I chose to opt out.

**Q.**    From your recollection, did the ad discuss opting out, or did the ad discuss filing a claim?

**A.**    There was one -- my recollection was that there was -- I got messages soliciting me to opt out of the claim after I had signed on to be in the class.  I got messages, I think either an ad or emails, asking me to -- soliciting me to opt out of the class.

**Q.**    So is it fair to say that you did not understand about the option to opt out until you visited the ClaimsHero website?

**A.**    I don't know.

**Q.**    Okay.

**A.**    No, I don't -- I --

**Q.**    That's okay.

**A.**    I think the answer to that question is probably no.  I did understand, from whatever materials I was sent, either advertisements or emails.

**Q.**    Mr. Kochin, you signed a declaration and filed a declaration in this case, correct?

**A.**    Yes.

        **MS. DAFA:**  Okay.  I'm going to be referring to docket number 463.

        **THE COURT:**  It says we're having trouble.  Are we able to show documents now?

        **THE COURTROOM DEPUTY:**  Yes.  Your Honor, their tech person can share his screen.

THE COURT:  All right.  Go ahead.

Mr. Witness, if you can't see the document, we'll proceed in a different way.  This is the judge talking.  But they think they can show you the document, so let's give it a try.

THE WITNESS:  Okay.  I see a document.  Yes, sir.

THE COURT:  All right.  Go ahead, Counsel.

BY MS. DAFA:

Q.   Mr. Kochin, at the time that you signed this document, was it your understanding that ClaimsHero prepared and submitted an opt-out on your behalf?

A.   Yes.

MS. DAFA:  Okay.  I don't have any further questions, Your Honor.

THE COURT:  All right.  Thank you.

Any redirect?

MR. FREEDMAN:  No, Your Honor.  Just thank Professor Kochin for his time.

THE COURT:  Okay.  Can I excuse Mr. Kochin from any further testimony and let him go?

MR. NATH:  Yes, Your Honor.  We appreciate his time as well.

THE COURT:  Okay.  Professor -- you're a professor, right?

THE WITNESS:  I am a professor.

THE COURT:  Okay.  Well, congratulations.  And thank

you for your work, and go back to work, and you're excused.

THE WITNESS:  Thank you.

THE COURT:  Okay.  Bye-bye.

THE WITNESS:  Bye.

THE COURT:  All right.  Who would Plaintiffs like to call next?

MR. NATH:  Your Honor, we would ask at this point for the CEO to be called, Mr. Freund, given some of the testimony so far.

THE COURT:  Is Jane Adams still unavailable?

MR. FREEDMAN:  I was told she's back on, but I can't see the Zoom.

THE COURTROOM DEPUTY:  I can bring her in.

THE COURT:  Is Jane Adams on?

THE COURTROOM DEPUTY:  I'm putting her on right now.

THE COURT:  All right.  We'll do Jane Adams, and then we'll call the CEO.

MR. FREEDMAN:  Thank you, Your Honor.

THE COURT:  All right.

MR. FREEDMAN:  Your Honor, I understand you've said they can call the CEO.  I just feel obligated on behalf of my clients to reiterate that that means they will be standing around for a significant amount of time right before Thanksgiving, and I would appreciate if we could get through with them and then to the CEO.  He's here in person, and it's

not fair to these clients.

**THE COURT:**  I'll put some time limits on it.  I don't think you have to worry too much.

**MR. FREEDMAN:**  Thank you.

**THE COURT:**  Thank you for your objection.

Is Ms. Adams on now?

**THE WITNESS:**  Yes.

**THE COURT:**  Thank you.  Ms. Adams, I'm the judge.  Can you hear me okay?

**THE WITNESS:**  Yes.

**THE COURT:**  All right.  We're going to let you -- since you want to reach the airport, are you driving in a car right now?

**THE WITNESS:**  Yes, I am.  I'm a passenger.

**THE COURT:**  Okay.  Well, we're going to try to make it work with you on your way to the airport.

**THE WITNESS:**  Okay.

**THE COURT:**  So raise your right hand and take an oath, please.  Go ahead.

(The witness was sworn.)

**THE WITNESS:**  I do.

**THE COURTROOM DEPUTY:**  Please state your full name and spell your name for the record.

**THE WITNESS:**  Jane Adams, J-A-N-E A-D-A-M-S.

**THE COURTROOM DEPUTY:**  Thank you.

**THE COURT:**  Okay.  First question.

**JANE ADAMS,**

called as a witness by ClaimsHero, having been duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. FREEDMAN:**

Q.    Thank you.  Good morning, Ms. Adams.

A.    Good morning.

Q.    My name is Vel Freedman.  We've met before.  I'm your lawyer in this case.

The judge has given me an opportunity to ask you some questions, and after that, counsel for the class will get to ask you some questions.  Okay?

A.    Okay.

Q.    Ms. Adams, can you share with the Court the name of the copyrighted work that you believe Anthropic infringed on in this case?

A.    There are two.  One is *How to Sell What You Write*.  The other is *Boundary Issues*.

Q.    And Ms. Adams, are you aware that the judge in this case has approved preliminarily a settlement which would award you approximately $3,000 per work, less attorneys' fees and costs, if you do nothing and just file a claim in this case?

A.    Yes, I'm aware of that.

Q.    Do you want to participate in that settlement, Ms. Adams?

**A.**   No.  I want to file a claim.

**Q.**   And Ms. Adams, you come from a family of lawyers?

**A.**   Yes.

**Q.**   And did -- are you aware, Ms. Adams, that ClaimsHero -- you have agreed to pay ClaimsHero approximately 40 percent of any recovery that you get from that litigation against Anthropic?

**A.**   Yes.

**Q.**   And are you aware that ClaimsHero has obtained co-counsel -- that's my firm, Freedman Normand -- and Ms. Brannen's firm, Stris & Maher, to help litigate that case?

**A.**   Yes.

**Q.**   And you're aware, Ms. Adams, that that doesn't cost you anything else.  ClaimsHero is just splitting its fee with those other law firms, correct?

**A.**   Yes.

**Q.**   Ms. Adams, did ClaimsHero ever tell you that it was only going to charge you a, quote, "small fee"?

**A.**   No.

**Q.**   Are you aware, Ms. Adams, that the judge in this case has found that Anthropic's use of your book to train its AI was a fair use and not compensable under the law?

**A.**   Yes.

**Q.**   Do you still want to opt out of this case, Ms. Adams?

**A.**   Yes.

**MR. FREEDMAN:**  Thank you so much.

Your Honor, I have no further questions.

**THE COURT:**  Okay.  Cross-examination?

**CROSS-EXAMINATION**

**BY MR. DOSHI:**

**Q.**  Hi, Ms. Adams.  Can you hear me all right?

**A.**  Yes.

**Q.**  Ms. Adams, have you opted out of the settlement?

**A.**  Yes.

**Q.**  How did you first hear about ClaimsHero?

**A.**  I'm not sure.  I don't remember.

**Q.**  Do you remember if you got an email?

**A.**  Yes, I do remember that, but I don't have it in my email file.

**Q.**  Do you know who sent you that email?

**A.**  I think Kyle Roche sent it to me.

**Q.**  Are you aware, Ms. Adams, that the law firm that the lawyer that just spoke with you is at has been disqualified twice before in the last few years?

**MR. FREEDMAN:**  Objection.  Again, Your Honor, it's a mischaracterization of the record.

**THE COURT:**  Overruled.

Please answer the question the best you can.

**A.**  No, I'm not aware of that.

**Q.**  And Ms. Adams, have you ever read the long-form notice in

this case, or do you even know what that is?

**A.**    No.

         **MR. DOSHI:**  Thank you, Ms. Adams.

    Nothing further, Your Honor.

         **THE COURT:**  Anything more?

         **MR. FREEDMAN:**  Nothing further.

    Thank you, Ms. Adams.

         **THE COURT:**  Ms. Adams, okay.  Are you close to the airport yet?

         **THE WITNESS:**  I'm close, but there's a long line, as you can imagine.

         **THE COURT:**  Well, you're free to go now.  We're going to excuse you.  Have a safe journey.

         **THE WITNESS:**  Thank you.

         **THE COURT:**  All right.  Bye-bye.

    Okay.  Now we go to the CEO.  How much time do you need on direct examination?

         **MR. NATH:**  I think that's a question for Mr. Freedman.

         **THE COURT:**  Well, who wants to go first on this?  Do you want to go first?

         **MR. FREEDMAN:**  I think it makes sense, Your Honor.  We can lay a foundation of what ClaimsHero is and --

         **THE COURT:**  All right.  You go first.  How much time do you need?  20 minutes?

         **MR. FREEDMAN:**  That should be enough, Your Honor.

THE COURT: All right. I'll give each side 20 minutes presumptively, subject to change.

Okay. Sir, please come forward.

And for the record, the witness is in person here in the courtroom. Please raise your right hand to take an oath to tell the truth.

(The witness was sworn.)

THE WITNESS: I affirm.

THE COURTROOM DEPUTY: Please be seated. Speak clearly into the microphone. Please state your name and spell it for the record.

THE WITNESS: Sure. Full name, Matthew Freund, M-A-T-T-H-E-W F-R-E-U-N-D.

THE COURT: Okay. You need to use the microphone closer to your voice.

THE WITNESS: Is this good, Your Honor?

THE COURT: That's better now. Move it closer. You don't have to -- yeah. Thank you.

Go ahead, Counsel.

MR. FREEDMAN: Thank you.

**MATTHEW FREUND,**

called as a witness by ClaimsHero, having been duly sworn, testified as follows:

///

///

**DIRECT EXAMINATION**

**BY MR. FREEDMAN:**

**Q.**   Good morning, Mr. Freund.

**A.**   Good morning.

**Q.**   Mr. Freund, where do you reside?

**A.**   Miami Beach, Florida.

**Q.**   And where are you presently employed?

**A.**   ClaimsHero Holdings LLC.

**Q.**   When did you first start working for ClaimsHero?

**A.**   June 2023.

**Q.**   And was that around when ClaimsHero was founded?

**A.**   Yes.

**Q.**   What is your position at ClaimsHero?

**A.**   CEO.

**Q.**   And can you tell the judge approximately how many people work at ClaimsHero today?

**A.**   16.

**Q.**   And you understand, Mr. Freund, that you're here today to allay some of the Court's concerns about ClaimsHero?

**A.**   I do, yes.

**Q.**   Can you describe for the Court ClaimsHero's business at a high level?

**A.**   Sure.  ClaimsHero is a law firm that services its clients by providing them access to two types of legal actions.  The first service we provide is participation in different mass

actions.  This includes mass torts, mass arbitrations, or in this case, opting out of an existing class action settlement to file individual claims directly.  In these mass actions, we partner with some of the top law firms in the country to pursue litigation.

The other service that we offer our clients is to help them learn about and, in some cases, actually file claims for class action settlements that they may be eligible for.

**Q.**   Okay.  I'd like to focus you on that first style of business, the participation in mass actions and direct lawsuits.

Can you describe to the Court, again at a high level, how that process works for ClaimsHero?

**A.**   Yes.  The first step of the process is we identify these mass action campaigns.  To identify these campaigns, we work in partnership with litigation boutiques, midsized plaintiffs firms to develop a legal strategy.  An example of this is one of our early campaigns was a mass arbitration against TikTok as it related to claims concerning social media addiction and data privacy questions.

On this campaign, we partnered with two different litigation boutiques to pursue these claims.  These two firms were Freedman Normand Friedland, which was founded by some former Boies Schiller litigators.  The other firm was Nagy Wolfe Appleton, which was founded by a former Susman Godfrey

partner.

So once we've identified the mass action, the next step is we advertise the representation. We do this via traditional attorney advertising as well as standing up a landing page on our website, which has all the tools and forms needed for potential clients to input their information.

At that point then, we have a team of attorneys and paralegals who will review the submitted information to see if it matches up against the eligibility requirements that we develop in consultation with our law firm partners. At this point then, we verify the information, and if we think that the potential client has an eligible claim, we will countersign their engagement letter.

And then on an ongoing basis, we will assist our law firm partners in litigating the case. While, to date, our law firm partners do the lion's share of legal work, we interface with clients doing things such as data and documentation collection, keeping them updated on the status of the legal action, preparing them for depositions, and so on.

**Q.** So I want to unpack this process as it relates to the Anthropic opt-out, which is why we're here today, but first, I'd like to understand a few additional threshold points about ClaimsHero.

So has ClaimsHero been involved in any active litigations?

**A.** Yes. Over the past two years, we have been involved in

active litigations against Microsoft, Google, TikTok and Coinbase.

**Q.** And what is your role in these -- are these mass actions?

**A.** They are, yes.

**Q.** And what is your role in these mass actions and litigations that you've participated in so far?

**A.** So while our partner firms will appear in court, what ClaimsHero does is interface with our clients and provide active and ongoing assistance in these litigations.

**Q.** Do you disclose to clients that you'll be partnering with other firms to handle much of the active court litigation?

**A.** Yes, we do.

**Q.** And where?

**A.** We disclose this in our advertisements, on our websites, and we also feature this in our engagement letter too.

**Q.** So talking about engagement letters, when is a consumer presented with an engagement letter from ClaimsHero?

**A.** After the potential client completes the intake form on our website, they are served with an engagement letter.

**MR. FREEDMAN:** Your Honor, can I mark for identification ClaimsHero Exhibit 1.

(Exhibit 1 was marked for identification.)

**MR. FREEDMAN:** May I approach, Your Honor?

**THE COURT:** Sure.

**MR. NATH:** Your Honor, I just want to make sure. This

is not a Bates number.  We were produced documents.  I just want to make sure this is identical to the one that was produced to us yesterday.  Otherwise, we've had no notice of this agreement.

**MR. FREEDMAN:**  It's identical.

**THE COURT:**  I'm sorry.  Is this something that was provided to counsel?

**MR. FREEDMAN:**  Yes, Your Honor.

**MR. POTTER:**  The production yesterday -- may I stand, Your Honor?

**THE COURT:**  Come up here, or we can't hear you, please.  And your name?

**MR. POTTER:**  Alex Potter, Your Honor.

The production yesterday was of the actual countersigned engagement letters of the individual clients.  This is the form engagement letter that's used universally for the Anthropic --

**THE COURT:**  Is it otherwise identical?

**MR. POTTER:**  That's my understanding, yes, sir.

**THE COURT:**  No, no.

**MR. FREEDMAN:**  Yes, Your Honor.

**MR. POTTER:**  Yes, Your Honor.

**THE COURT:**  Your understanding is no good.

**MR. FREEDMAN:**  Well, may --

**THE COURT:**  It has to be you can tell me yes, it is identical.

**MR. POTTER:**  This is what is presented to --

**THE COURT:**  All right.

**MR. POTTER:**  -- clients who signed up for the Anthropic campaign, Your Honor.

**THE COURT:**  What's wrong with that?

**MR. NATH:**  We accept counsel's representation.  If we find a discrepancy --

**THE COURT:**  All right.  Then let's proceed.

Go ahead.

**BY MR. FREEDMAN**

Q.  Okay.  What are we looking at, Mr. Freund?

A.  This is the engagement letter for the Anthropic opt-out.

Q.  And all of the clients, the six clients that ClaimsHero represents in this opt-out effort, did they sign engagement letters that are identical to this?

A.  Yes.

Q.  Okay.  So we were discussing the disclosure of the work with co-counsel before I introduced the exhibit.  Do you recall that?

A.  Yes.

Q.  And can you direct the Court to where it tells clients in this engagement letter that you will be working with co-counsel?

A.  Yes.  If you look at the second paragraph on page 4, what it says is client understands that the firm intends to

co-counsel with other lawyers to prosecute any litigations -- any litigation against Anthropic and that the firm will do so under a fee sharing agreement that will be disclosed to the client.

**Q.** Mr. Freund, can I direct you for a moment to the second page of the engagement letter?

**A.** Yes.

**Q.** Do you see the section that says "acknowledgment regarding settlement opt-out"?

**A.** Yes.

**Q.** Can you read the first sentence of that paragraph?

**A.** Yes. It says, "Client acknowledges that by electing to opt out of the settlement, client foregoes the right to receive any payment, distribution, or benefit provided to settlement participants."

**Q.** And then can you skip to the final sentence of that paragraph, the one that starts "client understands that"?

**A.** Yes. "Client understands that opting out involves risks, including the potential for increased costs, delay, or an adverse judgment, and that no assurance of success or compensation can be made or implied."

**Q.** And all of ClaimsHero's clients are presented with this engagement letter?

**A.** Yes.

**Q.** Sorry. One more thing, Mr. Freund. Can I direct you back

to page 4, that second paragraph.

A.    Yes.

Q.    Does ClaimsHero's affiliation with other law firms like my law firm, Freedman Normand, and Stris Maher, increase the amount of money that clients will pay for their representation?

A.    No.  Absolutely -- no, it does not.

Q.    Do you tell clients that?

A.    We do tell clients that, yes.

Q.    Where do you tell clients that?

And just to move this along, I'll direct you to the bottom of that same paragraph.

A.    Yes.  So in the last sentence, it says that client authorizes the firm to retain and associate with other co-counsel as the firm may deem appropriate and to share any legal fees resulting from the client's matter with such co-counsel with the express understanding that any legal fees to be paid to such co-counsel will be paid from legal fees recovered by the firm and will not increase the legal fees due from client to the firm.

Q.    Okay.  What percent fee does ClaimsHero charge clients who want to sign up for the Anthropic opt-out cases?

A.    40 percent, though after consultation with co-counsel, we will be adjusting -- we have adjusted the -- amended the fee schedule with how we treat the first $3,000 of any potential outcome.

As it pertains to the first $3,000, we will lower it to the lesser of 25 percent or whatever percentage the Court awards to Plaintiffs' counsel.

**MR. NATH:**  Your Honor, we'll move to strike that testimony.  We haven't been given those agreements before.

**THE COURT:**  Come up here.  I can't hear your objection.

**MR. NATH:**  Your Honor, we would move to strike that testimony because we haven't been given any of those agreements or amendments before today, and they were ordered to produce their --

**THE COURT:**  Well, on cross-examination --

**MR. NATH:**  -- retention agreements.

**THE COURT:**  -- you can point out that what he said is not in this agreement.

**MR. NATH:**  Understood, Your Honor.

**THE COURT:**  So overruled.

Go ahead.

**BY MR. FREEDMAN:**

**Q.**  Can you show me where, Mr. Freund, in the engagement letter it tells clients that ClaimsHero charges clients 40 percent?

**A.**  Yes.  At the bottom of page 2.

**Q.**  So I'm looking at the section titled "contingent fees." Can you read that, the first few, I guess, first half or so of

that first line?

**A.** Yes. "The client agrees to pay the firm a fee equal to 40 percent of the gross sum recovered by the firm on behalf of the client by settlement or by judgment."

**Q.** Okay. On that note, Mr. Freund, there have been some statements in the record that ClaimsHero represented to potential Anthropic clients that it would only charge them a small fee; is that true?

**A.** No, that is not.

**Q.** Has ClaimsHero ever said that to Anthropic clients?

**A.** We have never made that statement, no.

**Q.** And were you aware before just now that the Court was under the impression that that statement had been made?

**A.** When I heard that the Court was under that impression, Your Honor, I was very surprised as I don't believe that is a representation that we've ever made in our ads or on our website. So because of that, I went back and looked through old communications, old websites to see if that was mistakenly something we ever said.

**Q.** And did you say it?

**A.** No, we have never said that. We have never represented to potential clients, current clients that they will pay a small fee. We have always said it would be 40 percent.

**Q.** How many firms has ClaimsHero partnered with since it began operations?

**A.**   Since operations, we have partnered with eight different law firms.  These law firms tend to fall into two different categories.  One is prominent litigation boutiques who have experience taking on and winning against big law firms, and the other category is nationally recognized mid-sized plaintiffs law firms.

**Q.**   Now, Mr. Freund, you understand the Court is concerned about ClaimsHero's ability to actually take this many claims on against these sort of defendants, right?

**A.**   Yes.

**Q.**   Can you give the Court some color on how you ensure ClaimsHero and the firms you partner with can handle the mass actions that you are actually advertising?

**A.**   Yes.  We work in very close coordination with our legal partners on any mass action, and part of that is keeping a very close eye on the amount of clients that we have.  We will closely monitor both the volume and velocity of new sign-ups we're seeing, and if there's ever any slight question as to our ability to handle that volume of clients, we will then go in, bring on additional partner firms, and pause any additional intake until we get that firm in place.

I would point to our work in the -- in a TikTok mass arbitration that we pursued where we were -- initially started the engagement with just FNF but eventually brought on Nagy Wolfe Appleton as our volume of clients increased.  So the work

on these mass actions is an iterative process with our partner firm.

Q.    Does ClaimsHero have sufficient capital to support the campaigns that it's pursuing on behalf of its clients?

A.    Yes.  We've raised nearly 20 million dollars to fund our business operations, and we also get the commitments from our partner firms to help finance the cost and expenses that go into these mass actions.

In the case of this Anthropic opt-out mass action, we've gotten commitment from Stris and FNF that they will split the legal fees associated with filing all of these individual claims.

Q.    And what about the costs?  Have the law firms agreed to fund the costs as well?

A.    Yes, they have.

Q.    Has ClaimsHero had any particular success in its two-year history?

A.    Yes.  A case that we co-counseled with FNF and with Nagy Wolfe Appleton is a case where we represent tens of thousands of parents who are seeking to assert legal claims against TikTok for social media addiction and data privacy-related concerns.

TikTok thus far has refused to arbitrate these claims, so FNF and Nagy filed suit in the Central District of California to compel arbitration.  Just recently, in early September, the

judge issued an order granting this petition to compel arbitration.

And so because of this, TikTok hired a former solicitor general of the U.S. to take the Court on appeal to the Ninth. So at this point, ClaimsHero is continuing to work in tandem with FNF and Nagy Wolfe both on the appeal and the ongoing arbitration.

**Q.**    And just so the record is clear, you've been saying FNF. Is that Freedman Normand --

**A.**    Yes.

**Q.**    -- Friedland?

**A.**    FNF is Freedman Normand Friedland.

**Q.**    I want to take a step back.  Why do these experienced, prestigious litigation boutiques and mid-sized national plaintiffs law firms -- why are they working with ClaimsHero? What is the problem that ClaimsHero solves?

**A.**    Sure.  So large plaintiffs firms have the resources, have the bandwidth to pursue hard cases to trial.  What these firms do not have, and what the vast majority of law firms do not have, is the tools needed to locate, manage, and litigate cases on behalf of thousands of plaintiffs.

And so what ClaimsHero does is we solve this with our technology platform.

**THE COURT:**  I'm sorry.  You solve this with what?

**THE WITNESS:**  With our technology platform, Your

Honor.

So our CTO was an earlier engineer at --

**BY MR. FREEDMAN:**

Q.   What is a CTO?  Sorry.

A.   Excuse me?

Q.   What is a CTO?

A.   Chief Technology Officer.

Q.   Okay.

A.   So our chief technology officer, I want to say, early engineer at Facebook, and we had built a transparent platform that enables our partner firms to efficiently and compliantly prosecute thousands of claims.

Q.   All right.  I'd like to switch gears and discuss ClaimsHero's Anthropic opt-out claim.  When did ClaimsHero first begin looking into this dispute?

A.   We began looking into AI copyright dispute, issues around that, before the settlement was announced.  I would say as we were discussing this, we had had interest from at least five different law firms who were interested in pursuing individual claims as more light was shed on the underlying conduct of Anthropic and companies like them as to how they pirated large data sets.

Q.   Is -- do the facts of this case, as it relates to Anthropic, are there similar cases pending against other large AI companies?

**A.**    It is our understanding yes, there is.

**Q.**    Do you have a co-counsel agreement in place to litigate the opt-out cases for this Anthropic case?

**A.**    Yes, we do.  We have a co-counsel agreement in place with Freedman Normand Friedland and Stris Maher.  Both of these firms have extensive experience in taking on extremely well-resourced defendants and also have experienced both on the plaintiff and defendant side of complex litigations.

With the case of FNF, they've done defense work for multinational, publicly traded companies, complex commercial litigations.  They also have a robust plaintiff class action practice that has done work in securities, data breach, antitrust cases, most recently securing an over 300 million dollar settlement against a series of elite colleges and universities.

And with our other partner Stris, they have extensive experience in high stakes litigation in federal trial, appellate court, even arguing some cases in front of the Supreme Court of the United States around questions of copyright litigation.  And Elizabeth Brannen.

Then, who's here today, is the former director of intellectual property at Barnes & Noble.

**Q.**    So let me switch gears for a second, Mr. Freund.  I want to cover the interactions ClaimsHero had with class counsel.  Okay?

When did class counsel contact you?

**A.**    Sunday, November 2nd.

**Q.**    And when did you get on a call after they contacted you on November 2nd to discuss their concerns?

**A.**    Monday, November 3rd.

**Q.**    So the next day?

**A.**    Yes.

**Q.**    And what issue did they flag on that phone call?

**A.**    They flagged an issue with the "start claim" button on the Anthropic website, as well as the fact that we did not state explicitly that ClaimsHero is not class counsel nor are we the claims administrator.

**Q.**    Did they make any demands on that call?

**A.**    They demanded that we take down the Anthropic website.

**Q.**    Completely?

**A.**    Yes.

**Q.**    Did you address the issues they raised on the call about the claim button and the relationship with the settlement administrator?

**A.**    Yes, immediately.

**Q.**    And how so?

**A.**    We added a disclaimer to the initial section of the site that stated explicitly we are not the claim administrator, and we updated the button in question to opt out today.

**Q.**    Did you make other changes to make it clear that you were

not affiliated with the claims administrator and that class members were opting out, not filing a claim form?

**A.** Yes. We also updated the check box that anyone who completes the form to be a potential client completes asserting that, along with adding other FAQs and language as it relates to the opt-out and describing the opt-out effort.

**Q.** And after you made these changes to the website to clarify the issues class counsel raised or remedy them, did you follow up with an email to ask if any further changes were needed, in their view?

**A.** We did, yes.

**Q.** When?

**A.** The same day, that evening.

**MR. FREEDMAN:** Okay. I am going to mark as demonstrative 1, Your Honor, a portion of the email that's already in the docket, docket entry 442-3.

**BY MR. FREEDMAN:**

**Q.** Is this the email that you were referencing, Mr. Freund?

**A.** Yes, it is.

**Q.** And can you read for the record what the letter ends with after it addresses the changes you made to the website?

**A.** Yes. It says "I trust this correspondence has resolved your concerns. To the extent it has not, I'd be happy to speak with you again about what exactly you find problematic."

**Q.** And did class counsel take you up on this offer and

discuss any other potential issues they had with the lawsuit -- with the website?

**A.**   No, they did not.

**Q.**   What did they do instead?

**A.**   They filed their motion.

**Q.**   Would ClaimsHero have been willing to make any more changes to the site if claims counsel had raised reasonable concerns with you?

**A.**   Yes, we would.

**Q.**   Why?

**A.**   We want to, you know, operate in good faith and address questions that the Court may have if there's questions as to what's on the site.  So we want to be adherent to any concerns that might be arising.

**Q.**   I think on November 13th, Judge Alsup ordered ClaimsHero to make certain changes to its website within 48 hours.  Did you timely make those changes?

**A.**   Yes, we did.

**Q.**   Mr. Freund, what is ClaimsHero trying to do in this case?

**A.**   ClaimsHero is simply seeking to provide a viable alternative to class members who do not wish to accept the $3,000 settlement.

        **MR. FREEDMAN:**  Thank you, Mr. Freund.

    Your Honor, I have no further questions.

        **THE COURT:**  Thank you.

Cross-examination?

**CROSS-EXAMINATION**

**BY MR. NATH:**

Q.   Thank you, Mr. Freund.  Good morning.

You're the chief executive officer of ClaimsHero, correct?

A.   Yes.

Q.   Do you report to anybody?

A.   A board, but no.

Q.   And who's on your board?

A.   Our board is Nick Shekerdemian, Elliott Richmond, Nelson Estrada, Garrett Marcotte, and myself.

Q.   And ClaimsHero is a law firm, right?

A.   Yes.

Q.   You are not licensed to practice law in any state; is that right?

A.   Myself personally?

Q.   Yes.

A.   Yes.

Q.   You are not licensed to practice?

A.   I am not licensed to practice, yes.

Q.   And ClaimsHero is soliciting class members to opt out of the Bartz versus Anthropic settlement, right?

A.   Yes.

Q.   And as someone who runs a law firm, you understand how a class action settlement works, right?

**A.** At a high level, yes.

**Q.** Class members have an opportunity -- can make a decision. They can opt out of the settlement. That's one option, right?

**A.** Yes.

**Q.** They opt out of the settlement. They give up their opportunity to participate in the settlement and collect money out of the settlement, right?

**A.** Yes.

**Q.** And then they have another option. They can file a claim to settlement, right?

**A.** Yes.

**Q.** And if you file a claim, you can collect money from the settlement, right?

**A.** Yes.

**Q.** ClaimsHero, as a law firm, has an independent obligation to make sure that its communications with the public and potential clients are not misleading. Do you agree with that?

**A.** Yes.

**Q.** Does ClaimsHero take that obligation seriously?

**A.** Yes.

**Q.** ClaimsHero started a marketing campaign on October 27th, 2025, of this year, right?

**A.** Yes.

**Q.** That was after the settlement was announced?

**A.** Yes.

**Q.** And earlier you said you had started considering AI copyright cases before the Bartz versus Anthropic settlement was announced, right?

**A.** Yes.

**Q.** But you didn't start a marketing campaign before the settlement was announced, did you?

**A.** No.

**Q.** And you mentioned that there are a lot of other AI copyright cases out there against defendants like OpenAI and Meta, right?

**A.** I do not know the names specifically, but yes.

**Q.** You're aware that there are copyright cases against OpenAI?

**A.** Yes.

**Q.** You're aware that there are copyright cases against Meta, right?

**A.** Yes.

**Q.** ClaimsHero hasn't started a marketing campaign for any cases against Meta, OpenAI, or other potential defendants other than Anthropic?

**A.** No.

**Q.** So the only marketing campaign you started was about Anthropic, where there was a one and a half billion dollar settlement announced, right?

**A.** Yes.

**Q.** Your testimony -- you remember you submitted a declaration in this case?

**A.** Yes.

**Q.** And you submitted it on, I believe, November 12th, 2025, right?

**A.** Yes.

**Q.** And that was a declaration you submitted after your conversation with class counsel, right?

**A.** Yes.

**Q.** Okay. I was on that call, right?

**A.** Yes.

**Q.** Is it fair to say that one of the concerns that class counsel raised was that ClaimsHero's communications made it look like they would help people file claims, but in reality, it was soliciting opt-outs; is that fair?

**A.** Yes.

**Q.** And that was communicated on that call, right?

**A.** Yes.

**Q.** And after that call, is it fair to say that ClaimsHero went back and looked at all its advertising on its website; is that right?

**A.** Yes.

**Q.** Okay. And your testimony in your declaration submitted to the Court, was that all of your advertising to date from the very beginning on October 27th all the way to today has been

truthful; isn't that right?

**A.** Yes.

**Q.** Okay. I want to take a look at some of that advertising. Actually, I want to quote -- do you have your declaration in front of you by any chance?

**A.** I do not, no.

**MR. NATH:** Okay. We have a copy. I would like to -- may I approach, Your Honor?

**THE COURT:** Please.

**THE WITNESS:** Thank you.

BY MR. NATH:

**Q.** This is the declaration you submitted to the Court?

**A.** Yes.

**Q.** It was under penalty of perjury?

**A.** Yes.

**Q.** The same oath that you took today?

**A.** Yes.

**Q.** Did you write this declaration?

**A.** Yes.

**Q.** Okay. And I want to take you to the paragraph you wrote, paragraph 26. Can you read paragraph 26 into the record?

**A.** "On October 27th, ClaimsHero began social media advertising to truthfully inform class members that they may be entitled to more compensation than the settlement provided and to direct them to ClaimsHero's website so that they could

determine their eligibility to opt out and file a claim in court against Anthropic.

**Q.** And so there were two parts of your campaign, right? There was the social media advertising; is that right?

**A.** That is -- yes.

**Q.** And then you also had a website, right?

**A.** Yes.

**Q.** Okay. And let's talk about that what you call truthful advertising. I want to pull up what has been produced to us as CH 69. We also have black and white printed copies.

**THE COURT:** Let the witness have one, and give me one.

**THE WITNESS:** Thank you.

**THE COURT:** Thanks.

**MR. NATH:** Your Honor, is it okay if I turn the screen so I can...

**THE COURTROOM DEPUTY:** Yeah.

BY MR. NATH:

**Q.** Is this one of ClaimsHero's advertisements?

**A.** It is, yes.

**Q.** And this is an advertisement that went live?

**A.** Yes.

**Q.** Okay. And where was it circulated?

**A.** It looks like it is a Meta app.

**Q.** And did a similar or identical advertisement get circulated on other social media platforms?

**A.**   I believe this ad was on Meta.

**Q.**   Okay.  And when you say Meta, is that Facebook and Instagram?

**A.**   Yes.

**Q.**   Okay.  So class members who are on Facebook and Instagram may have been exposed to this advertisement, right?

**A.**   Yes.

**Q.**   And just to be clear, your testimony is that this advertisement is truthful, right?

**A.**   Yes.

**Q.**   And it's not misleading, right?

**A.**   Yes.

**Q.**   Okay.  And we just spoke a little while ago that -- you're aware and you were aware at the time that you circulated these ads that class members have two options, to opt out or file a claim to settlement, right?

**A.**   Yes.

**Q.**   Okay.  And so at the top of the advertisement, there's a reference to -- it says "Qualify today for potential serious cash settlement at ClaimsHero.io, a trusted law firm with over 500,000 users."

Do you see that?

**A.**   Yes.

**Q.**   Okay.  Did you approve these advertisements before they went out?

**A.**    Yes.

**Q.**    Who else was involved in approving the advertisements?

**A.**    We also get outside counsel reviewing ads.

**Q.**    And what law firm?

**A.**    Freedman Normand Friedland.

**Q.**    Okay.  And that's the law firm formerly known as Roche Freedman?

**A.**    Yes.

**Q.**    Okay.  And the Roche is Kyle Roche?

**A.**    Yes.

**Q.**    Now, that's a reference to a serious cash settlement in this ad, right?

**A.**    Yes.

**Q.**    And you would agree with me that the only -- that ClaimsHero at that time and now does not have any secured settlement with Anthropic, right?

**A.**    Yes.

**Q.**    There was no existing settlement with Anthropic between ClaimsHero and any of its clients and Anthropic, right?

**A.**    Yes.

**Q.**    Yet there's a reference to a serious cash settlement in this ad, right?

**A.**    Yes.

**Q.**    Okay.  Then let's scroll down.  It says "compensation alert," and you see it says, "Authors of pre-2021 published

books plus copyrighted within 5 years equals potential book piracy payouts."

Do you see that?

A.    Yes.

Q.    Okay.  And, again, you were aware at the time that ClaimsHero published this advertisement that class members had a choice between opting out or filing a claim to settlement, right?

A.    Yes.

Q.    Okay.  But you signed off an advertisement with a big blue button that said, "Start your claim," right?

A.    Yes.

Q.    Okay.  And your testimony is that that's not misleading at all?

A.    Yes.

Q.    If you click on this advertisement, how long was this advertisement live?

A.    This ad was probably live for five days.

Q.    And five days on Meta -- so Instagram and Facebook, right?

A.    Yes.

Q.    How many people clicked on this advertisement and went to ClaimsHero's website?

A.    I don't know that.

Q.    You haven't tracked that?

A.    No, and I don't know that that level of data is available.

**Q.** If you clicked on this, you went to ClaimsHero -- it took you to ClaimsHero's website, right?

**A.** It took you to the Anthropic web page of ClaimsHero.

**Q.** ClaimsHero's Anthropic landing page, right?

**A.** Yes.

**Q.** Okay. And there, on ClaimsHero's Anthropic landing page, there was a button that said, at least as of October 27th through about November 3rd, that said, "Start claim," right?

**A.** Yes.

**Q.** Okay. And if a class member started their claim, they were given an option to create a ClaimsHero account, right?

**A.** Yes.

**Q.** Okay. And so someone who saw this advertisement, clicked on the advertisement, could have gone to the ClaimsHero website and created a ClaimsHero account, right?

**A.** Yes.

**Q.** And you don't have to sign a retention agreement to create a ClaimsHero account, right?

**A.** Yes. I mean no, you do not. Excuse me.

**Q.** Okay. So people who were exposed to this advertisement, visited the ClaimsHero website, and created an account, they would have shared their contact information with ClaimsHero, right?

**A.** Yes.

**Q.** And they may have current active accounts with ClaimsHero,

right?

A.    In the case of someone who created an account?

Q.    Correct.

A.    Yes.  That would create an account.

Q.    And so ClaimsHero would be able to communicate with those people because they have their contact information, right?

A.    We would be able to, yes.

Q.    How many people created new ClaimsHero accounts since the time that ClaimsHero started its campaign on October 27th, 2025?

A.    About 45,000 people.

Q.    45,000 people between October 27th, 2025, and today created new ClaimsHero accounts after your Anthropic campaign went live?

A.    Yes.

Q.    How many people signed retention agreements?

A.    For the Anthropic case?

Q.    Correct.

A.    Yeah.  I believe we had about 60 people complete retention agreements.

Q.    You said 60?

A.    Yes.

Q.    60 people completed retention agreements for Anthropic since the time that this advertising campaign went live?

A.    In -- yes.

**Q.**  Okay.  And you have produced -- let me take a step back.

Did you read the transcript of the last hearing?

**A.**  Yes.

**Q.**  So you're aware that the Court ordered ClaimsHero to produce a number of documents, right?

**A.**  Yes.

**Q.**  And one of those -- some of those records were the names of people who have signed up with ClaimsHero, right?

**A.**  Yes.

**Q.**  Okay.  And so you can sign up with ClaimsHero by creating an account without signing a retention agreement, right?

**A.**  Yes.

**Q.**  Okay.  And ClaimsHero has not turned over those records. They haven't identified people who have created an account after the campaign was started but haven't signed a retention agreement?

**A.**  No.

**Q.**  You have not done that?

**A.**  We have not provided those?  Is that what you're asking?

**Q.**  You have not provided those records?

**A.**  No.

**Q.**  Okay.  And how many retention agreements did ClaimsHero produce in response to the Court's order?

**A.**  I believe we produced six.

**Q.**  Six?

**A.**   I think six or seven, yeah.

**Q.**   Okay.  But 60 people have signed Anthropic retention agreements?

**A.**   Yes.

**Q.**   Okay.

**THE COURT:**  Can I interrupt?  Are these retention agreements to file a claim or retention agreements like the ones we've seen to opt out and bring a separate lawsuit?

**THE WITNESS:**  To opt out and bring a separate lawsuit, Your Honor.

**THE COURT:**  Okay.  Thank you.

**BY MR. NATH:**

**Q.**   And so about 54 retention agreements have not been produced?

**A.**   Yes.

**Q.**   Okay.  And those though are retention agreements that ClaimsHero entered into with members of the class?

**A.**   No.

**Q.**   Okay.  These are members -- people who were not in the class?

**A.**   Based on our review, yes.

**Q.**   Okay.  All 54 are people who aren't in the class?

**A.**   Yes.

**THE COURT:**  I'm confused.  Say that question again. All 54 what?

**BY MR. NATH:**

Q.   All 54 of the other people who have signed retention agreements with ClaimsHero -- I'm talking about the retention agreements that haven't been produced -- those are people who are not class members?

A.   Yes.

Q.   Okay.  How about the 45,000 people who created accounts? Do you know how many of those are class members?

A.   We aren't able to tell that.

Q.   Okay.  But you haven't produced any records of any of those names, right?

A.   No.

Q.   Okay.  So someone could have been exposed to this advertisement that describes settlement compensation, created a ClaimsHero account, and may have decided to fill out a retention agreement later or access their account later, but we wouldn't know -- we wouldn't have their contact information, right?

A.   That's not the case.  We would know if they signed the retention agreement.

Q.   ClaimsHero would know if they signed a retention agreement, right?

A.   Yes.

Q.   But you haven't turned over those names to class counsel?

A.   For -- no, not for people that we don't think are members

of the class.

**Q.** I'm sorry. Let me take a step back.

**A.** Yeah.

**Q.** 45,000 people -- since you started this advertising campaign, 45,000 people signed up with ClaimsHero by creating an account, right?

**A.** They created an account, correct.

**Q.** Correct. Okay. And you haven't turned over those names?

**A.** No.

**Q.** Only the names of people who signed retention agreements, right?

**A.** Yes.

**Q.** Okay. And among those 45,000 people, there may be more class members who were exposed to ClaimsHero's advertisements, right?

**A.** We don't know.

**Q.** You don't know one way or the other?

**A.** No.

**Q.** So there may be more people who were exposed to ClaimsHero's advertisements, right?

**A.** Potentially.

**Q.** Okay. Now, this is one of the ads. This was on Facebook and Meta.

I want to turn to another ad, which is CH 005. This is another ad that was live that ClaimsHero distributed?

**A.** Yes, the image on the screen.

**Q.** Okay.

**MR. FREEDMAN:** Your Honor, I apologize, but I can't see the ad.

Is there a way -- do you have a copy of it for me?

**MR. NATH:** It's a video. Is that better?

**MR. FREEDMAN:** Yeah. Thank you.

**BY MR. NATH:**

**Q.** This is another ad that was live on ClaimsHero's website? Sorry. Let me ask that question again.

This is another social media ad that ClaimsHero published?

**MR. FREEDMAN:** I'm sorry. I'm just going to check one more time. Can you identify it so that we can refer to it later?

**MR. NATH:** CH 005. This was a Bates that was produced to us yesterday.

**MR. FREEDMAN:** Thank you.

**MR. NATH:** And Michael, could we hit play on the video.

(Video recording played.)

**BY MR. NATH:**

**Q.** Have you seen this ad before?

**A.** Yes.

**Q.** You signed off on it?

**A.** Yes.

**Q.**    Including the part that has a button that says, "Start your claim"?

**A.**    Yes.

**Q.**    And how long was this ad live for?

**A.**    I believe five days.

**Q.**    And you don't see -- from reviewing this ad, you don't see how a class member could see this and think that it's an advertisement for a firm that would help you file a claim?

**A.**    A claim in what sense?

**Q.**    File a claim to the settlement.

**A.**    No.

**Q.**    No one could be confused?

**A.**    I don't believe so, no.

**Q.**    Okay.  If you clicked on this ad -- again, we went through it -- it took you to the website, and there was a sign-up process, right?

**A.**    Yes.

**Q.**    And for several days, that sign-up process had a "start claim" button on it?

**A.**    Yes.

**Q.**    After a conversation with class counsel -- oh, sorry.

Can you remind me again?  How long was this ad live?

**A.**    I believe five days.

**Q.**    Five days.  Was this taken down on November 3rd?

**A.**    I believe on the 2nd.

Q.   On the 2nd.

A.   Yeah.

Q.   Okay.  And then was it restarted at any point?

A.   No.

Q.   Okay.  Now, November 3rd, you had a conversation with class counsel, right?

A.   Yes.

Q.   You reviewed the language on your website, right?

A.   Yes.

Q.   Okay.  And you made changes to the website, right?

A.   Yes.

Q.   And one of the concerns raised during the conversation with the class counsel was that you were giving people the false impression that they were signing up with you to file claims, right?

A.   Yes.

Q.   Okay.  Even after you made those changes, isn't it true that you continued to advertise the Anthropic settlement as a, quote, "popular claim" on the ClaimsHero website?

A.   Yes.

Q.   Okay.  And it's also true that even after that conversation, after you reviewed the website, there was a part of the website related to the Anthropic settlement that said you could claim your share in minutes?

A.   We updated that, as well as updated the popular claim.

Q.   But that remained on the website until at least November 12th, 2025, right?

A.   I don't know the exact date, but --

Q.   Okay.  But you didn't take it down immediately after a conversation with class counsel, right?

A.   We adjusted the language on the Anthropic landing page.

Q.   Okay.  Then I'll take you back to your declaration.  I want to turn you to paragraph 49.  Sorry.  Paragraph 50.

Can you read paragraph 50 into the record?

A.   "ClaimsHero continues to pause its social media video advertisements until they can be revised to prominently reference opting out of the settlement."

Q.   And as of November 12th, 2025, you had represented to the Court that you had paused video social media advertisements?

A.   Yes.

Q.   Was that true?

A.   Yes.

Q.   Were there still videos, ClaimsHero videos live and available online?

A.   One clarification.  We paused ads that did not have the prominent reference to the opt-out settlement.

Q.   Okay.  And so there were no more video ads available online as of November 12th, 2025, that didn't reference opting out?  Sorry.  Let me ask that question again.

All of the video ads as of November 12th, 2025, had a

prominent reference to opting out?

**A.**    Yes.

**Q.**    Okay.  And so you had taken down all the other videos?

**A.**    Yes.

**Q.**    Okay.  I'm going to show you a video that we watched after you filed this declaration.  This is -- we also found a copy of it in what you produced yesterday.  This is CH000138 that was live on the internet at that time, and we can play the --

          **THE COURT:**  At what time?

          **MR. NATH:**  I'm sorry?

          **THE COURT:**  You said it was live at that time.  What time?

          **MR. NATH:**  Live after ClaimsHero filed this declaration, docket 461.

          **MR. FREEDMAN:**  Objection, Your Honor.  I'm not -- counsel appears to be testifying, but I'm not sure what he means by live.

          **THE COURT:**  You are testifying.  I can't take your -- you just can't do that.

          **MR. NATH:**  Well, Your Honor --

          **THE COURT:**  You have to show it -- ask him.  He's the one that's under oath.

          **MR. NATH:**  Fair enough, Your Honor.

          **THE COURT:**  Now, if it's a dispute, I'll let you get on the stand and testify.  But you've got to do it from the

stand, not just talking.

**MR. NATH:** Fair enough, Your Honor. We have a separate declaration that we submitted with the Court about this, but we'll just play the video at this point.

**THE COURT:** All right. Just play the video with the asterisk beside it. Go ahead.

By the way, I can't hear anything on the video. Does it have sound?

**MR. NATH:** It does have sound.

(Video recording played.)

**THE COURT:** Can we fix this? I can't hear any of the audio.

**MR. SMYSER:** I can play it on here, Your Honor.

**THE COURT:** Come up a little closer so that both the witness -- use the lectern there. Maybe it will be good enough.

**MR. NATH:** If we could get ready to press play on 3.

**MR. SMYSER:** 1, 2, 3.

(Video recording played.)

**BY MR. NATH:**

Q. Are you familiar with that commercial?

A. I'm familiar with that video, yes.

Q. And you signed off on it?

A. Yes.

Q. Was this video available to watch online as of November

12th, 2025?

**A.**    Yes.

**Q.**    Was this video available to watch online at the time you signed and submitted this declaration to the Court?

**A.**    Yes.

**Q.**    And that video doesn't reference opting out, right?

**A.**    No.

**Q.**    And, in fact, it says at the end that people who watch the video may be, quote, "eligible to file a claim"; is that right?

**A.**    Yes.

**Q.**    Okay.  And again, class members have two options.  They can opt out of the settlement, or they can file a claim, right?

**A.**    Yes.

**Q.**    And ClaimsHero is actually intending to help them with only the former, opting out, right?

**A.**    Correct.

**Q.**    ClaimsHero is not helping people file claims with the settlement, right?

**A.**    With the settlement administrator, no.

**Q.**    I want to turn to the retention agreement.  I think we can use the one that's in front of you right now.

And the first question I have to ask is do you -- you talked a little bit about an amendment to this agreement, right?

**A.**    Yes.

Q.    To reduce the contingent fee?

A.    Yes.

Q.    Is that -- has that amendment been executed?

A.    It has been confirmed by our clients via email.

Q.    It's been confirmed by email?

A.    Yes.

Q.    Okay.  Do you know what an integration clause is in a contract?

A.    I'm not familiar with that.

Q.    Okay.  Let me take you to -- assuming you have the same version that I do, it's page -- it's the fourth page of the contract, and it's about two pages above the section 5 representation of others with similar claims.

A.    Yes.

Q.    Okay.  And there's a paragraph that starts, "Client understands that this retention agreement contains."

       Do you see that?

A.    Yes.

Q.    "Client understands that this retention agreement contains the entire agreement between the clients and the firm with respect to the claims and may only be amended pursuant to a further written document signed by both the client and the firm."

       Do you see that?

A.    Yes.

**Q.**    There hasn't been any amendment that's been signed by both the client or the firm yet --

**MR. FREEDMAN:**  Objection.

**BY MR. NATH:**

**Q.**    -- has there?

**MR. FREEDMAN:**  Calls for a legal conclusion.

**THE COURT:**  What?

**MR. FREEDMAN:**  Objection.  Calls for a legal conclusion on whether or not an email is sufficient signature to amend the document.

**THE COURT:**  Overruled.

Please answer.

**THE WITNESS:**  Could you restate it?

**BY MR. NATH:**

**Q.**    Has there been a document signed by both the client and the firm amending the fee agreement?

**A.**    No.

**Q.**    It's fair to say that the amendment that you were talking about at this point is not enforceable?

**MR. FREEDMAN:**  Objection.  Calls for a legal conclusion.

**THE COURT:**  Sustained.

**BY MR. NATH:**

**Q.**    Let me turn to -- you heard the testimony of two of the class members earlier, right?

**A.**   Yes.

**Q.**   Well, three class members, but I want to focus on two of them in particular, Ms. Adams and Professor Kochin.  You heard their testimony?

**A.**   Yes.

**Q.**   And you heard that they both testified that they opted out of the settlement?

**A.**   Yes.

**Q.**   Have they opted out of the settlement?

**A.**   What do you mean?

**Q.**   Has Ms. Adams opted out of the settlement?

**A.**   Please clarify.

**Q.**   I'm -- you're testifying here for ClaimsHero, right?

**A.**   Yes.

**Q.**   Do you know what it means to opt out of the settlement?

**A.**   Yes, but are you asking if she's filed through us or filed individually through the claims administrator?

**Q.**   I am asking you, as her -- as the CEO of her law firm, whether Ms. Adams has opted out of the settlement?

        **MR. FREEDMAN:**  Objection, Your Honor.  Hold on.  I think we have a potential privilege issue here, because if his knowledge comes from communications he's discussed with Ms. Adams, it will be privileged as a communication with her law firm.

        If he's aware outside of his communications with Ms. Adams

whether she's taken action to opt out, then I have no objection.

**MR. NATH:**  Your Honor, can I respond to that?

**THE COURT:**  Sure.

**MR. NATH:**  The fact of whether Ms. Adams has opted out or not opted out is not privileged.  Communications may be privileged, but the fact is not privileged.

**MR. FREEDMAN:**  Yes, Your Honor, but whether she has or has not, I don't know, but all he's really asking is whether Ms. Adams has told him she's opted out, and that communication could be a true fact.  She may have said that she opted out, and it may be she did, or she may have said that she opted out and didn't, and it's his obligation to then take steps.

My point is we're not soliciting the fact of the opt-out. He could ask that, "Are you aware whether she has actually opted out?"

Instead, we're getting to the attorney-client communication, which is protected.

**MR. NATH:**  Your Honor, he's revising the question. The question was whether she has opted out, and that is --

**THE COURT:**  Well, let me ask the question.

You -- there's an order of the Court that deals with how to go about opting out.  Do you know what that order says?

**THE WITNESS:**  At a high level, yes, Your Honor.

**THE COURT:**  What?

**THE WITNESS:** At a high level, yes, Your Honor.

**THE COURT:** What do you think it says?

**THE WITNESS:** That a class member has to indicate that they wish to be excused from the settlement and that they have to notify that they would like to opt out of the settlement.

**THE COURT:** And how do they go about doing that? Does it have to be an ink signature?

**THE WITNESS:** I do not believe it has to be an ink signature, but they do have to notify that they would like to opt out.

**THE COURT:** All right. Now, do you know one way or the other whether Ms. Adams has done that?

**THE WITNESS:** Ms. Adams has executed with us that she would like to opt out. We have not submitted her opt-out yet.

**THE COURT:** Is the same true for the other guy?

**THE WITNESS:** Yes, Your Honor.

**THE COURT:** All right. Is that good enough for your purposes?

**MR. NATH:** Yes, Your Honor, and -- but can I follow up with a question, Your Honor?

**THE COURT:** Ask your question.

BY MR. NATH:

**Q.** Mr. Freund, is it fair to say that you don't know whether either of those clients have actually opted out and submitted an opt-out form?

**MR. FREEDMAN:**  Your Honor, again --

**THE COURT:**  Well, what he said was that they gave some kind of a form -- whether it's adequate or not, I don't know -- to ClaimsHero and that ClaimsHero has not yet submitted it. Now, I'm not saying that what you're about to submit, if you ever do submit it, would be adequate.  You better read the Court's order to make sure you're doing it right, if you're doing it at all.

But I don't know how he could know whether she or he, the class member, has alternatively done it in some other way.  I just think that's impossible to know.

**MR. NATH:**  Fair enough, Your Honor.  I think I can follow up with a different set of questions.

So Michael, could I get CH --

**THE COURT:**  You're well past your 20 minutes, but I'll give you a little bit longer.  Go ahead.  Let's try to finish up this point.

BY MR. NATH:

Q.   Actually, let me just ask this:  Have you read the intake form -- are you familiar with it? -- that ClaimsHero provides potential clients?

A.   Yes.

Q.   And does that intake form state, quote, "I hereby request to be excluded from the proposed class in Bartz v. Anthropic PBC"?

**A.** Yes.

**Q.** And class members check a box that says that?

**A.** Yes.

**Q.** And then it also says, quote, "I authorize ClaimsHero to take necessary steps on my behalf to opt out of the settlement," right?

**A.** Yes.

**Q.** Okay. And both of the clients -- other than Mr. Carreyrou, both of the clients who testified today were under the impression that they had already opted out of the settlement; is that right?

**A.** My understanding is they told us --

**MR. FREEDMAN:** Objection. Sorry. Yeah.

Objection, Your Honor. If he's asking whether they stated that testimony, I'm happy to stipulate to it. But he's asking about their understanding, which, again, the only other thing he could have obtained from them would have been through communications, which are privileged.

**MR. NATH:** Your Honor --

**THE COURT:** Well, limit your answer to what was said here in court in the public -- I don't remember precisely how it was worded.

What is your point? Is your point that they have not yet opted out and, therefore, you still represent them?

**MR. NATH:** Our point is that class members, through

their intake form, are getting the impression that by filling out the intake form, they are opting out of the settlement. And so these class members believe that they have already opted out.

And the way the intake form is worded, it seems very clear -- it makes it look like "I am hereby actually opting out of the settlement by doing this" and that you have to do nothing further to opt out.

**THE COURT:** Well, if that's their impression, that would be wrong.

**MR. NATH:** That's correct, Your Honor. That's part of the reason --

**THE COURT:** That would be wrong.

**MR. NATH:** That's part of the issue that we have to discuss.

**THE COURT:** That is not enough to opt out, and so read the Court's order. Read what it requires. But I think we're arguing over something that doesn't require more time.

**MR. NATH:** Yes, Your Honor. Let me -- I'd like to move on to -- go back to the fee agreement.

**BY MR. NATH:**

**Q.** The fee agreement provides for 40 percent contingency fee, right?

**A.** Yes.

**Q.** Okay. Is it fair that the fee agreement does not obligate

ClaimsHero or any other law firm to file a lawsuit on behalf of the opt-out clients that it signs up?

**A.** You're saying by signing the fee agreement if it obligates us or not?

**Q.** Correct.

**A.** I'd have to review to confirm what obligations we're under, but yes, until we co-sign, I do not believe we're under any obligations, no.

**Q.** After you cosign, is ClaimsHero obligated to file a lawsuit on behalf of its clients?

**A.** We are obligated to either file or let them know if we will not file.

**Q.** You're obligated to let them know?

**A.** We do let them know, yes.

**Q.** Well, I'm asking you: Does the agreement obligate ClaimsHero to inform its clients if it decides not to take their case?

**A.** I would have to review --

        **MR. FREEDMAN:** Objection. It calls for a legal conclusion on the interpretation and retention agreement.

        **THE COURT:** Well, it's possibly an important point.

        **MR. NATH:** I'm going to take --

        **THE COURT:** Mr. Witness, does your retention agreement flat out say that ClaimsHero is going to bring the lawsuit, or does it just say you're authorized to bring the lawsuit?

**THE WITNESS:** Let me look at the specific language.

**THE COURT:** Yes. Take your time.

**MR. FREEDMAN:** May I direct the witness to the top of page 2?

**THE WITNESS:** Yes. So per the agreement, in the top of the retention agreement on page 2, "Client further understands that the law or facts relevant or applicable to client's claim may change and that these changes may impact whether and to what extent the firm is able or willing to file claims on client's behalf."

**BY MR. NATH:**

**Q.** So if a class member opts out and signs up with ClaimsHero --

**A.** Yeah.

**Q.** -- ClaimsHero can decide not to take the case ultimately, right?

**A.** If the facts were relevant or applicable to the client's claim, then yes.

**Q.** Well, let me take you back to page 1, because there's more language here.

**MR. FREEDMAN:** And Your Honor, just on that, this is what I was worried about. The clients are still sitting in the waiting room. I don't know, but -- I can't see, but I assume they are. It's, like, days before Thanksgiving. This is why I wanted to get to the clients first.

THE COURT:  Please, go have a seat.  Counsel is right in the middle of his examination.

Now, ask your question again more clearly.  I didn't follow what we're getting at.

**BY MR. NATH:**

Q.   Can we go back to page 1, Mr. Freund.  And I'm looking at the paragraph under section 1 that starts, "Client understands that the firm is taking on clients' matter subject to investigation concerning the merits of clients' claims."

Do you see that?

A.   Yes.

Q.   Okay.  And then the second to last sentence in that same paragraph, do you see it says, "Client understands that it may take the firm at least 90 days and potentially longer to evaluate clients' potential claims," right?

A.   Yes.

Q.   So if ClaimsHero -- under this agreement, if ClaimsHero decides that a client's claim is not meritorious even after they've opted out, ClaimsHero is not obligated to file a lawsuit on their behalf, right?

MR. FREEDMAN:  Objection under the rule of completeness.  Can he read the next sentence?

THE COURT:  Witness, please answer.

Overruled.

Please answer.

**THE WITNESS:** Please restate the question.

BY MR. NATH:

**Q.** Under the terms of this agreement, ClaimsHero is not obligated to file a lawsuit on behalf of the client if it decides that the claim is meritless, even after the client opts out?

**A.** Correct, that we would not have opted them out.

**THE COURT:** Say that again.

**THE WITNESS:** We wouldn't have opted the client out.

BY MR. NATH:

**Q.** Well, if the client was already opted out, ClaimsHero, under this agreement, is not obligated to actually pursue the claim?

**A.** Correct.

**Q.** Okay. And I want to -- and then you said earlier that ClaimsHero -- you weren't sure whether ClaimsHero is obligated to notify the client if it decides not to pursue the claim, right?

**A.** We do obligate -- or we do -- excuse me -- notify clients.

**Q.** I'm not asking whether you do. I'm asking about the contract. Let me take you to page 2 and the first full paragraph of page 2. Do you see it says, "In the event the firm determines it will no longer pursue client's claims, the firm will try to notify client of that development," right? Do you see that?

**A.**    Where are you seeing this?

**Q.**    On the first full paragraph of page 2 that starts, "In the event that."

**A.**    Yes.

**Q.**    Okay.  Do you see what it says there?

**A.**    Yes.

**Q.**    So the firm is obligated to try to reach the client, but the firm is not obligated to actually notify the client if it makes a decision not to pursue a claim?

**A.**    Yes.

**Q.**    Now, I want to talk about the 40 percent -- well, and let me actually take us down again under section 3.

Do you see section 3 on page 2?

**A.**    Yes.

**Q.**    And then it also says again -- the second paragraph says, "Client understands and agrees."

Do you see that?

**A.**    Yes.

**Q.**    Okay.  So it says, "Client understands and agrees that the firm is not obligated to prosecute or defend any court litigation or appeals in connection with client's matter but that, A, client approves the firm taking on such representation if the firm deem it advisable and that, B, such representation be undertaken at this firm's sole discretion."

Do you see that?

**A.**   Yes.

**Q.**   So after the opt-out period expires and after the claims period expires, ClaimsHero will be under no obligation to even file a lawsuit on behalf of its clients, correct?

**A.**   Yes.

**Q.**   Now I want to get to the contingency fee.  So there's a 40 percent contingency fee, right?

**A.**   Yes.

**Q.**   Does that cover everything related to the litigation?

**A.**   Costs and fees are in addition to that.

**Q.**   Okay.  But that does -- does that cover all attorney work related to the litigation?

**A.**   Yes.

**Q.**   Is that true?

**A.**   Yes.

**Q.**   Okay.  I want to take you to the last sentence that starts on page 2.  It starts, "The contingency fee does not cover." Can you read that?

**A.**   Yes.  "The contingency fee does not cover a representation of the client against any counterclaim or cross-complaint or related action."

**Q.**   The sentence continues, right?

**A.**   "And does not include court litigation or appeals and other types of petitions or requests for review or collateral proceedings."

**Q.** Okay. So two types of works that are not covered by the contingency fee include, quote, "court litigation" and, quote, "appeals"; is that right?

**A.** Yes.

**Q.** Okay. And so after you charge the 40 percent contingency fee, if there's court litigation or appeals, that might not be enough to cover it, right?

**A.** Yes. It gives us the right. It does not mean that's what we'll do.

**Q.** Now I want to talk about expenses.

**THE COURT:** Well, wait a minute. If it doesn't cover court litigation, what is the point? Is it 40 percent just in case you're able to snag a good settlement before going to court?

**THE WITNESS:** No, Your Honor.

**THE COURT:** Well, then it says here it does not include court litigation. What is the point of excluding court litigation? I think these people on the phone thought they -- you were going to be representing them in court with the 40 percent.

**THE WITNESS:** We will be representing them in court for 40 percent, Your Honor.

**THE COURT:** That's not what it says. It says it does not cover, does not include court litigation or appeals.

**THE WITNESS:** I believe, Your Honor, that's referring

to the costs and expenses related to court litigation.

THE COURT:  Okay.

MR. NATH:  Can I ask a follow-up question, Your Honor?

THE COURT:  Sure.  Go ahead.

BY MR. NATH:

Q.   There's a separate part of the agreement covering costs and expenses, right?

A.   Yes.

Q.   Okay.  That's section B of section 3.  It starts on page 3.

A.   Yes.

Q.   Okay.  And that's a separate section from the description of the contingency fee?

A.   Yes.

Q.   Okay.  And the costs and expenses of litigation include things like expert fees and costs for court reporters and hotels and lodging, right?

A.   Yes.

Q.   Someone who runs a law firm -- do you know approximately how much a litigation expense budget you'd need for a complex copyright case like this one?

A.   It very much depends on a case-by-case basis.

Q.   North of a million dollars?

A.   It depends on the case.

Q.   You think it might be -- for a case like this, it might be

less than a million dollars?

THE COURT: Less than what?

MR. NATH: Less than a million dollars.

A.   It depends on the case.

Q.   You try it all the way to trial. You don't know?

A.   It all depends on the case.

Q.   Okay. Expenses. So the first thing -- for clients who sign up with ClaimsHero, the first thing that happens is the 40 percent contingency fee is deducted, right?

A.   In terms of any potential outcome?

Q.   For their ultimate take-home, right. If you're an opt-out client, you go with ClaimsHero, ClaimsHero exercises its right under the agreement to file a lawsuit. Let's talk about what the client actually takes home. Okay?

A.   Sure.

Q.   So let's say ClaimsHero hits it out of the park for a client and there's a hundred thousand dollar recovery for their work. Okay? Are you with me so far?

A.   Yeah.

Q.   All right. The first thing that's assessed is the 40 percent contingency fee; is that right?

A.   No. The first thing that's assessed is how we treat the first $3,000 of any potential outcome, which we have said will be the lower of 25 percent or whatever percentage the Court awards to the class member.

Q.   I want to talk about the agreement that you've actually executed with your clients, not the amendment that has not been executed.  Does that make sense?

THE COURT:  Well, that's what you want to talk about, but he wants to talk about the addendum.  Time is short.  I want you to bring this to a close.

MR. NATH:  Fair enough, Your Honor.

THE COURT:  Before you bring it to a close, you said that this witness or someone else was disbarred in two courts.  I haven't heard anything about that.  I'd like to know what's going on there.

MR. NATH:  Your Honor, we did not say that this witness was disbarred or anyone was disbarred in two courts.

THE COURT:  Well, who was it that was disbarred?

MR. NATH:  No one was disbarred.  I don't think that there --

THE COURT:  Disqualified or something.

MR. NATH:  Yes.  The FNF law firm has been removed as class counsel in two cases, one in the SDNY in front of Judge Failla, and a second time in front of Judge Donato in the Northern District of California, where they were removed in connection with a video where their founding partner and the founder of ClaimsHero described basically litigation misconduct using class action litigation on behalf of a separate client as a stalking horse to obtain confidential information about

competitors.

THE COURT:  Is all of that true?  Do you know to what extent that's true?

THE WITNESS:  In regards to the matters that were just brought up?

THE COURT:  What?

THE WITNESS:  I said in regards to the matters that just were brought up, Your Honor, that being true?

THE COURT:  Do you know whether there have been two -- what was it?  Disqualifications?

MR. NATH:  Two -- they were removed as class counsel, interim class counsel.  We have the orders with us that we can provide --

THE COURT:  Well, there is a difference between interim and class counsel.  Do you understand the difference?

MR. NATH:  Yes, of course, Your Honor.  They were appointed --

THE COURT:  Well, you didn't say that up front.  You said as class counsel.

MR. NATH:  Fair enough, Your Honor.  They were appointed as interim class counsel in one case.  I can't recall whether it was interim or class counsel in the other case, but they were removed.

Under the PSLRA, the Court does immediately at the outset of a case appoint counsel.

THE COURT:  All right.  Is that true, that they were removed twice?

THE WITNESS:  That is my understanding, yes.

THE COURT:  All right.  Thank you.  Okay.  You're going to have to prove all of that separately.  He's not in a position to vouch for why they were removed.

THE WITNESS:  Just to clarify, that's not related to ClaimsHero, Your Honor.

THE COURT:  What?

THE WITNESS:  That's not related to ClaimsHero, Your Honor.

THE COURT:  It was some other case?

THE WITNESS:  That's related to Freedman Normand Friedland.  That's not ClaimsHero.

THE COURT:  All right.  Go ahead.

BY MR. NATH:

Q.   Freedman Normand Friedland is one of the firms that you're partnering with in the Anthropic case, right?

A.   Yes.

Q.   One of the founding partners -- I'll refer to them as FNF. Do you know what I'm referring to?

A.   Yeah.

Q.   Okay.  One of the founding partners of FNF is Kyle Roche, right?

A.   Yes.

**Q.** And Mr. Roche was the one in the video that led to FNF being removed as counsel, plaintiffs' counsel in SDNY and the other case in the Northern District of California, right?

**A.** Yes.

**Q.** And Mr. Roche is also the founder of ClaimsHero; is that right?

**A.** He's a cofounder, yes.

**Q.** And he is listed on -- is Mr. Roche listed as a principal of ClaimsHero on ClaimsHero's filing with the Arizona Corporation Commission?

**A.** I believe so, yes.

**MR. NATH:** I just have a couple more questions, Your Honor, and I'd like to --

**THE COURT:** I'll give you three minutes.

**BY MR. NATH:**

**Q.** You've revised your website in response to the Court's order, right?

**A.** Yes.

**Q.** Okay. And one of the FAQs on your website says, "What law firm will file suit on my behalf if I hire ClaimsHero to opt me out and pursue my case against Anthropic," right?

**A.** I believe so, yes.

**Q.** Okay. And as part of that answer, your website says, "If you decide to opt out and retain ClaimsHero, we will partner with another one of these law firms to file an individual suit

on your behalf against Anthropic."

Does that sound right to you?

A.    Yes.

Q.    Okay.  Is it fair to say that someone reading that might get the impression that if they sign up with you that they will -- they're signing up with someone who's committed to filing a lawsuit against Anthropic?

A.    Yes.

Q.    I want to take you to -- you have the fee agreement in front of you?

A.    Yes.

Q.    I want to take you to what is, I believe, the fourth page, at the very top.

A.    Okay.

Q.    And it says, "Client agrees not to attempt on his or her part to unilaterally settle the claims that are subject to this retention agreement.  Client will rely exclusively upon representation of the firm during any settlement negotiations."

Do you see that?

A.    Yes.

Q.    What does that mean?

A.    That the client is -- basically what it says, that the client is signing up with the firm, and as mentioned in the retention agreement, other law firms that the firm will partner with in pursuing their claim.

**MR. NATH:**  Nothing further, Your Honor.

**THE COURT:**  Any redirect?

**MR. NATH:**  Thank you.

**MR. FREEDMAN:**  Your Honor, may I have one minute to confer with my co-counsel?

**THE COURT:**  Sure.

We're going to take a break because the Court reporter needs one.  We'll take a 15-minute break at this time.

**MR. FREEDMAN:**  Your Honor, could we just alert the clients in the waiting room that the Court's in recess for 15 minutes.

**THE COURT:**  Yes.  Please alert them that we'll resume in 15 minutes.

I want you to think about whether or not these last three have anything to add to the first three.  So if it's just going to be a repeat, then what's the point?  But if there's something new, we'll hear it, and then I'd like to hear them all.

**MR. NATH:**  Your Honor, I think we can say right now we're fine foregoing the remaining witnesses.

**THE COURT:**  What?

**MR. NATH:**  We're fine letting the remaining witnesses go, from Plaintiffs' perspective.

**THE COURT:**  You probably went to a lot of trouble to get them here, so let's ask you.

**MR. FREEDMAN:** I understand that, Your Honor. If the Court is satisfied with the evidentiary record from the previous three clients, I don't think these three have much more to add.

**THE COURT:** All right. Can I excuse the three other class members?

**MR. NATH:** Yes, Your Honor.

**MR. FREEDMAN:** Your Honor, if I may, do you mind just bringing them on and thanking them for attending?

**THE COURT:** I would be happy to.

Can we just bring them on. Tell me when you've got them.

**THE COURTROOM DEPUTY:** Okay, Judge. They're on.

**THE COURT:** Actually, I take it back. I have a question I want to ask them, so I'm going to ask them to stand by. Okay? All right.

**THE COURTROOM DEPUTY:** Do you want me to bring them back in to the waiting room?

**THE COURT:** Put them in the waiting room, and I'll try to get to them as soon as I can, but there is a question that I have that the lawyers have not been asking that I want to ask. So I do have a question. Sorry.

We'll take a 15-minute break. Keep the three class members in the waiting room. Thank you.

**THE COURTROOM DEPUTY:** Okay. Court is in recess.

(Recess taken.)

THE COURTROOM DEPUTY:  All rise.  We are back on the record.

THE COURT:  Okay.  Are we ready to continue with the CEO?

MR. FREEDMAN:  Yes, Your Honor.

THE COURT:  Sure.  Have him come on back to the stand, please.

MR. FREEDMAN:  One moment, Your Honor.

### REDIRECT EXAMINATION

BY MR. FREEDMAN:

Q.   Okay.  Mr. Freund, you went over language in the engagement letter with class counsel.  Do you recall that?

A.   Yes.

Q.   And specifically about the contingent fee.  Do you recall that?

A.   Yes.

Q.   And the language said, "The contingency fee does not cover representation of the client against any counterclaim or cross-complaint.  Related action does not include court litigation or appeals," right?

A.   Yes.

Q.   Was it ClaimsHero's intention to say it doesn't include court litigation related to counterclaims and cross-complaints?

A.   Yes.

Q.   And does ClaimsHero intend to bring these cases and feel

that it is obligated to do so in good faith?

**A.**   Yes.

**Q.**   To the extent that that is not clear enough, is ClaimsHero willing to amend this engagement to strike the words "court litigation" so that it's very clear what ClaimsHero intends to do?

**A.**   Yes, we are.

**Q.**   We looked at some advertisements with class counsel.  Do you recall that?

**A.**   I do.

**Q.**   And you had given testimony that ads that did not have the word "opt-outs" were paused.  Do you recall that?

**A.**   Yes.

**Q.**   And then you were shown a video that didn't have an opt-out button in it, but it was available on the internet, right?

**A.**   Yes.

**Q.**   Can you explain to the Court why that is?  What does that mean?  I mean, how are those two things consistent, that you paused the advertising but yet this video was available?

**A.**   Yes.  So the video in question was one that was posted and up on one of our YouTube pages.  That said, there was no ad spend directing any traffic to that video, and so while it was online, there was no ad spend, no money being sent to send traffic to that ad.  And to avoid any confusion on this case,

on this question, we took that video down.

**Q.**    So I want to unpack that a little bit.

**A.**    Yes.

**Q.**    When you do advertising on social media, you upload videos to an account; is that right?

**A.**    Yes.

**Q.**    And then you pay money to have that video pushed out to various users, right?

**A.**    Yes.

**Q.**    And when you said you paused all advertising, did you mean that you stopped paying any money and pulled all the campaigns to push that video out?

**A.**    Yes.  We paused all spend.

**Q.**    And so the video still existed because you had uploaded it at some point on your account page, but it wasn't being pushed out to anybody; is that fair?

**A.**    Yes, that's fair.

**Q.**    So you'd have to go look for it to find it?

**A.**    Correct.

**Q.**    Is that what you meant when you said you paused all advertisements?

**A.**    Yes.

**Q.**    And then when you found out from class counsel that this was still available and that they had objection to the fact that you could access this video, what did you do?

**A.**   We took it down.

**Q.**   You talked before about certain ads that had the word "claims" on it.  Do you recall that?

**A.**   I do, yes.

**Q.**   And actually, before I get there, we discussed with -- you discussed with class counsel that 45,000 people have created an account with ClaimsHero since October 27th.  Do you recall that?

**A.**   I do, yes.

**Q.**   I want to break that down a bit.

First of all, is there a difference between signing up with ClaimsHero and creating an account?

**A.**   Yes, there is a difference.

**Q.**   Can you explain to the Court what the difference is?

**A.**   Yes.  So anyone can visit our account -- visit our site. Excuse me -- and create an account by putting in a few pieces of information and agreeing to our terms of service, and they create an account, versus signing up, you have to go to a specific landing page, go through that page, go through the intake form, and then press submit on that form.

And then at that point, you then are served with an engagement letter, which you then have to execute if you want to technically sign up.

**Q.**   So outside of, like, generally -- you know, general terms of service and privacy policy stuff, is it true that when

somebody creates an account with ClaimsHero, you have no obligations to them, they have no obligations to you?

**A.** Correct.

**Q.** And is there a reason why there have been 45,000 sign-ups with ClaimsHero since October 27th?

**A.** So as discussed, we have various mass actions ongoing, and for one of those mass actions, we have been driving more traffic for that mass action.

**Q.** Which one?

**A.** This is the TikTok direct mass arbitration.

**Q.** And how many people have opted in or, since that date, signed up for the TikTok claims?

**A.** We've had about 30,000 people sign up in that period.

**Q.** And so you've had 30,000 people sign up for the TikTok claims in that time period, and you said you had 60 people execute engagement letters for this case; is that fair?

**A.** Yes, that's fair.

**Q.** So it's 30,000 versus 60. And of the 60, only seven were class members; is that right?

**A.** That is correct.

**Q.** And of the seven, ClaimsHero only countersigned six of those engagement letters; is that correct?

**A.** That is correct.

**Q.** And finally, we looked at some of these advertisements that talked about claims, and you said that they were not

misleading.

Is that because you believe that once you click on that link, it brought you to the landing page where it explained over and over that you would be opting out?

A.    That is one of the reasons why, yes.

Q.    And is it also true that in your mind, "claim" meant filing a lawsuit?

A.    Exactly, yes.

Q.    But you recognize that there could be some ambiguity there; is that fair?

A.    That's fair.

Q.    And the Court ordered you to make changes?

A.    It was first class counsel that asked me to make changes, and so in good faith, we made those changes.

Q.    So you made voluntary changes when they pointed this out to you, right?

A.    Yes.

Q.    And then the Court ordered you to make changes.  You made those too, right?

A.    Yes.

Q.    Now, all the ads that we looked at today, every single one of them, they led to how many people signing engagement letters with ClaimsHero?

A.    About 60.

Q.    And all six of them were here today?

**A.**   Of the ones that we countersigned and we think are class members, yes.

**Q.**   And there was one who signed who we didn't countersign, ClaimsHero didn't countersign?

**A.**   They came in later, yes.

**Q.**   Okay.  Would you be willing to make further language to ClaimsHero's website to the extent the Court believes further changes are necessary?

**A.**   Yes, we are.

**Q.**   Would you be willing to make further changes to ClaimsHero's website if class counsel raises reasonable concerns?

**A.**   We would, yes.

**Q.**   Even though the Court didn't order the changes?

**A.**   Yes.

> **MR. FREEDMAN:**  Thank you, Your Honor.

> **THE COURT:**  Any recross?  Very brief.

> **MR. NATH:**  Very brief, Your Honor.

> **RECROSS-EXAMINATION**

**BY MR. NATH:**

**Q.**   Mr. Freund, when you start the intake form on the website, at the end of it, there's a blue button that says, "Opt me out"; is that right?

**A.**   Correct, yes.

**Q.**   Okay.  That's after you fill out the whole form, you can

click opt me out?

A.    Correct.

Q.    And then after that, after you click "Opt me out," you're presented with the retention letter, right?

A.    Correct.

Q.    And you can choose to execute the retention letter, right?

A.    Correct.

Q.    How many people clicked "Opt me out" but didn't sign the retention letter?

A.    I do not know the exact number.  I think maybe 20 or 30.

Q.    20 or 30?

A.    Yes, I think so.

Q.    And how many of those 20 or 30 are class members?

A.    We believe just one.

Q.    Okay.  And have you disclosed that name to class counsel?

A.    I believe we did, yes.

Q.    Okay.  And among people who created accounts, the 45,000, some of them may be related to TikTok.  Some of them may have been directed to your page through one of your Anthropic advertisements, right?

A.    Potentially.

Q.    Okay.  Briefly, about the video that you spoke about that was available on November 12th, that was on -- if I'm understanding correctly, that was on ClaimsHero's YouTube page?

A.    It was on one of our YouTube pages.

**Q.**    Okay.

**A.**    Yes.

**Q.**    And it was a YouTube page that you controlled what videos were on there?

**A.**    Yes.

**Q.**    And you had the ability to take it down?

**A.**    Yes.

        **MR. NATH:**    Okay.  Nothing further.

        **THE COURT:**    Okay.  The witness can step down.
Thank you.

        **THE WITNESS:**    Thank you, Your Honor.

        **THE COURT:**    Just leave the documents up here on the
bench, witness bench.

        **THE WITNESS:**    Yes, sir.

        **THE COURT:**    All right.  Let's get -- who do you want
to hear next?  Let's do -- does anybody on your list have an
urgent need to be next?

        **MR. FREEDMAN:**    Not that I -- not that I'm aware of,
Your Honor.

        **THE COURT:**    Well, then I'm going to go with Lisa
Barretta.

        **MR. FREEDMAN:**    Your Honor, give me one minute just to
find.

        **THE COURT:**    Go ahead.

        **MR. FREEDMAN:**    Your Honor, would you like me to go

through sort of what we've been doing, or did you just have targeted questions?

THE COURT:  No.  You go ahead and do your short direct.

MR. FREEDMAN:  Very good.

THE COURT:  Tell me when she's on the line.

THE COURTROOM DEPUTY:  She is.

THE COURT:  Okay.  Ms. Barretta, can you hear me?  I'm the judge.

THE WITNESS:  Yes, Your Honor.  I can hear you.

THE COURT:  Thank you.  Thank you for being patient. We need to ask you to raise your right hand and take an oath to tell the truth.

THE WITNESS:  Okay.

(The witness was sworn.)

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Thank you.  Please state your full name and spell it for the record.  Thank you.

THE WITNESS:  Lisa Barretta.  That's L-I-S-A B-A-R-R-E-T-T-A.

THE COURT:  Thank you.

First question.

**LISA BARRETTA,**

called as a witness by ClaimsHero, having been duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. FREEDMAN:**

**Q.**   Good morning, Ms. Barretta.  My name is --

**A.**   Good morning.

**Q.**   -- Vel Freedman.  We've spoken before.  I represent you in this case.

The judge has given us an opportunity to ask you some questions, and then he's going to give class counsel some time to ask you questions too.  Okay?

**A.**   Okay.

**MR. FREEDMAN:**  I'm sorry.  Is there a way to make Ms. Barretta a little bit louder?

**THE COURTROOM DEPUTY:**  It's 100 percent right now.

**MR. FREEDMAN:**  Okay.

**THE COURTROOM DEPUTY:**  Ms. Barretta, can you speak into your microphone?

**THE WITNESS:**  Yes.  Can you hear me clearly?

**MR. FREEDMAN:**  Much better.  Thank you.

**THE WITNESS:**  Okay.

**BY MR. FREEDMAN:**

**Q.**   Ms. Barretta, can you share with the Court what the copyrighted work is that you believe Anthropic has infringed on in this case?

**A.**   *The Street Smart Psychic's Guide to Getting a Good Reading*, published in 2009.

**Q.** And Ms. Barretta, are you aware that the Court has preliminarily approved a settlement in this case where you would have to file a claim form, and you could get about $3,000, less the amounts of money that need to be paid to class counsel and for costs?

**A.** Yes, I'm aware of that.

**Q.** And do you want to participate in that settlement?

**A.** No, I do not want to participate.

**Q.** Do you want to opt out of that settlement?

**A.** Yes, I do.

**Q.** Can you explain to the Court why you want to opt out of the settlement?

**A.** I just feel it is really a matter of principle. A copyright should protect me and my work and other authors. That's why we have copyright laws. And for someone to willingly and knowingly obtain these materials in an unlawful way -- I feel $3,000 an author is just a slap on the wrist that legitimizes such actions.

And it's really not so much about the money as it is the principle. It's the law. It's the law. That's why we have a copyright.

**Q.** And Ms. Barretta, you understand that there's no guarantees; you could file a direct claim against Anthropic, and you could lose, right?

**A.** I understand that.

**Q.** Ms. Barretta, are you aware that you have agreed to pay ClaimsHero 40 percent of your recovery, although for the first $3,000, it's no more than 25 percent?

**A.** I'm fully aware of the terms, and I'm agreeable with all of them.

**Q.** And Ms. Barretta, are you aware that ClaimsHero's engagement letter has some terms in it that says, you know, if the facts change or the law changes, they're not obligated to bring the case against Anthropic?

**THE COURT:** That's not what it says.

**MR. FREEDMAN:** I'll let you cover that, Your Honor.

**THE COURT:** You're misstating what the document says. You can read it out loud, and then that would be okay.

**MR. FREEDMAN:** That's all right, Your Honor.

**THE COURT:** But that's a mischaracterization.

**MR. FREEDMAN:** I will -- it seems the Court wants to cover it. I will let the Court cover it.

**THE COURT:** That's an important point.

**BY MR. FREEDMAN:**

**Q.** And Ms. Barretta, at any time did ClaimsHero tell you it was only going to take -- and I quote -- "a small fee"?

**A.** I don't remember them saying a small fee. If they did, it -- look, if they take a fee, I feel any work that ClaimsHero is doing, they're entitled to it because I believe that they're representing authors who really need a voice. It's not about

the money.  It's the principle with me.

Q.   And Ms. Barretta, you've spoken to me about this case, correct?

A.   Yes.

Q.   And you know that I'm committed to take your case, right?

A.   Yes, I do.

Q.   And you've spoken to Ms. Brannen, and she's committed?

A.   Absolutely.

MR. FREEDMAN:  I have no further questions, Your Honor.

THE COURT:  Okay.  Cross-examination?

**CROSS-EXAMINATION**

BY MS. DAFA:

Q.   Good morning, Ms. Barretta.  Thank you for being here today.

A.   Okay.

Q.   I'm one of the attorneys that represents the class of the plaintiffs in this case.  Can you hear me okay?

A.   Yes.  Fine.

Q.   Okay.  Great.

Ms. Barretta, have you opted out of the settlement?

A.   Yes.

Q.   How did you first hear about ClaimsHero?

A.   My son, who works in media, came across the information that, you know, authors who had their books illegally

downloaded were entitled to some type of, you know, recourse from that action.

So he sent the link over to me.  I looked at it, and, you know, did a little bit of back and forth research on my own, and then I decided that I did want to go with ClaimsHero.

Q.    Did your son send you the link to the website?

A.    Yes, I believe he did.  Actually, it went to my daughter's computer, and then I saw it on her computer.

Q.    Just to clarify, did your son send you a link to the ClaimsHero website?

A.    I have to really remember.  Like I said, he sent it first to my daughter's computer.  I looked at it, and the information, I read it.  Like I said, when I saw ClaimsHero, I did my own back and forth looking things up, and I was satisfied, and I decided I wanted to talk to them.

Q.    Ms. Barretta, you filed a declaration in this case, correct?

A.    With ClaimsHero?

Q.    No.  In this case, you filed a -- you signed and filed a declaration; is that correct?

A.    Yes.

Q.    Okay.  And do you recall who wrote the declaration?

A.    Would it have been Kyle Roche or Matt or -- I'm really not sure who wrote it.

Q.    Okay.  In that declaration, you stated that you hired

ClaimsHero to do two things, to opt you out of the settlement and to handle your individual lawsuit.  Is that fair to say?

**A.**   That's fair to say.

**Q.**   And did -- at the time, did you believe that ClaimsHero would prepare and submit an opt-out on your behalf?

**A.**   Yes.  I thought they would take care of everything.

**Q.**   What led you to --

(Overlapping speakers.)

**Q.**   I apologize.  Go ahead and finish.

**A.**   I said since I signed up with them, yes.  I'm aware of what type of work they did.

**Q.**   What led you to the understanding that ClaimsHero was going to be opting you out of the case?

**A.**   My conversations --

**MR. FREEDMAN:**   Your Honor, objection.  We're going to get into privileged communications between Ms. Barretta and her counsel.

**THE COURT:**   Overruled.

Please answer.

**A.**   My conversations with the attorneys, the procedure, opting out of the case.  They're going to represent me in going in a different direction.

**Q.**   Did you read anything or sign anything that led you to believe that you'd be opting out of the case?

**A.**   I believe I did.  There's a lot of papers to read.

**Q.** At the time you signed your declaration, what was your understanding of how ClaimsHero would handle your individual suit?

**A.** My understanding was that I was opting out of the $3,000, less fees and that they were going to pursue it in the direction based on the fact that the way this material was obtained was illegal. They knew they were taking it, and once again, we talked about copyright law, and that has a lot of traction, and it should be upheld. And I believe in their philosophies, and I'm comfortable with them.

**Q.** Prior to the signing up with ClaimsHero, were you aware of this court's ruling on summary judgment, including Anthropic's fair use defense?

**A.** I remember seeing something about -- before I even heard about ClaimsHero, something in maybe Publishers Lunch about authors that could file claims if they -- if their books were on the list.

**Q.** My question was just a little bit different. It's in regards to the summary judgment order in this case. Did you ever receive that order or review it?

**A.** Anything that was sent over to me, I read it. I could not tell you exactly the specifics, but I read it, and what I read, I agreed with.

**Q.** Do you know if you received or reviewed the long-form notice in this case?

**A.**    I have a file of everything I received from them, so I'm assuming so.  I mean, I could go through my files and tell you, but, you know, they sent over everything as required.

**Q.**    Do you recall whether or not the long-form notice was part of those materials?

**THE COURT:**  She may not know what "long-form" means.

**THE WITNESS:**  Yeah.  I'm not familiar with the terms, by "long-form."

**MS. DAFA:**  Okay.

**THE WITNESS:**  If you could explain that.

**BY MS. DAFA:**

**Q.**    The long-form notice contains information about the settlement and options regarding the settlement, including filing a claim or opting out.

Do you recall seeing any kind of document like that?

**A.**    I did send over a signature about opting out, I believe, and going with them.  I mean, that's my understanding is -- you know, bottom line is I talked to them.  I'm comfortable with them.  We share the same philosophies.  And it's about the principle, and I believe in them.  I want to stay with them.

**Q.**    Did you, Ms. Barretta -- prior to signing up with ClaimsHero, did you receive any estimate regarding the likely cost to litigate a copyright infringement case like this one against a large defendant?

**MR. FREEDMAN:**  Objection, Your Honor.  Again, if it

came from counsel, it would be privileged, and it would be very useful potentially to Defendants in merits-based litigation.

**THE COURT:**  The subject matter is not privileged. Overruled.

Please answer.

**THE WITNESS:**  I'm sorry.  Was it do I understand?

**BY MS. DAFA:**

**Q.**  I can repeat the question for you.

Prior to signing up with ClaimsHero, did ClaimsHero provide you with any estimate regarding the likely cost to litigate a copyright infringement case against a large defendant like Anthropic?

**A.**  We had a discussion about -- and I do understand that when cases are protracted and continue, the costs can incur and that they can go into appeal, and like I said, it's like -- I understand that, and it's -- and you can't just let things like this happen.  You need somebody to stand up to uphold the copyright law.

**Q.**  Ms. Barretta, do you know what direct notice means?

**A.**  I'm not familiar with the legal term.

**Q.**  At the time that you signed the retention agreement, did you understand that direct notice by first class mail and email to class members like yourselves had not yet been issued?

**A.**  I'm not aware of that, but to be honest with you, the mail in Philadelphia is so slow, even if they sent it, it could take

forever.

**Q.** Fair enough. Did you know that notice is also going to be sent by email?

**A.** I did not know that, but if they sent it, everything's in a file.

**Q.** And did you know that notice will contain information regarding the settlement, including your options?

**A.** You may be putting it in another language than -- I don't have the option to go back and sue on my own, something like that, if they fail, or -- I don't know exactly what you want to know.

**Q.** You testified earlier that your attorneys will take about 40 percent in a contingency fee; is that right?

**A.** Yes.

**Q.** Do you understand, Ms. Barretta, that the firm may decide ultimately not to file a claim for you against Anthropic?

**A.** I understand that.

        **MS. DAFA:** Okay. No further questions.

        **THE COURT:** I have a question.

    Ms. Barretta, this is the judge.

        **THE WITNESS:** Yes, Your Honor.

        **THE COURT:** It looks to me like there is this possibility, and I want to see if you can comment on it. It looks to me like you definitely believe you have opted out of this settlement. Is that part correct?

THE WITNESS: That part is correct.

THE COURT: All right. But then it could turn out that this law firm will refuse to prosecute a case on your behalf. Is that also your understanding?

THE WITNESS: That's my understanding.

THE COURT: So if that were to happen, you would be out of luck on the settlement, and you'd be out of luck on your own lawsuit. Is that a fair statement?

THE WITNESS: Your Honor, it's fair because the settlement -- it's not a great sum of money, but it's -- look, if they can get away with it in paying that, I felt sorry for authors, and I do understand if ClaimsHero decided to drop the case because litigation would be too expensive. That's okay, because the thing I appreciate the most is they're willing to really, you know, make people understand what it means to have a copyright.

It's not about the money. It's the principle. If I don't get any money, I don't get any money. I wasn't counting on it to begin with, but I just feel authors need a voice, and they need somebody to make a mark and understand that AI is here to stay, and it has a very large footprint. But there should also be parameters and controls to protect people that are basically teaching this machine and not getting compensated for it.

THE COURT: Well, $3,000 per book is compensation.

THE WITNESS: Your Honor, I only have one book out of

my three.

THE COURT:  Well, all right.  Okay.

Anybody have any further questions that fall within the scope of what's been asked?

MR. FREEDMAN:  No, Your Honor.  Just thanks to Ms. Barretta for coming.

THE COURT:  Okay.

MR. NATH:  No, Your Honor.

THE COURT:  Ms. Barretta, thank you.

THE WITNESS:  Thank you.

THE COURT:  You've been very patient with us, and we appreciate your time.  So have a good day.

THE WITNESS:  Thank you so much.

THE COURT:  You're excused.

THE WITNESS:  Okay.

THE COURT:  All right.  Let's go to --

MR. FREEDMAN:  Your Honor, I've been told that Mr. Shishkin needs to go next.

THE COURT:  Okay.  Let's do Mr. Shishkin.

THE COURTROOM DEPUTY:  He's on Zoom.

THE COURT:  Okay.  Mr. Shishkin, can you hear me?  I'm the judge.

THE WITNESS:  Yes, I can hear you fine, sir.

THE COURT:  Welcome to the U.S. District Court.  I'm going to ask you to raise your right hand to take an oath to

tell the truth.

(The witness was sworn.)

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please state your full name and spell it for the record.

THE WITNESS:  My name is Philip Shishkin.  It's P-H-I-L-I-P.  My last name is Shishkin, S-H-I-S-H-K-I-N.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  All right.  Thank you.  Welcome.

First question.

PHILIP SHISHKIN,

called as a witness by ClaimsHero, having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FREEDMAN:

Q.   Good morning, Mr. Shishkin.  My name is Vel Freedman.  I represent you in these proceedings.

We've met before, right?

A.   Yes, we have.

Q.   And Ms. Brannen is here off camera.  You've met her as well?

A.   I have.

Q.   Mr. Shishkin, can you please share the name of the copyrighted work that you believe Anthropic has taken in this case improperly?

**A.** Yes. My book is called *Restless Valley: Revolution, Murder, and Intrigue in the Heart of Central Asia*. It was published by Yale University Press.

**Q.** And what was it about, in brief?

**A.** It's a nonfiction book summarizing and talking about revolutions and U.S. involvement in Central Asia, Afghanistan, and other countries ending with "stan" after 9/11.

**Q.** And Mr. Shishkin, do you understand that the Court in this case has given preliminary approval to a settlement that if you filed a claim form in you'd be entitled to about $3,000, less the amounts paid to counsel and costs?

**A.** Yes, I do.

**Q.** Do you want to participate in that settlement?

**A.** I do not.

**Q.** Do you want to opt out of that settlement?

**A.** Yes, I do.

**Q.** And have you hired ClaimsHero to opt you out of that settlement?

**A.** Yes, I have.

**Q.** And do you understand that ClaimsHero has partnered with my firm, Freedman Normand, and Ms. Brannen's firm, Stris & Maher, to litigate that on your behalf?

**A.** Yes, I do.

**Q.** And you understand that we are committed to litigating that case for you?

**A.** Yes, I do.

**Q.** Do you understand, Mr. Shishkin, that you have agreed to pay 40 percent of any contingent recovery, except the first 3,000, where we won't take more than 25 percent or what class counsel gets.

But about 40 percent of any recovery will go to the lawyers in this case. Do you understand that?

**A.** Yes, I do.

**Q.** And do you know that litigation filed against Anthropic is not certain?

**A.** Yes, I do.

**Q.** You could lose?

**A.** Yes, I do.

**Q.** And you know that the law firms reserve the right to potentially not even file your claim if they don't think it's meritorious?

**A.** I understand that.

**Q.** At any point in time, Mr. Shishkin, did ClaimsHero ever tell you that they were going to charge you a, quote, "small fee," quote?

**A.** No.

**Q.** And do you understand that the judge has ruled in this case that the use of your book to train in AI is a fair use and not compensable?

**A.** I understand that.

MR. FREEDMAN:   I have no further questions, Your Honor.

Thank you, Mr. Shishkin.

THE COURT:   All right.   Cross-examination?

MR. SMYSER:   Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. SMYSER:

Q.   Good morning, Mr. Shishkin.   Can you hear me okay?

A.   I can hear you fine.   Good morning.

Q.   My name is Craig Smyser.   I represent the class in this matter.   It's nice to meet you.   I just have a few quick questions for you.

So Mr. Shishkin, have you opted out of the settlement?

A.   Yes, I have.

Q.   And you retained ClaimsHero on October 27th, 2025; is that correct?

A.   That is correct.

Q.   And when you retained ClaimsHero, did you understand that ClaimsHero was committed to file a lawsuit on your behalf against Anthropic?

A.   Yes, I did.

MR. SMYSER:   Thank you, Your Honor.   No further questions.

THE COURT:   Anything more?

MR. FREEDMAN:   No, Your Honor.

THE COURT:  All right.  Thank you, Mr. Shishkin.  You're free to go.

THE WITNESS:  Okay.  Thank you, Your Honor.

THE COURT:  All right.  Next is Sacks.

Mr. Sacks, this is the judge.  Can you hear me?

THE COURTROOM DEPUTY:  He's on now.

THE COURT:  Mr. Sacks, this is the judge.  Can you hear me?

THE WITNESS:  Yes, I can hear you.

THE COURT:  Okay.  Get a little closer to the microphone, if you can.  You're coming in faint.

THE WITNESS:  Okay.  How's that?

THE COURT:  Much better.  Thank you.  Please raise your right hand and take an oath to tell the truth.

(The witness was sworn.)

THE WITNESS:  I affirm.

THE COURTROOM DEPUTY:  Please state your full name and spell your name for the record.

THE WITNESS:  Matthew Daniel Sacks, M-A-T-T-H-E-W, middle name, D-A-N-I-E-L.  Last name, S-A-C-K-S.

THE COURTROOM DEPUTY:  Thank you.

**MATTHEW SACKS**,

called as a witness by ClaimsHero, having been duly sworn, testified as follows:

///

**DIRECT EXAMINATION**

**BY MR. FREEDMAN:**

**Q.**   Good morning, Mr. Sacks.  Can you see me now?

**A.**   Yes, I can.

**Q.**   Okay.  Good morning, Mr. Sacks.  My name is Vel Freedman. I represent you in this case.

We've met before, right?

**A.**   I believe so, yes.

**Q.**   And you met my co-counsel.  She's off-screen.  You can't see her.  But Ms. Brannen -- you've also talked with her before?

**A.**   Yes.

**Q.**   Mr. Sacks, can you share with the Court the name of the copyrighted work that you believe Anthropic has infringed on in this case?

**A.**   *Pro Website Development and Operations*.

**Q.**   And can you share with us just a tiny bit about what it was about?

**A.**   It's about running large-scale website infrastructure, computer infrastructure.

**Q.**   Mr. Sacks, are you aware that the Court in this case has granted preliminary approval to a settlement that if you file a claim form in, you'd be entitled to about $3,000, less amounts that have to be paid in attorneys' fees and costs?

**A.**   I am aware of that, yes.

**Q.**   Do you want to participate in that settlement?

**A.**   No, I do not.

**Q.**   Do you want to opt out of that settlement?

**A.**   Yes, I do.

**Q.**   Have you hired ClaimsHero to opt you out and file that litigation on your behalf?

**A.**   Yes, I have.

**Q.**   And were you aware, when doing so, that ClaimsHero is going to charge you about 40 percent of any recovery?

**A.**   I'm aware of that, yes.

**Q.**   And you're aware that ClaimsHero partners with law firms like mine, Freedman Normand, and Ms. Brannen's, Stris & Maher, to help prosecute those cases?

**A.**   Yes, I am aware of that.  Yes.

**Q.**   And Mr. Sacks, you're aware that the law firms are not obligated to file the lawsuit if they determine that your case is not a good one or can't win; is that fair?

**A.**   Yes.

**Q.**   At any point in time, Mr. Sacks, did ClaimsHero tell you they were only going to charge you a small fee?

**A.**   No.

**Q.**   Are you aware that in this case, Mr. Sacks, the judge has held that Anthropic's use of your book to train its AI was a fair use, and you're not entitled to any damages for it?

**A.**   I'm aware of that, yes.

**MR. FREEDMAN:** Thank you, Mr. Sacks. I appreciate your time. The Court has given class counsel an opportunity to ask you questions as well, so they'll be up next. Thank you.

**THE WITNESS:** Thank you.

**CROSS-EXAMINATION**

BY MR. SMYSER:

Q. Good morning, Mr. Sacks. My name is Craig Smyser. Can you hear me okay?

A. Yes, I can. Good morning.

Q. Thanks for joining us. I represent the class in this case, and I just have a few questions for you.

My first question is just have you opted out of the settlement?

A. No.

Q. And you retained ClaimsHero on October 27th, 2025; is that correct?

A. I believe so, yes.

Q. And when you retained ClaimsHero, were you under the impression that they were committed to file a lawsuit on your behalf?

A. No.

Q. Were you under the impression that they were committed to file an opt-out request on your behalf?

A. I'm not sure on that one.

Q. But you did not think that they were committed to file a

lawsuit on your behalf, correct?

**A.**   Correct.

**Q.**   When you retained ClaimsHero, what did you believe they were obligated to do for you?

**A.**   Potentially pursue litigation for copyright infringement.

**MR. SMYSER:**   Thank you, Mr. Sacks.   No further questions.

**THE COURT:**   Anything more?

**MR. FREEDMAN:**   No, Your Honor.

**THE COURT:**   All right.   I'm going to excuse Mr. Sacks. Mr. Sacks, thank you.   You've been very patient, and you've been an assistance to the U.S. District Court.   So thank you for taking the time to do that, but you're excused now and may hang up.

**THE WITNESS:**   Okay.   Thank you, Judge.

**THE COURT:**   Yeah.   Bye-bye.

**THE WITNESS:**   Bye.

**THE COURT:**   Okay.   So let's have a discussion on what you've proven or not proven.   Let's start with Plaintiff first.

**MS. GEMAN:**   Thank you, Your Honor. I think what we've learned is that the problems that Rule 23(d) of the Federal Rules are designed to address have been made manifest here and that there's been blatant misleading communications and predatory conduct. Number one, we have learned that these class members some

of them, some of whom -- even if they don't know the legal phrase like "long-form notice," generally seem unaware of the court-ordered materials and the website and that the information they got was from ClaimsHero itself.

Number two, many of these class members believe that they have already opted out. Indeed, four out of the six indicated that they thought that they opted out. And this is not surprising, as Ms. Barretta said that she was given to believe that ClaimsHero would, quote, "take care of everything." Of course, they haven't been given the class notice, which, in questions 40 and follows, are very clear about the requirements to opt out.

Number three, there is a real risk that these folks will be left high and dry, notwithstanding that the website continues to say that ClaimsHero will bring a law firm. What we've learned is that, in fact, ClaimsHero may not bring a law firm and may not even inform clients if they don't bring a law firm, thus leaving clients with nothing.

There's been a lot of emphasis on this question of small fee versus not small fee. I think it's a bit of a red herring. Mr. Freund said that they quote, "always say that it's going to be 40 percent." We could point Your Honor to previously filed docket 442-5, where it says -- which is part of ClaimsHero's marketing.

It says, "Is there a fee associated with engaging

ClaimsHero?"

"Yes, but nothing upfront, and we only get paid if your lawsuit is successful.  We take a percent of your win."

What this doesn't say -- and I'm sorry.  I'll just add, too, that Mr. Freedman himself said directly to Your Honor -- when Your Honor asked if they referred to it as a quote, "small percentage," Mr. Freedman said, "That's correct, Your Honor."

But anyway, the point is that notwithstanding --

**THE COURT:**  That was at the prior hearing.

**MS. GEMAN:**  Yes, Your Honor.  I apologize.

**THE COURT:**  And he said that he misspoke or something like that.

**MS. GEMAN:**  He did say that today, but certainly what he said was unambiguously, quote, "That's correct, Your Honor," in the earlier hearing.

In any event, what we've learned is that, notwithstanding that this document, previously filed, says, "We take a percent of your win," even that isn't true.

The retainer agreement that has been introduced into the record states, quote, "In the event that the client settles the claim unilaterally and without the direct involvement of the firm, the firm will still be entitled to recover fully all of their fees and expenses as set forth above."

We're still really left very unsure as to what exactly ClaimsHero is going to do for these class members, other than

having misled them.

We appreciate that CEO Mr. Freund denied that he believes anything was misleading.  Indeed, it was precisely that refusal that made us so very alarmed and had us bring this to your attention so quickly.  The documents shown during his exam clearly show that claims and opt-outs have been conflated, and there remains this general sense of ease of not having to do much on the part of the class members.

Instead, folks who sign up with ClaimsHero will, if the case is even brought, pay the 40 percent as well as, of course, any costs that exist, another fact that, at most, seemed to be an area of uncertainty for the people who testified.

We respectfully submit that paragraph 50 of Mr. Freund's declaration, in which he stated that the materials had been taken down was a false statement.  We showed Your Honor a video that was, in our view, patently misleading, and we want to note that we had previously, for the sake of the record and the number that -- I'm sorry -- the record and the docketing that docket 4771, filed on 11/13, clearly states the full transcript of the video, the video, again, that ClaimsHero had absolute control over and could have taken down but did not, notwithstanding this representation to the Court.

There are many other things to say.  It's been a long morning.  But we feel as though it has been absolutely demonstrated that the class needs to be protected; that

corrective notice is warranted; that people should be -- that class members must be told that -- not that ClaimsHero will bring a lawsuit but that ClaimsHero may or may not; that whether or not that they do, they might still seek 50 percent -- I'm sorry.  I beg your pardon -- 40 percent; that actual court-approved materials absolutely have to be provided to these individuals.

Now, Your Honor, I want to note that we haven't received all the material that Your Honor ordered.  We can say this confidently, even if with what has been produced and what has been shown today:

We would like to see these revised agreements, and we believe that the corrective notice should have the points that we indicated, again, clarifying the nature of the potential lawsuits that might be brought and that even if they're not brought, people might still pay certain moneys.  We think that should be made -- all of that should be made very clear to class members.

In terms of the population of people to whom corrective notice should be sent, we believe it should include the individuals who testified today.  We believe it should include the other six individuals mentioned as having signed up.

Now, we're not asking for corrective notice to go to 45,000 people.  We understand that some of those 45,000 people may not be class members, but Your Honor clearly ordered, on

page 52 of the transcript from last time, that people who had engaged with or become involved with ClaimsHero were supposed to be determined and information about them sent to us.

At this point, we would request that -- and we can do this cross-referencing ourselves -- that of those 45,000 people, that we be entitled to send corrective notice to those people as well.

Again, we believe there has been misleading and predatory conduct here, that there is no question that the earlier iterations of the website and the marketing were egregiously misleading; that even the current iteration, the sort of supposedly crystal clear marketing is still materially very misleading about very core issues for people who think that they're being opted out or for people who think that they're claiming -- or for people who think that everything is going to be done by ClaimsHero, none of which are true; that this notice is required.

We think that certain changes to the website, if Your Honor is so inclined to order them, could be made immediately. We think that the corrective notice that should be disseminated should go to -- should include any orders that Your Honor issues about the marketing that we've seen here and the misleading marketing.

We don't believe that ClaimsHero has made any arguments that would suggest that this remedy is not abundantly required.

Instead, what we heard last time was citations to completely inapposite cases where some courts issued ex-ante and total bans on communications, totally untethered from any finding of misleading information.

Here, we have exactly the opposite; repeated misrepresentations and even a misrepresentation about the fact that the misleading misrepresentations have stopped. We're happy to answer any questions that Your Honor has, but we think that every single piece of today's argument further underscores what we first requested when we were so alarmed to learn about this on November 4th.

**THE COURT:** Okay. Thank you. I've got a couple questions for you.

**MS. GEMAN:** Yes, sir.

**THE COURT:** I'm having trouble understanding the difference between the 45,000 versus just six. There are only six class members who have signed up; am I correct?

**MS. GEMAN:** Well, Your Honor, six, and then we learned of one more yesterday. So there are seven who have signed retainer agreements.

**THE COURT:** I thought the seventh one was not a class member.

**MS. GEMAN:** No, Your Honor. That's another issue. There is a seventh class member named --

**THE COURT:** What was the issue on the seventh member?

**MS. GEMAN:** We just learned about her yesterday, notwithstanding that she signed up earlier.

**THE COURT:** Let's say that they're the seventh.

**MS. GEMAN:** I beg your pardon?

**THE COURT:** Let's say they're the seventh.

**MS. GEMAN:** Right.

In addition to those seven, there are also people with whom ClaimsHero is in touch, and we were given those six names yesterday. That's a separate six names. So that brings us to 13.

The 45,000 people is the population of people who, on or after October 27th, which was the launch of the Anthropic marketing, signed up with ClaimsHero. We don't know, of those 45,000, how many of them are class members in this case. And of course, we acknowledge that some of them may have signed up for other campaigns that ClaimsHero is running.

However, that is a large number of people, and given that many of them may be class members, we feel that those people absolutely need curative notice. Does that make sense, Your Honor?

So there's people who signed up with ClaimsHero in the relevant time period, where we are presently agnostic as to which case they signed up for. There's the people from whom we heard today plus another, and then there's another group of people --

THE COURT: You said there were six in this last group?

MS. GEMAN: Last time there were six, and there were six who filed declarations and six --

THE COURT: Six or 60?

MS. GEMAN: Oh, six.

THE COURT: Plus seven.

MS. GEMAN: Plus Ms. Black.

THE COURT: So there's 13 all together?

MS. GEMAN: Correct. 13 plus some unknown number that is something less than 45,000 of people who signed up with ClaimsHero --

THE COURT: What is the status of the six that we don't even know their names? What is that status?

MS. GEMAN: We were given their names. We just know that they're in touch with ClaimsHero, and we don't know yet. I can tell you this, Your Honor: Notwithstanding with these class members were led to believe, neither -- other than Mr. Carreyrou, none of them have, as yet, opted out.

THE COURT: How do we know he's opted out?

MS. GEMAN: We have his opt out.

THE COURT: He did it on his own?

MS. GEMAN: Yes. I mean, in other words, he signed it himself on October 9th. I don't know what communications he may have had in connection with that with ClaimsHero or Mr.

Roche.

**THE COURT:** Well, the Court's order lists certain things that are required.

**MS. GEMAN:** Yes.

**THE COURT:** So if we start cutting slack for one guy and saying, "Oh, we'll accept it anyway," then we've got to do that for everyone. So make sure that it complies with the Court's order.

**MS. GEMAN:** Yes, Your Honor.

**THE COURT:** Okay. Let me hear from the other side.

**MS. GEMAN:** If I could just say one final thing, Your Honor.

**THE COURT:** Sure.

**MS. GEMAN:** May I just note that there's a couple orders that were referenced in today's examinations that we submit are suitable for judicial notice, and they were the orders referenced by Mr. Nath in connection with the Roche Freedman law firm. And if I could just read the -- we have copies for counsel and for Your Honor, but if I could read the case numbers into the record.

**THE COURT:** Go ahead.

**MS. GEMAN:** Okay. Thank you.

The first is in the Northern District of California, as indicated earlier. The case is Valenti versus Dfinity USA Research LLC. It's "Order Re Lead Counsel," Case Number

21-cv-06118-JD, signed May 8th, 2023.

THE COURT:  What's the most interesting sentence? Read them, just one sentence.

MS. GEMAN:  Let me -- it says, "FNF may not serve as lead counsel."

I'm looking at page 7, line 20 to 22, and Judge Donato stated, "The other conclusion driven by the record is that there is serious doubt about the ability of FNF to litigate this case in the best interests of the class.  FNF's docket entries manifest undue attention to its own interests and concerns with scant mention of the class and its claims."

THE COURT:  All right.  What's the other document?

MS. GEMAN:  The other document is in the matter of In re Tether and Bitfinex Crypto Asset Litigation in the Southern District of New York, Case Number 19-civ-9236.  And I think Your Honor's about to ask me the same question.

THE COURT:  Yes.

MS. GEMAN:  And I see my co-counsel is --

THE COURT:  You've been abandoned by your --

MS. GEMAN:  No, no, no.  I have been rescued by, not abandoned.

The language is this, Your Honor, and I'm reading from page 4 from docket 253 dated 10/28/22 starting at line 16.  The document states:

"In January of 2022, nearly two years after my appointment

of an interim class counsel team that included the Roche Freedman firm and before the production of discovery in this case, one of the principals at the Roche Freedman, Kyle Roche, made a series of ill-advised comments suggesting, if not asserting, his close ties to and financial interest in Ava Labs, a research and development company that is involved in developing the Avalanche platform and the Ava cryptocurrency, as well as Mr. Roche's strategic deployment of class action litigation to aid Ava Labs, both by focusing regulators on Ava's competitors and on obtaining confidential information concerning those competitors through the class action process," end quote.

I believe that's what my co-counsel called a stalking horse.  We have copies of these for the record.

THE COURT:  Thank you.

MS. GEMAN:  Thank you, Judge.

THE COURT:  Tell me, though, why that -- how do you think those two decisions play into what I have to decide?

MS. GEMAN:  Well, Your Honor, I think Your Honor will, of course, decide based on what's presented to the class members here, because that's the core inquiry of Rule 23(d), but to the extent that there has been defenses by ClaimsHero about the sort of experience and background and knowledge of their law firm, we feel like the entire background should be relevant.

In addition, Your Honor, that we've learned through Ms. Barretta's testimony, or at least we can infer, based on what she said, that Mr. Roche himself seems to be in touch with at least some of these class members.  As Ms. Barretta noted, she believed that she learned something from, quote, a conversation with Kyle Roche.

THE COURT:  All right.  Thank you.

MS. GEMAN:  Thank you.

THE COURT:  Be sure and give those copies to the clerk.

MS. GEMAN:  Absolutely, Your Honor.

THE COURT:  Your turn.

MR. FREEDMAN:  Your Honor, I'll just start with those orders.  First of all, these orders are years old, and they relate to a highly specific instance.  They have nothing to do with the case in front of us.  The order from Judge Donato disqualified my firm years ago based on a --

THE COURT:  I thought it was 2023.

MR. FREEDMAN:  Yeah.  Well, that's years ago.

THE COURT:  Is that years ago?

MR. FREEDMAN:  I believe so, Your Honor, being that the plural years is --

THE COURT:  It's two years ago, but I don't know. It's barely years.

MR. FREEDMAN:  Your Honor --

**THE COURT:** That's an exaggeration on your part. It's relevant. What do you want it to be? Three days ago? Three weeks ago?

**MR. FREEDMAN:** Well, Your Honor, it's been --

**THE COURT:** It is what it is, and whatever it's worth, it's worth, but the fact that it's two years ago is not ancient history.

**MR. FREEDMAN:** I didn't mean to suggest it was ancient --

**THE COURT:** Let's go over the merits.

**MR. FREEDMAN:** Okay. The merits, Your Honor.

Your Honor, the Court has recognized multiple times that clients have a right to opt out, and you've said it multiple times in court. You've said it in your orders.

The law recognizes quite clearly that law firms have a First Amendment right to advertise, and courts around the country also recognize that it's a good thing to have opt-out counsel available in these cases to both provide an alternative to class members who don't want to take a settlement, even if it's reasonable, and to insert some adversity into proceedings when Your Honor no longer has adverse parties in front of him.

**THE COURT:** I'm going to interrupt you on that while your CEO is here. We said this once before, and I want it to be very clear. If your strategy is to opt them out and then go to Anthropic and say, "Give us a sweeter deal," no.

**MR. FREEDMAN:** Message received, Your Honor.

**THE COURT:** You're not going to do that. If you do that, then that's an X called extortion, and that will not be allowed.

So you have said several times today you're going to bring your own lawsuit. This business about investigating facts and law -- you should know that cold by now. You should have these lawsuits on file now. You should not be waiting to try to work Anthropic or some kind of a side deal or plaintiffs' counsel. If I find out that that's going on, Ms. Cabraser knows what I would do. That would be totally unethical.

Now, I don't believe you would do that. You will not do that, and I think that's what you're hoping for. I think you're hoping -- there is no way you're going to be able to litigate this case all -- but you have committed to do that to these people.

I heard you say it several times today. You're going to bring a lawsuit. You're not going to back off and say, "Oh, we can't afford it. Oh, it's not worth it," or try to talk your clients out of it.

That would be so unethical, you ought to be disbarred if that's what you try to do after you tricked these -- not tricked, but it would be tricking if you said, "Oh, we can't bring the lawsuit now."

You're going to bring that lawsuit against Anthropic, a

separate lawsuit, and you're not going to ride on the coattails of this settlement. And they're going to fight you tooth and nail, and then your clients will wind up high and dry. High and dry, because they are not going to settle with your law firm or ClaimsHero.

So I want that to be very clear. If I think extortion's going on, I'm going to act quickly.

**MR. FREEDMAN:** I understand, Your Honor. I've heard you.

**THE COURT:** And my successor judge will know all about this. He will act or she will act quickly to --

**MR. FREEDMAN:** I understand that, Your Honor. You've made that very clear.

I don't know why the Court is assuming, without any evidence indicating, that we intend to do something untoward, and I'd ask the Court to hear the evidence in front of him before making statements like that.

**THE COURT:** I've seen the evidence in this case.

**MR. FREEDMAN:** Your Honor --

**THE COURT:** And I'm telling you I don't see how you could get a better deal than the deal that's on the table now. It's 1.5 billion dollars. It's not 3,000, but it's for all these people in the class, which, is, in my mind, pretty good considering all that they could get would be statutory damages, and given the purpose to which this was done, that was a good

settlement for the class.

**MR. FREEDMAN:**  Your Honor --

**THE COURT:**  And for you to tell these people you're going to get them more -- okay.

**MR. FREEDMAN:**  Well, Your Honor --

**THE COURT:**  I can't say it's impossible, but it would only be because of the extortion value of a nuisance lawsuit. It won't be because you're going to actually win and do something better than these good lawyers over here have done. And I think there is a high risk that you're going to leave them high and dry, and they're going to lose out on this settlement, and you won't give them a thing.

All right.  But I'm going to come back to that.  I want to hear the rest of your argument as to what's going on here.

**MR. FREEDMAN:**  I understand, Your Honor.  I respectfully disagree, and nobody said that the settlement is a bad deal, but that doesn't mean it's a deal for everybody.  And I think you heard from the clients they're well aware they can lose, but nobody is doing a quick money grab or anything like that here, Your Honor.  That's just not what's happening.

I think what you heard today from ClaimsHero's CEO is that ClaimsHero is attempting to work in good faith.  It followed -- it made changes when approached by class counsel, and it offered to make more changes before -- if class counsel wanted, but class counsel didn't give it an opportunity.  They just ran

straight to the Court.

THE COURT:  Well --

MR. FREEDMAN:  The Court --

THE COURT:  -- they had lots of evidence you were misleading the class.  Of course they ran straight to the Court.

MR. FREEDMAN:  Well, Your Honor, my point is ClaimsHero was willing to work with class counsel, and it stands ready to work with class counsel.  Of course, the Court made certain orders about changes, and ClaimsHero implemented those changes.

THE COURT:  Most of them, yes.  Most of them, but not all of them.

MR. FREEDMAN:  Well, Your Honor, if we overlooked one, then we will correct it immediately, but I'm not aware of one that was overlooked.

THE COURT:  They pointed some out in the evidence.

MR. FREEDMAN:  That was before the -- the evidence that they showed the Court all predates the orders entered by this court.

Your Honor, ClaimsHero -- I believe the evidence showed that ClaimsHero is a serious operation.  It's working on a number of these mass claims -- this is not the only one -- and that it is teamed up with well-resourced law firms and experienced law firms to do these sort of cases.  I'm happy to

proffer to the Court on my experience and Ms. Brannen's experience and our law firms' accomplishments in similarly sized litigation.

Your Honor, we go up against firms like Arnold & Porter and Morrison Foerster all day long and clients just like Anthropic all the time.  In January of this year, I took CNN to a trial.  That's also a multibillion dollar entity.  We went to trial, and we won.

Your Honor, we do this all the time.  This is not, like -- these are not cases that are -- we're not some small solo practitioner law firm that doesn't understand what we're taking on.  We're serious law firms that take on serious cases, and we're prepared to do these cases.

And Your Honor, you also heard from all the clients that --

**THE COURT:**  You haven't filed a single lawsuit yet.

**MR. FREEDMAN:**  No, no, no, Your Honor.  FNF --

**THE COURT:**  No.  I'm talking about of these six people, none of them -- see, now that leads me to think you're just waiting in the weeds to try to work them for a nuisance settlement, and so you don't have to even file the lawsuit. And then they say no, the opt-out period runs, and they're high and dry.

**MR. FREEDMAN:**  Your Honor, you're misinterpreting the evidence, Your Honor.  The reason we haven't filed anything yet

is because you ordered us all here to a hearing.  You ordered our clients all to appear, and we are respecting your jurisdiction --

**THE COURT:**  So before the end of the year, we'll see these lawsuits?

**MR. FREEDMAN:**  Your Honor, as long as you don't stop us, I expect the lawsuit --

**THE COURT:**  I'm not going to stop you.  You are free on these six people.  Go file a lawsuit tomorrow.  I promise you something:  None of them are going to be filed by the end of year, because it's Mr. Holdup Artist I'm talking to.

**MR. FREEDMAN:**  Your Honor, I strenuously object to that.  There's no evidence suggesting that that's what I'm going to do, none.  And I'm not going to do it.

**THE COURT:**  I've been around for a long time.  I can see it.  Your plan is to try to work this with no lawsuit and get 40 percent.  If you can't do that, you're going to find some excuse for leaving them high and dry.

**MR. FREEDMAN:**  Your Honor, you're saying that without any evidence of that, and I object to it.  But I --

**THE COURT:**  Okay.

**MR. FREEDMAN:**  I understand that's your --

**THE COURT:**  Then I hope I'm wrong and that by the end of the year, we've got six lawsuits on file against Anthropic. That will prove that you do plan to at least file the lawsuit.

**MR. FREEDMAN:**  Your Honor, I understand that, but you are a very well-respected federal judge, and when you make statements like that without evidence, it has major effects on us.

**THE COURT:**  Well, look at the record of what you did in this case.

**MR. FREEDMAN:**  Your Honor, first of all --

**THE COURT:**  Push the claims button, and it goes straight to opt out.

**MR. FREEDMAN:**  Your Honor, first of all --

**THE COURT:**  You're telling me that was honest?

**MR. FREEDMAN:**  Your Honor --

**THE COURT:**  That was dishonest.

**MR. FREEDMAN:**  There's a distinction between ClaimsHero, the client who I represent, and the comments you just made a second ago.  If you're directing them at ClaimsHero, I still take an issue with it --

**THE COURT:**  Who you represent.

**MR. FREEDMAN:**  I'm sorry?

**THE COURT:**  Who you represent.

**MR. FREEDMAN:**  Okay.  But Your Honor, you said, "You, Mr." --

**THE COURT:**  All right.  Mr. ClaimsHero did it, but it's your client.

**MR. FREEDMAN:**  I understand that, Your Honor.  But

there's a distinction, and I'm an officer of the Court, and you have no reason to make those kind of aspersions.

And Your Honor, I'd submit that ClaimsHero's advertisements could use some correcting. Class counsel talked about it. They made the corrections. You ordered it. They made the corrections. But currently, it's very clear what's going on at ClaimsHero's website after you made certain changes to their website, and they stand ready to work with class counsel to make more.

Your Honor, you heard from the clients. They were aware that there's a 40 percent fee. They were never told there was a small fee. It's true I misspoke at the last hearing. I mea culpa'd that immediately at the beginning of this hearing. I didn't hear you say it. I -- sometimes, you know, you just miss things. I read it in the transcript. It was the first word out of my mouth, to tell you I made a mistake.

They never said it. That's why I made sure every class member told you that they never heard it. ClaimsHero's CEO told you they never said it. So I understand I made a mistake, and I own that. But people make mistakes, Your Honor. It never happened, and you heard it directly from the clients.

They know -- the three at the end were asked. They know we're not obligated to file a lawsuit. We intend to, but Your Honor, there's just -- rules of professional responsibility require that if we investigate and determine, for example, that

the case is frivolous -- no, no, Your Honor.  Please let me finish this point, because I'm not going where you think I'm going -- then we have an obligation not to file a frivolous case.

So we have to -- we fully intend to file these cases, Your Honor, but we have to -- we can't tell a client that we're obligated to file a case, if, for example, the Rules of Professional Conduct require us not to.  So it's standard language in retention agreements.  This is standard retention agreement language.

**THE COURT:**  Wait a minute.  Don't you see the flaw in that?  They think they've already opted out of this lawsuit.  So you take your good sweet time and tell them in due course, "Oh, I'm sorry.  The time has passed.  You opted out.  You don't get the 3,000, but we've decided your case is frivolous."

**MR. FREEDMAN:**  No, Your Honor.

**THE COURT:**  Then they'll be high and dry.

**MR. FREEDMAN:**  But Your Honor --

**THE COURT:**  That's what you're setting them up for.

**MR. FREEDMAN:**  No, Your Honor.

**THE COURT:**  That's how you're setting it up.

**MR. FREEDMAN:**  Your Honor, that's not what we're doing.  I don't understand why you keep saying that.

**THE COURT:**  Because you just laid it out yourself.

**MR. FREEDMAN:**  No, I didn't, because --

THE COURT:  You said it was ethically required.

MR. FREEDMAN:  To tell clients, to inform them that there is a chance their claim is frivolous if, for example, they're not a rights holder.  I mean, I'm coming up with an example.

But at the end of the day, Your Honor, these clients will be opted out once their claims are verified.  They haven't been opted out yet, but they will be, and the lawsuits will be brought.  You know --

THE COURT:  They thought --

MR. FREEDMAN:  -- Your Honor --

THE COURT:  They thought -- when they asked them the question, they thought they had, except for one, all been opted out already.

MR. FREEDMAN:  Well, Your Honor, we didn't dig into what exactly opt -- what they meant by opted out, if they meant they knew they were getting opted out.  But we intend to opt them out, Your Honor.

Now, you also heard from them -- all acknowledged they realize they could lose the case.  They all acknowledged it, and they all acknowledged they want to do it anyways, Your Honor.

THE COURT:  Yeah.  It's fair to say they could lose the case.  I agree that's a high risk, but that is -- presupposes there will be a case.

**MR. FREEDMAN:**  Your Honor, I don't --

**THE COURT:**  And you keep dancing around on whether you are actually going to file a lawsuit.

**MR. FREEDMAN:**  That's -- Your Honor, that's not true. Folks told me that -- I said multiple times today that we're going to file a lawsuit.  You heard me say it.  I'm not dancing around that.

**THE COURT:**  Do you want to let me tell you another ethical problem that you're up against?  When this time to opt out runs, which is in January, and you're still fiddling around with the holidays and you're still fiddling around deciding whether or not there's a frivolous case here and they have relied, to their detriment, on you, and then you go back to them and say, "Oh, I'm sorry, but we've decided your case isn't strong enough to file," then they say, "Well, wait a minute, the time is running.  I've already opted out.  Now I lose out on the $3,000."

**MR. FREEDMAN:**  Your Honor, my client --

**THE COURT:**  And that is -- you better decide soon --

**MR. FREEDMAN:**  Your Honor --

**THE COURT:**  -- whether you're going to file or not and give them time to get back into the case.  And, again, there's not going to be any extortion.  Nobody gets a sweeter deal if they use that reinclusion clause.

**MR. FREEDMAN:**  Your Honor, my client fully understands

that.

However, Your Honor, there are some issues that we have. For example, the works list is not posted online. We have no way of knowing whether or not somebody's a class member, because the works list has been sealed by the Court and is not posted online. So the reason that class counsel has six or seven names is because we were in correspondence with six or seven people who expressed an interest in potentially opting out.

THE COURT: Well, just a second. How could that be? The class members -- it's a public document. Can't they go on and see if their name's on the list?

MS. GEMAN: Yes, Your Honor.

THE COURT: Well, okay.

MS. GEMAN: Yes, Your Honor. There's a --

THE COURT: All right. So all of these six people have told you that they are on the list.

MR. FREEDMAN: The claims -- the works list was public on the claims administrator's website, and we were able to verify these six are class members, but it's no longer posted to the settlement administrator's website, and we have no way of accessing it. Where is it posted publicly?

THE COURT: On what -- help me understand that, please.

MR. NATH: Your Honor, in response to the Court's

order last week, the website was taken down temporarily, and the Court gave us until 7:30 this morning to get it back up with the court-ordered requirements.  And so it's now back up as of 7:30 this morning.

**THE COURT:**  Is this list available?

**MR. NATH:**  The works list is now back --

**THE COURT:**  It's searchable?

**MR. NATH:**  It's searchable.

**THE COURT:**  All right.  So there was a temporary glitch.

**MR. FREEDMAN:**  For a week, Your Honor.  Okay.  I'm glad to hear it.  But we had no way.

So what happened -- we got contacted by six or seven people.  I forgot the exact number.  We had no way of verifying whether they were class members or not.  So we gave their names to class counsel because we had no way to verify.

But, Your Honor, I'm glad to hear it's back up.

**THE COURT:**  Well, they are your client.

**MR. FREEDMAN:**  I'm sorry?

**THE COURT:**  They are your client.

**MR. FREEDMAN:**  No, no.  Your Honor.  They aren't our client.

**THE COURT:**  You can file a lawsuit just from the information your clients give you.

**MR. FREEDMAN:**  Your Honor, there's -- that's not true,

Your Honor because you certify -- you preliminarily certify the class of the people on the works list, so I need to verify the clients are actually on the works list to make sure they're eligible to opt out.

**THE COURT:** All right. But now --

**MR. FREEDMAN:** Now it's resolved, and I'm glad to hear it.

**THE COURT:** That's a small point. You can opt them out tomorrow. You can file your lawsuit a week later. You have all the information you need, and the longer you delay in doing that, you're running the risk that these people are going to be left high and dry with no remedy.

**MR. FREEDMAN:** I understand that, Your Honor, and I'm sure my client understands that as well. Your Honor, we're here because --

**THE COURT:** I don't think they understand it. They understand they could bring a lawsuit and lose. I don't think they understand that you may not bring a lawsuit at all because you yourself kept telling them, "Well, don't you know how committed I am?"

**MR. FREEDMAN:** Your Honor --

**THE COURT:** And they said yes.

**MR. FREEDMAN:** And Your Honor, we are committed, and we intend to bring these lawsuits.

Your Honor, we're here today to, first of all, make sure

we can proceed with the six we have. I'm glad the Court is permitting that. But Your Honor, under First Amendment principles, ClaimsHero, my client, would like to continue with the advertisements as corrected by the Court and instructed by class counsel and to continue to provide an option for class members that do not want to take the settlement.

And Your Honor, there's a distinction between somebody saying, "This is a bad deal" -- nobody's saying that this is a bad deal. They are just saying they don't want this deal. And it's their right. It's their case. It's their copyright. And Your Honor, the Court --

**THE COURT:** I agree with all of that.

**MR. FREEDMAN:** And Your Honor, the Court may not be understanding or considering that copyright cases come with attorneys' fees provisions. And so in some instances, it's not the best way to bring them as a class action.

Now, it is for some people who don't want to deal with an actual lawsuit and the burden of an actual lawsuit. That's true. And for many people, I'm sure they will file claim forms and get their settlement. Absolutely.

But there are people that are more risk tolerant or who are not happy -- you heard from some of our clients. As a principle, they don't want to take this settlement. And you have well-established law firms that are standing ready, willing, and able to take on these cases.

And it's not new in the law that when attorneys' fees are provided under statute that it provides an incentive for law firms to bring these cases, because when they win, they get attorneys' fees.

And, Your Honor, I understand your fair use ruling, but even setting aside the fair use ruling, it's pretty much apparent that Anthropic has illegally downloaded these books and created a library out of them, and that constitutes a violation that comes with attorneys' fees. And now the question is "How much is the jury going to award on top of that?"

But you keep suggesting that ClaimsHero isn't really going to do it or they're not interested or it makes no sense or it's crazy, but Your Honor, the incentives in the law make it make sense to bring individual cases in these cases. And that is what my client is trying to do, provide an alternative, a third way -- a second way. You can opt out, or you can stay in.

But there's nothing wrong with that alternative, Your Honor, and --

**THE COURT:** Well, what your client is offering, at least what the class members think it's offering, is you can opt out, and we will get you a different law firm, and they're going to go actually sue in court, and we'll try to get you a better deal than the $3,000. That's what they think.

And of course, "Yeah, we might lose." But somebody's

going to bring a lawsuit on their behalf.  That's what they think.

**MR. FREEDMAN:**  Yes, Your Honor.  I understand that's what they think.

**THE COURT:**  But your agreement doesn't say that.  Your retention agreement clearly gives you many outs so that you can decide in the interim, "We don't want to do it."

**MR. FREEDMAN:**  And Your Honor, the last three clients were aware of that.

**THE COURT:**  They were not aware of it.

**MR. FREEDMAN:**  They understand the record.

**THE COURT:**  You asked them yourself, "Mr. So-and-So, you" -- leading question beyond belief.

"Mr. So-and-So, do you know how committed I am" -- and you said -- "to bring your lawsuit?"

They said, "Yes, yes.  I know you're committed."

Well --

**MR. FREEDMAN:**  That's true, Your Honor.

**THE COURT:**  Okay.  So I think you've stuck yourself.  They have every right to sue you from here to kingdom come if you didn't bring that lawsuit based on that one question and answer alone, and I would be on the sidelines saying, "Yeah, I think he did promise him that, to do it."

Listen, I need to be done in 20 minutes.  I want to ask you.

Do you have any objection to their using the advertisements that they -- as corrected?

**MS. GEMAN:** Yes, Your Honor.

**THE COURT:** Come on. Give me your best one they could --

**MS. GEMAN:** Yeah.

**THE COURT:** They are entitled to advertise.

**MS. GEMAN:** A hundred percent, Your Honor.

**THE COURT:** Okay. So --

**MS. GEMAN:** We've always been clear. But again, Your Honor's put your finger on it. The page still says, "If you decide to opt out and retain ClaimsHero, we will partner with another one of these law firms to file an individual suit on your behalf against Anthropic."

It doesn't say "we may." It doesn't say -- it just is very unambiguous, and it seems to us that that should have -- that should be qualified --

**THE COURT:** All right. Let's have ClaimsHero answer this question now.

Which way do you want it to be? That you have the right to say, "No, we're not going to file that lawsuit after all" or that you absolutely commit that you will file a lawsuit?

**MR. FREEDMAN:** At what point, Your Honor?

**THE COURT:** What?

**MR. FREEDMAN:** At what point, Your Honor?

**THE COURT:** The point where you are advertising to get clients.

**MR. FREEDMAN:** Well, Your Honor, obviously we can't commit to absolutely bring a law firm just by --

**THE COURT:** Well, then this is a very valid point she's making. That should be corrected to say, so it's very clear -- write this down -- that "If you opt out, then we may decide not to file a lawsuit after all, and you may be left without any remedy."

That would be a fair statement based on what you're telling me now. That would be very clear to the -- so at least they can think about it.

What else is on your list? That one, to me is the biggest one.

**MS. GEMAN:** That, to us, Your Honor, is also the biggest as well as our respectful request for corrective notice to the individuals who were exposed, in particular, to earlier iterations.

**THE COURT:** The 45,000? I don't think we have to be sending out 45,000 -- I think the people who actually sent in and tried to opt out, I think those are the ones we need to deal with it.

**MS. GEMAN:** So I think, Your Honor, we appreciate that, at minimum those 13 then. I guess we would request --

**THE COURT:** Well, you haven't gotten but six so far.

**MS. GEMAN:** There's the seven who have already been retained and then the six others who are in process.

**THE COURT:** Those should be disclosed to class counsel.

**MR. FREEDMAN:** They were, Your Honor. We don't know if they're even class members because until 7:30 this morning, we had no way of verifying that.

Have you verified? Are they class members?

**MS. GEMAN:** One of them is, I believe. We would -- we will cross-check.

Again, our request is for any of the people who have been exposed to ClaimsHero's advertising. We are happy to do the cross-check.

**THE COURT:** If somebody has said that they have opted out, they think that they're a class member.

**MR. FREEDMAN:** No, Your Honor. These were people that corresponded with ClaimsHero and expressed an interest in opting out. And because the Court's order said any class members that have requested to be opted out, we erred on the side of caution because we could not identify if they were class members, and we simply disclosed their names.

**THE COURT:** If they expressed interest in opting out, then they probably are class members, and you ought to turn those names over to counsel.

**MR. FREEDMAN:** We did, Your Honor.

THE COURT:  Well, then why are you complaining then?

MS. GEMAN:  Your Honor, the question is whether corrective notice can go to such individuals.  Just in the form of sending them --

THE COURT:  All right.

MS. GEMAN:  Making sure they've seen the class website.

THE COURT:  This agreement, as it's written, there are two problems.  One is that it does not commit them to filing a lawsuit as written.  So they could wind up opting out, the law firm not bringing the lawsuit, and they are left high and dry with no remedy.  That's the big problem.

The second problem, which is almost as big, is that the 40 percent -- I think this was just a mistake in the way it was written, but it does say it does not include court litigation.

MR. FREEDMAN:  Your Honor, on the third one I agree with you that it's written poorly, and it will be fixed immediately.

THE COURT:  All right.  Thank you.

Okay.  Those are the only two things that I feel are --

MS. GEMAN:  Yes, Your Honor.  There's one --

THE COURT:  Are problems.

MS. GEMAN:  Yes.  There's one more thing, Your Honor, which harkens back to the original actuating concern of conflating claims and opt-outs.  And my co-counsel, Mr. Nath,

will address that very briefly, with Your Honor's permission.

THE COURT: Okay.

MR. NATH: Your Honor, the very last thing is the current intake form as we just saw it basically says people are saying, "I hereby opt out of the settlement" essentially, or something similar to it, and then there's another box that they check.

It sounds very much like -- and you can see that the class members are confused -- people are thinking, when they check that box, that they are doing something official and actually opting themselves out of the settlement. So we --

MR. FREEDMAN: Your Honor, I can short-circuit it. We'll change it. We were trying to make sure people understand what they're doing, but we will change it to say --

THE COURT: What does the Court's order require for somebody to opt out?

MR. NATH: You have to personally sign the opt-out form, and then it has -- you have to include your name, your copyright information, your ownership interest, and a statement saying, quote, "I hereby request to be excluded from the proposed class in Bartz v. Anthropic PBC," with the case number. "I certify under penalty of perjury that all information I have provided is true and correct."

THE COURT: Well, then what ClaimsHero should be doing is when somebody wants to opt out, ClaimsHero should send that

form to the class member, who then fills it out properly, gives it back to ClaimsHero with a signature, then ClaimsHero files it --

MR. FREEDMAN:  We have --

THE COURT:  -- with the claims administrator.

MR. FREEDMAN:  Well, Your Honor, I think what my friend is saying is that there is a form when you go through ClaimsHero's website.  We want to make -- ClaimsHero, my client, is trying to make sure that people understand what they're doing.  So there's a little radio button that says, "Opt me out of this case."

And I think what counsel is saying is maybe somebody could get confused that that is the opt out, and so we will make it clear that, while we're making sure you know what you're doing, this is not the opt-out form.  We will say, "We want ClaimsHero to take the necessary actions and file the necessary forms to opt me out."

THE COURT:  Well, that -- yes, but that means you've got to use the court-approved form, and there should be a real signature on it, and it's not enough for you to say, well, you're the authorized representative.

MR. FREEDMAN:  We will follow your orders, Your Honor.

THE COURT:  All right.  You've got to follow the orders.

MR. FREEDMAN:  We will follow your orders.

Your Honor, at the very first hearing -- I understand the Court's concerned and the Court is worried that ClaimsHero might be doing something wrong, but as I said before, there's a difference between concern and actual findings.

And I just want to clarify for the record, because your statements have a very big effect on ClaimsHero, which -- Your Honor, I know you have your suspicions, but I thought the evidence today was clear that they are trying to do the right thing.  They don't get everything right every single time -- that's true -- and that's why they're working with class counsel, and that's why they obviously abide by your orders.

But, Your Honor, when you made the statement like at the first hearing, "Your client is a fraud," it has a massive effect on ClaimsHero, Your Honor.  It really does.  And so I'd ask you to make --

THE COURT:  Did I say that?

MR. FREEDMAN:  You did, Your Honor.

THE COURT:  Well, I'll rephrase it.  Based on the evidence at the first hearing, your client was committing a fraud on the class members.  I can't say that its whole operation is a fraud.  That would be too much.  But your client was misleading class members.

MR. FREEDMAN:  And Your Honor, I understand that the -- I want to -- Your Honor, and I appreciate that very much.  But fraud implies a degree of intentionality, and I

don't think that that came across, Your Honor.

So I understand the Court found that ClaimsHero was misleading class members, but ClaimsHero took corrective action on its own before the Court made any orders and followed the Court's directive.

And so I would ask the Court to revise it not to be committing a fraud but was misleading class members.  I understand that, and that is what it is.  But there's a difference between that and the intentionality of a fraud. Your Honor, you are, you know, just to be completely candid, a venerated district court judge who's been on this bench for a long time.  Your words carry significant weight.

THE COURT:  I don't believe anyone has relied on my comments other than the people in this courtroom.

MR. FREEDMAN:  No, Your Honor.  They were reported by the press publicly, Your Honor.  And so I would ask that you just clarify that you have your concerns.  You've made those very clear, but you are not saying that they are a fraud or committing fraud.

THE COURT:  I'm not going that far.  You want me to repeat what I said?  What they were doing, based on the evidence in this case -- until the plaintiffs' counsel found out about it and brought it to my attention, they were committing a fraud on class members by using that claims button, fraudulently drawing people over to the opt-out thing

or the bait and switch.

Now, I'm sorry.  I disagree with you.  To me, if that case alone went to a jury, you would lose.  The jury would find fraud.  So I'm sorry.  I'm not going to change.  But I won't say the whole company is a fraud.  I take that part back.

MR. FREEDMAN:  Appreciate it.

THE COURT:  The thing they were doing in this case was fraudulent.

MR. FREEDMAN:  Thank you, Your Honor.

THE COURT:  And now it's been mostly corrected, maybe totally corrected, but that's thanks to counsel, not you. These people had to blow the whistle on you.

MR. FREEDMAN:  You mean ClaimsHero, Your Honor?

THE COURT:  What?

MR. FREEDMAN:  ClaimsHero, Your Honor?

THE COURT:  That's what I mean, ClaimsHero.

MR. FREEDMAN:  Thank you, Your Honor.  I understand.

THE COURT:  All right.  Do we need any briefing or anything for -- let me ask class counsel.

MS. GEMAN:  Your Honor, I think the record is clear, and Your Honor has spent a lot of time on this.

To the extent we're at the Court's pleasure, if you think there's any issues that require clarification, we'd certainly be happy to submit short briefing.

THE COURT:  I don't.  I think we've covered it here.

What about you?

**MR. FREEDMAN:**  No, Your Honor.

**THE COURT:**  Now, there is a recurring issue here. These six people, except for one, actually thought they had opted out.  That needs to be corrected.  Somebody should be getting to them and saying, "Well, you aren't opted out. You're still in the lawsuit because we haven't filed the right forms yet."

**MR. FREEDMAN:**  We will let them know today, Your Honor.

**THE COURT:**  Thank you, so that they can -- you can -- that's curable.  It's curable, but you should do it.

Okay.  I will see you all, I guess, maybe in December.  I don't know.  We don't have a hearing, do we?

**MS. GEMAN:**  We don't have anything on calendar, Your Honor.

**THE COURT:**  Okay.  Good.  I hope this problem now is fixed, and bring it to my attention if there's anything more I can do.  Thank you.

**MS. GEMAN:**  Thank you.

**MR. FREEDMAN:**  Thank you, Your Honor.

**THE COURTROOM DEPUTY:**  All rise.  Court is adjourned.

(The proceedings concluded at 11:49 A.M.)

---o0o---

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Wednesday, November 26, 2025

_____

April Wood Brott, CSR No. 13782