Justin A. Nelson*
Alejandra C. Salinas*
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (SBN 316062)
Michael Adamson (SBN 321754)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
rnath@susmangodfrey.com
madamson@susmangodfrey.com

Jordan W. Connors*
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101-2683
Telephone: (206) 516-3880
jconnors@susmangodfrey.com

Samir Doshi*
J. Craig Smyser*
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 51st Floor,
New York, NY 10001-8602
Telephone: (212) 336-8330
sdoshi@susmangodfrey.com
csmyser@susmangodfrey.com

*Co-Lead Class Counsel*
*(Pro Hac Vice)*

Rachel Geman*
Jacob S. Miller*
Danna Z. Elmasry*
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
rgeman@lchb.com
jmiller@lchb.com
delmasry@lchb.com

Daniel M. Hutchinson (SBN 239458)
Jallé Dafa (SBN 290637)
Amelia Haselkorn (SBN 339633)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
dhutchinson@lchb.com
jdafa@lchb.com
ahaselkorn@lchb.com

Betsy A. Sugar*
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 Second Ave., #1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com

*Co-Lead Class Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, and MJ + KJ, INC., individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case No.: 3:24-cv-05417-WHA <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND PLAINTIFF SERVICE AWARDS** <br><br> **DATE:  April 23, 2026** <br> **TIME:  12:00 pm** <br> **PLACE: Courtroom 12** |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 23, 2026 at 12:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 12 of the United States District Court for the Northern District of California, located at 450 Golden Gate Ave., San Francisco, CA 94102, Class Counsel Lieff Cabraser Heimann & Bernstein, LLP and Susman Godfrey L.L.P. ("Class Counsel") will, and hereby do, move the Court pursuant to Federal Rule of Civil Procedure 23(h) for an order awarding:

      a.      Attorneys' fees to Plaintiffs' Counsel of 20% of the non-reversionary Settlement Fund, consisting of $1.5 billion plus interest paid by Anthropic or accrued in the Settlement Fund;

      b.      Unreimbursed litigation expenses totaling $1,969,421.75 that Class Counsel reasonably and necessarily incurred in furtherance of the prosecution of this Action, as well as the establishment of a reserve cost fund up to $17,030,000.00 for future expenses that will be reasonably and necessarily incurred in furtherance of the prosecution of this Action and in the administration of the Settlement; and

      c.      Service awards of $50,000 for each of the three Settlement Class Representatives, totaling $150,000.

This Motion is brought pursuant to the Court's Order Granting Preliminary Approval of Class Action Settlement (Dkt. 437), paragraphs 1.17, 1.24, 8.1 of the Settlement Agreement (Dkt. 363-3), and Federal Rule of Civil Procedure 23(h). The motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities set forth below, the accompanying Declarations (and all exhibits attached thereto) of Class Counsel Rachel Geman and Justin A. Nelson, Publishers' Coordination Counsel Jay Edelson and Matthew J. Oppenheim, Authors Coordination Counsel Nancy E. Wolff, Professor Samual Issacharoff, Professor Brian T. Fitzpatrick, Professor William B. Rubenstein, the pleadings and records on file in this Action, and such other arguments the Court may consider.

## STATEMENT OF ISSUES TO BE DECIDED

Pursuant to Rule 23(h), this Motion raises the following issues:

1.      Whether the Court should award to Plaintiffs' Counsel reasonable attorneys' fees of 20% of the non-reversionary Settlement Fund, consisting of $1.5 billion plus interest paid by Anthropic or accrued in the Settlement Fund;

2.    Whether the Court should award unreimbursed litigation expenses totaling $1,969,421.75 that Class Counsel reasonably and necessarily incurred in furtherance of the prosecution of this Action, as well as establish a reserve cost fund up to $17,030,000.00 for future expenses that will be reasonably and necessarily incurred in furtherance of the prosecution of this Action and in the administration of the Settlement; and

3.    Whether the Court should award Service Awards of $50,000 to each of the three Settlement Class Representatives for their time and effort in pursuing this Action on behalf of the Class.

Dated: December 3, 2025

By: /s/ DRAFT
Justin A. Nelson *
Alejandra C. Salinas *
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (SBN 316062)
Michael Adamson (SBN 321754)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
rnath@susmangodfrey.com
madamson@susmangodfrey.com

Samir Doshi*
J. Craig Smyser *
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 51st Floor,
New York, NY 10001
Telephone: (212) 336-8330
sdoshi@susmangodfrey.com
csmyser@susmangodfrey.com

Jordan W. Connors *
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
jconnors@susmangodfrey.com

By: /s/ DRAFT
Rachel Geman *
Jacob S. Miller*
Danna Z. Elmasry*
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
rgeman@lchb.com
jmiller@lchb.com
delmasry@lchb.com

Daniel M. Hutchinson (SBN 239458)
Jallé Dafa (SBN 290637)
Amelia Haselkorn (SBN 339633)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
dhutchinson@lchb.com
jdafa@lchb.com
ahaselkorn@lchb.com

Betsy A. Sugar*
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 Second Ave., #1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................... 1

    A.    Pleading and Case Schedule ................................................................................ 1

    B.    Intensive Fact Discovery Efforts ......................................................................... 2

    C.    Class Counsel's Efforts and Expenses to Prepare Expert Reports ...................... 3

    D.    Plaintiffs' Counsel's Hard-Fought Victories ...................................................... 3

        1.    Summary Judgment ................................................................................. 3

        2.    Class Certification ................................................................................... 4

        3.    Anthropic's Emergency, Multi-Forum Briefing ..................................... 4

    E.    Class Counsel's Association with Additional Counsel ........................................ 5

    F.    Plaintiffs' Counsel's Effective Advocacy at Mediation ...................................... 7

    G.    Obtaining Preliminary Approval of the Settlement ............................................. 8

    H.    Continuing Efforts to Administer the Settlement ................................................ 8

ARGUMENT ................................................................................................................... 9

    A.    This Court Should Employ the Percent-of-Common-Fund Method ..................... 9

    B.    Class Counsel's Fee Request Is Reasonable ...................................................... 11

        1.    Class Counsel Achieved Exceptional Results for the Class. .................. 11

        2.    Litigating This Novel Copyright Infringement Claim on a Contingency Basis
            Against a Well-Funded AI Company Was Extremely Risky. ............................. 13

        3.    The Requested Fee Is Consistent with the Relevant Market Rate........................ 14

        4.    A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fees. ... 18

            a.    The Number of Hours Devoted to the Case Was Reasonable. .................. 19

            b.    The Hourly Rates Are Reasonable. ......................................................... 20

            c.    The Multiplier is Justified Given the Results Obtained, the Complexity of the
               Issues, and the Contingent Nature of the Representation .......................... 21

    C.    The Court Should Reimburse Class Counsel's Reasonable Litigation Expenses ............. 22

    D.    Service Awards for the Named Class Representatives are Warranted .............................. 23

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fowler v. Wells Fargo Bank, N.A.*,
  2019 WL 330910 (N.D. Cal. Jan. 25, 2019).................................................................. 20

*Allapattah Servs. Inc. v. Exxon Corp.*,
  454 F. Supp. 2d 1185 (S.D. Fla. 2006) ...................................................................... 17

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) ........................................................................................ 2

*Beaver v. Tarsadia Hotels*,
  2017 WL 4310707 (S.D. Cal. Sept. 28, 2017).......................................................... 24

*Beesley v. Int'l Paper Co.*,
  2014 WL 375432 (S.D. Ill. Jan. 31, 2014) ................................................................ 19

*Benson v. DoubleDown Interactive, LLC*,
  No. 18-cv-0525-RSL, 2023 WL 3761929 (W.D. Wash. June 1, 2023) ..................... 17

*Brotherton v. Cleveland*,
  141 F. Supp. 2d 907 (S.D. Ohio 2001) ..................................................................... 24

*Doe v. MasterCorp*,
  No. 1:24-cv-678 (ED VA 2024), Dkt. Nos. 24, 25, and 33 ....................................... 21

*Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*,
  137 F.R.D. 240 (S.D. Ohio 1991)............................................................................. 24

*Ferrick v. Spotify USA Inc.*,
  No. 16-CV-8412 (AJN), 2018 WL 2324076 (S.D.N.Y. May 22, 2018) ..................... 16

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
  No. 13-5693, 2017 WL 4685536 (C.D. Cal. May 8, 2017)............................. 16, 20, 23

*Grey Fox, LLC v. Plains All-Am. Pipeline, L.P.*,
  2024 WL 4267431 (C.D. Cal. Sept. 17, 2024) .......................................................... 20

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)................................................................................................... 11

*Hofstetter v. Chase Home Fin., LLC*,
  2011 WL 5545912 (N.D. Cal. Nov. 14, 2011) (Alsup, J.) ......................................... 23

*In re Activision Sec. Litig.*,
  723 F. Supp. 1373 (N.D. Cal. 1989)......................................................................... 10

*In re Anthem, Inc. Data Breach Litig.*,
No. 15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018)............................. 10

*In re Apple Inc. Device Performance Litig.*,
2021 WL 1022866 (N.D. Cal. Mar. 17, 2021), appeal dismissed,
No. 23-15416, 2023 WL 10447843 (9th Cir. Aug. 8, 2023) ....................................... 18

*In re: Blue Cross Blue Shield Antitrust Litig.*,
2022 WL 4587617 (N.D. Ala. Aug. 9, 2022) ........................................... 16, 23

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ................................................. 11, 19, 22

*In re Capacitors Antitrust Litig.*,
2018 WL 4790575 (N.D. Cal. Sept. 21, 2018) ................................................ 15

*In re Checking Acct. Overdraft Litig.*,
830 F. Supp. 2d 1330 (S.D. Fla. 2011) ................................................. 17

*In re Coll. Athlete NIL Litig.*,
2025 WL 1675820 (N.D. Cal. June 6, 2025) ........................................... 17, 19

*In re: College Athlete NIL Litig.*,
No. 20-cv-3919 CW, Dkt. 1001 (N.D. Cal. July 11, 2025) ....................................... 16, 23

*In re Doral Fin. Corp. Sec. Litig.*,
No. 1:05-md-01706-ECF No. 107 (S.D.N.Y. July 17, 2017) ....................................... 22

*In re Dun & Bradstreet Credit Servs. Customer Litig.*,
130 F.R.D. 366 (S.D. Ohio 1990) ................................................. 24

*In re Facebook Biometric Info. Priv. Litig.*,
522 F. Supp. 3d 617 (N.D. Cal. 2021), *aff'd*, No. 21-15553,
2022 WL 822923 (9th Cir. Mar. 17, 2022)......................................... 8, 21

*In re: Facebook, Inc. Consumer Privacy User Profile Litig.*,
No. 3:18-MD-02843-VC, 2023 WL 8445812 (N.D. Cal. Oct. 10, 2023) ..................... 17, 23

*In re General Motors LLC Ignition Switch Litig.*,
2020 WL 7481292 (S.D.N.Y. Dec. 18, 2020) ................................................. 20

*In re High-Tech Employee Antitrust Litig.*,
2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ................................................. 24

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) ................................................. 19

*In re Initial Public Offering Sec. Litig.*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009) ................................................. 17

*In re Napster, Inc. Copyright Litig.*,
  No. 3:00-MD-00-1369, Dkt. 1324 (N.D. Cal. Feb. 14, 2008) ..................................... 16

*In re Omnivision Tech, Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................................................................. 10

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. Feb. 27, 2015) ..................................................................... 11

*In re Optical Disk Drive Prods. Antitrust Litig.*,
  959 F.3d 922 (9th Cir. 2020) .................................................................................. 18

*In re Revco Sec. Litig., Nos. 851, 89cv593*,
  1992 WL 118800 (N.D. Ohio 1992) ........................................................................ 24

*In re Syngenta AG MIR 162 Corn Litig.*,
  357 F. Supp. 3d 1094 (D. Kan. 2018), *aff'd* 61 F.4th 1126 (10th Cir. 2023) .................. 17

*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) .................................................................................. 19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ....................................................... 17

*In re Titanium Dioxide*,
  2013 WL 6577029 (D. Md. Dec. 13, 2013) ............................................................... 24

*In re Wells Fargo & Co. Shareholder Derivative Litig.*,
  445 F. Supp. 3d 508 (N.D. Cal. 2020) ..................................................................... 11

*Jenson v. First Tr. Corp.*,
  2008 WL 11338161 (C.D. Cal. June 9, 2008) ............................................................ 15

*Kadrey v. Meta Platforms, Inc.*,
  788 F. Supp. 3d 1026 (N.D. Cal. 2025) ................................................................... 13

*Katz-Lacabe v. Oracle Am., Inc.*,
  No. 2024 WL 4804974, at *5 (N.D. Cal. Nov. 15, 2024), *appeal on other issues*, 2025 WL 2270042
  (9th Cir. Apr. 5, 2025) ........................................................................................... 23

*Katz-Lacabe, et al. v. Oracle America, Inc.*,
  No. 3:22-cv-4792, Dkt. 181 (N.D. Cal. Nov. 11, 2024) ............................................. 20

*Kifafi v. Hilton Hotels Ret. Plan*,
  999 F. Supp. 2d 88 (D.D.C. 2013) .......................................................................... 24

*Lawrence E Jaffe Pension Plan v. Household Int'l. Inc.*,
  No. 1:02-cv-05893 ................................................................................................ 17

iv

*Lloyd v. Navy Fed. Credit Union*,
  2019 WL 2269958, at *13 (S.D. Cal. May 28, 2019)................................................................. 22

*Martin v. Toyota Motor Credit Corp.*,
  2022 WL 17038908 (C.D. Cal. Nov. 15, 2022) ...................................................................... 20

*McCown v. City of Fontana*,
  565 F.3d 1097 (9th Cir. 2009) ........................................................................................ 11

*McCoy v. Health Net, Inc.*,
  569 F. Supp. 2d 448 (D.N.J. 2008) .................................................................................. 24

*Meta Platforms, Inc. v. Soc. Data Trading Ltd.*,
  2022 WL 18806267, at *5 (N.D. Cal. Nov. 15, 2022),
  *. report and recommendation adopted*, 2022 WL 18806265 (N.D. Cal. Dec. 8, 2022) ....................... 20

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) .......................................................................................... 23

*Roman v. Jan-Pro Franchising Int'l, Inc.*,
  2024 WL 2412387 (N.D. Cal. May 23, 2024) (Alsup, J.) ............................................... *passim*

*Senne v. Kansas City Royals Baseball Corp.*,
  2023 WL 2699972 (N.D. Cal. Mar. 29, 2023) ..................................................................... 18

*Skochin v. Genworth Fin., Inc.*,
  2020 WL 6536140 (E.D. Va. Nov. 5, 2020)......................................................................... 22

*Tait v. BSH Home Appliances Corp.*,
  2015 WL 4537463 (C.D. Cal. July 27, 2015) ..................................................................... 10

*Thomas v. MagnaChip Semiconductor Corp.*,
  2018 WL 2234598 (N.D. Cal. May 15, 2018)...................................................................... 10

*Van Vranken v. Atl. Richfield Co.*,
  901 F. Supp. 294 (N.D. Cal. 1995)................................................................................... 24

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ............................................................................... 17, 18

*Ward v. United Airlines, Inc.*,
  2024 WL 269149 (N.D. Cal. Jan. 24, 2024) (Alsup, J.) ............................................ 1, 9, 10

*Williams v. Rohm & Haas Pension Plan*,
  658 F.3d 629 (7th Cir. 2011) .......................................................................................... 18

*Wright v. Stern*,
  553 F. Supp. 2d 337 (S.D.N.Y. 2008) .............................................................................. 24

**Statute**

28 U.S.C. § 1292(b) ........................................................................................................... 4

**Rule**

Civ. L.R. 7.9 ..................................................................................................................... 4

**Other Authorities**

5 Newberg & Rubenstein on Class Actions § 15:80 (6th ed.) .................................................. 18

Am. Law Inst., Principles of the Law of Aggregate Litigation §3.13(b) (2010) ........................ 10

*Anthropic Settlement*, Copyright Alliance (Oct. 28, 2025), https://tinyurl.com/Participating-Bartz .... 13

*Authors Guild Welcomes Approval of Anthropic Settlement*, Authors Guild (Sept. 25, 2025),
    https://tinyurl.com/Authors-Guild-Statement ..................................................................... 13

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J.
    Empirical L. Stud. 811, 832 (2010) ............................................................................ 10, 15

Cade Metz, *Anthropic Agrees to Pay $1.5 Billion to Settle Lawsuit With Book Authors*, N.Y. Times (Sept.
    5, 2025) ........................................................................................................................ 18

*Updated Map of US Copyright Suits v. AI*, Chat GPT Is Eating the World, https://tinyurl.com/Map-
    US-Copyright-Suits ....................................................................................................... 18

Chris Cooke, *Major Labels Add Piracy Claims to Suno Lawsuit After $1.5 billion Anthropic Settlement*,
    Complete Music Update (Sept. 22, 2025), https://tinyurl.com/Suno-lawsuit-after-Anthropic ......... 13

Craig Anderson, *Judge grants preliminary approval of $1.5B Anthropic AI copyright case* ................... 13

*Author's Guild Welcomes Approval of Anthropic Settlement*, Daily Journal (Sept. 25, 2025),
    https://tinyurl.com/Preliminary-Approval ......................................................................... 13

Edward Lee, *The Susman Godfrey Playbook in Lawsuits v. AI*, Chat GPT is Eating the World (Sept.
    15, 2025), https://tinyurl.com/Susman-Godfrey-Playbook ................................................... 13

Edward Zitron, *This Is How Much Anthropic and Cursor Spend on Amazon Web Services*, Where's
    Your Ed At? (Oct. 20, 2025), https://tinyurl.com/Anthropic-Spend ........................................ 14

*Latham & Watkins,* law.com, https://tinyurl.com/Latham-Watkins ........................................... 14

*Lex Lumina LLP Spotlight Guide*, Chambers & Partners, https://tinyurl.com/Lex-Lumina (last
    accessed Dec. 2, 2025) .................................................................................................... 14

Nelson, Nath, Smyser, *Poisoning the WeLL(M): Pirated Data, Large Language Models, and Copyright*,
    The Advocate, Winter 2024, https://tinyurl.com/Poisoning-The-Well ..................................... 13

Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993–2008* ............................................................................................................... 10, 15

*Vault Law 100*, VAULT, https://tinyurl.com/Vault-Rankings...................................................................... 14

1

*"I don't see how you could get a better deal."[1]*

That is how the Court described the Settlement in this case. Rightfully so. Class Counsel achieved for the Class the largest publicly reported copyright recovery in American history. Dkt. 437 at 6. That "home run" result was procured by "some of the best lawyers in America." Dkt. 431 at 17; Dkt. 484 at 54.

Class counsel now respectfully move for attorneys' fees of 20% of the common fund, markedly below the 25% "benchmark for a reasonable fee award" in the Ninth Circuit. *Ward v. United Airlines, Inc.*, 2024 WL 269149, at *5 (N.D. Cal. Jan. 24, 2024) (Alsup, J.). The requested award reflects the "impressive" monetary result obtained for the class despite the "real risks in this action," including the "[m]ultiple issues of first impression" counsel litigated. *Id.* at 6. It also reflects the "skill and grit" required to litigate this case, exemplified by the more than 18,000 hours counsel have devoted and the millions of dollars they have expended—and will continue to expend—with no assurance of compensation or reimbursement. *Roman v. Jan-Pro Franchising Int'l, Inc.*, 2024 WL 2412387, at *4 (N.D. Cal. May 23, 2024) (Alsup, J.). And it reflects, too, the significant non-monetary relief counsel obtained: the destruction of the pirated LibGen and PiLiMi datasets, and a "tailored," past-only release. Dkt. 437 at 5.

Class Counsel likewise submit that the additional relief they request is well warranted: compensation for costs and of expenses reasonably incurred (including $15 million for disseminating notice to the class and administering the settlement) as well as reasonable service awards for the Class Representatives. Each Class Representative dedicated significant time and effort to the case, with some likening it to "[their] job." Dkt. 386 ¶7. It is exactly this type of work that service awards are designed to honor.

## BACKGROUND

### A.  Pleading and Case Schedule

On August 19, 2024, Plaintiffs filed suit against Anthropic asserting copyright claims in the novel and untested area of AI. Dkt. 1. Plaintiffs' principal allegations were that Anthropic unlawfully downloaded copyrighted works from pirated datasets without authorization, and then commercially exploited them by training on them. *Id.* Anthropic answered Plaintiffs' complaint on October 21, 2024, asserting 13 affirmative defenses, including fair use. Dkt. 57. Prior copyright cases against technology companies had foundered on fair use; as Anthropic emphasized at every opportunity, that defense doomed owners of book copyrights who

---

[1] Dkt. 503 at 139.

asserted infringement claims against Google. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 206 (2d Cir. 2015).

The Court set March 6, 2025 as the deadline for Plaintiffs' motion for class certification and August 29, 2025 as the fact discovery cutoff and deadline for Plaintiffs' expert reports. Dkt. 50 at 16–18. Plaintiffs served discovery the very same day this schedule was set. At the Court's request, Class Counsel then prepared for and presented a detailed technology tutorial on January 30, 2025. Dkt. 80.

On February 20, 2025, Anthropic requested a case management conference to "adjust[] the case schedule to provide for consideration of a motion for summary judgment before consideration of Plaintiffs' motion for class certification." Dkt. 88 at 4. After a hearing on February 25, 2025, the Court granted Anthropic's request for an expedited motion for summary judgment but denied the request to move class certification until the end of discovery, instead ordering "simultaneous[]" motion practice. Dkt. 98 at 17–18.

## B.    Intensive Fact Discovery Efforts

From the moment discovery opened until the case settled, Class Counsel litigated at full throttle. As recounted in an earlier submission by Class Counsel, *see* Dkt. 363-2 at 6–8, those efforts included:

- Reviewing more than 80,000 documents and two million pages of materials produced by Anthropic;

- Serving 186 requests for production, 29 interrogatories, and 65 requests for admission;

- Inspecting hundreds of gigabytes of training data, Slack exports, Notion wikis and Google Vault data;

- Spending nearly one thousand hours inspecting source code, training data, and books data;

- Litigating 17 discovery motions, relating to topics such as the timing and scope of document productions, privilege challenges, and issues related to depositions and dataset inspections;

- Engaging in extensive third-party discovery, including subpoenas to major publishers, OpenAI, Google, Amazon, Shawn Presser (creator of a books dataset), and Anna's Archive (creator of PiLiMi);

- Taking and defending 20 depositions, with deposition transcripts spanning more than 4,300 pages;

- Preparing for six additional depositions set to occur in the final days of the fact-discovery period;

- Responding to 263 requests for production, 75 interrogatories, and 395 requests for admission;

- Revealing Anthropic's piracy via LibGen and PiLiMi, which Class Counsel then successfully incorporated into their class certification brief in just six days' time; and

- Assisting Plaintiffs with the production of more than 20,000 pages of documents, including manuscript drafts, publishing contracts, registration certificates, and sales statements.

### C.    Class Counsel's Efforts and Expenses to Prepare Expert Reports

If not for the Settlement, Plaintiffs' opening expert reports would have been due on August 29, 2025. In the months leading up to that deadline, Class Counsel worked closely with experts on a broad range of topics, including economics; market harm and piracy; large language models; the books in the relevant datasets; Anthropic's use of Class works; torrenting, seeding, and leeching; and topics related to fair use. Dkt. 363-2 at 8. Those expert reports were *in addition* to the several expert reports that Plaintiffs submitted in opposition to Anthropic's motion for summary judgment and in support of Plaintiffs' motion for class certification. *See* Dkts. 125; 155; 156. The expert analysis required to develop the Works List alone demanded thousands of hours of attorney and expert labor to parse Anthropic's data, much of it spent in a secure environment while performing numerous levels of analysis and quality checks. *See* Nelson Decl. ¶10. By the time the case settled, each of Plaintiffs' experts had substantially completed their merits reports.

### D.    Plaintiffs' Counsel's Hard-Fought Victories

In parallel with the fast-moving tasks described above, Class Counsel also litigated major motions "bristl[ing] with important issues," Dkt. 296 at 2, for which little or no precedent existed.

#### 1.    Summary Judgment

Anthropic moved for summary judgment, arguing that its acquisition of copyrighted books for large language model training qualified as fair use. Dkt. 122. On April 3, 2025, the Court posed hypothetical written questions concerning fair use to both sides to be addressed in the Parties' briefing. Dkt. 135. Plaintiffs filed their opposition on April 24, 2025, and Anthropic replied on May 8, 2025. Dkts. 158, 181. The summary judgment record was extensive: 65 pages of briefs, 96 exhibits comprising hundreds of pages, multiple depositions, and five expert witnesses. Dkt. 363-2 at 9. The Court heard argument on the summary judgment motion on May 22, 2025, and the Parties submitted supplemental briefing on May 23, 2025. Dkts. 214–15.

On June 23, 2025, the Court issued its Order on Fair Use, granting Anthropic's motion for summary judgment in part and denying it in part. Dkt. 231. The Court denied summary judgment on Plaintiffs' copyright infringement claims related to the initial acquisition of works Anthropic obtained from pirated sources like Library Genesis and Pirate Library Mirror. *Id.* at 19, 31. The Court observed that Anthropic's acquisition of copyrighted books that "it could have purchased or otherwise accessed lawfully" was "inherently, irredeemably infringing even if the pirated copies are immediately used for the transformative

use and immediately discarded*.*" *Id.* at 18–19. At the time, no court had recognized on an evidentiary record a copyright infringement claim against an AI company for acquiring pirated works. Class Counsel were the first—and, to our knowledge—remain the only attorneys to have secured such a result.

### 2.    Class Certification

Plaintiffs first received access to the LibGen and PiLiMi datasets that formed the core of this case on March 21, 2025—only six days before their opening class certification brief was due. Nelson Decl. ¶12. Nonetheless, Class Counsel and their experts worked tirelessly and timely filed the motion for class certification on March 27, 2025. Dkt. 363-2 at 9. Anthropic opposed on April 17, and Plaintiffs replied on May 1. Dkts. 125, 146, 172. The record on class certification included 65 pages of briefs, 96 exhibits amounting to hundreds of pages, and multiple declarations. Dkt. 363-2 at 9. The Court held a hearing on May 15, 2025, and pursuant to the Court's order at the hearing, the Parties submitted supplemental briefs the next day. Dkts. 199, 201, 202, 203. The Court certified a Rule 23(b)(3) "LibGen & PiLiMi Pirated Books Class," calling this matter a "classic" case for certification. Dkt. 244 at 15, 31. No counsel had previously obtained a favorable class-certification order in a copyright infringement case against an AI company *See id.* at 15.

### 3.    Anthropic's Emergency, Multi-Forum Briefing

Anthropic sought leave to appeal the Court's summary judgment and class certification rulings. On July 14, Anthropic moved for leave to appeal pursuant to 28 U.S.C. § 1292(b) or, in the alternative, for reconsideration pursuant to Civ. L.R. 7.9. Dkt. 241. In doing so, Anthropic argued that the Court's order on fair use addressed "novel and consequential legal questions about the proper fair-use standard in the context of copyright infringement challenges to groundbreaking generative artificial intelligence . . . technology." *Id.* at 1. Plaintiffs opposed Anthropic's motion in a 24-page response filed on July 28, 2025. Dkt. 276. Anthropic replied on August 4, 2025. Dkt. 284. Its motion was due to be heard on August 28. Dkt. 241 at 1.

Anthropic also filed a Rule 23(f) petition with the Ninth Circuit, seeking interlocutory appeal of the Court's class certification ruling. No. 25-4843 (9th Cir.), Dkt. 1. Plaintiffs opposed that petition on August 14, *id.*, Dkt. 19, while at the same time finalizing expert reports, taking key depositions, and reviewing thousands of newly produced documents during the final weeks of fact discovery. Anthropic further sought, on July 24, a stay of this Court's proceedings, arguing that proceeding to trial would be inappropriate while its Rule 23(f) petition was pending. Dkt. 272. Plaintiffs opposed on July 28, and Anthropic replied on July

30. Dkts. 275, 278. The Court denied Anthropic's motion to stay on August 11, holding that although "this case bristles with important issues," they "should be adjudicated only after a trial so that, on appeal, our court of appeals will have the benefit of a full record and findings." Dkt. 296 at 2. Anthropic then filed an emergency motion in the Ninth Circuit for a stay pending resolution of its Rule 23(f) petition. CA9, Dkt. 18. Plaintiffs opposed Anthropic's motion to stay on August 25, CA9, Dkt. 25, again during an intensely busy stretch of reviewing thousands of recently produced documents, taking critical depositions, finalizing nearly a half-dozen expert reports for service by August's end, and negotiating and mediating a potential settlement. The Ninth Circuit proceedings were stayed as a result of this settlement. CA9, Dkt. 27.

### E.  Class Counsel's Association with Additional Counsel

The Class has benefited from the complementary contributions of Publishers' Coordination Counsel ("PCC")[2] and Authors' Coordination Counsel ("ACC").[3] Working in close coordination with Class Counsel, the PCC increased publisher participation, expanded and validated the Works List, helped prepare witnesses and trial strategy, and was instrumental in negotiating the record-breaking settlement. In parallel, the ACC provided targeted copyright expertise and author-side outreach that improved the methodology for vetting works—including hard-to-verify pre-ISBN and renewal records—resulting in tens of thousands of additional verified works and enhanced notice and claims support to authors.

***Publisher's Coordination Counsel.*** Edelson PC and Oppenheim + Zebrak, LLP ("O+Z") have represented the interest of publishers in the common goal of maximizing the per-work recovery for the Class. PCC Decl. ¶32. That work included: working with Class Counsel to assemble the Works List, enlisting and preparing publisher witnesses to be poised for an historic trial, and now helping to deliver this groundbreaking settlement for the benefit of the entire Class. *Id.* ¶¶36–40. The PCC have well fulfilled their mandate to "represent[] the interests of publishers in the common goal of maximizing per-work recovery for the Class" and "provid[e] the publishers' perspective and assist[ing] with trial preparation and strategy, class notice, and settlement discussions." Dkt. 298. The PCC also provided tremendous value in producing the final Works List, collaborating with Class Counsel to ensure inclusion of qualifying works, resulting in a

---

[2] On August 11, 2025, Class Counsel notified the Court that they associated with additional counsel to assist in representing the Class during a key stretch of the litigation. Dkt. 298.

[3] Cowan, DeBaets, Abrahams & Sheppard LLP ("CDAS") has been on the case from the beginning.

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR ATTORNEYS' FEES
CASE NO. 3:24-CV-05417-WHA

Works List approximately 20% larger than it would have been otherwise. PCC Decl. ¶39.

Following class certification, the PCC began near-daily coordination with the AAP, the Publishers Association of the UK, the Association of University Presses, and numerous major publishers. *Id.* ¶35. Then, with trial looming, the PCC identified and prepared executive witnesses to testify about the publishing industry, the value of books, and the harms of piracy, and worked to produce documents and prepare for depositions. *Id.* ¶36. The PCC also joined Class Counsel in developing trial strategy and contributing to expert reports and witness planning. *Id.* ¶37.

When mediation became possible, PCC engaged collaboratively with Class Counsel to help secure the record-breaking settlement now before the Court. *Id.* ¶40. In addition to helping craft key deal points, the PCC was also critical in designing the highly claimant-friendly Plan of Allocation and Distribution, under which any class member will receive a check for their share, with 18 months to claim or cash it. *Id.* ¶41. The PCC also assisted in drafting both the term sheet and the Settlement Agreement, leveraging knowledge of both the publishing industry and the administration of large-scale settlements. *Id.* ¶40.

The PCC continued to offer critical assistance even after preliminary approval. For example, the PCC responded to a wave of publisher class member interest by holding town halls with publisher trade organizations and their members, both at home and abroad. *Id.* ¶42. PCC also coordinated amongst numerous publishers—including the largest—to undertake a massive effort in gathering contact information for the Settlement Administrator to effect top-tier class notice. *Id.* ¶43. PCC continues to speak to publishers and holds regular weekly meetings to ensure the Settlement and claims process are carried out effectively, and that Class Members have the information they need and get their questions answered. *Id.* ¶44.

***Authors' Coordination Counsel.*** These efforts supplemented assistance provided by CDAS who was on the original complaint. Dkt. 1 at 20. CDAS advised Class Counsel on copyright law at all stages of the case, including reviewing certain pleadings, assisting with defensive discovery responses, addressing relevant copyright law issues, and gathering information and communication related to the Plan of Allocation & Distribution. CDAS's work included assistance on the Class List; on the Plan of Distribution, Claim Form, and Class Notice; and with stakeholders on the Class List, including soliciting input from these stakeholders.

In addition, CDAS served as ACC, in which capacity it advised and assisted Class Counsel with the compilation of the Works List, including by improving the methods by which works were assessed for

satisfaction of the class criteria. For example, CDAS assisted Class Counsel with developing a method to ensure that works published immediately prior to the introduction of ISBNs and the full digitization of copyright records—*i.e.*, from the 1964-1977 period—were included on the Works List. ACC Decl. ¶11. CDAS also aided Class Counsel in determining which renewal registrations satisfied the class criteria. Because much of this work involved manual review and because of the specialized nature of these reviews, CDAS attorneys and staff members worked under Class Counsel's supervision. As a result of CDAS's efforts, Class Counsel was able to verify tens of thousands of additional works for inclusion on the Works List. *Id.* ¶13. Finally, with respect to notice, CDAS facilitated the connection of Class Counsel to author groups and to the major literary agencies. *Id.* ¶14. CDAS has similarly aimed to ensure the highest possible understanding of the Settlement, so that Class Members could make informed decisions about the Settlement, and CDAS will continue to advise Class Members throughout the claims process, ensuring they are fully appraised of their rights. *Id.* ¶15–18.

The law firms representing Plaintiffs have agreed to divide any fees awarded by the Court as follows: LCHB and SG with 37.5% each, CDAS with 5%, O+Z with 12.5%, and Edelson PC with 7.5%.

## F.     Plaintiffs' Counsel's Effective Advocacy at Mediation

Consistent with the Court's order, Dkt. 8, Class Counsel did not start discussing settlement with Anthropic until after the Court expressly granted them permission to do so, Dkt. 210. Class Counsel first discussed the possibility of mediation during a May 28, 2025, call with Anthropic's counsel. Dkt. 363-2 at 12. Class Counsel then worked with Anthropic's counsel to select a mediator and develop a process and schedule for mediation, with the initial mediator supervising all settlement discussions. *Id*. Class Counsel participated in several mediation sessions before later retaining Layn Phillips to mediate. *Id.* at 12–13.

After the Court's orders on class certification, summary judgment, and Anthropic's motion to stay, Class Counsel prepared a mediation brief and submitted it on August 14. *Id.* at 13. Class Counsel then coordinated with the mediator to prepare for an all-day mediation session. *Id*. That all-day session did not yield a final agreement, so Class Counsel continued to press ahead with their various fact- and expert-discovery tasks. *Id*. All the while, intense settlement discussions continued, including several mediation sessions during the weekend of August 24–25. *Id.* Late on the night of August 25 (already August 26 in the Eastern and Central time zones), the Parties executed a binding term sheet and notified this Court and the

1    Ninth Circuit the following morning. *Id*. at 12. Class Counsel spent hundreds of hours mediating this case,

2    all without any assurance of compensation. *See Geman* Decl. ¶ 59.

3        **G.    Obtaining Preliminary Approval of the Settlement**

4        After reaching an agreement on settlement terms with Anthropic, Class Counsel's job was (and

5    remains) far from done. Class Counsel submitted a motion for preliminary approval on September 5, 2025,

6    less than two weeks after executing a binding term sheet. Dkt. 363. In connection with that filing, Class

7    Counsel submitted six separate declarations and a dozen exhibits. *Id*. Class Counsel, along with PCC and

8    ACC, then attended an initial hearing on preliminary approval on September 8, 2025, at which the Court

9    required additional briefing. Dkt. 372. Following the hearing, the Court submitted 34 questions for Class

10   Counsel to answer in collaboration with Anthropic, regarding *inter alia* the claims, opt-out, and distribution

11   processes. Dkts. 375, 383. Class Counsel, with assistance from PCC and ACC, timely responded to those

12   questions, which required substantial research and resulted in a 53-page submission just one week after the

13   Court issued its final questions. Dkt. 418. Class Counsel also submitted a 33-page supplemental brief in

14   support of preliminary approval, Dkt. 401, with a detailed Plan of Allocation that flowed from contractual

15   arrangements, Dkt. 401-1, and backed by 16 declarations, Dkts. 385–400. The declarants included

16   representatives from numerous industry organizations—both author and publisher—offering support for the

17   settlement and affirming their intent to assist with distributing notice to Class Members. *E.g.*, Dkts. 388–96.

18       **H.    Continuing Efforts to Administer the Settlement**

19       Class Counsel, PCC, and ACC continue to devote substantial resources to ensure the Settlement is

20   administered in the best interests of the Class. Since preliminary approval, they have remained in active

21   coordination with the Settlement Administrator to monitor claim processing. To date, the Administrator has

22   received over 29,000 claims for 95,000 works, reflecting robust class participation at this early stage, with

23   many more claims no doubt likely to follow, including significant claims by large publishers.[4] In addition,

24   Class Counsel have answered hundreds of Class Member inquiries and conducted targeted research to

25   validate their contact information. *See* Geman Decl. Decl. ¶ 6. Class Counsel have also overseen the drafting

26   of guidance materials to promote accessibility and fairness across the Class. *See id.*

---

27   [4] That claims rate—nearly 20%— already "vastly exceeds the rate of 4–9% that is typical for consumer class

28   actions." *In re Facebook Biometric Info. Priv. Litig.,* 522 F. Supp. 3d 617, 622 (N.D. Cal. 2021), *aff'd*, No.
     21-15553, 2022 WL 822923 (9th Cir. Mar. 17, 2022)

1    Class Counsel have also conducted several townhall webinars for publishers, authors, and agents to

2    inform Class Members about the Court-approved notice materials and website. *Id.* For claimants requiring

3    additional assistance, Class Counsel have assisted with Settlement Website navigation and escalation paths

4    for complex issues, including bulk filing for Class Members with multiple works on the Works List. *Id.* Last,

5    Class Counsel have proactively monitored online activity—including social media and web posts—to detect

6    efforts to mislead or confuse Class Members, and promptly raise such issues with the Court when necessary.

7    *E.g.,* Dkt. 442. Class Counsel is committed, as the Court instructed, to "bird dog this [Settlement] at every

8    stage and bring to [the Court's] attention problems when they arise so that we can get together and see how

9    to solve the problems." Dkt. 431 at 17.

## ARGUMENT

11    Each factor courts consider under the percentage-of-the-fund method supports awarding the requested

12    20% fee to Class Counsel. The request is significantly below this Circuit's presumptively reasonable 25%

13    benchmark—and it is so despite Class Counsel securing the largest known copyright settlement in history,

14    which is among the most significant class action settlements. The 20% fee is also well below the market rate

15    for non-class contingency cases, to say nothing of this highly risky and significantly expensive case. The fee

16    also reflects the excellent non-monetary relief secured: a tailored, past-only release and the destruction of the

17    pirated datasets—which has garnered widespread praise from author and publisher communities alike.

18    The lodestar crosscheck similarly supports counsels' request. The requested fee of 20% would

19    constitute a lodestar multiplier of 9.32—based on the current and future time expenditures of Class Counsel—

20    which is within the range awarded in "many, many" cases. Fitzpatrick Decl. ¶36. Class Counsel also request

21    reimbursement of costs and expenses totaling $1,969,421.75 which were reasonably incurred in litigating

22    this action, and the award of $50,000 in Service Awards to compensate the Class Representatives for their

23    critical contributions to the common benefit and the Class.

24    ### A.    This Court Should Employ the Percent-of-Common-Fund Method

25    To calculate fees in common fund cases, "the majority of courts [apply] the percentage-of-recovery

26    method." *Ward*, 2024 WL 269149, at *5; *Roman*, 2024 WL 2412387, at *4 (same). That method "appears to

27    be dominant," *In re Omnivision Tech, Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008), receiving

28    "widespread and nearly exclusive use" in practice, 2 McLaughlin on Class Actions § 6:24 (22nd ed.); *see*

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR ATTORNEYS' FEES
CASE NO. 3:24-CV-05417-WHA

*also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 832 (2010) (lodestar method used in 9–12% of settlements at the time); Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009–2013*, 92 N.Y.U. L. Rev. 937, 945 (2017) (lodestar method used only 6.29% of the time from 2009–2013, down from 13.6% from 1993–2002 and 9.6% from 2003–2008); Am. Law Inst., Principles of the Law of Aggregate Litigation §3.13(b) (2010) (the "percentage-of-the-fund approach should be the method utilized in most common-fund cases"); *Thomas v. MagnaChip Semiconductor Corp.*, 2018 WL 2234598, at *3 (N.D. Cal. May 15, 2018) (where the "benefit to the class is easily quantified in common-fund settlements," district courts often "award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar" (citations omitted)).

The percentage-of-the-fund method makes good sense: it "align[s] the lawyers' interests with achieving the highest award for the class members, and reduc[es] the burden on the courts that a complex lodestar calculation requires." *Tait v. BSH Home Appliances Corp.*, 2015 WL 4537463, at *11 (C.D. Cal. July 27, 2015) (citing *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1374–77 (N.D. Cal. 1989)). The method likewise "remov[es] the inducement to unnecessarily increase hours, prompt[s] early settlement, reduc[es] burdensome paperwork for counsel and the court and provid[es] a degree of predictability to fee awards." *Activision*, 723 F. Supp. at 1376 (N.D. Cal. 1989) (citing Report of the Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. 237, 258 (1986)). Instead, "[b]y tying the award to the recovery of the Class, Class Counsel's interests are aligned with the Class, and Class Counsel are incentivized to achieve the best possible result." *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018) (citation omitted)). The "percentage-of-recovery approach" is therefore "generally favored in common fund cases because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." 6A Fed. Proc., L. Ed. § 12:445.

This Court has repeatedly—including as recently as last year—employed the percentage-of-recovery approach in circumstances like those here, where there is a non-reversionary common fund. *See Ward*, 2024 WL 269149, at *5; *Roman*, 2024 WL 2412387, at *4. The Court should adopt the same approach here for the "home run" (Dkt. 484 at 54) settlement in this case.[5]

---

[5] Because Anthropic is paying the Settlement in installments over time, Class Counsel commits to taking its fee only on the portion of the money that has been paid into the fund, not on outstanding payments.

**B.**    **Class Counsel's Fee Request Is Reasonable.**

"Under the percentage-of-recovery method, the attorneys' fees equal [a] percentage of the common settlement fund." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. Feb. 27, 2015). "For more than two decades, the Ninth Circuit has set 'the benchmark for an attorneys' fee award in a successful class action [at] twenty-five percent of the entire common fund.'" *In re Wells Fargo & Co. Shareholder Derivative Litig.*, 445 F. Supp. 3d 508, 519 (N.D. Cal. 2020) (quoting *Williams v. MGM Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997)); *see also Roman*, 2024 WL 2412387, at *5 ("[A]wards tend to adhere to our court of appeals' benchmark."). To calculate the percentage-of-recovery award, "courts generally start with the 25 percent benchmark and adjust upward or downward depending on:

> The extent to which class counsel achieved exceptional results for the class, whether the case was risky for class counsel, whether counsel's performance generated benefits beyond the cash fund, the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis."

*Id.* (cleaned up) (quoting *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015)). "Foremost among these considerations, however, is the benefit obtained for the class." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011); *see Hensley v. Eckerhart,* 461 U.S. 424, 434–36 (1983); *McCown v. City of Fontana,* 565 F.3d 1097, 1101–02 (9th Cir. 2009) ("reasonableness of the fee is determined primarily by reference to the level of success achieved by the plaintiff"). ***All*** these factors point to ***increasing*** the benchmark to more than 25% of the recovery. Class counsel, however, is seeking 20% of the recovery here—below the benchmark.

**1.**    **Class Counsel Achieved Exceptional Results for the Class.**

The Settlement achieved here is not just exceptional—it is historic. As the Court noted in its Opinion on Preliminary Approval, the Settlement is "the largest copyright class action settlement in history." Dkt. 437 at 6. The size of the $1.5 billion non-reversionary settlement is extraordinary, both from an aggregate and per-work perspective, with the settlement fund equating to more than $3,000 per work. That per-work amount is, as the Court observed, "an order of magnitude more than the maximum proposed for books in the *Google Books* settlement that was rejected for releasing future claims." *Id.* at 5–6 (citing *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 672 (S.D.N.Y. 2011)). It is also more than "four times the statutory minimum for ordinary infringement, which is also the most common award in copyright cases," and more

than "fifteen times the statutory minimum for innocent infringement of $200." *Id.* at 5. Although it remains early, the Class's response to the Settlement has been resoundingly positive. As of December 1, 2025, over 29,000 claims have been submitted for over 95,000 works. The high claims rate at this early stage confirms that the Settlement is delivering meaningful compensatory benefits.

Class Counsel also secured valuable non-monetary relief. The Settlement requires Anthropic to "destroy all the original files of works torrented/downloaded from Library Genesis or Pirate Library Mirror, and any copies that originate from the torrented copies," subject to certain legal preservation obligations. Dkt. 363-3 ¶2.2. This destruction is an enormous victory for victims of Anthropic's piracy, given Anthropic's intent to retain the pirated works "forever." Dkt. 244 at 3. Another important benefit is Anthropic's certification that "neither the LibGen or PiLiMi datasets, nor any portions of those datasets, were in the training corpus of any of its commercially released" LLMs. Dkt. 363-3 ¶3.1. That certification further assures that Anthropic must lawfully acquire—and pay for—each copyrighted book the company uses to train its commercially released models. The per-work recovery secured in the Settlement is even stronger in light of Anthropic's certification that it did not use the LibGen or PiLiMi books in any of its commercially released models. *See* Dkt. *Id.* These benefits have repercussions far beyond this litigation:

- **Author Kirk Wallace Johnson**: "This settlement marks an important moment for the legal and moral framework that has bound us to each other since we started telling each other stories: that it's wrong to steal; that the system of justice protects us from those that ignore it, and that we don't have to sacrifice everything we once valued on the altar of big tech." Dkt. 387 ¶10.

- **Author Charles Graeber**: "If you believe books are essential to a culture, this settlement is essential." Dkt. 386 ¶19.

- **Author Andrea Bartz**: "Together, authors and publishers are sending a message to AI companies: You are not above the law, and our intellectual property isn't yours for the taking." Dkt. 385 ¶6.

The Settlement is thus a benefit to creators everywhere, setting a precedent for those who seek to protect their works and livelihoods from some of the world's most powerful technology companies.[6]

Class Counsel's expertise was pivotal to this successful outcome. At preliminary approval, the Court

---

[6] *See also* Rachel Kim, *Top 5 Things You Need to Know About Participating in the $1.5 Billion Bartz v. Anthropic Settlement*, COPYRIGHT ALLIANCE (Oct. 28, 2025), https://tinyurl.com/Participating-Bartz ("It was a huge victory for authors and copyright owners of all types . . . as it addresses Anthropic's past infringements, does not give Anthropic permission for future use of copyrighted works, and emphasizes the need for AI companies to move toward a licensed, permission-based access business model.").

lauded the caliber of the lawyers before it as "some of the best [] in America," underscoring the professional skill that brought the settlement to fruition.[7] Commentators have since praised Class Counsel for working tirelessly to move a milestone settlement across the finish line on behalf of rightsholders.[8] Indeed, Class Counsel's strategy in litigating this case has been emulated by plaintiffs elsewhere: for example, the major music labels sought to amend their complaints to add similar piracy allegations on the heels of the $1.5 billion settlement announcement in this case.[9] And according to one commentator, "[n]o law firm[s] ha[ve] had a greater impact among the 50 U.S. copyright lawsuits against AI companies than" *Bartz* counsel.[10]

### 2. Litigating This Novel Copyright Infringement Claim on a Contingency Basis Against a Well-Funded AI Company Was Extremely Risky.

This case was teeming with risk. Before this litigation, no court had ever (a) found an AI company liable for copyright infringement, (b) held that piracy by an AI company constituted copyright infringement, or (c) certified a class in a copyright infringement action against an AI company or for owners of book copyrights. In fact, other litigants asserting similar theories of liability have not yet succeeded. In *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1036 (N.D. Cal. 2025), for example, which raised similar claims of unlawful piracy and unlawful use of registered copyright books for training, the court granted summary judgment **to Meta**, a fact that Anthropic emphasized extensively and repeatedly in the briefing.

Even if Class Counsel succeeded in obtaining a large judgment above $3,000 per work, and even if that judgment and amount stood after JMOLs in this court and after years of appeals, Class Counsel faced the possibility that Anthropic ultimately would not be able to pay. For example, Anthropic reportedly spent $5.6 billion in 2024, earning much less than that in revenue[11], all while competing against the "Magnificent Seven" tech giants. And while Anthropic is currently raising money at eye-popping valuations, there is no

---

[7] Craig Anderson, *Judge grants preliminary approval of $1.5B Anthropic AI copyright case*, DAILY JOURNAL (Sept. 25, 2025), https://tinyurl.com/Preliminary-Approval.

[8] *Authors Guild Welcomes Approval of Anthropic Settlement*, AUTHORS GUILD (Sept. 25, 2025), https://tinyurl.com/Authors-Guild-Statement.

[9] Chris Cooke, *Major Labels Add Piracy Claims to Suno Lawsuit After $1.5 billion Anthropic Settlement*, COMPLETE MUSIC UPDATE (Sept. 22, 2025), https://tinyurl.com/Suno-lawsuit-after-Anthropic.

[10] Edward Lee, *The Susman Godfrey Playbook in Lawsuits v. AI*, CHAT GPT IS EATING THE WORLD (Sept. 15, 2025), https://tinyurl.com/Susman-Godfrey-Playbook; *See also* Nelson, Nath, Smyser, *Poisoning the WeLL(M): Pirated Data, Large Language Models, and Copyright*, THE ADVOCATE, Winter 2024, https://tinyurl.com/Poisoning-The-Well

[11] Edward Zitron, *This Is How Much Anthropic and Cursor Spend on Amazon Web Services*, WHERE'S YOUR ED AT? (Oct. 20, 2025), https://tinyurl.com/Anthropic-Spend.

1  guarantee the company will perform well years from now or would have the *cash flow* to pay a judgment.

2  Amidst all this unpredictability, one thing was certain: Class Counsel was sure to face a large team

3  of first-rate defense counsel. *See* Nelson Decl. ¶8. Anthropic, in fact, was represented by counsel from five

4  different law firms, including the second largest American law firm by revenue (Latham & Watkins),[12] three

5  other international law firms (Arnold & Porter, Morrison & Foerster, and Cooley), and a highly regarded IP

6  litigation boutique led by Professor Mark Lemley.[13] Anthropic brought its enormous resources to bear,

7  routinely resisting plaintiffs' discovery requests all the way through motion practice on 17 motions to compel

8  and hearings on many of those motions, resulting in the appointment of a Special Master. *E.g.*, Dkts. 104,

9  110, 136, 225, 230, 232, 234, 262, 291, 336. The Court itself described the task of litigating against Anthropic

10  as "just a monumental undertaking." Dkt. 484 at 20.

11  Any one of these issues might have turned the tide against Plaintiffs and left Class Counsel with

12  nothing to show for their efforts other than millions of dollars in unreimbursed time, costs, and expenses. The

13  Court itself observed that while "Plaintiffs have a strong case on the downloading," "success is not assured

14  were they to go to trial." Dkt. 437 at 4. The settlement here thus avoids a paramount risk to the Class—"a

15  prolonged, complex, and expensive trial," whose result could be "a loss [that] would result in no recourse"

16  or a damages award that "could be truncated after trial." *Id.* at 4–5. And even if none of that came to pass,

17  still "[a]ll the district court's rulings and verdict could get appealed." *Id.* at 5. In addition, as the Court itself

18  noted, because "the Court ruled that it was okay for Anthropic to . . . buy the book, take it apart, scan it and

19  use it," the final per-work award of "$3,000 is way more than" the cost of Anthropic's scanning, which would

20  be "$1 or $5 or $10." Dkt. 431 at 14. "So, that was another additional risk . . . going forward." *Id.* Finally,

21  this settlement still has not received final approval and the "blow" provision in the Settlement Agreement

22  remains live. Thus, even now—with significant notice costs spent and more of the anticipated $15 million

23  expenditure ahead, all unrecoverable absent final approval—real risks remain.

24  **3.    The Requested Fee Is Consistent with the Relevant Market Rate.**

---

25  [12] *Latham & Watkins,* LAW.COM, https://tinyurl.com/Latham-Watkins (last accessed Dec. 2, 2025).

26  [13] *See Lex Lumina LLP Spotlight Guide*, CHAMBERS & PARTNERS, https://tinyurl.com/Lex-Lumina (last
27  accessed Dec. 2, 2025) (noting the firm's "globally recognized academic leadership in intellectual property"
     and artificial intelligence specialty); *Vault Law 100*, VAULT, https://tinyurl.com/Vault-Rankings (last
28  accessed Dec 2, 2025) (Latham & Watkins ranked #4, Cooley #22, Morrison Foerster #24, Arnold & Porter
     Kay Scholer LLP #33).

Class Counsel's requested fee award of 20 percent is well within the market rate for contingency representations. "'Market rates' are a question of 'lawyers' reasonable expectations for recovery of contingent fees, which are based on the circumstances of the case and the range of fee awards out of common funds of comparable size.'" *In re Capacitors Antitrust Litig.*, 2018 WL 4790575, at *5 (N.D. Cal. Sept. 21, 2018) (internal brackets omitted) (quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002)). In non-class cases, both Susman Godfrey and LCHB receive far greater than the 20% requested here. For example, when Susman Godfrey advances expenses in non-class cases, it typically receives 40% of the gross sum recovered, with increases to 45 to 50% depending on the timing of settlement and trial (indeed, at the time this case settled, SG's typical rate would have been 45%). Nelson Decl. ¶7. Lieff Cabraser is an entirely plaintiff-side firm, and though the overwhelming majority of its fees are awarded in Court-supervised class or mass actions, the firm regularly handles certain individual plaintiff-side cases (such as individual tort matters and whistleblower matters) with similar percentage structures, especially where trial and appellate work are conducted. *See* Geman Decl. ¶ 30. Indeed, were a case like this brought by a standalone, private litigant, "the customary fee arrangement would likely be contingent, on a percentage basis, and in the range of 30% to 40% of the recovery." *Jenson v. First Tr. Corp.*, 2008 WL 11338161, at *13 n.15 (C.D. Cal. June 9, 2008). Class Counsel's requested 20% fee is conservative relative to these market benchmarks.

The requested is also reasonable relative to percentages awarded in other class actions. An empirical study of every federal class action settlement in 2006 and 2007 shows an average fee award of 25.4% and a median award of 25%, with nearly two-thirds of fee awards between 25% and 30%. Fitzpatrick, *An Empirical Study*, at 833–34. The study also evaluated 111 settlements in the Ninth Circuit, and the numbers for those settlements were similar, with a mean of 23.9% and a median of 25%. Fitzpatrick Decl. ¶19. The results of other empirical studies accord. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical L. Stud. 248, 260 (2010) (mean award of 24% and a median of 25%, with a mean and median of 25% in 101 Ninth Circuit cases); Eisenberg et al., 92 N.Y.U. L. Rev. at 951 (mean award of 27% and a median award of 29%, with a mean of 26% and a median of 25% in 144 Ninth Circuit cases); *Roman*, 2024 WL 2412387, at *5 ("Various empirical studies . . . have documented the mean percentage award in common fund cases over the span of two decades, and found that in our circuit, the mean award has fluctuated between 23.9% and 26%.").

The requested fee is also reasonable relative to copyright class cases, in which courts have routinely awarded up to 30% of the settlement fund, as shown in the following table:

| Copyright Class Cases | | | |
|---|---|---|---|
| **Case** | **Class Recovery and Relief** | **Fees Awarded** | **Attorneys' Fees as Percentage of** |
| *Ferrick v. Spotify USA Inc.*, No. 16-CV-8412 (AJN), 2018 WL 2324076 (S.D.N.Y. May 22, 2018) | <u>Cash Fund</u>: $43.45 million<br><br><u>Overall Settlement Value</u>: $112.55 million | $13.035 million | 30% of the Cash Fund<br><br><br>11.6% of the Overall Settlement Value |
| *In re Napster, Inc. Copyright Litig.*, No. 3:00-MD-00-1369, Dkt. 1324 (N.D. Cal. Feb. 14, 2008) | <u>Settlement Fund</u>: $130 million | ~$28.7 million | 22.1% of the Settlement Fund |
| *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-5693, 2017 WL 4685536 (C.D. Cal. May 8, 2017) | <u>Settlement Fund</u>: between $25.5 million and $73 million, depending on future royalty payments | Between $7.65 million and $21.9 million, depending on future royalty payments | 30% of the Settlement Fund |

And, when compared to other "megafund" settlements ranging in value from $410 million to more than $2.5 billion, Class Counsel's request for 20% remains a conservative fee award:

| Megafund Class Cases | | | |
|---|---|---|---|
| **Case** | **Class Recovery and Relief** | **Fees Awarded** | **Attorneys' Fees as Percentage of** |
| *In re: Blue Cross Blue Shield Antitrust Litig.*, 2022 WL 4587617 (N.D. Ala. Aug. 9, 2022) | <u>Settlement Fund</u>: $2.67 billion | ~$626.6 million | ~23.5% of the Settlement Fund |
| *In re: College Athlete NIL Litig.*, No. 20-cv-3919 CW, Dkt. 1001 (N.D. Cal. July 11, 2025) | <u>NIL Claims Fund</u>: $1.976 billion<br><br><u>Additional Settlement Fund</u>: $600 million<br><br>Injunctive relief | $475.2 million + 0.75–1.25% of future amounts | 20% of NIL Claims Settlement Fund + 10% of the Additional Compensation Settlement Fund + $20,000,000 upfront injunctive fee + .75% to 1.25% of future amounts |
| *Lawrence E Jaffe Pension Plan v. Household Int'l. Inc.*, No. 1:02-cv-05893, Dkts. | <u>Settlement Fund</u>: $1.575 billion | ~$388 million | ~24.7% of the Settlement Fund |

| | | | |
|---|---|---|---|
| 2222, 2265 (N.D. Ill. Aug. 29, 2016) | | | |
| *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094 (D. Kan. 2018), *aff'd* 61 F.4th 1126 (10th Cir. 2023) | Settlement Fund: $1.51 billion | ~$503.3 million | 33.3% of the Settlement Fund |
| *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) | Settlement Fund: $1.08 billion | ~309.7 million | 28.6% of the Settlement Fund |
| *Allapattah Servs. Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | Settlement Fund: $1.075 billion | ~$325.4 million | ~31% of the Settlement Fund |
| *In re: Facebook, Inc. Consumer Privacy User Profile Litig.*, No. 3:18-MD-02843-VC, 2023 WL 8445812 (N.D. Cal. Oct. 10, 2023) | Settlement Fund: $725 million | $181.25 million | 25% of the Settlement Fund |
| *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) | Settlement Fund: $586 million | ~$170.1 million | ~29% of the Settlement Fund |
| *Benson v. DoubleDown Interactive, LLC*, No. 18-cv-0525-RSL, 2023 WL 3761929 (W.D. Wash. June 1, 2023) | Settlement Fund: $415 million | ~$121.5 million | 29.3% of the Settlement Fund |
| *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) | Settlement Fund: $410 million | ~$123 million | ~30% of the Settlement Fund |

Courts do not hesitate to award fees of 25% or more in even the largest settlements when the relevant factors support that outcome, as they do here. Indeed, the two cases above with the most comparable settlement size of around $1.5 billion (*Jaffe* and *Syngenta*) awarded 24.7% and 33%; *see also In re Coll. Athlete NIL Litig.*, 2025 WL 1675820, at *21 (N.D. Cal. June 6, 2025) (awarding, *inter alia*, 20% award representing $395.2 million in fees without conducting crosscheck analysis).

Although some empirical studies have found mean and median awards of less than 25% in cases with multi-hundred-million-dollar settlements, *see* Fitzpatrick Decl. ¶¶21, Ninth Circuit case law does not require lower percentages for large settlements. In *Vizcaino*, for example, the Ninth Circuit rejected the "increase-decrease rule"—under which "the percentage of an award generally decreases as the amount of the fund increases"—"as a principle governing fee awards." 290 F.3d at 1047. The Ninth Circuit reiterated that holding in *In re Optical Disk Drive Prods. Antitrust Litig.*, stating, "we have already declined to adopt a

bright-line rule requiring the use of sliding-scale fee awards for class counsel in megafund cases, and we are bound by circuit precedent." 959 F.3d 922, 933 (9th Cir. 2020); *see also In re Apple Inc. Device Performance Litig.*, 2021 WL 1022866, at *6 (N.D. Cal. Mar. 17, 2021), appeal dismissed, No. 23-15416, 2023 WL 10447843 (9th Cir. Aug. 8, 2023) (starting with 25% benchmark in $310 million settlement).

The Court should decline to apply a sliding-scale approach here. That method "create[s] perverse incentives: if class counsel receives less of each next dollar that they secure for the class, they may have an incentive to settle when their percentage drops from 25% to 20% . . . thereby encouraging quick settlements at sub-optimal levels." 5 Newberg & Rubenstein on Class Actions § 15:80 (6th ed.). It is thus unsurprising that "'[p]rivate parties would never contract for such an arrangement, because it would eliminate counsel's incentive to press for' a higher settlement." *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) (quoting *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001)). Class Counsel submit that following the traditional approach of aligning the fees to the recovery is especially important here given (a) the precedent-setting nature of this litigation and Settlement;[14] and (b) the dozens of hotly litigated copyright class actions currently pending against AI companies.[15]

### 4.    A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fees.

Where "the court achieves a reasonable result using the method it selects"—here, by awarding a below-market-rate contingency fee to class counsel—the lodestar "cross-check is not required." *Senne v. Kansas City Royals Baseball Corp.*, 2023 WL 2699972, at *18 (N.D. Cal. Mar. 29, 2023). Indeed, a NDCA court recently approved—without conducting a crosscheck analysis in a case with a $1.96 billion settlement fund—"attorneys' fees equivalent to 20% of the NIL Claims Settlement Fund (or $395.2 million in fees), 10% of the Additional Compensation Claims Settlement Fund (or $60 million in fees), an upfront injunctive relief award of $20 million to be paid by Defendants.") *In re Coll. Athlete NIL Litig.*, 2025 WL 1675820, at *21 (N.D. Cal. June 6, 2025). Indeed, the "use of a lodestar cross-check has fallen into disfavor." *Beesley v. Int'l Paper Co.*, 2014 WL 375432, at *3 (S.D. Ill. Jan. 31, 2014). As the Seventh Circuit explained, courts

---

[14] *See, e.g.*, Cade Metz, *Anthropic Agrees to Pay $1.5 Billion to Settle Lawsuit With Book Authors*, N.Y. Times (Sept. 5, 2025), https://tinyurl.com/Anthropic-Agrees-To-Settle ("The settlement in the Anthropic case . . . could influence other cases.").

[15] *See Updated Map of US copyright suits v. AI (Oct. 27, 2025) Total = 57 suits*, Chat GPT Is Eating the World, https://tinyurl.com/Map-US-Copyright-Suits (identifying copyright suits against AI companies).

should "give counsel the market rate for legal services," and counsel's fee should "be answered by reference to arrangements that satisfy willing buyers and sellers rather than the compensation that a judge thinks appropriate as a matter of first principles." *Synthroid*, 325 F.3d at 975. Should the Court nevertheless choose to apply the crosscheck here, such analysis only further supports the fees that Plaintiffs' counsel request.

### a.    The Number of Hours Devoted to the Case Was Reasonable.

Under the crosscheck method, the court calculates a "presumptively reasonable" fee by multiplying the hours expended by an hourly rate comparable to other similarly experienced attorneys. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 571 (9th Cir. 2019); *In re Bluetooth Headset*, 654 F.3d at 941. Counsel have presently devoted 26,191.10 hours to this litigation, resulting in a lodestar of $22,304,844. Geman Decl. ¶23. The hours for each firm are, detailed in the declarations submitted herewith, have been categorized as follows: (1) administrative; (2) experts and consultants (including expert depositions); (3) pleadings, briefs, and legal analysis; (4) case management; (5) offensive discovery; (6) client communications and defensive discovery; (7) third party discovery; (8) court appearances and preparation for the same; (9) investigation and document analysis; (10) depositions; and (11) settlement. Counsels' work was necessary to prosecute Plaintiffs' claims; time spent by attorneys and staff who worked fewer than ten hours on the case, and time devoted to this fee application, have been omitted from the lodestar. *Id.* ¶17.

Class Counsel performed this work efficiently. Counsel reviewed hundreds of thousands of documents, took and defended twenty depositions, successfully opposed Anthropic's summary judgment motion, prevailed in their class certification motion, and secured the largest copyright settlement in history. Since the Court granted preliminary approval, Counsel has diligently worked to finalize class notice, respond to inquiries from potential class members, and Zoom information sessions aimed at potential class members to serve as a resource to the Class. Geman Decl. ¶ 6. Additionally, Class Counsel has been actively monitoring communications and marketing campaigns directed at class members. *See, e.g.*, Dkt. 442.

Further, Counsel will continue to devote substantial time and resources through final approval and beyond to ensure that Class Members are fully supported. Such "projected fees are appropriate considerations in lodestar cross-checks." *Martin v. Toyota Motor Credit Corp.*, 2022 WL 17038908, at *14 (C.D. Cal. Nov. 15, 2022) (citing *In re Volkswagen*, 746 F. App'x 655, 649)). Class Counsel, PCC, and ACC continue to—and will continue to—"bird dog" the claims administration process, as the Court required. This

has and will include reviewing and vetting claim submissions from class members (including documentary submissions, like contracts), responding to class member inquiries, facilitating resolution of any discrepancies or conflicting information in claims submissions for the same works, coordinating proceedings with the Special Master, explaining options to class members (submitting a claim, opting out, objecting, or doing nothing) and the consequences of each choice, monitoring social media and internet publications for false and misleading information about the Settlement (*see* Dkt. 442 regarding ClaimsHero), providing individualized assistance to those who wish to file claims or submit opt out forms, and working with and oversee the Settlement Administrator to ensure orderly and accurate notice, administration, and distribution.

As such, Counsel reasonably expect that such efforts will require 14,066.50 hours of additional time, resulting in a $9,866,925 lodestar (bringing the total expected lodestar to $32,171,769). *See* Nelson Decl. ¶17; Geman Decl. ¶21; PCC Decl. ¶55, 61; ACC Decl. 18.[16]

### b.    The Hourly Rates Are Reasonable.

The reasonable hourly rate is "the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Fowler v. Wells Fargo Bank, N.A.*, 2019 WL 330910, at *6 (N.D. Cal. Jan. 25, 2019) (citation omitted). Courts in this district and Circuit have repeatedly approved Class Counsel's requested hourly rates in class action cases.[17] LCHB and SG's rates also have been approved by other courts, as well.[18] Alongside its class action practice, moreover, SG regularly represents large corporate clients in high-stakes litigation on an hourly basis, and the rates used here are the same rates charged to SG's hourly clients—including by lawyers on this case. Nelson Decl. ¶24. The same is true of O+Z, which also does work for rightsholder clients on an hourly basis.[19]

---

[16] This lodestar is conservatively calculated using 2025 rates, even though nearly all projected work will occur after 2025 and each law firm will be implementing standard hourly rate increases starting in 2026.

[17] *See, e.g., Grey Fox, LLC v. Plains All-Am. Pipeline, L.P.*, 2024 WL 4267431, at *6 (C.D. Cal. Sept. 17, 2024) (approving hourly rates of LCHB); *Katz-Lacabe, et al. v. Oracle America, Inc.*, No. 3:22-cv-4792, Dkt. 181 at 9 (N.D. Cal. Nov. 11, 2024) (same); *Meta Platforms, Inc. v. Soc. Data Trading Ltd.*, 2022 WL 18806267, at *5 (N.D. Cal. Nov. 15, 2022), *report and recommendation adopted*, 2022 WL 18806265 (N.D. Cal. Dec. 8, 2022) (approving SG's rates); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2017 WL 4685536, at *8-9 (C.D. Cal. May 8, 2017) (same). A fuller list is found at Geman Decl. ¶¶26-27.

[18] *In re General Motors LLC Ignition Switch Litig.*, 2020 WL 7481292, at *3 n.3 (S.D.N.Y. Dec. 18, 2020) (LCHB's rates "reflect prevailing rates in the Southern District of New York for 'for similar services by lawyers of reasonably comparable skill, expertise and reputation.'") There are other instances where Lieff Cabraser's fee petitions have been approved in full and the court did not do a lodestar crosscheck. *E.g., Doe v. MasterCorp*, No. 1:24-cv-678 (ED VA 2024), Dkt. Nos. 24, 25, and 33.

[19] *See also In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 633 (N.D. Cal. 2021) (finding

The rates here are also reasonable when compared to prevailing market rates and, if anything, are far *below* such rates. For example, a compilation of rates of peer firms approved by bankruptcy courts shows that rates for partners extended to the low $2,000 range for 12 major law firms, with five firms setting such rates at $2,350 and above, including two of Anthropic's law firms in this case (Morrison and Forester ($2,475) and Latham and Watkins ($2,550)). See Ex. 1. By contrast, no Lieff Cabraser partners' rates are remotely close to that range, and only one Susman Godfrey partner who was regularly involved in the action charged a comparable—but still lower—rate ($2,250), which SG's hourly clients pay. Geman Decl. ¶24; Nelson Decl. ¶26. Meanwhile, the hourly rates for partners Mr. Nath, Ms. Salinas, and Mr. Adamson—who were three of the five main SG partners involved—are *below* the absolute lowest rate reported for partners in that survey. *See* Ex. 1 ($1,050) *with* Nelson Decl. ¶25 ($975); *see also* Geman Decl. ¶24 ($905 rate for Dafa and as low as $835 for other partners); Nelson Decl. ¶ 24 (noting that a 2025 study commissioned by accounting firm PWC reported that the median partner billing rate for an AM Law 50 firm was $1,700). The same trend holds true for associates. *See* Ex. 1 ($760-$1,310); Nelson Decl. ¶25; Geman Decl. ¶24; PCC Decl. Ex. A; ACC Decl. 20 (all Class Counsel associates with rates under $1,000, and most under $700).

Considering the prevailing rates in this District, the qualification and experience of counsel, Class Counsel's billing rates are eminently reasonable. *See* Dkt. 362-4 through Dkt. 362-7; Nelson Decl. ¶¶22–26.

### c.    The Multiplier is Justified Given the Results Obtained, the Complexity of the Issues, and the Contingent Nature of the Representation

The district court may adjust the lodestar calculation upward to account for the "quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935, 941-42 (9th Cir. 2011).

The requested award of 20% represents a multiplier of approximately 9.32 relative to the combined present and future time expenditures of counsel. This multiplier is supported by the historic nature of the settlement, the cutting-edge nature of the legal issues, the vigorous, hard-fought defense mounted by highly capable counsel, and the high caliber of advocacy necessary to overcome those hurdles and secure a historic

---

Edelson PC's hourly rates reasonable for their experience and locality); *id.* at Dkt No. 499-3 at ¶¶ 25-33 (N.D. Cal. Oct. 15, 2020) (Declaration of Professor William B. Rubenstein finding that "the hourly rates [Edelson PC] utilize are entirely consistent with the rates judges in [the Northern District of California] explicitly approved in overseeing class action settlement since 2019, and the average, or blended, hourly rate—while above the median—appropriately reflects the level of lawyering required").

settlement. *See, e.g.*, Rubenstein Decl. 15-24 (collecting cases); Fitzpatrick Decl. ¶¶19-27 (collecting cases); *Skochin v. Genworth Fin., Inc.*, 2020 WL 6536140, at *10 (E.D. Va. Nov. 5, 2020) (lodestar multiplier of 9.05 following settlement of up to $164 million); *Lloyd v. Navy Fed. Credit Union*, 2019 WL 2269958, at *13 (S.D. Cal. May 28, 2019) (following $24.5 million settlement, the court applied 10.96 multiplier, highlighting the significant risks associated with the contingent nature of the case); *In re Doral Fin. Corp. Sec. Litig.*, No. 1:05-md-01706-ECF No. 107 (S.D.N.Y. July 17, 2017) (following a $129 million settlement, the court applied a lodestar multiplier of 10.26).

It is worth emphasizing the two expert declarations Class Counsel submitted from Professors Rubenstein and Fitzpatrick—the former, a longtime "proponent of the lodestar cross-check," Rubenstein Decl. at 24, the latter, of the "opinion that courts should not do it," Fitzpatrick Decl. ¶35; *id.* (observing that "half of courts nationwide do not perform the crosscheck with the percentage method," and that "the majority approach is the better one"). Despite their differences in the abstract, their analyses in this case could hardly be more similar. "[T]here is significant evidence in the record of this case," Professor Rubenstein explains, "to support the conclusion that Class Counsel have earned a significant multiplier." Rubenstein Decl. 24. "I believe the fee request here is within the range of reasonable awards," adds Professor Fitzpatrick, because even under the crosscheck the requested award is "hardly unprecedented." Fitzpatrick Decl. ¶36.

## C. The Court Should Reimburse Class Counsel's Reasonable Litigation Expenses

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Roman*, 2024 WL 2412387, at *5. Class Counsel have incurred $1,969,421.75 in unreimbursed litigation expenses, including costs related to experts, discovery, mediation, legal research, filing fees, document hosting services, copying and mailing, and other customary litigation expenses. *See* Geman Decl. ¶¶51, 53; Nelson Decl. ¶40; ACC Decl. ¶24; PCC Decl. ¶58. Class Counsel anticipate $17,030,000.00 in future expenses that will be reasonably and necessarily incurred in furtherance of the prosecution of this Action, and request a reserve cost fund up to that amount. Geman Decl. ¶55 (overviewing future expenditures); *see also* Dkt. 399 (Keough Decl) at ¶117 (estimating the cost to complete the robust notice program at $15 million). To be especially mindful of the Class, Counsel are not seeking reimbursement for hotels, meals, and fees paid to Messrs. Rubenstein and Fitzpatrick. Nor are Counsel seeking reimbursement for travel, meal, and lodging expenses for the Class Representatives.

1    Courts regularly find the expenses for which Class Counsel seek reimbursement are "billed

2   to paying clients in non-contingency matters" and are recoverable. *Katz-Lacabe v. Oracle Am., Inc.*, No.

3   2024 WL 4804974, at *5 (N.D. Cal. Nov. 15, 2024) (subsequent history omitted).[20] In megafund cases such

4   as this, courts also commonly approve millions of dollars in costs, including amounts that exceed those that

5   Class Counsel seek here.[21] Class Counsel therefore submit their request is proper.

6       **D.    Service Awards for the Named Class Representatives are Warranted**

7    Class Counsel request that the Court award Class Representatives Andrea Bartz, Inc., MJ+KJ, Inc.,

8   and Charles Graeber service awards of $50,000 for their contributions to, and leadership in, this historic case.

9   "Incentive awards are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958

10  (9th Cir. 2009) (emphasis omitted) (citing 4 William B. Rubenstein et al., *Newberg on Class Actions* § 11:38

11  (4th ed.2008)). While such "awards are discretionary," they are commonly issued because of the many

12  benefits they provide: "compensat[ing] class representatives for work done on behalf of the class";

13  "mak[ing]up for financial or reputational risk undertaken in bringing the action"; and recognizing class

14  representatives' "willingness to act as a private attorney general." *Id.*

15   Service awards to the class representatives here are particularly warranted in light of the critical

16  contributions they made to the case, the significant out-of-pocket expenditures each tendered as part of their

17  involvement, and the overwhelming monetary recovery provided to the class by the settlement here.[22]

18  _____

19  [20] *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2017 WL 4685536, at *10 (C.D. Cal. May 8, 2017)
    (copyright class action reimbursing expenses related to "discovery, the services of experts and specialist
20  appellate counsel, mediation, travel, technology support costs, a mock trial, and the cost of computer research
    and services"); *Hofstetter v. Chase Home Fin., LLC*, 2011 WL 5545912, at *1 (N.D. Cal. Nov. 14, 2011)
    (Alsup, J.) (approving same plus "costs associated with class notice and settlement mailings").

21  [21] *See In re Blue Cross Blue Shield Antitrust Litig.*, 2022 WL 4587617, at *1 (N.D. Ala. Aug. 9,
22  2022), *aff'd*, 85 F.4th 1070 (11th Cir. 2023) ($40.9 million in costs); *In re: College Athlete NIL Litig.*, No.
    20-cv-3919 CW, Dkt. 1001 at *5 (N.D. Cal. July 11, 2025) ($9 million in costs); *In re Facebook, Inc.
23  Consumer Priv. User Profile Litig.*, 2023 WL 8445812, at *3 (N.D. Cal. Oct. 10, 2023), *aff'd* 2025 WL
    484621 (9th Cir. Feb. 13, 2025) ($4.1 million in costs).

24  [22] *See Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 300 (N.D. Cal. 1995) ($50,000 to one class
25  representative); *Wright v. Stern*, 553 F. Supp. 2d 337, 342 (S.D.N.Y. 2008) ($50,000 to each of
    eleven class representatives); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 374
    (S.D. Ohio 1990) ($35,000-55,000 each to five class representatives); *Kifafi v. Hilton Hotels Ret. Plan*, 999
26  F. Supp. 2d 88, 106 (D.D.C. 2013) ($50,000 award); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 479-
    80 (D.N.J. 2008) ($60,000 award); *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 914 (S.D. Ohio 2001)
27  ($50,000 to lead plaintiff); *In re Revco Sec. Litig., Nos. 851, 89cv593*, 1992 WL 118800, at *7 (N.D. Ohio
    1992) ($200,000 award); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240,
    250-51 (S.D. Ohio 1991) ($50,000 awards to each of six named plaintiffs); *Beaver v. Tarsadia Hotels*, 2017
28  WL 4310707, at *8 (S.D. Cal. Sept. 28, 2017) ($50,000 award to four representatives); *In re High-Tech*

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR ATTORNEYS' FEES
CASE NO. 3:24-CV-05417-WHA

**Andrea Bartz, Inc.**: Ms. Bartz, on behalf of Andrea Bartz, Inc., has "invested many hours into this lawsuit" and "will continue to do so for as long as necessary." Dkt. 385 at 1–2. She has (i) "answered extensive discovery requests, handing over thousands of pages of documents and digging through a decade's worth of contracts and communications to provide accurate information"; (ii) "met with my counsel for many hours and participated in an extensive deposition"; (iii) "traveled from [her] home in New York to San Francisco to attend the deposition and major court hearings," including both of the Court's preliminary approval hearings; and (iv) "reviewed and approved major court filings, including the settlement agreement." *Id.* at 2. Ms. Bartz also "pepper[ed] [her] attorneys with questions about the case, read[] up on copyright law, [and] shar[ed] important information about [her] claims and the class's potential point of view." *Id.*

Ms. Bartz also engaged heavily in the settlement process itself. For example, she "dedicated substantial time to the proposed plan of distribution" and was "heavily involved in the creation and refinement of the materials" related to the settlement. *Id.* at 2. To ensure class members could "understand the settlement," Ms. Bartz "made comments and suggestions on the notice packet, claim form, and other materials, identifying potential pitfalls and suggesting language for clarity and inclusion." *Id.* Ms. Bartz was, in short, the consummate "informed and engaged class representative." *Id.*.

**Charles Graeber**: Mr. Graeber was also thoroughly involved, including "calls and emails at all hours of the day from counsel requesting information and paperwork, and [his] own calls and emails volunteering anything potentially relevant." Dkt. 386 at 2. "Then came the attorney meetings to educate me about the intricacies of the case and my obligations," which "included representing the interests of the full class, a group of hundreds of thousands of authors and publishers." *Id.* As he says, "It became my job." *Id.*

That job required "numerous redeye cross-country flights for critical meetings and depositions," including "travel[] to major court hearings." *Id.* It also required "hours of process and preparation; reviewing thousands of pages of documents to ensure accuracy; reviewing major filings . . .; and ultimately, scrutinizing and signing the settlement agreement," which "was accompanied by a steady back-and-forth of questions" between Mr. Graber and Class Counsel. That process was "daunting, grueling and, at times, invasive." *Id.* Mr. Graber's "work as a writer[] took a back seat": "Whatever my previous deadlines, there was no case but

---

*Employee Antitrust Litig.*, 2015 WL 5158730, at *18 (N.D. Cal. Sept. 2, 2015) (authorizing $80,000 and $120,000 awards in case with $415,000,000 settlement fund); *In re Titanium Dioxide,* 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) ($125,000 award to lead class representative out of $163.5 million settlement).

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR ATTORNEYS' FEES
CASE NO. 3:24-CV-05417-WHA

this civil case; my top job now was to represent all stakeholders in this critical class action to the best of my ability. This responsibility continues to be an honor, whatever it takes." *Id.* at 3.

In doing so, Mr. Graeber "sank [him]self into details for the proposed plan of allocation," placing himself "in the shoes of the thousands of class members who would be coming to this settlement cold." *Id.* That produced many "urgent" discussions that "started early and went late," by "Zoom, text, email and phone." *Id.* Mr. Graeber recognizes that his "work is only just begun," and he will continue zealously "represent[ing] the settlement to authors, our fellow stakeholders, and the public at large." *Id.* at 3–4.

**MJ+KJ, Inc.**: Since this case began, Mr. Johnson on behalf of MJ+KJ, Inc., has taken his "responsibility to the others in the class as seriously as possible." Dkt. 387 at 2. That "has taken the form of hundreds of hours of calls with counsel to make sure [he] understood each twist and turn of the litigation; extensive work responding to discovery requests, digging up thousands of pages of contracts, emails, and other documents; sitting for a lengthy deposition; reviewing court filings and the settlement agreement; and flying to attend multiple court hearings." *Id.* Mr. Johnson also "felt a duty to understand the origins and future trajectories of the AI companies that trained their LLMs on pirated intellectual property," and did so by "reading numerous books and long-form reporting," as well as "experimenting extensively with the AI platforms to better understand their capabilities." *Id.* Indeed, Mr. Johnson was "so heavily involved in discussions about the proposed distribution plan that [he] had to set my paid work aside." *Id.* That sacrifice, he reports, was "essential" to his "obligations to explain this settlement to other members of the class." *Id.*

## CONCLUSION

For the reasons set forth above, Class Counsel respectfully requests that the Court grant their motion for an award of attorneys' fees, reimbursement of costs, and service awards to the Class Representatives.

Dated: December 3, 2025

By: */s/ Justin Nelson*
Justin A. Nelson *
Alejandra C. Salinas *
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com


Rohit D. Nath (SBN 316062)
Michael Adamson (SBN 321754)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
rnath@susmangodfrey.com
madamson@susmangodfrey.com

Samir Doshi*
J. Craig Smyser*
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 51st Floor,
New York, NY 10001
Telephone: (212) 336-8330
sdoshi@susmangodfrey.com
csmyser@susmangodfrey.com

Jordan W. Connors*
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
jconnors@susmangodfrey.com

By: */s/ Rachel Geman*
Rachel Geman *
Jacob S. Miller*
Danna Z. Elmasry*
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
rgeman@lchb.com
jmiller@lchb.com
delmasry@lchb.com
Daniel M. Hutchinson (SBN 239458)
Jallé Dafa (SBN 290637)
Amelia Haselkorn (SBN 339633)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
dhutchinson@lchb.com
jdafa@lchb.com
ahaselkorn@lchb.com

Betsy A. Sugar*
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
222 Second Ave., #1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com

## **ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing

Dated: December 3, 2025

*/s/ Justin Nelson*_____