EDELSON PC
Jay Edelson (pro hac vice)
J. Eli Wade-Scott (pro hac vice)
350 North LaSalle, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

EDELSON PC
Brandt Silverkorn (SBN 323530)
150 California St., 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

OPPENHEIM & ZEBRAK, LLP
Matthew J. Oppenheim (pro hac vice)
Jeffrey M. Gould (pro hac vice)
4530 Wisconsin Avenue, NW, Fifth Floor
Washington, DC 20016
Tel:  202-480-2999

*Publishers' Coordination Counsel*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, AND MJ + KJ, INC., individually and on behalf of others similar situated,<br><br>                Plaintiffs,<br>    *v.*<br><br>ANTHROPIC PBC,<br><br>                Defendants. | Case No. 3:24-cv-05417-WHA<br><br>Hon. William Alsup<br><br><br>**DECLARATION OF PUBLISHERS' COORDINATION COUNSEL JAY EDELSON AND MATTHEW J. OPPENHEIM IN SUPPORT OF APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES/CHARGES** |

Pursuant to 28 U.S.C. § 1746, Matthew J. Oppenheim and Jay Edelson jointly declare and state as follows, except where specified:

1.      We are each partners at one of the firms named as Publishers' Coordination Counsel ("PCC") in the above-captioned action. We make this declaration based on our personal knowledge, as to each of our firms, and our review of the records our respective firms kept during the pendency of this case.

2.      I, Jay Edelson, am an attorney admitted to practice in Illinois. I am the Founder and CEO of Edelson PC ("Edelson"), which was retained as PCC in the above-captioned action, for the purpose of representing Publishers. I am one of the attorneys who oversaw and conducted the day-to-day activities as PCC in the above-entitled action (the "Litigation"). I am submitting this declaration in support of Class Counsel's application for an award of attorneys' fees and expenses in connection with the legal services rendered by Edelson in the Litigation.

3.      I, Matthew J. Oppenheim, am an attorney admitted to practice in the District of Columbia, New York, and Maryland, among other U.S. Federal Courts. I am the co-founding partner and managing partner of Oppenheim + Zebrak, LLP ("O+Z" and together with Edelson, the "Firms), which was retained as PCC in the above-captioned action, for the purpose of representing Publishers. I am one of the attorneys who oversaw and conducted the day-to-day activities as PCC in the Litigation. I am submitting this declaration in support of Class Counsel's application for an award of attorneys' fees and expenses in connection with the legal services rendered by O+Z in the Litigation.

4.      **Background Regarding Edelson PC, by Mr. Edelson Only**

5.      I, Jay Edelson, am the Founder and CEO of Edelson PC, which has been engaged as Publishers' Coordination Counsel in the above-captioned action. I am over the age of 18 and fully competent to make this Declaration.

6.      I have personal knowledge of the facts set forth herein and if called upon to testify as a witness, I could and would competently testify hereto.

7.      I have over two decades of experience representing plaintiff classes. I've been

1  named three times by Law360 as a "Titan of the Plaintiffs Bar," and by Forbes as one of

2  "America's Top 200 Lawyers." I was also named to Fast Company's "Most Creative People in

3  Business" list, where I was the first plaintiffs' attorney to ever receive that recognition.

4         8.     My firm has over 100 attorneys and staff across six offices, including Chicago

5  and San Francisco. The firm is structured around dedicated teams that allow our attorneys to

6  devote their full resources and attention to each stage of the case: a dedicated Investigations

7  team, Litigation team, and Appellate team (among others). Particularly relevant to our work in

8  technology cases, we have a unique-in-the-industry forensic investigations lab, staffed by non-

9  lawyer technologists and led by the firm's Chief Technologist, Shawn Davis.

10         9.     We have been named, in multiple years, a Consumer Protection Group of the

11  Year (2016, 2017, 2019, 2020), a Class Action Group of the Year (2019), a Plaintiff's Class

12  Action Powerhouse (2017, 2018, 2019), and a Cybersecurity and Privacy Group of the Year

13  (2017, 2018, 2019, 2020, 2022, 2023) by Law360. The National Law Journal also recognized us

14  as "Elite Trial Lawyers" in Consumer Protection (2020, 2021), Class Action (2021),

15  Privacy/Data Breach (2020), Mass Torts (2020), and Sports, Entertainment and Media Law

16  (2020). Just considering cases where we have served as lead counsel, our verdicts and

17  settlements exceed $5 billion.

18        10.    In cutting-edge technology cases, particularly, my firm's track record is

19  unparalleled. The *New York Times* called me "Tech's Least Friended Man" for my firm's

20  innovation and success in bringing technology-related class actions, and observed that our cases

21  "read like a time capsule of the last decade, charting how computers have been steadfastly

22  logging data about our searches, our friends, our bodies."[1]

23        11.    We filed the first-ever case under the Illinois Biometric Information Privacy Act

24  ("BIPA"), which resulted in the largest single-state privacy settlement ever at $650 million,

25  which was reached on the eve of trial. *See In re Facebook Biometric Information Privacy Litig.*,

26

27    [1]     Conor Dougherty, *Jay Edelson, the Class-Action Lawyer Who May Be Tech's Least Friended Man*, N. Y. TIMES (Apr.4,2015), https://www.nytimes.com/2015/04/05/technology/unpopular-in-silicon-valley.html.

DECLARATION OF JAY EDELSON AND MATTHEW
J. OPPENHEIM ISO APPLICATION FOR AWARD
OF ATTORNEYS' FEES AND EXPENSES/CHARGES
        -3-

522 F. Supp. 3d 617 (N.D. Cal. 2021). In approving the settlement, Judge Donato of this District noted the "landmark result" achieved for the Class, observing that Edelson and its co-counsel had produced a "major win for consumers in the hotly contested area of digital privacy." 522 F. Supp. 3d at 620-621.

12.    We've secured more than $700 million in settlements and verdicts against illegal online casinos under Washington State's gambling laws after winning a watershed Ninth Circuit victory for consumers against such companies in *Kater v. Churchill Downs Inc.*, 886 F.3d 784 (9th Cir. 2018). When assessing the fairness of one of those settlements for $415 million, Judge Lasnik of the Western District of Washington described how my firm worked "in the Executive branch, the legislative branch, and the Judicial branch" to secure an extraordinary result for its clients in a "unique" case—describing the firm as "all in with high quality and very admirable lawyering[.]" *Benson v. DoubleDown Interactive LLC*, No. 18-cv-00525, dkt. 550 (W.D. Wash. June 22, 2023).

13.    The firm was lead counsel in *Spokeo v. Robins*, in which the Supreme Court held that "intangible harm" could satisfy Article III standing requirements. *See* 136 S. Ct. 1540 (2016). Commentators called the case "the most important privacy class action and consumer case of the decade."[2]

14.    We also have deep experience in AI cases, where we have been at the forefront of AI issues since the advent of this industry. We represent governments in first-of-their-kind enforcement actions tackling harm to teens from social media AIs. We also represent families individually against AI companies for encouraging self-harm and suicide in both teenagers and adults, as well as catastrophic third-party injuries. And we secured a consent decree from Clearview AI—in what's been called a "milestone for civil rights"—that bans Clearview's AI-powered face recognition from the private market. *American Civil Liberties Union v. Clearview*

---

[2]    *See John K. Higgins, Supreme Court to Hear 'Non-Injury' Privacy Class Action*, E-COMMERCE TIMES (May 6, 2015), https://www.ecommercetimes.com/story/supreme-court-to-hear-non-injury-privacy-class-action-82015.html.

1   *AI, Inc.*, No. 20 CH 4353 (Cir. Ct. Cook Cty.).[3]

2       15.     Our firm has had particular success in trying class action cases, where we've

3   prevailed in four class action trials in recent years. The largest single damages verdict was a

4   $925 million verdict in a privacy case, *Wakefield v. ViSalus, Inc.*, No. 3:15-cv-1857-SI (D. Or.

5   June 24, 2019).[4] In a case on behalf of a class of wildfire survivors in Oregon against the local

6   utility, PacifiCorp, the jury found PacifiCorp liable to the entire class—finding that it recklessly

7   caused the Labor Day 2020 wildfires—and awarding punitive damages classwide. The jury also

8   awarded more than $90 million to the 17 plaintiffs. Subsequent damages trials have resulted in

9   nearly $600 million in verdicts to date, with thousands of people in the class to go—paving the

10  way to billions in liability.

11      16.     Finally, my firm is one of the most outspoken voices in reforming the Plaintiffs'

12  bar. As just one example, we exposed attorney Tom Girardi's decades-long client Ponzi scheme

13  that stole more than $100 million from clients and others. I have long advocated for higher

14  claims rates—an issue on which we lead the industry in routinely securing 20%+ claims rates,

15  including in the *Facebook* settlement mentioned above.

16  **Background Regarding Oppenheim + Zebrak, LLP ("O+Z"), by Mr. Oppenheim Only**

17      17.     I, Matthew J. Oppenheim, am the Co-Founder and Managing Partner of O+Z,

18  which has been engaged as Publishers' Coordination Counsel in the above-captioned action. I am

19  over the age of 18 and fully competent to make this Declaration.

20      18.     I have personal knowledge of the facts set forth herein and if called upon to testify

21  as a witness, I could and would competently testify hereto.

22      19.     I have over 30 years' experience representing content owners, including education

23  and trade book publishers, in their content protection efforts, including in several of the most

24  ---

25  [3]      *See S.T.O.P. Welcomes Clearview AI, ACLU Settlement, Calls For National Ban*, SURVEILLANCE
    TECHNOLOGY OVERSIGHT (May 9, 2022),https://www.stopspying.org/latest-news/2022/5/9/stop-welcomes-
    clearview-ai-aclu-settlement-calls-for-national-ban.

26  [4]      The verdict was later vacated, with the Ninth Circuit holding that the lower court had to consider whether
    the damages awarded by the jury potentially violated due process. *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1125

27  (9th Cir. 2022).

1  preeminent and influential copyright infringement cases of our time. I have been honored with

2  recognitions by many different groups. *Chambers USA* has ranked me multiple times as a

3  leading intellectual property litigation lawyer and *Super Lawyers* has identified me multiple

4  times as a "Top Rated Intellectual Property Litigation Attorney in Washington, DC." I have been

5  repeatedly named to the *Best Lawyers in America*® list for Copyright Law, and by *Law360* as a

6  "Titan of the Plaintiffs Bar." *Legal 500* described me "as a premier litigator regarding complex

7  disputes for technology, copyright, and trademark cases." *Billboard* magazine regularly names

8  me to its distinguished "Top Music Lawyers" list, which honors lawyers on the front lines of the

9  music industry's legal battles and deals.

10        20.      O+Z, which I co-founded in 2011, has 35 attorneys and staff across two offices,

11  including Washington, D.C. and New York. Our firm is comprised of lawyers dedicated to

12  helping clients with adversarial matters involving copyright and trademark infringement,

13  artificial intelligence, piracy, counterfeiting, royalty disputes, and other commercial disputes.

14  O+Z prides itself on being the go-to copyright litigation firm for many of the biggest content

15  companies in the world, including numerous book publishers. O+Z has a proven track record of

16  successfully litigating in court, negotiating private resolutions, and providing thoughtful

17  guidance on copyright and trademark issues.

18        21.      O+Z has been recognized, multiple times, by *Chambers USA*, *Super Lawyers,* and

19  *Managing IP* as leaders in intellectual property and copyright law. Chambers has reported that

20  O+Z is "very aggressive and very creative in pursuing theories to protect trademark and copy

21  owners' rights" and "is utterly fearless in taking on the biggest companies and very

22  knowledgeable about copyright technology cases." *Managing IP* selected O+Z as the Copyright

23  Firm of the Year for the Eastern half of the United States in 2021. Several of my partners and I

24  have also been recognized multiple times by *Billboard* magazine as the "Top Music Lawyers"

25  and by *Legal 500* as a "Leading Firm."  In addition to calling O+Z "among the best of the best

26  copyright litigation firms," *Legal 500* testimonials also described O+Z as having the "highest

27  level of expertise in copyright litigation" and a "deep bench" of "experienced and polished trial

1  lawyers," who are "both smart and strategic."

2      22.    O+Z is a litigation boutique. Prior to this matter, we had never served as counsel

3  in a class action. While we have been involved in many very large copyright cases, they have all

4  been mass enforcement cases where we represent individual plaintiffs asserting claims on their

5  own behalf.

6      23.    O+Z has litigated numerous BitTorrent copyright infringement cases, including

7  against several internet service providers. *See Cox Commc'ns v. Sony Music Entertainment et al.*,

8  No. 24-171 (U.S.) (on appeal to the U.S. Supreme Court after $1 billion jury verdict finding Cox

9  liable for contributory and vicarious copyright infringement of more than 10,000 sound

10 recordings and musical compositions); *Warner Records Inc et al.*, *v. Charter Commc'ns, Inc.*,

11 1:19-cv-00874 (D. Colo.) & *UMG Recordings, Inc. et al.*, *v. Charter Commc'ns, Inc.*, 1:21-cv-

12 02020 (D. Colo.) (settled parallel peer-to-peer copyright infringement cases involving more than

13 13,800 sound recordings and musical compositions)); *UMG Recordings, Inc. et al., v. Bright

14 House Networks, LLC.*, 8:19-cv-00710 (M.D. Fla.) (settled peer-to-peer copyright infringement

15 case involving more than 7,500 sound recordings and musical compositions); *In re Frontier

16 Comm'ns Corp.*, 20-22476 (Bankr. S.D.N.Y.) & *UMG Recordings, Inc. et al.*, *v. Frontier

17 Comm'ns Corp.*, 1:21-cv-05050 (S.D.N.Y.) (settled parallel peer-to-peer copyright infringement

18 cases involving more than 12,000 sound recordings); *Warner Records Inc. et al v. Altice USA,

19 Inc.*, 2:23-cv-00576 (E.D. Tex) (similar pending case involving more than 10,000 sound

20 recordings and musical compositions); *UMG Recordings, Inc. et al v. Verizon Commc'ns Inc.*,

21 1:24-cv-05285 (S.D.N.Y.) (similar pending case involving more than 17,300 sound recordings));

22 and *Grande Commc'ns Networks LLC v. UMG Recordings, Inc. et al.* (No. 24-967) (U.S.)

23 (certiorari petition filed by Grande to U.S. Supreme Court after $47 million jury verdict in favor

24 of music companies).

25      24.    O+Z has also litigated a copyright infringement case on behalf of four education

26 publishers against one of the shadow pirate libraries at issue in this case, Library Genesis (aka

27 LibGen). *See Cengage Learning, Inc. et al. v. Does 1-50 d/b/a Library Genesis*, Case No. 23-cv-

08136-CM (S.D.N.Y. Sept. 24, 2024) ($30 million default judgment and permanent injunction prohibiting infringement of plaintiffs' works or facilitation of such infringement, and transfer of Libgen domain names to plaintiffs).

25.     As a trial lawyer, I have served as lead counsel in obtaining many of the largest copyright and trademark verdicts in history. This includes a $1 billion jury verdict for the music industry against Cox Communications for its illegal downloading, copying and distributing of copyrighted music through BitTorrent. This verdict was reportedly the 5th largest jury verdict in the United States in 2019, and one of the largest copyright statutory damages awards ever. (*Sony Music Entertainment et al.*, *v. Cox Comm'ns, Inc. et al.*, Case No. 1:18-cv-950-LO-JFA (E.D.VA)).[5]

26.     Over the years, O+Z has served as the primary counsel to the publishing industry dealing with the problem of mass counterfeiting of physical books. In this vein, we have brought claims against numerous distributors of illegal counterfeit books. *See John Wiley & Sons, Inc. et al.*, *v. Rivadeneyra*, 2:2013-cv-01085 (D.N.J.); *The McGraw-Hill Companies, Inc., et al.*, *v. Chuck Jones, et al.*, 5:14-cv-0042-TBR-LLK (W.D. Ken.); *Cengage Learning, Inc. et al.*, *v. Follett Corp. et al.*, 1:17-cv-04672-PKC (S.D.N.Y.); *Cengage Learning, Inc. et al. v. Appalacian Inc. et al.*, Civil Action No. 17-cv-1009 (MCA) (LDW); *Pearson Educ., Inc. et al.*, *v. Rentu.com, LLC*, 2:18-CV-0040 (DLB)(CJS) (E.D. Ky.); *Pearson Educ., Inc. et al.*, *v. C&N Logistics, Inc.*, Case No. 3:18-cv-00438 (M.D. Tenn.); *Cengage Learning, Inc. et al.*, *v. Morena for Int'l Trading*, 19-cv-1727 (N.D. Ill.); *McGraw Hill LLC et al.*, *v. Radius Int'l, Inc.*, 1:21-cv-04325 (N.D. Ill.); *Pearson Educ., Inc. et al.*, *v. Bookholders LLC*, PX-21-cv-0594 (D. Md.); *Pearson Educ., Inc. et al.*, *v. Hasan, et al.*, No. 1:23-cv-07284-PAC (S.D.N.Y.).

27.     Also, among the counterfeiting cases we handled was a case against a commercial book distributor who served as the back end of Amazon's book rental program. There, I served

---

[5] The verdict was later vacated, with the Fourth Circuit affirming willful contributory liability for over 10,000 copyrights but reversing the jury's vicarious liability finding and remanding for retrial on damages. The case is currently before the U.S. Supreme Court with a ruling expected in mid-2026.

as lead trial counsel in obtaining a large jury verdict against a U.S. commercial book distributor for willful copyright and trademark and infringement, in which the jury awarded copyright statutory damages of $100,000 per work, and maximum trademark damages of $2 million per mark, along with a fee award and a permanent injunction against any further infringement, arising from the defendant's import and sale of counterfeits. The verdict was upheld by U.S. District Judge William H. Pauley III. This trial was fundamental to the book publishing industry's fight to ensure distributors adequately safeguard against counterfeits. (*John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606 (S.D.N.Y. 2018)).

28.    As part of our efforts to address the systemic counterfeiting problem, O+Z worked with the publishing industry and with the book distributors to develop Best Practices for distributors. Those Best Practices have been widely adopted and stopped a significant amount of the counterfeiting that was plaguing the industry. *See* https://stopcounterfeitbooks.com/; https://stopcounterfeitbooks.com/barnes-noble-education-major-educational-content-providers-commit-to-fight-counterfeit-textbooks/.

29.    I have also been counsel in numerous high profile and important copyright cases over the last several decades, including: *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004 (9th Cir. 2001) (enjoining Napster from using its peer-to-peer service, in effect, shutting down the company); *In re: Aimster Copyright Litigation*, 02-4125 (7th Cir. 2003) (upholding preliminary injunction shutting down peer-to-peer file-sharing service); *MGM v. Grokster*, 545 U.S. 913 (2005) (finding Grokster, a company that distributed and promoted software to infringe copyrights, liable for resulting acts of infringement); *Sony BMG Music Entertainment, et al.*, *v. Tenenbaum*, No. 12-2146 (1st Cir. 2013) (upholding judgment in favor of record companies for willful copyright infringement); *Capitol Records, Inc. v. Thomas-Rasset*, No. 11-2820 (8th Cir. 2012) (upholding judgment in favor of record companies for willful copyright infringement); *Hachette Book Group, Inc. v. Internet Archive*, No. 23-1260 (2d Cir. 2024) (affirming ruling that Internet Archive's system of scanning physical books to convert into e-books was not fair use). I was personally involved in these prominent cases, securing wins for the content owners.

30.     O+Z also has deep experience in AI cases including in the book publishing and music industries. Our lawyers are regularly called upon to speak at CLE events and provide background information for members of Congress. We are representing several music publishers in a case similar to this one against Anthropic, which we filed in 2023. (*Concord v. Anthropic*, Case No. 5:24-cv-03811 (N.D. Cal.)). O+Z is also representing several news publishers including Condé Nast, The Atlantic, and Vox in a copyright and trademark infringement action against Cohere, an artificial intelligence company, for its unauthorized use and copying of the publishers' news and magazine articles and brand names. (*Advance v. Cohere*, 1:25-cv-01305 (S.D.N.Y))*.* O+Z also began counseling a group of education publishers on AI issues in 2024.

**Our Firms' Work as Publishers' Coordination Counsel, by Mr. Edelson & Mr. Oppenheim**

31.     On August 11, 2025, Class Counsel filed a Notice of Association of Additional Counsel, informing the Court that Edelson PC and O+Z—would serve as "Publishers' Coordination Counsel" ("PCC"). However, our work in this matter began weeks earlier.

32.     After the Court issued its July 17, 2025, Order on Class Certification, representatives from certain publishers began engaging with Class Counsel and sought additional counsel to assist in representing the interests of publishers in the common goal of maximizing the per-work recovery for the Class. Indeed, Class Counsel invited the active participation of publisher class members through the PCC, based on their deep knowledge in copyright law and the publishing industry, value they could bring to the class as a whole, and because the class as originally proposed consisted of authors only.

33.     I, Jay Edelson, along with other attorneys at my firm, began speaking with publishers regarding this matter on July 26, 2025 (a Saturday). I spoke with individual publishers and as a group repeatedly in the ensuing days.

34.     I, Matthew Oppenheim, along with other attorneys at my firm, began speaking with publishers regarding this matter on approximately July 16, 2025, after the summary judgment decision was issued.  Those discussions continued on July 18 immediately after the Class Certification Order was issued.  I spoke with individual publishers and as a group

Declaration of Jay Edelson and Matthew
J. Oppenheim ISO Application for Award
of Attorneys' Fees and Expenses/Charges                    -10-

1    repeatedly in the ensuing days.

2         35.    Edelson and O+Z spoke jointly to the publishers on July 31. Since that initial July

3    31 meeting, our firms have engaged in near-daily (and often many-times-daily) meetings with

4    legal teams from AAP, the Publishers Association of the UK (PA), the Association of University

5    Presses, as well as numerous major trade, education, and independent publishers. These

6    organizations and businesses dedicated their highest-level in-house counsel to this case for

7    months at no cost to the class.

8         36.    Through these meetings, the PCC identified executive-level witnesses from the

9    publishers who volunteered to testify about how their industry works, the creative, educational

10   and scientific importance of books, as well as their efforts to fight piracy and the harm that

11   comes from that piracy. The PCC then worked with those witnesses to gather documents for

12   expedited production in advance of trial and provide for their depositions.

13        37.    Meanwhile, the PCC joined Class Counsel in developing trial strategy and

14   contributing to expert reports, witness planning and the overall trial plan.

15        38.    The PCC engaged in an all-out effort to assist Class Counsel in compiling the

16   Works List, committing a team of lawyers with extensive knowledge, understanding and

17   experience with clearing works for inclusion in copyright cases, Copyright Office registration

18   issues, commercially available databases of registered works, nuances of the ISBN system,

19   works with multiple editions, foreign works, litigation experience against shadow libraries, and

20   many years working closely with publishers on all these issues. The PCC's attorneys worked

21   full-time for weeks with Class Counsel's team of lawyers, staff, and experts to refine the

22   technical analysis to assess works for satisfaction of the class criteria, including by searching

23   copyright office databases, identifying ISBNs, and matching works to the criteria for class

24   inclusion. The PCC team reviewed tens of thousands of files downloaded by Anthropic, engaged

25   with dozens of publishers and provided feedback to improve the expert technical analysis

26   through systematic improvements, all aimed at ensuring the Works List was accurate and as

27   thorough as possible.

39.     With that assistance from the PCC, Class Counsel was able to refine these matching processes and identify works which otherwise may not have been included. These efforts resulted in a Works List at least 20% larger than otherwise. Through the extensive efforts of the publishers and PCC, we were able to help the Class submit the Works List on the Court's schedule.

40.     The PCC participated in the settlement negotiations for the benefit of the entire class. The publishers' bargaining power and the Firms' own experience negotiating large settlements of this kind played a critical role in this settlement's outcome. Based on the Firms' extensive background in these matters, we believe the $1.5 billion settlement, and preliminary approval of such settlement, would not exist but for the contributions of the publishers and the PCC. In addition to its role in negotiating the settlement, the PCC helped draft both the term sheet and the settlement agreement, lending its class action expertise to reduce a complicated deal into an actionable agreement. In doing so, the PCC leveraged its knowledge of both the publishing industry and the administration of large-scale settlements to ensure the agreement effectively serves the interests of the Class.

41.     The PCC also participated extensively in the Working Group process on a short timeline, ensuring the creation of an allocation process that treats both authors and publishers fairly. Indeed, the PCC proposed the incredibly claimant-friendly distribution process—which we believe to be the most claimant-friendly ever designed—including the multiple opportunities for claimants to receive payment, automatic checks if claimants do not file a claim, and 18 months to come forward to collect their distribution.

42.     Since the Court granted preliminary approval, Dkt. 427, the PCC has continued its active role in advancing the Class's interests. For example, in the weeks following the Court's September 25, 2025, hearing, the PCC responded to a wave of publisher class member interest by holding town halls with publisher trade organizations and their members, both at home and abroad—including the AAP, UK Publishers' Association, International Publishing Association, Association of University Presses, Independent Publishers Guild, and Publishers' Licensing

1   Services. Collectively, approximately 800 publisher representatives attended these sessions. The

2   PCC also met or communicated with nearly 200 publisher class members individually, many of

3   them multiple times.

4       43.     The publishers, directed by the PCC, also agreed to undertake a massive effort in

5   gathering information for Notice. Dkt. 401 at 14. Over the course of six weeks, publishers

6   worked tirelessly to gather contact information for more than 750,000 authors or other potential

7   rightsholders associated with nearly 320,000 works in the Settlement, ensuring that the Notice

8   has the broadest possible reach to authors and other potential rightsholders. PCC worked hand-

9   in-hand with the publishers to coordinate this effort and gather information for the benefit of the

10  entire Class. The PCC supported publishers every step of the way ensuring notice information

11  was clear and in an easily consumable format for JND, mitigating delays in JND sending notice

12  out broadly and quickly within the court ordered timeframe.

13      44.     The PCC has continued to hold weekly meetings with publishers to assist with the

14  information-gathering to facilitate the notice and claims process. The PCC has met or conferred

15  dozens of times with JND and/or Class Counsel to clarify and resolve questions that the

16  publishers raised, ensuring efficient administration of the settlement and a high claims rate.

17  Given the significant role that publishers play in providing the information necessary for this

18  case—and the unprecedented size and complexity of the settlement—the PCC has undertaken

19  substantial efforts to ensure that publishers have the answers, guidance, and resources they need

20  to understand their options under the settlement, including the option to opt out, submit a claim,

21  and file an objection.

22      45.     The PCC has been present at every critical juncture of this settlement,

23  coordinating the resources and expertise of the publishers to help secure the settlement's

24  exceptional monetary value and to assemble the information necessary for its effective

25  administration. Throughout the PCC's involvement, the PCC firms devoted multiple attorneys

26  full-time—including mornings, nights, and weekends—to meet the Court's deadlines and

27  prepare to conduct a trial that included new publisher witnesses, and then to work towards the

1    settlement that has been negotiated and notice and claims process approved by the Court.

2    **The PCC Firms' Financial Risk and Work on the Case, by Mr. Edelson & Mr. Oppenheim**

3    46.    None of the publishers have paid the PCC anything and the PCC has disclaimed

4    payments outside of the class action. The publishers are not paying our costs, and the PCC has

5    disclaimed reimbursement of costs outside the class action process. Nor did we ask for fees or

6    costs directly from the publishers: our role is representing publishers' interests as a whole.

7    47.    The PCC undertook this case on a purely contingent basis, which bore significant

8    risks with no guarantee of success. Any number of things could have derailed this case before

9    trial—the possibility that this Court could decertify the class; a Rule 23(f) petition; an emergency

10    motion to stay in the Ninth Circuit; forthcoming Daubert motions; and a motion to certify an

11    interlocutory appeal, among others. There is also always the risk of a reversal on appeal,

12    particularly where a fair use defense is in play. Given these significant uncertainties, the PCC

13    committed considerable resources with no guarantee that any fee would ever be realized.

14    48.    Despite these substantial risks, the PCC advanced costs and were prepared to

15    further dedicate significant resources to prosecute this case, including through trial and any

16    appeals. When the PCC agreed to become engaged in this case, they understood that they would

17    need to forego other potentially profitable work in order to litigate this case to a successful

18    conclusion.

19    49.    As noted above, the time and effort devoted by the PCC to this case was

20    significant. In total, the PCC collectively recorded over 3,411 hours of work and a collective

21    lodestar of $3,090,956.50. The time spent by the Firms, by timekeeper and their respective

22    lodestars is attached as **Exhibit A**. Set forth as **Exhibit B** are the number of hours the Firms

23    spent on various categories of activities related to the action by each biller.

24    50.    The PCC's lodestar represents the work that we have undertaken since our

25    involvement in the case and does not include the additional work that will be required through

26    final approval. The PCC's lodestar likewise does not include any time spent preparing this Fee

27    Petition or the supporting documents for the same.

**Edelson PC's Rates, Expenses and Review, by Mr. Edelson Only**

51.    The rates set forth in **Exhibit A** for Edelson timekeepers are the usual and customary rates set by Edelson and are the same rates the Firm charges its hourly paying clients.[6]

52.    It is my Firm's policy that each attorney is responsible for keeping track of his or her billable time by, at least, the tenth of an hour in centralized software known as "Freshbooks."

53.    Edelson contributed substantially to the common costs fund maintained by Class Counsel in the amount of $250,000.00 (in assessments over time) since becoming involved as PCC.

54.    All of the information regarding Edelson's time and expenses is taken from time and expense reports and supporting documentation prepared and/or maintained by the Firm in the ordinary course of business. These reports (and backup documentation where necessary or appropriate) were reviewed by me and under my direction, in connection with the preparation of this Declaration. The purpose of this review was to confirm both the accuracy of the entries, as well as the necessity for, and reasonableness of, the time and expenses committed to the Litigation. As a result of this review, reductions were made to time in the exercise of billing judgment, including other attorneys who contributed to the case but had less than ten hours of time. Based on this review and the adjustments made, I believe that the time reflected in the Edelson's lodestar calculation is reasonable and was necessary for the effective and efficient prosecution and resolution of the Litigation.

55.    The Edelson team expects to devote additional time to this matter in the months following this filing. In particular, we anticipate performing work to support publishers during the claims process, assist Class Counsel and the Settlement Administrator with publisher-related issues, and prepare for the final approval briefing and hearing. I estimate these tasks will require an additional 422.5 hours of Edelson time expenditure at a lodestar of $565,775.00. These estimates are informed by the volume and complexity of analogous tasks already completed in

---

[6]    The sole exception is Mr. Edelson's rate, which is currently $3,000 per hour for matters in which the Firm serves as lead counsel. Mr. Edelson is using a reduced rate here to reflect that he is serving in a non-lead capacity.

1    this case post-settlement and by our assessment of the work that will reasonably be required as

2    the settlement and claims process proceeds. A per-person, per-month overview of these

3    projections is available at the Court's request. These projections do not include time likely to be

4    spent in the event of appeals.

5    **O+Z's Rates, Expenses and Review, by Mr. Oppenheim Only**

6          56.    O+Z generally does not agree to handle matters strictly on an hourly basis.

7    Rather, in the ordinary course, we negotiate alternative billing arrangements that generally

8    involve a mix of both hourly rates and success fees. Those alternative billing arrangements are

9    customized for the particular matter, taking into consideration a variety of factors, including

10    claims and likely defenses, the risk involved, and the potential for recovery, among other factors.

11    In virtually all instances, the alternative billing arrangement model results in lower monthly fees

12    for the clients and higher revenue for O+Z. For purposes of this petition, we have used our

13    baseline hourly rates that are intentionally set at below-market levels to provide extra value to

14    our clients and allow for alternative billing arrangements, but we have not included any success

15    fee or success fee-multipliers in the exhibits setting forth O+Z's rates and lodestar. The rates set

16    forth in **Exhibit A** for O+Z timekeepers are the usual and customary rates that O+Z charges its

17    hourly paying clients in 2025 in the absence of an alternative billing arrangement.

18          57.    It is my Firm's policy that each attorney and billable timekeeper is responsible for

19    keeping track of his or her billable time by, at least, the tenth of an hour in centralized software

20    known as "eBillity."

21          58.    O+Z seeks an award of $14,002.09 in expenses in connection with the

22    prosecution of the Litigation. These expenses fall into the following two categories:

23              a.    Transportation: $8,679.99. In connection with the prosecution and

24    settlement of this case, O+Z has paid for work-related transportation expenses related to

25    attending court hearings, publisher-class member meetings, and the mediation. The date,

26    destination and purpose of each trip is set forth in the attached **Exhibit C**. O+Z is not seeking

27    reimbursement for hotel or meal expenses incurred during travel.

Declaration of Jay Edelson and Matthew
J. Oppenheim ISO Application for Award
of Attorneys' Fees and Expenses/Charges

-16-

b.      e-Discovery Review Platform: $5,322.10. Relativity One is an eDiscovery Review Platform that the Firm used to securely house and review documents and other electronically stored information in connection with third-party subpoenas issued to absent class member publishers. The vendor that was paid for these services and the breakdown of these charges by date are set forth in **Exhibit D**.

59.      O+Z's expenses pertaining to this case are reflected in the books and records of the Firm. These books and records are prepared from receipts, credit card statements, and other documents and are an accurate record of the expenses

60.      The information in this declaration regarding O+Z's time and expenses is taken from time and expense reports and supporting documentation prepared and/or maintained by O+Z in the ordinary course of business. These reports (and backup documentation where necessary or appropriate) were reviewed by me and under my direction, in connection with the preparation of this Declaration. The purpose of this review was to confirm both the accuracy of the entries, as well as the necessity for, and reasonableness of, the time and expenses committed to the Litigation. As a result of this review, reductions were made to both time and expenses in the exercise of billing judgment, including other attorneys who contributed to the case but had less than ten hours of time and all time spent on this matter prior to August 1, 2025. Based on this review and the adjustments made, I believe that the time reflected in O+Z's lodestar calculation and the expenses for which reimbursement is sought herein are reasonable and were necessary for the effective and efficient prosecution and resolution of the Litigation. In addition, I believe that the expenses are all of a type that would normally be charged to a fee-paying client in the private legal marketplace.

61.      The O+Z team expects to devote additional time to this matter in the months following this filing. In particular, we anticipate performing work to support publishers during the claims process, assist Class Counsel and the Settlement Administrator with publisher-related issues, and prepare for the final approval briefing and hearing. I estimate these tasks will require an additional 1,663 hours of O+Z time expenditure at a lodestar of $1,106,850.00 (combined

1   with Edelson's projections, the PCC collectively projects 2,085.5 hours with a combined lodestar

2   of $1,672,625.00.). These estimates are informed by the volume and complexity of analogous

3   tasks already completed in this case post-settlement and by our assessment of the work that will

4   reasonably be required as the settlement and claims process proceeds. Since preliminary

5   approval alone, O+Z has spent hundreds of hours assisting publishers with the claims process

6   and anticipates this will continue. A per-person, per-month overview of these projections is

7   available at the Court's request. These projections do not include time likely to be spent in the

8   event of appeals.

10   We declare under penalty of perjury that the foregoing statements (where made by the

11   respective signer) are true and correct.

13   Executed on this 3rd day of December, 2025 at Boca Raton, Florida.

15   */s/ Jay Edelson*

16   Jay Edelson

17   Executed on this 3rd day of December, 2025 by Matthew Oppenheim at Washington,

18   D.C.

19   */s/ Matthew J. Oppenheim*

20   Matthew J. Oppenheim

# EXHIBIT A

**Exhibit A**

PCC Fees By Timekeeper

| Edelson PC | Title | Hours | Rate | Subtotal |
|---|---|---|---|---|
| Jay Edelson | Partner | 301 | $2,000.00 | $602,000.00 |
| Eli Wade-Scott | Partner | 402.6 | $1,400.00 | $563,640.00 |
| Ryan Andrews | Partner | 131 | $1,600.00 | $209,600.00 |
| Max Hantel | Associate | 46.6 | $700.00 | $32,620.00 |
| Melissa Muller | Associate | 89.3 | $575.00 | $51,347.50 |
| Seth Mayer | Associate | 14.5 | $700.00 | $10,150.00 |
| Hannah Hilligoss | Associate | 22 | $800.00 | $17,600.00 |
| **EDELSON TOTAL** | | **1007** | | $ **1,486,957.50** |

| O+Z | | Hours | Rate | Subtotal |
|---|---|---|---|---|
| Matthew Oppenheim | Partner | 247.8 | $ 900.00 | $ 223,020.00 |
| Jeffrey Gould | Partner | 427.8 | $ 900.00 | $ 385,020.00 |
| Corey Miller | Partner | 60.3 | $ 855.00 | $ 51,556.50 |
| Katheryn Enters | Partner | 551.9 | $ 755.00 | $ 416,684.50 |
| Keith Howell | Associate | 245.7 | $ 725.00 | $ 178,132.50 |
| Carly Kessler Rothman | Associate | 163.2 | $ 700.00 | $ 114,240.00 |
| Lauren Bergelson | Associate | 17.7 | $ 605.00 | $ 10,708.50 |
| Bret Matera | Associate | 14.4 | $ 565.00 | $ 8,136.00 |
| Eddie Crouse | Associate | 22.6 | $ 555.00 | $ 12,543.00 |
| Michelle Gomez-Reichman | Associate | 15.2 | $ 555.00 | $ 8,436.00 |
| Maureen Garry | Program Director | 453.2 | $ 330.00 | $ 149,556.00 |
| Derek Keimel | Paralegal | 39.4 | $ 265.00 | $ 10,441.00 |
| Ahmin Thornhill | Paralegal | 25.5 | $ 245.00 | $ 6,247.50 |
| Brandon Agraviador | Paralegal | 46.5 | $ 245.00 | $ 11,392.50 |
| Drew Perez | Paralegal | 30.9 | $ 245.00 | $ 7,570.50 |
| Karla Rodriguez | Paralegal | 29.7 | $ 245.00 | $ 7,276.50 |
| Mel Lamma | Paralegal | 12.4 | $ 245.00 | $ 3,038.00 |
| **O+Z TOTAL** | | **2404.2** | | $ **1,603,999.00** |

| PCC TOTAL | | **3411.2** | | $ **3,090,956.50** |
|---|---|---|---|---|

# EXHIBIT B

**Exhibit B**
PCC Fees By Category & Timekeeper

| Edelson Timekeeper | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | Total Sum of Hours | Current Rate | Lodestar at Current Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jay Edelson (P) | 1.6 | 0 | 63.1 | 20.5 | 1.2 | 64.4 | 0 | 10 | 6 | 0 | 134.2 | 301.0 | $2,000.00 | $602,000.00 |
| Eli Wade-Scott (P) | 1.6 | 0 | 108.4 | 11.9 | 3.2 | 111 | 0 | 11.1 | 11.6 | 0 | 143.8 | 402.6 | $1,400.00 | $563,640.00 |
| Ryan Andrews (P) | 0 | 0.8 | 35.5 | 0 | 2.7 | 8.1 | 0 | 1.8 | 1.4 | 0 | 80.7 | 131.0 | $1,600.00 | $209,600.00 |
| Max Hantel (A) | 0 | 0 | 8.2 | 0 | 0 | 26.7 | 0 | 1.5 | 0 | 0 | 10.2 | 46.6 | $700.00 | $32,620.00 |
| Melissa Muller (A) | 0 | 0 | 22.5 | 0 | 0 | 34.2 | 0 | 0 | 0 | 0 | 32.6 | 89.3 | $575.00 | $51,347.50 |
| Seth Mayer (A) | 0 | 0 | 4.4 | 0 | 0 | 10.1 | 0 | 0 | 0 | 0 | 0 | 14.5 | $700.00 | $10,150.00 |
| Hannah Hilligoss (A) | 0 | 0 | 13.7 | 0 | 0 | 2.5 | 0 | 0 | 5.8 | 0 | 0 | 22.0 | $800.00 | $17,600.00 |
| **Edelson Total:** | **3.2** | **0.8** | **255.8** | **32.4** | **7.1** | **257** | **0** | **24.4** | **24.8** | **0** | **401.5** | **1007** | | **$1,486,957.50** |

| O+Z Timekeeper | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | Total Sum of Hours | Current Rate | Lodestar at Current Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Matthew Oppenheim (P) | | | 15.6 | 34.4 | | 89.8 | 4 | 26.3 | | | 77.7 | 247.8 | $900.00 | $223,020.00 |
| Jeffrey Gould (P) | | 1.7 | 55.7 | 73.6 | | 132.9 | 9.5 | 37.5 | 1.9 | 0.5 | 114.5 | 427.8 | $900.00 | $385,020.00 |
| Corey Miller (P) | | 1.5 | 6.8 | 11.2 | | 10.5 | 27.5 | | | 2.2 | 0.6 | 60.3 | $855.00 | $51,556.50 |
| Katheryn Enters (P) | | 14.1 | 12.1 | 231.2 | | 246.5 | 1.3 | | | | 46.7 | 551.9 | $755.00 | $416,684.50 |
| Keith Howell (A) | | 8.3 | 8.6 | 172.4 | | 38.3 | | | 5.1 | 8.3 | 4.7 | 245.7 | $725.00 | $178,132.50 |
| Carly Kessler Rothman (A) | | 1 | 50.6 | 9.7 | | 31 | 50.8 | | 0.6 | 1.6 | 17.9 | 163.2 | $700.00 | $114,240.00 |
| Lauren Bergelson (A) | | | 3.6 | | | | 14.1 | | | | | 17.7 | $605.00 | $10,708.50 |
| Bret Matera (A) | | | 2.5 | | | | | | 1.2 | 10.7 | | 14.4 | $565.00 | $8,136.00 |
| Eddie Crouse (A) | | | 16 | | | 0.6 | 6 | | | | | 22.6 | $555.00 | $12,543.00 |
| Michelle Gomez-Reichman (A) | | | 0.2 | 1.1 | | | | | | 13.9 | | 15.2 | $555.00 | $8,436.00 |
| Maureen Garry (PD) | | 20.6 | 1.5 | 176.2 | | 238 | | | | | 16.9 | 453.2 | $330.00 | $149,556.00 |
| Derek Keimel (PL) | 5.3 | | 6.2 | 2.7 | | 0.4 | 24.8 | | | | | 39.4 | $265.00 | $10,441.00 |
| Ahmin Thornhill (PL) | | | | 24 | | | | | | 1.5 | | 25.5 | $245.00 | $6,247.50 |
| Brandon Agraviador (PL) | | | | 46.5 | | | | | | | | 46.5 | $245.00 | $11,392.50 |
| Drew Perez (PL) | | | 0.9 | 30 | | | | | | | | 30.9 | $245.00 | $7,570.50 |
| Karla Rodriguez (PL) | | | | 29.7 | | | | | | | | 29.7 | $245.00 | $7,276.50 |
| Mel Lamma (PL) | | | | 12.1 | | | | | | | 0.3 | 12.4 | $245.00 | $3,038.00 |
| **O+Z Total:** | **5.3** | **47.2** | **180.3** | **854.6** | **0** | **788** | **138** | **63.8** | **8.8** | **38.7** | **279.3** | **2404.2** | | **$1,603,999.00** |

(1) Administrative
(2) Expert Consultants (including expert depositions)
(3) Pleading/briefing/legal analysis
(4) Case management
(5) Offensive discovery
(6) Client communication and defensive discovery
(7) Third-party discovery
(8) Court appearances/preparation
(9) Investigation and document analysis
(10) Depositions
(11) Settlement

(P) Partner
(A) Associate
(PD) Program Director
(PL) Paralegal

# EXHIBIT C

**Exhibit C**

O+Z Transportation: $8,679.99

| Name | Date | Destination | Purpose |
|------|------|-------------|---------|
| Oppenheim, M. | 8/13/25 | New York, NY | Publisher meetings |
| Oppenheim, M. | 8/18/25 - 8/19/25 | New York, NY | Mediation |
| Gould, J. | 8/18/25 - 8/19/25 | New York, NY | Mediation |
| Oppenheim, M. | 9/7/25 - 9/9/25 | San Francisco, CA | Preliminary Approval Hearing |
| Gould, J. | 9/7/25 - 9/9/25 | San Francisco, CA | Preliminary Approval Hearing |
| Oppenheim, M. | 9/24/25 - 9/26/25 | San Francisco, CA | Preliminary Approval Hearing |
| Gould, J. | 9/24/25 - 9/26/25 | San Francisco, CA | Preliminary Approval Hearing |

# EXHIBIT D

**Exhibit D**

eDiscovery Review Platform: $5,322.10

| Date | Vendor | Purpose |
|---|---|---|
| 9/23/25 | Cimplifi | eDiscovery security and review platform for securely storing and review documents |
| 10/16/25 | Cimplifi | eDiscovery security and review platform for securely storing and review documents |
| 11/18/25 | Cimplifi | eDiscovery security and review platform for securely storing and review documents |