GAW POE LLP
CHRISTOPHER WIMMER (BAR # 263275)
cwimmer@gawapoe.com
ONE EMBARCADERO, SUITE 1200
SAN FRANCISCO, CA 94111
Telephone: (415) 326-3957
Facsimile: (415) 737-0642

SLARSKEY LLC
DAVID N. SLARSKEY *pro hac vice application pending*
dslarskey@slarskey.com
767 THIRD AVENUE, 14TH FLOOR
NEW YORK, NY  10017
Telephone: (646) 893-6082

Attorneys for Proposed Intervenor Textbook and Academic Authors Association

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC. CHARLES GRAEBER, KIRK WALLACE JOHNSON, and MJ + KJ, INC., individually and on behalf of others similarly situated,<br><br>               Plaintiffs,<br><br>    vs.<br><br>ANTHROPIC PBC,<br><br>Defendants. | CASE NO. 3:24-CV-05417-WHA<br><br>**NOTICE OF MOTION AND MOTION TO INTERVENE AND FOR CURATIVE COMMUNICATION PURSUANT TO RULE 23(D); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>   Date:  January 27, 2026<br>   Time: 8:00 am<br>   Courtroom: 12 – 19th Floor<br><br>   The Honorable William H. Alsup |

## NOTICE OF MOTION AND MOTION TO INTERVENE
## AND FOR CURATIVE COMMUNICATION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE THAT** that on January 27, 2026 at 8:00 a.m., or as soon thereafter as this matter may be heard before the Honorable William H. Alsup, in Courtroom 12–19th Floor of the United States District Court for the Northern District of California in the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102, Proposed Intervenor Textbook and Academic Authors Association ("TAA") shall, and hereby does, move this Court, for an order granting TAA's Motion to Intervene and for Curative Communication pursuant to Federal Rule of Civil Procedure 23(d).

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Declarations of Kim Pawlak and David Slarskey, and all papers and pleadings on file in this action, and any evidence or argument that may be presented at the time of hearing.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT FACTS AND BACKGROUND ......................................................................... 2

A.    Background on the Textbook and Academic Authors Association .......................... 2

B.    TAA's Concerns for Textbook Authors (or Authors of "Educational" Works, as Defined
      by the Settlement Agreement) .................................................................................. 3

C.    The Misleading Communications Sent by Sage ...................................................... 4

D.    TAA's Effort to Address the Issue Through Class Counsel .................................... 7

E.    TAA's Request for Relief ........................................................................................ 8

ARGUMENT .......................................................................................................................... 9

I.    Textbook and Academic Authors Association Should be Permitted to Intervene for the
      Purpose of Raising Concerns About the Claims Process ........................................ 9

II.   The Court Should Direct Class Counsel to Issue a Curative Notice to Sage Authors and
      Bar Further Communications Between Publishers and Authors That Are Inconsistent
      With the Court-Approved Settlement Framework ................................................. 11

CONCLUSION ..................................................................................................................... 13

1

## **<u>TABLE OF AUTHORITIES</u>**

2

**Cases**

3

*Abdurahman v. Alltran Fin., LP*
    330 F.R.D. 276 (S.D. Cal. 2018)..........................................................................9

4

5

*Allied Concrete & Supply Co. v. Baker*
    904 F.3d 1053 (9th Cir. 2018)..............................................................................9

6

*Am. Rivers v. Wheeler*
    No. C 20-04636 (WHA), 2020 WL 5993229 (N.D. Cal. Oct. 9, 2020)................9

7

8

*Baykeeper v. U.S. Env't Prot. Agency*
    No. C 19-05941 (WHA), 2020 WL 228279 (N.D. Cal. Jan. 15, 2020) ................9

9

*Camp v. Alexander*
    300 F.R.D. 617 (N.D. Cal 2014) .........................................................................13

10

11

*Cnty. of Santa Clara v. Astra USA, Inc.*
    No. C 05-03740 (WHA), 2010 WL 2724512 (N.D. Cal. July 8, 2010)...............11

12

*Gulf Oil Co. v. Bernard*
    452 U.S. 89 (1981)...............................................................................................10

13

14

*In re Lendingclub Sec. Litig.*
    282 F. Supp. 3d 1171 (N.D. Cal. 2017) ...........................................................9, 10

15

*O'Connor v. Uber Techs., Inc.*
    No. C-13-3826 (EMC), 2013 WL 6407583 (N.D. Cal. Dec. 6, 2013) ......10, 11, 12

16

17

*O'Connor v. Uber Techs., Inc.*
    No. C-13-3826 (EMC), 2014 WL 1760314 (N.D. Cal. May 2, 2014)..................10

18

*Retiree Support Grp. of Contra Costa Cnty. v. Contra Costa Cnty.*
    No. 12-CV-00944 (JST), 2016 WL 4080294 (N.D. Cal. July 29, 2016).........11, 12

19

20

*Scholl v. Mnuchin*
    483 F. Supp. 3d 822 (N.D. Cal. 2020) ..............................................................9, 10

21

*Smith v. L.A. Unified Sch. Dist.*
    830 F.3d 843 (9th Cir. 2016)...........................................................................8, 9, 10

22

23

**Rules**

24

Fed. R. Civ. P. 23(d) ................................................................................................1

25

Fed. R. Civ. P. 24 .................................................................................................8, 9

26

27

28

1

## STATEMENT OF THE ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3))

2  1.    Should Textbook and Academic Authors Association ("TAA") be permitted to

3         intervene in this action, on a limited basis, to present concerns to the Court regarding

4         the administration of the settlement process?

5  2.    Should the Court direct Class Counsel to issue a curative notice to Class member

6         authors, whose publisher is Sage Publishing ("Sage"), (i) directing them to disregard

7         communications they might have received from Sage concerning the claims process;

8         (ii) informing them that the Court has approved a process for determining their share

9         of the settlement proceeds if they do not know how much they should receive, and

10        (iii)( explaining that the Court-approved settlement and claims process, including the

11        plan of allocation, do not require the settlement proceeds for a Work to be split based

12        on the *sales royalty rate* in the author's publishing agreement?

1

## PRELIMINARY STATEMENT

2      Textbook and Academic Authors Association ("TAA") is a not-for-profit 501(c)(3) member

3  organization of approximately 3,800 members, at least 200 of which are Class members,[1] devoted to

4  supporting authors of textbooks, scholarly journal articles, and academic books. At the invitation of

5  Class Counsel, TAA participated in the "Author/Publisher Working Group" that worked to ensure that

6  the plan of distribution for settlement proceeds fairly and accurately allocates recoveries between

7  textbook authors and publishers. Since the Court's preliminary approval of the settlement, acting

8  alongside Class Counsel, TAA has been working in support of the settlement, informing authors as to

9  how to access and participate in the claims process.

10      As detailed herein, on Friday, December 12, 2025, TAA became aware that Sage Publishing,

11  Inc. ("Sage"), one of the leading textbook publishers, estimated to have more than 1,000 "educational

12  works" for which Class members are entitled to recovery in settlement, had contacted its Class authors

13  by email. The mass email contained misleading communications—including instructions to authors as

14  to how to fill out the claim submission form in a manner designed to benefit Sage at the authors'

15  expense. As evidenced by the response of the author who received this communication and sent it to

16  TAA, the communication may mislead authors and encourage them to seek less than they are entitled

17  to in the settlement allocation process. The Sage emails undermine the Court-ordered distribution plan

18  and unfairly threaten to adversely impact authors in the claims process, for Sage's own benefit.

19      Mindful of this Court's pronouncements that it wanted to be promptly informed of any issues

20  related to the plan of distribution that might result in authors not being treated fairly, or Class members

21  otherwise being misinformed such that they may not file claims or obtain the relief to which they are

22  entitled, TAA promptly raised its concerns with Class Counsel to discuss them last week. TAA now

23  seeks to intervene and bring the issue before the Court: prompt corrective action should be required

24  given the looming deadlines and the holidays.

25

26

27

28

---

[1] Some of these authors have several works in the class.

TAA seeks (i) to intervene in this action for the limited purpose of bringing to the Court's attention its concerns with the claims process, and (ii) an order requiring curative measures pursuant to Rule 23(d).

### RELEVANT FACTS AND BACKGROUND

**A.      Background on the Textbook and Academic Authors Association**

TAA is a 501(c)(3) not-for-profit organization that is the only organization devoted solely to supporting authors of textbooks, scholarly journal articles, and academic books, by providing comprehensive resources, events, and networking opportunities, and by advocating on their behalf. (*See* Decl. of Kim Pawlak dated December 21, 2025 ("Pawlak Decl.") ¶ 1.) TAA has approximately 3,800 members, of which at least 200 are class members. (*Id.* ¶ 21.)

Class Counsel consulted TAA in connection with the class settlement in this action on or about September 13, 2025, several days after the September 8, 2025 conference at which the Court expressed its concern to assure that authors and publishers were placed on an equal playing field in the process for allocating settlement proceeds between them. (*See* Tr. of Sept. 8, 2025 proceedings at 15:08–17 ("I would like for you to explain what is going on between the guilds, the publishers. What kind of deal are you trying to do behind the scenes?").) (Pawlak Decl. ¶ 2.)

Since then, TAA has worked diligently with Class Counsel to support settlement efforts and to fairly resolve issues concerning the allocation of settlement proceeds between textbook and academic authors on the one hand, and publishers on the other. (*Id.* ¶ 3.) In particular, TAA leadership participated in the "Author-Publisher Working Group" settlement mediation and negotiations that took place between September 13 and the preliminary approval hearing on September 25, 2025. (*Id.* ¶¶ 3–4.) Given TAA's interest in the settlement, on behalf of its authors, TAA's Executive Director personally attended the preliminary approval hearing, traveling from her home in Wisconsin. (*Id.* ¶ 4.) TAA has been assisted by counsel from Slarskey LLC and Archstone Law Group, David Slarskey and Brenda Ulrich, whose work in support of the class settlement efforts has been acknowledged by Class Counsel. (*See* Doc. 505-3 (Declaration of Rachel Gelman) ¶ 45 (noting that Slarskey and Archstone are "two firms experienced in representing authors," and disclosing that "[i]n light of their

contributions, Class Counsel intends to share $137,431.40 from any fee awarded . . . for work completed in connection with the Author-Publishing Working Group.").

Since the preliminary approval hearing, TAA has prepared and distributed materials to its member authors, and conducted webinars designed to raise awareness of the settlement and inform authors how to navigate the process and file a claim. Those webinars have been open to all authors (not only TAA members) as a public service. TAA has coordinated those efforts with Class Counsel, who have attended webinars TAA hosted, and incorporated feedback from Class Counsel to assure that it is providing accurate and reliable information to authors. (Pawlak Decl. ¶ 6.)

**B.      TAA's Concerns for Textbook Authors (or Authors of "Educational" Works, as Defined by the Settlement Agreement)**

For textbook authors in particular—whose works were defined as "educational works" based on the identity of their publishers for purposes of settlement administration—there are additional complexities in the settlement process: whereas trade and academic authors enjoy a presumption that they will share 50/50 in settlement proceeds with their publishers, and may simply claim as much, textbook authors do not enjoy that presumption. (Pawlak Decl. ¶ 7.)

Instead, the settlement provides for a process whereby participating authors and participating publishers each state their claim as to their best understanding of their contractual relationship, and what percentage of the proceeds they should receive vis-à-vis the other—if they know—and if they disagree, or if they do not know what percentage they should receive, there is a process defined for the exchange of information. If no agreement can *then* be reached, the dispute will be submitted to a Special Master. Importantly, if one party claims, and the other party does not claim (and does not opt out), then the claiming party will receive its unopposed claimed percentage of the recovery, and may receive the entirety of the settlement proceeds for a particular work. (*Id.* ¶ 8.)

There are certain built in economic dynamics associated with this complex structure, insofar as there are far fewer educational work publishers, who each have aggregate interests in a greater number of works than each individual educational work author. The publishers have access to far better information and resources than the authors, and can act in a coordinated, strategic fashion across

all their titles in an effort to maximize their recovery across their portfolio of works. This is one reason why TAA looks to the Court, through this application and otherwise, to perform the critical function of closely monitoring communications to class members. Publishers have a strong incentive to take advantage of authors through unfair communications, and it is much easier for them to do so on a wholesale basis. (*Id.* ¶ 9.)

At the preliminary approval hearing, the Court acknowledged that this distribution plan "necessarily is going to have some complications," and that "to manage this process to a successful and an ethical end" would require counsel "to bird dog this at every stage and bring to my attention problems when they arise so that we can get together and see how to solve the problems." (Tr. of Sept. 25, 2025 Proceedings at 17:03–16.) It is based on those comments that TAA seeks to intervene and place the following issue before the Court. (Pawlak Decl. ¶ 10.)

## C.     The Misleading Communications Sent by Sage

On December 12, 2025, TAA's Executive Director received an email from one of TAA's members, who forwarded an email received from Sage Publications. (*See* Pawlak Decl. ¶ 11 and Ex. 1, Dec. 12, 2025.[2]) Ms. Pawlak has since confirmed that several other Sage authors in the Class received similar emails. TAA has several concerns about the email, and presume that Sage sent out similar emails to the many hundreds of authors in their educational portfolio.

*First*, fundamentally, the email contradicts, and for some recipients, may well be understood to supersede the Court-approved notice that is intended to guide authors with respect to how to file a claim, and what they may be entitled to in the settlement. There is a Court-approved process for informing authors about the settlement terms, and for resolving issues if an author does not know how much they are entitled to under their contract or the settlement agreement. The Court-approved process does *not* begin with the publisher instructing the author on what the publisher believes the author should receive. Rather, contrary to Sage's email that (as discussed below) presumes the correctness of

---

[2] I have redacted the name and title of the member to protect that author from any potential retaliation. Publishers exercise economic power over authors and have—in the past—used author complaints as a basis for withdrawing support for author works. While I do not have any reason to believe Sage would do so in this case, insofar as the identity of the author is not important to this issue, discretion would seem to support redaction of personally-identifying information.

the publisher's assertion that the *royalty-on-sale* rate governs the allocation of settlement proceeds (in this instance, a 90/10 split between publisher and author), the Court-approved process requires claimants to provide contractual information about the split applicable to each work—and provides for information exchange in the likely case where an author *simply does not know* what their contract requires. (Pawlak Decl. ¶ 12.)

*Second*, Sage does not clearly disclose that it has a conflict of interest with the authors to whom it is communicating. While that conflict is implicit from the structure of the settlement—for each work the publishers and authors must allocate the proceeds in a zero-sum exercise—the average author receiving this communication may not intuitively recognize that Sage's email is a self-interested communication from the publisher, or that the author's rights may differ from Sage's representations, discussed below. (*Id.* ¶ 13.)

*Third*, Sage tells the author that it "believe[s] your share should match the royalty rate you receive for a sale of your Work applicable to the pirated format of the Work used by Anthropic. **According to our records, that rate is 10%**. Payment will be made to you directly by the Settlement Administrator." (Emphasis in original). There is *no basis in the settlement agreement for the conclusion that the author's share should be limited to the "royalty rate you receive for a sale of your Work,"* and most textbook publishing agreements contain *other clauses* that govern the allocation of revenues associated with *licensing* (as opposed to *sales*), to which this settlement payment is more akin. The *sales* royalty rates are set to account for the costs of marketing, production, distribution, and sales—none of which apply in the instance of pirated infringement. There is no cost basis associated with the piracy to justify the low "royalty on sale" rate that Sage advocates. (Indeed, this entire lawsuit was brought *by authors*, based on the infringement of *their work*, and publishers only intervened at the very end to assert entitlement to some portion of the proceeds.) The absence of any cost basis is why *sublicensing* revenues are often shared 50/50 between authors and publishers—or at a minimum, far more favorably to authors than the *sales* royalty rate. This is a key disagreement between authors and publishers, and central to the process that the Court approved, with a Special Master to resolve

case-by-case disputes based on the entirety of the parties' contract. The email from Sage is an attempt to short-circuit and unfairly influence that resolution process. (Pawlak Decl. ¶ 14.)

Fourth, Sage *specifically tells the author how to fill out their claim form*: "To help avoid delays, please include this allocation percentage in your claim." Sage also suggests that the process approved by the Court for resolution of this issue, if the author *does not know* what they are entitled to, "could slow down the process of recovery and delay your royalty payment." It is inappropriate for the publishers to be telling authors how to fill out their claim forms. The Court adopted an appropriate, expedited, and methodical process for determining what textbook authors and publishers should receive. Sage suggests to the contrary, that to claim anything other than 10% will lead to undue delay. (*Id.* ¶ 15.)

Fifth, this misleading guidance from Sage is likely to suppress author participation and thus result in Sage's claim becoming a self-fulfilling prophecy. If authors believe that they are entitled to only 10% of the recovery, they may not bother to go through the effort of filing a claim (which is already a substantial effort, given the additional complexity for textbook authors to make a claim). In that case, Sage's 90% claim will not be opposed by the author, and Sage may have manufactured consent to an improper split based upon its unfair and misleading communication. By suppressing author participation, Sage could ultimately receive *100%* of the amount ultimately allocated for that work. (Pawlak Decl. ¶ 16.) This is not a theoretical concern: in the email forwarded to TAA, the author indicated "[t]hey [Sage] are saying 10% which seems like a rip off for writers! Before I respond to them, wondered if you have any info from other publishers? Are they all taking the $$ and leaving writers the crumbs?" (Pawlak Decl., Ex. 1.) This author—who has been led by Sage to believe they are being "ripped off", based on an allocation of the settlement proceeds that is *not approved by the Court*—might well decide not to participate based on Sage's email, thus *fulfilling* Sage's self-serving claim that it is entitled to 90% of the recovery on that work if the author does not file a claim.

Sixth—*some authors will take Sage's misleading advice*. TAA is aware of at least one author who filled out their claim form in reliance on the email from Sage, and thereby restricted their claim based on Sage's email, *even though they did not know whether that was the correct allocation or not*.

That author (and presumably others) should have had the benefit of the resolution process approved by the Court, but was misled into filing a claim based on Sage's email. (Pawlak Decl. ¶ 17.)

And *finally*, Sage expressly seeks to *dissuade* class members from consulting with counsel—even *Class Counsel*—to understand their rights. Sage writes, "Note: You may hear from lawyers or companies offering to assist with your claim. The claims process is designed to be simple and straightforward, allowing authors and other rights holders to complete it *without assistance*." (emphasis supplied). In other words, Sage is warning authors to *disregard precisely the manner of communication that Sage is making*. (*Id.* ¶ 18.)

Sage continues that authors should "[b]e advised that working with third parties to file your claim will likely diminish the amount you recover under the settlement." This is false—it is unlikely that taking assistance would lead to a recovery of *less than 10%*, which is what Sage told the author to claim. Moreover, it is also very misleading, and probably unethical. If lawyers were involved with writing or reviewing Sage's email, it is a conflict of interest to the extent those lawyers have obligations to educational authors as class members, or are otherwise improperly and indirectly communicating to class members. (*Id.* ¶ 19.)

**D.     TAA's Effort to Address the Issue Through Class Counsel**

On the morning of Tuesday December 16, counsel for TAA received a copy of the "Sage's plan" email that is annexed as Exhibit 1 to the Declaration of Kim Pawlak. (*See* Declaration of David Slarskey dated December 21, 2025 ¶ 4.) After discussing the matter with TAA representatives, TAA counsel promptly forwarded the email to counsel from Lieff Cabraser and Susman Godfrey, cognizant of their representations to the Court in connection with the ClaimsHero motion, *i.e.*, the need to protect against communications that may deter participation and mislead class members.[3] (Slarskey Decl. ¶ 4.)

---

[3] *See* Doc. 442, Mot. for Order Limiting Third Party Communications with Class Members, at 14 ("ClaimsHero's webpage therefore undermines the Court-ordered notice process and curative notice is needed. Courts regularly cure solicitations, like these, that are intended to mislead class members to opt out of a class settlement.") While Sage's email does not encourage authors to *opt out* (because an author opting out would opt out the entire work, and deny Sage its recovery), it has a similar effect of misleading authors, encouraging them to claim less than they may be entitled to, or ultimately *not file a claim*—which would benefit Sage by maximizing its recovery on any affected work.

1    Counsel conferred on this issue on December 17, 2025. TAA decided to bring this issue

2    directly to the Court's attention, cognizant of the Court's comments during prior proceedings that it

3    wished to be made aware of issues promptly as they arise, so they could be appropriately resolved.

4    (*Id.* ¶ 5.)

5    **E.    TAA's Request for Relief**

6    To be very clear, TAA *supports* the settlement—despite the complexities for textbook

7    authors—in substantial part because TAA also represents academic authors, who receive the benefit

8    (like trade authors) of a 50% default presumption in the allocation of settlement proceeds. But TAA

9    has supported and worked towards implementation of the settlement, for textbook authors in particular,

10   in reliance upon the negotiated, Court-approved process, and with the expectation that this issue in

11   particular—*i.e.*, the allocation of settlement proceeds between textbook authors and publishers—

12   would be fairly and impartially resolved, through the Court-ordered process and Special Master if

13   necessary. (Pawlak Decl. ¶ 20.)

14   TAA is a small, lightly-staffed organization, and does not stand to earn a *dollar* from this

15   settlement—though it is dedicating significant resources to assist its individual members (and authors

16   more broadly) so that they can receive their fair share of this settlement. While TAA is doing all it

17   reasonably can to inform authors and provide support for this process, *publishers* have the ability to

18   reach *all of their authors with the push of a button*—as Sage apparently did—and issue misleading or

19   unfair communications that will adversely impact author class members. (*Id*. ¶ 21.)

20   TAA cannot police publisher communications to authors, and is not aware of whether other

21   publishers are engaged in similar types of communications to their authors, but hopes that the Court

22   will take Sage's communication seriously, and require Sage to issue an appropriate, Court-approved

23   curative communication that (i) directs authors to disregard the prior email; (ii) discloses the conflict

24   of interest inherent to that communication; and (iii) refers authors to the court-approved resources that

25   are available for authors to educate themselves about the claims process. (*Id.*)

26

27

28

1

**ARGUMENT**

**I.    Textbook and Academic Authors Association Should be Permitted to Intervene for the Purpose of Raising Concerns About the Claims Process**

Intervention as of right under Rule 24(a)(2) is appropriate upon satisfaction of a four-factor test: (1) the applicant  must assert a "significantly protectable" interest relating to the property or transaction that is the subject of the action; (2) the applicant's interest is not adequately represented by the parties to the action; (3) the applicant must be situated such that disposition of the action may, as a practical matter, impair or impede its ability to protect that interest; and (4) the applicant's motion must be timely. Fed. R. Civ. P. 24(a); *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 853 (9th Cir. 2016) (reversing denial of motion to intervene brought by subclass who wished to challenge the legality of certain aspects of a class settlement agreed to by the parties but of dubious legality and harmful to the subclass); *Am. Rivers v. Wheeler*, No. C 20-04636 (WHA), 2020 WL 5993229, at *2 (N.D. Cal. Oct. 9, 2020). Rule 24(a)(2)'s requirements are "broadly interpreted in favor of intervention." *Smith*, 830 F.3d at 853 (quotation marks and citation omitted); *see also Baykeeper v. U.S. Env't Prot. Agency*, No. C 19-05941 (WHA), 2020 WL 228279, at *2 (N.D. Cal. Jan. 15, 2020) ("Rule 24(a) is underscored by a 'liberal policy in favor of intervention.'" (citation omitted)).

The Court may also exercise its discretion and allow permissive intervention under Rule 23(b). For permissive intervention, the applicant need only show that: (1) independent grounds for jurisdiction exist; (2) the motion is timely; and (3) the intervenor's claim or defense shares a common question of law or fact with the main action. Fed. R. Civ. P. 24(b); *Scholl v. Mnuchin*, 483 F. Supp. 3d 822, 825 (N.D. Cal. 2020). Further, in exercising its discretion, the court should consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1177 (N.D. Cal. 2017).

Whether under the mandatory or permissive standard, TAA should be permitted to intervene in this action, for the purpose of raising concerns and seeking relief in connection with the communications from Sage.

TAA should be permitted to intervene as of right because it satisfies each of the "mandatory" factors: (i) it has a protectible interest in this process, both as a representative organization that assists textbook and academic authors, and as a participant in the Author/Publisher Working Group that mediated the distribution plan for the class settlement, *see Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1067–68 (9th Cir. 2018) (finding that a labor union had a significant protectable interest because its members had a significant protectable interest); *Abdurahman v. Alltran Fin., LP*, 330 F.R.D. 276, 282 (S.D. Cal. 2018) (finding that a company had a significant protectable interest in enforcing the settlement agreement that it bargained for); (ii) the applicant's interests are not adequately represented by the parties to the action, insofar as Class Counsel did not apparently intend to pursue prompt curative measures when presented with the issue; (iii) ignoring the issue TAA wishes to raise (*i.e.*, disposition of the issue without addressing it) will impair TAA's ability to assure authors of fairness in the claims process; and (iv) the application is timely—it was brought to Class Counsel promptly upon TAA learning of the issue, and promptly to the Court thereafter. As in *Smith*, where the Ninth Circuit reversed the denial of a motion to intervene by subclass members, to raise legal issues concerning a class settlement, this Court should permit TAA to intervene as of right. *See Smith*, 830 F.3d at 853.

Even if the Court does not grant TAA permission to intervene as of right, permissive intervention is appropriate: (i) independent grounds for jurisdiction exist, insofar as TAA is a representative organization representing more than 200 class members, with the specific mission of advocating for and assisting textbook and academic authors, including in their dealings with publishers and in legal issues related to their profession; (ii) the motion is timely, as discussed above; and (iii) while not strictly a "claim or defense," the issues that TAA seeks to bring before the Court are plainly intertwined with the administration of the settlement process already before the Court. In addition, there will be no delay caused by TAA's participation, here. *See Scholl*, 483 F. Supp. 3d at 825; *In re Lendingclub*, 282 F. Supp. 3d 1177. This Court has previously acknowledged the complexity associated with the plan of distribution, the specific risks to authors associated with the Court-

1    approved settlement framework, and a desire that the parties raise issues promptly that require Court

2    attention. TAA seeks to intervene in connection with and consistent with the Court's own guidance.

3    **II.    The Court Should Direct Class Counsel to Issue a Curative Notice to Sage Authors and**

4    **Bar Further Communications Between Publishers and Authors That Are Inconsistent**

5    **With the Court-Approved Settlement Framework**

6    "The prophylactic power accorded to the court presiding over a putative class action under

7    Rule 23(d) is broad; the purpose of Rule 23(d)'s conferral of authority is not only to protect class

8    members in particular but to safeguard generally the administering of justice and the integrity of the

9    class certification process." *O'Connor v. Uber Techs., Inc.*, No. C-13-3826 (EMC), 2014 WL

10    1760314, at *3 (N.D. Cal. May 2, 2014).

11    "[D]istrict courts have both a duty and broad authority to control communications to putative

12    class members . . . and to enter appropriate orders governing the conduct of counsel and the parties."

13    *O'Connor v. Uber Techs., Inc.*, No. C-13-3826 (EMC), 2013 WL 6407583, at *4 (N.D. Cal. Dec. 6,

14    2013). "The Supreme Court's articulation of the requisite factual finding for a district court to limit

15    class communications pursuant to Rule 23(d) does not require a finding of actual misconduct." *Id.*

16    (referring and citing to *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)). "The key is whether there

17    is 'potential interference' with the rights of the parties in a class action." *O'Connor*, 2013 WL

18    6407583, at * 5.

19    In circumstances like those found here, "courts in this district have imposed limitations on

20    communications, and invalidated agreements obtained through those communications, based on

21    findings that the communications were misleading, coercive, or omitted critical information." *Retiree*

22    *Support Grp. of Contra Costa Cnty. v. Contra Costa Cnty.*, No. 12-CV-00944 (JST), 2016 WL

23    4080294, at *6 (N.D. Cal. July 29, 2016) (citing, *inter alia, Cnty. of Santa Clara v. Astra USA, Inc.*,

24    No. C 05-03740 (WHA), 2010 WL 2724512 (N.D. Cal. July 8, 2010) (invalidating releases obtained

25    by inappropriate, incomplete, and misleading communications to absent class members) (collecting

26    cases). "[The Court's] discretion includes requiring the issuance of corrective notices and action to

27    ameliorate confusing or misleading communications." *O'Connor*, 2013 WL 6407583, at *7.

28

For the reasons set forth *supra* ("Relevant Facts and Background", Section C), corrective action is warranted under Rule 23(d) to ensure that the communication from Sage to its textbook authors does not improperly influence the claims process. Textbook authors stand in a precarious position: forced to determine and defend their entitlement to a share of the settlement proceeds by reference to specific contractual terms, whereas trade and academic authors benefit from a default presumption that they will split the settlement proceeds with publishers on a 50/50 basis, and can simply "check a box" on the claim form to claim that amount.

This process, which impacts approximately 25% of the Class, was part of the negotiated and court-approved settlement terms designed to protect all class members. But to be fair for authors, it depends upon impartial administration without undue or misleading influence from publishers, *particularly* because authors can be presumed, on the whole, to be both less sophisticated and have fewer resources available when it comes to identifying, understanding, and advocating for their rights under their publishing agreements—and also because authors may be susceptible to communications from their publishers, who may exercise some economic control over the author by virtue of the relationship.

Each publisher, by contrast, has a far greater aggregate economic interest and incentive to invest in strategic behavior—even unfair or misleading behavior like Sage's communication—that will tend to maximize its recovery from the class settlement at the expense of its authors.

Note there is deep conflict and a widespread history of litigation between classes of textbook authors and their publishers over the last several years, arising out of similar disputes over how publishers pay author royalties, or unfair and deceptive accounting practices.[4] Suffice to say that these are not new conflicts, particularly between textbook authors and the large textbook publishing houses. The communication from Sage speaks for itself, in its conflicted, misleading and contrary content, which "potentially interferes" with the agreed upon process for authors to obtain the necessary information to develop their claim and an impartial Special Master to resolve disputed issues.

---

[4] *See*, *e.g.*, *Bernstein v. Cengage Learning, Inc.*, No. 19-cv-07541 (S.D.N.Y.); *Flynn v. McGraw Hill LLC*, No. 21-cv-00614 (2d Cir.), *Gitman v. Pearson Educ. Inc.*, No. 14-cv-08626 (S.D.N.Y.).

1    *O'Connor*, 2013 WL 6407583 at *4. The communications were "misleading, coercive, or omitted

2    critical information." *Retiree Support Grp. of Contra Costa Cnty.*, 2016 WL 4080294, at *6.

3         Upon finding that the Sage emails were improper, and potentially interfere with the fair

4    administration of the claims process, Class Counsel should be directed to ensure that a curative

5    notice—approved by Class Counsel or the Court—goes to Sage authors, (i) identifying the

6    communications from Sage; (ii) informing class members that the Court has found the

7    communications to be misleading and potentially interfere with the claims process, (iii) directing class

8    members to disregard the contents of the Sage email, and (iv) inviting class members to contact Class

9    Counsel or the Settlement Administrator if they have questions about how to determine how much

10   they are entitled to under the settlement agreement. In addition, any Sage author who filed a claim

11   *after* the improper Sage communication should be specifically contacted and asked if they wish to

12   reconsider the amount of their claim.

13        Finally, the Court should direct Class Counsel, and the various lawyers who have appeared

14   here on behalf of publishers, to contact the educational publishers, and request that future

15   communications directed to authors and pertaining to the claims process should be reviewed by Class

16   Counsel before they are sent. Publishers should be notified that future violations may result in their

17   being barred from any recovery. *Cf. Camp v. Alexander*, 300 F.R.D. 617, 627 (N.D. Cal 2014)

18   (invalidating improperly obtained opt-out notices and cautioning parties that improper

19   communications to class members could result in sanctions).

20                              **<u>CONCLUSION</u>**

21        For the foregoing reasons, the Court should grant Textbook and Academic Authors

22   Association's motion to intervene, and should direct curative measures under Rule 23(d).

23

24

25

26

27

28

Date:  December 22, 2025

New York, New York

Submitted By:

SLARSKEY LLC

By:__/s/ David Slarskey_____
   David N. Slarskey *pro hac vice application pending*
   dslarskey@slarskey.com
   Adam Hollander (not admitted, only on the brief)
   Deepa Devanathan (not admitted, only on the brief)
   767 Third Avenue, 14th Floor
   New York, NY 10017
   Telephone: (212) 658-0661


GAW POE LLP


___/s/ Christopher Wimmer_____
CHRISTOPHER WIMMER (BAR #263275
cwimmer@gawapoe.com
ONE EMBARCADERO, SUITE 1200
SAN FRANCISCO, CA 94111
Telephone: (415) 326-3957
Facsimile: (415) 737-0642


**ECF Attestation**

I am the person efiling this document. I attest that each of the other signatories have concurred in the filing of the document.

*/s/ Christopher Wimmer*