<u>Exhibit 2</u>

CONFIDENTIAL

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                           ---oOo---

4     ANDREA BARTZ, ANDREA BARTZ,   )
      INC., CHARLES GRAEBER, KIRK   )
5     WALLACE JOHNSON, MJ + KJ,     )
      INC., individually and on     )
6     behalf of others similarly    )
      situated,                     )
7                                   )
                  Plaintiffs,       )
8                                   )
      vs.                           )   No. 3:24-cv-05417
9                                   )
      ANTHROPIC PBC,                )
10                                  )
                  Defendant.        )
11    _____)

12

13           TRANSCRIPT DESIGNATED "CONFIDENTIAL"

14

15             VIDEO-RECORDED DEPOSITION OF

16                  ANDREA MARIE BARTZ,

17         Taken in her individual capacity and as

18         a 30(b)(6) WITNESS FOR ANDREA BARTZ, INC.

19             Volume I - Pages 1 through 258

20    _____

21              Friday, March 7, 2025

22             San Francisco, California

23

24    Reported By:  JANE GROSSMAN, CSR No. 5225

25    Job No. SF 7222289

Page 1

CONFIDENTIAL

```
 1        A.   No.                                    09:36:43

 2        Q.   Have you ever seen any outputs from    09:36:55

 3   Claude, Anthropic's LLM?                         09:36:58

 4        A.   No.                                    09:37:01

 5        Q.   Do you think ChatGPT would be capable of   09:37:17

 6   writing a novel of a similar quality as the novels   09:37:19

 7   you write?                                       09:37:23

 8             MS. GEMAN:  Objection.                 09:37:24

 9             THE WITNESS:  I don't know.            09:37:25

10   BY MR. FARRIS:                                   09:37:26

11        Q.   Do you believe what you have seen ChatGPT   09:37:26

12   output, as far as creative writing, has been of a   09:37:36

13   similar quality to what you write?               09:37:42

14             MS. GEMAN:  Objection.                 09:37:46

15             THE WITNESS:  Can you define what you mean   09:37:47

16   by "similar quality"?                            09:37:48

17   BY MR. FARRIS:                                   09:37:50

18        Q.   The -- the artistic value of the prose --   09:37:52

19   do you think the artistic value of the prose that   09:37:57

20   you saw from ChatGPT in your style was equivalent   09:38:00

21   to -- to the artistic quality to your -- your   09:38:04

22   actually writing?                                09:38:06

23             MS. GEMAN:  Objection.                 09:38:08

24             THE WITNESS:  I think "artistic value" of   09:38:09

25   the prose is a subjective judgment call, so I can't   09:38:12
```

Page 34

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE WITNESS: No. | 09:49:14 |
| 2 | BY MR. FARRIS: | 09:49:15 |
| 3 | Q. Okay. And do you have any idea, sitting | 09:49:15 |
| 4 | here today, what amount of money you might request | 09:49:26 |
| 5 | for a future license to your works to Anthropic? | 09:49:30 |
| 6 | MS. GEMAN: Objection. | 09:49:33 |
| 7 | THE WITNESS: No. | 09:49:34 |
| 8 | BY MR. FARRIS: | 09:49:37 |
| 9 | Q. Okay. Would you be willing to license | 09:49:38 |
| 10 | your books to Anthropic for use as training data? | 09:49:40 |
| 11 | A. Yeah, if the terms were right, I would. | 09:49:44 |
| 12 | Q. Okay. What -- what terms would you seek? | 09:49:47 |
| 13 | MS. GEMAN: Objection. | 09:49:48 |
| 14 | THE WITNESS: That's, again, something | 09:49:53 |
| 15 | where I don't have the legal expertise. | 09:49:54 |
| 16 | But with expert testimony and legal input, | 09:49:56 |
| 17 | I would be open to it if the terms were fair. | 09:50:00 |
| 18 | BY MR. FARRIS: | 09:50:07 |
| 19 | Q. Would one of those terms that your | 09:50:07 |
| 20 | willingness to license your books to Anthropic | 09:50:09 |
| 21 | would depend on be the price? | 09:50:12 |
| 22 | A. Yes. | 09:50:16 |
| 23 | Q. Okay. What -- are you -- are you able to | 09:50:16 |
| 24 | say that there is any particular number of -- or any | 09:50:24 |
| 25 | particular price that would be too low for you to | 09:50:27 |

Page 43

| | | |
|---|---|---|
| 1 | consider training your works -- or licensing your | 09:50:30 |
| 2 | works to Anthropic? | 09:50:33 |
| 3 | A.   No. | 09:50:34 |
| 4 | Q.   Okay.  So if Anthropic had come to you | 09:50:35 |
| 5 | before it ever trained on your works and said it | 09:50:37 |
| 6 | would offer you $1 to train your -- to train on | 09:50:40 |
| 7 | your works for the next 10 years, would you have | 09:50:43 |
| 8 | considered that? | 09:50:45 |
| 9 | MS. GEMAN:  Objection. | 09:50:47 |
| 10 | THE WITNESS:  I would, because I would | 09:50:48 |
| 11 | need a full understanding of the terms and what that | 09:50:49 |
| 12 | really meant. | 09:50:53 |
| 13 | BY MR. FARRIS: | 09:50:55 |
| 14 | Q.   Okay.  So there's no number, sitting here | 09:50:55 |
| 15 | today, based on information you have, that would -- | 09:50:59 |
| 16 | that you would say is too low on what you would | 09:51:01 |
| 17 | license your works? | 09:51:04 |
| 18 | MS. GEMAN:  Objection. | 09:51:05 |
| 19 | THE WITNESS:  Correct. | 09:51:06 |
| 20 | BY MR. FARRIS: | 09:51:07 |
| 21 | Q.   Would you license your works to any AI | 09:51:24 |
| 22 | company that paid you enough? | 09:51:27 |
| 23 | A.   If the terms were fair, I would be open to | 09:51:31 |
| 24 | it for any AI -- any AI company, yes. | 09:51:36 |
| 25 | Q.   Okay.  Would it matter to you what -- what | 09:51:39 |

Page 44

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | the purpose of the AI company's products were? | 09:51:42 |
| 2 | A.   That would be one of a number of factors | 09:51:48 |
| 3 | that were important, yes. | 09:51:51 |
| 4 | Q.   Okay.  Have you heard of DeepSink -- | 09:51:52 |
| 5 | DeepSeek, the Chinese AI company? | 09:51:58 |
| 6 | A.   Not really, no. | 09:52:02 |
| 7 | Q.   Okay.  Would you be willing to license | 09:52:04 |
| 8 | your works to a Chinese AI company? | 09:52:06 |
| 9 | MS. GEMAN:  Objection. | 09:52:09 |
| 10 | THE WITNESS:  I don't know. | 09:52:12 |
| 11 | BY MR. FARRIS: | 09:52:13 |
| 12 | Q.   Okay.  Would you be willing to license | 09:52:13 |
| 13 | your works for use in an LLM that had, like, | 09:52:16 |
| 14 | military applications? | 09:52:20 |
| 15 | A.   I don't know. | 09:52:23 |
| 16 | Q.   Is it possible your willingness to license | 09:52:25 |
| 17 | would depend on something like that and knowing more | 09:52:28 |
| 18 | about what the applications were? | 09:52:32 |
| 19 | A.   Can you repeat the question, please? | 09:52:33 |
| 20 | Q.   Sure. | 09:52:35 |
| 21 | Is it possible your willingness to license | 09:52:37 |
| 22 | your works for use as training data would depend on | 09:52:40 |
| 23 | knowing more about the -- what the uses for your -- | 09:52:44 |
| 24 | of the LLM would be? | 09:52:45 |
| 25 | A.   Yes. | 09:52:46 |

Page 45

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Would you be willing to license your | 09:52:59 |
| 2 | works to train an LLM that was used for non-profit | 09:53:01 |
| 3 | research purposes? | 09:53:05 |
| 4 | A.   Again, I would be open to it. | 09:53:08 |
| 5 | Q.   Okay.  Is it possible you'd demand a | 09:53:11 |
| 6 | different price to license your works for -- to a | 09:53:14 |
| 7 | non-profit, as opposed to a for-profit company? | 09:53:17 |
| 8 | MS. GEMAN:  Objection. | 09:53:21 |
| 9 | THE WITNESS:  I don't know. | 09:53:22 |
| 10 | BY MR. FARRIS: | 09:53:22 |
| 11 | Q.   Assuming that Anthropic used all four of | 09:53:22 |
| 12 | your books in the exact same way, do you think you | 09:53:42 |
| 13 | should be compensated equally as for all four books? | 09:53:44 |
| 14 | MS. GEMAN:  Objection. | 09:53:49 |
| 15 | THE WITNESS:  I don't know. | 09:53:54 |
| 16 | BY MR. FARRIS: | 09:53:54 |
| 17 | Q.   Do you consider some of your books to be | 09:53:54 |
| 18 | more valuable than others? | 09:54:00 |
| 19 | A.   Can you define what you mean by | 09:54:05 |
| 20 | "valuable"? | 09:54:06 |
| 21 | Q.   Valuable from the standpoint of what you'd | 09:54:08 |
| 22 | be willing to license them for as training data. | 09:54:10 |
| 23 | A.   I don't know. | 09:54:17 |
| 24 | Q.   So you don't know whether you would | 09:54:19 |
| 25 | demand a higher price to license The Herd than | 09:54:21 |

Page 46

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | The Lost Night, for example? | 09:54:24 |
| 2 | A.   I can't think of any reason that I would | 09:54:30 |
| 3 | need a different price if they were being used | 09:54:32 |
| 4 | identically. | 09:54:35 |
| 5 | Q.   Okay.   Which of your books has been the | 09:54:41 |
| 6 | most successful in the marketplace? | 09:54:43 |
| 7 | A.   We Were Never Here. | 09:54:45 |
| 8 | Q.   Okay.   And so you -- do you think the fact | 09:54:46 |
| 9 | that We Were Never Here was the most successful in | 09:54:50 |
| 10 | the marketplace might drive a higher market price | 09:54:53 |
| 11 | for licensing and for -- | 09:54:56 |
| 12 | MS. GEMAN:   Objection. | 09:54:56 |
| 13 | THE REPORTER:   I'm sorry.   I lost part of | 09:55:00 |
| 14 | the question. | 09:55:00 |
| 15 | "Do you think" -- | 09:55:00 |
| 16 | MR. FARRIS:   Sure.   I'll re-ask it. | 09:55:01 |
| 17 | Q.   So you don't know whether you would ask | 09:55:03 |
| 18 | for a higher price to license your most successful | 09:55:04 |
| 19 | book, We Were Never Here, than you would for your | 09:55:07 |
| 20 | less successful books? | 09:55:10 |
| 21 | A.   That's correct.   I don't know. | 09:55:11 |
| 22 | Q.   Do you know -- do you have any idea of | 09:55:19 |
| 23 | whether Anthropic would value your more successful | 09:55:22 |
| 24 | works higher than your less successful works? | 09:55:28 |
| 25 | MS. GEMAN:   Objection. | 09:55:32 |

Page 47

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't know. | 09:55:32 |
| 2 | BY MR. FARRIS: | 09:55:34 |
| 3 | Q.   Do you have any idea how many books | 09:55:36 |
| 4 | Anthropic has used to train its LLMs? | 09:55:38 |
| 5 | A.   No. | 09:55:42 |
| 6 | Q.   Do you have any idea how much impact | 09:55:45 |
| 7 | adding or subtracting your works to Anthropic's | 09:55:48 |
| 8 | training database would have on the overall product? | 09:55:52 |
| 9 | MS. GEMAN:  Objection. | 09:55:54 |
| 10 | THE WITNESS:  Can you repeat the question, | 09:55:56 |
| 11 | please? | 09:55:57 |
| 12 | BY MR. FARRIS: | 09:55:58 |
| 13 | Q.   Sure. | 09:55:58 |
| 14 | Do you have any idea how much impact | 09:55:58 |
| 15 | adding or subtracting your particular works to | 09:56:01 |
| 16 | Anthropic's database would have on the overall | 09:56:04 |
| 17 | product itself? | 09:56:07 |
| 18 | MS. GEMAN:  Objection. | 09:56:10 |
| 19 | THE WITNESS:  All I know is that my works | 09:56:11 |
| 20 | must have had some importance if they were included | 09:56:13 |
| 21 | in the dataset. | 09:56:16 |
| 22 | BY MR. FARRIS: | 09:56:17 |
| 23 | Q.   Okay.  But you don't have any way to | 09:56:17 |
| 24 | measure that importance yourself? | 09:56:19 |
| 25 | A.   Correct. | 09:56:21 |

Page 48

CONFIDENTIAL

```
1      Q.    Okay.  How long is your longest book,         09:56:30
2   approximately?                                         09:56:32
3            You don't have to give me a page number.      09:56:33
4      A.    In the neighborhood of a hundred thousand     09:56:35
5   words.                                                 09:56:37
6      Q.    Okay.  And how long was your shortest         09:56:38
7   book, approximately?                                   09:56:43
8      A.    Maybe 90,000 words.                           09:56:46
9      Q.    Okay.  Do you think the amount you'd be       09:56:48
10  willing to license your works as training data to an   09:56:52
11  LLM for would depend on the number of words in the     09:56:55
12  book?                                                  09:56:57
13           MS. GEMAN:  Objection.                        09:56:57
14           THE WITNESS:  I don't know.                   09:56:57
15  BY MR. FARRIS:                                         09:56:58
16     Q.    You understand you brought this lawsuit on    09:57:17
17  behalf of a class of individuals?                      09:57:18
18     A.    My understanding is it's a class of, yeah,    09:57:22
19  individuals and entities that own copyrights.          09:57:24
20     Q.    Okay.  And you know you are -- you are a      09:57:29
21  representative of that class?                          09:57:31
22     A.    Yes.                                          09:57:32
23     Q.    All right.  Can you describe for me who       09:57:33
24  the members of the class are, as you understand it?    09:57:35
25     A.    My understanding is that it's the            09:57:38
```

Page 49

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | BY MR. FARRIS: | 12:35:22 |
| 2 | Q.   If Anthropic purchased a copy of your | 12:35:22 |
| 3 | book from an authorized bookseller and then used | 12:35:27 |
| 4 | that lawfully purchased book to train its LLMs, | 12:35:32 |
| 5 | would you object to that? | 12:35:37 |
| 6 | MS. GEMAN:  Objection. | 12:35:38 |
| 7 | THE WITNESS:  Yes. | 12:35:40 |
| 8 | BY MR. FARRIS: | 12:35:41 |
| 9 | Q.   Why? | 12:35:41 |
| 10 | A.   Because a book that is purchased one time | 12:35:42 |
| 11 | for the purposes of reading is, to me, very | 12:35:46 |
| 12 | different from an agreement to have it fed into | 12:35:50 |
| 13 | their algorithm. | 12:35:54 |
| 14 | Q.   So to give a more specific -- specific | 12:35:57 |
| 15 | example, if -- if Anthropic purchased a physical | 12:36:00 |
| 16 | copy of your book lawfully, and then scanned that | 12:36:05 |
| 17 | physical copy, made an electronic copy, and then | 12:36:08 |
| 18 | trained on that electronic copy, would you object to | 12:36:12 |
| 19 | that? | 12:36:14 |
| 20 | MS. GEMAN:  Objection. | 12:36:15 |
| 21 | THE WITNESS:  Yes. | 12:36:16 |
| 22 | BY MR. FARRIS: | 12:36:16 |
| 23 | Q.   Beyond Anthropic, do you believe there | 12:36:16 |
| 24 | are other LLM makers that have used your books as | 12:36:31 |
| 25 | training data without authorization? | 12:36:36 |

Page 125

| | | |
|---|---|---|
| 1 | Q.   What?  They somehow merged or acquired | 01:49:01 |
| 2 | it or something like that? | 01:49:03 |
| 3 | A.   Acquired it, yes, I believe. | 01:49:04 |
| 4 | Q.   Okay.  This is an unsigned document. | 01:49:06 |
| 5 | Do you have a reason -- do you think | 01:49:10 |
| 6 | there'd be a signed version of this out there | 01:49:11 |
| 7 | somewhere? | 01:49:15 |
| 8 | A.   I don't believe there is. | 01:49:15 |
| 9 | Q.   Okay.  Do you believe that there is a -- | 01:49:16 |
| 10 | was paperwork with CAA that you signed whenever that | 01:49:20 |
| 11 | merger or acquisition happened? | 01:49:25 |
| 12 | A.   I don't believe so. | 01:49:29 |
| 13 | Q.   Okay.  So as far as you're aware, this is | 01:49:29 |
| 14 | the document that -- this is, basically, your | 01:49:34 |
| 15 | written agreement with your literary agent? | 01:49:38 |
| 16 | A.   Yes. | 01:49:40 |
| 17 | Q.   Okay.  Are you aware of any other | 01:49:41 |
| 18 | agreements governing the terms of your relationship | 01:49:43 |
| 19 | with your literary agent? | 01:49:47 |
| 20 | A.   No. | 01:49:48 |
| 21 | Q.   Okay.  Do you believe that -- well, this | 01:50:03 |
| 22 | document appoints the literary agent to be your | 01:50:06 |
| 23 | exclusive agent for licensing certain rights related | 01:50:10 |
| 24 | to your works; correct? | 01:50:13 |
| 25 | MS. GEMAN:  Objection. | 01:50:15 |

Page 168

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE WITNESS:  Can you repeat that, please? | 01:50:16 |
| 2 | BY MR. FARRIS: | 01:50:18 |
| 3 | Q.   Sure. | 01:50:19 |
| 4 | This document appointments your literary | 01:50:19 |
| 5 | agent to be your exclusive agent for licensing | 01:50:22 |
| 6 | certain types of your works? | 01:50:25 |
| 7 | A.   Yes, that's my understanding. | 01:50:27 |
| 8 | Q.   Okay.  Do you have an understanding of | 01:50:28 |
| 9 | whether your literary agent is your agent for | 01:50:35 |
| 10 | purposes of licensing your works as training data to | 01:50:38 |
| 11 | LLMs? | 01:50:42 |
| 12 | MS. GEMAN:  Objection. | 01:50:43 |
| 13 | THE WITNESS:  Can you repeat that, please? | 01:50:43 |
| 14 | BY MR. FARRIS: | 01:50:44 |
| 15 | Q.   Yeah. | 01:50:45 |
| 16 | Do you have an understanding of whether | 01:50:45 |
| 17 | your literary agent is your agent for purposes of | 01:50:47 |
| 18 | licensing your works as training data to LLMs? | 01:50:50 |
| 19 | MS. GEMAN:  Objection. | 01:50:53 |
| 20 | THE WITNESS:  I don't know. | 01:50:55 |
| 21 | BY MR. FARRIS: | 01:50:56 |
| 22 | Q.   Have you ever discussed with your agent -- | 01:50:57 |
| 23 | your literary agent the prospect of licensing your | 01:51:01 |
| 24 | works as training data to LLMs? | 01:51:04 |
| 25 | A.   No. | 01:51:06 |

Page 169

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.    Have you ever discussed with your literary | 01:51:11 |
| 2 | agent whether your agent would need to be involved | 01:51:13 |
| 3 | with a license of your works as training data to | 01:51:17 |
| 4 | LLMs? | 01:51:20 |
| 5 | MS. GEMAN:  Objection. | 01:51:21 |
| 6 | THE WITNESS:  Not that I can recall. | 01:51:23 |
| 7 | BY MR. FARRIS: | 01:51:25 |
| 8 | Q.    Do you believe you would have the right to | 01:51:28 |
| 9 | negotiate a license to -- a license -- strike that. | 01:51:29 |
| 10 | Let me start again. | 01:51:37 |
| 11 | Do you believe you would be able to enter | 01:51:38 |
| 12 | negotiations in a license with an LLM company to | 01:51:40 |
| 13 | license your works as train data without involving | 01:51:44 |
| 14 | your agent? | 01:51:47 |
| 15 | MS. GEMAN:  Objection. | 01:51:48 |
| 16 | THE WITNESS:  Can you repeat that, please? | 01:51:57 |
| 17 | MR. FARRIS:  (Addressing the reporter) Do | 01:52:01 |
| 18 | you mind reading it back? | 01:52:01 |
| 19 | (Whereupon, the record was read as follows: | 01:52:03 |
| 20 | "Question:  Do you believe you would be | 01:52:03 |
| 21 | able to enter negotiations in a license | 01:52:03 |
| 22 | with an LLM company to license your works | 01:52:03 |
| 23 | as training data without involving your | 01:52:03 |
| 24 | agent?") | 01:52:03 |
| 25 | MS. GEMAN:  Objection. | 01:52:24 |

Page 170

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't know. | 01:52:51 |
| 2 | BY MR. FARRIS: | 01:52:51 |
| 3 | Q.   If I ask you the same question about your | 01:52:51 |
| 4 | film agent, would your answer be different? | 01:52:58 |
| 5 | MS. GEMAN:  Objection. | 01:53:01 |
| 6 | THE WITNESS:  Can you share the full -- | 01:53:05 |
| 7 | the full question related to my film agent? | 01:53:06 |
| 8 | BY MR. FARRIS: | 01:53:08 |
| 9 | Q.   Sure. | 01:53:08 |
| 10 | Do you believe you would have the right | 01:53:09 |
| 11 | to -- strike that.  I'm reading the wrong question. | 01:53:10 |
| 12 | Do you believe you'd be able to enter | 01:53:15 |
| 13 | negotiations for a license with an LLM company and | 01:53:17 |
| 14 | license your works as training data without | 01:53:21 |
| 15 | involving your film agent? | 01:53:24 |
| 16 | MS. GEMAN:  Objection. | 01:53:26 |
| 17 | THE WITNESS:  Yes. | 01:53:31 |
| 18 | BY MR. FARRIS: | 01:53:31 |
| 19 | Q.   Okay.  So you believe it's possible your | 01:53:33 |
| 20 | literary agent would need to be involved, but you | 01:53:35 |
| 21 | don't believe it's possible your film agent would | 01:53:39 |
| 22 | need to be involved in training data license | 01:53:41 |
| 23 | negotiations? | 01:53:45 |
| 24 | MS. GEMAN:  Objection. | 01:53:46 |
| 25 | THE WITNESS:  Well, I feel very confident | 01:53:48 |

Page 171

CONFIDENTIAL

```
1    I'm the copyright owner of my works.  And that would    01:53:50

2    give me the right to negotiate this.                    01:53:56

3         But I'm not a lawyer, so I'm not positive          01:54:00

4    about how that relates to this contract.                01:54:06

5    BY MR. FARRIS:                                          01:54:09

6        Q.   Okay.  Have you had -- ever had any            01:54:09

7    conversations with your film agent about LLM            01:54:11

8    training-data rights?                                   01:54:15

9        A.   No.                                            01:54:17

10       Q.   Okay.                                          01:54:17

11            THE VIDEOGRAPHER:  Could I ask you to          01:54:23

12   adjust your microphone?  It's kind of rubbing           01:54:24

13   against the shirt.                                       01:54:27

14            THE WITNESS:  Yeah.                            01:54:27

15            Is that better?                                01:54:36

16            (Deposition Exhibit 62 was marked for          01:54:37

17            identification.)                               01:54:48

18            THE WITNESS:  Thank you.                       01:54:49

19            MR. FARRIS:  All right.  I'm marking           01:54:59

20   Exhibit 62.  It is a document marked Bates -- I'm       01:55:00

21   sorry -- BARTZ-6 to BARTZ-22.                           01:55:07

22            And it is an agreement between                 01:55:19

23   Andrea Bartz, the person, and Penguin Random House      01:55:21

24   about The Lost Night.                                   01:55:25

25       Q.   Do you recognize this agreement,               01:55:32
```

Page 172

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | But at the time it was natural for me to | 01:58:22 |
| 2 | move to Ballantine with her. | 01:58:24 |
| 3 | Q. Okay. Okay. Section 3 of this agreement | 01:58:26 |
| 4 | is entitled "Grant of Rights: Territories." | 01:58:41 |
| 5 | Do you see that? | 01:58:43 |
| 6 | A. Yes. | 01:58:44 |
| 7 | Q. What types of rights do you believe you | 01:58:53 |
| 8 | granted, in this agreement, to your publisher? | 01:58:55 |
| 9 | MS. GEMAN: Objection. | 01:58:59 |
| 10 | THE WITNESS: You're referring to | 01:59:01 |
| 11 | Section 3 of this contract? | 01:59:02 |
| 12 | BY MR. FARRIS: | 01:59:03 |
| 13 | Q. Yes. | 01:59:04 |
| 14 | A. I gave my publisher the right to publish | 01:59:05 |
| 15 | my book, The Lost Night -- or to strike deals with | 01:59:09 |
| 16 | publishers in other countries and in other languages | 01:59:13 |
| 17 | to publish the book throughout the world. | 01:59:16 |
| 18 | Q. Okay. Do you believe you assigned | 01:59:19 |
| 19 | ownership of your copyright or any part of your | 01:59:21 |
| 20 | copyright to your publisher? | 01:59:25 |
| 21 | MS. GEMAN: Objection. | 01:59:27 |
| 22 | THE WITNESS: No, that's not my | 01:59:28 |
| 23 | understanding. | 01:59:30 |
| 24 | BY MR. FARRIS: | 01:59:30 |
| 25 | Q. Okay. Do you believe that you granted | 01:59:31 |

Page 176

| | | |
|---|---|---|
| 1 | your publisher the right to license your works as | 01:59:42 |
| 2 | LLM training data via this agreement? | 01:59:46 |
| 3 | MS. GEMAN:  Objection. | 01:59:49 |
| 4 | THE WITNESS:  I do not believe I granted | 01:59:50 |
| 5 | my publisher that right. | 01:59:52 |
| 6 | BY MR. FARRIS: | 01:59:53 |
| 7 | Q.   Okay.  Do you believe you have granted | 01:59:54 |
| 8 | your publisher the right to license any of your | 01:59:58 |
| 9 | works as LLM training data via any publishing | 02:00:00 |
| 10 | agreement? | 02:00:04 |
| 11 | MS. GEMAN:  Objection. | 02:00:05 |
| 12 | THE WITNESS:  No, as far as I know, I've | 02:00:07 |
| 13 | not granted those rights to my publisher. | 02:00:09 |
| 14 | BY MR. FARRIS: | 02:00:13 |
| 15 | Q.   Have you ever had any discussion or any | 02:00:14 |
| 16 | communication at all with Penguin Random House about | 02:00:18 |
| 17 | who owns the rights to license your works as LLM | 02:00:22 |
| 18 | training data? | 02:00:26 |
| 19 | MS. GEMAN:  Objection. | 02:00:27 |
| 20 | THE WITNESS:  Can you repeat the question, | 02:00:31 |
| 21 | please? | 02:00:32 |
| 22 | BY MR. FARRIS: | 02:00:33 |
| 23 | Q.   Yeah. | 02:00:33 |
| 24 | Have you ever had any communication with | 02:00:33 |
| 25 | Penguin Random House about the topic of licensing | 02:00:34 |

Page 177

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | your works as LLM training data? | 02:00:39 |
| 2 | MS. GEMAN:  Objection. | 02:00:42 |
| 3 | THE WITNESS:  No. | 02:00:42 |
| 4 | BY MR. FARRIS: | 02:01:01 |
| 5 | Q.  Has your publisher ever told -- have you | 02:01:01 |
| 6 | ever told your publisher that you believe it does | 02:01:02 |
| 7 | not have the right to license your works as LLM | 02:01:05 |
| 8 | training data? | 02:01:07 |
| 9 | MS. GEMAN:  Objection. | 02:01:08 |
| 10 | THE WITNESS:  Can you please repeat the | 02:01:13 |
| 11 | question? | 02:01:14 |
| 12 | BY MR. FARRIS: | 02:01:15 |
| 13 | Q.  Have you ever told your publisher that | 02:01:15 |
| 14 | you believe it does not have the right to license | 02:01:17 |
| 15 | your work as LLM training data? | 02:01:20 |
| 16 | A.  Not that I can recall. | 02:01:21 |
| 17 | Q.  Okay.  In Section 4, the next section | 02:01:23 |
| 18 | down, there's a reference to an advance. | 02:01:31 |
| 19 | Do you see that? | 02:01:35 |
| 20 | A.  Yes. | 02:01:36 |
| 21 | Q.  The advance for The Lost Night looks | 02:01:37 |
| 22 | like it was $150,000 in total; is that correct? | 02:01:39 |
| 23 | A.  Yes. | 02:01:42 |
| 24 | Q.  Have you earned out on that advance? | 02:01:43 |
| 25 | A.  No. | 02:01:46 |

Page 178

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.    Okay.   Are you paid royalties on | 02:01:46 |
| 2 | The Lost Night? | 02:01:52 |
| 3 | A.    If I were to earn out, I would start | 02:01:53 |
| 4 | getting royalties.   But currently my earnings are | 02:01:55 |
| 5 | advanced -- against the advance of 150,000. | 02:02:00 |
| 6 | Q.    Have you entered international publishing | 02:02:03 |
| 7 | agreements for The Lost Night? | 02:02:06 |
| 8 | A.    Penguin Random House has sold the rights | 02:02:08 |
| 9 | to The Lost Night in foreign countries, yes. | 02:02:11 |
| 10 | Q.    Okay.   Do you receive royalties for any | 02:02:14 |
| 11 | of the rights granted by Penguin Random House? | 02:02:19 |
| 12 | A.    So the foreign rights deals -- the money | 02:02:22 |
| 13 | that those foreign publishers pay also goes against | 02:02:29 |
| 14 | my advance. | 02:02:33 |
| 15 | Q.    Okay.   Are there any -- are there any | 02:02:35 |
| 16 | royalties for The Lost Night that you receive at | 02:02:42 |
| 17 | all from any license you've ever granted? | 02:02:45 |
| 18 | A.    I received money separately for the option | 02:02:49 |
| 19 | purchase of The Lost Night. | 02:02:52 |
| 20 | Q.    Okay.   Was the advance from The Lost Night | 02:02:55 |
| 21 | paid to Andrea Bartz, the person, or Andrea Bartz, | 02:03:03 |
| 22 | Inc.? | 02:03:06 |
| 23 | A.    I believe it was paid to Andrea Bartz, | 02:03:12 |
| 24 | Inc. | 02:03:14 |
| 25 | Q.    Are the royalties for the film option of | 02:03:24 |

Page 179

| | | |
|---|---|---|
| 1 | The Lost Night paid to Andrea Bartz, the person, or | 02:03:28 |
| 2 | Andrea Bartz, Inc.? | 02:03:31 |
| 3 | MS. GEMAN:   Objection. | 02:03:32 |
| 4 | THE WITNESS:   Andrea Bartz, Inc. | 02:03:34 |
| 5 | BY MR. FARRIS: | 02:03:35 |
| 6 | Q.   Has a film been made of any of your | 02:03:42 |
| 7 | works? | 02:03:45 |
| 8 | A.   Not to date. | 02:03:45 |
| 9 | Q.   But on the film option, rather than being | 02:03:46 |
| 10 | paid in advance, you're paid a running royalty? | 02:03:48 |
| 11 | A.   Can you define "a running royalty"? | 02:03:54 |
| 12 | Q.   Yeah.   Don't worry about the word | 02:03:56 |
| 13 | "running." | 02:03:59 |
| 14 | Just you're paid a royalty over time for | 02:04:00 |
| 15 | the film option, as opposed to getting a lump-sum | 02:04:02 |
| 16 | payment in advance, they way you were here? | 02:04:04 |
| 17 | A.   So the way that I'm paid for option | 02:04:07 |
| 18 | agreements is there's the option amount, which is | 02:04:09 |
| 19 | for a set number of months, usually 12 or 18, during | 02:04:13 |
| 20 | which that production company has the sole right to | 02:04:17 |
| 21 | try to get it produced. | 02:04:20 |
| 22 | And what's also negotiated and agreed upon | 02:04:22 |
| 23 | upfront is the purchase price. | 02:04:24 |
| 24 | So if the TV show or movie that they are | 02:04:27 |
| 25 | hoping to make were to actually get green-lit and go | 02:04:32 |

Page 180

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | to production, I would receive that as a one-time | 02:04:37 |
| 2 | lump sum. | 02:04:39 |
| 3 | But, then, the option, when it's up after | 02:04:40 |
| 4 | 12 or 18 months, they have the option to renew it | 02:04:42 |
| 5 | for the same price or to return the rights to me. | 02:04:46 |
| 6 | Q.   Okay.  And right now are all -- all four | 02:04:50 |
| 7 | novels are under option right now? | 02:04:52 |
| 8 | A.   No. | 02:04:54 |
| 9 | The option for The Lost Night was returned | 02:04:54 |
| 10 | to me, and the option for The Herd was returned to | 02:04:56 |
| 11 | me. | 02:05:00 |
| 12 | Q.   Okay.  So if Anthropic had come to you and | 02:05:23 |
| 13 | asked to license The Lost Night before using it as | 02:05:25 |
| 14 | training data -- strike that.  Let me start again. | 02:05:30 |
| 15 | Could Anthropic have gone to Penguin | 02:05:39 |
| 16 | Random House and obtained a license to the training | 02:05:41 |
| 17 | data for The Lost Night? | 02:05:44 |
| 18 | MS. GEMAN:  Objection. | 02:05:49 |
| 19 | THE WITNESS:  I'm not a lawyer or a | 02:05:49 |
| 20 | copyright expert.  But my understanding is no. | 02:05:51 |
| 21 | BY MR. FARRIS: | 02:05:55 |
| 22 | Q.   It -- if Penguin Random House had granted | 02:05:56 |
| 23 | a license to Anthropic to use The Lost Night as | 02:05:59 |
| 24 | training data, would you have objected to that? | 02:06:03 |
| 25 | MS. GEMAN:  Objection. | 02:06:05 |

Page 181

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE WITNESS:  I -- I believe I would | 02:06:07 |
| 2 | object to that. | 02:06:08 |
| 3 | BY MR. FARRIS: | 02:06:09 |
| 4 | Q.   Okay.  Would that answer be the same for | 02:06:09 |
| 5 | all of your books? | 02:06:12 |
| 6 | A.   Yes. | 02:06:13 |
| 7 | Q.   Do you believe you have the authority to | 02:06:25 |
| 8 | license your training -- your novels as training | 02:06:26 |
| 9 | data to Anthropic without consulting your publishing | 02:06:29 |
| 10 | company, Penguin Random House? | 02:06:33 |
| 11 | MS. GEMAN:  Objection. | 02:06:36 |
| 12 | THE WITNESS:  I'm not a lawyer or an IP | 02:06:37 |
| 13 | expert. | 02:06:39 |
| 14 | But that is my understanding. | 02:06:40 |
| 15 | BY MR. FARRIS: | 02:06:41 |
| 16 | Q.   Turn to Paragraph 10 of this agreement. | 02:06:41 |
| 17 | It's titled "Copyright." | 02:07:14 |
| 18 | Let me know when you're there. | 02:07:15 |
| 19 | A.   Okay. | 02:07:17 |
| 20 | MS. GEMAN:  Take the time you need to | 02:07:19 |
| 21 | review it. | 02:07:20 |
| 22 | BY MR. FARRIS: | 02:07:21 |
| 23 | Q.   Yeah, take a moment.  That's fine.  It's | 02:07:21 |
| 24 | only two and a half paragraphs.  Let me know when | 02:07:24 |
| 25 | you're ready. | 02:07:27 |

Page 182

| | | |
|---|---|---|
| 1 | Q.   Are you familiar with the Copyright | 02:40:12 |
| 2 | Clearance Center? | 02:40:13 |
| 3 | A.   Not really. | 02:40:15 |
| 4 | Q.   Are your works available to license on the | 02:40:16 |
| 5 | Copyright Clearance Center? | 02:40:19 |
| 6 | A.   I'm not sure. | 02:40:21 |
| 7 | Q.   Have you ever looked into the possibility | 02:40:28 |
| 8 | of licensing your works to the Copyright Clearance | 02:40:30 |
| 9 | Center? | 02:40:32 |
| 10 | MS. GEMAN:  Objection. | 02:40:34 |
| 11 | THE WITNESS:  Not personally. | 02:40:35 |
| 12 | BY MR. FARRIS: | 02:40:38 |
| 13 | Q.   Other than the Certified by Humans | 02:40:38 |
| 14 | potential training data license, have you | 02:40:41 |
| 15 | investigated any other means of getting your works | 02:40:43 |
| 16 | licensed as training data? | 02:40:48 |
| 17 | A.   Not that I can recall. | 02:40:51 |
| 18 | Q.   Have you taken any steps to license your | 02:40:53 |
| 19 | works as training data? | 02:40:58 |
| 20 | MS. GEMAN:  Objection. | 02:40:59 |
| 21 | THE WITNESS:  Can you repeat the question, | 02:41:07 |
| 22 | please? | 02:41:09 |
| 23 | BY MR. FARRIS: | 02:41:10 |
| 24 | Q.   Sure. | 02:41:10 |
| 25 | Have you taken anything that you would | 02:41:10 |

Page 208

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | consider a step towards licensing your works to | 02:41:12 |
| 2 | training data -- | 02:41:16 |
| 3 | MS. GEMAN:  Objection. | 02:41:18 |
| 4 | BY MR. FARRIS: | 02:41:18 |
| 5 | Q.   -- as training data? | 02:41:18 |
| 6 | (Clarification requested by the reporter.) | 02:41:20 |
| 7 | THE WITNESS:  No. | 02:41:21 |
| 8 | MR. FARRIS:  Okay.  Let's take a break. | 02:41:21 |
| 9 | THE VIDEOGRAPHER:  This marks the end of | 02:41:29 |
| 10 | Media Unit 4. | 02:41:30 |
| 11 | We are going off the record. | 02:41:32 |
| 12 | The time is 2:41 p.m. | 02:41:33 |
| 13 | (Recess taken:  2:41 p.m. until 2:54 p.m.) | 02:41:36 |
| 14 | THE VIDEOGRAPHER:  This marks the | 02:54:24 |
| 15 | beginning of Media Unit 5. | 02:54:25 |
| 16 | We are going back on the record. | 02:54:27 |
| 17 | The time is 2:54 p.m. | 02:54:29 |
| 18 | MR. FARRIS:  Okay.  This will be | 02:54:35 |
| 19 | Exhibit 66. | 02:54:47 |
| 20 | (Deposition Exhibit 66 was marked for | 02:54:48 |
| 21 | identification.) | 02:54:49 |
| 22 | THE WITNESS:  Thank you. | 02:54:49 |
| 23 | MR. FARRIS:  Exhibit 66 is a document with | 02:54:50 |
| 24 | the Bates numbers BARTZ-2339 through BARTZ-2342. | 02:54:55 |
| 25 | It is a Royalty Summary Statement dated | 02:55:04 |

Page 209

CONFIDENTIAL

CERTIFICATE OF REPORTER

1

2          I, the undersigned, a Certified Shorthand

3   Reporter of the State of California, do hereby

4   certify:

5          That the foregoing proceedings were taken

6   before me at the time and place herein set forth;

7   that any witnesses in the foregoing proceedings,

8   prior to testifying, were administered an oath; that

9   a record of the proceedings was made by me using

10  machine shorthand which was thereafter transcribed

11  under my direction; and that the foregoing

12  transcript is a true record of the testimony given.

13         Further, that if the foregoing pertains to

14  the original transcript of a deposition in a Federal

15  Case, before completion of the proceedings, review

16  of the transcript [X] was [ ] was not requested.

17         I further certify I am neither financially

18  interested in the action nor a relative or employee

19  of any attorney or any party to this action.

20         IN WITNESS WHEREOF, I have this date

21  subscribed my name.

22                    Dated:  March 12, 2025

23

24

                      JANE GROSSMAN

25                    CSR No. 5225

                                      Page 255