<u>Exhibit 3</u>

1                UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF CALIFORNIA
3
4      _____
                                      )
5      ANDREA BARTZ, ANDREA BARTZ,    )
       INC., CHARLES GRAEBER, KIRK    )
6      WALLACE JOHNSON, MJ + KJ,      )
       INC., individually and on      )
7      behalf of others similarly     )
       situated,                      )
8                                     )
9                 Plaintiffs,         )
                                      )
       vs.                            ) No. 3:24-cv-05417
10                                    )
       ANTHROPIC PBC,                 )
11                                    )
                  Defendant.          )
12     _____)
13
14
15
16        VIDEOTAPED DEPOSITION OF KIRK WALLACE JOHNSON
17                  Los Angeles, California
18                  Thursday, March 6, 2025
19
20
21
22     Reported by:
       RENEE A. PACHECO, RPR, CLR
23     CSR No. 11564
24     Job No. 7222286
25     PAGES 1 - 227

                                            Page 1

```
1          Q    Have you done any professional writing on
2     fair use?
3          A    On fair use, no.
4          Q    Have you heard of the defense to copyright
5     infringement called fair use?                          10:24AM
6          A    Sorry.  Can you repeat the question?
7          Q    Have you heard of the defense to copyright
8     infringement known as fair use?
9          A    I have heard of fair use, yes.
10         Q    And I don't want to hear any -- about any     10:24AM
11    conversations you had with your lawyers, but do you
12    have any general understanding of what fair use is?
13         A    Not really.  I just have heard the phrase.
14         Q    From your work as an author, did you have
15    any kind of general understanding of what fair use     10:24AM
16    is?
17         A    Sorry.  Can you repeat the question?
18         Q    In your -- have you heard about fair use in
19    the context of doing work as an author?
20         A    Not that I can recall.                        10:25AM
21         Q    Switching gears, have you ever seen anyone
22    use Claude to generate an output that looked like
23    one of your books?
24         A    No.
25         Q    Is it correct you've never seen anything     10:26AM
```

Page 35

1    that came out of Claude that looks like one of your

2    books?

3        A    You just asked me if I had seen anyone use

4    Claude.  You're asking me something different now?

5        Q    I just want to -- yeah, it's a very similar      10:26AM

6    question, but regardless of whether you saw the

7    person use it, did you see -- did you see any output

8    that looked like your books?

9            MR. FREDRICKS:  Objection; form.

10           THE DEPONENT:  I have not really seen          10:26AM

11   hardly any Claude outputs.

12   BY MR. RAMALLO:

13       Q    So, similar question.  I just want to make

14   sure we have a clear record.

15           Have you ever seen a Claude output that          10:27AM

16   looks like one of your books?

17           MR. FREDRICKS:  Objection; form.

18           THE DEPONENT:  Do you mean a book length

19   output?  I'm trying to get an understanding of when

20   you say "that looks like one of my books."            10:27AM

21           Can you be more specific?

22   BY MR. RAMALLO:

23       Q    Have you ever seen a Claude output that

24   looks like it's a copy of your book?

25           MR. FREDRICKS:  Objection; form.               10:27AM

Page 36

```
1              THE DEPONENT:  Like I said, I have not seen
2     very many Claude outputs, like I said earlier, so I
3     can't really answer that.  Of the few that I've
4     seen, I was not asking it about my books.
5     BY MR. RAMALLO:                                    10:28AM
6         Q    Okay.  So just limited to the ones you've
7     seen, the Claude outputs that you have seen, they do
8     not appear to be copies of one of your books; is
9     that right?
10        A    I wasn't asking it or prompting it to       10:28AM
11    output my book.
12        Q    I understand, but I just -- I just want to
13    make sure we have a very clear record.  I understand
14    you didn't ask it to copy your book or give a
15    prompt.                                             10:28AM
16             I just want to understand, have you seen a
17    Claude output that appears to be a copy of your
18    book?
19        A    No, I have not seen one that appears to be
20    a copy of my book, but I have not asked it to copy   10:28AM
21    my book.
22        Q    Have you seen any other LLM besides Claude
23    generate an output that looks like one of your
24    books?
25        A    I would give the same answer as I did for   10:29AM
```

Page 37

```
 1    front of me, I would be open to exploring a license

 2    of my work for further training if it was fair.

 3         Q    Have you ever heard of the term

 4    "injunction"?

 5         A    I have.                              10:35AM

 6         Q    Do you have an understanding of what an

 7    injunction is?

 8         A    Again, I'm not a lawyer, but my

 9    understanding is when the courts force a person or

10    entity to stop doing what it's doing.           10:35AM

11         Q    Do you want the court to enter an

12    injunction against Anthropic in this case?

13         A    I can't remember the specifics on -- sorry,

14    can you repeat the question?  I'm just trying to

15    remember.  Can you repeat the question for me?   10:35AM

16         Q    Sure.  Do you want the court to enter an

17    injunction against Anthropic in this case?

18         A    What I want is for Anthropic to stop using

19    work that it illegally trained on.  And I don't want

20    it to continue training on works that it does not    10:36AM

21    have a license to train on.  So I can't tell you

22    whether or not the word "injunction" applies to

23    that.

24         Q    Are there any other reasons that you filed

25    this case that you have not mentioned?            10:36AM
```

                                                    Page 41

1          A    Not that I can recall right now.   Those are

2     the main reasons.

3          Q    Have you told me all of your goals for this

4     case?

5          A    I believe I have.                        10:36AM

6          Q    So assuming Anthropic did train its work --

7     its LLM on your works and that was infringement, how

8     much money would you need to be adequately

9     compensated in your opinion?

10         A    I can't answer that in the abstract.   I      10:37AM

11    would need to consult with my reps.   I would want to

12    know what the market value is, what's fair, but I

13    can't throw out a number here.

14         Q    What reps would you need to consult with?

15         A    When my books have been licensed, I have       10:37AM

16    agents -- literary agents who usually negotiate

17    those licenses or make me aware of those

18    opportunities, and my wife is also my personal

19    attorney.

20         Q    Is your wife a licensed attorney?             10:38AM

21         A    Yes, she is.

22         Q    How many literary -- literary agents do you

23    have?

24         A    At the moment, I have one literary agent

25    for my books.   I'm only speaking solely because in    10:39AM

                                                       Page 42

```
1    Hollywood, they also use the term "lit agent" for

2    somebody who would represent you with your books

3    being adapted for the screen.  And so, technically,

4    I have a lit agent in that regard.

5            And then until recently, I had a foreign        10:39AM

6    rights literary agent, but my understanding is that

7    that's now folded into my main literary agent's job.

8        Q    Am I understanding correctly, there's one

9    agent -- one literary agent for, like, physical

10   books on paper, and then there's a separate literary   10:40AM

11   agent for TV and film?

12           MR. FREDRICKS:  Objection; form.

13           THE DEPONENT:  There's a -- what Hollywood

14   refers to as a literary agent as somebody who would

15   potentially negotiate an option of my -- of my -- of   10:40AM

16   an adaptation of my work.  And then, yes, there is a

17   main literary agent who deals with -- with my books

18   and books in translation.

19   BY MR. RAMALLO:

20       Q    In order to determine fair compensation         10:40AM

21   from Anthropic, do you feel you would need to

22   consult with both of those literary agents?

23       A    No.

24       Q    Who do you believe you would need to

25   consult with?                                            10:40AM
```

Page 43

```
1          A    The truth is, I don't know anyone who

2     has -- whose work has been licensed for training in

3     LLM, and so this is fairly new to all of us.  But my

4     literary agent would be giving me advice on what the

5     fair market value might be if that data existed.          10:41AM

6          Q    So, potentially, your literary agent would

7     have to do additional research in order to come to a

8     fair market value; is that correct?

9               MR. FREDRICKS:  Objection; form.

10              THE DEPONENT:  I don't know how -- how she      10:42AM

11    would come to a fair market value estimation.

12    BY MR. RAMALLO:

13         Q    Do you believe you would need to consult

14    with your wife or another lawyer before coming to a

15    fair market valuation with Anthropic?                     10:42AM

16         A    I consult with my wife on everything,

17    including how we dressed our kids this morning.

18         Q    So, yes, you would consult with your wife

19    on fair market valuation?

20         A    I would want her advice or reaction to an      10:43AM

21    offer that came in.

22         Q    Do you believe you would need to speak with

23    a separate lawyer besides your wife in order to come

24    to a fair valuation?

25         A    I can't -- I can't answer that.                10:43AM
```

Page 44

```
 1          Q    Other than speaking with consultants or
 2    advisors, what other information do you believe you
 3    would need in order to come to a fair valuation for
 4    your works?
 5          A    Well, this is such a -- it feels like we're      10:43AM
 6    in such a hypothetical space here, but I would need
 7    to see the offer to understand what I'm considering.
 8    It's very hard for me to consider something in the
 9    abstract.  And, also, I am representing a class
10    here, and so I'm not -- it's not just my own          10:44AM
11    personal interest that I'm mindful of.
12          Q    What factors do you think are important in
13    coming to a valuation for a license to use your
14    works in LLM training data?
15          A    Are we talking about a license with        10:45AM
16    Anthropic, particularly?
17          Q    Yes.
18          A    I would have to see the deal myself.
19          Q    If Anthropic offered to license your books
20    for LLM training data at the price of one dollar per    10:46AM
21    book, would you agree to that number?
22          A    That doesn't strike me as a fair number.
23          Q    Why do you say that a dollar is not a fair
24    number?
25          A    I've never licensed my work for such a      10:46AM
```

Page 45

```
 1    small amount.  Collectively, I've spent over a
 2    decade of my life creating this work.  And I'm
 3    pretty sure that most of the other authors whose
 4    work -- whose works were infringed upon would feel
 5    similarly.  And I would also add that I -- I think          10:46AM
 6    Anthropic has made quite a bit of money off of this
 7    unauthorized exploitation of our work.  So on that
 8    level, one dollar seems awfully low.
 9        Q    So is it correct that you believe that the
10    amount of the license should depend on how much            10:47AM
11    effort the author spent in creating the work?
12        A    No, I didn't say that.
13        Q    Do you believe that someone who spent one
14    day creating their work should be entitled to the
15    same compensation as you, who has spent a decade           10:47AM
16    creating their works?
17        A    I can't speak to that, other than that if
18    the work is copyrighted and there's an infringement
19    upon that copyright, then I would -- I would view
20    all of this the same way.                                  10:48AM
21        Q    So you're saying that someone who spent
22    maybe one day is entitled to the same compensation
23    as someone who spent ten years working on a work?
24        A    You're asking about somebody who wrote a
25    book in one day?  Sorry.  It's hard for me to              10:48AM
```

Page 46

1    seriously consider that because it's impossible for

2    a human to write a book in a day.

3        Q    Do you believe, though, that the price

4    should take into account how much effort someone

5    took into creating the work?                          10:49AM

6        A    I'm not an expert in pricing or setting a

7    price for what a license to train an LLM ought to

8    be.

9        Q    Other than the fact that you spent a decade

10   creating your works, is there any other reason why    10:49AM

11   you believe that an offer of one dollar to license

12   your works is unfair?

13            MR. FREDRICKS:  Objection; form.

14            THE DEPONENT:  That was not the only

15   criteria I gave you when I first answered.            10:50AM

16   BY MR. RAMALLO:

17       Q    Well, give me all the criteria that you

18   have.  Let's get a complete list of them.

19       A    Well, I also referenced the fact that I've

20   never licensed my work to any end for one dollar.     10:50AM

21       Q    What other criteria makes that offer of one

22   dollar unfair?

23       A    You're asking on a moral level about

24   unfairness or what?

25       Q    Just in your opinion?  I'm asking for your   10:51AM

Page 47

1    personal opinion.

2        A    When I make a decision on licensing or

3    optioning my work, I'm not licensing it to somebody

4    who has already stolen it, so it's difficult for me

5    to come up with criteria for you here because we're        10:51AM

6    not just talking about an Anthropic license.  What I

7    can tell you is that if Anthropic had approached me

8    at the outset and proposed a license, I certainly

9    would have considered it with an open mind, and we

10   could have evaluated the fairness back then.             10:52AM

11       Q    So let's go to that hypothetical scenario

12   where Anthropic approached you first.

13            What other criteria would you find

14   important in evaluating the fairness of an offer?

15       A    It's so abstract what you're asking, that       10:52AM

16   it's difficult for me to answer.  I would take in

17   the advice of people that I trust.  I would try to

18   understand what the market value of my work is and

19   what the going rate is for a typical license or

20   option.                                                  10:53AM

21       Q    And you would take into account your

22   personal history of how much you've licensed your

23   works for in the past; is that right?

24       A    Well, I've never licensed my work for LLM

25   training, so I could not take that into             10:53AM

Page 48

1    consideration.

2        Q    I asked you earlier about the offer of the

3    hypothetical license of one dollar, and you said

4    that was unfair because you've never licensed your

5    work for one dollar before.                          10:54AM

6        A    Yes, that's true.

7        Q    So that would be a consideration in this

8    hypothetical license; correct?

9        A    Yes.

10       Q    Are there other considerations that you    10:54AM

11    would have in coming to a fair market value that we

12    haven't talked about?

13       A    Again, I'm not an expert in how that value

14    would be established and what a fair market value

15    would be, but I do know I would want to defer to    10:54AM

16    expert counsel on what's fair and what isn't, but I

17    don't need an expert to tell me that one dollar is

18    too little.

19       Q    Do you need an expert to tell you that a

20    hundred dollars is too little?                       10:55AM

21       A    No, I don't need an expert to tell me that

22    a hundred dollars would be too little.

23       Q    So one hundred dollars is too little; is

24    that right?

25       A    It would seem like a pretty small amount to  10:55AM

Page 49

1  me.

2      Q  Do you need an expert to tell you that one

3  thousand dollars is too little to license, say, one

4  book of yours?

5      A  Again, are you asking about a hypothetical          10:55AM

6  offer from Anthropic to license my book or other

7  companies?

8      Q  So let's -- do you need an expert to tell

9  you that one thousand dollars is too little to

10  license one of your books when the party on the       10:55AM

11  other side is someone who has never infringed your

12  works before?

13      A  I'm not an expert in the fair market rate

14  for these works for licensing for LLMs, so I can't

15  really make a guess as to what that fair market      10:56AM

16  value would be.

17      Q  So if the offer from a hypothetical company

18  that had never wronged you before was a thousand

19  dollars, you would need to find an expert first in

20  order to determine if that was actually fair; am I    10:56AM

21  understanding you correctly?

22      A  I was speaking in more abstract terms about

23  what the market -- fair market value is for this

24  kind of work.  If -- if I was told that a thousand

25  was a fair offer, I can say I -- on a gut level, I    10:56AM

Page 50

1   would not think that that's sufficient.  I will

2   admit it's difficult to separate out an abstract

3   offer from my understanding of the facts this case,

4   which is that Anthropic never made such an offer to

5   me and used my work illegally.  So it's difficult to          10:57AM

6   have an exchange about, well, how much should we pay

7   you now after we've already stolen your work from

8   you?  That resides in a different mental place of

9   fairness to me than somebody who I am certain has

10  never infringed upon my work.                                 10:57AM

11      Q    Okay.  So I want to make clear that my

12  question is about someone who has never wrong you

13  before, and they make you an offer of a thousand

14  dollars for use of one of your books to train their

15  LLM.                                                          10:58AM

16          Is that something that, with your gut, you

17  can reject?  Or is that something where you want to

18  talk to an expert first before you --

19      A    It's so abstract.  I would need to know the

20  terms of the deal, how long the license is for,              10:58AM

21  whether my work might -- whether it might undercut

22  the value of the original work.  Again, I'm not a

23  lawyer, but it seems silly to guess at what's fair

24  and what's not when I don't have any document in

25  front of me.  I don't have an offer in front of me          10:58AM

Page 51

1    to review.

2        Q   Okay.  Well, we know that you're able to

3    reject the one dollar offer out of hand with no need

4    to talk to an expert.

5            So in the situation where you're dealing                    10:59AM

6    with someone who hasn't taken anything from you

7    before, you know, what's the upper limit of an offer

8    that you would just reject out of hand without even

9    talking to an expert?

10           MR. FREDRICKS:  Objection; form.                            10:59AM

11           THE DEPONENT:  What's the upper limit or

12   the lower limit?  The upper -- I mean, if you want

13   to give me ten million per book, that's the upper

14   limit to me, then sure.

15   BY MR. RAMALLO:                                                     10:59AM

16       Q   Okay.  And what's lower limit?

17       A   I can't answer that.  I would need to see

18   what the terms of -- what the terms that are that

19   accompany the offer.  My IP is my most valuable

20   thing.  I don't just sign it away for nothing.  And  10:59AM

21   I make sure that I'm protecting it when I negotiate

22   a deal over licensing or optioning it.

23       Q   If a non-infringer offered you $500 to use

24   one of your books for LLM training in perpetuity, is

25   that something that you would either accept or        11:00AM

Page 52

1    reject based on your gut, or is that something where

2    you would still need more information?

3        A    I'd still need more information on -- on

4    what training means, on what potential risks might

5    accompany such a deal.                                    11:01AM

6        Q    Other than money and the length in years of

7    the license, are there other terms that would be

8    important to you?

9        A    Well, I think I said earlier I would not

10   want any of my licenses to undercut the value of the      11:01AM

11   original work.

12       Q    Are there any other terms that are

13   important to you?

14       A    There might be, but I can't enumerate them

15   all right now.                                            11:01AM

16       Q    Would you consider licensing to a nonprofit

17   company for lower price than you would consider

18   licensing to a for-profit company, all else being

19   equal?

20       A    What is -- in that question, what does all       11:02AM

21   else being equal" refer to?

22       Q    So neither of them have infringed in the

23   past, all of the other terms of the agreement, the

24   length of the years, the undercutting of the value,

25   all of that is the same.                                  11:02AM

Page 53

```
 1          A    I can't answer that in the abstract.

 2          Q    Would it be important to you to set limits

 3     on what purposes the AI model will serve before you

 4     decide to license your work to the creator of that

 5     model?                                              11:03AM

 6          A    I don't think I understand what that means.

 7          Q    So would you be willing to license your

 8     work for use in an AI model whose purpose is for

 9     DOGE, to determine what USAID programs to cut?

10          Would you have any objection moral or           11:03AM

11     otherwise to your works being used in that kind

12     of -- kind of AI model?

13          A    Are you asking about -- you asked before

14     about a license, though, not just about the

15     general -- how it might be used.  Are you talking    11:03AM

16     about the license now?

17          Q    Right.  Would it be important to you to put

18     in the license that, "My work cannot be used in any

19     AI model that is used for a purpose that's

20     objectionable to me"?                                11:04AM

21          A    I don't know that I can answer that.

22          Q    What additional information would you need

23     in order to be able to answer that?

24          A    Well, you're talking, in my understanding,

25     about one portion of a licensing deal, but I haven't 11:04AM
```

Page 54

```
 1    seen any -- any offer.  I haven't seen any licensing

 2    deal, and so it's difficult for me to -- to really

 3    speculate on that.

 4           I'm trying to think of -- of a use case --

 5    I don't know.  It's so difficult for me to answer          11:05AM

 6    this because it's -- it's such a hypothetical to me.

 7        Q    Would you consider offering a discount on a

 8    license to an AI model whose purpose was something

 9    very beneficial to society?  For example, making

10    books more accessible to the blind?                        11:05AM

11        A    Are we talking about Anthropic here?

12        Q    We're talking about someone who's never

13    wronged you before.

14        A    Again, without seeing the terms of the

15    deal, it's impossible for me to answer these kinds         11:06AM

16    of questions.

17        Q    So to get an answer, you'd really need to

18    see all of the terms at once and balance them all

19    out together; is that right?

20        A    I don't -- I don't do handshake deals based      11:06AM

21    on one element of an overall offer, especially when

22    it comes to, as you've noted, work that has taken me

23    a decade to create.  Yes, I would need to see all

24    the terms of the deal before I can determine whether

25    or not I would proceed with it.                            11:07AM
```

Page 55

```
 1          Q   So with a hypothetical LLM creator who had

 2     never wronged you before, would you consider a

 3     license for LLM training that permitted the LLM

 4     model to output long, verbatim portions of your

 5     book?                                              11:07AM

 6          A   Sorry.  Can you repeat that again?

 7          Q   Would you be willing to enter into a

 8     licensed with an LLM company that permitted them to

 9     use your work to train the model and then that also

10     permitted the model to output verbatim portions of  11:08AM

11     the text of your work, say, entire chapters, for

12     example?

13          A   So there's a training portion of the

14     license in this hypothetical?

15          Q   Yes.                                       11:08AM

16          A   And so on that particular portion of such a

17     license, I would need to, as I said, take in the

18     kind of totality of fairness.  Is it undercutting

19     the value of my -- of my work?

20              With regards to the output, I guess I would  11:08AM

21     need to understand the point of -- of such an

22     output.  I wouldn't understand why an AI company

23     needs to output verbatim chapters of my -- of my

24     work.

25          Q   So you need more information to answer that  11:09AM
```

Page 56

```
1     question; is that right?

2         A    Yes.

3         Q    In a hypothetical negotiation with an LLM

4     company that had not wronged you before, would you

5     insist on a right to audit the LLM's use of your          11:09AM

6     work?

7         A    I can't answer that.

8         Q    Way can't you answer it?

9         A    Because we're talking about a hypothetical

10    company, and I don't know what the purpose -- what        11:10AM

11    their intended purpose is of licensing my work.

12    And, again, I have -- I have no offer to evaluate.

13        Q    Would you insist on getting indemnification

14    from the LLM operator if the use of the work --

15    their use of your work caused you to be sued?             11:10AM

16        A    I think my answer is the same as before.

17    There's so many stacked hypotheticals here, that

18    it's difficult for me to -- to try to negotiate

19    clauses within a deal that I haven't seen.

20        Q    Would you insist that the LLM operator          11:10AM

21    disclose to the public that it had trained on your

22    work?

23        A    Again, the same answer as before.

24        Q    So shifting gears slightly, I'm going to

25    ask you now about what compensation you believe is        11:11AM
```

Page 57

1    fair or appropriate in this lawsuit as opposed to

2    these hypotheticals.

3            Are you with me?

4        A    Yes.

5        Q    Do you believe that you should be                    11:11AM

6    compensated the same for each of your three books

7    that Anthropic may have used?

8        A    Bless you.  I don't make a distinction

9    between the substance of my books.  It's just that

10    all -- all the books that were infringed upon should    11:11AM

11    be readdressed the same.

12        Q    So you believe each book should get the

13    same monetary award; is that correct?

14        A    I'm not an expert in how awards and damages

15    are assessed, but what I mean is that I'm -- I don't     11:12AM

16    make a distinction between my three books with this

17    lawsuit.

18        Q    Do you know whether the Claude model would

19    perform differently when trained on your books

20    relative to not being trained on your books?           11:13AM

21        A    I have no idea.

22        Q    Do you know whether the effect would be

23    discernible in the use of the Claude tool?

24        A    I have no idea.

25        Q    Do you know how many books or their            11:13AM

Page 58

```
 1              during the full term of copyright

 2              and any renewal or extensions

 3              thereof the exclusive right to

 4              publish the work, including the

 5              right to exercise or license the          01:52PM

 6              rights set forth in Paragraph 2

 7              throughout the world in the English

 8              language and all other languages."

 9              Do you see that?

10      A    I do.                                        01:53PM

11      Q    Do you have any understanding about whether

12   that language grants rights to the publisher over

13   licensing for LLM purposes?

14              MR. CONNORS:  Object to form.

15              THE DEPONENT:  Sorry.  Could you repeat the   01:53PM

16   question?

17   BY MR. RAMALLO:

18      Q    Do you have any understanding as to whether

19   this language grants the right to the publisher to

20   control licensing for LLM usages of the book?        01:53PM

21              MR. CONNORS:  Object to form.

22              THE DEPONENT:  Like I said earlier, I don't

23   believe LLMs existed back then.  But, no, I do not

24   believe it grants the publisher, in a general sense,

25   any right to license the work for LLM training.       01:53PM
```

                                                    Page 122

```
 1    BY MR. RAMALLO:
 2         Q   If someone wanted to license the work for
 3    LLM training, to your understanding, who would they
 4    need to get permission from?
 5              MR. CONNORS:  Object to form.              01:54PM
 6              THE DEPONENT:  Well, all -- as it says at
 7    the final sentence, all rights that I did not
 8    specifically grant to the publisher are reserved to
 9    me.
10              So whether it's LLM or a movie deal or a TV  01:54PM
11    deal, they would need to obtain a license or an
12    option from me.
13    BY MR. RAMALLO:
14         Q   Have you had any conversations with Simon &
15    Schuster as to whether Simon & Schuster has rights    01:54PM
16    to license for LLM purposes?
17         A   No.
18         Q   Other than with someone who was your
19    attorney, have you had any conversations with
20    anybody about whether this publishing agreement      01:55PM
21    gives Simon & Schuster the rights to license LLM
22    usages?
23         A   No.  I don't believe I've communicated with
24    anyone about that.
25         Q   On what basis do you believe that you,      01:55PM
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    time; correct?

2        A    Again, I don't believe they even existed

3    back then, so I don't believe I could have.

4        Q    Was anyone a co-author with you of "The

5    Feather Thief"?                                    02:42PM

6        A    No.

7        Q    Did you have an editor?

8        A    Yes.

9        Q    Who was your editor?

10       A    I had two; Kathryn Court, K-A-T-H-R-Y-N,    02:43PM

11   C-O-U-R-T, and Lindsey Schwoeri was the junior

12   editor on that case.  I can try to spell her name if

13   you need it, but it's -- it would be a guess.

14       Q    Okay.  We'll try it off the record then.

15   Thanks.                                            02:43PM

16            Did you exchange drafts of the book by

17   e-mail with your editors?

18       A    Yes.

19       Q    And who owned the copyright on "The Feather

20   Thief" when the copyright registration was filed?    02:43PM

21       A    I believe it was registered under MJ + KJ,

22   Inc.

23       Q    Has that changed at any time?

24       A    No.

25       Q    So MJ + KJ, Inc. is the owner to this day;    02:44PM

Page 142

```
 1    correct?

 2         A    Yes.

 3         Q    And who submitted the application for that

 4    work to the copyright office?

 5         A    It's my understanding that similarly to "To        02:44PM

 6    Be a Friend Is Fatal," that's the role of the

 7    publisher, and so the publisher for both "The

 8    Feather Thief" and my subsequent book is Viking,

 9    which is an imprint of Penguin Random House.

10         Q    Exhibit 37.                                         02:44PM

11         A    Thank you.

12              (Defendant's Exhibit 37 was marked

13              for identification.)

14    BY MR. RAMALLO:

15         Q    Do you recognize Exhibit 37?                        02:45PM

16         A    I do.

17         Q    What is it?

18         A    This is my book deal for what became known

19    as "The Feather Thief."

20         Q    Can you look at Page 11?                            02:45PM

21         A    Yeah.

22         Q    Do you recognize those signatures?

23         A    I recognize my own.

24         Q    Okay.  So the signature on the bottom is

25    your signature; correct?                                      02:46PM
```

Page 143

```
1           A    Yes.

2           Q    And as far as you know, is this the

3    effective publishing agreement for "The Feather

4    Underground" or "The Feather Thief"?

5           A    Yes, as far as I know.                02:46PM

6           Q    Has this agreement been modified to your

7    knowledge?

8           A    No, not to my knowledge.

9           Q    And is Viking the only domestic publisher

10   of "The Feather Thief"?                            02:46PM

11          A    I believe that there was a large print

12   addition that was published for the

13   visually-impaired, and I can't recall if that was

14   also Viking or a separate imprint within Penguin

15   Random House.                                      02:47PM

16          Q    Okay.  Do you have an understanding of

17   whether this agreement gives Viking ing the rights

18   to license LLM usage for "The Feather Thief"?

19          MR. CONNORS:  Object to form.

20          THE DEPONENT:  No, it's my understanding    02:47PM

21   that it does not.

22   BY MR. RAMALLO:

23          Q    Can you take a look at Section 1A?

24          A    Sorry.  It's very small print.

25          Q    Yeah.                                  02:48PM
```

Page 144

```
 1        A   I'm looking at it.
 2        Q   It says (as read):
 3               "The author hereby grants to the
 4        publisher during the full term of
 5        the copyright any renewals,                    02:48PM
 6        communications, and extensions
 7        thereof in each of following
 8        countries and territories, A, the
 9        exclusive right to print, publish,
10        and sell the work in whole or in               02:48PM
11        part," and it continues.
12        Do you see that?
13        A   I do see that.
14        Q   Is it your understanding that that language
15   does not grant Viking the right to license LLM      02:48PM
16   rights?
17        A   My understanding is that, no, it does not
18   because of Section 29A, in which it says that all
19   rights not specifically granted to the publisher are
20   reserved to the author.                             02:49PM
21        Q   All right.  So if someone wanted to license
22   the LLM rights for "The Feather Thief," who would
23   they need to talk to?
24        A   That would be me.
25        Q   Would they need to get the consent or       02:49PM
```

Page 145

1    permission of anyone else besides you?

2         A    No, not my knowledge.  Those rights are

3    reserved to me.

4         Q    Okay.  And would it be to -- would they

5    need to talk to you personally as an individual or          02:49PM

6    MJ + KJ?

7         A    Well, MJ + KJ, Inc. holds the copyright, so

8    I suppose they could be speaking to me as the

9    president of that S corporation, or one of my

10   representatives.                                             02:50PM

11        Q    All right.  Exhibit 37, Paragraph 5

12   provides for a $400,000 advance.

13             Do you see that?

14        A    I do.

15        Q    Did you receive that full $400,000 advance?     02:50PM

16        A    I did.

17        Q    And have you ever received any royalties

18   under this agreement?

19        A    I have.

20        Q    And given that your view is this agreement        02:50PM

21   does not give Viking any rights for LLM training, it

22   would not make sense that you would have any rights

23   under this agreement to royalties for such licenses;

24   is that your understanding?

25             MR. CONNORS:  Object to form.                     02:50PM

Page 146

```
 1      an imprint of Penguin Random House for "The

 2      Fisherman and The Dragon."

 3          Q    In your understanding, does Exhibit 41 give

 4      Random House the right to license material for LLMs?

 5              MR. CONNORS:  Object to form.                    03:16PM

 6              THE DEPONENT:  My understanding is that it

 7      does not.

 8      BY MR. RAMALLO:

 9          Q    All right.  Turning your attention to

10      Paragraph 3 that says, "Grant of Rights               03:16PM

11      Territories."

12              Do you see that?

13          A    I do.

14          Q    It says (as read):

15                  "The author grants the publisher          03:16PM

16              during the full term of copyright,

17              including renewals and extensions

18              thereof, applicable to the work in

19              each country covered by this

20              agreement, the right to publish,             03:17PM

21              distribute, sell, and otherwise make

22              available any and all editions

23              and/or formats of the work in whole

24              or in part, and to license said

25              rights on such terms that the                03:17PM
```

Page 161

```
 1              publisher deems advisable as follows
 2              exclusively throughout the world and
 3              exclusive territories in the English
 4              language."
 5              Do you see that?                          03:17PM
 6         A    I do see that.
 7         Q    Is it your understanding that if the
 8    publisher deems it advisable to make a license for
 9    LLM uses, that that is a right that the publisher
10    would have under this agreement?                    03:17PM
11         A    This is a publishing agreement to publish
12    my book.  Anything that is not published in my book
13    would have been reserved to me, as per Section 28 in
14    the agreement.
15         Q    If Anthropic or another AI company wanted  03:18PM
16    to license "The Fisherman and The Dragon" for LLM
17    purposes, who would they need to go to?
18         A    They would need to go to me.
19         Q    Okay.  Would they need to go to anyone
20    else?                                               03:18PM
21         A    Well, as with "The Feather Thief" and my
22    other works, the copyright is held by MJ + KJ, Inc.
23    So when I say "me," I mean me in my capacity as
24    president of my S corporation, but I'm the only one
25    that holds those rights.                            03:18PM
```

                                              Page 162

```
 1    month-by-month.

 2         Q    And you have not asked Penguin Random House

 3    for that information; is that correct?

 4         A    I have not.

 5         Q    Do you believe that Claude has impacted the      03:40PM

 6    sales of any of your books?

 7              MR. CONNORS:  Object to form.

 8              THE DEPONENT:  I have no way of knowing for

 9    sure.

10    BY MR. RAMALLO:                                            03:40PM

11         Q    Do you have any evidence that Claude has

12    impacted the sales of your books?

13              MR. CONNORS:  Object to form.

14              THE DEPONENT:  Any evidence that Claude in

15    particular?  Sorry.                                        03:41PM

16    BY MR. RAMALLO:

17         Q    Yes.

18         A    Not that I'm aware of.

19         Q    Do you have any evidence that LLMs in

20    general have impacted the sales of your books?            03:41PM

21              MR. CONNORS:  Object to form.

22              THE DEPONENT:  Are we talking about the

23    sale of my books?

24    BY MR. RAMALLO:

25         Q    Yes.                                             03:41PM
```

Page 171

```
1        A    Then no, not that I'm aware of.

2        Q    Are you aware of any evidence that Claude

3   has impacted the ability for you to exploit your

4   books with respect to film right licensing?

5        A    It's kind of a complicated question.  Are          03:41PM

6   you saying has it prevented me from optioning my

7   work to be adapted into a film or a TV series?

8        Q    Sure.  Has it prevented you?

9             MR. CONNORS:  Object to form.

10            THE DEPONENT:  No, not that I'm aware of.          03:42PM

11  Not yet.

12  BY MR. RAMALLO:

13       Q    Do you have any evidence that you would

14  have made more money through film and TV licensing

15  if Claude had never existed?                                03:42PM

16       A    Not that I'm aware of.

17       Q    Do you know of any evidence that you would

18  have made more money through speaking engagements if

19  Claude had never existed?

20       A    It's difficult for me to answer, but I'm          03:42PM

21  not aware of that, of any evidence that would affect

22  that.

23       Q    Are you aware of any evidence that Claude

24  has impacted any other of your income streams

25  related to writing?                                         03:43PM
```

Page 172

```
 1        BY MR. RAMALLO:

 2             Q    What about for "Washington Post"?

 3                  MR. CONNORS:  Object to form.

 4                  THE DEPONENT:  My answer would be the same

 5        as the previous answer.                          03:54PM

 6        BY MR. RAMALLO:

 7             Q    What about "The Los Angeles Times"?

 8                  MR. CONNORS:  Object to form.

 9                  THE DEPONENT:  My answer would be the same

10        as the previous answer.                          03:54PM

11        BY MR. RAMALLO:

12             Q    Are you aware of whether it's common in the

13        industry for authors besides yourself to have the

14        same deal, where they would retain the rights to

15        license to LLMs with respect to short-form works?  03:55PM

16                  MR. CONNORS:  Object to form.

17                  THE DEPONENT:  I can't speak with any

18        knowledge to what other authors' deals look like.

19        BY MR. RAMALLO:

20             Q    Have you heard of collective licensing of  03:55PM

21        books?

22             A    I've seen it referenced within the

23        complaint.

24             Q    Are any of your books available for

25        collective licensing?                            03:55PM
```

Page 181

```
 1          A    With that company?

 2          Q    With any company?

 3               MR. CONNORS:  Object to form.

 4               THE DEPONENT:  You're asking about that

 5     specific company, aren't you?                      03:55PM

 6     BY MR. RAMALLO:

 7          Q    Well, I don't want to -- are you referring

 8     to Copyright Clearance Center?

 9          A    Yes.  That's what I remember from the

10     complaint.  Sorry.                                 03:55PM

11          Q    Okay.  I'll ask you:  Are your books

12     available for collective licensing from the

13     Copyright Clearance Center?

14          A    No, not that I'm aware of.

15          Q    Why not?                                 03:56PM

16          A    I don't have an agreement with them.

17          Q    And are your books available for collective

18     licensing with anyone else besides Copyright

19     Clearance Center?

20          A    Can you just -- for my benefit, just define 03:56PM

21     "collective licensing"?

22          Q    A collective license -- let's see.

23               Are you aware of any organization similar

24     to Copyright Clearance Center who has collected the

25     rights to many different works of authorship and    03:56PM
```

Page 182

1    offered those as a bundle for training in LLM data?

2         A    Legally?  I know --

3         Q    Yes.

4         A    I know it was done illegally in this case.

5         Q    Legally.                                    03:57PM

6         A    Where they have struck a deal with authors?

7         Q    Yes.

8         A    I have a vague awareness that Harper

9    Collins has some opt-in program for its authors, but

10   I'm not a Harper Collins author and I don't really      03:57PM

11   know anything about that program other than what I

12   just said to you.

13        Q    It's fair to say none of your works are

14   available through Harper Collins; is that correct?

15        A    Yes, that is correct.                       03:57PM

16        Q    Have you done anything to investigate or

17   educate yourself about collective licensing?

18        A    No, I have not.

19        Q    Have you ever discussed with other authors

20   whether LLMs are good or bad for authors?             03:58PM

21             MR. CONNORS:  Object to form.

22             THE DEPONENT:  No, I don't recall ever

23   having discussed that.

24   BY MR. RAMALLO:

25        Q    Okay.  Can we take a break?                 03:58PM

                                         Page 183

```
 1                Inc. engaged in or anyone engaged in

 2                on behalf of MJ + KJ, Inc. regarding

 3                the licensing of the works for use

 4                to train large language models."

 5                Do you see that?                          04:37PM

 6        A    I do.

 7        Q    And I believe you testified you considered

 8    this lawsuit a negotiation in some way for a license

 9    to train large language models.

10                So putting that aside, were there any other   04:37PM

11    licenses or efforts to license the allegedly

12    infringed works besides this lawsuit?

13                MR. CONNORS:   Object to form.

14                THE DEPONENT:   Not that I can recall.

15    BY MR. RAMALLO:                                       04:38PM

16        Q    Okay.  Topic 8.

17                Who did you talk to other than attorneys in

18    an attorney-client privilege setting to prepare for

19    Topic 8?

20        A    I did not speak with anyone.                 04:38PM

21        Q    Okay.  And just for the record, Topic 8 is,

22    (as read):

23                "All facts relating to sales of

24                and revenues and profits generated

25                by any work MJ + KJ, Inc. alleges       04:38PM
```

Page 200

1    I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, Registered

3    Professional Reporter, Certified Live Note Reporter,

4    do hereby certify:

5    That the foregoing proceedings were taken

6    before me at the time and place herein set forth;

7    that any witnesses in the foregoing proceedings,

8    prior to testifying, were duly sworn; that a record

9    of the proceedings was made by me using machine

10   shorthand which was thereafter transcribed under my

11   direction; that the foregoing transcript is a true

12   record of the testimony given.

13   Further, that if the foregoing pertains to

14   the original transcript of a deposition in a Federal

15   Case, before completion of the proceedings, review

16   of the transcript [ X ] was [  ] was not requested.

17   I further certify I am neither financially

18   interested in the action nor a relative or employee

19   of any attorney or party to this action.

20   IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22   Dated: 3/12/25

23

24   RENEE A. PACHECO
     CSR No. 11564 RPR, CLR

25

Page 224