# EXHIBIT 22

Case 3:24-cv-05417-AMO   Document 554-22   Filed 01/21/26   Page 2 of 14
Highly Confidential Attorneys' Eyes Only
Thomas Turvey
Andrea Bartz, et al. vs. Anthropic PBC

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4    ANDREA BARTZ, et al.,    )
                               )
 5         Plaintiff,    ) Case No.:
                         ) 3:24-CV-05417-WHA
 6    v.                 )
                         )
 7    ANTHROPIC PBC,     )
                         )
 8         Defendants.   )
      _____)
 9                       )
10
11
12
13      VIDEOTAPED DEPOSITION OF THOMAS TURVEY
14      HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY
15              April 10, 2025
16                9:09 a.m.
17
18
19
20
21
22
23    REPORTED BY:
24    Tammy Moon, CSR No. 13184, RDR, CRR
25    JOB NO. 10162277
```

**Page 2**

```
 1    APPEARANCES:
 2    FOR PLAINTIFF ANDREA BARTZ, et al.:
 3    SUSMAN GODFREY LLP
      BY: ALEJANDRA SALINAS, ESQ.
 4    BY: COLLIN FREDRICKS, ESQ.
      1000 Louisiana St., Ste 5100
 5    Houston, Texas 77002-5096
      713.651.9366
 6    Asalinas@susmangodfrey.com
 7    FOR DEFENDANT:
 8    ARNOLD & PORTER KAYE SCHOLER LLP
      BY: JOSEPH RICHARD FARRIS, ESQ.
 9    Three Embarcadero Center, 10th Flr
      San Francisco, California 94111-4024
10    415.471.3100
      Joseph.farris@arnoldporter.com
11
12    ALSO PRESENT: JAKE MILLER, ESQ.
13    TIM KAMAL-GRAYSON, ANTHROPIC
14    J. CRAIG SMYSER (REMOTE)
15    RACHEL GEMAN (REMOTE)
16    NEIL GEORGE, THE VIDEOGRAPHER
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              INDEX TO EXAMINATION
 2                 THOMAS TURVEY
 3              Thursday, April 10, 2025
 4          Tammy Moon CSR No. 13184, RPR, CRR
 5          WITNESS: THOMAS TURVEY
 6
 7    EXAMINATION                          PAGE
 8    MS. SALINAS                           10
 9
10
...
25
```

**Page 4**

```
 1               INDEX TO EXHIBITS
 2                 THOMAS TURVEY
 3              Thursday, April 10, 2025
 4          Tammy Moon CSR No. 13184, RPR, CRR
 5    MARKED      DESCRIPTION              PAGE
 6    Exhibit 9   LinkedIn profile          34
 7    Exhibit 10  Tom Turvey's biography on the  37
 8                Publishers Launch Conferences
 9                website
10    Exhibit 11  Bates-stamped pages        67
11                ANT_BARTZ_000168435-ANT_BARTZ_
12                000168443
13    Exhibit 12  Bates-stamped pages        72
14                ANT_BARTZ_000211313-ANT_BARTZ_
15                000211323
16    Exhibit 13  Excel document             81
17    Exhibit 14  Bates-stamped page         83
18                ANT_BARTZ_000005492
19    Exhibit 15  Bates-stamped pages        99
20                ANT_BARTZ_000209219-
21                ANT_BARTZ_000209235
22    Exhibit 16  Bates-stamped pages       107
23                ANT_BARTZ_000532717-
24                ANT_BARTZ_000532718
25
```

Case 3:24-cv-05417-AMO   Document 554-22   Filed 01/21/26   Page 3 of 14
Highly Confidential Attorneys' Eyes Only
Thomas Turvey
Andrea Bartz, et al. vs. Anthropic PBC

Page 145

1  A. Correct, yeah.
2  Q. And in the email, you say: "The tech
3  company I am consulting for is building a research
4  library and is interested in buying one of each."
5  Is that correct?
6  A. Yes.
7  Q. So you were instructing Jaya to represent
8  to book distributors that you were purchasing books
9  because you were building a research library. Is
10 that correct?
11 A. That's what it says, yes.
12 Q. What did you mean by a "research library"?
13 A. It was more of a -- sort of a figure of
14 speech. A way of creating information that would be
15 voluminous and that we would use for research.
16 Q. What kind of research?
17 A. Research that we would conduct when we were
18 building our LLM. So it's typically what we
19 would -- that's how we would think about it.
20 Q. The research you needed to undertake to
21 build commercial models of LLMs?
22 A. Yes.
23 Q. So you were purchasing books for commercial
24 research?
25 A. We were purchasing books, yeah, for the

Page 146

1  purpose of data acquisition that would help inform
2  our -- our products, yeah.
3  Q. You were also purchasing books specifically
4  to train LLMs, correct?
5  A. Yes.
6  Q. Which you saw as sort of being one and the
7  same with building a research library?
8  A. Yes.
9  Q. Did you instruct other members of your team
10 to represent that if you were going out talking to
11 distributors, that the purpose of this project is to
12 build a research library?
13 A. I don't recall if I ever used that term or
14 phrase before or after. I don't recall that.
15 Q. You -- you believe this is the only place
16 you may have used that phrase, "building a research
17 library"?
18 A. I can't guarantee that, but I don't recall
19 using it outside of this context.
20 Q. Okay. Can you give me Document 36. Mark
21 this as Exhibit 20.
22    (Exhibit 20 was marked for identification.)
23 Q. This is an email with you and -- sorry. I
24 don't want to mispronounce the name of the person
25 this is an email from.

Page 147

1  A. Gyula Lakatos.
2  Q. Lakatos. This is an email from Gyula
3  Lakatos on October 30th, 2024. Is that correct?
4  A. Yes.
5  Q. This is an email to you and Ms. Latapie.
6  Is that correct?
7  A. Yes.
8  Q. Okay. Let's look at page three of the
9  email. Here there are some back-and-forths with you
10 and Ms. Slocum from Amazon, correct?
11 A. Yes.
12 Q. And in this email, you state to Katherine
13 on October 29th:
14       "Thanks, Katherine. Can you please
15    let the seller know we're happy to enter
16    into an NDA to preserve and protect
17    their data.
18       "I'd like to avoid mentioning us by
19    name but okay to mention we are an AI
20    company you work with building a
21    research library." Is that correct?
22 A. Yes.
23 Q. So here you were also representing to
24 Amazon that you were acquiring books for a research
25 library. Is that correct?

Page 148

1  A. Yeah. I was representing to, yes, Amazon
2  to represent to others.
3  Q. Okay. So at least in your conversations
4  with Amazon and conversations with your consultant
5  on communications with the Indian book distributor,
6  you were encouraging -- you were telling them the
7  purpose of this was to build a research library?
8  A. Yeah. I think I was trying to be as direct
9  as we could without getting into too many details.
10 So an AI company you work with building a research
11 library.
12 Q. Okay. You have talked about this a little
13 bit, but you believe Google Books is similar to
14 Project Panama?
15    MR. FARRIS: Objection to form.
16    THE WITNESS: I -- I mean, there are
17 aspects that are similar, I suppose, yeah.
18    MS. SALINAS:
19 Q. Are there any differences between Google
20 Books and Project Panama?
21 A. I mean, I suppose the -- the intent and
22 benefit of the digitization is slightly different,
23 and both are --
24 Q. What --
25    (Simultaneous colloquy.)

Case 3:24-cv-05417-AMO   Document 554-22   Filed 01/21/26   Page 4 of 14

Thomas Turvey | Highly Confidential Attorneys' Eyes Only | Andrea Bartz, et al. vs. Anthropic PBC

Page 189

1  Same stipulation: We would ask every vendor for --
2  you know, please don't send any that are
3  self-published or children's books or books that we
4  have that would be redundant, like Bibles and the
5  like.
6     Q.  When did you start acquiring books from
7  Baker & Taylor?
8     A.  That's a good question. I don't recall
9  exactly, but I believe it was in the summer of 2024.
10 May be midsummer, something like that.
11    Q.  Are you still acquiring books from Baker &
12 Taylor today?
13    A.  Yes.
14    Q.  Do you know how many books you anticipate
15 acquiring from Baker & Taylor?
16    A.  We have an agreement for roughly
17 ▇▇▇▇▇▇▇, and I think we are getting close to
18 that.
19    Q.  Okay. What about World of Books? When did
20 you start acquiring books from World of Books?
21    A.  I believe that was late 2024. So maybe
22 December -- November/December, something like that.
23    Q.  And for each of these publishers, as I
24 understand it, they would send you a list of their
25 inventory. You would then tell them there's some

Page 190

1  subset of books you don't want. But apart from
2  that, you would essentially just take the rest. Is
3  that how this worked?
4     A.  Yeah. Roughly -- these are book resellers,
5  just to be specific. But the -- roughly how it
6  works is they would send us a list of books that --
7  at different price points.
8         We would return books that we were
9  interested in manually. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
10 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
11 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
12 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
13    Q.  Okay. For World of Books, what kind of
14 books are you acquiring?
15    A.  Same profile as Better World, so basically
16 everything with a few exceptions.
17    Q.  Are you acquiring new books from World of
18 Books?
19    A.  No. They're a used book reseller.
20    Q.  Okay. Any other English language book
21 companies that I may have missed that you acquired
22 books from for Project Panama?
23    A.  Baker & Taylor, World of Books, Better
24 World. I think that's about it.
25    Q.  What about ThriftBooks?

Page 191

1     A.  ThriftBooks? I -- I don't think we ever
2  acquired any books from ThriftBooks.
3     Q.  Okay. And you didn't acquire any books
4  from Barnes & Noble?
5     A.  Correct.
6     Q.  Or Half Price Books?
7     A.  Correct. We investigated some books from
8  Half Price Books but never acquired.
9     Q.  Okay. Why did you end up not acquiring
10 anything from Half Price Books?
11    A.  I don't think they had as many as we had
12 assumed that they had had. And I think that --
13 uniquely. And I think the pricing was higher than
14 we could -- we were willing to pay.
15    Q.  Okay. So we have talked about the
16 acquisition. Now let's go to Phase 2: scanning.
17 Help me understand sort of the logistics of how it
18 worked once a book was acquired. You purchased
19 it -- how it goes from there to the scanning
20 facility and what happens at the scanning facility.
21    A.  Books are purchased. Purchase is
22 confirmed. Books are reserved, usually taken off
23 shelf if they're on shelf, set aside. Identify the
24 metadata, load it on -- in boxes or in Gaylords, put
25 on pallets, put in trucks.

Page 192

1         Either shipped if it's overseas, like in
2  the U.K. -- if it was a U.K. book purchase for World
3  Books -- Better World, if not trucked. Arrives in
4  Illinois, where Datamation is.
5         And metadata for the book is handshaked
6  between the scanning vendor and the manifest on the
7  book shipment so that it's one to one. We're sent a
8  copy of what's received.
9         And then scanning, we'll start -- taken off
10 the truck, onto the line. And then the vendor will
11 scan somewhere between ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇,
12 depending upon the volume that we have provided.
13    Q.  And to get into a bit more detail, I mean,
14 how does the scanning work? Does someone, you know,
15 cut up the book, run it through a machine? Is
16 someone standing there making a copy of each page?
17 Walk me through -- I know you visited the facility,
18 correct?
19    A.  Yeah. Sure.
20    Q.  So can you walk me through the logistics of
21 how the scanning occurs for each book.
22    A.  Yeah. I can tell you what I know. There's
23 a couple of different lines. Some are more manual
24 than others. Some others, almost fully automated.
25 Book is handed to an individual. If it's automated,

Case 3:24-cv-05417-AMO   Document 554-22   Filed 01/21/26   Page 5 of 14
Highly Confidential Attorneys' Eyes Only
Thomas Turvey
Andrea Bartz, et al. vs. Anthropic PBC

Page 193

1  put on a line. Book will come down.
2      The -- there's a machine -- there's
3  machines that are built for this kind of work in
4  Germany, I believe, that will cut binds -- bindings
5  from books -- so cut the glue so that you can then
6  open the book. So it's sheet fed into a scanning
7  machine page by page.
8      A high-resolution image is taken of the
9  pages. There's OCR that is then extracted after the
10 book is, like, sort of -- that book is disposed.
11 And then there's -- got a file that's concatenated,
12 OCR'd, and then created into a PDF normal. And then
13 that's uploaded to a site that we retrieve from.
14     Q. Okay. So you said from -- I assume in
15 Illinois, the facility, a data file is created and,
16 you said, uploaded to -- as a PDF. Is that uploaded
17 onto Datamation's computer in Illinois? Where is
18 that uploaded to?
19     A. That's a good question. I'm not totally
20 sure if that is a Datamation site or if there is a
21 S3 bucket that we are picking up from AWS. I'm not
22 exactly sure where in the world that site is, but I
23 know that there's -- we're handshaking with that
24 file. Yeah.
25     Q. So a copy is made by Datamation -- a PDF

Page 194

1  copy of the book?
2      A. Yeah, yeah.
3      Q. And then it may exist on Datamation's
4  computer. There may be then a secondary copy put on
5  an S3 bucket?
6      A. I think that's -- yeah. It's one or the
7  other. It could be both. I'm not exactly sure.
8      Q. There could be one or two copies that
9  exist: Datamation, the S3 bucket. What happens from
10 there? Is there an additional copy made internally
11 at Anthropic?
12     A. I don't know. I believe we download from
13 the S3 bucket and make -- make -- that goes into
14 some generalized data area. But I'm not a technical
15 engineering person, so I'm not exactly sure how that
16 trail works.
17     Q. Okay. So once it gets into the general
18 data bucket, you are not sure what happens to it?
19     A. That's right. We're mostly out of it at
20 that point.
21     Q. Okay. I know we're sort of using these --
22 general data bucket -- is there -- there a more
23 specific term for how it's referred to in Anthropic?
24     A. Yeah. I don't know, to be honest.
25     Q. Okay. Do you know who has access to this

Page 195

1  general data bucket?
2      A. Yeah. Someone -- mostly research
3  pretraining individuals. There are folks on that
4  team that manage that Panama pipeline, one person on
5  my team who manages the metadata and any bug fixing
6  that needs to happen between us and the scanning
7  vendor. So some combination of those folks.
8      Q. Is there anyone at Anthropic that does not
9  have access to this data bucket that contains the
10 books?
11     A. Most people don't have access, yeah.
12     Q. How many people have access to it?
13     A. I don't know for sure, but I would estimate
14 a half dozen, maybe, or something like that.
15     Q. Half a dozen Anthropic people and then
16 additional Datamation people?
17     A. Something like that, yeah.
18     Q. Okay. And with that access, do you know if
19 they're able to manipulate the document in any way
20 or what they're able to do with the document?
21     A. I don't know exactly. I'm sorry. Can --
22 if they're able to manipulate the document?
23     Q. Right. If I'm in the data bucket and I
24 see --
25     A. Yeah.

Page 196

1      Q. -- a PDF for, you know, Kirk Wallace
2  Johnson's book--
3      A. Yeah.
4      Q. -- can I -- can I edit the document? Can I
5  make another copy of it? Is there any restrictions
6  on what I can do with the document?
7      A. Well, it's a PDF. So I don't believe
8  that -- I'm not sure -- I think there's limitations
9  on what you could do with it. It's not like a Word
10 document, a reflowable. So there's page -- I
11 mentioned there's some text there. Yeah. I'm not
12 sure exactly what happens after that -- after it
13 gets uploaded.
14         (Simultaneous colloquy.)
15     Q. Are you aware of any restrictions on how
16 the documents can be used by the people who do have
17 access to them in the data bucket?
18     A. I'm not aware of any, no.
19     Q. Okay. And from -- what is your
20 understanding of the purpose of the books -- of
21 using the books once they're placed in the data
22 bucket?
23         MR. FARRIS: Object to the form.
24         THE WITNESS: Yeah. I'm -- the purpose
25 would be to add to a -- like, a pretraining sort of

Case 3:24-cv-05417-AMO   Document 554-22   Filed 01/21/26   Page 6 of 14

Thomas Turvey                    Highly Confidential Attorneys' Eyes Only                    Andrea Bartz, et al. vs. Anthropic PBC

Page 225

1  MS. SALINAS:
2  Q. Okay. You have some language in your
3  declaration that says: "Suggested it could be a
4  long road to get a deal done." What exactly did she
5  say to make you think --
6  A. I don't know exactly what she said. As I
7  mentioned, she implied that, you know, it could
8  be -- they weren't doing very much, and it could be
9  complicated.
10 Q. But she didn't say it would take a long
11 time, necessarily, to put together a catalog, right?
12 A. No, she didn't necessarily say there would
13 be a long time. She said that -- this basically
14 implied consistently that it might be complicated
15 internally, and it might take some time -- that that
16 was the "long road" part.
17 Q. How much time did she suggest it would
18 take?
19 A. I don't recall.
20 Q. Okay. So I guess is your characterization
21 of a "long road" -- that's sort of just your
22 assumption; that's not what she actually said?
23 A. No. She implied that there would be a long
24 road and it might be complicated, but I don't know
25 exactly what her words were. But usually when you

Page 226

1  are negotiating with a publisher of this size, a
2  normal deal would take months to execute in any
3  event, in my experience. So I think she was trying
4  to signal it might be longer than that.
5  Q. But you don't recall exactly what she said
6  to signal that?
7  A. I don't recall exactly what she said.
8  Q. Or generally what she said?
9  A. Generally, I recall that she said it might
10 be complicated and it might take some time.
11 Q. Okay. How did you end the conversation?
12 A. "Let's touch base again," I believe, or
13 something like that. I believe I said to her, now
14 that I think about it, that "Let me know when you
15 have something for me to review, and I'll let you
16 know if we're interested." I'm pretty sure that's
17 how we left it.
18 Q. Okay. And did you send -- what happened
19 after that?
20 A. I don't think we ever received anything.
21 I'm not totally sure about that, to be honest, but I
22 don't believe we ever received anything.
23 Q. As you sit here today, you don't know one
24 way or the other whether there was a subsequent
25 attempt to communicate with Anthropic from Penguin

Page 227

1  Random House?
2  A. I don't recall that there was, but I'm -- I
3  don't put it in the realm of no possibility that
4  there wasn't something sent as a follow-up. I
5  don't -- I don't remember it.
6  Q. Okay. Did you ever -- sounds like -- did
7  you ever make any attempt to follow up with her?
8  A. I don't think I did. I don't think I did.
9  Q. Did you ever send her any subsequent
10 written communication any which way?
11 A. I don't recall. There might have been a
12 thank you note or something like that, but I don't
13 recall.
14 Q. Did you ever discuss any potential pricing
15 with Penguin Random House?
16 A. Not that I recall.
17 Q. And you never discussed sort of any
18 particular catalog?
19 A. Well, and other than what she implied,
20 that, you know, there wasn't really anything there
21 yet and there might be in the future. But nothing
22 specific about a catalog, no.
23 Q. Why haven't you followed up with her since
24 you had this conversation a year ago now?
25 A. Well, we were -- at this time, this was --

Page 228

1  we were exploring multiple options here.
2  April 2024. So I was talking to multiple publishers
3  simultaneously.
4  
5  
6  
7  
8  
9  Q. But why haven't you followed up since?
10 It's been a year.
11 A. Well, we managed to acquire print books,
12 and that would be -- shift our strategy from, you
13 know, looking at whether or not there were digital
14 catalogs to license individually to Project Panama
15 about mid to late summer. So by the time I would
16 have maybe turned around and thought about reaching
17 out again, we'd already kind of shifted our focus.
18 Q. At this point, are you still interested in
19 a license to Penguin Random House?
20 A. We're not doing any book licensing directly
21 with publishers at this point since we shifted our
22 focus at Project Panama.
23 Q. Okay. Let's turn to HarperCollins.
24 Actually, I'm sorry. Let's go to Macmillan and then
25 go to HarperCollins, if that's okay.

Case 3:24-cv-05417-AMO   Document 554-22   Filed 01/21/26   Page 7 of 14
Highly Confidential Attorneys' Eyes Only
Thomas Turvey
Andrea Bartz, et al. vs. Anthropic PBC

Page 229

1  A.  Sure.
2  Q.  So Macmillan -- looks like you reached out
3  to them in March of 2024, according to your
4  declaration.  Is that correct?
5  A.  Yes.
6  Q.  Is there a reason why you decided to reach
7  out to them before the other publishers?
8  A.  I was reaching out ▬▬▬▬▬▬▬▬▬▬
9  ▬▬▬▬▬▬▬▬▬ and that was my motivation for
10 reaching out.
11 Q.  So that's why you contacted Macmillan
12 before Penguin Random House and HarperCollins?
13 A.  That's right.
14 Q.  Okay.  Who did you -- or did you or someone
15 on your team contact Macmillan?
16 A.  I did.  This was March 2024, so I didn't
17 really have a team at that point.
18 Q.  And who did you contact at Macmillan?
19 A.  Stefan von Holtzbrinck.
20 Q.  Okay.  And how did you contact them?
21 A.  Email, I believe.
22 Q.  Okay.  So you sent an email to -- asking
23 them to -- what did you say in the email to them?
24 A.  I think I just -- "can we talk about what
25 you might be doing with books or licensing?"  I

Page 230

1  don't remember exactly what I said.  Something like
2  that.
3  Q.  Okay.  Did you include anyone else on that
4  email?
5  A.  I did not that I recall.  I believe he
6  included in his response people that would be
7  responsible for discussing that.  That's my memory.
8  Q.  Okay.  So -- and you sent this email.  Do
9  you recall if it was early March, late March of
10 2024?
11 A.  I don't recall what part of March it was.
12 I think it was shortly after I started, so my guess
13 is that it was mid-March or something like that.
14 Q.  And do you recall what you said in the
15 email?
16 A.  No.  It was something about "Can we get
17 together to talk?" I think, something like that.
18 Q.  Do you recall if you specifically mentioned
19 what you wanted to speak about?
20 A.  I don't recall.
21 Q.  I'll represent to you we also did not get
22 those communications, so I can't show them to you
23 and ask you about them.  You said that you got a
24 response from him and he copied some members of his
25 team.  What did he say in response to you?

Page 231

1  A.  My memory is he just confirmed that he
2  would like to talk and I should meet these other
3  people who may be doing some licensing.
4  Q.  Do you know who the -- do you recall the
5  names of the other people he copied?
6  A.  No.  I believe they were either German or
7  Dutch.  I can't recall.  I believe it was at a
8  subsidiary of his.  I don't remember the name.
9  Digital Science, maybe.
10     It was a subsidiary of Macmillan that were
11 doing some development of computer use models, I
12 think.  For some reason, I think he thought they
13 were involved in maybe e-book licensing.  I'm not
14 exactly sure, to be honest, why he copied them.
15 Q.  Okay.  So he responded.  And did you all
16 agree to speak?
17 A.  He asked me to speak to these folks that he
18 copied.
19 Q.  Okay.  What did you say in response?
20 A.  I think "Thank you."  I think we set up a
21 time to talk, I believe.
22 Q.  And how did you go about -- did you set
23 that up over email?
24 A.  I think we set that up over email and then
25 subsequently had a videoconference a week or two

Page 232

1  later.
2  Q.  Sometime in March 2024?
3  A.  Yeah, my memory is it may be in March.  It
4  may have drifted into April.  I'm not exactly sure,
5  but we spoke in the subsequent weeks.
6  Q.  And what did you say to the -- do you
7  recall who at Macmillan you spoke to on that call,
8  their names?
9  A.  No, I don't.  I don't remember.  I remember
10 there being either a German or Dutch person.  There
11 were more than one.  I think there were two.  And I
12 believe they were at the same company.  I think the
13 name of the company was Digital Science, and I don't
14 remember their names.
15 Q.  Okay.  On that call, what did you say to
16 Macmillan?
17 A.  "Are you doing any" -- something to the
18 effect of "Are you doing any licensing to AI
19 companies for academic and scholarly books?"
20 Q.  And what did they say?
21 A.  My memory is they said they didn't know.
22 And they didn't think that they were, but they would
23 look into it -- something like that.  We were -- I
24 was also asking, I think, for journals as well.
25 Q.  So they said they didn't know if they were

Page 233

1  and they would look into it?
2      A.  Yeah.  That's my memory.
3      Q.  Do you recall who -- or which -- did they
4  all say that?  Because you said there were several
5  folks on the call.
6      A.  There were two, at least, folks -- may have
7  been three.  I think there were two.  Again, they
8  were in different parts of this company.  I believe
9  it was called Digital Science.
10         They weren't totally clear on what their
11  plans were is my memory.  And I believe that their
12  response was something like "We're not sure if we
13  are doing any of this right now.  Maybe some of the
14  units are, but we'll look into it for you and let
15  you know," something like that.
16     Q.  Okay.  About how long was that call?
17     A.  Maybe 30 minutes.
18     Q.  Okay.  What else did you discuss for the,
19  you know, 28 minutes if they just sort of told you,
20  "We're not sure if we're doing this"?
21     A.  I don't know.  I think they were asking
22  about Anthropic or things of that nature.
23     Q.  Did you indicate a willingness to enter
24  into a license with them?
25     A.  I expressed that we were interested in

Page 234

1  looking at whatever books they may -- and journals
2  that they had available.  I didn't commit to
3  anything but said that we would be interested in
4  taking a look.
5      Q.  You say in your declaration that they never
6  mentioned consumer book licensing.  Did you give
7  them an opportunity to mention consumer book
8  licensing in your discussion?
9      A.  Well, we were talking about, you know,
10  licensing of academic and professional books.  In
11  this particular discussion, the email, I believe, to
12  Stefan was about our -- kind of broadly "What are
13  you doing?" you know, I believe.
14         So I know he never responded with any "Hey,
15  we're doing some consumer book licensing or
16  academic" -- the folks he chose to put on this email
17  back to me were academic and professional scholarly
18  publisher folks but no -- no trade publishing folks.
19     Q.  Okay.  But you never affirmatively asked
20  about consumer books, it sounds like?
21     A.  I don't recall if I asked about it
22  confirmatively or they asked me and I may have said,
23  you know, "Sure.  You know, send us whatever you
24  have."  But I don't remember specifically asking
25  about trade books.

Page 235

1      Q.  And did you at any point in that
2  conversation tell Macmillan about Project Panama?
3      A.  No.
4      Q.  And in your conversation with Amanda at
5  Penguin Random House, did you ever tell Amanda
6  anything about Project Panama?
7      A.  No.
8      Q.  Okay.  After that video call with
9  Macmillan, did you send any subsequent -- send any
10  subsequent communications?
11     A.  Yes.  I think I may have reached out again
12  to the same -- those same folks about some journal
13  licensing, and that ended with -- relatively
14  recently, I believe, we signed an NDA.  And we are
15  now progressing ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
16  with a Macmillan ▇▇▇▇▇▇▇▇▇.
17     Q.  And have you had any subsequent
18  conversations with them about books?
19     A.  No.  I haven't, no, because after -- you
20  know, the timing of this was, you know, elaborate
21  or -- it was sort of pregnant.  So by the time I
22  went back to talk about journals, we had already
23  switched our focus for books to Panama.
24     Q.  So -- okay.  So you were no longer
25  interested in licensing books from Macmillan?

Page 236

1      A.  By the time I went back, yes, that is
2  correct.  It was more about ▇▇▇▇▇▇▇▇ content that
3  we were interested in.
4      Q.  And about when was that?
5      A.  It was relatively recently.  It was -- this
6  is April -- maybe February or March of this year.
7      Q.  At what point did you decide you were no
8  longer interested in licenses with trade publishers
9  because of Project Panama?
10         MR. FARRIS:  Object to the form.
11         THE WITNESS:  Yeah.  We -- we were trying
12  to figure out -- we had an all-of-the-above kind of
13  strategy from the beginning because we weren't sure
14  what was going to work and whether we could license
15  books from publishers simultaneously at Panama or
16  how many we were going to yield from Panama versus
17  licensing.
18         It was not clear how much it would cost.
19  None of it was clear.  So we were trying to do
20  multiple things at once.  But by the end of, let's
21  say, the summer of 2024, it became clearer that
22  "going down the licensing books one publisher at a
23  time" route was not going to succeed because of the
24  volume -- simply wasn't there.
25         ///

Case 3:24-cv-05417-AMO   Document 554-22   Filed 01/21/26   Page 9 of 14
Highly Confidential Attorneys' Eyes Only
Thomas Turvey                                   Andrea Bartz, et al. vs. Anthropic PBC

Page 237

1  MS. SALINAS:
2  Q. So after the summer 2024, you were no
3  longer interested in entering into licenses with
4  trade publishers?
5  A. Book publishers broadly became less
6  interesting at that point, I would say, for direct
7  licensing deals individually.
8  Q. Okay. Let's turn to HarperCollins. When
9  did you first contact HarperCollins?
10 A. This -- the declaration says June. I think
11 that's right. I think we had initially spoken maybe
12 and -- or had some contact through News Corp
13 around -- like, before June.
14    But we couldn't figure out a date for a
15 meeting until around June. I think there was some
16 travel or vacation, so forth. So we ended up
17 speaking directly around June.
18 Q. Okay. So you spoke -- did you reach out to
19 someone at News Corp, or did they -- someone from
20 News Corp reach out to you?
21 A. I think someone from News Corp reached out
22 to me, someone I'm very friendly with, and -- just
23 to check in, "How are you? How's the job?" that
24 kind of thing.
25 Q. Do you recall their name?

Page 238

1  A. Anoushka Healy.
2  Q. Okay.
3  A. And she's chief strategy officer at News
4  Corp. And then she asked to -- or said something to
5  the effect of "I believe Chantal is trying to get in
6  touch with you about whatever you are doing with
7  licensing." Chantal Restivo-Alessi --
8  Alessi-Restivo is the person I spoke to at
9  HarperCollins.
10 Q. Chantal is who you spoke to at
11 HarperCollins?
12 A. Mm-hmm.
13 Q. So your friend -- when did you speak to
14 your friend at News Corp?
15 A. I don't recall. I think it was shortly
16 after I joined because I think she was trying to
17 just check in to say hello. I believe it was
18 sometime in March. Not exactly sure.
19 Q. And so did she directly immediately connect
20 you with someone at HarperCollins?
21 A. She had mentioned someone that we knew in
22 common who is the chief digital officer at
23 HarperCollins and that we should -- she said, "You
24 might want to speak to Chantal. She might be trying
25 to talk to you about what your plans are."

Page 239

1  Q. So you know Chantal personally?
2  A. I do.
3  Q. Okay. And so then between that initial
4  outreach in March, did you then reach out to Chantal
5  in June, or did Chantal reach out to you?
6  A. I don't remember who reached out to who, to
7  be honest. But one of us reached out to the other,
8  so -- and we were trying to find dates for a
9  meeting. And that ended up, I think, having to get
10 pushed a couple times, and we had that meeting in
11 June.
12 Q. Okay. Was this outreach over email?
13 A. Pretty sure, yes.
14 Q. Someone sent an email to someone else
15 saying, "Let's connect to talk about books"?
16 A. Something like that, yeah.
17 Q. Okay. Do you know if anyone else was on
18 the communication?
19 A. I don't think so. I'm not totally sure
20 about this, but I don't think so.
21 Q. Okay. And at some point, you all agreed to
22 meet, I take it?
23 A. Met on -- on videoconference, yeah.
24 Q. Do you recall if there was any sort of
25 substantive statements about what you wanted to meet

Page 240

1  about in the back-and-forth communications setting
2  up the meeting?
3  A. My memory is I definitely wanted to talk to
4  her about ▮▮▮▮▮ because that was still a topic
5  of licensing internally, and I may have said
6  something about -- I don't know, but I may have said
7  something about "What are you doing with e-books as
8  well?" or something like that.
9  Q. So as you sit here today, you are not sure
10 if you affirmatively asked about books?
11 A. I definitely asked about ▮▮▮▮▮, I
12 believe. I don't know what the substance of the
13 email communication was specifically, but the
14 conversation was intended to be about ▮▮▮▮▮ and
15 also about their e-books strategy generally.
16 Q. Okay. So you have this call with Chantal
17 in June or --
18 A. Yeah.
19 Q. Okay. And I -- I'm sorry if I've already
20 asked you this, but was anyone else on the call?
21 A. I don't believe so. I don't recall anyone
22 else being on the call.
23 Q. And I don't realize -- did you create a
24 transcript of that call?
25 A. I don't think so. I would -- I doubt it.

Case 3:24-cv-05417-AMO    Document 554-22    Filed 01/21/26    Page 10 of 14
Highly Confidential Attorneys' Eyes Only
Thomas Turvey
Andrea Bartz, et al. vs.
Anthropic PBC

Page 241

1  Q. Okay. But you are not sure one way or the
2  other if the transcript was created?
3  A. I'm not sure if I made notes or anything,
4  but I would -- I would tend to doubt it, but I'm not
5  totally sure about that.
6  Q. Okay. Do you normally take notes when you
7  have a meeting?
8  A. Not often.
9  Q. Okay. But as you sit here today, you are
10 not sure whether you took any notes around your
11 first conversation with Chantal?
12 A. I'm not totally sure or not. Now, I could
13 have, but I'm not totally sure. I think I -- you
14 know, I was trying to figure out -- at this point, I
15 don't know what they're doing or not doing or if
16 they're licensing at all or if they're not licensing
17 at all or whatever.
18    I'm just trying to get some basic facts.
19 So it wasn't a get-down-to-business kind of
20 conversation.
21 Q. Now, by June 2024, Project Panama was well
22 underway, right?
23 A. June 2024, Panama was underway, yeah. Our
24 first -- our first orders had been made. The
25 shipments may have just arrived, yeah.

Page 242

1  Q. Okay. So what exactly did Chantal say to
2  you on this first communication?
3  A. Are you asking about the meeting or --
4  Q. Yes, the meeting. Yes.
5  A. My memory is that she said that they might
6  be interested in licensing ▌▌▌▌▌▌ depends on
7  the details, and that they had not licensed any
8  e-books to LLMs at that point.
9     But they were thinking about it and
10 thinking about an opt-in mechanism of some kind for
11 authors to state that they wanted their books to be
12 licensable by LLMs.
13 Q. So Chantal expressed that HarperCollins was
14 open and interested in a license for e-books for LLM
15 training. Is that right?
16 A. She stated that with ▌▌▌▌▌▌, that --
17 which she was personally responsible for, that would
18 be of interest, but she wasn't sure. It would
19 depend on the details and the catalog that they
20 would have. And that -- for e-books, that they were
21 just beginning to think about it. They were open to
22 thinking about it, basically.
23 Q. She was saying as of -- in June of 2024,
24 HarperCollins didn't -- did not yet have a position
25 as to whether they were open to licensing e-books to

Page 243

1  LLMs? I just want to make sure I understand the
2  testimony.
3     MR. FARRIS: Object to the form.
4     THE WITNESS: What she represented to me is
5  they were beginning to think about licensing e-books
6  to LLM, but they had no plan to at the moment and no
7  program or anything that was formal. But they were
8  thinking about ways that they might do that.
9     MS. SALINAS:
10 Q. So they were open to -- HarperCollins was
11 opening to licensing e-books in June of 2024 when
12 you spoke to them?
13 A. They indicated they were thinking about
14 ways to get that accomplished.
15 Q. I guess what's the difference between being
16 open to and thinking about it?
17 A. I don't know. It sounds like that they are
18 open to thinking about it, but they didn't -- had no
19 plan.
20 Q. I'm just -- I keep asking you if they were
21 open to it, and you keep coming back with they were
22 thinking about it. So I'm trying to understand why
23 you think there's a difference between my question
24 and your answer.
25 A. Yeah. I don't -- it wasn't clear to me

Page 244

1  whether they had made a decision that that was a
2  good idea or not, so I guess there's some potential
3  substantive difference between being open to it or
4  thinking about it and then thinking maybe later it's
5  not a good idea or something. I don't know.
6  Q. Did at any -- did she say anything on the
7  call to suggest that HarperCollins thought it was a
8  bad idea to license?
9  A. She definitely indicated that there would
10 be challenges, which is why they were taking an
11 opt-in approach, and that authors may be sensitive
12 about it and that they hadn't really talked about it
13 with agents much. And that -- it wasn't, like, a
14 slam dunk that this was going to happen.
15 Q. As I understand from what you are saying
16 about Chantal, she wasn't necessarily the person to
17 speak to about licensing e-books, though, correct?
18 A. No, she was. She was chief digital
19 officer.
20 Q. Okay. So she would have been the person to
21 negotiate both the e-books license and the
22 ▌▌▌▌▌▌ license?
23 A. Correct.
24 Q. And your testimony is as of June 2024, she
25 was representing to you HarperCollins just really

Page 245

1  doesn't know one way or the other as to whether
2  they're going to license e-books?
3     MR. FARRIS: Object to the form.
4     THE WITNESS: Yeah. What she had said to
5  me was she was thinking about -- they were thinking
6  about it as a company that -- if they would do
7  anything, it would do it on an opt-in basis. And if
8  there were, you know, more details about that, you
9  know, that she would let me know.
10    MS. SALINAS:
11    Q. Okay. Did you tell her that you would be
12 interested in licensing e-books?
13    A. I said potentially we would be interested,
14 yes.
15    Q. Did you tell her any particular e-books
16 that you would be interested in licensing?
17    A. I think what we were looking for at that
18 point were -- it was primarily ▓▓▓▓. So my
19 memory is I said something about ▓▓▓▓ to her.
20    Q. You told her you were particularly
21 interested in licensing her ▓▓▓▓ catalog?
22    A. Yeah. I think that was the -- our position
23 with trade publishers generally is that we -- if we
24 were going to do anything to start, we would start
25 with ▓▓▓▓ since that would have probably the

Page 246

1  most value to us in our guesses.
2     Q. Okay. How did you and Chantal end the
3  call?
4     A. I don't recall exactly, but it -- I believe
5  we agreed that if HarperCollins had catalogued the
6  license, she would be in touch, that kind of thing.
7     Q. If they had a catalog to license, she would
8  follow up with you?
9     A. Yeah, which is common in these
10 conversations. You know, publishers typically would
11 have -- if they have things to license at all, would
12 have a catalog or some descriptions and metadata of
13 kinds of books, numbers, that kind of thing.
14    Q. Now, did Chantal ever reach out to you
15 again?
16    A. I don't know if she ever reached out to me
17 again about this, about licensing. She may have
18 reached out about something else. I have a vague
19 memory of -- but I don't know that she ever -- I
20 don't know that I've ever seen -- I might be wrong,
21 but I don't know that I've ever seen a catalog
22 that's licensable from HarperCollins.
23    Q. That's a slightly different answer. My
24 question is just did Chantal follow up in any which
25 way on your conversation regarding licensing?

Page 247

1     A. I can't tell you for sure whether she did
2  or not. I don't recall.
3     Q. You don't know as you sit here today?
4     A. I don't know for sure.
5     Q. Okay. And do you recall if you ever
6  followed up with her on the conversation of
7  licensing?
8     A. I don't recall. I may have -- we were
9  really interested in ▓▓▓▓ at that time, so --
10 in particular. So I think that I may have followed
11 up again, but that -- I'm not totally sure about
12 that.
13    Q. You don't know one way or the other as you
14 sit here today?
15    A. Yeah. I don't know whether I reached out
16 to her again or whether she reached out to me again
17 for sure.
18    Q. Okay. Did you speak to anyone else at
19 HarperCollins?
20    A. Not at this time, no.
21    Q. So the full extent of your conversation
22 with HarperCollins is really the few emails with
23 Chantal and then the phone conversation. There may
24 have been one or two follow-ups. Is that correct?
25    A. I think that is about right, yeah.

Page 248

1     Q. Okay. Now, as you note in your
2  declaration, HarperCollins did eventually enter into
3  a license for AI training --
4     A. Yeah.
5     Q. -- correct? Do you know who that license
6  is with?
7     A. She implied that that license was with
8  Microsoft.
9     Q. She implied it?
10    A. Yeah.
11    Q. When did she imply it?
12    A. May be an email exchange, or maybe I read
13 that somewhere. I don't know if that came from
14 Chantal or not, to be honest.
15    Q. Well, you said "she." Why do you think you
16 said "she"?
17    A. I think I may have had a conversation with
18 her about it later, but I don't have a clear memory
19 of that. But I know I read media reports that the
20 deal was with Microsoft. So I don't know whether I
21 assumed that she had told me that or I read it in a
22 magazine or something.
23    Q. So you did have subsequent conversations
24 with Chantal about AI licensing, then?
25    A. I don't know whether I did or not.

Case 3:24-cv-05417-AMO   Document 554-22   Filed 01/21/26   Page 12 of 14
Highly Confidential Attorneys' Eyes Only
Thomas Turvey
Andrea Bartz, et al. vs. Anthropic PBC

Page 249

1    Q.   Well, you just testified that she told you
2    about the deal with Microsoft.
3    A.   Yeah.  I --
4    Q.   Is that right?
5    A.   No.  I just said I wasn't sure whether she
6    told me or I had read it in a magazine or if I
7    conflated those two.  I'm not clear, but it was
8    public information when I knew about it.
9    Q.   So you don't know as you sit here today
10   whether or not you had a conversation with her
11   directly about the Microsoft license?
12   A.   I don't know for sure, no.
13   Q.   Okay.  Why do you think Microsoft entered
14   into a license with HarperCollins?
15        MR. FARRIS:  Object to the form.
16        THE WITNESS:  I have no idea.
17        MS. SALINAS:
18   Q.   Do you think it was a good or bad business
19   decision on Microsoft's part?
20        MR. FARRIS:  Object to the form.
21        THE WITNESS:  I can't answer that.  I have
22   no idea.  I don't work for Microsoft.
23        MS. SALINAS:
24   Q.   Well, you say in your declaration that you
25   wouldn't agree to a similar deal.  Is that right?

Page 250

1    A.   The deal as reported -- it was quite
2    expensive, so I think that was one of the reasons.
3    Q.   Do you understand how much the deal cost
4    overall?
5    A.   No, I don't.  I understand that it was,
6    from media reports, $5,000 per book.
7    Q.   Did you send any emails about the
8    HarperCollins deal with Microsoft?
9    A.   Possibly.  I don't recall anything
10   specific, but it's possible.
11   Q.   Did you have any Slack conversations about
12   the Microsoft deal with -- the HarperCollins deal
13   with Microsoft?
14   A.   Possibly.
15   Q.   You don't recall one way or another as you
16   sit here?
17   A.   I don't recall any specific Slack messages
18   or email conversations.  That's entirely possible.
19   Q.   Okay.  And you think the deal is too
20   expensive?
21   A.   Relative to what Anthropic's willing to
22   pay, yes.
23   Q.   And you have no -- do you have any views as
24   to why Microsoft might be willing -- might have been
25   willing to pay that?

Page 251

1    A.   I do not.
2    Q.   How much is Anthropic willing to pay for a
3    book to license from HarperCollins?
4    A.   That's interesting.
5    We have an
6    understanding and valuation model that accounts for
7            and it might be -- fits within the -- the
8           .
9         There's some unit cost there that is an
10   upper bound that we might be willing to pay.  So it
11
12
13   Q.   What's the upper bound of what you are
14   willing to pay per book?
15   A.   For individual books, you are asking?
16   Q.   Yes.
17   A.   For an individual book, the valuation model
18   that we use most frequently cites
19   as the highest value.  I believe per book, it was
20   around, my memory,       I believe.
21   Q.   So the most Anthropic is willing to pay to
22   license a book for LLM training is
23   A.   No.  What I'm letting you know is that
24   there's a valuation model that we use for print book
25   purchasing, and that is the model that we would then

Page 252

1    theoretically use for other kinds of book
2    acquisition.  And that model has the top end of
3    textbooks being worth it to us around     last time
4    I looked.
5    Q.   How did you get to that     figure?
6    A.   It is an individualized unit cost based
7    upon a rather complicated formula that I am not
8    fully in the weeds on.
9
10
11
12
13
14
15
16   Q.   How do you determine what that denominator
17   is of, like, the -- sounds like you are attributing
18   some amount of money you are willing to spend to get
19   the next     tokens.  How do you determine what
20   that number should be?
21   A.   Yeah.  The folks that did the math there
22   would be better equipped to answer that, but it's
23   basically the cost -- my understanding is it's the
24   cost that -- to create an
25            basically, of          And there's

Case 3:24-cv-05417-AMO   Document 554-22   Filed 01/21/26   Page 13 of 14
Highly Confidential Attorneys' Eyes Only
Thomas Turvey                                                                          Andrea Bartz, et al. vs.
                                                                                       Anthropic PBC

Page 253

1   a relative value depending upon [redacted].
2   Q. Okay. What do you mean by the cost to
3   [redacted]?
4   A. The -- my understanding is that [redacted]
5   [redacted]
6   that's going to the -- the model.
7   Q. And how much of that cost are you
8   attributing to the data acquisition?
9   A. Acquisition. Yeah. I don't know the
10  answer to that.
11  Q. Okay. So as you sit here today, you are
12  not sure how much of the cost Anthropic is willing
13  to spend to get the next [redacted] tokens -- they're
14  willing to spend towards data acquisition?
15  A. Yeah. I don't know the answer to that
16  in -- in the model itself. That's not totally clear
17  to me. You know, I have a -- yeah. That's not
18  clear.
19  Q. You just understand the [redacted] is the
20  max of what you understand Anthropic is willing to
21  pay?
22  A. Per book for the -- kind of the highest
23  value of -- of book that we might find.
24  Q. Okay.
25  A. I mean, that's the upper bound. It's a

Page 254

1   model. It doesn't mean that every deal is -- you
2   know, adheres to that, but that's a general
3   guideline.
4   Q. What's stopping Anthropic from -- or why
5   haven't you called HarperCollins and said, "Hey, I
6   saw you signed a deal with Microsoft. Can we try to
7   negotiate something?"
8   A. Well, by the time I believe that deal was
9   public -- that I knew about it, anyway -- it was
10  beyond the time frame which we had already kind of
11  pivoted our book acquisition strategy to Panama.
12      I think that was -- this deal came out, I
13  believe, in the fall, is my memory, of 2024. Sort
14  of past the time frame where we had kind of decided
15  we were going to go in a different direction.
16  Q. So if HarperCollins called you tomorrow and
17  said, "We" -- "would you be interested in signing
18  the deal that Microsoft signed?" what would your
19  answer be?
20  A. It is highly unlikely.
21  Q. Why?
22  A. Well, the deal that Microsoft signed, as I
23  understand it, was very expensive on a per-book
24  basis, $5,000 per book, which is way beyond what
25  we're willing to pay.

Page 255

1   And it's -- my understanding is that it's
2   for a catalog of only nonfiction books. And my
3   understanding is that it's for a catalog where the
4   authors have opted in only.
5       So there are multiple ways that that goes
6   from a big number to a small number. And frankly,
7   I'm not -- now that we've pivoted our -- our plans
8   to Panama, there's not a ton of interest in doing
9   deals with book publishers only for books.
10  Q. Why is that? Why don't you have any
11  interest in entering into deals with publishers
12  directly now that you have Project Panama?
13  A. Volume, primarily. There's doing deals
14  with -- there are -- you know, just in the
15  U.S. alone, there are over 300 members of the
16  Association of American publishers, which is the
17  biggest book publishing trade association.
18      So that's at least 300 individual deals,
19  where if I could get our book strategy sorted with
20  one or two print book publishing deals where I
21  didn't have to spend the time going to each
22  individual publisher and negotiating for months -- I
23  don't have the resources or the time to do that.
24  Q. It was easier to just buy the books from a
25  distributor or reseller, correct?

Page 256

1   A. It was certainly more cost effective,
2   apparently. Certainly easier from a volume
3   standpoint.
4   Q. The fact that Microsoft was willing to pay
5   HarperCollins for -- 5,000 per book for licensing,
6   does that establish that there is some marketplace
7   for licensing books for LLM training?
8       MR. FARRIS: Object to the form.
9       THE WITNESS: In my mind, it establishes
10  that one publisher was willing to do one deal with
11  one entity. So I don't know what a definition of a
12  market is, but that doesn't sound like a market. It
13  sounds like a deal to me.
14      MS. SALINAS:
15  Q. Well, the deal establishes that there is a
16  supply of books available for LLM training, correct?
17      MR. FARRIS: Object to the form.
18      THE WITNESS: I think it establishes that
19  HarperCollins is willing to do one deal with one
20  entity with some books, yes.
21      MS. SALINAS:
22  Q. And does it establish that there is demand
23  for entering into a license with a publisher?
24      MR. FARRIS: Object -- object to the form.
25      THE WITNESS: I -- I would say it

Page 257

1 establishes the motivations of each individual.
2 That's what I would say.
3     MS. SALINAS:
4   Q.  Well, Microsoft paid HarperCollins because
5 they wanted to acquire books for training, correct?
6   A.  I don't know what Microsoft's motivations
7 were.
8   Q.  What do you think Microsoft's motivations
9 were?
10   A.  I have no idea.
11   Q.  You have no idea -- do you think they just
12 paid them for fun?
13   A.  I don't work for Microsoft.  I'm not
14 intimate with their strategy.  I don't talk to
15 people from Microsoft.  I have no idea what
16 motivated them.
17   Q.  You state in your declaration that you are
18 dubious whether this license has been duplicated or
19 instead intended to generate publicity.  What did
20 you mean by "generate publicity"?
21   A.  Harper has a tradition of doing things for
22 the first time to create a new pathway, potentially,
23 for their company to appear progressive with authors
24 and others to attract more business and more authors
25 to their platform.

Page 258

1     And so I haven't read about this deal ever
2 being duplicated since.  So it wasn't clear to me
3 whether it was done for purposes of marketing or if
4 it was done with different intent.  So -- and
5 because it was a large number per book relative to
6 the e-pay, I suppose that there could be other
7 motivations.
8   Q.  Well, you haven't paid any publisher
9 directly for any books, correct?
10   A.  Is that true?  I believe -- yeah, that's
11 probably true.  Yeah.
12   Q.  Let's go to Simon & Schuster and Hachette.
13 So in your declaration, as I understand it -- or did
14 you -- did you attempt any outreach to Simon &
15 Schuster or Hachette?
16   A.  I did not attempt any business outreach to
17 Simon & Schuster.  I had a discussion with some --
18 an executive there about a personal matter.  And,
19 yeah, that did -- I can't recall whether we ended up
20 talking about any business.  I don't think we did.
21 I'm not totally sure about that.
22   Q.  Why didn't you contact someone at Simon &
23 Schuster about licensing, like you did with the
24 other publishers?
25   A.  I think at this time, since I was also

Page 259

1 negotiating with other ▇▇▇▇▇▇▇▇▇▇
2 ▇▇▇▇▇▇▇ -- I was doing other kinds of
3 ▇▇▇▇▇▇▇▇▇ deals.  I was a one-man band.
4     I didn't have a ton of time to extend to
5 areas where I thought there would be more --
6 potentially more rights difficulties with trade
7 publishers relative to what I knew to be true for
8 deals that I had done in previous lives with
9 academic or professional publishers.
10   Q.  When you say "rights difficulties," what do
11 you mean?
12   A.  My experience, trade publishers
13 typically -- and the authors that are under contract
14 at trade publishers -- typically have the most
15 negotiated sets of rights.
16     Authors retain those rights unless they're
17 explicit in the agreement.  Anything not explicit in
18 the agreement usually requires some sort of
19 outreach, in my experience, to make sure that there
20 is a royalty amount agreed.
21     And that creates -- that's somewhat
22 different than how it works in the academic and
23 scholarly side, and that creates a lot more fiction
24 with trade publishers and the rights that they hold
25 relative to licensing to folks like us.

Page 260

1   Q.  Okay.  I think we have been going for, I
2 think, over an hour now.  Would you be okay to take
3 a ten-minute break?
4   A.  Sure.
5     THE VIDEOGRAPHER:  Time is 2:59 p.m.  We
6 are now off the record.
7     (Break taken.)
8     THE VIDEOGRAPHER:  Time is 3:14 p.m.  We
9 are back on the record.
10     (Exhibit 29 was marked for identification.)
11     MS. SALINAS:
12   Q.  Mr. Turvey, I'm going to hand you what's
13 been marked as Exhibit 29.  Let me know if you need
14 a moment with the document or if you are ready to
15 proceed.
16   A.  Yes.  Go ahead.
17   Q.  Okay.  What is this document?
18   A.  This was a principles document that I wrote
19 shortly after becoming employed at Anthropic.
20   Q.  What was the purpose of the document?
21   A.  It was to set up principles of operation
22 for me and whatever group I would end up managing
23 since it was a new function at Anthropic.
24   Q.  And as the title suggests, the principles
25 of what kind of data partnerships Anthropic would