1  Justin A. Nelson*
   Alejandra C. Salinas*
2  Collin Fredricks*
   **SUSMAN GODFREY L.L.P**
3  1000 Louisiana Street, Suite 5100
   Houston, TX 77002-5096
4  Telephone: (713) 651-9366
   jnelson@susmangodfrey.com
5  asalinas@susmangodfrey.com
   cfredricks@susmangodfrey.com
6
   Rohit D. Nath (SBN 316062)
7  **SUSMAN GODFREY L.L.P**
   1900 Avenue of the Stars, Suite 1400
8  Los Angeles, CA 90067-2906
   Telephone: (310) 789-3100
9  RNath@susmangodfrey.com
10 Jordan W. Connors*
   **SUSMAN GODFREY L.L.P**
11 401 Union Street, Suite 3000
   Seattle, WA 98101
12 Telephone: (206) 516-3880
   jconnors@susmangodfrey.com
13
   J. Craig Smyser*
14 **SUSMAN GODFREY L.L.P**
   One Manhattan West, 51st Floor,
15 New York, NY 10019
   Telephone: (212) 336-8330
16 csmyser@susmangodfrey.com

   Rachel Geman*
   Jacob S. Miller*
   Danna Z. Elmasry*
   **LIEFF CABRASER HEIMANN
   & BERNSTEIN, LLP**
   250 Hudson Street, 8th Floor
   New York, New York 10013-1413
   Telephone: (212) 355-9500
   rgeman@lchb.com
   jmiller@lchb.com
   delmasry@lchb.com

   Daniel M. Hutchinson (SBN 239458)
   Reilly T. Stoler (SBN 310761)
   **LIEFF CABRASER HEIMANN
   & BERNSTEIN, LLP**
   275 Battery Street, 29th Floor
   San Francisco, CA 94111-3339
   Telephone: (415) 956-1000
   dhutchinson@lchb.com
   rstoler@lchb.com

   Scott J. Sholder*
   CeCe M. Cole*
   **COWAN DEBAETS ABRAHAMS
   & SHEPPARD LLP**
   60 Broad Street, 30th Floor
   New York, New York 10010
   Telephone: (212) 974-7474
   ssholder@cdas.com
   ccole@cdas.com

17 *Attorneys for Plaintiffs and the Proposed Class
   in Bartz et al. v. Anthropic PBC, Case 3:24-cv-
18 05417 (N.D. Cal.)*

19 *(Pro Hac Vice)*

20                  UNITED STATES DISTRICT COURT

21               NORTHERN DISTRICT OF CALIFORNIA

22                    SAN FRANCISCO DIVISION

23 ANDREA BARTZ, ET AL.,              Case No.  3:24-cv-05417-WHA

24              Plaintiffs,           **PLAINTIFFS' OPPOSITION TO
                                      ANTHROPIC'S MOTION FOR
25 v.                                 SUMMARY JUDGMENT**

26 ANTHROPIC PBC,

27              Defendant.            **FILED UNDER SEAL**

28

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND .............................................................................. 2

    A.  Anthropic Prioritizes Books in its Race to Keep Up with OpenAI....................... 2

    B.  Anthropic Downloads and Torrents Millions of Pirated Books. ......................... 3

    C.  Anthropic Launches "Project Panama" to Get Even More Books.......................... 4

III.  LEGAL STANDARD ......................................................................................... 5

IV.  ARGUMENT ..................................................................................................... 5

    A.  Anthropic Cannot Establish That Its Downloading of Books For Free From
        Pirate Websites Is Fair Use As A Matter of Law.................................................. 6

        1.  Courts have consistently rejected fair use defenses of piracy..................... 6

        2.  Factor One: The purpose of Anthropic's piracy was to avoid
            purchasing lawful copies................................................................. 7

        3.  Factor Two: Books are at the core of copyright protection. ..................... 11

        4.  Factor Three: Anthropic repeatedly copied Plaintiffs' entire books......... 12

        5.  Factor Four: Anthropic has made no effort to meet its burden to
            establish that its piracy has not harmed the book sale market. ................ 12

    B.  Anthropic's Unlicensed Use of Books in LLM Training Is Not Fair Use. ........... 13

        1.  Factor One: Anthropic's use of books in training is commercial and
            not transformative. ......................................................................... 14

        2.  Factor Four: Potential market for LLM training....................................... 19

    C.  The Court's Five Questions Demonstrate the Absence of Fair Use Here............ 24

1

# TABLE OF AUTHORITIES

2

Page

3

**Cases**

4

*A&M Recs., Inc. v. Napster, Inc.*,
5
    239 F.3d 1004 (9th Cir. 2001), *as amended* (Apr. 3, 2001)............................................ *passim*

6

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009)................................................................................... 9, 18

7

*Am. Geophysical Union v. Texaco Inc.*,
8
    60 F.3d 913 (2d Cir. 1994).......................................................................................... *passim*

9

*Andy Warhol Foundation for the Visual Arts v. Goldsmith*,
10
    598 U.S. 508 (2023) ..................................................................................................... *passim*

11

*Atari Games Corp. v. Nintendo of America Inc.*,
    975 F.2d 832 (Fed. Cir. 1992)................................................................................... 8, 9

12

*Authors Guild, Inc. v. HathiTrust*,
13
    755 F.3d 87 (2d Cir. 2014)................................................................................. 9, 18, 22

14

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015).............................................................................. 9, 18, 25

15

*BMG Music v. Gonzalez*,
16
    430 F.3d 888 (7th Cir. 2005).......................................................................... 7, 11, 12

17

*Caldwell v. UnitedHealthCare Ins. Co.*,
18
    2021 WL 275467 (N.D. Cal. Jan. 27, 2021) (Alsup, J.) ...................................... 16

19

*Cambridge Univ. Press v. Patton*,
    769 F.3d 1232 (11th Cir. 2014)............................................................................... 16

20

*Campbell v. Acuff-Rose Music, Inc.*,
21
    510 U.S. 569 (1994) ................................................................................................. *passim*

22

*Cengage Learning, Inc. v. Library Genesis*,
23
    No. 23-cv-8136 (S.D.N.Y. Sept. 24, 2024), Dkt. 36............................................... 3

24

*Deppe v. United Airlines*,
    217 F.3d 1262 (9th Cir. 2000)................................................................................. 21

25

*Dr. Seuss Enters.L.P. v. ComicMix LLC*,
26
    983 F.3d 443 (9th Cir. 2020)................................................................................... 12

27

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
28
    109 F.3d 1394 (9th Cir. 1997)................................................................................. 11

1

### TABLE OF AUTHORITIES
(continued)

2

Page

3

*Elsevier Inc. v. Sci-Hub*,
2017 WL 3868800 (S.D.N.Y. June 21, 2017) .......................................................................... 3

4

*Fox News Network, LLC v. TVEyes*, Inc.,
5          883 F.3d 169 (2d Cir. 2018) ........................................................................................ 22

6

*Google v. Oracle*
7          593 U.S. at 26-29 ....................................................................................... 11, 16, 17

8

*Hachette Book Grp. v. Internet Archive*,
115 F.4th 163 (2d. Cir. 2024) ........................................................... 19, 22, 23, 25
9

*Harper & Row, Publrs. v. Nation Enters.*,
10         471 U.S. 539 (1985) ........................................................................................... 7, 19

11

*In re Aimster Copyright Litigation*,
12         334 F.3d 643 (7th Cir. 2003) (Posner, J.) ..................................................... 10

13

*In re Barboza*,
545 F.3d 702 (9th Cir. 2008) ................................................................................ 6
14

*In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868 (N.D. Cal.
15         2022) ............................................................................................................. 7

16

*Kelly v. Arriba Soft Corp.*,
17         336 F.3d 811 (9th Cir. 2003) ...................................................................... 9, 18

18

*MCA, Inc. v. Wilson*,
677 F.2d 180 (2d Cir. 1981) ............................................................................... 23
19

*McGucken v. Pub Ocean Ltd.*,
20         42 F.4th 1149 (9th Cir. 2022) ...................................................................... 19

21

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) ........................................................................................... 10
22

23         *Monge v. Maya Mags., Inc.*,
688 F.3d 1164 (9th Cir. 2012) ................................................................... 5, 13

24

*Oracle Am., Inc. v. Google LLC*,
25         886 F.3d 1179 (Fed. Cir. 2018) ..................................................................... 9

26

*Perfect 10, Inc. v. Amazon.com, Inc.*,
27         508 F.3d 1146 (9th Cir. 2007) ................................................... 9, 10, 11, 18

28

*Ringgold v. Black Ent. Television, Inc.*,
126 F.3d 70 (2d Cir. 1997) .......................................................................... 21

# TABLE OF AUTHORITIES
### (continued)

Page

*Sega Enterprises Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) ................................................................. 8, 11, 16, 17

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) ................................................................................ 21

*Sony BMG v. Tenenbaum*,
    672 F.Supp.2d. 217 (D. Mass. 2009) ...................................................... 10, 12, 16, 17

*Sony Computer Enterprise, Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ........................................................................... 8, 17

*Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*,
    2025 WL 458520 (D. Del. Feb. 11, 2025) (Bibas, J.) ................................. 17, 22, 24

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
    953 F.3d 638 (9th Cir. 2020) ................................................................................ 22

*Triller Fight Club II LLC v. H3 Podcast*,
    2023 WL 11877604 (C.D. Cal. Sept. 15, 2023) ...................................................... 10

*U.S. v. Moore*,
    604 F.2d 1228 (9th Cir. 1979) ............................................................................... 25

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) ....................................................................... 6, 7

*United States v. Slater*,
    348 F.3d 666 (7th Cir. 2003) ................................................................................ 6, 7

*Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*,
    447 F.3d 769 (9th Cir. 2006) ........................................................................... 14, 15

*White v. W. Pub. Corp.*,
    29 F. Supp. 3d 396 (S.D.N.Y. 2014) ....................................................................... 18

**Statutes**

17 U.S.C. § 106(1) ................................................................................................... 25

17 U.S.C. § 106(3) ................................................................................................... 25

17 U.S.C. § 107 ......................................................................................................... 6

17 U.S.C. § 107(1) ..................................................................................................... 7

17 U.S.C. § 107(4) ................................................................................................... 12

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

17 U.S.C. § 109............................................................................................................. 25

4

**Rules**

5

Fed. R. Civ. P. 56(a)................................................................................................... 5, 19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    **INTRODUCTION**

When the founders of Anthropic created their company in January 2021, they confronted a dilemma. Facing the daunting challenge of catching up with much larger rivals—including their erstwhile employer OpenAI and large technology companies with massive budgets such as Google and Meta—they were short on cash with little access to proprietary data and only a small window of time to catch up. So they cheated. Instead of relying on publicly-available data or paying for a license—which would have taken longer and cost more money—they went to known pirated websites and downloaded books for free.

And it worked. Anthropic's large-scale infringement of copyrighted books enabled it to jumpstart a business currently valued at $61.5 billion. Ex. 45. Books have provided the type of data that, in Anthropic's words, enable its models to "write well," rather than generating "low quality internet speak." Ex. 3. Books save time and money spent on computing. Ex. 4. And, as a result, books are what has kept Anthropic "neck-and-neck" with its competitors. Ex. 1. By exploiting the creative expression of copyrighted books to train its large language models, Anthropic generated dynastic wealth for its founders while leaving authors nothing.

Anthropic obtained books illegally from three known pirated sources: Books3, sourced from the illicit site Bibliotik; Pirate Library Mirror, a website that openly advertised its illegality; and Library Genesis, a notorious website shut down twice for copyright infringement and which uses a pirate ship for its logo. Courts have held time and again that downloading copyrighted works from pirate websites to avoid paying for them is copyright infringement which no fair use justifies. Anthropic hardly addresses this point in its motion, and it is dispositive here.

But Anthropic's infringing acts were not restricted to piracy. More recently, Anthropic has purchased millions of books—converting them to digital format in order to ingest them more easily for training its models. After acquiring books—either through piracy or by buying and scanning them—Anthropic copied books multiple times to train its LLMs. The training process, fundamentally, is intended to exploit the expressive elements of these works. It mines the order of words, expression of ideas, and sentence structure and compresses them into its LLMs. Despite the burgeoning licensing market for the use of copyrighted works for LLM training, Anthropic

1   made no effort to pay authors for these unlicensed reproductions. Courts have held that such

2   "institutional, systematic copying" to "avoiding the necessity of paying for license fees" is a

3   manifestly unfair use. *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 920 (2d Cir. 1994).

4       At most, Anthropic's fair use defense raises a litany of material factual disputes. These

5   include whether Anthropic has shown that a market for LLM training is unlikely to develop,

6   beyond any dispute of material fact, despite numerous publicly-reported licensing deals; whether

7   Anthropic's training process exploits the expressive elements of authors' works; and whether

8   Anthropic has shown beyond any dispute of fact that the public would benefit from a regime

9   where authors go entirely uncompensated from the exploitation of their works in training LLMs.

10   Resolution of each is needed to rule on Anthropic's fair use defense, and none can be resolved

11   without wading into hotly-disputed facts, expert battles, and credibility determinations.

12       Finally, even if relevant, the promise or peril of AI raises disputed factual issues. *See,*

13   *e.g.*, Ex. 38 (Anthropic CEO admitting AI "progress" will "concentrate wealth, increase

14   inequality" and "mak[e] human labor obsolete"). Regardless, this case is not a referendum on AI

15   and resolving it in Plaintiffs' favor would not end AI. It is about whether writers are entitled to

16   fair compensation for Anthropic's conscription of their creations to develop a wildly profitable

17   technology—one that threatens to eliminate the very profession that made it possible.

18   **II.**    **FACTUAL BACKGROUND**

19       **A.**    **Anthropic Prioritizes Books in its Race to Keep Up with OpenAI.**

20       In January 2021, several OpenAI employees defected to found Anthropic. Anthropic

21   released its flagship model, Claude, to the public on March 14, 2023, and has since released seven

22   subsequent versions of Claude, most recently Claude 3.7 Sonnet on February 24, 2025.

23       To train its LLMs, Anthropic uses, among other things, a massive amount of books. For

24   LLM training, books are what enable Anthropic to keep pace with OpenAI, Microsoft, and

25   Google. In a 2024 forecast shared with investors, Anthropic identified training data quality as one

26   of four keys to "staying neck-and-neck with OpenAI," because "[a]dding higher quality data

27   (particularly books that aren't publicly available on the internet) allows smaller and cheaper

28

1   models to outperform larger models." Ex. 1.[1] In 2023, Anthropic wrote that "data is likely to be

2   the main distinction between various AI labs over the next year" and named books as its example

3   of the "high-quality" data that "makes a huge difference to [its] models." Ex. 2; *see also* Zhao

4   Decl. ¶¶ 78-90. As Anthropic's valuation has ballooned, its opinion on the value of books has

5   only solidified. In late 2024, members of its Strategic Finance team wrote: "Heading into 2025,

6   we continue to have the strongest conviction around book data. Across all categories of written

7   data, books are both more useful and available in larger quantities." Ex. 4.

8                    **B.**     **Anthropic Downloads and Torrents Millions of Pirated Books.**

9           Anthropic began pirating books immediately after its founding. The first dataset it

10  downloaded was Books3, a dataset designed to mimic books datasets that OpenAI used to train

11  GPT-3. Books3's creator Shawn Presser, an independent developer, suspected that OpenAI's

12  books datasets were "sourced from an online 'shadow library' like Library Genesis, which offers

13  a vast repository of pirated text." Ex. 47. In October 2020, Presser announced Books3: 196,640

14  pirated books from a pirate website called Bibliotik. Ex. 5. Anthropic was founded the following

15  January, and by February 25, 2021, cofounder Ben Mann downloaded Books3. Ex. 6, at 4.

16          Next, Anthropic pirated the contents of Library Genesis (a/k/a "LibGen"). LibGen is a

17  website that has twice been shut down by federal courts and, since 2016, been listed on the

18  USTR's "Review of Notorious Markets for Counterfeiting and Piracy."[2] Anthropic cofounder

19  Ben Mann torrented LibGen in its entirety in June 2021. *See* Ex. 6, at 4.[3] Library Genesis's pirate-

20  ship logo is visible on Mann's browser. *See* Ex. 8 (screenshot of browser); Ex. 9.

21          In July 2022, a new website of pirated books launched called Pirate Library Mirror, a/k/a

22  "PiLiMi." PiLiMi's website boasts that it "deliberately violate[s] the copyright law in most

23  countries." Ex. 10. The website it "mirror[ed]" was Z-Library, "a popular (and illegal) library."

---

[1] All exhibits are attached to the Declaration of Collin Fredricks in Support of Plaintiffs'
Opposition to Anthropic's Motion for Summary Judgment.

[2] *See* Ex.7; *see also Elsevier Inc. v. Sci-Hub,* 2017 WL 3868800, at *1 (S.D.N.Y. June 21, 2017);
*Cengage Learning, Inc. v. Library Genesis,* No. 23-cv-8136 (S.D.N.Y. Sept. 24, 2024), Dkt. 36.

[3] Torrenting is a decentralized method of peer-to-peer file sharing often used to download
copyrighted material from pirated websites. *See* Zhao Decl. ¶ 22.

*Id.* This "mirror" site was necessary given the frequency with which legal authorities shut down Z-Library's domains. *See, e.g.*, Ex. 11. When PiLiMi launched, Mann wrote co-workers: "just in time!!!" Ex. 12; Ex. 13. Anthropic acquired its PiLiMi datasets by torrenting them, around July 2022. *See* Ex. 6, at 4.

After downloading millions of pirated books, Anthropic used them to train its LLMs. Its initial testing found that "training on just pile and Books3 did surprisingly well," which made its engineers "[m]ore excited for libgen seeing how well books3 is doing." Ex. 14. At an all-company meeting in June 2021, Anthropic announced it was constructing a "New Canonical Text Dataset," which would include "Libgen — now 200GB of books total, 2x [OpenAI's model] GPT-3." Ex. 15, at -06. Pirate Library Mirror was launched a year later, and Anthropic was hopeful that its success using LibGen to train its models would be replicated with PiLiMi, saying: "we know libgen books are highest quality data, [PiLiMi] claims to be a massive dataset of books so hopefully similar quality." Ex. 16, at -76.

Anthropic then set out to train a flagship model on these pirated books. The project's codename was "Finch," and its purpose "was to be the best yet in terms of its general capabilities and intelligence." Ex. 17, at 265:15-19. Anthropic trained Finch using *all three* pirated books datasets. *See* Fredricks Decl. ¶ 4. Anthropic never released Finch to the public. After training the model for about a month, Anthropic stopped for reasons it has refused to disclose, but internal documents confirm relate to legal issues. Ex. 17, at 262:12-25; Ex. 19 (Anthropic engineer: "we're dropping libgen and pilimi from the next dataset (for legal reasons)").

Anthropic continues to use LibGen to develop its LLMs. Given Claude's propensity to memorize its training data, and Anthropic's practice of hiding its training data, Anthropic monitors consumer-facing model outputs for the regurgitation of training data. To that end, Anthropic checks model outputs against LibGen. Ex. 17, at 93:23-94:14, 249:2-13.

**C.    Anthropic Launches "Project Panama" to Get Even More Books.**

Excited by the performance of Finch, Anthropic sought to replicate those results in a new model without training on as many pirated books. *See* Ex. 20, at -39 (Anthropic looking for a

1    dataset "good enough [to] recover the finch → lark performance hit").[4] Anthropic settled on a

2    project, codenamed Project Panama, to "destructively scan all the books in the world." Ex. 21. To

3    date, Anthropic has scanned over ▆ million books and approximately ▆00,000 to train its most

4    recent model, Claude 3.7. Zhao Decl. ¶ 33-34.

5            The process behind Project Panama is straightforward: Anthropic purchases books by the

6    truckload, has vendors scan and discard the physical copies, and then houses those scans in a

7    centralized "library" accessible to its engineers. *See* Ex. 22, at 146:3-8; Ex. 43. Anthropic does

8    not put any restrictions on how its engineers can use those books or how many additional copies

9    they can make. *See id.* at 196:15-18. Nor has Anthropic licensed the rights to use any of these

10   books, despite Plaintiffs' willingness to license. *See* Ex. 23, at 43:9-17; Ex. 24, at 32:16-25; Ex.

11   25, at 41:1-2; 67:6-9. Anthropic considers Project Panama to be "highly confidential and trade

12   secret," such that even revealing the simple fact that it has scanned books "would cause

13   competitive injury to Anthropic." *See, e.g.*, Dkt. 137, at 3. In fact, Anthropic goes so far as to seek

14   to prevent its book-scanning vendors from performing a similar service for Anthropic's LLM

15   competitors. *See, e.g.*, Ex. 26, at 1.

16   **III.    LEGAL STANDARD**

17           Summary judgment is proper only when there is no genuine dispute as to any material fact

18   and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Fair Use is an

19   affirmative defense, and "the defendant bears the burden of proof." *Monge v. Maya Mags., Inc.*,

20   688 F.3d 1164, 1170 (9th Cir. 2012). Anthropic bears the burden here for all of its uses of

21   Plaintiffs' copyrighted books: "fair use . . . requires an analysis of the specific 'use' of a

22   copyrighted work that is alleged to be 'an infringement.'" *Andy Warhol Foundation for the Visual*

23   *Arts v. Goldsmith*, 598 U.S. 508, 533 (2023).

24   **IV.    ARGUMENT**

25           Plaintiffs have two theories of infringement. For fair use purposes, Anthropic's infringing

26   _____

27   [4] After Anthropic stopped using LibGen and PiLiMi, Anthropic's engineers were concerned they
     were not getting "old-books quality data" from public-domain books. Ex. 20, at -39. One engineer
     mourned, "the amount of data we're leaving on the table because of copyright just makes my

28   bones hurt." *Id.* at -38.

acts correspond to distinct "uses" for analysis under 17 U.S.C. § 107. *Warhol*, 598 U.S. at 533; *cf. In re Barboza*, 545 F.3d 702, 704-05 & n.1 (9th Cir. 2008) (noting that unlicensed "infringement by duplication" required separate analysis from subsequent sales and distribution).

*First,* Anthropic infringed when it downloaded <mark>and torrented</mark> Plaintiffs' books from known pirated websites. Copying books from pirated websites to avoid paying for them is a standalone act of infringement that courts have consistently held is not fair use.[5]

*Second,* Anthropic committed copyright infringement when it made additional unlicensed copies of books to train its LLMs. That use too is not fair: when a company needs numerous copies to commercially exploit expressive elements of a work, it has to pay for the copies (or licenses) it needs. Anthropic didn't do that, and at most, whether its copying of books to train LLMs is fair use presents disputed factual issues that cannot be resolved on summary judgment.

**A.      Anthropic Cannot Establish That Its Downloading of Books For Free From Pirate Websites Is Fair Use As A Matter of Law.**

**1.      Courts Have Consistently Rejected Fair Use Defenses of Piracy.**

No court has *ever* held that downloading known pirated materials is fair use—much less when done by a $61.5 billion company, at a massive scale, to rake in massive revenues. It is an elementary principle of copyright law that copying an entire work simply to avoid paying for a legitimate copy is not fair use. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 n.10 (1994) ("most infringements are simple piracy," but "such cases are worlds apart from many of those raising reasonable contentions of fair use" (quotation omitted)).

Likewise, every court to address the issue has held that downloading copyrighted materials from a peer-to-peer file sharing website is not fair use. *See, e.g.*, *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001), *as amended* (Apr. 3, 2001) (affirming that users' downloading music files using the Napster directory is not fair use); *United States v. Slater*, 348 F.3d 666, 668 (7th Cir. 2003) (rejecting "Pirates With Attitudes" defendants' argument that district court erred by declining to give a fair use jury instruction); *UMG Recordings, Inc. v.*

---

[5] Because Anthropic fails to address its initial acquisition of pirated copies, it cannot do so for the first time on its reply.

1  *MP3.Com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000) (rejecting fair use defense even when

2  the downloader already owned one purchased copy); *BMG Music v. Gonzalez*, 430 F.3d 888, 890

3  (7th Cir. 2005) ("the only appellate decision on point has held that downloading copyrighted

4  songs cannot be defended as fair use, whether or not the recipient plans to buy songs she likes

5  well enough to spring for"). In *Slater*, the Seventh Circuit held that the defendants' fair use

6  arguments "barely pass the straight-face test" and that it was "preposterous to think that Internet

7  piracy is authorized by virtue of the fair use doctrine." 348 F.3d at 669 (cleaned up).

8       Thus, "no analysis is required" because "it is obvious . . . that downloading [copyrighted

9  materials] via peer-to-peer systems does not constitute fair use," *see In re DMCA § 512(h)*

10  *Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 879 (N.D. Cal. 2022). Downloading copyrighted

11  works from illegal websites to avoid the purchase price undermines a key purpose of copyright

12  law: "to assure contributors to the store of knowledge a fair return for their labors." *Harper &*

13  *Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 546 (1985). Regardless, the result is the same

14  applying the four factors to Anthropic's piracy.

15           **2.    Factor One: The purpose of Anthropic's piracy was to avoid
                      purchasing lawful copies.**

16

17       The first factor is the purpose and character of the use. 17 U.S.C. § 107(1). Under this

18  factor, the extent to which the use is transformative "must be balanced against the commercial

19  nature of the use," and commercial nature weighs more strongly when the use is more likely to

20  substitute for the original. *Warhol*, 598 U.S. at 532-33.

21           **a.    Anthropic's free downloads for a commercial purpose weigh
                     sharply against fair use.**

22       The purpose and character of Anthropic's use was inherently substitutive: it pirated books

23  to avoid the trouble and expense of purchasing lawful copies. Like mid-2000s teenagers,

24  Anthropic went to illegal websites to "get for free something they would ordinarily have to buy."

25  *Napster*, 239 F.3d at 1015. Anthropic does not argue—nor can it—that downloading or torrenting

26  is transformative. *See id.* ("downloading MP3 files does not transform the copyrighted work");

27  *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000).

28       Anthropic's use, in fact, is far worse than the piracy in *Napster* and *MP3.com*, as

1    Anthropic downloaded works for free as part of a multibillion dollar commercial enterprise.

2    There is no doubt that a *human* who downloaded large quantities of books from the Pirate Library

3    Mirror to read—instead of buying them—would be committing copyright infringement. *Napster*,

4    239 F.3d at 1015. Nor can Anthropic dispute that its large-scale book piracy was commercial:

5    Anthropic has generated over $1.4 billion in annual recurring revenue from Claude and, as its

6    CEO admitted, it stole books instead of "buy[ing]" them to avoid "a huge legal/practice/business

7    slog." Ex. 18; Ex. 27; Ex. 33, at -310, -324 (confirming even research activities were linked to

8    commercial development). Because the "commercial character of [a] use, though not dispositive,

9    tends to weigh against a finding of fair use," Anthropic's fair use defense is more meritless than

10   those flatly rejected in *Napster, MP3.com*, and other cases. *Warhol*, 598 U.S. at 537 (cleaned up).

11           Anthropic's Factor One argument relies on two lines of cases: (1) the "intermediate

12   copying" cases, and (2) the search-engine thumbnail cases. Neither helps its case.

13           **Intermediate copying cases:** These cases are inapposite because this case is not about

14   intermediate copying: it is about Anthropic's unlawful acquisition of its initial copy. The key

15   cases Anthropic cites are *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992),

16   and *Sony Computer Enterprise, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000). Both cases

17   involved reverse engineering computer code to understand its functional elements. *See Sega*, 203

18   F.3d at 1527-28; *Sony*, 203 F.3d at 608. Critically, the defendant in each case lawfully purchased

19   its initial copy. *See Sega*, 203 F.3d at 1514-15 ("Accolade purchased a Genesis console . . ."); 

20   *Sony*, 203 F.3d at 601 ("Connectix engineers purchased a Sony PlayStation . . ."). That is why the

21   decisions referred to the copying as "intermediate"—because the challenged copies were those *in*

22   *between* the initial lawful copy and the final transformative result.

23           By contrast, in *Atari Games Corp. v. Nintendo of America Inc.*, defendant Atari

24   unlawfully obtained the source code it wanted to reverse engineer by requesting a copy from the

25   Copyright Office, representing that it was "a defendant in an infringement action and needed a

26   copy of the program for that litigation." 975 F.2d 832, 836 (Fed. Cir. 1992). In reality, "no suit

27   existed." *Id.* The Court held that while true intermediate copying *would be* fair use, Atari's

28   unlawful acquisition of the source code foreclosed any intermediate copying defense: "To invoke

the fair use exception, an individual must possess an authorized copy of a literary work." *Id.* at

843. The Court continued: "Because Atari was not in authorized possession of the Copyright

Office copy of 10NES, any copying or derivative copying of 10NES source code from the

Copyright Office does not qualify as a fair use." *Id.*

Other cases Anthropic cites also fit this pattern. In each case, the defendant lawfully

obtained its *initial* copy before subsequently making additional copies in service of some

transformative end result. *See, e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202, 208 (2d Cir.

2015) ("*Google Books*") (Google acquired books through "bi-lateral agreements [with] a number

of the world's major research libraries"); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 90 (2d

Cir. 2014) ("Colleges, universities, and other nonprofit institutions . . . made the books in their

collections available for inclusion"); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630,

635 (4th Cir. 2009) (Plaintiffs "submitted their papers" to Defendant); *Oracle Am., Inc. v. Google

LLC*, 886 F.3d 1179, 1187 (Fed. Cir. 2018) (the Java code Google copied had been "made

available without charge under an open source license"). None of these cases involved Internet

piracy and each of them provides a stark contrast with the way in which Anthropic wrongfully

acquired books in the pirated datasets.

**Search-engine thumbnail cases:** *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146

(9th Cir. 2007) and *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) involved search

engines' use of thumbnails—"reduced, lower-resolution versions of full-sized images"—to direct

users to third-party websites with the full images. *Perfect 10*, 508 F.3d at 1155. These cases have

nothing to do with piracy. The defendants did not even store full-size copies of the images—just

the low-resolution thumbnails. *See id.* at 1160 ("Google does not have a copy of the images for

purposes of the Copyright Act."); *Arriba*, 336 F.3d at 815. And in *Perfect 10*, the plaintiff

challenged display and distribution, but not any initial illegal acquisition. 508 F.3d at 1159.

None of Anthropic's cited cases excuse downloading copyrighted works for free from

pirate websites in lieu of paying for lawful copies on the open market. And, as explained *supra*

IV.B.2.b., none involve the exploitation of the expressive elements, as Anthropic has done here.

**b.**    **Anthropic's Arguments About "Bad Faith" Are Irrelevant, Wrong, and Present Material Triable Questions That Cannot Be Resolved on Summary Judgment.**

Whether bad faith is a relevant consideration or not, Anthropic committed copyright infringement by its *actions*: downloading unauthorized copies of Plaintiffs' books from illegal websites. That infringement was actionable from the day Anthropic downloaded those initial copies regardless of any contemplated or actual subsequent copying and use, and regardless of the state of mind of the downloader.

In the many other cases that have analyzed whether downloading pirated works is fair use, the decisions did not turn on post-acquisition use. Most of these actions addressed claims of indirect infringement against website proprietors, where the downloaders of copyrighted content were the direct infringers. *See, e.g.*, *In re Aimster Copyright Litigation*, 334 F.3d 643, 645 (7th Cir. 2003) (Posner, J.) (explaining that the "[t]eenagers and young adults" who use the Aimster platform "are the direct infringers"); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919 (2005); *Sony BMG v. Tenenbaum*, 672 F.Supp.2d 217, 226 (D. Mass. 2009). The question in those cases was whether the direct infringers' downloads were fair use—and courts categorically answered "no" *regardless of* how the downloaders later used the works. Surely some users of peer-to-peer networks who downloaded music were also taking music lessons or seeking artistic inspiration, but no court has held that this subsequent conduct inoculates the decision to acquire a work for free instead of paying for it. Quite the opposite: Because the "purpose and character" of piracy is to "get for free something they would ordinarily have to buy," it is not excused by some later conduct. *Napster*, 239 F.3d at 1015. This has nothing to do with "bad faith," as Anthropic contends, but is relevant to the purpose and character of the use.

In any event, bad faith is still a relevant consideration in this Circuit. *See Perfect 10*, 508 F.3d at 1164 n.8 (reciting "the general rule that a party claiming fair use must act in a manner generally compatible with principles of good faith"); *Triller Fight Club II LLC v. H3 Podcast*, 2023 WL 11877604, at *8 (C.D. Cal. Sept. 15, 2023) ("[u]ntil and unless the Supreme Court rules that the defendants' good faith—or lack thereof—is not a relevant consideration, this Court is bound by the holdings of the Ninth Circuit.").

1    And here, whether Anthropic downloaded pirated books in bad faith presents at minimum

2    a material and disputed question of fact. Anthropic's employees knew they were downloading

3    and torrenting pirated books. *See, e.g.*, Ex. 13 (describing PiLiMi's books as being sourced from

4    "a popular (and illegal) library"); Ex. 28, at -95 (document describing Books3 as "183k pirated

5    books," with a plus-sign next to "high quality" but a minus-sign next to "legal status"); Ex. 29, at

6    -33 (Turvey noting that "books published after 1929 found on the Web" are often "pirated and

7    posted illegally"). Indeed, the names of the sites themselves give the game away. The LibGen

8    website that Anthropic downloaded from had a pirate ship as its logo. Ex. 9; Ex. 10. At a

9    minimum, there are disputed material facts regarding whether Anthropic's conduct comported

10   with "principles of good faith and fair dealing." *Perfect 10*, 508 F.3d at 1164 n.8.

11   In sum, Anthropic's piracy was an end-run around the most basic principle of copyright

12   law and was quintessentially commercial under Factor One. As in *Napster*, Anthropic's "repeated

13   and exploitative unauthorized copies of copyrighted works were made to save the expense of

14   purchasing authorized copies." 239 F.3d at 1015. In the words of Judge Easterbrook,

15   "downloading full copies of copyrighted material without compensation to authors cannot be

16   deemed 'fair use.'" *Gonzalez*, 430 F.3d at 891.

17   **3.    Factor Two: Books are at the core of copyright protection.**

18   The second fair use factor "calls for recognition that some works are closer to the core of

19   intended copyright protection than others, with the consequence that fair use is more difficult to

20   establish when the former works are copied." *Campbell*, 510 U.S. at 586. "Creative works," like

21   books, receive greater protection than "informational and functional works," like computer code.

22   *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997). While

23   Anthropic effectively ignores Factor Two, that is where the Court started in *Google v. Oracle*,

24   and the fact that the computer code at issue was "functional in nature" figured prominently in the

25   Court's ultimate finding of fair use. 593 U.S. at 26-29; *see also Sega*, 977 F.2d at 1527 (stating

26   that "the key to this case is that we are dealing with computer software," and signaling that

27   "wholesale copying" might merit a different result "in more traditional contexts.").

28

PLAINTIFFS' OPPOSITION TO ANTHROPIC'S
MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:24-CV-05417-WHA

1

        **4.**    **Factor Three: Anthropic repeatedly copied Plaintiffs' entire books.**

2

      Under the third factor, courts consider whether "the amount and substantiality of the

3

portion used in relation to the copyrighted work as a whole . . . are reasonable in relation to the

4

copying." *Campbell*, 510 U.S. at 586-87. "[C]opying an entire work militates against a finding of

5

fair use." *Napster*, 239 F.3d at 1016 (citation omitted). Anthropic admits it "generally" copies

6

"the entire text of the books." MSJ at 8, 18. The amount of Anthropic' copying bears no

7

"reasonable" relationship to Anthropic's illegitimate purpose of avoiding purchasing legitimate

8

copies here. This factor therefore weighs against fair use.

9

        **5.**    **Factor Four: Anthropic Has Made No Effort to Meet Its Burden to Establish That Its Piracy Has Not Harmed the Book Sale Market.**

10

      The fourth factor is considered the most important and addresses the impact on the

11

"potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The analysis

12

considers not just the defendant's conduct, but whether "unrestricted and widespread conduct of

13

the sort engaged in by [the defendant] could 'create incentives to pirate intellectual property.'"

14

*Dr. Seuss Enters.L.P. v. ComicMix LLC*, 983 F.3d 443, 461 (9th Cir. 2020) (quoting *Monge*, 688

15

F.3d at 1182). Here, the harm caused by piracy like Anthropic's is straightforward: Plaintiffs did

16

not receive the financial benefits they would have received from the purchase of lawful copies.

17

*See Napster*, 239 F.3d at 1017 ("Having digital downloads available for free on the Napster

18

system necessarily harms the copyright holders' attempts to charge for the same downloads.");

19

*Tenenbaum*, 672 F.Supp.2d at 231 ("It is difficult to compete with a product offered for free.");

20

*Gonzalez*, 430 F.3d at 890-91 ("[A]ll 1,000+ of [defendant's] downloads . . . undermined the

21

means by which authors seek to profit.").

22

      Anthropic does not even address this type of harm, but it is undeniable that the book sales

23

market is a thriving market. *See* Malackowski Decl. ¶ 31. And that market is readily available for

24

AI companies to participate in—as confirmed by Anthropic's own Project Panama.[6] After

25

deciding to stop pirating books for legal reasons, Anthropic started purchasing single copies of

26

_____

27

[6] Anthropic's subsequent purchases do not cure its past infringement. *See Napster*, 239 F.3d at 1018-19 (rejecting fair use even in situations where the downloader "eventually purchase[s] the music" or wants "to listen to music he already owns").

28

PLAINTIFFS' OPPOSITION TO ANTHROPIC'S
MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:24-CV-05417-WHA

1    millions of books. To date, Anthropic has spent $    million on book purchases, and it plans to

2    spend "at least another $    million." Turvey Decl. ¶ 22. Those purchases, unlike Anthropic's

3    earlier piracy, benefit authors. *See* Malackowski Decl. ¶¶ 31-34.[7]

4           Anthropic asserts that its free downloads here were permitted because it put these pirated

5    books to a transformative use—using them for "teaching" and "learning." *See* Kaplan Decl.

6    ¶¶ 35-36, 64. But if a would-be infringer could get off scot-free by identifying some educational

7    purposes, then copyright protection would be of little use in the internet age. *Napster* and its

8    progeny would effectively be dead letter. Anyone could download books, music, or movies from

9    Napster-type websites, so long as they could show they had some "transformative" purpose

10   similar to Anthropic's: perhaps they downloaded *The Power Broker* to learn about Robert Moses.

11   But lofty purposes do not entitle one to take pirated copies free off the internet. In *Napster*,

12   because the plaintiffs sought to hold Napster contributorily liable for the infringing acts of its

13   users, the Ninth Circuit addressed a laundry list of potentially noninfringing uses of the peer-to-

14   peer network software and rejected each one. *See Napster*, 239 F.3d at 1017-19. If Napster had

15   needed only to show that some portion of users put their illegal downloads to educational

16   purposes, there is little doubt the case would have come out the other way.

17          But it didn't, and that makes sense. Without the ability to protect the longstanding market

18   for book sales (or album sales, or movie sales), copyrights would offer little incentive to create.

19   Authors write books to sell them. Humans and multibillion-dollar corporations cannot circumvent

20   that market by copying them from the dark corners of the internet.

21         **B.**    **Anthropic's Unlicensed Use of Books in LLM Training Is Not Fair Use.**

22          In addition to its pirated downloads, Anthropic infringed when it made additional copies

23   of Plaintiffs' works to train its LLMs without a license to do so. This is the second infringing act

24   that requires a fair use analysis, and it encompasses not only the books Anthropic pirated and

25   used in training, but also the books Anthropic purchased as part of Project Panama.

26   _____

27   [7] While Anthropic has primarily purchased *used* books through Project Panama, Dr. Malackowski
     explains that used book purchases still financially benefit authors. Malackowski Decl. ¶ 34. And
     there is no question that "unrestricted and widespread" piracy like Anthropic's would harm the

28   book sale market broadly. *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1182 (9th Cir. 2012)

1    Under the four factors, Anthropic's use of books in training is not fair use either. The

2    analysis under Factors 2 and 3 is identical to above: Plaintiffs' books are creative works (not

3    computer code), and Anthropic copied them in their entirety. Factors 1 and 4 also weigh against

4    fair use, and at a minimum hinge on disputed questions of fact, as set forth below.

5            1.    **Factor One: Anthropic's use of books in training is commercial and not**
     **transformative.**
6

7            a.    **Anthropic Cannot Invoke Fair Use to Avoid Paying for the**
     **Copies It Needs to Fuel Its Commercial Mission.**

8    In *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994), the Second

9    Circuit faced a fact pattern very similar to Anthropic's Project Panama. Texaco employed

10   "between 400 and 500 researchers nationwide . . . to develop new products and technology

11   primarily to improve its commercial performance in the petroleum industry." *Id.* at 915. To

12   support those researchers, Texaco subscribed to "many scientific and technical journals," which it

13   kept in a centralized library. *Id.* When researchers wanted to access those journals, they would

14   check them out from that library. *Id.* Texaco, however, only paid for a few subscriptions. *Id.* So

15   its researchers would often photocopy articles in their entirety to "have them available for later

16   reference as needed," before checking them back in to Texaco's library. *Id.* The Second Circuit

17   held that Texaco's copying was not fair use. The purpose of its "institutional, systematic copying"

18   was to "increase[] the number of copies available to scientists while avoiding the necessity of

19   paying for license fees or for additional subscriptions." *Id.* at 916. And even though the copies

20   were used for research, the court found that research "could be regarded simply as another 'factor

21   of production' utilized in Texaco's efforts to develop profitable products." *Id.* at 922.

22   This is also the law in the Ninth Circuit. In *Wall Data Inc. v. Los Angeles Cnty. Sheriff's*

23   *Dep't*, 447 F.3d 769, 774 (9th Cir. 2006), the Los Angeles County Sheriff's Department

24   purchased 3,663 licenses to the plaintiff's software. But it then went on to load that software onto

25   6,007 workstations, configuring the software so that it "could only be accessed by 3,663

26   workstations at a time." *Id.* at 776. This, too, was not fair use, because the copies "'were made to

27   save the expense of purchasing authorized copies,' or at least the expense of purchasing a more

28   flexible license." *Id.* at 779 (quoting *Napster*, 239 F.3d at 1015).

1       Like Texaco and the Sheriff's department, Anthropic first acquired physical copies of the

2    books it wanted to house in its internal "research library." Ex. 22, at 145:7-146:8 (Project Panama

3    is "one and the same with building a research library"); Ex. 31; Ex. 32. It then photocopied those

4    books and gave its engineers access to the scans, so they make additional copies to train

5    thousands—possibly millions—of LLMs and conduct commercial research. *See* Ex. 22, at

6    191:15-194:16; 196:15-18; Ex. 17, at 224:1-12. Even training a *single* model requires creating a

7    lot of copies: including raw copies, filtered copies, tokenized copies, and copies compressed in

8    the training process. *See* Zhao Decl. ¶ 38. And as in *American Geophysical Union* and *Wall Data*,

9    the same principle applies: when a commercial entity needs a lot of copies of a copyrighted work,

10   it must pay for the copies it needs. It is not sufficient to pay for a single copy, then use

11   technological means to distribute additional copies throughout the company. Anthropic "could

12   have bargained for the flexibility it desired, but it did not." *Id.* at 781.[8]

13          b.    **The Parties Vigorously Dispute the Nature and Details of the**
                  **Training Process**
14

15       Anthropic argues that "Claude itself" is transformative, and is different from a book. MSJ

16   at 13, 14. But that addresses the wrong question. Plaintiffs need not show that *Claude itself* is an

17   infringing copy of Plaintiffs' books. Here, the infringing copies are the numerous copies of

18   Plaintiffs' books Anthropic made to train its LLMs, like the photocopied journal articles in

19   *Texaco*. The question under Factor One for this use is whether *the copying of books to train*

20   *Claude* is transformative.

21       Using books to train LLMs is not a transformative use, and at best there are disputed facts.

22   Anthropic tries to avoid this conclusion by anthropomorphizing its LLMs, likening Claude to "an

23   intelligent human," MSJ at 1, and failing to provide a systematic explanation of LLM training.

24       Anthropic avoids going into any detail to avoid drawing attention to the parties' very

25   different explanations of what is going on in the training process. As Plaintiffs' expert Ben Zhao

26   ─────────────
     [8] Anthropic argues that some of the LLMs it trained were used for internal "research" and
27   therefore not "commercial." This is wrong because, like most technology companies, Anthropic's
     "research" drove its commercial development. *See* Ex. 33 at -310, -324. It is also irrelevant at this
28   stage because Anthropic admits that it used each of Plaintiffs' works to train a commercially
     released Claude model. *See* Ex. 46 (identifying Plaintiffs' works in training datasets).

1   explains (including with reference to Anthropic's model-training source code), LLM training is

2   better understood as a sophisticated type of compression. *See* Zhao Decl. ¶ 54-77. LLMs train by

3   compressing a version of the expression contained in their training data in their weights and

4   biases—which explains why they retain the ability to regurgitate that expression verbatim if

5   prompted. *See id.* Anthropic may disagree with this characterization, but the parties' conflicting

6   descriptions of the training process present another issue of disputed material fact. *See Caldwell*

7   *v. UnitedHealthCare Ins. Co.*, 2021 WL 275467, at *3 (N.D. Cal. Jan. 27, 2021) (Alsup, J.)

8   ("summary judgment must be denied in favor of a trial at which time the various experts can be

9   cross-examined and their credibility assessed.").

10          It is also false that Anthropic used Plaintiffs' books for a "fundamentally different purpose

11   from the books themselves." MSJ at 1. By Anthropic's own telling, it used books for one of their

12   core purposes: facilitating "learning" using human expression. According to Anthropic, books

13   enable LLMs to write like human authors, answer technical questions like human experts, and

14   give advice like human consultants. And the training process is what gives LLMs like Claude

15   those abilities. In that sense, what an LLM gets out of a textbook or a novel is analogous to what

16   any human student or reader would get out of them. *See* Ex. 4, at -41 (Anthropic research finding

17   that "fiction books improve prose and math/science books improve coding").

18          But to equate Claude (or any LLM, for that matter) with a human—a strategy Anthropic

19   relies upon heavily to justify its infringement—is a fallacy. Fundamentally, humans must pay for

20   the copyrighted works they learn from (or otherwise lawfully procure them)—and humans are not

21   multi-billion-dollar companies. *See Texaco*, 60 F.3d at 916; *Cambridge Univ. Press v. Patton*,

22   769 F.3d 1232, 1237, 1283 (11th Cir. 2014) (after bench trial, reversing grant of fair use to

23   university whose professors made copies of books for students, because the professors' "unpaid

24   copying was nontransformative and they used Plaintiffs' works for one of the purposes for which

25   they are marketed").

26          In addition, Anthropic argues that its copying is fair use because it used books "only as

27   inputs." MSJ at 10, 11. But the cases it cites are inapposite. Most of the cases (including *Sega*,

28   *Sony*, and *Google v. Oracle*) involved computer code. In the only case so far to address whether

1   AI training is fair use, the court emphasized this very distinction: "[T]hose cases are all about

2   copying computer code. This case is not." *Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*,

3   2025 WL 458520, at *8 (D. Del. Feb. 11, 2025) (Bibas, J.) (holding that the reproduction of

4   Westlaw headnotes to train an AI model was not fair use).

5         Not only did those cases all involve computer code, they all involved mining the

6   *functional elements* of that code, rather than its expressive qualities. *See Oracle*, 593 U.S. at 3

7   ("Google copied these lines not because of their creativity or beauty but because they would

8   allow programmers to bring their skills to a new smartphone computing environment."); *Sony*,

9   203 F.3d at 603-04 (copying was "necessary to gain access to the unprotected functional elements

10  within the program"); *Sega*, 977 F.2d at 1527 (disassembly was "the only way to gain access to

11  the ideas and functional elements embodied in [the] copyrighted computer program"). Here, by

12  contrast, Anthropic needs books precisely for their expressive qualities—prose, coherence, and

13  organization. Unlike *Oracle*, *Sony*, and *Sega*, where the expression was beside the point, here the

14  expression is the entire point. Just as Warhol chose Goldsmith's photograph for its aesthetics,

15  Anthropic chooses books precisely for their expressive content. *See, e.g.*, Ex. 3 (internal memo

16  calling for training material with "good writing," the "kind of content an editor would approve

17  of," because it "teaches" the LLM to "write well, rather than low quality internet speak").

18        LLMs mimic human writing by strip mining and compressing that expression—even to

19  the point of verbatim memorization. Anthropic's own research has found that LLMs "memorize

20  A LOT, like A LOT." Ex. 35, at -109; *see also* Ex. 36 (Claude "learned from the training set with

21  a high degree of memorization" and "reconstructs (copyrighted) training data with little

22  prompting effort"). That focus on and use of the expressive content contained in the books in

23  question categorically differentiates this case from cases like *Sega, Sony*, and *Google*, where there

24  was no serious dispute as to the functional (rather than expressive) nature of the use.

25        To attempt to keep Claude from regurgitating the passages it has memorized, Anthropic

26  has set up "guardrails" to screen both Claude's inputs and its outputs. *See* Kaplan Decl. ¶¶ 67-68.

27  And it even uses the books it pirated to screen Claude's output and try to keep it from

28  regurgitating the copyrighted works it trained on. *See* Ex. 17, at 93:23-94:14, 249:2-13; Zhao

Decl. at 75-77. The fact that such stringent guardrails are necessary confirms the scope of Anthropic's memorization problem—and underscores that Claude mines the *expression* from the copyrighted works it trains on. Anthropic even admits memorization is "a problem." MSJ at 4. At a minimum, the degree of Claude's memorization during training presents another disputed issue of material fact.

Furthermore, the *non*-computer code cases Anthropic relies on (*Google Books*, *HathiTrust*, *Perfect 10*, and *Arriba*), as addressed above, are inapposite as they all involved a similar pattern of transformation: the defendants indexed creative works so that users could search for them more easily. Because only a snippet of the book (*Google Books*, *HathiTrust*) or a low-resolution version of the image (*Perfect 10*, *Arriba*) was shown to the user, the use was merely as "a pointer directing a user to a source of information," rather than serving a competing "entertainment, aesthetic, or informative function." *Perfect 10*, 508 F.3d at 1165.[9] And, unlike the index-and-search cases, Anthropic takes pains to prevent users, competitors, and the world at large from discovering which books it used during training. *See* Ex. 37, at 5.

*Google Books*, in particular, "test[ed] the boundaries of fair use," and is nothing like Anthropic's use of books here. 804 F.3d at 206. In that case, again, Google executed "bi-lateral agreements" with "a number of the world's major research libraries" to create a searchable index of books. *Id.* at 208. When users search the Google Books index, they are directed to links to buy the queried books, generating revenue for authors. *Id.* at 209. As in the other cases Anthropic cites, the book was used as a "pointer" which directed users to the creative work. Anthropic, by contrast, offers no evidence that its exploitation of Plaintiffs' works promotes books sales, as was critical in *Google Books*.

\* \* \*

Ultimately, Anthropic's whole argument collapses into its contention that use in training is transformative. When a use is transformative, Anthropic tells the Court, nothing else matters.

---

[9] Anthropic also cites the inapposite Fourth Circuit case *iParadigms*. There, student papers were indexed and used to detect plagiarism, a different purpose from the originals and another example of an "index-and-search" use entirely distinct from Anthropic's covert use here. 562 F.3d at 634-35. The same goes for *White v. W. Pub. Corp.*, 29 F. Supp. 3d 396, 399 (S.D.N.Y. 2014), in which legal briefs were indexed to make them text-searchable.

That is not the case. Plaintiffs disagree that Anthropic's use of books in training is transformative. But even if it *were* transformative, that doesn't end the analysis. As the Court explained in *Warhol*, the first factor "is just one factor in a larger analysis." 598 U.S. at 528-29; *Harper & Row*, 471 U.S. at 566 (calling Factor Four "undoubtedly the single most important element of fair use"). The Court should give all four factors due weight and reject Anthropic's attempt to reduce the entire case down to whether LLM training is transformative.

### 2.    Factor Four: Potential market for LLM training.

Anthropic's unlicensed use of books in training harmed Plaintiffs by depriving them of licensing revenues they are owed—and that other AI companies are already paying. *See Hachette Book Grp. v. Internet Archive*, 115 F.4th 163, 192 (2d. Cir. 2024) ("impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor"); Malackowski Decl. ¶¶ 39-52. Anthropic states there is no Factor Four harm because no market for books as LLM training data "exists or plausibly could," MSJ at 20, but it doesn't come close to meeting its burden to disprove Factor Four harm as a matter of law. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) ("Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets."); *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1163 (9th Cir. 2022).[10]

### a.    Disputed factual questions about the licensing market for LLM training precludes summary judgment on fair use.

In assessing the Fourth Factor, the Court should consider whether a defendant has deprived the Plaintiff of licensing revenues, provided that there is a "traditional, reasonable, or likely to be developed market[]" for the use in question. *Am. Geophysical Union* 60 F.3d at 931. Anthropic does not dispute that it deprived Plaintiffs of licensing revenues, but only disputes whether there is a burgeoning market for LLM training for Plaintiffs' works. Because Anthropic cannot establish that a licensing market is unlikely to develop—beyond any dispute of fact—it

---

[10] Because Anthropic decided to move for summary judgment at this early stage, its document productions are ongoing. To the extent the Court finds that additional discovery could confirm that the fair use determination depends on material fact disputes, the Court should deny Anthropic's motion under Rule 56(d). *See* Fed. R. Civ. P. 56(d); Fredricks Decl. ¶ 2.

1   cannot meet its burden on summary judgment as to Factor Four.

2          There is a mountain of evidence confirming that an LLM training market for books is

3   likely to develop. Plaintiffs' expert James Malackowski—Co-founder and Senior Managing

4   Director of Ocean Tomo—analyzed a number of public and nonpublic licensing deals or

5   negotiations for AI training licenses, the rise of intermediaries to facilitate collective licensing

6   regimes where there is disparate ownership, the large demand for LLM training material, and the

7   willingness of rightsholders to enter licensing markets, ultimately concluding that an LLM

8   training market for books is likely to develop in the near future. Malackowski Decl. ¶¶ 39-52.

9   Anthropic may disagree with Mr. Malackowski's conclusions, or try and wish away the tens of

10  public AI training licensing deals, but it cannot establish—as it must on summary judgment—that

11  a licensing market for training is unlikely to develop as a matter of law.

12         Anthropic offers its own competing expert testimony from Dr. Steven Peterson, but Dr.

13  Peterson's conclusions are deeply flawed—and certainly not the stuff of summary judgment. Dr.

14  Peterson first argues that a licensing market could never emerge because of transaction costs. But

15  Dr. Peterson fails to account for the *already-actually-existing* examples of licenses for books as

16  LLM training data. *Id.* ¶¶ 39-52, 59. Second, Dr. Peterson fails to recognize the ways in which

17  books are uniquely suited for training data licenses as they are a relatively small portion of overall

18  LLM training data but especially highly valued by LLM developers. *Id.* ¶¶ 43, 54-55 Third, Dr.

19  Peterson ignores both the contemporary evidence from LLM training data licenses and the

20  historical evidence that intermediaries arise in the presence of new technologies to facilitate IP

21  market development. *Id.* ¶¶ 23-30, 39-52, 67, Appx. 3, 4. In particular, history has shown that

22  once unlawful copying is judicially prohibited, market forces naturally react by developing

23  legitimate alternatives (e.g., the emergence of iTunes after Napster was shut down). *Id.* ¶ 51.

24         Anthropic also relies on the testimony of Tom Turvey, its Head of Data Partnerships, for

25  the self-serving assertion that, in Anthropic's experience, paying for license is "unworkable".

26  MSJ at 22. But Anthropic's documents tell a different story—namely, that Anthropic abandoned

27  licensing efforts not because it was unworkable, but because it was *more expensive*. Ex. 18;

28  Malackowski Decl. ¶¶ 63-65. Mr. Turvey, in fact, made little meaningful effort at licensing

1   negotiations, never even discussing price or quantity with any major book publishers. *See* Ex. 22
2   at 227:14-22, 246:14-247:25, 235:8-23, 258:12-21. Anthropic's claim that a licensing marketing
3   for LLM training is unlikely to develop depends entirely on competing expert and fact witness
4   testimony, and for that reason Factor Four cannot be resolved in Anthropic's favor at summary
5   judgment.[11] *See Deppe v. United Airlines*, 217 F.3d 1262, 1266 (9th Cir. 2000) (court "may not
6   make credibility determinations" at summary judgment).

        b.    **Lost licensing revenues are a cognizable market harm.**

8          Anthropic argues that lost licensing revenues are not cognizable in this case as a matter for
9   law for two reasons, neither of which holds water.

10         *First*, Anthropic argues that Plaintiffs' assertions of lost licensing revenue "fall[] prey to a
11  long-recognized circularity problem." MSJ 19. But it is well-worn law that the "vice of
12  circularity" is easily "avoid[ed] . . . by considering only *traditional, reasonable, or likely tobe*
13  *developed markets* when considering a challenged use upon a potential market." *Ringgold v.*
14  *Black Ent. Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997) (cleaned up) (reversing summary
15  judgment grant for defendants in light of evidence of unpaid licensing fees); *Am. Geophysical*
16  *Union,* 60 F.3d at 931 (holding that "traditional, reasonable, or likely to be developed markets"
17  are "legally cognizable" and "[t]he vice of circular reasoning arises only if the availability of
18  payment is conclusive against fair use").[12] Because a reasonable juror could find that a licensing
19  market for Plaintiffs' works is likely to develop (*supra* IV.2.a), Anthropic falls far short of its
20  burden to show that lost licensing revenues are non-cognizable here as a matter of law.

21         *Second*, Anthropic argues that lost licensing revenues are non-cognizable where the
22  allegedly infringing use in question is "transformative." MSJ 18-19. This is irrelevant and wrong.

[11] Assessing Mr. Turvey's credibility will be especially important. When he was an employee at Google and testified in the antitrust case against Apple in 2013, his credibility was severely undermined during cross-examination. *See* Ex. 40 ("Turvey had gone from saying the publishers had told him directly, to saying they had merely told people on his team, to finally saying the publishers had 'likely' told someone on his team").

[12] Anthropic cites *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013). But *Seltzer confirmed* that the Court, on Factor Four, must "consider[] any impact on traditional, reasonable, or likely to developed [sic] markets," ultimately concluding that, in that particular case, the plaintiff failed to supply any evidence of cognizable lost licensing revenues.

PLAINTIFFS' OPPOSITION TO ANTHROPIC'S MOTION FOR SUMMARY JUDGMENT CASE NO. 3:24-CV-05417-WHA

It is irrelevant because Anthropic's copying to train its models is nontransformative, *supra* IV.1.b. But setting that aside, Anthropic is also wrong on the law. The principle Anthropic relies on traces back to the Supreme Court's decision in *Campbell v. Acuff-Rose Music, Inc.*, and applies where there is some economic reason why a copyright holder may be disincentivized to license a particular type of transformative work. 510 U.S. at 571. For example, "when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act." *Id.* at 591-92. There is, however, no *per se* rule that Factor Four is categorically irrelevant for any transformative use. *See id.* at 591 (noting that transformative use merely makes market harm "less certain"); *Fox News Network, LLC v. TVEyes*, Inc., 883 F.3d 169, 180 (2d Cir. 2018) (considering licensing revenues where use was "somewhat transformative"). Rather, "the role of the courts is to distinguish between biting criticism that merely suppresses demand and copyright infringement, which usurps it." *Id.* at 592 (cleaned up). Anthropic offers no explanation for why its use here is anything like the markets addressed in *Campbell* and its progeny—*e.g.,* criticism, parody, or commentary—nor could it.[13]

### c.    The public benefit weighs against fair use and presents trial issues of fact.

The Court must also "balance the benefit the public will derive if the use is permitted [against] the personal gain the copyright owner will receive if the use is denied." *Hachette*, 115 F.4th at 195. In considering public benefit, the Court must do so "[w]ithin the framework of the Copyright Act," which recognizes "'the Progress of Science and useful Arts' is best promoted by laws that protect authors' original works and permit authors to set the terms of engagement, at least for a limited time." *Id.*; *Ross Intel.*, 2025 WL 458520 at *10 ("Copyrights encourage people to develop things that help society . . . . Their builders earn the right to be paid.").

Here, the record confirms that the public will benefit more from a regime in which authors

---

[13] Anthropic's other cited cases confirm its misreading. *HathiTrust*'s example of the sort of "transformative uses" for which harm "does not count" is "a negative book review . . . dissuading readers from purchasing copies of her book." 755 F.3d at 99. Anthropic's one Ninth Circuit case is quoted only for the unremarkable proposition that "a copyright holder cannot prevent others from entering *fair use* markets." *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020) (emphasis added).

1    are compensated for the use of their material for LLM training versus one in which they are not.

2    LLM technology is rapidly developing and improving and, as it gets better, will likely reduce the

3    incentives for humans to create new works. As Anthropic's CEO Dario Amodei predicts, because

4    AI has the capability of processing and generating expression far faster than humans, AI will "in

5    the long run mak[e] human labor obsolete," including the labor of human writers. Ex. 38.

6    Compensation for use in AI training will create the incentives for human authorship necessary to

7    preserve future public benefit from human creativity. What is more, the progress of AI depends

8    on human authorship, and written works in particular. As Anthropic's Jared Kaplan admits,

9    development of a high-quality LLM *requires* quality training data, that is, quality human

10   expression. On the other hand, "it would be impossible to properly train an LLM like Claude

11   entirely or predominantly on synthetic data"—*i.e.*, data generated by AI. Kaplan Decl. ¶ 44.

12   LLMs may indeed hold promise, but that continued promise and progress depends on continued

13   *human* creation—and one way to incentivize that essential human creation in the AI-era is by

14   compensating authors for the use of their works in LLM training.

15       Anthropic's arguments about the public benefit make two assumptions: (1) without free

16   access to copyrighted books, LLMs could not exist; and (2) LLMs undisputedly benefit the

17   public. Both questions are highly contested and cannot be resolved on summary judgment.

18       As to the first assumption, copyrighted books make up only a tiny percentage of

19   Anthropic's training corpus. For example, Books3 supplied 1.3% of the sampled tokens for

20   Claude 1, and scanned books supplied 0.91% of the sampled tokens for Claude 3.5 Haiku. Kaplan

21   Decl. ¶ 53. Anthropic therefore does not need copyrighted books to create an LLM, but it needs

22   high-quality expression to create the *most commercially competitive* LLM. But fair use does not

23   exist to protect one company's commercial advantage over its competitors. *MCA, Inc. v. Wilson*,

24   677 F.2d 180, 182 (2d Cir. 1981) ("the court may consider whether the alleged infringing use was

25   primarily for public benefit or for private commercial gain").

26       As to the second question, Anthropic's sweeping statements about the promise and myriad

27   applications for AI more generally is irrelevant to the fair use analysis, which is focused on

28   considering the public benefit "within the framework of the Copyright Act." *Hachette*, 115 F.4th

at 195; *Ross Intel*., 2025 WL 458520, at *10. But in any event, whether LLMs hold more promise than peril—or the opposite—is hotly contested. In an internal memorandum dated July 2021, Anthropic's own CEO Dario Amodei admitted that AI's progress meant massive wealth inequality, where AI companies benefit at the expense of the rest of humanity:

> I think this is a real and important concern, especially when considered as part of an overall trend for AI progress to concentrate wealth, increase inequality, and in the long run automate labor. Zooming very far out, what is happening macroeconomically is that distributed human labor is being used to train AI models by large, centralized actors, who concentrate the resulting profits while in the long run making human labor obsolete.

Ex. 38. What is more, Anthropic's CEO reported there is a 10-25% risk that its LLMs will cause human extinction or catastrophically impair human civilization. *See* Ex. 39, at 1. At minimum, the public benefit factor presents yet another series of material factual disputes that cannot be resolved in Anthropic's favor on summary judgment. *Thomson Reuters*, 2025 WL 458520, at *10.

### C.   The Court's Five Questions Demonstrate the Absence of Fair Use Here.

**1.   *Case 1.* An e-book is purchased at full price and read over five days by the purchaser. Each day he reloads the entire e-book.**

Plaintiffs assume that this purchase is from an authorized / legitimate retailer. Plaintiffs assume that "reload[ing] the entire e-book," refers to re-downloading it from the retailer and, in so doing, the person is not violating any of the e-book's digital rights management or license. If these hold, then the purchaser has violated neither copyright law nor any license.

**2.   *Case 2.* Same as Case 1 but he buys the e-book for one cent from a notorious counterfeiter known as Books 'R' Cheap.**

This is paid piracy. For example, Z-Library and Anna's Archive both offer paid subscription services which increase users' download caps. *See* Ex. 41; Ex. 42. In this case, the copy made by the purchaser (and the additional copies made during re-loadings) is an infringing act not protected by fair use. *See supra* IV.A.

**3.   *Case 3.* Same as Case 2 but his purpose throughout is to write a transformative parody of the work (and he does).**

This case implicates two "uses." The initial acquisition from a counterfeiter is infringement; the purchaser's subsequent actions are irrelevant. As to use in a "transformative parody," that requires a fact-specific fair use analysis of its own. *See Warhol*, 598 U.S. at 533.

1
2

    **4.**    <u>*Case 4.* **Same as Case 3 but his purpose further includes to write the parody with cowriters, so he buys one e-book and copies it for all co-writers (they jointly write the parody).**</u>

3

        The analysis here is the same as to the initial acquisition of the counterfeit copy

4

(infringing) and the resulting parody (arguably fair use). However, there is now a third use: the

5

copies that the purchaser made for his co-writers would also be infringing acts. *See* 17 U.S.C. §

6

106(1) (reproduction). Furthermore, the distribution to the cowriters for purpose of their common

7

enterprise could also be an infringing act not excused by "fair use." *Id.* § 106(3) (distribution).

8

    **5.**    <u>*Case 5.* **Someone buys a copy of the e-book at full price and then gives it to a writer who uses it to write a transformative parody of the work.**</u>

9

10

        Assuming that the copy was purchased from an authorized retailer there is no

infringement as to the receipt of that initial copy by the purchaser. As to the gift of the e-book,

11

Plaintiffs assume the Court means gifting a copy of the e-book (rather than, e.g., the Kindle on

12

which the ebook resides). If the gift involves making an unlicensed copy of the e-book, that

13

would be an infringing act subject to a fair use analysis. As to the use by the writer, the legality of

14

that use would again depend on the outcome of the fact-specific fair use analysis.

15

    **6.**    <u>**Briefly explain to what extent it makes any difference for the copyright laws whether the work is purchased as an e-book or instead in print and converted by the purchaser immediately into a digital format before the next step.**</u>

16

17

18

        This coda primarily implicates the so-called "First Sale Doctrine." Under the First Sale

19

Doctrine, an individual who acquires a lawful copy of the work (*e.g.*, per Cases 1 and 5) is free to

20

dispose of that particular copy in a manner they see fit. *See* 17 U.S.C. § 109. However, as this

21

coda specifies that the physical book purchaser *immediately* converts the physical book to a

22

"digital format," that is a *prima facie* infringing act under the statute and the digital copy is no

23

longer subject to a First Sale defense. *See* 17 U.S.C. § 106(1) (reproduction right); *U.S. v. Moore,*

24

604 F.2d 1228, 1232 (9th Cir. 1979). There would still be fair use analysis of this *prima facie*

25

infringement implicating a panoply of considerations.[14] *See Hachette*, 115 F.4th at 181-82.

26

27

28

---

[14] For instance, the precise manner in which the digital copy was stored could impact the results of that analysis. *See Google Books*, 804 F.3d at 227.

1   Dated: April 24, 2025                    Respectfully submitted,

2                                            /s/ *Justin A. Nelson*

3                                            Justin A. Nelson

4                                            Justin A. Nelson (*Pro Hac Vice*)

5                                            Alejandra C. Salinas *(Pro Hac Vice)*
                                             Collin Fredricks (*Pro Hac Vice*)

6                                            **SUSMAN GODFREY L.L.P..**
                                             1000 Louisiana Street, Suite 5100

7                                            Houston, TX 77002-5096
                                             Telephone: (713) 651-9366

8                                            jnelson@susmangodfrey.com
                                             asalinas@susmangodfrey.com

9                                            cfredricks@susmangodfrey.com

10                                           Rohit D. Nath (SBN 316062)

11                                           **SUSMAN GODFREY L.L.P.**
                                             1900 Avenue of the Stars, Suite 1400

12                                           Los Angeles, CA 90067-2906
                                             Telephone: (310) 789-3100

13                                           RNath@susmangodfrey.com

14                                           Jordan W. Connors *(Pro Hac Vice)*

15                                           **SUSMAN GODFREY L.L.P.**
                                             401 Union Street, Suite 3000

16                                           Seattle, WA 98101
                                             Telephone: (206) 516-3880

17                                           jconnors@susmangodfrey.com

18                                           J. Craig Smyser *(Pro Hac Vice)*

19                                           **SUSMAN GODFREY L.L.P.**
                                             One Manhattan West, 51st Floor,

20                                           New York, NY 10019
                                             Telephone: (212) 336-8330

21                                           csmyser@susmangodfrey.com

22                                           *Proposed Co-Lead Counsel*

23                                           Rachel Geman *(Pro Hac Vice)*
                                             Jacob S. Miller *(Pro Hac Vice)*

24                                           Danna Z. Elmasry *(Pro Hac Vice)*
                                             **LIEFF CABRASER HEIMANN**

25                                           **& BERNSTEIN, LLP**
                                             250 Hudson Street, 8th Floor

26                                           New York, New York 10013-1413
                                             Telephone: (212) 355-9500

27                                           rgeman@lchb.com
                                             jmiller@lchb.com

28                                           delmasry@lchb.com

PLAINTIFFS' OPPOSITION TO ANTHROPIC'S
                                             MOTION FOR SUMMARY JUDGMENT
                                             CASE NO. 3:24-CV-05417-WHA

1

2      Daniel M. Hutchinson (SBN 239458)
       Reilly T. Stoler (SBN 310761)
3      **LIEFF CABRASER HEIMANN**
       **& BERNSTEIN, LLP**
4      275 Battery Street, 29th Floor
       San Francisco, CA 94111-3339
5      Telephone: (415) 956-1000
       dhutchinson@lchb.com
6      rstoler@lchb.com

7      *Proposed Co-Lead Counsel*

8      Scott J. Sholder (Pro Hac Vice)
       CeCe M. Cole (Pro Hac Vice)
9      **COWAN DEBAETS ABRAHAMS**
       **& SHEPPARD LLP**
10     60 Broad Street, 30th Floor
       New York, New York 10010
11     Telephone: (212) 974-7474
       ssholder@cdas.com
12     ccole@cdas.com

13     *Additional Counsel for the Class*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28