UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, and MJ + KJ, INC., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 3:24-CV-05417-WHA<br><br>Action Filed: August 19, 2024<br><br>**SUPPLEMENTAL DECLARATION OF STEVEN R. PETERSON IN SUPPORT OF DEFENDANT ANTHROPIC PBC'S MOTION FOR SUMMARY JUDGMENT** |

# SUPPLEMENTAL DECLARATION OF STEVEN R. PETERSON

I.   INTRODUCTION

1. My name is Steven R. Peterson. I have previously submitted a Declaration in this matter that contains a statement of my background and qualifications.[1] A list of the materials relied upon in the preparation of my report is attached as Exhibit A. Counsel for Anthropic PBC has asked me to evaluate the analysis in James E. Malackowski's April 24, 2025 Declaration on behalf of Plaintiffs.[2] Mr. Malackowski's Declaration has not led me to change any of the opinions stated in my prior Declaration.

2. Mr. Malackowski agrees with certain of the key conclusions in my Declaration, and where he claims to disagree, he does not engage with my economic analysis addressing Claude's impact on Plaintiffs' copyrights or on the practicability of a licensing market. Mr. Malackowski's observations of certain transactions and entities in the marketplace does not substitute for economic analysis of the viability of the licensing market or undermine any of my opinions as an economist.

II.   MR. MALACKOWSKI DOES NOT DISPUTE THAT CLAUDE IS NOT A SUBSTITUTE FOR BOOKS

3. Mr. Malackowski agrees that "Claude itself is not the substitute for books."[3] Mr. Malackowski's admission that Claude does not compete with books concedes my conclusion that Claude and its services are sold in separate markets than books.[4] This result implies that Claude is a different product than books and is economically transformative.

---

[1] Declaration of Steven R Peterson in Support of Anthropic's Motion for Summary Judgment, March 27, 2025 ("Peterson Declaration").
[2] Declaration of James E. Malackowski, April 24, 2025 ("Malackowski Declaration").
[3] Malackowski Declaration, ¶ 38.
[4] Peterson Declaration, ¶ 5.

███████████████████████████████████████

### III. A MARKET FOR LICENSES FOR TEXT TO TRAIN LLMS IS IMPRACTICABLE

#### A. It Makes No Economic Sense for Mr. Malackowski to Limit the Scope of His Analysis to Licensing Books with Registered Copyrights

4. Mr. Malackowski does not take on the analysis of whether a market to license the amount of data required for a frontier LLM's training corpus is practicable. Instead, he asserts that the economic analysis of the licensing market should be limited to "one type of training data – copyright registered books."[5]

5. Mr. Malackowski's narrow focus on licensing books makes no economic sense for two reasons. **First**, Claude is economically transformative – that is, Claude and its uses are not substitutes for books or other training data, as Mr. Malackowski admits. I understand that with the current technology, creating an economically transformative frontier LLM requires a massive training corpus like the one used to train Claude.[6] Thus, the economic issue is whether there is an incipient market to license the necessary volume of text for that purpose.

6. **Second**, in a scenario in which training is not fair use, licensing only a small portion of the copyrighted text in the training corpus, as Mr. Malackowski envisions, would leave an AI firm with a frontier LLM exposed to substantial copyright liability on the rest of the training corpus.[7] Licensing only "copyright registered books" is futile if a license is required to train LLMs on all copyrighted data (beyond just books) because the firm could spend scarce funds licensing books and would still face substantial copyright liability on the rest of its training corpus.

7. In Mr. Malackowski's "copyright registered book" scenario, frontier LLM firms could not license the data they need and would not exist, and consequently, they would not be in the

---

[5] Malackowski Declaration, ¶ 59 (Arguing the proper scope of analysis is "whether existing or likely to develop markets exist for the various uses to which Anthropic put one type of training data – copyright registered books.").

[6] Declaration of Jared Kaplan in Support of Anthropic's Motion for Summary Judgment ("Kaplan Declaration"), ¶ 35.

[7] Kaplan Declaration, ¶ 53. Books were ████████ of the unique tokens in the training corpus for Claude 3.5. The share of copyright registered books that Mr. Malackowski analyzes would be a still smaller share.

- 2 -

market to license copyright registered books. In short, Mr. Malackowski's scenario addressing only "copyright registered books" is internally inconsistent because he does not consider whether AI firms comparable to those in the market today could exist in his scenario.

**B.   Mr. Malackowski Does Not Dispute the Large Transactions Costs or the Incomplete Information on Ownership of Rights in the Hypothetical Licensing Market**

8.  Mr. Malackowski does not dispute the existence of high transaction costs and incomplete information in the licensing market that I identified in my prior Declaration.[8] He attempts to dismiss the issue with the blanket assertion that all real-world markets have transaction costs[9] and incomplete information.[10] Of course, markets exist, and in the real world, they have transaction costs and incomplete information. This says nothing about the markets that do not exist as the result of transaction costs and incomplete information.[11] Mr. Malackowski does not attempt to explain how a frontier LLM would license all of the data in its training corpus in the hypothetical training market.

9.  Mr. Malackowski's assertion that collective licensing could address market imperfections is no more than that – an assertion. There is no dispute that the hypothetical AI-training rights are widely dispersed or that information on who holds training rights is incomplete.[12] Thus, either an AI firm or intermediary would have to consolidate and validate those rights, which is complicated and costly in the best of circumstances. And these are hardly the best of circumstances: incomplete information makes it impossible to resolve the underlying complexity of dealing with the millions of authors that would have to enter agreements just to license "copyright registered books."

10. AI firms are not the first to face a huge licensing effort with high transactions costs and incomplete information. The U.S. Copyright Office has closely examined orphan works

---

[8]   Peterson Declaration, Section VI.
[9]   Malackowski Declaration, ¶ 60.
[10]  Malackowski Declaration, ¶ 67.
[11]  *See* Peterson Declaration, ¶ 55 and footnotes 46-48.
[12]  Peterson Declaration, ¶ 72 and footnote 86.

- 3 -

and mass digitization and recommended that Congress pass legislation to establish collective licensing to solve these problems.[13] The Copyright Office found that licensing for mass digitization is "essentially impossible" due to market imperfections such as transaction costs as well as the sheer volume of required permissions,[14] noting that "the costs of securing ex ante permissions from every rightsholder individually often will exceed the value of the use to the user."[15] For orphan works, the Copyright Office notes the issue of incomplete information: "a user's ability to seek permission or to negotiate licensing terms is compromised by the fact that, despite his or her diligent efforts, the user cannot identify or locate the copyright owner." The licensing of books for AI-training purposes suffers from the issues that the Copyright Office identified for orphan books and mass digitization, indicating that the licensing of books alone would be "essentially impossible."

---

[13] "Orphan Works and Mass Digitization," United States Copyright Office, June 2015, pp. 1-8, available at https://www.copyright.gov/orphan/reports/orphan-works2015.pdf (accessed 3/19/2025).

[14] "Orphan Works and Mass Digitization," United States Copyright Office, June 2015, p. 1, available at https://www.copyright.gov/orphan/reports/orphan-works2015.pdf (accessed 3/19/2025) ("First, with respect to orphan works, referred to as "perhaps the single greatest impediment to creating new works," a user's ability to seek permission or to negotiate licensing terms is compromised by the fact that, despite his or her diligent efforts, the user cannot identify or locate the copyright owner.  Second, in the case of mass digitization – which involves making reproductions of many works, as well as possible efforts to make the works publicly accessible – obtaining permission is essentially impossible, not necessarily because of a lack of identifying information or the inability to contact the copyright owner, but because of the sheer number of individual permissions required.") (internal footnotes omitted).

[15] "Orphan Works and Mass Digitization," United States Copyright Office, June 2015, p. 5, available at https://www.copyright.gov/orphan/reports/orphan-works2015.pdf (accessed 3/19/2025) ("In the case of mass digitization, the issue is not so much a lack of information as it is a lack of efficiency in the licensing marketplace. For a digitization project involving hundreds, thousands, or millions of copyrighted works, the costs of securing ex ante permissions from every rightsholder individually often will exceed the value of the use to the user. This would be true even if every relevant copyright owner could be identified and located.  Thus, even where a library or other repository agrees that a use requires permission and would be willing to pay for a license (e.g., to offer online access to a particular collection of copyrighted works), the burdens of rights clearance may effectively prevent it from doing so.").

11. 

---

[16] Mr. Malackowski cites additional agreements that he characterizes as "AI licensing deals for textual works." Malackowski Declaration, Appendix 5. None of these other agreements is available to me. However, Mr. Malackowski does not demonstrate the relevance of these agreements, many of which involve firms that do not appear to develop frontier LLMs (i.e., ProRata.ai and Perplexity), or appear to involve rights or consideration other than a training license. In any event, examples of agreements covering small amounts of training data with a handful of entities do not affect my opinion that a market to license training data is impracticable. Peterson Declaration, ¶¶ 74-77. Even if taken as training licenses for frontier LLMs, Mr. Malackowski has identified no entity that has trained a frontier LLM exclusively on licensed data. The agreements listed by Mr. Malackowski would cover a miniscule portion of the data needs for such a purpose.

[17] Ex. 47, HC004_ANT0004027. See also Ex. 48, HC004_ANT0003890.

[18] See https://www.harpercollins.com/pages/aboutus (accessed 5/6/2025) (noting HarperCollins "has a print and digital catalog of more than 200,000 titles"); Winthrop Declaration in Support of Anthropic's Opposition to Plaintiffs' Motion for Class Certification, Ex. 42 (ECF No. 147-27), HC004_ANT0001559 at HC004_ANT0001569.



---

[19]    Ex. 49, HC004_ANT0003864 at HC004_ANT0003866, ███████████████████████████████████████████████████████████████████████; Winthrop Declaration in Support of Anthropic's Opposition to Plaintiffs' Motion for Class Certification, Ex. 42 (ECF No. 147-27), HC004_ANT0001559 at HC004_ANT0001569, ███████████████████████████████████████████████████████████████████████

[20]    Winthrop Declaration in Support of Anthropic's Opposition to Plaintiffs' Motion for Class Certification, Ex. 42 (ECF No. 147-27), HC004_ANT0001559 at HC004_ANT0001568.

[21]    *See* Order 22 Granting Licensee Participants' Motion to Compel SoundExchange Joint Petitioners to Produce Additional Negotiating Documents, United States Copyright Royalty Judges, Docket No. 23-CRB-0012-WR, January 14, 2025, available at: https://app.crb.gov/document/download/47136, p. 53 (accessed 5/6/2025). The Licensees (SiriusXM, Pandora and the National Association of Broadcasters) produced documents showing that their own negotiations spanned 4 to 6 months. *See* p. 45.

[redacted]

d. Finally, even accepting Mr. Malackowski's citation of the HarperCollins arrangement as evidence of a willing buyer willing seller transaction to license training data, [redacted] [24] Anthropic's recently reported valuation was $61.5 billion.[25] Firm values are equal to the net present value of their expected free cash flow indefinitely into the future.[26] Thus, the implied value of three years of use of Anthropic's training corpus is [redacted]

### IV. MR. MALACKOWSKI'S EXAMPLES OF COLLECTIVE LICENSING ARE NOT ANALOGOUS TO THE HYPOTHETICAL MARKET FOR TRAINING LICENSES

---

[22] If licensing Claude's training corpus requires 32,000 hypothetical negotiations, and Anthropic can run 1,000 negotiations simultaneously, assuming that each negotiation was four months per SoundExchange, then the licensing for Claude 3.7's corpus would take 10.67 years. If the negotiations instead take six months, the length of time rises to 16 years.

[23] 8 million books at 125,000 tokens per book yields 1T tokens. 8 million books at $5,000 per book is $40 billion.

[24] Anthropic's valuation model shows that [redacted] respectively. To calculate the implied value of the corpus, I have conservatively assumed HarperCollins catalog is worth two times the average token and applied that rate to the size of Anthropic's corpus. See ECF No. 119-4, Ex. 45 (WTP Valuation Model, ANT_BARTZ_000279410).

[25] See https://www.anthropic.com/news/anthropic-raises-series-e-at-usd61-5b-post-money-valuation (accessed 5/7/2025).

[26] See, e.g., Richard A. Brealey, Stewart C. Myers, Franklin Allen, and Alex Edmans, Principles of Corporate Finance, 14th Edition, 2023, pp. 105-107.

- 7 -

12. Mr. Malackowski claims that "IP markets have developed to facilitate the exchange of artistic works and inventions."[27] As described above, AI-training rights remain highly dispersed whether for copyright registered books or other sources of copyrighted text. Mr. Malackowski does not dispute that entities seeking to consolidate rights to license collectively would face transaction costs and incomplete information, but he has not addressed how these impediments would be overcome. As a result, Mr. Malackowski has no economic basis to suggest that intermediaries will arise to resolve at scale the transaction costs and incomplete information that characterize the hypothetical market for AI-training rights.

13. In addition, the examples that Mr. Malackowski offers of the development of IP markets are not instructive regarding the effort to license training data for frontier LLMs.

14. **Patent Pools.** Mr. Malackowski suggests patent pools "bundle patents from multiple holders, offering them collectively to the marketplace."[28] Thus, Mr. Malackowski asserts that collective licensing of this kind "reduces transaction costs" and "reduces the likelihood of (patent) litigation."[29] Patent pools, however, address the problem that many patents may be needed to produce a complicated device, such as a microchip. When patents that read on a device, for example, are held by many companies, there is the possibility that many or all hold patents that would block other manufacturers from producing or at least create the potential for patent litigation. Manufacturers practicing their patents may be able to invent around certain patents, but this is a costly and potentially uncertain solution to avoid infringing other firms' IP. This issue arises because patents protect a different form of intellectual property than copyright, which does not extend to ideas.

15. A solution is a patent pool under which each firm licenses its potentially blocking patents to the other firms in the industry. This pooling arrangement allows firms to avoid the problem that they reciprocally block each other from practicing the patents that they own. Firms that

---

[27] Malackowski Declaration, ¶ 26.
[28] Malackowski Declaration, ¶ 25.
[29] Malackowski Declaration, ¶ 25.

- 8 -

license the patents in the pool, whether they contributed to it or not, can operate with greatly reduced risk of patent suits.[30]

16. AI firms, of course, do not have exclusive rights over their training data and cannot block other AI firms from using any training data. Nor can a copyright owner block anyone from creating an original work embodying the ideas in their copyrighted work. Thus, the mutual blocking that patent pools resolve does not exist in the AI industry with regard to training data. Moreover, the scale of the licensing effort to form a patent pool in an industry where the relevant patent holders are known is orders of magnitude smaller than the scale of licensing that AI firms would have to undertake and is not beset with the uncertainty regarding ownership that is present in the hypothetical market to license training text.

17. **Music Licensing.** Mr. Malackowski also points to examples of music licensing as important developments in IP licensing. He claims that after Napster succumbed to legal challenges, companies like iTunes and Spotify have been able to license many millions of songs successfully.[31] In particular, Mr. Malackowski notes that Spotify has many complex license agreements and that its royalty payments are complex.

   a. The example of music licensing is not instructive regarding the market to license training data for frontier LLMs because many of the "markets" to license musical works and sound recordings are highly regulated with some subject to economic regulation of prices. The rights for the musical works underlying the sound recordings, and in some cases the sound recording rights themselves, are provided under a mix of arrangements, such as compulsory licenses, some of which have prices determined by the Copyright Royalty Board.[32] The compulsory licensing

---

[30] Carl Shapiro, "Navigating the Patent Thicket: Cross Licenses, Patent Pools and Standard Setting," *Innovation Policy and the Economy,* Vol. 1, Adam B. Jaffe, *et al.* eds, MIT Press, 2001, pp. 126-128.
[31] Malackowski Declaration, ¶ 26.
[32] Musical Works, Sound Recordings, & Copyright, U.S. Copyright Office, https://www.copyright.gov/music-modernization/sound-recordings-vs-musical-works.pdf (accessed 5/7/2025) (describing separate ownership and licensing arrangements for musical works and sound recordings); Mechanical License Royalty Rates, U.S. Copyright Office,

- 9 -

SUPP. PETERSON DECL. ISO MOTION FOR SUMMARY JUDGMENT                    No. 3:24-CV-05417-WHA

      regimes were established and modified over more than a century by acts of Congress and through antitrust consent decrees between certain licensing intermediaries and the Department of Justice.[33] In fact, Congress's latest major revision to the Copyright Act, the Music Modernization Act of 2018, was driven by an effort to address an emerging market failure resulting from the inability of services like Spotify to identify the owners of all the musical compositions streamed by their services.[34] Thus, Congress had to act to avoid leaving Spotify and others in the untenable position of not being able to license musical works because of incomplete information over ownership. Moreover, this market failure occurred in a marketplace of copyrighted musical works with a much more concentrated group of counterparties than the marketplace that must be successfully navigated to compile a ▉ token training corpus required to train an LLM like Claude.

    b. The market characteristics also differ materially. Sound recordings are owned by music labels, which are and were highly concentrated when iTunes was established.[35] Importantly, record labels had been in the business of selling their artists' music to listeners through various distribution channels and paying artists their share of the income from those sales for a long time. Thus, the iTunes store and later streaming services were able to obtain rights to most sound recordings

---

https://www.copyright.gov/licensing/m200a.pdf (accessed 5/7/2025) (Copyright Royalty Board licensing rates as of 2023).

[33] Copyright Act of 1909 § 1(e), 35 Stat. 1075 (establishing compulsory mechanical licenses); *United States v. ASCAP*, 41 Civ. 1395 (S.D.N.Y.) (consent decree entered 1941, last modified in 2001); *United States v. BMI*, 64 Civ. 3787 (S.D.N.Y.) (consent decree entered 1941, incorporated into 1966 consent decree, last modified in 1994); 109 Stat. 336 (1995) (establishing compulsory performance licenses), *codified at* 17 U.S.C. § 114(d)(2).

[34] *See* 17 U.S.C. § 115(d)(3) (authorizing the designation of a centralized royalty collector); id. § 115(d)(3)(I) (establishing a process for identifying absentee rightsowners); id. § 115(d)(3)(J) (prescribing how unclaimed royalties are to be allocated).

[35] In the 2002, roughly 75% of the global music industry was controlled by Universal Music Group, Sony Music, BMG, EMI and Warner Music. Charles Goldsmith, Matthew Karnitschnig and Martin Peers, "As Music Sector's Woes Worsen, Sony, BMG Propose a Merger," *The Wall Street Journal*, November 7, 2003, available at: https://www.wsj.com/articles/SB106811692358829000 (accessed 5/6/2025).

        from a small number of counterparties.  In contrast, publishers have not consolidated AI-training rights from their authors.  Thus, iTunes, Spotify, and others did not face the problem of licensing works from many millions of parties who were frequently unknown or unreachable for a nonconsumptive use that had not been previously contemplated.  And where the music platforms faced dispersed and uncertain rights ownership, Congress intervened.

    c. The complexity of Spotify's licensing systems that Mr. Malackowski raises demonstrates why the market to license training rights for frontier LLMs is impracticable.  An AI firm would face higher levels of licensing complexity than Spotify does *in an environment with a greater degree of incomplete information about who controls the rights for a work*.  Spotify solved a complex licensing problem with a combination of good information on rights ownership and Congressional and DOJ intervention to define compensable rights and create compulsory licenses to simplify market mechanisms and allow licensees to manage their liability.  An AI firm has to solve a much more difficult licensing problem covering billions of works with dispersed ownership and incomplete information regarding who owns a particular work.  The intersection of complexity and incomplete information is one reason the market for licensing training data is impracticable under existing conditions.

18. **YouTube and Content ID.**  Finally, Mr. Malackowski raises YouTube's ability to manage content from millions of creators while allowing rightsholders use of its Content ID system to flag infringing material.[36]  But Mr. Malackowski's analysis ignores how YouTube, and other online service providers, developed subject to the Digital Millennium Copyright Act safe harbors.  The safe harbors implemented by Congress place the burden of monitoring for infringement online on copyright owners and insulate new technologies from monetary liability associated with the vast amounts of content transmitted over or available on the

---

[36] Malackowski Declaration, ¶ 27.

internet.[37]  YouTube ultimately developed its industry-leading Content ID system subject to those safe harbor protections against liability for non-transformative, consumptive uses on its platform.

## V. MR. MALACKOWSKI'S ALTERNATIVE THEORIES OF HARM IGNORE MY ECONOMIC ANALYSIS OF THE MARKET FOR BOOKS

19. As I noted above, Mr. Malackowski agrees with me that Claude is not a substitute for books.  Instead, Mr. Malackowski claims "there is a risk of future market substitution" in the market for books because Claude can be used "to generate prose."[38]  Critically, Claude has many uses that are unrelated to writing books, even when the use entails writing prose.  For example, among other uses,[39] Claude can draft reports based on the results of clinical trials, a use of Claude's ability to write prose with no impact on book sales.

20. Mr. Malackowski supports his assertion of harm to the book market based on Claude's ability to accelerate book writing, which he argues leads to more books.[40]  But this concern ignores the economic balance copyright inherently seeks through the provision of a limited monopoly on a particular expression.[41]  By limiting the extent of a copyright's monopoly,

---

[37]     Cf. Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 41 (2d Cir. 2012) ("[T]he safe harbor expressly disclaims any affirmative monitoring requirement" for the service provider). YouTube also avails itself of the compulsory licensing regimes for music rights referenced above. See United States v. ASCAP, 616 F. Supp. 2d 447 (S.D.N.Y. 2009) (proceeding regarding YouTube's application to ASCAP for a blanket license); In re Determination of Royalty Rates & Terms for Making & Distributing Phonorecords (Phonorecords III), 88 Fed. Reg. 5506  (Aug. 10, 2023) (with Google/YouTube as participant in proceeding to set statutory mechanical royalties under Section 115); In re Determination of Rates & Terms for Digital Performance of Sound Recordings & Making of Ephemeral Copies to Facilitate Those Performances (Web V), 86 Fed. Reg. 59452 (Oct. 27, 2021) (with Google/YouTube as a participant in proceeding to set statutory license for noninteractive streams and ephemeral reproductions of sound recordings).
[38]     Malackowski Declaration, ¶¶ 35, 38.
[39]     See Peterson Declaration, ¶ 5.
[40]     Malackowski Declaration, ¶ 35.  Mr. Malackowski also claims that authors have had to compete against knockoff books (Malackowski Declaration, ¶¶ 36-37).  Mr. Malackowski does not give a specific definition of a knockoff book.  To the extent knockoff books are intended to be mistaken for other books, the problem is something other than Claude's ability to write prose.  Mr. Malackowski gives no indication of the overall prevalence of so-called knockoff books among class members' titles.
[41]     William M. Landes and Richard A. Posner, "An Economic Analysis of Copyright Law," The Journal of Legal Studies, Vol. 18, No. 2. June, 1989, p. 333.

1   copyright law allows authors to create new works that do not infringe an existing copyright.
2   Economically, new works that do not infringe on an existing copyright benefit consumers
3   and, by definition, do not impermissibly harm the value of protected expression in any
4   given existing work.

21. In other words, Claude's ability to assist users with the authorship of new, creative expression, including books, is consistent with the economic justifications for copyright.[42] New expression that is not substantially similar to – i.e., does not substantially copy expression from – any existing work is consistent with these economic justifications because it benefits the public without infringing on the copyright monopoly granted to prior authors.

22. Moreover, Mr. Malackowski does not engage with my empirical analysis of the market for books in the United States. I demonstrated in my prior Declaration that, in the highly competitive market for books in the United States, Claude is unlikely to have more than a de minimis effect on the market for books and on any book in particular.[43] This is because, as I explained, the market for books in the United States is highly competitive and was already highly competitive prior to the development of LLMs.

   a. The number of books published in the United States has grown from about 280,000 books in 2005 to more than three million books in 2023.[44] Of the 3 million books published in 2023, about 2.6 million were self-published, and 2023 was the fifth consecutive year in which more than two million books were self-published in the United States. Clearly, factors other than the widespread availability of LLMs, such

---

[42]   Peterson Declaration, ¶ 16.
[43]   See Peterson Declaration, ¶¶ 6, 23, 30, 35-41.
[44]   Andrew Albanese and Jim Milliot, "Self-Publishing's Output and Influence Continue to Grow," Publishers Weekly, November 8, 2024, available at https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/96468-self-publishing-s-output-and-infuence-continue-to-grow.html (accessed 3/17/2025); "Title Output Up," Publishers Weekly, June 18, 2007, available at https://www.publishersweekly.com/pw/print/20070618/5223-title-output-up.html (accessed 3/17/2025).

- 13 -

as e-books and the increase in self-publishing, have led to an increase in the number of books published in the United States.[45]

b. Most of the over three million books published each year get little attention from readers and have low sales. Among books with traditional publishers, a small share of books generates most of publishers' profits.[46] Thus, even prior to the introduction of LLMs, authors competed for attention in a marketplace in which a small share of books got most of the sales and in which there was a long tail of books that got little attention and had few sales. This is a highly competitive environment with millions of books seeking greater readership and attention each year. Mr. Malackowski offers no analysis to demonstrate that the availability of LLMs will affect a market with these competitive characteristics, let alone reduce the value of any particular book within that market.

c. Mr. Malackowski's concern regarding the book market is focused on new books. He does not assert or demonstrate that the values of the stock of existing registered copyrighted books – the economically inconsistent training data market he has defined – will be harmed by Claude. Most books published in prior years will have seen their highest sales at their release (when there may have been publicity or book tours to support sales), and as such would not be harmed through the mechanisms Mr. Malackowski raises.

---

[45] Peterson Declaration, ¶¶ 38-39. *See also* Andrew Albanese and Jim Milliot, "Self-Publishing's Output and Influence Continue to Grow," Publishers Weekly, November 8, 2024, available at https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/96468-self-publishing-s-output-and-infuence-continue-to-grow.html (accessed 3/17/2025) ("According to Bowker marketing manager Andy Kovacs, the continued growth is being fueled in part by the emergence of a growing number of increasingly efficient and user-friendly services, such as Draft2Digital, IngramSpark, and Amazon's market-leading Kindle Direct Publishing, among others.").

[46] Peterson Declaration, ¶ 40 ("A 2022 New York Times article explained that 'In 2021, fewer than one percent of the 3.2 million titles that BookScan tracked sold more than 5,000 copies,' and that 'Penguin Random House executives said that just 35 percent of books the company publishes are profitable. Among the titles that make money, a very small sliver – just 4 percent – account for 60 percent of those profits.'").

- 14 -

    d.  With regard to new books, there is no reason to think that, in a marketplace with three million books published each year, non-infringing AI-assisted works will materially impact the value of any work created by either (1) the vast majority of authors who already generate very few sales or (2) the much smaller number of authors who have achieved commercial success.[47]

23. Mr. Malackowski also raises a concern regarding potential knockoff books. He gives no examples involving Claude or the named Plaintiffs. However, he cites articles about Kara Swisher's recent book, *Burn Book: A Tech Love Story*,[48] which was reportedly beaten to market by AI-generated knockoff books, but spent six weeks on the New York Times Bestseller List, peaking at #2.[49] Mr. Malackowski does not state whether he considers knockoff books to be infringing.[50] As I state above, non-infringing competition benefits the reading public. If some of the knockoff books Mr. Malackowski raises infringed Ms. Swisher's copyright or her right to exclusively use her name and likeness for commercial purposes, Mr. Malackowski does not explain how this issue is unique to works produced with the assistance of AI or why existing IP law would provide inadequate protection to the owners of rights in the infringed works.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 8, 2025, in Arlington, Massachusetts.

_____
STEVEN R. PETERSON

---

[47] Additionally, a new book may be written by an author who has not written a book previously and, therefore, cannot be a member of the proposed class of copyright owners with books in Claude's training corpus.

[48] Malackowski Declaration ¶¶ 36-37 and footnotes 50-55.

[49] *See* https://www.nytimes.com/books/best-sellers/2024/03/17/combined-print-and-e-book-nonfiction/ (#2) (accessed 5/7/2025); https://www.nytimes.com/books/best-sellers/2024/04/28/combined-print-and-e-book-nonfiction/ (6 weeks) (accessed 5/7/2025).

[50] Malackowski Declaration, ¶¶ 36-37.

## CERTIFICATE OF SERVICE

I, Douglas A. Winthrop, am the ECF user whose identification and password are being used to file the foregoing **SUPPLEMENTAL DECLARATION OF STEVEN R. PETERSON IN SUPPPORT OF DEFENDANT ANTHROPIC PBC's MOTION FOR SUMMARY JUDGMENT**.

Dated: May 8, 2025

      /s/ *Douglas A. Winthrop*

# EXHIBIT A

## Materials Relied Upon

This Declaration relies upon the materials listed in Exhibit B (Materials Relied Upon) to my March 27, 2025 Declaration, in addition to the following materials:

**Academic**

- Carl Shapiro, "Navigating the Patent Thicket: Cross Licenses, Patent Pools and Standard Setting," *Innovation Policy and the Economy,* Vol. 1, Adam B. Jaffe, *et al.* eds, MIT Press, 2001.
- Richard A. Brealey, Stewart C. Myers, Franklin Allen, and Alex Edmans, *Principles of Corporate Finance*, 14th Edition, 2023.

**Bates Documents**

- HC004_ANT0003864-66.
- HC004_ANT0003890-92.
- HC004_ANT0004027-28.
- Winthrop Declaration in Support of Anthropic's Opposition to Plaintiffs' Motion for Class Certification, Ex. 42 (ECF No. 147-27), HC004_ANT0001559.

**Declarations**

- Declaration of James E. Malackowski, April 24, 2025.
- Declaration of Steven R Peterson in Support of Anthropic's Motion for Summary Judgment, March 27, 2025.

**Legal – Law and Other Proceedings**

- 109 Stat. 336 (1995).
- 17 U.S.C. § 114(d)(2).
- 17 U.S.C. § 115(d)(3), 115(d)(3)(J), 115(d)(3)(I).
- *Cf. Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 41 (2d Cir. 2012).
- Copyright Act of 1909 § 1(e), 35 Stat. 1075.
- *In re Determination of Rates & Terms for Digital Performance of Sound Recordings & Making of Ephemeral Copies to Facilitate Those Performances* (*Web V*), 86 Fed. Reg. 59452 (Oct. 27, 2021).
- *In re Determination of Royalty Rates & Terms for Making & Distributing Phonorecords* (*Phonorecords III*), 88 Fed. Reg. 5506 (Aug. 10, 2023).
- Mechanical License Royalty Rates, U.S. Copyright Office, https://www.copyright.gov/licensing/m200a.pdf (accessed 5/7/2025).

- Musical Works, Sound Recordings, & Copyright, U.S. Copyright Office, https://www.copyright.gov/music-modernization/sound-recordings-vs-musical-works.pdf (accessed 5/7/2025).
- Order 22 Granting Licensee Participants' Motion to Compel SoundExchange Joint Petitioners to Produce Additional Negotiating Documents, United States Copyright Royalty Judges, Docket No. 23-CRB-0012-WR, January 14, 2025, available at: https://app.crb.gov/document/download/47136 (accessed 5/6/2025).
- *United States v. ASCAP*, 41 Civ. 1395 (S.D.N.Y.).
- *United States v. ASCAP*, 616 F. Supp. 2d 447 (S.D.N.Y. 2009).
- *United States v. BMI*, 64 Civ. 3787 (S.D.N.Y.).

**Publicly Available**

- Charles Goldsmith, Matthew Karnitschnig and Martin Peers, "As Music Sector's Woes Worsen, Sony, BMG Propose a Merger," The Wall Street Journal, November 7, 2003, available at: https://www.wsj.com/articles/SB106811692358829000 (accessed 5/6/2025).
- https://www.anthropic.com/news/anthropic-raises-series-e-at-usd61-5b-post-money-valuation (accessed 5/7/2025).
- https://www.harpercollins.com/pages/aboutus (accessed 5/6/2025).
- https://www.nytimes.com/books/best-sellers/2024/03/17/combined-print-and-e-book-nonfiction/ (accessed 5/7/2025).
- https://www.nytimes.com/books/best-sellers/2024/04/28/combined-print-and-e-book-nonfiction/ (accessed 5/7/2025).