1  DOUGLAS A. WINTHROP (Bar No. 183532)
   Douglas.Winthrop@arnoldporter.com
2  JOSEPH FARRIS (Bar No. 263405)
   Joseph.Farris@arnoldporter.com
3  JESSICA L. GILLOTTE (Bar No. 333517)
   Jessica.Gillotte@arnoldporter.com
4  ESTAYVAINE BRAGG (Bar No. 341400)
   Estayvaine.Bragg@arnoldporter.com
5  **ARNOLD & PORTER KAYE SCHOLER LLP**
   Three Embarcadero Center, 10th Floor
6  San Francisco, CA 94111-4024
   Telephone:    (415) 471-3100
7  Facsimile:    (415) 471-3400

8  MARK LEMLEY (Bar No. 155830)
   mlemley@lex-lumina.com
9  **LEX LUMINA LLP**
   700 S. Flower Street, Suite 1000
10 Los Angeles, CA 90017
   Telephone:    (213) 600-6063
11

12 *Attorneys for Defendant* ANTHROPIC PBC

ANGEL T. NAKAMURA (Bar No. 205396)
Angel.Nakamura@arnoldporter.com
OSCAR RAMALLO (Bar No. 241487)
Oscar.Ramallo@arnoldporter.com
ALLYSON MYERS (Bar No. 342038)
Ally.Myers@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone:    (213) 243-4000
Facsimile:    (213) 243-4199

JOSEPH R. WETZEL (Bar No. 238008)
joe.wetzel@lw.com
ANDREW M. GASS (Bar No. 259694)
andrew.gass@lw.com
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone:    (415) 391-0600
Facsimile:    (415) 395-8095

13

14 **UNITED STATES DISTRICT COURT**

15 **NORTHERN DISTRICT OF CALIFORNIA**

16 **SAN FRANCISCO DIVISION**

17

18 ANDREA BARTZ, ANDREA BARTZ, INC.,
   CHARLES GRAEBER, KIRK WALLACE
19 JOHNSON, and MJ + KJ, INC., individually and on
   behalf of others similarly situated,
20
                    Plaintiffs,
21
22        v.
23 ANTHROPIC PBC,
24                Defendant.

Case No. 3:24-CV-05417-WHA

Action Filed: August 19, 2024

**ANTHROPIC PBC'S OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION**

Date:  May 15, 2025
Time:  8:00 a.m.
Place:  Courtroom 12, 19th Floor

Judge: Honorable William H. Alsup

25
26
27
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 1

FACTS ........................................................................................................................ 2

    A.   The proposed classes. ...................................................................................... 2

    B.   The class members and their works. ................................................................ 3

         1.   The Plaintiffs. ........................................................................................ 3

         2.   Andrea Bartz and Andrea Bartz, Inc. .................................................. 3

         3.   Charles Graeber ..................................................................................... 4

         4.   Kirk Wallace Johnson and MJ + KJ, Inc. ........................................... 5

         5.   Other authors in the putative classes. ................................................... 6

    C.   The Scanned Books Class datasets. ................................................................ 7

    D.   The Internet Books Class datasets. ................................................................. 8

         1.   Books3 ................................................................................................... 8

         2.   LibGen .................................................................................................. 8

         3.   PiLiMi ................................................................................................... 9

    E.   Identifying books in the datasets. .................................................................... 9

ARGUMENT ............................................................................................................ 10

I.  THE COURT SHOULD NOT CERTIFY PLAINTIFFS' PROPOSED RULE 23(b)(3)
DAMAGES CLASSES BECAUSE THEY FAIL TO ESTABLISH COMMONALITY,
PREDOMINANCE, OR ADEQUACY. ............................................................... 10

    A.   Individualized issues of copyright ownership and validity, infringement, and remedies
predominate. .................................................................................................. 10

         1.   Copyright registrations are insufficient evidence of ownership. ........ 11

         2.   Book-by-book evidence required to prove ownership and validity predominates. ... 13

         3.   The proposed classes are not ascertainable because neither the rightsholders
nor the relevant books can be readily identified. ............................... 17

             a.   Metadata is not sufficient to ascertain the books in the Internet Books
Datasets. ................................................................................... 17

             b.   Tools from *The Atlantic* are not sufficient to identify the books in
Anthropic's Books3 or LibGen Datasets. ................................. 18

             c.   Dr. Zhao's hash method is not sufficient to identify specific books in the
Internet Books Datasets. ........................................................... 19

         4.   Infringement requires individualized proof. ...................................... 19

         5.   Plaintiffs fail to provide any class-wide model for determining actual damages
and disgorgement. .............................................................................. 21

         6.   Statutory damages suffer the same flaws as actual damages. ............ 22

    B.   The class action vehicle is not superior. ...................................................... 23

    C.   Plaintiffs are not adequate class representatives because many rightsholders use
LLMs and do not object to the use of their works in training. ..................... 23

II.  THE COURT SHOULD NOT CERTIFY INJUNCTIVE RELIEF CLASSES BECAUSE PLAINTIFFS SEEK TO MAXIMIZE MONETARY RECOVERY. ...................................... 24

III. THE COURT SHOULD NOT CERTIFY SUBCLASSES OR "ISSUE CLASSES" THAT MERELY REPLICATE THE SUBCLASSES .......................................................... 24

CONCLUSION .................................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*,
   747 F.3d 673 (9th Cir. 2014)................................................................22

*Am. Express Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013)................................................................10

*Antonick v. Elec. Arts, Inc.*,
   841 F.3d 1062 (9th Cir. 2016)................................................................20

*Aquarian Found., Inc. v. Lowndes*,
   127 F.4th 814 (9th Cir. 2025)................................................................11

*Bateman v. Am. Multi-Cinema, Inc.*,
   623 F.3d 708 (9th Cir. 2010)................................................................23

*Betts v. Reliable Collection Agency, Ltd.*,
   659 F.2d 1000 (9th Cir. 1981)................................................................25

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)................................................................10

*Danjaq LLC v. Sony Corp.*,
   263 F.3d 942 (9th Cir. 2001)................................................................15

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)................................................................18, 21

*DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*,
   870 F.3d 978 (9th Cir. 2017)................................................................13, 14

*Fahmy v. Jay-Z*,
   908 F.3d 383 (9th Cir. 2018)................................................................17

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,
   499 U.S. 340 (1991)................................................................11

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
   2015 WL 4776932 (C.D. Cal. May 27, 2015)................................................................12

*Football Ass'n Premier League Ltd. v. YouTube, Inc.*,
   297 F.R.D. 64 (S.D.N.Y. 2013)................................................................11, 17, 23

*Hanagami v. Epic Games, Inc.*,
   85 F.4th 931 (9th Cir. 2023)................................................................20

*In re Napster*,
    2005 WL 1287611 (N.D. Cal. June 1, 2005) ........................................................ 12

*In re SFPP Right-of-Way Claims*,
    2017 WL 2378363 (C.D. Cal. May 23, 2017) ...................................................... 15

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
    153 F.3d 82 (2d Cir. 1998)................................................................................... 17

*Kim v. Allison*,
    87 F.4th 994 (9th Cir. 2023) ................................................................................ 23

*Li v. EFT Holdings, Inc.*,
    2015 WL 12681648 (C.D. Cal. Dec. 14, 2015) ................................................... 23

*Lytle v. Nutramax Lab'ys, Inc.*,
    114 F.4th 1011 (9th Cir. 2024) ............................................................................ 21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) (en banc) ............................................................... 10

*Pecover v. Elec. Arts Inc.*,
    2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) ..................................................... 24

*Peer Int'l Corp. v. Pausa Recs., Inc.*,
    909 F.2d 1332 (9th Cir. 1990)............................................................................. 22

*Schneider v. YouTube, LLC*,
    674 F. Supp. 3d 704 (N.D. Cal. 2023) ...................................................... 11, 12, 25

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008)............................................................................. 16

*UMG Recordings, Inc. v. Uncharted Labs, Inc.*,
    2025 WL 1047517 (S.D.N.Y. Apr. 8, 2025)..................................................... 19, 20

*Utopia Ent., Inc. v. Claiborne Par.*,
    2006 WL 8435006 (W.D. La. Jan. 10, 2006)....................................................... 12

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996)............................................................................... 25

*Van v. LLR, Inc.*,
    61 F.4th 1053 (9th Cir. 2023) .............................................................................. 10

*Vulcan Golf, LLC v. Google*,
    254 F.R.D. 521 (N.D. Ill. 2008)........................................................................... 13

*Waite v. UMG Recordings, Inc.*,
    450 F. Supp. 3d 430 (S.D.N.Y. 2020).................................................................... 3

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................................ 10

*WB Music Corp. v. Rykodisc, Inc.*,
    1995 WL 631690 (E.D. Pa. Oct. 26, 1995) ........................................................ 11

*Xavier v. Philip Morris USA Inc.*,
    787 F. Supp. 2d 1075 (N.D. Cal. 2011) ............................................................. 15

*Zinser v. Accufix Rsch. Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ...................................................................... 23, 24

**Statutes**

17 U.S.C. § 107(2)-(3) ............................................................................................. 20

17 U.S.C. § 304(a)(1)(C) ......................................................................................... 15

17 U.S.C. § 501(b) ................................................................................................... 13

17 U.S.C. § 504(c)(1)-(2) ......................................................................................... 22

**Other Authorities**

Fed. R. Civ. P. 23 ............................................................................................... 12, 25

Fed. R. Civ. P. 23(a) ................................................................................................ 10

Fed. R. Civ. P. 23(b) ................................................................................................ 10

Fed. R. Civ. P. 23(b)(3) ...................................................................................... 10, 23

Fed. R. Civ. P. 23(c)(4) ............................................................................................ 25

Fed. R. Civ. P. 23(c)(5) ............................................................................................ 25

1              **INTRODUCTION AND SUMMARY OF ARGUMENT**

2          Plaintiffs ask this Court to certify an unprecedented copyright class action to adjudicate the

3   rights associated with five million or more books, spanning nearly a century of publishing history.

4   The proposed classes would sweep in a medley of "natural persons, estates, literary trusts, and loan-

5   out companies" from all over the world who are the "legal or beneficial" owners of these copyrights.

6   But determining whether even a ***single*** asserted copyright is valid, and, if so, who or what owns it, is

7   rarely straightforward and is often one of the most highly litigated aspects of any copyright suit.

8          Plaintiffs alone vividly illustrate the problems presented by their requested certification. This

9   case began as a lawsuit by three individual authors. ECF No. 1. Four months later, apparently in

10  recognition of overlooked ownership gaps, Plaintiffs filed a First Amended Complaint, adding as

11  additional plaintiffs two loan-out companies associated with two of the authors, and it is these loan-

12  out companies, and not the authors, that now claim to own the copyrights in the subject works. ECF

13  No. 70 ("FAC") ¶¶ 12-16. Then, discovery revealed that they may have overlooked yet another loan-

14  out company with ownership interests in the copyrights asserted here. Discovery also revealed that

15  all Plaintiffs have engaged in assignments or transfers of their copyrights—including some ***during***

16  the pendency of this case apparently designed to remedy additional ownership gaps. The prospect of

17  this kind of fact-specific inquiry playing out up to five million times explains why no court, ever, has

18  certified a copyright class even remotely approaching this scale or complexity. This action cannot be

19  litigated in a way that will provide common answers to the foundational issue of whether the

20  millions of purported class members in fact own copyrights nor whether such copyrights are valid

21  and enforceable.

22         Plaintiffs have also failed to carry their burden to show that individualized issues of

23  copyright infringement and damages do not predominate. They propose no plan for how the Court

24  should determine whether any single book was infringed and what the damages for that particular

25  infringement were. Nor have Plaintiffs demonstrated that the classes are ascertainable: There is no

26  practical or reliable way to identify each of the works at issue, much less to link each of the works

27  back to the correct rightsholders.

28         And even if all of these issues could be overcome, Plaintiffs are not adequate class

-1-

representatives because they have an irreconcilable conflict with the putative classes: Many rightsholders, including academics, researchers, and writers who use Large Language Models ("LLMs"), disagree with the position taken by Plaintiffs and actively use and benefit from LLMs like Claude.

The Court should deny the motion for class certification.

# FACTS

## A.    The proposed classes.

The individual Plaintiffs are book authors who seek to represent classes of the "legal or beneficial owners" of the copyrights in millions of books. Plaintiffs' Motion for Class Certification ("Mot.") (ECF No. 121-3) at 1; Expert Declaration of Dr. Ben Y. Zhao ("Zhao Decl.") (ECF No. 121-4) ¶¶ 20, 24, 33, 39-40. They propose two principal classes: (1) an "Internet Books Class" (referred to by Plaintiffs as a "Pirated Books Class," though they have not defined what "pirated" means) and (2) a "Scanned Books Class." Mot. at 1. Both classes include "natural persons, estates, literary trusts, and loan-out companies" who are the "legal or beneficial owners" of books that: (a) were registered with the United States Copyright Office within five years of the work's publication; (b) were registered with the United States Copyright Office before being acquired by Anthropic, or within three months of publication; and (c) are assigned an International Standard Book Number (ISBN) or Amazon Standard Identification Number ("ASIN"). *Id.* For the Scanned Books Class, rightsholders whose books were purchased and scanned by Anthropic, Plaintiffs further limit the class based on books that were actually "used by Anthropic in LLM training." *Id.* In contrast, for the Internet Books Class, they define the class based solely on whether the rightsholders' books were "downloaded by Anthropic" as part of the Books3 dataset or from Library Genesis ("LibGen") or Pirate Library Mirror ("PiLiMi") without a further limitation that the books were actually used in LLM training. *Id.*

Plaintiffs also propose two "Alternative" subclasses of the Internet Books Class. *Id.* at 1-2. The only difference between the subclasses and their parent class is that: Alternative Class #1 is limited to rightsholders whose books were in the dataset Books3; Alternative Class #2 is limited to rightsholders whose books were in the datasets LibGen and PiLiMi. *Id.* In addition to damages and

issues classes, Plaintiffs ask to certify an injunctive relief class despite seeking actual damages, disgorgement, pre- and post-judgment interest, and statutory damages to "maximiz[e] recovery . . . and compensation" for the class. *Id.* at 13, 22-23; ECF No. 70 at 18.

### B. The class members and their works.

#### 1. The Plaintiffs.

In the Complaint, filed on August 19, 2024, there were three Plaintiffs: the book authors Andrea Bartz, Charles Graeber, and Kirk Wallace Johnson. On December 4, 2024, Plaintiffs filed the First Amended Complaint to add two "loan-out corporation[s]": Andrea Bartz, Inc. and MJ + KJ, Inc. (for Kirk Wallace Johnson). FAC ¶¶ 15-16. A "loan-out company" is typically a wholly owned "personal services company formed by individuals looking to minimize their tax burdens." Michael Lovitz, *Loan-Out Companies: Unintended Consequences for Creators?*, 35-FALL Del. Law 16, 16 (2017). It typically employs the creator and is, therefore, the legal author and initial owner of the creator's works under the work for hire doctrine. *See Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 441-42 (S.D.N.Y. 2020).

Plaintiffs propose that copyright ownership for the classes could be proven by copyright registrations alone, but, as discussed below, the history of this case and discovery have revealed that each Plaintiff has a unique and complex ownership story that cannot be demonstrated in that way. Nor could "affidavit[s]" (Mot. at 16) supply the necessary missing ownership information. Even these Plaintiffs have demonstrated an inability to understand the complexities of their own copyrights and lack records sufficient to fill gaps in their knowledge.

#### 2. Andrea Bartz and Andrea Bartz, Inc.

Plaintiffs Andrea Bartz and her loan-out company, Andrea Bartz, Inc. ("Bartz Inc."), allege Anthropic infringed the copyrights in four novels published by Penguin Random House: *The Lost Night: A Novel*, *The Herd*, *We Were Never Here*, and *The Spare Room*. FAC ¶¶ 58, 61. Bartz Inc. is, and always has been, the registered owner of the copyrights in all four works. Exs. 1-4.[1] Bartz Inc. (and not Bartz) is a party to the publishing agreements for all of her books. Exs. 5-7. Bartz has

---

[1] All exhibits are attached to the Declaration of Douglas A. Winthrop in Support of Defendant Anthropic PBC's Opposition to Plaintiffs' Motion for Class Certification ("Winthrop Decl.").

testified that she has entered into film option agreements for all of her books, but has not been able to produce complete documentation of them. Ex. 8, Deposition of Andrea Bartz ("Bartz Dep.") 162:22-24; Ex. 9; Ex. 10. All advances and royalties for all four books have been paid to Bartz Inc. *E.g.*, Bartz Dep. 195:1-17; 213:21-214:4.

Initially, Bartz apparently did not realize Bartz Inc. was the registered owner of her copyrights. In September 2020, after being alerted to this, she demanded that her publisher amend the copyright registration to name her (individually) as the copyright owner. Ex. 11. However, Bartz testified that she ultimately realized she was "incorrect in asking [her publisher] to change [the copyright registrations]." Bartz Dep. 148:20-152:22. Shortly after this, in October 2020, Bartz and her publisher executed an amendment to her publishing agreements confirming Bartz Inc. would be named on the copyright notices in her books. Ex. 12. At her deposition, Bartz testified that there was no amendment to her contracts as a result of this confusion; but when shown the amendment, Bartz testified that her memory was "refreshed" that there was in fact an amendment to the contract. Bartz Dep. 152:18-154:15.

Since then, Bartz has executed multiple documents transferring the rights in her books from herself to Bartz Inc. First, in April 2021, she assigned "all rights she may have in the nature of copyright in the Work" *We Were Never Here* to Bartz Inc. Ex. 13. She testified that she did this in connection with a film option to Netflix to "clear out any possibility of confusion" about the rights. Bartz Dep. 159:3-162:5. Later, in February 2025, during this litigation, Bartz executed a similar assignment of rights to Bartz Inc. for her other three books. Ex. 14. When asked if she believed that she retained any right to her copyrights after these assignments, Bartz testified that she was "not positive" (Bartz Dep. 159:3-162:5) and noted several times that she was "not a lawyer" (*id.* at 164:19-166:3).

### 3.    Charles Graeber

Plaintiff Charles Graeber alleges that Anthropic infringed the copyrights in two non-fiction books published by Hachette Books Group: *The Good Nurse: A True Story of Medicine, Madness, and Murder* (a true crime account of the life of a serial killer) and *The Breakthrough: Immunotherapy and the Race to Cure Cancer* (about the history of immunotherapy). FAC ¶ 59.

Graeber is the registered owner of the copyrights in both books. Exs. 15-16; *see also* Exs. 17-18. He testified that no one else has ownership rights. Ex. 19, Deposition of Charles A. Graeber ("Graeber Dep.") 125:10-12; 136:14-137:15. However, Graeber has a corporation, Having & Selling LLC, which has entered into agreements claiming to be the owner of rights in *The Good Nurse* and purporting to license out book rights. *E.g.*, Ex. 20 (6/24/21 agreement representing that Having & Selling LLC "is the sole and exclusive owner of the rights which are the subject of this agreement" and granting exclusive rights to publish *The Good Nurse* in Italian); Ex. 21 (3/3/23 agreement granting "the sole and exclusive right" to publish *The Good Nurse* in Czech). Although Graeber stated that he was not familiar with the term "loan-out" company, he set up this company for "tax purposes." Graeber Dep. 164:9-21. Having & Selling LLC is not a plaintiff in this case. Graeber testified that Having & Selling LLC sometimes is paid royalties on book sales in connection with at least certain foreign publisher agreements. *Id*. at 162:20-164:5.

Graeber is a party to a December 2019 option agreement with 22nd Street Entertainment LLC ("22nd Street") for *The Good Nurse* that led to its adaptation into a movie. *Id.* at 155:10-156:3; Ex. 22. Via a subsequent assignment pursuant to the option agreement, Graeber assigned "all rights of every kind or nature whatsoever in and to the Work, in perpetuity, throughout the universe, in any and all media and means of exploitation whether now known or hereafter devised" to 22nd Street, except for expressly reserved rights. Ex. 22 at BARTZ000004667, BARTZ000004627. The reserved rights are narrow and specific—*e.g.*, print publication and radio rights—and there are no references to LLM training rights or other uses in future technologies. *Id.* Schedule 2. Graeber also testified that he did not know whether there are any agreements between Having & Selling LLC and any third party and whether Having & Selling LLC receives royalties from any third party. Graeber Dep. 164:24-165:22.

### 4. Kirk Wallace Johnson and MJ + KJ, Inc.

Plaintiffs Kirk Wallace Johnson and his loan-out company, MJ + KJ, Inc. ("MJ + KJ"), allege Anthropic infringed three non-fiction books: *To Be A Friend Is Fatal* (a memoir about the Iraq war), *The Feather Thief* (a true crime account of a famous thief), and *The Fishermen and the Dragon* (a historical account of an ecological disaster). FAC ¶¶ 60, 62.

1    Johnson was the original registered owner of the copyright for *To Be a Friend Is Fatal*,

2  whereas MJ + KJ was the original registered owner of the copyrights for the other two books as

3  Johnson's "employer." Exs. 23-25. Unlike the other loan-out companies, MJ + KJ is not wholly

4  owned by Johnson. His spouse (who is not a plaintiff here) is a member of that LLC and has been

5  paid a salary by MJ + KJ at times. Ex. 26, Deposition of Kirk W. Johnson ("Johnson Dep.") 88:16-

6  90:23. Johnson and his spouse established MJ + KJ for "liability reasons" and "financial

7  housekeeping." *Id.* He is paid the royalties for his book *To Be a Friend Is Fatal*, and MJ + KJ is paid

8  the royalties on Johnson's other two books. Exs. 27-29.

9    Johnson is a party to a publishing agreement for *To Be a Friend Is Fatal*, which is published

10  by Simon & Schuster. Ex. 30. In contrast, MJ + KJ is a party to the publishing agreement for his

11  other two books, which are published by Penguin Random House. Exs. 31-32. MJ + KJ has entered

12  several option agreements related to the rights in Johnson's books. For example, MJ + KJ granted

13  Amazon an option to purchase "all right, title and interest other than the reserved rights specified on

14  Exhibit A" for *The Feather Thief*. Ex. 33, § 3. Again, the reserved rights are narrow and specific—

15  *e.g.*, print publication and podcast rights—and there is no reference to LLM training or other future

16  technological uses. *Id.* Ex. A.

17    On January 28, 2025, during this litigation, Johnson assigned all of his rights for all three

18  books "for all purposes under the Copyright Act" to MJ + KJ, including "the right to sue for past

19  infringement." Ex. 34. He did this to "clarify . . . the copyright would be held by MJ + KJ" (Johnson

20  Dep. 116:6-12) as a "matter of housekeeping" (*id.* at 133:20-134:13).

21         **5.    Other authors in the putative classes.**

22    The putative classes are broad and heterogeneous, consisting of hundreds of thousands to

23  millions of rightsholders whose books span all genres and were published in many countries over

24  approximately the last century. While it is impossible to identify the books in the datasets with any

25  precision, it is certain that each class includes rightsholders of: (i) innumerable genres of books,

26  including fiction, textbooks, encyclopedias, history, biography, language arts, philosophy, poetry,

27  technology, and much more; (ii) books authored by citizens of other countries; and (iii) books

28  published across the full span of the past century. Declaration of Mohit Iyyer ("Iyyer Decl.") ¶¶ 91-

ANTHROPIC'S OPP. TO MOT. FOR CLASS CERTIFICATION              No. 3:24-CV-05417-WHA

102; Ex. 35 at 3.

The class members' books may have been published by any of the 16,000+ publishers in the world, with a patchwork of publishing agreements (not to mention agreements related to film rights and other uses) allocating the rights in those works.[2] The majority of those agreements will not contain terms specifically addressing which party has the rights to license the works for LLM training, and not one of Plaintiffs' publishing agreements does, despite many of their books being published in the last few years by the biggest U.S. publishers. Exs. 5-7; 17-18; 30-32. *See also* Ex. 36, International Thriller Writers Survey on Artificial Intelligence ("ITW Survey"), at 10-11 (less than 3% of survey respondents said that their publishing contracts contained any wording specific to artificial intelligence).[3]

The rightsholders in the classes undoubtedly reflect a wide spectrum of views about AI technology and the use of their books by LLMs. Indeed, many of the rightsholders will not be the original authors at all—but will own the rights via assignment, such as academic institutions, media companies, non-author members of loan-out companies (such as Johnson's spouse), estates, and literary trusts. Moreover, as addressed below, even among actual authors, views vary significantly depending on the uses and benefits these individuals receive from AI technology.

**C.     The Scanned Books Class datasets.**

Since 2024, Anthropic has invested in a project to purchase physical books and scan them for use in its LLM training corpus. Declaration of Tom Turvey ("Turvey Decl.") (ECF No. 123-2) ¶¶ 20-27. These books have been purchased from new and used book sellers and are purchased in bulk, usually in batches of tens of thousands of books. *Id.* ¶ 23. Once purchased, the books are shipped to a vendor to be scanned, after which that scanned data is provided to Anthropic and compiled into datasets. *Id.* ¶ 25. So far, subsets of these books have been used to train two different commercial models of Claude. *Id.* ¶ 26. According to Plaintiffs' expert, there were at most around

[2] Shahool Al Bari, *Global Book Publishing – Market Research Report (2014-2029)*, IBIS World, *available at* https://www.ibisworld.com/global/industry/global-book-publishing/572/ (July 2024).
[3] *See also* The Authors Guild, *Survey Reveals 90 Percent of Writers Believe Authors Should Be Compensated for the Use of Their Books in Training Generative AI* ("Authors Guild Survey"), May 15, 2023, at 3 ("67 percent of writers surveyed said they were not sure whether their publishing contracts . . . include permissions or grant of rights to use their work for any AI-related purposes.").

██████ books in the scanned books dataset used to train Claude 3.5 Haiku model, and at most ██████ books in the scanned books dataset used to train Anthropic's most recent commercial LLM, Claude 3.7 Sonnet. Zhao Decl. ¶¶ 39, 40.

### D.    The Internet Books Class datasets.

#### 1.    Books3

Before it started using scanned books, Anthropic used a books dataset it obtained from the internet known as "Books3" in the training corpus of some of its commercial LLMs. The dataset was a small part of many other sources of data that Anthropic obtained from the internet (including academic journals and papers, Wikipedia, source code, government records, and a comparatively massive amount of crawled web data). Declaration of Jared Kaplan ("Kaplan Decl.") (ECF No. 119-5) ¶¶ 48-53. Anthropic stopped using Books3 in the training corpus of Claude over a year ago. *Id*. ¶¶ 49-50.

Books3 is a subset of a large-scale, diverse dataset known as "The Pile," which was created by the research group EleutherAI for the purpose of training LLMs. *See* Leo Gao et al., *The Pile: An 800GB Dataset of Diverse Text for Language Modeling* (Dec. 31, 2020), at 1.[4] Books3 was "derived from a copy of the contents of the Bibliotik private tracker made available by Shawn Presser" and contains a "mix of fiction and nonfiction." *Id.* at 3. According to public reporting, Bibliotik is an open source library on the internet, which was created by crowdsourcing. Iyyer Decl. ¶ 20. Books3 is the smallest of the datasets at issue for purposes of class certification; according to Plaintiffs, it is comprised of at most around 197,000 books. Zhao Decl. ¶ 20. Other than highly unreliable crowdsourced file names, there is no metadata identifying the contents of Anthropic's Books3 Dataset. Iyyer Decl. ¶¶ 22-25. Anthropic's version of Books3 is also incomplete, due to extraction errors and failed downloads; indeed, more than 2,000 records that Dr. Zhao describes as possible "books" in Anthropic's version of Books3 contain less than one page of text. *Id.* ¶ 87.

#### 2.    LibGen

Early in the company's history, Anthropic acquired two different internet book datasets

---

[4] Available at https://arxiv.org/abs/2101.00027.

ANTHROPIC'S OPP. TO MOT. FOR CLASS CERTIFICATION          No. 3:24-CV-05417-WHA

called LibGen and PiLiMi. Declaration of Mycal Tucker ("Tucker Decl.") ¶ 11. According to public reporting, LibGen, like Bibliotik, is an open source library on the internet, which was created by crowdsourcing. Iyyer Decl. ¶ 44. Anthropic used its LibGen Dataset in the training corpus of at least one research and development LLM, which was not released commercially. Tucker Decl. ¶ 17. Anthropic has limited metadata associated with its LibGen Dataset that purports to identify the books within it, but that metadata was not created or verified by Anthropic. Rather, like the dataset itself, the metadata was crowdsourced over many years and, therefore, contains an incalculable amount of missing and erroneous information. Iyyer Decl. ¶ 47.

### 3.    PiLiMi

After LibGen was created, another online library called Z-Library (or "Z-Lib") was created as a "mirror," or copy, of LibGen. *Id.* ¶ 44. PiLiMi later made a copy of Z-Lib. *Id.* Due to their intertwined origins, there is likely a great deal of overlap between the works in these datasets. *Id.* Anthropic did not use its PiLiMi Dataset in the training corpus for an LLM that completed pretraining (*i.e.*, there was never a completely trained LLM created using PiLiMi that served any purpose). Tucker Decl. ¶ 20. As with LibGen, Anthropic has metadata associated with its PiLiMi Dataset that purports to identify the books within it, but that metadata is of unknown provenance and contains an incalculable amount of erroneous information. Iyyer Decl. ¶ 47. For instance, less than 30% of PiLiMi metadata entries are associated with an actual book file. *Id.* ¶ 53.

### E.    Identifying books in the datasets.

It is undisputed that neither Anthropic nor Plaintiffs have a complete list of putative class members or even the titles of each book implicated by their proposed classes. To demonstrate that their classes nonetheless are ascertainable, Plaintiffs rely on the declaration of their expert, Dr. Zhao, who asserts that he can identify "which books are present in Anthropic's datasets" by: (i) consulting their metadata, (ii) using publicly-available tools built by *The Atlantic* magazine, and/or (iii) using a hash matching algorithm and human visual comparison. Zhao Decl. ¶¶ 42, 50-67. We address each proposed approach below.

ANTHROPIC'S OPP. TO MOT. FOR CLASS CERTIFICATION          No. 3:24-CV-05417-WHA

**ARGUMENT**

Plaintiffs fail to show they are entitled to class treatment—"an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted). They bear the burden of proving the requirements of Rule 23(a) are satisfied as well as the requirements for one kind of class under Rule 23(b). *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664-65 (9th Cir. 2022) (en banc). In practice, these "stringent requirements" will "exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).

Plaintiffs' sprawling and heterogenous proposed classes fail each of the commonality, predominance, and adequacy requirements of Rules 23(a) and Rule 23(b)(3). Their asserted subclasses and issue classes are merely subsets of the Internet Books Class and, thus, have the same defects. And, their proposed injunctive relief class is inappropriate in an action primarily seeking monetary relief.

I.    **THE COURT SHOULD NOT CERTIFY PLAINTIFFS' PROPOSED RULE 23(b)(3) DAMAGES CLASSES BECAUSE THEY FAIL TO ESTABLISH COMMONALITY, PREDOMINANCE, OR ADEQUACY.**

A.    **Individualized issues of copyright ownership and validity, infringement, and remedies predominate.**

Plaintiffs face overwhelming problems with commonality and predominance. As to commonality, which presents a lower bar, Plaintiffs do not carry their burden of establishing that there are "common *answers*" to the central issues of ownership and validity, infringement, and remedies. *Dukes*, 564 U.S. at 350 (citation omitted). They also are unable to clear the "even more demanding" predominance hurdle of Rule 23(b)(3). *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Rather, for due process to be served, their claims would require individualized discovery and potentially millions of mini-trials on copyright ownership and validity, infringement, and remedies. That bars certification. *Van v. LLR, Inc.*, 61 F.4th 1053, 1067 n.11 (9th Cir. 2023) (individualized issues overcome predominance when "the discovery and trial process must assess thousands of claims one claim at a time").

**1.    Copyright registrations are insufficient evidence of ownership.**

Establishing ownership of a valid copyright is an "essential predicate" for each copyright plaintiffs' claim. *Schneider v. YouTube, LLC*, 674 F. Supp. 3d 704, 718 (N.D. Cal. 2023) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)). Plaintiffs' suggestion that the Court can adjudicate the ownership of copyrights in millions of books based on copyright registrations alone as "common proof" (Mot. at 15-17) is reason enough to deny class certification. There is no precedent for certifying a class on such thin evidence of ownership, and for good reason: Copyright registrations are not "definitive" evidence of ownership of a valid copyright. *Aquarian Found., Inc. v. Lowndes*, 127 F.4th 814, 819 (9th Cir. 2025). Copyright registrations are not typically vetted for accuracy[5] and, even if initially accurate, only reflect a snapshot of ownership rights at the time of registration. As Plaintiffs' own experience shows, they will frequently not reflect subsequent assignments. Relying on copyright registrations alone to prove ownership and validity would amount to a violation of due process for both Anthropic and potential plaintiffs who might be erroneously excluded due to inaccurate records.

Courts have repeatedly recognized in the class action context that determining copyright ownership and licensing requires a "highly individualized" inquiry. *Schneider*, 674 F. Supp. 3d at 722. Indeed, another court faced with the prospect of a much smaller copyright class action characterized it as presenting a "Frankenstein monster" of individualized issues. *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 297 F.R.D. 64, 65 (S.D.N.Y. 2013) (citation omitted). For this reason, "copyright claims are poor candidates for class-action treatment." *Schneider*, 674 F. Supp. 3d at 717 (citation omitted); *see also WB Music Corp. v. Rykodisc, Inc.*, 1995 WL 631690, at *6 (E.D. Pa. Oct. 26, 1995) (copyright validity is "particular to … one case and no other"). This is true with classes orders of magnitude smaller than the ones proposed here. *See Football Ass'n*, 297 F.R.D. at 65 ("hundreds" of members) (citation omitted); *Schneider*, 674 F. Supp. 3d at 726 ("one thousand

---

[5] Compendium of U.S. Copyright Office Practices ("Compendium") § 309.2 (Jan. 2021) (the Office "generally will accept the facts stated in the application and other registration materials, unless they are implausible or conflict with information in the registration materials, the Office's records, or other [generally known] information").

ANTHROPIC'S OPP. TO MOT. FOR CLASS CERTIFICATION                    No. 3:24-CV-05417-WHA

1   members"); *Utopia Ent., Inc. v. Claiborne Par.*, 2006 WL 8435006, at *1 (W.D. La. Jan. 10, 2006)

2   ("over 3,000" works).

3       Plaintiffs rely on only two cases as examples of certified classes "involving allegations of

4   largescale infringement." Mot. at 10, 15-16. Their analogies fail: Neither case relied solely on

5   copyright registrations to resolve issues of ownership and validity.

6       In *Flo & Eddie, Inc. v. Sirius XM Radio, Inc*., the court did not rely on copyright registrations

7   ***at all***. 2015 WL 4776932 (C.D. Cal. May 27, 2015). Instead, it certified a class of only 273

8   copyright owners based on three different pre-existing third-party commercial databases tracking

9   pre-1972 hit songs played on SiriusXM. *Id.* at *8, 11. As the court held, the commercial value of

10  these songs created obvious market incentives for accurate ownership tracking across those

11  databases. *Id.* at *7. *See also* Ex. 37, U.S. Copyright Office, Report on Orphan Works ("2006

12  Orphan Works Report") 31-32 (Jan. 2006) (noting problems with identifying copyright owners

13  "appear to be less frequent in areas where rights may be administered collectively" via third-party

14  resources, as "in the music industry"). Here, no accurate commercial database of rightsholders exists

15  like the ones in *Flo & Eddie*.

16      The class certified in *In re Napster* was limited to 27,000 pre-identified music-publisher

17  principals who worked with a ***single*** "common licensing and collection agent," the Harry Fox

18  Agency. 2005 WL 1287611, *5 (N.D. Cal. June 1, 2005). Moreover, the court specifically found that

19  the active involvement of the Harry Fox Agency would "reduce, if not eliminate, any complications

20  that may arise from adjudicating the individual aspects of the class members' claims." *Id.* at *9. As

21  *Schneider* noted in distinguishing both *In re Napster* and *Flo & Eddie*, such "streamlined

22  circumstances" are a "far cry" from a situation in which the court would be required to sort out

23  ownership rights of millions of unidentified copyright owners. 674 F. Supp. 3d at 722. In sum, no

24  court has ever held copyright registrations alone are sufficient evidence of ownership and validity to

25  meet Rule 23's predominance requirement, and the dissimilar circumstances presented by *Flo &

26  Eddie* and *Napster* do not support certification here.

27

28

ANTHROPIC'S OPP. TO MOT. FOR CLASS CERTIFICATION                    No. 3:24-CV-05417-WHA

### 2. Book-by-book evidence required to prove ownership and validity predominates.

Each class member will need to provide evidence they are the "legal or beneficial owner" of the exclusive right to the copyright in their book for LLM training purposes. 17 U.S.C. § 501(b). This necessarily implicates myriad individual book-by-book factual issues, which will predominate. *See Vulcan Golf, LLC v. Google*, 254 F.R.D. 521, 528, 537 (N.D. Ill. 2008) ("[T]he possibility of hundreds if not thousands of individual hearings related to [registered trademarks] ownership" renders class certification improper, since "multiple time-consuming inquiries regarding ownership" will be necessary).

To determine "legal ownership" of the copyright for each book will require, at the very least, examination of the circumstances in which the book was authored and the terms of any contractual agreement allocating rights for the book, including publication agreements, option agreements, assignments, and/or termination of rights. Even when a copyright holder transfers legal ownership, the inquiry does not end, as the classes also include "beneficial owner[s]," often "an author who ha[s] parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees." *DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 988 (9th Cir. 2017) (internal citation omitted). But the question of who receives royalties often does not determine ownership, as "an author who receives royalties for a work created under a work-for-hire agreement, and thus who never had ownership of the work, is not a beneficial owner." *Id.* Thus, resolving legal and beneficial ownership also requires determining whether the book was created as a work for hire. Even though they presumably were carefully selected and vetted, Plaintiffs themselves perfectly illustrate that deciding who is a legal or beneficial owner is an individualized question that cannot be answered through class-wide proof:

***Plaintiffs Andrea Bartz and Bartz Inc.*** Despite alleging otherwise (FAC ¶ 58), Bartz appears to be neither the legal nor beneficial owner of ***any*** of her works. Bartz herself clearly did not understand who owned the copyrights in her works as recently as 2020 when she (mistakenly) demanded that her publisher amend her copyright registrations. Ex. 11. It now seems that all of Bartz's books were written as works-for-hire in the scope of her employment for Bartz Inc. Without

1    previously being a legal owner, Bartz cannot now qualify as a beneficial owner. *DRK Photo*, 870

2    F.3d at 988. Bartz has since taken other actions that further confirm the assignment of all legal titles

3    in her copyrights to Bartz Inc. (including via a mid-litigation assignment), which also receives all

4    royalties for her books. Ex. 14. There are, at this time, five purported class members before the

5    Court. It is telling that one of them appears to have no legal or beneficial ownership in her works.

6        ***Charles Graeber (and Non-Named Plaintiff Having & Selling LLC).*** Graeber claims to be

7    the owner of all the rights in his works. Graeber Dep. 125:10-12; 137:13-15. But this assertion

8    appears to be incorrect. Having & Selling LLC has entered into agreements claiming to be the owner

9    of rights in *The Good Nurse* and it has licensed the work to third parties. *E.g.*, Exs. 20-21. Further,

10   Graeber himself assigned "all rights of every kind or nature whatsoever in and to [*The Good Nurse*]

11   in perpetuity, throughout the universe, in any and all media and means of exploitation whether now

12   known or hereafter devised" except for expressly reserved rights—in connection with the adaptation

13   of that book into a Netflix movie. Ex. 22 at BARTZ000004627. There do not appear to be any

14   express reservations that would cover the rights to use the work for LLM training, which raises a

15   legitimate question about whether 22nd Street, the assignee, owns those rights. Graeber also does not

16   know if Having & Selling LLC is paid royalties related to the assignment to 22nd Street. Graeber

17   Dep. 165:20-22. Therefore, there are unresolved questions about whether Graeber retains legal and

18   beneficial ownership of the copyright in *The Good Nurse*. Notably, 22nd Street is not a plaintiff in

19   this case.

20       ***Plaintiffs Kirk Wallace Johnson and MJ + KJ.*** It appears that, for some time, Johnson was

21   the legal owner of the copyright in *To Be a Friend Is Fatal*, while MJ + KJ held rights to the other

22   books authored by Johnson (although, for at least a time, MJ + KJ also granted Amazon an option to

23   purchase "all right, title and interest [in and to *The Feather Thief*] other than the reserved rights

24   specified on Exhibit A" which did not list LLM training rights). Ex. 33 § 3, Ex. A. However, during

25   this litigation, Johnson assigned all of his rights "for all purposes under the Copyright Act" to MJ +

26   KJ, including "the right to sue for past infringement." Ex. 34. Therefore, Johnson, like Bartz, appears

27   to have no legal or beneficial ownership in his works.

28       In sum, just three individual authors, selected by sophisticated law firms, present a morass of

ANTHROPIC'S OPP. TO MOT. FOR CLASS CERTIFICATION            No. 3:24-CV-05417-WHA

ownership issues raising thorny factual and legal questions. Plaintiffs argue that the need to navigate and resolve such complex issues "could be streamlined by affidavit." Mot. at 16. Not so. As demonstrated by their testimony and actions, Plaintiffs themselves had great difficulty explaining how their rights are allocated and often did not possess documentation necessary to verify such allocation. *E.g.*, Bartz Dep. 162:22-24 (testifying that she optioned all four of her books); Winthrop Decl. ¶ 3 (Bartz has not produced options for two of her books); Graeber Dep. 164:24-165:22 (testifying that he is unaware of agreements relating to Having & Selling LLC's ownership of copyright in his books). Allowing putative class members to simply assert ownership by affidavit would deprive Anthropic of the ability to obtain discovery showing flaws in self-serving ownership claims and test such claims through cross-examination. *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1090 (N.D. Cal. 2011). Moreover, Anthropic has a constitutional right to have a jury and/or Article III judge—not a claims administrator—decide critical factual and legal issues of ownership. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001); *see also In re SFPP Right-of-Way Claims*, 2017 WL 2378363, at *15 (C.D. Cal. May 23, 2017).

Resolving these kinds of contractual complications would be just the first step in addressing copyright ownership. The need to assess the individual ownership questions described below also predominates over any common issues.

***Public Domain Works.*** Across the proposed classes there no doubt are countless rightsholders whose books have fallen into the public domain for a wide variety of reasons that would require individualized inquiry to resolve. For reference, Cornell University has compiled a chart illustrating the many ways that the copyright for books can lapse. Ex. 38. As just one example, by now, a reasonable number of the rightsholders in books published before 1964 will have passed away, and their works may have fallen into the public domain if their registrations were not properly renewed. *Id.* It will require litigation of individualized issues to make these determinations. And this is far from a simple process: It requires determining if the author timely renewed the copyright and an investigation into who among the author's relatives were still living at the time of renewal. *See* 17 U.S.C. § 304(a)(1)(C); Nimmer on Copyright § 9.05.

***Orphan Works.*** Because Plaintiffs' asserted classes are so expansive, there is no question

that a significant number of the books at issue are "orphan works," *i.e.*, "a copyrighted work [whose rightsholder] cannot be identified." Ex. 37, 2006 Orphan Works Report 1. As noted in a study by the U.S. Copyright Office, orphan works have been a pervasive problem that has plagued the copyright system for years. *Id.* at 21-22 (citing Carnegie Mellon University Libraries study finding 22% of book publishers could not be located—let alone the individual rightsholders in those books). Another Copyright Office study found that, despite "mass digitization" efforts such as Google Books, the problem of orphan works has persisted. Ex. 39, U.S. Copyright Office, Orphan Works and Mass Digitization ("2015 Orphan Works Report") 2 (June 2015) ("The Office concludes, as it did previously, that the orphan works problem is widespread and significant."). Per the findings cited there, "[s]tudies of library collections of printed, published books and similar works estimate that between 17% and 25% of published works and as much as 70% of specialized collections are orphan works." *Id.* at 38.

   ***Works For Hire (Including Academic Books)***. The classes include a large number of rightsholders whose works were written as works for hire, such as books written for loan-out companies and academic books. *See* Iyyer Decl. ¶ 93; *see also* Turvey Decl. ¶ 24 (noting that Anthropic values academic books the most for use as training data). These books pose significant individualized issues related to copyright ownership. For example, the copyright in a book authored by a professor who is an employee of a university may, under some circumstances, belong to the university. However, this is not necessarily the case because copyright ownership policies for academic books vary from university to university and tend to change over time. *See* Robert C. Denicola, *Copyright and Open Access: Reconsidering University Ownership of Faculty Research*, 85 Neb. L. Rev. 351, 380 (2006).[6] Therefore, books written in academic or other work for hire contexts all present individualized issues to untangle.

   ***Foreign Rightsholders***. There likely are numerous foreign rightsholders in the classes. Iyyer Decl. ¶ 102. For them, determining ownership and the effectiveness of any transfer of rights likely

---

[6] In addition, rightsholders lack standing to sue for infringement in scenarios where rights were transferred in a putative exclusive license grant from a non-exclusive rightsholder, such as a joint author. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1146 (9th Cir. 2008).

1   will implicate complex and individualized choice of law analyses and/or the application of foreign

2   law. *See, e.g.*, *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir.

3   1998); *Fahmy v. Jay-Z*, 908 F.3d 383, 392 (9th Cir. 2018). *See, e.g.*, *Football Ass'n*, 297 F.R.D. at

4   67 ("Questions of [copyright] title, assignment … are better handled in the jurisdictions (often

5   foreign) in which they arise, rather than thousands of miles away.").

6          The issues discussed above represent only a sliver of the complications that could arise over

7   the adjudication of rights in millions of books. Even if only 0.5% of the possible 5 million books in

8   LibGen required discovery and trial to determine copyright ownership—which is an unreasonably

9   optimistic assumption given what we have seen with just a handful of carefully selected plaintiffs—

10  that would still require more than 25,000 trials about works in LibGen alone. These ownership issues

11  swamp any other common issues and should preclude certification.

              **3.    The proposed classes are not ascertainable because neither the**
12            **rightsholders nor the relevant books can be readily identified.**

13

14         The Court should also deny class certification because, as discussed in detail above, Plaintiffs

15  present no viable method to ascertain who ***owns*** the copyrights to the books at issue. But to identify

16  the rightsholders, one first needs to identify the books at issue, and Plaintiffs do not present a reliable

17  or practical way to do this either: None of the methods proposed by Plaintiffs' expert objectively or

18  reliably identify the relevant books, much less their owners.

              **a.    Metadata is not sufficient to ascertain the books in the Internet**
19            **Books Datasets.**

20

21         Dr. Zhao first contends he can identify books by "consult[ing] the metadata" associated with

22  Books3, LibGen, and PiLiMi (Zhao Decl. ¶¶ 43-50), but the metadata from these datasets is

23  incomplete and/or unreliable. Iyyer Decl. ¶¶ 22-28, 44-53.

24         ***Books3.*** The contents of Anthropic's Books3 Dataset have file name labels, but there is no

25  other metadata. Tucker Decl. ¶ 13; Iyyer Decl. ¶¶ 22-24. These file names are crowdsourced and

26  originate from unidentified individuals who uploaded copies of books to the internet and then

27  manually entered (or did not enter) related file names. Iyyer Decl. ¶ 20. They are riddled with

28  incomplete or incorrect information that cannot reliably identify the books in the dataset.

1    *Id*. ¶¶ 25-28.

2    **LibGen and PiLiMi.** Anthropic's LibGen and PiLiMi Datasets are associated with

3    additional metadata, but because the books in the LibGen dataset are uploaded by users, the dataset

4    suffers all the same quality issues as the Books3 file names and is unreliable for the same reasons.

5    Iyyer Decl. ¶ 47.

6    Despite these known problems with the metadata, Dr. Zhao admitted he did not perform any

7    error rate calculation to assess whether the metadata was reliable. Ex. 40, Deposition of Ben Zhao

8    ("Zhao Dep.") 32:14-33:19 (LibGen), 36:17-24 (PiLiMi). Instead, Dr. Zhao relied on it simply

9    because Anthropic produced it. Zhao Dep. 33:10-19, 98:21-24. But Anthropic produced the LibGen

10   and PiLiMi metadata in its possession to comply with its discovery obligations; Anthropic has never

11   used that metadata to identify specific books in those datasets. Tucker Decl. ¶ 16. As such, Dr.

12   Zhao's suggestion that the class could be ascertained by "consulting the metadata" should be

13   rejected. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

14
15   **b.    Tools from *The Atlantic* are not sufficient to identify the books in Anthropic's Books3 or LibGen Datasets.**

16   Next, Dr. Zhao posits that the Court could rely on two tools created by *The Atlantic* magazine

17   to allow rightsholders to search for books within Anthropic's Books3 or LibGen Datasets, even

18   though Dr. Zhao himself later conceded he ***did not rely*** on them. *Compare* Zhao Decl. ¶ 50 *with*

19   Zhao Dep. 112:4-113:3. This method is unreliable too because, again, Dr. Zhao did nothing to

20   validate the accuracy of these tools, which were created by people unknown to him with unknown

21   qualifications. *Id*. 49:19-50:21; 57:9-12. Indeed, *The Atlantic* itself states that the tools may contain

22   false positives and false negatives because they may "not return books" that are included, "list

23   incorrect authors," and contain "mistakes and inaccuracies." Iyyer Decl. ¶ 30. Furthermore,

24   Anthropic acquired its Books3 and LibGen Datasets several years earlier than *The Atlantic* obtained

25   its versions of these datasets from the public web, such that *The Atlantic*'s versions of those datasets

26   likely comprise different sets of books. *Id*. ¶¶ 33, 58.

27
28

1              c.    **Dr. Zhao's hash method is not sufficient to identify specific books**
2                    **in the Internet Books Datasets.**

3          Implicitly acknowledging neither metadata nor *The Atlantic* tools provide an accurate means

4    to identify the works, Dr. Zhao provides an "alternative" hash matching method. This method relies

5    on a computer algorithm written by Dr. Zhao that classifies a book as being in an Anthropic dataset

6    if any file in the dataset has 100 or more sentences in common with a digitized copy of an

7    authoritative copy of the book (*i.e.,* a "source of truth"). Zhao Decl. ¶¶ 52-57; Iyyer Decl. ¶ 68. But

8    this method is neither feasible nor reliable.

9          Implementing Dr. Zhao's hash method would require first obtaining a digitized copy of ***all*** of

10   the books that ***may or may not*** be in the datasets. Iyyer Decl. ¶¶ 64-65. In practice, this would mean

11   acquiring accurate digitized copies of essentially all the books registered for U.S. copyrights to lay

12   the foundation for an admissible infringement analysis. In fact, another district court recently

13   required the production of deposit copies—not just any purportedly authoritative copy—to prove

14   "the contours of what was registered" in the context of another generative AI copyright case,

15   rejecting the use of "audio fingerprinting technology" to identify works in suit. *UMG Recordings,*

16   *Inc. v. Uncharted Labs, Inc.,* 2025 WL 1047517, at *1 (S.D.N.Y. Apr. 8, 2025). Dr. Zhao does not

17   dispute that his hash matching method is completely impractical, testifying that the "hash algorithm

18   is [not] designed" to "[d]etermine the complete contents" of the datasets, and confirming that he had

19   no plan to acquire digitized copies of all the books necessary to do so. Zhao Dep. 71:17-72:5, 74:3-

20   76:24.[7]

21             4.    **Infringement requires individualized proof.**

22         Even if it were possible to identify all the books in the Internet Books Datasets and who

23   owns their copyrights, other individual issues predominate, including proving the infringement of

24   specific books, and, if the Court were to find Anthropic's use of copyrighted training data generally

25   _____

26   [7] As detailed in the Iyyer Declaration, the hash method suffers numerous other methodological
     flaws and subjective criteria that make it unreliable at determining whether even a single book is in
27   or out of any dataset. Iyyer Decl. ¶¶ 67-79. And, Dr. Zhao did not conduct any statistical validation
     testing for the rate of false positives or false negatives his method would produce. Zhao Dep. 84:3-
28   85:15, 86:14-88:17.

ANTHROPIC'S OPP. TO MOT. FOR CLASS CERTIFICATION                    No. 3:24-CV-05417-WHA

is not fair use, whether it constitutes fair use for some books.

**Infringement.** As just discussed, Plaintiffs cannot meet their burden of showing ascertainability because their proposed methodology for doing so depends on the impossible task of obtaining authoritative digital copies of every book under copyright. For the same reason, Plaintiffs lack any methodology to prove infringement of any particular book. Copyright infringement **requires** an actual comparison of the work subject to copyright and the allegedly infringing material. *Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1066 (9th Cir. 2016) (affirming JMOL for defendant when plaintiff did not introduce evidence of the source code allegedly copied; collecting cases for well-established proposition that "[p]roof of the infringement claim consists of the works alleged to be infringed" (internal quotation omitted)). Sweeping, evidence-free statements that Anthropic "copied books" is not sufficient to prove that, in any given case, Anthropic used a particular book in training that is substantially similar to **the actual work** on which a class member obtained a registered copyright based on the deposit copy. *Accord UMG Recordings,* 2025 WL 1047517, at *1. As just one example of the issues that will arise proving infringement, Anthropic's expert found *thousands* of records in the datasets that appeared to be extraction errors or other instances where very little text appeared as a possible "book." Iyyer Decl. ¶¶ 35-40, 87-90. Whether such copying of small amounts of text is *de minimis* or infringing is an intensely factual issue that "does not turn on the mere length of the copied material." *Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 946 (9th Cir. 2023). A jury will need to assess, book-by-book, whether the amount of text copied is substantial, "both qualitatively and quantitatively," within the specific "context of each case." *Id.*

**Fair Use.** As set out in Anthropic's motion for summary judgment, there are no material facts in dispute necessary to establish that, as a matter of law, the transformative nature of LLM training, along with the other fair use factors, render Anthropic's use of Plaintiffs' books fair use, defeating their claims of infringement. But if this Court disagrees and permits their infringement claims to proceed, Anthropic's fair use defense may turn on facts specific to each of the individual rightsholders' books at issue. That is because at least two of the four statutory factors may require individual analyses in this case: "the nature of the copyrighted work" (factor two) and "the amount and substantiality of the portion used" (factor three). 17 U.S.C. §§ 107(2)-(3). Moreover, both of

1   these factors vary extremely among the books at issue. Iyyer Decl. ¶¶ 87-90 (discussing book

2   fragments), 92 (factual books); Ex. 35 at 3 (categories of books).

3          **5.    Plaintiffs fail to provide any class-wide model for determining actual**
            **damages and disgorgement.**
4

5          Class certification should also be denied because Plaintiffs provide no "damages model to

6   demonstrate that damages are susceptible to common proof." *Lytle v. Nutramax Lab'ys, Inc.*, 114

7   F.4th 1011, 1024 (9th Cir. 2024). Indeed, they do not even attempt to meet their burden to "chart out

8   a path to obtain all necessary data and demonstrate that the proposed method will be viable as

9   applied to the facts of a given case" and to survive at least a "limited" *Daubert* analysis (*id.* at 1031-

10  32). Rather, they hand-wave the problem by (i) calling disgorgement a "collective remedy" (ignoring

11  how this would be applied book-to-book and model-to-model among the many possible

12  rightsholders) and (ii) arguing that "actual damages" will not "vary book-to-book" (ignoring rafts of

13  evidence to the contrary). *See* Turvey Decl. ¶ 17; Ex. 41, Deposition of Tom Turvey ("Turvey

14  Dep.") 251:13-252:15; Tucker Decl. ¶¶ 4-10.

15         Plaintiffs provide no roadmap for how a disgorgement remedy would be crafted where

16  Anthropic used vastly different sets of books to train different types of models. For example,

17  Anthropic's more recent commercial models were trained on scanned books but not its Books3

18  dataset. Kaplan Decl. ¶¶ 49-50. In contrast, Anthropic never trained any commercial model that

19  actually generated revenue using its LibGen Dataset. And it never used its PiLiMi Dataset to train

20  any type of complete model at all.

21         As their sole proof that damages "do *not* vary book-to-book," Plaintiffs point to a single

22  HarperCollins license (which they obtained via subpoena but do not attach as evidence) that offered

23  $5,000 per book. Mot. at 22. But even that license proves ▮▮▮▮▮▮▮▮▮▮ The license provides

24  that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████ Confirming that different kinds of books have different

values, HarperCollins' CEO has recently noted his company has not been able to license ***any*** fiction

books at ***any*** price.[8]

### 6. Statutory damages suffer the same flaws as actual damages.

The same individualized issues that pervade the actual damages analysis afflict the analysis

of statutory damages. Potential statutory damages cover a very broad range of $200 to $150,000 per

work. 17 U.S.C. §§ 504(c)(1)-(2). In determining the amount of an award, "the court is to be guided

by what is just in the particular case" *Peer Int'l Corp. v. Pausa Recs., Inc.*, 909 F.2d 1332, 1336 (9th

Cir. 1990) (internal quotation omitted). The amount of the award depends on numerous factors that

can only be decided on an individualized basis, including: (i) revenue lost by the copyright holder as

a result of the infringement, (ii) the profits earned by the defendant as a result of the infringement,

(iii) the need to deter future infringement, (iv) the need to penalize the defendant, (v) the

circumstances of infringement, and (vi) whether the infringement was intentional. Ninth Circuit

Man. Model Civ. Jury Instrs. § 17.35 (2017).

As a first step, to even reach the threshold issue of entitlement to statutory damages, there

would need to be an individualized inquiry into when the copyright was registered with respect to

the date of publication and infringement. *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g

Co.*, 747 F.3d 673, 678 (9th Cir. 2014) ("Registration prior to infringement or, if the work is

published, within three months of publication, is necessary for an owner to obtain statutory damages

and attorneys' fees."). Thus, to award statutory damages, the Court must make all of the

individualized assessments that go into an actual damages or disgorgement analysis—*e.g.*, plaintiffs'

losses (which presumably would vary dramatically based on the license fee the book could

command, assuming a license were required here),[9] and defendant's gain—and then layer that

---

[8] *See* The Open Book Podcast, "Truly Global with Brian Murray," (Jan. 13, 2025), *available at*
https://openroadintegratedmedia.com/podcast/ at 00:22:51 (HarperCollins has "not been unable to
reach terms with anybody for fiction. I don't have a partner on the AI platform side who's willing to
entertain those talks right now.").

[9] As established in the Tucker and Turvey Declarations, the amount that Anthropic values particular
kinds of books and its willingness to pay for them varies widely. Tucker Decl. ¶¶ 9-10; Turvey
Decl. ¶ 17.

analysis with additional subjective factors, such as the defendant's state of mind and concepts of "what is just." *Peer Int'l Corp.*, 909 F.2d at 1336. Rather than engage with those factors, Plaintiffs propose the Court should simply steamroll over them (and due process) by applying "basic arithmetic: multiplying the number of copyrighted books . . . by the statutory penalty." Mot. at 22. The Court should decline that invitation.

**B.    The class action vehicle is not superior.**

Plaintiffs fail to carry their burden to show a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Because individual issues predominate, a class action is not superior to individual actions. *See Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001) (superiority element is closely linked to predominance).

There is ample incentive for putative class members to pursue individual claims because "the availability of statutory damages [in copyright cases] is designed to give litigation value to each individual case." *Football Ass'n*, 297 F.R.D. at 66. Moreover, litigating this case as a class action raises significant due process problems for Anthropic and members of the classes that can be avoided by individual lawsuits. It deprives Anthropic of the ability to obtain discovery about individualized issues and to test individualized flaws in those claims. And it would require countless individuals and entities from across the globe to have their claims lumped together and potentially adjudicated without any knowledge that they were part of the class. *Li v. EFT Holdings, Inc.*, 2015 WL 12681648, at *2 (C.D. Cal. Dec. 14, 2015) (denying certification with Chinese class members because of concern that "notice [could] be made on the absent class members consistent with due process"). The prospect of ruinous statutory damages—$150,000 times 5 million books—only compounds the significant due process implications of certification here. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 722-23 (9th Cir. 2010).

**C.    Plaintiffs are not adequate class representatives because many rightsholders use LLMs and do not object to the use of their works in training.**

Plaintiffs have alleged they are harmed by the use of their works in LLM training, but, given the massive scope of the classes they seek to represent, this undoubtedly conflicts with the views of

putative class members (many of whom are not even authors). *Kim v. Allison*, 87 F.4th 994, 1000-02 (9th Cir. 2023) (reversing grant of class certification based on conflict with 7,000 members constituting 5% of the class). Claude assists people, including authors, with writing tasks. Kaplan Decl. ¶ 23. Many members of the classes **benefit** from the use of AI tools and do not wish to see them crippled by licensing. *See* Ex. 43[10] at 2 (20% of fiction writers and 25% of non-fiction writers use AI); Ex. 44 ("Authors Alliance NOI Response") at 8 (noting that many writers use "Claude . . . as part of their creative processes").[11] Academic authors in particular use AI in their professional work, and many of them use books in the same way Anthropic does: to develop LLMs. Ex. 45 at 2.[12] Similarly, Oxford University Press surveyed academic researchers and found that 76% of researchers use AI tools in their research. Ex. 46 at 4.[13] Plaintiffs cannot adequately represent a class of people when a significant number of people in that same class benefit from the very conduct they claim is unlawful. *See Pecover v. Elec. Arts Inc.*, 2010 WL 8742757, at *9 (N.D. Cal. Dec. 21, 2010) (noting that one type of disqualifying conflict is "if class members benefit from the same acts alleged by the [Plaintiffs] to be harmful to other members of the class") (internal quotation omitted).

## II.    THE COURT SHOULD NOT CERTIFY INJUNCTIVE RELIEF CLASSES BECAUSE PLAINTIFFS SEEK TO MAXIMIZE MONETARY RECOVERY.

The Court should deny Plaintiffs' underdeveloped request to certify injunctive relief classes, which is appropriate only when the "primary relief sought is declaratory or injunctive." *Zinser*, 253 F.3d at 1195. Plaintiffs admit that their goal is "maximizing recovery . . . and compensation" for the classes (Mot. at 13), thereby defeating their request.

## III.    THE COURT SHOULD NOT CERTIFY SUBCLASSES OR "ISSUE CLASSES" THAT MERELY REPLICATE THE SUBCLASSES

Plaintiffs alternatively seek to split the Internet Books Class into subclasses or "issue classes"

---

[10] Ex. 43, The Society of Authors Policy Team, *SoA survey reveals a third of translators and quarter of illustrators losing work to AI* (Apr. 11, 2024), https://societyofauthors.org/2024/04/11/soa-survey-reveals-a-third-of-translators-and-quarter-of-illustrators-losing-work-to-ai/.
[11] Ex. 44, Authors Alliance, *RE: Policy Study on Artificial Intelligence, Docket Number 2023-6* (Oct. 30, 2023).
[12] Ex. 45, Project LEND, Response to Notice of Inquiry (NOI) and request for comments (Oct. 30, 2023).
[13] Ex. 46, Oxford University Press, *Researchers and AI: Survey Findings*.

based on (1) Books3, and (2) LibGen and PiLiMi, but neither proposed subclass is certifiable. Splitting the massive Internet Books Class into two massive subclasses does nothing to address the intractable problems with the parent class and, under Rule 23(c)(5) "each subclass must independently meet the requirements of Rule 23." *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).

Plaintiffs' cursory alternative request that the Court certify "issue classes" also fails because they do not identify any "particular issues" for resolution. Fed. R. Civ. P. 23(c)(4). Thus, Plaintiffs do not carry their burden to explain how any issue class would "advance the litigation as a whole." *Schneider*, 674 F. Supp. 3d at 727. Their contention that they need not show predominance to certify an issue class (Mot. at 24) is wrong. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (reversing class certification because district court erred by not considering whether issue class met predominance requirement as to those issues). Certifying either proposed "issue class" would leave the Court bogged down in adjudicating millions of individual issues of ownership, validity, infringement, and remedies, for which Plaintiffs submit no realistic management plan, and for which no realistic plan could be devised.

## CONCLUSION

Courts have consistently recognized that "copyright claims are poor candidates for class-action treatment." *Schneider*, 674 F. Supp. 3d at 717 (citation omitted). The copyright claims asserted here are no different. The Court should deny the motion for class certification.

Dated: April 17, 2025                          By:    /s/ Douglas A. Winthrop

**ARNOLD & PORTER KAYE SCHOLER LLP**

*Attorneys for Defendant*
ANTHROPIC PBC

# CERTIFICATE OF SERVICE

I, Douglas A. Winthrop, am the ECF user whose identification and password are being used to file the foregoing **ANTHROPIC PBC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**.

Dated: April 17, 2025

/s/ *Douglas A. Winthrop*