# EXHIBIT 9

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

## OPTION/PURCHASE AGREEMENT

### "WE WERE NEVER HERE"

A.  DATE.          This agreement ("**Agreement**") is entered into as of April 16, 2021 ("**Effective Date**").

B.  PARTIES.       Netflix Entertainment, LLC ("**Company**") and Andrea Bartz Inc. ("**Owner**")

C.  PROPERTY.      "We Were Never Here" ("**Work**"), a novel written by Andrea Bartz ("**Author**"), and all elements thereof (including, without limitation, the title, themes, stories, plot, scenes, dialogue, characters, settings, worlds, illustrations, designs and all other elements and contents therein), all translations, adaptations, arrangements, revisions, dramatizations, continuations, supplements, reissues and versions thereof, and any research material relating to the Work, whether now existing or hereafter created by or with the authority of Owner or Author or any of their successors, assigns or licensees (all of the foregoing including the Work may be referred to herein as the "**Property**").

D.  PICTURE.       The proposed feature-length motion picture based on the Property and currently entitled "We Were Never Here" ("**Picture**").

The parties hereby agree as follows:

1.      CONDITIONS PRECEDENT.  Company's obligations under this Agreement are conditioned upon satisfaction of the following "**Conditions Precedent**":

        1.1.     Company's receipt of this Agreement signed by Owner, in form and substance satisfactory to Company, including, without limitation: (i) an executed copy of the Short-Form Option attached hereto as Exhibit "A"; (ii) an executed copy of the Short-Form Assignment attached hereto as Exhibit "B"; (iii) if the Work is a published work or is under contract to be published, an executed copy of the Publisher's Release attached hereto as Exhibit "C"; each of which is incorporated herein by this reference.

        1.2.     Company's receipt and written approval of complete chain-of-title documentation to the Property, including, without limitation, any third party releases (including documentation from illustrators and contributors, if any), waivers and/or consents required by Company in connection with the Property and/or the Picture, in each instance in form and substance satisfactory to Company.

        1.3.     Company's receipt of documentation required by Company in order to pay Owner under this Agreement, including, without limitation, a fully completed I.R.S. Form W-9.

        1.4.     Company's receipt of a fully signed copy of the assignment agreement between Owner and Author with respect to the Property, and Company's approval of such agreement in its sole discretion.

        1.5.     Company's receipt of closed deal terms and a fully signed copy of the Certificate of Engagement for the producing services of Sarah Schecter and Molly Sims in connection with the Picture, in form and substance satisfactory to Company.

2.      OPTION.

        2.1.     Grant of Option.  In consideration of $█500 ("**Initial Option Payment**"), payable to Owner within ten (10) business days following satisfaction of the Conditions Precedent, Owner hereby grants to

CONFIDENTIAL - ATTORNEYS' EYES ONLY

BARTZ000003547

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

Company an irrevocable and exclusive option ("**Option**") to purchase all Rights (as defined below) in and to the Property. The Initial Option Payment shall be deemed an advance against, and shall be deductible from, the Purchase Price set forth in Paragraph 3 below.

2.2.    Initial Option Period. The initial Option period shall commence upon the Effective Date and shall expire on the date that is eighteen (18) months after satisfaction of the Conditions Precedent ("**Initial Option Period**"). Company shall notify Owner of the date on which the Conditions Precedent are satisfied, provided, however, Company's failure to do so shall not be a breach of or affect the validity of this Agreement.

2.3.    Extension Period. Company shall have the right to extend the Initial Option Period for an additional eighteen (18) months ("Extension Period") by giving Owner written notice thereof on or before the expiration of the Initial Option Period and by paying Owner, within ten (10) business days following such written notice, the sum of $█████500 ("**Extension Payment**"), which sum shall not be applicable against the Purchase Price.

2.4.    Option Period. References to the "**Option Period**" hereunder shall refer to the Initial Option Period and any extensions thereof. If the Option Period expires on a Saturday, Sunday or national holiday or during the period between Christmas Eve and New Year's Day, then the Option Period shall be tolled through the next business day.

2.5.    Option Period Activities. During the Option Period, Company shall have the exclusive right to engage in all development and pre-production activities including, but not limited to, the right to have one or more screenplays written and/or other material created based on, inspired by, or adapted from the Property. If Company does not exercise the Option, Company shall have no further rights in and to the Property, but Owner shall not be deemed to have acquired any right, title or interest in or to any of the material prepared by or at Company's direction and Company shall own all such material.

2.6.    Automatic Extensions. The Option Period and all other negotiation and other time periods hereunder shall be deemed automatically extended for: (i) a period of time equal to any period during which Owner is in breach or default hereof; (ii) the entire duration of any third party claim that arises from a breach or alleged breach of Owner's representations, warranties or agreements hereunder or from any other matter with respect to which Owner is required to indemnify Company hereunder (provided that such extension shall not exceed a period of twelve (12) months unless litigation or arbitration regarding such claim has commenced, in which case the extension shall continue until such claim is resolved); and (iii) the length of each Extrinsic Event that interrupts, hinders or prevents the on-going business of Company and/or Company's development, pre-production and/or production activities in connection with any production intended to be based upon the Property. Company shall use good faith reasonable efforts to give notice of any such extension, provided that a failure to give such notice shall not be deemed a breach of this Agreement or a condition to the effectiveness of such extension. For purposes hereof, an "**Extrinsic Event**" shall mean any matter beyond the control of Company, including, without limitation, the following: labor disputes (including strikes, walkouts, lockouts, labor disruption and other labor controversies, in each case whether or not beyond Company's control); delay of common carrier or of materials, transportation, power or other commodity; the enactment of any law, executive order, or judicial decree; any governmental action; fire, flood, or other action of the elements; earthquake, or other acts of god; war (whether or not declared); act of terrorism (whether domestic or foreign, whether or not politically motivated, and whether or not directed at Company or its property); civil disturbance; the death, default, or incapacity of a principal cast member (or an alteration in physical appearance of a principal cast member), a director, or a producer; loss, replacement or delay in accessing key location(s); the breach of contract of any person or entity (other than Owner) furnishing services or granting rights in connection with any production intended to be based upon the Property; any mutual postponement; epidemic or pandemic.

Page 2 of 28
OIF | "WE WERE NEVER HERE" – Andrea Bartz_Option-Purchase Agr_v7_083121_KO_EXE

CONFIDENTIAL - ATTORNEYS' EYES ONLY

BARTZ000003548

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

3.    EXERCISE OF OPTION / PURCHASE PRICE.

3.1.    Company may exercise the Option at any time during the Option Period by giving Owner written notice thereof. Within ten (10) business days following such written notice, Company shall pay Owner an amount equal to $▮,000 ("**Purchase Price**") less the Initial Option Payment. Whether or not Company delivers such notice to Owner, Company shall be deemed to have exercised the Option upon the commencement of principal photography of the Picture at any time on or before the date of expiration of the Option Period, in which event the Purchase Price less the Initial Option Payment shall be payable not later than ten (10) business days following commencement of principal photography.

3.2.    The parties acknowledge and agree that the Purchase Price constitutes full and complete consideration for all rights and privileges (including the Rights) granted hereunder and the promises, representations and warranties made by Owner hereunder, and additionally shall be deemed to include full and complete consideration for any consulting or similar services rendered by Owner, if any, in connection with the Property.

4.    PASSIVE PAYMENTS. Provided that: (a) Owner is not in breach or default hereof; (b) Company exercises the Option and the Picture is produced and released as a feature-length live-action motion picture; and (c) Company (or any assignee) actually produces or causes to be produced any subsequent production(s) based on the Picture as described below, then Owner shall be entitled to receive the minimum passive payments set forth below, subject to the conditions specified ("**Passive Payments**").

4.1    Netflix SVOD Sequel, Netflix SVOD Remake, Theatrical Sequel or Theatrical Remake. If Company produces a live-action English language feature-length sequel, prequel or remake of the Picture, in each case, intended for initial release in the United States theatrically (each such sequel or prequel a "**Theatrical Sequel**", and each such remake a "**Theatrical Remake**"), or intended for initial release on the Netflix subscription video-on-demand service (such service, the "**Netflix Service**", and each such sequel or prequel a "**Netflix SVOD Sequel**", and each such remake a "**Netflix SVOD Remake**"), Owner shall be entitled to the following amounts:

4.1.1.    Sequel. For each Netflix SVOD Sequel or Theatrical Sequel, a one-time payment equal to one hundred percent (100%) of the amount of the Purchase Price, such payment to be made within thirty (30) days after completion of principal photography of such Netflix SVOD Sequel or Theatrical Sequel.

4.1.2.    Remake. For each Netflix SVOD Remake or Theatrical Remake, a one-time payment equal to fifty percent (50%) of the amount of the Purchase Price, such payment to be made within thirty (30) days after completion of principal photography of such Netflix SVOD Remake or Theatrical Remake.

4.2.    Television Program / Subscription Video-On-Demand Series. If Company produces a live-action English language made-for-television motion picture ("**MOW**"), mini-series ("**Mini-Series**"), or an episodic television series or episodic subscription video-on-demand ("**SVOD**") series ("**Episodic Series**") based upon the Picture, in each case, intended for initial broadcast via a television or SVOD service in the United States, Owner shall be entitled to the following amounts:

4.2.1.    MOW or Mini-Series.

(A)    For each MOW produced for initial broadcast on network prime-time free television or on the Netflix Service, a one-time-only payment of ▮ Thousand U.S. Dollars ($▮,000) per hour (prorated for any partial hour), up to a cap of ▮ Thousand U.S. Dollars ($▮,000). For each Mini-Series produced for and initially broadcast on network prime-time free television or on the Netflix Service, a one-time-

Page 3 of 28
OIF | "WE WERE NEVER HERE" – Andrea Bartz_Option-Purchase Agr_v7_083121_KO_EXE

CONFIDENTIAL / NON–PRECEDENTIAL / NON–CITABLE

only payment of ███ Thousand U.S. Dollars ($██,000) per hour (prorated for any partial hour), up to a cap of ███ Thousand U.S. Dollars ($██,000). Any payments made to Owner under this Paragraph 4.2.1(A) shall be payable within thirty (30) days following the initial U.S. broadcast or commercial exhibition of the MOW / Mini-Series, as applicable.

(B)    For each MOW or Mini-Series produced for initial broadcast on a pay TV or premium cable station (e.g., HBO, Showtime, FX and AMC) or on the Amazon SVOD service, then in lieu of the Passive Payments set forth in Paragraph 4.2.1(A) above, Owner shall be entitled to a one-time-only payment equal to seventy-five percent (75%) of the applicable amount set forth in Paragraph 4.2.1(A) above for such MOW or Mini Series, payable within thirty (30) days following the initial U.S. broadcast or commercial exhibition of the MOW / Mini-Series, as applicable.

(C)    For each MOW or Mini-Series produced for initial broadcast on any other platform (e.g., on a U.S. free television network at non-prime time, a U.S. basic cable television channel or an SVOD service that is not the Netflix Service and is not the Amazon SVOD service), then in lieu of the Passive Payments set forth in Paragraph 4.2.1(A) above, Owner shall be entitled to a one-time-only payment equal to fifty percent (50%) of the applicable amount due under Paragraph 4.2.1(A) for such MOW or Mini-Series, payable within thirty (30) days following the initial U.S. broadcast or commercial exhibition of the MOW / Mini-Series, as applicable.

4.2.2.    Episodic Series.

(A)    For each Episodic Series produced for initial broadcast on U.S. network prime-time television or on the Netflix Service, the amounts set forth below, which amounts shall be payable within thirty (30) days following the initial U.S. broadcast of the applicable Episodic Series:

(i)    $██355 per episode having a running time of fifteen (15) minutes or less;

(ii)    $██260 per episode having a running time of more than fifteen (15) minutes, but not more than thirty (30) minutes or less;

(iii)    $██295 per episode  having a running time of more than thirty (30) minutes, but not more than sixty (60) minutes; and

(iv)    $██650 per episode having a running time of more than sixty (60) minutes.

(B)    For each Episodic Series produced for initial broadcast on a pay TV or premium cable station (e.g., HBO, Showtime, FX and AMC) or on the Amazon SVOD service, then in lieu of the Passive Payments set forth in Paragraph 4.2.2(A) above, Owner shall be entitled to an amount equal to seventy-five percent (75%) of the applicable amount set forth in Paragraph 4.2.2(A) above for such Episodic Series, payable within thirty (30) days following the initial U.S. broadcast of the applicable Episodic Series.

(C)    For each Episodic Series produced for initial broadcast on any other platform (e.g., on a U.S. free television network at non-prime time, a U.S. basic cable television channel or an SVOD service that is not the Netflix Service and is not the Amazon SVOD service), then in lieu of the Passive Payments set forth in Paragraph 4.2.2(A) above, Owner shall be entitled to an amount equal to fifty percent (50%) of the applicable amount set forth in Paragraph 4.2.2(A) above for such Episodic Series, payable within thirty (30) days following the initial U.S. broadcast of the applicable Episodic Series.

OIF | "WE WERE NEVER HERE" – Andrea Bartz_Option-Purchase Agr_v7_083121_KO_EXE

CONFIDENTIAL - ATTORNEYS' EYES ONLY

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

4.2.3.    With respect to each of the MOW/Miniseries passive payment tiers set forth in Paragraph 4.2.1 and the Episodic Series royalty tiers set forth in Paragraph 4.2.2: if Company determines, as of the time that the applicable passive payment becomes payable to Owner hereunder, that the "industry standard" has evolved such that a particular mode or outlet of exploitation (e.g., "premium cable station" or "HBO") may reasonably be deemed allocable to a higher tier than as set forth above (e.g., a mode/outlet referred to in Subparagraph (C) of one of such tiers being deemed allocable to Subparagraph (A) or (B) of the applicable tier), then Company agrees to consider in good faith the payment of the applicable passive payment at such higher tier point on a non-precedential basis. Company may (but is not obligated to), take into account objective factors (e.g., guild minimums and/or commissioning budget standards) in its aforementioned determination, if any, and such determination shall be at Company's sole discretion.

4.A.    BEST SELLER BONUSES.  If Company produces the Picture, and provided Owner is not in breach or default hereof, then upon commencement of principal photography of the Picture, Owner shall be entitled to receive the following "**Best Seller Bonuses**" for each week the Picture appears on either (a) The New York Times Hardcover Fiction best seller list or (b) The New York Times Combined Print and E-Book Fiction best seller list (each a "**Best Seller List**") prior to commencement of principal photography of the Picture:

i.    $█ 500 per week for each week that the Work is listed as number one on the Best Seller List;

ii.    $█ 000 per week for each week that the Work is listed as number two through five on the Best Seller List;

iii.    $█ 500 per week for each week that the Work is listed as number six through ten on the Best Seller List.

In no event shall the sums payable pursuant to this Paragraph 4.A, if any, exceed the sum of $█ 000.  Payment, if any, shall be made within thirty (30) days after commencement of principal photography of the Picture; provided however, that payment of the Best Seller Bonuses are subject to Company's receipt of documentary evidence in form satisfactory to Company verifying the number of weeks, listing and position of the Work on the Best Seller List.  For the avoidance of doubt, if the Work appears on both Best Seller Lists during the same week prior to commencement of principal photography of the Picture, Owner shall only be entitled to one (1) Best Seller Bonus for such week, which Best Seller Bonus shall be based on the Best Seller List with the Work in the higher position for such week (e.g., if during the same week the Work appears in the second (2nd) position on The New York Times Combined Print and E-Book Fiction Best Seller List and in the sixth (6th) position on The New York Times Hardcover Fiction Best Seller List, then Owner's Best Seller Bonus for such week shall be $█ 000). For clarity, only one Best Seller Bonus per week shall be awarded regardless of whether the Work appears on more than one applicable Best Seller List in the same week.

4.B.    LIVE STAGE PRODUCTIONS.  Provided that Owner is not in breach or default hereof, if and when Company desires to exploit its exclusive live stage rights by mounting a live stage production (which can be a dramatic play, a musical or any other form of live stage production) which is based upon or adapted from the Property, Company shall propose terms to Owner with respect to Owner's economic participation therein. Such terms shall be within customary fair market parameters for owners of book rights licensing live stage rights to a third party. Company and Owner shall then negotiate in good faith to reach an agreement on terms, including with respect to Owner's economic participation. If, after thirty (30) days of good faith negotiation, the parties are unable to agree to mutually acceptable terms, then either party shall have the right to seek binding arbitration for the sole purpose of determining Owner's economic participation. The arbitrator (who shall be selected by mutual agreement of the parties) shall take into account, among other factors: (a) the fair market value of such live stage rights derived from the Property; and (b) Company's contribution to such value by having produced

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                      BARTZ000003551

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

the audio-visual production based on the Property, if any. If the parties reach an agreement on terms or if the terms are determined through arbitration, Company shall provide Owner with an agreement incorporating the agreed-upon terms and the parties shall proceed in good faith to fully negotiate and promptly sign the agreement. Company shall have the sole right in perpetuity after payment of the Purchase Price to mount the live stage production in accordance therewith.

5.      GRANT OF RIGHTS.  Upon exercise of the Option, Owner hereby sells, grants, conveys and assigns to Company, exclusively and irrevocably, in perpetuity and throughout the universe, in all languages, in any and all media now known or hereafter devised, all right, title and interest in and to the Property and all elements thereof (collectively, the "**Rights**"), excluding only the Reserved Rights as set forth in Paragraph 6 below, and subject to Paragraph 5.7 below.

        5.1.    Audiovisual Works.  Without limiting the generality of the foregoing, the Rights granted to Company include the following: the right to produce any number of audiovisual works of all types now known or hereafter devised based on or incorporating all or part the Property (including, without limitation, the right to make sequels, prequels, remakes and other derivative works based on the Picture and/or the Property and/or any element(s) thereof); live stage rights in and to the Property; all allied, ancillary and subsidiary rights in and to the Property, including, without limitation, podcast rights, music and music publishing rights (including, without limitation, all mechanical and performance rights), soundtrack album and phonograph rights, merchandising and commercial tie-in rights (including, without limitation, the exploitation and/or licensing of characters and other elements of the Property for all types of goods, services and theme park and other types of attractions, and for games in all formats, media and platforms now known or hereafter devised); and all rights to use all or any part of the Property to advertise, promote and publicize the Picture and any and all other works created by or for Company in the exercise of the Rights granted to Company hereunder.

        5.2.    Copyright/Exploitation Rights.  With respect to the Picture and all other works created by or for Company in the exercise of the Rights, as between Company and Owner, Company shall own all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights now or hereafter recognized in any and all territories and jurisdictions (including by way of illustration only, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public) and the right (but not the obligation) to secure copyright and trademark registration and protection thereof in all countries and territories where such protection is available, in Company's own name or otherwise, and the right to exploit the Picture and all other such works in all media, markets and languages and in any manner now known or hereafter devised (including, without limitation, any and all forms of theatrical, television, non-theatrical, home video, DVD, Blu-Ray, mobile, cell phone, flash memory device, electronic-sell-through, download to own, pay-per-view, internet, interactive, video-on-demand, near-video-on-demand, and subscription-video-on-demand exploitation). Company acknowledges and agrees that a third-party now or hereafter may own the copyright in non-English translations of the Work created in connection with the exercise of the Publication Rights reserved by Owner hereunder (each, a "Translation"), and accordingly, the grant of rights to Company set forth herein in such Translation is limited to such rights, if any, that Owner may have in such Translation (in connection therewith, Owner represents and warrants that Owner has not and shall not grant to, or authorize the exercise by, any third-party any rights in a Translation (a) other than rights that fall within the definition of Reserved Rights and subject to the limitations thereon or (b) that are equivalent to or that conflict with or otherwise limit any of the rights granted to Company hereunder).

        5.3.    Alteration Rights.  Company shall have the right to change, add to, delete or take from, translate, or otherwise modify the Property in any manner Company may in its sole and absolute discretion determine in connection with the Picture and other works that utilize all or part of the Property.  To the fullest extent allowable under applicable law, Owner hereby irrevocably waives or assigns to Company, on behalf of Owner

OIF | "WE WERE NEVER HERE" – Andrea Bartz_Option-Purchase Agr_v7_083121_KO_EXE

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                    BARTZ000003552

CONFIDENTIAL / NON–PRECEDENTIAL / NON–CITABLE

and Owner's heirs, executors, administrators and assigns, all moral rights or so-called "droit moral" or any similar laws or legal principles, including, without limitation, rights of integrity and paternity. Owner covenants and agrees, on behalf of Owner and Owner's heirs, executors, administrators and assigns, not to institute, support, maintain or permit directly or indirectly any litigation or proceedings instituted or maintained on the ground that Company's exercise of its rights in the Property in any way constitutes an infringement or violation of any moral rights or droit moral, or is in any way a defamation or mutilation of the Property, or any part thereof, or contains unauthorized variations, alterations, modifications, changes or translations.

     5.4.    Rental Rights. Owner hereby irrevocably and unconditionally waives in favor of Company all of its moral rights and author's rights in and to the Picture and all other works created by or for Company in the exercise of the Rights granted to Company hereunder, and irrevocably assigns to Company all rental and lending rights, rights of communication to the public and all satellite broadcast and cable retransmission rights that Owner may now or shall hereafter own. For the avoidance of doubt, Owner agrees that the sums payable to Owner hereunder include consideration for the assignment to and exercise by Company, its successors, licensees and assigns, of the rental and lending rights assigned to Company hereunder, and that without prejudice to the Owner's rights at law such payment constitutes full equitable consideration for the grant and exercise of such rights.

     5.5.    Prior Instruments. The Rights shall include all of Owner's rights and entitlements under any and all prior instruments, agreements, assignments, and releases in connection with the Property, as same may have been amended, including the full benefit of all representations, warranties and agreements made by any party therein ("**Prior Instruments**").

     5.6.    Institution of Legal Action. Company shall have the free and unrestricted right, but not the obligation, exercisable at Company's cost and expense, to institute and prosecute, in the name of and on behalf of Owner and/or Author or otherwise, any and all actions, suits or proceedings at law, in equity or otherwise, for the violation, impairing, or impeding of any of the rights granted in this Agreement (including, but not limited to actions for violation of Owner's and/or Author's right of publicity, and/or to enjoin and restrain any infringement of the Rights herein granted). In furtherance of the foregoing, Owner and Author hereby assign to Company any and all causes of action arising from any such infringement and any and all recoveries obtained in any such action. Owner and/or Author will fully cooperate with Company in connection with any controversy which may arise and/or litigation which may be brought concerning the rights granted to Company hereunder. Owner and/or Author will not compromise, settle or in any manner interfere with any such litigation or proceeding, and Owner and/or Author acknowledge that Owner and Author shall have no interest in and/or to any recoveries obtained in connection therewith. Company shall have the right to join Owner and/or Author as a party plaintiff or defendant in any such litigation or proceeding.

     5.7.    Assignment of Copyright. The rights granted and assigned to Company hereunder include all of Owner's right, title and interest in and to any and all copyrights in and to the Property and all elements thereof, together with all benefits of such copyrights and all remedies held thereunder, but only insofar as such copyrights pertain to or affect any of the rights, privileges and/or property granted to Company in this Agreement.

6.     RESERVED RIGHTS/HOLDBACKS / COMPANY'S NEGOTIATION RIGHTS / FROZEN RIGHTS.

     6.1.    Reserved Rights. Owner reserves the following rights ("**Reserved Rights**") in the Property, subject to the terms and conditions set forth below, it being agreed that Owner shall have no right to utilize any elements from the Picture or any new or changed material created by or for Company in the exercise of the Rights or otherwise:

CONFIDENTIAL - ATTORNEYS' EYES ONLY    BARTZ000003553

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

6.1.1.    Publishing Rights. The following publishing rights in the Property (such rights, subject to the following exclusions, the "**Reserved Publishing Rights**"), provided, however, that Company shall have the right to publish screenplays, storybooks, souvenir booklets, "making-of-the-movie" and "coffee-table" type books relating to any motion picture based upon the Property, and further provided that Company shall have the right to use excerpts taken from the Property in order to create and publish stories, synopses and/or summaries for the purpose of advertising, promoting, and/or publicizing the Picture and/or any and all other works created by or for Company in the exercise of the Rights granted to Company hereunder (provided that no such publication shall contain excerpts taken from the Property in excess of the lesser of 7,500 words or 10% of the text of the Work in the aggregate):

(A)    Print Editions.  The right to print, publish and sell print editions of the Property in book form and in magazines or other periodicals, whether in installments or otherwise. Owner agrees to engage in good faith discussions with Company regarding the potential publication of a paperback edition of the Property at a time and in a manner that will aid in the advertising and exploitation of the Picture (such publication, if any, the "**Paperback Publication**"); provided, however, that in no event shall Owner be obligated to arrange for any Paperback Publication that would conflict with any contract that Owner may have in respect of the hardcover or softcover publication rights in and to the Property (provided Owner uses Owner's good faith reasonable business efforts to eliminate such conflict). Prior to arranging for any Paperback Publication, Owner shall ascertain from Company the final release title to be used for such Picture and, if directed by Company, shall recommend to the publisher of the Paperback Publication that it use the same title and advise and consult with the Company with respect to the front and back covers of said publication and any still photographs, artwork and/or credits to be included therein. In no event shall Owner or such publisher have the right to use any material owned or controlled by Company whatsoever (including, without limitation, logos, corporate names, titles, stills, artwork and/or credits) unless and until expressly granted by Company pursuant to a written agreement between Company and such publisher. At the request of Owner, Company will negotiate in good faith within Company's customary parameters to allow such publisher to utilize, in a manner approved by Company, a reasonable amount of artwork, still photography, logos, and credits from the Picture based on the Work (to the extent available and subject to third party contractual limitations).

(B)    Recorded Readings. The right to publish recorded non-dramatic readings by a single narrator of the text of published print editions of the Property in the form of audiobooks, digital download/streaming, or similar audio-only devices individually purchased by the end-user.

(C)    Electronically Read Editions. The right to publish the text of published print editions of the Property in the form of e-books (e.g., Kindle) or similar electronically read formats individually purchased by the end-user. Such electronically read editions may contain non-moving visual illustrations which are reproductions of the illustrations contained in the applicable print edition of the Property, if any, but may not contain moving visual images and/or audio tracks of any kind (other than brief introductory music between chapters and/or interviews of Owner not to exceed one (1) minute in length).

6.1.2.    Non-Dramatic Radio Rights.  The right to broadcast on radio non-dramatic, audio-only readings of published print editions of the Property ("**Reserved Radio Rights**"); provided, however, that Company shall have the right to broadcast on radio excerpts from and publicity regarding the Property for advertising and publicity purposes and Company shall have the right to simulcast productions based on the Property by means of radio and to transmit the soundtrack or portion(s) thereof by means of radio.

6.1.3.    Recital Rights.  Owner shall have the right to authorize single and dual voice non-dramatic live readings of the Property before a live audience (except, to clarify, not a stage play or a musical), provided that such readings are not recorded, reproduced and/or broadcast in any manner (other than a non-

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    BARTZ000003554

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

commercial recording thereof which is made solely for historical or archival purposes, provided such recording is not later broadcast) ("**Reserved Recital Rights**").

      6.1.4.   Live TV Rights. Subject to Paragraphs 6.1.6 and 6.1.7 below, the right to telecast a non-dramatic live reading of the Property directly from the reading to the audience, the reading not being recorded on any device by any means whatsoever except for non-commercial archival purposes. Such live telecast shall occur simultaneously with the reading and shall not be reproduced by any method or means. Owner's right hereunder is subject to Company's right at all times: (i) to use live actors to televise excerpts from and abridged versions of any audiovisual works produced hereunder for advertising/promotional and exploitation purposes, and (ii) to telecast its audiovisual works.

      6.1.5.   Author–Written Sequels. Subject to Paragraphs 6.1.6 and 6.1.7 below with respect to the Equivalent Rights and the Equivalent Reserved Rights, the right to write and publish printed versions of Author-Written Sequels to the Property, whether hardcover or softcover and in magazines or other periodicals, whether in installments or otherwise. An "**Author-Written Sequel**" is a work of authorship, whether created by or authorized by Owner before, contemporaneously with or after the creation of the Property that (i) uses one (1) or more of the characters appearing in the Property participating in different events from those found in the Property (whether prior to, concurrent with, or subsequent to the events contained in the Property) and whose plot is substantially different from that of the Property, and/or (ii) is published or marketed as a sequel or prequel to the Property, or as part of a series or anthology that includes or is related to the Property.

      6.1.6.   Holdbacks. Except for the Reserved Publishing Rights, Reserved Radio Rights and Reserved Recital Rights, Owner shall not exercise or exploit, or permit the exercise or exploitation of, any of the Reserved Rights until four (4) years after the initial commercial exhibition of the Picture, or six (6) years after the date of exercise of the Option by Company, whichever occurs first ("**Holdback Period**"). Further, Owner agrees that if Owner writes an Author-Written Sequel, Owner will not dispose of or exploit rights in such Author-Written Sequel corresponding or equivalent to the Rights ("**Equivalent Rights**") or to the Reserved Rights other than publishing rights, non-dramatic radio rights, and non-dramatic recital rights ("**Equivalent Reserved Rights**") until expiration of the Holdback Period. Upon the expiration of the Holdback Period, Company shall have the right of first negotiation and last refusal with respect thereto, in accordance with the provisions of this Paragraph 6, provided, however, Company shall not be obligated to exercise or waive such right to negotiate prior to having an opportunity to review a completed manuscript for such Author-Written Sequel. With respect to the Equivalent Rights, Owner's right to convey any such rights to a third party is in any case limited to a one-picture license, only, in the new characters and material contained in such Author-Written Sequel and not contained in the Property, it being understood that all characters and material contained in the Property (as well as characters and/or material created by, or under the authority of, Company in connection with the exercise of Company's rights hereunder) belong solely and exclusively to Company in perpetuity throughout the universe. Additionally, the Equivalent Rights may only be licensed to a third party if the Author-Written Sequel is published and protected by copyright, and the Equivalent Rights in not more than one (1) Author-Written Sequel may be disposed of in any two (2) year period, the first such period shall be the two (2) years commencing after the expiration of the Holdback Period, and each succeeding two (2) year period shall be the two (2) years following the date on which the most recently submitted Author-Written Sequel was submitted to Company pursuant to this Paragraph 6.

      6.1.7.   First Negotiation / Last Refusal. If Owner at any time proposes to negotiate with any party for the license, exercise or other disposition of any or all of the Reserved Rights (other than the Reserved Publishing Rights, Reserved Radio Rights, and Reserved Recital Rights), or the Equivalent Rights or the Equivalent Reserved Rights, Owner shall give Company written notice thereof and an opportunity to so negotiate prior to Owner so negotiating with any third party. If Company elects to so negotiate, Owner and Company shall

CONFIDENTIAL - ATTORNEYS' EYES ONLY

BARTZ000003555

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

negotiate in good faith for a period of not less than thirty (30) days from the commencement of such negotiations, and if an agreement does not result therefrom, Owner may thereafter negotiate with any third party. If Owner at any time is prepared to enter into an agreement with a third party for the license, exercise or other disposition of any or all of the Reserved Rights, or the Equivalent Rights, or the Equivalent Reserved Rights, Owner shall, before entering into such agreement, give Company written notice of the proposed terms thereof (and all modifications of such terms) and the party involved. In each instance, Company shall then have ten (10) business days after receipt of Owner's written notice in which to elect to acquire the rights involved on the monetary terms contained in the written notice, it being understood that Company shall not be obligated to meet any non-monetary term set forth in such written notice which cannot be met as easily by one party as another. If Company does not elect to acquire the rights involved, Owner shall be free to enter into an agreement with the third party for such rights, but only upon the terms and conditions previously specified in Owner's written notice to Company; provided, however, that if such agreement between Owner and such third party is not confirmed in writing within thirty (30) days following the date that Owner is free to enter into an agreement with the third party, Company's negotiation rights hereunder shall revive with respect to the rights involved. Company's negotiation rights hereunder shall continue in full force and effect so long as Owner retains any right, title or interest in and to the Reserved Rights, or the Equivalent Rights or the Equivalent Reserved Rights.

6.2.    Frozen Rights. On a strictly non-precedential basis the following Rights are "frozen": novelizations of the Picture, graphic novel rights and comic book rights (collectively, "**Frozen Rights**"). For the purpose of this Agreement, "frozen" shall mean that Company will not exploit such Frozen Rights without Owner's written consent or the parties' mutual written agreement. If Company wishes to exploit any Frozen Right(s), Owner agrees to engage in good faith discussions with respect thereto, provided that the applicable Frozen Right(s) may only be exercised pursuant to the aforementioned consent or agreement.

7.    CREDIT. Provided that Owner is not in default hereof, then, subject to applicable guild and union restrictions, Company shall accord Author credit as follows:

7.1.    On Screen. On screen, on a single card separate from the card used to accord "Screenplay By" or "Written By" credit, in the main titles (i.e., where the individual credits for the principal cast and the "directed by" credit appear, whether located at the beginning of the Picture or at the end of the Picture as so-called "main-on-end titles") of all positive prints of the Picture, in substantially one (1) of the following forms: (i) "Based on the novel by Andrea Bartz", if the title of the Picture is the same as the title of the Work, or (ii) "Based on the novel "We Were Never Here" by Andrea Bartz", if the title of the Picture is something other than the title of the Work.

7.2.    Paid Ads. Subject to Paragraphs 7.4 and 7.5, in the billing block portion, if any, of paid advertising for the Picture that is issued or directly controlled by Company and in which the billing block appears ("**Paid Ads**").

7.3.    Excluded Ads. In the billing block portion, if any, of Excluded Ads in which the screenwriter(s) is/are accorded credit in the billing block of such Excluded Ad (other than in an award, congratulatory or nomination ads naming only the honoree(s), ads announcing a personal appearance, the audio portion of trailers, teasers, and radio and television advertising).

7.4.    Exclusions and Exceptions. Company's Paid Ad credit obligations as set forth herein, if any, shall be subject to Company's and any distributor's standard and customary exclusions and practices and additionally shall not apply to the following forms of Paid Ads (collectively, "**Excluded Ads**"): group, list, institutional and so-called teaser advertising; special advertising; announcement advertising; advertising relating primarily to the source material upon which the Picture is based or to the author thereof, any member of the cast, the producer(s),

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                              BARTZ000003556

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

writer(s) or any other personnel involved with the production of the Picture; award, nomination, congratulatory and similar advertising; trailers (including promotional films) and other screen, radio or television advertising; advertising in narrative form; advertising for film festivals, film markets and the like; advertising one-half page (or the equivalent in SAU's) in size or less; outdoor advertising (including, but not limited to so-called 24-sheets); theater display advertising; advertising in which no credit is accorded other than credits to actors and/or to Company and/or to any other company financing or distributing the Picture. Notwithstanding anything to the contrary herein, the following shall not be considered Paid Ads or Excluded Ads for any purpose hereunder: DVD's, Blu-ray discs and other home video devices and the covers, packages, containers and jackets therefor; publicity and promotional items, and materials for such items; digital media (e.g., internet banner ads, related content ads, social media ads, etc.) and/or artwork and other material appearing on the Distribution Service (as defined below); so-called "showcase" campaigns; advertising relating to subsidiary or ancillary rights in the Picture (including, but not limited to novelizations, screenplays or other commercial publications, products, merchandising, press books, souvenir programs and other promotional items, music publishing, sheet music and song books, and soundtrack recordings) or in connection with content available for download, streaming or video-on-demand; voiceovers, advertising, publicity and exploitation relating to by-products or commercial tie-ins; and other advertising not relating primarily to the Picture.

7.5.     Subsequent Productions. Company shall propose a source material credit for Author on subsequent feature-length sequels, prequels or remakes of the Picture or on subsequent episodic productions based upon the Picture (i.e., Company shall apply in good faith then-current Writers Guild of America ("WGA") source material credit criteria, including, without limitation, factors such as whether any of the primary characters in such subsequent production are characters which appeared in the Property or whether the story line for the subsequent production is derived directly from the Property); provided that Owner agrees that if Company determines in good faith that the screenwriters of the Picture or of the applicable subsequent production would be entitled to sole "Story by" under WGA source material guidelines, Company may elect not to propose a source material credit for Author on such subsequent production (it being understood that whether any source material credit is ultimately included and the form of such source material credit, if any, will be finally determined by Company).

7.6.     General Credit Matters. Except as expressly provided for in this Paragraph 7, all other aspects of Author's credit (including placement, form, size, style, duration, prominence etc.) shall be determined by Company in its sole and absolute discretion. No casual or inadvertent failure by Company and no failure by any third party to comply with the credit provisions of this Agreement shall constitute a breach of this Agreement by Company. Any reference herein to the "title" of the Picture shall be deemed to mean the "regular" title unless such reference is specifically made to the "artwork" title. If other material is incorporated into the screenplay for the Picture, then Company may, in its sole discretion, also accord credit with respect to such material. All credits shall be subject to foreign co-production and/or tax or treaty production rules and requirements (if any). If Company fails to accord the required credit hereunder, then upon written notice by Owner to Company specifying such failure in reasonable detail, Company shall use reasonable efforts prospectively to cure such failure, provided that neither Company nor any third party shall be obligated to destroy, cease using, withdraw from distribution or the marketplace, or replace any existing (i.e., created, printed, exhibited, distributed and/or committed prior to the date of Company's receipt of such notice) content, product and/or materials, whether online, digital and/or physical. Company shall use reasonable commercial efforts to advise third party distributors/licensees with whom it is in privity of contract to accord credits pursuant to this Paragraph (and inclusion of such credit requirements in any agreement with and/or documentation provided to the applicable third party shall be deemed to satisfy such efforts), provided that, notwithstanding anything to the contrary herein, no third party failure to comply with the credit specifications set forth herein shall constitute a breach of this Agreement by such third party.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

BARTZ000003557

CONFIDENTIAL / NON–PRECEDENTIAL / NON–CITABLE

8.       ANNOTATION GUIDE.  If and to the extent any material (including, without limitation, characters and characterizations) contained in the Property is based in whole or in part on any actual individual, whether living or dead, or any "real life" incident, Owner shall prepare and deliver to Company, promptly upon Company's request, a complete, true and accurate written annotation of such material ("**Annotation**") in accordance with the guidelines provided in the Annotation Guide attached hereto as Exhibit "D" and incorporated by reference herein. Owner shall also accurately provide such other information as may be reasonably required by Company or its insurance carrier for the purpose of evaluating the risks involved in utilizing the Property and/or the exploitation of any of the Rights.

9.       NAME AND LIKENESS.  Owner hereby grants to Company the right to use and authorize others to use, in any manner or medium, throughout the universe, in perpetuity, Author's name (including any professional name and any sobriquet), likeness, and biographical information, with no additional compensation to Owner or Author, in and in connection with the following: (i) the Picture and any and all other works created by or for Company in the exercise of the Rights granted to Company hereunder including the advertising, publicity, promotion, distribution, exhibition and/or exploitation thereof, and (ii) products and/or services of the Picture's distribution service (such distribution service, whether delivered by Netflix, Inc. its parent(s), subsidiary(ies), affiliate(s), entities, and/or any successor(s), assign(s), licensee(s) and/or other entities under common control with or of any of the foregoing, the "**Distribution Service**") and/or its promotional and/or commercial partners (including, without limitation, with respect to promotional and/or commercial tie–ins, product placement and point–of–purchase campaigns) which coincide (as determined by Company in its sole good faith business judgment) with the advertising, publicity, promotion, distribution, exhibition or exploitation of the Picture or any other work created by or for Company in the exercise of the Rights granted to Company hereunder; provided that Author will not be represented as personally endorsing any product or service without Author's prior consent. Owner may provide photographs and/or other likenesses of Author for Company's use in connection with this Paragraph 9, and Company shall give good faith consideration to using such photographs and/or other likenesses, provided that Owner provides such photographs and/or other likenesses no later than ten (10) days after Company's request therefor; provided, however, any failure by Company to use such photographs and/or other likenesses shall not be deemed a breach of this Agreement. Owner may provide facts to be used in Author's biography for Company's use in connection with this Paragraph 9, and Company shall give good faith consideration to using such facts (subject to Company's right to edit such facts), provided that Owner provides such facts no later than ten (10) days after Company's request therefor; provided, however, any failure by Company to use such facts shall not be deemed a breach of this Agreement. Notwithstanding anything to the contrary herein, Owner hereby acknowledges and agrees that the use of Author's name in cast/crew lists, billing blocks, main or end title credits, trailers, and/or other similar materials shall not be deemed to constitute an endorsement that would require Author's consent.

10.      NO OBLIGATIONS / RIGHTS CUMULATIVE / NO DEROGATION.  Without limiting Company's rights at law or in equity, all of Company's obligations hereunder are subject to Owner not being in default of the Agreement. Nothing contained in this Agreement shall be construed as requiring Company to exercise or exploit, or to continue to exercise or exploit, any of the rights herein granted to Company or to maximize revenues. All rights granted to Company hereunder shall be cumulative. Company may exercise or refrain from exercising any one or more of such rights separately from, simultaneously together, or in connection with any other rights granted to Company hereunder or from other sources, and regardless of whether said rights are granted in the disjunctive or conjunctive. Nothing contained in this Agreement shall be construed to be prejudicial to, or operate in derogation of, any rights, licenses, benefits, privileges or property that Company may now or hereafter enjoy or be entitled to as a member of the general public or that Company may otherwise have independent of this Agreement.

11.      REVERSION.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                            BARTZ000003558

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

11.1.    If Company exercises the Option and if principal photography of the Picture does not commence by the date that is five (5) years after the date of Company's exercise of the Option ("**Reversion Period**"), then all of the Rights in and to the Property granted to Company hereunder shall revert to Owner, subject to and conditioned upon Company's receipt of documentation ("**Documentation**"), as is sufficient in Company's sole good faith judgment, to vest Company with a perfected first-priority security interest and lien ("**Security Interest**") to secure the payment to Company of an amount ("**Reversion Price**") equal to the aggregate of the following: (i) all amounts paid by Company to Owner in connection with the Property; (ii) an overhead fee equal to ten percent (10%) of the aggregate amount determined in the foregoing clause (i); and (iii) interest on the aggregate amount determined pursuant to the foregoing clauses (i) and (ii) at the prime rate of Company's primary bank plus one and one-half percent (1.5%); which Reversion Price shall be due and payable to Company in accordance with Paragraph 11.2 below. The Reversion Period shall be automatically extended by the length of time of each event or matter set forth in Paragraph 2.6 above. Further, Company shall have the right to extend the Reversion Period (as same may have been automatically extended as provided for herein) for an additional period of eighteen (18) months by giving Owner written notice thereof prior to the expiration of such Reversion Period and concurrently paying Owner the sum of $▮500.

11.2.    The Reversion Price shall be due and payable upon the earlier of: (i) Owner setting up the Property, or any element thereof, with any third party (e.g., the option, sale, license, transfer or other commitment to a third party with respect to the Property); and (ii) the commencement of principal photography of the first project based on or produced in connection with the Property or the Rights or any element thereof. In addition, upon expiration of the Reversion Period, if ever, Company shall automatically be vested with (and Owner shall execute all Documentation necessary to so vest in Company) a Security Interest in the Property until the Reversion Price has been paid in full to Company, and Company shall have the right to take any and all action to enforce and/or protect Company's rights hereunder. In the event that the Rights in and to the Property granted to Company hereunder  revert to Owner in accordance with this Paragraph 11, and if Owner or any third party at any time thereafter makes any disposition of the Property or any element thereof, or produces or in any way facilitates the development and/or production of any work based, in whole or in part, upon the Property or any element thereof (each an "**Other Work**"), then Owner shall indemnify and hold harmless Company and the Company Indemnitees from and against any and all claims arising from or in connection with the disposition of the Property or any element thereof, and/or arising from or in connection with the development, production and/or exploitation of any Other Work, pursuant to the indemnification procedures set forth in Paragraph 13 below.

11.3.    In the event of a reversion in accordance with this Paragraph 11, Owner shall not be deemed to have acquired any right, title or interest in or to any screenplays, treatments, outlines or other material created or developed by or for Company which is based upon the Property or any element thereof.

12.    REPRESENTATIONS AND WARRANTIES. Owner represents, warrants and agrees that:

12.1.    Original Work. The Property was written solely by Author and is wholly original with Author (except for minor and incidental material that is in the public domain throughout the universe, which Owner shall promptly identify to Company upon Company's request therefor).

12.2.    Prior Publication/Agreements. The Work was initially submitted for copyright registration with the United States Copyright Office in the name of Andrea Bartz Inc. on August 10, 2021, under Registration Number _____. Owner has entered into only the following agreement(s) with third parties for the publication or dramatic production of the Property: the Publishing Agreement with Penguin Random House dated November 12, 2019; and the Property shall be deemed to have been previously published or exploited for

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                          BARTZ000003559

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

the purpose of any applicable collective bargaining agreement.

12.3.    No Infringement.  Neither the Property, nor any material supplied by Owner to Company hereunder, nor any part or element thereof, nor the exercise by Company (including its successors, assignees and licensees) of any or all of the rights granted to it hereunder, shall at any time: (i) infringe upon or violate the personal or property rights or any other rights of any person or entity (including, without limitation, the rights of copyright, trademark, privacy and publicity); or (ii) contain any element or material that in any manner constitutes a libel, slander or other defamation of any person or entity (solely with respect to non-copyright and non-trademark related claims, the representations specified in this Paragraph 12.3 are made to the best of Owner's knowledge, including that which Owner should have known after investigation in the exercise of reasonable prudence and due inquiry).

12.4.    Annotation.  The Property is wholly fictional and is not based in whole or in part on any actual individual, whether living or dead, or any "real life" incident, except if and to the extent specified in the Annotation furnished by Owner to Company concurrently with the execution of this Agreement, if any.

12.5.    No Encumbrances.  The Property, the Rights and all other rights and privileges granted or to be granted to Company hereunder are and shall at all times be free and clear of any liens, claims, charges or encumbrances.

12.6.    No Claims.  No claims, litigation or other proceedings have heretofore been asserted and/or brought and no claims, litigation or proceedings are pending, nor have any of the foregoing (to the best of Owner's knowledge, including that which Owner should have known after reasonable investigation in the exercise of reasonable prudence and due inquiry) been threatened, relating to the Property, the Rights and/or any of the other rights and privileges granted or to be granted to Company hereunder.

12.7.    Authority.  Owner is duly organized, validly existing and in good standing under the laws of its jurisdiction, and Owner has all requisite power and authority to own and operate its properties, to carry on its businesses as now conducted and proposed to be conducted. Owner is the sole and exclusive owner of the Property, and of all the Rights, and of all other rights and privileges granted or to be granted to Company hereunder, and Owner has full right, power and authority to make and perform this Agreement without obtaining the consent or approval of any person or entity. When executed and delivered, this Agreement will be the legally valid and binding obligation of Owner.

12.8.    No Prior Grant.  Owner has not heretofore in any way exercised, disposed of, or optioned the Rights or any part thereof.  Without limiting the generality of the foregoing, the Property has not previously been performed, exploited or exhibited as a motion picture, television production, play or in any other form of audio-visual production, and no rights have been granted or licensed to any third party to do so.

12.9.    Copyright Protection.  The Property enjoys, and will enjoy, either statutory or (to the extent it may exist) common law copyright protection in the United States and all other jurisdictions adhering to the Berne and Universal Copyright Conventions, and the Rights granted to Company hereunder are and will be exclusive in all such jurisdictions.

12.10.   No Impairment/No Payments.  Owner has not done or omitted to do, nor will Owner do or omit to do, any act or thing which does, could or will interfere with, impair, abrogate, encumber, increase the expense and/or time necessary to, or adversely or otherwise affect Company's full enjoyment or use of the Rights and all other rights and privileges granted and to be granted to Company under this Agreement.

Page 14 of 28
OIF | "WE WERE NEVER HERE" – Andrea Bartz_Option-Purchase Agr_v7_083121_KO_EXE

CONFIDENTIAL - ATTORNEYS' EYES ONLY

BARTZ000003560

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

12.11.    No Third Party Obligations.    Owner has not entered into any agreement (written or oral, implied or express) with any third party which relates to the Picture or the production of the Picture, nor has Owner made any promises to any third party in connection with the Picture or the production of the Picture.

12.12.    Prior Instruments Valid.    Owner has delivered a copy of all Prior Instruments, if any, to Company prior to Owner's execution of this Agreement. The Prior Instruments, if any, have not been modified or cancelled in any way other than by valid written amendment attached thereto, and are in full force and effect as originally signed or as amended.    Owner has not granted or assigned any right, title or interest heretofore acquired by Owner in, to or under the Prior Instruments in any manner inconsistent with the rights granted to Company under this Agreement.    Owner has paid to the party or parties entitled thereto all sums which have heretofore become payable under any of the Prior Instruments, and Owner will hereafter pay or cause to be paid, to the party or parties entitled thereto, all sums which may hereafter accrue under all Prior Instruments.

13.    INDEMNIFICATION.

13.1.    By Owner.    Owner shall indemnify and hold harmless Company, its parent, subsidiary and affiliated entities, successors, licensees and assigns, and their respective members, officers, directors, shareholders, representatives, employees, contractors, partners, licensees and agents (collectively, "**Company Indemnitees**") from and against all third party claims, actions, liabilities, losses, damages, and expenses (including reasonable outside attorneys' fees and costs) arising out of, relating to, or founded upon: (i) Owner's breach or default of any representation, warranty, or agreement herein; and/or (ii) Owner's gross negligence, and/or intentionally tortious or reckless acts or omissions; and/or (iii) Owner's exploitation of the Reserved Rights (each, an "**Owner-Indemnified Claim**" and collectively, "**Owner-Indemnified Claims**").

13.2.    By Company.    Company shall indemnify, defend and hold harmless Owner from and against any and all third party claims, actions, liabilities, losses, damages, and expenses (including reasonable outside legal fees and costs) arising out of, relating to, or founded upon: (i) the alteration by Company of the Property or material added to the Property by Company; and/or (ii) Company's development, production, distribution and/or other exploitation of the Picture, or any other works created by or for Company in the exercise of the Rights granted to Company hereunder or any element thereof or ancillary rights therein; provided Company shall have no indemnification obligations arising out of, relating to, or founded upon an Owner-Indemnified Claim(s) as set forth above.

13.3.    Notice Of Claim/Control.    A party seeking indemnification shall, upon presentation of any claim or institution of any action covered by the foregoing indemnity provision, promptly notify the other party in writing of the presentation of such claim or the institution of such action, giving full details thereof. Company shall have the right, but not the obligation, to maintain control of the conduct of the defense of any claim or action for which Owner is the indemnifying party; provided that in any such claim or action, Owner may have independent counsel, at Owner's sole cost and expense, participate on behalf of Owner.    With respect to any claims for which Company is the indemnifying party, Company shall maintain control of the conduct of the defense thereof. The indemnified party shall, upon the indemnifying party's request, cooperate (which shall not include the payment of any of the indemnifying party's fees, costs or expenses) in the defense thereof, it being understood that failure to cooperate will result in denial of indemnification. Company shall have the right to adjust or settle any claim or action as it may determine in its sole good faith discretion without affecting the foregoing indemnity; provided, however, that if Company and/or Owner are named defendants to a claim in which damages, if any, are confined solely to monetary damages at law (i.e., cash only), and Company wishes to enter into a settlement but Owner is unwilling to accept such settlement, Company will not settle any portion of any claim(s) attributable to Owner (other than customary clearance claims or claims that, if successful, would diminish or eliminate any of the Rights granted to Company hereunder, any of which Company may settle in its

CONFIDENTIAL - ATTORNEYS' EYES ONLY

BARTZ000003561

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

sole discretion), but may settle any claim against Company; and further provided that, if Company wishes to enter into a settlement agreement for any claim involving Company and/or Owner as named defendants and Owner is unwilling to accept such settlement agreement, then Company shall no longer have any obligation to defend and/or indemnify Owner with respect to the entire claim which Company was willing to settle. Company shall not make an admission of liability on behalf of Owner as part of any settlement.

14.     IRREVOCABILITY / COPYRIGHT.  Owner shall take and complete any and all steps and proceedings required by the law of any jurisdiction in the world in which the Property is published to secure copyright in the Property and to prevent the Property from falling into the public domain by reason of any such publication. Owner shall take such steps as may be reasonably necessary to renew or extend, insofar as possible, any and all copyrights now or hereafter secured upon the Property, including in the Reserved Rights.  All Rights granted and agreed to be granted to Company under this Agreement shall be irrevocably vested in Company in perpetuity, including, without limitation, for the full term of copyright protection everywhere in the world and in any and all renewals, extensions and revivals thereof, subject to Owner's right of reversion set forth in Paragraph 11 above. As a material part of the consideration paid to Owner for its execution of this Agreement, Owner agrees that in the event the termination of transfer provisions of Section 203 of the United States Copyright Act shall be applicable prior to the termination of Company's rights hereunder, and/or if Owner otherwise becomes entitled to exercise any right of reversion or recapture ("**Recapture Rights**"), Owner shall not be entitled to use any title used for any audiovisual work produced under this Agreement, and Company shall have a right of first negotiation and right of last refusal with respect to the renewal of the Rights granted to Company hereunder in accordance with the procedure set forth herein as if the Recapture Rights were deemed a Reserved Right hereunder.  If Owner fails to do any of the things specified in the first two sentences of this Paragraph, Company is hereby irrevocably granted the power (which is coupled with an interest) to perform such acts and take such proceedings in the name and on behalf of Owner as its attorney-in-fact.

15.     PREMIERE. If the Picture is released to the general public and provided that Owner is not in default hereof, then Author and a guest shall receive invites to one (1) major U.S. "celebrity" premiere of the Picture arranged by Company, if any.  If Author attends such premiere at a location more than seventy-five (75) miles from Author's closest residence (i.e., closest to the location of the premiere), Author (but not Author's guest, who shall be entitled only to an invite to the premiere itself, if any) shall be provided with the following, subject in each instance to Company's customary booking and expense policies and procedures: (a) reasonable round-trip air transportation between the premiere location and either Author's closest residence or such other location as Author may be at the time of the premiere (provided that the transportation costs in connection with such other location are not greater than those in connection with Author's closest residence); (b) reasonable hotel accommodations; (c) ground transportation to and from all airports and living accommodations; and (d) Company's customarily provided per diem entitlement.

16.     DVD/BLU-RAY DISC.  If the Picture is released to the general public and is substantially based upon the Property, and provided that Owner is not in default hereof, then Company shall provide Author with either a DVD or a Blu-Ray of the Picture (for Author's personal home use only) if and when the same is commercially available.

17.     PUBLICITY RESTRICTIONS.  Owner shall not release, disseminate or issue, or authorize, encourage or cause the release, dissemination or issuance, of any publicity (including, without limitation, making any form of public statement, furnishing information or opinions to members of the press whether "on-the-record" or "off-the-record" and whether or not for attribution, and/or participating in any other manner in the writing, publication or broadcast of any news story, publicity, press release or exploitation of any kind, or any response thereto) in any manner and/or media (including, without limitation, by television, radio, newspaper, and/or interactive/social media/social networking services/websites such as Facebook, Twitter or any other interactive

OIF | "WE WERE NEVER HERE" – Andrea Bartz_Option-Purchase Agr_v7_083121_KO_EXE

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                  BARTZ000003562

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

social network or personal blog) concerning this Agreement, Company (including any of its officers, employees or agents), the Picture or any person(s) rendering services or providing products in connection therewith without Company's prior specific written consent; provided, however, that non-derogatory references to the Property and/or incidental non-derogatory references to the Picture shall be permitted, in each case, solely to the extent they do not include any Confidential Information. The publicity restrictions specified in this Paragraph may be referred to herein as the "**Publicity Restrictions**".

18.      CONFIDENTIALITY.  Owner shall at all times keep confidential, and shall not use in any manner that is detrimental to Company's interests, the following: any information relating to the Picture (including, but not limited to, plots, stories, characters, dialogue, development/production/distribution plans, ancillary exploitation plans, marketing plans and surveys, development and production costs and other financial information); the terms of this Agreement, and all other information relating to the business of Company, and any related or affiliated entity thereof (collectively, the "**Confidential Information**"). Owner shall have a continuing duty to not disclose any Confidential Information to any person or entity in any manner, except as authorized by Company in writing or required by law, and to the extent Owner is legally compelled to disclose such Confidential Information by the valid order of a court of competent jurisdiction, in which event Owner shall so notify Company as promptly as practicable (and, if possible, prior to making any disclosure) and shall cooperate in obtaining a protective order narrowing the scope of such disclosure and/or use of the Confidential Information. Owner's confidentiality obligations hereunder shall apply to any and all media whatsoever, including, without limitation, any social networking site; micro-blogging service; user-generated or user-uploaded content website; online forum, discussion thread or comment section; personal website or blog; user modified website; or any other website, service, platform, program, application or other form or method of communication, whether now known or hereafter devised (e.g.,   Facebook, Twitter, YouTube, etc.). Owner may disclose Confidential Information to Owner's representatives who (i) have been advised of and agreed to abide by the obligations of confidentiality; (ii) agree not to disclose the Confidential Information; and (iii) require the information in order to advise Owner in accordance with the Agreement. Notwithstanding the foregoing, Owner agrees to notify Company immediately upon discovery or suspicion of any unauthorized disclosure of Confidential Information in any form, including that which may result in Confidential Information being released, duplicated or otherwise transferred outside the control of Owner (including without limitation, through an electronic hack). Upon Owner's discovery of any such unauthorized disclosure of Confidential Information, Owner agrees to cooperate with Company to regain possession of the Confidential Information and prevent its further unauthorized use and/or dissemination.

19.      INSURANCE.  Owner shall be covered under (i) Company's errors and omissions insurance policy; and (ii) if the Picture is produced, Company's general liability insurance policy for the Picture; in accordance with the terms and subject to the exclusions, conditions and limitations of such policy(ies), including subrogation, for so long as, and only to such extent as, such policy(ies) is/are carried by Company, provided that coverage is available at no additional cost to Company and with no additional deductible.  The provisions of this Paragraph shall not be construed so as to limit or otherwise affect any obligation, representation or agreement by Owner hereunder.

20.      COMPANY'S RIGHTS UNIQUE / COMPANY'S RIGHT TO INJUNCTIVE RELIEF.  Each of the rights and privileges granted and agreed to be granted to Company hereunder, and the restrictions upon and obligations of Owner (including, without limitation, the confidentiality, non-disclosure and publicity restrictions set forth herein), under this Agreement is of an unusual, extraordinary and intellectual character giving it a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in any action at law. Accordingly, a breach or default of this Agreement, or any part thereof, by Owner shall cause Company irreparable injury, and Company shall be entitled to seek, and shall be entitled to, injunctive and any and all other equitable relief to secure enforcement of this Agreement, but resort to such relief shall not waive Company's other rights or remedies.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                              BARTZ000003563

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

21.     REMEDIES.  In the event of a breach or default of this Agreement by Company, Owner agrees that Owner's sole remedy shall be the right to seek money damages incurred as a result of such breach or default, if any.  Owner shall not seek or have the right to injunctive or other equitable relief, or to rescind this Agreement or the rights granted herein, or to restrain in any manner the production, distribution, exhibition, advertising or any other exploitation of any production based upon the rights granted hereunder or produced pursuant to this Agreement, or any subsidiary or ancillary rights in connection with the foregoing. In no event shall Company be liable for consequential, special, exemplary or punitive damages, including, without limitation, lost or anticipated profits.

22.     REMEDIES CUMULATIVE. All remedies accorded herein or otherwise available to Company shall be cumulative, and no one such remedy shall be exclusive of any other.  The commencement or continuation of any action by Company shall neither constitute an election on Company's part to terminate this Agreement or any of Company's rights hereunder, nor constitute or result in the termination of any of Company's rights hereunder, unless Company shall expressly so elect by written notice to Owner.  The pursuit by Company of any remedy under this Agreement or otherwise shall not be deemed to waive any other or different remedy which may be available under this Agreement or otherwise at law or in equity.

23.     ASSIGNMENT.

        23.1.   By Company. Company may assign, license, transfer and/or delegate this Agreement in whole or in part (including, without limitation, the Rights and all other rights, obligations, options and privileges granted or to be granted to Company and Company's options and obligations hereunder, and all of Owner's representations and warranties hereunder), to any person or entity, and this Agreement and any or all of said rights, obligations, options, and privileges shall inure to the benefit of, and may in turn be freely licensed or assigned by, any such assignee, successor, transferee or designee.  In the event of any assignment, license, transfer or delegation by Company of this Agreement or any of Company's rights, obligations, options or privileges hereunder, Company shall remain secondarily liable unless such assignment is to an entity that assumes Company's obligations in writing and such entity is a major or mini-major production and/or distribution company, a U.S. television network, a party who supplies a substantial amount of Company's motion picture financing, a similarly financially responsible entity or any party which is affiliated with, owned or controlled by Company, or owns or controls Company or which through merger, operation of law, consolidation or acquisition succeeds to substantially all of the assets of the Company, in which case Company shall be relieved of all of its obligations hereunder.

        23.2.   By Owner. Neither this Agreement nor any of Owner's rights or obligations hereunder may be assigned, licensed, transferred and/or delegated by Owner; provided that Owner may assign, on a one-time basis, the right to receive the Passive Payments hereunder, subject to and conditioned upon Company's receipt of a Notice of Irrevocable Authority in form and substance satisfactory to Company executed by Owner and by the assignee and, if required by Company, Company's receipt of an Acknowledgement of Notice of Irrevocable Authority executed by Company, Owner and the assignee.  Any such assignment shall at all times be subject to all of Company's rights hereunder.

24.     NOTICES / PAYMENTS. Notices and other communications required or permitted to be given under this Agreement shall be given in writing and delivered by: personal delivery; overnight delivery service; mail; or email with reasonable evidence of receipt (e.g., confirmation by reply email or "read receipt"), properly addressed and stamped with the required postage (if applicable), and shall be sent to the addresses set forth below (subject to changes of which the parties are notified in writing in accordance herewith).  Notices shall be deemed given on the date personally delivered or emailed, one (1) business day after a notice is sent by overnight courier or certified mail, or three (3) business days after the date mailed.  All time periods hereunder shall be automatically

CONFIDENTIAL - ATTORNEYS' EYES ONLY

BARTZ000003564

CONFIDENTIAL / NON–PRECEDENTIAL / NON–CITABLE

extended if Owner fails to timely provide written notice to Company of all requisite payment information (e.g., tax ID numbers, addresses, etc.), including any updates or changes thereto, until such time as such information is received and processed by Company. Each party may change its mailing address or email address for notification purposes by giving the other party written notice of the new address which change shall become effective on the date upon which such written notice is received. Failure to deliver notice to any "courtesy copy" recipient(s) shall not be deemed a breach hereof. For the avoidance of doubt, Company does not accept service of proceedings via email.

| | |
|---|---|
| Notices to Owner: | c/o ICM Partners |
| | 10250 Constellation Boulevard |
| | Los Angeles, CA 90067 |
| | Attention: Josie Freedman |
| | Email: josie.freedman@icmpartners.com |
| | |
| With a courtesy copy of notices | |
| and payments to Owner: | c/o ICM Partners |
| | 65 East 55th Street |
| | New York, NY 10022 |
| | Attention: Amy Mellman |
| | Email: amy.mellman@icmpartners.com |
| | |
| To Company: | 5808 W. Sunset Boulevard |
| | Los Angeles, CA 90028 |
| | Attention: Head of Business & Legal Affairs, |
| | Original Independent Film |
| | Email: oif-legalnotices@netflix.com and legal@netflix.com |

For any inquiries regarding start paperwork, invoices, and timing of payments, please contact the Contract Administration department at the following email address: OFBLA-Payments@netflix.com.

25.    WAIVER. No waiver by either party hereto of any failure by the other party to keep or perform any covenant or condition of this Agreement shall be deemed a waiver of any preceding, succeeding or continuing breach or default of the same, or any other covenant or condition. Without limiting the foregoing, Company's payment of any compensation, and/or performance of any obligation, hereunder shall not constitute a waiver by Company of any breach by Owner. No action and/or omission of Company hereunder shall constitute a breach or default of this Agreement unless Owner first notifies Company in writing setting forth such alleged breach or default and Company does not cure same within a reasonable time after receipt of such notice, except that with respect to Company's failure to make a payment to Owner hereunder, the cure period shall be not more than fifteen (15) business days following Company's receipt of such notice.

26.    CONSTRUCTION. The language of this Agreement shall in all cases be construed as a whole according to its fair meaning and not strictly for or against any of the parties. The headings used in connection with the paragraphs and subparagraphs of this Agreement are inserted only for the purpose of reference. The identity of the drafter or the relative bargaining power of the parties shall not be considered in construing or interpreting any provision hereof. No addition, deletion, revision, change or other alteration in or to drafts of this Agreement prepared prior to the execution of the Agreement shall be referred to by any of the parties hereto in any arbitration or other proceeding in which the construction, interpretation or meaning of this Agreement is in dispute or otherwise be used for purposes of construing or interpreting any of the terms, provisions or language of this Agreement in adjudicating or otherwise resolving any such arbitration or proceeding.

OIF | "WE WERE NEVER HERE" – Andrea Bartz_Option-Purchase Agr_v7_083121_KO_EXE

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                        BARTZ000003565

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

27.     SEVERABILITY.  Nothing herein contained shall be construed so as to require the commission of any act contrary to law, and, if any provision of this Agreement conflicts with any present or future statute, law, ordinance or regulation, the provision of this Agreement affected shall be curtailed and limited only to the minimum extent necessary to make it consistent with such legal requirements and/or provision(s).

28.     RELATIONSHIP OF THE PARTIES.  This Agreement is not a partnership between or joint venture by the parties hereto and neither party is the agent of the other.  This Agreement is not for the benefit of any third party, whether or not referred to herein.

29.     OTHER AGREEMENTS.  Any breach, default or incapacity of Owner and/or Author under any other agreement with Company (and/or Company's related or affiliated entities), if any, in connection with the Picture shall, at Company's election, constitute a breach, default or incapacity (as applicable) of Owner and/or Author under this Agreement.  There shall be no duplication of the rights or benefits provided under this Agreement (e.g., invitations to premieres), and those provided under any other agreement between Company, on the one hand, and Owner and/or Author (and/or any entity utilized by Author), on the other hand, in connection with the Picture.

30.     FURTHER INSTRUMENTS.  Owner agrees to execute such further documents and do any other acts required by Company or its successors, licensees or assignees to evidence or effectuate Company's rights hereunder. If Owner fails to do so after a period of five (5) business days (reducible to two [2] business days if exigencies require), then Owner hereby appoints Company as Owner's attorney-in-fact with the full power and authority to do so on Owner's behalf, which power is coupled with an interest, with full rights of substitution and delegation, and shall be irrevocable. Company shall provide Owner with courtesy copies of any such document executed in Owner's name; provided that Company's failure to do so shall not be deemed to be a breach of this Agreement or affect the validity of such assignment, instrument or document.

31.     CONCURRENT EXECUTION. Concurrently with the execution of this Agreement, Owner shall execute and deliver to Company the Short-Form Option in the form attached hereto as Exhibit "A" and the Short-Form Assignment in the form attached hereto as Exhibit "B". The Short-Form Assignment shall not be dated or recorded with the United States Copyright Office unless and until Company has exercised the Option; at such time when Company has exercised the Option, if ever, Company shall have the right to date the Short-Form Assignment as of the date of exercise and may thereafter file it with the United States Copyright Office. If the Work has been published, Owner shall cause the publisher(s) of the Work to execute a Publisher's Release in the form attached hereto as Exhibit "C" concurrently with the execution of this Agreement.

32.     GOVERNING LAW.  This Agreement was fully negotiated and entered into, and shall be governed by and construed and enforced, in accordance with the laws of the State of California (United States of America) without regard to its rules on conflict of laws or any other rules that would result in the application of a different body of law.

33.     DISPUTE RESOLUTION. The parties agree to submit disputes arising under this Agreement to a court of competent jurisdiction in Los Angeles County, California.

34.     USE OF PERSONAL DATA: Owner hereby acknowledges that for purposes connected with the Agreement, including compliance with this Agreement and Company's legal and regulatory obligations in the normal course of a production (for example, as part of completing customary tax, immigration and insurance documents, and other customary start paperwork), Company may collect, use, and otherwise process certain individually identifiable information about Owner, Owner's relatives and associates (in the event such individuals are designated as emergency contacts or beneficiaries, for example) provided by Owner, including without

OIF | "WE WERE NEVER HERE" – Andrea Bartz_Option-Purchase Agr_v7_083121_KO_EXE

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                           BARTZ000003566

CONFIDENTIAL / NON–PRECEDENTIAL / NON–CITABLE

limitation personal data such as name, address, email address, government ID, banking and insurance information and sensitive personal data such as race or ethnic origin, health conditions (in the event Company requires medical records or an exam in connection with the production), criminal convictions and history (in the event Company requires a background check in accordance with its policies), and trade union information (collectively "**Personal Data**"). Owner further acknowledges that the processing of Personal Data may involve transfer or disclosure to Company's affiliated companies, Company's employees and agents, and to third parties, including without limitation, third party service providers, external advisors, government agencies, regulators and authorities, courts and other tribunals and other persons connected with Company and/or the Production and that such transfer may be to countries that may not provide a level of protection to Personal Data equivalent to that provided by Owner's home country, but in such instances Company shall use reasonable endeavors to have in place adequate measures to ensure the security of the Personal Data. To ensure that the Personal Data remains as accurate as possible, Owner hereby agrees to inform Company as soon as reasonably practicable of any changes thereto. Owner also represents and warrants that Owner is authorized to disclose Personal Data to Company. Company hereby informs Owner that Owner may have certain rights in respect of Personal Data (such as access, rectification and portability) and that further information about these rights and Company's processing of personal data generally can be obtained upon request from Company.

35.    COUNTERPARTS. This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original and all of which taken together shall constitute one and the same instrument. Scanned and electronic signatures provided hereto will be deemed original for all purposes hereunder, provided Company reserves the right to require Owner to provide original and/or notarized signatures (e.g., for government filings).

36.    ENTIRE AGREEMENT. This Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter hereof and replaces any and all prior agreements, understandings and representations, whether written or oral, relating in any way to the subject matter hereof. This Agreement may not be modified except by a written instrument signed by the parties.

*Signature Page Follows*

OIF | "WE WERE NEVER HERE" – Andrea Bartz_Option-Purchase Agr_v7_083121_KO_EXE

CONFIDENTIAL - ATTORNEYS' EYES ONLY

BARTZ000003567

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

In consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto have executed and delivered this Agreement as of the Effective Date.

### NETFLIX ENTERTAINMENT, LLC

By: _____

Its: Authorized Signatory

ACCEPTED AND AGREED:

**ANDREA BARTZ INC.**

By: _____

Its: President

FIN#: _____

By countersigning this Agreement, Author confirms that Author has read and understood this Agreement and confirms the authority of Owner to grant the rights herein granted to Company in accordance with the provisions hereof, and Author joins in and confirms all grants, representations, warranties and agreements made by Owner hereunder. Author will look solely to Owner for any and all compensation hereunder.

_____

**ANDREA BARTZ**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

BARTZ000003568

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

## EXHIBIT "A"
## SHORT-FORM OPTION

For good and valuable consideration, receipt of which is hereby acknowledged, the undersigned, ANDREA BARTZ INC., hereby grants to NETFLIX ENTERTAINMENT, LLC ("**Company**"), its successors and assigns, the sole and exclusive option to acquire all right, title and interest, except for certain rights expressly reserved by the undersigned, in and to that certain work of authorship ("**Property**") described as follows:

| | |
|---|---|
| TITLE: | "We Were Never Here" |
| AUTHOR: | Andrea Bartz |
| PUBLISHER: | Penguin Random House (Ballantine Books) |
| DATE OF PUBLICATION: | August 3, 2021 |
| COPYRIGHT REGISTRATION NO.: | |

The Property includes, but is not limited to: (i) all contents; (ii) all past, present and future adaptations and versions; (iii) the title, characters and theme; and (iv) the copyright and all renewals and extensions of copyright.

This instrument is executed in accordance with and is subject to that certain Option/Purchase Agreement ("**Agreement**") between the undersigned and Company dated as of April 16, 2021 ("**Agreement Date**"), relating to the option granted to Company to purchase the above-mentioned rights in the Property, which rights are more fully described in the Agreement. In the event of any conflict between this Short-Form Option and the Agreement, the Agreement shall control.

IN WITNESS WHEREOF, the undersigned has executed this Short-Form Option as of the Agreement Date.

**ANDREA BARTZ INC.**

By: _____

Its: _____President_____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

BARTZ000003569

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

## ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA            )
COUNTY OF                      )

On _____, 20__, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

Place Notary Seal Above

---

### OPTIONAL

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

**Description of Attached Document:**

Title or Type of Document:  Short-Form Option _____

Document Date: _____                Number of Pages: _____

Signer(s) Other Than Named Above: _____

Capacity(ies) Claimed By Signer(s): _____

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| Individual _____ | Individual _____ |
| Corporate Officer(s) -- Title(s): _____ | Corporate Officer(s) -- Title(s): _____ |
| Partner -- Limited General | Partner -- Limited General |
| Attorney-in-fact | Attorney-in-fact |
| Trustee  [Top of thumb here] | Trustee  [Top of thumb here] |
| Guardian or Conservator | Guardian or Conservator |
| Other: _____ | Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

Page 24 of 28
OIF | "WE WERE NEVER HERE" – Andrea Bartz_Option-Purchase Agr_v7_083121_KO_EXE

CONFIDENTIAL - ATTORNEYS' EYES ONLY                BARTZ000003570

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

## EXHIBIT "B"
### SHORT-FORM ASSIGNMENT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, ANDREA BARTZ INC. ("**Assignor**"), as of _____, 20__, sells and assigns to NETFLIX ENTERTAINMENT, LLC ("**Assignee**"), its successors and assigns, in perpetuity and throughout the universe, all right, title and interest, except for certain rights expressly reserved by the undersigned, in and to that certain work of authorship ("**Property**") described as follows:

| | |
|---|---|
| TITLE: | "We Were Never Here" |
| AUTHOR: | Andrea Bartz |
| PUBLISHER: | Penguin Random House (Ballantine Books) |
| DATE OF PUBLICATION: | August 3, 2021 |
| COPYRIGHT REGISTRATION NO.: | _____ |

The Property includes, but is not limited to: (i) all contents; (ii) all past, present and future adaptations and versions; (iii) the title, characters and theme; and (iv) the copyright and all renewals and extensions of copyright.

This Assignment is executed in accordance with and is subject to that certain Option/Purchase Agreement ("**Agreement**") between the Assignor and Assignee dated as of April 16, 2021, relating to the sale and assignment to Assignee of the above-mentioned rights in the Property, which rights are more fully described in the Agreement. In the event of any conflict between this Short-Form Assignment and the Agreement, the Agreement shall control.

IN WITNESS WHEREOF, the undersigned has executed this Short-Form Assignment on the date indicated above.

**ANDREA BARTZ INC.**

By: _____

Its: President _____

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                         BARTZ000003571

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

### ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                    )
COUNTY OF                              )

On _____, 20___, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

      WITNESS my hand and official seal.

_____
Signature of Notary Public

      Place Notary Seal Above

---

### OPTIONAL

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

**Description of Attached Document:**

Title or Type of Document:   Short-Form Assignment_____

Document Date: _____       Number of Pages: _____

Signer(s) Other Than Named Above: _____

Capacity(ies) Claimed By Signer(s): _____

| Signer's Name: _____ | | Signer's Name: _____ | |
|---|---|---|---|
| Individual _____ | | Individual _____ | |
| Corporate Officer(s) -- Title(s): _____ | | Corporate Officer(s) -- Title(s): _____ | |
| Partner -- Limited General | | Partner -- Limited General | |
| Attorney-in-fact | Top of thumb here | Attorney-in-fact | Top of thumb here |
| Trustee | | Trustee | |
| Guardian or Conservator | | Guardian or Conservator | |
| Other: _____ | | Other: _____ | |
| Signer Is Representing: _____ | | Signer Is Representing: _____ | |

Page 26 of 28
OIF | "WE WERE NEVER HERE" – Andrea Bartz_Option-Purchase Agr_v7_083121_KO_EXE

CONFIDENTIAL - ATTORNEYS' EYES ONLY

BARTZ000003572

CONFIDENTIAL / NON-PRECEDENTIAL / NON-CITABLE

EXHIBIT "C"

PUBLISHER'S RELEASE

[Attached.]

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    BARTZ000003573

CONFIDENTIAL / NON–PRECEDENTIAL / NON–CITABLE

## EXHIBIT "D"

### ANNOTATION GUIDE

Annotated property should contain for each element, whether an event, setting, character or section of dialogue within a scene, notes in the margin which provide the following information:

1.    Characters:  For each character:

     (a)    Whether the character is real, fictional or composite.

     (b)    For real characters, whether the actual person is living or dead (if living, whether a release has been signed), and whether the name has been changed.

     (c)    For composite characters, the name(s) of actual person(s) on whom the composite character is based, and what characteristics can be attributed to such actual person(s).

2.    Scene Notations:  For each element:

     (a)    Whether it presents or portrays fact, fiction or fiction which is a product of inference from fact.

     (b)    If fact or a product of inference from fact, the source material therefor, such as:

          (i)    For books:  title, author and page(s).

          (ii)    For newspaper or magazine articles:  date, page and column.

          (iii)    For interviews:  whether notes or tapes exist and, if so, a page or tape reference, and the participants.

          (iv)    For trial or deposition transcripts:  the court or other forum, date, person testifying, and transcript page number.

          (v)    Any other source.

3.    To the extent possible, multiple sources should be identified for each element.  Descriptive annotation notes are helpful (e.g., the setting is a restaurant because John Smith usually had business meetings in restaurants when visiting New York - Los Angeles Times; August 30, 1993, p.9).

4.    If partly fact and partly fiction, indicate what parts are fact and what parts are fiction.  For factual parts, describe source material as specified in Paragraph 2(b) above.

Copies of all materials referenced pursuant to Paragraph 2(b) above should be retained for no less than five (5) years for review by Company and cross-indexed by reference to page and scene numbers.  If notations are coded to avoid repeated references, a key to such coding must be separately provided.  Annotation is not required for general elements with no detail (*e.g.*, Int. Apartment. Day. however, a specific address such as 3124 Alvarado Street, Los Angeles, does.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                          BARTZ000003574