# EXHIBIT 17



**GRAND CENTRAL PUBLISHING**

AGREEMENT dated September 6, 2007 by and between Grand Central Publishing, a division of Hachette Book Group USA, Inc., 237 Park Avenue, New York, NY 10017 (the "Publisher") and **Charles Graeber** (the "Author") ℅ The Susan Golomb Literary Agency, 875 Avenue of the Americas, Suite 2302, New York, NY 10001, Attn: Susan Golomb, with respect to the non-fiction work provisionally entitled **UNTITLED\*** (the "Work"), as further described below.

*The final title shall be mutually agreed upon between the Author and the Publisher.

1.  **GRANT OF RIGHTS:** (a)  The Author hereby grants and assigns to the Publisher exclusive print, audio and electronic rights in the Work (and any revisions thereof), in whole or in part for the full term of copyright (including any renewals and extensions), in the English language, including the right to reproduce, publish, distribute, transmit, deliver, transfer, market and/or sell the Work, by any means including, but not limited to, fixed-copy, digital delivery, download, streamed formats, shared file distribution and wireless methods, in any media now known or hereafter devised, throughout the United States of America, its territories and dependencies, the Philippines, Puerto Rico and Canada (the "Exclusive Territory"). The Publisher may exercise and authorize others to exercise the above-described rights including the rights specified below in paragraph 4. The Publisher shall have the right to exercise or authorize others to exercise the same rights non-exclusively throughout the rest of the World excluding the British Commonwealth territories as listed in Schedule A hereto (the "Non-exclusive Territory"). (The Exclusive Territory and the Non-exclusive Territory shall be jointly called the "Territory"). The Publisher shall not sell, make or authorize sales to customers in countries as set forth in Schedule A, unless the country has lost its exclusivity pursuant to the laws of the country.

    (b)  The Work is described as follows: **an inside account of the hunt for Charles Cullen, America's most prolific serial killer, and an investigation of those complicit in his crimes. The Work shall consist of approximately between one hundred thousand and one hundred fifty thousand (100,000 – 150,000) words and a sufficient number of photographs for an 8 page black and white insert or as otherwise mutually agreed.**

    (c)  The Author grants to the Publisher and its licensees the irrevocable right to use the Author's name and approved likeness on the Work and in the sale, marketing and advertising of the Work. Any likeness supplied by the Author to the Publisher shall be deemed to have been approved.

    (d)  For the purposes of this Agreement, audio rights shall mean the right to use the Work as the basis for one or more non-dramatic sound recordings consisting of abridged and/or unabridged versions of the Work in audible form or in a form which can be rendered into audible form (hereafter referred to as an "Audio Work"). The scripts of all audio versions will be submitted to the Author for approval. The Audio Work may contain, in addition to the Work, incidental interstitial passages and background music and sounds supplied by the Publisher. Upon termination of this Agreement the Author shall be entitled to purchase the master copy of the Audio Work on terms to be mutually agreed in good faith.

    (e)  (i)  For the purposes of this Agreement, electronic rights shall mean the right to transform the unenhanced, non-dramatic, verbatim content of the Work (i.e., including text and any illustrations, etc.) into electronic, digital and magnetic media (whether now known or hereafter devised) without any material video or audio enhancement (the "Electronic Versions"), and shall include the right to publish and make available Electronic Versions, alone or as part of

HIGHLY CONFIDENTIAL
BARTZ000000207

publisher exercising rights reserved hereunder by the Author will contain reciprocal terms with respect to sales activity within the Publisher's Exclusive Territory. It is agreed and acknowledged that a casual or inadvertent failure to comply with the foregoing restrictions shall not be deemed a breach of agreement and such activities shall be deemed included within the grant of rights granted under agreements entered into by the Publisher or by any other English language publisher. Neither such party shall be responsible for the failure by any third party customer to honor such restrictions.

2. **ADVANCE:** (a) In consideration of the Author's promises and obligations under this Agreement, the Publisher shall pay to the Author as an advance against and on account of all of the Author's earnings under this Agreement, the sum of ███████ thousand dollars ($██,000.00), it being understood that all amounts payable under this paragraph 2 shall be referred to as the "Advance." The Advance shall be payable as follows:

(i) ███████ thousand dollars ($██,000.00) on execution of this Agreement;

(ii) ███████ thousand dollars ($██,000.00) on acceptance by the Publisher of at least half the manuscript and an outline;

(iii) ███████ thousand dollars ($██,000.00) on acceptance by the Publisher of the complete and final manuscript of the Work;

(iv) ███████ thousand dollars ($██,000.00) on first publication of the Publisher's hardcover edition of the Work; and

(v) ███████ thousand dollars ($██,000.00) on first publication of the Publisher's paperback edition of the Work.

(b) The Publisher agrees that the Advance shall be increased by a one-time bonus payment (the "Bonus Advance") of ███████ thousand dollars ($██,000.00), in the event that the total Advance is earned during the twelve (12) months following first publication of the hardcover edition of the Work, such Bonus Advance to be paid within thirty (30) days of the conclusion of the twelve (12) month period specified above. All earnings shall be subject to the Publisher's standard policies on reserves. Any royalties or licensing income accruing to the Author over and above the original Advance which have already been paid to the Author during the said twelve (12) month period shall be applied against the Bonus Advance, if any, due the Author at the end of such period.

(f) The Publisher agrees to increase the Advance in increments specified below, such increments not to exceed a total of ███████ thousand dollars ($██,000.00) for the Work, for each week the Work appears on The New York Times Hardcover Non-Fiction Bestseller List (the "List"), as follows:

(i) ███████ thousand dollars ($██,000.00) for each week the Work appears at position #1 on the List;

(ii) ███████ thousand dollars ($██,000.00) for each week the Work appears at positions #2 - #5 on the List; and

(iii) ███████ thousand five hundred dollars ($██,500.00) for each week the Work appears at positions #6 - #10 on the List.

Such amounts shall be paid to the Author, if earned, once a month commencing thirty (30) days after the initial appearance on such List.

3. **ROYALTIES:** Royalties shall accrue to the Author's account from sales by the Publisher of the Work, in whole or in part, in any media, as set forth below. For the purposes of this Agreement, the term "retail price" shall mean the suggested retail price for the Work less any freight pass-through increment, if any (not to exceed the lesser of $.50 or 5% of the retail price) and the term "net sales revenue" shall mean all sums actually received by the Publisher from its sales of the Work, less any applicable taxes, and any commissions or fees (not to exceed 15%) to third party agents or distributors incurred in making such sales.

(a) On copies sold in the United States:
    (i) hardcover editions:
        15% of the retail price

    (ii) trade paperback editions:
        7.5% of the retail price

HIGHLY CONFIDENTIAL
BARTZ000000208

(b) On copies sold outside the United States:
   (i)   hardcover editions:
       15% of net sales revenue

   (ii)   trade paperback editions:
       7.5% of net sales revenue

   (iii)   mass market editions:
       8% of net sales revenue

(c) Audio Work editions:
   (i)   10% of net sales revenue on all copies sold as packaged units (such as tapes and CDs) in the United States

   (ii)   7.5% of net sales revenue on all copies sold as packaged units (such as tapes and CDs) outside the United States

   (iii)   25% of net sales revenue on all copies transmitted by means of digital delivery.

(d) Electronic Versions:
   (i)   25% of Net Electronic Sales Receipts (as that term is hereafter defined below) on all copies sold. In the event the imprint publishing the Work generally offers its authors a higher base royalty rate for Electronic Versions, the Publisher will thereafter increase the Author's base royalty to such rate.

   (ii)   "Net Electronic Sales Receipts" shall mean all monies actually received by the Publisher from sales of the Electronic Versions as defined in paragraph 1(e)(i) above, less any applicable taxes, handling or processing fees paid by the Publisher, customer refunds resulting from bona fide ordering, billing or other errors in the transmission of the Work and commissions (not to exceed 15%) or fees payable to third parties (such as web hosters and digital rights management providers) incurred in connection with effecting the transaction or transmission of the Electronic Version to the customer. No deductions shall be made for normal overhead expenses. In the event the Electronic Version is sold by the Publisher in conjunction with other work(s) or as part of a package, group, bundle, subscription, installment series or other multiple work method, the royalty shall be multiplied by the Share Fraction. "Share Fraction" means a fraction, the numerator of which is the number of consumer downloads or readings of the Work and the denominator of which is the number of consumer downloads or reading of all works in the package, group, bundle, subscription, installment series or other multiple work method in which the Work is included.

(e) Large print:
   (i)   hardcover editions sold in the United States:
   5% of the retail price on the first 5,000 copies; 7.5% of the retail price on all copies thereafter

   (ii)   paperback editions sold in the United States:
   5% of the retail price

   (iii)   hardcover and paperback editions sold outside the United States:
   5% of net sales revenue

(f) Sets:
On copies sold by the Publisher as part of a package (subject to the Author's approval if such packages shall include works other than the Author's), or a set for a single price, the retail price or net sales revenue shall be determined by prorating the retail price or net sales revenue received from the sale of the entire package in proportion to the suggested retail prices for the separate items contained in the package, whether or not such works are sold separately.

(g) High discount; premium; large quantity; direct marketing:
Notwithstanding the above, the royalties in subparagraph (a), (c)(i) and (e)(i) and (ii) above shall not apply to the sales set forth below, which shall have the following royalties:

HIGHLY CONFIDENTIAL
BARTZ000000209

(i) On copies sold at a discount of 55% or greater off the retail price, the royalty shall be 10% of net sales revenue for hardcover and paperback editions and 7.5% of net sales revenue for all other editions (e.g. large print).

(ii) On copies sold as premiums (defined as promotional items not for individual resale) (the placement of such premiums shall be subject to the prior approval of the Author), or at a discount of 60% or greater off the retail price, the royalty shall be 10% of net sales revenue for hardcover editions and 7.5% of net sales revenue for all other editions (e.g. large print).

(iii) On copies sold as a result of the Publisher's direct marketing programs, the royalty shall be 10% of net sales revenue for hardcover editions and 7.5% for all other editions (e.g. large print).

(h) *Overstock:*

(i) Should there be an overstock of the Work on hand which is not likely to be depleted in a reasonable time, or should the Publisher choose to remainder the Work, the royalty rate shall be 10% of the net sales revenue on copies of the hardcover edition and 7.5% of net sales revenue on copies of the paperback and on copies of all other editions (e.g. large print) sold at a discount of more than 50% but less than 60% off the retail price and 7.5% of net sales revenue on copies of all editions of the Work sold at a discount of 60% or more off the retail price, except as set forth in subparagraph 3(i) below.

(ii) In the event the Work is remaindered the Publisher shall use reasonable efforts to notify the Author and the Author shall be given a period of two weeks following written notice from the Publisher in which to purchase all or any portion of said copies at cost plus freight. Failure to provide such notice shall not be deemed a breach of the terms of this Agreement. The Work shall not be remaindered by the Publisher sooner than one year after first publication.

(i) *Non-royalty dispositions:*
No royalty shall be payable to the Author on copies of the Work destroyed, distributed without charge for purposes of review, advertising, publicity, sample or the like, disposed of at or below cost, copies sold to the Author hereunder, or copies supplied free of charge to charitable institutions.

4. **RIGHTS AND LICENSING REVENUE:** (a) The Publisher shall be entitled to exercise and license the rights granted in this Agreement in the Work, in whole or in part, upon such terms as it deems advisable, and the Author shall earn a share of the Publisher's "net licensing revenue" as set forth below. The term "net licensing revenue" shall mean all sums actually received by the Publisher from licensing rights in the Work, less any commissions (not to exceed 15%) to sales agents and foreign taxes incurred by the Publisher in disposing of such rights, and shall exclude the Publisher's reasonable charges to licensees for the manufacture, handling and delivery of copies of the Work.

| Rights | Publisher's Share | Author's Share |
|---|---|---|
| Abridgment*, adaptation*, anthology*, Audio Work**, book club**, condensation*, deluxe, digest*, educational, Electronic Versions*, graphic*, hardcover reprint**, large print, library, microfiche, microfilm, omnibus**, paperback reprint**, permission, second serial** and syndication** | 50% | 50% |

*subject to the Author's approval
**subject to consultation with the Author

(b) The Publisher may license the reproduction in Braille or other publication of the Work, in whole or in part, for the disabled, without charge. In the event the Publisher receives income for such licenses, the Author and the Publisher shall equally share such income.

HIGHLY CONFIDENTIAL

BARTZ000000210

Publisher's UK affiliates), such license will be negotiated at arm's length, on terms similar to the terms of comparable licenses between the Publisher and unaffiliated companies.

(d)   The Publisher shall provide in any license it makes with respect to the Work that the licensee shall not make any changes in the text of the Work without the Author's prior written approval, except with respect to changes for typesetting and/or translation purposes. The Publisher shall provide copies of licenses on written request by the Author, however inadvertent failure to do so shall not be deemed a breach of this Agreement.

5.   **RESERVED RIGHTS:** (a)   All rights not specifically granted to the Publisher hereunder are reserved to the Author and may be exercised or disposed of by the Author at any time during the term of this Agreement; such reserved rights include but are not limited to, first serial, motion picture, television, theatrical, electronic multimedia, lyric, merchandising, screenplay and game rights and all other rights now known or hereinafter developed. Electronic multimedia rights in the Work are understood to mean the right to produce or authorize other third parties to produce derivative adaptations of the Work, which are not primarily text based, with accompanying sounds, images or graphics which are more than incidental to the text and reproduced in an electronic format.  No less than 12 months after first publication of the Work the Author may, subject to the Publisher's approval (not to be unreasonably withheld), publish or authorize publication of the actual script of a bona fide stage play based on the Work where such play has actually been produced, provided that the cover and design of any such published script is materially different from any available print edition published by the Publisher and/or its licensees and provided it is made clear on the cover that this edition is a published script of a stage play.

(b)   The Author will notify the Publisher of any exploitation of reserved rights and the Publisher may utilize such information in connection with marketing the Work.

(c)   In the event the Author retains the right to license English-language publication of the Work in the United Kingdom ("UK"), the Publisher agrees to notify the Author (and, if requested, the Author's UK licensee) of the Publisher's scheduled publication date for the hardcover and paperback editions of the Work (and any subsequent changes thereto), and the Author shall obtain the UK licensee's commitment not to publish editions of the Work prior to said dates.

6.   **DELIVERY AND ACCEPTANCE:** (a)   The Author agrees to deliver to the Publisher not later than **June 15, 2009** (the "Delivery Date"), one paginated, double-spaced typed copy and one computer disc copy (in a format designated by the Publisher) of the complete and final manuscript of the Work described above, along with a proposed title for the Work, all in content and form satisfactory to the Publisher. The Publisher agrees to negotiate in good faith one extension to the Delivery Date based upon the Author's good faith need for additional time to research and write the Work. Any extension of the Delivery Date must be agreed to in writing by the Publisher in order to be binding. No failure by the Publisher to enforce the Delivery Date shall limit the Publisher's rights under this section.

(b)   (i)   The Author shall, at the Author's sole expense, deliver to the Publisher by the Delivery Date all mutually agreed upon photographs, illustrations, drawings, charts, footnotes, source notes, bibliography and any other materials (collectively, the "Related Materials"), all in content and form satisfactory to the Publisher, along with any third party permissions and releases required for publication of the Work or for the exercise of any of the rights granted hereunder. Said permissions and releases shall cover all territories, markets and editions covered by this Agreement. (A sample form, which the Author can customize for the Author's specific needs, is attached as a courtesy as Exhibit A.) If the Work is non-fiction, the Author and the Publisher shall mutually determine if there should be an index and whether it will be prepared by the Author or the Publisher. The cost of such index shall be borne by the Author up to a maximum sum of one thousand five hundred dollars ($1,500.00). For the purposes of this Agreement such index shall be considered to be part of the Work.

(ii)   If the Author fails to make timely delivery of the Related Materials, any index, permissions or releases, satisfactory to the Publisher in form and content, the Publisher shall have the right, but not the obligation, to continue this Agreement and upon notice obtain on

permissions and releases, the Publisher shall notify the Author whether the Work is acceptable. If the Publisher determines in its good faith judgment that any or all of such delivered materials are unacceptable, the Publisher will provide written editorial comments to the Author within 90 days of receipt, along with specific requests for revisions. In such event the Author shall deliver the revised Work within 90 days thereafter. If the Publisher fails to provide written editorial comments within 90 days, the Author shall so notify the Publisher and the Publisher will respond with editorial comments within 30 days of said notice. The Publisher shall advise the Author as to the acceptability of the revised manuscript within 30 days of receipt. All such periods may be extended by mutual agreement. Any request by the Publisher for changes or revisions in any portion of the Work shall constitute notice to the Author that the Work is not then acceptable to the Publisher. Provided the manuscript is delivered by the Delivery Date, the Publisher's determination whether the manuscript is acceptable shall not be based upon changes in market conditions. (See subparagraph 8(b).)

(d) The Author shall retain one copy of the manuscript of the Work and all originals of the Related Materials submitted to the Publisher. If the Publisher loses or damages beyond reasonable wear and tear the manuscript or Related Materials, the cost of any retyping or photocopying the manuscript and/or any duplicating by mechanical or conventional means of Related Materials deemed necessary by the Publisher, shall be paid by the Publisher.

(e) The Author understands and agrees that it is the Author's sole responsibility to render the Work acceptable to the Publisher and that any assistance, encouragement or critical comments provided by the Publisher shall not obligate the Publisher to accept the manuscript or to further assist the Author in rendering the manuscript acceptable to the Publisher.

(f) The Author will deliver to the Publisher on or before the Delivery Date a selection of color photographs of the Author cleared of all necessary permission, which may be used by the Publisher on the cover and jacket of the Work and in marketing. (Sample forms which the Author may customize are attached as a courtesy as Exhibits B and C.)

7. **AUTHOR'S RIGHTS TO TERMINATE:** (a) If, following acceptance of the Work, the Publisher fails to publish such Work within the period specified in paragraph 10 below for any reason not attributable to an act or omission by the Author or due to an extension covered in paragraph 10, the Author may send the Publisher written notice demanding publication of the Work. If the Publisher shall not publish such Work within six months after receipt of such notice, then the Author shall have the right, in lieu of any other remedies, to terminate this Agreement on written notice to the Publisher and retain all payments previously made to the Author under this Agreement and shall be paid any unpaid amounts as specified in Paragraph 2(a) and on termination all rights with respect to the Work shall forthwith revert to the Author.

(b) If, two years from the date of the Publisher's first publication, the Work shall not be available for sale in any full-length traditional print format edition by the Publisher or any of its licensees (excluding book club and large print editions), the Author may request that the Publisher revert its rights to the Work. Within six months after receipt of the Author's written request for reversion, if the Publisher, or a licensee of the Publisher, does not put an edition of the Work into production to be offered for sale, then the Publisher shall revert to the Author all rights granted herein with respect to the Work, subject to repayment by the Author of any overpayment of royalties or other sums due the Publisher under this Agreement, provided however that any unearned portions of the Advance shall not be considered sums due the Publisher. A Work shall be available for sale as long as the Publisher has the Work in stock, or an outstanding license to publish the Work in book form within 12 months is in effect, or if earnings accruing to the Author from the Work total more than $500 cumulatively over the two consecutive royalty periods prior to the Publisher's receipt of the Author's reversion request. The Publisher's rights to any option work under paragraph 15 shall survive any reversion under this subparagraph 7(b). The Author must notify the Publisher at the time of any reversion request if motion picture or television rights are under option or contract.

(c) In the event of a filing of bankruptcy by the Publisher, to the extent permitted by law, the Author shall have the right to buy back the rights granted herein at fair market value, and thereupon this Agreement shall terminate, except for the Publisher's right to complete production for any work in process and dispose of any existing inventory.

effect, and the Author shall have no right to license or assign rights to the Work (or any substantially similar work) to any other person, firm or entity. If this Agreement is so terminated for non-delivery by the Author, then for one year after such termination the Author shall not offer the Work (or any substantially similar work) for publication to any third party without first offering it to the Publisher on the same terms and conditions as set forth herein.

(b) If, after timely delivery of a complete and final manuscript of the Work, the Related Materials and any required permission or releases, and after the revision process outline in subparagraph 6(c) the Publisher determines in its good faith judgment that the Work hereunder is not acceptable, the Publisher shall have the right to terminate this Agreement. Upon notice that the Work is not acceptable, the Author shall repay all amounts paid by the Publisher in connection with the Work ("Amount Owed"). Said payment shall be out of first and all proceeds received by the Author from any sale or license of rights in the Work (or any substantially similar work ("First Proceeds")). The Author hereby (i) assigns and transfers to the Publisher the Author's right to receive First Proceeds and (ii) authorizes and directs any other entity from whom the Author is entitled to receive First Proceeds to pay such amounts directly to the Publisher on the Publisher's written demand therefor, until such time as the Publisher is repaid the Amount Owed in full. Notwithstanding the above, if the Publisher does not receive the Amount Owed in full within 18 months from the Author's receipt of written notice from the Publisher that the Work is not acceptable, the Publisher shall thereupon be entitled to seek repayment of the full Amount Owed. Until repayment in full to the Publisher of the Amount Owed in full, all rights granted to the Publisher by the Author under this Agreement shall remain in full force and effect except as mutually agreed. However, the Publisher shall permit the Author to offer rights in the Work to other publishers subject to the aforementioned terms and subject to the Author advising the Publisher in writing of the financial terms of any offer the Author wishes to accept, such terms to remain confidential. The Author agrees that any agreement with any third party will provide that the Publisher be paid directly out of all proceeds due the Author under such agreement until the entire sum due the Publisher hereunder has been paid.

(c) The Publisher shall be entitled to decline to publish the Work at any time (regardless of any prior acceptance of the Work) if, in the Publisher's good faith judgment, the Work contains material which is likely to give rise to a claim of libel, injury, obscenity or violation of any law or right of any person or entity. In such event the Publisher shall notify the Author of its concerns and the Author may seek to remedy such problem. If the Author fails or is unable to provide such a remedy, then the Publisher shall be entitled to terminate this Agreement, without limitation of any other rights and remedies under this Agreement, subject to the repayment to the Publisher of all monies paid and/or expenses incurred by the Publisher in connection with the Work. Until repayment in full by the Author to the Publisher of such amounts, all rights granted to the Publisher in this Agreement shall remain in full force and effect, and the Author shall have no right to grant, license or assign rights to the Work (or a substantially similar work) to any other person or entity.

(d) If the Author dies or becomes incapable of completing and delivering the complete and final manuscript in accordance with subparagraph 6(a) or fulfilling any other material obligations under this Agreement, the Publisher shall, with the consent of the Author or the Author's representatives, have the right but not the obligation to publish, edit, revise, or complete the Work upon giving proper credit to the Author for the portion created by the Author; any reasonable costs incurred by the Publisher for services performed by a third party in that regard shall be charged against the Author's earnings under this Agreement. If consent is withheld by the Author or the Author's representatives, or if the Publisher chooses not to exercise its right to publish, edit, revise, or complete the Work, the Publisher may terminate this Agreement, subject to repayment by the Author of any amounts paid by the Publisher in connection with the Work.

9. **PRINTER'S PROOFS:** The Publisher agrees to send, and the Author agrees to read, revise, correct and approve the manuscript copyedited by the Publisher. The Author agrees to return such approved and/or corrected copyedited manuscript to the Publisher within 14 business days of the receipt thereof by the Author. The Author shall also have the right to review the proof of the Work. If the Author fails to return such approved and/or corrected copyedited manuscript and proof within 14 business days, the Publisher shall have the right to

HIGHLY CONFIDENTIAL
BARTZ000000213

10.  **PUBLICATION OF THE WORK:** (a)    Subject to paragraphs 7 and 8, the Work will be published not later than 18 months after the Publisher's acceptance of the Work, including the Related Materials and any necessary index, permissions and releases, and in such formats, style, manner, and under such imprints, in such quantities, and at such prices as the Publisher deems appropriate. Such period may be extended in the event the Publisher fails to publish due to forces beyond its reasonable control. In the event of any delay from any such cause, postponement of publication shall be for a period of time reasonably related to such cause. The Publisher intends to publish the Work initially in hardcover format and intends to subsequently publish the Work in paperback format. The Publisher shall publish the Work initially in hardcover format. The Work shall appear under the Twelve imprint in both hardcover and paperback formats. The Publisher shall not publish the Work in paperback format sooner than 9 months after hardcover publication without the Author's approval.

(b)    The Author authorizes the Publisher to make the manuscript of the Work conform to its standard style in punctuation, spelling, capitalization and usage. The Author shall have approval of the final copyedited manuscript. Except as may be otherwise expressly provided in this Agreement, no other changes will be made to the manuscript without the Author's consent.

(c)    Other than listings in paperback editions of other works by the Author and other similar works published by the Publisher, the Publisher agrees not to insert any advertising into its editions of the Work, except that other editorial and/or advertising materials may appear with the Electronic Versions (e.g., banner ads or notices on a web page) consistent with industry customs and practices. No editorial content or advertising material shall be inserted within the text of the Work and no endorsement by the Author of any product or service may appear in connection with the Electronic Versions of the Work without the express written consent of the Author; however banner and sidebar advertisements on electronic book supplier web pages shall not be considered an endorsement by the Author. The Publisher agrees to pass the foregoing restrictions on to all licensees (other than to licensees with licenses for book club editions, condensed books, reprint paperback editions and/or for use of extracts from the Work in periodicals).

11.  **PUBLICITY:** (a)    The Publisher shall have the sole discretion to determine what, if any, advertising, promotional or publicity services the Publisher may perform for the Work. The Publisher may publish or authorize publication of selections of up to 10% of the total text of the Work and/or one or more chapters from the Work not to exceed 7,500 words in any media (whether now known or hereafter devised), including the world wide web, for purposes of publicizing and promoting the Work. The Publisher may authorize display of all or portions of the Work for promotional purposes on internet search engines such as Amazon.com's "Search Inside the Book." However the entire Work shall not be available as the result of one search. The Publisher may publish or authorize publication of excerpts of the Work prior to publication on the Publisher's own website only, and the Publisher and the Author shall mutually agree on such selections. Nothing herein shall interfere with the Author's reserved first serial rights.

(b)    Upon the Publisher's request the Author agrees to participate in publicity for the Work. The Publisher shall consult with the Author before scheduling events (taking into consideration the Author's prior professional commitments of which the Author shall notify the Publisher in a timely manner) and shall bear all the reasonable and customary costs and expenses of such publicity. The Author agrees to comply with the Publisher's instructions and guidelines regarding such publicity. At the Publisher's request and at the Publisher's expense, the Author's promotional services shall continue for a minimum of two weeks coinciding with publication of the Work, it being understood that such services may consist of touring, bookstore and media appearances. It is acknowledged that the Author's promise to perform the foregoing promotional and publicity activities is a material inducement to the Publisher to enter into and perform this Agreement and constitutes an essential part of the consideration provided to the Publisher hereunder.

(c)    In the event the Author desires to obtain or perform any publicity independently of the Publisher in connection with the Work (such as interviews, website activities, personal appearances), the Author agrees to provide notification of all such activities to the Publisher's Publicity Department

create a dramatic work based upon the Work may publish in printed form an excerpt from the Work or from such dramatic work, of not more than 7,500 words or 10% of the Work, whichever is less in the aggregate, for purposes of trade advertising or promoting said dramatic work and not for sale to consumers.

12.  **AUDIO RECORDING SERVICES:** If the Publisher and the Author mutually agree, then the Author shall render services as a reader of abridged and/or unabridged scripts of the Audio Work for a fee to be negotiated in good faith and consistent with fees paid by the Publisher to other Authors narrating similar Audio Works. In the event the Author does not to render reading services then the Author shall have approval of a third party to perform such services from a selection of narrators proposed by the Publisher. The Author agrees to promptly and faithfully comply with all of the Publisher's reasonable instructions and requests in connection with said recordings. All reasonable expenses in connection with such services shall be borne by the Publisher.

(a)  The Publisher will notify the Author in advance of its requirements with respect to the date(s) and timing of recording session(s). The precise dates and times will be scheduled by the Publisher in consultation with the Author. During the initial recording session and continuing up to for 15 days thereafter the Author will be available to appear at additional times as may be designated by the Publisher (subject to the Author's prior professional commitments) for "retakes" or additional recordings with respect to the Audio Work if the Publisher deems it necessary or advisable to achieve a satisfactory result.

(b)  (i)  The Author acknowledges that all recordings made in connection with the Audio Work and all performances embodied therein including recordings of the Author reading the Work (collectively, the "Recordings") shall be "work made for hire" as that term is defined under the U.S. Copyright Act, specially commissioned by the Publisher. To the extent, if any, that any such Recordings are determined not to be "work made for hire," the Author hereby assigns to the Publisher any and all rights the Author may have in the Recordings, including all copyrights, it being understood that nothing herein is intended or shall be deemed to assign copyright in the literary work upon which the Recordings are based. The © copyright in any Audio Work shall be owned by the Author, and the ℗ copyright shall be retained by the Publisher. The Publisher shall include the following copyright notices in each copy of the Audio Work:

> Copyright ℗ [year] by Hachette Audio
> Copyright © [year] by **Charles Graeber**

(ii)  The Publisher shall have the right to use, refrain from using, change, add to and subtract from the Recordings, consistent with current industry practice as long as the final recording does not deviate from the Author approved final script. Without limiting the foregoing, the Publisher shall have the right to include the Recordings in the Audio Work. The Author hereby grants to the Publisher the right to use excerpts of the Recordings of no longer than 5 minutes for advertising and promotional purposes in connection with the Work and/or Audio Work.

13.  **COPYRIGHT:** (a)  The Publisher agrees to submit an application for registration of the copyright in the Work in the name of the Author in the United States of America. The Author agrees that the Publisher may record this Agreement or a memorandum hereof in the United States Copyright Office. The Author hereby appoints the Publisher to be the Author's attorney-in-fact to execute and to file any and all documents necessary to record in the Copyright Office the assignment of exclusive rights made to the Publisher hereunder. The Publisher shall include the following copyright notice in each of its editions of the Work:

> Copyright © [year] by **Charles Graeber**

(b)  The Publisher acknowledges that portions of the Work have appeared in New York Magazine. If the Work or any portion of the Work has been previously published or will be published prior to the Publisher's publication, the Author shall submit an application for registration of the copyright in the Author's own name or obtain and deliver to the Publisher a duly executed and recorded assignment of copyright, a reversion of rights from the previous

Publisher's name and address so that the Publisher may submit an application for registration of the copyright in the Work as provided in subparagraph 13(a) above.

(d) In the event that any copyright in the Work is infringed, the Author and the Publisher may agree on a joint action in regards thereto, failing which either party shall have the right to proceed. If the parties proceed jointly, the expenses and recoveries, if any, shall be shared equally; if they do not proceed jointly, the party going forward with such action shall bear all expenses and shall retain any recovery. In no event shall either party be liable to the other for failure to take action.

14. **AUTHOR'S COPIES:** The Publisher shall furnish at no charge 20 free copies of each of its initial print and Audio Work, if any, editions of the Work to the Author and 25 copies to the Author's agent. The Author and the Author's agent each will receive one free copy of the Electronic Version of the Work, if any, in Adobe Acrobat or other similar format as the Publisher selects. The Author and the Author's representative shall have the right to purchase, on a non-returnable basis, additional copies of the print and Audio Work editions of the Work at 50% off the catalog price plus any shipping or freight charges, for personal use only and not for resale, and will be invoiced accordingly. All orders require payment in advance of 50% of sums due for the total order. No royalty shall be due the Author for such copies. The Publisher shall supply the Author's representative with between 5 and 10 copies of licensed editions provided such copies are made available to the Publisher; however, failure to do so shall not be deemed a breach of the terms of this Agreement. The Author's copies shall be sent directly to the Author at 4 Ash Street, Nantucket, MA 02554.

15. **OPTION:** (a) The Author agrees to submit exclusively to the Publisher, for consideration as below described, a detailed proposal for the Author's next book-length non-fiction work before submitting same or a complete manuscript therefor to any other party.

(b) The Publisher shall have a period of 45 days after the submission of a detailed proposal (which period shall not commence to run prior to 45 days after acceptance of the Work), within which to notify the Author whether it desires to publish such next work. If within said time the Publisher notifies the Author of its desire to publish the Author's next work, the Author shall thereupon negotiate in good faith exclusively with the Publisher with respect to the terms of such publication. If the Publisher and the Author are unable to arrive at a mutually satisfactory agreement after negotiating for a period of 30 days, the Author shall be free to submit such next work elsewhere.

16. **CONFLICTING PUBLICATION:** (a) During the term of this Agreement, the Author shall not, except as specifically allowed herein, without written permission of the Publisher, publish or permit to be published any material based upon or incorporating material from the Work or which would compete with its sale or impair the rights granted hereunder.

(b) Subject to the terms above, the Author agrees that in no event will the Author publish or authorize publication of any other book-length work of which the Author is an author, contributor or collaborator until six months after publication of the Work.

17. **AUTHOR'S WARRANTIES:** (a) The Author warrants, represents and covenants: that the Author owns all rights and licenses herein conveyed and has the full and sole right and authority to convey all such rights and perform the Author's obligations hereunder; that the Work will be the Author's next book-length work (whether under the Author's own name or otherwise); that the Work is original with the Author in all respects, except for any portion which has been previously published and is identified as such; that, with respect to works of non-fiction, all statements contained in the Work as published are true or based on reasonable research for accuracy; that the Work is not in the public domain and is or may be validly copyrighted or registered for copyright in the United States and is likewise protectible throughout all countries in the territory where the laws provide for such protection; that the title of the Work may be used by the Publisher in the exercise of all or any of the rights herein conveyed; that the use or reproduction of the Work or any part thereof or the exercise of any of the rights herein granted, will not in any way infringe upon any statutory or common law copyright or trademark, or give rise to a claim of a libel or defamation, or invasion of the rights of privacy or of publicity of any party, or violate any law or regulation; that the Author has not done and will not do any act or

HIGHLY CONFIDENTIAL

BARTZ000000216

of no basis on which such a claim may be asserted and will promptly notify the Publisher in writing if such knowledge changes; that the use, with reasonable care and skill, of any recipe, instruction, material, advice or formula contained in the Work will not result in injury, and the Author will include in the Work appropriate warnings and safety precautions concerning any potential hazards that may be involved in the use of any such recipe, instruction, material, advice or formula.

(b) The warranties, representations and covenants hereunder, along with the indemnity set forth in paragraph 18 below shall apply to the Work and any revisions thereof and shall survive any termination of this Agreement.

(c) The Author's warranties, representations and covenants as detailed herein and indemnity obligations under paragraph 18 do not extend to materials added by the Publisher and not approved by the Author.

18. **INDEMNITY:** (a) The Author undertakes to indemnify and hold harmless the Publisher and its officers, directors, agents, employees, licensees and assigns from and against any liabilities, damages, costs, expenses (including reasonable counsel fees), judgments, settlements, penalties, or losses of any kind or nature whatsoever which may be incurred by the Publisher or its officers, directors, agents, employees, licensees or assigns for or in connection with any claim, action or proceeding inconsistent with any of the representations or warranties herein contained or based upon or arising out of anything contained in the Work (a "Claim"). The Publisher and the Author shall each with all reasonable promptness notify the other of any Claim.

(b) In the event of any such Claim, the Publisher shall select counsel and undertake the defense thereof. The Author shall have the right (but not the obligation) to have separate counsel at the Author's own expense, it being understood that the conduct of the defense shall remain under the Publisher's control. The Author shall cooperate fully with the Publisher in the defense of any Claim and the Author agrees to maintain the confidentiality of all communications relating to the Claim. The Publisher will consult with the Author prior to the settlement of any Claim.

(c) The Publisher agrees to cover the Author as an additional insured under any Errors and Omissions insurance maintained by the Publisher with respect to Claims of libel, invasion of privacy, violation of the right of publicity, copyright infringement and trademark infringement arising from the Publisher's publication of the Work, subject to the terms hereof. In the event such a Claim is asserted against the Publisher and/or the Author, the Errors and Omissions insurance in effect at the time such Claim is asserted shall be applicable and the Publisher and the Author shall equally share all costs, judgments and settlements not covered by the insurer up to the amount of the applicable deductible, except as set forth under paragraph 18(d). Any coverage by such insurance shall be applied towards satisfaction of the Author's indemnity obligations under paragraph 18, provided however that the Author shall be responsible for all costs, judgments and settlements attributable to willful or reckless breach by the Author of any of the Author's representations or warranties under this Agreement.

(d) If any Claim is brought or made against the Publisher and/or the Author and/or if the Publisher is able to settle any Claim and Author disapproves of such settlement, then the Author can forgo the insurance coverage set forth in paragraph 18(c) and elect to proceed at the Author's own expense with the defense of the remaining Claim against the Author (which may include bringing an appeal in the event of an unfavorable judgment), subject to payment by the Author into an escrow account of the full amount of all potential losses, expenses or damages as determined by the Publisher and its insurer. If the Author so proceeds with the defense of the Claim and obtains a favorable final judgment in the matter, the Author shall recover such escrow amount and any damages awarded to the Author, less the amount of any uninsured losses, expenses or damages arising out of the Claim which the Publisher has incurred. Notwithstanding the foregoing, the Publisher shall at all times have the right to defend and/or settle any Claim brought against the Publisher.

(e) During the pendency of such Claim, the Publisher may withhold payments due to the Author under this agreement to the extent reasonably necessary to conduct the defense

HIGHLY CONFIDENTIAL

BARTZ000000217

provided such Claim was covered by the Publisher's insurance in place at the time such Claim was brought.

(f) If, in the opinion of the Publisher, the Work contains material which may involve the Publisher in litigation, the Publisher may elect to engage outside legal, professional or technical expert(s) to review the manuscript. The Author will cooperate fully with the Publisher and its representatives conducting such review, and the Author agrees to maintain the confidentiality of all communications relating to such review. If the Author refuses to make such changes as are advised by the Publisher or its reviewer(s), the Publisher will have no obligation to publish the Work, and will have the right to terminate this Agreement in accordance with the terms of paragraph 8(c). Notwithstanding any expert review which may be obtained by the Publisher, nothing in this Agreement shall be deemed to impose upon the Publisher any duty of independent investigation or relieve the Author of any of the obligations assumed by the Author hereunder.

19. **ACCOUNTING STATEMENTS:** (a) The Publisher shall render semi-annual statements of account covering sales (less returns, actual and estimated) and net licensing revenues as of June 30 and December 31, and shall mail such statements to the Author not later than the following September 30 and March 31, together with the payment of amounts due thereon. Upon the Author's written request, following receipt of a royalty statement, the Publisher agrees to provide the Author with the number of copies of the Work in each printing, gross sales, returns, reserves against returns, inventory and any other relevant accounting information. Such requests may only be made twice in any one year period. The Publisher's inadvertent failure to comply with the provisions of the foregoing sentence shall not be deemed to be a breach of this Agreement.

(b) The Publisher may deduct any overpayment of royalties or any other amounts due the Publisher from the Author under this or any other agreement, from any payments due from the Publisher to the Author under this or any other agreement. (An unearned advance shall not constitute an overpayment or a sum due from the Author.) Nothing herein shall be deemed to permit the Publisher to cross-collateralize earnings with respect to other agreements between the Publisher and the Author.

20. **AUDIT RIGHTS:** The Author may, at the Author's own expense, audit the books and records of the Publisher relating to the publication of the Work pursuant to this Agreement at the place where the Publisher maintains such books and records in order to verify statements rendered to the Author hereunder. Any such audit shall be conducted only by an independent certified public accountant during reasonable business hours in such a way as to not interfere with the Publisher's normal business activities. In no event shall an audit with respect to activity currently reported on a statement commence later than 24 months from the date of such statement, nor shall any audit continue for longer than five consecutive business days, nor shall audits be made hereunder more frequently than twice annually nor shall records supporting any such statements be audited more than once. All statements rendered hereunder shall be binding upon the Author and not subject to objection for any reason unless such objection is made in writing stating the basis thereof and delivered to the Publisher within 24 months from delivery of such statement, or if an audit is commenced prior thereto, within 30 days from the completion of the relative audit. In the event that an underpayment of five percent (5%) or more of amounts actually due to the Author is discovered in the course of any such audit, then the cost of such audit, up to the amount of the underpayment, but not to exceed five thousand dollars ($5,000.00), shall be borne by the Publisher and the Publisher shall pay any underpayment within thirty (30) days of the Author's written request. The term "underpayment" shall not include any disputes as to reasonable and customary amounts retained by the Publisher as reserves against returns.

21. **PUBLISHER NOT A TRUSTEE:** In no event shall the Publisher be obligated to segregate from any of its other funds, any of the sums which may be paid to the Publisher by customers or other parties relating to the Work, nor shall the Publisher be considered a trustee, pledgeholder or fiduciary of the Author.

22. **MULTIPLE AND ACTUAL AUTHOR(S):** Intentionally deleted.

HIGHLY CONFIDENTIAL

BARTZ000000218

24. **ASSIGNMENT:** (a) This Agreement shall be binding upon the assigns, heirs, executors, and administrators of the Author, and upon the assigns and successors of the Publisher.

(b) This Agreement and the rights and benefits and all of its obligations hereunder shall not be assignable or transferable by the Publisher except to a corporate parent, affiliated company or a wholly owned subsidiary or in connection with a transfer of all or substantially all of the Publisher's assets or any imprint(s), or upon consent of the Author (such consent not to be unreasonably withheld). Notwithstanding the above, rights granted hereunder may be exercised by the Publisher or the Publisher's affiliates except as specified in subparagraph 10(a).

(c) The Author shall not assign any of the Author's obligations hereunder, and any such purported assignments shall be void, but the Author may on written notice to the Publisher, assign or transfer any monies due or to become due under this Agreement. If at any time more than three parties shall be entitled to receive payments which would otherwise be due to the Author hereunder the Publisher may, at its option, require that all such parties execute and deliver an agreement in form satisfactory to the Publisher appointing a disbursing agent for all such parties.

25. **NOTICES:** All notices which either party hereto is required or may desire to give to the other shall be in writing and given by addressing the same to the attention of the Publisher and to the General Counsel of the Publisher and to the Author at the address set forth on page 1 or at such other address as may be designated in writing by any such party in a notice to the other given in the manner prescribed in this paragraph. All such notices shall be sufficiently given when the same shall be sent by registered or certified mail postage prepaid.

26. **ENTIRE AGREEMENT; MODIFICATION:** This Agreement represents the entire agreement between the parties and supersedes all prior agreements and understandings with respect to the subject matter hereof, and the Author acknowledges that the Author has not relied on any understanding or agreement not set forth in this Agreement. This Agreement shall not be modified except in writing signed by the party charged therewith. No written waiver of any term or condition of this Agreement shall excuse the performance of any act other than those specifically referred to therein.

27. **CONSTRUCTION; JURISDICTION:** This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements executed and fully performed therein. It is agreed that New York courts (state and federal) only, will have jurisdiction over any controversies regarding this Agreement; any action or proceeding which involves such a controversy will be brought only in those courts, in New York County.

28. **HEADINGS:** The headings of the paragraphs of this Agreement are for convenience of reference only, are not part of this Agreement, and shall not limit or otherwise affect the meaning of this Agreement.

29. **AGENCY:** The Author hereby confirms that that the Author has irrevocably appointed and designated Susan Golomb of the Susan Golomb Literary Agency (the "Agent") 875 Avenue of the Americas, Suite 2302, New York, New York 10001 as the Author's sole Agent throughout the world with respect to the Work and all rights therein. The Author hereby authorizes and directs the Publisher to pay and forward all statements and monies accruing from the Publisher to the Author with respect to the Work solely to and in the name of the Agent, and the Publisher agrees to do so. The Author hereby empowers the Agent to act on the Author's behalf in all matters arising from or pertaining to this Agreement and/or the Work. It is agreed between the Author and the Agent that the Author hereby irrevocably agrees to pay the Agent and the Author hereby authorizes the Agent to receive and retain, and the Author hereby irrevocably assigns and transfers to the Agent an amount equal to 15% of all monies accruing, payable or paid to the Author under this Agreement and otherwise accruing from the Publisher to the Author with respect to the Work. Nothing in the foregoing shall be construed to obligate the Publisher to make any payments to the Agent with respect to such 15% sum and the Publisher's sole obligation shall be to remit to the Agent all

The Agent's Tax Identification Number is: __20-5316264__.

30. **EFFECTIVENESS OF AGREEMENT:** This Agreement shall be of no force and effect unless signed by the Author and the Publisher within 90 days of the date first written above.

**SPECIAL PROVISIONS:**

31. **COVER APPROVAL:** The Author shall have approval on the jacket/cover design and jacket/cover copy for the Work at the sketch stage and at the final stage of production.

32. **DEFAULT:** If the Publisher shall, during the existence of this Agreement, fail to send a royalty statement or make a payment as provided herein, except for good faith business reasons, then the Author may send written notice of such failure to the Publisher. If the Publisher fails to remedy such failure within thirty (30) days of receipt of such notice then the Author may send a second notice. If the Publisher fails to remedy such failure within fifteen (15) days of receipt of such second notice then this Agreement shall terminate at the expiration of such second notice period, without limitation of either the obligation by the Publisher to pay the Author any monies due under paragraph 19 of this Agreement, or the rights of the parties under paragraphs 17 and 18 hereunder, all of which shall survive any such termination. All such notices shall be sent in accordance with the terms of paragraph 25 hereof with an additional copy to the Publisher's CFO.

33. **CONFIDENTIALITY:** Both parties acknowledge that confidentiality of the financial terms of this Agreement, the contents of the Work, and the process of preparing the Work pursuant to this Agreement, constitute a material condition of this Agreement. The Author and the Publisher agree to maintain, such confidentiality and the Author agrees to require researchers, writers, or assistants collaborating or working with the Author on the Work to maintain such confidentiality.

34. **CONSULTATION ON EDITOR:** In the event that Jonathan Karp leaves the employment of the Publisher prior to completion of principal editing of the Work, the Publisher will consult closely with the Author regarding assignment of a new editor to work with the Author so that the Author is comfortable with said new editor. If the Author thereafter has concerns, the Publisher of Grand Central Publishing agrees to use all reasonable efforts to address such concerns with the Author.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the latest day and year written below.

_[signature]_
Charles Graeber
Social Security No.: [redacted]
Date: 9.07.07

GRAND CENTRAL PUBLISHING, a division of Hachette Book Group USA, Inc.
By: _[signature]_
Jamie Raab
Executive Vice-President and Publisher
Date:

HIGHLY CONFIDENTIAL                                                        BARTZ000000220

EXHIBIT A
# TEXT / ILLUSTRATIONS PERMISSION

(name and address
of rights owner/controller):

RE: [MATERIAL TO BE USED]

Dear Sir/Madam:

I [am writing / have written] a book to be published on the subject of _____ for a work tentatively entitled _____ (the "Work") to be published by Grand Central Publishing, a division of Hachette Book Group USA, Inc.

I am writing to you to request permission to include in the Work [material of approximately _____ words OR illustration(s) / artwork as described] from _____ [TITLE] written OR created by _____ [AUTHOR'S / ARTIST'S NAME]. Enclosed is a copy of the material I wish to use. Will you please grant permission to me and my publishers and their affiliates, licensees and assigns for the use of this material in the Work in any and all editions, in ALL LANGUAGES/ENGLISH LANGUAGE (DELETE AS APPLICABLE), in whole or in part, throughout the world, in all media now known or hereafter devised, including advertising and promotion of the Work?

Please specify the appropriate copyright acknowledgement or credit lines below.

Please sign below to indicate your agreement and return this original letter to me. I have included a copy for your files.

Very truly yours,

_____
[PROPRIETOR]
[ADDRESS]

In consideration of my desire to assist you with respect to the Work, which I believe will be of benefit to the public, I hereby grant you and the Publisher the permission requested above. I warrant and represent that I am the owner of the rights granted herein and that the selected material does not infringe upon the copyright or any other rights of anyone. I understand you will include the following line in the Work.

_____
Form of Copyright Acknowledgment/Credit line


_____
[GRANTOR]
Date:

EXHIBIT B

# PERMISSION FROM COPYRIGHT OWNER TO USE AUTHOR PHOTOGRAPH

*This agreement should be used by authors acquiring and supplying photographs of themselves as to which the rights are owned by a third party (usually the individual who took the photograph or photographic agency), i.e., the "Grantor". This form, completed and signed by the Grantor, should be sent to the Publisher with a copy (not the original) of the author photograph.*

**AGREEMENT** dated _____ between _____ (the "Grantor") and _____ (the Author").

The Grantor hereby grants the Author, the Author's successors and assigns, and Grand Central Publishing, a division of Hachette Book Group USA, Inc., and its successors, assigns, affiliates and licensees (collectively, the "Publisher"), an exclusive license to reproduce and publish in all media (whether now known or hereafter devised), throughout the world, a photograph of the Author created and/or owned by the Grantor, described as follows, a copy of which is attached hereto:

_____

license shall entitle the Publisher to use the Photograph _____ (the Photograph"). Such on all editions and versions, in whole or in part, and in connection with the Publisher's sale, marketing, advertising and promotion of a work tentatively entitled: _____ and in same manner with respect to all other works by the Author published by the Publisher (collectively, the "Works").

The Grantor acknowledges that the Photograph may be used for commercial purposes and agrees that the Publisher may modify, crop, alter or retouch a reproduction (i.e., not the original) of the Photograph as the Publisher deems appropriate.

In consideration of the above grant of rights, the Author shall compensate the Grantor by payment of a one-time fee of $_____ and/or the Author will direct the Publisher to include a credit in all copies of its edition(s) the Works as follows:_____

The Grantor agrees that no compensation in connection with the Publisher's use of the Photograph shall be due to the Grantor from the Publisher.

The Grantor warrants and represents that the Grantor is the sole creator of the Photograph and/or owner of all rights of copyright in the Photograph; that the rights granted herein are free and clear and that the Grantor has the full power to grant such rights; that use of the Photograph will not violate any copyright or any other right of any third party and will not be contrary to law. The Grantor shall indemnify the Author and the Publisher for any claims or expenses (including reasonable attorneys' fees) arising out of any claim inconsistent with the above warranties or representations.

The Grantor and the Author acknowledge that the Publisher is not responsible for returning any material submitted hereunder.

This agreement and all matters arising from or related to this agreement (including its validity and interpretation) shall be governed by, construed and enforced in accordance with the law of the State of New York without reference to its choice of law doctrine.

| | |
|---|---|
| Grantor _____ | Author _____ |
| Address: _____ | Address: _____ |
| Date: _____ | Date: _____ |

_____
Copyright Owner (if not Grantor)

HIGHLY CONFIDENTIAL
BARTZ000000222

EXHIBIT C
## AUTHOR PHOTO RELEASE

*This form should be completed and signed by authors supplying photographs of themselves as to which they have already acquired all rights from the photographer. The completed, signed form should be sent to the Publisher with a copy (not the original) of the author photograph.*

Dear ........................:

You have delivered to Grand Central Publishing, a division of Hachette Book Group USA, Inc., a photograph of yourself (the "Photograph"), a copy of which is attached hereto, for use in all media (whether now known or hereafter devised), throughout the world by Grand Central Publishing, a division of Hachette Book Group USA, Inc., its successors, assigns, affiliates and licensees (collectively, the "Publisher") on the cover and/or jacket flap in and/or on all editions and versions, in whole or in part, and in connection with the Publisher's sale, marketing, advertising and promotion of your forthcoming book tentatively entitled

_____ and in the same manner with respect to all other works by you published by the Publisher (collectively, the "Works").

You warrant that: you are the owner of copyright in the Photograph, or you have acquired the necessary reproduction rights to the Photograph for the use by the Publisher; the rights granted herein by you are free and clear; the Publisher's use of the Photograph will not violate any rights of any third party, nor be contrary to law; the Photograph may be used for commercial purposes and the Publisher may modify, crop, alter or retouch a reproduction (i.e., not the original) of the Photograph as the Publisher deems appropriate; you have or shall obtain written permission from any persons depicted in the Photograph other than yourself, which permissions shall be timely delivered to the Publisher.

The Author acknowledges that the Publisher is not responsible for returning any material submitted hereunder.

Please supply the proper photo credits below.

AGREED TO AND ACCEPTED:

AUTHOR NAME (PRINT): _____

AUTHOR SIGNATURE: _____

ADDRESS: _____

DATE: _____

PHOTO CREDITS: _____

HIGHLY CONFIDENTIAL
BARTZ000000223

## SCHEDULE A

Ascension
Australia (including Tasmania)
Bangladesh
Belize
Bhutan
Botswana
Brunei
Burma (Myanmar)
Cameroons
Cyprus
Egypt
Falkland Islands
Fiji
Gambia
Ghana
Gibraltar
Guyana
India
Iraq
Irish Republic
Jamaica
Jordan
Kenya
Kuwait
Lesotho
Malawi
Maldives
Malta and Gozo
Mauritius (including Rodrigues)
Namibia
Nepal
Nigeria
Pacific Islands, comprising
    _____Tonga
    _____Western Samoa
    _____Nauru
    _____Vanuatu
    _____New Hebrides
    _____Ellice Islands
    _____Union Islands

Pacific Islands, comprising (continued)
    _____Norfolk Islands
    _____Pitcairn Islands
    _____Tuvalu
    _____Kiribati
    _____Cocos Islands
    _____Solomon Islands
Pakistan
Papua New Guinea
St. Helena
Seychelles
Sierra Leone
Sikkim
Somali Republic
South African Republic
South Yemen
Sri Lanka
Sudan
Swaziland
Tanzania
Trinidad and Tobago
Tristan da Cunha
Uganda
United Kingdom (including Northern Ireland, Isle of Man, and Channel Islands)
West Indies and British West Indies, comprising
    _____Bahamas
    _____Barbados
    _____Bermuda
    _____Turks, Caicos, Cayman, Leeward (including Anguilla, Antigua and Barbuda, Montserrat, St. Kitts and Nevis) and Windward (including Dominica, Grenada, St. Lucia, St. Vincent and the Grenadines) Islands
    _____British Virgin Islands
Zambia
Zimbabwe

The Publisher will not knowingly sell copies of the Work into the territories listed above, nor authorize any other party to do so, however the Publisher shall not be responsible for the actions of any third parties.

Notwithstanding the above, the Publisher reserves the right to sell copies of the Work into any territories listed above where the party authorized to sell in such territory has lost its exclusivity pursuant to the laws of such territory.

HIGHLY CONFIDENTIAL
BARTZ000000224