# EXHIBIT 18



**GRAND CENTRAL**
**PUBLISHING**

AGREEMENT dated December 14, 2015 by and between Grand Central Publishing, a division of Hachette Book Group, Inc., 1290 Avenue of the Americas, New York, NY 10104 (the "Publisher") and Charles Graeber c/o Writers House LLC of 21 West 26th Street, New York, NY 10010, attn: Susan Golomb (the "Author"), with respect to the non-fiction work provisionally entitled **THE BREAKTHROUGH*** (the "Work"), as further described below.

*The final title of the Work shall be mutually agreed upon between the Author and the Publisher.

1. **GRANT OF RIGHTS:** (a) The Author hereby grants and assigns to the Publisher exclusive print, audio and electronic rights in the Work (and any revisions thereof), in whole or in part, for the full term of copyright (including any renewals and extensions), in the English language, including the right to reproduce, publish, distribute, transmit, deliver, transfer, market and/or sell the Work, by any means including, but not limited to, fixed-copy, digital delivery, download, streamed formats, shared file distribution and wireless methods, in any media now known or hereafter devised, throughout the United States of America, its territories and dependencies, the Philippines, Puerto Rico and Canada (the "Exclusive Territory"). The Publisher may exercise and authorize others to exercise the above-described rights including the rights specified below in paragraph 4. The Publisher shall have the right to exercise or authorize others to exercise the same rights non-exclusively throughout the rest of the world excluding the British Commonwealth territories as listed in Schedule A hereto (the "Non-exclusive Territory"). (The Exclusive Territory and the Non-exclusive Territory shall be jointly called the "Territory.") The Publisher shall not sell, make or authorize sales to customers in countries as set forth in Schedule A, unless the country has lost its exclusivity pursuant to the laws of the country.

(b) The Work is described as follows: **cancer immunotherapy, the discovery of cancer's "secret handshake", and how a new generation of scientists finally cracked the code on how the human immune system can fight – and beat – the disease. The Work shall consist of approximately 75,000 – 85,000 words and a mutually agreed number of illustrations (the "Illustrations").**

(c) The Author grants to the Publisher and its licensees the irrevocable right to use the Author's name, approved likeness and approved brief biography on the Work and in the sale, marketing and advertising of the Work. Any such likeness and biographical material submitted to the Publisher by the Author shall be deemed approved.

(d) For the purposes of this Agreement, audio rights shall mean the right to use the Work as the basis for one or more non-dramatic sound recordings consisting of abridged and/or unabridged versions of the Work in audible form or in a form which can be rendered into audible form (hereafter referred to as "Audio Work(s)"). The scripts of all abridged versions will be submitted to the Author for approval. The Audio Work(s) may contain, in addition to the Work,

Graeber/Writers House LLC
CDB 12/14/15

1

HIGHLY CONFIDENTIAL                                                                                                          BARTZ000000225

non-dramatic narrative or interstitial passages and background music and sounds supplied by the Publisher.

(e) (i) For the purposes of this Agreement, electronic rights shall mean the right to transform the content of the Work into electronic, digital and magnetic media (whether now known or hereafter devised) (the "Electronic Version(s)"). The Publisher shall not include any material audio or video enhancements in Electronic Version(s) without the approval of the Author. It is understood that due to the requirements and technology of the electronic format, non-substantial changes may have to be made to the Work. Any substantive changes, such as condensation or abridgment, shall be subject to the Author's approval. The Publisher shall not itself offer an Electronic Version of the Work for sale as part of a package, group or bundle which includes works by other authors without the Author's approval.

(ii) The Publisher shall not itself offer an Electronic Version of the Work for sale as part of a package, group or bundle which includes works by other authors without the Author's approval. The Author shall be entitled to notify Publisher of its desire to have the Work removed from any subscription service in which the Work is contained. The Publisher shall, within 30 days of receipt of such notice, notify such subscription service provider that the Work is to be removed from that service, and shall use commercially reasonable efforts thereafter to implement the withdrawal in accordance with the provisions of any distribution agreement in place between the Publisher and such service provider.

(iii) The Publisher agrees not to directly market or promote the Electronic Version(s) specifically to customers located in countries in which the Publisher has not been granted rights or to knowingly and systematically sell such Electronic Version(s) to any customers located therein. The Author agrees that any agreement with any other English language publisher exercising rights reserved hereunder by the Author will contain reciprocal terms with respect to sales activity within the Publisher's Exclusive Territory. It is agreed and acknowledged that a casual or inadvertent failure to comply with the foregoing restrictions shall not be deemed a breach of agreement and such activities shall be deemed included within the grant of rights granted under agreements entered into by the Publisher or by any other English language publisher. Neither such party shall be responsible for the failure by any third party customer to honor such restrictions.

(e) In the event the Author provides or approves of additional material in connection with the Work such as an interview/Q&A session with the Author and/or other companion material (collectively, "Bonus Material"), the Publisher may include such Bonus Material in the Electronic Version(s) and/or the print editions of the Work and such Bonus Material shall be deemed part of the Work. With respect to any Bonus Material provided to the Publisher by the Author, the Author will be responsible for obtaining all third party permissions and releases necessary for the Publisher to reproduce, publish, license and sell such material in accordance with this Agreement.

2. **ADVANCE:** (a) In consideration of the Author's promises and obligations under this Agreement, the Publisher shall pay to the Author the sum of ▮▮▮▮▮ thousand dollars ($▮,000.00) as an advance against and on account of all of the Author's earnings under this Agreement,, it being understood that all amounts payable under this paragraph 2 shall be referred to collectively as the "Advance."

(b) The Advance shall be payable as follows:

2

Graeber/Writers House LLC
CDB 12/14/15

HIGHLY CONFIDENTIAL
BARTZ000000225

(i) ▓▓▓ thousand dollars ($▓000.00) on execution of this Agreement;

(ii) ▓▓▓ thousand dollars ($▓000.00) on the Publisher's acceptance of the Work, cleared of all necessary permissions and releases; and

(iii) ▓▓▓ thousand dollars ($▓000.00) on the Publisher's initial publication of the Work in the United States but in no event later than 18 months after payment of the sum due under subparagraph 2(b)(ii).

(c) (i) The Advance shall be increased by a one-time payment (the "Escalating Advance Payment") of ▓▓▓ thousand dollars ($▓000.00) (and such payment shall be considered to increase the Advance to ▓▓▓ thousand dollars ($▓000.00)) in the event that the Author's earnings from "Regular Net Sales" (as that term is defined in subparagraph 2(c)(iii)) of the Publisher's hardcover edition of the Work and Electronic Version(s) in the United States reach at least ▓▓▓ thousand dollars ($▓000.00) in the first 12 months following the Publisher's initial publication of the Work in the United States (the "Sales Period").

(ii) If earned, the Escalating Advance Payment will be paid 30 days after the end of the Sales Period.

(iii) For the purposes of this subparagraph 2(c) "Regular Net Sales" shall mean sales of the hardcover edition of the Work accounted for under subparagraph 3(a)(i), adjusted to reflect real or estimated returns in accordance with the Publisher's usual reserve policies, and sales of Electronic Version(s) (except for promotional sales) accounted for under subparagraph 3(d)(i).

(iv) Any royalty or licensing payments over and above the Advance that have been paid to the Author prior to the end of the Sales Period shall be considered to fulfill all or part of such payment obligations.

3. **ROYALTIES:** Royalties shall accrue to the Author's account from sales by the Publisher of the Work, in whole or in part, in any media, as set forth below. For the purposes of this Agreement, the term "retail price" shall mean the suggested retail price for the Work, and the term "net sales revenue" shall mean all sums actually received by the Publisher from its sales of the Work, less any applicable taxes, and any commissions or fees to third party agents or distributors incurred in making such sales.

(a) On copies sold in the United States:
   (i) hardcover editions:
      10% of the retail price on the first 5,000 copies;
      12.5% of the retail price on the next 5,000 copies; and
      15% of the retail price on all copies thereafter

   (ii) trade paperback editions:
      7.5% of the retail price

   (iii) mass market editions:
      8% of the retail price on the first 150,000 copies; and
      10% of the retail price on all copies thereafter

(b) On copies sold outside the United States:
   (i) hardcover editions:

3

Graeber/Writers House LLC
CDB 12/14/15

HIGHLY CONFIDENTIAL    BARTZ000000227

        10% of net sales revenue

  (ii)  trade paperback editions:
       7.5% of net sales revenue

  (iii)  mass market editions:
       8% of net sales revenue

(c)  *Audio Work(s) editions:*
  (i)  10% of net sales revenue on Audio Work(s) sold as packaged units (such as CDs) in the United States

  (ii)  7.5% of net sales revenue on Audio Work(s) sold as packaged units (such as CDs) outside the United States

  (iii)  25% of net sales revenue on all Audio Work(s) sold and transmitted by means of digital delivery, or by other wireless or magnetic means

(d)  *Electronic Version(s):*
  (i)  25% of Net Electronic Sales Receipts (as that term is defined in subparagraph 3(d)(ii) below) on all sales of the Publisher's Electronic Version(s). In the event the Publisher generally offers its authors a higher base royalty rate for such Electronic Version(s), the Publisher will thereafter increase the Author's base royalty to such rate. At any time following three years from the Publisher's initial publication of an Electronic Version of the Work in the United States, the Author may serve written notice to the Publisher of the Author's desire to review the royalty rate set forth in this subparagraph 3(d)(i). If the Author and the Publisher fail to reach an agreement within a period of 60 days following the Publisher's receipt of such notice, the Author may: 1) allow the Publisher to continue its sales of the Electronic Version at the existing royalty rate; or 2) require the Publisher to discontinue sales of any and all Electronic Versions unless and until the Author and the Publisher agree in writing upon a new royalty rate to replace the one set forth in this subparagraph 3(d)(i). It is understood and agreed, however, that there shall be no reversion of the electronic rights granted herein.

  (ii)  "Net Electronic Sales Receipts" shall mean all monies actually received by the Publisher from sales by the Publisher (directly or through agents or distributors) of Electronic Version(s), less any applicable taxes, handling or processing fees paid by the Publisher, customer refunds resulting from bona fide errors in the transmission of the Work and commissions or fees paid or payable to third parties in connection with effecting the transaction or transmission of the Electronic Version to the customer. No deductions shall be made for normal overhead expenses. In the event the Electronic Version is sold by the Publisher as part of a package, group, bundle, subscription, installment series or other multiple work method, the royalty shall be multiplied by the Share Fraction. "Share Fraction" means a fraction, the numerator of which is the number of consumer downloads or readings of the Work and the denominator of which is the number of consumer downloads or readings of all works in the package, group, bundle, subscription, installment series or other multiple work method in which the Work is included.

(e)  *Large print:*
  (i)  hardcover editions sold in the United States:
       10% of the retail price

4

(ii) paperback editions sold in the United States:
7.5% of the retail price

(iii) hardcover editions sold outside the United States:
10% of net sales revenue

(iv) paperback editions sold outside the United States:
7.5% of net sales revenue

(f) *Sets:*
On copies of the Work sold by the Publisher as part of a package or a set for a single price, the retail price or net sales revenue shall be determined by prorating the retail price or net sales revenue received from the sale of the entire package in proportion to the suggested retail prices for the separate items contained in the package, whether or not such works are sold separately. The Author shall have approval of the inclusion of the Work in the Publisher's packages and/or sets that contain works by other authors.

(g) *High discount; premium; large quantity; direct marketing:*
Notwithstanding the above, the royalties in subparagraphs 3(a), (c)(i) and (e)(i) and (ii) above shall not apply to the sales set forth below, which shall have the following royalties:

(i) On copies sold at a discount of 55% or greater off the retail price, the royalty shall be 10% of net sales revenue for hardcover and paperback editions and 7.5% of net sales revenue for all other editions (e.g., large print editions) (however such royalty rates shall not apply to returnable sales made to trade bookselling outlets and chains).

(ii) On copies sold as premiums* (defined as promotional items not for individual resale), or at a discount of 60% or greater off the retail price, the royalty shall be 10% of net sales revenue for hardcover editions and 7.5% of net sales revenue for all other editions (e.g., large print editions).

*The Author shall have approval over any goods or services offered as part of a premium deal.

(iii) On copies sold as a result of the Publisher's direct marketing programs (other than sales to the general public from a consumer commerce website maintained by the Publisher, if any), the royalty shall be 10% of net sales revenue for hardcover editions and 7.5% of net sales revenue for all other editions (e.g., large print editions).

(h) *Overstock and Remaindering:*
(i) Should there be an overstock of the Work on hand which is not likely to be depleted in a reasonable time, or should the Publisher choose to remainder the Work, the royalty rate shall be 10% of net sales revenue on copies of the hardcover edition and 5% of net sales revenue on copies of the paperback and on copies of all other editions (e.g., large print editions) sold at a discount of more than 50%, but less than 60%, off the retail price and 5% of net sales revenue on copies of all editions of the Work sold at a discount of 60% or more off the retail price, except as set forth in subparagraph 3(i) below.

(ii) In the event the Work is remaindered, the Publisher shall use reasonable efforts to notify the Author and the Author shall be given a period of two weeks following written

5

HIGHLY CONFIDENTIAL

BARTZ000000229

notice from the Publisher in which to purchase all or any portion of said copies at the Publisher's cost plus freight. Failure to provide such notice shall not be deemed a breach of the terms of this Agreement.

(i) *Non-royalty dispositions:*
No royalty shall be payable to the Author on copies of the Work destroyed, distributed without charge for purposes of review, advertising, publicity, sample or the like, disposed of at or below cost, copies sold to the Author hereunder, or copies supplied free of charge to charitable institutions.

4. **RIGHTS AND LICENSING REVENUE:** (a) The Publisher shall have the exclusive rights to exercise and license the rights granted in this Agreement in the Work, in whole or in part, upon such terms as it deems advisable, and the Author shall earn a share of the Publisher's "net licensing revenue" as set forth below. The term "net licensing revenue" shall mean all sums actually received by the Publisher from licensing rights in the Work, less any commissions or fees to agents selling the rights to third party publishers and foreign taxes incurred by the Publisher in disposing of such rights, and shall exclude the Publisher's reasonable charges to licensees for the manufacture, handling and delivery of copies of the Work.

| Rights | Publisher's Share | Author's Share |
|---|---|---|
| Abridgment*, adaptation*, anthology*, Audio Work(s)**, book club**, condensation*, deluxe, digest**, educational, Electronic Version(s)*, graphic*, hardcover reprint**, large print, library, microfiche, microfilm, omnibus*, paperback reprint**, permission, second serial** and syndication** | 50% | 50% |

(b) The Author shall have approval over the licensing of the rights designated with "*" in subparagraph 4(a) above in connection with any changes made to the Work. The Author's approval of graphic rights shall be at the Author's sole discretion. The Publisher shall consult with the Author regarding any license of the rights designated by "**" in subparagraph 4(a) above.

(c) The Publisher may license the reproduction in Braille or other publication of the Work, in whole or in part, for the disabled, without charge.

(d) In the event the Publisher exercises any of the rights specified in paragraph 4 itself in lieu of licensing same, the royalty rates, where not otherwise provided for in paragraph 3 above, shall be mutually agreed consistent with prevailing book industry standard. In the event any right specified in paragraph 4 is licensed by the Publisher to an affiliated company, other than to the Publisher's UK affiliates, such license will be negotiated at arm's length, on terms similar to the terms of comparable licenses between the Publisher and unaffiliated companies.

(e) The Publisher shall use reasonable efforts to notify the Author of all licenses entered into by the Publisher and the terms thereof. Upon the Author's written request, the Publisher shall furnish the Author with copies of any agreement licensing rights listed in subparagraph 4(a) above.

6

Graeber/Writers House LLC
CDB 12/14/15

HIGHLY CONFIDENTIAL    BARTZ000000230

5.  **RESERVED RIGHTS:**   (a)   All rights in the Work not granted to the Publisher hereunder are reserved to the Author, including, but not limited to, dramatic rights (such as motion picture, television, cable, radio, videocassette, audiovisual, multimedia), calendar and poster rights (except that the Publisher shall have the right to distribute posters for publicity purposes), commercial and general merchandising rights and merchandising tie-in rights. No less than 12 months after first publication of the Work the Author may, subject to the Publisher's approval (not to be unreasonably withheld) publish or authorize publication of the actual script of a bona fide stage play based on the Work where such play has actually been produced, provided that the cover and design of any such published script is materially different from any available print edition published by the Publisher and/or its licensees and provided it is made clear on the cover that this edition is a published script of a stage play.

(b)   The Author will make best efforts to notify the Publisher in writing of any exploitation of reserved rights and the Publisher may utilize such information in connection with marketing the Work.

(c)   In the event the Author retains the right to license publication of English language editions of the Work in the United Kingdom ("UK"), the Publisher agrees to notify the Author (and, if requested, the Author's UK licensee) of the Publisher's scheduled publication date(s) for its hardcover and/or paperback edition(s) of the Work (and any subsequent changes thereto), and the Author shall obtain the UK licensee's commitment not to publish comparable edition(s) of the Work prior to said date(s).

(d)   The Publisher acknowledges that a third party producer or motion picture company which acquires rights to create a dramatic work based upon the Work may publish in printed form an excerpt from the Work or from such dramatic work, of not more than 7,500 words from or 10% of the Work, whichever is less in the aggregate, for purposes of trade advertising or promotion of said dramatic work and not for sale to consumers.

6.  **DELIVERY AND ACCEPTANCE:**   (a)   The Author agrees to deliver to the Publisher not later than **December 1, 2016** (the "Delivery Date"), one paginated, double-spaced typed copy and one computer disc copy (in a format designated by the Publisher) of the complete and final manuscript of the Work, the Illustrations (in a reproducible form reasonably designated by the Publisher ) along with any proposed changes to the provisional title for the Work specified herein, all in content and form satisfactory to the Publisher. Any extension of the Delivery Date must be agreed to in writing by the Publisher in order to be binding. No failure by the Publisher to enforce the Delivery Date shall limit the Publisher's rights under this paragraph 6.

(b)   (i)   The Author shall, at the Author's sole expense, deliver to the Publisher by the Delivery Date all photographs, illustrations, drawings, charts, footnotes, source notes, bibliography and any other materials as mutually agreed upon (collectively, the "Related Materials"), all in content and form satisfactory to the Publisher, along with any third party permissions and releases required for publication of the Work and/or for the exercise of any of the rights granted hereunder. Said permissions and releases shall cover all territories, markets and editions covered by this Agreement. (A sample form, which the Author can customize for the Author's specific needs, is attached as a courtesy as Exhibit A.)

(ii)   If the Author fails to make timely delivery of the Related Materials, any permissions or releases, satisfactory to the Publisher in form and content, the Publisher shall have the right, but not the obligation, to continue this Agreement and obtain on behalf of the Author any such Related Materials, permissions or releases and charge the cost thereof to the

7

Graeber/Writers House LLC
CDB 12/14/15

HIGHLY CONFIDENTIAL
BARTZ000000231

Author and shall also have the right to withhold sums to cover such actual or estimated costs from any payments due to the Author hereunder.

    (iii)    The Publisher agrees to contribute to the Author up to seven hundred dollars ($700.00) (the "Grant"), which sum will not be accounted for as part of the Advance, for expenses incurred by the Author in connection with clearing permissions and releases for the Work. The Grant shall constitute full payment by the Publisher for any and all expenses related to such expenses. The Grant shall be payable on the Publisher's acceptance of the Work, cleared of all necessary permissions and releases, and upon the Publisher's receipt of appropriate invoices or other documentation.

    (c)    Following delivery by the Delivery Date of the complete and final manuscript of the Work in the length specified in this Agreement, the Illustrations, the Related Materials and any third party permissions and releases, the Publisher shall notify the Author whether the Work is acceptable. If the Publisher determines in its good faith judgment that any or all of such delivered materials are unacceptable, the Publisher will provide written editorial comments to the Author within 60 days of receipt, along with requests for revisions. In such event the Author shall deliver the revised Work within 60 days thereafter. If the Publisher fails to provide written editorial comments within 60 days, the Author shall so notify the Publisher and the Publisher will respond with editorial comments within 30 days of receipt of said notice. Any request by the Publisher for changes or revisions in any portion of the Work shall constitute notice to the Author that the Work is not then acceptable to the Publisher. Provided the manuscript is delivered by the Delivery Date, the Publisher's determination whether the manuscript is acceptable shall not be based upon changes in market conditions. (See subparagraph 8(b).)

    (d)    The Author shall retain one copy of the manuscript of the Work and all originals of the Related Materials submitted to the Publisher. If the Publisher loses or damages beyond reasonable wear and tear the manuscript or Related Materials, the cost of any retyping or photocopying the manuscript and/or any duplicating by mechanical or conventional means of Related Materials deemed necessary by the Publisher shall be paid by the Publisher.

    (e)    In the event the Work will include original drawings, illustrations or photographs or transparencies (the "Artwork") and the Author believes that any Artwork to be submitted to the Publisher has a value that exceeds the cost of mechanical or conventional reproduction or is irreplaceable, then the Author shall so notify the Publisher in writing prior to submitting such Artwork and the Publisher shall furnish an "Artwork Valuation Form" for completion by the Author. The Publisher shall, in its sole discretion, after review of the completed Artwork Valuation Form, determine whether the Author may submit the Artwork. If the Publisher notifies the Author that the Publisher will receive such submission, the completed Artwork Valuation Form shall be attached to this Agreement; if the Publisher notifies the Author that it declines to receive such submission, the Publisher may require submission of the Artwork in an alternative format to be determined in consultation with the Author.

    (f)    The Author understands and agrees that it is the Author's sole responsibility to render the Work acceptable to the Publisher and that any assistance, encouragement or critical comments provided by the Publisher shall not obligate the Publisher to accept the manuscript or to further assist the Author in rendering the manuscript acceptable to the Publisher.

    (g)    The Author will deliver to the Publisher on or before the Delivery Date, a selection of color photographs of the Author cleared of all necessary permission, which may be used by the Publisher on the cover and jacket of the Work and in marketing. (Sample forms which the Author may customize are attached as a courtesy as Exhibits B and C.)

HIGHLY CONFIDENTIAL

BARTZ000000232

7.  **AUTHOR'S RIGHTS TO TERMINATE:** (a) If, following acceptance of the Work, the Publisher fails to publish the Work within the period specified in subparagraph 10(a) below for any reason not attributable to an act or omission by the Author or due to an extension covered in subparagraph 10(a), the Author may send the Publisher written notice demanding publication of the Work. If the Publisher shall not publish the Work within six months after receipt of such notice, then the Author shall have the right, in lieu of any other remedies, to terminate this Agreement on written notice to the Publisher and retain all payments previously made to the Author under this Agreement, and receive all unpaid portions of the Advance with respect to the terminated Work.

(b) If, three years from the date of the Publisher's first publication, the Work shall not be available for sale in any full-length regular print edition by the Publisher the Author may request that the Publisher revert its rights to the Work. Within six months after receipt of the Author's written request for reversion, if the Publisher does not put such an edition of the Work into production to be offered for sale, then the Publisher shall revert to the Author all rights granted herein with respect to the Work, subject to repayment by the Author of any overpayment of royalties or other sums due the Publisher under this Agreement (excluding an unearned advance). A Work shall be available for sale as long as the Publisher has a full-length regular print edition of the Work in stock and lists the Work in the Publisher's then current catalog of books or if earnings accruing to the Author from full-length editions or versions of the Work total more than five hundred dollars ($500.00) cumulatively over the two consecutive royalty periods prior to the Publisher's receipt of the Author's reversion request. Upon the Publisher's request following any reversion request by the Author, the Author shall promptly notify the Publisher if motion picture, television, dramatic, merchandising or other reserved rights are under option or contract. The Publisher's rights to any option work under paragraph 15 shall survive any reversion under this subparagraph 7(b).

(c) In the event of a filing of bankruptcy by the Publisher, to the extent permitted by law, the Author shall have the right to buy back the rights granted herein at fair market value, and thereupon this Agreement shall terminate, except for the Publisher's right to complete production for any work in process and dispose of any existing inventory.

(d) If this Agreement is terminated pursuant to subparagraph 7(a) or 7(c) or paragraph 32, the option under paragraph 15 shall terminate.

8.  **PUBLISHER'S RIGHTS TO TERMINATE:** (a) If the Author shall fail to deliver the complete and final manuscript of the Work, the Illustrations, the Related Materials, or any required permissions or releases on or before the Delivery Date, the Publisher shall have the right to terminate this Agreement and the Author shall repay all amounts paid by the Publisher in connection with the Work within 30 days of written request from the Publisher. Until repayment in full of such amounts, all rights granted to the Publisher in this Agreement shall remain in full force and effect, and the Author shall have no right to grant, license or assign rights to the Work (or any substantially similar work) to any other person, firm or entity. If this Agreement is so terminated for non-delivery by the Author, then for one year after such termination the Author shall not offer the undelivered Work (or any substantially similar work) for publication to any third party without first offering it to the Publisher on the same terms and conditions as set forth herein and the Publisher shall have 30 days from receipt of the Work in which to advise the Author whether or not it wishes to go ahead and reinstate this Agreement and publish the Work.

9

HIGHLY CONFIDENTIAL                                                                                      BARTZ000000233

(b) If, after timely delivery of the complete and final manuscript of the Work, the Illustrations, the Related Materials and any required permissions or releases, the Publisher determines in its good faith judgment that any portion or all of the Work is not acceptable pursuant to subparagraph 6(c), including the opportunity to revise the Work as set forth in such subparagraph, the Publisher shall have the right to terminate this Agreement. Upon notice that the Work is not acceptable, the Author shall repay all amounts paid by the Publisher in connection with the Work (the "Amount Owed") out of all proceeds received by the Author from any sale or license of rights in the Work (or any substantially similar work) (collectively, "Proceeds"). The Author hereby (i) assigns and transfers to the Publisher the Author's right to receive Proceeds and (ii) authorizes and directs any other entity from whom the Author is entitled to receive Proceeds to pay such amounts directly to the Publisher on the Publisher's written demand therefor, until such time as the Publisher is repaid the Amount Owed in full. Notwithstanding the above, if the Publisher does not receive the Amount Owed in full within 18 months from the Author's receipt of written notice from the Publisher that the Work is not acceptable, the Publisher shall thereupon be entitled to receive repayment of the full Amount Owed. Until repayment in full to the Publisher of the Amount Owed, all rights granted to the Publisher by the Author under this Agreement shall remain in full force and effect. However, the Publisher shall permit the Author to offer rights in such terminated Work to other publishers subject to the aforementioned terms and subject to the Author advising the Publisher in writing of the financial terms of any other offer the Author wishes to accept.

(c) The Publisher shall be entitled to decline to publish the Work at any time (regardless of any prior acceptance of the Work) if, in the Publisher's good faith judgment, the Work contains material which is likely to give rise to a claim of libel, injury, obscenity or violation of any law or right of any person or entity. In such event the Publisher shall notify the Author of its concerns and the Author may seek to remedy such problem. If the Author fails or is unable to provide such a remedy, then the Publisher shall be entitled to terminate this Agreement, without limitation of any other rights and remedies under this Agreement, subject to the repayment to the Publisher of all monies paid and/or expenses incurred by the Publisher in connection with the Work. Until repayment in full by the Author to the Publisher of such amounts, all rights granted to the Publisher in this Agreement shall remain in full force and effect, and the Author shall have no right to grant, license or assign rights to the Work (or any substantially similar work) to any other person or entity.

9. **PRINTER'S PROOFS:** The Author agrees to read, correct and approve the manuscript copyedited by the Publisher. The Author agrees to return such approved and/or corrected copyedited manuscript to the Publisher within 14 days of the receipt thereof by the Author. The Author shall also have the right to review the proof of the Work. If the Author fails to return such approved and/or corrected copyedited manuscript and proof within 14 days, the Publisher shall have the right to publish the Work in the condition in which it was submitted to the Author by the Publisher or to delay publication. The cost of alterations in the proofs required by the Author in excess of 10% of the original cost of composition, other than corrections of the Publisher's or printer's errors, shall be charged to the Author hereunder or shall, at the option of the Publisher, be paid by the Author upon receipt of invoice; provided, however, that in either case the Publisher shall, upon request, furnish to the Author a statement of such additional expenses, and shall make available at the Publisher's office the corrected proof for inspection by the Author.

10. **PUBLICATION OF THE WORK:** (a) Subject to paragraphs 7 and 8, the Work will be published not later than 18 months after the Publisher's acceptance of the Work, in such formats, style, manner, and under such imprints, in such quantities, and at such prices as the Publisher deems appropriate. Such period(s) may be extended in the event the Publisher fails

10

Graeber/Writers House LLC
CDB 12/14/15

to publish due to forces beyond its reasonable control. The Publisher shall initially publish the Work in hardcover format under the Twelve imprint and intends to subsequently publish the Work in paperback format.

(b)  The Author authorizes the Publisher to make the manuscript of the Work conform to its standard style in punctuation, spelling, capitalization and usage. Except as may be otherwise expressly provided in this Agreement, no other changes will be made to the manuscript without the Author's consent.

(c)  Other than listings in paperback editions and Electronic Versions of other works by the Author published by the Publisher, and other similar works published by the Publisher, the Publisher agrees not to insert any advertising into its editions of the Work, it being understood that other editorial and/or advertising materials may appear with the Electronic Versions (e.g., banner ads or notices on a web page) consistent with industry customs and practices. The Publisher agrees to pass the foregoing restrictions on to all licensees of the Work (other than to licensees with licenses for book club editions, condensed books, reprint paperback editions and/or for use of extracts from the Work in periodicals).

11.  **PUBLICITY:**  (a)  The Publisher shall determine, in its good faith business judgment, how it shall advertise, publicize and/or promote the Work, which might include making selections of the Work available in any and all media, whether print, video, television, radio, world wide web, wireless, podcast or mobile, to promote the sale of the Work.

(b)  In the event the Publisher requests the Author to participate in publicity for the Work, the Author agrees to perform such reasonable promotional or publicity services for a minimum of 14 days coinciding with publication of the Work, it being understood that the Publisher and the Author shall consult and mutually agree on the scheduling and location of such promotion, taking into consideration any prior professional commitments the Author has notified the Publisher of in writing in a timely manner. The Author's promotional services may consist of touring, bookstore, and media appearances and interviews. The Publisher shall bear all the reasonable and customary costs and expenses of such publicity arranged by the Publisher. The Author shall comply with the Publisher's reasonable instructions and guidelines regarding such promotion. It is acknowledged that the Author's promise to perform the foregoing promotional and publicity activities is a material inducement to the Publisher to enter into and perform this Agreement and constitutes an essential part of the consideration provided to the Publisher hereunder.

(c)  The Author shall collaborate with the Publisher in maximizing cross-promotional opportunities in connection with the Publisher's publication of the Work. Specifically, the Author agrees that beginning at least one month prior to publication of the Work and continuing through at least six months following such publication, the Author will promote the Work via the Author's personal and/or branded website(s), if any, (collectively, "Author Website"), the Author's blog(s), if any, and via other social media outlets in which the Author communicates with consumers, including but not limited to Twitter and Facebook account(s), if any. The details and manner of the specific cross-promotional activities set forth in this subparagraph 11(c) shall be arranged by the Author following consultation with the Publisher.

(d)  In the event the Author desires to obtain or perform any other publicity independently of the Publisher in connection with the Work (such as interviews, website activities, personal appearances), the Author agrees to coordinate all such activities with the Publisher's Publicity Department.

11

Graeber/Writers House LLC
CDB 12/14/15

HIGHLY CONFIDENTIAL                                                                                                         BARTZ000000235

(e) If the parties mutually agree to include a reference to the Author Website on the Publisher's editions of the Work, it is understood that the Publisher shall have no responsibility, obligation or liability with respect to the Author Website.

12. **AUDIO RECORDING SERVICES:** Intentionally deleted.

13. **COPYRIGHT:** (a) The Publisher agrees to submit an application for registration of the copyright in the Work in the name of the Author in the United States of America within 90 days of first publication of the Work; however, failure to do so shall not be deemed a breach of this Agreement. The Author agrees that the Publisher may record this Agreement or a memorandum hereof in the United States Copyright Office. The Author hereby appoints the Publisher to be the Author's attorney-in-fact to execute and to file any and all documents necessary to record in the Copyright Office the assignment of exclusive rights made to the Publisher hereunder. The Publisher shall include the following copyright notice in each of its editions of the Work:

> Copyright © [year] by **Charles Graeber**

(b) If the Work or any portion of the Work has been previously published or will be published prior to the Publisher's publication, the Author shall submit an application for registration of the copyright in the Author's own name or obtain and deliver to the Publisher a duly executed and recorded assignment of copyright, a reversion of rights from the previous publisher or a permission in accordance with paragraph 6, along with the appropriate copyright notice to be included in the Publisher's editions of the Work.

(c) If the Work has been published or will be published prior to the Publisher's publication in any other English-speaking country, the Author shall promptly deliver to the Publisher one copy of such prior edition together with the exact publication date and the publisher's name and address so that the Publisher may submit an application for registration of the copyright in the Work as provided in subparagraph 13(a) above.

(d) In the event that any copyright in the Work is infringed, the Author and the Publisher may agree on a joint action in regards thereto, failing which either party shall have the right to proceed. If the parties proceed jointly, the expenses and recoveries, if any, shall be shared equally; if they do not proceed jointly, the party going forward with such action shall bear all expenses and shall retain any recovery. The Author and the Publisher will notify each other of any notices of copyright infringement and each party shall be consulted prior to the commencement of any infringement suit by the other party. In no event shall either party be liable to the other for failure to take action.

14. **AUTHOR'S COPIES:** The Publisher shall furnish at no charge 35 free copies of its initial print edition of the Work and two copies of its initial packaged trade Audio Work(s), if any, of the Work to the Author and 15 copies of its initial print edition of the Work and two copies of its initial packaged trade Audio Work(s), if any, of the Work to the Author's agent. On request and if feasible, the Author and the Author's agent each will receive one free copy of the Electronic Version(s) of the Work, if any, in Adobe Acrobat or other similar format as the Publisher selects; however failure to do so shall not be deemed a breach of this Agreement. The Author and the Author's agent shall have the right to purchase, on a non-returnable basis, additional copies of the print editions and packaged trade Audio Work editions, if any, of the Work at 50% off the retail price plus any shipping or freight charges, for personal use only and not for resale, and will be invoiced accordingly. No royalty shall be due the Author for such copies.

12

Graeber/Writers House LLC
CDB 12/14/15

HIGHLY CONFIDENTIAL
BARTZ000000236

15. **OPTION:** (a) The Author agrees to submit exclusively to the Publisher, for consideration as below described, a detailed proposal for the Author's next book-length non-fiction work before submitting same or manuscript(s) therefor to any other party.

(b) The Publisher shall have a period of 30 days after the submission of a detailed proposal (which period shall not commence to run prior to 30 days before the Publisher's initial hardcover publication of the Work), within which to notify the Author whether it desires to publish such next work. If within said time the Publisher notifies the Author of its desire to publish the Author's next work, the Author shall thereupon negotiate in good faith exclusively with the Publisher with respect to the terms of such publication. If the Publisher and the Author are unable to arrive at a mutually satisfactory agreement after negotiating for a period of 30 days, the Author shall be free to submit such next work elsewhere.

16. **CONFLICTING PUBLICATION:** (a) During the term of this Agreement, the Author shall not, without written permission of the Publisher, publish or permit to be published any material based upon or incorporating material from the Work or which would compete with its sale or directly impair the rights granted hereunder.

(b) Subject to the terms above, the Author agrees that in no event will the Author publish or authorize publication of any other book-length work of which the Author is the sole author, main contributor or principal collaborator until six months after publication of the Work, provided the Publisher publishes the Work in accordance with the time period set forth in subparagraph 10(a)..

17. **AUTHOR'S WARRANTIES:** (a) The Author warrants, represents and covenants: that the Author owns all rights and licenses herein conveyed and has the full and sole right and authority to convey all such rights and perform the Author's obligations hereunder; that the rights granted hereunder are free and clear and no third party consents or permissions are required for performance of this Agreement; that the Work will be the Author's next book-length work (whether under the Author's own name or otherwise); that the Work is original with the Author in all respects, except for any portion which has been previously published and is identified as such; that, with respect to works of nonfiction, all statements contained in the Work as published are true or based on reasonable research for accuracy; that the Work is not in the public domain and is or may be validly copyrighted or registered for copyright in the United States and is likewise protectible throughout all countries in the territory where the laws provide for such protection; that the title of the Work may be used by the Publisher in the exercise of all or any of the rights herein conveyed; that the use or reproduction of the Work or any part thereof or the exercise of any of the rights herein granted, will not in any way infringe upon any statutory or common law copyright or trademark, or plagiarize any other work, or give rise to a claim of a libel or defamation, or invasion of the rights of privacy or of publicity of any party, or violate any law or regulation; that the Author has not done and will not do any act or thing that has or will in any way impair, prevent or interfere in any manner with the full and exclusive enjoyment by the Publisher of any of the rights or licenses herein conveyed; that the Author has not made any misrepresentations to the Publisher about the Work or the Author's life story or credentials; that the Author is not under any agreement or obligation to mention any product, service or brand name in the Work, or as part of promotion for the Work, in exchange for payment or other consideration from any third party; that to the knowledge of the Author there are no claims or litigation pending or threatened, which might adversely affect or in any way prejudice the Publisher's exclusive rights in the Work or any of the rights or licenses herein granted and the Author knows of no basis on which such a claim may be asserted and will promptly notify the Publisher in writing if such knowledge changes; that the use, with reasonable care and skill, of

13

Graeber/Writers House LLC
CDB 12/14/15

HIGHLY CONFIDENTIAL
BARTZ000000237

any recipe, instruction, material, advice or formula contained in the Work will not result in injury, and the Author will include in the Work appropriate warnings and safety precautions concerning any potential hazards that may be involved in the use of any such recipe, instruction, material, advice or formula.

(b)  The warranties, representations and covenants hereunder, along with the indemnity set forth in paragraph 18 below shall apply to the Work and any revisions thereof and shall survive any termination of this Agreement.

18.  **INDEMNITY:**  (a)  The Author undertakes to indemnify and hold harmless the Publisher and its officers, directors, agents, employees, customers, licensees and assigns from and against any liabilities, damages, costs, expenses (including reasonable counsel fees), judgments, settlements, penalties, or losses of any kind or nature whatsoever which may be incurred by the Publisher or its officers, directors, agents, employees, customers, licensees or assigns for or in connection with any claim, action or proceeding inconsistent with any of the representations or warranties herein contained or based upon or arising out of anything contained in the Work (a "Claim"). The Publisher and the Author shall each with all reasonable promptness notify the other of any Claim.

(b)  In the event of any such Claim, the Publisher shall select counsel and undertake the defense thereof. The Author shall have the right (but not the obligation) to have separate counsel at the Author's own expense, it being understood that the conduct of the defense shall remain under the Publisher's control. The Author shall cooperate fully with the Publisher in the defense of any Claim and the Author agrees to maintain the confidentiality of all communications relating to the Claim.

(c)  The Publisher agrees to cover the Author as an additional insured under any Errors and Omissions insurance policy maintained by the Publisher with respect to Claims of libel, invasion of privacy, violation of the right of publicity, copyright infringement and trademark infringement arising from the Publisher's publication of the Work ("Covered Claim"). In the event a Covered Claim is asserted against the Publisher and/or the Author, the Errors and Omissions insurance in effect at the time such Covered Claim is asserted shall be applicable and the Publisher and the Author shall equally share all costs, judgments and settlements not covered by the insurer up to the amount of the deductible, subject to the terms of such policy and subparagraph 18(b) above. Any insurance payment shall be applied towards satisfaction of the Author's indemnity obligations under subparagraph 18(a), provided however that the Author shall be responsible for all costs, judgments and settlements attributable to willful or reckless breach by the Author of any of the Author's representations or warranties under this Agreement or any failure by the Author to comply with the terms of subparagraph(s) 18(a), (b) and/or (e).

(d)  During the pendency of such Claim, the Publisher may withhold payments due to the Author under this or any other agreement to the extent reasonably necessary to conduct the defense thereof and to satisfy any liability therein.

(e)  If, in the opinion of the Publisher, the Work contains material which may involve the Publisher in litigation, the Publisher may elect to engage outside legal, professional or technical expert(s) to review the manuscript of the Work. The Author will cooperate fully with the Publisher and its representatives conducting such review, and the Author agrees to maintain the confidentiality of all communications relating to such review. If the Author refuses to make such changes as are advised by the Publisher or its reviewer(s), the Publisher will have no obligation to publish the Work and will have the right to terminate this Agreement in accordance with the terms of paragraph 8. Notwithstanding any expert review which may be obtained by

14

HIGHLY CONFIDENTIAL

BARTZ000000238

the Publisher, nothing in this Agreement shall be deemed to impose upon the Publisher any duty of independent investigation or relieve the Author of any of the obligations assumed by the Author hereunder.

19. **ACCOUNTING STATEMENTS:** (a) The Publisher shall render semi-annual statements of account covering sales (less returns, actual and estimated) and net licensing revenue as of June 30 and December 31, and shall mail such statements to the Author not later than the following September 30 and March 31, together with the payment of amounts due thereon. Upon the Author's written request, the Publisher agrees to provide the following information subsequent to the semi-annual accountings: total number of copies being held as a reserve against returns and itemized listing of any subsidiary rights advances. Upon the Author's written request (but not more than twice in any calendar year), the Publisher shall also provide an explanation of any reserve. The Publisher shall pay promptly remit to the Author any sums legitimately owed to the Author pursuant to errors identified by either the Publisher itself or the Author.

(b) The Publisher may deduct any overpayment of royalties or any other amounts due the Publisher from the Author under this or any other agreement, from any payments due from the Publisher to the Author under this or any other agreement. (An unearned advance shall not constitute an overpayment or a sum due from the Author.) Nothing contained herein authorizes the Publisher to cross-collateralize the Work with any other work under a different agreement.

(c) At the Publisher's election, the Author shall repay any overpayments made to the Author and not deducted pursuant to subparagraph 19(b) above within 30 days of receipt.

20. **AUDIT RIGHTS:** The Author may, at the Author's own expense, audit the books and records of the Publisher relating to the publication of the Work pursuant to this Agreement at the place where the Publisher maintains such books and records in order to verify statements rendered to the Author hereunder. Any such audit shall be conducted only by an independent certified public accountant during reasonable business hours in such a way as to not interfere with the Publisher's normal business activities. In no event shall an audit with respect to activity currently reported on a statement commence later than 24 months from the date of such statement, nor shall any audit continue for longer than ten consecutive business days, nor shall audits be made hereunder more frequently than twice annually nor shall records supporting any such statements be audited more than once. All statements rendered hereunder shall be binding upon the Author and not subject to objection for any reason unless such objection is made in writing stating the basis thereof and delivered to the Publisher within 24 months from delivery of such statement, or if an audit is commenced prior thereto, within 30 days from the completion of the audit. In the event that the audit establishes an underpayment of 5% or more of amounts actually due to the Author, then the cost of such audit, up to the amount of the underpayment, but not to exceed ten thousand dollars ($10,000.00), shall be borne by the Publisher and the Publisher shall pay any underpayment within 30 days of receipt of the Author's written request. The term "underpayment" shall not include any disputes as to reasonable and customary amounts retained by the Publisher as reserves against returns.

21. **PUBLISHER NOT A TRUSTEE:** In no event shall the Publisher be obligated to segregate from any of its other funds, any of the sums which may be paid to the Publisher by customers or other parties relating to the Work, nor shall the Publisher be considered a trustee, pledgeholder or fiduciary of the Author.

15

22. **MULTIPLE AND ACTUAL AUTHOR(S):** This paragraph has been intentionally deleted.

23. **APPROVALS:** Wherever under the terms of this Agreement the Author's approval or consent may be required, such approval or consent shall not be unreasonably withheld or delayed. The Author agrees to notify the Publisher in writing, specifying particular objections to any item the Author does not approve of. Notification of disapproval must be received within five business days, unless a different approval period is specifically provided for in this Agreement, or the Author's approval or consent shall be deemed granted.

24. **ASSIGNMENT:** (a) This Agreement shall be binding upon the assigns, heirs, executors, and administrators of the Author, and upon the assigns and successors of the Publisher.

(b) This Agreement and the rights and benefits hereunder shall not be assignable or transferable by the Publisher except to a corporate parent, affiliated company or a wholly owned subsidiary or in connection with a transfer of all or substantially all of the Publisher's assets or any imprint(s), or upon consent of the Author (such consent not to be unreasonably withheld). Notwithstanding the above, rights granted hereunder may be exercised by the Publisher or the Publisher's affiliates.

(c) The Author shall not assign any of the Author's obligations hereunder. The Author may, on written notice to the Publisher, direct, assign or transfer future payments under this Agreement, but may not designate more than three payees.

25. **NOTICES:** All notices which either party hereto is required or may desire to give to the other shall be in writing and given by addressing the same to the attention of the Publisher and to the General Counsel of the Publisher and to the Author at the address set forth on page 1 or at such other address as may be designated in writing by any such party in a notice to the other given in the manner prescribed in this paragraph. All such notices shall be sufficiently given when the same shall be sent by registered or certified mail postage prepaid.

26. **ENTIRE AGREEMENT; MODIFICATION:** This Agreement represents the entire agreement between the parties and supersedes all prior agreements and understandings with respect to the subject matter hereof, and the Author acknowledges that the Author has not relied on any understanding or agreement not set forth in this Agreement. This Agreement shall not be modified except in writing signed by the party charged therewith. No written waiver of any term or condition of this Agreement shall excuse the performance of any act other than those specifically referred to therein.

27. **CONSTRUCTION; JURISDICTION:** This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements executed and fully performed therein. It is agreed that New York courts (state and federal) only, will have jurisdiction over any controversies regarding this Agreement; any action or proceeding which involves such a controversy will be brought only in those courts, in New York County.

28. **HEADINGS:** The headings of the paragraphs of this Agreement are for convenience of reference only, are not part of this Agreement, and shall not limit or otherwise affect the meaning of this Agreement.

29. **AGENCY:** The Author hereby irrevocably appoints Writers House LLC, 21 West 26th Street, New York, NY 10010; attn: Susan Golomb, as the Author's agent (the "Agent")

Graeber/Writers House LLC
CDB 12/14/15

HIGHLY CONFIDENTIAL

BARTZ000000240

to act in all matters pertaining to or arising out of this Agreement and all other agreements, licensing or otherwise dispersing of any rights in the Work for which there are options under this Agreement. All statements and monies due to the Author shall be delivered to the Agent whose receipt thereof shall constitute a good and valid discharge. In consideration for services rendered, the Author irrevocably assigns and transfers to the Agent a sum equal to 15% of all monies due to the Author under this Agreement and related agreements (plus any monies advanced to or disbursements made on behalf of the Author by the Agent), and the Agent shall retain such amounts from all monies received for the account of the Author. The provisions of this paragraph shall survive the termination of this Agreement.

The Agent's Tax Identification Number is: ▮▮▮▮▮▮▮

30.   **EFFECTIVENESS OF AGREEMENT:**   This Agreement shall be of no force and effect unless signed by the Author and the Publisher within 90 days of the date first written above.

**SPECIAL PROVISIONS:**

31.   **COVER CONSULTATION:**   The Publisher shall consult with the Author regarding the cover design and cover copy for the Publisher's edition(s) of the Work.

32.   **DEFAULT:**   If the Publisher shall, during the existence of this Agreement, fail to send a royalty statement or make a payment as provided herein, except for good faith business reasons, then the Author may send written notice of such failure to the Publisher. If the Publisher fails to remedy such failure within 30 days of receipt of such notice then the Author may send a second notice. If the Publisher fails to remedy such failure within 15 days of receipt of such second notice then this Agreement shall terminate at the expiration of such second notice period, without limitation of either the obligation by the Publisher to pay the Author any monies due under paragraph 18 of this Agreement or the rights of the parties under paragraphs 17 and 18 hereunder, all of which shall survive any such termination. All such notices shall be sent in accordance with the terms of paragraph 25 hereof with an additional copy to the Publisher's CFO.

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement on the latest day and year written below.

                                              Grand Central Publishing,
                                              a division of Hachette Book Group, Inc.

_____               By:_____
Charles Graeber                                  Jamie Raab
Date:                                                  President and Publisher
                                                   Date:

Graeber/Writers House LLC
CDB 12/14/15

HIGHLY CONFIDENTIAL
BARTZ000000241