# EXHIBIT 22

22nd Street Entertainment, LLC
150 W. 22nd Street, 9th Floor
New York, NY 10011

Dated as of December 16, 2019

Charles Graeber
c/o CAA
2000 Avenue of the Stars
Los Angeles, CA 90067

Deposition Exhibit   12

Deponent: C. Graeber

Date:   March 5, 2025

Reporter: Jane Grossman, CSR No. 5225

Re:    "The Good Nurse" / Literary Option/Purchase Agreement

Ladies and Gentlemen:

Reference is hereby made to that certain Literary Material Option/Purchase Agreement dated as of August 7, 2013, by and between Summit Entertainment, LLC ("Lionsgate") and Charles Graeber ("Owner") in connection with Lionsgate's option to acquire certain rights in and to the book written by Owner entitled "The Good Nurse" (the "Work"), as amended pursuant to an amendment dated as of June 30, 2017 (the "Lionsgate Option/Purchase Agreement"). A copy of the Lionsgate Option/Purchase Agreement is attached hereto as Exhibit "A". Capitalized terms used but not defined herein shall have those meanings ascribed to them in the Lionsgate Option/Purchase Agreement.

Owner acknowledges that the Lionsgate Option/Purchase Agreement expired on January 29, 2019 and therefore is no longer in force or effect. Notwithstanding the foregoing, Company wishes to option the rights to the Work on the terms and conditions set forth in the Lionsgate Option/Purchase Agreement, except as modified below, and Owner wishes to option such rights to Company. Accordingly, the parties hereby agree as follows:

1.     Owner hereby grants Company the Option to purchase the rights in and to the Work on the same terms and conditions as the Lionsgate Option/Purchase Agreement, except as follows:

(a)    Company shall be the contracting party in lieu of Lionsgate and substituted for Lionsgate in each and every instance in which Lionsgate is referred to; it being understood that Company shall have all of the same rights and assume all of the same obligations as Lionsgate.

(b)    Paragraph 1 of the Lionsgate Option/Purchase Agreement shall hereby be deleted in its entirety and replaced with the following:

1.     CONDITIONS PRECEDENT. Company's obligations hereunder will be subject to the following Conditions Precedent: (i) complete execution and delivery of this Agreement to Company; (ii) receipt and approval by Company of the chain-of-title to the Work required by Company, including (without limitation) the short form option, short form assignment and publisher's quitclaim attached hereto as Exhibits "B" through "D"; and (iii) receipt by Company of all tax, immigration, and payment documentation necessary for Company to effect payment hereunder.

(c)    Paragraph 3.1.1 of the Lionsgate Option/Purchase Agreement shall hereby be deleted in its entirety and replaced with the following:

3.1.1    For the option to acquire in perpetuity (subject to the reversionary rights hereunder) the rights granted hereunder (the "Option") for the period(s) set forth below, Company shall pay the following sums:

HIGHLY CONFIDENTIAL

(a)        ████ Thousand Five Hundred Dollars ($██,500) (the "**Initial Option Fee**"), which sum shall be payable promptly following satisfaction of the Conditions Precedent set forth above and shall be fully applicable against, and shall serve to reduce, the Purchase Price (as defined below), for the period commencing as of the date hereof and ending twelve (12) months after the date of the execution of this Agreement by Owner and satisfaction of the Conditions Precedent (the "**Initial Option Period**").

(b)        ████ Thousand Five Hundred Dollars ($██,500) (the "**Second Option Fee**"), which sum shall be payable to Owner in the event Company (in its sole discretion) elects to extend the Option Period for an additional twelve (12) month period (the "**Second Option Period**") by giving Owner notice of such election and making payment on or before the expiration of the Initial Option Period. The Second Option Fee shall not be applicable against the Purchase Price.

The Initial Option Period and Second Option Period shall collectively be referred to as the "**Option Period**". In the event that the Option Period would otherwise expire on a Saturday, Sunday or national holiday, said period shall be extended without notice until the end of the next following business day. If Company (or its successors or assigns, if applicable) does not elect to extend or to exercise the Option, then the rights granted hereunder in and to the Work shall expire automatically at the end of the final day of the Option Period.

(d)        Paragraph 3.1.2 of the Lionsgate Option/Purchase Agreement shall hereby be deleted in its entirety and replaced with the following:

3.1.2   (a)        The Option may be exercised only by written notice to Owner during the Option Period. Upon such exercise, the Purchase Price shall promptly be paid to Owner. In the event Company commences principal photography of the Picture at any time during the Option Period prior to delivering such written notice, the Option shall be deemed to have been exercised as of the date of the first day of principal photography, and the Purchase Price shall be paid to Owner promptly thereafter.

(b)        In full and complete consideration for the rights granted herein and for the representations and warranties of Owner hereunder, and provided Owner is not in material default hereof or under this Agreement, Company shall pay to Owner upon the exercise of the Option, an amount equal to Two and One-Half Percent (2.5%) of the "In-Going Direct Budget" of the Picture (as hereinafter defined), with a floor of ████ Thousand Dollars ($██,000) and a ceiling of ████ Thousand Dollars ($██,000), less the Initial Option Fee (the "**Purchase Price**"). The "In-Going Direct Budget" shall be defined as the total budget of the Picture excluding financing costs and interest, E&O insurance, completion bond fees, contingency, and overhead at the commencement of principal photography. The Purchase Price shall be payable upon exercise of the Option described herein, but in no event later than the date of commencement of principal photography of the Picture. In the event that the In-Going Direct Budget is not determined at the time Purchaser exercises the Option, Purchaser shall pay the minimum Purchase Price set forth above (i.e. $██,000), less the Initial Option Fee, and the balance shall be paid as soon as the Ingoing Direct Budget is determined, but in any event no later than the commencement of principal photography of the Picture.

(e)        Paragraph 3.2 of the Lionsgate Option/Purchase Agreement shall hereby be deleted in its entirety and replaced with the following:

3.2      Contingent Participation. If Company, its licensees, designees, parents, subsidiaries, successors or assigns produces the Picture based on the Work, then provided that Owner is not in uncured material breach of this Agreement, Owner shall receive a sum equal to Two and One-Half Percent (2.5%) of One Hundred Percent (100%) of the "**Producer's Share of AGR**", as defined in the applicable financing agreements for the Picture (the "**Contingent Compensation**"). The parties hereby acknowledge that, in the event any other non-financing participant of the Picture is granted a definition of Producer's Share of AGR that is more

HIGHLY CONFIDENTIAL

BARTZ000004622

favorable than the definition of Producer's Share of AGR granted to Owner under this Agreement, Owner shall be entitled to the benefits of such more favorable definition.

(f)     Paragraph 3.3.1.4 of the Lionsgate Option/Purchase Agreement shall hereby be deleted in its entirety and replaced with the following:

3.3.1.4  In addition to the above, for each Theatrical Subsequent Production, Owner shall also be entitled to Two and One-Half Percent (2.5%) of One Hundred Percent (100%) of the "Producer's Share of AGR" (or equivalent term, as such term is defined in accordance with such Theatrical Subsequent Production's financing agreements), if any.

(g)     Notwithstanding anything to the contrary in Paragraph 8 of the Lionsgate Option/Purchase Agreement, the Reversion Date shall be seven (7) years after the date of payment to Owner of the Purchase Price (i.e., if Company has not commenced principal photography of the Picture within seven (7) years after the date of payment to Owner of the Purchase Price, then the reversionary terms of Paragraph 8 shall apply).

(h)     Paragraph 10 of the Lionsgate Option/Purchase Agreement shall hereby be deleted in its entirety and replaced with the following:

10.     PUBLICITY.  Owner shall not, individually or by means of press agents or publicity or advertising agencies, employed or paid by Owner or otherwise, circulate, publish or otherwise disseminate any news stories or articles, books, photographs, blogs, "tweets", Facebook or other online posting, or other publicity, or material, containing Owner's name and relating directly or indirectly to Owner's employment, the subject matter of this Agreement, the Picture or the services to be rendered directly or indirectly to Owner unless same are first approved in writing by Company.  Notwithstanding the foregoing, Owner may release publicity about Owner which makes non-derogatory incidental reference to the Picture.

(i)     Paragraph 15 of the Lionsgate Option/Purchase Agreement shall hereby be deleted in its entirety and replaced with the following:

15.     PREMIERES.  Owner shall be provided with two (2) tickets to the initial U.S. celebrity premiere of the Picture in the United States.  Company will also use its reasonable, good-faith efforts to cause the U.S. distributor of the Picture to provide Owner and one (1) guest with travel and accommodations in connection with one (1) U.S. celebrity premiere; it being understood that no failure by any U.S. distributor to provide such travel and/or accommodations shall be a breach of this Agreement.

2.     Concurrently with the execution of this Agreement Owner will execute the "Short Form Option" agreement attached hereto as Exhibit "B" and the "Assignment" attached hereto as Exhibit "C" ("Assignment"). Owner shall not date the Assignment. If Company exercises the Option, then Company shall date the Assignment as of the date of exercise. Notwithstanding the foregoing, the Assignment shall not be in effect unless and until Company exercises the Option and pays the Purchase Price.

Please sign in the space provided below to indicate your acknowledgement and acceptance of the above terms.

*Signatures on following page*

HIGHLY CONFIDENTIAL

Sincerely,

22nd Street Entertainment, LLC

By: _Aaron Cole_

Its: _Secretary_

ACCEPTED AND AGREED:

_[signature]_

CHARLES GRAEBER

HIGHLY CONFIDENTIAL

BARTZ000004624

**EXHIBIT "A"**

**LIONSGATE OPTION/PURCHASE AGREEMENT**

HIGHLY CONFIDENTIAL

BARTZ000004625

## <u>LITERARY MATERIAL OPTION/PURCHASE AGREEMENT</u>

This agreement is dated as of August 7, 2013.

A.    <u>PARTIES</u>.  SUMMIT ENTERTAINMENT, LLC ("Company") and CHARLES GRAEBER ("Owner").

B.    <u>WORK</u>.  THE GOOD NURSE, a non-fiction book written by Charles Graeber (referred to herein sometimes as "Owner" and sometimes as "Author," depending on the context), which was published by Hatchette on April 15, 2013  ("Book"), including the characters, events, titles, themes, stories, dialogue and all other contents thereof and therein which shall be collectively referred to herein as the "Work".

C.    <u>PICTURE</u>.  This Agreement concerns the first Motion Picture project, to be based in whole or in part on the Work presently entitled "THE GOOD NURSE" ("Picture"); and additional Motion Picture projects or Television Productions based in whole or in part on the Work.

The parties hereby agree as follows:

1.    <u>CONDITIONS PRECEDENT</u>.  Company's obligations are subject to the following (collectively, "Conditions Precedent:"):

   1.1    If the Work has been published or is under contract to be published, receipt by Company of a Publisher's Release, in the form attached hereto as "Schedule 4" (or a similar form approved by Company in its sole discretion) signed by the publisher(s) of the Work; and

   1.2    If the Work has been published or is under contract to be published, Company's receipt of a copy of the grant-of-rights provisions of the agreement between Owner and each publisher of the Work; and

   1.3    Delivery by Owner to Company of all chain-of-title documentation for the Work and clearance of such chain-of-title documentation satisfactory to Company in its sole discretion;

   1.4    Receipt by Company of a copy of this Agreement, signed by Owner, including the Short Form Option and Short Form Assignment attached hereto and incorporated herein by reference;

   1.5    Receipt by Company of all tax, immigration and payment documentation necessary to effect payment hereunder; and

   1.6    Company closing a deal for the producing services of Darren Aronofsky ("Aronofsky") on the Picture as evidenced by Company's receipt of a Certificate

<div align="center">1</div>

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

of Engagement executed by Aronofsky for his producing services in connection with the Picture.

2.    ASSIGNMENT OF RIGHTS.

2.1    Subject to the terms of this Agreement (including without limitation the reversion provisions in Paragraph 8 below), Owner hereby irrevocably conveys, grants, and assigns to Company, its successors, licensees, and assigns, on the terms and conditions set forth in this Agreement, the sole and exclusive option to acquire all rights of every kind or nature whatsoever in and to the Work, in perpetuity, throughout the universe, in any and all media and means of exploitation whether now known or hereafter devised, including but not limited to sole and exclusive Motion Picture, Television Production, Sequel, and Remake rights, and all other allied and ancillary rights thereto (including without limitation publication rights to the screenplay of any and all Motion Pictures produced under this Agreement), except for the Reserved Rights and Frozen Rights specifically enumerated in Schedule 2 attached hereto.

2.2    Company shall have all rights herein granted in and to the Work, whether in existing versions, future versions, translations, dramatizations, arrangements, revisions, continuations, supplements, or reissues of the Work, and whether written or published by or with the authority of Owner or Owner's successors, assigns, or licensees. To the extent that the Work is taken from or based on prior drafts, notes, research, source material, or other works owned or controlled by Owner (the "Prior Materials"), Company's rights in and to the Work shall include a grant of rights in and to such Prior Materials. Company acknowledges that Owner/Author did not enter into any life story/release type agreements with any of the individuals depicted in the Work. Owner's/Author's rights in the life stories of the individuals depicted in the Work is the same as any other member of the general public including, without limitation, Company.

2.3    All rights granted to Company under this Agreement shall be cumulative, and Company may exercise or refrain from exercising any one or more of said rights separately from, simultaneously, together, or in connection with any other rights granted to Company herein or from other sources, and regardless of whether said rights are granted in the disjunctive or conjunctive.

2.4    Company shall have the right throughout the Option Period to engage in all customary development and pre-production activities in connection with the Picture, including without limitation the preparation and submission of treatments, screenplays, teleplays, and all other writings based in whole or in part on the Work for use in connection with any of the rights granted hereunder. All of the results and proceeds of any such activities shall at all times be the sole and exclusive property of Company, whether or not the Option (as defined in Paragraph 3 below) is exercised.

2

HIGHLY CONFIDENTIAL                                                      BARTZ000004627

2.5    Although it is presently Company's intention to develop the Work as a Theatrical Motion Picture, Company may elect to exploit any of the rights granted hereunder at any time and in any order. For the avoidance of doubt, Company is not obligated to produce the Picture, but if it does, it may use all or part of the Work in one or more Motion Pictures in Company's sole discretion.

3.    CONSIDERATION. Subject to satisfaction of the Conditions Precedent, Company agrees to pay and Owner agrees to accept the amounts set forth in Paragraph 3.1 as full consideration for the rights herein granted and for Owner's/Author's representations, warranties, and agreements herein contained:

3.1    Cash Consideration.

3.1.1 For the option to acquire in perpetuity (subject to the reversion provision in Paragraph 8 below) the rights granted hereunder (the "Option") for the period(s) set forth below (collectively the "Option Period"), Company shall pay the following sums:

(a)    ▊▊▊▊ Thousand Dollars ($▊,000) ("Initial Option Fee") for the first period of the Option Period ("Initial Option Period") commencing as of the date hereof and continuing until eighteen (18) months after satisfaction of the Conditions Precedent, payable on the later of (i) signing of this Agreement by Owner, and (ii) satisfaction of the Conditions Precedent. The sum paid pursuant to this Paragraph 3.1.1(a) shall be applicable against the Purchase Price (as defined below).

(b)    ▊▊▊▊ Thousand Dollars ($▊,000) ("Second Option Fee") if Company in its sole discretion elects to extend the Option Period for a further period ("Second Option Period") continuing through and including eighteen (18) months after the expiration of the Initial Option Period, by giving Owner notice (pursuant to Paragraph 14.10 below) of such election and making payment on or before the expiration of the Initial Option Period. The sum paid pursuant to this Paragraph 3.1.1(b) shall not be applicable against the Purchase Price.

If Company (or its successors or assigns, if applicable) does not elect to extend or to exercise the Option, then the rights granted hereunder in and to the Work shall expire automatically at the end of the final day of the Option Period. In the event that the Option Period would otherwise expire on a Saturday, Sunday, or national holiday, it shall be extended without notice until the end of the next business day.

3.1.2 If Company elects to exercise the Option (which it shall not be obligated to do), Company shall do so by giving Owner notice (pursuant to

3

HIGHLY CONFIDENTIAL

BARTZ000004628

Paragraph 14.10 below) of such election prior to the expiration of the Option Period and concurrently paying to Owner an amount ("Purchase Price") equal to [REDACTED] Thousand Dollars ($[REDACTED],000) less the Initial Option Fee (i.e., $[REDACTED],000). Notwithstanding the foregoing, Company shall be deemed to have elected to exercise the Option upon the commencement by Company of principal photography on the Picture at any time prior to the expiration of the Option Period, in which event payment shall be due not later than the first day of principal photography. If Company exercises the Option, the rights granted hereunder shall exist in perpetuity in accordance with the terms of this Agreement.

3.1.3 Any Option Period(s) provided for hereunder shall be extended automatically, without cost to Company, by the following:

(a) Any force majeure event or other event that interrupts or interferes with Company's development and/or production of the Picture and/or Company's ongoing business including, without limitation, any labor dispute, strike, fire, war or governmental action, terrorist attack, or any disruptive event beyond Company's control. Such extension shall be for a period equal to the duration of such interference or interruption, provided, however, that any extension of any Option Period based on one (1) continuing force majeure event shall not exceed six (6) months in the aggregate (for the avoidance of doubt, any Option Period may again be suspended for any other force majeure event).

(b) Any Claim arising under Paragraph 4.6. Such extension shall continue from notice of such Claim until any such Claim is resolved, provided that if no formal legal proceedings (including, without limitation, settlement negotiations) are commenced within one (1) year after such Claim is made, then such extension shall expire at such time. At any time during the occurrence of any such Claim, if in Company's good faith judgment the Claim interferes with Company's rights, Company may, in addition to all its other legal and equitable remedies, rescind this Agreement, and in such event Owner shall pay Company any monies received from Company in connection with the Work. Owner's/Author's representations, warranties, and resultant obligation to indemnify Company in the event of any breach thereof shall survive expiration, rescission, or termination of this Agreement.

(c) Company shall use reasonable efforts to confirm any extension hereunder in writing, provided that a failure to do so shall not be deemed a breach hereof or affect the terms or effect of such extension as set forth herein.

3.2    Contingent Participation. In addition to the consideration provided for in Paragraph 3.1 above, if Company (or its successors or assigns, if applicable) produces and releases the Picture based upon the Work, Owner shall be entitled to the following contingent compensation:

    3.2.1  For the Picture, Owner shall be entitled to a sum equal to five percent (5%) of one hundred percent (100%) of "Defined Proceeds" (as defined below), if any, of the Picture.

    3.2.2  "Defined Proceeds" shall be defined, computed, and accounted for in accordance with Exhibit "DP" and the Rider thereto, both of which are attached hereto and incorporated herein by this reference. For the avoidance of doubt, there shall be no overhead charged on interest, no interest charged on overhead, no interest charged on interest, no cross-collateralization with other pictures and no abandonment charges for other pictures.

3.3    Subsequent Pictures/Additional Productions. If, in addition to the Picture, Company (or its successors or assigns, if applicable) produces and releases additional Motion Picture(s) and/or Television Production(s) based upon the Work (but not based upon any Author-Written Sequel(s) (as defined in Schedule 2 attached hereto), Owner shall be entitled to the additional payments set forth below. Owner acknowledges that if Company produces subsequent or additional Motion Picture(s) and/or Television Production(s) based upon Author-Written Sequel(s), Owner shall be entitled to the Purchase Price for such Author-Written Sequel(s) set forth in Schedule 4 attached hereto in lieu of any compensation set forth in this Paragraph 3.3.

    3.3.1  Subsequent Theatrical Motion Picture(s). For each subsequent Theatrical Motion Picture (including Sequels, prequels, and Remakes) produced by Company based upon the Work (each a "Theatrical Subsequent Production"), Owner shall be entitled to the following:

        3.3.1.1 If the "Direct Cost Budget" (as defined below) of such Theatrical Subsequent Production is equal to or greater than the Direct Cost Budget of the Picture, then an amount equal to one hundred percent (100%) of the Purchase Price actually paid pursuant to Paragraph 3.1.2 above.

        3.3.1.2 If the Direct Cost Budget of such Theatrical Subsequent Production is less than the Direct Cost Budget of the Picture, then a prorated amount of the Purchase Price actually paid pursuant to Paragraph 3.1.2 above based on the Direct Cost Budget of the Theatrical Subsequent Production compared to the Direct Cost Budget of the Picture. By way of example only, if the Direct Cost Budget of the Picture is Twenty Million Dollars, but the Direct Cost

5

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

Budget of the Theatrical Subsequent Production is Fifteen Million Dollars (i.e., 75% of the Direct Cost Budget of the Picture), then Owner shall receive an amount equal to seventy-five percent (75%) of the Purchase Price actually paid pursuant to Paragraph 3.1.2 above for such Theatrical Subsequent Production. Notwithstanding the foregoing, Company agrees that in any event that the aforementioned royalty payment for a Theatrical Sequel (including prequels) shall be no less than fifty percent (50%) of the Purchase Price actually paid pursuant to Paragraph 3.1.2 above, and the aforementioned royalty payment for a Theatrical Remake shall be no less than thirty-three and one-third percent (33.3%) of the Purchase Price actually paid pursuant to Paragraph 3.1.2 above.

3.3.1.3  For purposes of this Agreement, the Direct Cost Budget for the Picture means the final, bonded (if Company elects to secure a completion bond for the Picture), ingoing production budget of the Picture prepared by Company's line producer and approved by Company (excluding bond, insurance [including essential element, if applicable], financing [including interest], the Purchase Price, Company's customary overhead, any rebates/subsidies, and contingency).

3.3.1.4  In addition to the above, Owner shall also be entitled to five percent (5%) of one hundred percent (100%) of the Defined Proceeds (as defined above), if any, of each Theatrical Subsequent Production.

3.3.2  DTV Pictures.  If any of the subsequent Motion Pictures are produced for direct-to-video home video sales and/or rental (instead of for initial theatrical release) ("DTV Picture") in lieu of the compensation set forth in Paragraphs 3.3.1 above, Owner shall be entitled to a fee of a flat ████████ Thousand Dollars ($█,000).

3.3.3  Television Production(s).

    3.3.3.1      Network Prime-Time Television Productions.  For each Television Production (other than a DTV production) that is produced for initial telecast on a U.S. network as defined by the FCC during hours that are prime-time under the FCC definition, Owner shall be entitled to a payment as follows:

        (a)      Series Royalties.  Owner shall be entitled to a payment (a "Series Royalty") for each episode of a television series based on the Work as follows:

6

HIGHLY CONFIDENTIAL

BARTZ000004631

| Length of Series Episode | Royalty per Episode |
|---|---|
| 30 minutes | $█500 |
| 31 to 60 minutes | $█250 |
| Over 60 minutes | $█750 |

(b)    Rerun Payment. Twenty percent (20%) of the applicable Series Royalty set forth in Paragraph 3.3.3.1 (a) above shall be payable not later than thirty (30) days after telecast for each of the first five (5) U.S. Network reruns of such episode.  No further sums shall be payable for any other runs of such episode.

(c)    MOW & Mini-Series Royalties.  For each network Television Production that is not an episode of a television series (other than a DTV production) Owner shall be entitled to a payment (a "Non-Series Royalty") of $█,000 per hour, prorated for a partial hour, up to an aggregate of $█,000 for the entire MOW or Mini-Series.

3.3.3.2    Other Television Productions.  For each Television Production (other than a DTV production) that is not produced for initial telecast on a U.S. network as defined by the FCC during hours that are prime-time under the FCC definition, Owner shall be entitled to a payment equal to fifty percent (50%) of the applicable royalties set forth in Paragraph 3.3.3.1 above, except that if a television series is initially produced for premium cable television (i.e., either HBO or Showtime), Owner shall be entitled to a series royalty payment equal to seventy-five percent (75%) of the applicably royalties set forth in Paragraph 3.3.3.1(a) above.

3.3.3.3    Spinoffs: For a U.S. network primetime television "generic" or "planted" spinoff, as those terms are customarily defined in the television industry, of a U.S. television series based on the Picture, the following amounts: for a generic spinoff, one-half (1/2) of the applicable royalties set forth above for the applicable series; and for a planted spinoff, one-quarter (1/4) of the applicable royalties set forth above for the applicable series.

3.3.3.4    Theatrical Release of Television Production.  If an MOW or mini-series based on the Picture and intended for initial exhibition on U.S. television is generally released before paying audiences in the U.S. and Canada as a theatrical motion picture before such MOW or mini-series is broadcast on U.S. television or is otherwise released to the public (including without limitation release in any home entertainment format), Owner shall be entitled to an additional payment equal to one hundred

7

HIGHLY CONFIDENTIAL                                                                                  BARTZ000004632

percent (100%) of the applicable royalty set forth in Paragraph 3.3.3.1(c) above. If such MOW or mini-series is so released in the U.S. and Canada as a theatrical motion picture after its broadcast on U.S. television or is otherwise released to the public, Owner shall be entitled to fifty percent (50%) of the applicable royalty set forth in Paragraph 3.3.3.1(c) above. If such MOW or mini-series is so released outside the United States and Canada as a theatrical motion picture (whether before or after its broadcast on U.S. television or is otherwise released to the public), Owner shall be entitled to fifty percent (50%) of the applicable royalty set forth in Paragraph 3.3.3.1(c) above. Payments pursuant to this Paragraph 3.3.3.4 shall be on a one-time-only basis and in no event shall Owner be entitled to receive an aggregate amount pursuant to this Paragraph 3.3.3.4 that is more than one hundred percent (100%) of the applicable royalty set forth in Paragraph 3.3.3.1(c) above.

3.3.4  Payment of Above Obligations.  Payment of royalties for Theatrical Sequels (including prequels) and Theatrical Remakes shall be made upon commencement of principal photography of such Theatrical Sequel or Theatrical Remake. Payment of royalties for DTV Pictures shall be made upon completion of principal photography of such DTV Picture. Payment of royalties for Television Productions shall be made within thirty (30) days following completion of post- production for such Television Production or individual episode thereof. In the event Company fails to make any of the aforesaid payments within the time and in the manner set forth in this Agreement, Owner acknowledges and agrees that Owner's sole remedy shall be an action at law to recover such payments, and in no event shall any rights revert to Owner, nor shall Owner have or be deemed to have any lien, charge, or other encumbrance upon such rights to secure payment of said sums.

3.4    Live Stage Royalty.  If Company produces a live, "first-class" (as that term is customarily defined in the legitimate stage industry) legitimate dramatic or musical stage production in the English language based upon the Work and presented before a live paying audience (other than so-called "developmental productions") at a first-class theater in New York City on Broadway or a first-class theater in London in the West End (each a "Play"), in lieu of any other participation in stage revenues in connection with the Picture or any other motion picture produced by Company (or its assignee) based upon the Work, Owner shall be entitled to receive a contingent royalty in an amount equal to Twenty Percent (20%) of the net royalty actually received by and accessible to Company in respect of the licensing or disposition of the right to produce such Play on the live stage based on the Work (the "Contingent Royalty"). Agency commissions, negotiators' fees, and any screenwriters' share of such monies shall be deducted in calculating net monies. Company shall have the right (but not the obligation) to license or assign merchandising, cast album or other subsidiary rights to itself or to any affiliate, but any such transaction shall be on financial terms consistent

8

HIGHLY CONFIDENTIAL                    BARTZ000004633

with the financial terms upon which Company enters into comparable transactions with third parties (or, if there are no such comparable transactions, on "fair market" financial terms). For the avoidance of doubt, Owner shall not be entitled to any portion of any monies Company might receive in connection with such "first class" Play which is not based on Company's position as the underlying rights holder of the Work, including, without limitation, any sum(s) (however characterized) Company or any of its affiliates might receive as a producer of such Play and/or in consideration of the provision of financing (by Company or a third party procured by Company) for any Play nor shall Owner share in non-monetary consideration received by Company, if any. Other than as set forth in this Paragraph, Owner shall not be entitled to any compensation in connection with a Play or a production of a Play.

4.    **WARRANTIES.** Owner/Author represents, warrants, and agrees that, as of the date of this Agreement and continuing thereafter:

4.1    Owner/Author is the sole and exclusive owner throughout the universe of all rights herein granted and has full power and authority to grant said rights to Company and to agree to the restrictions on the rights reserved to Owner/Author herein; none of said rights has been granted, encumbered, or otherwise disposed of in any manner to any Person; no Motion Picture based in whole or in part upon the Work has been authorized by or produced with the knowledge or consent of Owner/Author; the Work has not been published (except as set forth in Schedule 1 attached hereto) nor has it been presented on television, radio, or the stage by or with the knowledge or consent of Owner/Author, nor has Owner/Author authorized any such publication or presentation, except as may be specifically referred to in Schedule 1 (described in Paragraph 4.5 below); Owner/Author has not done or omitted to do and will not do or omit to do any act or thing, by license, grant, or otherwise, that will or to the best of Owner's/Author's knowledge, including that which Owner/Author should have known in the exercise of reasonable prudence, may impair or encumber any of the rights herein granted or interfere with the full enjoyment of said rights; and, so far as Owner/Author is aware in the exercise of reasonable prudence, there are no claims or litigation pending or threatened that will or might adversely affect any of the rights herein granted to Company.

4.2    Other than non-fiction and public domain elements, the Work is original with Author and neither the Work nor any part of the Work is taken from or based on any other material; to the best of Author's knowledge, or that which Author should have known in the exercise of reasonable prudence, neither the Work nor any part of the Work nor the exercise by Company of the rights herein granted will constitute a libel or slander of any Person, or will violate or infringe upon any Person's trademark, trade name, copyright, patent, right of privacy, or other literary, dramatic, musical, artistic, personal, private, civil, property, or other right. Author makes no warranty hereunder, however, with respect to any material added to the Work by Company or any material change made to the Work by

**9**

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL

BARTZ000004634

Company. The parties acknowledge that the Work is based on the true life story of Charlie Cullen and related individuals. Owner/Author represents and warrants that Owner/Author did not enter into any life story type agreements or obtain any releases from Charlie Cullen or any of the other individuals depicted in the Work. Company shall, in its sole discretion, determine whether such agreements/releases are necessary for exploitation of the rights granted Company hereunder.

4.3    If Owner is not the Author of the Work, that Author wrote the Work as an employee of Owner and the Work is deemed to be a "work made for hire" pursuant to the copyright laws of the United States or any similar law of any other jurisdiction.

4.4    The Work is not in the public domain and enjoys, and will enjoy, either statutory or (to the extent it may exist) common law copyright protection in the United States and all countries adhering to the Berne and Universal Copyright Conventions, and the rights granted to Company hereunder are and will be exclusive.

4.5    Attached hereto, marked Schedule 1 and made a part of this Agreement by this reference, is a statement of all publications, if any; prior uses, if any; prior versions, adaptations, and translations, if any; and the copyright status of the Work. If there are no prior uses, etc. of the Work, such statement shall set forth the existence, if any, of any valid agreement(s) with third parties for the publication or dramatic production of the Work; in such event, the Work shall be deemed to have been previously published or exploited for the purpose of any applicable collective bargaining agreement.

4.6    Owner hereby agrees to indemnify, make good, and save and hold harmless Company, its successors, licensees, officers, directors, employees, and assigns (each an "Indemnified Party") from and against any losses, damages, costs, charges, reasonable outside attorneys' fees, recoveries, actions, judgments, penalties, expenses, and any other loss that may be obtained against, imposed upon, or suffered by Company or any other Indemnified Party, arising out of or related to any breach of Owner's/Author's representations, warranties, and/or agreements hereunder ("Claim"). If any Claim is asserted or filed by a third party against any Indemnified Party, Company shall give Owner prompt written notice thereof, and Company may, at Owner's expense, defend against any such Claim with counsel selected and retained by Company. After consulting with Owner (provided that in the event of any disagreement, Company's decision shall be final and binding),Company may compromise or settle such Claim upon such terms that Company may deem reasonable provided that Company shall not, as part of any settlement, make an admission of liability on behalf of Owner. Pending determination of any such Claim, Company may withhold all amounts due Owner hereunder in an amount related to the reasonable maximum exposure of such Claim. Company shall

10

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

release amounts so withheld if no formal legal proceedings are commenced within one (1) year after such Claim is made or taken.

Company hereby agrees to defend, indemnify, make good, and save and hold harmless Owner/Author and Owner's/Author's successors and assigns, from and against any losses, damages, costs, charges, reasonable attorneys' fees recoveries, actions, judgments, penalties, expenses, and any other loss that may be obtained against, imposed upon, or suffered by Owner/Author and Owner's/Author's successors and assigns, arising out of or related to Company's exercise of the rights granted hereunder (including the production, distribution, and/or exploitation of any Motion Picture produced hereunder or any element thereof), except for such losses, damages, etc. imposed upon or suffered by Owner/Author (and Owner's/Author's successors and assigns), that arise out of or are related to any Claim. Except to the extent resulting from a Claim, Owner/Author shall be covered under Company's policies of errors and omissions insurance and, if the Picture is produced, general liability insurance for the Picture, subject to all of the terms and conditions thereof, including without limitation the exclusions and limitations set forth in such policies.

5.    DROIT MORAL/RIGHTS TO COMPANY MATERIAL/USE OF TITLE.

  5.1    "Droit Moral." Owner/Author hereby waives the benefits of any provision of law known as "droit moral" or any similar laws, and agrees not to institute, support, maintain, or authorize any demand, claim, or lawsuit on the grounds that any exploitation of the Work by Company in any way is an infringement of any of Owner's/Author's "droit moral," constitutes a defamation or mutilation of any part of the Work, or contains unauthorized variations, alterations, modifications, changes, or translations.

  5.2    Rights To Company Material. Owner/Author shall not have any right, title, or interest whatsoever in or to any plot, story, character, music, lyrics, dialogue, screenplay, or other material of any kind created by or for Company in the exercise of its rights hereunder, or in or to any Motion Picture produced hereunder, or any Remake, Sequel, Television Production or other derivative version of the Work created by, for, or with the authorization of Company that is within the rights granted to Company hereunder.

  5.3    Use Of Title. If the title(s) of the Work is used for any Motion Picture not otherwise incorporating the plot, theme, characterizations, motive, and treatment of the Work ("based on" the Work), such Motion Picture shall not under any circumstances be deemed to be based on the Work.

6.    INSTRUMENTS.

  6.1    Pursuant to the terms of this Agreement, Owner/Author hereby grants to Company all of Owner's/Author's right, title, and interest in and to any and all

11

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

BARTZ000004636

agreements, assignments, releases, and other written instruments (collectively "Instruments") heretofore or hereafter executed in favor of Owner/Author or any predecessor of Owner/Author, insofar as said documents grant or purport to grant to Owner/Author or any such predecessor any of the rights, privileges, and property herein granted to Company, together with the full benefit of all representations, warranties, indemnities, and arrangements made by any party in favor of Owner/Author any such predecessor, insofar as the same pertain to or affect any of the rights, privileges, and property herein granted to Company. Without limiting the foregoing, if Owner is not the Author of the Work, on Company's request Owner shall deliver to Company, in a form reasonably satisfactory to Company, a copy of the required relevant provisions of the Assignment Agreement between Owner and Author pursuant to which Author assigned the Work to Owner as set forth in Paragraph 4.3 above.

6.2    Owner/Author represent and warrant that all Instruments have not been amended, modified, or canceled in any way and are in full force and effect as originally signed; that Owner/Author has not granted or assigned any right, title, or interest heretofore acquired by Owner or Author in, to, or under any Instruments in a manner inconsistent herewith; and that there have been paid to the party or parties entitled thereto all sums that have heretofore become payable under any of the Instruments, and, except as herein specifically provided, Owner shall hereafter pay or cause to be paid to the party or parties entitled thereto, all sums that may hereafter accrue under such Instruments.

7.    COPYRIGHTS.

7.1    Assignment of Copyright Interests.  Pursuant to the terms of this Agreement, Owner and Author further grant and assign to Company the following rights:

7.1.1  All of Owner's and Author's right, title, and interest in and to any and all copyrights in and to the Work and each and every part thereof, together with all benefits of said copyrights and all remedies held thereunder, but only insofar as said copyrights pertain to or affect any of the rights, privileges, and property herein granted to Company by the terms of this Agreement (and excluding, for the avoidance of doubt, the copyright in and to the Work) (such rights are collectively referred to as "the Copyrights").

7.1.2  All actions and causes of action for infringement or violation of the Copyrights, or relating thereto, and all damages, profits, penalties, and other recoveries, and all other rights of every kind and character that Owner or Author may now or hereafter have directly or indirectly, as a result of any such infringement or violation.

12

HIGHLY CONFIDENTIAL                                                                                     BARTZ000004637

7.1.3  The right to secure copyright and/or trademark registration and protection thereof in all countries and territories where such protection is available, in Company's own name or otherwise.

7.1.4  The right in perpetuity to manufacture Copies and to distribute, sell, vend, lease or rent, license, exhibit, transmit, broadcast (by terrestrial, satellite or other means), project, reproduce, publish (as that term is defined and used in the U.S. Copyright Act), use, perform, advertise, publicize, market, exploit, turn to account, and derive revenue in any form or manner therefrom, without any territorial restriction whatsoever, by any and all media, methods, systems, and processes now or hereafter known, invented, used, or contemplated, and the right to import or export such Copies into or out of any territory without any restriction.

7.1.5  It is further expressly understood and agreed that Motion Pictures, Sound Records, and all other items produced hereunder shall constitute independent derivative works, and Company and its successors, assigns, and licensees shall have the perpetual right to exercise the rights granted hereunder irrespective of the expiration, termination, transfer, renewal, or extension of any copyright owned or controlled by Owner/Author or by any heirs, executors, widow, widower, children, successors, or assigns of Owner/Author.  Company shall in no event have any fewer rights by reason of this Agreement than any member of the public may have now or hereafter.

7.2    Protection Of The Copyright.  Owner/Author agrees to prevent the Work or any element of the Work from entering into the public domain; to cause to be affixed to each copy of the Work or any part thereof published or offered for sale by or with the authority of Owner or Author, notice of copyright complying in all respects with U.S. copyright law and with the Berne Convention and the Universal Copyright Convention; to register the Work in the U.S. for such protection; to contract for the benefit of Company for the above protection in all grants concerning the Work hereunder made to others; not to cause or authorize any publication of the Work or any arrangement, revision, or reissue thereof in any form without requiring the publisher of such publication to duly register the same for copyright protection in the United States and every country where such publication occurs; and to specifically reserve the rights herein granted, when any grant is made to others of any rights or interest in the Work.

7.3    Recapture Of Rights By Owner or Author.

7.3.1  If, pursuant to any copyright or similar law, Owner/Author becomes entitled to exercise any right of reversion, recapture or termination (the "Termination Right") in or to all or part of the rights granted hereunder (it being understood that Owner/Author shall not have any Termination Right if the Work or any part thereof is a "work made for hire" as defined in the

13

HIGHLY CONFIDENTIAL

U.S. Copyright Act), and Owner/Author duly exercises the Termination Right, then, from and after the date that Owner/Author has the right, pursuant to such copyright or similar law, to transfer all or part of such rights (the "Recaptured Rights") to a third party, Company shall have the first right to purchase from Owner/Author the Recaptured Rights. If Owner/Author decides to accept from any third party a bona fide offer with respect to all or part of the Recaptured Rights, then in each such instance, Owner/Author shall, promptly after deciding to accept such offer, make a written offer to Company, specifying such terms and conditions which Owner/Author is prepared to accept, and the name(s) of the third party who made the offer to Owner/Author, to enter into an agreement with Company with respect to the Recaptured Rights on the same such terms and conditions. At any time within thirty (30) days after receipt of notice of such written offer from Owner/Author, Company may notify Owner of its acceptance of such offer, and in such event, the rights referred to in such offer shall be assigned to Company, subject to Company's compliance with the terms of the offer so accepted, provided, however, that Company shall not be required to meet such terms which cannot be as easily met by one transferee as another, including, without limitation, the use of certain talent. If Company thereby acquires from Owner/Author all or part of the Recaptured Rights, then Owner and Author agree to enter into a written agreement with respect thereto.

7.3.2  If Company elects not to purchase the Recaptured Rights, Owner/Author may dispose of said Recaptured Rights but only to the offeror and upon the terms and conditions specified in such Owner's/Author's notice, it being understood and agreed that Owner/Author may not dispose of such rights to any other party or upon terms and conditions any different from those offered to Company hereunder without again offering such Recaptured Rights to Company as herein provided.

7.4    Company's Authority To Act. Owner and Author hereby appoint Company, or its nominee, as Owner's/Author's irrevocable attorney-in-fact, with the right but not the obligation, for the sole benefit of Company, and at Company's expense, to bring, prosecute, defend and appear in suits, actions and proceedings of any nature under or concerning all copyrights in and to the Work, or concerning any infringement of any such copyright, or any interference with any of the rights herein granted to Company; and to take such action as Company may in its good faith deem advisable to enforce, protect and/or defend any of the rights, privileges and property herein granted to Company under any and all such copyrights, as well as any of the rights, licenses, privileges, warranties and agreements contained and/or set forth in any of the documents herein referred to, insofar as the same relate to the rights, privileges and property herein granted to Company; and to litigate, collect and receive for all damages arising from any infringement of any such rights. Any such action may

14

HIGHLY CONFIDENTIAL                                                          BARTZ000004639

be taken by Company in the name of Owner or Author or otherwise, and Company may join Owner and/or Author as a party plaintiff or defendant in any such suit, action or proceeding. If Owner or Author fails to do or cause to be done any and all acts and things necessary to obtain the renewal, if any, of any United States copyright involved, or if Owner or Author fails to execute and deliver or cause to be executed and delivered to Company all instruments consistent herewith required in accordance with the provisions of this Agreement within seven (7) business days (or three [3]) business days in cases of exigency) after Company's request for such instruments, Owner and Author hereby appoint Company, or its nominee, as Owner's and Author's irrevocable attorney-in-fact in Owner's and Author's name and on Owner's and Author's behalf, for the sole benefit of Company, with the right, but not the obligation, to do any and all acts and things necessary for the obtaining of such renewal copyright, if any, and to execute and deliver all such instruments for the purposes aforesaid. Company shall provide Owner with a copy of any such instrument executed by Company on Owner's and/or Author's behalf, provided that Company's inadvertent failure to do so shall not be deemed a breach hereof.

7.5    Further Documents. Owner and Author agree to duly acknowledge, execute and deliver or to procure the due execution and delivery to Company of any and all further assignments, publishers' releases, copyright registration applications, and other documentation consistent herewith that may be necessary or expedient to carry out and effectuate the purposes and intent of this Agreement (including, but not limited to, any and all copyright assignments that have been or are to be executed in connection therewith and any copyright registration applications necessary to perfect Company's security interests in such assignments). Company shall first request that Owner or Author provide such documents, but if Owner and Author fail to provide same to Company within seven (7) business days (or three [3]) business days in cases of exigency) after Company's request for such documents, Owner and Author hereby appoint Company, or its nominee, as Owner's and Author's irrevocable attorney-in-fact, with the right but not the obligation, to prepare or complete any such copyright assignment or copyright registration applications for the Work or for elements of the Work and to execute the same in Owner's and/or Author's name, or obtain execution thereof by others, and record or register the same in the United States Copyright Office or elsewhere as Company sees fit. Company shall provide Owner with a copy of any such document executed by Company on Owner's and/or Author's behalf provided that Company's inadvertent failure to do so shall not be deemed a breach thereof.

8.        REVERSION. Subject to the provisions of this Paragraph 8, if Company has not commenced principal photography of the Picture within five (5) years after the date of payment to Owner of the Purchase Price ("Reversion Date"), then Owner may give Company written notice thereof and Company may elect, in its sole discretion to: (A) pay Owner an additional ▮ Thousand Dollars ($▮,000) ("Reversion Extension Payment") within ten (10) business days of Company's receipt of such written notice,

**15**

HIGHLY CONFIDENTIAL                                      BARTZ000004640

upon which payment the Reversion Date shall be extended for one (1) additional year ("Extension Period"); or (B) commence photography of the Picture within thirty (30) days of its receipt of Owner's written notice, in which event Company shall retain ownership of its rights under this Agreement. Company's right to extend the Reversion Date in one-year increments by payment of additional Reversion Extension Fee(s) shall be a rolling right such that at the end of each Extension Period, if Company has not yet commenced principal photography of the Picture then Owner may again give Company written notice thereof and Company may again elect, in its sole discretion, to: (A) pay Owner an additional Reversion Extension Fee within ten (10) business days of Company's receipt of such written notice, upon which payment the Reversion Date shall be extended for an additional one-year Extension Period; or (B) commence principal photography of the Picture within thirty (30) days of its receipt of Owner's written notice, in which event Company shall retain ownership of its rights under this Agreement. If at the end of any Extension Period after receipt of written notice from Owner as described above Company elects not to pay Owner an additional Reversion Extension Fee, and Company elects not to commence principal photography of the Picture within the applicable allotted time period, then all right, title and interest conveyed to Company hereunder in and to the Work shall revert to Owner, subject to a first priority lien and security interest being retained by Company as set forth below. All time periods set forth herein shall be subject to suspension and extension as a result of any force majeure event or other event that interrupts or interferes with Company's development and/or production of the Picture and/or Company's ongoing business including, without limitation, any labor dispute, strike, fire, war or governmental action, terrorist attack, or any disruptive event beyond Company's control; such extension shall be for a period equal to the duration of such interference or interruption, provided, however, that any Extension Period hereunder based on one (1) continuing force majeure event shall not exceed six (6) months in the aggregate (for the avoidance of doubt, any Extension Period hereunder may again be suspended for any other force majeure event). For the avoidance of doubt, if any of the rights granted to Company hereunder revert to Owner, Company shall retain all rights in and to all materials developed by Company based upon the Work (e.g., outlines, treatments, screenplays) and any additions or translations to the Work created by Company. For the further avoidance of doubt, if Company commences principal photography of the Picture, the reversion right under this Paragraph 8 shall be extinguished.

8.1    Upon Owner or Author entering into an agreement with a third party for the development and/or production of the Work, Owner shall repay or cause to be repaid to Company an amount equal to the aggregate of: (i) the aggregate amount of all out of pocket expenses and costs actually incurred by Company in connection with the development of the Picture including, without limitation, all sums paid to Owner hereunder ("Sunk Costs"), (ii) interest on the Sunk Costs computed from the date such cost was incurred until the date repaid at a rate of 125% of the U.S. prime rate as quoted by the Wall Street Journal ("Interest"), and (iii) an overhead fee equal to ten percent (10%) of the Sunk Costs ("Overhead").

THE GOOD NURSE -- Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL

BARTZ000004641

8.2    Prior to any reversion of rights set forth above, Owner and Author agree to execute a UCC-1 financing statement as evidence of Company's security interest in and to the Work, and any document, instrument or agreement reasonably required by Company to evidence Owner's assumption of any and all executory obligations with respect to the Picture. Upon Owner's or Author's failure to execute such financing statements or other agreements within five (5) days following Company's request therefore, Company shall have the right, and Owner hereby appoints Company as her irrevocable attorney-in-fact (coupled with an interest), to execute and file such financing statements with the Secretaries of State for California and New York and any other offices Company deems necessary, on behalf of Owner.

9.    NAME AND LIKENESS. Company shall have the right (but not the obligation) to publish, advertise, announce, use, and display, in any manner or medium, the name, approved biography (such approval right to be subject to Author's timely furnishing Company with a factually accurate approved biography no later than five [5] business days [reducible to two (2) business days in the case of exigency] following Author's or Author's representative's receipt of Company's request therefor), and approved photographs or other likenesses (such approval right to be subject to Author timely furnishing Company with an approved photograph or likeness no later than five [5] business days [reducible to two [2] business days in the case of exigency] following Author's or Author's representative's receipt of Company's request therefor) of Author in connection with advertising, publicizing, promoting, and exploiting, in whole or in part, the Picture and any product or material derived therefrom or related thereto, or in connection with any exercise by Company of its rights hereunder. Notwithstanding the foregoing, except for the Picture, the Work, and other Motion Pictures (including without limitation Subsequent Pictures and/or Additional Productions) based on the Work, Author's name, biography, photographs or other likenesses shall not be displayed as endorsing any product without Author's prior, written consent. Notwithstanding the foregoing, it is understood and agreed that the use of Author's name in a billing block on any item of merchandise or other material shall not require Author's consent.

10.    PUBLICITY. Owner/Author shall not issue or authorize the dissemination of information or publicity relating to this Agreement, any Motion Picture based on the Work, or Company's plans to develop or produce a Motion Picture based on the Work, except that Owner/Author may issue publicity which relates primarily to Author and only incidentally mentions the Picture, provided that any publicity issued by Author shall not derogate, disparage or defame the Picture or any person, firm or corporation (including, without limitation, Company, its parents, affiliates, and subsidiaries) associated with the Picture.

11.    CREDIT. Subject to any restrictions and requirements of any applicable collective bargaining agreements, and provided that the Picture is based on the Work:

11.1    On Screen: Author shall be entitled to receive source material credit ("Source Credit") on screen, on all positive prints of the Picture, on a separate card,

17

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL                                                                     BARTZ000004642

in the main titles (at the beginning of the Picture if credit is accorded to the director at the beginning of the Picture, otherwise at the end of the Picture) in substantially one of the following forms: "Based on the book 'The Good Nurse' by Charles Graeber (if the title of the Picture is different from that of the Work) or "Based on the book by Charles Graeber" (if the title of the Picture is the same as that of the Work). The average size of type used to accord Author's credit on screen shall not be less than the average size of type used to accord credit to the screenwriter(s) of the Picture on screen.

11.2    In Paid Advertising:  Subject to Company's customary exclusions and policies, the foregoing Source Credit shall also be accorded in the full billing block of paid advertising issued by Company or under its control.  The Source Credit shall also be accorded in any excluded paid advertising issued by Company or under its control in which the credit to the Picture's screenwriter(s) appears (other than award, nomination and/or congratulatory ads and voice-over ads), in a size of type no less than the average size of type used to accord credit to the Picture's screenwriter(s) in such billing block.

11.3    Except as specifically provided above, all other aspects of Author's credit shall be determined by Company in its sole discretion.  If other source material is incorporated into the Picture's screenplay, Company may, in its sole discretion, also accord credit with respect to such other source material.  With respect to subsequent Motion Pictures based on the Work ("Subsequent Picture(s)"), including the marketing and promotion of such Subsequent Picture(s), Company shall credit Author or the Work in any way it chooses.  For the avoidance of doubt, Company has complete discretion with respect to the title of the Picture or any Subsequent Picture(s), and Company may abbreviate the title of the Work in any way it chooses in its sole discretion.  No casual or inadvertent failure to comply with any of the provisions of this Paragraph 11 shall be deemed a breach of this Agreement by Company. Following written notice from Owner specifying the details of any failure to comply with this Paragraph 11, Company shall use reasonable efforts to cure prospectively any such failure.  Company shall use all reasonable business efforts to notify subdistributors of the credit obligations herein.

12.    ASSIGNMENT.  Company may assign, transfer, license, delegate, and/or grant all or any part of its rights hereunder to any Person.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.  In the event Company shall sell or assign all of its right, title, and interest in and to the Work, and in the event such assignee shall assume all of the executory obligations of Company as of the date of such transfer, Company shall be and is hereby released from all further obligations to Owner/Author hereunder accruing from and after such transfer, provided that Company shall remain secondarily liable to Owner/Author unless such assignment is made to (i) a parent, subsidiary or affiliated corporation of Company, or (ii) any corporation with or into which Company may merge or consolidate, or (iii) any person, firm or corporation

18

HIGHLY CONFIDENTIAL

BARTZ000004643

succeeding to all or a substantial portion of Company's assets used in connection with the production of motion pictures, or (iv) a major or mini-major motion picture studio or distributor, a U.S. free or pay television network or a similarly financially responsible party, and such assignee assumes Company's obligations hereunder in writing. Owner/Author shall not have the right to assign Owner's/Author's rights and obligations hereunder, provided that Owner/Author shall have a one-time right to assign Owner's/Author's right to receive Owner's Contingent Participation set forth in Paragraph 3.2 above provided Owner/Author and Owner's/Author's assignee sign and deliver to Company Company's standard Notice of Irrevocable Authority and a Distributor's Acceptance which will state, among other things, that Owner's/Author's assignee shall not have any independent audit rights and will provide Company with the name and address of the party to whom all statements due hereunder should be sent. Any such assignment shall at all times be subject to all of Company's rights hereunder.

13.    DEFINITIONS.

As used herein:

"*Copies,*" with reference to a Motion Picture or Sound Record, means and includes any negative, positive print, dupe negative, video or other electronic tape recording, disc, or other physical article of any kind produced, re-produced, or re-recorded by means of any photographic, electrical, electronic, mechanical, digital, or other processes or devices now or hereafter known, invented, or used on which such Motion Picture and/or Sound Record or any part thereof is printed, imprinted, recorded, reproduced, or otherwise fixed, together with any package, cartridge, cassette, disc, or other container in which the same may be distributed or sold. "*Copies,*" with reference to a screenplay or teleplay, means any typewritten, printed, or otherwise fixed copies thereof in substantially the form used in connection with production of the Motion Picture involved, whether or not accompanied by explanatory notes or comments, still photographs, or other illustrations. "*Copies,*" with reference to a musical composition or the lyrics thereof, means any copies, arrangements, orchestrations, or versions thereof, whether or not in the form used in connection with the Motion Picture involved.

"*Motion Picture*" means and includes motion pictures, cinematograph films, and photoplays of every kind and character whatsoever, including the Sound Records thereof, as well as clips and other portions thereof, produced by means of any photographic, electrical, electronic, mechanical, digital, or other processes or devices now or hereafter known, invented, or used, by which photographs, pictures, drawings, images, or other visual reproductions or representations are or may be printed, imprinted, recorded, or otherwise fixed on film, tape, or any other material of any description (whether translucent or not) for later projection or exhibition in such manner that the same are or appear to be in motion on a screen, television tube, or other medium or device, whether or not accompanied by Sound Records.

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL                                                    BARTZ000004644

*"Owner"* means and includes all parties listed under Paragraph A as "Owner," and shall be deemed to designate each and all of such parties jointly and severally, and this Agreement shall inure to the benefit of and be binding upon each and all of such parties jointly and severally. Any one of such parties is hereby authorized to execute additional or supplemental documents to this Agreement for and on behalf of all such parties and bind them jointly and severally.

*"Person"* includes any association, organization, partnership, business trust, corporation, entity, or governmental agency, as well as natural persons.

*"Remake"* means a Motion Picture that is based on the plot or story of a prior Motion Picture produced hereunder. *"Remake"* does not include: (i) a Sequel; or (ii) versions (such as foreign versions or shortened or expanded versions) or re-issues of a particular Motion Picture. A *"Theatrical Remake"* means a Theatrical Motion Picture that is a Remake.

*"Sequel"* means a Motion Picture using one or more of the characters of the Work participating in entirely different events from those found in the first Motion Picture based on the Work (whether such events are prior to, concurrent with, or subsequent to the events of the prior motion picture[s] produced hereunder). If the only character(s) taken from the Work and used in a Sequel are minor characters in the Work, no Sequel payment shall be owing to Owner for such sequel unless such minor character is a distinctive character from the Work. A *"Theatrical Sequel"* means a Theatrical Motion Picture that is a Sequel.

*"Sound Records"* means and includes sound recordings and reproductions of any kind and character whatsoever produced, by means of any electrical, electronic, mechanical, digital, or other processes or devices now known or hereafter known, invented, or used by which sound may be recorded for later transmission or playback, whether or not simultaneously or in synchronization or timed relation with Motion Pictures.

*"Television Production"* means a Motion Picture produced hereunder based on the Work other than the Picture intended for initial exhibition on television or via any other form of exhibition or distribution (including without limitation home video and the Internet) that is not initial exhibition by theatrical release, including but not limited to: (i) a pilot or an episode of a television series (episodic or anthology), it being understood that a *"Television Series"* includes the pilot therefor, regardless of length and regardless of whether there is any binding commitment for any ensuing series of episodes from such pilot; (ii) a so-called *"made-for-television"* or *"movie-of-the-week"*; or (iii) a so-called *"miniseries"* consisting of a television Motion Picture that is a serialization of the plot or story of the Work and is intended for exhibition sequentially in two or more segments; and (iv) a direct-to-video production. Any such Television Production may be a Remake or Sequel as defined above, but for the avoidance of doubt, if any

20

HIGHLY CONFIDENTIAL

BARTZ000004645

Television Productions (alone or combined) are released for theatrical exhibition with or without new matter, such theatrical version shall not be considered to be a Theatrical Motion Picture. Any Motion Picture that qualifies as a promotional work (such as a "making-of" documentary or behind-the-scenes television special) or as a merchandising use of the Work shall not be deemed a Television Production.

*"Theatrical Motion Picture"* means a feature-length Motion Picture produced hereunder based on the Work and intended for initial exhibition by theatrical release. Any Motion Picture that qualifies as a promotional work (such as a "making of" documentary or behind-the-scenes featurette) or as a merchandising use of the Work shall not be deemed a Theatrical Motion Picture.

*"Work"* includes all prior, present, and future versions, translations, adaptations, issues and editions of the Work (whether written by Author or by others with Author's consent, and whether illustrated by Illustrator or by others with Illustrator's consent), its theme, story, plot, characters, and character names; its title(s) and subtitle(s), if any; its music, lyrics, choreography, sets, costumes, orchestrations, arrangements, if any; and, wherever throughout the world protectible thereby, its statutory and common law copyright or copyrights, all present or future renewals and extensions of such copyrights, and all rights comprehended in such copyrights, and each and every part of all thereof. *"Work"* does not include material written or prepared by Company or under Company's authority.

14.    <u>MISCELLANEOUS.</u>

14.1    This Agreement and the instruments executed pursuant hereto include the entire understanding between the parties and replace all former negotiations, agreements, and representations with respect to the subject matter hereof. No modification, alteration, or amendment of this Agreement shall be valid or binding unless in writing and signed by the party to be charged with such modification, alteration, or amendment.

14.2    No waiver by either party of any breach hereof shall be deemed a waiver of any preceding or succeeding breach hereof. Company shall not be liable for any breach of this Agreement unless it has received written notice from Owner of such breach and has not, within a reasonable time after receipt of such notice, cured such breach.

14.3    Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this Paragraph 14.3, and neither party shall become liable for the representation, act, or omission of the other contrary to the provisions of this Agreement.

HIGHLY CONFIDENTIAL                                                      BARTZ000004646

14.4    Nothing contained in this Agreement shall be construed to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order, or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, provided that in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements; provided, further, that no other provision of this Agreement shall be affected thereby, and such other provisions shall continue in full force and effect.

14.5    Nothing in this Agreement shall be construed as obligating Company to develop, produce, or distribute any Motion Picture based in whole or in part upon the Work.

14.6    To the extent, if any, that this Agreement is subject to the Writers Guild of America Agreement ("WGA Agreement"), it is agreed that if there is any inconsistency between this Agreement and the WGA Agreement, the latter shall prevail, but only to the extent necessary to avoid inconsistency. All payments hereunder are not in addition to, but are included in, or include all applicable minimum scale payments provided for in the WGA Agreement. Company shall be entitled to the full benefit of all rights of offset permitted under the WGA Agreement.

14.7    Owner/Author shall keep confidential all matters relating to the Picture and this Agreement provided that Owner/Author may disclose terms in this Agreement as required by law, and to Owner's/Author's attorney(s), accountant(s), representatives and agent(s) including for quote purposes.

14.8    If Company breaches this Agreement, Owner's/Author's remedy shall be limited to an action for actual damages, if any, and in no event shall Owner/Author be entitled to terminate the Agreement or to seek to enjoin the exploitation of the rights granted in this Agreement (including but not limited to the exhibition, distribution, advertising, and promotion of any works created pursuant to the terms of this Agreement).

14.9    Because all parties were assisted or had the opportunity to be assisted by their counsel in reviewing and agreeing to this Agreement, it shall be deemed to have been drafted by all the parties hereto, and no ambiguity shall be resolved against any party by virtue of such party's participation in its drafting.

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL

BARTZ000004647

14.10 <u>Notices</u>:  Notices hereunder shall be in writing and shall be addressed:

To Company:                            2700 Colorado Avenue
                                       Suite 200
                                       Santa Monica, CA 90404
                                       Attention:  Theatrical Legal Affairs
                                       Facsimile:  (310) 255-3738

To Owner:                              c/o Creative Artists Agency
                                       2000 Avenue of the Stars
                                       Los Angeles, CA 90067
                                       Attn: Matthew Snyder & Kristen Baldwin

Courtesy Copy to:                      The Susan Golomb Literary Agency
                                       540 President Street, 3rd floor
                                       Brooklyn, NY 11215
                                       Attn: Susan Golomb

or to such other address subsequently provided by notice.

Any notice hereunder shall be given by personal delivery, express mail courier with written receipt confirming delivery, or certified mail with written receipt confirming delivery.  The date of the giving of such notice shall be the date of such personal delivery, one (1) business day after mailing by express mail courier, or three (3) business days after mailing by certified mail; provided that in the event of conflict with the date of the written receipt then the date that the receipt was signed shall control.

For purposes of this Agreement, "business day" shall mean any day other than a Saturday, Sunday, national holiday, or other day on which Company is closed for business.

14.11 <u>Payments</u>:  Any accounting statements and payments required under this Agreement shall be sent to Company at the address listed in Paragraph 14.10 above, and to Owner at the following address:

To Owner:                              c/o Creative Artists Agency
                                       2000 Avenue of the Stars
                                       Los Angeles, CA 90067
                                       Attn: Matthew Snyder

15.    <u>PREMIERE</u>.  Provided the Picture is based upon the Work and Owner/Author is not in material default hereunder, Company shall invite Author and Author's non-business related companion to attend the first United States celebrity premiere, if any, of the Picture.  If Author attends such premiere and such premiere is more than fifty (50)

<div align="center">23</div>

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL

BARTZ000004648

miles from Author's residence within the continental U.S, Author and Author's non-business related companion shall be entitled to first-class round-trip transportation (if used and subject to availability), and Author shall be entitled to (if used) first class accommodations and a reasonable expense per diem. In addition to other reasonable and customary promotional services, Company may require the appearance of Author at any other premiere and/or film festival, subject to Author's reasonable availability and provided that transportation, accommodations, and a per diem as set forth in the previous sentence shall be provided to Author only in connection therewith.

16.     DVD.  Provided the Picture is based upon the Work and Owner/Author is not in material default hereunder, if and when DVDs, Blu-Rays, and Soundtracks of the Picture are commercially available for release to the general public, Company shall furnish one (1) of each to Author for Author's personal use only, subject to Company's customary terms and conditions and any existing MPAA or other customary practices in the motion picture industry which may restrict Company's ability to provide Author with such DVD or Blu-Ray.

17.     GOVERNING LAW.  THE INTERNAL SUBSTANTIVE LAWS (AS DISTINGUISHED FROM THE CHOICE OF LAW RULES) OF THE STATE OF CALIFORNIA AND THE UNITED STATES OF AMERICA APPLICABLE TO CONTRACTS MADE AND PERFORMED ENTIRELY IN CALIFORNIA SHALL GOVERN (i) THE VALIDITY AND INTERPRETATION OF THIS AGREEMENT, (ii) THE PERFORMANCE BY THE PARTIES OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER, AND (iii) ALL OTHER CAUSES OF ACTION (WHETHER SOUNDING IN CONTRACT OR IN TORT) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TERMINATION OF THIS AGREEMENT OR OTHERWISE RELATING TO THE PICTURE.

18.     LEGAL PROCEEDINGS – ARBITRATION.  The parties agree that, except as otherwise required by any applicable guild collective bargaining agreement, any and all disputes or controversies of any nature between them arising, regarding or relating to any aspect of this Agreement's formation, meaning, performance or breach, or arising from or relating to, in any way, this Agreement (whether or not relating to the Picture or to any of the matters referred to in clauses (i), (ii) and/or (iii) of Paragraph 14 above), shall be determined in accordance with the mediation and arbitration rules of JAMS (or, with the agreement of the parties, ADR Services) before a single neutral mediator (for the mediation) ("Mediator") and a single neutral arbitrator (for the arbitration) ("Arbitrator") with such proceedings to be conducted in Los Angeles, California . The parties hereto shall endeavor first to resolve the controversy or claim through mediation administered by JAMS and conducted before a mutually agreeable mediator before commencing any arbitration.

        The Arbitrator shall be an attorney or retired judge with at least ten (10) years experience in the motion picture industry (*e.g.*, the arbitrators designated in the DGA, SAG or WGA collective bargaining agreements or persons having comparable qualifications) and shall be mutually agreed upon by Company and Lender. If Company and Lender are unable to agree on an Arbitrator, the Arbitrator shall be selected through

24

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

BARTZ000004649

a process whereby each party shall select and concurrently exchange the names of ten (10) preferred arbitrators on each side from the list of the JAMS arbitrators in Los Angeles, with a listing of preferences 1 through 10 for such arbitrators. The highest preference arbitrator name appearing on both lists shall be the Arbitrator. In the event that this initial process does not result in the selection of an arbitrator, then each party will select one arbitrator from the JAMS list of arbitrators and in turn, those selected arbitrators will make a final decision on the Arbitrator to be used. The fees of the Mediator and Arbitrator shall be borne equally by Company and Lender, save and except that the Arbitrator may require that any arbitration fees be borne in such other manner as the Arbitrator determines is required in order for this arbitration clause to be enforceable under applicable law.

The parties shall be entitled to conduct discovery in accordance with Section 1283.05 of the California Code of Civil Procedure, provided that (a) the Arbitrator must authorize all such discovery in advance based on findings that the material sought is relevant to the issues in dispute and that the nature and scope of such discovery is reasonable under the circumstances, and (b) discovery shall be limited to depositions and production of documents unless the Arbitrator finds that another method of discovery (e.g., interrogatories) is the most reasonable and cost efficient method of obtaining the information sought. There shall be a record of the proceedings at the arbitration hearing and the Arbitrator shall issue a Statement of Decision setting forth the factual and legal basis for the Arbitrator's decision. If neither party gives written notice requesting an appeal within ten (10) business days after the issuance of the Statement of Decision, the Arbitrator's decision shall be final and binding as to all matters of substance and procedure, and may be enforced by a petition to the Superior Court, which may be made ex parte, for confirmation and enforcement of the award.

If either party gives written notice requesting an appeal within ten (10) business days after the issuance of the Statement of Decision, the award of the Arbitrator shall be appealed to three (3) neutral arbitrators (the "Appellate Arbitrators"), each of whom shall have the same qualifications and be selected through the same procedure as the Arbitrator. The appealing party shall file its appellate brief within thirty (30) days after its written notice requesting the appeal and the other party shall file its brief within thirty (30) days thereafter. The Appellate Arbitrators shall thereupon review the decision of the Arbitrator applying the same standards of review (and all of the same presumptions) as if the Appellate Arbitrators were a California Court of Appeals reviewing a judgment of the California Superior Court, except that the Appellate Arbitrators shall in all cases issue a final award and shall not remand the matter to the Arbitrator.

The decision of the Appellate Arbitrators shall be final and binding as to all matters of substance and procedure, and may be enforced by a petition to the Superior Court, which may be made ex parte, with the notice to the non-prevailing party, for confirmation and enforcement of the award. The party appealing the decision of the Arbitrator shall pay all costs and expenses of the appeal, including the fees of the Appellate Arbitrators and the reasonable outside attorneys' fees of the opposing party, unless the decision of the Arbitrator is reversed, in which event the expenses of the appeal shall be borne as determined by the Appellate Arbitrators.

25

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

BARTZ000004650

The Arbitrator shall have the power to enter temporary restraining orders, preliminary and permanent injunctions. Prior to the appointment of the Arbitrator or for remedies beyond the jurisdiction of an arbitrator, at any time, Company may seek *pendente lite* relief in a court of competent jurisdiction in Los Angeles County, California without thereby waiving its right to arbitration of the dispute or controversy under this section.

All arbitration proceedings (including proceedings before the Appellate Arbitrators) shall be closed to the public and confidential and all records relating thereto shall be permanently sealed, except as necessary to obtain court confirmation of the arbitration award. The provisions of this Paragraph 19 shall supersede any inconsistent provisions of any prior agreement between the parties.

IN WITNESS WHEREOF, the parties hereto have signed and delivered this Agreement.

CHARLES GRAEBER ("Owner" and "Author")

ACCEPTED AND AGREED TO:

SUMMIT ENTERTAINMENT, LLC

By:

Its:    EVP & General Counsel

26

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL

## SCHEDULE 1

**Statement of all publications, prior uses, prior versions,
adaptations, translations, and copyright status of the Work**

Owner makes the following representations and warranties with respect to the Work:

1.    PUBLICATIONS.

Name of publisher:  Twelve, an imprint of Grand Central Publishing, a division of Hachette Book Group, Inc.

Date of first publication:    April 15, 2013

Territory of rights:    North America

A copy of this publishing agreement and a release from this publisher in the attached form shall be provided to Company as a condition precedent to Company's payment obligations pursuant to this Agreement.

2.    PRIOR USES.

None, except as set forth on this schedule.

3.    PRIOR VERSIONS.

None.

4.    ADAPTATIONS AND TRANSLATIONS.

UK Edition published by Atlantic Books in 2013.

5.    COPYRIGHT STATUS OF THE WORK.

Date registered with the U.S. Copyright Office: May 30, 2013

Date of first publication listed on registration application: April 15, 2013

Copyright registration number: TX 7-731-544

1

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL

BARTZ000004652

## SCHEDULE 2

## FROZEN & RESERVED RIGHTS

The following rights in the Work and any Author-Written Sequels (as defined below) are either frozen ("Frozen Rights") or reserved to Owner/Author ("Reserved Rights") subject to the provisions of this Agreement.

I.    FROZEN RIGHTS:  The following rights shall not be exploited unless and until such time that Company and Owner mutually approve in writing such exploitation:

    A.    Novelization Rights. The right to write, publish, authorize and/or distribute any fictionalization, whether hardcover or softcover, as serials or otherwise, with or without illustrations by photographs, drawings or cartoons, of any Motion Picture or other production based on the Work and/or an Author-Written Sequel. For the avoidance of doubt, the right to publish the Book as a graphic novel is reserved to the Owner/Author as set forth in Paragraph II.A. below.

II.    RESERVED RIGHTS:  The following rights are reserved to Owner/Author for Owner's/Author's use and disposition in accordance with the terms set forth herein:

    A.    Publication Rights.  The right to publish and distribute in all languages throughout the world printed versions of the  Book owned or controlled by Owner/Author, whether hardcover or softcover, and in magazine or other periodicals, in installments or otherwise, including the right to publish as a graphic novel, and via one-voice or dual-voice audio recording (i.e., so-called "Books-on-Tape" whether on audiocassette, audio disc, or other audio-only media), and  via electronic or digital publication provided that such electronic or digital versions, regardless of format, contain text only or text with moving or non-moving images, but further provided that such moving or non-moving images will not dramatize events described in the Work as published, and to the extent such images are accompanied by voice recordings, those recordings will be single or dual voice. Such publications by Author may be copyrighted in the name of Author, subject to the provisions of Paragraph 7 of the Agreement.  For the avoidance of doubt, the copyright in the Book is reserved to Author. Notwithstanding the foregoing, Company shall have the right to publish excerpts from and summaries of the Book, provided such excerpts do not exceed seven thousand five hundred (7500) words in the aggregate, in connection with the advertising and publicizing of any Motion Picture(s) produced hereunder (including, without limitation, in interactive versions on its promotional website and in souvenir programs), and in "making-of-the-movie" and "coffee table" type books for the Motion Picture(s) produced hereunder.  For the avoidance of doubt, Company shall also have the right to publish the screenplay from any Motion Picture(s) produced hereunder.

Owner/Author agrees to use good faith efforts to arrange for publication of a paperback edition of the Book at a time and in a manner that will aid in the advertising and

1

HIGHLY CONFIDENTIAL

BARTZ000004653

exploitation of the Picture; provided, however, that in no event shall Owner/Author be obligated to arrange for publication of any such paperback edition if such publication would conflict with any contract that Owner/Author may have in respect of the hardcover or softcover publication rights in and to the Book, provided Owner/Author uses good faith efforts to eliminate such conflict. In this connection, Owner/Author agree that, before arranging for such publication, Owner/Author shall ascertain from Company the final release title to be used for such Picture, and shall recommend to the publisher that it use the same title and advise and consult with Company with respect to the front and back covers of said publication and any still photographs, artwork, and credits to be included therein and Company shall cooperate with Owner/Author and publisher to coordinate the use of artwork in connection therewith. In no event, however, shall such publisher have the right to use any still photographs or artwork owned or controlled by Company without Company's specific written approval.

   B.    Author-Written Sequel Rights. For purposes of this Agreement, the term "Author-Written Sequel" shall mean a literary property (story, novel, play, or otherwise), whether written before or after the Book and whether written by Author or by a successor-in-interest of Author or authorized by Author, using one or more of the characters appearing in the Book, participating in different events from those found in the Book (whether prior to, concurrent with, or subsequent to the events contained in the Book), and whose plot is substantially different from that of the Book. Author shall have the right to write and authorize the writing of Author-Written Sequels and exploit Publication Rights (as described in Paragraph A above) in such Author-Written Sequels subject to the provisions of this Agreement. The rights that are deemed Frozen Rights in the Book shall be deemed Frozen Rights in all Author-Written Sequels ("Equivalent Frozen Rights"), and all the same restrictions shall apply. The rights that are deemed Reserved Rights in the Book shall be deemed Reserved Rights in all Author-Written Sequels ("Equivalent Reserved Rights"), and all the same restrictions shall apply. Owner/Author agrees not to exercise, exploit, or offer any other rights of any kind (including without limitation motion picture, television, and ancillary rights) in or to any Author-Written Sequel that are equivalent to the rights granted to Company hereunder in the Book ("Equivalent Rights"), except as set forth in Schedule 4 attached hereto.

   C.    Radio Rights. The right to broadcast the Work by sound (as distinguished from visually) by radio, subject to Company's right at all times: (i) to exercise its radio rights for advertising and exploitation purposes by living actors or otherwise, by the use of excerpts from or condensations of the Work or any Motion Pictures; and (ii) to broadcast its Motion Pictures by radio. Owner/Author agrees not to exercise, nor to permit any other person to exercise, Owner's/Author's radio rights earlier than four (4) years after the first general release of the Picture or six years after the date on which the Option is exercised, if at all, whichever is earlier (the "Restricted Period"), provided that the Restricted Period shall be extended while there is in effect, in any particular country or territory, a network television broadcasting license for any Motion Picture produced in the exercise of rights assigned hereunder, plus one year thereafter, in such country or territory, whenever such license is in effect. After the expiration of the Restricted Period, as extended, Company shall have the right of first negotiation and

<center>2</center>

HIGHLY CONFIDENTIAL

BARTZ000004654

last refusal rights with respect to said Reserved Rights, in accordance with the provisions of Schedule 3 attached to this Agreement.

D.    <u>Live Television Rights</u>.  The right to telecast directly from the performance to the audience, the performance not having been recorded on film, tape, wire, or other substance or device whatsoever, subject to Company's right at all times:  (i) to use live actors to televise excerpts from and condensations of the Work or any Motion Pictures produced hereunder for advertising and exploitation purposes; and (ii) to telecast its Motion Pictures.  Owner/Author agrees not to exercise, nor to permit any other person to exercise, Owner's/Author's live television rights earlier than four (4) years after the first general release of the Picture or six(6) years after the date on which the Option is exercised, if at all, whichever is earlier (the "Restricted Period"), provided that the Restricted Period shall be extended while there is in effect, in any particular country or territory, a network television broadcasting agreement for any Motion Picture produced in the exercise of rights assigned hereunder, plus one year, whenever such license is in effect.  After the expiration of the Restricted Period, as extended, Company shall have the right of first negotiation and last refusal with respect to said Reserved Rights in accordance with the provisions of Schedule 3 attached to this Agreement.

E.    <u>Recital Rights</u>.  Owner shall have the right to authorize single and dual voice non-dramatic live readings of the Work before a live audience (for the avoidance of doubt, this right does not apply to stage plays or musicals), provided that such readings are not recorded on film, tape, wire, or other substance or device whatsoever (other than a recording thereof which is made solely for historical or archival purposes, provided such recording is not later broadcast or otherwise exhibited).

F.    <u>Extent of Reserved Rights</u>.

F.1    It is expressly agreed that Owner's/Author's reserved rights under this Schedule 2 relate only to material written by Author or authorized by Author and incorporated into the Work and any Author-Written Sequel, and not to any screenplay, teleplay, music, lyrics, sequels, elements, ideas or other material written or authorized by Company pursuant to its rights under this Agreement, even though the same may contain characters or other elements contained in the Work or an Author-Written Sequel.

F.2    Notwithstanding anything to the contrary contained in this Schedule 2, it is specifically agreed that included among the rights granted to Company under this Agreement and not reserved to Owner is the sole, exclusive, and irrevocable right to use and exploit the Work and any Motion Picture or other production utilizing the Work, in whole or in part, in or in connection with any amusement/tour/theme park and the advertising, promotion, and exploitation thereof, whether or not such use by Company conflicts and/or interferes with any of Owner's/Author's Reserved Rights.

..................

3

HIGHLY CONFIDENTIAL

BARTZ000004655

## SCHEDULE 3

## RIGHT OF FIRST NEGOTIATION AND LAST REFUSAL

After the expiration of any applicable holdback period(s) set forth in Schedule 2, each time Owner/Author desires to exercise or dispose of any of the Reserved Radio Rights, and/or Reserved Live Television Rights set forth in Schedule 2, Company shall have a right of first negotiation and a right of last refusal with respect to such Reserved Rights as more fully set forth in Paragraphs A and B below.

A.     Right of First Negotiation:  If Owner/Author desires to dispose of or exercise any Reserved Right or any interest therein (the "Offered Right"), whether directly or indirectly, then Owner shall give notice to Company of such desire. Commencing upon Company's receipt of such written notice there shall be a fifteen (15) business day period in which Owner and Company may negotiate in good faith for such Offered Right. If by the end of such negotiation period no agreement has been reached or if at any time during such negotiation period Company gives Owner notice that Company declines to negotiate for such Offered Right, then Owner/Author shall be free to negotiate elsewhere with respect to such Offered Right, subject to Company's right of last refusal set forth in Paragraph B below.

B.     Right of Last Refusal:

B.1     If with respect to the Offered Right Company declines to negotiate or there is no agreement pursuant to Company's right of first negotiation as set forth in Paragraph A above, and with respect to the Offered Right Owner/Author makes and/or receives any bona fide offer that Owner/Author proposes to accept, Owner shall give notice to Company of such offer specifying the particulars thereof, including any Offered Rights that are the subject of such offer, the name and address of the offeror, the proposed financial terms, and all other material terms of such offer. During the period of ten (10) business days after receipt of said notice (the "Reconsideration Period"), Company shall have the exclusive option to license or acquire, as the case may be, the particular Offered Right(s) referred to in such offer, upon the same financial terms and other terms set forth in such notice ("Company's Purchase Option"), it being agreed that in no event shall Company be required to meet any term or condition which cannot be met as easily by Company as by any other offeror (such as the required employment of a particular performer or director whose services are exclusive to such offeror).

B.2     If Company elects to exercise Company's Purchase Option, Company shall notify Owner of the exercise thereof within the Reconsideration Period; Company and Owner shall then promptly execute written agreements conveying

1

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

BARTZ000004656

to Company such Offered Right(s). If Company does not elect to exercise Company's Purchase Option, Owner/Author shall be free to accept said bona fide offer (but only upon the terms and conditions specified in such bona fide offer); provided, however, if any such proposed offer is not confirmed in writing within thirty (30) days following the expiration of the Reconsideration Period, Company's Purchase Option shall revive and shall apply to such proposed offer again and to each and every further offer or offers at any time received by Owner/Author relating to the particular Offered Right(s). Company's Purchase Option shall continue in full force and effect, upon all of the terms and conditions of these Paragraphs A and B, so long as Owner/Author retains any right, title, or interest in or to the particular Offered Right(s).

........................

2

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL

## SCHEDULE 4

## EQUIVALENT RIGHTS IN AUTHOR-WRITTEN SEQUELS

A.      Owner/Author agrees that at any time during the Option Period for the Work and thereafter as set forth herein ("AWS Holdback Period"), Company may purchase the Equivalent Rights in any Author-Written Sequel. If Company has not purchased the Equivalent Rights in an Author-Written Sequel by the later of: (A) four (4) years from the date of the initial general release of the Picture or other production based on the Work or six (6) years from the date of Company's exercise of the Option, whichever is earlier; and (B) on a non-precedential basis due to the unique circumstances of this deal, four(4) years from the date of the U.S. publication of such earliest unused Author-Written Sequel, then Owner may give Company written notice thereof and Company may elect, in its sole discretion and within ten (10) business days of Company's receipt of such written notice, to: (i) pay Owner Fifty Thousand Dollars ($50,000) ("AWS Extension Payment"), upon which payment the AWS Holdback Period shall be extended for one (1) additional year ("AWS Extension Period"); or (ii) purchase such AWS outright by payment of the AWS Purchase Price set forth in Paragraph B below, in which event Company shall acquire all Equivalent Rights in such Author-Written Sequel. Company's right to extend the AWS Holdback Period in one-year increments by payment of additional AWS Extension Payment(s) shall be a rolling right such that at the end of each AWS Extension Period, if Company has not yet purchased the Equivalent Rights in such Author-Written Sequel Owner may again give Company written notice thereof and Company may again elect, in its sole discretion, to: (A) pay Owner an additional AWS Extension Payment within ten (10) business days of Company's receipt of such written notice, upon which payment the AWS Holdback Period shall be extended for an additional one-year AWS Extension Period; or (B) purchase the Author-Written Sequel outright by payment of the AWS Purchase Price set forth in Paragraph B below, in which event Company shall acquire all Equivalent Rights in such Author-Written Sequel. If Company does not pay the AWS Purchase Price (as set forth below) for such Author-Written Sequel on or before the expiration of the AWS Holdback Period for such Author-Written Sequel (as it may be extended by payment of the AWS Extension Payment(s) set forth above), then Owner may offer the Equivalent Rights in such Author-Written Sequel to any third party, subject to the following: (i) a first priority lien and security interest being retained by Company as set forth in Paragraphs 8.1 and 8.2 of the Agreement, except the "Sunk Costs" shall be those costs associated with development of the production based on such Author-Written Sequel, (ii) Company's right of last refusal as described in Paragraph B of Schedule 3, except the "Offered Right" shall be the Equivalent Rights in such Author-Written Sequel, and (iii) provided that Owner's right to do so is limited to new characters and material contained in such Author-Written Sequel that was not previously contained in the Work, any prior Author-Written Sequel purchased by Company, or any Motion Picture or other production produced by Company based thereon. All time periods set forth herein shall be subject to

3

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL

BARTZ000004658

suspension and extension as a result of any force majeure event or other event that interrupts or interferes with Company's development and/or production of Motion Pictures and/or Company's ongoing business including, without limitation, any labor dispute, strike, fire, war or governmental action, terrorist attack, or any disruptive event beyond Company's control; such extension shall be for a period equal to the duration of such interference or interruption, provided, however, that any extension of any time period set forth herein based on one (1) continuing force majeure event shall not exceed six (6) months in the aggregate (for the avoidance of doubt, any time period set forth herein may again be suspended for any other force majeure event).. The procedure set forth above shall apply on a rolling basis to all Author-Written Sequels.

B.      If Company elects to acquire the Equivalent Rights in any Author-Written Sequel (which it shall not be obligated to do), Company shall do so by giving Owner notice of such election prior to the expiration of the applicable AWS Holdback Period and concurrently paying to Owner the following ("AWS Purchase Price"): (i) if the Direct Cost Budget of the production based on such Author-Written Sequel ("AWS Production") is equal to or greater than the Direct Cost Budget for the Picture, then the AWS Purchase Price shall be an amount equal to two and one-half percent (2.5%) of the Direct Cost Budget of the AWS Production with a "floor" of ▮▮▮▮ Thousand Dollars ($▮,000) and a "ceiling" of ▮▮▮▮▮ Thousand Dollars ($▮,000); OR (ii) if the Direct Cost Budget of the AWS Production is less than the Direct Cost Budget for the Picture, then the AWS Purchase Price shall be a prorated amount of the Purchase Price for the Work based on the Direct Cost Budget of the AWS Production compared to the Direct Cost Budget for the Picture (e.g., if the Direct Cost Budget for the AWS Production is 75% of the Direct Cost Budget for the Picture, then the AWS Purchase Price shall be 75% of the Purchase Price for the Work (i.e., $▮,000)), but in any event the AWS Purchase Price shall be no less than ▮▮▮▮ Thousand Dollars ($▮,000).  If Company pays the AWS Purchase Price for any Author-Written Sequel, Company shall acquire, in perpetuity, the Equivalent Rights in such Author-Written Sequel (i.e., all the same rights that Company acquired in the Work).  For purposes of calculating the AWS Purchase Price, the Direct Cost Budget of the production shall be the final, Company-approved budget for the production excluding financing fees and charges (including interest), completion bond fees and charges, all insurance costs (including essential element insurance, if applicable), the AWS Purchase Price, Company's overhead, any production rebate and/or subsidy, and a customary contingency, measured as of the first day of principal photography of the production and as approved by the applicable completion guarantor, studio, network, distributor, principal financier, and/or lender for the production, as applicable.

C.      In addition to the applicable Purchase Price set forth above, if Company produces and releases a Theatrical Motion Picture based upon such Author-Written Sequel ("AWS Picture"), Owner shall also be entitled to the following contingent

4

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

                                          BARTZ000004659

compensation for each AWS Picture: a sum equal to five percent (5%) of one hundred percent (100%) of the Defined Proceeds, if any, of the AWS Picture.

D.    For the avoidance of doubt, if Company acquires Equivalent Rights in an Author-Written Sequel Owner shall be entitled to the AWS Purchase Price set forth in Paragraph B above, and the contingent compensation (if any) set forth in Paragraph C above; Owner shall not be entitled to the compensation set forth in Paragraph 3.3 of the Agreement for Subsequent Pictures/Additional Productions (i.e., no double compensation for subsequent productions).

..........................

5

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL

## SHORT FORM OPTION

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, Charles Graeber ("Owner"), hereby grants to Summit Entertainment, LLC and its successors and assigns (herein called "Company"), the sole, exclusive and irrevocable option to acquire all motion picture, television, and other allied and ancillary rights in and to the book entitled "The Good Nurse," and any subsequent books thereto (which, together with the title, themes, contents, characters, and other versions thereof, is hereinafter called the "Work") written or authorized by Owner, including without limitation, the titles, characters, characterizations, issues, editions and translations, and any and all parts, elements or versions of any and all of the foregoing, subject to the rights reserved by Owner, all as more particularly set forth in and subject to the terms and conditions of that certain Agreement between the undersigned and Company dated as of August 7, 2013.

IN WITNESS WHEREOF, the undersigned has executed this document as of this 7th day of August, 2013.

CHARLES GRAEBER
("Owner")

6

HIGHLY CONFIDENTIAL

BARTZ000004661

State of ~~CALIFORNIA~~ *New York*
County of ~~LOS ANGELES~~ *New York* } ss.

On __January 28th 2014__ before me, __Vanessa Russell__,
Notary Public, personally appeared __Charles Graeber__

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under **penalty of perjury** under the laws of the State of ~~California~~ *New York* that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

VANESSA RUSSELL
Notary Public, State of New York
Qualified in Kings County
No. 01RU6188211
My Commission Expires 06-02-2016

──────── *OPTIONAL* ────────

Description of Attached Document

Title or Type of Document:

Document Date:                    Number of Pages:

Signer(s) Other Than Named Above:

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: | Signer's Name: |
|---|---|
| ☐ Individual | ☐ Individual |
| ☐ Corporate Officer | ☐ Corporate Officer |
|   Title(s): |   Title(s): |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Attorney-in-Fact | ☐ Attorney-in-Fact |
| ☐ Trustee | ☐ Trustee |
| ☐ Guardian or Conservator | ☐ Guardian or Conservator |
| ☐ Other: | ☐ Other: |
| Signer is Representing: | Signer is Representing: |

7

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL

BARTZ000004662

## SHORT FORM ASSIGNMENT

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, Charles Graeber ("Owner"), hereby sells, assigns, transfers, and sets over to Summit Entertainment, LLC and its successors and assigns (herein called "Company"), the sole and exclusive motion picture rights, television, and other allied and ancillary rights in and to the book entitled "The Good Nurse" and any subsequent books thereto (which, together with the title, themes, contents, characters, and other versions thereof, is hereinafter called the "Work") written or authorized by Owner, including without limitation, the titles, characters, characterizations, issues, editions and translations, and any and all parts, elements or versions of any and all of the foregoing, subject to the rights reserved by Owner, all as more particularly set forth in and subject to the terms and conditions of that certain Agreement between the undersigned and Company dated as of August 7, 2013.

Dated this **2 8** day of **January**, 201**4**

CHARLES GRAEBER
("Owner")

8
THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL

BARTZ000004663

State of ~~CALIFORNIA~~ New York

County of ~~LOS ANGELES~~ New York } ss.

On _Janury 28th 2014_ before me, _Venessa Russell_,

Notary Public, personally appeared _Charles Graeber_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under **penalty of perjury** under the laws of the State of ~~California~~ New York that the foregoing paragraph is true and correct.

WITNESS my hand and ~~official seal.~~

VANESSA RUSSELL
Notary Public, State of New York
Qualified in Kings County
No. 01RU6188211
My Commission Expires 06-02-2016

———————— **OPTIONAL** ————————

Description of Attached Document

Title or Type of Document:

Document Date:                    Number of Pages:

Signer(s) Other Than Named Above:

**Capacity(ies) Claimed by Signer(s)**

Signer's Name:                    Signer's Name:
☐ Individual                      ☐ Individual
☐ Corporate Officer               ☐ Corporate Officer
   Title(s):                         Title(s):
☐ Partner — ☐ Limited ☐ General   ☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact                ☐ Attorney-in-Fact
☐ Trustee                         ☐ Trustee
☐ Guardian or Conservator         ☐ Guardian or Conservator
☐ Other:                          ☐ Other:

Signer is Representing:            Signer is Representing:

9

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL

BARTZ000004664

## SCHEDULE 5

### PUBLISHER'S RELEASE

For good and valuable consideration (including, but not limited, to the undertaking of Summit Entertainment, LLC ("Company") to commence development of a possible motion picture based on the literary work described below), the undersigned hereby acknowledges and agrees forever, for the express benefit of Company and its representatives, successors, and assigns, that the undersigned has no claim to or interest in the worldwide motion picture rights (silent, sound, talking), television rights, radio broadcasting rights, home video rights, electronic publishing rights (including, without limitation, CD-ROM, DVD, CD-I and computer or electronic game rights), theme park rights, non-publication merchandising rights, or any other rights of any kind other than the print publication and single- or two-voice non-dramatic "books-on-tape" rights that have been previously granted to the undersigned, in or to that certain literary work published by the undersigned and described as follows:

Title:                                                         "The Good Nurse"

Written by:                                              Charles Graeber
Date and Place of First Publication:
Copyright Registration Number:

The undersigned hereby consents to the use of excerpts from the said literary work, not exceeding seven thousand five hundred (7,500) words in total, for the purpose of advertising, publicizing, and/or exploiting any motion picture, television production, or other versions thereof based principally on the said literary work, through the publication of such excerpts in summaries and synopses, which may be copyrighted by and/or in the name of said author and/or the author's heirs, representatives, licensees, and assigns, in any and all languages, in any and all countries of the world, and in any form or media; and "making-of-the-movie" and "coffee-table" type books relating to such motion pictures and productions.

IN WITNESS WHEREOF, the undersigned has executed this instrument this _____ day of _____, 200_.


_____
[Publisher]


10

THE GOOD NURSE – Book Option-Purchase (Charles Graeber) v5 (Final)

HIGHLY CONFIDENTIAL



## AMENDMENT TO LITERARY MATERIAL OPTION/PURCHASE AGREEMENT

Dated as of June 30, 2017

Charles Graeber
c/o Creative Artists Agency
2000 Avenue of the Stars
Los Angeles, CA 90067
Attn: Kristen Baldwin

Re: "The Good Nurse" / Option Extension

Dear Mr. Graeber:

Reference is hereby made to that certain literary material option and purchase agreement (the "Option Agreement") dated as of August 7, 2013, between Summit Entertainment, LLC ("Company") and Charles Graeber ( "Owner"), with respect to the non-fiction book entitled "The Good Nurse," written by Owner.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Summit and Owner hereby amend the Option Agreement so that the following Paragraph 3.1.1.(c) is deemed added to the Option Agreement:

(c) ▆▆▆▆▆▆ Thousand Dollars ($▆000) ("Third Option Fee") if Company in its sole discretion elects to extend the Option Period for a further period (the "Third Option Period") continuing through and including the date which is eighteen (18) months after the expiration of the Second Option Period (i.e., through and including January 29, 2019), by giving Owner notice (pursuant to Paragraph 14.10 below) of such election and making payment on or before the expiration of the Second Option Period. The sum paid pursuant to this Paragraph 3.1.1(c) shall not be applicable against the Purchase Price.

Except as expressly set forth herein, all other terms and conditions set forth in the Option Agreement remain in full force and effect. Capitalized terms utilized herein and not otherwise defined are deemed to have the same meaning as set forth in the Option Agreement. This amendment may be executed in one or more counterparts, each of which when taken together shall constitute one and the same agreement, and each of which shall constitute an original copy of this amendment. Signatures delivered via facsimile or electronically via PDF or TIFF shall have the same legal weight and effect as original signatures.

SUMMIT ENTERTAINMENT, LLC

By: _____

Title: _____

CHARLES GRAEBER

_____

1

"The Good Nurse"
Amendment to Option Agmt v1

HIGHLY CONFIDENTIAL

EXHIBIT "B"

**SHORT-FORM OPTION**

KNOW ALL MEN BY THESE PRESENTS: That for good and valuable consideration, receipt of which is hereby acknowledged, the undersigned, CHARLES GRAEBER, hereby grants to 22ND STREET ENTERTAINMENT, LLC (the "**Company**"), and its successors and assigns, the sole and exclusive option to purchase all rights, including without limitation, all motion picture, television, allied and ancillary rights (except certain reserved rights set forth in the Literary Option/Purchase Agreement referred to below), in the original literary and/or dramatic work (the "**Work**") described as follows:

Title:                                   "**THE GOOD NURSE**"

Author:                              CHARLES GRAEBER

Name(s) of Publisher(s):     Twelve / Grand Central Publishing

Date and Place of Publication:   3/16/13 / United States

Copyright Date and Registration No.   © 2013   ISBN 978-0-416-50529-1
                                                            Reg # TX0007731544

Name of Copyright Registrant:   CHARLES GRAEBER

        The Work includes but is not limited to: all plots, themes, titles, dialogue, language, incidents, action, book, characters and copyrights thereof, including all renewals and extensions of such copyright, and any translations, bookizations, dramatizations, sequels, remakes and other adaptations or versions thereof, now made or hereafter created, made or permitted to be made by the undersigned.

        This instrument is executed in accordance with and is subject to the agreement (the "**Literary Option/Purchase Agreement**") between the undersigned and the Company, dated as of December 16, 2019 relating to the option granted to the Company to purchase the above-mentioned rights in the Work, which rights are more fully described in said Literary Option/Purchase Agreement.

        IN WITNESS WHEREOF, the undersigned has executed this Short-Form Option as of the ___9th___ of
January 2019. 2020.

Charles Graeber

HIGHLY CONFIDENTIAL

STATE OF _New York_ )
                          )ss.
COUNTY OF _Queens_ )

On _January 9, 2020_, before me, _Bogumila T Roseburg_, a notary public, personally appeared CHARLES GRAEBER, personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Notary Public in and for said
County and State

BOGUMILA T. ROSEBURG
NOTARY PUBLIC - STATE OF NEW YORK
NO. 01RO5071459
QUALIFIED IN QUEENS COUNTY
COMMISSION EXPIRES JANUARY 13, 2023

HIGHLY CONFIDENTIAL

EXHIBIT "C"

**SHORT-FORM ASSIGNMENT**

In consideration of the payment of One Dollar ($1.00) and other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned, CHARLES GRAEBER (hereinafter referred to as "**Owner**") hereby irrevocably sells, grants, assigns and sets over unto 22ND STREET ENTERTAINMENT, LLC (hereinafter referred to as "**Company**"), and its representatives, heirs, successors and assigns in perpetuity, throughout the universe and exclusively, all motion picture, television, video, allied, ancillary, incidental and subsidiary rights (collectively, the "**Rights**") (other than the reserved rights set forth in the Literary Option/Purchase Agreement referred to below) which Owner has or may have in and to the original literary material (collectively, the "**Work**"), described below and in and to the Work as the copyright in the Work may be renewed by Owner or Owner's heirs, successors in interest or assigns, including, without limitation, the Rights, as fully set forth in the agreement referred to below:

TITLE OR DESCRIPTION:          "**THE GOOD NURSE**"

AUTHOR:                                    **CHARLES GRAEBER**

NAME(S) OF PUBLISHER(S):       _Twelve ( Grand central publishing/_
                                                                _Hachette Books_

COPYRIGHT DATE:                      _© 2013_

The undersigned and Company have entered into a formal Literary Option/Purchase Agreement dated as of December 16, 2019 relating to the transfer and assignment of the foregoing rights in and to the Work, which rights are more fully described in said Literary Option/Purchase Agreement, and this Assignment is expressly made subject to all of the terms, conditions and provisions contained in said Literary Option/Purchase Agreement.

Company is hereby empowered to bring, prosecute, defend and appear in suites, actions and proceedings of any nature under or concerning all copyrights and all renewals thereof in and to the Work, or concerning any infringement of any such copyright or renewal copyright, or interference with any of the rights hereby granted to Company under said copyrights or renewals thereof, in his own name or in the name of Owner but at the expense of Company, and at its option, Company may join Owner as a party in such suit, action or proceeding.

_January_ IN WITNESS WHEREOF, the undersigned has executed this assignment on the _7_ day of _January_, ~~2019.~~ _2020_

_____
Charles Graeber ("**Owner**")

BOGUMILA T. ROSEBURG
NOTARY PUBLIC - STATE OF NEW YORK
NO. 01RO5671459
QUALIFIED IN QUEENS COUNTY
COMMISSION EXPIRES JANUARY 13, 20_23_

HIGHLY CONFIDENTIAL

STATE OF _New York_ )
                                    )ss.
COUNTY OF _Queens_ )

On _January 9, 2020_, before me, _Bonita T Roseburg_, a notary public, personally appeared CHARLES GRAEBER, personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

        WITNESS my hand and official seal.

                                    _[signature]_
                                    Notary Public in and for said
                                    County and State

                        BOGUMILA T. ROSEBURG
                    NOTARY PUBLIC - STATE OF NEW YORK
                            NO. 01RO5071469
                        QUALIFIED IN QUEENS COUNTY
                    COMMISSION EXPIRES JANUARY 13, 2023

HIGHLY CONFIDENTIAL

**EXHIBIT "D"**

**Publisher's Quitclaim**



**GRAND CENTRAL**
**PUBLISHING**

Grand Central Publishing,
A division of Hachette Book Group, Inc.
1290 Avenue of the Americas,
New York, NY 10104

## PUBLISHER'S RELEASE

For good and valuable consideration from 22nd Street Entertainment, LLC (the "Producer"), Grand Central Publishing, a division of Hachette Book Group, Inc. (the "Publisher"), hereby acknowledges that it has no claim or interest in worldwide dramatization rights, such as motion picture (silent, sound, talking), television, home video, radio, dramatic and theatrical performance (collectively "Production") rights, in the literary work entitled *THE GOOD NURSE. A TRUE STORY OF MEDICINE, MADNESS, AND MURDER* (the "Work") by Charles Graeber (the "Author"), or any other rights in the Work other than those rights granted to the Publisher pursuant to the publishing agreement between the Publisher and the Author dated May 22, 2019.

The Work was published by the Publisher in the United States in April 2013 and copyright has been registered in the United States Copyright Office under registration #7-731-544.

The Publisher has no objection and consents to the publication by and/or in the name of the Author or Author's licensees and assigns, throughout the world, of excerpts of the Work (but not a summary of the Work) not exceeding a total of 7,500 words or 10% of the Work (whichever is less) in the aggregate, for purposes of advertising and publicizing the Production and not for sale to consumers.

IN WITNESS WHEREOF, the undersigned has executed this instrument this 10th day of January, 2020.

Grand Central Publishing,
A division of Hachette Book Group, Inc.

By:_____
Sean Desmond
Vice President