# EXHIBIT 40

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1            IN THE UNTIED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4   ANDREA BARTZ, CHARLES           :

 5   GRAEBER, and KIRK WALLACE       :

 6   JOHNSON, individually and on    :   Case No.

 7   behalf of others similarly      :   3:24-cv-05417

 8   situated,                       :

 9            Plaintiffs,            :

10      v.                           :

11   ANTHROPIC PBC,                  :

12            Defendant.             :

13   _____X

14        CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

15

16            Remote Videotaped Deposition of

17                 BEN Y. ZHAO, PH.D.

18                Tuesday, April 8, 2025

19                    10:06 a.m.

20

21

22   Job No.: 7300646

23   Pages: 1 - 116

24   Reported By: DEBRA BOLLMAN FARFAN, RDR, CRR, CRC

25              CA CSR No. 11648
```

Page 1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          Videoconference Deposition of BEN Y. ZHAO,

2     Ph.D., held remotely:

3

4

5              Witness Location:

6              REMOTE

7

8

9

10

11         Pursuant to notice, before Debra Bollman Farfan,

12    Registered Diplomate Reporter, Registered Merit

13    Reporter, Certified Realtime Reporter, Certified

14    Realtime Captioner, and Certified Shorthand

15    Reporter No. 11648, in and for the State of

16    California.

17

18

19

20

21

22

23

24

25

                                              Page  2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1              A P P E A R A N C E S

 2

 3      ON BEHALF OF THE PLAINTIFFS ANDREA BARTZ, et

 4      al.:

 5           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

 6           BY:  DANIEL HUTCHINSON, ESQUIRE

 7                RACHEL GEMAN, ESQUIRE

 8           275 Battery Street, 29th Floor San

 9           Francisco, CA 94111-3339

10           Telephone: (415) 956-1000

11           Dhutchinson@lchb.com

12

13      ON BEHALF OF PLAINTIFFS ANDREA BARTZ, et al.:

14           SUSMAN GODFREY LLP

15           BY:  CRAIG SMYSER, ESQUIRE

16                ALEJANDRA SALINAS, ESQUIRE

17           One Manhattan West

18           New York, NY 10001-8602

19           (212) 336-8330

20           Csmyser@susmangodfrey.com

21

22

23

24

25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1        A P P E A R A N C E S   C O N T I N U E D

 2

 3     ON BEHALF OF THE DEFENDANT ANTHROPIC PBC:

 4          ARNOLD & PORTER KAYE SCHOLER LLP

 5          BY:  OSCAR RAMALLO, ESQUIRE

 6          777 South Figueroa Street

 7          44th Floor

 8          Los Angeles, CA 90017-5844

 9          Oscar.Ramallo@arnoldporter.com

10

11

12

13   ALSO PRESENT:

14     KARL JOHNSTON, ANTHROPIC IN-HOUSE COUNSEL

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1              P R O C E E D I N G S

 2                    * * * * *

 3         THE REPORTER:  Good morning, Counsel.

 4         My name is Debra Farfan, California CSR

 5    Number 11648.

 6         Please state your appearances for the

 7    record, starting with the taking attorney.

 8         MR. RAMALLO:  Good morning.  My name is

 9    Oscar Ramallo of Arnold & Porter Kaye Scholer LLP,

10    on behalf of the defendant, Anthropic PBC.  And

11    also with me is Karl Johnston, who is in-house

12    counsel at Anthropic.

13         MR. HUTCHINSON:  And for the plaintiffs and

14    proposed class, Daniel Hutchinson of Lieff Cabraser

15    Heimann & Bernstein.

16         MS. GEMAN:  On Zoom, Rachel Geman, Lieff

17    Cabraser Heimann & Bernstein.

18         MR. SMYSER:  And Craig Smyser, Susman

19    Godfrey.

20

21                    EXAMINATION

22    BY MR. RAMALLO:

23      Q.  Good morning, Dr. Zhao.

24      A.  Morning.

25      Q.  Can you please state your name and spell it
```

Page 7

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    for the record.

2        A.   Sure.  Ben Zhao, B-e-n, Z-h-a-o.

3        Q.   Have you ever been deposed before,

4    Dr. Zhao?

5        A.   I have.

6        Q.   How many times?

7        A.   Once or twice, I think.

8        Q.   Okay.  Do you recall the names of the cases

9    you were deposed in?

10       A.   Oh, off the top of my head, I actually

11   don't recall.  It's been a few years.  Right around

12   the post-pandemic years when everything was a bit

13   of a blur.

14       Q.   Did you testify in your capacity as an

15   expert witness in those cases or as a fact witness?

16       A.   As my -- in a role as an expert witness.

17       Q.   All right.  So I'll just go over a few

18   ground rules for the deposition.  Since I know you

19   have some experience, I won't go through all of the

20   typical ones.  Do you understand that just a few

21   moments ago, you took an oath to tell the truth?

22       A.   I do.

23       Q.   Do you understand that you are now sworn to

24   tell the truth just like you will be in the future

25   if there is a jury trial?

Page 8

1    datasets.  They are ANT_BARTZ_000436661 and

2    ANT_BARTZ_000436662.  Do you see that?

3         A.  Yes.

4         Q.  Okay.  I'm going to define a false positive

5    as a book whose metadata is listed in the file or

6    document ending in 61, but is not actually in the

7    LibGen/fiction dataset.  Does that make sense?

8         A.  When you say the actual LibGen dataset,

9    which dataset are you referring to?

10        Q.  Thanks for clarifying.  Yes, the Anthropic

11   dataset, Anthropic's version of LibGen.  Does that

12   make sense?

13        A.  Yes.

14        Q.  Did you do anything to determine if there

15   are false positives in ANT_BARTZ_00043661 [sic]?

16            MR. HUTCHINSON:  Objection as to form.

17            THE WITNESS:  No, I don't believe so.

18   BY MR. RAMALLO:

19        Q.  Can you tell us the rate of false

20   positives?

21        A.  I believe you just asked me the question,

22   whether I computed the false positive, and I said

23   no.

24        Q.  Fair enough.  Have you done anything to

25   compute the rate of false negatives?

Page 32

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1        A.   No.
 2             MR. RAMALLO:  All right.  Can we take a
 3    five-minute break?
 4             THE WITNESS:  Okay.
 5
 6             (Recess ensued from 10:47 a.m. to
 7     10:54 a.m.)
 8
 9    BY MR. RAMALLO:
10        Q.   Dr. Zhao, do you believe that the LibGen
11    metadata that Anthropic produced is complete,
12    accurate, and reliable?
13        A.   I have no reason to believe the opposite.
14    So, yes, I do.
15        Q.   Is the basis of that that Anthropic
16    produced it?
17        A.   Yes.
18        Q.   Is there any other basis for your belief?
19        A.   No.
20        Q.   Has Anthropic ever indicated that the
21    metadata is complete, accurate, and reliable?
22             MR. HUTCHINSON:  Objection as to form.
23             THE WITNESS:  I'm not sure.  I do not
24    believe I have communicated directly with
25    Anthropic.  They may have made such statements that
```

Page 33

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    when it first was created to mirror the Z-library.

2    Yeah.

3        Q.  Do you know if the files in there were

4    created by crowdsourcing?

5        A.  I did not analyze the process by which they

6    created that data.

7        Q.  Do you know if PiLiMi is a static dataset

8    or if it changes over time?

9        A.  I am not sure about that.  I do not have

10   specific information to answer that question.

11       Q.  Do you know what process, if any, the

12   creators of PiLiMi used to make sure that the

13   metadata is accurate?

14       A.  I do not know the creators, nor how they

15   created these datasets, so I do not have

16   information to answer that question.

17       Q.  For any of the Anthropic PiLiMi datasets,

18   did you do anything to determine the false positive

19   rate?

20       A.  I did not.

21       Q.  For any of Anthropic PiLiMi datasets, did

22   you do anything to determine the false negative

23   rate?

24       A.  I did not.

25       Q.  Have you attempted to look at PiLiMi

Page 36

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q.  By rely on, I mean it's something you

2    consider in forming your opinions in this case.

3    A.  So the question is somewhat vague.  I've

4    analyzed the dataset that Anthropic produced of the

5    Book3 data.

6    Q.  What Books3 metadata, if any, do you rely

7    on in order to determine what books exist inside of

8    Books3?

9    A.  Again, this question is somewhat vague.

10   Can you rephrase?  Yeah.

11   Q.  How do you use metadata in Books3 to

12   identify what books are in that dataset?

13   A.  I analyze the actual dataset that was

14   provided.

15   Q.  The dataset that was provided by Anthropic;

16   is that right?

17   A.  Yes.

18   Q.  Did you analyze anything other than what

19   was provided by Anthropic?

20   A.  I did not.

21   Q.  Do you know the rate of false positives in

22   what was provided by Anthropic?

23   A.  Again, I had no reason to believe that

24   Anthropic did not produce the dataset to the best

25   of their intent.  So, no, I do not.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      Q.   Did you do anything to analyze the rate of

2    false negatives in the data that was provided by

3    Anthropic?

4      A.   No.

5      Q.   Are you aware of any statements by

6    Anthropic that this data is reliable, accurate, and

7    complete?

8      A.   Again, I don't communicate directly with

9    Anthropic.  So if such statements were made, I do

10   not think I would have seen it.

11     Q.   Are you aware of any evidence that

12   Anthropic uses this data within the ordinary course

13   of its business?

14     A.   Again, I am not privy to what Anthropic

15   does with data internally.  So I do not have that

16   information.

17     Q.   Do you know the process that Anthropic went

18   through in order to generate metadata from Books3?

19     A.   I do not know.

20     Q.   So is it fair to say you don't know how

21   reliable that process is?

22        MR. HUTCHINSON:  Objection as to form.

23        THE WITNESS:  Again, the data was provided

24   by Anthropic, and I have no reason that they acted

25   in anything but good faith.  So, no, I do not

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q.  Sure.  When preparing the table in

2    paragraph 68, did you attempt to find plaintiffs'

3    books in Books3 by consulting Books3 metadata?

4    A.  I don't believe so, no.

5    Q.  Okay.  Why not?

6    A.  Because Anthropic had already admitted to

7    finding the author's information on their own in

8    Books3.

9    Q.  All right.  You also state in your report

10   that you can rely on the Atlantic's database of

11   Books3 to identify books in Anthropic's version of

12   Books3; is that correct?

13            MR. HUTCHINSON:  Objection as to form.

14            THE WITNESS:  That's a long question.  Are

15   you referring to -- I'm trying to find it.

16            Yes, right.  So I see the mention of the

17   two Atlantic articles.  Sorry.  Can you repeat the

18   question again, now that I have it in front of me?

19   BY MR. RAMALLO:

20   Q.  Sure.  So you say another way to identify

21   what books are in Books3 is to look at the Atlantic

22   tool, referenced in paragraph 50 of your

23   declaration, correct?

24   A.  Yes.

25            MR. HUTCHINSON:  Objection as to form.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
1   BY MR. RAMALLO:
2        Q.  And did you say yes?
3        A.  Yes.
4        Q.  Do you know when the Atlantic downloaded
5   its version of Books3?
6        A.  I do not know.
7        Q.  Do you know when Anthropic downloaded its
8   version of Books3?
9        A.  I believe we have source code from
10  Anthropic on the download.  I also believe we
11  have -- let's see.  I believe we have source code
12  on the actual downloading of Books3.  I do not
13  recall if there was a date stamp on the source
14  code.
15       Q.  Did you see the source code that the
16  Atlantic used to download Books3 and create its
17  search tool?
18       A.  I did not.
19       Q.  Do you know the identity of the person who
20  created the Atlantic's search tool?
21       A.  I did not.  But I do -- the article was
22  written by the author, Alex Reisner.  And if I
23  recall, he refers to, in that article, getting the
24  dataset roughly, you know, in that same year,
25  summer of that same year.  So that would have been
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    sometime summer of 2023.   But I do not know exact

2    dates.

3        Q.   Do you know Mr. Reisner's qualifications

4    for creating search tool?

5        A.   I do not.

6        Q.   Do you know if anyone might have assisted

7    Mr. Reisner in creating the search tool?

8        A.   I do not have that information.

9        Q.   Have you done anything to rule out the

10   possibility that there are books in the Atlantic's

11   version of Books3 that are not in Anthropic's

12   version?

13       A.   The question is have I done anything to

14   rule that out?

15       Q.   Correct.

16       A.   I have not.

17       Q.   Have you done anything to rule out the

18   possibility that there are books in Anthropic's

19   version of Books3 that are not in the Atlantic's

20   version?

21       A.   I have not.

22       Q.   Do you know what percentage of books in

23   Anthropic's version of Books3 are not in the

24   Atlantic's version?

25       A.   I believe you just asked me the question

Page 50

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    whether I have checked for that, and the answer was

2    no.

3        Q.   Okay.   I'm looking at paragraph 19 of your

4    declaration.   And in there you state that Shawn

5    Presser tweeted that there are 196,640 books in

6    Books3.

7            Do you see that?

8        A.   Yes, I see that.

9        Q.   And then in paragraph 20 you say that

10   Anthropic has approximately 196,640 unique files in

11   its version of Books3.   Do you see that?

12       A.   I see that.

13       Q.   My question to you is, what do you mean by

14   "approximately 196,640"?   What's the actual number

15   Anthropic has?

16       A.   To the best of my knowledge, 196,640.

17       Q.   Okay.   Why did you say "approximately" if

18   it was that specific number?

19       A.   I don't recall.

20       Q.   How did you determine the number in

21   Anthropic's version?

22       A.   I believe I counted the files.

23       Q.   Do you know how many books are in the

24   Atlantic's version of Books3?

25       A.   I do not know the exact number.

Page 51

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      Q.   I'll drop an exhibit into the chat, which
2   will be Exhibit 73.   Sorry.   I didn't drop it into
3   the chat.   I dropped it into the DropBox.
4      A.   Can you drop it into the chat, please?   I
5   do not have realtime access to the DropBox.
6      Q.   I cannot.   Do you want to take five minutes
7   to set up off the record to get you that access.
8
9          (Recess ensued from 11:29 a.m. to
10    11:42 a.m.)
11
12   BY MR. RAMALLO:
13      Q.   Do you have the exhibit, Dr. Zhao?
14      A.   Yes, I do.
15          (Deposition Exhibit No. 73 was marked for
16   identification and attached hereto.)
17      Q.   Okay.   All right.   Then I am ready.
18          Do you see Exhibit 73 on your screen,
19   Dr. Zhao?
20      A.   I do.
21      Q.   Okay.   Let's turn to page 4.
22      A.   Okay.
23      Q.   Before I do that, this is entitled, "These
24   183,000 Books Are Fueling the Biggest Fight in
25   Publishing and Tech."

Page 52

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          Do you see that?

2      A.   I see that.

3      Q.   Do you understand this article describes

4   the Books3 look-up tool that you're relying on in

5   your report?

6          MR. HUTCHINSON:   Objection as to form.

7          THE WITNESS:   Yes, I do.

8   BY MR. RAMALLO:

9      Q.   Okay.   Looking at page 4, I've highlighted

10  a sentence that says:   Of the 191,000 titles I

11  identified, 183,000 have associated author

12  information.

13         Do you see that?

14     A.   I do.

15     Q.   So that means the Atlantic's tool, at least

16  according to this page, is missing author

17  information for about 8,000 books, correct?

18         MR. HUTCHINSON:   Objection as to form.

19         THE WITNESS:   That seems a reasonable

20  assumption.

21  BY MR. RAMALLO:

22     Q.   Okay.   It says that the total number of

23  books is about 191,000, correct?

24     A.   It doesn't actually state that.   It says

25  "of the 191,000 titles I identified."

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1     Q.  Fair enough.  So he identifies 191,000

2  titles.  Do you know how many total files are in

3  his version, "his" being the Atlantic's author's

4  version of Books3?

5         MR. HUTCHINSON:  Objection as to form.

6         THE WITNESS:  I do not have that

7  information.

8  BY MR. RAMALLO:

9     Q.  Did you know that there was an earlier

10  article from the Atlantic describing the same

11  Books3 database?

12     A.  I'm sorry.  Can you clarify?  When you say

13  "earlier," earlier than what?

14     Q.  Earlier than the article shown in

15  Exhibit 73.

16     A.  Can you show me the article you're

17  referring to?

18         (Deposition Exhibit No. 74 was marked for

19         identification and attached hereto.)

20     Q.  Yes, I can.  So let me drop it in the

21  DropBox.  So I've placed in the DropBox as

22  Exhibit 74, an Atlantic article entitled,

23  "Revealed:  The Authors Whose pirated books are

24  Powering Generative AI."

25         Let me know, Dr. Zhao, when you have

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1     downloaded that successfully.

2          A.   Yes.   Yes, I have that article.

3          Q.   Okay.   Turning up to page 5, the Atlantic

4     author states:   This process revealed 190,000

5     entries.   I was able to identify more than 170,000

6     books -- about 20,000 were missing ISBNs or weren't

7     in the book database.

8               Do you see that?

9               MR. HUTCHINSON:   Objection as to form.

10              THE WITNESS:   Yes, I see where that says

11    that.

12    BY MR. RAMALLO:

13         Q.   Can you explain why the Atlantic's

14    reporting changes the number of books that can be

15    identified from 170,000 to 183,000?

16              MR. HUTCHINSON:   Objection as to form.

17              THE WITNESS:   I don't presume to understand

18    what the author meant.   I will only point out that

19    the numbers are consistent, in that

20    180-whatever-thousand-number books is more than

21    170,000, which is what's stated here.

22    BY MR. RAMALLO:

23         Q.   Go back to Exhibit 73.   I'm looking at the

24    last paragraph on page 4.   And it says:   Because of

25    inconsistencies in the spelling of author names,

Page 55

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1  the search may not return books that are, in fact,

2  in Books3.

3        Do you see that?

4     A.  I see that.

5     Q.  Do you agree that the search may not return

6  books that are, in fact, in Books3?

7        MR. HUTCHINSON:  Objection as to form.

8        THE WITNESS:  I don't presume to make

9  assumptions about the functionality of the search

10  engine and its quality.  But I believe the author's

11  statement.

12  BY MR. RAMALLO:

13     Q.  So you have no reason to dispute the

14  author's statement?

15     A.  I have no reason to dispute the author's

16  statement.

17     Q.  And you have not done any work to determine

18  the rate of false negatives in the Atlantic's

19  version of Books3, correct?

20     A.  I have not.

21     Q.  Okay.  Now, I'm looking at the last

22  sentence of Exhibit 73.  It says:  And because of

23  possible errors in the book-identification process,

24  which involves detecting an ISBN within the text of

25  the books and using a book database to find their

Page 56

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    author and title, there is a very small chance of

2    false positives.

3            Do you see that?

4        A.  I see that.

5        Q.  Do you agree that the Atlantic's version of

6    Books3 has a chance of false positives?

7        A.  I believe the author's statement as he

8    makes it in this document, yes.

9        Q.  Okay.  And to be clear, you have not

10   attempted to determine the rate of false positives

11   in the Atlantic's search tool, correct?

12       A.  I have not.

13       Q.  All right.  Your report also relies on a

14   LibGen look-up tool from the Atlantic; is that

15   correct?

16           MR. HUTCHINSON:  Objection as to form.

17           THE WITNESS:  Can you point me to the

18   specific paragraph you're referring to?

19   BY MR. RAMALLO:

20       Q.  So it's paragraph 50 refers to a LibGen

21   look-up tool in the Atlantic, correct?

22       A.  Give me one sec.

23       Q.  Sure.

24       A.  Yes, I see that.

25       Q.  Do you know when the Atlantic downloaded

Page 57

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    its version of LibGen?

2        A.   I do not have that information.

3        Q.   Do you know when Anthropic downloaded its

4    version of LibGen?

5        A.   Again, I believe we have source files

6    related to the actual download process and the

7    torrents.   I do not recall if they have specific

8    timestamps or mention specific dates in them.

9        Q.   You have not seen the code that the

10   Atlantic used to download or create its search tool

11   or database, right?

12       A.   I have -- no, I have not.

13       Q.   Do you know the identity of the person who

14   created the Atlantic's search tool?

15       A.   I do not.

16       Q.   Do you know that person's qualifications?

17       A.   I do not.

18            (Deposition Exhibit No.  75 was marked for

19            identification and attached hereto.)

20       Q.   Okay.   I'm going to drop Exhibit 75 into

21   the DropBox.   And this is a Atlantic article

22   entitled, "Search LibGen, the Pirated-Books

23   Database That Meta Used to Train AI."

24            Let me know when you have that, Dr. Zhao.

25            I saw you nod, do you have it?

Page 58

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          A.   Yes, I just got it, yeah.

2          Q.   Great.

3               This is the article you cite in your

4     declaration, correct?

5          A.   Let me double-check real quick.

6               Yes.   That seems to be the case.

7          Q.   I'm at page 3 of Exhibit 75.   There

8     contains a disclaimer that says:   Disclaimer:

9     LibGen contains errors.   You may, for example, find

10    that list -- you may, for example, find books that

11    list incorrect authors.   The search tool is meant

12    to reflect material that could be used to train AI

13    programs, and that includes materials containing

14    mistakes and inaccuracies.

15              Do you see that?

16         A.   I do.

17         Q.   Before signing your declaration, did you

18    read that disclaimer?

19         A.   I believe I have read this article, yes.

20         Q.   The disclaimer says that the tool contains

21    mistakes and inaccuracies, right?

22         A.   What tool are you referring to?

23         Q.   The tool to search through LibGen.

24         A.   I don't believe that's -- I'm sorry.   Which

25    sentence are you referring to?   I don't believe

Page 59

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    that's stated by the disclaimer.

2        Q.    "This search tool is meant to reflect

3    material that could be used to train AI programs,

4    and that includes material containing mistakes and

5    inaccuracies."

6            Do you see that?

7        A.    Yes.

8        Q.    And you did not mention the disclaimer in

9    your declaration, right?

10       A.    I don't believe that statement says what

11   you said it says.    This statement says that the

12   search tool is meant to reflect material that could

13   contain mistakes and inaccuracies.    It does not say

14   this search tool is inaccurate.

15       Q.    Okay.    So is it your understanding that The

16   Atlantic's LibGen search tool is 100 percent

17   accurate in identifying the contents of the LibGen

18   dataset that The Atlantic has?

19       A.    I'm sorry.    Could you rephrase that

20   question?

21       Q.    Do you believe that The Atlantic's search

22   tool is 100 percent accurate and reliable in

23   identifying what books are in the Atlantic's LibGen

24   dataset?

25       A.    I do not have that information.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      Q.   Okay.   And you did not present any evidence

2   or opinion in your declaration that disagrees with

3   any part of the disclaimer, correct?

4      A.   Let me see.

5           I don't believe I made express statements

6   to say that, no.

7      Q.   If I told you that Anthropic acquired its

8   LibGen datasets in 2021, would it make you doubt

9   the reliability of using The Atlantic's 2025

10  version of LibGen to talk about the contents of

11  Anthropic's version of LibGen?

12     A.   Are we speaking in hypotheticals?

13     Q.   Yes.

14     A.   I have no idea what I would react to it if

15  you said that.   Are you making that statement?

16     Q.   I am making a hypothetical, correct.

17     A.   I guess I don't know what I would react to

18  in a hypothetical.   My statements are all in the

19  report.

20     Q.   All right.   Looking at the rest of the

21  disclaimer, it says:   It's impossible to know

22  exactly which parts of LibGen Meta used to train

23  its AI, and which parts it might have decided to

24  exclude; this snapshot was taken in January 2025,

25  after Meta is known to have accessed the database,

Page 61

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    so some titles here would not have been available
2    to download.
3              Do you see that?
4        A.   I see that.
5        Q.   Do you have any reason to dispute that The
6    Atlantic has a snapshot of LibGen taken in
7    January 2025?
8        A.   No.   I have no reason to disagree with the
9    author to their statement.
10       Q.   Okay.   And assuming that it's true that
11   Anthropic acquired LibGen datasets in 2021, would
12   that make you doubt the reliability of using The
13   Atlantic's search tool in order to determine the
14   contents of Anthropic's LibGen datasets?
15       A.   No.
16       Q.   Why not?
17       A.   I don't have reason to believe -- can you
18   repeat the full question again?   It was rather
19   long.
20       Q.   Okay.   Maybe -- are you aware that LibGen
21   is a collection that is constantly growing to add
22   new books?
23       A.   Sorry.   My little USB thing here is acting
24   up.   My apologies.
25             Can you repeat the question again?

                                        Page 62

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q.  Do you know that LibGen, as a collection,
2  is constantly growing and adding new books?
3    A.  I don't believe LibGen currently is active,
4  so I disagree with that statement.
5    Q.  Do you have specific evidence that no books
6  were added to LibGen between 2021 and 2025?
7    A.  I don't have information either way.
8    Q.  If it were true, that books were added to
9  LibGen after Anthropic acquired LibGen, but before
10  The Atlantic acquired LibGen, that would cause
11  reliability issues in using The Atlantic search
12  tool to determine the contents of Anthropic's
13  version of LibGen, correct?
14    A.  Are you making that statement, or is this a
15  hypothetical?  I'm not aware of any information
16  about this.
17    Q.  It's a hypothetical.
18        Can you answer the hypothetical, please?
19    A.  I would rather not speculate.  I don't have
20  information based on what I know of as to this
21  particular statement, so I'd rather not make a
22  hypothetical -- react to a hypothetical.
23    Q.  Okay.  So if there were one million more
24  books in The Atlantic's version of LibGen than in
25  Anthropic's version of LibGen, you would see no

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1   issue in still relying on The Atlantic's tool to
2   identify what is Anthropic's version?   Is that what
3   I'm hearing?
4       A.   No, that's not what you're hearing.   I'm
5   stating that I have no information about whether
6   the LibGen database changed in that time period.
7   So I can't entertain a hypothetical.   If cats were
8   dogs, would I be testifying today?   I honestly have
9   no information about that question.   So I wouldn't
10  be able to answer.
11           (Deposition Exhibit No. 76 was marked for
12           identification and attached hereto.)
13      Q.   I've put in the DropBox Exhibit 76.   And
14  Exhibit 76 is a printout from the Library Genesis
15  website, libgen.rs, from April 7, 2025.
16           Do you have that, Dr. Zhao?
17      A.   Yeah.   I'm trying to -- give me one second.
18  I'm trying to download it.
19      Q.   Sure.
20      A.   Okay, I have it.
21           MR. HUTCHINSON:   I'll have a standing
22  objection as to form with any questions regarding
23  this exhibit document.
24  BY MR. RAMALLO:
25      Q.   Okay.   All right.   Do you see on page 8

Page 64

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    this document indicates on the second line that

2    there is a book by Bikram Kashari Pattanaik,

3    published in the year 2025 that is inside of

4    LibGen?

5        A.   Can you point to it?   There's a lot of

6    table entries here.

7        Q.   Are you seeing that?

8        A.   Okay.   "Fundamentals of Rural Development"?

9        Q.   Yes.

10       A.   Okay.   I see that, yes.

11       Q.   So common sense would tell us that a book

12   published in 2025 could not have been added to

13   LibGen in 2021, correct?

14       A.   Is that what this table denotes?

15       Q.   That's correct.

16            Do you have any specific evidence that

17   LibGen has remained static since 2021?

18       A.   I do not.

19       Q.   Okay.   So would you agree that if LibGen

20   has changed since 2021, that would cause a

21   reliability problem in using a tool that is based

22   on a 2025 version of LibGen, wouldn't you?

23       A.   I'm missing the logic here.   Why?

24       Q.   Because more books can be added to the

25   later version of the database than the version

Page 65

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Anthropic had.

2           Wouldn't you agree that would create a

3    reliability problem?

4       A.   Can you specify what you mean by

5    "reliability problem"?   The search engine is

6    providing what its supposed to provide.   So it is

7    reliable?

8       Q.   Let me ask it this way.

9           Do you know what percentage of books in

10   either of Anthropic's two LibGen datasets are not

11   in The Atlantic's version of LibGen?

12      A.   I do not know.

13      Q.   Do you know the percentage of books in The

14   Atlantic's version of LibGen that are not in either

15   of Anthropic's two LibGen dataset?

16      A.   I don't have that information.

17      Q.   Putting aside any potential differences

18   between Anthropic's and The Atlantic's version of

19   LibGen, do you know how many books that really are

20   in The Atlantic's version of LibGen will not show

21   up through The Atlantic search tool?

22      A.   I'm sorry.   Can you repeat that question

23   again?

24      Q.   Let me try to make a shorter version of it.

25      A.   Yes, please.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q.   Have you ever attempted to determine the
2  number of false negatives that would arise in using
3  LibGen's search tool -- I'm sorry -- The Atlantic's
4  LibGen search tool?
5    A.   False negatives meaning the number of books
6  that go beyond -- that exist beyond what the search
7  engine is responding with?
8    Q.   Correct.
9    A.   No, I have not.
10    Q.   Have you ever attempted to determine the
11  number of false positives in The Atlantic's LibGen
12  search tool?
13    A.   And by "false positives" in this context,
14  you mean?  Can you specify?
15    Q.   A book that is returned as being inside of
16  LibGen by The Atlantic search tool but is, in fact,
17  not in there.
18    A.   I have not.
19    Q.   Okay.  Turning back to Exhibit 72, which is
20  your report.  In there you describe a book hashing
21  method, correct?
22    A.   Yes.
23    Q.   Did you attempt to use your hash method to
24  find plaintiffs' books within the scanned book
25  class?

Page 67

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1              THE WITNESS:  I do not.
 2    BY MR. RAMALLO:
 3        Q.  You do not present a plan in your
 4    declaration for determining or acquiring all of the
 5    books that meet criteria A and C, correct?
 6              MR. HUTCHINSON:  Objection as to form.
 7              THE WITNESS:  I'm sorry.  Can you repeat
 8    that question?
 9    BY MR. RAMALLO:
10        Q.  Do you present a plan in your declaration
11    for identifying all of the books that meet both
12    criterias A and C?
13        A.  Do I have -- did I present a plan?  I'm not
14    quite sure what you mean.  What kind of plan are
15    you referring to?  Like an algorithm?  I'm a little
16    confused.
17        Q.  You have not stated in any way how to
18    identify all of the books that meet both criteria A
19    and C; isn't that right?  Whether it's an
20    algorithm, whether it's through magic spells, there
21    is nothing in your declaration that tells you how
22    to do that, correct?
23              MR. HUTCHINSON:  Objection as to form.
24              THE WITNESS:  That's correct.  However,
25    again, I would point out that item D is far more
```

Page 71

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    specific than either of those.  And because the

2    class, as I understood it, is defined with sets of

3    books that satisfy all A, B, C, and D, I don't need

4    to only merely satisfy some subset.  Especially

5    since D is far more specific.

6    BY MR. RAMALLO:

7        Q.  Okay.  Wouldn't it be circular to rely on D

8    to narrow the list, because it assumes the very

9    thing that you're looking for?  Whether the book

10   was downloaded by Anthropic as part of one of the

11   datasets at issue?

12       A.  No.

13           MR. HUTCHINSON:  Objection as to form.

14           THE WITNESS:  Why would it be circular?

15   BY MR. RAMALLO:

16       Q.  How could you use D to narrow down the

17   universe of books that you need to test to

18   determine whether they were downloaded by Anthropic

19   in Books3 Library Genesis or Pirate Library Mirror?

20           MR. HUTCHINSON:  Objection as to form.

21           THE WITNESS:  I guess I'm confused.  I

22   don't understand why this is in question.  This

23   data was provided to us by Anthropic.

24   BY MR. RAMALLO:

25       Q.  What data are you referring to?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    especially with LibGen and PiLiMi along with their

2    dataset, is that not self-explanatory?

3        Q.   I'm asking about using your hash method.

4    And I believe you're telling me you can look at

5    metadata, which is an entirely different method.

6    Does that help clarify where we're maybe talking

7    past each other?

8        A.   Perhaps.  So we're talking about the hash

9    method.  All right.  The hash method is just one of

10   multiple schemes that you can use -- a common

11   method that you can use to identify whether a book

12   is in a particular dataset.

13       Q.   Okay.  So let's assume that we were only

14   going to use the hash method to determine whether a

15   book is in a dataset.  Can you do that?

16       A.   Okay.

17       Q.   If you make that assumption, isn't it true

18   that in order to determine the complete contents of

19   the dataset, you would need a digitized copy of

20   every book that may or may not be within the

21   dataset under investigation, correct?

22       A.   I think there's a little leap here.  You

23   were saying in order to construct a complete --

24   what were the words you used?  In order to

25   construct to complete what?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      Q.   Determine the complete contents of the
2    database.
3      A.   Right.  So I don't believe the hash
4    algorithm is designed to do that.  The hash
5    algorithm is designed to take any book that you may
6    have a sample of and use it to determine whether it
7    matches something in the dataset.
8      Q.   Okay.  I think I understand you.
9           So the point is, is that the hash method,
10   by itself, cannot be used to determine the complete
11   contents of a dataset?
12         MR. HUTCHINSON:  Objection as to form.
13         THE WITNESS:  I don't believe that's true
14   either.  I'm just stating what the algorithm was
15   designed to do.  It is designed to take a book that
16   you have on hand, digitally or hard copy, and run
17   it through the algorithm in order to determine
18   whether it matches something in the database.
19   BY MR. RAMALLO:
20     Q.   Isn't it true that in order to use the hash
21   method, and no other methodology, to determine the
22   complete contents of the database, or dataset under
23   consideration, you would need a digitized copy of
24   every book that may or may not be within the
25   dataset?

Page 75

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          A.    I'm sorry.   That is an awfully long

2    statement with quite a bit of parenthetical

3    phrases.   I honestly couldn't provide that

4    guarantee.   I'm not sure that I caught all the

5    phrases.

6          Q.    If I wanted to know if Catch 22 was in

7    Books3, using the hash method, I would need a

8    digitized copy of Catch 22, correct?

9          A.    Yes.

10         Q.    Okay.   And just having a digitized copy of

11   Catch 22 doesn't tell me whether or not East of

12   Eden is in the dataset, correct?   Using the hash

13   method, correct?

14         A.    Yes.

15         Q.    In order to rule out East of Eden, you

16   would also need a digitized copy of East of Eden to

17   run the hash method, correct?

18         A.    Yes.

19         Q.    And that would be true for any other book

20   ever written, correct?   In order to rule it out or

21   in, I would need a digitized copy of that book if I

22   was relying solely on the hash method, correct?

23         A.    If you were relying solely on the hash

24   method, yes.

25         Q.    Okay.   Let's assume your hash algorithm is

                                           Page 76

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

 1   please ask the question again.

 2       Q.   Would your hash method, as modified, to not

 3   throw out sentences of ten words or less, detect

 4   those two sentences as different from each other?

 5            MR. HUTCHINSON:  Objection as to form.

 6            THE WITNESS:  It would not.  But, again,

 7   let me repeat that that is not my hash method.

 8   When you modify my algorithm, it is no longer my

 9   algorithm.

10   BY MR. RAMALLO:

11       Q.   Okay.  And I want to make sure we have a

12   clear record.

13            As modified, it would say the sentences are

14   different, correct?

15       A.   No.  It would say the sentences are the

16   same.

17       Q.   So "The door is blue," all with one space,

18   would be the same as "The door is blue" with two

19   spaces between "is" and "blue."  Is that your

20   testimony?

21       A.   They would be identified as the same

22   sentence, yes.

23       Q.   Okay.  Does your source code have any steps

24   for normalizing multiple spaces into a single

25   space?

Page 79

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1        A.   It does.
 2        Q.   And what is that method?
 3        A.   It strips out twice spaces as tokens.
 4        Q.   When testing plaintiffs' books, is it
 5   correct that you use .TXT files to run plaintiffs'
 6   books through your hash method?
 7        A.   I'm sorry.  Can you be more specific what
 8   you mean?
 9        Q.   Yeah.
10            Is it correct -- is it correct that you
11   used your hash method to determine whether
12   plaintiffs' books were in various Anthropic
13   datasets?
14        A.   I'm sorry.  I was -- I thought there was
15   more to the question.  That was the end?
16        Q.   That's the end, yes.
17        A.   I apologize.  Can you repeat again?  I'm
18   sorry.  I'm not trying to be a pain, it's just I
19   thought there was a second phrase coming, and I
20   wasn't -- I missed it.
21        Q.   Did you use your hash method to test
22   whether plaintiffs' books were in one or more of
23   Anthropic's various datasets?
24        A.   Yes.
25        Q.   And when doing that, did you use a .TXT
```

Page 80

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    sentences would be different, if that is the

2    question.

3        Q.  Okay.  Have you done any validation testing

4    to determine how often those types of differences

5    in hash codes would result in false negatives in

6    your hash method?

7        A.  We have tested our algorithm and visualized

8    some of the results.  So, yes, we have taken a look

9    at how often OCR errors produce different hash

10   results for individual sentences.

11       Q.  Okay.  Explain to me what process you used

12   to conduct the testing that you just described.

13       A.  We have run the hash algorithm on samples

14   of files that we believe, based on metadata, to

15   represent the same file, and then we have analyzed

16   the percentage of sentence hash codes that match or

17   do not match with the overall set of hash codes.

18       Q.  How many sample files did you use to

19   conduct that testing?

20       A.  I don't recall the exact number.

21       Q.  And that exact number is not described in

22   your report, correct?

23       A.  Let me check.

24           No, I don't believe we stated that number

25   in the report.

Page 84

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      Q.   Okay.   Did you consult with a statistician
2    to determine if you used an adequate number of test
3    samples?
4      A.   No.
5      Q.   Did you, yourself, or anyone on your team,
6    conduct any statistical analysis to ensure that you
7    used a sufficient number of test samples to
8    validate your methodology?
9      A.   We conducted enough testing to be convinced
10   that it was representative of the overall dataset.
11     Q.   To be clear, that's for you to be
12   subjectively convinced, but you did not conduct any
13   formal statistical analysis, correct?
14     A.   Yes.   This is based on my expertise and my
15   knowledge of the area.
16     Q.   Okay.   Are you aware of any research papers
17   that say a method can be validated based on the
18   creator's expertise, rather than through
19   statistically validated testing?
20     A.   There are numerous statistical methods for
21   validating experimental methods.   And to the extent
22   that we use them as scientists and as researchers,
23   which ones we use and how we use them to our
24   satisfaction is based on our expertise and
25   knowledge of the area.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q.   Okay.  Can you identify me a research paper

2   that supports what you just said?

3    A.   I don't believe people write research

4   papers about research methodology.  This is common

5   to research methodology.

6    Q.   Is it correct that your hash method

7   methodology does not care where in the book a

8   sentence appears?

9    A.   Let me check my report.  One sec.

10   Can you repeat the question again?

11    Q.   Is it correct that your hash method does

12   not care where in the book a sentence appears?

13    A.   That is correct.

14    Q.   Have you done any validation testing to

15   determine the amount of false positives that result

16   from the hash method being agnostic about the

17   location of sentences in the books under

18   comparison?

19    A.   No, based on my belief that there are not

20   multiple copies of identical books with sentences

21   transposed in order.

22    Q.   As we discussed, your hash method does not

23   compare sentences of fewer than ten words; is that

24   correct?

25    A.   That is correct.

Page 86

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q.   Why did you pick the number ten?

2    A.   Because we believe that a smaller number

3    would have been fine in order to remove the common

4    sentences that could provide false positives.   But

5    we went extra high in order to reduce, beyond all

6    doubt, the likelihood of false positives in

7    matching.   So we wanted a more conservative

8    algorithm.   So we chose a number that we believe is

9    higher than necessary.

10    Q.   Have you done any validation testing to

11    determine the rate of false positives that occur

12    when you set that --

13    A.   We have.

14    Q.   You have?

15    A.   We have.

16    Q.   What was that validation testing?

17    A.   How detailed do you want the process?

18    Q.   Well, give me two sentences overview, and

19    we'll start there.

20    A.   Okay.   We took lots of files that we had a

21    reasonable belief about what was in them.   We

22    matched them against each other.   We looked at the

23    results, and we looked visual inspection to confirm

24    that there were not false positives.

25    Q.   Okay.   Okay.   What was the rate of false

Page 87

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    positives?

2        A.   At the current parameters that we put into

3    the -- we described in the report, zero.

4        Q.   How many files did you test in your

5    validation testing?

6        A.   I don't have the exact number in front of

7    me.

8        Q.   Okay.   And did you, or someone on your

9    team, or a statistician do an analysis to determine

10   whether you used an adequate number of test files?

11       A.   Can you repeat the last part of that

12   sentence again?   I think I missed a word.

13       Q.   Did you or someone on your team or a

14   statistician do a statistical analysis to determine

15   whether you used an adequate number of test files

16   in your validation testing?

17       A.   No.   We used our best judgment.

18       Q.   Can you point me to a research paper that

19   says you can use your best judgment instead of a

20   statistical analysis?

21       A.   I would assert that using our best judgment

22   as researchers is implicit in basically every

23   research paper that we write.

24       Q.   But you can't point me to a specific paper

25   that supports what you say; is that correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    A.  I don't have information regarding that.

2    This statement is true, to the best of my

3    knowledge.

4    Q.  Okay.  So let's look at paragraph 44.  You

5    cited five documents with metadata -- you cited

6    five documents with the metadata in question in

7    paragraph 44 of your declaration, correct?

8    A.  Yes.

9    Q.  And after that you quote a discovery

10   response that says:  Anthropic produced a report of

11   metadata identifying author, title, and ISBN (where

12   available) for all books that it had purchased and

13   scanned at -- and then it gives a long Bates

14   number.

15       Do you see that?

16   A.  Yes.

17   Q.  So that is saying Anthropic has provided

18   metadata where available, not 100 percent

19   comprehensive metadata, correct?

20   A.  Yes.

21   Q.  Are you aware of any discovery response in

22   which Anthropic states it has complete metadata for

23   all books that fall within the scanned books class?

24   A.  I am not aware of such a statement.

25   Q.  Did you check the metadata in the scanned

Page 98

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1              UNTIED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3
 4   ANDREA BARTZ, et al.,          )
                                    )
 5               Plaintiffs,        )
                                    )
 6          vs.                     )
                                    ) CASE No.
 7   ANTHROPIC PBC,                 ) 3:24-cv-05417
                                    )
 8               Defendant.         )
     _____    )
 9
10          I, DEBRA BOLLMAN FARFAN, CSR No. 11648, in
11   and for the State of California, do hereby certify
12   that the foregoing is a true and accurate
13   transcript of the proceedings taken down by me in
14   shorthand and thereafter reduced to typewritten
15   form, on Tuesday, April 8, 2025, as thereon stated.
16   And the same is a true, correct, and complete
17   transcript of the testimony at said proceedings.
18          I further certify that I am not interested
19   in the event of the action.
20          Executed at Norco, California, on the
21   9th of April, 2025.
22
23
24
            DEBRA BOLLMAN FARFAN, CSR 11648
25          RMR, RDR, CRR, CRC
```

                                        Page 114