Justin A. Nelson (*pro hac vice*)
Alejandra C. Salinas *(pro hac vice)*
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (SBN 316062)
Michael Adamson (SBN 321754)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
rnath@susmangodfrey.com
madamson@susmangodfrey.com

Samir Doshi*
J. Craig Smyser*
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 51st Floor,
New York, NY 10001-8602
Telephone: (212) 336-8330
sdoshi@susmangodfrey.com
csmyser@susmangodfrey.com

Jordan W. Connors*
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101-2683
Telephone: (206) 516-3880
jconnors@susmangodfrey.com

*Co-Lead Class Counsel*
*(Pro Hac Vice)*

Rachel Geman *(pro hac vice)*
Jacob S. Miller *(pro hac vice)*
Danna Z. Elmasry *(pro hac vice)*
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
rgeman@lchb.com
jmiller@lchb.com
delmasry@lchb.com

Elizabeth J. Cabraser (SBN 083151)
Daniel M. Hutchinson (SBN 239458)
Jallé H. Dafa (SBN 290637)
Amelia Haselkorn (SBN 339633)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
ecabraser@lchb.com
dhutchinson@lchb.com
jdafa@lchb.com
ahaselkorn@lchb.com

Betsy A. Sugar*
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
222 Second Ave., #1640
Nashville, TN 37201-2375
Telephone: (615) 313-9000
bsugar@lchb.com

*Co-Lead Class Counsel*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA BARTZ, ANDREA BARTZ, INC., CHARLES GRAEBER, KIRK WALLACE JOHNSON, and MJ + KJ, INC., individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br> Defendant. | Case No.: 3:24-cv-05417-AMO <br><br> **NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF SETTLEMENT** <br><br> Date: April 23, 2026 <br> Time: 2:00 PM <br> Judge: Hon. Araceli Martínez-Olguín |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 23, 2026 at 2:00PM in Courtroom 10—19th Floor of the Phillip Burton Federal Building at 450 Golden Gate Avenue San Francisco, CA 94102, Plaintiffs Andrea Bartz, Inc., Charles Graeber, and MJ + KJ Inc. ("Plaintiffs") and Class Counsel, on behalf of the Class, will and hereby do move the Court for an order granting final approval of the Class Action Settlement.

This Motion is based upon this Notice of Motion; the Memorandum of Points and Authorities in Support thereof; the Declarations of Class Counsel, the Notice and Claims Administrator, and the additional Declarations submitted herewith from organizations that support the Settlement or assisted with Notice; the Court's Preliminary Approval Orders, both written and verbal (Dkts. 427, 437); and the records, pleadings, and papers filed in this action and in the related Ninth Circuit litigation (No. 25-4843 (9th Cir.)); and upon such argument as may be presented to the Court at the hearing of this motion.

## STATEMENT OF ISSUE TO BE DECIDED

This Motion raises the following issue:

Whether the Court should grant final approval of the preliminarily approved Settlement in this class action case.

Dated: March 19, 2026

By: */s/ Justin A. Nelson*
Justin A. Nelson (*pro hac vice*)
Alejandra C. Salinas (*pro hac vice*)
**SUSMAN GODFREY L.L.P**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (SBN 316062)
Michael Adamson (SBN 321754)
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
RNath@susmangodfrey.com
MAdamson@susmangodfrey.com

J. Craig Smyser (*pro hac vice*)
Samir H. Doshi (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 51st Floor,
New York, NY 10001
Telephone: (212) 336-8330
csmyser@susmangodfrey.com
sdoshi@susmangodfrey.com


*Co-Lead Counsel*

By: */s/ Rachel Geman*
Rachel Geman (*pro hac vice*)
Jacob S. Miller (*pro hac vice*)
Danna Z. Elmasry (*pro hac vice*)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
rgeman@lchb.com
jmiller@lchb.com
delmasry@lchb.com

Elizabeth J. Cabraser (SBN 83151)
Daniel M. Hutchinson (SBN 239458)
Jallé H. Dafa (SBN 290637)
Amelia Haselkorn (SBN 339633)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
dhutchinson@lchb.com
jdafa@lchb.com
ahaselkorn@lchb.com

Betsy A. Sugar* (*pro hac vice*)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
222 2nd Avenue S., Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com

*Co-Lead Counsel*

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ...................................................................................... 1

STATEMENT OF ISSUE TO BE DECIDED............................................................................. 1

MEMORANDUM IN SUPPORT OF MOTION ....................................................................... 1

    I.   INTRODUCTION ....................................................................................................... 1

        A.    Principal Terms of the Settlement.................................................................. 2

            i.    Historic Settlement Fund: Non-Reversionary Fund of $1.5 Billion .............. 2

            ii.    Substantial Prospective Relief ..................................................................... 2

            iii.   Limited Release: Past Release of Non-Output Claims Only ........................ 2

        B.    Case Background ........................................................................................... 3

            i.    The Complaint and the Extensive Discovery that Followed ........................ 3

            ii.    The Many Disputed Motions on Novel Legal Issues.................................... 4

            iii.   Negotiation of the Settlement ...................................................................... 6

            iv.   Trial Preparation ......................................................................................... 6

            v.    The Court's Preliminary Approval of the Settlement ................................... 6

        C.    Administration of the Settlement ................................................................... 7

            i.    Preliminarily Approved Plan of Allocation and Distribution ...................... 7

            ii.    Notice Program ........................................................................................... 7

            iii.   Assisting Class Members............................................................................. 9

            iv.   Key Statistics: Claims, Opt-Outs, and Objections ....................................... 9

    II.  LEGAL STANDARD.................................................................................................. 9

    III. ARGUMENT ........................................................................................................... 10

        A.    The Rule 23(e)(2) Factors Are Satisfied ................................................... 10

            i.    Adequate Representation by Class Representatives and Class Counsel...... 10

            ii.    The Settlement Was Negotiated At Arm's Length ..................................... 11

            iii.   The Relief Provided To The Class Is Outstanding .................................... 11

            iv.   The Settlement Treats Class Members Equitably....................................... 13

        B.    The *Churchill* Factors are Satisfied .......................................................... 13

            i.    Plaintiffs' case and the risks of further litigation........................................ 13

            ii.    The risk of maintaining class action status throughout the trial ................. 13

            iii.   The amount offered in settlement ............................................................... 14

            iv.   The extent of discovery completed and the stage of the proceedings.......... 14

            v.    The experience and views of counsel ........................................................ 14

            vi.   The presence of a governmental participant ............................................... 15

            vii.  The reaction of the class members to the proposed s.................................. 15

C.    The Northern District of California's Procedural Guidelines are Satisfied .......... 16

    i.    The Best Practicable Notice Plan Has Been Successfully Implemented ..... 16

D.    The Objections To The Settlement Do Not Counsel Against Final Approval ..... 16

    i.    Objections to the Settlement Amount ........................................................... 17

    ii.    Objections to the Attorneys' Fees Request .................................................. 18

    iii.    Expansions to the Class Definition ............................................................. 19

    iv.    Miscellaneous Objections ........................................................................... 20

IV. CONCLUSION ................................................................................................. 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aguilar Auto Repair, Inc. v. Wells Fargo Bank, N.A.*,
2025 WL 1753509 (N.D. Cal. May 23, 2025) ...............................................................11, 13, 14

*Allen v. Bedolla*,
787 F.3d 1218 (9th Cir. 2015) .......................................................................................17

*Altamirano v. Shaw Indus., Inc.*,
2016 WL 1271046 (N.D. Cal. Mar. 31, 2016).........................................................................14

*Authors Guild v. OpenAI, Inc.*,
No. 23-cv-8292 (S.D.N.Y.)...........................................................................................22, 23

*Bayat v. Bank of the West*,
2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) ..........................................................................14

*C.H. by & through Hubbard v. Google LLC*,
2026 WL 92063 (N.D. Cal. Jan. 13, 2026).........................................................................14

*Carlotti v. ASUS Computer Int'l*,
2019 WL 6134910 (N.D. Cal. Nov. 19, 2019) ......................................................................10

*Chun-Hoon v. McKee Foods Corp.*,
716 F. Supp. 2d 848 (N.D. Cal. 2010) ...........................................................................15, 16

*Churchill Vill., L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004) ................................................................................. *passim*

*Cottle v. Plaid Inc.*,
340 F.R.D. 356 (N.D. Cal. 2021).......................................................................................18

*Etter v. Thetford Corp.*,
2016 WL 11745096 (C.D. Cal. Oct. 24, 2016).....................................................................20

*Garner v. State Farm Mut. Auto. Ins. Co.*,
2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .............................................................11, 13, 14

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .......................................................................................17

*Hopson v. Hanesbrands Inc.*,
2009 WL 928133 (N.D. Cal. Apr. 3, 2009) ...........................................................................12

*In re California Pizza Kitchen Data Breach Litig.*,
129 F.4th 667 (9th Cir. 2025) ........................................................................................9

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    2020 WL 1873554 (N.D. Cal. Mar. 11, 2020)...................................................................19

*In re Google LLC St. View Elec. Commc'ns Litig.*,
    611 F. Supp. 3d 872 (N.D. Cal. 2020) ................................................................................10

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
    2013 WL 5275618 (S.D. Cal. Sept. 17, 2013).....................................................................20

*In re Korean Air Lines Co. Antitrust Litig.*,
    2013 WL 7985367 (C.D. Cal. Dec. 23, 2013)......................................................................20

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010,*
    910 F. Supp. 2d 891 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) ..............................................................................................19

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2007) ..............................................................................14

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ..............................................................................................18

*Isquierdo v. W.G. Hall, LLC*,
    2017 WL 4390250 (N.D. Cal. Oct. 3, 2017)...........................................................12, 14, 15

*Kent v. Hewlett-Packard Co.*,
    2011 WL 4403717 (N.D. Cal. Sept. 20, 2011) ...................................................................20

*Kulik v. NMCI Med. Clinic Inc.*,
    2023 WL 2503539 (N.D. Cal. Mar. 13, 2023)........................................................13, 14, 16, 17

*Larsen v. Trader Joe's Co.*,
    No. 11-cv-05188, 2014 WL 3404531 (N.D. Cal. Jul. 11, 2014) ...........................................14

*Messineo v. Ocwen Loan Servicing, LLC*,
    2017 WL 733219, at *7 (N.D. Cal. Feb. 24, 2017) .............................................................12

*Nado v. John Muir Health*,
    2026 WL 82232 (N.D. Cal. Jan. 12, 2026).............................................................9, 13, 15, 16

*Ochinero v. Ladera Lending, Inc.*,
    2021 WL 4460334 (C.D. Cal. July 19, 2021).......................................................................10

*Officers for Justice v. Civ. Serv. Comm'n of City and County of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) ..............................................................................................18

*Padron v. Golden State Phone & Wireless*,
    2018 WL 2234550 (N.D. Cal. May 16, 2018)...............................................................10, 15

*Reed v. 1-800 Contacts, Inc.*,
    2014 WL 29011 (S.D. Cal. Jan. 2, 2014)............................................................................15

**Statutes**

17 U.S.C. § 410(c) ...............................................................................................................20

17 U.S.C. § 412 ....................................................................................................................20

17 U.S.C. § 501(b) ..........................................................................................................22, 23

17 U.S.C. § 504(c) .......................................................................................................11, 12, 20

28 U.S.C. § 1292(b) ...............................................................................................................5, 12

Sprigman, Christopher Jon, Statutory Damages Under the Copyright Act ....................................11

**Rules**

Fed. R. Civ. P. 23 ..........................................................................................................11, 13, 16

Fed. R. Civ. P. 26 ..................................................................................................................23

**Other Authorities**

Anthropic Settlement, COPYRIGHT ALLIANCE (Oct. 28, 2025),
https://tinyurl.com/Participating-Bartz ..........................................................................................8

*First-of-its-kind AI Copyright Infringement Lawsuit,* NPR (Sept. 5, 2025),
https://tinyurl.com/first-of-its-kind .............................................................................................8

## MEMORANDUM IN SUPPORT OF MOTION

### I.    INTRODUCTION

Plaintiffs move for final approval of this historic, "home run" Settlement. Since preliminary approval, Class Members have voted overwhelmingly to accept it. In addition to regular class notice and a robust advertising notice campaign, this Settlement has generated extensive press coverage—both in the most prominent mainstream press outlets like the *New York Times* and *Washington Post* as well as specialized media focused on the publishing industry and the writing community. Third parties ran sophisticated campaigns soliciting opt-outs. Class Members encompass some of the most sophisticated parties, such as authors who follow AI developments carefully and large corporations who have a duty to maximize shareholder value.

The class has spoken. Fewer than 0.4% of the Class Works have been opted out. Authors and publishers have submitted claims for more than 54% of the Class Works—an extraordinary figure—with 11 days still left in the claims period and some of the largest class members expected to claim. This overwhelming support for the settlement reflects its merit: an unprecedented $1.5+ billion monetary recovery, over $3,000 per work; Anthropic's certification that it did not use copies of the pirated books in any released model and its promised destruction of Class Members' pirated works; the limited, "tailored" release imposed; and a fair and efficient method of distributing the recovery. The Settlement Administrator distributed notice of this exceptional Settlement far and wide; 506,194 potential Class Members were sent notice not returned as undeliverable, representing 99.5% of the Works on the Works list.  Keough Supp. Decl. ¶ 79.

Judge Alsup orally granted preliminary approval of the Settlement on September 25, 2025, Dkt. 427, subsequently confirming in a written order that the "settlement is within the range likely to be granted final approval." Dkt. 437. The Settlement is "fair, adequate, and reasonable," Judge Alsup explained, because of its "tailored release, injunctive relief, and per-work award"; the "prompt closure" it provides; the "extensive" discovery and "arm's length" negotiation that preceded it; and the "equitabl[e]" method of distribution it offers. *Id.* at 4-7. "I don't see how you can get a better deal," he observed. Dkt. 503, at 155.

The Class agrees. Not only do the low opt-out rate and high claim rate speak for themselves, the declarations submitted from all manner of major organizations representing authors and publishers demonstrate that the Settlement merits final approval. *See* Dkts. 385-398. The Settlement is—and remains—

a "home run." Dkt. 431 at 13.

### A.    Principal Terms of the Settlement

#### i.    Historic Settlement Fund: Non-Reversionary Fund of $1.5 Billion

The Settlement Agreement requires Anthropic to pay $1.5 billion plus interest into a non-reversionary Settlement Fund, which will be distributed to Class Members on a uniform per-work basis. The "Settlement is the largest copyright class action settlement in history," Dkt. 437 at 6 (Order granting on Preliminary Approval), and is an excellent result for the Class viewed by any metric.

The Agreement provides for payment as follows: (1) $300 million within five business days of preliminary approval; (2) $300 million within five business days of final approval; (3) $450 million the earlier of September 25, 2026 (the one-year anniversary of preliminary approval) or within 30 days after final approval if a qualified financing event occurs; and (4) $450 million the earlier of September 25, 2027 or within 30 days after a second qualified financing event occurs. Interest is accruing on payments (3) and (4). Anthropic has made the first $300 million payment and has confirmed that the first qualified financing occurred. Thus, soon after final approval, an additional $750 million will be deposited into an interest-bearing escrow account.

#### ii.    Substantial Prospective Relief

The Settlement also requires Anthropic to destroy the original files of the works it obtained from LibGen and PiLiMi, and to destroy any copies that originate from the torrented/downloaded copies. Anthropic has committed to destroy the datasets within 30 days of final judgment—or conclusion of any other preservation or court-ordered obligations—and will certify as much in writing. In addition, Anthropic "represents that neither the LibGen or PiLiMi datasets, nor any portions of those datasets, were in the training corpus of any of its commercially released large language models." SA § 3.1 (Dkt. 363).

#### iii.    Limited Release: Past Release of Non-Output Claims Only

In exchange for the Settlement's extraordinary relief, Class Members will release only claims for Works on the Works List that "aris[e] from Defendant's alleged past torrenting." SA § 1.29.  The release "extend[s] only to past claims"—*i.e.*, claims arising before August 25, 2025—and does not extend to output claims of any kind. *Id*. At preliminary approval, Judge Alsup correctly noted that this limited release of past claims only was "tailored." Dkt. 437 at 5.

**B.**    **Case Background**

**i.**    **The Complaint and the Extensive Discovery that Followed**

Plaintiffs filed this action on August 19, 2024. Dkt. 1. Anthropic answered an Amended Class Action Complaint on December 18, 2024, denying liability and asserting affirmative defenses, including fair use. Dkt. 72. The Court entered a case management order on October 10, 2024, setting fact discovery to close on August 29, 2025; opening expert reports due the same day; and a jury trial set for December 1, 2025. *See* Dkt. 49. To effectively litigate those motions, Plaintiffs sought discovery into the full extent of Anthropic's piracy. Although Anthropic vigorously resisted, Anthropic revealed on the eve of class certification and summary judgment briefing that it had pirated books from two previously-undisclosed sources: Library Genesis ("LibGen") and Pirate Library Mirror ("PiLiMi").

**Written Discovery.** Plaintiffs served 186 requests for production, 29 interrogatories, and 65 requests for admission. Dkt. 363 (CC Decl. ¶¶ 14–22). Anthropic served 263 RFPs, 75 interrogatories, and 395 RFAs. *Id.* The Parties negotiated and the Court entered three stipulated discovery protocols: a Protective Order, an ESI and Hard-Copy Document Protocol, and a Protocol for Inspection of Training Data and Source Code. *See* Dkts. 63, 74, 85. The Parties also litigated 17 discovery motions. Dkt. 363 (CC Decl. ¶ 19).

**Document Production and Data Analysis.** Between the Court's class certification order on July 17 and August 25 alone, Anthropic produced 54,782 documents comprising 1,640,241 pages, bringing the total defense production to more than 80,000 documents and over 2 million pages. *Id.* ¶ 15. This is in addition to the hundreds of gigabytes of Slack exports, Notion wikis, and Google Vault data. *Id.* For their part, Plaintiffs produced more than 20,000 pages in response to Anthropic's 263 RFPs. *Id.*

**Depositions.** By the time of Settlement—just days before the fact discovery cut-off—the Parties had conducted 20 depositions, including fact and expert depositions in connection with class certification, 30(b)(6) depositions, depositions of the Plaintiffs, and  depositions of the Anthropic's main trial witnesses (including many of Anthropic's co-founders; the individuals who torrented the relevant datasets; and those in charge of pre-training, technology, and products). *Id.* ¶ 17-18. The deposition transcripts span 4,331 pages. *Id.* ¶ 18.

**Expert Discovery.** The Parties submitted extensive expert reports at summary judgment and class certification, including on market harm, large language models, economics, and the relevant datasets. On August 1, 2025, the Parties exchanged the topics of expert opinions to be offered at trial. *Id.* ¶ 21. Those topics

included the pirate libraries; Anthropic's use of Class Works; torrenting, seeding, and leeching; and topics related to fair use. *Id.* By the time the Parties filed their Notice of Settlement, Dkt. 354, the Parties' experts had already substantially completed their expert reports, in anticipation of the August 29 deadline to serve opening expert reports—the same day as the close of fact discovery. *Id.*

**Third Party Discovery.** Plaintiffs subpoenaed OpenAI, Google, Amazon, Shawn Presser (creator of a books dataset), and Anna's Archive (creator of PiLiMi), obtaining, after extensive efforts and additional motion practice, documents from virtually all these sources. *Id.* ¶ 22.

**Creation of the Class and Works List**. Unlike many class actions, Anthropic did not have a tidy list of Class Members. Indeed, Anthropic resisted class certification in part on this basis. Plaintiffs spent substantial time and effort not only on uncovering the full scope of infringement but in generating a list of class works and members. Plaintiffs and their experts devoted thousands of hours of time to gathering, analyzing, and matching data from multiple sources to determine the list of Works that satisfy the criteria for inclusion in the Class. The Settlement terms provided a $1.5 billion payment for up to 500,000 class works, and an additional $3,000 per-work payment thereafter. After Plaintiffs provided a draft of the list to Anthropic, Anthropic had the opportunity to supplement the list. The final Works List was 482,460. That Anthropic could have supplemented up to 17,000 additional works for the same settlement amount but did not do so strongly suggests that the Works List is robust. The parties have stipulated that the listed Works meet all works-related class criteria, including timing of registration, publication, and downloading. *See* Dkt. 437 at 3.

### ii.    The Many Disputed Motions on Novel Legal Issues

The Parties extensively briefed critical issues during the litigation, including at summary judgment, class certification, and in an interlocutory posture in this Court and before the Ninth Circuit. Many of the issues were ones of first impression.  The notable motions include:

**Summary Judgment**. Anthropic moved for summary judgment on March 27, 2025 asserting that its acquisition of copyrighted books was shielded by the fair use doctrine. Dkt. 122. On June 23, after extensive briefing and argument, the Court granted Anthropic's motion in part and denying its motion in part. Dkt. 231 (Order on Fair Use). The Court found that Anthropic's reproduction of purchased and scanned books to train its AI models constituted fair use. *Id.* at 13-14, 30–31. The Court, however, denied summary judgment as to the works Anthropic obtained from Library Genesis and Pirate Library Mirror. *Id.* at 19, 31. At that time, no

court had ever recognized on an evidentiary record a copyright infringement claim against an AI company for acquiring pirated works. Class Counsel developed this "pirated works" theory. Dkt. 505, at 14.

**Class Certification**. Plaintiffs moved for class certification on March 27. Dkt. 125. On July 17, 2025, after extensive briefing, depositions, and argument, the Court certified the following Rule 23(b)(3) "LibGen & PiLiMi Pirated Books Class," which now serves as the Settlement Class definition. Dkt. 244 at 19, 31.

> All beneficial or legal copyright owners of the exclusive right to reproduce copies of any book in the versions of LibGen or PiLiMi downloaded by Anthropic. "Book" refers to any work possessing an ISBN or ASIN which was registered with the United States Copyright Office within five years of the work's publication and which was registered with the United States Copyright Office before being downloaded by Anthropic, or within three months of publication. Excluded are the directors, officers and employees of Anthropic, personnel of federal agencies, and district court personnel.

The Court observed this "civil action exemplifies the classic litigation that should be certified as a representative action, for the entire class stands aggrieved by defendant's downloading of their books from pirate libraries." *Id.* at 1. The Court appointed Plaintiffs Andrea Bartz Inc., MJ + KJ Inc., and Graeber as Class Representatives and SG and LCHB as Class Counsel. *Id.* at 31. This was the first favorable class-certification order in a copyright infringement case against an AI company.

Plaintiffs immediately commenced work on a form of notice, notice distribution plan, and Works List in parallel with ongoing discovery. *See* Dkt. 363-2 (original CC Decl. ¶¶ 47–53). Plaintiffs submitted a proposed Notice Plan on August 15, Dkt. 317, a process that followed weeks of engagement with Class Members, trade organizations, and others, Dkt. 318 ¶¶ 6–7. Anthropic filed oppositions to the Notice Plan on August 18, Dkt. 329, and August 20, Dkt. 334, to which Plaintiffs responded on August 25, Dkt. 350.

**Anthropic's Efforts to Prevent Trial**. On July 14, 2025, Anthropic moved for leave to appeal pursuant to 28 U.S.C. § 1292(b) or, in the alternative, for reconsideration. Dkt. 241. A motion hearing was noticed for August 28. Dkt. 241 at 1. On July 31, Anthropic filed a Rule 23(f) petition in the Ninth Circuit, seeking immediate interlocutory review of the Court's class certification ruling. *See* No. 25-04843 (9th Cir.), Dkt. 1. Plaintiffs filed their opposition in the Ninth Circuit on August 14. Anthropic moved for leave to file a reply brief on August 21. CA9, Dkt. 22. That motion remains held in abeyance. In conjunction with its § 1292(b) motion for interlocutory review, motion for reconsideration, and motion for interlocutory review under Rule 23(f), Anthropic requested the Court grant a stay of proceedings, Dkt. 272 which Plaintiffs

opposed on July 28, Dkt. 275, to which Anthropic replied on July 30. Dkts. 278. On August 11, the Court denied Anthropic's motion. Dkt. 296. Anthropic then filed an emergency motion to stay in the Ninth Circuit. CA9, Dkt. 18. Plaintiffs opposed on August 25, CA9, Dkt. 25. That motion remains in abeyance as well.

### iii.    Negotiation of the Settlement

On May 23, 2025, the Court issued an order permitting the Parties to engage in settlement discussions. Dkt. 210. The Parties then addressed the possibility of mediation on May 28, 2025. Dkt. 363-2 (original CC Decl. ¶ 36). The Parties selected a neutral mediator who then supervised mediation sessions over the following week. *Id*. Multiple mediation sessions were held but the Parties did not reach a settlement agreement. *See id.* ¶¶ 36–37. In August 2025, the Parties resumed mediation with a second neutral mediator—former U.S. District Judge Layn Phillips. On August 25, after substantial arms-length negotiation, the Parties executed a binding term sheet and notified this Court and the Ninth Circuit the following morning. *See Id*. ¶¶ 33, 38, 39). A long-form Settlement Agreement was signed on September 5, 2025.

### iv.    Trial Preparation

At the time of Settlement, the Parties were also preparing for trial, and working on trial strategy, the disclosure of trial witnesses, jury considerations, and planning for pre-trial motion practice.  CC Decl. ¶ 4.

### v.    The Court's Preliminary Approval of the Settlement

On September 5, 2025, Plaintiffs filed an Unopposed Motion for Preliminary Approval, accompanied by six declarations and several exhibits. Dkt. 363. Among other things, the Preliminary Approval brief described each of the factors for Preliminary Approval under the Northern District of California rules along with an accompanying table. *Id*. at 8. The Parties then appeared at a hearing on September 8, 2025, after which the Court issued an order stating that "[p]reliminary approval was postponed pending submission of further clarifying information," including Plaintiffs' submission of a plan of allocation and distribution. Dkt. 371. After the hearing, the Court posed 34 questions to the Parties. *See* Dkts. 375, 383. Those questions were answered in a 53-page submission on September 23, 2025, Dkt. 418, which was preceded on September 22 by Plaintiffs' submission of a 33-page supplemental brief in support of preliminary approval, Dkt. 401, accompanied by a detailed Plan of Allocation, Dkt. 401-1, and 16 additional declarations, Dkts. 385–400.

The Court held another hearing on September 25, at which it preliminarily approved the Settlement. Dkt. 427. At the Court's request, Plaintiffs' counsel described on the record why the Settlement was in the

best interests of the class. Dkt. 431 at 11:4-14:1. The Court observed that the per-work award of $3,000 was "a very good settlement for what was done here." *Id.* at 17:2. The Court also "approv[ed] the plan of distribution." *See id.* at 17. The Court subsequently issued a written order reaffirming the Settlement's preliminary approval. Dkt. 437. It confirmed that discovery in this matter was "extensive," and that "[e]ach side was reasonably well informed of the true universe of facts when they signed the term sheet in August 2025." *Id.* at 4. It further observed that the "settlement agreement was negotiated at arm's length and will likely be found to lack collusion." *Id.* at 6. The Court noted that Plaintiffs' "success is not assured were they to go to trial" on either liability or damages. *Id.* at 4. "The settlement," the Court thus observed, "provides value in prompt closure": it "avoids a prolonged, complex, and expensive trial — and all ensuing appeals." *Id.* at 5. The Court then concluded by finding that the Settlement's "tailored release, injunctive relief, and per-work award" rendered it "fair, adequate, and reasonable." *Id*.

## C.    Administration of the Settlement

### i.    Preliminarily Approved Plan of Allocation and Distribution

The approved Plan of Allocation and Distribution ("POAD") was designed—after consultation with industry experts, both publishers and authors—to ensure the fair and efficient distribution of Settlement funds. The POAD honors contractual terms, ensures an efficient process to encourage a high claims rate, and provides for payment to all owners of a claimed Work. The POAD provides a non-mandatory 50-50 default between authors and publishers for non-education works. Dkt. 401-1 at 4 (¶ 4(a)(i)). This default represents the industry norm amongst trade and university publishing contracts. Dkt. 437 at 7. A claimant may elect a different split. Dkt. 401-1 at 6 (¶ 4(e)). For education works, because of the variation and lack of consensus regarding contractual terms, the Claim Form requires the claimant's good-faith representation regarding the appropriate split. *Id.* at 5 (¶ 4(b)(ii)). Importantly, the POAD ensures that ***any*** identified rightsholder (even those who do not file claims) will receive a check for their share of the per-work award. *Id.* at 4 (¶ 3(c)(ii)(3)). Any disputes about allocation will be resolved by the court-appointed Special Master. *Id.* at 5 (¶ 3(d)).

### ii.    Notice Program

Class Counsel and JND effected the best practicable notice that Judge Alsup ordered, *see* Dkt. 437 at 7-13, via a state-of-the-art program that used multiple modes of notice, *see* Keough Supp. Decl. ¶¶ 32-83.

***Direct notice.*** Direct notice was sent, and not returned as undeliverable, to 506,194 potential Class

Members representing 480,114 Works—that is, 99.5% of Works on the Works List. *Id.* at ¶ 79.

***Industry Group Notice.*** Plaintiffs supplemented this extensive direct notice program with notice through prominent industry groups and guilds.[1] These industry-group notice efforts commenced immediately after preliminary approval was granted and persisted throughout the notice period. *See id.* at ¶ 32.

***Media Notice.*** JND placed print and digital notice with leading publications in the United States and Canada, and distributed a press release to ~5,000 media outlets nationwide and in Canada, including to journalists who specialize in reporting on higher education, teaching, books, and publishing. *Id*.

***Social Media and Digital Notice.*** JND served over 100 million digital impressions through GDN, Facebook, Instagram, and Reddit; used multiple targeting strategies to direct notice to likely class members; and further stimulated claims by serving 44.6 million "reminder" digital impressions. *Id.* at ¶ 75.

***Online Notice.*** JND's Settlement Website readily identifies important information and deadlines. The Website includes the long form notice, Settlement Agreement, a searchable Works List, an online automated Claim Form, and a downloadable Claim Form; it is ADA-compliant and optimized for both mobile and computer visitors; and its address is prominently displayed in all printed notice documents, accessible through email and digital notices, and imprinted via QR code in the mailed and print notices. As of March 19, the Website has tracked 1,077,135 unique users. *Id.* at ¶ 89.

***Media Coverage***. Because of the high-profile nature of this Class Action, the Settlement has generated substantial media coverage in both general and specialized media. That coverage has emphasized the widespread "approval from the creative community"[2] that the Settlement has received, noting that it represents "a huge victory for authors and copyright owners of all types."[3]

***Third-Party Opt-Out Solicitations***. Although not part of the notice program, third parties have spent substantial resources soliciting opt-outs (sometimes in misleading ways). Class Counsel spent significant

---

[1] Those groups included The Association of American Publishers; the Authors Guild, the Creative Artists Agency; The Independent Publishers Guild; Novelists, Inc.; The Publishers Association; the Publishers' Licensing Services; the Romance Writers of America, Inc.; the Science Fiction and Fantasy Writers Association; the Sisters in Crime; The Society of Authors; William Morris Endeavor (WME) Books; the Writers Union of Canada; Writers House; and the Association of University Presses.

[2] Chloe Veltman, *Anthropic Settles with Authors in First-of-its-kind AI Copyright Infringement Lawsuit,* NPR (Sept. 5, 2025), https://tinyurl.com/first-of-its-kind.

[3] Rachel Kim, Top 5 Things You Need to Know About Participating in the $1.5 Billion Bartz v. Anthropic Settlement, COPYRIGHT ALLIANCE (Oct. 28, 2025), https://tinyurl.com/Participating-Bartz.

effort making sure that communications were not misleading. *See, e.g.*, Dkt. 503. These communications, however, gave further information to class members about their options.

### iii.    Assisting Class Members

Plaintiffs have spent thousands of hours assisting Class Members in the Settlement administration process. *See* CC Dec. at ¶ 26. That effort has spanned the work of dozens of attorneys across both law firms; interacting with Class Members via email, phone, video conference, and virtual meetings; on weekdays, weekends, holidays, and throughout all hours of the day. Plaintiffs have established a dedicated email inbox and phone line staffed throughout the business day with multiple attorneys to answer Class Member inquiries. Plaintiffs have similarly monitored online activity daily to unearth efforts to mislead or confuse Class Members, promptly raising them with the Court. *See, e.g.,* Dkts. 442, 478, 503 (ClaimsHero). Plaintiffs have and will continue to fulfill the Court's mandate to "bird dog this [Settlement] at every stage." Dkt. 431 at 17.

Those efforts have made a difference, with Class Members describing them as a "lifeline to this whole claim filing process." *See* CC Dec. at ¶ 29. They have noted that they feel "very fortunate to be represented" by Class Counsel,*id.* whose assistance "cut through the clutter of information." *Id*. And they have called the assistance "prompt," "rapid," "kind," "clear," "quick," "invaluable," and "excellent." *Id*.

### iv.    Key Statistics: Claims, Opt-Outs, and Objections

The Class's participation in the Settlement has been outstanding. As of March 19, there are 99,450 claims for 264,809 Works, representing 54% of the Works List. By contrast, there are 350 opt-outs (less than 0.5% of the Works List) and 41 objections (only 32 of which are from Class Members). *See generally* Keough Supp. Decl. at ¶¶ 95; 102. Plaintiffs will update these statistics after the claims period.[4]

## II.    LEGAL STANDARD

"In reviewing the proposed settlement, a court does not need to assess whether the settlement is ideal or the best outcome, but rather whether the settlement is fair, free of collusion, and consistent with plaintiff's fiduciary obligations to the class." *Nado v. John Muir Health*, 2026 WL 82232, at \*2 (N.D. Cal. Jan. 12, 2026). To conduct that inquiry, courts consider: (i) the Rule 23(e)(2) criteria, *see In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 674 (9th Cir. 2025); (ii) the "*Churchill*" factors, *see Churchill*

---

[4] The Settlement Administrator received five otherwise valid opt-outs that were submitted untimely, after the February 9 deadline. Those opt-outs represent 45 Works. In Class Counsel's view, neither the Court-ordered POAD nor the Court-ordered settlement schedule contemplate late opt-outs.

*Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); and (iii) the Northern District's Procedural Guidance for Class Action Settlements, *see Carlotti v. ASUS Computer Int'l*, 2019 WL 6134910, at *13–17 (N.D. Cal. Nov. 19, 2019). Courts also consider whether the class received adequate notice. *See Padron v. Golden State Phone & Wireless*, 2018 WL 2234550, at *3 (N.D. Cal. May 16, 2018).

The Rule 23(e)(2) criteria are whether: (i) "the class representatives and class counsel have adequately represented the class"; (ii) "the proposal was negotiated at arm's length"; (iii) "the relief provided for the class is adequate"; and (iv) "the proposal treats class members equitably relative to each other." The *Churchill* factors are "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Churchill*, 361 F.3d at 575. The NDCA's Procedural Guidance calls for consideration of (i) "class member response"; (ii) attorneys' fees; and (iii) service awards.

## III.    ARGUMENT

### A.    The Rule 23(e)(2) Factors Are Satisfied

#### i.    Adequate Representation by Class Representatives and Class Counsel

In considering adequacy, courts evaluate "the nature and amount of discovery" undertaken, the contributions of the class representatives, and the experience of class counsel. *Ochinero v. Ladera Lending, Inc.*, 2021 WL 4460334, at *4 (C.D. Cal. July 19, 2021); *see In re Google LLC St. View Elec. Commc'ns Litig.*, 611 F. Supp. 3d 872, 890 (N.D. Cal. 2020). At preliminary approval, Judge Alsup confirmed the Class is "represented by excellent counsel." Dkt. 437 at 5.

Class Counsel "are experienced class action litigators" who "spent thousands of hours on motion practice and discovery, which enabled them to assess the benefits of settlement relative to the risks of further litigation." *In re Google LLC*, 611 F. Supp. 3d at 890. The Class Representatives also well-represented the Class. Ms. Bartz "invested many hours into this lawsuit," including by "answer[ing] extensive discovery requests, handing over thousands of pages of documents and digging through a decade's worth of contracts and communications to provide accurate information" Dkt. 385 at 2. Mr. Graeber took "numerous redeye

cross-country flights for critical meetings and depositions," including "travel[] to major court hearings." Dkt 386 at 2. And Mr. Johnson conducted "hundreds of hours of calls with counsel" as well. Dkt. 387 at 2.

### ii.     The Settlement Was Negotiated At Arm's Length

At preliminary approval, Judge Alsup confirmed there were no indicia of collusion. Dkt. 437 at 6-7. As explained above, the Settlement was procured through several mediation sessions facilitated by two neutral mediators. By the time the Settlement was reached, moreover, the Parties had already litigated class certification and summary judgment; were just days away from concluding fact discovery and exchanging opening expert reports; and were in active litigation of potentially case-dispositive motions in the Ninth Circuit and this Court. Those events present a textbook example of a non-collusive settlement. *See  Garner*, 2010 WL 1687832, at *13; *Aguilar,* 2025 WL 1753509, at *4.

### iii.     The Relief Provided To The Class Is Outstanding

The next Rule 23(e)(2) factors requires consideration of: "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; [and] (iii) the terms of any proposed award of attorney's fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(i). At preliminary approval, Judge Alsup found that the Rule 23(e)(2) factors were satisfied, Dkt. 437 at 4, 7, and they continue to be.

The monetary relief the Class will receive is historic. This is the largest publicly reported copyright recovery in history, the largest publicly reported copyright settlement, and the largest class-action copyright recovery. *See* Dkt. 437 at 6.The estimated per-work payment of over $3,000 is similarly impressive. That award is four times the minimum statutory damages amount and fifteen times the minimum statutory damages amount for innocent infringement. 17 U.S.C. § 504(c). It is also four times higher than the "most common award" issued in copyright cases, which is $750 per work. *See* Brady, Benjamin and Germano, Roy and Sprigman, Christopher Jon, Statutory Damages Under the Copyright Act: An Empirical Study, 41 (Sept. 23, 2023). Judge Alsup likewise recognized that the per-work award is "a very good settlement for what was done here." Dkt. 431 at 17. Class Members also receive significant non-monetary relief, including Anthropic's destruction of the original files of the pirated works.

The scope of this relief is especially impressive given that the "costs, risks, and delay of trial and appeal" were significant. Fed. R. Civ. P. 23(e)(2)(C)(i). Risks teemed even prior to trial: (i) the Ninth Circuit

could have granted Anthropic's emergency request for stay or Anthropic's Rule 23(f) petition; (ii) and this Court could have granted Anthropic's § 1292(b) motion, Anthropic's its motion for reconsideration of the fair use order, or any number of *Daubert* or pre-trial motions. The Court also could have decertified the class, as it stated it could do at any point. *See* Dkt. 431 at 7, 15.

These risks would have only been amplified at trial. There, the Class faced the risks of an adverse jury verdict or an insubstantial recovery. The Court acknowledged as much in denying Anthropic's motion to stay, "[f]or all we know at this stage, Anthropic will persuade the jury to find facts vindicating it completely," the Court observed. Dkt. 296 at 6. Trial would also have featured Anthropic's central fair use defense, which could have disposed of the Class's claims entirely. Anthropic would similarly have had the opportunity to present an innocent infringement defense which, if successful, could have limited any recovery to as low as $200 per work, less than 7% of the per-work payment under the Settlement. *See* 17 U.S.C. § 504(c)(2).

Finally, even if Plaintiffs avoided these risks, Anthropic's post-trial motions and appeals would present material risk themselves. At best, unsuccessful post-trial efforts by Anthropic would delay Class Members' recoveries by years. At worst, those efforts could outright eliminate any verdict in the Class's favor. Indeed, any decision by this Court weighing the four fair use factors would have been reviewed *de novo* by an appellate court, subject to further review by the United States Supreme Court in this fast and rapidly involving area of law. *See* Dkt. 437 at 4-5 (preliminary approval order acknowledging that "[a]ll the district court's rulings and verdict could get appealed" after trial). And any large damages award could have been subject to remittitur. *See* Dkt. 431 at 12 (comments by Judge Alsup about size of the award at approval hearing). The Settlement merits final approval given those risks. *See Hopson*, 2009 WL 928133, at *7; (N.D. Cal. Apr. 3, 2009) (final approval where "Plaintiffs may have a strong case, but the risks inherent in continued litigation are great," including that "Defendants strongly deny liability" and key legal issues remained "open" and undecided); *Isquierdo*, 2017 WL 4390250, at *4 (similar).

The second Rule 23(e) factor—"the effectiveness of any proposed method of distributing relief"— likewise supports final approval. At this point, 99,450 Claims have been filed for 264,809 works, representing a claims rate of 54%, which is well-above other class action settlements that have been approved in this Circuit. *See, e.g.* essineo, 2017 WL 733219, at *7 (final approval with "higher than average" claims rate of 9.26% of 9,374 class members). The Claims period remains live for 11 more days, and Class Counsel

expect that the number of submitted claims will grow substantially.

### iv.    The Settlement Treats Class Members Equitably

The Settlement also satisfies the final Rule 23(e)(2) factor, which asks whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). As Judge Alsup explained in granting preliminary approval: "The settlement agreement will likely be found to treat every class member equitably. *Each work gets the same award.*" Dkt. 437 at 7. That remains true. All works in the Class are treated the same; each Work for which a valid claim is submitted will receive the same amount from the Settlement Fund; all payments to Class Members will be distributed at the same time; and Anthropic's agreement to destroy the files of the pirated LibGen and PiLiMi works, as well as any copies that originate from the torrented/downloaded copies, will benefit all Class Members equally. That is an equitable result through and through. *See Nado*, 2026 WL 82232, at \*3; *Raffin*, 2018 WL 6011551, at \*4 (pro rata distributions fair where class members suffered same privacy harm and were eligible for statutory damages).

The Parties do not have agreements to modify the Settlement Agreement. *See* Rule 23(e)(2)(C)(iv); Dkts. 521–528. Plaintiffs' fee request is addressed in separate briefing. *See* Rule 23(e)(2)(C)(iii).

### B.    The *Churchill* Factors are Satisfied

#### i.    Plaintiffs' case and the risks of further litigation

Plaintiffs' success here was far from "assured." *Kulik v. NMCI Med. Clinic Inc.*, 2023 WL 2503539, at \*6 (N.D. Cal. Mar. 13, 2023). As Judge Alsup explained, "Plaintiffs have a strong case on the downloading, but success is not assured were they to go to trial." Dkt. 437 at 4. "And, a loss would result in no recourse" at all. *Id.* at 5. The Settlement thus avoids "a prolonged, complex, and expensive trial—and all ensuing appeals," providing "value in prompt closure." *Id.* That favors final approval. *Garner*, 2010 WL 1687832, at \*11 (final approval where settlement offered "prompt relief"); *Aguilar*, 2025 WL 1753509, at \*5 (similar).

#### ii.    The risk of maintaining class action status throughout the trial

Although the Court concluded during preliminary approval that "there is almost no risk that the main issues would subvert class certification," Anthropic's Rule 23(f) petition was briefed in the Ninth Circuit at the time the term sheet was signed. Dkt. 437 at 5. While Plaintiffs were confident on the merits of that motion, the risk of pre-trial decertification thus could not be discounted. *See* Dkt. 431 at 7, 15 (Alsup, J.) (discussing risk of decertification). This factor thus also supports final approval.

### iii.    The amount offered in settlement

The fourth *Churchill* factor—the amount offered in settlement—"is generally considered the most important, because the critical component of any settlement is the amount of relief obtained by the class." *Bayat v. Bank of the West*, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015). This factor is manifestly satisfied. The non-reversionary monetary relief in this case is historic; there is significant non-monetary relief; and the release is carefully "tailored." Dkt. 437 at 5. Where, as here, "the settlement recovery for the class members is substantial given the circumstances of the case," and there is "a significant payout, particularly considering the scale of the alleged harm," final approval is warranted. *Kulik*, 2023 WL 2503539, at *6; *see Aguilar*, 2025 WL 1753509, at *5 (final approval where "substantive prospective relief" was obtained).

### iv.    The extent of discovery completed and the stage of the proceedings

"This factor evaluates whether the parties have sufficient information to make an informed decision about settlement." *Larsen v. Trader Joe's Co.*, 2014 WL 3404531, at *5 (N.D. Cal. Jul. 11, 2014) (quotation marks omitted). "Rather, the court's focus is on whether the parties carefully investigated the claims before reaching a resolution." *Altamirano v. Shaw Indus., Inc.*, 2016 WL 1271046, at *5 (N.D. Cal. Mar. 31, 2016). Judge Alsup found "[d]iscovery was extensive," Dkt. 437 at 4, and it was, *see supra* Section I(B). This *Churchill* factor is thus also satisfied. *See Isquierdo*, 2017 WL 4390250, at *5 (final approval where parties engaged in "significant amount of formal and informal discovery," including "multiple sets of discovery requests and responses, and exchang[ing] documents including extensive company data"); *Garner*, 2010 WL 1687832, at *13 (N.D. Cal. Apr. 22, 2010) (final approval where case was "heavily litigated," including via "motions raising complex legal and factual issues" and "multiple discovery disputes").

### v.    The experience and views of counsel

As this Court observed in granting preliminary approval, "[b]oth sides are represented by excellent counsel, and it is their judgment that the result reached is fair, adequate, and reasonable." Dkt. 437 at 5. And as Class Counsel have previously explained, in their "decades of experience litigating large complex cases across the country, this Settlement easily ranks among the most successful outcomes." Dkt. 363 at 12. In such circumstances, the recommendations of "counsel should be given a presumption of reasonableness," and counsels' recommendations thus themselves weigh in favor of final approval. *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2007) (citation omitted); *see C.H. by & through Hubbard v. Google*

*LLC*, 2026 WL 92063, at *4 (N.D. Cal. Jan. 13, 2026) (same).

### vi.    The presence of a governmental participant

There is no governmental entity involved in this litigation, and this factor is inapplicable. *See Padron*, 2018 WL 2234550, at *5.

### vii.    The reaction of the class members to the proposed s

Class Members' reactions have been overwhelmingly positive, reflected in the extraordinary claims rate. *Cf. Reed v. 1-800 Contacts, Inc.*, 2014 WL 29011, at *7 (S.D. Cal. Jan. 2, 2014) (claims rate of 13.7% indicated "high rate of participation" that "weigh[ed] heavily in favor of approval settlement"). By contrast, opt-outs and objections have been rare: there are 350 opt-outs (0.37% of the total Works) and 41 objections.[5] "It would seem that there would be no better indicator of those interests than the feedback the court gets from class members themselves." 4 Newberg and Rubenstein on Class Actions § 13:58 (6th ed.). Indeed, the "absence of a large number of objections to a proposed class action settlement" "raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nado*, 2026 WL 82232, at *3 (Martínez-Olguín) (quotation marks and citation omitted).[6] This participation rate is especially notable given the sophistication of the parties, the heavy interest in the subject matter, and the solicitation of opt-outs by third parties.

The declarations that accompany this brief further illustrate Class Members' overwhelming support of the Settlement. The Publishers Association Limited and the International Publishers Association report that they and their members "strongly support . . . [t]his $1.5 billion settlement" which "not only provides significant compensation to class members, but also sends an important message that AI companies cannot build their commercial models by illegally pirating books." Stevenson Dec. at ¶ 8. The Association of University Presses similarly reports that "its members strongly support the settlement." Berkery Dec. at ¶ 4.

---

[5] Some of these 41 in fact support the Settlement, while nine of them are not Class Members and thus not formally "objectors" at all. We nevertheless use "objectors" and "objections" throughout for ease of reference.

[6] *See also Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (final approval where "only" 45 objections and 500 opt-outs had been received in a class of 90,000); *Isquierdo*, 2017 WL 4390250, at *6 (N.D. Cal. Oct. 3, 2017) (opt-out rate of "a fraction of 1%" indicated "extremely positive reaction from the class to the proposed settlement" which "strongly favors final approval"); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) (granting final approval of settlement where 16 out of 329 class members (4.86%) requested exclusion).

And the American Association of Publishers explains that "the proposed settlement is beneficial to all class members." Pallante Dec. ¶ at 13.

Declarations submitted from authors' groups share this enthusiasm. The Writers' Union—founded in 1973 and the "national organization of professionally published writers" in Canada—states that its "members have expressed resounding support for the Settlement." Segan Dec. ¶ at 6. Meanwhile, senior leaders of major author organizations throughout the United States—the Authors Guild, the Science Fiction & Fantasy Writers of America, Sisters in Crime, Novelists, Inc., and the Romance Writers of America, Inc.—report that "this Settlement is a genuine success" and that they "are proud to support it." Not For Profit Dec. at ¶ 16.

By any metric—quantitative or qualitative—this Settlement has garnered widespread approval from Class Members. Plaintiffs respectfully submit it should also garner final approval from the Court.

**C.    The Northern District of California's Procedural Guidelines are Satisfied**

**i.    The Best Practicable Notice Plan Has Been Successfully Implemented**

Class Counsel and JND effected the preliminarily approved, state-of-the-art notice plan, which Judge Alsup described "embodies what someone desirous of informing an absentee about the settlement against Anthropic would adopt." Dkt. 437 at 11. That plan included several complementary modes of indirect notice, comprehensive direct notice through first class letter mail, reminder notices via email, and additional-rightsholder notice through Claim Form submissions (*see* Dkt. 401-1, POA&D § 3(c)(ii)). Mailing or email addresses were compiled for 99.98% of Works on the Works List, covering 594,945 potential Class Members. Keough Supp. Decl. ¶ 28. 506,194 potential Class Members were sent notice not returned as undeliverable, representing 99.5% of the Works list. *Id.* at ¶ 79.[7] That robust notice well surpasses the Rule 23 standard. *See Kulik*, 2023 WL 2503539, at *6 (final approval where "the Settlement Administrator complied with the notice plan" that was submitted at preliminary approval).[8]

**D.    The Objections To The Settlement Do Not Counsel Against Final Approval**

Forty-one individuals filed comments with the Court about the Settlement, some in favor of the Settlement, spanning 119 Works or 0.02% of the Works on the Works List. Thirty-two of these were filed by

---

[7] JND sent 419,985 direct mail Notices, of which 71,159 were returned as undeliverable. Keough Supp. Decl. at ¶ 39. As of the date of this brief, JND has remailed a total of 9,394 direct mail Notices. *Id.* JND sent 293,515 direct email Notices, of which 22,782 were ultimately identified as undeliverable. *Id.* at ¶ 48.

[8] The remaining two factors under NDCA's Procedural Guidance—attorneys' fees and service awards—are addressed in Plaintiffs' reply brief concerning the fee request submitted herewith.

Class Members, while others were filed by non-class members who sought to be included in the Settlement. While respectful of the views of each objector, Class Counsel do not believe any objection counsels against final approval of the Settlement.

### i.    Objections to the Settlement Amount

One common objection concerns the amount of the settlement in this case.[9] Although Class Counsel understand this objection is well-intentioned, it does not provide a basis to withhold final approval.

Objections to the settlement amount have taken two forms. *First*, some objectors argue that the overall settlement amount is inadequate because (a) the value Anthropic gained from its piracy is greater the settlement amount; and (b) the settlement amount is insufficient to deter Anthropic and other AI companies given their massive financial valuations. *Second*, some objectors argue that the per-work award is insufficient because (a) statutory damages could be much higher than $3,000 per work; and (b) the harm that they and other class members suffered is greater than what the per-work award provides in recompense.

As discussed above, this highly novel case was littered with risks at every step that would have followed absent settlement—pre-trial *Daubert* issues; the trial, and then post-trial proceedings. Indeed, with respect to damages, the Court observed during the preliminary approval hearing that because the Court had "ruled that it was okay for Anthropic to go . . . to a library where they had books on sale for $1 each; pay $1; buy the book, take it apart, scan it and use it"—damages could have amounted to as low as "$1 or $5 or $10." Dkt. 431 at 14. By contrast, the Court observed, "$3,000 is way more than that." *Id.* The per-work award is "an order of magnitude more than the maximum proposed for books in the *Google Books* settlement that was rejected for releasing future claims." *Id.* at 5–6 (citing *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 672 (S.D.N.Y. 2011)). It is also more than "four times the statutory minimum for ordinary infringement, which is also the most common award in copyright cases," and more than "fifteen times the statutory minimum for innocent infringement of $200." *Id.* at 5; *see also* Dkt. 363 at 11 (Plaintiffs' counsel discussing size of award). As Judge Alsup observed, "I don't see how you could get a better deal." Dkt. 503 at 139.

At all events, a settlement is a "a highly negotiated compromise," *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015), and it is "well-settled law that" even "a cash settlement amounting to only a fraction of

---

[9] Objections raising this argument are: Dkts. 439 (Reding), 544 (Hale), 546 (Johnston), 549 (Stewart), 551 (Werner), 564 (Sappington), 566 (Burke-Garcia), 571 (Hampton), 572 (Chakanga), 584 & 593 (Burton), 594 (Choi), 595 (DesJardins), 596 (Lee), 598 (Hyder), Story (599); 601 (Larson), 606 (Lee).

the potential recovery will not per se render the settlement inadequate or unfair," *Officers for Justice v. Civ. Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982). Far from a "fraction," the settlement fund here is historic. *See Cottle v. Plaid Inc.*, 340 F.R.D. 356, 374 (N.D. Cal. 2021) (individual awards of $10–$39 "fair and adequate compromise" despite statutory damages of $5,000 per violation).

### ii.   Objections to the Attorneys' Fees Request

Class Counsel received three objections related to the requested fee award. *See* Dkts. 545 (Golomski), 551 (Werner), 564 (Sappington). These objections to Class Counsel's fee award lack merit.

Class Counsel's requested fee award does not provide a basis to deny final approval. Class Counsel's request of 12.5% is far lower than the "benchmark" award in the Ninth Circuit, and even far lower than the 20% presented to the Class in Counsel's fee application or the 25% presented in the notice disseminated to the Class. And that is even though each factor the Ninth Circuit considers when reviewing an upward departure from the benchmark is present here, including the "exceptional results" obtained, the immense "risk[]" presented, the presence of non-monetary benefits "beyond the cash fund," the significant "burdens class counsel experienced while litigating the case," the "contingency basis" of Class Counsel's representation, and the squarely-within "market rate" nature of the fee request. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015)). The statement by one objector (Dkt. 564 at 2) that "25% of the settlement fund in attorneys' fees is disproportionate to the actual benefit delivered to the class," because the "maximum penalty is $250,000" and the settlement amount was "98.8% below the maximum penalty" is thus misplaced. Class Counsel sought 20% (now 12.5%, and never 25%); the maximum award is $150,000 (not $250,000); and the per-work award well accounts for the risks here.

Another objector (Werner) states that any fee award should be reduced because the "settlement paperwork" "did not include adequate instruction on to how to e-file with the Court." Dkt. 551 at 4. This Court carefully reviewed the notice sent to class members, however, which provided information on both hard-copy and electronic means to file claims. *See, e.g.*, Dkt. 495. On that point, the significant claims rate speaks for itself. To the extent Werner's objection relates to the ability to file an objection electronically on the Court's docket, there are ample publicly available resources that explain how to do so. Moreover, the Court accepts paper submissions which can be docketed, as many filings in this case indicate.

Another objector (Bond, Dkt. 589) asks the Court to approve the settlement but requests that it ensure Class Counsel receive any fee award in the same proportion as when Anthropic funds the Settlement. Objector Story (Dkt. 599) likewise asks for Class Counsel to receive any payment "in step" with Class Members payments. The Settlement Agreement already accounts for both issues, itself stating that Class Counsel shall be paid the Fee Award "in equal installments proportionate to Anthropic's payments to the Settlement Fund." Dkt. 363-3 at 30. Bond also expresses concern about Anthropic's finances and its ability to pay.

### iii.    **Expansions to the Class Definition**

Other objectors and putative objectors seek to broaden the class definition to include non-Class works, contending the Class should not be limited to works that bear copyright registration numbers.[10] These individuals argue that the Court's class definition, which requires that the work was "registered with the United States Copyright Office," is (i) likely to exclude smaller publishers and independent authors whose works are often not registered; (ii) unfair to foreign and non-English authors whose works may be protected even absent registration; and (iii) unfair because some publishers have not registered authors' copyrights even when obligated to do so. Some individuals also assert that the class definition should not require ISBNs because that approach excludes journal articles. *See* Dkt. 541 (Tombs); Dkt. 542 (Leahy).

*First*, the "number of putative objectors (non-class members) who wish to be included within the Settlement . . . illustrate[s] in vivid form . . . the fact that this settlement is viewed as so desirable that people are clamoring to get in." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 934 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) (cleaned up). That is understandable; the Settlement provides Class Members extraordinary monetary and non-monetary relief, at the cost of only a "tailored" release.

*Second*, these putative objectors do not have standing to make their objections, and the Court should thus not consider them. "Under Federal Rule of Civil Procedure 23(e), 'nonclass members have no standing to object to the settlement of a class action.'" *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2020 WL 1873554, at *4 (N.D. Cal. Mar. 11, 2020) (quoting *San Francisco NAACP v. San Francisco Unified School Dist.*, 59 F. Supp. 2d 1021, 1032 (N.D. Cal. 1999)). The Court should thus not consider these objections here.

---

[10] Dkts. 438 (Barrett), 540 (Paolinelli), 541 (Tombs), 546 (Johnston), 551 (Werner), 552 (Miller), 585 (Ryker), 565 (Glenn), 602 (Bishop), 603 (Newton), 604 (Tascabili), 605 (Editrice), 607 (Boringhieri), 608 (Salani Editore), 610 (Longanesi), 611 (Vallardi Editore), 612 (Garzanti).

*See In re Hydroxycut Mktg. & Sales Practices Litig.*, 2013 WL 5275618, at *2 (S.D. Cal. Sept. 17, 2013) (striking objection because objector had not "carried his burden of proving standing as a class member"); *In re Korean Air Lines Co. Antitrust Litig.*, 2013 WL 7985367, at *2 (C.D. Cal. Dec. 23, 2013) (similar); *Kent v. Hewlett-Packard Co.*, 2011 WL 4403717, at *3 (N.D. Cal. Sept. 20, 2011) (similar).

Declining to consider objections by non-Class Members is particularly warranted here. Individuals whose works are not on the Works List are not subject to the Settlement Agreement at all, including its release. This is thus a paradigmatic case where non-class members have no injury to complain stemming from the Settlement Agreement whose final approval they seek to disrupt. *See Etter v. Thetford Corp.*, 2016 WL 11745096, at *12 (C.D. Cal. Oct. 24, 2016) (finding that class members "outside the settlement class definition [are] unharmed by this agreement" and thus lacked standing).

*Third*, if the Court considers these objections, it should not find them to have merit. The inclusion of the Copyright Registration number was an integral component of the class definition that the Court ordered. *See* Dkt. 244 at 22-23. It likewise provides a presumption of validity as to the Work's eligibility for copyright protection, *see* 17 U.S.C. § 410(c), while helping to ensure common determination of damages in light of the uniform "statutory damages" award that the Registration Number permits. 17 U.S.C. §§ 412, 504(c)(1)). Indeed, the presence of the registration itself forms the basis for the statutory damages award. *See id.*[11]

### iv.   Miscellaneous Objections

Certain objections have been lodged that do not neatly fall into one of the foregoing categories. *First*, objectors contend the settlement should have included additional relief. Stewart (Dkt. 549) contends that Anthropic's model should provide attributions to authors' works. Burke-Garcia (Dkt. 566) and Story (Dkt. 599) contend that the Settlement should require Anthropic to develop mechanisms for licensing authors' works. DesJardins (Dkt. 595) argues that Anthropic should not be permitted to scan works to train its LLMs, and that Anthropic should be liable for promoting "outdated" information in the Works. Hale (Dkt. 544) contends that "the fraudulently-gained 'AI' [should] be deleted."

---

[11] These reasons also explain why the Registration Number—and not, for example, the ISBN—define what Work is part of the class where an entry on the Works List contains information that points to different works (*e.g.*, an ISBN that points to one work but a Registration Number that points to another work). Unlike other information on the Works List, only the Registration Number is present exactly 482,460 times on the Works List—*i.e.*, once for every work that the Parties stipulated and the Court ordered constituted the Works-In-Suit.

These objections do not provide a basis to deny final approval. As explained above, the monetary and non-monetary relief afforded the Class are outstanding—including the relief requiring Anthropic to (as Hale requests) destroy the pirated works. In addition, this case did not concern AI outputs; as part of the Settlement, Anthropic certified that it did not use the copies from pirate libraries in any released model; the Settlement Agreement's release does not apply to forward looking claims for which licensing could be relevant; and the Court already ruled at summary judgment that Anthropic's book scanning project was fair use. The foregoing objectors' arguments are thus inconsistent with the posture and litigation of the case.

*Second*, two objectors—through counsel James Bartolomei (Dkts. 571 (Hampton), 572 (Chakanga))—contend in nearly identical submissions that the Court-approved notice "is a tool of suppression drafted in a non-neutral way that could steer and intimidate authors into a settlement by hiding and obscuring the potential value of their claims and failing to disclose what they are potentially releasing if they settle." *E.g.*, Dkt. 571 at 1–2. Page 6 of the Notice, however, expressly informs Class Members that "the Copyright Act provides for statutory damages of between $200 and $150,000 per work."[12] Other documents posted on the settlement website, including the Court's preliminary approval order, reiterate that "a victory for plaintiffs could vary from $150,000 per work down to $200 per work." Dkt. 437 at 4. The objectors also contend that the Notice, carefully vetted by Judge Alsup, inaccurately states that they "will not receive any payment" by opting out even though they could subsequently bring claims against Anthropic. But that same page of the notice they cite also states that "if you opt out a work from the Settlement, that means that you and any other legal or beneficial owners of that work will not receive any payment *from the Settlement for that work*." *See* LFN. The objectors do not and cannot identify any problem with that accurate court-approved statement.

These objectors also argue that portions of the parties' briefing at summary judgment and class certification were sealed until January 21, 2026, and that they did not have enough time to review them before January 29, the former opt-out deadline, to consider them. The opt-out deadline was subsequently extended to February 9, however, and the objectors do not contend they were unable to properly consider the formerly sealed documents in that time. Moreover, the objectors omit that the Court's decisions at class certification and summary judgment were fully available and that much of the class certification and summary judgment briefing was already available long before that date, providing more than enough information to determine

---

[12] The Long Form Notice (hereinafter "LFN") is available at https://tinyurl.com/LongFormNotice.

whether to opt out of the Class. Lastly, the objectors do not grapple with the Notice that the Court approved, which itself amply explains the risks, history, and litigation posture of the case.

*Third*, one objector (Dkt. 425 (Ruden)) argues that the Court should compel the parties to go to trial instead of approving the settlement. As discussed above, the Settlement in this case carefully balanced the marked risks to the class from further proceedings—including the risks of pre-trial *Daubert* issues, at-trial risks related to liability and damages, and post-trial risks stemming from the number of novel and consequential issues in the case—as recognized earlier by Judge Alsup himself.

*Fourth*, Victoria Lee Bishop (Dkt. 602), principally argues that (i) the Court should review Class Counsel's fee application with respect to non-class-counsel firms; (ii) the class should be broadened to include international and non-English authors; and (iii) the distribution plan disadvantages authors because of the default split and the Court's appointment of Theodore Cheng as special master to resolve disputes.

Bishop's objections lack merit. To start, Bishop is not a class member by her own admission, and she thus lacks standing. *Id.* at 7 ("I believe myself to be an improperly excluded class member."); *supra* Section III(D)(ii). In any event, Bishop's objections are not persuasive. Class Counsel are addressing the fee application in a reply brief herewith, in which their lodestar is calculated based only on their contributions in the case—not other law firms. In addition, the fact that Bishop advocates for expanding the Class demonstrates the settlement's merit, not its deficiency. Finally, the Court did not find Mr. Cheng was conflicted based on his extensive declaration, *see* Dkt. 501 at 6, and the Claim Form does not mandate any split between claimants. To the contrary, the default option—formed after extensive consultation with industry stakeholders—is just that: an option. Any class member is entitled to claim any percentage of any work to which they are entitled.[13]

Bishop also lists several other objections to the settlement, many offered with little to no explanation. She posits that (i) notice was insufficient under 17 U.S.C. § 501(b); (ii) the named plaintiffs are not adequate; (iii) authors and publishers were involved at an early stage but not named as interested parties in Plaintiffs' "initial disclosures"; (iv) Class Counsel did not disclose they represent the Plaintiffs in *Authors Guild v. OpenAI, Inc.*, No. 23-cv-8292 (S.D.N.Y.); (v) class notice in insufficient because it was "delayed," during

---

[13] Some organizations—such as the Textbook and Academic Authors Association—have inquired whether Mr. Cheng will superintend communications between class members. Class Counsel have explained that, per the Court's Order, Mr. Cheng's role is limited to adjudicating instances in which (1) "Class Members dispute the ownership of a work or the portion of the settlement award for [that] work" and (2) the "dispute cannot be resolved by mutual agreement, as facilitated by the Settlement Administrator." Dkt. 501 at 2.

which point "publishers negotiated allocation without author participation" and "materially misstated author's rights and the Court's powers"; (vi) the allocation plan is not adequate because authors' interests were not adequately protected, publishers can "take authors' unclaimed money," "no evidence or law supports" the default split for non-education works," and a publisher "can bar their authors from recovery." Notwithstanding these objections, Bishop "does not oppose the Settlement in principle," *id.* at 1, and requests the Court address her objections "without disturbing the $1.5 billion settlement." *Id.* at 6.

These objections also lack merit. *First*, Judge Alsup correctly concluded that the class notice is "sufficient" and "adequate" under Section 501(b), because it "summarizes the amended complaint and states the claims to be released upon settlement." Dkt. 437 at 11. Bishop does not address Judge Alsup's finding, let alone square her assertion that "only the named plaintiffs" received notice with the exceedingly broad distribution of class notice that has occurred. *Supra* Section III(C)(i).. *Second*, Bishop likewise does not address Judge Alsup's finding that the class representatives are adequate, Dkt. 244 at 11–14, nor offer any support for her contention that the representatives' contracts are "highly atypical." Bishop also ignores that Class Counsel reviewed contracts far beyond those of just the class representatives. Dkt. 400 at 3–4. *Third*, Bishop is incorrect that the Authors Guild, AAP, and corporate publishers had to be identified in Class Counsel's Rule 26 initial disclosures, which were made well before class certification and thus appropriately concerned the "individual[s] likely to have discoverable information" in this case—*i.e.*, the named Plaintiffs. Bishop is similarly mistaken that Class Counsel was required to disclose the publicly available fact that they represent other plaintiffs in other AI copyright class actions. And in any event, Class Counsel did disclose this repeatedly.[14] *Fourth*, Bishop errs in contending that publishers were exclusively represented. All three of the named Plaintiffs are authors, and the plan of allocation was developed in consultation with the Author-Publisher Working Group, consisting of both author representatives and publisher representatives. Dkt. 363-2 at 17; *see also* 401 at 14–16. *Fifth*, it is simply untrue that publishers can "claim" authors' awards or preclude them from recovery. There is no mechanism in the claims process—none—for that outcome, and indeed, the Claim Form **obligates** publishers to list author contact information. Moreover, for any work with multiple owners, any other identified owner is sent a check automatically. Dkt. 401-1 at 4.

*Fifth*, Matthew Chase (Dkt. 543) argues the Works List should include certain works connected to the

---

[14] *See, e.g.*, Dkt 125-1, at 4; Dkt. 363-2, at 18–19; 29; Dkt 505-1 at 12; Dkt. 505-3 at 4.

pseudonym he occasionally uses to publish. But those Works are not in-suit and Chase thus lacks standing to object to a settlement that does not govern them. Natahsa Grace (Dkt. 550) similarly contends that the Works List should be expanded to include certain works of Grace's that were "copyrighted in a group registration." Dkt. 550 at 1. Grace likewise lacks standing to challenge the non-inclusion of these works.

*Sixth*, George Burton (Dkt. 584, 593) argues that distribution of the award is biased "in favor of the Publisher" and that the Settlement does not protect "authors from possible future harm." James Sills (Dkt. 600) raises similar arguments. The POAD, however, permits any claimant to demand their contractual rights regarding the per-work award be honored, Dkt. 401-1 at 6, and the Settlement only releases past claims. Dkt. 363-3 at 7.

*Seventh*, Robert Sappington (Dkt. 564) argues that the "scope of the release is overly broad" because it "prevents Class Members from pursuing future claims related to the ongoing use of models already trained on our works." That is incorrect. Anthropic has "represent[ed] that neither the LibGen or PiLiMi datasets, nor any portions of those datasets, were in the training corpus of any of its commercially released large language models." Dkt. 363-3 at 14. The Agreement's release, moreover, does not apply to conduct after August 25, 2025, or to output claims at all. Dkt. 437 at 5.

*Eighth*, Dale Carson (Dkt. 597) contends that the per-work award should be greater for books that (i) serve [a] more important function," in contrast to "fiction and humor" books; and (ii) were "referenced frequently" by Anthropic's models. Dkt. 597 at 2. The pro-rata distribution of the class award, however, is a feature of the Settlement, not a bug, and ensures equality amongst class members. It also makes sense, considering that Anthropic downloaded the pirated books in two large tranches, millions of files at a time, with no regard to the unique value of any particular Work. There is no basis to disturb that carefully crafted distribution plan, especially considering that Class Members seeking a greater per-work award retained the option to file suit against Anthropic instead of participating in the settlement.

*Ninth*, Liz Hyder (Dkt. 598) argues that Anthropic did, in fact, use the pirated works in its commercially released models because one of Anthropic's models purportedly "outputs entire books." But Hyder does not identify any pirated work that Anthropic reproduced and does not recognize that the Court held that Anthropic's book-scanning project—which Anthropic could use for its models—was fair use.

*Tenth*, Pierce B. Story (Dkt. 599) contends that notice was not distributed broad enough because "only

66% of the authors" on the Works List were located for purposes of notice. But the direct notice efforts resulted in notice being sent, and not returned as undeliverable, to 506,194 potential Class Members representing 480,114 Works—that is, 99.5% of the Works List. Under the POAD, moreover, any rightsholders to a Work identified in any Claim Form for that Work will automatically receive a check for their per-work share of the proceeds. Dkt. 401-1 at 4–5.. The also get an additional notice from the Settlement Administrator that a claim potentially implicating their Work was filed, and then another 70 days—even past the claims deadline—to file a claim for that work. *Id*. The Claims process is designed to ensure all Class Members can claim; the exceptionally strong Claims rate to-date is evidence of just that.

*Eleventh*, James Sills (Dkt. 600) contends Anthropic must destroy *all* books its models use. But the certified class includes books in LibGen and PiLiMi only, and injunctive relief is thus appropriately tailored.

*Twelfth*, Alisa Smith (Dkt. 609) states that two of her works on The Atlantic's list of books in LibGen should be on the Works List. But the court-approved FAQs explain that "[f]or a variety of reasons, many of the books listed in The Atlantic's list of LibGen files do not meet the Class definition," including because "Anthropic did not download any works from LibGen after July 2021" but "[t]o compile its list, The Atlantic used metadata from LibGen as that database existed in 2025."[15]

*Finally*, Amy Schapiro (Dkt. 588) contests the exclusion of employees of federal agencies from the Class and requests an exception be made for authors whose federal employment does not relate to their Work. Plaintiffs did not request the Court exclude employees of federal agencies from the Class, but the Court included it as part of the class definition. Dkt. 244 at 11. Plaintiffs are sensitive to the concern that the Court may not have intended to exclude individuals from the Class merely because they are presently employed by a federal agency, especially where the individual created the Work outside the scope of their employment as a federal employee, but Plaintiffs do not have the ability to change what the Court added to the class definition.[16] *See* Dkt. 8 (favoring class settlements "limited only to the claims certified for class treatment").

## IV.    **CONCLUSION**

---

[15] The Frequently Asked Questions "FAQs" are available at https://tinyurl.com/AnthropicFAQ.

[16] Plaintiffs received a letter dated January 12, 2026, from Robert Jacobson objecting to the settlement, but the letter has not been posted on the Court's docket and thus is not a valid objection. Jacobson contends that the compensation in the Settlement is not adequate; that the Settlement should contain a licensing arrangement; and that the Settlement should disclose exactly how Anthropic used class works in its training models. These arguments lack merit for the reasons explained herein.

Plaintiffs respectfully request that the Court grant final approval of the settlement.

Dated: March 19, 2026

By: */s/ Justin A. Nelson*

Justin A. Nelson (*pro hac vice*)
Alejandra C. Salinas (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (SBN 316062)
Michael Adamson (SBN 321754)
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
Rnath@susmangodfrey.com
Madamson@susmangodfrey.com

J. Craig Smyser (*pro hac vice*)
Samir H. Doshi (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 51st Floor,
New York, NY 10001
Telephone: (212) 336-8330
csmyser@susmangodfrey.com
sdoshi@susmangodfrey.com

*Co-Lead Counsel*

By: */s/ Rachel Geman*

Rachel Geman (*pro hac vice*)
Jacob S. Miller (*pro hac vice*)
Danna Z. Elmasry *(pro hac vice)*
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
rgeman@lchb.com
jmiller@lchb.com
delmasry@lchb.com

Elizabeth J. Cabraser (SBN 83151)
Daniel M. Hutchinson (SBN 239458)
Jallé H. Dafa (SBN 290637)
Amelia Haselkorn (SBN 339633)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
ecabraser@lchb.com
dhutchinson@lchb.com
jdafa@lchb.com
ahaselkorn@lchb.com

Betsy A. Sugar (*pro hac vice*)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
222 2nd Avenue S., Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com

*Co-Lead Counsel*

**ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.


Dated: March 19, 2026

/s/ Justin Nelson

JOINT NOTICE OF MOTION AND MOTION RE: UPDATE ON
SETTLEMENT AND ADDITIONS TO SETTLEMENT WEBSITE
CASE NO. 3:24-CV-05417