**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ANDREA BARTZ and KIRK WALLACE JOHNSON, individually, and ANDREA BARTZ, INC., CHARLES GRAEBER, and MJ + KJ, INC., individually and as representatives of the class,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 3:24-cv-05417-AMO<br><br>**DECLARATION OF CLASS COUNSEL IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL AND MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS** |

**DECLARATION OF CLASS COUNSEL**

Rachel Geman and Justin A. Nelson jointly declare and state as follows:

1.     We are Co-Lead Class Counsel for Plaintiffs in the above-captioned case. We make this declaration in support of Plaintiffs' Motion for Final Approval of the Settlement Agreement and Plaintiffs' Motion for Attorneys' Fees, Costs, and Class Representative Service awards.

2.     I, Rachel Geman, am a partner at Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser"), and serve as an attorney of record for Plaintiffs in the above-captioned class action. I am also a court-appointed Class Counsel. I am an active member in good standing of the New York State Bar, and am admitted *pro hac vice* to practice before this Court. Dkt. 29. I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.

3.     I, Justin A. Nelson, am a partner at Susman Godfrey L.L.P. ("Susman Godfrey"), and serve as an attorney of record for Plaintiffs in the above-captioned class action. I am also a court-appointed Class Counsel. I am an active member in good standing of the bar of Texas, and am admitted *pro hac vice* to practice before this Court. Dkt. 34. I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.

4.     At the outset, we are proud to inform the Court that, as of the morning of March 19, there have been 99,419 claims for 273,331 works, representing 54.8% of the Works List. By contrast, only 1,802 Works—approximately 0.37% of the Works List—have been opted-out, while only 32 objections from Class Members have been filed.[1]   We will update these figures before the final approval hearing, and after conclusion of the Claims Period.  The claims rate has jumped materially over even the past few days, a trend we expect to continue as major publishers continue to file claims.

## I.     THE SETTLEMENT WAS HARD-FOUGHT AND IS EMINENTLY FAIR

### a.   This case was sharply contested from beginning to end.

5.     Our prior declaration detailed the background of the case through preliminary approval, *see* Dkt. 363-2, which we summarize here. In short, this case undeniably required an overwhelming amount of effort from our law firms, all on an especially compressed timeline in a highly-novel, fast-moving area of law.

DECL. ISO MOT. FINAL APPROVAL AND
ATTORNEYS' FEES
CASE NO. 3:24-CV-05417-AMO

6.      Plaintiffs filed this case on August 19, 2024, on behalf of themselves and a proposed class of legal and/or beneficial owners of copyrighted works, alleging that Defendant Anthropic PBC ("Anthropic"), violated the Copyright Act, 17 U.S.C. § 501 et seq. by reproducing their works without permission. Dkt. 1 at 18. Anthropic filed its answer on October 21, 2024. Dkt. 57. Plaintiffs thereafter filed an amended complaint on December 4, 2024. Anthropic again answered rather than moving to dismiss. Dkt. 72.

7.      ***Document Production and Written Discovery.*** Anthropic produced more than 80,000 documents and over 2 million pages, including "Attorneys-Eyes' Only" source code documents, Slack exports, Notion wikis, and Google Vault data. Plaintiffs produced more than 20,000 pages of manuscript drafts, publishing contracts, registration certificates, and sales statements. Plaintiffs served 186 individual requests for production ("RFP"), 29 interrogatories, and 65 requests for admission ("RFA"). Across the three plaintiffs, Anthropic served 263 RFPs, 75 interrogatories, and 395 RFAs. The Parties' written discovery responses to interrogatories and RFPs spanned over 500 pages. A critical issue in document discovery related to production of books that Anthropic downloaded. Plaintiffs' original complaint related to one dataset, Books3, that comprised under 200,000 book files. Plaintiffs were not aware that Anthropic had used LibGen and PiLiMi, and Anthropic initially tried to shield that information from discovery by limiting discovery to information about commercially-released models. We pressed Anthropic to disclose ESI related to Library Genesis and other shadow libraries, and through that process—and several discovery motions—we uncovered Anthropic's use of LibGen and PiLiMi. Anthropic ultimately produced the millions of files sourced from LibGen and PiLiMi just a short period before Plaintiffs' motion for class certification was due.

8.      ***Depositions.*** Plaintiffs took four Rule 30(b)(6) depositions of Anthropic related to dataset acquisition; LibGen and PiLiMi metadata; multiple topics relating to acquisition and use of books datasets relevant to the certified Class and the benefits Anthropic obtained from such acquisition and use; ESI preservation, document repositories, and retention policies. In addition, during the period the Parties were briefing summary judgment and class certification, Plaintiffs deposed three fact witnesses from Anthropic plus one of its experts. In July and August, Plaintiffs deposed many of the main trial witnesses, including many of Anthropic's co-founders; the individuals who torrented the relevant datasets; and those in charge of pre-training, technology, and products. Anthropic meanwhile took five depositions of the named plaintiff authors and their loan-outs between March 5–7, 2025, and deposed one of Plaintiffs' experts. By the time the

DECL. ISO MOT. FINAL APPROVAL AND
ATTORNEYS' FEES
CASE NO. 3:24-CV-05417-AMO

Parties executed the term sheet, the Parties had conducted 20 depositions, and were actively preparing for depositions of trial witnesses on both sides, including Anthropic's CEO. The deposition transcripts in this case span 4,331 pages.

9. ***Expert Discovery.*** Both sides submitted expert reports in connection with Anthropic's motion for summary judgment and Plaintiffs' motion for class certification. Those expert reports addressed topics related to economics, market harm, large language models, and the ascertainment of books in the datasets. On August 1, the Parties exchanged topics of expert reports relating to trial experts, covering piracy; shadow libraries; Anthropic's use of Class Works; torrenting, seeding, and leeching; fair use related topics; and others. The Parties disclosed a total of 41 experts that could offer expert testimony. And by August 25—the date of the Parties' executed Term Sheet—the Parties' experts had substantially completed reports and the attendant work in advance of the August 29 discovery deadline to serve opening expert reports

10. ***Contested Motions.*** The Parties intensely litigated summary judgment, class certification, interlocutory review under 28 U.S.C. §1292(b), interlocutory review under Rule 23(f), motions to stay, motions related to notice, and 17 discovery motions.

a. Summary Judgment. On March 27, 2025, Anthropic moved for summary judgment, asserting fair use for its acquisition of copyrighted books for large language model training. Dkt. 122. Plaintiffs opposed on April 24, 2025, and Anthropic replied on May 8, 2025. Dkt. 163, 181. Judge Alsup heard argument on May 22, 2025, and the Parties provided supplemental briefing the following day pursuant to Court order. Judge Alsup granted in part and denied in part Anthropic's motion for summary judgment, finding that reproducing purchased-and-scanned books to train AI constituted fair use but denied summary judgment on the copyright infringement claims related to the works Anthropic obtained from Library Genesis and Pirate Library Mirror. *Id.* at 19, 31.

b. Class Certification. On March 27, 2025, Plaintiffs moved for class certification, Anthropic opposed on April 17, and Plaintiffs replied on May 1. Dkt. 125, 146, 172. Judge Alsup held a hearing on May 15, 2025, and the Parties submitted supplemental briefing on May 16, 2025, pursuant to Court order. Dkts. 199, 201, 202, 203. Judge Alsup certified a Rule 23(b)(3) "LibGen & PiLiMi Pirated Books Class" on July 17, 2025, appointing Plaintiffs Andrea Bartz Inc., Graeber, and MJ + KJ Inc. as Class Representatives, and Lieff Cabraser and Susman Godfrey as Co-Lead Class Counsel. Dkt. 244 at 9, 31.

c.      Interlocutory Review under Section 1292(b). On July 14, 2025, Anthropic moved for leave to immediately appeal the Court's summary judgment ruling under 28 U.S.C. § 1292(b), or alternatively for leave to move for reconsideration pursuant to L.R. Civ. 7-9. Dkt. 241. Plaintiffs filed their opposition on July 28, 2025. Dkt. 276.  On August 4, 2025, Anthropic filed its reply (Dkt. 284). The Court was scheduled to hear the motion on August 28. Dkt. 241 at 1.

d.      Interlocutory Review under Rule 23(f). On July 31, 2025, Anthropic filed a Rule 23(f) petition with the Ninth Circuit seeking immediate review of the class certification order. CA9, Dkt. 1. Plaintiffs opposed on August 14, 2025. CA9, Dkt. 19. Anthropic moved for leave to reply on August 21, 2025. CA9, Dkt. 22. That motion remains held in abeyance.

e.      Motions to Stay. In addition to the motion for interlocutory appeal and petition for interlocutory appeal, Anthropic moved to stay the District Court proceedings on July 24, 2025. Dkt. 272. Plaintiffs opposed on July 28, 2025 and Anthropic replied on July 30. Dkts. 275, 278. Judge Alsup denied Anthropic's motion to stay on August 11, 2025. Dkt. 296 at 2.  Anthropic also filed an emergency motion in the Ninth Circuit seeking a stay pending resolution of its Rule 23(f) petition. CA9, Dkt. 18. Plaintiffs filed their opposition on August 25, 2025. CA9, Dkt. 25. That motion remains held in abeyance as well.

11.    ***Trial Preparation***.  At the time of preliminary approval, trial was less than three months away, scheduled to commence on December 1, 2026. Trial preparation was thus underway, including the selection of witnesses; disclosures and document preparation related to potential witnesses; jury strategy issues; and strategic planning in developing Plaintiffs' trial case and rebutting Anthropic's.

**B.      Class Counsel Thoughtfully Developed the Approved Notice Plan.**

12.    Notice. Following the class certification order, Plaintiffs began working on the notice, the notice plan, and the Class List. Class Counsel collected publisher and author contact information from multiple sources, including author organizations, literary agencies, and agent organizations; Amazon.com for self-published and non-self-published books available on that website; publishers' organizations; and directly through a case website.  On August 15, 2025, Plaintiffs submitted a proposed notice plan following substantial outreach to potential Class members. Dkt. 317. Class Counsel recommended that JND Legal Administration ("JND") act as the class action notice administrator.

DECL. ISO MOT. FINAL APPROVAL AND
ATTORNEYS' FEES
CASE NO. 3:24-CV-05417-AMO

13.     Effective notice to potential Class Members required first identifying the copyrighted works at issue, a task that demanded significant effort. Plaintiffs and their experts compiled the Works List after devoting considerable time to gathering, analyzing, and matching data from multiple sources: the raw text and metadata of the files that Anthropic downloaded, United States Copyright Office data, and the International Standard Book Number ("ISBN") and book metadata from Bowker Books Data ("Bowker").

14.     Plaintiffs used the book files Anthropic downloaded to develop two processes for identifying works and their copyright registrations. Both processes ultimately relied on matching ISBNs to Bowker metadata, which could then be used to identify corresponding U.S. Copyright Office registration records. In the first process, Plaintiffs extracted ISBNs directly from the raw text of the book files. Where an ISBN was unavailable from the raw text, Plaintiffs used title and author information from the LibGen and Z-Library metadata to search Bowker for matching title-author pairs, from which ISBNs could then be obtained.

15.     Plaintiffs filed a final copy of the Works List on November 12, 2025. Dkt. 473. 482,460 Works comprise the Works List. Dkt. 548 at 1. Anthropic had an opportunity to review the Works List before it was filed and proposed changes to it. Under the Settlement Agreement, Anthropic could have added another 17,540 works to the list without paying more into the common fund. *See* Settlement Agreement (Dkt. 363-3) § 1.34.

**C.**     **The Settlement was Intensely Negotiated and Offers the Class Historic Relief, Distributed Via a Fair and Efficient Plan of Allocation and Distribution.**

16.     On May 23, 2025, Judge Alsup issued an order permitting the Parties to engage in settlement discussions. Dkt. 210. The Parties selected and began sessions with a neutral mediator, which did not result in settlement. All material conversations during this timeframe happened either directly with a mediator or with a mediator facilitating.

17.     In August 2025, the Parties resumed mediation with a new mediator, the Hon. (Ret.) Layn R. Phillips, after receiving the Court's rulings on class certification, summary judgment, and Anthropic's motion to stay.  The Parties submitted their mediation briefs to Judge Phillips on August 14, 2025.

18.     On August 19, 2025, the Parties participated in a full-day mediation session that included both Class Counsel firms, the Publishers Coordination Counsel firms, in-house counsel for Anthropic, and outside

counsel for Anthropic. Following the in-person mediation session, the Parties continued to negotiate a settlement over the course of the following week and weekend of August 24–25, 2025.

19. On August 25, 2025, the Parties executed a binding Term Sheet memorializing the material terms of the Settlement Agreement. That Term Sheet, like the Settlement Agreement, required:

a. the creation of a non-reversionary Settlement Fund of at least $1.5 billion for the benefit of the certified class, with Anthropic contributing an additional $3,000.00 per work for any work that it added to the Works List that meets the class criteria above 500,000 works;

b. a release of past claims only, limited to those works on the Works List and claims arising from the same factual predicate of this lawsuit—Anthropic's alleged torrenting, scanning, retention, and use of the Works (and excluding from the release any claims based on the output of AI models);

c. no release of any claims for future reproduction, distribution, and/or creation of derivative works of the works on the Works List; and an acknowledgement that the release does not constitute, in any respect, a license to torrent, scan, or train AI models on any copyrighted works, or to create infringing outputs from AI models;

d. certified destruction of all the original files of works downloaded from Library Genesis or Pirate Library Mirror and any copies that originate from the torrented copies, with an exception only for retention due to legal preservation or court-ordered obligations;

e. a clear and streamlined claims process that will allow class members to receive pro rata cash payments; and

f. limited releases only of claims arising from the identical factual predicate of this lawsuit.

20. The Parties negotiated and finalized a comprehensive Settlement Agreement and Release executed on September 5, 2025. Dkt. 363-3.

21. The Settlement Agreement also creates a Plan of Allocation and Distribution ("POAD"), which was intentionally designed to facilitate the fair and efficient distribution of Settlement funds after consultation with industry experts, both publishers and authors. The POAD provides that authors and publishers for non-education works will—as a default option—split each per-work award in half, with co-authors and co-

- 7 -

publishers splitting the author or publisher share of the award equally amongst themselves. Dkt. 401-1 ¶ 4(a)(i). This default represents the industry norm amongst trade and university publishing contracts. *See* Dkt. 396 Pallante Supp. Decl. ¶ 22. Nevertheless, the default is only an option; and any claimant may elect a different split.

22.    The Claim Form does not provide a default percentage for per-work award allocation amongst education works claimants. The Form requires the claimant to submit a good-faith representation regarding the percentage of recovery to which the claimant is entitled, and requests the claimant submit any relevant contracts or publishing agreements to demonstrate their ownership interests. *Id.* ¶ 4(b)(ii). Class Counsel determined that contracts for educational works varied too significantly to provide a meaningful default.

23.    The POAD ensures that any identified rightsholder to the work (even those who do not file claims) will receive a check for their share of the per-work award if one of their co-rightsholders files a claim. *Id.* ¶ 3(c)(ii)(3). If the rightsholder does not cash the check within 18 months, the funds will be redistributed to the filing claimant(s) for the work. *Id.*

## D.    Judge Alsup Correctly Granted Preliminary Approval of the Settlement

24.    On September 5, 2025, Plaintiffs filed an Unopposed Motion for Preliminary Approval. Dkt. 363. The Parties then appeared at a hearing on September 8, 2025, after which Judge Alsup postponed preliminary approval pending supplemental briefing and Plaintiffs' submission of a plan of allocation and distribution. Dkt. 371. After the hearing, Judge Alsup posed 34 questions to the Parties. *See* Dkts. 375, 383. The Parties answered the questions in a 53-page submission on September 23, 2025. Dkt. 418. Plaintiffs also submitted a supplemental brief in support of preliminary approval on September 22, 2025, Dkt. 401, accompanied by a Plan of Allocation, Dkt. 401-1, and further declarations, Dkts. 385–400.

25.    Judge Alsup held another hearing on September 25, 2025, at which he preliminarily approved the settlement and the plan of distribution. Dkt. 427. Judge Alsup thereafter issued a written preliminary approval order. Dkt. 437. Judge Alsup concluded that the Settlement's "tailored release, injunctive relief, and per-work award" rendered it "fair, adequate, and reasonable." Dkt 437 at 5.

## II.    CLASS COUNSEL WORKED TIRELESSLY TO ENSURE THE SETTLEMENT'S SUCCESS

### A.    Class Counsel worked closely with Class Members throughout the claims process.

26.    Dozens of attorneys across both law firms have spent thousands of hours assisting Class Members in the settlement administration process via email, phone, video conference, and virtual meetings. Plaintiffs have established both a dedicated email inbox and phone line which are staffed throughout the business day with multiple attorneys to quickly answer Class Member inquiries. Class Counsel has: (i) addressed Class Member inquiries; (ii) provided Class Members with pre-populated Claim Forms; (iii) personally assisted Class Members in completing claim forms; (iv) discussed the Settlement Website and the information provided; (v) mailed hard copies of Claim Forms to authors who were less familiar with online systems; (vi) clarified questions on the Works List and the Works List lookup tool; and (vii) discussed the Court's rulings and their relationship to the Settlement.

27.    Class Counsel have made every effort to respond to every class member who has reached out, fielding more than 5,200 calls and emails inquiring into a range of topics from eligibility to participate in the settlement to filling out and submitting the claim form. This figure does not include hundreds or thousands of participants who attended online webinars conducted or participated in by Class Counsel or the PCC and who had their questions answered in those fora. In sum, Class Counsel have spent thousands of hours working to ensure that Class Members understood their rights under the settlement and how to exercise them.

28.    Class Counsel have similarly monitored online activity daily to guard against efforts to mislead or confuse Class Members, promptly raising them with the Court. *See, e.g.,* Dkt. 442; Dkt. 613. Plaintiffs have and will continue to "bird dog this [Settlement] at every stage and bring to [the Court's] attention problems when they arise so that we can get together and see how to solve the problems" as Judge Alsup ordered. Dkt. 431 at 17.

29.    Class members have described the assistance received as providing a "lifeline to this whole claim filing process." They have noted that they feel "very fortunate to be represented" by Class Counsel, whose assistance "cut through the clutter of information." They have called the assistance "prompt," "rapid," "kind," "clear," "quick," and "excellent."

DECL. ISO MOT. FINAL APPROVAL AND
ATTORNEYS' FEES
CASE NO. 3:24-CV-05417-AMO

**B.      Class Counsel Regularly Monitored Communications to Class Members and Readily Intervened to Prevent Confusion or Deceit**

30.      Another aspect of Class Counsel's work has been the close and daily monitoring of communications to Class Members to ensure the absence of misleading or confusing communications and otherwise to ensure the efficient administration of the Settlement.

31.      Multiple communications amplified the court-approved Notice and directed Class Members to the Settlement Website and to Class Counsel. The declarations in support of final approval detail these efforts, and indeed, even other organizations posted information about the Settlement on their websites (for example, literary agency the Writers' House).  The efforts of multiple author and publisher organizations to distribute information about the Settlement are among the reasons it was so well-publicized.

32.      On the other hand, a second category of communications raised concerns, namely, those relating to third party claims assistance companies and third party opt-outs solicitors. When Class Counsel became aware that third parties were launching or considering campaigns to provide claims assistance to Class Members in exchange for part of the recovery, Class Counsel engaged in productive dialogue with most such companies about why their campaigns should be disfavored. Class Counsel similarly monitored communications, engaged in dialogue with, and—where necessary—sought protections against opt-out solicitors. Dkts. 442; 477 (ClaimsHero). As a result of Class Counsel's efforts, and in the wake of a hearing under Rule 23(d) and a subsequent evidentiary hearing, ClaimsHero was required to make significant changes to its marketing. See, e.g., Dkt. Nos. 442, 460, 477, 478.

**C.      Class Counsel Unreservedly Support the Settlement**

33.      We have carefully reviewed the actions of the Class Members in response to the Settlement and have closely engaged with them, personally communicating with Class Members nearly every day, and leading (or overseeing) the webinars attended by hundreds of Class Members. This review also has involved evaluating the objections and responses; both of us have communicated with certain of the objectors and responders as well.

34.      *First*, the extraordinary low opt out rate is especially indicative of the widespread approval that the Settlement has garnered from Class Members. The settlement involved extensive notice, a fulsome opt-out period, efforts by others to procure opt-outs, and extensive publicity and media. Nevertheless, the opt-out

rate remains less than one half of one percent. Further, 34 class members on account of 177 works who originally opted out sought to have their works re-included in the settlement. *Second*, there are only 32 Class-Member objectors,[2] an especially low figure as well. While we are respectful of those objectors' views, their positions should not affect final approval for the reasons set forth in the final approval brief. And *third*, the present claims rate of over 54%—with still 11 days to go in the Claims Period, and major publishers and very large number of authors planning to file claims shortly—confirms that the claims process is working extremely well. *Fourth*, in both our experiences, this settlement is an excellent outcome. The miniscule opt-out and objection rates, in a Settlement that captured the attention and active engagement of Class Members, demonstrate the desirability of the Settlement in the eyes of the Class.

## III.    CLASS COUNSEL'S FEE REQUEST IS REASONABLE.

35.    Class Counsel seek 12.5% of the Settlement Fund (representing an approximately 6.92 multiplier), reimbursement of expenses (those already incurred and a reserve for future expenses), and Service Awards for the Class Representatives. This request represents a further reduction from Class Counsel's initial request of 20%, and is now only half of the benchmark reasonable award in the Ninth Circuit of 25%.

### A.    Lodestar Calculation

36.    Class Counsel implemented eleven categories of mandatory task codes to appropriately categorize their time in this litigation: (1) Administrative; (2) Expert Consultants (including expert depositions); (3) Pleading/briefing/legal analysis; (4) Case management; (5) Offensive discovery; (6) Client communication and defensive discovery; (7) Third-party discovery; (8) Court appearances/preparation; (9) Investigation and document analysis; (10) Depositions; and (11) Settlement.

> i.    Lieff Cabraser's Lodestar Demonstrates the Rigor, Dedication, and Efficiency it Brought to This Litigation

37.    Rachel Geman testifies to the Lieff Cabraser sections.

38.    My prior declaration included a description of the work done on this case from inception through December 1, 2025, as well as background information for individuals who contributed significant

---

[2] Of the 41 responses filed, eight were by individuals who did not have works on the Works List, so are not Class Members and do not have standing to object. Even among those with standing, there was support found for the Settlement. For example, Class Member Heidi S. Bond explained that the settlement should be approved in her filing. Dkt. 589.

hours to the case. Dkt. 573-4. Through this declaration, I provide updated time records for the additional hours spent on this case from December 1, 2025 through March 15, 2026.

39.     Partners, associates, and staff attorneys have over the last several months dedicated a significant amount of time to assisting with Settlement-related work.  Here we have leveraged our experience in complex settlements with extremely engaged Class Members and stakeholders, and in creating and implementing streamlined and efficient procedures to address both routine and bespoke questions and issues. We also were prepared from the beginning to implement appropriate monitoring of communications.

40.     These additional hours include work: (i) responding to and—if necessary—investigating inquiries from Class Members and prospective Class Members; (ii) overseeing the work of the Settlement Administrator; (iii) conferring regarding administration of the Settlement (mostly with co-Class Counsel; as well as other co-counsel, Anthropic's counsel, and industry stakeholders); (iv) monitoring the communications about the settlement by third parties and, as necessary, conferring or litigating to ensure the Class was not subject to misleading communications; related, responding to inquiries about communications about the settlement; (v) participating in webinars; (vi) claims stimulation efforts (both for non-filers and for filers who did not list all their works); (vii) preparing to secure final approval of the Settlement. As before, we have monitored for efficiency, and have excluded time spent addressing counsel's request for fees, as well as time spent in connection with Judge Alsup's December 23, 2025 Order and my response.

41.     As laid out in my original declaration, we have continued to staff this case with three partners on the day-to-day tasks: myself, Daniel M. Hutchinson, and Jallé Dafa.

42.     Lieff Cabraser associates Danna Elmasry, Amelia Haselkorn, Jacob Miller, and Betsy Sugar have also continued to dedicate significant time to this litigation.

43.     Lieff Cabraser staff attorneys Hannah Lazarz, Peter Roos, Jae Park, Katherine Post, Jose Garcia, Jonathan Zaul, Cameron Saunders, and Tanya Ashur have further dedicated substantial time to continue assisting in administering the settlement, attending weekly calls to discuss how to best support class members and interacting with class members on a daily basis.

44.     Lieff Cabraser has worked 16,501.40 hours with a current lodestar of roughly $12,159,449.00, specifically, we have logged 3,511.80 hours for a lodestar $2,231,249.50 for December 1, 2025 through March 15, 2026 based on 2025 rates.

45.      **Exhibit A** includes all work performed by Lieff Cabraser on behalf of Plaintiffs and Class Members, as summarized by timekeeper. As shown in **Exhibit A**, Lieff Cabraser has devoted approximately 16,501.40 hours to this litigation, accumulating a lodestar of approximately $12,159,449.00 from inception to March 15, 2026. This updated lodestar accounts for the additional 3,511.80 hours Lieff Cabraser has worked on this matter since December 1, 2025, representing an additional $2,231,249.50 in lodestar. This excludes time spent by attorneys and staff who billed fewer than 10 hours on the case and it also excludes time spent on the fee application and fee-related work.

46.      The chart below provides information by the eleven categories:

| TASK CODE | DESCRIPTION | HOURS |
|---|---|---|
| 1 | Administrative | 485.40 |
| 2 | Experts/Consultants (Including Expert Depositions) | 204.20 |
| 3 | Pleading/Briefing/Legal Analysis | 1,744.40 |
| 4 | Case Management | 708.80 |
| 5 | Offensive Discovery | 748.80 |
| 6 | Client Communication and Defense Discovery | 1,401.80 |
| 7 | Third Party Discovery | 111.30 |
| 8 | Court Appearances and Preparation for the Same | 619 |
| 9 | Investigation and Document Analysis | 3,261.50 |
| 10 | Depositions | 773.60 |
| 11 | Settlement | 6,442.60 |
| | **TOTAL HOURS** | 16,501.40 |

47.      Lieff Cabraser is committed to working on this case through final resolution (if approved) and after. Lieff Cabraser attorneys and non-attorneys staff are currently overseeing settlement administration, responding to Class Member inquiries, assisting Class Members who reach out, and otherwise engaging in the tasks set forth in this Declaration.

   *ii.*      Susman Godfrey's Lodestar Reflects the Intensity and Efficiency with Which it Litigated this Action

48.      Justin A. Nelson testifies to the Susman Godfrey sections.

49.      I am incredibly proud of the Susman Godfrey team's incredible efforts to litigate this historic case, which led to an unprecedented recovery on behalf of the class. To date, Susman Godfrey has devoted

DECL. ISO MOT. FINAL APPROVAL AND
ATTORNEYS' FEES
CASE NO. 3:24-CV-05417-AMO

10,968.3 hours to the matter, resulting in a present lodestar of $10,508,447.50 based on 2025 rates. The firm prosecuted this case on a purely contingent basis, paying all expenses alongside co-counsel to the exclusion of other fee-generating work, accepting the significant risk that a fee would only be procured if meaningful relief for the class was secured.

50.     The below schedule provides a summary reflecting the amount of time spent by the attorneys and professional support staff of Susman Godfrey who were involved in this litigation until March 15, 2026; the lodestar calculation is made using 2025 billing rates only, even for work performed in 2026. The schedule was prepared from daily time records regularly prepared and maintained by Susman Godfrey, which are available at the request of the Court. Time expended in preparing the application for fees—including with respect to the attorney declarations submitted on December 31, 2025, in response to the Court's order—and submitting requests for reimbursement of expenses are excluded and not reflected below. Hours worked by summer associates are excluded, as are a small number of attorneys and staff who provided fewer than 10 hours of time have also been excluded and are not reflected below:

| TIMEKEEPER | TITLE | HOURLY RATE | TOTAL HOURS | VALUE |
|---|---|---|---|---|
| Bhatia, Vineet | Partner | $2,300.00 | 11.0 | $ 25,300.00 |
| Nelson, Justin | Partner | $2,250.00 | 1,296.3 | $ 2,916,675.00 |
| Connors, Jordan | Partner | $1,100.00 | 356.7 | $ 392,370.00 |
| Gervais, Michael | Partner | $1,075.00 | 43.5 | $ 46,762.50 |
| Adamson, Michael | Partner | $975.00 | 534.1 | $ 520,747.50 |
| Nath, Rohit | Partner | $975.00 | 1,473.7 | $ 1,436,857.50 |
| Salinas, Alejandra | Partner | $975.00 | 557.0 | $ 543,075.00 |
| Doshi, Samir | Associate | $850.00 | 1,030.2 | $ 875,670.00 |
| Smyser, Craig | Associate | $825.00 | 1,817.4 | $ 1,499,355.00 |
| Fredericks, Collin | Associate | $750.00 | 1,050.7 | $ 788,025.00 |
| Karlin, Molly | Of Counsel | $900.00 | 165.0 | $ 148,500.00 |
| Stemkovsky, Alex | Staff Attorney | $625.00 | 60.3 | $ 37,687.50 |
| Clark, Audra | Staff Attorney | $575.00 | 916.4 | $ 526,930.00 |
| Galik, Kristin | Staff Attorney | $575.00 | 147.8 | $ 84,985.00 |
| Gipson, Vicki | Staff Attorney | $550.00 | 82.6 | $ 45,430.00 |
| Mohsen, Rania | Staff Attorney | $500.00 | 260.6 | $ 130,300.00 |
| Rodriguez, Samantha | Staff Attorney | $500.00 | 22.8 | $ 11,400.00 |
| Aana, Patrick | Staff Attorney | $450.00 | 139.4 | $ 62,730.00 |
| Mikhael, Nehad | Staff Attorney | $450.00 | 57.7 | $ 25,965.00 |
| Sinha, Reetu | Staff Attorney | $450.00 | 731.2 | $ 329,040.00 |
| Izquierdo, Martha | Paralegal | $300.00 | 72.8 | $ 21,840.00 |
| Loaiza, Nicholas | Paralegal | $275.00 | 141.1 | $ 38,802.50 |
| | | TOTAL | 10,968.3 | $ 10,508,447.50 |

51.     These figures illustrate the remarkably efficient staffing model of the Susman Godfrey team.

- 14 -

52.     That focus is not surprising to me. Susman Godfrey takes pride in efficiency. The firm does not employ a "pyramid structure" with a small number of equity partners and a large number of associates; to the contrary, nearly half of Susman Godfrey attorneys are equity partners. Susman Godfrey is also familiar with the risks this case posed; unlike many law firms, we often do not bill by the hour but bet on ourselves to achieve the best result for the client. In non-class cases where the client advances expenses, our normal percentages range from 35-45% depending on the stage of the case. Where we advance expenses as we are doing here, the fee generally ranges from 40-50%. At the stage of the case where this case settled, and with the firm advancing expenses as opposed to the client, our normal contingent fee would have been approximately 45% in a non-class case.

53.     Neither am I surprised by the team's success. Despite its lean staffing model, SG alongside co-counsel produced a groundbreaking victory in a highly novel area of law, litigating exhaustively and intensely from day one. As expressed earlier, millions of pages of documents were produced; a dozen-and-a-half motions to compel were litigated; several case-dispositive motions were fully briefed in this court and the Ninth Circuit; expert reports were on the verge of submission; 20 depositions occurred—all in one year, all against some of the largest and most well-recognized defense firms in the country.

54.     The scope of the litigation was not just substantial, it was undeniably novel. In my previous declaration, I noted that "[b]efore this litigation, I am aware of no court having ever (a) held that piracy by an AI company constituted copyright infringement, or (b) certified a class in a copyright infringement action against an AI company." Dkt. 573-2 at ¶ 9. That remains true even today, months later.

55.     Since preliminary approval, the SG team has also worked tirelessly to ensure the success of the settlement, expending nearly 1,000 hours communicating with class members about it, as demonstrated by Susman Godfrey's categorized time records. That work included interacting with Class Members via phone, email, and video conference, to: (i) answer all manner of questions; (ii) assist with filing claims, including bulk claims; (iii) notify Class Members of their rights under the settlement; (iv) ensure updates to Claim Forms were accurately processed; (v) explain the Court's orders to class members; (vii) ensure that class members with medical difficulties could still file claims, and more. Class Counsel also participated in online webinars; reviewed third party communications and sought court relief where appropriate; interceded where appropriate in communications between class members; and engage in claim stimulation efforts. I am

DECL. ISO MOT. FINAL APPROVAL AND
ATTORNEYS' FEES
CASE NO. 3:24-CV-05417-AMO

confident that our team interacted with a class member nearly every day since preliminary approval, including on weekends and holidays.

56.     SG's categorized time records are broken down using eleven categories of task codes: (1) Administrative; (2) Expert Consultants (including expert depositions); (3) Pleading/briefing/legal analysis; (4) Case management (including development of the Works List); (5) Offensive discovery; (6) Client communication and defensive discovery; (7) Third-party discovery; (8) Court appearances/preparation; (9) Investigation and document analysis; (10) Depositions; and (11) Settlement. The schedule below provides a summary reflecting the amount of time spent in aggregate by the attorneys and professional support staff of Susman Godfrey who were involved in this litigation in each of these categories. The schedule was prepared from daily time records. Time expended in preparing the application for fees and submitting requests for reimbursement of expenses are excluded and not reflected below. Hours worked by summer associates and a small number of attorneys and staff who provided fewer than 10 hours of time have also been excluded and are not reflected below.

| TASK CATEGORY | TOTAL HOURS | TOTAL |
| --- | --- | --- |
| Case Management | 3,932.2 | $4,009,020.00 |
| Pleadings, Briefing, Analysis | 1,801.9 | $1,859,232.50 |
| Investigation and Document Analysis | 1,332.0 | $943,465.00 |
| Settlement | 1,170.0 | $1,148,590.00 |
| Court Appearance | 823.7 | $1,007,842.50 |
| Offensive Discovery | 542.1 | $469,875.00 |
| Client Communication/Defensive Discovery | 506.9 | $303,945.00 |
| Deposition | 453.8 | $426,362.50 |
| Experts/Consultants | 290.4 | $247,987.50 |
| Administration | 103.1 | $85,272.50 |
| Third-Party Discovery | 12.2 | $6,855.00 |
| TOTAL | 10,968.3 | $10,508,447.50 |

**B.     Projected Time for Both Firms**

57.     In our prior declarations, we estimated that settlement administration tasks from December 1, 2025 through February 2027 would, in total, require an additional 11,891.6 hours of work for Class Counsel and a total expected lodestar of $8,119,300 for work related to settlement administration. Dkt 573-2 at ¶ 17, 21. In the first 3-and-a-half months of that 15-month period—i.e., from December 1, 2025 through March 15, 2026—our teams have collective incurred 5,138.5 hours and $3,427,087 in lodestar. These figures confirm

that our previous estimates for future time were appropriate and likely conservative. As an additional measure of conservatism, we have the projections for work in 2026 (and our reporting of work actually performed in 2026 in the sections above) are all calculated using lower 2025 hourly rates.

58.    As we previously estimated, the total lodestar across our two firms is $27,082,963.

***

At the end of the second preliminary approval hearing, Judge Alsup remarked "We have some of the best lawyers in America in this courtroom now." Dkt. 431 at 17. We are grateful to call those lawyers our colleagues, and even more grateful that we could, together, deliver this momentous result to hundreds of thousands of hard-working authors and publishers across the country.

C.    **Unreimbursed Costs and Litigation Expenses**

59.    Lieff Cabraser and Susman Godfrey incurred, and continue to incur, unreimbursed out-of-pocket costs and expenses from a joint litigation cost fund, separate litigation expenses borne solely by each firm, and future outlays for in-progress expenses

60.     Class Counsel established and maintained a cost fund to jointly pay significant litigation expenses.

61.    By paying the vast majority of the expenses through the shared cost fund, Class Counsel ensured that there would be minimal risk of duplicative costs.

62.    As reported in the original Geman Declaration (Dkt. 505-3), LCHB accumulated unreimbursed out-of-pocket costs and expenses from a joint litigation cost fund, separate litigation expenses borne solely by LCHB, and future outlays for in-progress expenses.

63.    As set forth below, these include costs advanced in connection with customary litigation expenses, such as testifying and consulting experts, mediation, legal research, filing fees, document hosting services, copying and mailing, and other customary litigation expenses.

64.    The Cost Fund:  Because of the substantial financial commitment required to prosecute a class action of this size and scope, Class Counsel established and maintained a cost fund to jointly pay significant litigation expenses. The total extant Cost Fund payments for which reimbursement are sought are $2,779,950.26—$2,439,950.26 contributed by Class Counsel, and $340,000 by the Edelson firm (which

contributed after they joined the case). Each of the firms has advanced these monies with no guarantee of repayment.

65. LCHB maintained detailed records of the cost fund and each payment from it. LCHB's business records document the following payments from the cost fund for required litigation expenses.

66. The below chart summarizes the total costs, updated since December 3, 2025, that have already been made out of the case cost fund:

| COST TYPE | TOTAL |
|---|---|
| Court Reporters | $2,401.55 |
| Deposition Services | $113,111.39 |
| E-Discovery | $46,381.75 |
| Experts | $1,368,210.39 |
| Manual Filing Expenses | $113.16 |
| Mediation Services | $230,746.37 |
| Settlement Publication Services | $246,577.19 |
| Special Master | $3,660.00 |
| Trial Consultants | $60,111.13 |
| Class List | $82,526.25 |
| Outside Legal Fees | $626,111.08 |
| TOTAL | $2,779,950.26 |

67. Class Counsel *do not* seek reimbursement for additional expert costs they incurred, including costs for experts William B. Rubenstein and Brian Fitzpatrick. These unreimbursed costs were borne by Class Counsel alone.

68. The requested case costs have been reasonable, necessary, and proportionate to the needs of a novel, complex copyright action and should be reimbursed.

69. LCHB-Specific Costs: In addition to the Cost Fund, LCHB expended a significant amount of out-of-pockets costs for litigation expenses. As with the Cost Fund, expenses were calculated from the firm's books and records and therefore represent an accurate recordation of costs and expenses. Especially given the risk of the litigation, LCHB expended only that which was reasonably necessary for the continued prosecution and resolution of this litigation. LCHB's business records document the following additional payments for required litigation expenses:

   *iii.*    Lieff Cabraser

70. Rachel Geman testifies to the Lieff Cabraser sections.

- 18 -

71.    In addition to the Cost Fund, LCHB expended a significant amount of out-of-pockets costs for litigation expenses. As with the Cost Fund, expenses were calculated from the firm's books and records and therefore represent an accurate recordation of costs and expenses. Especially given the risk of the litigation, LCHB expended only that which was reasonably necessary for the continued prosecution and resolution of this litigation. LCHB's business records document the following additional payments for required litigation expenses:

| COST TYPE | TOTAL |
|---|---|
| Electronic Database Charges | $39,135.01 |
| Travel (Air and Ground Transportation) | $21,758.19 |
| Research Charges | $10,641.67 |
| Process Service | $1,657.60 |
| Messenger Delivery Service | $1,971.41 |
| PHV Fees | $984.00 |
| Copies | $546.00 |
| Deposition Expenses Charges | $414.50 |
| Filing Fees | $328.00 |
| Postage | $61.24 |
| Outside Copy Service | $55.50 |
| **TOTAL** | **$77,553.12** |

72.    Lieff Cabraser has excluded internal printing costs and certain travel related expenses, including hotels and food.

73.    It is Lieff Cabraser's policy and practice to prepare records from expense vouchers, check records, credit card records, and other source materials. Based on my oversight of Lieff Cabraser's and other firms' work in connection with this litigation and my review of these records, I believe them to constitute an accurate record of the expenses incurred by the firms. Itemized expense reports are available for review should the Court deem it appropriate.

        iv.    Susman Godfrey

74.    Justin A. Nelson testifies to the Susman Godfrey sections.

75.    SG also contributed to the joint litigation cost fund in this case as addressed above. As categorized and shown in the below schedule, separate from the joint litigation fund, SG also advanced a total of $117,694.75 in other un-reimbursed expenses in connection with the prosecution of this case. These expenses were reasonably necessary to the prosecution of this case and are of the type SG normally incurs in

litigation. These include costs advanced in connection with customary litigation expenses, such as testifying and consulting experts, mediation, travel fees, and other customary litigation expenses. Expenses were calculated from the firm's books and records and represent an accurate recordation of costs and expenses. SG has not submitted for reimbursement any expenditures incurred on meals or hotels.

| EXPENSE TYPE | TOTAL |
|---|---|
| Air Travel | $ 44,453.68 |
| Outside Photocopy Services | $ 22,097.04 |
| Expert Fees | $ 14,125.00 |
| Ground Transportation (Taxis, Car Service) | $ 12,944.65 |
| Research Charges | $ 14,025.02 |
| Filing Fees | $ 2,275.00 |
| Deposition Expenses | $ 1,570.65 |
| Prints (Color) | $ 1,052.00 |
| Videotaped Deposition Expenses | $ 1,000.00 |
| Prints (Black & White) | $ 998.80 |
| Messenger Delivery Service | $ 572.44 |
| Online Research Services | $ 462.95 |
| Trial Transcripts | $ 383.55 |
| Court Document Alerts | $ 399.30 |
| Process Service Fees | $ 328.00 |
| Parking | $ 231.15 |
| Court Reporter Expense | $ 196.85 |
| Secretarial Overtime | $ 430.00 |
| Trial and Trial Preparation Expenses | $ 77.00 |
| Certificate Copies of Documents | $ 50.00 |
| Mileage (Travel) | $ 21.00 |
| TOTAL | $ 117,694.08 |

76.     It is Susman Godfrey's policy and practice to prepare records from official source materials such as receipts and credit card records. Based on my oversight of the compilation of Susman Godfrey's expenses in this case, I believe them to constitute an accurate record of the expenses reasonably and actually incurred in the prosecution of this action. Indeed, they understate the expenses because we did not include expenses for hotel or food even though the firm imposes limitations on reimbursement amount and even though such costs are regularly submitted for reimbursement in class action cases. For airfare, I personally purchase economy tickets and Susman Godfrey typically reimburses no higher than the lowest refundable economy fare. All case expenses were passed along at cost, with no additional mark-up to the firm. Itemized expense reports are available for review by the Court should the Court deem it appropriate.

## B.   Future Payments

77.   Class Counsel will continue to pay for additional costs and expenses to resolve this litigation. These future costs include payment for Court-ordered contracted costs and expenses that are in the process of being performed.

| COST TYPE | TOTAL |
|---|---|
| Settlement Administrator | $15,000,000.00 |
| Special Master | $1,500,000.00 |
| Ongoing Works List Expert and Case Management Costs | $70,000.00 |
| Additional 10% Reserve | $1,650,000.00 |
| **TOTAL** | **$18,220,000.00** |

78.   <u>Costs Reserve</u>. Class Counsel request a costs reserve of $18,220,000.00 for payment of these future costs. The composition of this request has changed in a few respects. First, as set forth above, Class Counsel have paid deferred expert expenses, deferred Works List costs, and deferred outside legal fees that became due. The anticipated expert, Works List, and other costs has therefore been reduced from $1,030,000 to $70,000. Second, as set forth below, Class Counsel have changed the anticipated amount for the Special Master from $1,000,000 to $1,500,000 based on the high claims rate so far. Class Counsel prospectively request this Costs Reserve to ensure efficient settlement administration and to avoid multiple, ongoing requests to the Court as expenses are incurred. Any unspent amounts remaining in the costs reserve shall be treated as Settlement Funds and disbursed to Class Members pursuant to the Settlement Agreement.

79.   <u>The Settlement Administrator</u>. By far the largest pending expense is the estimated $15 million due to the Court-appointed Settlement Administrator, JND Legal. *See* Supplemental Declaration of Jennifer M. Keough Regarding Proposed Class Notice Plan (Dkt. 399), at ¶ 117. Class Counsel will be personally responsible for advancing settlement costs and expenses on behalf of Plaintiffs and Class Members.

80.   <u>The Special Master</u>. On November 25, 2025, the Court appointed Theodore K. Cheng as Special Master for settlement claims in this matter. In the event that Class Members dispute the ownership of a work or the portion of the settlement award for a work to which they are entitled—and in the event that dispute cannot be resolved by mutual agreement, as facilitated by the Settlement Administrator—these disputes will be addressed and resolved by the Special Master in his capacity as a Court-appointed neutral.

The Special Master shall be compensated for time reasonably expended in connection with this matter at the rate of $500 per hour and for any reasonably necessary out-of-pocket expenses.  While Class Counsel originally requested a reserve amount of $1,000,000 for the special master, Class Counsel believe a more-conservative estimate is warranted based on the high claims rate and the possibility that class members may wish the Special Master to resolve any differences in submissions.

81.    Ongoing Works List Expert & Case Management Costs.  Class Counsel continue to incur out-of-pocket costs for settlement administration and case management.  For example, Class Counsel anticipate significant costs for the expert who assisted in compiling the Works List, who has assisted in response to Class Members who make claims and inquire about the Works List. Similarly, Class Counsel have incurred, and will continue to incur, costs related to final approval, settlement administration, and claims processing.  To be clear, Class Counsel will not receive reimbursement for such costs without specific Court authorization.  At this time, Class Counsel merely request authority to withhold such funds in a Cost Reserve so that they are available, if reasonable and appropriate.  Class Counsel will report all such costs in their post-Distribution Accounting.

82.    10% Reserve. In light of the exceptional participation of the Class, and the remarkably high claims rate, Class Counsel respectfully request that the Court authorize an additional reserve of 10% of the costs budget—$1,650,000.00, based on the current costs reserve request of $16,570,000.00—to cover unanticipated expenses that may arise during the remaining administration of the Settlement. The robust level of Class Member engagement—while a testament to the fairness and value of the Settlement—has generated demands on settlement infrastructure that were not fully foreseeable at the outset. In particular, the facilitation of claims distribution to such a large number of participating Class Members will entail significant logistical and administrative costs beyond those initially budgeted. This modest reserve would ensure that the settlement administration process is not disrupted by funding shortfalls and that Class Members continue to receive the prompt, efficient service they have come to expect from Class Counsel. Any unused portion of this reserve would be returned to the Settlement Fund for distribution to Class Members.

**C.      Service Awards**

83.      Class Counsel respectfully reiterates its request for service awards of $50,000 for each of the three Class Representatives to compensate their efforts and sacrifices in service to the Class. The three Class Representatives made exceptional contributions on behalf of the Settlement Class and should each be recognized for their active participation and contributions throughout this litigation.

***

84.      I, Rachel Geman, declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct to the best of my knowledge and that this declaration was executed in New York, New York on March 19, 2026.

85.      I, Justin A. Nelson, declare under penalty of perjury under the laws of the United States and the State of Texas that the foregoing is true and correct to the best of my knowledge and that this declaration was executed in Whistler, Canada on March 19, 2026.

Respectfully submitted,

/s/ Rachel Geman
Rachel Geman (*Pro Hac Vice*)

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

*Co-Lead Class Counsel*

/s/ Justin A. Nelson
Justin A. Nelson (*Pro Hac Vice*)

**SUSMAN GODFREY L.L.P**

*Co-Lead Class Counsel*

# EXHIBIT A

## LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

From: Inception

To: 03/15/26

**Matter Number: 4392-0001**

**PARTNER**

| NAME | HOURS | RATE | TOTAL |
|---|---|---|---|
| ELIZABETH CABRASER | 88.40 | 1,740.00 | 153,816.00 |
| JALLÉ DAFA | 662.40 | 905.00 | 599,472.00 |
| RACHEL GEMAN | 1,251.30 | 1,260.00 | 1,576,638.00 |
| DANIEL HUTCHINSON | 1,423.70 | 1,115.00 | 1,587,425.50 |
| ANNE SHAVER | 43.70 | 985.00 | 43,044.50 |
| REILLY STOLER | 336.80 | 835.00 | 281,228.00 |
| | **3,806.30** | | **4,241,624.00** |

**ASSOCIATE**

| NAME | HOURS | RATE | TOTAL |
|---|---|---|---|
| DANNA ELMASRY | 524.90 | 630.00 | 377,928.00 |
| ANNA FREYMANN | 48.40 | 690.00 | 38,720.00 |
| AMELIA HASELKORN | 521.90 | 655.00 | 396,644.00 |
| JACOB MILLER | 1,795.10 | 690.00 | 1,436,080.00 |
| BETSY SUGAR | 437.70 | 550.00 | 282,316.50 |
| | **3,328.00** | | **2,531,688.50** |

**STAFF ATTORNEY**

| NAME | HOURS | RATE | TOTAL |
|---|---|---|---|
| TANYA ASHUR | 561.10 | 655.00 | 367,520.50 |
| JOSE GARCIA | 325.00 | 630.00 | 204,750.00 |
| HANNAH LAZARZ | 527.80 | 655.00 | 345,709.00 |
| JAE PARK | 1,057.10 | 630.00 | 665,973.00 |
| KATHERINE POST | 475.70 | 630.00 | 299,691.00 |
| PETER ROOS | 920.30 | 655.00 | 602,796.50 |
| CAMERON SAUNDERS | 117.00 | 630.00 | 73,710.00 |
| JONATHAN ZAUL | 508.00 | 630.00 | 320,040.00 |
| | **4,492.00** | | **2,880,190.00** |

**CONTRACT ATTORNEY**

| NAME | HOURS | RATE | TOTAL |
|---|---|---|---|
| AYODELE VASSALL | 209.50 | 630.00 | 131,985.00 |
| | **209.50** | | **131,985.00** |

**PARALEGAL/CLERK**

| NAME | HOURS | RATE | TOTAL |
|------|-------|------|-------|
| SEGEV BERNER-KADISH | 178.90 | 480.00 | 85,872.00 |
| DAJUNG CHUNG | 136.50 | 480.00 | 65,520.00 |
| CAHRON CROSS | 726.00 | 480.00 | 348,480.00 |
| ARIANA DELUCCHI | 429.50 | 540.00 | 231,930.00 |
| MADELEINE HARRISON | 421.00 | 480.00 | 202,080.00 |
| ELLA HUGHES | 197.80 | 480.00 | 94,944.00 |
| ELIZABETH KEENLEY | 228.80 | 540.00 | 123,552.00 |
| ERIK KRUGER | 355.70 | 540.00 | 192,078.00 |
| BENJAMIN LANG | 431.20 | 540.00 | 232,848.00 |
| JAMES MCCANN | 130.10 | 480.00 | 62,448.00 |
| GEMMA MEADOWS | 126.10 | 480.00 | 60,528.00 |
| THOMAS STORY | 336.80 | 480.00 | 161,664.00 |
| ARIK TALMON | 142.50 | 515.00 | 73,387.50 |
| MADELEINE TURNER | 277.80 | 480.00 | 133,344.00 |
| BRIANA VITO | 148.50 | 540.00 | 80,190.00 |
| | **4,267.20** | | **2,148,865.50** |

**LITIGATION SUPPORT / RESEARCH**

| NAME | HOURS | RATE | TOTAL |
|------|-------|------|-------|
| MARGIE CALANGIAN | 86.60 | 565.00 | 48,929.00 |
| ANTHONY GRANT | 91.50 | 565.00 | 51,697.50 |
| MICHAEL MAZZARELLA | 37.10 | 565.00 | 20,961.50 |
| ELLY OXMAN | 10.80 | 565.00 | 6,102.00 |
| FAWAD RAHIMI | 86.30 | 565.00 | 48,759.50 |
| ELIZABETH SCHNEIDER | 69.70 | 565.00 | 39,380.50 |
| JENNIFER WILLIAMS | 16.40 | 565.00 | 9,266.00 |
| | **398.40** | | **225,096.00** |

| | MATTER TOTALS | 16,501.40 | | 12,159,449.00 |

# EXHIBIT B

| Name | Class Member? | Postmarked | Date Filed | Dkt. | Objection Category | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Settlement Amount | Fee Request | Expansion of Class | Misc. |
| Ruden | Y | | 9/25/2025 | 425 | | | | x |
| Barrett | N | | 10/20/2025 | 438 | | | x | |
| Reding | Y | | 10/22/2025 | 439 | x | | | |
| Paolinelli | N | | 1/14/2026 | 539 540 | | | x | |
| Tombs | N | | 1/14/2026 | 541 | | | x | |
| Leahy | N | | 1/14/2026 | 542 | | | x | x |
| Chase | Y | | 1/14/2026 | 543 | | | | x |
| Hale | Y | | 1/14/2026 | 544 | x | | | x |
| Golomski | Y | | 1/14/2026 | 545 | x | x | | |
| Johnston | N | | 1/14/2026 | 546 | x | | x | |
| Stewart | Y | | 1/15/2026 | 549 568 | | | | x |
| Grace | Y | 12/15/2025 | 1/15/2026 | 550 567 | | | x | x |
| Werner | Y | 12/15/2025 | 1/16/2026 | 551 569 | x | x | x | x |
| Miller | N | | 1/8/2026 | 552 | | | x | |
| Sappington | Y | | 1/13/2026 | 564 | x | x | | x |
| Glenn | Y | | 1/21/2026 | 565 | | | x | |
| Burke-Garcia | Y | | 1/20/2026 | 566 | x | | | x |
| Hampton | Y | | 1/23/2026 | 571 | x | | | x |
| Chakanga | Y | | 1/23/2026 | 572 | x | | | x |
| Burton | Y | | 1/12/2026 2/04/2026 | 584 593 | x | | | x |
| Ryker | N | | 1/21/2026 | 585 | | | x | |
| Shapiro | Y | | 1/19/2026 | 588 | | | | x |
| Bond | Y | | 1/30/2026 | 589 | | x | | |
| Choi | Y | | 1/30/2026 | 594 | x | | | |
| DesJardins | Y | | 2/2/2026 | 595 | x | | | x |
| Lee | Y | 2/12/2026 | 2/10/2026 2/20/2026 | 596 606 | x | | | |
| Carson | Y | | 2/9/2026 | 597 | x | | | x. |
| Hyder | Y | | 2/12/2026 | 598 | x | | | |
| Story | Y | | 2/13/2026 | 599 | x | x | | x |
| Sills | Y | | 2/13/2026 | 600 | | x | | x |
| Larson | Y | | 2/13/2026 | 601 | x | | | |
| Bishop | N | | 2/13/2026 | 602 | | | x | x |
| N. Editori | Y | 1/27/2026 | 2/20/2026 | 603 | | | x | x |
| T. Editori | Y | 1/27/2026 | 2/17/2026 | 604 | | | x | x |
| Nord | Y | 1/27/2026 | 2/17/2026 | 605 | | | x | |
| B. Editore | Y | 1/27/2026 | 2/17/2026 | 607 | | | x | x |
| A. Editore | Y | 1/27/2026 | 2/17/2026 | 608 | | | x | |
| Smith | Y | 2/8/2026 | 2/17/2026 | 609 | x | x | x | |
| Longanesi | Y | 1/27/2026 | 2/17/2026 | 610 | | | x | |
| A. Edotpr | N | 1/27/2026 | 2/17/2026 | 611 | | | x | |
| Garzanti | Y | 1/27/2026 | 2/17/2026 | 612 | | | x | |