**FILED**

APR 24 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**Shahid Mahmud**
CEO and Publisher, Arc Manor, Inc.
P.O. Box 10339
Rockville, MD 20849
shahid@arcmanor.com

April 20, 2026

Clerk of Court
United States District Court
Northern District of California
San Francisco Division
450 Golden Gate Avenue
San Francisco, CA 94102

**Re:** Andrea Bartz, et al. v. Anthropic, PBC, Case No. 3:24-cv-05417-AMO
**Statement of Class Member Arc Manor, Inc. in Support of Final Approval of Class Action Settlement**

Dear Judge Martínez-Olguín:

## I. INTRODUCTION

I write as a class member to respectfully urge this Court to grant final approval of the proposed class action settlement. I submit this statement in response to the objection filed by Professor Lea Bishop (Dkt. No. 630), which characterizes publishers as adversaries of authors who have corrupted the settlement process to divert funds that rightfully belong to authors alone. That characterization is contrary to how the publishing industry actually works, and if accepted, would undermine the interests of the very authors Professor Bishop claims to protect.

I am the CEO and Publisher of Arc Manor, Inc., a small independent press based in Rockville, Maryland, that has been publishing science fiction and fantasy since 2006. Arc Manor operates several imprints, including Phoenix Pick, Caezik SF & Fantasy, and others. We publish both classic reprints and original contemporary works. Our titles have won or been nominated for the Hugo Award, the Nebula Award, the World Fantasy Award, and the Prometheus Award, among others. I offer this perspective not as a representative of major corporate publishing, but as an independent publisher whose livelihood and whose authors' livelihoods depend on the fair resolution of this case.

## II. THE OBJECTION MISCHARACTERIZES THE PUBLISHER-AUTHOR RELATIONSHIP

Professor Bishop's objection rests on the premise that publishers "inserted themselves" into this litigation and are attempting to claim money that belongs entirely to authors. This premise

fundamentally misunderstands how publishing contracts work—not just at major houses, but at small presses like mine.

### A. Publishers Acquire Exclusive Rights and Are the Legal Owners of Those Rights.

In virtually every publishing contract Arc Manor executes—and, to my knowledge, in the standard contracts used across the industry—the author grants the publisher the exclusive right to publish, distribute, and exploit the work. The author transfers to the publisher the right to collect all earnings from the work. The publisher then compensates the author through an agreed-upon royalty rate.

This is not a minor administrative detail. It is the fundamental economic structure of the publishing relationship. When Arc Manor acquires a book, we typically pay the author an advance against royalties—often a significant sum for a small press—before we have earned a single dollar from the work. We then invest substantial additional capital in editing, cover design, interior layout, printing, marketing, distribution, and catalog management. The publisher bears the financial risk of bringing a book to market. If the book fails commercially, the publisher absorbs the loss; the author keeps the advance.

When a third party infringes the copyright in a work to which the publisher holds exclusive rights, the infringement injures the publisher directly. The publisher is not a bystander to the author's claim; the publisher is a rightsholder whose own legally acquired rights have been violated. This is precisely why Judge Alsup's class certification order defined the class to include both "beneficial or legal copyright owners." Publishers holding exclusive licenses are the legal owners of the publication rights at issue.

### B. The Proposed 50/50 Split Is Generous to Authors Relative to Underlying Contracts.

Professor Bishop asserts that authors are entitled to "100%" of the settlement proceeds, and that the distribution plan improperly allows publishers to take "50% or more." This claim ignores the contractual reality.

Under standard publishing contracts, the publisher collects all revenue and pays the author a royalty. For a typical book, that royalty might be 7.5%–15% of the cover price for print editions and 25% to 40% of net receipts for digital editions. If one were to distribute the settlement proceeds strictly according to the underlying contractual allocation of revenue, the author's share would be far less than 50%. The proposed distribution plan, which allocates a substantial portion to authors, is therefore more favorable to authors than a strict application of their own contracts would dictate.

Professor Bishop quotes Judge Alsup's concern that authors' "own agreements give them 100 percent." With respect, that is not what most publishing agreements provide. They provide for the publisher to collect 100% of earnings and remit royalties (a portion of those amounts collected, based on the contractual language) to the author. Those are very different things.

## III. PUBLISHERS BORE REAL COSTS THAT THE INFRINGEMENT DAMAGED

The objection treats publishers as if they are rent-seekers who contributed nothing and now seek to claim unearned windfalls. Speaking from my own experience, nothing could be further from the truth.

For each title Arc Manor publishes, we typically invest in the following: an advance payment to the author (typically thousands of dollars); professional editing (developmental, line, and copy editing with at least two, but often three separate editors); cover art commissioning (we only use human artists) and design; interior layout and typesetting; printing and binding (for physical editions); distribution and fulfillment; marketing and publicity campaigns, including advertising, social media, and convention appearances; catalog management and metadata maintenance; and rights management and contract administration.

When Anthropic downloaded pirated copies of books that we held exclusive publishing rights to at that time, from LibGen and PiLiMi, it did not merely copy the author's words. It copied the finished product that represents the publisher's investment—the edited, designed, formatted work that we brought to market. The harm to the publisher is real, direct, and independent of the harm to the author. Both deserve compensation.

A Redacted copy of a current contract signed by an author with Arc Manor is included as exhibit 'A.' While all contracts tend to be slightly different, this is fairly standard language for an Arc Manor contract, and it is also fairly typical of most traditional fiction contracts currently in use by various publishers.

## IV. THE CLAIMS-MADE PROCESS IS STANDARD AND NECESSARY

Professor Bishop characterizes the claims-made process as a scheme to deter authors from filing claims so that publishers can capture their share. This accusation does not withstand scrutiny.

Claims-made processes are standard in class action settlements of this magnitude. They exist because the court must verify that claimants are actual class members with valid claims. The alternative Professor Bishop proposes—simply mailing checks to authors at the addresses used for the Class Notice—sounds appealing in its simplicity, but it ignores significant practical realities: authors move; addresses become outdated; some authors are deceased and their estates must be located; works have multiple rightsholders whose respective shares must be determined; and the identity of the current rightsholder (author or publisher) must be verified, particularly where rights have reverted.

That publishers can file claims more efficiently than individual authors is not evidence of a conspiracy. Publishers maintain catalog databases, ISBN records, and rights tracking systems. This is infrastructure we build and maintain at considerable expense precisely to manage our rights—rights that were assigned to us by our authors under contract. The efficiency of that

process benefits our authors as well, because it ensures that claims are filed correctly and completely for titles in our catalog.

At Arc Manor, when we file claims for our titles, we are protecting the revenue stream from which our authors are paid. Every dollar we recover in this settlement is a dollar from which our authors receive their contractual royalty. If we failed to file claims, our authors would receive nothing. To ensure that our authors were contacted properly we provided the settlement lawyers a separate spreadsheet with contact information for each of our authors whose books we identified as being part of the claim.

Moreover, unlike major publishers, Arc Manor does not have dedicated legal departments. In Arc Manor's case, I (as the owner) personally did 100% of the research and then filed the claim, and I am certain many smaller publishers were more similar to me than any of the major corporations.

## V. THE OBJECTION'S "BIG PUBLISHER" NARRATIVE DOES NOT FIT THE CLASS

Professor Bishop's objection paints publishers with a single brush, implying that all publishers are large corporations working to exploit authors. The reality of the publishing industry is far more varied.

Small independent presses like Arc Manor operate in close partnership with our authors. We know them personally. We attend conventions together. We advocate for their work. Many of our editorial and business decisions are made collaboratively with our authors. Our authors chose to publish with us rather than self-publish because we offer them professional services, industry access, and financial investment that they could not otherwise afford.

If the Court were to accept Professor Bishop's argument that publishers have no legal right to share in this settlement, it would not only harm large publishing houses—it would devastate small presses like mine. We would lose compensation for the infringement of rights we lawfully acquired and invested heavily to exploit. Our authors would lose the publisher's share of the recovery, which flows back to them indirectly through our continued ability to invest in their future works, pay competitive advances, and maintain the infrastructure that supports their careers.

## VI. THE ARBITRATION MECHANISM PROTECTS BOTH PARTIES

Professor Bishop criticizes the settlement's arbitration mechanism for resolving disputes between authors and publishers over the allocation of per-title recovery. She characterizes this as throwing authors to the wolves.

In fact, an arbitration process is faster, cheaper, and more accessible than sending every author-publisher allocation dispute back to federal court. If there is a genuine disagreement between an

author and a publisher about how to divide their share of the settlement proceeds, someone must resolve it. Arbitration provides a practical mechanism to do so. The alternative—forcing authors and publishers into separate federal litigation over each disputed title—would be far more burdensome for both parties, and would delay payments to everyone.

## VII. CONCLUSION

The proposed settlement represents a historic recovery for authors and publishers whose works were pirated and used without permission. It is the largest copyright settlement in U.S. history. The distribution plan recognizes the legitimate interests of both authors and publishers—because both hold legally cognizable rights in the works at issue, and both suffered real harm from Anthropic's conduct.

Professor Bishop's objection, however well-intentioned, rests on a misunderstanding of how publishing contracts allocate rights and revenue. Accepting her arguments would not help authors. It would unravel the contractual framework on which the entire publishing industry— and authors' livelihoods—depend.

I respectfully urge this Court to approve the settlement and overrule the objection.

Respectfully submitted,

Shahid Mahmud
CEO and Publisher, Arc Manor, Inc.
Class Member
240-533-1004

Attachment: Exhibit A. Redacted copy of contract.

## CERTIFICATE OF SERVICE

I hereby certify that on April 21st, 2026, I caused a true and correct copy of the foregoing Statement of Class Member Arc Manor, Inc. in Support of Final Approval of Class Action Settlement to be served by first-class mail, postage prepaid, upon the following:


**Class Counsel:**
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111

**Counsel for Defendant Anthropic, PBC:**
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071

**Pro Se Objector:**
Lea Bishop
3627 N. Pennsylvania St.
Indianapolis, IN 46205

_____
Shahid Mahmud

**EXHIBIT A: REDACTED SIGNED CONTRACT**



**PUBLISHING AGREEMENT**



DS
EW

**Agent's Initials** _____

made on _____ REDACTED _____ between  REDACTED  c/o J  REDACTED
whose address is  REDACTED , (hereinafter called the
Author); and **Arc Manor Inc.** whose principal place of business is at Rockville, Maryland, USA (hereinafter called
the Publisher):

In consideration of the mutual covenants herein contained, the parties agree as follows:

### 1. GRANT OF RIGHTS

The Author, on behalf of the Author and the Author's heirs, executors, administrators, successors
and assignees, grants to the Publisher the exclusive rights to publish in print book form, eBook form and audio form
in all countries of the World in the English language, one (1) book tentatively titled  REDACTED
 (hereinafter called the Work), which title may be changed only by mutual consent in writing. This
Agreement and the grant of all rights herein shall be for the full term of the copyright and applicable extensions and
renewals if any. This Agreement and the grant of these rights will be subject to termination clauses as detailed in
Sections 19 and 20 of this Agreement.

### 2. REPRESENTATIONS AND WARRANTIES

The Author represents that he is the sole proprietor of the Work and that the Work to the best of their knowledge does
not contain any libelous matter and does not violate the civil rights of any person or persons, does not infringe any
existing copyright and has not heretofore been published in book form. The Author also warrants that these rights are
owned or controlled by the Author without encumbrance and that the Author has full power to grant the listed rights
to The Publisher. The Author shall hold harmless and indemnify the Publisher from any recovery finally sustained
by reason of any violations of copyright or other property of personal right; provided, however, that the Publisher
shall with all reasonable promptness notify the Author of any claim or suit which may involve the warranties of the
Author hereunder; and the Author agrees fully to cooperate in the defense thereof. The warranties contained in this
article do not extend to drawings, illustrations, insofar as not furnished by the Author, or to any other material not
furnished by the Author. If the Work has been previously published in any form, the Author warrants that the rights
granted herein have reverted to the Author. As an addendum to this Agreement, the Author shall detail the name and
contact information of the previous rights holder and indicate the date that the rights reverted back to the author. If a
judgment is obtained against the Publisher for usurping rights still controlled by another publisher or other entity than
Publisher or the Author, the Author agrees to hold the Publisher harmless and to indemnify the Publisher for reasonable
damages and costs. If the Publisher prevails against a suing party or resolves the matter by out-of-court settlement,
the Author will be liable to indemnify the Publisher for defense and settlement costs if the Author's warrantees are
found to be invalid.

### 3. COPYRIGHT OWNERSHIP AND REGISTRATION

The Author is the owner of the copyright of the Work. As a condition of this Agreement, the Publisher agrees to print
in every copy of the Work a Copyright Notice identifying the Author as the owner of the copyright in the manner that
complies with the regulations of the US Copyright Act and the Universal Copyright Convention.

1

The Publisher is not obligated to initiate legal proceedings should a Claim arise regarding a third party infringing the Author's or the Publisher's rights. If such a Claim arises, the Author and the Publisher may sue either jointly or severally. The Publisher shall not be held liable for failing to take action upon a Claim.

## 4. DELIVERY

Author agrees to deliver the complete manuscript by **REDACTED**

## 5. PUBLICATION

The Publisher agrees to publish the Work in book form at its own expense, not later than twelve months after the delivery of the completed Work. In the event of delay from causes beyond the control of the Publisher, the publication date may be postponed accordingly, but not to exceed twenty-four months from the delivery of the completed work. If the Work has not published within thirty-six months of the date of this Agreement, the author may give written notice of the cancellation of this contract and the contract will terminate 90 days from the date of the written notice.

Advances paid to the Author will not be refundable due to the failure of the Publisher to publish the Work within 36 months.

## 6. EDITING AND PROOFREADING

The Publisher shall make no changes in, additions to, or eliminations from the manuscript without the consent of the Author, and to obtain such consent, shall submit the edited manuscript to the Author for their approval (this may entail multiple rounds of editing). The Author agrees to return such proof to the Publisher with their corrections within thirty (30) days of the receipt thereof by him. The cost of alterations required by the Author, other than corrections of typesetting errors, in excess of twenty-five percent (25%) of the original cost of composition, shall be charged against the earnings of the Author under this Agreement; provided, however, that the Publisher shall upon request promptly furnish to the Author an itemized statement of such additional expenses, and shall make available at the Publisher's office the corrected proof for inspection by the Author or their representatives.

The Author acknowledges that the Publisher may require up to three rounds of editing/proofing to be examined and approved by the Author, including developmental editing, copy-editing (typically provided as a red-lined MS Word document) and final proof-reading (typically provided as a PDF of the final typeset version of the book).

The Author will be given reasonable opportunity to review any changes made to the manuscript, including, but not limited to, each stage of editing and proofreading.

## 7. COVER ART

The Publisher shall provide cover art at its own expense. While he Publisher has the final decision, the Publisher will consult with the Author on the artwork and design.

## 8. WORK TITLE

The Publisher will not change the title of the books without the Author's written consent.

## 9. ISBN

The Publisher will obtain and assign an ISBN (International Standard Book Number) for the Work. The Publisher will assign as many ISBN designations as required by the various publication formats listed in Section 1. The Publisher will use the assigned ISBN as part of the formal identification and will notify relevant services of the ISBN of the Work.

## 10. SELLING PRICE AND DISCOUNTS

The Publisher will set the retail price ("cover price") of the Work, based on length, comparable works, and format.

2

The Publisher reserves the right to raise or reduce the price at any time prior to or after publication. The Publisher also reserves to right to set and change at any time the discount offered for the wholesale and/or retail purchase of the book.

## 11. OWNERSHIP OF CHARACTERS

Except as allowed under the Sections of this Agreement governing promotion of the Work, where the Work is a work of fiction, the Author owns the characters and controls their use in sequels or series books, whether published by the Publisher or another Publisher. The Publisher will have a non-exclusive right to use the title, and all material, including characters in the Work, for the purpose of advertising, publishing and promoting the Work.

## 12. PUBLISHER'S NAME, LOGO, AND TRADEMARK

The Author will not have rights to, or in, any trademark, service mark, trade name or logos used by the Publisher, unless expressly permitted to do so in writing. The Author may, with the Publisher's permission, have limited use of the Publisher's trademarks, logos, symbols, or name for use in approved promotional material. The Author may use the cover art in the Author's promotional material. The Publisher's provided and/or copyrighted cover art may not be used by other publishers producing the Work in formats not listed in Section 1 without permission of the Publisher. Any remuneration for the use of this cover art will be separately negotiated between publishers.

## 13. ROYALTIES AND LICENSES

The Publisher shall pay to the Author or their duly authorized representatives, the following royalties.

(a) A royalty rate for paperback books of 8% of the book's list price up to 20,000 copies sold and 10% for all copies sold in excess of 20,000 (with the stated exception listed in 'e' below).

b) A royalty rate for hardcover books of 10% of the book's list price up to 5,000 copies; 11% for sales between 5,000 and 10,000 copies and 13% for all copies sold in excess of 10,000 copies. (with the stated exception listed in 'e' below).

(c) A royalty equal to the Forty percent (40.0%) of the net receipt by the publisher on all copies of the Work sold in any format not covered by Sections 13(a) and 13(b) above, including, e-books and audio books (with the exceptions noted in section (e) below) for sales up to 20,000 units in any specific format and Fifty percent (50%) for sales in excess of 20,000 units. This section does not apply to Derivative rights that are discussed in Section 14 of this contract.

(d) Fifty percent (50%) of the net proceeds of any license granted to another publisher to bring out a separate edition of the Work (in any format where the Publisher has been granted rights by this contract). This section does not apply to Derivative rights that are discussed in Section 14 of this contract.

(e) No royalties shall be payable for copies furnished to the Author or on copies for review, sample, provided for Authors own (directly or through the Author's representative or agent) purchase, purchased by the Publisher for marketing or promotional purposes, or other similar purposes, or on copies destroyed or returned. The Publisher may purchase copies of the Work from any source, including retail stores, for marketing and promotional purposes.

(f) The Publisher may, from time to time, offer the Author's books for sale on a consignment basis. Vendors who are offered 'consignment' facilities may include retail bookstores and dealers offering books at conventions, fairs and similar events. Works covered by this contract will not be considered sold unless the Publisher is informed by the consignee that the consignee intends to purchase copies of the Work and the consignee is invoiced for the sale (the sale may be for the consignee's own use, or based on sales the consignee has made). Royalty, for sales made to the consignee will be applied as per sections 13(a) and 13(b) of this contact. No Royalties will be due from the books being placed on consignment unless those books are sold to the consignee as detailed above.

(g) Payments due to the Author from the Publisher will be adjusted for actual returns to the publisher (including, but not limited to, returns from vendors and individual buyers.

3

DocuSign Envelope ID: 1A5AF-8/E-289A-4BA8-B/9E-2H2-2b730466

The Publisher reserves the right to establish a reserve against returns, not to exceed 35% of royalties due in any given period. Funds reserved against returns not utilized for actual returns may not be held for more than three statement periods and shall be paid to the Author with the first regular Royalty payment due after the expiration of the third statement period. The Publisher agrees not to establish a reserve against returns for books not offered to trade on a returnable basis.

(h) The Publisher may include excerpts of the Work in promotional material, including other works by the author covered by this contract and works of other authors published by the Publisher, or in Galaxy's Edge magazine with the sole purpose of promoting the Author's Work. An excerpt shall be defined as a segment of the book where such a segment's word count is not greater than 10,000 words. No royalty will be due on the inclusion and distribution of such excerpts in other Works or other promotional materials.

(i) The Author shall receive an Advance Against Royalties (hereinafter called the Advance) of REDACTED , for the Work when this contract is signed by both the Author and the Publisher. Half of the Advance REDACTED shall be payable upon the signing of the contract, and the balance REDACTED upon the publication of the Work OR 365 days from the signing of the work, whichever occurs earlier.

The advance is non-refundable unless the contract is terminated due to the failure of the author to deliver The Work as stipulated in Section 4 of this contract. If the contract is terminated due to the failure of the author to deliver The Work as stipulated in Section 4, the Author agrees to return the Advance to the Publisher within thirty (30) days of the receipt of the notice of termination from the Publisher.

Royalty payments accruing to the Author shall first offset the Advance in complete before any additional payments are made to the Author. All offsets will be detailed in the regular statements due the Author as stipulated in Section 17.

(j) The Publisher may offer a limited number of copies of the work for promotional purposes including as free 'giveaways' (not to exceed 45 days for each book in any given calendar year) and as 'prizes' in competitions held by the publisher or partner websites. The sole purpose of these giveaways and prizes will be to promote the works of the Author. No royalty will be due on books used for such purposes.

(h) Earnings from any websites where earnings are based on membership (or like) fees will be allocated to The Work as per the terms of the contract.

## 14. DERIVATIVE RIGHTS

N.A. (Author retains full derivative rights).

## 15. OVERPAYMENT

In all instances in which the Author shall have received an overpayment of monies under the terms hereof, the Publisher may deduct such overpayment from any further sums payable to the Author in respect to the Work.

## 16. NOTIFICATION AND PAYMENT

The Publisher agrees promptly to advise the Author of the terms of any contracts entered into for any grant or license permitted under this Agreement. Such contracts shall be made available by the Publisher to the Author or their representative at the office of the Publisher, and a copy thereof will be furnished the Author upon their written request. The Author's share of such proceeds or royalty shall be promptly paid to him upon receipt by the Publisher.

If the proceeds accruing to the author are less than five hundred dollars then the Author's share will be included in the statement and payment regularly due to the author under section 18 of this contract.

It is the Author's responsibility to communicate with the Publisher any change in Taxpayer Identification Number

4

or Social Security Number, Postal Mailing Address, Telephone Numbers, or Electronic Mail address. If the Author fails to advise the Publisher of any changes in the above that prevent the timely payment of royalties, the Publisher is authorized to hold, without penalty, payment of royalties until current information is received. If a check sent by regular post is returned by the post office or express delivery service as undeliverable, the Publisher shall first attempt to contact the Author by all existing contact information before unilaterally withholding payment of royalties. Author may request payment via a bank wire transfer and agrees to have any bank charges deducted from the amount owed, or they may request payment via Paypal without any charges being deducted.

## 17. AUTHOR'S COPIES

The Author shall be permitted to purchase copies for their personal use at a discount of forty percent (40%) of the retail price plus reasonable shipping and handling charges. Ten copies of the final printed form of each book comprising the Work will be provided to the Author direct at his home address without any cost or shipping/handling charges for the first edition, and a single copy of each subsequent edition. The Author's home address is:



REDACTED

Two copies will be provided to the agent, free of charge or shipping costs.

## 18. STATEMENTS AND PAYMENTS

The Publisher agrees to render semi-annual statements by August 31 and February 28 in each year following the publication hereof, showing an account of sales and all other payments due hereunder to June 30 and December 31 preceding said respective accounting dates. Payment then due shall accompany such statements. Payments will be considered due on August 31 and February 28 for the six-month period preceding June 30 and December 31 respectively. All payments will be adjusted for actual returns, and any errors related to prior payments.

## 19. REVERSION AND TERMINATION

(a) At any time prior to the publication, or during the publication, or after the publication of the Work but only AFTER the advance has been paid in full, the Publisher may, at its discretion, cancel this contract and remove the Work from publication or distribution for reasons of poor sales, excessive returns, or any other reasons. The Publisher shall give notice to Author 30-days prior to requested removal from distribution. Notice must be in writing by certified mail or other receipted or traceable delivery service, including email where return acknowledgement is received. When the Publisher removes the Work from sale and gives notice to the Author, this contract shall terminate and all rights granted shall revert to the Author with immediate effect. The Author understands that books that have already been purchased and are stocked by bookstores, such as Amazon.com, may be continued to be sold until such stock is exhausted. The Publisher has no control over what has already been placed out in the marketplace, but will ensure that no additional books will be printed, distributed, or sold in the wholesale market to the extent possible.

(b) The Author understands that the Publisher may withdraw the Work (after publication) from the market for short periods of time (not to exceed 90 days) for any reason including technical reasons or to effect corrections and/or changes to the Work or the Work's cover. Should the Work remain out of print for more than 90 days the Author may request the immediate termination of this contract by written notice. 'Written Notice' as used in this clause will mean registered mail by the official postal authorities of the Author's domicile or other similar traceable means of communication.

(c) If the Publisher shall, during the existence of this Agreement, default in the delivery of semi-annual statements or in the making of payments as herein provided and shall neglect or refuse to deliver such statements or make such payments, or any of them, within ninety (90) days after written notice of such default, this Agreement shall terminate at the expiration of such ninety (90) days and all rights granted shall revert to the Author with immediate effect without prejudice to the Author's claim for any monies which may have accrued under this

5

Agreement or to any other rights and remedies to which the Author may be entitled. 'Written Notice' as used in this clause will mean registered mail by the official postal authorities of the Author's domicile or other similar traceable means of communication.

(d) If the Publisher shall fail to publish the Work within the period stipulated in Section 5 and is provided written notice of cancellation by the author, or otherwise fails to comply with or fulfill the terms and conditions hereof, or in the event of bankruptcy as in Section 20 hereof provided, this Agreement shall terminate and the rights herein granted to the Publisher shall revert to the Author. In such event all payments theretofore made to the Author shall belong to the Author. All liabilities of the Author towards the Publisher will be considered terminated.

(e) Upon the termination of this Agreement for any cause under this Section or Section 20, all rights granted to the Publisher shall revert to the Author for their use at any time and the Publisher shall return to the Author all property originally furnished by the Author.

(f) The Author may request the termination of this contract and the Publisher will grant such request if the following two conditions are met:
    i) The termination request occurs after five years from the date of publication of the Work, and
    ii) Royalties accruing to the Author in any two subsequent royalty periods are less than $250 on a cumulative basis over the two subsequent periods.

## 20. BANKRUPTCY AND INSOLVENCY

If a petition in bankruptcy shall be filed by or against the Publisher, or if it shall be adjudged insolvent by any court, or if a Trustee or a Receiver of any property of the Publisher shall be appointed in any suit or proceeding by or against the Publisher, or if the Publisher shall make an assignment for the benefit of creditors or shall take the benefit of any bankruptcy or insolvency Act, or if the Publisher shall liquidate its business for any cause whatsoever, this Agreement shall terminate automatically without notice, and such termination shall be effective as of date of the filing of such petition, adjudication, appointment, assignment or declaration or commencement of reorganization or liquidation proceedings, and all rights granted hereunder shall thereupon revert to the Author.

## 21. RESERVED RIGHTS

All rights in the Work now existing, or which may hereafter come into existence, not specifically herein granted are reserved to the Author for their use at any time. Reserved publication rights include, but are not limited to, the right to publish or cause to be published in any form, excerpts, summaries of the Work, thereof, not to exceed ten thousand (10,000) words in length.

These reserved rights include performance (film/television, dramatic/stage, radio), interactive multimedia (including apps and gaming), merchandise/commercial rights, graphic novel, and comic book adaptation.

## 22. ASSIGNMENT

No assignment of this contract by the Author to another party, voluntary or by operation of law, shall be binding upon the Publisher without the Publishers written permission. However, the Author may assign or transfer any monies due or to become due under this Agreement.

## 23. ARBITRATION

Any controversy or claim arising out of this Agreement or the breach thereof shall be settled by arbitration in accordance with the rules then obtaining. Such arbitration shall be held in Rockville, MD unless otherwise agreed by the parties. The Author may, at their option, in the case of failure to pay royalties, refuse to arbitrate, and pursue alternative legal remedies.

## 24. NOTICES

Any written notice required under any of the provisions of this Agreement shall be deemed to have been properly

served by delivery in person or by mailing the same in paper or by electronic means to the parties hereto at the addresses set forth above, except as the addresses may be changed by notice in writing; provided, however, that notices of termination shall be sent by registered mail.

## 25. WAIVER

A waiver of any breach of this Agreement or of any of the terms or conditions by either party thereto, shall not be deemed a waiver of any repetition of such breach or in any wise affect any other terms or conditions hereof; no waiver shall be valid or binding unless it shall be in writing, and signed by the parties.

## 26. INFRINGEMENT

If during the existence of this Agreement the copyright shall be infringed, the Publisher may, at its own cost and expense, take such legal action, in the Author's name if necessary, as may be required to restrain such infringement or to seek damages therefore. The Publisher shall not be liable to the Author for the Publisher's failure to take such legal steps. If the Publisher does not bring such an action, the Author may do so in their name at their own cost and expense. Money damages recovered for an infringement shall be applied first toward the repayment of the expense of bringing and maintaining the action, and thereafter the balance shall belong to the Author, provided, however, that any money damages recovered on account of a loss of the Publisher's profits shall be divided equally between the Author and the Publisher.

## 27 OPTIONS ON FUTURE WORKS BY AUTHOR

The Publisher shall have the exclusive option to acquire, upon mutually agreeable terms, the publishing rights to any sequel written by the Author. This right of first refusal only applies to sequels to the Work and not to any other, unrelated Work by the Author. The Publisher will be granted a period of 60 days after being given a fifty page (approximately) excerpt and a detailed synopsis for review before being required to respond and if the Publisher has not responded within 60 days, the Author may consider this option terminated.

## 28. PUBLICITY, SOCIAL MEDIA AND MARKETING.

The Author may be asked to assist in marketing efforts by participating in interviews, blogs, speaking at conventions, social media posts and other events organized by the Publisher and/or the Publisher's publicist in an attempt to promote the Work. The Author agrees to participate in any reasonable request made.

The Author also agrees to utilize their own social media presence to promote the Work within the scope of the Author's general social media presence.

## 29. DOCUMENTS

If any of the rights granted to the Publisher revert to the Author, the Publisher shall execute all documents which may be necessary or appropriate to revest all such rights in the Author.

## 30. LAW

This Agreement shall be construed in accordance with the laws of the State of Maryland and the United States of America.

## 31. INHERITANCE

This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators and assigns of the Author, and upon and to the successors and assigns of the Publisher.

## 32. AGENCY

The Author hereby appoints his/her agent, █████████ REDACTED █████████

7

REDACTED as Author's sole and exclusive agent with respect to the Work. All statements and sums of money due and payable to Author under this Agreement shall be rendered and paid to the Agent, whose receipt thereof shall be a good and valid discharge of the Publisher's obligations, and who shall act with the Authority of the Author in all matters arising out of the Agreement. The Author hereby confirms that this agency appointment shall be binding upon Author's heirs, executors, and assigns. The provisions of this paragraph shall survive the termination of this Agreement.

This Agreement may not be modified, altered, or changed except by an instrument in writing signed by the Author and the Publisher.

DocuSigned by

REDACTED

**Author**

DocuSigned by

SHAHID MAHMUD

**Arc Manor**

