# BHU SRINIVASAN

**Case:** Bartz v. Anthropic PBC, No. 3:24-cv-05417 WHA (N.D. Cal.)

**From:**

Bhu Srinivasan

25801 Pacific Coast Highway

Malibu, California 90265

bhu@bhumedia.com

(917) 576-1913

| RECEIVED |
| :---: |
| 1/21/2026 |
| Mark B. Busby<br>CLERK, U.S. DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>SAN FRANCISCO |

**To:** The Court of the Honorable Judge Araceli Martinez-Olguin

**RE:** Objection to the Anthropic Settlement

January 21, 2026

Dear Judge Martinez-Olguin,

1. I am Bhu Srinivasan, an author. My book, *AMERICANA: A 400-Year History of American Capitalism*, was published by Penguin Press in 2017. I am the copyright holder.

2. On October 14, 2025, I learned from my agent that there was a settlement with Anthropic, of which I am a class member due to my book.

3. Upon release in 2017, *AMERICANA* was selected as one of The Economist's Best Books of the Year. My work was endorsed by multiple Pulitzer Prize-winning and eminent historians including Alan Taylor, the leading scholar on early American history and two-time Pulitzer Prize-winner; Richard White, the nation's foremost expert on the history of the Gilded Age and Professor

**AMERICANA: A 400-YEAR HISTORY OF AMERICAN CAPITALISM**

# BHU SRINIVASAN

Emeritus at Stanford; and Liaquat Ahamed, the Pulitzer Prize-winner for his work on central banking in the 1920s and 1930s.

4.  In 2018, the longest serving Federal Reserve Chairman in American history, Alan Greenspan, cited my book multiple times in his work *Capitalism in America*.

5.  Since then, my book has been selected and featured by Warren Buffett and Charlie Munger at Berkshire Hathaway shareholder meetings, including making Mr. Buffett's reading list in his final year as Chairman and CEO of Berkshire Hathaway. My book is widely read on Wall Street.

6.  Marc Andreesen, the inventor of the web browser, tweeted multiple pages of the opening chapter of my book in a 2022 Thanksgiving post. Partners of the largest venture capital firms in Silicon Valley are familiar with my work. Chamath Pahilpatiya, an early Facebook executive and co-host of the ALL IN podcast, called it a "Tour de Force". Among readers, my book is a staple in Silicon Valley.

7.  *AMERICANA's* framework presented the 400-year economic development of America as a series of next big things, from the limited liability of the common shareholders of the Virginia Company to the dawn of the mobile age. AI is the newest installment of the next big thing, which America has always been brilliant at discovering. I am one of the foremost experts in the world at understanding how next big things unfold in all their facets.

8.  My TED Talk on capitalism as an "operating system" has been viewed millions of times. AMERICANA is a strong seller in China with meaningful royalties. The television rights are currently being developed.

9.  So, I was shocked and infuriated to learn that my book was taken off a pirated website to train Anthropic's LLM. To earn meaningful royalties from China, but to have my work misappropriated by a profit-motivated Silicon Valley startup does not sit well.

10. I take protection of my intellectual property rights very seriously. I own the rights to exploit my work to serve as the foundation of any large language model.

11. I take issue with Judge Alsup's fair use finding for Anthropic that other than the theft of my work from a pirated website, Anthropic otherwise could have simply bought a used copy of AMERICANA for $3.99 on Amazon to train its LLM without any further liability to me. This logic will not withstand scrutiny. I object to the settlement for the entire class as it affirms Judge Alsup's fair use finding.

12. Indeed, Anthropic's strategy to populate its LLM with books from pirated sites was to avoid "legal/practice/business slog", as cofounder and CEO Dario Amodei stated. Anthropic was worried about anything that would delay the development of their LLM. This was quoted in Judge Alsup's ruling on Fair Use.

13. This stated intent by Anthropic's CEO within a month of the company's founding suggests cost-benefit analysis familiar to startup culture. The asymmetric nature of blockbuster startup returns is this: If Anthropic turned out to be worth nothing, there is no liability to worry about as there would be nothing to sue for. If Anthropic was a hit, the liability as a proportion of the company's valuation would be meaningless to either itself or a deep-pocketed acquirer (YouTube's acquisition by Google is a good example). In an extremely competitive market with large sums at stake, time is of the essence. This modus operandi is common in Silicon Valley.

14. Further, Anthropic's internal position to avoid "legal/practice/business slog" was not some principled position that taking works under copyright from a pirated website was protected by the safe harbor of "Fair Use". The decision to violate copyright was intended as an expedient that could be accounted for and dealt with later once the company was successful.

15. Beyond being undercut by Anthropic's own stated motivation, the finding of fair use has immense problems.

16. Artificial Intelligence is a fundamental breakthrough like flight or radio or electricity transmission. Old frameworks are not adequate. It would be akin to applying maritime law to the dawn of flight.

17. Breakthroughs not only often test old and necessitate new regulatory frameworks, they create new forms of property rights. For instance, once man could capably fly, it had to be determined exactly how high could one fly over another's farm without violating the farmer's property rights. It was unprecedented. Similarly, the wireless telegraph (radio) needed an entirely new system of allocating frequencies and transmission rights. Airwaves and air space became property.

18. The era of AI is going to create a new set of property rights for copyright holders. I do not believe that Judge Alsup's ruling on fair use is going to survive or be the last word on this. The Copyright Act of 1976 did not contemplate this application to a computing breakthrough decades later.

19. It is worth remembering that from the early years of the web emerged the phenomenon of user-generated content – comments, reviews, forum discussions, user websites, etc. This new form of property was seen as

potentially creating liability to internet platforms for their user's content, and the Digital Millennium Copyright Act (DMCA) was created.

20. The Digital Millennium Copyright Act is what enables social networks to avoid liability for both their users' posts and any violations of 3rd-party copyrights instigated by their users. An entirely new framework in the DMCA was developed because there was no historical precedent that clearly delineated the responsibilities of social media and Internet platforms when it came to user-generated content. It makes little sense then that an equally transformative era in AI would seek to rely on a regulatory framework from 1976 to define and limit the property rights of authors.

21. And that is exactly what this is issue is about: property rights. Anthropic took my property without asking or offering compensation to avoid "business slog." Now this court has blessed this conduct using an antiquated framework holding that had Anthropic simply legally procured a copy of my book AMERICANA, say on Amazon or even a used copy at "library sales for $1, $2, $5" as Judge Alsup stated on November 13, the company would have been in the clear to use my work to train their model. The court's simplistic logic is ridiculous. The court's reductive reasoning is inversely proportional to the immense complexity of AI, the ramifications of which are going to require entirely new regulatory frameworks and decades of judicial fine-tuning. (pg. 54 of the Nov 13 transcript.)

22. Consider a scenario where an AI company wanted to create a filmmaking tool. For training, the company decides to only ingest the 100 highest-grossing movies in Hollywood history to train – to parse each frame for every element from dialogue to lighting to cinematography to transitions. The court's logic is that such a startup merely needed to buy 100 used DVDs to be able to do so legally under fair use. What if this same company decided for its next version it wanted to train on the top 100 books that became Hollywood

blockbusters? Is this fair use? Of course not. If ingesting 100 books is not fair use, neither is 100,000 books.

23. Judge Alsup wrote this in his fair use finding:

> *"Over time, Anthropic came to value most highly for its data mixes books like the ones Authors had written, and it valued them because of the creative expressions they contained. Claude's customers wanted Claude to write as accurately and as compellingly as Authors. So, it was best to train the LLMs underlying Claude on works just like the ones Authors had written, with well-curated facts, well-organized analyses, and captivating fictional narratives — above all with "good writing" of the kind "an editor would approve of."*

24. Anyone can write a tweet or comment. Few can stitch together a coherent narrative encompassing 150,000 words or 500 pages. To teach a model how to write long, well-reasoned, beautiful narrative is the Holy Grail of AI.

25. Most troublingly, Anthropic's conduct removed my rights as a property holder to do an exclusive deal with a preferred LLM either now or in the future. This is not a form of agency that I should have been deprived of. It eliminated my pricing power. In the media business, exclusive rights are often the fundamental basis of value and an important tool for price discovery.

26. It also eliminated my artistic and philosophical power as a writer to withhold my work from entities that I may not have aligned with. There is nothing fair about depriving the artist of his right to silence regarding his own words, to withhold his consent to this idea of progress.

# BHU SRINIVASAN

27. Judge Alsup's fair use ruling seems a hasty, last-minute stretch to further his mark in this new era of AI, to endure upon his retirement.

28. The settlement is unacceptable. This was not fair use. It sets a terrible precedent. The settlement amount of $1.5 billion has no deterrence effect. Anthropic, with investors anticipating this impending settlement, raised capital at $180 billion valuation in Sept 2025, a large increase from the approx. $60 billion valuation in April 2025, just five months earlier. Much of the approx. $120 billion valuation delta here is the immense value of Anthropic shedding this case's liability, and for a mere $1.5 billion at that.

29. Lastly, it should be noted that the framers of the constitution affirmed the property rights of authors before getting to the amendments that addressed civil liberties, such as the free speech rights of its citizens. Protecting copyright is an important bedrock principle in this country. This court should take its time.

30. No attorney has been involved in preparing this objection nor has any attorney been retained to protect my interests as it relates to this issue. I do not intend to appear at the final approval hearing unless requested by the court.

I thank the court for its consideration.

Bhu Srinivasan

January 21, 2025