**Pages 1 - 46**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martinez-Olguin, Judge

ANDREA BARTZ, et al, )
)
Plaintiffs, )
)
vs. ) **NO. 4:24-cv-05417-AMO**
)
ANTHROPIC PBC, )
)
Defendant. )
)

San Francisco, California
Thursday, May 14th, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For the Plaintiffs:

SUSMAN GODFREY, LLP
1000 Louisiana Street
Houston, TX 77002
**BY: JUSTIN A. NELSON, ATTORNEY AT LAW**

SUSMAN GODFREY, LLP
1900 Avenue of the Stars, Ste 1400
Los Angeles, CA 90067
**BY: ROHIT DWARKA NATH, ATTORNEY AT LAW**

REPORTED REMOTELY BY: Andrea Bluedorn, RMR, CRR, CRC
Official United States Reporter

**APPEARANCES:** (CONTINUED)

For the Plaintiffs:

SUSMAN GODFREY, LLP
One Manhattan West, 50th Fl
New York, NY 10001
**BY: SAMIR DOSHI, ATTORNEY AT LAW**
**JAMES CRAIG SMYSER, ATTORNEY AT LAW**

For the Plaintiffs in the class:

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Fl
New York, NY 10013-1413
**BY: RACHEL GEMAN, ATTORNEY AT LAW**

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 29th Fl
San Francisco, CA 94111-3339
**BY: ELIZABETH JOAN CABRASER, ATTORNEY AT LAW**
**JALLE H. DAFA, ATTORNEY AT LAW**
**DANIEL M. HUTCHINSON, ATTORNEY AT LAW**

For the Defendants:

MORRISON & FOERSTER, LLP
425 Market Street
San Francisco, CA 94105
**BY: DARALYN J. DURIE, ATTORNEY AT LAW**

ARNOLD & PORTER KAYE SCHOLER, LLP
4 Embarcadero Center, 14th Fl
San Francisco, CA 94111-4024
**BY: JOSEPH RICHARD FARRIS, ATTORNEY AT LAW**
**DOUGLAS WINTHROP, ATTORNEY AT LAW**

For the Objectors Brenda Hampton, Chinoto Chakanga, Laura Esquivel, and Jordi Castells:

DUNCAN FIRM, PA
809 W. 3rd Street
Little Rock, AR 72201
BY: JAMES HENRY BARTOLOMEI, III, ATTORNEY AT LAW

Also Present: **DEVON HANLEY COOK, Attorney for Anthropic**

**Thursday, May 14th, 2026** **2:00 p.m.**

**P R O C E E D I N G S**

---o0o---

**COURTROOM DEPUTY:** Now calling civil matter 24-5417, Bartz, et al v. Anthropic, PBC.

Counsel, if you could please approach the lectern and state your appearances beginning with plaintiff's counsel.

**MR. NELSON:** Good afternoon, Your Honor.

Justin Nelson from Susman Godfrey.

**THE COURT:** Good afternoon.

**MR. NELSON:** With me from Susman Godfrey is Rohit Nath, Samir Doshi, and Craig Smyser.

I'm also joined by our class representatives Kirk Wallace Johnson, Charles Graeber, and Andrea Bartz. And also present is the CEO of JND claims administrator, Ms. Jennifer Keough.

**THE COURT:** Good afternoon to you all.

**MS. GEMAN:** Good afternoon, Your Honor.

Rachel Geman, Lieff Cabraser Heimann & Bernstein for plaintiffs in the class. I'm joined today by Elizabeth Cabraser, Daniel Hutchinson, and Jalle Dafa.

**THE COURT:** Good afternoon to you.

**MS. DURIE:** Good afternoon, Your Honor.

Daralyn Durie from Morrison & Foerster for Anthropic.

I'm joined by Douglas Winthrop and Joe Farris from

Arnold & Porter and Devon Hanley Cook from Anthropic.

**THE COURT:** Good afternoon.

Okay. So good afternoon to everyone present. We're here on plaintiff's motion for final approval and motion for attorney's fees. Just to give you all a sense of what to expect this afternoon, I'm going to start by letting the attorneys make about a five minute presentation, any presentation that you would like and then I'll have some questions for you all.

I know that there is an attorney James Bartolomei present or representing -- who indicated he would be present representing a handful of objectors and opt-outs so, Mr. Bartolomei, are you present? All right. You too will get five minutes at some point this afternoon.

I also received requests to be heard from some of the class members, each of them who are present either in the courtroom or on Zoom will get two minutes.

Individuals who are not members of the class will not be given the floor. And any person who is given an opportunity to speak will be given one opportunity. You will not get another opportunity thereafter.

So before I -- and, Ms. Geman, you'll be making -- you all decide, Mr. Nelson or Mr. Geman, which of you will be taking the mic for plaintiffs, but before you all make whatever presentation, I do want to note for the record that there were

some recent objections filed that came in earlier in the year, and as you all realize, I think, right, those got lost on the shuffle on the Court side. So I'm inclined to deem those objections timely since any delay in their filing is not -- was not due to anything from the individual's behalf but instead on the Court's part.

I'm also inclined to do the same with the objections that class counsel kept from the Court. I believe there are at least three objections class counsel received in January and that weren't filed until directed to do so by the Court so I'm inclined to go ahead and consider those. And if class counsel would like to speak to that, you of course are welcome to do so.

I also will want to hear from you about what I should do with other objections that came in more recently.

As you -- before I hand the mic over to you all, as you get into your presentations, please know that I didn't consider any arguments presented in the footnotes of your briefs because my standing order says that that's my practice. So there you have it.

With that, I give the mic to class counsel for whatever presentation they would like to make.

**MR. NELSON:** Thank you, Your Honor.

And for the Court's knowledge, I will be giving the opening presentation and then depending upon the issues that

court might have or the questions, either Ms. Geman or myself will respond, if that's acceptable.

**THE COURT:** Certainly. Thank you.

**MR. NELSON:** And just briefly with respect to what Your Honor just said about the objections, we have no objection of course to what Your Honor just suggested and of course that's acceptable to us.

Again, very briefly, we think anything not submitted to the Court or class counsel or filed after February 9th, which is the opt-out date and objection date, should be deemed untimely. So that is our position with respect to that.

But may I please the Court, Justin Nelson from Susman Godfrey.

I do want to start with an update to the Court on the claims rate. On April 30th, we filed the then current claims rate of 91.3 percent. Since then, additional timely claims have continued to be processed. The current claims rate is 92.77 percent for a total of 447,576 claimed works.

In the Court's preliminary approval order at docket 437, Judge Alsup went through in detail the factors for final approval including the express factors under Rule 23(e) and the implied factors under the *Churchill* case. He found that the proposed settlement here was likely to be granted final approval. As he noted on page 6 of the order, one of the only open questions was whether class members would embrace the

settlement. We now have that answer and the answer is a resounding yes.

The participation spans all types of copyright owners from self-published authors to large publishers part of publicly traded companies. This class is highly sophisticated and engaged. Each of them made a considered decision to participate, and for good reason. As Judge Alsup wrote, this is the largest copyright class action settlement in history. It also provides substantial injunctive relief in the form of destruction of the pirated datasets and a certification that Anthropic did not use the materials from the pirated websites in commercially released models.

And the release is a limited one for past conduct only and not including output claims. The opt-out rate is miniscule as are the objections for a class of this size. With respect to opt-outs, we have one additional change from the proposed order, class members Esquivel and Castells ask for a late opt-out, and in our proposed order, we subjected denial without prejudice pending comment from other rights holders. Since then, we provided notice to the other rights holders and received no objections, and accordingly, do not oppose their request for their late opt-out.

With respect --

**THE COURT:** Sorry. Go ahead.

**MR. NELSON:** With respect to the objections, many of

the objections are by people requesting that their works be added to the settlement, itself a sign of the settlement strength. 26 of the 53 objections in fact pertain to the works list and request inclusion in the class. Not only are their objections incorrect, they lack standing because they are not the owners of a work on a work list. As the preliminary approval order states on page 3 of the preliminary approval order, if a work is not on the works list, then a copyright owner of the right to reproduce that work is not in the class and their claims are not release.

This is the first major AI copyright settlement. Our constitution specifically mentions copyrights for a reason. It provides the economic incentive to allow the diversity of ideas, thoughts, and creativity that makes our country flourish. Currently, there's widespread apprehension among all those who rely on copyrights to make a living, not just book authors and publishers. One of the reason why a large percentage of the class is participating is because the settlement provides not just substantial monetary relief but substantial injunctive relief as well such as the destruction of these pirated databases and a certification that the pirated copies were not used in a commercial model along with the limited past release.

In short, the proposed settlement here is more than the fair, reasonable, and adequate standard as required by Rule

23(e). The reasons for approval have only gotten stronger since the preliminary approval order and we request that the Court grant final approval of this historic settlement.

Thank you, Your Honor.

**THE COURT:** Thank you, Mr. Nelson.

Ms. Durie, do you want to say anything?

**MS. DURIE:** No, Your Honor. I have nothing to add to that.

**THE COURT:** Thank you.

Mr. Bartolomei, could you please come forward.

Go ahead.

**MR. BARTOLOMEI:** Good afternoon, Your Honor.

My name is James Bartolomei and I'm of counsel with the Duncan Firm and I'm here representing four of the class members; Brenda Hampton, Chinonto Chakanga, Laura Esquivel, and Jordi Castells.

As Your Honor just heard, plaintiff class counsel has withdrawn their objections so I'm not going to spend a lot of time on those two lay opt-outs that are still requesting that they be allowed to opt-out.

But I am going to address the one distinct issue that class counsel just failed to address in his opening is whether class settlement notice was sufficient. Nothing that I'm asking for or my clients are asking for today takes a dollar away from any class member who has already filed a claim. And

I'm not here to ask this Court to stop -- stop this settlement from ever being approved.

My clients want what every class member deserves, which is sufficient information to make an informed, knowing, and intelligent choice as to whether $3,000 was worth releasing a claim for books pirated by Anthropic that are worth up to $150,000 per work.

Now why was the notice incomplete? You know, in our papers -- and I'll highlight the supplement that was filed on May 8th, just Friday last week, objector Chakanga filed a notice with the Court that demonstrated that the summary judgment order, which arguably is probably the most important order in this case, was never provided to the class. That document was 231, the summary judgment order. I call it the fair use order.

It was absent from the settlement website. It just appeared -- and I don't know if it happened on Saturday or Sunday or Monday, but class counsel made the decision to add that document and I'd like to enter after I'm done a copy of the screenshot of the current, you know, version of the settlement website. But the proposed order that was submitted to Your Honor to consider today, it was violated because there's two operative documents that the proposed order relies on. It's the FJC checklist and Northern District of California procedural guides.

And those two authorities, they require that class counsel put on the neutral website all of the important documents. Well, the prior court's, Judge Alsup's, fair use order has never been on that website. And it's a key document. Class counsel put it on there on Saturday, Sunday or Monday. I'm not entirely sure.

But that admission, it's an important document. Most reasonable minds in this courtroom today would say, yeah, it's one of the documents, this order, that caused this case to settle.

Now the question that the Court ought to be asking class counsel is very simple, why is the most important merits ruling in this case not available to the class on the neutral website. It wasn't available at all during the entire opt-out period, seven and a half months after the fair use order was issued. There really is no good answer.

I just want to highlight a key quotes from the FJC class action guidelines checklist. On page 4 it says will key documents be available on a neutral website. The summary judgment document order is listed as one of those key documents.

Class members should have had access to this. It's not just the fair use order. All of the summary judgment briefing that was done, all of the evidence of the underlying alleged wilfulness that gave rise to the fair use order was --

is in that briefing. And one of the things I'd like to highlight for the Court is the *In re Anthem* data breach case in which Judge Koh, she held when the modification makes the settlement less desirable, notice may be required because courts cannot be sure whether more class members would have chosen to opt-out to the settlement or -- object to the settlement or exclude themselves from the class.

Here, the deficiency of not having the most important order available to the class, it's going to make settlement less desirable. We don't have to guess about that.

Secondarily, Your Honor on January the 15th, issued an order that required hundreds of documents and thousands of the under -- pages of the underlying summary judgment evidence to be unredacted and made available to the public. The public access is critical, not just for the public and the press, but for the class members to make informed decisions.

And at the end of the day, again, I'm not trying to stop this settlement from ever being approved, but the Court has a chance to cure the due process defect. And the fact of the matter is is that the new claims rate of 92 percent or whatever it is probably consists of the Lion's share of large publishing houses. What I'm concerned about for every class member is the independent author who maybe didn't know about this or maybe didn't have the ability to understand or retain counsel.

The FJC checklist --

**THE COURT:** You're at time. I'll let you finish the thought.

**MR. BARTOLOMEI:** The FJC checklist explicitly says it's a minimum of 30 days from complete dissemination of the critical documents made available to the class that just wasn't present. We're asking for a cure of just 35 days, open up the opt-out period, and it allows this Court to avoid a fatal defect in the notice.

Thank you, Your Honor.

**THE COURT:** Thank you.

Jenny, let's go ahead and hear from the -- actually, before I turn to the folks on Zoom, are there any class members present? I'm sorry, beyond the folks represented by counsel at this table.

Okay. Great. Give me one second.

**COURTROOM DEPUTY:** Your Honor, I'm going to go ahead and promote over Stacy Werner.

**THE COURT:** Go ahead.

**MS. WERNER:** Your Honor, am I heard?

**THE COURT:** Yes.

**MS. WERNER:** Okay. I do believe that the -- let's see if I can fix the visual.

My name is Stacy Werner, S-T-A-C-Y, Lynn, L-Y-N-N, Werner, W-E-R-N-E-R, Esq. I have been an attorney for

approximately 30 years. I'm licensed in the state of Connecticut where I do business.

I am not only an author, I am also a member of the class. I have three out of my seven books as part of the statement of works. For my seven books, each took a year to write, that is seven years. Anthropic probably stole my books in under seven seconds.

I spent about 200 legal hours in prep for this moment now and I have two minutes to speak which is a bit daunting, to be honest, however, I will speak fast and do the best that I can.

I have done quite a bit of research. I wanted to start briefly with Fordham Law Review, Volume 89-2020, and it talks about good objectors being critical to the class action process because the judge reviewing the settlement does not have the benefit of usual adversarial setting.

I can't tell you how it seems from the documents that I've accessed how little insight has been given to the independent publishers. I, in particular, had filed contracts that I had with my small press. Not only were thousands of us violated from our publisher for breach of their contractual duty to actually file copyright, but we are getting absolutely taken advantage of a second time now.

More importantly, my big frustration and disappointment, if not outright disgust, with the litigation

settlement that's being proposed now is that many of us, thousands of us had actual copyright warning language and I -- because I have two minutes, I won't quote it -- but you will in fact, Your Honor, see it in my brief that's specifically --

**THE COURT:** I'm going to give you that warning now. You've got about ten seconds left.

**MS. WERNER:** I'm going to ask for a little bit of flexibility.

The notice was completely inaccurate --

**THE COURT:** You have --

**MS. WERNER:** -- box 47 to learn how to efile. Efile instructions were given by many entities including the New Hampshire District Court. I had called class settlement for guidance, I got a call back from the --

**THE COURT:** You have -- your time is up, Ms. Werner. I need to move on to the next person. That's what I have because I need to hear from all of you.

**MS. WERNER:** If you could come back to me should you have time, Your Honor. After 200 hours and me being a victim in this case, I cannot tell you how --

**THE COURT:** Ms. Werner, I will ask my courtroom deputy to eject you. Please stop. I need to move on to the next person.

Thank you.

Who is next?

**COURTROOM DEPUTY:** Promoting Ms. Pinder.

Ms. Pinder, please state your name and spell it for the court reporter.

**MS. PINDER:** Good afternoon, Your Honor.

My name is Victoria Pinder, V-I-C-T-O-R-I-A, P-I-N-D-E-R. I'm pro se. May I be heard?

**THE COURT:** Please proceed.

**MS. PINDER:** Thank you so much.

I'm a USA best selling author. I have over a hundred novels that I have written. I have four works on the works list under four separate copyrights and my objection on docket 641 and the reply at docket 648 concern one of those registrations, TX0008716839.

This single registration covers more than 40 individual novels that I have published. Each book has its own ISBN, own ISIN and was separately downloaded by Anthropic from its own pirated resources. A fact the settlement administration has confirmed in writing, yet the settlement courts found 40 plus of those novels in one claim simply because I used a lawful group copyright registration at the US Copyright Office expressly permitted at the time.

Two authors with the same number of unfringed books should not receive vastly different compensations based on lawful regulation they chose themselves. Class counsel objection on docket 646 does not engage with the stay say and

one sentence that I could have registered originally and that is the very objection I'm objecting to.

And in their red line proposal at docket 646.2 page 11, they also ask this court to find my objection invalid on procedural grounds but class action themselves cannot docket my objection as docket 641 is in compliance with its April 8th order. They cannot docket my objection and then ask the Court to rule invalid.

And a copy in court's chambers, WAPO at CAND US Court.Gov on November 15 and December 15 -- December 1st, 2025 three months before the deadline. So, Your Honor, of the four class objectors labeled invalid in the red line, I am the only one submitting a substantial challenge to the settlement allocation methodology.

They misstated my name repeatedly, this time as Laya Victoria, conflated me with a different objector, their choice to seek procedural dismissal on a substantive question while engaging in less critical objections on the merit goes to whether 23(e) adequate representation has been met.

First, I'd like to ask the Court of one of three things, modify the plan of allocation so distinct works with group register count as separate works, which they are. Alternatively, refer my claim to the Special Master Cheng under existing referral order docket 501 or, at a very minimum, correct my name on the papers because my name has always been

Victoria Pinder.

Thank you for your time.

I read fast.

**THE COURT:** Thank you, Ms. Pinder.

Let's go ahead and promote the next person, Ms. Galang.

**COURTROOM DEPUTY:** Promoting Mr. Chase.

You have two minutes, Mr. Chase.

**MR. CHASE:** It's Matthew Chase, M-A-T-T-H-E-W, C-H-A-S-E.

I am a class member based on 15 works that appear on the works list that they listed on the settlement administration website. I am here to specifically speak to a flaw that I found in class counsel's methodology for curating the closed works list. I do feel that I conveyed that pretty clearly in my written objection so I won't beat around those points again for the sake of everyone, but I would like to highlight something that I don't think I necessarily pinpointed.

One of the issues is that the encouraged way of the U.S. Copyright Office compendium is that to do your real name and then -- so, in this case, I would have copyright registered some works under my real name, and then they would be published under a pseudonym so that would not match based on the way that class counsel curated their list. It would only be the

alternative ways that have a match for match with pseudonym and pseudonym. Class counsel confirmed this by email.

The issue that -- the biggest issue this presents is that it doesn't just exclude everyone who did the way that the U.S. Copyright Office encourages, it only excludes some because the name for name match sometimes were partial names. So if Mary Joe registers a copyright as Mary Joe and her book is published as Mary Smith, she is included in the closed works list. Because I don't have a similar name match, I registered the same as Mary Joe but I will not be included and I am being treated differently. I'm not being treated equally to Mary Joe in this case.

I believe this comes from systemic issues in publishing that don't recognize some of the disadvantages that self published and small published authors have. I also think that there are big portions of the class action suit that deal with pieces that don't deal with pseudonyms which is something class counsel acknowledged when they -- after the works list was revealed, came to this court and asked for them to deal with pseudonyms in a particular way because many romance authors would be affected by it a certain way.

I also think that the no release --

**THE COURT:** Time -- okay. Go ahead.

**MR. CHASE:** I will concede my time.

Thank you very much for having me.

**THE COURT:** Thank you.

**COURTROOM DEPUTY:** Ms. Grace is promoted.

**MS. GRACE:** Good afternoon, Your Honor.

My name is Natasha Grace, N-A-T-A-S-H-A, G-R-A-C-E.

I am a class member for two works but my other works are wrongly excluded because I used group registration like objector Victoria Pinder. Class counsel has confirmed that they didn't look at the contents section of the copyright registration which is the only place where all of the titles of the group registration are listed.

I would like to add a suggestion to my objection. To avoid delaying the settlement in another matching process, I propose that a portion of the costs reserve be set aside for the wrongly excluded works and that the administrator put up an intake form on the website where authors who feel they were wrongly excluded can submit their titles, ISBNs or ISINs as well as their copyright registration numbers for further verification.

Thank you.

**THE COURT:** Thank you, Ms. Grace.

**COURTROOM DEPUTY:** Promoting Ms. Larson. Ms. Larson are you there?

**THE COURT:** To folks in the attendee list, I understand there's no one left with their hand raised -- oh, there's one. Do me a favor, look at those.

**MR. TOMBS:** Thank you, Your Honor, for unsealing my objection. So may I be heard?

**THE COURT:** Yes. Please spell your first and last name for the court reporter and thereafter you have two minutes.

**MR. TOMBS:** Of course. My first name is George, G-E-O-R-G-E, and my last name is Tombs, T-O-M-B-S; M, as in Michael; B, as in Barbara; S, as in Sarah.

I appreciate the opportunity to speak today. I commend Andrea Bartz for her initiative and stamina in pursuing this matter. I have basically two objections which I outlined in document 5401 that was unsealed recently. The first is I believe that this settlement as proposed is sending a cruise missile or maybe I should say a fleet of drones into the very principle of copyright as protected by the Berne Convention which, as we know, goes back to 1886.

It's well established by all signatory countries including the United States and Canada, where I live. And I am also very concerned that this settlement would create a precedent that would allow other companies to pirate works -- and Lord knows there are many other lawsuits in motion at the present time -- basically to undermine copyright in the United States and other countries around the world and enable very aggressive AI training models to exploit the works without compensation of thousands and hundreds of thousands and

possibly even millions of authors.

I'm not seeking anything other than to speak today. I don't know what the Court will decide ultimately, but I just point out that I looked in the matter of the works of my grandfather who was a professor at Columbia University, my father who published with Columbia University Press, and myself and all together we have 56 works in LibGen which I believe Anthropic used to develop its AI training model.

None of these works are accepted. And the idea that people have to register with U.S. Copyright is simply untrue and I believe that the way things worked out with the settlement as it is developed --

**THE COURT:** Finish that thought.

**MR. TOMBS:** It narrowed -- the definition of eligible works so that's all I have to say.

**THE COURT:** Thank you, Mr. Tombs.

**MR. TOMBS:** Thank you very much.

**THE COURT:** Mr. Jacobson.

**COURTROOM DEPUTY:** Go ahead, Mr. Jacobson.

**MR. JACOBSON:** Hello. Robert, R-O-B-E-R-T. My last name is Jacobson, J-A-C-O-B-S-O-N.

Good afternoon, Your Honor. My name is Robert Jacobson again.

I am a class member and objector. I'm the author of Space Is Open For Business on the settlements work list. My

objection is at docket 646-3. I submitted it by email on January 12th, within the deadline.

So I have a three points to the rule and (e) I would like to speak to. One is approximately $3,000 per work is roughly 2 percent of the $150,000 statutory ceiling available to registered authors under Section 504. After this court already found that the central library was not fair use.

Number two, the settlement releases past claims but proves nothing addressing ongoing commercial use of the trained models.

And, three, class members have not been told how their specific works were used in training, making proportionality impossible to assess. I ask the Court to please weigh whether the settlement on these points meets the fair, reasonable, and adequate standard for registered authors.

Thank you, Your Honor.

**THE COURT:** Thank you Mr. Jacobson.

**COURTROOM DEPUTY:** Ms. Hootman.

**MS. HOOTMAN:** Hi. My name is Nicole Ramsey Hootman. That's N-I-C-O-L-E. Last name is H-O-O-T-M-A-N.

And my primary question about the settlement is I don't really understand how it can be just if Anthropic -- Anthropic is continuing to profit from essentially stealing our work even after the settlement is complete. You know, even with copyright regarding my publisher, like they have to pay me

ongoing for the use of my work and for people buying it. Anthropic has used it and continues to profit off of the use of my work. So a one-time payment doesn't really seem like justice. And that's basically all I have.

**THE COURT:** Thank you.

Any more class members?

**COURTROOM DEPUTY:** No, Your Honor. That is it.

**THE COURT:** All right. Thank you.

All right. So as I indicated at the beginning, I have some questions for plaintiff's counsel. I understand for Mr. Nelson that both he and Ms. Geman may answer different questions so let me turn to those now.

As you started -- as I think you heard from at least one objector, and this is actually my first note too, I get the sense from many of the folks who filed objections that they feel class counsel has given their concerns short shrift, not only in class counsel's responses to the direct inquiries but also in their papers. So let me ask you, if I agree with them that class counsel hasn't sufficiently grappled with some of the substance of their objections, what's the path forward?

**MR. NELSON:** The path forward, Your Honor, would be that by either Monday morning or Monday evening or whenever the Court wants, including Friday evening at 5:00 p.m., we will file a proposed revised order that addresses in detail any of those objections.

I do think, Your Honor, that given some of the late objections that have come in, there are a couple things that need to be updated in the proposed order anyway so we have no objection to resubmitting a proposed order by the earliest possible date for Your Honor's convenience, as early as 5:00 on Friday evening or 9:00 a.m. on Monday or whenever Your Honor may so chose.

**THE COURT:** Let me ask you a couple of other questions about the -- related to the final approval motion.

Based on the JND declaration in support of the motion for final approval, I understand there are -- no, we talked a little bit -- well so I understood from the declaration there were five late opt-outs and you mentioned a few by name. Am I right that your -- earlier you mentioned you no longer have any continuing objection to those late opt-outs being considered. Is that right?

**MR. NELSON:** Well the only two -- as I understand, the only two people that have asked for reconsideration of that or consideration based upon the excusable neglect standard are Ms. Esquivel and Mr. Castells, and so they have -- are the only ones who attempted to demonstrate excusable neglect. With respect to those, we do not have any objection or no longer have any objection because we forwarded their request to the other rights holders.

With respect to any of the others, they have not

attempted to demonstrate excusable neglect and so, therefore, our objection would still stand because it is late. To the extent we have no objection should they want to get something in, for example, as early as tomorrow evening and try to demonstrate excusable neglect for those three others, then I think we would stand down in our objection assuming that the other rights holders also do not oppose.

**THE COURT:** Mr. Nelson, you may have -- I think you presented this at the outset but could you remind me how many opt-outs there are at this point?

**MR. NELSON:** Thank you, Your Honor. Yes. I don't think I stated that exact number. Currently there are --

**THE COURT:** Go ahead.

**MR. NELSON:** There are 350 valid opt-outs covering 1,802 works. That is not including Ms. Esquivel and Mr. Castells.

**THE COURT:** And do you know how many late opt-outs there are? We've been discussing at least Ms. Esquivel and Mr. Castells, but do you know how many --

**MR. NELSON:** It is a handful. We can try to get you that, but it is -- you can probably count them on at least your fingers, Your Honor.

**THE COURT:** So let me ask you something that I hope is in your papers because part of what I'm looking for -- I hear your proposal that they should be proving excusable neglect,

but I guess what I'm looking for is I don't believe there's anything in your papers, and that's in part because there's no reply ultimately about case law addressing whether those late opt-outs should be accepted or not.

**MR. NELSON:** Thank you, Your Honor.

And to be clear, if -- we will stand down on the objection if it's easier and so we will withdraw those objections with respect to any of the late opt-outs that have come in, Your Honor.

**THE COURT:** Let's talk a little bit now about the proposed $50,000 incentive awards. I get that there are -- or that there may be a reason for a high award in a case where a class representative faces a risk of retaliation or of being blackballed, but I don't think I saw anything in your papers suggesting that's the case here. So if that's in your papers, could you please point me to it.

**MR. NELSON:** Thank you, Your Honor.

Ms. Geman will address that.

But before, let me -- I do have numbers on the late out opt-outs. There are five late opt-outs in total. I believe they total 102, so I was off, but there's 102 works I believe, so thank you, Your Honor.

**THE COURT:** Thank you.

**MS. DURIE:** We do have an objection to simply permitting all of the late opt-outs without any showing of

excusable neglect. We're happy to make a supplemental submission, but we do think there should be some factual basis for the Court to make that determination with respect to the late opt-outs.

**THE COURT:** Ms. Durie, am I right -- and, again, this is the joy of this sort of motion -- I've commented I don't have a reply I think similarly but there's nothing from all of you for --

**MS. DURIE:** Right.

**THE COURT:** -- as one would expect. All right. But I appreciate that.

**MS. DURIE:** Thank you.

**MR. NELSON:** For purposes of clarity, it is -- I'm really bad at reading handwriting. It is in fact not 102. It is on paragraph 102 of the declaration. So I unfortunately don't have an exact number. I still don't believe it is more than a handful but we will get that and update it, Your Honor.

**THE COURT:** If it's in the declaration, I can also look at paragraph 102. Thank you.

**MR. NELSON:** Thank you, Your Honor.

**THE COURT:** Certainly.

Ms. Geman.

**MS. GEMAN:** Thank you, Your Honor.

The class reps in this case are not in that sense like an employee who might have the employer go after them, but they

did face tremendous risk of being on the forefront of a highly publicized, highly scrutinized case where there is a lot of chatter, a lot of discussions, and it was a reputational and day-to-day risk for them.

To be clear, Your Honor -- and I would respectfully suggest, Your Honor, that the declarations that the class reps set forth in connection with preliminary approval which were objection by objection would be the best place to determine that. I can tell Your Honor --

**THE COURT:** Ms. Geman, where do you cite that to me in your motion for final approval? Because why should I know to go look at their declarations from the preliminary approval if you don't cite them to me?

**MS. GEMAN:** Thank you, Your Honor.

There -- in connection with the motion for fees, costs, and service awards, that is where we addressed that -- that is where we addressed the class representatives. We also would point you to docket 619-2 which was submitted alongside the fee proposal which addressed the class reps.

I would also, Your Honor, if I may, respectfully suggest that among the points that were made in the papers we believe apply with great force here, there was a ton of work put in by the class reps against this sort of reputational and exposure risk, they added value to the case. And by the metrics that the case law considers which includes the percent

of the fund and the sort of ratio between the class rep award and the awards for class members, the requested amount we submit is handily satisfied in this large and very time and work-intensive case.

If it would be helpful for Your Honor, we can show you the pages in the briefing that addressed service awards in particular.

**THE COURT:** Yes, please, that's actually what I asked for so yes, please.

**MR. NELSON:** Yes, Your Honor.

So in docket -- in terms of the reply paper docket 6231, pages 14 through 15 is where service awards were addressed in the reply noting among other things that there are not objections to the service awards. The declaration, as I mentioned, is 619-2. I would also note that the docket numbers for the initial declarations were docket 385.

**THE COURT:** I'm going to stop you there, Ms. Geman. Are those cited in your motion for attorneys' fees or in your motion for final approval? I see Mr. Nelson nodding so I think he has --

**MS. GEMAN:** Yes, they are. I was trying to get an exact page for you --

**THE COURT:** Please.

**MS. GEMAN:** So I would reference Your Honor to docket 620, page 15 with a reference to the same docket numbers that I

was just reading into the record for Your Honor.

**THE COURT:** And just to be clear, you're telling me that in those pages and paragraphs I will find information about the reputational harm?

**MS. GEMAN:** Well I would say more risk than harm, right, so I just want to be completely transparent. I don't -- you know, I think that there was the possibility that people would be concerned or critical but what was discussed in the declarations was just how much they were sort of out there, how much communications they had with the other people in the class and that we think is a point in addition to the main points we made about -- that I already -- I won't repeat because Your Honor knows the law.

**THE COURT:** All right. Thank you for that.

**MR. NELSON:** Thank you, Your Honor.

**THE COURT:** Let's talk now about the 18 million cost reserve that counsel is requesting in the final approval motion. And I of course want to note for you that that's higher than the 17 million reserve requested in the initial fee motion.

**MS. GEMAN:** Yes, Your Honor.

**THE COURT:** What I want to ask you all about because what I don't see -- and, again, point me to it if I missed it, I don't think I saw a breakdown of those costs that -- with any specificity about why those amounts are appropriate so I could

really use a sense of what -- I could also really use a sense of what kind of controls are in place to make sure spending isn't out of hand and why it isn't appropriate to require you all to submit requests for reimbursement as expenses are incurred.

I also don't entirely understand what comprises the deferred expenses, including the expert expenses, the work list costs, the outside legal fees, so if you could point me to where that's explained in the papers, because best as I can currently tell, it is buttressed by a declaration -- by JND's declaration where there's a paragraph that says these sums are appropriate and that's all I've got.

**MS. GEMAN:** Yes, Your Honor.

So I would refer Your Honor to docket 619-1 which goes into great detail starting around I believe paragraph -- in the 60s and follows for the information about, among other things, excluded costs and explaining the new total. Your Honor had asked I think why was the reserve updated from the original December 2025 request of 17 million -- 17.03 million. This was because we paid down costs relating to ongoing work on the works list and other costs.

And in addition, we opt the reserve based on then current information, in particular the claims rate being so high, we opt the estimate for the special master from 1 million to 1.5 million, and in addition, sought a ten percent

additional reserve. To be clear, Your Honor, we have no objection to providing Your Honor on an ongoing basis with costs as they become, you know -- for example, the special master as his costs become, you know, incurred.

I believe Your Honor knows that JND, we negotiated with them and there's a cap of 15 million and that's much -- that's the Lion's share of the reserve. And so really, Your Honor, this was just based on of kind of facts on the ground, the huge claims rate, our best estimate.

Of course, Your Honor, any money that is not spent on this cost reserve will go back to the class, and so we -- you know, and then I think Your Honor also asked how do we -- you know, how do we sort of keep costs down and we did address this in the papers but at a high level there are some categorical exclusions such as meals and hotels, internal printing costs. Obviously money to fee experts is not chargeable to the class and we would not charge it to the class. We have taken care to limit costs, mindful that, you know, we don't want to be penny wise pound foolish so we did put a lot of work and risk into work such as the class list development and other matters.

But we do feel that it's a reasonable cost amount relative to cases of this massive size. And, again, Your Honor, we're an open book. Whatever type of reporting you would like that's more granular is absolutely acceptable.

**THE COURT:** Ms. Geman, just to make sure I'm following

this. You're pointing me to 16 -- excuse me, 619-1. I just want to make sure that I -- I encourage you all to please point me back to what you've already submitted so I did hear you sort of lead with that answer. Is that the one place you're pointing me? Is there anywhere else you want to point me?

**MS. GEMAN:** So, yes, Your Honor. We would -- and, Your Honor, I apologize I think I said starting in the 60s and going through the 70s, but my partner is telling me to be a little more precise. And page -- paragraph 17 of our -- no, 77 of our reply dec goes into more detail.

I would also note, Your Honor, that the cost discussion in the reply in support of our fees addressed cost issues and those had the corresponding decs as well. But the sort of charts that go through precisely what the different costs are and who the vendors are found in the declaration, Your Honor.

**THE COURT:** Thank you, Ms. Geman.

Let me ask you a question about the request for reimbursement of costs. I see that one of the declarations filed in support of your motion for final approval says the total exact cost fund payments for which reimbursement are sought are $2,779,950.26; $2,439,950.26 contributed by class counsel and $340,000 contributed by the Edelson Firm which contributed after they joined the case and that's at docket number 619-1 at 17, and I have three questions about this.

First, the last time many of us saw each other, maybe not everyone was present, but the last time we all saw each other, I referenced that Judge Alsup had previously told you all that non appointed counsel -- and I doubled down on his assertion -- that non appointed counsel won't be getting compensated out of class funds. So I'd like to understand why the Edelson Firm's expenses are included, and I need to know if you folded any other non class counsel's attorneys expenses into what class counsel is currently requesting.

**MS. GEMAN:** Thank you, Your Honor.

Just for clarity, the reference to the Edelson Firm's 340,000 contribution was not that firm's incurred costs, but conversely, their contribution into the cost fund. So that -- so they wound up contributing approximately 12.2 percent of the cost fund, the last contribution being before we last saw each other, Your Honor.

So this was not their -- you know, their travel for depositions or anything like that, this was their contributions into the cost fund. That firm had contributed about 11.4 percent of the total unreimbursed litigation expenses. But what that money was used for not costs of other counsel but instead the -- you know, that share of the vendors and costs noted in our cost fund chart at paragraph 66 of 619-1.

So I don't know if that makes sense to Your Honor but it's -- so it's what they paid in not what they took out.

**THE COURT:** I understand that but you're asking me to reimburse that and it looks to me like you're asking me to reimburse the Edelson Firm in from class funds and that's the part I need you to explain to me.

**MS. GEMAN:** Okay. I understand Your Honor. So Your Honor is saying that if indeed that, you know, that the costs would follow the fees and not be reimbursable, you know, we would respectfully request that those were costs for the benefit of the class, but whatever Your Honor decides is what Your Honor decides. I do just want to be transparent though, you know, about what those costs were for.

**THE COURT:** I appreciate that.

All right. Here is my second question about this request for reimbursement of costs. There's a new figure -- there's a new figure that is almost 810 -- or this new figure, rather, the new figure of 2,77 -- I don't want to say it again.

**MS. GEMAN:** 2.7.

**THE COURT:** 2.7 or 2.8 if we round up but that's the point, we're lawyers, and even though I should be able to read the dollar amount, it's just too hard on the fly.

So, all right. So this new figure is about $810,000 more than the original expense figure that was closer -- or just above 1.9 or, you know, again, rounding up, just 2 million requested in the fee motion filed back in December. So let me ask you, should I treat that motion, the original motion, as

withdrawn and superseded by the final approval for that number, are you now requesting -- are you now requesting the $2,779,950.26? Should I -- is that what you're requesting now, or should I look at the entirely -- at this new entirely different number which I think is $2,975,197 and 70 something cents.

**MS. GEMAN:** 74 cents.

**THE COURT:** I've got an extra digit in my notes which is why I hedged.

**MS. GEMAN:** Yes. Thank you, Your Honor.

**THE COURT:** That's what's in the reply brief. What do you want me to look at?

**MS. GEMAN:** Sorry. I can be very unambiguous. The 2.975 reflects the cost fund plus internal Lieff and Susman costs that didn't go to the cost fund but that are relatively minor because that's the delta between the 2.97 and the 2.779. Upshot is that's what we've already paid and we just updated basically for Your Honor.

**THE COURT:** Thank you.

And then last question with regard to this, I saw an entry in your declaration, Ms. Geman, in support of the fee motion at docket number 505-3, paragraph 55 for outside legal fees in the amount of $199,000 for special -- for, quote, specialized counsel efforts necessary to prosecute the case efficiently. That 199,000 went up to 626,000 in the final

approval motion.

I'm not -- I would really appreciate some explanation of how that numbered tripled in the course of three months and why it should be reimbursed. It looks like another attempt to get non appointed attorneys paid out of the common fund.

**MS. GEMAN:** Your Honor, the 626,111.08 for outside legal fees was paid to the firms that were mentioned in the 34 questions that Judge Alsup had us do as assisting with particularized projects related to settlement and appellate issues. That -- the beneficiaries of that payment were MoloLamken, Vinson & Elkins, and Irell & Manella. This doesn't include any money to the other law firms of whom you were speaking.

And, again, this conceptually was flagged -- or not just conceptually but specifically flagged in the Court's questions and that is a specific and precise amount that has been paid to those questions.

**THE COURT:** Thank you, Ms. Geman.

I'm going to shift a little bit now in case it means -- to you, flag for Mr. Nelson if he needs to get up on his feet -- but my remaining questions have to do with the attorneys' fees. I'm right to look at that.

**MS. GEMAN:** You're right, Your Honor.

Thank you, Your Honor.

**MR. NELSON:** Thank you, Your Honor.

**THE COURT:** Of course.

So, Mr. Nelson, let me -- let's talk a little bit about the estimated hours for anticipated future legal work and what they're based on. In the initial fee motion class counsel represented that the total lodestar for all of the firms was a little over 22 million. When that motion was filed, the estimate future work was 14,066 and a half hours totaling 9.8 -- 9.9 million in fees which raised the total lodestar to 32 -- I'm going to start rounding here, folks -- to about 32 million.

If I have the numbers right, class counsel's current lodestar is 22.7 million which takes into account work performed from December 2025 to March 2026 and class counsel are claiming a total lodestar of more than 27 million to account for anticipated future work. So here is -- I'm running through that just so you can tell me if I'm following all of that, but my question for you is where is this anticipated future work described in detail?

**MR. NELSON:** I believe it's described in our original declaration attached to our December 3rd fee filing that describes in detail how we came up with that projection. We then -- to be clear, we believe that that is based upon what actually has happened a very conservative projection. We have not updated that projection since the actual time, even though our actual time as incurred has been more than anticipated as

we have gone forward.

And given the amount of claims, we expect that given the dealing with the number of claims that it's still a highly conservative projection but we are not increasing it from what our original projection was in that December 3rd filing. That's docket 505-1, paragraph 16 through 21.

**THE COURT:** Thank you.

One more question for you about the fee request. In looking through your materials, I see that you all cited most non megafund cases and out of circuit authorities. I'd like you to identify for me your three best in circuit megafund cases that I should look to in continuing to consider your request for attorneys' fees.

**MR. NELSON:** Thank you.

**THE COURT:** Yeah. I just want to say I'm especially looking for something that justifies your 6.92 multiplier.

**MR. NELSON:** Thank you, Your Honor.

Well two things. First, I think that the best case from this circuit is Judge Wilken's recent order in the *NCAA* case. That was, I believe, a 20 percent fee. Now, the multiplier was around 3.3 or 3.4. It was lower than that but I do want to emphasize three points with respect to the multiplier.

The first is this was a fantastic result for the class as a whole and that is not just my saying so, that is evidenced

by the claims rate here. It is evidenced by Judge Alsup's comment at the November 3rd -- excuse me, November 13th hearing where Judge Alsup stated that this was a home run and there is a narrow path towards a home run. He complimented all counsel, including the defendant's counsel, of course.

But it was -- so that's point number one which is this -- it was a -- and the most important point here is that we have a $1.5 billion cash settlement plus we have substantial injunctive relief that is a part from the monetary relief, and we have a very limited past release. So that's point number one is the fantastic result.

Point number two is this is not simply a creature of multiplying a very large number by another very large number. This was really in two respects a creation of class counsel. First, when this case was originally filed, Pirate Library Mirror and Library Genesis were not included. Anthropic in fact tried very hard to hide that fact.

We, after substantial discovery, uncovered their piracy which led to this result. And so this was not a case of going into it that simply we knew what was going on. We had to really uncover and dig into the facts through repeated motions in front of Judge Alsup. And so that by itself shows, I think, the diligence and the work and the effort that went into it.

But there's more, which is this is an untested area of law. This is not something, again, where this is the first

major AI settlement. Judge Alsup's opinion I think beat Judge Chhabria's opinion by a day and so it really was the very first opinion on these matters. And so we are -- we are at the forefront of law and we are taking substantial risk on this, and still to this day given the $15 million dollars, for example, in potential costs if this settlement falls through, we are still taking substantial risk with respect to that.

And the third point, I would point Your Honor to Professor Rubenstein's declaration -- sorry. Before I go on to point three, there is another point, which is in addition to all of what I just described, the works list itself was a hugely important undertaking, and unlike other classes where one can just download a list of, for example, people who used Google Ad words or who have a Facebook account, this was a case where we had to intensely, intensely develop the works list to get to the 482,000 works on the works list that we spent -- our goals were to be maximally accurate and maximally comprehensive.

In other words, the class size is due to our own efforts to create that. And it should give comfort, by the way on that point, that Anthropic by the terms of the settlement, had the ability to add up to 17,000 more works that would have been for the same price. When we originally negotiated the settlement, it was up to 500,000 works for the same $1.5 billion. In other words, there was no cost for Anthropic to

add more works if those works actually existed and met all of the criteria of the class.

The fact that there were still a delta of 17,000 which is why the actual per work settlement here is not 3,000, it's 3,100 is because we did not go to 499,999. So what we did was really spend an incredible.

Amount of effort to develop the very class list that is being used.

And point number three is Professor Rubenstein's declaration which I would point Your Honor to because it's really -- it's attached to our original fee petition. It talks about how we were incredibly efficient. And that as compared to other megafund cases, we have a substantially lower number of hours and did it in a very effective way.

And look, Your Honor, I also think that that is a credit to Judge Alsup. He kept us on track, he kept us moving, and he kept us efficient. So I don't want to say it is all class counsel's doing but it was -- we did not -- you know, again, just as an objective matter as described by Professor Rubenstein's declaration who very much believes in the lodestar cross-check, and our two declarants were Professor Fitzpatrick and Professor Rubenstein who really approached these from opposite directions, and I would encourage Your Honor to read Professor Rubenstein's declaration and our description of that in our reply fee motion which really does go into the

efficiency part of it.

The other point, again, because this is such a cutting edge area of law and as Professor Rubenstein does describe, this really is -- I don't mean a legal precedent but it really does set a path for other potential settlements going forward in how to handle these large AI class actions. So all of that -- and of course the -- there's of course law from the Ninth Circuit as well that of course a lodestar -- and I understand Your Honor does do a lodestar cross-check, I'm not arguing that, I just --

**THE COURT:** You already have in your papers.

**MR. NELSON:** So -- fair enough.

But there is, given the size of the recovery and the excellent work, it is completely in line to have our reduced fee request of 12.5 percent that -- we heard the Court, we heard the objectors as they have come in. Almost all of them, there's only eight deal with the fee request and most of those, for example, don't actually talk about our percentage. There are a couple but literally it is a couple. The rest say, for example, it should be less than 20 percent or less than 15 percent, so we heard the Court and we tried -- we weren't trying to negotiate against ourselves. We were trying to do a real number that this court could approve that fell within the range of multipliers.

The other case I would say is -- I believe it's the

*Gutierrez* case from Judge Alsup where Judge Alsup said that a 5.5 multiplier was well within the range of a reasonable multiplier and so -- and that wasn't as large as this but it was a very large settlement.

And then I would also point Your Honor to the -- it's *Cambridge Analytica*. Because Your Honor asked for three so -- it's Facebook, Your Honor. And those are cited in our proposed order as well. But those would be the three that I would give Your Honor in addition to the Ninth Circuit law that's cited there.

**THE COURT:** Thank you, Mr. Nelson.

So, folks, I want to thank you for sitting through all of this. I also want to thank you for your presentations and I understand that defense counsel wants to be heard at least with regard to whether or not the late objections -- or, excuse me, the late opt-outs are considered.

I'm going to take the matter under submission.

You can expect short orders to follow, let's say, by tomorrow because I will ask you all for submissions, brief submissions to help keep this moving and get it -- and get us to wherever we're going.

Ms. Durie, do you have something you want to add?

Okay. Thank you, all.

**MR. NELSON:** Thank you.

**THE COURT:** Have a good rest of your day.

**COURTROOM DEPUTY:** Court is in recess.

(Proceedings adjourned at 3:13 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, May 15th, 2026.

Andrea K Bluedorn

Andrea K. Bluedorn, RMR, CRR
Official United States Reporter