# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA BARTZ and KIRK WALLACE JOHNSON, individually, and ANDREA BARTZ, INC., CHARLES GRAEBER, and MJ + KJ, INC., individually and as representatives of the class,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 3:24-cv-05417-AMO<br><br>**[SECOND SUPPLEMENTAL PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; GRANTING MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND PLAINTIFF SERVICE AWARDS; JUDGMENT**<br><br>Re: Dkt. Nos. 573, 619 |

Before the Court are Plaintiffs Andrea Bartz, Inc., Charles Graeber, and MJ + KJ Inc.'s Motion for Final Approval of Class Action Settlement and Motion for Attorneys' Fees, Reimbursement of Expenses, and Plaintiff Service Awards. The proposed Settlement: (1) creates a non-reversionary Settlement Fund of $1.5 billion plus interest for the 482,460 works on the Works List; (2) provides injunctive relief in the form of the destruction of the datasets from the pirated websites Library Genesis ("LibGen") and Pirate Library Mirror ("PiLiMi") and a certification that no copies from those sites were used in the training of any commercially-released model; and (3) grants a limited release to Anthropic for past use only (defined as August 25, 2025) and that does not include any release of claims related to the models' output regardless of timeframe. Dkt. 619 (Mot. Final Approval) at 2. The Settlement also includes a Plan of Allocation and Distribution that distributes the payments to legal and beneficial owners of the Works on a per-work basis based on their respective ownership of the Work. Dkt. 401-1 (Plan of Allocation and Distribution) ¶¶ 1, 3. The Agreement also provides a mechanism for resolving any disputes between Class Members via a Special Master. Dkt. 401-1 (Plan of Allocation and Distribution) ¶¶ 1, 3. The Motions were

heard before this Court on May 14, 2026. Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority and the fifty-three submissions filed with respect to the Settlement, and good cause appearing, the Court hereby **GRANTS** both Motions for the following reasons.

I.      DISCUSSION

      A.      <u>Final Approval of Settlement</u>

          1.      <u>Rule 23(e)(1)</u>

Before granting final approval, the Court must ensure that the notice was provided "in a reasonable manner to all class members who would be bound by the proposal" and "certify the class for purposes of judgment." Fed. R. Civ. P. 23(e)(1).

The Notice Plan constituted the best notice that is practicable under the circumstances to all Class Members and was sufficiently implemented by the Settlement Administrator, effecting Class Notice that fully complied with the requirements of Federal Rule of Civil Procedure 23 and due process. The forms of Notice disseminated by the Settlement Administrator included links to the Court-approved Settlement website, which itself included over 50 comprehensive and Court-approved FAQs. *Bartz, et al. v. Anthropic PBC, Settlement Website*, https://www.anthropiccopyrightsettlement.com/faq (FAQ).

The Settlement Administrator compiled contact information from a wide range of sources including submissions by the Author's Guild, the Science Fiction Writers of America, the Author's Registry, more than 170 publishers, and through a variety of third-party sources, including Bowker ISBN Services, the U.S. Copyright Office, commercial data sources (such as Amazon.com), and targeted web searches. Dkt. 619-3, Declaration of Jennifer M. Keough of JND Legal Administration in Support of Final Approval ¶ 20. Notice included direct mail and email to rightsholders sent to 594,945 potential Class Members associated with 99.98 percent of the Works on the Works List with notice not returned as undeliverable to Class Members associated with at least 99.5 percent of the Works on the Works List. *Id.* ¶¶ 28, 79. The Notice campaign also included distribution of press through journalists specializing in the education and publishing industries, publication in newsletters such as *Publishers Weekly, The Chronicle of Higher Education, Writer's*

*Digest, Poets & Writers*, publication in newspapers and magazines such as *The Atlantic*, *The Toronto Star*, *The Globe and Mail*, and *La Presse*, and widespread social media campaigns. *Id.* ¶ 32.

The findings of the Preliminary Approval Order (Dkts. 427, 437) are confirmed and all requirements for maintenance of a class action set forth in Federal Rules of Civil Procedure 23(a) and (b)(3) remain satisfied. The certified Class is reaffirmed and defined as follows:

> All beneficial or legal copyright owners of the exclusive right to reproduce copies of any book in the versions of LibGen or PiLiMi downloaded by Anthropic as contained on the Works List. "Book" refers to any work possessing an ISBN or ASIN which was registered with the United States Copyright Office within five years of the work's first publication and which was registered with the United States Copyright Office before being downloaded by Anthropic, or within three months of first publication. Excluded are the directors, officers and employees of Anthropic, personnel of federal agencies, and district court personnel. For avoidance of doubt, only works included on the Works List are in the Class.

The Court reaffirms the appointment of Andrea Bartz, Inc., Charles Graeber, and MJ + KJ Inc. as Class Representatives. *See* Dkt. 437 (Order on Preliminary Approval of Class Action Settlement); *see also* Dkt. 244 (Order on Class Certification). These Class Representatives have fairly and adequately represented, and will continue to fairly and adequately represent, the interests of the Class. *See* Dkt. 437, at 14. No Objections challenged the Class Representatives' appointment or adequacy.

The Court reaffirms the appointment of Lieff Cabraser Heimann & Bernstein, LLP and Susman Godfrey L.L.P. as counsel representing the Class under Federal Rule of Civil Procedure 23(g). *See* Dkt. 437 at 14 (Preliminary Approval Order); Dkt. 244 at 14 (Class Certification Order). Class Counsel have fairly and adequately represented, and will continue to fairly and adequately represent, the interest of the Class. The Objections and putative objections suggesting that they have not adequately and vigorously represented the Class lack merit and are overruled. Dkts. 425 (Ruden), 543, 653 & 659 (Chase), 641, 648 & 661 (Pinder). These objections are addressed in more detail in Section I.D. below.

The Court reaffirms the appointment of JND Legal Administration ("JND") to serve as the Settlement Administrator and finds that it has thus far fulfilled its duties under the Settlement. *See*

Dkt. 437 at 14. The Settlement Administrator's estimated expenses are reasonable given the scope and complexity of this Settlement, and the Settlement Administrator shall be paid in accordance with the Settlement Agreement. *See* Dkt. 399 (Supp. Keough Decl.) ¶ 117. The Settlement Administrator agreed to provide notice, administration, and distribution services for approximately $15 million. Dkt. 668, May 14, 2026 Hr'g Tr. at 33:5–7. No Objections challenge JND's appointment.

### 2. Rule 23(e)(2)

In order to approve a proposed class action settlement, a court must hold a hearing and find that the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In reviewing the proposed settlement, courts analyze whether the settlement is fair, free of collusion, and consistent with plaintiff's obligations to the class. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

Pursuant to Federal Rule of Civil Procedure 23(e)(2) and this District's Procedural Guidance for Class Action Settlements, the Settlement is fair, reasonable, adequate, and in the best interests of the Class Members. Class Counsel and the Class Representatives ably protected and furthered the best interests of the Class in this Action. *See* Dkt. 619 (Mot. Final Approval) at 10–11. There are no indicia of fraud or collusion underlying this non-reversionary Settlement, which was the result of several informed arm's length mediation sessions and subsequent negotiations facilitated by two respected mediators. These settlement proceedings began only after the Court expressly granted permission to engage in settlement discussions and after both class certification and summary judgment were briefed and argued. Dkt. 363-2 (Class Counsel Decl. in Support of Prelim. Approval) at ¶¶ 23, 25, 36; *see* Dkt. 619 (Mot. Final Approval) at 11; Fed. R. Civ. P. 23(e)(2) advisory committee's note (2018); *see also Aguilar Auto Repair, Inc. v. Wells Fargo Bank, N.A.*, 2025 WL 1753509, at *4 (N.D. Cal. May 23, 2025). The non-reversionary Settlement Fund of $1.5 billion plus interest provides meaningful relief to the Settlement Class given the range of Class Members' reasonable possible recoveries, especially since further litigation would likely be complex, expensive, lengthy, and risky. Dkt. 619 (Mot. Final Approval) at 11–13. The estimated per-work payment of over $3,100 is four times the minimum statutory damages amount for willful

infringement. *See* 17 U.S.C. § 504(c)(1). The Settlement Agreement provides for a fund of $1.5 billion (plus interest) for up to 500,000 works, plus an additional $3,000 per work for every work that Anthropic added above 500,000. *See* Dkt. 363-3 (Settlement Agreement) ¶ 1.34. The actual number of works on the Works List is 482,460, which results in an amount of $3,109.07 per Work plus interest. *See* Dkt. 437 at 5 n.2 (Preliminary Approval Order). And because the fund is non-reversionary, the amount per work of any unclaimed Work will revert to the Settlement Fund. At the current claims rate of 92.77% for 447,576 works, the reversionary amount would result in an additional $242.32 per Work for a total of $3,351.39 per claimed Work (although the exact amount of the reversion will depend on confirmation of claims and any additional timely claims submitted). The Settlement's methods of processing claims and distributing funds to Class Members are fair and adequate. *See* Dkt. 619-3 (Supp. JND Decl.) ¶¶ 90–96; Dkt. 401-1 (Plan of Allocation and Distribution) ¶¶ 3, 5. As of April 16, 2026, 91.3% of the Works List had been claimed, for a total of 440,490 works. *See* Dkt. 643-1 (Declaration of Jennifer M. Keough Regarding Claims Received) ¶ 3. As of May 14, 2026, Class Counsel represented that 92.77% of the Works List had been claimed, Dkt. 668, May 14, 2026 Hr'g Tr. 6:17–18, which reflects the efficiency and fairness of the Claims Process and Class Members' enthusiasm for the Settlement.

The Settlement also satisfies the final Rule 23(e)(2) factor, which asks whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The Court recognized at preliminary approval that: "Each work gets the same award. The awards are alike because the evidence has shown that Anthropic pirated works alike (the claim core to this case)." Dkt. 437 (Preliminary Approval Order) at 7. Not only are all class works treated the same in that they receive the same award, Anthropic's agreement to destroy the files of the pirated LibGen and PiLiMi works, as well as any copies that originate from the torrented/downloaded copies, will benefit all Class Members equally as well. *See, e.g.*, *Nado v. John Muir Health*, No. 24-CV-01632-AMO, 2026 WL 82232, at *3 (N.D. Cal. Jan. 12, 2026); *Raffin v. Medicredit, Inc.*, 2018 WL 6011551, at *4 (C.D. Cal. May 11, 2018).

As the Court recognized at preliminary approval, while individual Class Members may receive different amounts from each work's equal award, any difference appropriately depends on

each Class Member's individual contractual and ownership arrangements with other co-owners (or, for solely owned works, the lack thereof). On this score, the Settlement is also fair: all Class Members have had the opportunity to identify the portion of the per-work award to which they are entitled, and to the extent there are disputes over the split of a particular per-work settlement award, Class Members who do not resolve such disputes with assistance from the Settlement Administrator may submit those disputes for resolution confidentially through the Special Master. *See, e.g.*, Dkt. 437 (Preliminary Approval Order) at 7 ("No matter the type of work, it is only fair to let any claimant have the chance to show why any split applies, and the claim form so allows for all. The settlement plan affords notice, claim forms, further notice, and a plan of distribution."). The Court reaffirms the Plan of Allocation and Distribution that was approved at preliminary approval, which reflects the equitable treatment of Class Members. *See* Dkt. 401-1 (Plan of Allocation and Distribution).

The Settlement's terms of a proposed award of attorneys' fees, including timing of payments, are reasonable. Attorneys' fees are to be paid based on the benefit received by the Class, and were agreed to be capped at 25 percent. *See* Dkt. 363-3 (Settlement Agreement) ¶ 81. There is no clear sailing provision. Under the Settlement, the timing of fee payments will correlate with Anthropic's payments into the Settlement Fund. *Id.* Moreover, as fully described below, Class Counsel requested an award that is only half of the maximum identified in the Settlement and associated notice documents. *See id.*; Long-Form Notice ("LFN") at 16 (available at https://tinyurl.com/LongFormNotice); Dkt. 363 (Mot. for Prelim. Approval).

The Ninth Circuit's *Churchill* factors also provide a framework for evaluating the fairness of a class action settlement. While the "key [*Churchill*] factors are now baked into the text of Rule 23(e), . . . the remaining ones can still be considered for [fairness] analysis." *In re Cal. Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 674 (9th Cir. 2025). The remaining *Churchill* factors relevant here include the strength of the plaintiffs' case, the risk of maintaining class action status throughout the trial, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, and the reaction of the class members to the proposed settlement. *See Churchill Vill., L.L.C. v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004).

The $1.5+ billion Settlement—plus the substantial non-monetary relief that the Settlement includes—provides substantial benefits to the Class in light of the novel claims asserted. Success at trial was not assured, and a loss would have left the Class with no recourse. Dkt. 619 (Mot. Final Approval) at 11–13; Dkt. 363 (Mot. for Prelim. Approval) at 22–23. Additionally, Anthropic's Rule 23(f) petition was fully briefed in the Ninth Circuit when the Settlement was reached. Mot. Final Approval at 11–13. The $1.5+ billion Settlement thus provides substantial benefits relative to these and other litigation risks. The Settlement is also informed by extensive discovery and expert analysis—including review of over 80,000 documents and two million pages of materials, 20 depositions spanning more than 4,300 pages, 17 discovery motions, and extensive third-party discovery. Dkt. 619 (Mot. Final Approval) at 3–5; Dkt. 363 (Mot. for Prelim. Approval) at 9–11; Dkt. 363-2 (Declaration of Class Counsel in Support of Preliminary Approval) at 6–8.

The Class is represented by "excellent counsel, and it is their judgment that the result reached is fair, adequate, and reasonable." Dkt. 437 at 5 (Preliminary Approval Order); *see also* Dkt. 363-3 at 18–25. The Preliminary Approval Order stated that one of the only open questions was the response of the Class. *See* Dkt 437, at 4–5. The Class's response was overwhelmingly favorable: the claims rate has reached at least 92.77% of Works, while only 350 valid opt outs, spanning just 1,802 Works (which is only 0.3% of the total number of Works), and 53 Objections or comments were filed. *See* Dkt. 643 (Plaintiffs' Updated Claims Report) at 1. At the fairness hearing, Class Counsel reported that the claims rate subsequently had grown from 91.3% to 92.77%. Dkt. 668, May 14, 2026 Hearing Tr. 6:17– 18; *see also* N.D. Cal. Procedural Guidance for Class Action Settlements, Final Approval ¶ 1 (Class Members' Response). This rate is substantially higher than other claims-made settlements. *See, e.g.*, *Messineo v. Ocwen Loan Servicing, LLC*, 2017 WL 733219, at *6–7 (final approval with "higher than average" claims rate of 9.26% of 9,374 class members); Dkt. 363 at 17 n.5.

Three Class Members even wrote to the Court to express support for the Settlement. *See* Dkts. 589 (Bond); 644 (Mahmud); 638 (Miles). Mahmud calls the Settlement "a historic recovery for authors and publishers whose works were pirated and used without permission" and "urge[d] this Court to approve the settlement." Dkt. 644 at 5. Bond recognizes that "[t]he amount achieved

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

in this settlement is probably as high as it can be for authors to actually receive a somewhat meaningful payment without triggering legislation or administrative action that would meaningfully limit our rights," recognizing as well the "additional risk to delay[ing]" resolution of the Class's claims against Anthropic. Dkt. 589 at 3. And Miles requested that, were Class Counsel's fee award 15% (or presumably less), then the Court should "[a]pprove the settlement on its merit." Dkt. 638 at 1.

Many other Class Members have also expressed their satisfaction with the settlement, including the work conducted by the Class Representatives and Class Counsel to administer it. For instance, Class Members have "described the assistance received as providing a 'lifeline to this whole claim filing process.' They have noted that they feel 'very fortunate to be represented' by Class Counsel, whose assistance 'cut through the clutter of information.' They have called the assistance 'prompt,' 'rapid,' 'kind,' 'clear,' 'quick,' and 'excellent.'" Dkt 619-1, at ¶ 29 (Class Counsel Decl. in Support of Fee Mot.). These efforts are in addition to those of the Settlement Administrator, which, as set forth in the declaration of its CEO Jennifer Keough, included responding to more than 8,867 calls with a live agent and responding to more than 21,000 emails. *See* Dkt. 619-3 at ¶ 100; *see also Dkt.* 619-2, ¶ 18 (March 19, 2026 Joint Declaration by Class Representatives) ("Collectively, we could copy and paste hundreds of social media posts, DMs, texts, and other correspondence we've received sharing the same sentiment: gratitude, congratulations, hope, excitement, relief."); *see also id.* ¶ 14 ("Between us, we have had hundreds of conversations on this subject, with colleagues, friends, and strangers. All expressed a sense of hope, however small, kindled by this settlement, and gratitude for our part in it."). The extraordinary claims rate further demonstrates that Class Members have been able to file claims easily.

After full consideration of the factors, the Court finds that the Settlement meets the necessary procedural considerations and substantive qualities under Rule 23(e)(2), and is fair, reasonable, and adequate.

**B.    Final Approval of the Plan of Distribution & Allocation and Claims Process**

The Court finds that the Settlement Administrator effectively administered the Claims program pursuant to the Settlement Agreement and the Memorandum Opinion on Preliminary

Approval (Dkt. 437) and that the Claims process was fair, reasonable, and adequate.

The Court adopts the Parties' proposal for allocating the Net Settlement Fund. *See* Dkt. 401-1 (Plan of Allocation and Distribution). The Plan of Allocation and Distribution provides payments to be distributed to valid claimants, who will receive a *pro rata* per-work share, to be divided among copyright owners based on either elected default splits (for non-education works only) or a percentage split determined by contracts or publishing agreements. *Id.* ¶ 4. If any funds remain in the Settlement Fund after all Valid Claims are paid, the Parties anticipate a redistribution of the remaining funds to Settlement Class Members unless it is economically infeasible to do so. Subject to Court approval, any final balance will be directed in *cy pres*.

The Settlement also provides a fair and reasonable process for the resolution of any disputes. Should any disputes arise among valid claimants for a given Work that are not resolved otherwise, the Special Master will make a reasonable determination based on the evidence before him, for any disputes submitted to the Special Master that cannot be resolved by mutual agreement with the assistance of the Settlement Administrator. *See id.* ¶¶ 3(d), 4; Dkt. 501 (appointing Theodore K. Cheng as Special Master). All submissions made to the Special Master in connection with any dispute resolution process—including publishing agreements—shall remain confidential and under seal.

## C.    **Releases**

Upon the Effective Date, the Parties shall have, fully and irrevocably released and forever discharged one another from any and all Released Claims as to the Works on the Works List. Dkt. 363-3 (Settlement Agreement) ¶¶ 1.29, 3.1, 6.2.g. Accordingly, the Settlement shall terminate the Action. *See id.* ¶ 6.2(f). The Release, however, shall not include any claims related to the enforcement of the Settlement or Protective Order (Dkt. 63). The Release does not implicate any Objections seeking to add Works to the Works List, each of which this Order overrules. As the Court earlier found, "if a work is not on the Works List, then a copyright owner of the right to reproduce that work is not in the class (unless as an owner with respect to another work that is on the list)." Dkt. 437 (Preliminary Approval Order) (emphasis removed). The Release also does not include any future conduct after August 25, 2025, and does not include any output claims. Dkt. 619

(Mot. Final Approval) at 2.

### D.     Objections to the Settlement

The Court overrules the Objections and putative Objections to the Settlement. *See* Dkts. 425, 438–39, 539/540, 541–42, 543/653/659, 544–46, 549/568, 550/67, 552, 564–66, 571, 572/84/93, 585, 588–89, 594–95, 596/606, 597–98, 599/600, 601, 602/630, 603–05, 607–12, 630, 635–40, 641/648, 642, 644–45, 646-3, 654. The Court addresses the Objections by category below, and further holds that any putative Objection filed by a non-class member is stricken because non-class members "lack[] standing to object to the settlement." Dkt. 632 at 1 n.1; *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2020 WL 1873554, at *4 (N.D. Cal. Mar. 11, 2020) (citations omitted).

### 1.     Notice

The Objections challenging the reach, content, and duration of the Notice Plan are overruled. *See* Dkts. 551, 569 & 618 (Werner); 571 & 650 (Hampton); 572, 649 & 655 (Chakanga); 599 (Story).

As discussed in the Preliminary Approval Order and the declarations of the Settlement Administrator, the notice plan was comprehensive and thorough. Dkt. 437 at 7–13 (Preliminary Approval Order); Dkt. 319 at ¶¶ 21–73 (Decl. of J. Keough); Dkt. 363-12 at ¶¶ 42–97 (Decl. of J. Keough); Dkt. 399 at ¶¶ 33–98 (Suppl. Decl. of J. Keough); Dkt. 619-3 at ¶¶ 32–83 (Decl. of J. Keough). Estimated to cost $15 million, Dkt. 399 at ¶ 117 (Supp. Decl. of J Keough), the Notice Plan comprised:

- ***Direct notice.*** Direct notice was sent, and not returned as undeliverable, to 506,194 potential Class Members representing 480,114 Works—that is, 99.5% of Works on the Works List. Dkt. 619-3 at ¶ 79 (Decl. of J. Keough).

- ***Industry Group Notice.*** Direct notice was supplemented with notice through prominent industry groups and guilds. These industry-group notice efforts commenced immediately after preliminary approval was granted and persisted throughout the notice period. *See id.* at ¶ 32.

- ***Media Notice.*** JND placed print and digital notice with leading publications in the United States and Canada, and distributed a press release to ~5,000 media outlets nationwide and in Canada, including to journalists who specialize in reporting on higher education, teaching, books, and publishing. *Id*.

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

- ***Social Media and Digital Notice.*** JND served over 100 million digital impressions through GDN, Facebook, Instagram, and Reddit; used multiple targeting strategies to direct notice to likely class members; and further stimulated claims by serving 44.6 million "reminder" digital impressions. *Id.* at ¶¶ 52, 75.

- ***Online Notice.*** JND's Settlement Website readily identifies important information and deadlines. The Website includes the long form notice, Settlement Agreement, a searchable Works List, an online automated Claim Form, and a downloadable Claim Form; it is ADA-compliant and optimized for both mobile and computer visitors; and its address is prominently displayed in all printed notice documents, accessible through email and digital notices, and imprinted via QR code in the mailed and print notices. As of March 19, 2026, the Website tracked 1,077,135 unique users. *Id.* at ¶ 89.

As to reach, mailing or email addresses were compiled for 99.98% of Works on the Works List, covering 594,945 potential Class Members. Dkt. 619-3 ¶ 28 (Decl. of J. Keough). 506,194 potential Class Members were sent notice not returned as undeliverable, representing 99.5% of the Works List, *id.* at ¶ 79—well-above the 70 percent notice rate that the Federal Judicial Center considers reasonable. *See* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* at 3 (2010). The notice period ran 70 days, from December 1, 2025—the date that the Settlement Administrator completed dissemination of direct notice, *see* Dkt. 548 at 6 (Joint Case Mgmt. Statement)—to February 9, 2026, Dkt. 583 (extending opt-out and objection deadline). Within the 70-day direct notice period, JND disseminated notice through direct mail, email, reminder postcards and emails, print and digital press releases, and a media campaign garnering over 105.4 million impressions via social media and paid search. Dkt. 619-3 ¶¶ 52, 59, 70, 75 (Decl. of J. Keough). Finally, the Settlement Administrator notified Class Members when someone else had submitted a valid Claim Form in connection with a work on the Works List for which the Class Member was identified as a potential rightsholder. *See* Dkt. 440-1 at 17, FAQ 31 (Long-Form Notice). That supplemental notice gave Class Members an additional 70 days to claim.

As to content, the Court-approved Notice expressly stated that statutory damages could range from $200 to $150,000 per Work. It also gave "equal dignity" to the options of filing a claim and opting out. *See* Class Notice at https://www.anthropiccopyrightsettlement.com/documents; Dkt. 437 (Preliminary Approval Order); Dkt. 490 at 1–2 (Further Order re Class Notice); Dkt. 495 at 4 (Third Order re Class Notice). The direct notice, whose dissemination began on November 24,

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

2025, Dkt. 495 at 5 (Third Order re Class Notice), reflected Class Counsel's submissions and the Court's directives on this precise point. Further, no requirement exists that the Notice explain how to e-file with the Court, and many non-lawyers successfully lodged Objections.

As to duration, the two Objections that argue that the Notice period was too short are overruled. *See* Dkts. 571 & 650 (Hampton), 572, 649, & 655 (Chakanga). The 70-day direct notice period exceeded the 35-day period specified in this District's Procedural Guidance for Class Action Settlements. Both Hampton and Chakanga's objections are discussed in more detail below. Werner and Story's objections are addressed below at pages 24–26, 40, 63, and 64–65.

**Chakanga (Dkts. 572, 649 & 655) & Hampton (Dkts. 650 & 571)**

Chinonto Chakanga (pen name "Chino Chakanga") and Brenda Hampton, represented by the same counsel, object that (1) the Notice did not give Class Members sufficient notice of the potential recovery from a separate claim against Anthropic if they opted out of the settlement, (2) that certain portions of the parties' briefs and exhibits remained sealed until January 21, 2026 and thus that the notice period was too short, (3) that the summary judgment order was not posted on the settlement website, and (4) that the Works List includes works that do not meet the criteria for inclusion. *See* Dkt. 571 at 1–5; Dkt. 572 at 1–5; Dkt. 655 at 2–3.

As to the first ground, the Court ensured that the Notice provided "equal dignity" to the options of filing a claim and opting out. Specifically, the direct notice stated that "the Copyright Act provides for statutory damages of between $200 and $150,000 per work, depending on factors including the harm that was actually caused by the infringement, and whether the alleged infringer reasonably believed its use was fair or instead acted willfully. If the use was fair (or there was no copying), the defendant owes $0." *See* LFN at 6. Similarly, the documents provided on the settlement website explained in detail the alternatives to the settlement and the potential value of claims brought through trial. *See, e.g.,* Dkt. 437 at 4–5 (Preliminary Approval Order). Both Hampton and Chakanga's objections mischaracterize the Notice as failing to state that an opt-out only excludes payment from the settlement while leaving the right to pursue an independent claim against Anthropic. However, the Notice plainly states that opting out forgoes payments from the Settlement while permitting opt-outs to file separate lawsuits against Anthropic:

You may exclude yourself and every other legal and beneficial owner of your work by following the directions below by February 9, 2026. *This is the only option that allows you to bring your own separate lawsuit against Anthropic for the claims this Settlement resolves.* If you exclude yourself and all other rightsholders, you will *give up the right to receive any payment from this Settlement* and will prevent all other legal and beneficial owners of your works from receiving any payment from this Settlement. Notice, p. 2; *see also id.* at p. 16 (FAQ #40) ("[i]f you opt out a work from the Settlement, that means that you and any other legal or beneficial owners of that work will not receive any payment *from the Settlement for that work*.").

Hampton and Chakanga both cite *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 330 (N.D. Cal. 2018) in support of their objection on this ground but that case concerned whether substantive modifications to the terms of the settlement following a fairness hearing required additional notice. It does not support their objection. In light of the above, the Court overrules this ground.

As to the second ground, the notice period ran 70 days from the completion of direct notice, i.e., from December 1, 2025 to February 9, 2026, doubling the 35-day-period specified in this District's Procedural Guidance for Class Action Settlements. *See* Dkts. 496, 583. The Chakanga and Hampton objections cite no authority in support of their contention that sealed portions of the class certification and summary judgment briefing prevented class members from making an informed decision regarding their rights and the Court is aware of none. In any event, the Court's Class Certification Order, its Order on Fair Use, and its Order on Preliminary Approval, were never sealed and provided an ample factual basis to permit class members to make an informed decision regarding their rights. Those orders recounted the factual history of Anthropic's piracy and use of the works, the Court's reasoning regarding fair use, and included numerous quotes from the evidentiary record—including both documents and fact and expert witness testimony—bearing on these issues. *E.g.*, Dkt. 244 (Order on Class Certification) (describing factual background in detail, including that "in June 2021, Anthropic's co-founder used the infamous BitTorrent protocol to copy books peer-to-peer from decentralized copies of another pirate library—Library Genesis, or LibGen (*see* ¶ 45). He set a computer program to pause torrenting if disk space got "exhausted" (Br. Exh. 19 at -0389775). These five million copies again came from ebooks, this time remaining in file types like .epub and .pdf to be "viewed as eBooks."); Dkt. 231 (Order on Fair Use) (describing factual background, including the downloading of the LibGen and PiLiMi databases, which

"Anthropic knew had been pirated," the scanned books  project, in which it "stripped the books from their bindings, cut their pages to size, and scanned the books into digital form," and the resulting "research library").

The Court further notes that Question Four in the Long Form Notice summarizes the issues at summary judgment. LFN at 5–6. Neither Chakanga nor Hampton—nor their counsel—have identified any document that was unsealed that would have made any impact on a class member's decision to opt out, nor is there reason to believe that any of these unsealed documents would likely have been material to a Class Member's decision, given the extensive detail in the Court's orders, the public briefing on class certification and summary judgment, the extensive hearing transcripts in the case, and the court-approved Notice.

Chakanga cites *Avery v. TEKsystems, Inc.*, 165 F.4th 1219 (9th Cir. 2026), which considered whether a 13-day opt-out period that occurred entirely over a holiday period may present fairness issues. *See id.* at 1232. *Avery* is inapt. That case concerned a defendant's misleading communications to class members trying to force class members into arbitration, and held that the district court properly relied on Rule 23(d) when denying the defendant's motion to compel arbitration. *See id.* at 1231–33. The Ninth Circuit found that the *Avery* defendant's communications "repeatedly disparaged the efficacy of class actions and misleadingly claimed that class actions are 'wasteful, inefficient means for resolving disputes' that 'tend to enrich only attorneys rather than the individuals who may have legitimate claims,'" and included numerous inaccuracies, including that "a class action 'requires [the defendant] to ignore individual employee issues and concerns." *Id.* at 1231, 1224. This "disparaging and inaccurate framing of class actions was particularly significant because [the defendant's] communications 'were the first communication many putative class members received about the case'" and appeared "'designed to prevent putative class members from opting into the lawsuit and opting out of the [Agreement].'" *Id.* at 1231. The emails also included instructions not to "share this email" and strongly implied that class members would need to "hire their own attorneys and pay out of pocket to obtain legal advice." *Id.* at 1232. It was in that context that the court noted that the roll-out of these emails on December 19, 2023, with a purported deadline of January 1, 2024, "added to the confusion" created by the content of the

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

communications, with the ultimate effect of the totality of these facts being that the defendant had "upended FRCP 23(d) by turning the opt-out process into an opt-in process." *Id.* at 1232.–

The Court-approved Notice similarly explained that "[i]n June 2025, the district court ruled that using the books to train AI models was fair use and therefore not a violation of the Copyright Act but left for trial the question whether downloading and use of works from LibGen and PiLiMi was fair use." LFN at 6. And the Notice itself directed class members to PACER for additional information about the settlement and the litigation. LFN at 24; *see also* Northern District of California Procedural Guidance for Class Action Settlements ¶ 3 ("The notice should include the following information . . . . Instructions on how to access the case docket via PACER"). The Court also notes that the Fair Use order along with the Settlement itself have been the subject of extensive media coverage. *See, e.g.*, Dkt. 399 ¶¶ 50–87. In light of the above, the Court finds that the omission of the Fair Use order from the settlement website did not undermine the sufficiency of the Notice under Federal Rule of Civil Procedure 23(c)(2)(B). The Court thus overrules this objection. As to the fourth ground, the Court found that Class Counsel set forth a detailed and sufficient methodology for accurate compilation of the Works List in their motion for preliminary approval and accompanying declaration. *See* Dkt. 363 at 14–16; Dkt. 363-2 at 15–17. Nonetheless, the Court anticipated objections concerning the eligibility of certain works on the Works List at preliminary approval. The Court thus clarified in its preliminary approval order (and the parties agreed) that the Works List serves as a defining record of which works are included in the Settlement and which works are not. The Court declines to revisit that determination and as such this ground is overruled.

### 2.   Works List and Class Definition

The putative Objections and comments requesting that the Court expand the Class definition and Works List are overruled and, in many cases, stricken. *See* Dkts. 438 (Barrett), 540 (Paolinelli), 541 (Tombs), 542 (Leahy), 543, 653 & 659 (Chase), 546 (Dames of Detection, Inc. (Johnston)), 550, 567, & 634 (Grace), 551, 569 & 618 (Werner), 552 (Miller), 565 (Glenn), 572, 649, & 655 (Chakanga), 571 & 650 (Hampton), 585 (Ryker), 588 (Schapiro), 602, 630 & 663 (Bishop), 603 (Newton Compton Editori SRL), 604 (Tea Tascabili Degli Editori Assn. SPA), 605 (Casa Editrice Nord SRL), 607 (Bollati Boringhieri Editore SRL), 608 (Adriano Salani Editore SRL), 609 (Smith),

610 (Longanesi & C. SRL), 611 (Antonio Vallardi Editore SRL), 612 (Garzanti SRL), 645 (Houghton), 637 (Leonard), 639 (Watkins Media Ltd. & Collective Ink Ltd.), 640 (Sarah M. Johnson), and 641, 648 & 661 (Pinder). Prior to discussing the specific objections, the Court first sets forth the general principles that apply to these objections.

*First*, as the Court previously held, non-class members lack standing, including to make objections regarding works that are not on the Works List and are thus unaffected by the Settlement. *See* Dkt. 632 (Order re Motion Hearing); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2020 WL 1873554, at *4 (quoting *San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F. Supp. 2d 1021, 1032 (N.D. Cal. 1999)); *In re Hydroxycut Mktg. & Sales Practices Litig.*, Nos. 09md2087, 09cv1088 BTM (KSC), 2013 WL 5275618, at *2 (S.D. Cal. Sept. 17, 2013) (striking objection because objector had not "carried his burden of proving standing as a class member"); *In re Korean Air Lines Co. Antitrust Litig.*, MDL No. 1891, 2013 WL 7985367, at *2 (C.D. Cal. Dec. 23, 2013) (similar); *Kent v. Hewlett-Packard Co.*, No. 5:09-cv-05341-JF (HRL), 2011 WL 4403717, at *3 (N.D. Cal. Sept. 20, 2011) (similar); *Tarlecki v. bebe Stores, Inc.*, No. C 05-1777 MHP, 2009 WL 3720872, at *1, n.1 (N.D. Cal. Nov. 3, 2009) (similar).

*Second*, the Class is limited only to owners of works listed on the Works List. *See* Dkt. 437 at 2. In granting preliminary approval, the Court added this qualifier to the class definition: "For avoidance of doubt, only works included on the Works List are in the Class." Dkt. 437 at 2. A number of objections or comments take issue with the raise the concern that there may be works that otherwise meet the class criteria but are excluded from the Works List.

However, the Court foresaw this issue and the potential for future disputes if one party were to contend that their work had been released in the Settlement by virtue of meeting these criteria even though the work was not listed on the Works List. The Works List serves to avoid any ambiguity in what claims are or are not released by the Settlement, and ensures certainty and finality. Dkt. 437 at 3. Equally important, claims arising out of the use of works that are not on the Works List—even if they otherwise meet or appear to meet the other class criteria—are preserved and unaffected by the Settlement. For this reason, objections that certain additional works should have been added to the Works List are overruled—the claims related to those works are preserved,

as the Works List serves as a defining record of which works are covered by the Settlement and which works are not.

*Third*, a number of objections take issue with the requirement that any book listed on the Works List must possess a copyright registration number (registered within a certain timeframe, as set out in the Class definition) as well as an ISBN or ASIN for certainty regarding the eligible and included works. Yet these requirements track the substantive law. Indeed, as the Court previously found in certifying a contested litigation class, there is good reason for the registration requirement. *See* Dkt. 437 at 8 (Preliminary Approval Order). Registered works enjoy a presumption of originality and validity as to copyright protection, *see* 17 U.S.C. § 410(c), and therefore, statutory damages. 17 U.S.C. §§ 412, 504(c)(1). *See* Dkt. 244 at 22 (Class Certification Order); Dkt. 437 at 2, 8 (Preliminary Approval Order). The Court notes that any owner of a copyrighted work (or of any exclusive rights in the work) is entitled by statute to register the work with the Copyright Office. *See* 17 U.S.C. § 408(a). Accordingly the requirement that a work be registered in order to be eligible for Works list inclusion does not exclude independent authors, small publishing houses, foreign publishers, or non-English authors, each of whom is free to file for registration of their works, and many of whom have done exactly that.

As to the requirement that works on the Works List possess an ISBN or ASIN, these unique identifiers generally ensure that information regarding a work, including its publisher, author, and date of publication, can be identified, as well as aiding in the identification of any corresponding copyright registration. *See* Dkt. 244 at 22–23 (Class Certification Order). As with Copyright Registration, ISBNs and ASINs are easily obtained. *See* https://tinyurl.com/ISBN-Registration (listing prices for ISBN registration); https://tinyurl.com/ASIN-Registration (explaining how to obtain an ASIN for Amazon-listed items); https://tinyurl.com/ISBN-Exemption (explaining that exemptions are available for books without an ISBN). As such, the requirement that a work possess an ISBN or ASIN for Works List inclusion represents a beneficial addition to the eligibility requirements which does not exclude independent authors, small publishing houses, foreign publishers, or non-English authors. And, to repeat, an author or publisher whose work is not on the

Works List—whether because it is not registered or does not have an ISBN or ASIN—is not giving up any rights to such work.

*Fourth*, as Class Counsel's filings and the FAQ available on the Settlement Website explain, there are a variety of reasons why a work which any given individual or entity believes should have been included on the Works List was not included, including because Anthropic may not have downloaded the work. For instance, the work may not have been available in LibGen or PiLiMi at the time of Anthropic's downloads. *See Bartz, et al. v. Anthropic PBC, Settlement Website*, https://www.anthropiccopyrightsettlement.com/faq (FAQ #51). The FAQs provide many other illustrative examples of why a work may not be on the Works List, using Court-approved language.

*Fifth,* the Court finds that Class Counsel set forth a detailed and sufficient methodology for accurate compilation of the Works List in their motion for preliminary approval and accompanying declaration. *See* Dkt. 363 at 14–16; Dkt. 363-2 at 15–17. That methodology relied on primary sources produced in this case, e.g. (1) the metadata and raw book files produced by Anthropic, (2) industry-standard ISBN databases, e.g., Bowker Books (the official ISBN agency for the United States), *see* https://www.bowker.com/books-in-print, and (3) Copyright Office records to compile, check, and verify works for inclusion on the Works List. This methodology was vetted and refined through numerous rounds of manual verification resulting in the current Works List, including with the assistance of Plaintiffs' retained outside technical experts. As Class Counsel stated, their goal in putting together the Works List was to be "maximally accurate and maximally comprehensive." Dkt. 668, May 14, 2026 Hearing Tr. at 42:17–18.

Moreover, much of the data used to compile the Works List—including the catalogs compiled from Anthropic's LibGen and PiLiMi downloads—was hotly contested when the parties briefed class certification. At that point in time, Anthropic vigorously opposed class certification, in part, on the ground that the metadata from LibGen and PiLiMi were insufficiently reliable and accurate to be relied upon. Plaintiffs disagreed, and presented expert testimony and a methodology for reliably identifying works in the class. As the Court found, Plaintiffs presented evidence "to support the contention that Anthropic adopted and relied upon this list of the books it copied, and thereby admitted the list of books it copied." *See* Dkt. 244 (Class Certification Order) at 16. The

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

Court further found that "[e]ven Anthropic's own expert stated in his declaration that a list of errors found in LibGen over the span of several years has lengthened by about one post for every 400 books—suggesting an error rate of less than one percent (*compare* ¶ 49 *with* ¶ 45). Such a per work list could come in via an expert at trial." *Id.*; *see id.* at 20 ("Anthropic's Expert Iyyer has explained that the PiLiMi book catalog is substantially similar to the LibGen book catalog . . . When asked to estimate whether the errors in this metadata amounted to more than one percent, Expert Iyyer declined."). The Court's prior findings after contested class certification briefing and argument about the LibGen and PiLiMi metadata confirm the reliability of the data used to compile the Works List for settlement purposes.

Underscoring the Works List's comprehensiveness, the Court notes that Anthropic had the ability and strong incentive to add additional works to the Works List, as any works up to 500,000 would not have increased the total settlement fund and yet would have expanded the scope of released works under the Settlement. *See* Settlement Agreement ¶ 1.34. Anthropic did not identify any additional works beyond the 482,460 currently present on the list.

*Sixth,* to the extent a dispute arises where claimants dispute ownership of a Work based on information in the Works List data, the Court-appointed Special Master can address them.

Against these general points, the Court now addresses the specific Objections and comments:

**Barrett (Dkt. 438)**

Judith A. Barrett contends that she is an owner of numerous books present on the works list. *See* Dkt. 438 at 1-2. Barrett's objection states that she also "hold[s] rights in numerous self-published works, many of which appeared on the LibGen list prior to 2022" and that she "object[s] to the Settlement because it only provides payments to authors and publishers who filed registered copyrights, while excluding self-published authors without such registrations." *Id.* at 2. Barrett states that this is unfair and that such books "included in datasets that [Anthropic] used to train AI models . . . should qualify for compensation." *Id.* Barrett argues that this exclusion "does not equitably account for [such] works." *Id.* In short, Barrett's objection seeks to void the requirement

that copyright registration be used as a criterion for Works List inclusion and seeks to expand the Works List.

Barrett's objection is overruled. As noted above, (1) the requirement that a work possess a registration provided certainty and predictability regarding the inclusion and validity of the works on the Works List; (2) self-published authors were able to register their works during the relevant time period (as shown by the presence of self-published works on the Works List); and (3) the Class is limited to the works present on the Works List in order to provide predictability and finality to all parties. Any work that is not on the Works List is not impacted by the Settlement and owners of rights in such works retain their right to bring suit as to them.

For the reasons set forth herein, including at pages 14–19, the Court finds the Works List sufficiently reliable.

**Paolinelli (Dkt. 540)**

Richard Paolinelli, publisher of Tuscany Bay Books, objects to the inclusion of U.S. Copyright Registration as a criteria for inclusion of works on the Works List as "[a] vast majority of small [publishing] houses, like Tuscany Bay Books, and independently published authors do not bother with this registration as it is no longer needed" in light of the presence of "ASIN/ISBN numbers" and "date[s] of publication" which are listed on Amazon for works sold online. Dkt. 540 at 1–2. As a threshold matter, Paolinelli has not demonstrated he is, and indeed does not claim to be a Class Member. 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed.) ("The objector, as a party seeking to generate a court ruling, has the burden of demonstrating her standing").

Even if he were, Paolinelli's objection would be overruled for the reasons set forth above regarding Barrett's objection (which similarly sought to remove U.S. Copyright Registrations from the criteria for Works List inclusion).

**Tombs (Dkt. 541)**

George Tombs objects to the settlement on the grounds that the Works List only includes "books" and "further require[s] U.S. Copyright Office registration within a defined period." Dkt. 541 at 2. Tombs acknowledges that none of the books or journal articles authored by his late grandfather, his father, or himself are listed on the Works List. *Id.* at 2-3. Because Tombs is not a

SECOND SUPP. PROPOSED ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT | CASE NO. 3:24-CV-05417-AMO

Class Member, he does not have standing to make his objection, and it is thus stricken. Moreover, as discussed above, a class of "books" using either ISBN or ASIN numbers as well as the use of registration numbers as part of the class definition are appropriate in this settlement class. *See supra* at 17–18. Any work not on the Works List is not released, and there is thus no legal prejudice from the exclusion of any work from the Works List. Regardless of the circumstances of a work's exclusion, no claims related to it are released.

**Leahy (Dkt. 542)**

Stephen Michael Leahy (pen name "Stephen M. Leahy") objects on the grounds that he has "been wrongly excluded from the case" because he has "written a [] journal article that has been wrongly excluded from the settlement class." Dkt. 542 at 1. Leahy does not have standing to make his objection, and even if he does, his objection fails for the reasons set forth above and it is thus overruled.

**Chase (Dkts. 543, 653, and 659)**

Matthew Chase objects to the settlement primarily on the grounds that he believes additional eligible works were left off the Works List (and thus excluded from the Settlement) due to an inadequate mechanism for matching authors with pseudonyms to their real names where the U.S. Copyright Office information for a given work did not list the pseudonym under which the name was published. As concerns the Works List, Chase also objects (1) that the disclosures regarding the Works List may have led authors without works listed to wrongly believe their works were not included in the files downloaded by Anthropic; (2) that, while he has "no sympathy for Anthropic in this case," these exclusions are not "fair" to Anthropic because they may lead to additional suits against Anthropic; (3) he believes that there may be additional flaws in the creation of the Works List; and (4) he believes that Class Counsel have failed to exercise "reasonable efforts" at creating the Works List.

As to Chase's primary objection, the gravamen of his objection seeks to add additional works to the Works List. As repeatedly noted, all owners of works that are not included in the Works List retain their rights to bring suit to challenge Anthropic's conduct. As to Chase's claim that Anthropic may face additional suits in the future, the limitation of the settlement class to those

works which appear on the Works List was appropriate in order to provide finality to both Anthropic and rightsholders regarding which works were included vs. excluded in this Settlement. Anthropic is represented by excellent counsel who, as noted below, had the opportunity to review the Works List and had every incentive to ensure that the Works List was as comprehensive as possible. The Settlement also contained a "blow provision" that would terminate the settlement if a certain percentage of works were opted-out, thus indicating that counsel for all parties considered this issue of future liability.

The Court further notes that, as set forth in the Long Form Notice and Settlement Website FAQs, there are several reasons why any given work is not present on the Works List. The Court cannot conclude that any additional works owned by Chase or others would have been listed on the Works List if any different methodology had been used.

As set forth above, and in connection with preliminary approval, Class Counsel has utilized and explained a detailed and sufficient methodology for accurate compilation of the Works List in their motion for preliminary approval and accompanying declaration. *See* Dkt. 363 at 14-16; Dkt. 363-2, at 15-17. There was no simple 'list of books' that Anthropic downloaded from the websites at issue. Instead, there were files that required analysis and matching. *Id.* Based on the methodology and efforts recounted in the motion for preliminary approval and accompanying declarations, the Court concludes that Class Counsel was diligent in compiling the Works List. The Court declines to speculate whether, if changes had been made to this methodology, additional works could have been included on the Works List without, e.g., introducing errors to the list. Based on the Court's findings and the record before it regarding the substantial efforts undertaken by Class Counsel to compile an accurate Works List, Chase's objections regarding the Works List are overruled.

The same logic disposes of Chase's objections regarding the Works List disclosures. The Notice contained a detailed FAQ regarding the Works List and listed numerous reasons why works would not appear, including that they may have failed one or more inclusion criteria or validation checks used in the matching process, while also stressing that owners of works not on the Works List retained all their rights. *See* Notice (FAQ #49-52). Thus, the Notice adequately advised Class

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

Members regarding the compilation of the Works List and otherwise complied with Federal Rule of Civil Procedure 23(c)(2)(B). This ground is thus also overruled.

**Dames of Detection, Inc. (Johnston) (Dkt. 546)**

Dames of Detection, Inc. (d/b/a Level Best Books) ("Dames") through their counsel Matthew S. Johnston, objects that (1) the class definition is "too restrictive due to reliance on only U.S. Copyright registrations," which is "not necessary to secure copyright protection," and (2) the $3,000 per work amount may be "insufficient to punish Anthropic's conduct and avoid similar conduct in the future." Dkt. 546 at 1.

As an initial matter, while the objection states that "[m]any of [Dames'] authors are included within the class as it is currently defined," the objection does not state which, if any, works on the Works List Dames is a legal or beneficial owner of. Dames, as an objector, has the burden to establish standing to object to the Settlement, yet it has failed to identify any works on the Works List it owns. This is an independent reason to overrule this objection, particularly in light of the fact that Dames is represented by counsel. 4 Newberg and Rubenstein on Class Actions § 13:22. However, even considering the objection on its merits, the Court overrules both of the proposed grounds. First, and as noted, all owners of works which are not included in the Works List retain their rights to bring suit to challenge Anthropic's conduct. And the limitation of the settlement class to those works that appear on the Works List was appropriate to provide finality to both Anthropic and rightsholders regarding which works were included vs. excluded. As the Court noted at class certification and preliminary approval, copyright registration is a prerequisite to bringing suit in federal court for copyright infringement, and it also resolved any potential issues related to ownership by establishing a presumption of validity and entitlement to statutory damages. *See* Dkt. 244 (Class Certification Order) at 22; Dkt. 437 (Preliminary Approval Order) at 2, 8. The objection itself appears to concede these benefits, stating that "declar[ing] and identify[ing] authorship and giv[ing] notice of ownership of rights," "secur[ing] access to federal courts for infringement litigation," and "enabl[ing] statutory damages in lieu of proving actual economic loss" are three of the "primary reasons to register a work" with the United States Copyright Office. Dkt. 546 at 2. Because all owners of non-registered works retain their rights to bring suit and because the

registration requirement represented a sensible and beneficial requirement for administrability and statutory-damages eligibility in the class which the Court earlier certified, this ground is overruled.

Second, the objection that the amount in the settlement does not represent a sufficient amount to punish and deter Anthropic's conduct is also overruled. As noted in the Preliminary Approval Order, the "per-work award of about $3,000, less costs and fees" represents "four times the statutory minimum for ordinary infringement, which is also the most common award in copyright cases, of $750[,] [a]nd, that amount is fifteen times the statutory minimum for innocent infringement of $200." Dkt. 437 at 5. This settlement represents the single largest reported copyright recovery of any kind in the history of United States copyright law. In exchange for this amount, the release is limited to past conduct regarding the use of the works in training, but does not "give up claims about *past* AI *outputs*, nor claims of *any* kind about *future* conduct," and Class Members also receive "an injunction that Anthropic destroy copies of their works derived from LibGen and PiLiMi (so long as not subject to legal preservation requirements)." The size of the settlement has drawn an enormous amount of attention to the practices of AI companies in pirating data and industry publications have frequently noted that AI companies should refrain from similar conduct going forward given the amount of the settlement fund here. Dkt. 619-3 at 154-252 (Decl. of J. Keough). Additionally, to the extent Dames believes that the amount should be higher, it had the right to opt-out its works and file suit. As the Preliminary Approval Order noted, it was then "premature to assess class members' reactions" to the amount of relief provided by the settlement, Dkt. 437 at 6 (Preliminary Approval Order), but, since that time, the 92.77% claims rate and less-than-1% opt-out rate demonstrate that the Class does not share Dames' views.

**Werner (Dkts. 551, 569, and 618)**

Stacy Lynn Werner (pen name "Stacy Hoff") objects principally on the ground that her publisher "fail[ed] to file for U.S. Copyright registration, despite being contractually bound to do so." Dkt. 551 at 2. Werner further alleges that her publisher went out of business and so she has "no legal recourse to sue my publisher for its contractual failure to register all of my novels with the U.S. Copyright Office." *Id.* at 3. Werner objects that Anthropic is benefitting from her "publisher's failure to perform." *Id.* Werner also lists a number of other grounds for objection

including (1) the "low-dollar-per-author settlement award," and (2) that the settlement "violate[s] the long-standing common law theory of Authorship and Copyright protection by insisting on actual U.S. Registration (regardless of a Copyright Notice page) [and] will undoubtedly result in *de-facto* encouragement of further theft and piracy by AI companies . . . [which is] against public policy." *Id.*

As to Werner's principal ground of objection—that the Works List does not include unregistered works, and particularly those unregistered works which were not registered due to alleged noncompliance by a publisher with a term of an agreement with an author—the Court again notes that all owners of non-registered works retain their rights to bring suit against Anthropic under the terms of the Settlement. Additionally, because the registration requirement represented a sensible and beneficial requirement for administrability and statutory-damages eligibility in the Class which the Court earlier certified, this ground is overruled.

As to Werner's objection that the per-work damages amounts are too low, the Court again incorporates the findings of the Preliminary Approval Order regarding the per-work award. Specifically, the Court reiterates that the "per-work award of about $3,000, less costs and fees" represents "four times the statutory minimum for ordinary infringement, which is also the most common award in copyright cases, of $750[,] [a]nd, that amount is fifteen times the statutory minimum for innocent infringement of $200." Dkt. 437 at 5 (Preliminary Approval Order). This settlement represents the single largest reported copyright recovery of any kind in the history of United States copyright law and the release is limited to past conduct regarding the use of the works in training, but does not "give up claims about *past* AI *outputs,* nor claims of *any* kind about *future* conduct." *Id.* The Court further notes that Class Members also receive "an injunction that Anthropic destroy copies of their works derived from LibGen and PiLiMi (so long as not subject to legal preservation requirements)." *Id.* Werner asks the Court to take judicial notice of an article reporting that, as of September 2025, Anthropic's valuation was approximately $183 billion. Dkt. 551 at 4; Dkt. 551 Ex. I. The Court need not resolve this request, as, even if taken as true, the previously listed considerations and the extraordinarily high claims rate amply justify the size of the per-work award here. This ground is overruled.

As to Werner's objection that the settlement violates "common law theor[ies] of Authorship and Copyright protection," *id.* at 3, this appears to be principally directed to Werner's earlier objection that the Settlement should include additional works not listed on the Works List. That objection is overruled for the same reasons discussed herein. The Court further notes that nothing in the Settlement's terms or releases impacts claims of authorship, copyright protection, or copyright infringement for unregistered works not included on the Works List. Werner's objection is thus overruled. The Court further notes that Werner's objection related to Notice is overruled for the reasons discussed herein. *See supra* at 10–15.

### Miller (Dkt. 552)

Teresa K. Miller objects on the grounds that she is excluded from the Settlement by her publisher's alleged failure to timely register copyright in her work *Borderline Fortune*. *See* Dkt. 552. Miller does not state that she has any ownership interest in any work currently on the Works List. Because Miller is not a class member, she does not have standing to make her objection and it is thus overruled. Additionally, were the Court to consider Miller's objection, the Court again notes that Miller, like all other owners of non-registered works, retains her rights to bring suit against Anthropic under the terms of the Settlement. Additionally, because the registration requirement represented a sensible and beneficial requirement for administrability and statutory-damages eligibility, Miller's objection is overruled.

### Glenn (Dkt. 565)

Glenn objects that "the case's applicability" is "to only authors whose works are formally registered with the U.S. Copyright Office." Dkt. 565 at 1. Glenn's objection is overruled. Glenn does not have standing to urge the inclusion of Works not on the Works List. The Court again notes that Glenn, like all other owners of non-registered works, retains his rights to bring suit against Anthropic under the terms of the Settlement. In addition, and for the reasons explained, the registration requirement represented a sensible and beneficial requirement for administrability and statutory-damages eligibility.

### Carwile / Ryker (Dkt. 585)

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

Deborah L. Carwile (pseudonym "Jada Ryker") objects that her works were "excluded from the settlement payment due to a copyright [registration] not being filed." Dkt. 585 at 1. Because Carwile is not a class member, she does not have standing to make her objection and it is thus overruled. Additionally, were the Court to consider Carwile's objection, the Court again notes that Carwile, like all other owners of non-registered works, retains her rights to bring suit against Anthropic under the terms of the Settlement. Additionally, because the registration requirement represented a sensible and beneficial requirement for administrability and statutory-damages eligibility, Carwile's objection is overruled.

**Schapiro (Dkt. 588)**

Schapiro objects that she is excluded from participation in the Settlement because she currently works as a federal employee. She states that the work which she claims an ownership interest in and which is present on the Works List—*Millicent Fenwick: Her Way*—was written "on my personal time and was in no way connected to my federal employment" but instead was composed by Schapiro as an independent piece of scholarship. Dkt. 588 at 1. The Court, on its own accord, defined the Class to exclude the "personnel of federal agencies." Dkt. 437 at 2 (Preliminary Approval Order). The Settlement is clear that the claims of any such federal agency personnel are preserved, as they are not "Releasing Parties" under the Settlement Agreement. Dkt. 363-3 at 7 (Settlement Agreement). Because she is not a Class Member, Schapiro retains all rights in her works and may pursue any claims regarding these works and lacks standing to object to the Settlement.

**Bishop (Dkts. 602 & 663)**

As the Court previously held regarding Professor Bishop's purported objections, "[Professor] Bishop is not a member of the class and therefore lacks standing to object to the settlement." *See* Dkt. 632 at 1 n.1.

To the extent the Court were to consider Professor Bishop's objections regarding the Works List, these objections concern (1) the requirement that a work be registered with the U.S. Copyright Office and (2) the requirement that a work possess an ISBN or ASIN. As to both grounds, the Court again notes that Professor Bishop, like all other owners of non-registered works, retains her rights

to bring suit against Anthropic under the terms of the Settlement. Additionally, because the registration requirement represented a sensible and beneficial requirement for administrability and statutory-damages eligibility, and because the ISBN/ASIN requirement assisted in ensuring that information regarding a work, including its publisher, author, date of publication, and corresponding copyright registration could be identified, Professor Bishop's objection is overruled.

Professor Bishop also incorrectly contends that the requirement for U.S. Copyright registration necessarily excluded foreign rightsholders. However, the Settlement FAQ she cites to support her claim simply describes why foreign language works may have been less likely to be present on the Works List. Nothing in the Class definition excludes foreign rightsholders who have a legal or beneficial interest in a work registered with the U.S. Copyright Office (and which met the other criteria for inclusion). And nothing in the copyright laws prevented foreign rightsholders from registering their works with the Copyright Office. Professor Bishop also incorrectly claims that the Notice was never translated. That is incorrect. *See* Dkt. 619-3 at ¶ 32 n.3 (Decl. of J. Keough) (stating that the Settlement Website, notice documents, and Settlement Agreement had been translated into French as part of Class Counsel's efforts to reach all class members). These objections are thus overruled.

Professor Bishop's other grounds for objection are addressed elsewhere in this Order. *See infra* at 47–48.

**Newton Compton Editori SRL (Dkt. 603), Tea Tascabili Degli Editori Assn. SPA (Dkt. 604), Casa Editrice Nord SRL (Dkt. 605), Bollati Boringhieri Editore SRL (Dkt. 607), Adriano Salani Editore SRL (Dkt. 608), Longanesi & C. SRL (Dkt. 610), Antonio Vallardi Editore SRL (Dkt. 611), and Garzanti SRL (Dkt. 612)**

The Italian corporate entities listed above submitted essentially identical objections on the grounds (1) that the Settlement "limits compensation to a narrow and arbitrary subset of titles" which does not "reflect the actual scope of the alleged use" and without "adequately accounting for the use of multiple editions, translations, and non-English language works," (2) that the Settlement "should [] not be interpreted as resolving, on the merits, the legality of [AI training uses]," (3) that the Settlement covers "only a limited subset of works despite the fact that the alleged training dataset is understood to have included millions of copyrighted titles," leaving a "substantial number of works—presumptively including works in which the Objector holds rights—[] excluded from

any compensation," and (4) that "nothing in the Settlement should be construed as implying consent to text and data mining or AI training activities under jurisdictions where such uses are subject to different legal standards or require express authorization." *See, e.g.,* Dkt. 603 at 1–2. These objections are overruled for the reasons stated below.

As to the first and third grounds, these objections again seek to expand the Works List to include additional works. As noted above, the Class is limited to owners of those works which appear on the Works List in order to provide certainty and finality to all parties. The objecting entities retain all rights for works not listed and for uses which are not released by the Settlement. These grounds are thus overruled.

As to the second and fourth grounds, these do not appear to be objections to the merits of the Settlement or arguments why the scope of the release renders the Settlement not fair, reasonable, or adequate under governing law. Indeed, the Settlement itself states "[t]he release does not constitute, in any respect, a license to torrent, scan, or train AI models on any copyrighted works, or to create infringing outputs from AI models." Dkt. 363-3 at ¶ 1.29 (Settlement Agreement). These grounds are thus more appropriately styled as reservations of rights which do not implicate any factor the Court is required to consider in granting final approval. These grounds are thus overruled.

**Smith (Dkt. 609)**

Alisa Smith objects (1) that two additional works which she owns were not listed on the Works List despite her belief that they meet the criteria for inclusion, and (2) to any global release regarding her works because "[t]he Settlement amount per work is too low to adequately compensate for global use." Dkt. 609 at 1–2. She also objects that Class Counsel should not be compensated for any expenses associated with addressing her claimed errors and, if the claimed errors affected other authors, objects that Class Counsel should not receive 25% of the common fund as fees.

As to the first ground, and as noted, all owners of works which are not included in the Works List retain their rights to bring suit to challenge Anthropic's conduct as to those works. And the limitation of the settlement class to those works which appear on the Works List was an appropriate

limitation in order to provide finality to both Anthropic and rightsholders regarding which works were included vs. excluded. Because all owners of non-registered works retain their rights to bring suit, this ground is overruled.

As to the second ground, the Court notes that the Settlement only involves a limited release for past conduct and that Anthropic has represented in the Settlement Agreement "that neither the LibGen or PiLiMi datasets, nor any portions of those datasets, were in the training corpus of any of its commercially released large language models." Dkt. 363-3 at 14. (Settlement Agreement). In addition, the Agreement's release does not apply to conduct after August 25, 2025. The Court again incorporates the findings of the Preliminary Approval Order regarding the per-work award. Specifically, the Court reiterates that the "per-work award of about $3,000, less costs and fees" represents "four times the statutory minimum for ordinary infringement, which is also the most common award in copyright cases, of $750[,] [a]nd, that amount is fifteen times the statutory minimum for innocent infringement of $200." Dkt. 437 at 5 (Preliminary Approval Order). This settlement represents the single largest copyright recovery of any kind in the history of United States copyright law and the release is limited to past conduct regarding the use of the works in training, but does not "give up claims about *past* AI *outputs*, nor claims of *any* kind about *future* conduct." *Id.* The Court further notes that Class Members also receive "an injunction that Anthropic destroy copies of their works derived from LibGen and PiLiMi (so long as not subject to legal preservation requirements)." *Id.* The size of the settlement has drawn an enormous amount of attention to the practices of AI companies in pirating data and industry publications have frequently noted that AI companies should refrain from similar conduct going forward given the amount of the settlement fund here. Dkt. 619-3 at 154-252 (Decl. of J. Keough.). Additionally, to the extent Johnson believes that the amount should be higher, she had the right to opt-out her works and file suit. As the Preliminary Approval Order noted, it was "premature to assess class members' reactions," Dkt. 437 at 6, but since that time, the 92.77% claims rate and less-than-1% opt-out rate demonstrate that the Class does not share her views. This ground is thus overruled. Finally, the objection as it relates to fees is addressed in Section II.A(3), *infra*.

**Houghton (Dkt. 645)**

SECOND SUPP. PROPOSED ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT | CASE NO. 3:24-CV-05417-AMO

Stephanie Houghton claimed that the "class seems impossible to define clearly." Dkt. 645 at 1–2. She did not, however, argue that final approval be denied as a result. Instead, she expressed some confusion about the role that "Unique ID" numbers play in settlement administration. Dkt. 645 at 1. Unique ID numbers were created for the purpose of making the claim-submission process easier by pre-populating known rightsholder information associated with a given work. The purpose of these Unique IDs was to help rightsholders save time, especially if they had numerous works on the Works List. Because each work can have multiple rightsholders, each work can also have multiple Unique IDs. Houghton submitted two claims, each with a different Unique ID. One validly submitted claim is sufficient, and submitting a second claim does not invalidate the first. Thus, Houghton was not prejudiced by the existence of multiple Unique ID numbers. And the fact that Houghton wrote to confirm that she submitted her claims correctly suggests her desire to participate in the Settlement, thus weighing in favor of approval.

**Leonard (Dkt. 637)**

Michelle Willingham Leonard (pen names "Michelle Willingham and Avery Chandler") objects that she is excluded from participation in the Settlement because she currently works as a federal employee. Leonard notes that she would be entitled to some $60-90,000 from the settlement if she were permitted to participate. Dkt. 637 at 1–2. The Court, on its own accord, defined the Class to exclude the "personnel of federal agencies." Dkt. 437 at 2 (Preliminary Approval Order). The Settlement is clear that the claims of any such federal agency personnel are preserved, as they are not "Releasing Parties" under the Settlement Agreement. Dkt. 363-3 at ¶ 1.30 (Settlement Agreement). Because she is not a Class Member, Leonard retains all rights in her works and may pursue any claims regarding these works and lacks standing to object to the Settlement.

**Watkins Media Ltd. & Collective Ink Ltd. (Dkt. 639)**

Watkins Media Limited and Collective Ink Limited object to the "exclusion of non-US-registered works from the scope of the proposed Anthropic [] settlement." Dkt. 639 at 1. As noted above, the Class is limited to owners of those works which appear on the Works List in order to provide certainty and finality to all parties. Watkins Media and Collective Ink, like all other owners of non-registered works, retain their rights to bring suit against Anthropic under the terms of the

-31-

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

Settlement. *See* Dkt. 437 at 3 (Preliminary Approval Order); Dkt. 363-3 at 7 (Settlement Agreement). Nothing in the Class definition excludes foreign rightsholders who have a legal or beneficial interest in a work registered with the U.S. Copyright Office (and which met the other criteria for inclusion). And nothing in the copyright laws prevented foreign rightsholders from registering their works with the Copyright Office. The objecting entities retain all rights for non-registered works not listed and for uses which are not released by the Settlement. In other words, the Settlement resolves a specific set of claims for a specific set of works; it does not—and does not purport to—modify the general scope of copyright protection. Additionally, because the registration requirement represented a sensible and beneficial requirement for administrability and statutory-damages eligibility, these objections are overruled.

**Johnson (Dkt. 640)**

Sarah Johnson (pen name "Sai Marie Johnson") objects to the settlement because (1) eligibility for inclusion on the Works List depended on registration of a U.S. Copyright "within 3 months of publication or before August 2022" even though "copyright is automatic upon creation;" (2) the "proposed payout is a fraction of the statutory damages typically associated with willful copyright infringement" which fails to "reflect the long-term loss of creative licensure or the devaluation of human-authored works caused by the training of LLMs on stolen data," and (3) because the "settlement allows a multi-billion dollar AI company to 'buy' its way out of massive piracy for a 'discounted' rate, setting a dangerous precedent that it is cheaper to steal human IP and settle later than to license it fairly." Dkt. 640 at 1.

As to the first ground, all owners of works which are not included in the Works List retain their rights to bring suit to challenge Anthropic's conduct. As the Court noted at class certification and preliminary approval, the requirement for registration resolved any potential issues related to ownership by establishing a presumption of validity and entitlement to statutory damages. *See* Dkt. 244 (Class Certification Order) at 22; Dkt. 437 (Preliminary Approval Order) at 2, 8. Because all owners of non-registered works retain their rights to bring suit and because the registration requirement represented a sensible and beneficial requirement for administrability and statutory-damages eligibility in the class which the Court earlier certified, this ground is overruled.

As to the second and third grounds, the Court again incorporates the findings of the Preliminary Approval Order regarding the per-work award. Specifically, the Court reiterates that the "per-work award of about $3,000, less costs and fees" represents "four times the statutory minimum for ordinary infringement, which is also the most common award in copyright cases, of $750[,] [a]nd, that amount is fifteen times the statutory minimum for innocent infringement of $200." Dkt. 437 at 5 (Preliminary Approval Order). This settlement represents the single largest copyright recovery of any kind in the history of United States copyright law and the release is limited to past conduct regarding the use of the works in training, but does not "give up claims about *past* AI *outputs*, nor claims of *any* kind about *future* conduct." *Id.* The Court further notes that Class Members also receive "an injunction that Anthropic destroy copies of their works derived from LibGen and PiLiMi (so long as not subject to legal preservation requirements)." *Id.* The size of the settlement has drawn an enormous amount of attention to the practices of AI companies in pirating data and industry publications have frequently noted that AI companies should refrain from similar conduct going forward given the amount of the settlement fund here. *See* Dkt. 619-3 at 154–252 (Decl. of J. Keough). Additionally, to the extent Johnson believes that the amount should be higher, she had the right to opt-out her works and file suit. As the Preliminary Approval Order noted, it was "premature to assess class members' reactions," Dkt. 437 at 6 (Preliminary Approval Order), but since that time, the 92.77% claims rate and less-than-1% opt-out rate demonstrate that the Class does not share her views.

### Pinder (Dkts. 641, 648, and 661) and Grace (Dkts. 550, 567, and 634)

Victoria Pinder and Natasha Grace object to the settlement on the grounds that additional works should have been included on the Works List to reflect the fact that certain works are registered as "group works" under a single copyright registration number. (Pinder's filings also object that her name was incorrectly listed as "Lea Victoria Pinder" in an earlier version of the proposed order, her name is corrected here).

First, as to Pinder's objection, the Court finds that it is untimely and thus independently overrules her objection for that reason. Pinder's initial objection is dated April 9, 2026, some 59 days after the February 9, 2026 objection deadline. *See* Dkt. 641 at 5. Pinder attaches

correspondence to her reply in support of her objection indicating that she included the chambers email for the judge formerly presiding over this matter in correspondence with Class Counsel regarding the group registration of her works in November and December 2025. *See* Dkt. 648 Ex. A, Ex. B. However, the Notice documents were clear that objections must either be filed "electronically," i.e. via PACER, filed "in person at any location of the United States District Court for the Northern District of California," or mailed to "the Class Action Clerk, United States District Court for the Northern District of California, 450 Golden Gate Avenue, 16th Floor, San Francisco, CA 94102." *See* LFN at 18-19. Nothing in the Court's rules or the settlement materials treats copying the court on correspondence as a valid method for making an objection. In an additional filing and at the final approval hearing, Pinder claimed that Class Counsel "treated Ms. Pinder's objection as a valid objection warranting docketing" when they filed her initial objection on April 10, 2026. Pinder argues that Class Counsel should thus be precluded from arguing that the objection is "invalid." *See* Dkt. 661. However, Pinder mistakes Class Counsel's docketing of her objection in accordance with the Court's instructions at Dkt. 632 as an admission that the objection was valid. But Class Counsel's diligence in following the Court's instructions to docket letters and filings which they received does not amount to any judicial admission of validity. As such, Pinder's objection is invalid and overruled. *See e.g.*, *Moore v. Verizon Commc'ns Inc.*, 2013 WL 4610764, at *12 (N.D. Cal. Aug. 28, 2013) (overruling one objection "because it is untimely" and others "for failing to comply with the procedural requirements for objecting to the Settlement").

Second, even if the Court were to consider Pinder's objection alongside Grace's objection, these objections both seek to have additional works added to the Works List. As repeatedly noted, all owners of works which are not included in the Works List retain their rights to bring suit to challenge Anthropic's conduct. And, as the Court has found, the limitation of the settlement class to those works which appear on the Works List was appropriate in order to provide finality to both Anthropic and rightsholders regarding which works were included vs. excluded. Pinder argues in her reply in support of her objection that her objection actually challenges "the methodology by which works that ARE on the Works List are counted for purposes of compensation." *See* Dkt. 648 at 2. However, the Works List includes only one work associated with the registration

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

TX0008716839, the registration number which Pinder claims is a group registration. Pinder agrees that this work is properly on the Works List but seeks to recover for additional works that were registered under the same registration. Thus, Pinder's objection, in effect, seeks to add additional titles that are not listed on the Works List. This objection is overruled for the same reason as other objections seeking to add works to the Work List, and the claims related to these additional titles are not released under the Settlement. And in Grace's case, none of the works she claims are associated with group registrations are on the works list. Thus, because both Pinder and Grace seek to have additional works added to the Works List, their objections are overruled.

Third, Pinder and Grace appear to argue that additional of their works would have matched had a different matching approach been used for the creation of the Works List. As an initial matter, and as set forth in the Long Form Notice and Settlement Website FAQs, there are a variety of reasons why any given work is not present on the Works List and the Court cannot conclude that any additional works owned by Pinder or Grace would have been listed on the Works List if any different methodology had been used. Class Counsel set forth a detailed and sufficient methodology for accurate compilation of the Works List in their motion for preliminary approval and accompanying declaration. *See* Dkt. 363 at 14–16 (Motion for Preliminary Approval); Dkt. 363-2 at ¶¶ 47–53 (Class Counsel Decl.). The Court declines to speculate whether, if changes had been made to this methodology, additional works could have been included on the Works List (or how much potential error or overbreadth alternative methodologies might carry). The Court further notes that Anthropic had the ability and strong incentive to add additional works to the Works List (as any works up to 500,000 would not have increased the total settlement fund and yet would have expanded the scope of released works under the Settlement) but was apparently unable to identify any additional works beyond the 482,460 currently present on the list. In essence, these objections present no basis for the Court to conclude that the Settlement is not fair, reasonable, and adequate, and merely restate the already-rejected ground that additional works should have been included on the Works List. The Court thus overrules both Pinder and Grace's objections.

Finally, based on their objections, the Court understands that both Pinder and Grace may object to the manner in which Class Counsel addressed their concerns. The Court finds no basis for

-35-

concluding that Class Counsel failed to faithfully and adequately serve the needs of the Class. Indeed, as set forth in the declaration of Class Counsel in support of their motion for final approval, Class Counsel has fielded more than 5,200 calls and emails from class members and expended more than one thousand hours communicating with class members regarding the settlement. . Dkt. 619-1 at ¶¶ 27, 46, 51 (Class Counsel Decl.). As the declaration states, Class members have "described the assistance received as providing a 'lifeline to this whole claim filing process.' They have noted that they feel 'very fortunate to be represented' by Class Counsel, whose assistance 'cut through the clutter of information.' They have called the assistance 'prompt,' 'rapid,' 'kind,' 'clear,' 'quick,' and 'excellent.'" *Id.* at ¶ 29. These efforts are in addition to those of the Settlement Administrator JND Legal Administration, which, as set forth in the declaration of its CEO Jennifer Keough, included responding to more than 8,867 calls with a live agent and responding to more than 21,000 emails. *See* Dkt. 619-3 at ¶ 100 (Decl. of J. Keough). Over 447,000 works have been claimed across over 100,000 separately filed claims, demonstrating a process that has worked across this huge class. In short, the Court finds that Class Counsel has ably served the needs of the Class in navigating the claims process.

### 3. Adequacy of Relief, Claims Rate, and Remaining Objections

As a threshold matter, the Court notes that Class Members' reactions have been almost uniformly positive, reflected in the claims rate of 92.77%. By contrast, opt-outs and objections have been sparse: there are 350 opt-outs (0.37% of the total Works) and 53 Objections or putative objections, some of which in fact support the Settlement. "It would seem that there would be no better indicator of those interests than the feedback the court gets from class members themselves." 4 Newberg and Rubenstein on Class Actions § 13:58 (6th ed.). The "absence of a large number of objections to a proposed class action settlement "raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nado*, 2026 WL 82232, at *3 (Martínez-Olguín) (quotation marks and citation omitted).

The Court also notes that Class Counsel have submitted several declarations that illustrate widespread support for the Settlement.

- The Publishers Association Limited and the International Publishers Association report that they and their members "strongly support . . . [t]his $1.5 billion

settlement" which "not only provides significant compensation to class members, but also sends an important message that AI companies cannot build their commercial models by illegally pirating books." Dkt. 622-1 (Stevenson Decl.) at ¶ 8.

- The Association of University Presses similarly reports that "its members strongly support the settlement." Dkt. 622-2 (Berkery Decl.) at ¶ 4.

- The American Association of Publishers explains that "the proposed settlement is beneficial to all class members." Dkt. 622 (Pallante Decl.) ¶ at 13.

- The Writers' Union—founded in 1973 and the "national organization of professionally published writers" in Canada—states that its "members have expressed resounding support for the Settlement." Dkt. 619-5 (Degen Decl.) ¶ at 6.

- Other major author organizations throughout the United States—the Authors Guild, the Science Fiction & Fantasy Writers of America, Sisters in Crime, Novelists, Inc., and the Romance Writers of America, Inc.—report that "this Settlement is a genuine success" and that they "are proud to support it." Dkt. 619-4 (Not For Profit Decl.) at ¶ 16.

*Monetary relief*. The Objections and comments contending that the $1.5+ billion in monetary relief that the Settlement provides is too low, including because of the range of potential statutory damages provided under the Copyright Act, are also overruled. Dkts. 439 (Reding), 544 (Hale), 546 (Dames of Detection, Inc. / Johnston), 549 (Stewart), 551, 569, & 618 (Werner), 564 (Sappington), 566 (Burke-Garcia), 571 & 650 (Hampton), 572, 649, & 655 (Chakanga), 584 & 593 (Burton), 594 (Choi), 595 (DesJardins), 596 & 606 (Lee), 598 (Hyder), 601 (Larson), 609 (Smith), 640 (Johnson), 642 (Hootman), 646-3 & 662 (Jacobson), 654 (Srinivasan). These Objections do not, however, present "a realistic assessment of the overall risks and rewards of a trial." *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 626 (N.D. Cal. 2021), *aff'd,* No. 21-15553, 2022 WL 822923 (9th Cir. Mar. 17, 2022). Moreover, a settlement is "a highly negotiated compromise," *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015), and it is "well-settled law that" even "a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair," *Officers for Justice v. Civ. Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982).

That is especially true in the circumstances of this case, where significant risks lingered before, during, and after trial. As discussed, prior to trial, numerous dispositive motions risked

defeating Plaintiffs' claims outright. *See supra* at 59–60 (discussing Anthropic's interlocutory and emergency motions). During trial, Anthropic could "persuade the jury to find facts vindicating it completely," Dkt. 296 at 6 (Order Denying Stay), or the jury could award a monetary award much lower than $3,000 per work (to say nothing of injunctive relief), *see* Dkt. 431, Sept. 25, 2025 Hearing Tr. at 14:5-11 (Court observing that damages could have amounted to as low as "$1 or $5 or $10"). And after trial, "[a]ll the district court's rulings and verdict could get appealed." Dkt. 437 at 4 (Preliminary Approval Order). Indeed, just months ago, the Supreme Court vacated a jury award of "$1 billion in statutory damages" in a copyright infringement case. *Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959, 966 (2026). That vacatur occurred six **years** after the jury award was rendered, *id.*, demonstrating both the monetary and timing-based risks of foregoing settlement. In light of risks like these, the Court understandably previously concluded here that "there was only a narrow path to a home run in this case, and that home run is well represented by the $3,000." Dkt. 484, Nov. 13, 2025 Hearing Tr. at 54:20–21.

The Court now addresses the Objections in turn, overruling each for the reasons provided herein. The Court notes that, to the extent any Class Member believes the per-work amount is too low, they had the ability to opt out; none of the following Class Members have opted-out, however.

**Reding (Dkt. 439)**

Reding contends that the proposed, per-work settlement amount is "insulting" because it is significantly lower than the maximum per-work award authorized by law of $150,000. Dkt. 439 at 1. The Court does not agree. As was observed during the preliminary approval hearing, because the Court had "ruled that it was okay for Anthropic to go . . . to a library where they had books on sale for $1 each; pay $1; buy the book, take it apart, scan it and use it"—damages could have amounted to as low as "$1 or $5 or $10." Dkt. 431, Sept. 25, 2025 Hearing Tr. at 14:5-11. By contrast, the Court observed, "$3,000 is way more than that." *Id.* The per-work award is "an order of magnitude more than the maximum proposed for books in the *Google Books* settlement that was rejected for releasing future claims." Dkt. 437 (Preliminary Approval Order) at 5–6 (citing *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 672 (S.D.N.Y. 2011)). It is also more than "four times the statutory minimum for ordinary infringement, which is also the most common award in copyright

cases," and more than "fifteen times the statutory minimum for innocent infringement of $200." *Id.* at 5; *see also* Dkt. 431, Sept. 25, 2025 Hearing Tr. at 11:15-13:25 (Plaintiffs' counsel discussing size of award). As Judge Alsup previously observed, "I don't see how you could get a better deal." Dkt. 503, Nov. 25, 2025 Hearing Tr. at 139; *see also Cottle v. Plaid Inc.*, 340 F.R.D. 356, 374 (N.D. Cal. 2021) (individual awards of $10–$39 "fair and adequate compromise" despite statutory damages of $5,000 per violation).

**Hale (Dkt. 544)**

Hale argues that the "money offered is not fair compensation for [Anthropic's] theft or for what they build from that theft." Dkt. 544 at 1. As discussed above, the Court finds that the per-work award is excellent, particularly given the risks in this case and the comparable monetary recoveries in other copyright actions. In addition, the Court notes that Anthropic has represented in the Settlement Agreement "that neither the LibGen or PiLiMi datasets, nor any portions of those datasets, were in the training corpus of any of its commercially released large language models." Dkt. 363-3 at ¶ 3.1 (Settlement Agreement). The Agreement's release does not apply to conduct after August 25, 2025, or to output claims at all. *Id.* at ¶ 1.29. The Settlement further requires Anthropic to destroy the original files of the works it obtained from LibGen and PiLiMi, and to destroy any copies that originate from the torrented/downloaded copies, *id.* at ¶ 2.2, just as Hale requests. Anthropic has indeed committed to destroy the datasets within 30 days of final judgment—or conclusion of any other preservation or court-ordered obligations—and will certify as much in writing. *Id.*

**Dames of Detection, Inc. (Johnston) (Dkt. 546)**

Dames contends that the $1.5 billion settlement fund "amounts to less than one percent of Anthropic's current valuation," which is "a mere slap on the wrist for violating the copyrights of millions of authors." Dkt. 546 at 4. Dames further contends that the "proposed settlement will not serve as a deterrent for future infringing uses of copyrighted material to train large language models or other AI applications." *Id.* For reasons similar to those provided above, the Court concludes that Dames's objection does not have merit. In addition, the Court notes that the Settlement Agreement does not release future claims of any kind, and does not release output claims (past or future) of

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

any kind either. Dkt. 363-3 at ¶ 1.29 (Settlement Agreement). The Settlement Agreement also specifies that its "release does not constitute, in any respect, a license to torrent, scan, or train AI models on any copyrighted works, or to create infringing outputs from AI models." *Id*. Accordingly, Dames's contention that the Settlement Agreement permits the "future infringing uses of copyrighted material to train large language models" is incorrect. Dkt. 546 at 4.

**Werner (Dkts. 551, 569, & 618)**

Werner argues that the per-work award "is too low," and the "total settlement amount that will be actually paid is artificially and unfairly deflated because" the Works List requires a work to possess an ISBN and U.S. Copyright number. Dkt. 551 at 4. The Court rejects Werner's objection to the per-work award for the reasons discussed. As to the Works List, Werner lacks standing to call for the inclusion of additional works that are not affected by the Settlement. Moreover, on the merits, the Court does not agree that the overall settlement amount is deflated. Class Counsel report that this is the largest copyright class action settlement in history. Finally, the Court notes that Werner's request that more works be included in the class is itself a strong sign of the Settlement's merits, including its per-work award.

**Sappington (Dkt. 564)**

Sappington argues that the "proposed payment of approximately $3,000 per work is insufficient compensation for the willful ingestion of [his] creative work into a commercial AI model," and that the Settlement amount "fails to account for the perpetual commercial value Anthropic derives from [his] intellectual property." Dkt. 564 at 2. Sappington further contends that the "scope of the release is overly broad" because it "prevents Class Members from pursuing future claims related to the ongoing use of models already trained on our works." *Id.* These statements are not correct. The release does not apply to future claims of any kind. And Anthropic has represented that none of the Works on the Works List derived from "the LibGen or PiLiMi datasets . . . were in the training corpus of any of its commercially released large language models." Dkt. 363-3 at ¶ 3.1 (Settlement Agreement).

**Burke-Garcia (Dkt. 566)**

Burke-Garcia argues that the "Settlement permits Anthropic and similarly situated AI firms

to utilize copyrighted works in large datasets while offering only minimal monetary restitution to affected authors." Dkt. 566 at 1. Burke-Garcia further contends that "[w]ithout stronger remedies or clearer recognition of authors' rights, the proposed Settlement risks signaling that large-scale, uncompensated use of creative works is an acceptable cost of doing business." *Id.* at 2.

Again, however, the Settlement Agreement is conditioned on Anthropic's representation that "the LibGen or PiLiMi datasets . . . were [not] in the training corpus of any of its commercially released large language models." Dkt. 363-3 at ¶ 3.1 (Settlement Agreement). In addition, the Settlement Agreement does not contain a forward-looking release of any kind, and instead goes to lengths to expressly state that its "release does not constitute, in any respect, a license to torrent, scan, or train AI models on any copyrighted works, or to create infringing outputs from AI models." *Id.* at ¶ 1.29.

**Burton (Dkts. 584 & 593)**

Burton argues that the settlement award will be not properly distributed between authors and publishers because there "is excessive bias in favor of the [p]ublisher." Dkt. 593 at 1. Burton further notes that distributing the award based on the publisher's "sales volume" would "be the most equitable option for all parties." *Id.* at 2.

Under the terms of the Settlement, however, claimants are entitled to receive whatever per-work share of the settlement award to which they are entitled under their author-publisher contractual relationship. To be sure, the Settlement provides a non-mandatory 50-50 default between authors and publishers for non-education works, Dkt. 401-1 at ¶ 4(a)(i)) (Plan of Allocation), developed based on the industry norms amongst trade and university publishing contracts, *see* Dkt. 400 at ¶¶ 11–15 (Class Counsel Decl.). But a claimant may elect a different split by providing supporting documentation. *See* Dkt. 401-1 at ¶ 4(e) (Plan of Allocation). The same is true of education works which lack the default option: an author or publisher may claim whatever split their contract provides them. *Id.* at ¶ 4(a)(ii). Burton does not advance any argument that binding contracts between publishers and authors should be set aside, let alone identify the Court's authority to do so. Nor does Burton provide any evidence to suggest that sales volume would be equitable or feasible in this context. Burton's objection is overruled.

**Choi (Dkt. 594)**

Choi argues that the per-work award is "not enough" and "not nearly adequate," particularly in view of the fact that it is "substantially less than the statutory damages of $150,000 per work." Dkt. 594 at 1. For the reasons provided above, the Court does not agree with this analysis. The per-work award in this case represents a strong recovery to the class when all pertinent considerations are taken into account.

**DesJardins (Dkt. 595)**

Like his co-author Burton (Dkt. 584 & 593), DesJardins contends that settlement funds will be inequitably distributed between publisher and author. *See* Dkt. 595 at 2. As discussed above, the Court does not agree. The contract between the publisher and the author determines the allocation award, and DesJardins offers no reason prior contractual agreements between the parties should not control. The objection is overruled.

**Lee (Dkts. 596 & 606)**

Lee argues that "the amount offered is paltry and does not in any way reflect the full value of the unauthorized use of [Lee's] work." Dkt. 596 at 1, Dkt. 606 at 2. First, Lee appears to misstate the degree to which Lee's work was used. As mentioned, "neither the LibGen or PiLiMi datasets, nor any portions of those datasets, were in the training corpus of any of [Anthropic's] commercially released large language models." Settlement Agreement ¶ 3.1. In addition, the Court reaffirms its conclusion that the per-work award in this case is strong. And while Lee contends that the amount offered is too low, 92.77% of Works on the Works List have been claimed for the settlement amount, indicating that the outlier stance that Lee's position represents. Lee's objection is thus overruled.

**Hyder (Dkt. 598)**

Hyder contends that the per-work award is inadequate because "[r]ecently published documents" show that one of Anthropic's commercially released models "outputs entire books near-verbatim including in-copyright novels." Dkt. 598 at 1. But Hyder does not identify any work on the Works List that was used to train the model she identifies. In addition, Hyder does not distinguish between works that are on the Works List because they were acquired through the

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

LibGen or PiLiMi datasets (which Anthropic has represented were not used in training its commercial models) and identical copies of that work that Anthropic may have otherwise acquired. Without that analysis, the Court cannot speculate that Anthropic has violated its representation in the settlement agreement that "neither the LibGen or PiLiMi datasets, nor any portions of those datasets, were in the training corpus of any of [Anthropic's] commercially released large language models," Settlement Agreement ¶ 3.1., and the Court has no reason to believe that Anthropic has violated this representation.

**Larson (Dkt. 601)**

Larson argues that her work was "uploaded into [an] AI training model" without her "consent or compensation, resulting in significant economic damages (market harm)." Dkt. 601 at 1. Larson estimates that the market harm caused by Anthropic's conduct was between $448,500 to $735,000, and therefore contends that the per-work award in this case is inadequate. As explained above, however, the LibGen and PiLiMi datasets were not used in training Anthropic's commercial models. And the per-work award adequately reflects the competing considerations in this case, including the risk of further litigation. The extremely high claims rate of 92.77% further demonstrates the clear adequacy of the settlement, including the per-work award. Larson's objection is overruled.

**Johnson (Dkt. 640)**

Johnson contends that the "proposed payout is a fraction of the statutory damages typically associated with willful copyright infringement" and "does not reflect the long-term loss of creative licensure or the devaluation of human-authored works caused by the training of LLMs on stolen data." Dkt. 640 at 1. As discussed above, this case does not concern commercially-released LLMs that were trained on data from LibGen and PiLiMi. And the per-work award is reasonable for the reasons the Court has explained. Johnson's objection is overruled.

**Hootman (Dkt. 642)**

Hootman argues that the settlement amount is a "slap on the wrist" in light of Anthropic's significant financial resources, and argues that the settlement gives Anthropic "the ability to profit indefinitely from [Hootman and other's] work[s] without [their] consent." Dkt. 642 at 2. Hootman

further notes that "[b]ut for one single payment, Anthropic will continue to benefit financially from [Hootman's] work *forever*." *Id.* And Hootman observes that "[a]s long as the AI trained on [her] work is still in operation, justice has not been served." *Id.*

Hootman's objection is overruled. First, the release in this case only applies to conduct on or before August 25, 2025—it does not operate prospectively at all. In addition, the release does not apply to output claims in any capacity. And Anthropic has again represented that its commercial released models were not trained on the LibGen and PiLiMi datasets. The premises for Hootman's objection—that Anthropic will continue to benefit "forever" and "indefinitely"—are not accurate. The settlement in this case is the largest reported copyright settlement in American history, and the Court disagrees with Hootman's characterization of that settlement as insignificant.

### Jacobson (Dkts. 646-3 & 662)

Jacobson argues that the "settlement payment represents a small fraction of the potential statutory recovery and fails to adequately compensate authors whose creative works were pirated and exploited to build commercial AI systems valued in the billions of dollars." Dkt. 646-3 at 1. This objection is overruled for the reasons provided; the per-work award is adequate and, contrary to Jacobson's suggestion, Anthropic has represented that the LibGen and PiLiMi datasets were not used in training any commercially released model. Jacobson also contends that the settlement "provides no meaningful protection against future unauthorized use and no ongoing licensing arrangement." Dkt. 646-3 at 2. That is also incorrect. The release in the Settlement Agreement does not apply to any future claims at all.

### Srinivasan (Dkt. 654)

Srinivasan opted-out of this case and is therefore not a class member with standing to object. In any event, Srinivasan's contention (Dkt. 654 at 7) that the aggregate settlement amount is too low is incorrect and provides no basis to deny final approval, for the reasons explained herein.

*Claims Rate.* One Objection (Story, Dkt. 599) submitted in December 2025 stated that the claims rate did "not bode well for full participation" in the Settlement. Dkt. 599 at 6. The claims rate has since increased to 92.77 percent as of May 14, 2026, Dkt. 668, May 14, 2026 Hearing Tr. at 42:17-18, eclipsing most if not virtually all claims made class action cases, *see* McLaughlin on

Class Actions § 6:24 (8th ed.) ("Claims-made settlements typically have a participation rate in the 10-15 percent range."); *Sierra v. City of New York*, 2023 WL 7016348, at *2 (S.D.N.Y. Oct. 25, 2023) (86% claims rate "magnitudes above the average for class action cases") (emphasis added). This Objection is overruled.

*Non-Monetary Relief*. Several Objections request additional non-monetary relief, including novel licensing schemes (Dkt. 599 (Story) at 3; Dkt. 566 (Burke-Garcia)), source attribution in Anthropic's outputs (Dkt. 549) (Stewart), deletion of AI models (Dkt. 544 (Hale)), and abolishing use of scanned books for training (Dkt. 595 (DesJardins)); *see also* Dkts. 425 (Ruden), 584 & 593 (Burton), 599 (Story), 600 (Sills), 603 (N.C. Editori), 604 (T.T.D. Editori), 605 (Nord), 607 (Editore), 608 (A.S. Editore), 610 (Longanesi), 611 (A.V. Editore), 612 (Garzanti), 646-3 & 662 (Jacobson). These requests go beyond the scope of this Settlement and the remedies attainable thereunder, especially given the Court's fair use ruling regarding the training of large language models. *See Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025). The Settlement already provides ample forward-looking protections, including the destruction of Class Members' pirated Works. Settlement Agreement ¶ 2.2. Anthropic attests it did not use Class Members' Works to train a commercial model, and the Settlement does not release claims for future harm or claims "based on the output of AI models." *Id.* ¶¶ 1.29, 3.1. These Objections are overruled.

**Stewart (Dkt. 549)**

Stewart argues that the "settlement fails to recognize the importance of source attribution," and that such attribution "has both reputational and economic value to authors." Dkt. 549 at 1. For example, Stewart explains that "[m]easures of attribution of an author's work [] play an important role in obtaining external grants and other forms of support from government, industry, and other organizations." *Id.* The settlement's "[f]ailure to require attribution," Stewart argues, "deprives the creators of original content the reputational and economic value that reside in the production of original work and subsequent attribution."

Stewart's objection is overruled. First, the Court finds for the reasons discussed that the monetary and non-monetary relief offered by the Settlement is significant. While additional relief may theoretically be available—as it is in many settlements—that does not render the Settlement

here inadequate. Second, the Court notes that source attribution is inapt here, given Anthropic's representation that it did not use as source material any of the material in the LibGen or PiLiMi datasets that this case concerns. Settlement Agreement ¶ 3.1.

**Carson (Dkt. 597)**

Carson argues that the per-work award should not be equal for all Works. In Carson's view, "[w]riters who create teachings designed to protect readers from dangerous encounters with police should be rewarded more highly in comparison to other writings which fail to serve this more important function," "such as fiction and humor." Dkt. 597 at 1-2. In addition, Carson objects that "authors whose writing have not been absorbed into the Anthropic algorithm are to be compensated equally to authors whose works have been referenced frequently." *Id.* at 2. Carson's objection is overruled. The Settlement's equal treatment of Class Members is a feature, not a bug, and is particularly justified in view of Anthropic's uniform treatment of the Works, downloading them all. Finally, Anthropic has represented that it did not place the LibGen or PiLiMi datasets at issue in this case into the training corpus of any commercially released model, so Carson's objection to the degree to which Anthropic's models make use of the pirated works is misplaced. Settlement Agreement ¶ 3.1.

*Request for Trial.*

**Ruden (Dkt. 425)**

Ruden contends that the Court should "insist on a trial." Dkt. 425 at 2. But, as discussed in Plaintiffs' Motion for Final Approval (Dkt. 619 at 11–13), pressing forward with trial would implicate substantial costs, delays, and risks, including the possibility of zero recovery for all Class Members. As the Court stated previously, the Settlement is "a good deal. You don't get the maximum statutory damages in every case. In fact, you might not even get statutory damages." Dkt. 484 at 54. Class Members who nevertheless wanted to roll the dice to pursue additional damages had the ability to do so by opting out. *See, e.g.*, *Cruz et al. v. Anthropic PBC*, No. 3:26-cv-04482, Dkt. 1 (N.D. Cal. May 13, 2026) (complaint against Anthropic filed by plaintiffs who opted out of the Settlement). Accordingly, "[t]hat certain Class Members evaluate the risks differently, or would prefer to go to trial despite those risks, does not prevent the Court from

granting final approval to the Settlement." *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 323 (N.D. Cal. 2018); *see also Perkins v. LinkedIn Corp*, 2016 WL 613255, at *6 (N.D. Cal. Feb. 16, 2016) (same).

*Plan of Allocation and Distribution*. Bishop (Dkt. 602) argues that the dispute resolution process is inadequate because it fails to include authors' agents and that the appointment of Cheng as Special Master will favor publishers. Bishop is not a Class Member, however, and thus lacks standing to object. Her objection is stricken. It is also without merit. First, authors' agents are not included in the definition of the settlement class, and their mandatory inclusion in the dispute resolution process is thus unwarranted. Second, the Court carefully reviewed Cheng's qualifications and attestations that no conflict existed, and appointed Cheng accordingly. *See* Dkt. 501. Cheng noted that "[a]fter conducting a reasonable investigation, including consulting my own conflicts database, and based upon my recollection and to the best of my knowledge, I have determined that I do not have a relationship with the parties, the attorneys, this action, or this Court that would require disqualification under 28 U.S.C. § 455." Dkt. 458 at 6. He further noted that he did "not anticipate having any actual or potential conflicts (or even any disclosures) with respect to any claimants who may appear before [him]"; that he "never represented a book author or book publisher during [his] years in private law practice"; and that he did "not have any present intention to represent a book author or book publisher in the future." *Id.*

*Attorneys' Fees*. Eight Objections address Class Counsel's request for attorneys' fees, none of which were filed after Class Counsel's revised fee request was submitted March 19, 2026. Dkts. 545 (Golomski), 551, 569, & 618 (Werner), 564 (Sappington), 589 (Bond), 599 (Story), 600 (Sills), 609 (Smith), 638 (Miles). Those objections are addressed in Section II.A(3).

*Procedurally Improper Objections*. The Court also overrules the following objections on the independent ground that each is procedurally deficient. *See Moore*, 2013 WL 4610764, at *12 (overruling objections "for failing to comply with the procedural requirements for objecting to the Settlement," including timeliness); *Gould v. Motel 6, Inc.*, 2014 WL 12571421, at *2 (C.D. Cal. Jan. 10, 2014) ("Because the objections are untimely, the Court need not consider the merits of objectors' arguments."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 7575004 (N.D. Cal.

Dec. 27, 2011) ("His objection herein is untimely . . . . On that basis alone, the Court refuses to consider the objection."); *see id.* (citing cases).

- The objections of Watkins Media Limited and Collective Ink Limited (Dkt. 639) and Johnson (Dkt. 640) fail to comply with the requirement, provided in the Long-Form Notice, that all objections must be sent "to the Court" or "must be filed with the Court." LFN at 18–19. Johnson sent her objection to the Settlement Administrator via email. *See* Dkt. 640. Watkins Media Limited and Collective Ink Limited likewise sent their objection to the Settlement Administrator via email and, it appears, also Anthropic. *See* Dkt. 639.

- The objection of Michelle Willingham Leonard (Dkt. 637) is invalid because it was submitted on April 1, 2026, past the February 9, 2026 deadline for submitting all objections. *See* Dkt. 583.

- The objection of Victoria Pinder (Dkt. 641) is invalid both because it was not sent to the Court and because it was submitted on April 9, 2026, past the objection deadline. *See* LFN at 18–19; Dkt. 583.

- The second objection of Lea Bishop is invalid because it too was submitted past the objection deadline and because, by her own admission, she is not a Class Member. *See* Dkt. 630 at 7 (dated April 2, 2026); *see also* Dkt. 632 at 1 n.1. Bishop's objection also stresses that it "does NOT ask the Court to reject the $1.5 billion settlement." Dkt. 630 at 2.

- The objection of Bhu Srinivasan (Dkt. 654) is invalid because he has timely opted out his Works and, therefore, he has no standing to object and is not a Class Member. *See* LFN at 2, 19. In addition, his objection is premised on the incorrect notion that the Settlement affirms the findings made in the Court's Order on Fair Use (Dkt. 231), with which Srinivasan disagrees. The Settlement does not affirm such findings and instead reflects the risk that, but for a settlement, those findings may or may not have been affirmed by the Ninth Circuit in a potential future appeal.

### E.    Opt-Outs

Only two Class Members have sought court approval for acceptance of a late opt-out request. Laura Esquivel (Dkts. 635 & 651) and Jordi Castells (Dkt. 636 & 652), through counsel, filed papers styled as "objections" requesting the Court grant their late opt-out requests, as well as declarations that attempt to describe the circumstances justifying their late opt-out. Anthropic opposes this request. Class Counsel do not oppose these requests, and other rightsholders for their works also have not raised any concerns after being informed of the requests on May 1, 2026. For this reason, and because Esquivel and Castells have demonstrated good cause for their late opt-out requests, Esquivel's and Castells's untimely opt-out requests are **GRANTED**. *See Bowman v. UBS*

*Fin. Servs., Inc.*, 2007 WL 1456037, at *3 (N.D. Cal. May 17, 2007) (collecting cases endorsing "excusable neglect" standard for untimely opt-out requests); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 6276092, at *1 (N.D. Cal. Apr. 20, 2017) ("A class member who seeks to opt out of a class action settlement after the applicable deadline has passed must show that 'excusable neglect' or good cause excuses the delay.") (quoting *Silber v. Mabon*, 18 F.3d 1449, 1455 (9th Cir. 1994)).

Class Counsel also report that there are seven other individuals whose opt-out requests are late but would otherwise be valid. None of these seven class members have applied to the Court to request relief from the opt-out deadline and thus none can meet their burden to "show that excusable neglect or good cause excuses the delay." *Volkswagen*, 2017 WL 6276092, at *1. These class members will therefore not receive relief from the opt-out deadline.

### F.    Other Settlement Matters

The Action and all Released Claims asserted against the Parties are settled and dismissed with prejudice. Execution of the Settlement shall proceed as set forth in the Settlement Agreement.

The Parties shall file a post-distribution accounting in accordance with the Northern District's Procedural Guidance for Class Action Settlements within 21 days after the substantial completion of the Net Settlement Fund's distribution ("Post-Distribution Accounting"). In addition to the information contained in the Guidance, the Post-Distribution Accounting must discuss any significant or recurring concerns communicated by class members to the Settlement Administrator or Class Counsel since final approval, any other issues in settlement administration since final approval, and how any concerns or issues were resolved. The Parties may request a continuance of the deadline for the Post-Distribution Accounting if the information required as part of the accounting is not yet available.

The Court reserves jurisdiction over the subject matter and each Party to the Settlement with respect to the interpretation and implementation of the Settlement for all purposes, including enforcement of any of the terms thereof at the insistence of any Party and resolution of any disputes that may arise relating to the implementation of the Settlement or this Order.

## II.   Attorneys' Fees, Expenses, and Service Awards

Plaintiffs move for (1) 12.5 percent of the $1.5+ billion Settlement Fund in attorneys' fees to Class Counsel; (2) reimbursement of $2,975,197.46 in litigation expenses incurred by Class Counsel; (3) a cost reserve of $18,220,000 for future expenses, including payment to the Settlement Administrator; and (4) service awards of $50,000 to each Class Representative. *See generally* Reply Brief in Support of Fee Application. The Court addresses each request in turn.

### A.   Attorneys' Fees

Class Counsel requests a fee of 12.5 percent of the common fund. It does not seek any separate award for the injunctive relief. Of the 53 objections, 8 relate to the fee award. The small number of objections concerning Counsel's fee request—8 total objections, 6 of which do not object to the amount sought in Class Counsel's revised request, and none of which were filed after Class Counsel submitted its reduced fee request on March 19—reflects the "strong, positive response from the class, supporting Class Counsel's requested fees." *Volkswagen*, 2017 WL 2178787, at *2 (awarding 15.6% of $327 million settlement). That is especially true considering the composition of the class here, which comprises sophisticated entities including authors, leading publishing houses, and large corporations. *See, e.g., Stop & Shop Supermarket Co. v. SmithKline Beecham Corp*, 2005 WL 1213926, at *10, 18 (E.D. Pa. May 19, 2005) (noting presence of "sophisticated businesses" in awarding a 15.6 multiplier); Dkt. 505-7 (Fitzpatrick Decl.) ¶ 18 (discussing that "when sophisticated businesses hire counsel on contingency, they often use one-third-or-more percentages"). The specifics of each objection are addressed after a discussion of the general principles and guidance applicable to the fee request.

Class Counsel's requested fee of 12.5 percent to Class Counsel is reasonable. It is appropriate under a percentage of the fund method and through a lodestar cross-check analysis. It is further justified by the exceptional recovery to the class, which has resulted in not just the highest copyright class action settlement of all time but the highest copyright recovery of any type. On a per-work basis, the amount is well above other copyright settlements. *See, e.g.*, Dkt. 363-1. And that is just the monetary recovery. The settlement also provides substantial injunctive relief through the destruction of the pirated datasets and a certification that no copies from the pirated datasets

were used in any commercial model, and also includes a limited release that does not apply to any conduct after August 25, 2025 nor does it release any output claims. Class Counsel's efforts also had a direct impact on the size of the class through the discovery of the full extent of Anthropic's infringement and its use of the LibGen and PiLiMi datasets as well as through the development of the Works List. The amount also reflects the substantial risk that Class Counsel undertook, including due to the novelty of these claims. And the strong class participation also favors the 12.5% award. As the Court previously stated, "In my mind, there was only a narrow path to a home run in this case, and that home run is well represented by the $3,000." Dkt. 484, Nov. 13, 2025 Hearing Tr. 54:20-21.

### 1.     Percentage-of-the-Common Fund Method

The fee request is reasonable under the percentage-of-fund method. The requested fee is significantly less than the presumptively reasonable 25 percent benchmark employed in this Circuit. *See Ward v. United Airlines, Inc.*, 2024 WL 269149, at *5 (N.D. Cal. Jan. 24, 2024). Each of the factors that courts consider in the percentage-of-fund method strongly support the fee that Counsel request here. *See id.*

To calculate fees in common fund cases, "the majority of courts [apply] the percentage-of-recovery method." *Ward*, 2024 WL 269149, at *5 (Alsup, J.); *Roman v. Jan-Pro Franchising Int'l, Inc.*, No. 3:16-CV-05961-WHA, 2024 WL 2412387, at *4 (N.D. Cal. May 23, 2024) (Alsup, J.) (same). To calculate the percentage-of-recovery award:

> Courts generally start with the 25 percent benchmark and adjust upward or downward depending on the extent to which class counsel 'achieved exceptional results for the class,' whether the case was risky for class counsel, whether counsel's performance 'generated benefits beyond the cash fund,' the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (*e.g.*, cost, duration, foregoing other work), and whether the case was handled on a contingency basis.

*In re Wells Fargo & Co. Shareholder Derivative Litig.,* 445 F. Supp. 3d 508, 519 (N.D. Cal. 2020) (cleaned up) (quoting *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015)). "Foremost among these considerations, however, is the benefit obtained for the class." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011); *see Hensley v.*

*Eckerhart*, 461 U.S. 424, 434–36 (1983); *McCown v. City of Fontana*, 565 F.3d 1097, 1101–02 (9th Cir. 2009) (reasonableness of the fee "is determined primarily by reference to the level of success achieved by the plaintiff").

***Results for the Class.*** As the Court noted in its Opinion on Preliminary Approval, the Settlement is "the largest copyright class action settlement in history." *Bartz*, 2025 WL 2961371, at *3. The size of the $1.5 billion non-reversionary settlement is extraordinary, both from an aggregate and per-work perspective, with the settlement fund equating to more than $3,000 per work. *Id.* That per-work amount is "an order of magnitude more than the maximum proposed for books in the *Google Books* settlement that was rejected for releasing future claims." *Id.* (citing *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 672 (S.D.N.Y. 2011)). It is also more than "four times the statutory minimum for ordinary infringement, which is also the most common award in copyright cases," and more than "fifteen times the statutory minimum for innocent infringement of $200." *Id.*

The Settlement exceeds comparable class action recoveries in the copyright context. For instance, in *Ferrick v. Spotify USA Inc.*, the court lauded a class-wide copyright settlement valued at approximately $112.5 million (with $43.45 million paid in cash) as a "significant recovery" for the 535,000-member class, even though the award was valued at $210.28 per class member. 2018 WL 2324076, at *1, *6 (S.D.N.Y. May 22, 2018); *see also Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2017 WL 4685536, at *2 (C.D. Cal. May 8, 2017) (common fund between $25 and $99 million in copyright case); *Lieber v. Bertelsmann AG*, Dkt. 1298 (N.D. Cal. Aug. 31, 2007) ($130 million common fund in Napster case involving pirated music). So too does the case compare favorably to other class-wide settlements of statutory damages claims outside the copyright context. *See, e.g.*, *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 2023 WL 8443230, at *1, *3 (N.D. Cal. Oct. 10, 2023) ($725 million settlement fund for 253 million class members); *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 629 (N.D. Cal. 2021) ($650 million settlement fund for 6.9 million class members); *see also* Dkt. 363-1 (collecting cases reflecting comparable settlements). As the *New York Times* reported shortly after the Settlement was reached, "[t]he settlement is the largest payout in the history of U.S. copyright cases." Cade Metz, Anthropic

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

Agrees to Pay $1.5 Billion to Settle Lawsuit With Book Authors, N.Y. TIMES (Sept. 5, 2025), https://tinyurl.com/Anthropic-Agrees-To-Settle.

Class Counsel also secured valuable non-monetary relief. The Settlement requires Anthropic to "destroy all the original files of works torrented/downloaded from Library Genesis or Pirate Library Mirror, and any copies that originate from the torrented copies," subject to certain legal preservation obligations. Settlement Agreement ¶ 2.2. This destruction is a victory for Class Members, given Anthropic's intent to retain the pirated works "forever." *Bartz*, 791 F. Supp. 3d at 1047; *see also* Dkt. 505-7 (Fitzpatrick Decl.) ¶¶ 32-33 (discussing the importance of compensating counsel for the injunctive relief by increasing the percentage of the common fund when the value of such relief cannot be readily calculated and the caselaw holding as much, including *Staton v. Boeing Co.*, 327 F.3d 938, 946 (9th Cir. 2003)).

Finally, the relief to the Class was procured through the particular efforts of Class Counsel. Plaintiffs were originally not aware that Anthropic had used LibGen and PiLiMi at all, and Anthropic tried to limit discovery in this case to information about commercially-released models, in which LibGen and PiLiMi were not used per Anthropic's representation. *See* Dkt. 619-1 (Class Counsel Decl.) ¶ 7. Plaintiffs nevertheless filed several discovery motions related to Library Genesis and other shadow libraries, and it was only through that contested process that Anthropic's use of LibGen and PiLiMi came to light. *See, e.g.*, Dkts. 86, 102, 109. And indeed, Plaintiffs first received access to the LibGen and PiLiMi datasets that formed the core of this case on March 21, 2025—only six days before their opening class certification brief was due. Dkt. 505-1 (Nelson Decl.) ¶ 14. Yet Plaintiffs were able to certify a class and partially defeat summary judgment based on the LibGen and PiLiMi datasets, leading to this Settlement.

***Risk of Litigating this Action on Contingency.*** Before this litigation, no court had ever (a) found an AI company liable for copyright infringement, (b) held that piracy by an AI company constituted copyright infringement, or (c) certified a class in a copyright infringement action against an AI company or for owners of book copyrights. Dkt. 506-1 (Mot. Attorneys' Fees) at 13. Class Counsel also litigated against experienced attorneys from five different, major law firms. *Id.* at 14. Class Counsel also bore—and continue to bear—risk on expenses. The expenses to the Settlement

Administrator alone total $15 million, let alone the other costs such as experts. Moreover, as discussed extensively (*infra* at 59–60, 68–70), risks existed at every juncture—from pursuing discovery to class certification to summary judgment through expert reports and the development of a Works List.

*Market Rates.* Class Counsel's requested fee award of 12.5 percent is within the relevant market rate for contingency representations. The requested fee is reasonable relative to percentages awarded in other class actions, copyright class cases, and megafund cases. *Id.* at 16–18. Compared to other "megafund" settlements ranging in value from $410 million to more than $2.5 billion, Class Counsel's request for 12.5 percent is right in line. *See In re: Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2022 WL 4587617 (N.D. Ala. Aug. 9, 2022) (awarding ~23.5 percent of the $2.67 billion settlement fund); *In re: College Athlete NIL Litig.*, No. 20-cv-3919 CW, 2025 WL 3171376, at *1 (N.D. Cal. July 11, 2025) (awarding 20 percent of the $1.976 billion NIL claims settlement fund plus 10 percent of the $600 million additional compensation settlement fund plus $20,000,000 upfront injunctive fee and 0.75 percent to 1.25 percent of future amounts); *Lawrence E Jaffe Pension Plan v. Household Int'l. Inc.*, No. 1:02-cv-05893, Dkts. 2222, 2265 (N.D. Ill. Nov. 10, 2016) (awarding ~24.7 percent of the $1.575 billion settlement fund); *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094 (D. Kan. 2018), *aff'd* 61 F.4th 1126 (10th Cir. 2023) (awarding 33.3 percent of the $1.51 billion settlement fund); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) (awarding 28.6 percent of the $1.08 billion settlement fund); *Allapattah Servs. Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (awarding ~31.3 percent of the $1.075 billion settlement fund).

Similar contingent agreements also support a 12.5% fee award. Opt-out counsel in this case are charging at least 33% for the same claims. *See, e.g.,* https://claimshero.com/ai-book-pirating (35% fee for "AI Book Pirating" cases); https://sgcarney.substack.com/p/the-65000-an-hour-anthropic-lawsuit (33.3% for opt out actions against Anthropic); *Vizcaino*, 290 F.3d at 1049 (crediting "evidence showing that the retainer agreements [of 30%] reflected the standard contingency fee for similar cases."). Class Counsel have submitted declarations that the fee request here is far below standard contingency rates. *See* Dkt. 619-1 ¶ 52; Dkt. 505-1 ¶ 7. And the

Declaration of Professor Brian Fitzpatrick discusses that even the 20% original request was "well below" the "percentages in standard contingency-fee agreements in similar individual cases." Dkt. 505-7 (Fitzpatrick Decl.) ¶ 18.

### 2.      Lodestar Crosscheck

The Court observes that Class Counsel has referred to the authority holding that where "the court achieves a reasonable result using the method it selects," the lodestar "cross-check is not required." *Senne v. Kansas City Royals Baseball Corp.*, No. 14-cv-00608 JCS, 2023 WL 2699972, at *18 (N.D. Cal. Mar. 29, 2023). There are indeed a body of cases so holding. *See, e.g., Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 630 (9th Cir. 2020) (compiling cases affirming district court's discretion not to perform a crosscheck of the lodestar and holding: "This Court has consistently refused to adopt a crosscheck requirement, and we do so once more."); *In re Coll. Athlete NIL Litig.*, 2025 WL 3171376, at *1 n.2 (lodestar crosscheck unnecessary, particularly given the results class counsel achieved for the class and the risks and costs of continued litigation); *Andrews v. Plains All Am. Pipeline L.P.*, No. CV-154113 PSG (JEMx), 2022 WL 4453864, at *2 (C.D. Cal. Sept. 20, 2022) (lodestar crosscheck unnecessary "due [in part] to the exceptional circumstances of [the] case") (citation omitted).

However, as stated at the May 14 hearing, this Court will conduct a lodestar cross-check. Under this analysis, the Court similarly concludes that Class Counsel's fee request is reasonable.

Under the crosscheck method, the court calculates a "presumptively reasonable" fee by multiplying the hours expended by an hourly rate comparable to other similarly experienced attorneys. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 571 (9th Cir. 2019). Class Counsel's time expenditures were indeed reasonable given the extensive discovery in this case, and the substantially sized Class, with whom Class Counsel have been in close contact for months. Mot. for Attorneys' Fees at 9. In addition, Class Counsel's rates are reasonable and fit within "the prevailing rates in this District, [and] the qualification and experience of counsel." Dkt. 506-1 at 21; *see also* Dkt. 505-3 ¶¶ 26–27 (collecting cases approving rates).

### Class Counsel's Lodestar

The first step in conducting a lodestar crosscheck is determining the appropriate lodestar

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

for the analysis. Class Counsel's total reported lodestar—both present and projected—is $27,082,963.50. Dkt. 623-1 at 4. This lodestar figure reflects both past time spent on the case and projected time that Class Counsel anticipated it would spend on the case in administering the settlement and in connection with obtaining final approval of the Settlement. In Class Counsel's December 3, 2025, motion for attorneys' fees, Class Counsel reported that its total past time through December 1, 2025, was 22,490.70 hours, reflecting a lodestar of $18,963,663.50. (This includes a total of 9,341.6 hours (reflecting a lodestar of $9,312,610) from Susman Godfrey and 13,149.10 hours reflecting a lodestar of $9,651,053.50 from Lieff Cabraser, for a total 22,490.7 hours and $18,963,663.50 in lodestar. Dkt. 505-1 (Nelson Decl.) ¶ 3; Dkt. 505-3 (Geman Decl.) ¶ 17.)

At that time, Class Counsel also projected that they would have to spend substantial additional time on the case, including in seeking final approval of the Settlement and administering the settlement, consistent with the Court's directive that Class Counsel was charged with "bird dog[ging]" the Settlement administration process "at every stage." Dkt. 431, Sept. 25, 2025 Hearing Tr. at 17:13-16. As of December 3, 2025, Class Counsel projected its anticipated time through February 2027 as follows: A total of 11,891 hours reflecting $8,119,300 in lodestar. (This includes a total of 5,356 reported anticipated hours (reflecting a lodestar of $3,969,575) from Susman Godfrey and 6,535 reported anticipated hours (reflecting a lodestar of $4,149,725) Lieff Cabraser, for a total of 11,891.6 hours and $8,119,300 in lodestar. Dkt. 505-1 (Nelson Decl.) ¶ 17; Dkt. 505-3 (Geman Decl.) ¶ 21.).

On March 19, 2026, Class Counsel filed its reply brief in support of its motion for attorneys' fees (Dkt. 620), where it provided updates on the firms' time and lodestar incurred through March 15, 2026. In those filings, Class Counsel reported that, between December 1, 2025 through March 15, 2026—i.e., roughly 3.5 months of the 15 month period for which Class Counsel had projected time in its initial fee motion—it had incurred an additional 5,138.5 hours reflecting a lodestar of $3,427,087 for a total of 27,629.2 hours in actual time through March 15, 2026 and 6,752.5 hours in projected future time. The projected future time is the difference between the December estimate and actual time expended between the original fee motion and March 15. In other words, the total lodestar projection did not increase from the original conservative estimate. Time expended in

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

preparing the application for fees and submitting requests for reimbursement of expenses were excluded and not reflected in any of the foregoing calculations. *See, e.g.*, Dkt. 619-1 at 12, 14, 16 (Declaration of Class Counsel).

Since March 15, Class Counsel has represented that it has expended significant additional time, including in preparing the Final Approval Motion due March 19, conferring with class members and JND on claims, making additional filings (*see, e.g.*, Dkt. 643; Dkt. 646), and preparing for and arguing the Final Approval Hearing. *See* Dkt. 672. That time is included in the projected additional time since March 15. The projections on future time also stop in February 2027 even though Class Counsel expects additional work to continue after that date on claims administration.

Class Counsel's inclusion of anticipated future time expenditures is proper and in keeping with well-established precedent. "Several courts in this district have included future hours in the lodestar calculation to achieve reasonable compensation." *Perez v. Rash Curtis & Assocs.*, No. 4:16-CV-03396-YGR, 2020 WL 1904533, at *18 (N.D. Cal. Apr. 17, 2020) (collecting cases); *see also Lou v. Am. Honda Motor Co., Inc.*, 2025 WL 1359067, at *11 (N.D. Cal. May 9, 2025), *judgment entered sub nom. Aberin v. Am. Honda Motor Co.*, 2025 WL 1651941 (N.D. Cal. June 11, 2025) (similar); *Herrera v. Cnty. of Los Angeles*, 2026 WL 507909, at *2 (C.D. Cal. Feb. 23, 2026) (recognizing counsel's inclusion into the lodestar of "unbilled work on the attorney's fee motion, the yet to be filed final approval motion, and post-approval work").

Class Counsel's expectation that it will spend significant time in administering the Settlement is especially warranted here because, as previously noted, the Court has made clear its expectation that Class Counsel "bird dog" the settlement process. Dkt. 431, Sept. 25, 2025 Hearing Tr. at 17:13-16. Here, even after final approval, significant work will remain in the claims administration process, including in finalizing and reviewing claim submissions for hundreds of thousands of works, continuing to interact with class members as inter-class member splits are resolved, and administering the distribution of payments. *See* LFN at 13 ("How will disputes be resolved?").

The Court further agrees that Class Counsel's projections of future time are reasonable,

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

supportable, and, if anything, conservative. For instance, Class Counsel explained the derivation of their expected time expenditures in declarations submitted on December 3, 2025. *See* Dkt. 505-1, 505-3. Counsel explained that the estimate made "making conservative projections based on the time . . . invested at analogous points in the case—namely, in the period before and following preliminary approval, where many similar tasks were conducted." Dkt. 505-1 at 7. Counsel then detailed the various tasks that Class Counsel expected to conduct, including "the submission of additional briefing, the preparation for and participation in a final approval hearing"; "offer[ing] ongoing aid to the Settlement Administrator and to Class Members"; and "working with the Settlement Administrator to reach amicable resolutions between differing parties; and ensuring, if ultimately necessary, that Class Members can utilize the services of the Special Master." *Id.* ¶ 20; Dkt. 505-3 ¶¶ 19-20.

Though the Court finds Class Counsel's projected time reasonable, the Court will take an additional step to protect the interests of the Class. The Court notes that Class Counsel have agreed that 10% of the fee amount will be withheld until the Parties file a post-distribution accounting in accordance with this District's Procedural Guidance for Class Action Settlements. To the extent that Class Counsel's actual time incurred (using 2025 rates) is less than the amount used to calculate the lodestar ($27,082,963.50), the Court hereby **ORDERS** Class Counsel to report that to me in the post-distribution accounting. If it is less than that amount, the Court may reduce Class Counsel's fee award by some or all of the holdback amount, at the Court's discretion.

For the foregoing reasons, the Court agrees that Class Counsel's future time projections are properly included in the lodestar calculation. Taking into account Class Counsel's reported time and lodestar through March 15, 2026, Class Counsel's *past* lodestar through March 15, 2026 is $22,667,896.50. That means that as of March 15, 2026, Class Counsel's *projected future* lodestar from March 16, 2026 through February 2027 was $4,692,213. The Court therefore uses a lodestar of $27,082,963.50 in conducting a lodestar crosscheck.

**The Lodestar Cross-Check Supports the Requested 12.5% Fee Award.**

A lodestar cross-check in this case is consistent with the 12.5% fee request. With a lodestar of $27,082,963.50, Class Counsel's requested multiplier is 6.92 based on the requested 12.5% fee.

While this multiplier is on the high side, the Court agrees that the multiplier of 6.92 is within the supportable range and reflects the excellent result secured for the Class set against the eminent risks and challenges of the case. It also reflects that the relief to the class includes not just the non-reversionary settlement fund but injunctive relief as well. *See supra* at 53–54 (discussing injunctive relief in the context of the percentage of the recovery basis).

The Ninth Circuit has previously recognized comparable multipliers are appropriate, and indeed did so in a copyright infringement action that was materially less risky, less consequential, and less developed than this case. In *Steiner v. Am. Broad. Co.*, the Ninth Circuit affirmed the district court's award of a lodestar multiplier of 6.85, finding it "well within the range of multipliers that courts have allowed." 248 F. App'x 780, 783 (9th Cir. 2007). The Court reached that conclusion despite there being no depositions, no motions to dismiss, no motions for summary judgment, and no opposition to class certification. The Ninth Circuit emphasized that "class counsel ran the risk of not being paid at all," and "faced two reasonably possible scenarios in which they would effectively 'lose' and not recover any attorneys' fees." *Id.* at 782 n.2.

*Steiner* strongly supports Class Counsel's fee request here. This case was much further along than *Steiner*: summary judgment and class certification had been extensively briefed, heard and decided; virtually all fact depositions having been completed (including depositions in connection with class certification and summary judgment); extensive expert work; voluminous document and data discovery, including of third parties; ongoing and intensifying trial preparation; contested interlocutory or emergency briefing in this Court and the Ninth Circuit; and highly complex, technical source code and training data review that occupied hundreds of hours of attorney and expert time, including in the creation of the Works List. *See generally* Dkt. 619-1 (Class Counsel declaration overview case history).

This case was highly risky, too. As the Court previously acknowledged in denying Anthropic's motion to stay, "[f]or all we know at this stage, Anthropic will persuade the jury to find facts vindicating it completely." Dkt. 296 at 6. And "[a]ll the district court's rulings and verdict could get appealed" after trial. Dkt. 437 at 4 (preliminary approval order). At the time of settlement, moreover: (i) the Ninth Circuit could have granted Anthropic's emergency request for stay or

Anthropic's Rule 23(f) petition; (ii) and this Court could have granted Anthropic's § 1292(b) motion, Anthropic's motion for reconsideration of the fair use order, or any number of *Daubert* or pre-trial motions. The Court also could have decertified the class at any point. *See* Dkt. 431 at 7, 15. Indeed, at the same time as the summary judgment decision in this case, another court in this district granted summary judgment for the defendant on another putative AI copyright class action, a decision that Anthropic relied on in seeking emergency interlocutory review. *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1035 (N.D. Cal. 2025). The Court accordingly observed that "there was only a narrow path" for Class Counsel to succeed. Dkt. 484, Nov. 13, 2025 Hearing Tr. 54:20-21. The Settlement was a "home run" anyway. *Id.*

In the face of these significant risks, the advanced posture of this litigation at the time it settled, and the strength of the relief offered by the Settlement, *Steiner* amply supports Class Counsel's fee request.

So too does the case law developed in the wake of *Steiner*, which recognizes the propriety of multipliers comparable to that here. One court, for instance, has observed that "multipliers of 4.0 and above are frequently applied in granting fee awards from common funds." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2017 WL 6040065, at *9 (N.D. Cal. Dec. 6, 2017), *aff'd*, 768 F. App'x 651 (9th Cir. 2019); *see also id.* at *9 n.57 (collecting cases). In *Gutierrez v. Wells* Fargo, Judge Alsup approved a multiplier of 5.5 and stated it was "certainly within the range of reasonable multipliers awarded in other megafund actions." 2015 WL 2438274, at *8 (N.D. Cal. May 21, 2015).

Another court in this District—*Aguilar Auto Repair, Inc. v. Wells Fargo Bank, N.A.*— concluded that a multiplier of 6.99 "is within the acceptable range in the Ninth Circuit." 2025 WL 1753509, at *10 (N.D. Cal. May 23, 2025) (citing *Steiner*). Still a third court has found that multipliers of 13.42, 15.42, and 18.15 are all "within the surveyed acceptable range in the Ninth Circuit." *Perez v. Rash Curtis & Assocs.*, 2020 WL 1904533, at *21 (N.D. Cal. Apr. 17, 2020); *see also In re Google Location Hist. Litig.*, 2024 WL 1975462, at *15 (N.D. Cal. May 3, 2024) (favorably citing *Steiner* as a principal authority on multipliers in the Ninth Circuit); *Harbour v. California Health & Wellness Plan*, 2024 WL 171192, at *8 (N.D. Cal. Jan. 16, 2024) (same);

*Grannan v. Alliant L. Grp., P.C.*, 2012 WL 216522, at *10 (N.D. Cal. Jan. 24, 2012) (same); *Wolf v. Permanente Med. Grp., Inc.*, 2018 WL 5619801, at *2 (N.D. Cal. Sept. 14, 2018 (same); *Galeener v. Source Refrigeration & HVAC, Inc.*, 2015 WL 12977077, at *1 (N.D. Cal. Aug. 21, 2015) (same); *Buccellato v. AT & T Operations, Inc.*, 2011 WL 3348055, at *2 (N.D. Cal. June 30, 2011) (same).

Authorities outside this district but citing circuit precedent have also repeatedly recognized the propriety of multipliers akin to the one Class Counsel seek. *See, e.g.*, *Herrera v. Cnty. of Los Angeles*, 2026 WL 507909, at *2 (C.D. Cal. Feb. 23, 2026) (favorably citing *Steiner* and 10 other cases in support of multipliers comparable to the one here); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) (citing *Vizcaino* and a dozen other cases in support of the observation that "[c]ourts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers").

Three final points also support a 12.5% fee award here with a lodestar cross check. *First*, the result here is exceptional. It is the largest copyright class action settlement ever. It is the largest known copyright recovery ever. It is multiples above other copyright class action settlements on a per-work basis. *See* Dkt. 437 at 6; *see also* Dkt. 363-1. The litigation here concerned cutting-edge and novel issues of law, along with a distribution plan that required substantial thought and effort in order to develop a plan that both honored contractual agreements and was streamlined. The overwhelming support of the class is a testament to this exceptional result.

*Second*, the principal factor driving lower percentages of the common fund and lodestar multiplier in mega-fund cases that, in many such cases, the size of the recovery is simply a function of the size of the class and has nothing to do with the efforts of class counsel. Here, as discussed *supra* at 52–53, Class Counsel was instrumental in discovering the extent of Anthropic's infringement and specifically its use of the LibGen and PiLiMi pirated datasets that form the class. This discovery was hard-fought, and Class Counsel incorporated it into its motion for class certification when it finally received the information less than a week before the motion was due. Similarly, Class Counsel expended significant effort in developing the Works List—a list that forms the basis of the class itself. For that reason, unlike the typical mega-fund settlement, Class

Counsel's efforts were instrumental in driving the size of the Class and thus the total overall recovery.

*Third*, for a class of this size, Class Counsel exhibited tremendous efficiency. As Professor Rubenstein details in his Declaration, Class Counsel's lodestar "reflects remarkable efficiency in the quantity of hours expended to bring about this $1.5 billion settlement." Dkt. 505-8 at ¶ 1. The hours expended here are "about one-third of the norm for cases of this size." *Id.*; *see also id.* ¶¶ 16-24 (discussing in more detail how Class Counsel were efficient "and that their efficiency was remarkably productive," ¶ 22).

In light of this authority, and the specific facts of this case and settlement discussed above, the Court concludes that a lodestar crosscheck supports Class Counsel's fee request of 12.5%.

### 3.  Objections to Fees

The Objections related to Class Counsel's fee request are overruled, including because—as discussed in the foregoing section—the Court has concluded that governing law supports Class Counsel's fee request. *See* Dkts. 545 (Golomski), 551, 569, & 618 (Werner), 564 (Sappington), 589 (Bond), 599 (Story), 600 (Sills), 609 (Smith), 638 (Miles).

The small number of objections concerning Counsel's fee request—8 total objections, 6 of which do not object to the amount sought in Class Counsel's revised request, and none of which were filed after Class Counsel submitted its reduced fee request on March 19—reflects the "strong, positive response from the class, supporting Class Counsel's requested fees." *Volkswagen*, 2017 WL 2178787, at *3 . That is especially true considering the composition of the class here, which comprises sophisticated entities including authors, leading publishing houses, and large corporations.

As a general matter, the Court's prior discussion of the reasonableness of Class Counsel's requested fee award under the governing case law provides grounds alone to overrule each objection. *See supra* at 50–62. The Court also addresses each objection on an individual basis below.

**Golomski (Dkt. 545)**

Golomski argues that Class Counsel's prior fee request for 20% of the Settlement Fund was

"exorbitant, and unreasonable," because that fee award would not be "commensurate with the attorneys' work." *Id.* at 2. Golomski further argued that he did "not believe" that Class Counsel's request for future cost reserve in the amount of $17 million was "reasonably needed for future expenses." *Id.* And Golomski noted that "members of the Class . . . are entitled to much more than $3,000 per work." *Id.*

Golomski's objection to Class Counsel's fee award is now moot. While Class Counsel sought an award of 20% of the Settlement Fund, they have since reduced their request to 12.5% in response to the Court's prior opinion and order on attorneys' fees. Dkt. 646-1 at 16. Assuming Golomski's objection could be read as applying to even Class Counsel's revised request, it lacks merit. As explained herein, the Court approves Class Counsel's requested fee award as consistent with the governing case law in this Circuit. *See, e.g.*, *Vizcaino*, 290 F.3d at 1052.

### Werner (Dkts. 551, 569, and 618)

Werner argues that the requested fee award should be reduced because the "settlement paperwork" "did not include adequate instruction on to how to e-file with the Court." Dkt. 551 at 4. But the notice sent to class members provided information regarding both hard-copy and electronic means to file claims. The notice also informed class members how to mail any objections to the Court, and provided—over a dozen times—the email address at which the Settlement Administrator could be reached with questions. No other class member besides Werner indicated they had difficulty submitting their objection electronically, and the claims rate demonstrates that class members similarly did not find challenging e-filing of claims. In addition, the Court and Class Counsel electronically filed all objections received. And since Werner's objection, the fee request was in fact reduced.

### Sappington (Dkt. 564)

Sappington contends that the "request for 25% of the settlement fund in attorneys' fees is disproportionate to the actual benefit delivered to the class" considering that the maximum statutory penalty is $250,000. Dkt. 564 at 2. Sappington therefore requests that "the Court reduce the attorneys' fees by 98.8%"—*i.e.*, the difference between the $3,000 per-work award and the purported $250,000 maximum statutory award. Sappington's objection lacks merit. First, the

$250,000 figure Sappington cites applies to criminal copyright violations, not civil ones, for which the maximum penalty is $150,000. Second, Sappington's request is moot because it neither addresses Class Counsel's original fee request (20%) nor Class Counsel's revised fee request (12.5%). Finally, contrary to Sappington's contention, the per-work award that the Settlement provides is an excellent result given the risks in this case, as evidenced by (among other things) the 92.77% claims rate and extremely small number of objections and opt-outs.

**Bond (Dkt. 589)**

Bond requests that "the court largely approve this settlement," noting that the "amount achieved in this settlement is probably as high as it can be for authors to actually receive a somewhat meaningful payment." Dkt. 589 at 3. Bond does not object to Class Counsel's fee award. *See id.* at 5 (characterizing Class Counsel's initial fee request of 20% as their "fair share"). But Bond does "ask that class attorneys share equally in the risk of Anthropic insolvency," meaning that "[i]f compensation is approved as a percentage of the settlement, [Class Counsel's] payment should be structured so that it scales with the *actual* amount that is taken in." *Id.* at 5. Bond's concern, however, is already aptly addressed in the settlement agreement itself, which provides that "Class Counsel shall be paid the Fee Award in equal installments proportionate to Anthropic's payments to the Settlement Fund." *See* Settlement Agreement ¶ 8.2. Accordingly, her objection is overruled.

**Story (Dkt. 599)**

Story argues that Class Counsel's initially requested fee award of 20% should be reduced because "Counsel settled far too quickly" and because the per-work award is a "pittance." Dkt. 599 at 3. For the reasons explained herein, the Court disagrees. The per-work award is four times greater than "the most common award in copyright cases, of $750." Dkt. 437 at 5; *see also* Dkt. 431 Sept. 25, 2025 Hearing Tr. 17:2-3 (Judge Alsup commenting that the per-work award is "a very good settlement for what was done here"). The 92.77% claims rate further speaks to the settlement's desirability. And despite Story's contention to the contrary, the Settlement occurred at an advanced stage of the litigation—after class certification and summary judgment, just days before the end of fact discovery and the commence of expert discovery, and after trial preparation had commenced— where the case still teemed with risk for Plaintiffs. *Cf.* Dkt. 437 at 4 (preliminary approval order

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

observing that "Plaintiffs have a strong case on the downloading, but success is not assured were they to go to trial").

Story also contends that the release in the Settlement Agreement is "overly narrow in scope" because Anthropic "simply gets release from liability for past conduct." Dkt. 599 (Story) at 3. But a narrow release **benefits** the Class, and thus does not counsel against final approval. The tailored release also underscores the sufficiency of the monetary relief offered; Class Members give up less in exchange for their recovery, retaining their rights to sue for future misconduct. *See* Dkt. 536-3 ¶ 1.29 (Settlement Agreement). The past-only release does not apply to any output claims, narrowing it even further.

Finally, Story argues that "only roughly 66% of the authors of the Works List were located, potentially leaving over eighty thousand {80,000) authors out of ready access to the Settlement fund." Dkt. 599 at 2. But Notice included direct mail and email sent to 594,945 potential Class Members associated with 99.98 percent of the Works on the Works List with notice not returned as undeliverable to Class Members associated with at least 99.5 percent of the Works on the Works List. *See* Dkt. 619-3 (Decl. of J. Keough) ¶¶ 28, 79. In addition, the POAD makes clear that *any* identified rightsholders will be sent a check regardless of whether they filed a claim. *See* Dkt. 401-1 at 4.

**Sills (Dkt. 600)**

Sills objects to Class Counsel being "paid up to 25% of the Settlement Fund" because "a much smaller percentage of the Settlement Fund [should] be paid for attorneys' fees" to ensure that "authors and publishers [are] paid much more for each work." Dkt. 600 at 1. As discussed, Class Counsel have revised their fee request to 12.5%, which is half of the fee request disclosed in the long-form notice, and still less than the 20% indicated in Class Counsel's initial attorneys' fees motion. Sills's objection is therefore moot and, for the reasons provided herein, the Court agrees that Class Counsel's requested award is warranted under this Court's governing precedent. *See, e.g.*, *Vizcaino*, 290 F.3d at 1052.

**Smith (Dkt. 609)**

Smith contends that two additional works of Smith's should be on the Works List, and their

exclusion from the Works List suggests Class Counsel's "work was careless and may cause authors to be underpaid in this settlement," thus warranting a reduction in Class Counsel's fee award. Dkt. 609 at 2. Smith notes that his works in question are included on the compilation of LibGen works published in *The Atlantic*. *Id.* However, as the settlement website—using Court-approved language—notes, "[f]or a variety of reasons, many of the books listed in The Atlantic's list of LibGen files do not meet the Class definition." *Bartz, et al. v. Anthropic PBC, Settlement Website*, https://www.anthropiccopyrightsettlement.com/faq (FAQ #51). Those reasons include that while "Anthropic did not download any works from LibGen after July 2021, *The Atlantic* compiled its list using "metadata from LibGen as that database existed in 2025," and [b]etween July 2021 and 2025, millions of additional books were added to LibGen." *Id.* (emphases omitted). Smith does not reconcile his objection with the FAQs. And Smith further lacks standing to object to the inclusion of works that are not on the Works List and are therefore not subject to the settlement. *See, e.g.*, *In re Cathode Ray Tube*, 2020 WL 1873554, at *4.

**Miles (Dkt. 638)**

Miles objects that Class Counsel's fee award should be reduced to 15%. Dkt. 638 at 1. Because Class Counsel have revised their fee request to 12.5%, Miles's objection is moot. Miles also states that, were Class Counsel's fee award 15%, then the Court should "[a]pprove the settlement on its merit." *Id.* Accordingly, Miles's objection presents no grounds to deny final approval.

In view of the foregoing, the Court concluded that Class Counsel's requested fee award is reasonable and therefore, finds that Class Counsel is **GRANTED** 12.5 percent of the Settlement Fund in attorneys' fees.

**B.    Litigation Expenses**

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Roman*, 2024 WL 2412387, at *5; *see also* Fed. R. Civ. P. 23(h).

Class Counsel have incurred $2,975,197.46 in unreimbursed litigation expenses, including costs related to experts, discovery, mediation, legal research, filing fees, document hosting services,

copying and mailing, and other customary litigation expenses. Dkt. 619-1 ¶¶ 64–75 (describing the cost fund and detailing the litigation expenses that Class Counsel incurred by category). Class Counsel do not seek reimbursement of several costs, including hotels and meals. *Id.* ¶¶ 72, 76. Class Counsel also do not seek reimbursement or fees paid to experts Rubenstein and Fitzpatrick. *Id.* ¶ 67.

Class Counsel further anticipate an additional $18,220,000 in expenses related to the administration and finalization of the settlement. *Id.* ¶ 78. The largest pending expense, according to Class Counsel, is the estimated $15 million due to the Court-appointed Settlement Administrator, JND Legal. *See* Supplemental Declaration of Jennifer M. Keough Regarding Proposed Class Notice Plan (Dkt. 399), at ¶ 117. Class Counsel further seek a cost-reserve of $1,500,000 toward any payment for court-appointed Special Master, Theo Cheng. That request is "based on the high claims rate and the possibility that class members may wish the Special Master to resolve any differences in submission." Dkt. 619-1 at 22. Next, Class Counsel state that they "Counsel continue to incur out-of-pocket costs for settlement administration and case management," including "significant costs for the expert who assisted in compiling the Works List," and costs related to "settlement administration[] and claims processing." *Id.* Finally, Class Counsel note that "in light of the exceptional participation of the Class, and the remarkably high claims rate, Class Counsel respectfully request that the Court authorize an additional reserve of 10% of the costs budget— $1,650,000.00, based on the current costs reserve request of $16,570,000.00—to cover unanticipated expenses that may arise during the remaining administration of the Settlement." *Id.*

The expenses for which Class Counsel seek reimbursement, including those identified in the cost reserve, are "typically [] billed to paying clients in non-contingency matters" and are recoverable. *Katz-Lacabe*, 2024 WL 4804974, at *5; *see Flo & Eddie*, 2017 WL 4685536, at *10 (reimbursing in copyright class action expenses incurred in "conjunction with discovery, the services of experts and specialist appellate counsel, mediation, travel, technology support costs, a mock trial, and the cost of computer research and services"); *Hofstetter v. Chase Home Fin., LLC*, No. C 10-01313 WHA, 2011 WL 5545912, at *1 (N.D. Cal. Nov. 14, 2011) (Alsup, J.) (approving same plus "costs associated with class notice and settlement mailings").

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

Moreover, the Court finds that Class Counsel have a sufficient basis for the cost reserve they seek, including because Class Counsel have identified specific costs that are reasonable in the context of settlement administration—namely notice, dispute resolution, and claims administration. The Court notes that Class Counsel have stated that "Class Counsel will not receive reimbursement for such costs without specific Court authorization." Dkt. 619-1 at 22.

None of the three Objections to Class Counsel's expenses explains why any of Class Counsel's past or anticipated expenses are unreasonable or why Class Counsel would not be entitled to reimbursement of such expenses. Class Counsel's past costs and anticipated future expenses to the Settlement Administrator and Special Master are reasonable. *See In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *8 (N.D. Cal. Aug. 17, 2018) (granting final approval where administration reached $23 million, or 20 percent of the $115 million settlement).

For these reasons, the Court **GRANTS** the request for reimbursement of $2,975,197.46 in incurred expenses, and a cost reserve of $18,220,000 in anticipated expenses. The Court further **ORDERS** Class Counsel to submit status reports, beginning on July 15, 2026, then and every 2 months thereafter, detailing (i) which costs have been incurred since the prior status report for which Class Counsel seek to apply the cost reserve; (ii) the reason and purpose the costs were incurred; and (iii) an attestation that said costs were reasonable in the context of settlement and claims administration. Reimbursements from the cost reserve for incurred expenses may be paid 30 days after the submission of the status report disclosing such expenses.

## C.    Service Awards for Class Representatives

No objection was received with respect to the request for $50,000 service award per class representative. "Incentive awards are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (emphasis omitted) (citing 4 William B. Rubenstein et al., *Newberg on Class Actions* § 11:38 (4th ed. 2008)). While such "awards are discretionary," they are commonly issued because of the many benefits they provide: "compensat[ing] class representatives for work done on behalf of the class"; making "up for financial or reputational risk undertaken in bringing the action"; and recognizing class representatives' "willingness to act as a private attorney

general." *Id.* at 958–59. Indeed, Class Representatives bore the particular reputational risk of prosecuting an eminently risky case which could have left authors and publishers with little to nothing. *See* Dkt. 431 Sept. 25, 2025 Hearing Tr. 14:2-15 (damages could have amounted to as low as "$1 or $5 or $10"). The Class Representatives were also on the forefront of communicating about the case and the settlement. *See* Dkts. 385, 386, 387, 619-2 (Class Representative declarations); *see also* Dkt. 619-1 ¶ 83 (Declaration of Class Counsel in Support of Final Approval); Dkt. 399 (Decl. of J. Keough) (discussing extensive media coverage of settlement).

Thus, the requested service awards for the three Settlement Class Representatives—Andrea Bartz, Inc., Charles Graeber, and MJ+KJ, Inc.—are reasonable and appropriate, amounting to only 0.01% of the Settlement Fund. Consistent with the Court's Procedural Guidance for Class Action Settlements, the Class Representatives submitted evidence of the value provided by the proposed awardees, the risks they undertook in participating, the time they spent on the litigation, and any other justifications for the awards. *See* Dkt. 619-2 (Declaration of Class Representatives In Support of Final Approval); *see also* Dkts. 385 (Bartz Decl.), 386 (Graeber Decl.), 387 (Johnson Decl.). That evidence confirms that all three Class Representatives expended considerable time and effort to assist in the investigation and litigation of this case. *See id.* In particular, all three Class Representatives (i) reviewed filings; (ii) responded to extensive discovery requests; (iii) prepared for and sat for depositions; (iv) traveled to San Francisco for multiple hearings; (v) participated heavily in the negotiation of the Settlement, including the plan of allocation; (vi) submitted detailed declarations in support of preliminary approval; (vii) reviewed and contributed edits to the notice materials and claim form; and (viii) worked to implement the Settlement by speaking to other authors and stakeholders. *See* Dkts. 385–87. All three Class Representatives were committed to ensuring that the Settlement was fair to class members, and that class members could understand it, and treated their responsibilities to the Class as their jobs. *See id.* Service awards to the Class Representatives are well warranted in these circumstances. *See In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5158730, at *18 (N.D. Cal. Sept. 2, 2015) (authorizing $80,000 and $120,000 awards in case with $415,000,000 settlement fund). Further, no Objections challenge the requested service awards, and one indeed supports the requested service awards. *See* Dkt. 601 (Larson) at 2

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

("Lead plaintiffs should be entitled to $50,000.").

Therefore, the Court concludes that the requested service awards are reasonable and **GRANTS** $50,000 to each of the three Class Representatives, for a total of $150,000.

### III.    CONCLUSION

The Court concludes that final approval is warranted under the Rule 23(e) factors, Ninth Circuit precedent, and this District's Local Rules. The Court finds that under Rule 23(e)(2), (i) the Class Representatives and Class Counsel have adequately represented the Class; (ii) the proposed Settlement was negotiated at arm's length; (iii) the relief provided for the Class is adequate; and (iv) the proposed Settlement treats Class Members equitably relative to each other.

The Court further finds that all relevant *Churchill* factors are satisfied, including "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel . . . ; and [(7)] the reaction of the class members to the proposed settlement." *Churchill Vill.*, 361 F.3d at 575.

Finally, the Court has considered Class Members' response to the proposed Settlement, request for attorneys' fees, and request for service awards pursuant to the Northern District's Procedural Guidance for Class Action Settlements, and finds that final approval is warranted in light thereof.

Having considered the above, the Court finds that the proposed Settlement is fair, free of collusion, and consistent with Plaintiffs' fiduciary obligations to the Class. The Motion for Final Approval is hereby **GRANTED**. Upon the entry of this order and the Effective Date under the Settlement Agreement, all settling Parties and the Class shall be bound by the Settlement Agreement and this Order. The Settlement Administrator and Special Master shall have final authority to determine the share of the Net Settlement amount to be allocated to each Class Member pursuant to the plan of allocation and distribution approved by the Court.

The Court **DENIES** the validity of any opt-out submitted past the February 9, 2026 deadline, with the exception that Esquivel's and Castells's untimely opt-out requests are

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO

**GRANTED**.

The Court **GRANTS** Plaintiffs' Motion for: (1) attorneys' fees to Class Counsel of 12.5 percent of the non-reversionary Settlement Fund, consisting of $1.5 billion plus interest paid by Anthropic or accrued in the Settlement Fund, (2) reimbursement of expenses totaling $2,975,197.46 and a cost reserve of $18,220,000 in anticipated expenses, and (3) service awards of $50,000 for each of the three Settlement Class Representatives (totaling $150,000). The Court will withhold 10 percent of Class Counsel's fee award until the Parties file a post-distribution accounting in accordance with this District's Procedural Guidance for Class Action Settlements. The post-distribution accounting shall also disclose whether Class Counsel's total lodestar is less than $27,082,963.50, and, if so, the extent to which the lodestar is lower than $27,082,963.50.

Final judgment is hereby **ENTERED** in accordance with the terms of the Settlement Agreement and this Order. Without affecting the finality of this Order and Judgment, the Court reserves jurisdiction over the implementation of the Settlement, including enforcement and administration of the Settlement Agreement. This document constitutes a final judgment (and a separate document constituting the judgment) pursuant to Federal Rules of Civil Procedure 54 and 58.

The above-captioned Action is **DISMISSED** in its entirety with prejudice.

**IT IS SO ORDERED.**

Dated: _____, 2026.

                                                      _____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

SECOND SUPP. PROPOSED ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION SETTLEMENT
| CASE NO. 3:24-CV-05417-AMO