TAA

Kim Pawlak <kim.pawlak@taaonline.net>

---

## Anthropic Settlement process

1 message

---

**Frank M. Carrano** <carrano@uri.edu> Tue, Oct 13, 2026 at 9:58 AM
To: Kim Pawlak <kim.pawlak@taaonline.net>

Hi Kim,

I am totally frustrated with the Anthropic Settlement process. Eight of my books are involved, and they have various co-authors, some of whom are deceased. My publisher has arbitrarily claimed between 84% and 86% of the settlement amount. It has even done so on a title whose copyright I own!

Do I try to negotiate with my publisher? If so, how? I asked my editor for a contact with whom I could correspond. I received no response. I spoke with a settlement person several times seeking contact information for my publisher. First I was told they had no such contact information. Then I was told I must ask for the information in writing and include a list of the affected titles. I did this, and after a week or so, I received two points of contact. I wrote to both of them.

Proposing settlement percentages agreeable to my co-authors is a guessing game, especially so with a co-author's estate. And how does one negotiate with my publisher, a large worldwide corporation? It's me versus their attorneys, when they have already made unjustified claims to their share of the settlement.

Anthropic stole my books, and now I am left to plead for compensation with little guidance from the settlement administrator.

-Frank

Frank M. Carrano, Ph. D. ___________________________________
Author publishing with Pearson Education and Educative.io.
Professor Emeritus of Computer Science, University of Rhode Island
carrano@uri.edu

Kim Pawlak, Executive Director
Textbook & Academic Authors Association

Dear Kim,

I am among the many authors whose educational works were found by the Court to have been pirated by Anthropic. Whereas of course I am grateful for the Court's judgment against Anthropic for its piracy, I am now finding it difficult, at best, to complete what is expected of me in submitting my claim.

The biggest problem is the excessive amount of the judgment claimed by the publisher, in our case Pearson Education. Pearson maintains that because by contract it receives 85% of the revenue arising from sales of the books and related materials, it therefore is entitled to the same percentage of the Bartz-Anthropic judgment allotted to those works. This by no means follows. Certainly, the publisher has, like the authors, suffered harm from Anthropic's piracy, and is thus entitled to a share of the judgment. However, the primary victim here, to use that word, is the authors, because we are the sole creators of the intellectual content pirated (that is, stolen) by Anthropic.

The fact is that our publishing agreements do not contemplate or address the prospect of theft of the intellectual property involved, to say nothing of how proceeds from a Court judgment arising from such theft should be divided between author and publisher. And yet we, as authors, are left to fend for ourselves in somehow arguing from those agreements that an 85% share of the judgment for the publisher is excessive. Of course it is excessive, but neither author nor publisher can establish a "correct" allocation from the publishing agreements.

Yet the publishers retain attorneys and we do not. So the only recourse we have as authors is to refuse to agree to the publisher's demands, thus placing our case in "Disagreement." This can only result in no one getting anything. But the alternative is to grant the publisher's unjust position and receive very little of the judgment. We would welcome some relief from the Court in this matter.

Best regards,

David Calvis
Co-author of the Edwards/Penney/Calvis textbooks in differential equations, pub. Pearson Ed.

TAA

Kim Pawlak <kim.pawlak@taaonline.net>

---

**Confusion over the Bartz vs. Anthropic case and allocation**

1 message

---

**Janet Salmons, PhD** <jsalmons@pm.me> Mon, Oct 12, 2026 at 2:13 PM
To: Kim Pawlak <kim.pawlak@taaonline.net>

Dear Kim,

Thank you for your advocacy for writers!

While I am adept at reading and analyzing complex documents, the Bartz vs. Anthropic case materials and allocation processes are very confusing.

After discovering the insulting allocation of 90% to the publisher, I contacted Sage to ask about an equitable 50 - 50 split for *Qualitative Online Interviews*. They offered no option for negotiation and noted the option of the Special Master review. That is what I would like, but it in not clear whether I am in the queue or not? There has been no further communication from the Settlement Administrator or information about when and how that review will occur.

I certainly hope that an objective reviewer would see that educational writers like me spent years doing research and writing our books. I also created all the graphics stolen as a part of the piracy.

Your help in finding the next steps in the process is greatly appreciated.

Best regards,
Janet Salmons

**Janet Salmons, PhD (She/her/hers)**
Free-Range Scholar and Creative
*All human all the time!*
2024 - 2026 Research Fellow, Center for Advanced Internet Studies
Boulder, Colorado
www.salmons.blog:
"When the Field is Online" newsletter about qualitative research and writing in a connected world: http://tinyurl.com/qualnews

+1 (720) 893-1572

10-11-26

Jeff Hecht, science and technology writer, outlines problems in the Anthropic Settlement process:

1) It appears impossible to challenge and overturn classification of a book as "educational." The category was intended compensate educational publishers for preparing materials needed for classroom teaching, but publishers have extended the classification to books not intended for classroom learning. For example, my McGraw-Hill printed on the back cover of "The Laser Guidebook" in 1986 that the book was designed as a reference book for practicing design and application engineers so they could find the best laser for their needs. In a review, IEEE Spectrum called it "an excellent introductory reference for professionals involved with lasers." *Lasers & Applications,* an industry which was published for professional engineers and scientists using lasers, published excerpts from many of the chapters (with permission).

2) The Web software used by the Anthropic Copyright Settlement Allocation was difficult to use. Unlike much other web access software, it did not save input as it was entered, but only after the user had finished the page and entered SEND after completing the entries. If I stopped entering data for a period (say an hour), the software shut down without saving what had been entered. The software also did not appear to retain information such as copies of contracts entered during the initial filing, so I had to re-entered previously entered information to be sure it was available to resolve issues. If there were any directions about how authors could avoid those problems, I was unable to find it.

3) The treatment of essays and stories that were collected and published in book form was wildly inconsistent among publishers and those who compiled the list of Works, and the rules were never clearly explained. A MIT Press book which published an essay among an number of other articles on included several other authors, but only some of them (including myself) were included in the Works; others were ignored and not included in the preliminary version of the allocations. The Works list also included another book in which I was paid by the editors to publish a short story, but my not story was not listed in the Works.

4) The Anthropic Copyright Settlement removed a significant number of books during preparation of the pirated Works that had been used to train the Anthropic AI because the publishers had failed to register the copyrights for the books. As I understand it, that was a legal action because applying copyright penalties in this required the copyrights to have been registered. However, at least one publisher, Macmillan, said it would compensate authors, and other publishers might be sued by authors for failing to register copyrights. Having searched the Copyright files, I know Macmillan failed to copyright one book that might have been copyrighted. Yet the list of books that were removed from the Works because they had not been registered has not been distributed publicly without cost. This should be released so authors could take action against the publishers.

TAA

Kim Pawlak <kim.pawlak@taaonline.net>

**the incompetently designed Anthropic allocation portal**
1 message

**Jeffrey Arnett** <arnett@jeffreyarnett.com>
Reply-To: Jeffrey Arnett <arnett@jeffreyarnett.com>
To: "rnath@susmangodfrey.com" <rnath@susmangodfrey.com>, "rgeman@lchb.com" <rgeman@lchb.com>, "jdafa@lchb.com" <jdafa@lchb.com>, "MAdamson@susmangodfrey.com" <MAdar
"info@anthropicsettlement.com" <info@anthropicsettlement.com>, Kim Pawlak <kim.pawlak@taaonline.net>

To: the Anthropic Settlement Administrator and Attorneys:

I am writing to express my extreme dissatisfaction with the system you have set up for compensating authors in the Anthropic settlement. I have just spent THIRD TIME, changing the allocations in the allocation portal, and for the THIRD TIME, when I clicked on “Submit” after laboriously entering all the informa works for which I am to receive compensation, I received this message:

"An error occured during your submission. Please try again. If this problem persists, please contact the settlement administrator at the email below."

This is inexcusable. With all the resources provided by the settlement, how could you set up an allocation portal that prevents authors from challenging the Furthermore, each time THE SYSTEM FAILS TO SAVE ANY OF THE WORK ENTERING, SO THE AUTHOR HAS TO START OVER AGAIN EACH TIME.

You have disgracefully failed the authors who are supposed to be compensated. I am certain that I am far from the only one who has experienced this frust designed system. I’m sure many of them have given up by now.

I AM ASKING YOU TO FIX THE SYSTEM, NOW, AND THEN INFORM ALL AUTHORS, preferably accompanied by an extensive mea culpa. YOU ALSO N AUTHORS THAT THE DEADLINE FOR SUBMITTING CLAIMS THROUGH THE ALLOCATION PORTAL HAS BEEN EXTENDED TO NOVEMBER. I only l close contact with Kim Pawlak, the Executive Director of the Textbook and Academic Authors Association (TAAA), who has been in contact with you regard

I have pasted all the information I entered into the Allocation Portal below.

Sincerely,

[redacted]

Dear Kim,

I just wanted to write to thank TAA for supporting its members. If we had not had this professional organization, we would have been lost. To begin with when I looked at initial listings when the Anthropic lawsuit was emerging, I had ten publications that were on the list. Now there are only three. I am very unsure how that happened. We never received responses from our publisher even after I sent them a letter suggesting they were eligible to submit information. We initially didn't list a percentage for the publisher as we were unsure as to whether they were in a separate group (as we did not hear from them).

I think the publisher has little standing here other than they "lost potential permissions fees." Because this is an unprecedented situation it was never a part of any contact in the multiple iterations of our editions. As you know two editions of the 11 editions that exist with our textbook are included. The theft is not of royalties as no one is selling this product and "unlawfully" offering versions of the book. Anthropic is not receiving money that our Publisher is due. Royalty agreements are irrelevant to the final division of the lawsuit.

We never spoke to our publisher after multiple attempts to reach them through editors and others. We assumed they would be trying to reach us too during the mediation period but there was no contact until last week. We sent back information to them, but again have neither a response or even a confirmation of the receipt of the email.

What has been taken are the author's words. We set up our final divisions with the authors and publisher sharing in the 100 evenly after allotting the estate of our deceased author (passed away 18 years ago) getting a smaller percentage as the contribution was very different. It is clear what was valuable to this situation were the authors words and thinking.

The authors are exclusively responsible for content. Therefore, what Anthropic has taken without permission or payment is purely the product of the authors and not the publisher.

Again, thanks for providing the only information (written, presentations, etc.) that helped us navigate the various stages of the process.

Karen Karp

On Fri, Sep 25, 2026 at 6:55 PM [redacted] wrote:

Thank you, Kim!

I did go through the TAA settlement page today. I saw that I needed to sign my input, but I don't know if I signed anything or not. I was hoping to see an email or something that said my response was complete.

[redacted]

[redacted] No reply from Sage asking for Copy of Contract& Staff dealing with Anthropic Settlement External Inbox ×

C [redacted] to me

Wed, Sep 30, 4:03 PM (9 days ago)

Hi Kim: I sent the enclosed copy of my inquiries to a Sage employee asking for a copy of my contract & contact information on who to deal with at Sage regarding the settlement allocations. It was sent on 9/24, almost a week ago & I have yet to hear from her or anyone else at Sage.

Do you think I need to do anything else to prove eventually to the Master Official that I've made a good faith attempt to contact Sage - to no avail. I could also produce a screenshot showing my conversation with a Sage operator lasted 15 minutes as she was researching who I should speak with since none of the people I worked with 35 years ago were at Sage anymore.

I'm very reluctant to spend more time trying to contact Sage as it would seem they're not going to get back to me and/or may be assuming I'm too late in the process in my contacting them and may be opting to just let further time pass. I'd rather spend what little further time I can afford to spend on this lawsuit on drafting my arguments to the Master Person on why a 50/50 % allocation is justified.

I haven't yet read today's email from the Settlement Administrators, so I don't know if it affects me.

Thank you,

[redacted]

Hi –

Has anyone determined whether filling out the allocation forms and changing what the publisher had put in constitutes the negotiation that's required for the settlement? I'm finding it very difficult to contact a human being at big publishers like Pearson.

Thanks,

Hi Kim,

I'm more than puzzled by the allocation form. I've attached screenshots of my textbooks. The way it looks, I'm going to receive nothing, zip, nada. The publisher appears to be claiming either 100 percent or 85 percent. Two mystery authors that I have never head off are due 100 percent in one case and 25 in the other.

It doesn't get any weirder. I don't know what to think or what to do--except than letting it go. An individual (co)author can probably expect enough perhaps to resole her shoes....

You have kept us informed all through this process. Perhaps you have an explanation?

Best,

My publisher, Pearson, is claiming 86% arbitrarily for out-of-print books. For example, one contract was signed in 1989, and the book was published in 1991. The book has been out of print for a long time. The contract has no clause covering out-or-print books or of reversion of rights. I'm claiming a 100% share for the three authors. What happens if I just stay with my original claim?

Thanks,

Hi Kim:

I hope you are doing well. Sorry, I hit send before I was ready! I was just wondering if you know of a contact in Pearson who can address a discrepancy between what I am claiming for a split in the Anthropic case and what they are claiming. I figured you might know. I have contacted Pearson but I haven't gotten very far: only sales reps.

Thanks!

Hi Kim…I am a claimant however I never received an email regarding the status of my claim.
Can you explain?
Thanks so much,

Hi Kim,

Thanks for your prompt response to my first round of questions this morning. I want to raise three practical issues that are making it unnecessarily hard to fill out the forms.

1) There is no way to directly protest an incorrect Education classification -- unless I missed something. The Education classification seems to be built into the settlement form, and the protest can only be made by changing the Allocation and inserting a batch of documents and comments.

2) The consolidated claims form shuts down when I go away from the form for a period of about an hour and most or all of the changes I make under "Disagreements" vanish, so I have to re-enter everything. Am I missing something? I know we need a way to secure information, but there should be a way for us to safely close down the online form so the data entered can be preserved to finish another day.

Thanks for the good work,

Dear Ms. Pawlak,

I am the daughter of a textbook author and I submitted a claim to the Anthropic settlement administrator on behalf of my father's estate. Today I got the email from the settlement administrator about a disputed settlement allocation, and it looks like the publisher is asking for 85% of the settlement. I have 30 days to challenge this. I don't know where the original contract is. Do you have any advice for me as a non member of TAA? I can't see your most recent webinar. I know that in an earlier one you suggested asking for 50%.

Thanks for any advice.

TAA

Kim Pawlak <kim.pawlak@taaonline.net

[redacted]
message

herry L. Ferguson <ferguson@uottawa.ca> Fri, Oct 9, 2026 at 2:36 PI
o: Anthropic Copyright Settlement Administrator <info@anthropiccopyrightsettlement.com>
c: "rnath@susangodfrey.com" <rnath@susangodfrey.com>, "rgeman@lchb.com" <rgeman@lchb.com>, "jdafa@susmangodfrey.com" <jdafa@susmangodfrey.com>, MAdamson@susmangodfrey.com" <madamson@susmangodfrey.com>, Kim Pawlak <kim.pawlak@taaonline.net>

To whom it may concern:

In concluding this process, I wish the following statement to be on record.

Contesting the allocation of benefits derived from the Anthropic lawsuit settlement has been a lengthy and stressful process that I have had to complete on short notice since I missed a whole month that others had. I received the first notice about updates on October 2, 2026. I received nothing in September.

I have done my best to comply and to meet the multiple demands that come with disputing the allocation of funds. I have spent five days so far on this process: looking for 30 year-old contracts, emails, and royalty statements; engaging in email correspondence with multiple individuals; calling the settlement administration office; trying to understand the possible legal contingencies for parties claiming my share of the settlement; putting my arguments in writing; joining the TAA in order to receive answers to questions that scripted responses by administrators did not answer; and dealing with a program that gave error messages when I tried to complete the allocation updates for two books.

Regarding the latter point, the error messages showed when I attempted to assign percentages to rights holders. I am technologically competent, having taught online through Covid and having used three different interactive programs with large introductory and advanced courses. I created my own website for three books that I self-published after retiring. I taught full-time until two years ago when I retired at age 81. It was not possible, however, for me to resolve issues that reside at the system level.

Fortunately, I received assistance from an employee (Cisco), who went out of her way to seek help in resolving the technical issues and submitted on my behalf after receiving written permission in the form of an email. I mention her name because she is an employee who merits positive acknowledgment. Most employees, while

polite, work from scripted responses; and a man in the operational office was extremely rude, declaring that nothing was wrong with their program and explicitly refusing my request for assistance.

My main reason for wanting this statement go on record, however, is that I believe authors are seriously hurt in this process. The process is extremely biased in favor of the publishers.

Large publishers have lawyers on retainer, and it costs them nothing to dispute the claims of their authors. They ignore the fact that this lawsuit was about infringement of copyright--theft and illegal use of an author's work for training and data mining--not about royalties.The ambiguity in the process opens the possibility for publishers to create and define their own vocabulary, using legalese that obscures and confuses anyone who is not a lawyer. This new framework is a fantasy construction that applies 2026 constructs to decades-old contracts, allowing them to create their own criteria, which they then apply to their claims.

Authors accept token remuneration for the work for which they spend years acquiring knowledge, expertise, and writing skills and more years putting their ideas in a form that is acceptable to reviewers, publishers, and audiences. Publishers do not accept work until it has passed multiple reviews for content, style, and marketing potential and has reached a state that is close to publication quality. My memory is that 12 reviewers vetted an introductory textbook that I wrote and published with Oxford University Press in the US and Canada. Academic authors are even expected to do preliminary market research to identify target audiences. Marketing information is a required part of any academic book proposal. So much of the work for the publisher is done before they touch the book.

Publishers are also arbitrarily putting books in the wrong categories. There are clear differences between textbooks and scholarly works and trade books. Publishers are ignoring these differences and removing books from the scholarly works category so that they can dispute them under the heading of textbooks. Academics know the difference between textbooks and scholarly works; publishers know the difference. Any pretense at not knowing the difference is disingenuous and dishonest.

Sage Publications has made a lot of money on two of my academic (not text) books that they published. Obviously, the books do not sell as much as they did in the early years; however, I checked their Amazon.com rankings two days ago and the 1999 book (27 years after publication) was #254 in public relations and #391 in communications. My publisher cleared costs on my books many years ago.

When I started publishing in the 1980s, 5000 sales were considered a good target number for an academic book. Most didn't sell that well, and a book that sold 5000 copies helped to make up the revenues on other books that

did not sell well. We are in a different situation now. Publishers print on demand; they do not have large quantities of unsold books lying around warehouses. It used to be that authors could reclaim their books once they went out of print, but nothing goes out of print anymore as a result of on-demand digital printing; we never have an opportunity to move beyond our original contracts—and the Anthropic settlement shows that even those licensing agreements are being ignored.

Finally, I think it is wrong that we are asked to contact and negotiate with legal experts at the publishing houses and/or with individuals with whom we might have a poor relationship. If there is a dispute over rights, it is possible the relationship was not the best in the first place. And whose responsibility is it to make the first contact?

There is so much ambiguity in this whole process, and I have been nervous about omitting some step along the way. No one informs us if we accidentally overlook a required step. I am nervous, for example, about the fact that I had to ask someone at the settlement administration to complete the update; consequently, I have no screen shot to prove I certified the information. It would not be the fault of the person who helped me, but some anonymous person in the entrails of the organization could decide I missed this step even though I gave written permission for the changes and had no way to do upload the information myself. For that reason, I have asked in a separate email for an explicit acknowledgment of having signed whatever was required in the way of certification.

I hope that the decision makers and special masters will uphold the rights of authors and not give into the lawyers who operate on behalf of the publishers. If my publisher does not agree to my updated claim for 50/50 sharing on my two books, I am asking that the special master resolve the disputes. I am also asking for the special master to settle any dispute with the two series editors who would have been paid (if at all) directly by Sage. (I repeat this request in every communication, as I am unclear as to when we should make this statement; and I do not want to take a chance on failing to mention it at the right time.)

Thank you,
Sherry Devereaux
[redacted]

Sherry Ferguson, PhD
Emeritus Professor
Communication Department
University of Ottawa
Ottawa, Canada K1N 6N5